**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:24-cv-21983

CUBANOS PA'LANTE, ENGAGE MIAMI INC.,
FIU ACLU CLUB, CINDY POLO, LUIS SORTO,
MICHAEL RIVERO, ARLENE GOLDBERG,
and GENESIS M. CASTILLA FALCON,

     *Plaintiffs*,

v.

                                          **Three-Judge Court Requested**

FLORIDA HOUSE OF REPRESENTATIVES
and CORD BYRD, in his official capacity as
Florida Secretary of State,

     *Defendants*.

_____/

## COMPLAINT

      This action challenges four congressional districts and seven State House districts in South Florida as racially gerrymandered in violation of the Fourteenth Amendment. These seats form noncompact shapes, connect disparate neighborhoods, and divide established communities. In drawing these districts, the Florida Legislature subordinated traditional redistricting criteria and state constitutional requirements to race without narrowly tailoring the district lines to advance a compelling government interest. This racial gerrymandering unconstitutionally abridges Plaintiffs' rights to the equal protection of the laws. Plaintiffs bring suit to vindicate those rights, and allege:

## INTRODUCTION

      1.    While "[r]edistricting legislatures will . . . almost always be aware of racial demographics," *Miller v. Johnson*, 515 U.S. 900, 916 (1995), and are often required to look at race in drawing maps, the Fourteenth Amendment prohibits the unnecessary centering of race in redistricting decisions. Map-drawing in which race predominates, subordinating traditional, race-neutral redistricting considerations to racial decision-making, is presumptively invalid under the Equal Protection Clause. This type of excessively race-based line drawing is constitutional only where it satisfies strict scrutiny—where it is narrowly tailored to advance a compelling government interest. The Legislature fell far short of this exacting standard when it redrew congressional and State House districts in South Florida in 2022.

      2.    On February 3, 2022, the Legislature passed Senate Joint Resolution 100 ("SJR 100"), adopting Plan H000H8013 ("Plan 8013" or the "Enacted House Plan") to redraw the 120

districts for the Florida State House of Representatives.

3.      On April 21, 2022, the Legislature passed Senate Bill 2-C ("SB 2-C"), adopting Plan P000C0109 ("Plan 109" or the "Enacted Congressional Plan") to redraw Florida's congressional districts. Governor DeSantis signed SB 2-C into law the following day.

4.      Plaintiffs—five individual residents of South and Southwest Florida and three community membership organizations—challenge Congressional Districts ("CDs") 19, 26, 27, and 28 (the "Challenged Congressional Districts"); and House Districts ("HDs") 112, 113, 114, 115, 116, 118, and 119 (the "Challenged House Districts") (collectively, the "Challenged Districts") as racially gerrymandered in violation of the Fourteenth Amendment.

5.      In developing the Challenged Districts, the Legislature elevated race above all other considerations. The Challenged Districts feature tell-tale signs of racial predominance in the ways in which they deviate from traditional redistricting criteria: transgressing major geographic boundaries like the Everglades, unnecessarily splitting political subdivisions like the City of Miami and Collier County, and forming noncompact shapes.

6.      **Figure 1** below depicts the Challenged Congressional Districts and nearby area.



**Fig. 1.** *The Challenged Congressional Districts and surrounding area.*

7.      **Figure 2** below depicts the Challenged House Districts and surrounding area.



*Fig. 2.* *The Challenged House Districts and surrounding area.*

8.      Legislators and their staff did not hide the fact that race predominated above other considerations when they drew the Challenged Districts. In fact, they admitted it. According to House Redistricting Committee Chair Rep. Tom Leek, the Legislature drew the Challenged Districts "based on race" because the Legislature understood those districts to be "protected."

9.      For example, when Plan 109 was debated in the Florida House on April 20, 2022, Rep. Carlos Guillermo Smith asked Chair Leek, "Are these maps 'race-neutral' as the Governor has requested?"

10.     Chair Leek replied: "I believe the Governor used the term 'race-neutral' as a counterbalance to 'predominantly based upon race.' *And the maps are both race-neutral in areas, and, you know, [] also based on race in the areas that are protected.* So it's not one or the other."

11.     Rep. Smith followed up: "So what is the distinction between which areas of the state we've decided to have race-neutral and which areas of the state are not race-neutral?"

12.     Chair Leek responded: "*All of those protected districts are not race-neutral.*"

13.     The Legislature's use of race was not lawful. Section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301, and the Fair Districts Amendments to the Florida Constitution, Fla. Const. art. III, §§ 20–21 permit the state to subordinate other factors to race to protect minority voters if—and only if—certain prerequisites exist. *See Cooper v. Harris*, 581 U.S. 285, 301–02 (2017) (citing *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986)); *In re: Senate Joint Resol. of Legis. Apportionment 100* (*In re SJR 100*), 334 So. 3d 1282, 1288 n.5 (Fla. 2022); *League of Women Voters of Fla. v. Detzner* (*Apportionment VIII*), 179 So. 3d 258, 287 n.11 (Fla. 2015).

14.     These prerequisites include that (i) the minority group is politically cohesive and (ii) the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (citing *Gingles*, 478 U.S. at 51); *In re SJR 100*, 334 So. 3d at 1288 n.5; *Apportionment VIII*, 179 So. 3d at 287 n.11. These are referred to as the second and third *Gingles* preconditions, and together are commonly known as "racially polarized voting."[1]

15.     While the second and third *Gingles* preconditions may have been present in the past with respect to South Florida's Hispanic voters, by 2022, they were not. The Legislature was on notice that the demographics and voting patterns of the Hispanic community in South Florida had changed over time, but it ignored this evidence.

16.     South Florida's Hispanic community is not politically cohesive as required for the second *Gingles* precondition. Rather, it is nuanced, multifaceted, and diverse with respect to political behavior and preferences. But in crafting the Challenged Districts, the Legislature ignored this diversity and assumed that Hispanic voters in South Florida were politically homogenous and monolithic. This assumption was false. The Legislature was not entitled to draw race-based districts based on uninformed assumptions of racial sameness.

17.     Nor does the white majority vote as a bloc to defeat the Hispanic community's preferred candidates as required for the third *Gingles* precondition. The white majority in Florida usually votes in *coalition* with the majority of South Florida's Hispanic voters. In the decade

---

[1]     The first *Gingles* precondition—that the minority group is sufficiently large and geographically compact to constitute a minority in a reasonably configured district—is not a prerequisite under the Fair District Amendments' retrogression requirement but is a prerequisite under Section 2 of the VRA and the Fair Districts Amendments' vote-dilution requirements.

preceding the Challenged Districts' enactment (2012–2020), white voters statewide voted to defeat South Florida Hispanic voters' preferred candidates in only approximately one-third of statewide partisan general election contests. But even in those few contests, South Florida Hispanic voters did not vote cohesively for a single candidate. As for partisan primary contests, white voters in those years *supported* South Florida Hispanic voters' preferred candidates in all but one statewide Republican primary, and all but one statewide Democratic primary. The Legislature was not entitled to draw race-based districts based on uninformed assumptions of racial difference between white and Hispanic voters.

18.     The resulting harm to Plaintiffs is acute, and twofold. ***First***, racial gerrymandering "reinforces racial stereotypes and threatens to undermine our system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their constituency as a whole." *Shaw v. Reno*, 509 U.S. 630, 650 (1993). ***Second***, Plaintiffs are further harmed because, to achieve their preferred racial balancing, lawmakers sacrificed genuine communities of interest, unnecessarily dividing some that share commonalities and lumping others together that diverge.

19.     The Legislature was on notice that its handiwork was not sufficiently justified. Floridians, including individual legislators of both parties, stepped up to call out and question the Legislature's unconstitutional actions. But the Legislature dismissed those concerns.

20.     The Legislature's intentional sorting by race, absent narrow tailoring to achieve a compelling governmental interest, violates the Equal Protection Clause and renders the Challenged Districts unconstitutional racial gerrymanders.

## PARTIES

21.     Plaintiff CUBANOS PA'LANTE CORP. is a nonpartisan, nonprofit membership organization based in Miami-Dade County whose mission is to disrupt the status quo by educating, organizing, and mobilizing progressive Cuban Americans. Cubanos Pa'lante was founded in 2020 to be a political home for Cuban Americans to hold elected officials accountable and to advocate for the issues their community cares about. Cubanos Pa'lante's members are Hispanic Cuban Americans and reside in all the Challenged Congressional Districts and in at least HDs 115, 118, and 119.

22.     Plaintiff ENGAGE MIAMI INC. is a nonpartisan, nonprofit membership organization serving Miami-Dade County since 2015. Founded by young people organizing

against corruption in local politics, Engage Miami's mission is to build a more just, democratic, and sustainable community by developing a local culture of civic participation for young people. Engage Miami's members are largely Gen Z and Millennial Black and Latino residents of Miami-Dade County and reside in all the Challenged Districts except CD 19.

23.     Plaintiff the FIU ACLU CLUB is an unincorporated association organized as a Florida International University student organization, affiliated with the American Civil Liberties Union of Florida. The FIU ACLU Club's mission is to protect, defend, strengthen, and promote the constitutional rights of all people in Florida. The FIU ACLU Club's members, many of whom are Hispanic or Latino, are FIU students and alumni interested in being civically inclined, engaged, and active. The FIU ACLU Club has members who reside in all the Challenged Districts except CD 19 and HD 112.

24.     Plaintiff CINDY POLO is a Colombian American, Hispanic resident of HD 115 and CD 27.

25.     Plaintiff LUIS SORTO is a Salvadoran and Honduran American, Hispanic resident of HD 114 and CD 27.

26.     Plaintiff MICHAEL RIVERO is a Cuban American resident of CD 19.

27.     Plaintiff ARLENE GOLDBERG is a non-Hispanic resident of CD 19.

28.     Plaintiff GENESIS M. CASTILLA FALCON is a Cuban and Nicaraguan American, Hispanic resident of HD 118 and CD 28.

29.     By placing these individuals and the members of Cubanos Pa'lante, Engage Miami, and the FIU ACLU Club in the Challenged Districts, the State sends the message that it placed them in their districts simply because of their race.

30.     Plaintiffs are further harmed because the Enacted Plans split up their communities and group their communities with dissimilar ones, simply because of their race.

31.     If the Enacted Plans are not enjoined, these individuals and the members of Cubanos Pa'lante, Engage Miami, and the FIU ACLU Club will be harmed by living and voting in unconstitutionally racially gerrymandered districts.

32.     Defendant the FLORIDA HOUSE OF REPRESENTATIVES is the lower chamber of the Florida Legislature. Along with the Senate, the House is responsible for redrawing legislative and congressional districts after each decennial census. Fla. Const. art III, § 16. State representatives are elected from the Enacted House Plan.

33.     Defendant CORD BYRD is the Florida Secretary of State and is sued in his official capacity. He is the State's "chief election officer." Fla. Stat. § 97.012. His Department of State is responsible for "general supervision and administration of the election laws," including the Enacted Plans; administers candidate qualifying; receives election returns from the county canvassing boards; and issues certificates of election to successful candidates. *Id.* §§ 15.13, 99.061, 102.112, 102.151, 102.155.

## JURISDICTION AND VENUE

34.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 2201–02, as well as 42 U.S.C. §§ 1983 and 1988, because this action arises under the Constitution and laws of the United States.

35.     Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this District.

36.     A three-judge district court must be convened to hear this action because it challenges the constitutionality of the apportionment of congressional districts and a statewide legislative body. 28 U.S.C. § 2284(a).

## FACTS

**I.    Background and Legal Requirements**

37.     The Florida House comprises 120 members, each elected from a House district.

38.     As a result of apportionment following the 2020 Census, Florida sends 28 members to the U.S. House of Representatives, each elected from a congressional district.

39.     Legislative and congressional redistricting is principally the duty of Florida's Legislature, which is tasked with adopting redistricting plans for the Florida House, Florida Senate, and congressional districts after each decennial census.

40.     State legislative redistricting plans are passed by joint resolution.

41.     Congressional redistricting plans are passed as ordinary legislation, subject to gubernatorial veto or approval.

42.     Several key legal requirements cabin the Legislature's discretion in redistricting, including the Fourteenth Amendment's Equal Protection Clause, Section 2 of the VRA, and the Florida Constitution's Fair Districts Amendments.

43.     The Equal Protection Clause prohibits redistricting in which race predominates, subordinating traditional, race-neutral redistricting considerations to racial decision-making,

unless the use of race is narrowly tailored to advance a compelling government interest.

44.     Section 2 of the VRA prohibits racial vote dilution. Section 2's protections are triggered if the three *Gingles* preconditions are established, and if, in the "totality of the circumstances," "the political process is not 'equally open' to minority voters." *Milligan*, 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 45–46). The *Gingles* preconditions are that: (1) the minority group is sufficiently large and geographically compact to constitute a majority in a reasonably configured district; (2) the minority group is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. *Id.*

45.     The Florida Constitution's Fair Districts Amendments set forth two "tiers" of requirements for legislative and congressional redistricting in Florida. Fla. Const. art. III, §§ 20–21.[2] ***First***, Tier One prohibits redistricting plans and individual districts from being "drawn with the intent to favor or disfavor a political party or an incumbent"—banning partisan and incumbency gerrymandering. Fla. Const. art. III, §§ 20(a), 21(a). ***Second***, Tier One incorporates Section 2's vote-dilution standard, prohibiting districts from being "drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process." *Id.* art. III, §§ 20(a), 21(a); *In re Senate Joint Resol. of Legis. Apportionment 1176* (*Apportionment I*), 83 So. 3d 597, 619 (Fla. 2012). ***Third***, Tier One incorporates the "diminishment" or "retrogression" standard from Section 5 of the VRA, 52 U.S.C. § 10304(b), prohibiting districts drawn "to diminish [racial or language minorities'] ability to elect representatives of their choice." Fla. Const. art. III, §§ 20(a), 21(a). This requirement "attempts to eradicate impermissible retrogression in a minority group's ability to elect a candidate of choice." *Apportionment I*, 83 So. 3d at 620. ***Fourth***, Tier One mandates that districts be contiguous. Fla. Const. art. III, §§ 20(a), 21(a). These four Tier One requirements take precedence over the "Tier Two" requirements.

46.     Tier Two sets out three more requirements. The Tier Two requirements enshrine in the Florida Constitution several "traditional race-neutral districting principles." *See Miller*, 515 U.S. at 916. Tier Two requires that districts (1) be as nearly equal in population as is practicable; (2) be compact; and (3) where feasible, utilize existing political and geographical boundaries. Fla. Const. art. III, §§ 20(b), 21(b). The Legislature must adhere to the Tier Two requirements, unless

---

[2]     These two sections are virtually identical. Section 20 applies to congressional districts; Section 21 applies to legislative districts.

doing so would violate a Tier One requirement or federal law, and may deviate from the Tier Two requirements only to the extent necessary to comply with Tier One's minority-protection provisions or federal law.

47.      Following the 2020 Census, the Legislature embarked on its redistricting process through multiple committee and subcommittee meetings in both chambers. The Senate Committee on Reapportionment ("Senate Committee"), House Committee on Redistricting ("House Committee"), House Subcommittee on State Legislative Redistricting ("House Legislative Subcommittee"), and House Subcommittee on Congressional Redistricting ("House Congressional Subcommittee") held initial meetings in September, October, and early November 2021 to hear presentations on redistricting law from attorneys Daniel Nordby, Andy Bardos, and Pete Dunbar, and on redistricting fundamentals from committee staff, including explanations of the VRA and the Fair Districts Amendments' Tier One and Tier Two mandates.[3]

48.      Legislative staff and counsel also explained how whether a proposed district complied with the Tier One and VRA minority-protection mandates was determined by a "functional analysis." The functional analysis considered statistics within the proposed district including minority population, minority voting-age population, minority voter registration, minority turnout in past elections by race, and election results. Once the Legislature concluded that a given district was protected from minority diminishment or dilution under the VRA or Tier One, the functional analysis was how legislative staff determined whether the district was likely to perform for the minority group's candidates of choice.

49.      Following the presentations and throughout the redistricting process, legislators, their attorneys, and their staff used the terms "Tier One" and "Tier Two" as shorthand references to the requirements contained within those tiers, including Tier One's minority-protection provisions.

---

[3]   The presentations also defined key terminology. Staff presentations defined "geographic boundaries" and "political boundaries" as "[e]asily ascertainable and commonly understood features, such as rivers, railways, and primary and secondary roads. Primary and secondary roads include interstates, U.S. highways, and state highways;" and "[b]oundaries of a county or incorporated municipality (city, town, village, etc)," respectively. Legislative staff also defined the "benchmark plan": "The last legally enforceable redistricting plan in force or effect. A proposed redistricting plan is compared to benchmark plan to analyze its compliance with protections for racial and language minorities under federal and state law."

## II.     Racial Considerations Predominated in the Drawing of the Challenged Districts

50.     The Legislature's predominant goal in drawing all but one of the Challenged Districts was to preserve them as "Tier One-protected majority-minority Hispanic districts." The irregular shape of the other Challenged District, CD 19, was caused by the irregular, racially motivated shape of its neighboring Challenged District, CD 26. The Legislature's race-based decisions resulted in maps that needlessly split neighborhoods and political subdivisions and ignore traditional redistricting criteria. Where, as here, race is the central consideration in mapmaking and traditional, race-neutral criteria are subordinated to racial considerations, race predominates.

### A.     The Challenged State House Districts

#### 1.     *The Legislature Admitted that Race Predominated in Drawing the Challenged House Districts*

51.     The Legislature's express goal in drawing each of the Challenged House Districts was to preserve them as "Tier One-protected" majority-minority Hispanic districts—and lawmakers' statements during the legislative process demonstrate that to achieve this goal, racial considerations predominated.

52.     For state legislative districts, each chamber deferred to the other in drawing the map for its own body, with the House developing the House plan.

53.     The House Legislative Subcommittee met on **December 3, 2021** to workshop two draft plans (Plans 8005 and 8007) staff presented.

54.     Both of these drafts configured many of the Challenged House Districts in a generally long, skinny, north-south manner.

55.     Other Challenged House Districts split cities unnecessarily and connected disconnected populations on either side of Miami International Airport.[4]

56.     **Figures 3** and **4** below depict Plans 8005 and 8007.

---

[4]     Enacted HD 112 was numbered 111 in Plans 8005 and 8007.



*Fig. 3.* Plan 8005.      *Fig. 4.* Plan 8007.

57.     Walking through the Challenged House Districts, committee analyst Jason Poreda introduced them as "all protected majority-minority Hispanic districts where functional analysis [was] being performed to ensure the respective minority groups can elect candidates of their choice in each district, and that opportunity has not diminished."

58.     The full House Committee heard staff presentations walking through Plans 8005 and 8007 on **January 13, 2022**.

59.     Again, Mr. Poreda introduced the Challenged House Districts as "all protected Tier One majority-minority Hispanic districts, that in each one of them have had functional analysis performed on them to ensure that the minority groups' ability to elect a candidate of their choice is maintained, as is in the benchmark. So all of those districts fall into that category."

60.     The House Legislative Subcommittee convened again on **January 21, 2022**, taking up the next House draft: Plan 8009.

61.     **Figure 5** below depicts Plan 8009.



***Fig. 5.*** *Plan 8009.*

62.     Most of the Challenged House Districts in Plan 8009 were very similar to those in Plans 8005 or 8007. 100%, 97%, 98%, 98%, 80%, 64%, and 78% of the population in Plan 8009's HDs 112, 113, 114, 115, 116, 118, and 119, respectively, overlapped with their counterparts in Plan 8005. 100%, 95%, 97%, 99%, 99.9%, 77%, and 77% of the population in Plan 8009's HDs 112, 113, 114, 115, 116, 118, and 119, respectively, overlapped with their counterparts in Plan 8007.

63.     Except for a few minor changes to HDs 115 and 116 moving fewer than 2,000 people, plus tweaks to HDs 112 and 118 that affected no population, Plan 8009's Challenged House Districts were identical to the enacted districts.

64.     Then-Subcommittee Chair Rep. Cord Byrd (now Secretary of State) introduced the Challenged House Districts as "performing Hispanic districts protected by Tier One of the Florida Constitution" that were drawn "to maintain existing majority-minority districts" based on a "functional analysis conducted by staff [to] ensure[] the voting strength of the minority group," and noted "the Hispanic voting-age populations in these districts."

65.     The House Legislative Subcommittee recommended Plan 8009 to the full House

Committee by a 13-7 vote.

66.     On **January 26, 2022**, the full House Committee took up Plan 8013, the final House plan, which made a few small changes to the Challenged House Districts from Plan 8009.

67.     **Figure 6** below depicts Plan 8013, the Enacted House Plan.



*Fig. 6. Plan 8013.*

68.     Chair Byrd reiterated his earlier statement that the Challenged Districts were "Hispanic districts protected by Tier One" and were drawn "to maintain existing majority-minority districts," and noted the "Hispanic voting-age population in these districts are similar compared to the benchmark districts, with slight changes."

69.     The House Committee advanced Plan 8013 by a 17-7 vote.

70.     On **February 1, 2022**, the House took up SJR 100, including Plan 8013.

71.     Explaining Plan 8013 to the full House, Chair Leek listed the districts "drawn in compliance with Tier One," including "twelve protected Hispanic districts, all of which are majority-minority districts" drawn "to maintain existing majority-minority districts," and whose

"minority group's voting-age population are similar when compared to benchmark districts, with slight increases or decrease." The "twelve protected Hispanic districts" Chair Leek referred to include the seven Challenged House Districts.

72.     Walking through the Challenged House Districts and several adjacent ones, Chair Byrd yet again stated these districts:

> are all performing Hispanic districts protected by Tier One of the Florida Constitution. As mentioned, a functional analysis was conducted by staff to ensure the minority group's ability to elect is not diminished. All nine of these districts are majority-minority Hispanic districts entirely within Miami-Dade County.

73.     The following day, **February 2, 2022**, the House passed SJR 100, including Plan 8013 along with the Senate's plan for its own chamber, by a 77-39 vote.

74.     On **February 3, 2022**, the Senate passed the final version of SJR 100 with Plan 8013, by a 37-0 vote. There were no questions on the House plan, and there was no debate.

2.   *The Legislature Subordinated Traditional Redistricting Criteria to Race in Drawing the Challenged House Districts*

75.     In addition to the above express statements by legislators confirming racial considerations predominated in drawing the Challenged House Districts, the districts exhibit the tell-tale signs of racial predominance in the ways in which they deviate from traditional redistricting principles, some of which are embodied in Tier Two of the Florida Constitution's Fair Districts Amendments.

76.     Legislators admitted as much. For example, on February 1, 2022, Chair Leek explained to the House how the House Committee subordinated traditional redistricting criteria to race when drawing what it considered to be Tier One-protected districts: "If your primary concern is, as it should be, [] Tier One compliance—[] Tier Two is Tier Two for a reason. So, when it's a protected district, we focus much less on Tier Two."

a.   *"Long and Skinny" HDs 114, 115, 116, 118, and 119*

77.     HDs 114, 115, 116, 118, and 119 are all noncompact districts drawn to form long, skinny shapes running north-south.

78.     **Figure 7** below depicts HDs 114, 115, 116, 118, and 119.



**Fig. 7.** *HDs 114, 115, 116, 118, and 119.*

79.     These districts' irregular shapes drew legislators' attention on the House floor. House leadership confirmed those shapes were driven by racial considerations.

80.     Rep. Fentrice Driskell—a Redistricting Committee member—noted: "In looking at the districts in 8013, these districts [114, 115, 116, 118, and 119] are all long, skinny, vertical districts, and they are significantly greater in their length than they are in their width."

81.     Rep. Driskell then asked about these districts' low compactness scores, their long length relative to their width, and the fact that they "might be outliers with respect to the rest of the map."

82.     Chair Leek responded that there were "some protected districts, so there's another analysis that goes in that, in addition to compactness." Because "we get to compactness after Tier One, . . . we had to make sure the protected districts continue to perform within reason, as they had performed."

83.     Rep. Driskell then asked: "Was it necessary that those five districts be long and skinny and noncompact to comply with Tier One?"

84.     Chair Leek acknowledged the Tier One criteria took priority: "Tier One is a wholly separate analysis, and so we're not going to get to compactness until we are assured that Tier One

is satisfied."

85.     Finally, Rep. Driskell asked about several specific alternative configurations that would have made the Challenged House Districts compact:

> Why couldn't, for example, Districts 118 and 119 just be stacked on top of each other like squares? . . . Why wouldn't, for example, District 115 lose its northern appendage up to the Tamiami Trail and be more compact, taking up the southern portion of 116 and trading the appendage with 116?

86.     Chair Leek yielded to Chair Byrd, who explained: "Because that's a Tier One standard that we applied."

87.     The next day, in debate, Rep. Driskell summed up the deficiencies in the five "long and skinny" districts:

> The reason why I homed in on these districts is because when you look at them with the eye test, with compactness, they don't look very compact, they look a little irregularly drawn, some of them have appendages. And when you look at their compactness scores under the different ways to analyze those, whether it's Reock, Convex Hull or Polsby-Popper, these maps look like outliers. And the questions that I asked specifically that went to compactness and whether or not we took into consideration if we lopped off an appendage and tried to make it pass the eye test better and look more compact, what would that have done to the performance for minority voters in those districts. That's just one example . . . where I believe we could have done a better job.

88.     The mathematical measures of compactness Rep. Driskell mentioned bear out that the "long and skinny" districts are outliers. The mathematical measures the Legislature itself used were the Reock measure, Convex Hull measure, and Polsby-Popper measure. The highest compactness score possible under each measure is 1.0.

89.     HD 118 has the second worst Reock score of any district in Plan 8013, higher only than a district protected under Tier One for Black voters. HD 118 also has Plan 8013's second worst score under the Legislature's "Boundary Analysis," which seeks to quantify how much a district's boundary coincides with city limits, county lines, major roads and waterways, and railroads. HD 118 is in the thirteenth percentile for Polsby-Popper, and the twenty-ninth percentile for Convex Hull of all the districts in Plan 8013. HD 118 runs over fourteen miles north-south from the Tamiami Trail down to SW 232nd Street, but it is just 1.7 miles at its narrowest point.

90.     Next to HD 118, HD 119 also stretches from the Tamiami Trail to SW 232nd Street

and is over four times longer than it is wide. HD 119 has Plan 8013's seventh worst Reock score and its thirteenth worst Boundary Analysis score.

91.     HD 115 runs over 15.5 miles north-south from the Tamiami Trail to the Black Creek Canal south of Cutler Bay, but it is 1.8 miles at its narrowest point. HD 115 features a chimney-like appendage jutting north of Kendall Drive to the Tamiami Trail. HD 115 has Plan 8013's seventh worst Reock score, its eleventh worst Convex Hull score, and its twelfth worst Polsby-Popper score.

92.     Next to and partially wrapping around HD 115 is HD 114. HD 114 stretches from the Deering Bay Yacht & Country Club at SW 144th Street on its south end, to the Dolphin Expressway and Galloway Road in its northwest corner. As it winds north, HD 114 encompasses two separate pieces of the City of Miami—in Coconut Grove and Flagami—splitting Miami unnecessarily in the process. HD 114's scores are in the thirteenth percentile for Convex Hull, the fourteenth percentile for Reock, and the eighteenth percentile for Polsby-Popper.

93.     HD 116 is nestled between HDs 114 and 115 to the east, and HDs 118 and 119 to the west. Its shape is necessarily driven by the race-based configurations of its neighbors. HD 116 extends from NW 25th Street along the Sweetwater-Doral border, down to Killian Drive in Kendall. It is generally three times longer than it is wide. HD 116's Reock score is in the fourteenth percentile—tied with HD 114.

### b. HDs 112 and 113

94.     HDs 112 and 113 also transgress traditional redistricting criteria, indicating racial predominance. Their shapes are necessarily driven by the race-based configuration of its neighbor, HD 114.

95.     **Figure 8** below depicts HDs 112 and 113, including Miami International Airport. **Figure 9** below depicts HD 112, with each registered voter represented by a blue dot mapped at their home address, areas with non-residential land uses represented in grey, and parks represented in green.

 

*Fig. 8.* *HDs 112 and 113.*                *Fig. 9.* *HD 112 showing registered voters.*

96.      HD 112 is essentially comprised of two separate pieces. Its northern section takes in Miami Springs, Virginia Gardens, and part of Hialeah. Its southern bulge extends into the City of Miami to the Tamiami Trail and east to 17th Avenue. In between lies a largely uninhabited, 4,300-acre area encompassing Miami International Airport and the adjacent industrial zone. HD 112 ranks in the thirty-sixth, twenty-ninth, and thirty-eighth percentile for Reock, Convex Hull, and Polsby-Popper scores, respectively.

97.      Along with HD 114, HDs 112 and 113 split the City of Miami into more parts than necessary. HD 113 takes in the portions of the City of Miami that HDs 112 and 114 do not (and that are not in unchallenged HDs 108 and 109). HD 113's Polsby-Popper score is in the thirty-second percentile in Plan 8013; its Convex Hull score is in the twenty-second percentile.

**B.      The Challenged Congressional Districts**

    *1.      The Legislature Admitted that Race Predominated in Drawing the Challenged Congressional Districts*

98.      As with the Challenged House Districts, the Legislature's express goal in drawing each of the Challenged Congressional Districts (except CD 19) was to preserve them as "Tier One-protected" majority-minority Hispanic districts.

99.      Congressional redistricting proceeded concurrently in both chambers and eventually involved the Governor's office. The Senate and House initially passed plans with similar

South Florida configurations, Plans 8060 and 8019; the Legislature sent Plan 8019 to the Governor, who vetoed it over disagreements with districts outside of South Florida; then the Legislature passed, and the Governor signed, Plan 109, which in large part resembled Plans 8060 and 8019 in South Florida.

### a. *The Senate Passes Plan 8060*

100.   On the Senate side, the Senate Committee gave staff explicit directives to follow in developing draft maps, including that "Tier-Two standards apply unless complying with them would conflict with Tier-One standards or with federal law." Regarding compactness, the Senate Committee directed staff "to draw districts that are visually compact in relation to their shape and geography, and to use mathematical compactness scores where appropriate."

101.   Between November 16, 2021 and February 25, 2022, the Senate's Subcommittee on Congressional Reapportionment ("Senate Congressional Subcommittee"), Senate Committee, House Congressional Committee, and House Committee workshopped and considered different congressional map options presented by legislative staff.

102.   All of these plans featured a similar configuration for the Challenged Congressional Districts to that of the Enacted Congressional Plan.

103.   One district (numbered 26 in the House's drafts and 25 in the Senate's drafts) crossed the Everglades to connect urban Hialeah and Wynwood with rural Collier County to the Gulf of Mexico.

104.   Two other districts (numbered 27 and 28 in the House's drafts, and 27 and 26 in the Senate's drafts) divvied up the remainder of Miami-Dade's Hispanic population centers.

105.   **Figure 10** below depicts Plan 8002, one of the initial draft plans that Senate staff presented to the Senate Congressional Subcommittee.



***Fig. 10.*** *Plan 8002 (presented Nov. 16, 2021).*

106.    Walking through the first Senate drafts on **November 16, 2021**—all of which contained identical configurations for CDs 19, 25, 26, and 27—Senate Committee Staff Director Jay Ferrin explained that CDs 25, 26, and 27 were "Hispanic majority-minority districts that are protected from diminishment under Tier One."

107.    Mr. Ferrin noted that the boundaries of CDs 25, 26, and 27 primarily followed several major geographic boundaries, state roads, and interstates, but "depart[ed] from these geographic boundaries when necessary to equalize population and maintain the ability-to-elect in this and neighboring Tier One-protected districts."

108.    On the other side of the Everglades, Mr. Ferrin explained CD 19: "in Collier County, the shape of the district is a result of the configuration of District 25, which is a Hispanic majority-minority district protected from diminishment under Tier One."

109.    On **January 10, 2022**, the Senate Congressional Subcommittee advanced a later iteration of the Senate's congressional map, Plan 8040, for the full Senate Committee's consideration.

110.    Except for moving 28,204 people between CDs 19 and 25 in Collier County and several unpopulated blocks along highways, CDs 19, 25, 26, and 27 in Plan 8040 were identical to those in the plans workshopped on November 16, 2021.

111.    On **January 13, 2022**, the Senate Committee took up Plan 8040.

112.    Walking through Plan 8040, Mr. Ferrin explained how in "South Florida, this region contains five Tier One-protected districts. They are 20, 24, 25, 26, and 27.[5] This has a significant impact on the configuration of the region."

113.    Specifically, he noted again that CD 19 "is affected by the neighboring District 25, which is a Tier One-protected district."

114.    As to CD 25, Mr. Ferrin stated it "is majority-minority district protected from diminishment under Tier One," a "functional analysis" had been performed, and its "configuration is affected by adjacent Tier One-protected districts."

115.    As to CDs 26 and 27, Mr. Ferrin explained that they are "both majority-minority Hispanic districts that are protected from diminishment under Tier One" and said a "functional analysis" had been performed.

116.    With no debate, the Senate Committee advanced Plan 8040 to the Senate floor.

117.    On **January 19, 2022**, the full Senate took up Plan 8040.

118.    The Senate adopted an amendment by Sen. Shevrin Jones—Plan 8060—to keep the City of Miami Gardens whole, swapping 41,982 people along the CD 24/25 border.

119.    Questioning the Chair of the Senate Committee, Sen. Ray Rodrigues, Miami-Dade Sen. Annette Taddeo asked why the plan divided the Biscayne Bay islands—placing Key Biscayne and Virginia Key in CD 27, but Fisher Island, Miami Beach, the Venetian Islands, and more northerly islands in CD 24—whereas the benchmark plan united them in one district.

120.    Chair Rodrigues yielded to Mr. Ferrin, who responded in part: "Keep in mind that you're drawing Tier One-protected Hispanic districts here."

121.    In response to another question from Sen. Taddeo about why the Fontainebleau community was split between CDs 26 and 27, Chair Rodrigues stated in part: "We started drawing

---

[5]    Black voters' ability to elect preferred candidates in CDs 20 and 24 is protected from diminishment and dilution under the Fair Districts Amendments. Further, Section 2 of the VRA prohibits vote dilution with respect to Black voters in CD 20. Plaintiffs do not challenge either of those two districts.

from the bottom up there, keeping in mind this is a Tier One-protected district. So we had to ensure that the district, after it was drawn, would continue to perform in a functional analysis."

122.    A few minutes later when discussing the proposed map for the Senate's own districts, Chair Rodrigues explained the Senate Committee's race-centric approach to map-drawing in areas with a Tier One-protected district: "We started with a blank map, pulled in the demographics, and then drew until we had a Tier One-protected district."

123.    Chair Rodrigues went on: "*Once we highlighted the racial population, we began drawing from there.*"

124.    "*Once we had assured that we were Tier One-compliant, which trumps all the other Tier Two metrics,*" Chair Rodrigues explained, the Senate Committee then took into consideration the Tier Two standards.

125.    The Senate Committee followed this same approach when drawing its congressional maps.

126.    The Senate passed Plan 8060 the next day, **January 20, 2022**, by a 31-4 vote.

127.    Except for swapping 180 people, CDs 26 and 27 in Plan 8060 are identical to CDs 28 and 27, respectively, in the Enacted Congressional Plan.

### b.   *The House Passes Plan 8019*

128.    The House Congressional Subcommittee and full House Committee considered draft maps on **December 2, 2021,** and **January 13**, **February 18**, and **February 25, 2022**. Committee staff and Subcommittee Chair Rep. Tyler Sirois explained during these meetings that CDs 26, 27, and 28 were all protected Hispanic majority-minority districts and that staff conducted a functional analysis to ensure the minority group's ability to elect candidates of choice was protected in each of the three districts. Chair Sirois reiterated the same point later on the House floor.

129.    At the House Committee's **February 25, 2022** meeting, Chair Sirois explained that in the map advanced that day (Plan 8017), "our adjustments to Congressional Districts 27 and 28 mirror those of the districts that were in the map approved off the Senate floor [8060]. We were able to include these districts in this way as we try to bring this process in for a landing as soon as possible."

130.    Plan 8017 had an identical configuration for CDs 26, 27, and 28 in Miami-Dade County to the Enacted Congressional Plan.

131.    The western end of CD 26 in Plan 8017 differed from the Enacted Congressional Plan by less than 94,000 people.

132.    The full House took up its final congressional map (Plan 8019) on **March 3, 2022.** Plans 8019 and 8017 were identical in South Florida, including Districts 19, 25, 26, 27, and 28.

133.    Chair Leek explained that Plan 8019 and the Senate's Plan 8060 "are all fundamentally similar to each other in every district south of Indian River, Osceola, and the Polk County line."

### c.  The Governor's Veto and the Enacted Congressional Plan

134.    Governor DeSantis vetoed Plan 8019 due to disagreements over districts outside of South Florida.

135.    On **April 19, 2022**, the Legislature convened in a special session to take up a map that had the Governor's support: Plan 109.

136.    Plans 109 and 8019 were identical in Miami-Dade County, including the entirety of CDs 27 and 28, as well as CD 26's border in Miami-Dade.

137.    At CD 26's western end, Plan 109 shifted about 94,000 people.

138.    CD 19 in Plan 109 was nearly identical to Plan 8019, with about 49,500 people moved along the CD 19/26 border in Collier County, and about 44,500 people moved along the CD 19/17 border in Lee County.

139.    The Governor's Deputy Chief of Staff, J. Alex Kelly, presented Plan 109 to both the Senate Committee and House Congressional Subcommittee.

140.    Mr. Kelly explained that Plan 109 "is the product of consultation and collaboration between our office and House and Senate leadership, and it incorporates portions of the plan passed by the Legislature."

141.    He noted that "ten of the districts are identical to what the Legislature passed" and that Plan 109 "incorporates concepts from maps previously discussed," including "incorporat[ing] concepts from the map that was referred out of the House's Congressional Redistricting Subcommittee, Plan 8011, and" it "aligns in several other ways that I'll describe with plans considered and the style of the House and Senate's map drawing."

142.    Mr. Kelly explained that, for the districts he did change from 8019, he "worked off the Legislature's primary plan, 8019." He "began [his] work by downloading the Legislature's Plan 8019 and subsequently making changes."

143.     Referencing the Tier One-protected districts, Mr. Kelly stated that "the plan maintains the same number of performing minority-majority seats."

144.     Concluding his presentation by noting Plan 109's nips and tucks to CD 26, Mr. Kelly commented: "I equalized the population in Collier County. . . . The resulting District 26 still has a Hispanic voting-age population of 73.22%."

145.     Of the eighteen districts Plan 109 changed from Plan 8019, CD 26 was the *only* district for which Mr. Kelly cited a racial population percentage when he walked through the changes.

146.     Both the Senate Committee and House Congressional Subcommittee advanced Plan 109 to the floors of their respective chambers on **April 19, 2022**.

147.     Later that same day, the Senate heard Senate Bill 2-C (with Plan 109) on second reading, with senators asking questions of the bill sponsor, Chair Rodrigues.

148.     The next day, **April 20, 2022**, the Senate took up SB 2-C on third reading and debated the bill.

149.     Several legislators asked questions about the race-based nature of the Challenged Congressional Districts, as well as the Legislature's conclusion that the *Gingles* preconditions were present with respect to South Florida's Hispanic voters.

150.     In debate, Sen. Lori Berman critiqued Plan 109, noting that "we have seats that go almost two hundred miles in the present map" and "we also have seats that cross the Everglades to assure minority-majority Hispanic representation."

151.     The Senate passed SB 2-C by a 24-15 vote.

152.     The same day, the House took up Plan 109 on second reading, with representatives asking questions of the bill sponsor, Chair Leek.

153.     The next day, **April 21, 2022**, the House took up SB 2-C on third reading and debated the bill.

154.     The House passed SB 2-C by a 68-38 vote.

155.     Governor DeSantis signed it into law the next day.

   *2.   The Legislature Subordinated Traditional Redistricting Criteria to Race in Drawing the Challenged Congressional Districts*

156.     The Challenged Congressional Districts exhibit tell-tale signs of racial predominance in the ways in which they deviate from traditional redistricting principles, some of which are embodied in Tier Two of the Florida Constitution's Fair Districts Amendments.

157.    Debating in support of Plan 109, Republican Rep. Will Robinson—a member of
the House Committee and the vice chair of the House Legislative Subcommittee—confirmed that
the Legislature prioritized racial considerations (i.e., Tier One) over traditional redistricting criteria
(i.e., Tier Two) in what the Legislature believed to be Tier One-protected districts, including CDs
26, 27, and 28:

> I couldn't help notice yesterday there were a lot of questions about
> whether we elevated Tier Two standards over Tier One standards.
> We also heard this line of questioning in the subcommittee, and I
> want to say firmly that that has never been the case. Tier One always
> outranks Tier Two. And in my opinion, that is firmly true in this map
> before us.

*a.   CD 26: "The Stairway to Immokalee"*

158.    CD 26 is noncompact, spans from the Gulf of Mexico to Biscayne Bay, and consists
of two distinct population centers separated by the unpopulated Everglades.

159.    **Figure 11** below depicts CD 26, with each registered voter represented by a blue
dot mapped at their home address.



***Fig. 11.*** *CD 26. Each registered voter is represented by a blue dot mapped at their home address.*

160.    At the same time the Legislature enacted the cross-peninsular CD 26, Republican
Rep. Jenna Persons-Mulicka—a House Legislative Subcommittee member from Southwest
Florida—praised the elimination of a different State House district "which spanned coast-to-coast

connecting Collier, Miami-Dade, and Broward."

161.    Rep. Persons-Mulicka urged her colleagues to support the State House map because, in her words, "In the map before you we don't have that coast-to-coast district, but rather only two districts in the map before you cross the Miami-Dade County line."

162.    In contrast, the Legislature explicitly drew CD 26 as a coast-to-coast district for racial reasons, resulting in one more district than necessary crossing the Miami-Dade County line.

163.    A colloquy between North Miami Rep. Dotie Joseph and Alex Kelly in the House Congressional Subcommittee on April 19, 2022 highlights this dynamic.

164.    Rep. Joseph noted that CD 26 "spans from the Everglades to Collier County and Miami all the way to Hialeah." She asked Mr. Kelly to "talk to us about your premise in drawing that particular [district], and crossing over the way you did."

165.    Mr. Kelly responded in part: "Overall, as I mentioned earlier in my testimony, the Hispanic voting-age population of the district is still quite high. It's a little more than 73% Hispanic voting-age population."

166.    Rep. Joseph followed up: "So when you say you were in need of population, you were specifically referring to the Latino population to create this district?"

167.    Mr. Kelly explained how he drew CD 26 to target a specific percentage of voting-age Hispanics in the population:

> Really, both. I was in need of population initially just because I was taking the district out of Hendry County and then also out of part of the Immokalee [] area. . . . So in effect, I needed people for equal population, first and foremost, to complete the district. . . .
>
> *That said, knowing that this is a historically performing majority-minority Hispanic seat, I was watching those numbers carefully to make sure that in terms of the overall Hispanic voting-age population, I was staying very close to the benchmark seat, which I think is maybe a little bit more than 74%.*
>
> So the seat that I drew, the percentage is around 73. Still very high, still at a threshold that should perform for a Hispanic– a majority-Hispanic voting-age population seat.

168.    Then-Senator (now 17th Judicial Circuit Judge) Gary Farmer engaged in a colloquy with Chair Rodrigues, probing the race-based motivations and justifications for the Challenged Congressional Districts.

169.    Sen. Farmer began by asking: "A big consideration in drafting CD 26 is—and a lot

of districts in South Florida that are around it—is that 26 is a Tier One-protected district, correct?"

170. Chair Rodrigues responded simply: "That is correct."

171. Sen. Farmer continued:

> During the committee process, we talked about—the committee and members and testimony was received—that CD 26 was maybe having some Tier Two drawbacks that are necessary to maintain Tier One compliance. . . .
>
> I would use, by way of example, what's been referred to as the "Stairway to Immokalee," which stretches all the way to the Biscayne Bay from the Gulf of Mexico, cutting off a piece of CD 24 in Downtown Miami that's now connected to the rest of CD 24 only by a bridge. You've got this kind of stairway-looking district. Now [Plan] 109 actually introduces an additional split of Collier County, plus it cuts the Immokalee community in half, following local streets. . . .
>
> So I guess I'm just looking for confirmation that this map, 109, concluded that those Tier Two drawbacks are necessary to maintain that Tier One compliance for CD 26.

172. Chair Rodrigues replied:

> I did not have a discussion specific to that level of detail in the briefing that I received from the Executive Office of the Governor. But what I do have is confirmation, looking at the data, that District 26 retains its minority-majority status, and that particular seat is a minority-majority district for Hispanics. That was under both of the maps that we passed previously [8060 and 8019]; it remains in this map as well.

173. CD 26's compactness scores underscore how that traditional redistricting criterion was subordinated to race. Under the Reock measure, CD 26 has the third-worst score of all 28 districts in Plan 109. CD 26's Reock score of .29 falls well below the statewide average of .47 and the statewide maximum of .74. Under the Convex Hull measure, CD 26 scores worse than the average score in Plan 109. Under the Polsby-Popper measure, CD 26 has the fifth-worst score in Plan 109.

### b. CD 19 and the Naples Appendage

174. As Mr. Kelly and Mr. Ferrin admitted, CD 26's race-based configuration necessarily impacted CD 19, which was forced to take on a thin tail dribbling down the Gulf coast from Fort Myers, splitting Collier County in the process.

175. **Figure 12** below depicts CD 19.



***Fig. 12.*** *CD 19.*

176.    This appendage—less than four miles wide at its narrowest point but stretching 34 miles long from Bonita Springs to Cape Romano—is an aberration among all the enacted congressional districts.

177.    CD 19's compactness scores under mathematical measures of compactness underscore how that traditional redistricting criterion was subordinated to race: CD 19 has Plan 109's fifth-worst Reock score, at .33; CD 19's Convex Hull score is in the bottom half of districts in Plan 109; and CD 19's Polsby-Popper score is also in the bottom half of districts in Plan 109.

*c.   CDs 27 and 28*

178.    The Legislature also subordinated traditional redistricting criteria to race when drawing CDs 27 and 28.

179.    The shapes of CDs 27 and 28 are driven by the Legislature's goal of balancing Miami-Dade's Hispanic population between three districts—CDs 26, 27, and 28—and especially by CD 26's race-based configuration.

180.    **Figure 13** below depicts CDs 27 and 28.



***Fig. 13.*** *CDs 27 and 28.*

181.    As a result, CD 28 does not just connect the Florida Keys to South Dade communities like Homestead and Goulds, but also fingers up and over the Florida Turnpike to take in the Florida International University campus and areas north of the Tamiami Trail like Sweetwater and Fontainebleau.

182.    CD 27, meanwhile, connects Downtown Miami with far-flung portions of South Dade that CD 28 avoids in its own trek up the Turnpike, like Cutler Bay and Perrine.

183.    As Sen. Taddeo noted, Plan 109 divides the Biscayne Bay island communities between CDs 27 and 24, with Key Biscayne and Virginia Key in CD 27, and Fisher Island, Miami Beach, the Venetian Islands, and islands further north placed in CD 24.

184.    Further, Plan 109 unnecessarily splits the City of Miami between CDs 26 and 27.

**C.    Alternative Configurations Indicate Racial Predominance**

185.    Alternative configurations for the Challenged Districts demonstrate that it is possible to better comply with the traditional redistricting criteria the Legislature adopted (and that are embedded in the Tier Two standards).

186.    One such alternative configuration was submitted to the Legislature in a public submission on November 14, 2021: P000C0047 or Plan 47.

187.    **Figure 14** below depicts Plan 47.



*Fig. 14. Plan 47.*

188.    The Senate Congressional Subcommittee heard a presentation on Plan 47, including that it altered certain discrete districts from the staff-drawn draft plans, "avoid[ed] crossing the Everglades, thereby utilizing perhaps the most major geographic boundary in Florida, which also coincides with county boundaries," "improv[ed] compactness to [] districts throughout the region," "ma[de] ten additional cities whole on net," and "eliminat[ed] three city splits."

189.    As discussed above, Rep. Driskell asked about alternative configurations for the Challenged House Districts that would have made them more compact.

190.    P000H0019 or Plan 19, submitted to the Legislature by a member of the public in October 2021, oriented HDs 118 and 119 "stacked on top of each other like squares," exactly how Rep. Driskell suggested a few months



*Fig. 15. Plan 19.*

later. **Figure 15** on the previous page depicts HDs 116, 118, and 119 in Plan 19.

191.    But the Legislature rejected these configurations for the Challenged Districts.

192.    Other alternative configurations exist that better comply with race-neutral traditional redistricting principles like compactness, respect for political subdivisions, and following major geographic features.

193.    The existence of these alternative configurations provides additional circumstantial evidence of racial predominance in the Challenged Districts.

### III.    <u>The Use of Race Was Not Narrowly Tailored</u>

194.    Where, as here, race was the predominant factor in the government's decision-making, strict scrutiny is triggered and "[t]he burden thus shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper*, 581 U.S. at 292 (quoting *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 173, 193 (2017)). Compliance with the Voting Rights Act and corollary requirements like the Fair Districts Amendments' non-retrogression standard can justify the predominant consideration of race. Here, the Legislature identified no other compelling interest to justify its predominant use of race in drawing the Challenged Districts.

195.    "When a State invokes the VRA to justify race-based districting, it must show (to meet the 'narrow tailoring' requirement) that it had 'a strong basis in evidence' for concluding that the statute required its action." *Cooper*, 581 U.S. at 292 (quoting *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015)). "Or said otherwise, the State must establish that it had 'good reasons' to think that it would transgress the [VRA] if it did *not* draw race-based district lines." *Id.* at 293 (emphasis in original). "If a State has good reason to think that all the '*Gingles* preconditions' are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district. But if not, then not." *Id.* at 302 (citations omitted).[6]

### A.    The Second and Third *Gingles* Preconditions Are Absent in the Challenged Districts

196.    The Legislature lacked good reasons to think that the second *Gingles* precondition—minority voting cohesion—was met with respect to Hispanic voters in the

---

[6]    As noted above in footnote 1, all three *Gingles* preconditions must be present for liability under Section 2 of the VRA and the Fair Districts Amendments' vote-dilution requirement, but the Fair Districts Amendments' retrogression standard only requires the second and third preconditions to be present.

Challenged Districts.

197.   In the decade preceding the Challenged Districts' enactment, Hispanic voters exhibited a lack of voting cohesion in each of the benchmark districts (CDs 25, 26, and 27 under the benchmark congressional plan, and HDs 111, 112, 114, 115, 116, 118, and 119 in the benchmark House plan), in their newly drawn successor districts, in Miami-Dade County, and in the overall South Florida region.

198.   In the years leading up to the Challenged Districts' enactment, election results demonstrate that Hispanic voters generally did not vote cohesively within those geographies in elections for statewide office, U.S. Congress, and the Florida Legislature.

199.   The Legislature also lacked good reasons to think that the third *Gingles* precondition—white bloc voting sufficient to usually defeat the minority group's candidates of choice—was met.

200.   In the decade preceding the Challenged Districts' enactment (2012–2020), white voters statewide voted to defeat South Florida Hispanic voters' preferred candidates in only approximately a third of statewide partisan general election contests.

201.   But even in those few contests, South Florida Hispanic voters did not vote cohesively for a single candidate.

202.   In partisan primary contests, white voters in those years *supported* South Florida Hispanic voters' preferred candidates in all but one statewide Republican primary, and all but one statewide Democratic primary.

203.   "Here, electoral history provided no evidence that a § 2 plaintiff could demonstrate the third *Gingles* prerequisite—effective white bloc-voting." *Cooper*, 581 U.S. at 302.

**B.**    **The Legislature Was on Notice that the *Gingles* Preconditions Were Absent**

204.   The Legislature was on notice—but ignored—that the *Gingles* preconditions were absent. Prior court decisions and published scholarship revealed a lack of Hispanic voting cohesion, and during legislative sessions on redistricting, individual legislators questioned leadership about their assumptions of Hispanic voting cohesion and white bloc voting.

205.   In its 2015 decision in *League of Women Voters of Florida v. Detzner* (*Apportionment VIII*), the Florida Supreme Court noted "the evidence before this Court suggests a lack of Hispanic voting cohesion in" the benchmark district for proposed CD 26 (then numbered 25 under the map in place from 2002–2012). 179 So. 3d at 286–87. The court further noted that

expert evidence showed "Hispanic registered voters are closely divided among Republicans (36.5%), Democrats (30.6%), and Independents and Others (32.9%)" in the multi-county area covered by the three majority-Hispanic congressional districts. *Id.* at 287. The Florida Supreme Court concluded: "[T]here is scant evidence before this Court that Hispanics in Benchmark District 25 vote cohesively . . . ." *Id.*

206.    Six years later, a law review article examined the issue of political cohesion among South Florida's Hispanic electorate, concluding a lack of cohesion.[7]

207.    On March 4, 2022, the Latino Policy & Politics Institute at UCLA published a report on Hispanic voting patterns in South Florida, finding that "[a] close look at the data reveals that while there are patterns of cohesive voting, there are separate and distinct Latino voting blocs that vary by geography and ethnicity."[8] The UCLA report concluded: "Given the diversity within the Latino population, voting data make clear that it is not accurate to speak about 'the Latino vote' as one cohesive bloc."

208.    Later that month, in a case against the Secretary of State, the Northern District of Florida cited the Secretary's records to find "Latino Floridians are not particularly affiliated with either party" and credited the defendants' expert's testimony that "the best way to understand Hispanics is as swing voters." *League of Women Voters of Fla., Inc. v. Lee*, 595 F. Supp. 3d 1042, 1081 (N.D. Fla. 2022), *aff'd in part, rev'd in part on other grounds sub nom. League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 66 F.4th 905 (11th Cir. 2023).

209.    In 2021 and 2022, lawmakers probed House and Senate Committee leadership about their assumptions of Hispanic voting cohesion and white bloc voting as the Enacted Plans wound their way through the Legislature. At best, legislative leadership failed to answer these questions; at worst, their answers revealed that the Legislature forsook its duty to ensure its use of race was narrowly tailored to advance a compelling interest.

210.    For example, Rep. Joseph questioned Chair Leek on the House floor about Plan 8013, asking: "Did the House's analysis involve ecological regression or inference analysis to

---

[7]    Nicholas Warren, *Gingles Unraveled: Hispanic Voting Cohesion in South Florida*, 2 N.C. CIV. R.L. REV. 1 (2022) (posted on SSRN Sep. 7, 2021), https://papers.ssrn.com/sol3/papers.cfm? abstract_id=3912034.

[8]    Matt Barreto & Angela Gutierrez, *Taking a Deeper Look at Hispanic Voting Patterns in South Florida*, UCLA Latino Policy & Politics Institute (Mar. 4, 2022), https://latino.ucla.edu/research/ voting-in-south-florida/.

determine the level of minority cohesion, white voting bloc, and racially polarized voting?" During a lengthy colloquy, Chair Leek suggested some unspecified analysis had been "performed by experts" and "counsel," but he could not identify which districts the analysis had been conducted in and did not make the analyses available to other representatives.

211.    Chair Leek acknowledged that "cohesion is one of the factors in determining what is a protected district." He also appeared to acknowledge that Hispanics in Florida do not vote as cohesively as other groups: according to Chair Leek, "you may have African American protected districts [that] may be cohesive and able to elect the candidate of their choice with a 29% Black voting-age population," but for "Hispanics on the other hand, if you look across the maps, usually you won't see that type of performance occur until you get to about the 65% or 70% Hispanic voting-age population."

212.    Nonetheless, when asked whether the House had "confirmed . . . or contradicted" the Supreme Court's finding in 2015 of "a lack of Hispanic voting cohesion in the Miami-Dade area," Chair Leek declined to answer. When asked whether the House "considered the diversity within the Latino community when doing the functional analysis" he and others had repeatedly referred to, Chair Leek said it was "not part of the data that's given to us, the census data, or the elections data."

213.    In another colloquy on Plan 8013, Cuban American Rep. Susan Valdés asked Chair Leek if it is "a requirement that the minority group vote cohesively before one starts looking at dilution" and "before considering retrogression." Chair Leek's answers to both questions were nonresponsive.

214.    Rep. Valdés then tried to ask two related questions: (1) Whether the House's mapmakers "commissioned or relied upon any other reports, studies that were addressing the minority voting cohesion and racially polarized voting?" and (2) "Was there a report or another type of study done on how cohesively the Latino or Hispanic electorate in South Florida votes?" But the Speaker ruled both questions out of order.

215.    Responding to a question from Rep. Joseph when the House's congressional Plan 8019 was on the House floor March 3, 2022, Chair Leek all but admitted the Legislature did not have good reasons to believe the *Gingles* preconditions were present for the Challenged Districts, because he did not see it as the Legislature's role to even confirm their existence at all:

> For the edification of the body and people who haven't had to suffer through this for as many months as we have, the *Gingles* test is actually a test that's used to determine whether a plaintiff can bring a lawsuit or not. The required functional analysis that we have is constitutional. We're only required to perform the functional analysis, but we're not plaintiffs bringing a case. There might be plaintiffs in this room or outside of this room that are going to bring a case and have to pass that standard, but that's not us.

216.     Later, when Plan 109 was on the floor, Chair Leek reiterated the Legislature's belief that the *Gingles* preconditions were irrelevant. Rep. Ben Diamond asked him: "Has there been any analysis done on CD 26, with regard to the Latino voting population, that there will be sort of the cohesiveness necessary in that voting population in order to defend that district under th[e] [*Gingles*] test?" Chair Leek responded: "Remember, the only analysis that we are required to perform is the functional analysis, which has been done. We have not performed the analysis that you're talking about on the Governor's [] maps."

217.     Chair Leek was mistaken about what analysis the law required the Legislature to perform. "To have a strong basis in evidence to conclude that § 2 demands such race-based steps, the State must carefully evaluate whether a plaintiff could establish the *Gingles* preconditions . . . in a new district created without those measures." *Cooper*, 581 U.S. at 304.

218.     The State of Florida conducted no such careful evaluation.

*          *          *

219.     Debating in support of SB 2-C on April 21, 2022, Republican Rep. Mike Beltran—a member of the House Congressional Subcommittee—explained how the use of race in redistricting must be justified under strict scrutiny:

> The prevailing federal court caselaw basically comes with one proposition, which is: if you're going to take into account these types of things that we're not supposed to take into account[,] . . . it's got to be narrowly tailored. You have to have a compelling state interest, you can't have a sprawling geographic district, and you have to follow these principles. You really have these exacting principles. . . . if you really want to do it, you have to meet these stringent criteria.

220.     The Challenged Districts do not meet those stringent criteria. They are racial gerrymanders under the Fourteenth Amendment and violate Plaintiffs' rights to equal protection of the laws.

## CLAIMS FOR RELIEF

### COUNT ONE

**Racial Gerrymandering – Congressional Districts 19, 26, 27, and 28
in Violation of the Fourteenth Amendment to the U.S. Constitution
(42 U.S.C. § 1983)**

221.    Plaintiffs Cubanos Pa'lante, Engage Miami, the FIU ACLU Club, Polo, Sorto, Rivero, Goldberg, and Falcon reallege and reincorporate by reference Paragraphs 1, 3–6, 8–36, 38–39, 41–50, 76, 82, 84, 98–188, and 191–220 of this Complaint as though fully set forth herein.

222.    The Fourteenth Amendment to the U.S. Constitution provides in relevant part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."

223.    Under the Equal Protection Clause, a racial classification is prohibited unless it is narrowly tailored to serve a compelling state interest.

224.    As alleged in detail above, race was the predominant factor in the design of Congressional Districts 19, 26, 27, and 28. Race predominated over all other redistricting criteria when they were drawn, rendering them racial classifications subject to strict scrutiny.

225.    The use of race as the predominant factor in creating the Challenged Congressional Districts was not narrowly tailored to advance any compelling state interests, including compliance with Florida's Fair Districts Amendments or Section 2 of the Voting Rights Act.

226.    Consequently, the Challenged Congressional Districts do not survive strict scrutiny.

227.    Therefore, the Challenged Congressional Districts violate Plaintiffs' rights under the Equal Protection Clause and 42 U.S.C. § 1983.

### COUNT TWO

**Racial Gerrymandering – House Districts 112, 113, 114, 115, 116, 118, and 119
in Violation of the Fourteenth Amendment to the U.S. Constitution
(42 U.S.C. § 1983)**

228.    Plaintiffs Cubanos Pa'lante, Engage Miami, the FIU ACLU Club, Polo, Sorto, and Falcon reallege and reincorporate by reference Paragraphs 1–2, 4–5, 7–25, 28–37, 39–40, 42–97, 157, 185, 189–220, and 222–223 of this Complaint as though fully set forth herein.

229.    As alleged in detail above, race was the predominant factor in the design of House Districts 112, 113, 114, 115, 116, 118, and 119. Race predominated over all other redistricting criteria when they were drawn, rendering them racial classifications subject to strict scrutiny.

230.    The use of race as the predominant factor in creating the Challenged House Districts

was not narrowly tailored to advance any compelling state interests, including compliance with Florida's Fair Districts Amendments or Section 2 of the Voting Rights Act.

231.    Consequently, the Challenged House Districts do not survive strict scrutiny.

232.    Therefore, the Challenged House Districts violate Plaintiffs' rights under the Equal Protection Clause and 42 U.S.C. § 1983.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request the Court enter judgment in their favor and:

A.    Declare the Challenged Districts to be unconstitutional in violation of the Fourteenth Amendment as racial gerrymanders;

B.    Permanently enjoin Defendants and their agents from calling, conducting, supervising, or certifying any elections under the Challenged Districts;

C.    Enter a remedial decree that ensures Plaintiffs live and vote in constitutional districts;

D.    Order Defendants to hold special elections to limit the harm to Plaintiffs should adequate relief be unavailable prior to the next regular election;

E.    Award Plaintiffs reasonable attorneys' fees and costs of suit;

F.    Grant any other relief the Court deems just and proper.

Respectfully submitted May 23, 2024,

 */s/ Nicholas L.V. Warren*

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida**
1809 Art Museum Drive, Suite 203
Jacksonville, FL 32207
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Andrew J. Frackman*

Jorge L. Vasquez, Jr.*
Esperanza Segarra (FBN 527211)
**Vasquez Segarra LLP**
5 West 37th Street, Suite 6003
New York, NY 10018
(212) 752-8459
jorge@vsllplaw.com
esperanza@vsllplaw.com

Brian P. Quinn*
Patrick J. Jones*
Emily Murphy*
Gabrielle S. Jackson*
**O'Melveny & Myers LLP**
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300

**O'Melveny & Myers LLP**
7 Times Square
New York, NY 10036
(212) 326-2000
afrackman@omm.com

bquinn@omm.com
pjones@omm.com
emurphy@omm.com
gjackson@omm.com

*\* Pro hac vice application forthcoming*

*Counsel for Plaintiffs*