**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:24-cv-21983-Becerra/Torres

CUBANOS PA'LANTE, *et al.*,

    Plaintiffs,

v.

FLORIDA HOUSE OF REPRESENTATIVES
and CORD BYRD, in his official capacity as
Florida Secretary of State,

    Defendants.

_____/

**DEFENDANT FLORIDA HOUSE OF**
**REPRESENTATIVES' MOTION TO DISMISS**

Pursuant to Federal Rule of Civil Procedure 12(b)(1), Defendant, the Florida House of Representatives, respectfully moves to dismiss Plaintiffs' Complaint (ECF No. 1).

**INTRODUCTION**

This lawsuit seeks to nullify the constitutional rights of Hispanic voters under the Fair Districts Amendments to Florida's Constitution. Two years after the Florida Legislature redrew the State's congressional and state-legislative districts, Plaintiffs bring this action to strip Hispanic voters in South Florida of their constitutional rights under the non-diminishment provision of the Fair Districts Amendments. *See* Fla. Const. art. III, §§ 20(a), 21(a). After choosing not to participate in the Florida Supreme Court's constitutionally mandated review of Florida's new state-legislative districts, *see* Fla. Const. art. III, § 16(c), Plaintiffs now ask this Court to declare that the non-diminishment provision does not protect, but excludes Hispanic voters—despite the Florida Supreme Court's consistent, contrary application of the Florida Constitution.

Plaintiffs' claims are legally and factually flawed. Race was not the dominant and controlling rationale in the Legislature's drawing of districts in South Florida. Nor did the Legislature subordinate traditional race-neutral districting principles to racial considerations. Instead, the Legislature meticulously balanced all applicable redistricting standards—as evidenced by the Florida Supreme Court's unanimous approval of all 160 state-legislative districts under the Fair Districts Amendments. *See In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d 1282, 1290 (Fla. 2022).[1] Indeed, not a single Floridian filed an objection with the Florida Supreme Court to any of the State's new state-legislative districts—including those challenged here. *See* Fla. Const. art. III, § 16(c) (allowing "adversary interests to present their views"). And Plaintiffs' keystone litigation position—that the Florida Constitution's non-diminishment provision confers no constitutional rights on Hispanic voters—hinges on multiple, fundamental misunderstandings of the legal principles that undergird that provision. The challenged districts are constitutional, as the House will demonstrate at the appropriate time.

At the pleading stage, however, the House accepts, as it must, Plaintiffs' well-pleaded factual allegations. Still, for multiple reasons, the Court should dismiss Plaintiffs' claims.

*First*, none of the Plaintiffs has standing to challenge CD 19.[2] Plaintiffs do not claim that CD 19 was racially gerrymandered—only that a neighboring, allegedly racially gerrymandered district *impacted* CD 19's shape. The Supreme Court has twice rejected this impact theory, holding that voters in a district that was not racially gerrymandered, but that was impacted in its shape or composition by an adjacent, racially gerrymandered district, suffer no cognizable injury.

---

[1] All other challenges to Florida's newly enacted districts have also been rejected to date. *See Common Cause Fla. v. Byrd*, No. 4:22-cv-00109, 2024 WL 1308119 (N.D. Fla. Mar. 27, 2024) (three-judge court); *Sec'y of State Byrd v. Black Voters Matter Capacity Bldg. Inst., Inc.*, 375 So. 3d 335 (Fla. 1st DCA 2023), *rev. granted*, No. SC2023-1671, 2024 WL 370045 (Fla. Jan. 24, 2024).

[2] In this motion, congressional districts are designated "CD," and State House Districts are designated "HD."

*Second*, none of the Plaintiffs has standing to challenge CD 26 and HDs 112, 113, 116, and 119. None of the individual Plaintiffs lives in those districts, while the organizational Plaintiffs do not plausibly allege either organizational or associational standing. They do not allege organizational standing because they do not claim to have suffered an injury in their own right, distinct from any injury to their members. And they do not plead associational standing for two independent reasons: (a) they do not allege that any of their members who live in the challenged districts is a citizen or is eligible or registered to vote; and (b) their standing allegations are far too generic and threadbare to plausibly allege that the interests at stake in this redistricting case are germane to their organizational purpose.

*Third*, because the complaint does not allege that the individual Plaintiffs are eligible or registered to vote, the individual Plaintiffs do not have standing to assert a racial-gerrymandering claim with respect to *any* district. And because the organizational Plaintiffs do not have standing either, this Court should dismiss Plaintiffs' complaint in its entirety.[3]

## LEGAL STANDARD

In determining the sufficiency of a complaint, a court must first identify the elements the plaintiff must plead. *Ashcroft v. Iqbal*, 556 U.S. 662, 679–81 (2009). Next, the court must identify and disregard allegations that, as mere conclusions, formulaic recitations of the elements of a cause of action, and naked assertions devoid of factual enhancement, are not assumed to be true. *Id.* at 678–81; *accord McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018). Finally, the court must decide whether the allegations that remain—the complaint's well-pleaded factual allegations—state a plausible claim for relief. *Iqbal*, 556 U.S. at 679–80. The plausibility standard requires more than the mere possibility of an

---

[3] The House joins Plaintiffs' request for the convening of a three-judge court. ECF No. 1 ¶ 26; *see also* 28 U.S.C. § 2284(a) ("A district court of three judges shall be convened . . . when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body.").

entitlement to relief; the complaint's well-pleaded factual allegations must elevate the plaintiff's right to relief above the speculative level. *Id.*; *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 555 (2007).

A plaintiff must plead the elements of standing in the same manner as the elements of its claim—*i.e.*, its allegations of standing must satisfy *Iqbal*'s plausibility standard. *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1241 (11th Cir. 2022) (en banc).

## ARGUMENT

### I. NONE OF THE PLAINTIFFS HAS STANDING TO CHALLENGE CD 19.

Plaintiffs' challenge to CD 19 is unique among the challenges set forth in their complaint. While Plaintiffs allege that the other challenged districts were racially gerrymandered, they do not allege that CD 19 was. Rather, Plaintiffs allege that CD 26 was racially gerrymandered and that CD 26's shape *impacted* CD 19's shape. The Supreme Court has twice rejected this "impact" theory of racial gerrymandering. Because the downstream impacts of racial gerrymandering do not inflict a cognizable injury, this Court should dismiss Plaintiffs' challenge to CD 19.

In *United States v. Hays*, 515 U.S. 737 (1995), four voters alleged that the Louisiana Legislature racially gerrymandered the State's school districts. *Id.* at 740–41. They alleged that race impermissibly motivated the drawing of Districts 2 and 4, which were black-majority districts. *Id.* at 741–42. Although the plaintiffs resided in District 5, they alleged that District 5 was "segregated" because of the racially motivated designs of District 2 and 4. *Id.* at 746.

The Supreme Court concluded that the four voters lacked standing. It explained that, to challenge a district as a racial gerrymander, a voter must either reside in the allegedly racially gerrymandered district or otherwise "demonstrate that he or she, personally, has been injured by" the alleged racial classification. *Id.* at 744–45; *accord Thompson v. Smith*, 52 F. Supp. 2d 1364, 1371 n.10 (M.D. Ala. 1999) ("Voters entitled to pursue a gerrymandering claim are limited to those who reside within the racially gerrymandered district or those who can show by specific evidence that they suffer the special harms

associated with personally being subjected to a racial classification under the redistricting plan." (internal marks omitted)). Importantly, the mere fact that the plaintiffs resided in a district that was *impacted* by the shape of a neighboring, racially gerrymandered district was insufficient. *Hays*, 515 U.S. at 745. The alleged racial motivations behind Districts 2 and 4 did not "prove anything about the legislature's intentions with respect to District 5," nor did the record "reflect that the legislature intended District 5 to have any particular racial composition." *Id.* The plaintiffs' allegation that "the racial composition of District 5 would have been different if the legislature had drawn District 4 in another way" failed to "allege a cognizable injury under the Fourteenth Amendment." *Id.*

Five years later, in *Sinkfield v. Kelley*, 531 U.S. 28 (2000), the Court confirmed that residents of a district alleged to have been impacted by an adjacent, racially motivated district suffer no cognizable injury and thus lack standing to assert a racial-gerrymandering claim. In *Sinkfield*, the plaintiffs alleged that the Alabama Legislature racially gerrymandered Alabama's state-legislative districts when it purposefully created majority-minority districts. *Id.* at 28–29. The plaintiffs did not live in those districts, but rather in "adjacent" districts that "bordered" the majority-minority districts, and which the plaintiffs alleged were therefore the "product" of racial gerrymandering. *Id.* at 29. According to the plaintiffs, the shapes of their districts "were necessarily influenced by the shapes of the majority-minority districts upon which they border." *Id.* at 30.

As in *Hays*, the Court held that the plaintiffs lacked standing. It rejected the "suggestion . . . that an unconstitutional use of race in drawing the boundaries of majority-minority districts necessarily involves an unconstitutional use of race in drawing the boundaries of neighboring majority-white districts." *Id.* at 30–31. It found *Hays* "essentially indistinguishable" and reiterated that the racial gerrymandering of one district does not mean that the "neighboring" district was also racially gerrymandered. *Id.* at 31. As in *Hays*, the Court remanded to the district court with instructions to dismiss the complaint. *Id.*; *see also Gill v. Whitford*, 585 U.S. 48, 66 (2018) (explaining that a plaintiff who "alleges that he is the

5

object of a racial gerrymander . . . has standing to assert only that his own district has been so gerrymandered"); *Sanders v. Dooly County*, 245 F.3d 1289, 1291 (11th Cir. 2001) (recognizing that a plaintiff who does not reside in a racially gerrymandered district has no standing, even if the district in which the plaintiff resides is "indispensable to the racially motivated plan"); *Backus v. South Carolina*, 857 F. Supp. 2d 553, 560 (D.S.C.), *aff'd*, 568 U.S. 801 (2012) ("It is not enough for plaintiffs to allege that they reside in a district adjacent to a racially gerrymandered district and that the racial composition of their district would have been different absent the racial gerrymander.").

Key to the Court's holdings in *Hays* and *Sinkfield* is that a racial-gerrymandering claim challenges an individual district as a discrete unit—not the redistricting plan as a whole, *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262–63 (2015), nor only a portion of a district, *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 191–92 (2017). Courts do not attempt to guess which other districts were impacted and would have been drawn differently but for the impermissible motivations behind one district.

Plaintiffs' challenge to CD 19 here is indistinguishable from the challenges that were dismissed in *Hays* and *Sinkfield*. Plaintiffs do not allege that CD 19 itself was drawn with racial motivations. Instead, Plaintiffs allege that adjacent CD 26 was racially gerrymandered and that CD 26 in turn impacted CD 19's shape. These are the precise allegations of collateral, downstream impacts that the Supreme Court found insufficient in *Hays* and *Sinkfield*.

Thus, Plaintiffs allege that all of the challenged districts—"except CD 19"—were drawn to preserve the ability of Hispanic voters to elect representatives of their choice. ECF No. 1 ¶ 98; *accord id.* ¶ 50 (alleging that "all but one" of the challenged districts were drawn to preserve the ability of Hispanic voters to elect representatives of their choice, and identifying CD 19 as the exception). As to CD 19, Plaintiffs allege only that CD 19's "irregular shape . . . was *caused by* the irregular, racially motivated shape of its neighboring Challenged District, CD 26," *id.* ¶ 50 (emphasis added), and that "CD 26's race-based configuration *necessarily impacted* CD 19," *id.* ¶ 174 (emphasis added).

In any redistricting plan, the shape of one district will necessarily impact the shapes of other districts. These ripple effects do not entitle residents of the allegedly impacted districts to assert racial-gerrymandering claims against their own districts. For the reasons explained in *Hays* and *Sinkfield*, this Court should dismiss Plaintiffs' challenge to CD 19.

## II.   NONE OF THE PLAINTIFFS HAS STANDING TO CHALLENGE CD 26 AND HDS 112, 113, 116, AND 119.

Plaintiffs have not plausibly alleged their standing to challenge CD 26 and HDs 112, 113, 116, and 119. None of the individual Plaintiffs claims to live in those districts. ECF No. 1 ¶¶ 24–28. They live in CDs 19, 27, and 28 and HDs 114, 115, and 118. *Id.* The individual Plaintiffs do not therefore have standing to challenge CD 26 and HDs 112, 113, 116, and 119. *See supra* Part I. And for the reasons explained below, none of the organizational Plaintiffs has plausibly alleged either organizational or associational standing to challenge *any* district. Plaintiffs' challenges to CD 26 and HDs 112, 113, 116, and 119 should therefore be dismissed.

### A.   The Organizational Plaintiffs Do Not Plausibly Allege Organizational Standing.

None of the organizational Plaintiffs has organizational standing because none alleges a diversion of resources that might establish an injury suffered by the organization in its own right. ECF No. 1 ¶¶ 21–23; *see also S. River Watershed All., Inc. v. DeKalb County*, 69 F.4th 809, 819 n.11 (11th Cir. 2023) ("There are two ways to establish standing for organizational plaintiffs—the diversion-of-resources theory and the associational standing theory."); *City of S. Miami v. Governor*, 65 F.4th 631, 638 (11th Cir. 2023) (explaining organizational standing); *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1250 (11th Cir. 2020) (explaining that an impediment to the achievement of an organization's mission is insufficient to confer

7

organizational standing).[4] Because none of the organizational Plaintiffs alleges that it diverted resources in response to the challenged law and therefore suffered its own injury distinct from any injury suffered by its members, none has alleged organizational standing.[5]

### B. The Organizational Plaintiffs Do Not Plausibly Allege Associational Standing.

A membership organization that has not suffered its own injury may nevertheless sue in limited circumstances "as the representative of its members." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). To plead standing to sue on behalf of its members, the organization must plausibly allege that "its members would . . . have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). Here, the organizational Plaintiffs have failed to plead the first two elements of associational standing.

---

[4] Even the mere diversion of resources is insufficient to establish standing in light of *Food and Drug Administration v. Alliance for Hippocratic Medicine*, --- U.S. ---, No. 23-235, 2024 WL 2964140, at *13–14 (U.S. June 13, 2024).

[5] Even if the organizational Plaintiffs had pleaded injury to themselves, their claims would still be subject to dismissal for failure to plead third-party standing. As the Supreme Court explained, "even when the plaintiff has alleged injury sufficient to meet the 'case or controversy' requirement, . . . the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975); *accord Vote.org v. Callanen*, 39 F.4th 297, 303 (5th Cir. 2022) (explaining that a plaintiff that asserts the rights and interests of third parties must establish third-party standing even if the plaintiff "has shown organizational injury from the diversion of resources"); *Fair Elections Ohio v. Husted*, 770 F.3d 456, 461 (6th Cir. 2014) ("Even if AMOS were to demonstrate it had Article III standing, it would confront the additional barrier of the long-recognized limit on plaintiffs asserting the rights of third-parties."). Thus, a plaintiff that asserts a violation of the rights of non-parties must establish not only its own injury in fact, but also "a close relation to the third party" and "some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991). Because racial gerrymandering violates the equal-protection rights of voters who live in racially gerrymandered districts—not the rights of organizations—and because the organizational Plaintiffs do not attempt to plead third-party standing, their claims should be dismissed even if they had alleged injury to themselves.

### 1. The Organizational Plaintiffs Do Not Allege That Their Members Are Citizens and Eligible or Registered to Vote.

To allege that its members would have standing to sue in their own right, an organization must plausibly allege that one or more of its members has suffered or will imminently suffer a cognizable injury. While the organizational Plaintiffs allege that their members live in all of the challenged districts, they do not allege that those members are eligible or registered to vote—or even citizens. The complaint does not therefore plausibly allege that members of the organizational Plaintiffs have suffered a cognizable injury and would have standing to sue in their own right.

The "essence" of any allegation of racial gerrymandering "is that the State has used race as the basis for separating *voters* into districts." *Miller v. Johnson*, 515 U.S. 900, 911 (1995). Racial gerrymandering thus threatens the equal-protection rights of *voters*, not non-voters. *See Shaw v. Reno*, 509 U.S. 630, 639–41 (1993) (explaining that infringements of the right to vote are the "background" behind racial-gerrymandering claims); *id.* at 646 (explaining that racial gerrymandering "purposefully distinguishes between voters on the basis of race"). Likewise, the "harms that underlie a racial gerrymandering claim" are directed at the "voter who lives in the district." *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 263 (2015) (emphasis omitted); *see also Shaw*, 509 U.S. at 650 (explaining that racial gerrymandering "injures voters").

To allege standing to bring a racial-gerrymandering claim, an individual must claim to be a voter. In *Hays*, the Court explained that racial gerrymandering is an "effort to segregate voters into separate voting districts because of their race," 515 U.S. at 738 (quoting *Shaw*, 509 U.S. at 658), and that "[v]oters in such districts may suffer the special representational harms racial classifications can cause in the voting context," *id.* at 745. In concluding that only voters who live in the allegedly racially gerrymandered district have standing to sue, the Court noted that, while a statewide redistricting plan "affects all [of the State's] voters by classifying each of them as a member of a particular . . . district," it "inflicts race-based injury on [only] some . . . voters." *Id.* at 746 (emphases omitted); *see also Ala. Legis. Black Caucus*, 575 U.S. at 283 (Scalia, J., dissenting) ("A voter has standing to bring a racial-gerrymandering claim only if he votes in a

9

gerrymandered district, or if specific evidence demonstrates that he has suffered the special harms that attend racial gerrymandering." (citing *Hays*, 515 U.S. at 744–45)). Thus, in *League of United Latin American Citizens v. Abbott*, 604 F. Supp. 3d 463, 484 (W.D. Tex. 2022), the court concluded that an entity had associational standing to assert a racial-gerrymandering claim against "districts where its members reside and are registered to vote." *See also Johnson v. Mortham*, 915 F. Supp. 1529, 1536 (N.D. Fla. 1995) ("Registered voters have standing . . . in an action challenging the voting district in which the voters are registered.").

Here, the complaint does not allege that the members who reside in the challenged districts are citizens and eligible or registered to vote. It alleges only that "members" of the organizational Plaintiffs "reside" in the challenged districts. ECF No. 1 ¶¶ 21–23. Because racial gerrymandering classifies *voters* on account of race and injures *voters* who vote in unconstitutional voting districts, the complaint does not allege either a violation of the rights of—or an injury to—the organizational Plaintiffs' members. The organizational Plaintiffs have not therefore alleged associational standing.

### 2. The Organizational Plaintiffs Do Not Plausibly Allege That the Interests at Stake in This Redistricting Case Are Germane to Their Organizational Purpose.

The organizational Plaintiffs have not alleged associational standing for another reason as well: they have not plausibly alleged that "the interests at stake are germane to [their] purpose." *Georgia Republican Party v. SEC*, 888 F.3d 1198, 1203 (11th Cir. 2018). Rather than plausibly allege their organizational purpose and the germaneness of the interests involved in this litigation to that purpose, the organizational Plaintiffs provide broadly worded mission statements in the most vague and conclusory manner. Their soundbite-style allegations do not comport with *Iqbal*'s plausibility standard and, if sufficient, would eviscerate the germaneness requirement and undermine an important limitation on associational standing.

The germaneness requirement, though not unduly rigorous, serves an important purpose. A fit between the organization's purpose and the interests at stake in the litigation ensures that the organization is a proper representative to carry on litigation in place of its members. Because associational standing represents a departure from the ordinary Article III requirement that litigation be conducted by the injured parties themselves, *Warth*, 422 U.S. at 511; *see also Ass'n of Am. Physicians & Surgeons v. U.S. Food & Drug Admin.*, 13 F.4th 531, 537–42 (6th Cir. 2021) (calling for reexamination of the associational-standing doctrine and questioning its consistency with Article III principles), the limitations on associational standing guard the constitutional boundaries of the judicial power that Article III confers.

One of the justifications for the Supreme Court's recognition of associational standing is that "organizations often have specialized expertise and research resources relating to the subject matter of the lawsuit." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. v. Brock*, 477 U.S. 274, 289 (1986). When an organization fails to adequately plead its organizational purpose and to show how the interests at stake are germane to that purpose, it fails to show that it has any specialized expertise in the subject matter that would make it an appropriate representative of its members' interests. *Humane Soc. of the U.S. v. Hodel*, 840 F.2d 45, 56 (D.C. Cir. 1988) (explaining that the germaneness requirement requires that "an organization's litigation goals be pertinent to its specialized expertise and the grounds that bring its membership together").

Here, the organizational Plaintiffs plead their organizational purposes in the most generic and conclusory fashion and fail to plausibly allege the necessary fit between those purposes and the interests this case implicates. Cubanos Pa'Lante, for example, alleges that its mission is to "disrupt the status quo by educating, organizing, and mobilizing progressive Cuban Americans," and that it seeks "to hold elected officials accountable and to advocate for the issues their community cares about." ECF No. 1 ¶ 21. It does not disclose what it organizes and mobilizes its members to do, what it educates them about, what it seeks to hold elected officials accountable for and how, what issues their community cares

about, and what it does to advocate for those issues. Its allegation really says nothing at all. Under *Iqbal*'s plausibility standard—which disregards "mere conclusory statements" and "naked assertions devoid of further factual enhancement," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)—these allegations are insufficient to show that the interests at stake in this racial-gerrymandering case are germane to Cubanos Pa'Lante's organizational purpose—or to show that Cubanos Pa'Lante has any specialized expertise in the subject matter.

Similarly, Engage Miami meagerly alleges that its mission is to develop "a local culture of civic participation for young people" and thus to "build a more just, democratic, and sustainable community." ECF No. 1 ¶ 22. If possible, that allegation is even less informative than Cubanos Pa'Lante's standing allegations. It simply says that Engage Miami supports justice, democracy, and civic participation—hardly an uncommon sentiment. It does not describe any organizational activities or programs that might place its organizational purpose in concrete and plausible terms. Engage Miami's vague and conclusory description of its purpose—stated at a stratospheric level of generality—does not demonstrate any nexus between its organizational purpose and the interests at stake in this challenge to eleven voting districts.

Finally, the FIU ACLU Club alleges that its mission is to "protect, defend, strengthen, and promote the constitutional rights of all people in Florida." *Id.* ¶ 23.[6] A naked assertion that a plaintiff organization supports everyone's constitutional rights in some indeterminate way does not establish that the interests affected by this case are germane to the FIU ACLU Club's purpose. If it did, then the germaneness requirement would be no limitation at all. Any organization that claims to be philosophically committed to justice, or constitutional rights, or the general welfare and betterment of society would easily check the germaneness box—no matter the subject matter of the litigation or the specific interests at

---

[6] Ironically, in this litigation, the FIU ACLU Club seeks to strip South Florida Hispanics of their constitutional rights under the Fair Districts Amendments. ECF No. 1 ¶¶ 196–217. For the FIU ACLU Club, "all people" does not include "*all* people."

12

stake. The complaint contains no allegations that disclose what (if anything) the organization actually *does*, how (if at all) it supports constitutional rights, or which constitutional rights (if any) it has taken steps to support. It does not disclose whether its support of constitutional rights is merely abstract and academic or limited to litigation—or real and practical. It says too little to enable this Court to plausibly infer that the interests at stake in this redistricting lawsuit are germane to the organizational purpose of this student organization.

These threadbare allegations of organizational purpose stand in stark contrast to allegations in cases where organizational plaintiffs have established associational standing. In *South River Watershed Alliance*, the organizational plaintiff's mission was to advocate for restoration of the water quality and biodiversity of the South River and Chattahoochee River watersheds. 69 F.4th at 815. That purpose was germane to the litigation, *id.* at 820, which alleged that the defendants discharged untreated sewage into those watersheds, *id.* at 815. In *Florida State Conference of NAACP v. Browning*, 522 F.3d 1153 (11th Cir. 2008), the organizational plaintiffs—which conducted voter-registration drives and election-day education and monitoring to increase voter registration and participation among Florida's minority communities, *id.* at 1158, 1166—established associational standing to challenge a state statute that imposed verification requirements on voter-registration applicants, *id.* at 1160. And in *American Alliance for Equal Rights v. Fearless Fund Management, LLC*, --- F.4th ----, No. 23-13138, 2024 WL 2812981, at *1–2 (11th Cir. June 3, 2024), an organization dedicated to "ending racial classifications and racial preferences in America" successfully asserted associational standing to challenge an entrepreneurship funding competition open only to businesses owned by black women.

In contrast, courts have found generic and abstract allegations of organizational purpose insufficient to satisfy the germaneness requirement. *See, e.g., Vallejo Police Officers' Ass'n v. City of Vallejo*, No. 2:21-cv-00454, 2024 WL 1533894, at *1, *8 (E.D. Cal. Apr. 9, 2024) (concluding that organizational plaintiff failed to plausibly allege that interests at stake in litigation over discipline of police officer were

13

germane to its purpose, where complaint made only a "vague reference to the organization's broad purpose and activities" as the collective bargaining agent that negotiates for officers and advocates for their interests); *In re: Takata Airbag Prod. Liab. Litig.*, No. 1:14-cv-24009, 2016 WL 1266609, at *6 (S.D. Fla. Mar. 11, 2016) (concluding that organizational plaintiff failed to plausibly allege that interests at stake in multidistrict litigation regarding defective airbags were germane to its purpose, where organization made the "bare statement" that it was "dedicated to the efficient removal and reuse of automotive parts, and the safe disposal of inoperable motor vehicles"); *Am. Canine Found. v. Sun*, No. 3:06-cv-04713, 2007 WL 4208358, at *3–4 (N.D. Cal. Nov. 27, 2007) (concluding that organizational plaintiff failed to plausibly allege that interests at stake in litigation to challenge a county's mandatory spay-and-neuter program for dogs were germane to its purpose, where organization alleged only that it was formed to protect its members' constitutional rights and property and had advocated in opposition to a similar state statute).

The party that invokes a federal court's jurisdiction bears the burden to establish standing. *Walters v. Fast AC, LLC*, 60 F.4th 642, 647 (11th Cir. 2023). Here, the organizational Plaintiffs' broad and context-free allegations of support for justice, constitutional rights, and civic engagement are conclusory statements and naked assertions, and are not entitled to a presumption of truth. *See Iqbal*, 556 U.S. at 681 ("It is the conclusory nature of respondent's allegations . . . that disentitles them to the presumption of truth."). Because the organizational Plaintiffs have not sufficiently pleaded their organizational purposes or shown how the interests at stake in this racial-gerrymandering case are germane to those purposes, the complaint fails to plausibly allege associational standing.

### III.   BECAUSE THEY DO NOT CLAIM TO BE VOTERS, THE INDIVIDUAL PLAINTIFFS LACK STANDING.

Finally, none of the individual Plaintiffs has standing because none claims to be eligible or registered to vote in any of the challenged districts.

As explained above, racial gerrymandering injures voters, not non-voters. *See supra* Part II.B.1. Here, each of the individual Plaintiffs claims to be a "resident" of one or two challenged districts, ECF

14

No. 1 ¶¶ 24–28, but none claims to be eligible or registered to vote.[7] Because racial gerrymandering classifies *voters* on account of race and injures *voters* who vote in unconstitutional voting districts, the individual Plaintiffs have not alleged either a violation of their rights or an injury. And because the organizational Plaintiffs do not have standing either, *see supra* Part II.A. & II.B., the Court should dismiss the complaint in its entirety.

## CONCLUSION

"The rules of standing . . . are threshold determinants of the propriety of judicial intervention. It is the responsibility of the complainant clearly to allege facts demonstrating that [it] is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Warth v. Seldin*, 422 U.S. 490, 517–18 (1975). Plaintiffs have not done so here. This Court should accordingly dismiss their complaint.

Dated June 13, 2024.                                    Respectfully submitted,

/s/ *Andy Bardos*
Andy Bardos (FBN 822671)
andy.bardos@gray-robinson.com
GRAYROBINSON, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32301-1724
Telephone: 850-577-9090
*Attorneys for Defendant, Florida House of Representatives*

---

[7] Nor does the complaint clearly allege that the individual Plaintiffs are even citizens. *See* ECF No. 1 ¶¶ 24–29 (alleging that the individual Plaintiffs are "a Columbian American," "a Salvadoran and Honduran American," "a Cuban American," "a Cuban and Nicaraguan American," and "a non-Hispanic resident").