IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:24-21983-CIVIL BECERRA/TORRES

CUBANOS PA'LANTE, et al.,

    *Plaintiffs*,

v.

FLORIDA HOUSE OF REPRESENTATIVES,
et al.,

    *Defendants*.

_____/

## DEFENDANT SECRETARY OF STATE'S SECOND MOTION TO DISMISS

Plaintiffs fail to state a racial gerrymandering claim in their challenge to three congressional districts in South Florida and seven state-house districts also in South Florida. Doc.31 ¶ 4 (amended complaint). The *Twombly-Iqbal* standard requires that Plaintiffs allege facts sufficient to entitle them to relief. In a racial gerrymandering case such as this, Plaintiffs must plead facts that show direct or circumstantial evidence of race being the predominant factor in the drawing of districts. They didn't. Plaintiffs must plead facts sufficient to overcome the presumption of good faith to which the Florida Legislature is entitled. They didn't. Plaintiffs must present an alternative plan for the challenged congressional districts, showing that better-looking districts can be drawn consistent with race-neutral or constitutionally mandated redistricting objectives. They didn't. Plaintiffs must do the same for the challenged house districts. They didn't. This Court should thus dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6).

### Motion to Dismiss Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Only factual allegations are assumed to be true for purposes of a motion to dismiss; legal conclusions are not. *Id.* at 662-64. And while the four corners of the complaint usually govern, the incorporation-by-reference doctrine allows this Court to consider the material *referenced* or *attached* in a plaintiff's complaint, without converting the motion into a summary judgment motion, if the material is "(1)

1

central to the plaintiff's claim[,] and (2) undisputed." *Horsely v. Feldt*, 304 F.3d 1125, 1134-35 (11th Cir. 2002). "'Undisputed' in this context means that the authenticity of the document is not challenged." *Id.*; *see also Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) ("where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment" (citations omitted)).

## Argument

The facts, as alleged, don't state a claim for racial gerrymandering. Racial gerrymandering occurs when a legislature "gives race a predominant role in redistricting decisions." *Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1233 (2024). Race predominates when it's "the criterion that, in the" legislature's "view, could not be compromised," *Shaw v. Hunt*, 517 U.S. 899, 907 (1996), subordinating race-neutral districting criteria, like "compactness, contiguity, and core preservation," *Alexander*, 144 S. Ct. at 1234. Plaintiffs can prove racial predominance through direct evidence, such as explicit legislative language making race the predominant criterion, *id.*; circumstantial evidence, such as a district's bizarre shape explained by race alone, *id.*; or circumstantial evidence presented through an assessment of the *Arlington Heights* factors, *see Jacksonville Branch of the NAACP v. City of Jacksonville*, 635 F. Supp. 3d 1229, 1244-45 (M.D. Fla. 2022) (collecting cases, including *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999)). Regardless of whether they present direct or circumstantial evidence, Plaintiffs must also overcome the presumption of good faith to which the legislature is entitled. *Alexander*, 144 S. Ct. at 1235-36. They can—and indeed must—do that through alternative maps showing that it was possible for the legislature to take the many varying but permissible considerations into account when drawing districts. *Id.* at 1235 ("Without an alternative map, it is difficult for plaintiffs to defeat our starting presumption that the legislature acted in good faith."); *see also id.* at 1249 (concluding that the district court "critically erred by failing to draw an adverse inference against" plaintiffs "for not providing a substitute map that shows how the State could have achieved its legitimate political objectives" "while producing significantly greater racial balance" (cleaned up)).

2

### I. The complaint fails to include sufficient allegations concerning direct or circumstantial evidence that race predominated.

In Count I of their complaint, Plaintiffs allege that CD26, CD27, and CD28 are racial gerrymanders. Doc.31 ¶ 4. In Count II, Plaintiffs allege that HD112, HD113, HD114, HD115, HD116, HD118, and HD119 are racial gerrymanders. Doc.31 ¶ 4. But Plaintiffs fail to plead the requisite direct or circumstantial facts for either count—facts that, accepted as true, state a plausible claim.

**A.** Start with the congressional districts. As direct evidence of racial predominance, Plaintiffs rely on statements from a handful of legislators—those who both supported and opposed the congressional map—and legislative staffers. *E.g.*, Doc.31 ¶¶ 104, 116, 117, 126, 147. Even if one could infer from these statements that race predominated for that individual, which is a stretch, these statements still fail to create a plausible inference that "the legislature *as a whole* was imbued with racial motives." *Brnovich v. DNC*, 594 U.S. 647, 689 (2021) (emphasis added). That's because "[w]hat motivates one legislator to make a speech about [a portion of] a statute is not necessarily what motivates scores of others to enact it." *United States v. O'Brien*, 391 U.S. 367, 384 (1968). And what motivates one staffer to explain one part of a broader congressional plan tells us nothing about the intent of the legislative body that voted for the plan. *See id.*

Plaintiffs fail to allege sufficient circumstantial facts as well. They say that one district has an odd western boundary, that the City of Miami is unnecessarily split, that another district "consists of two distinct population centers separated by the unpopulated Everglades," and that some districts have low compactness scores compared to other districts in the same map. *E.g.*, Doc.31 ¶¶ 155, 170, 173, 182. Plaintiffs target, for example, CD26:

> Under the Reock measure, CD 26 has the third-worst score of all 28 districts in [the enacted map]. CD 26's Reock score of .29 falls well below the statewide average of .47 and the statewide maximum of .74. Under the Convex Hull measure, CD 26 scores worse than the average score in [the enacted map]. Under the Polsby-Popper measure, CD 26 has the fifth-worst score in [the enacted map].

Doc.31 ¶ 170. (The closer to 1.0, the better the compactness score. Doc.31 ¶ 86.)

But none of the alleged circumstantial facts—standing alone or considered together—can establish that race was "the criterion that, in the" legislature's "view, could not be compromised." *Shaw*, 517 U.S. at 907. After all, it's okay for a boundary to track the coastline as its western edge and include a chain of small islands. Doc.31 ¶ 173 & Fig. 12. The islands must be placed

3

somewhere. So too with the Everglades. Some districts will inevitably have better or worse compactness scores than others. And some cities must be split; that's necessarily true of large, populated cities like Miami. *E.g.*, *Common Cause v. Byrd*, 2024 U.S. Dist. LEXIS 54503, at *64 (N.D. Fla. Mar. 27, 2024) (the City of Jacksonville had to be split in the congressional map to meet relevant population requirements imposed by federal law).

Nor does *Arlington Height*'s test for circumstantial evidence of intent offer a refuge. That test looks to the (1) impacts of the challenged law, (2) its historical background, (3) the sequence of events leading up to its passage, (4) any procedural and substantive departures in its enactment, (5) the contemporary statements and actions of key legislators, (6) the foreseeability of any impacts, (7) the knowledge of any impacts, and (8) the availability of less discriminatory alternatives. *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 922 (11th Cir. 2023). Plaintiffs' complaint never mentions *Arlington Heights*. Allegations arguably relevant to the now-familiar factors are a mere afterthought; Plaintiffs focus instead on the supposed lack of political cohesion in South Florida's Hispanic community. *E.g.*, Doc.31 ¶¶ 15-17, 194-201.

**B.** Allegations concerning the house districts fail for similar reasons. Plaintiffs' direct evidence again comes from the statements of a handful of legislators and legislative staff. *E.g.*, Doc.31 ¶¶ 55, 62, 69, 78. And again, those statements don't establish that race predominated. At best, they shed light on the intent of certain individuals and not the intent of the whole legislature.

Allegations concerning circumstantial evidence are similarly lacking. As alleged, the circumstantial evidence consists of rectangles stacked side by side; the inclusion of an airport within a district; the splitting-up of a large, densely populated city like Miami; and low compactness scores compared to the overall map. *E.g.*, Doc.31 ¶¶ 78, 79, 94, 95. But again, Plaintiffs fail to allege how or why shapes like rectangles point to race as the predominant criterion, as opposed to twisting-and-turning appendages that track racial demographics with surgical precision. They fail to allege how or why including the airport in a district matters when the legislature must include the airport in *a* district. They fail to allege how or why splitting a populous city matters when the legislature must create districts throughout the state of roughly equal population, making it necessary to split large cities like Miami. And they fail to allege how or why the compactness numbers matter when Plaintiffs simply compare the numbers to the compactness scores for the overall plan, rather than some recognized floor for compactness.

4

Finally, the *Arlington Heights*-related allegations are missing. So, its factors can't help Plaintiffs allege that race predominated in the legislature's decision-making process.

## II. The complaint fails to overcome the presumption of good faith.

Plaintiffs may well respond that they have done enough to survive a motion to dismiss. They may say that it's okay at the pleading stage to include only a few quotes from the legislative record, to generally raise concerns about the shapes of the districts, to note that the City of Miami is split, to make a few points about the Everglades or the airport being included in a particular district, and to identify concerns about compactness. Not true. The presumption of good faith and the need to produce alternative plans makes the *Twombly-Iqbal* hurdle higher still for Plaintiffs.

**A.** The presumption of good faith plays an outsized role in redistricting cases. It's an "especially stringent" requirement that "directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 144 S. Ct. at 1235-36. The presumption "ensures that 'race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines.'" *Id.* (quoting *Miller v. Johnson*, 515 U.S. 900, 913 (1995)). Importantly, the presumption avoids having the judicial branch be "quick to hurl" race-based "accusations at the political branches." *Id.* In practice, when a court considers a statement from a legislator, the presumption requires the court to presume that the statement was made in good faith, and shouldn't "read" it "to demonstrate discriminatory intent" and then impute that intent to "the state legislature." *League of Women Voters of Fla. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373-74 (11th Cir. 2022). Nor should courts read discriminatory intent into the use of common shapes, the inclusion of certain places into districts, the splitting-up of large cities, or a series of compactness numbers without more.

Viewed through the "especially stringent" requirement that the Supreme Court has set for Plaintiffs, *Alexander*, 144 S. Ct. at 1235-36, no factual allegations or "reasonable inferences" from those allegations can save Plaintiffs' complaint, *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009). The relief they seek simply isn't plausible.

**B.** Plaintiffs' pleading deficiency is particularly pronounced because they fail to provide alternative maps for the congressional and house districts. On the same day that Plaintiffs filed this case, the Supreme Court made clear that "[w]ithout an alternative map, it is difficult for plaintiffs to defeat [this Court's] starting presumption that the legislature acted in good faith." *Alexander*,

5

144 S. Ct. at 1235. An alternative map, the Supreme Court explained, can be easily drawn and "can perform the critical task of distinguishing between" permissible and impermissible motivations in drawing district lines. *Id.* at 1249-50. This alternative map becomes essential for plaintiffs in racial-gerrymandering cases where there's a lack of weighty "direct evidence," or "some extraordinarily powerful circumstantial evidence." *Id.*

In other words, given the lack of other allegations, "only an alternative map" "can carry the day" for Plaintiffs in this case; only with such a plan can they state a plausible claim for relief. *Id.* at 1249. Yet we have no complete, alternative congressional or house maps here.

**C.** For their challenge to the congressional districts, Plaintiffs may point as an alternative to one map—P000C0047—from the legislature's redistricting portal.[1] Doc.31 ¶ 184. According to the portal, the authenticity of which is not in dispute, Nicholas Warren, counsel for Plaintiffs in this case, submitted the map. **Attachment A**.[2] But Mr. Warren's alternative map is only a partial map: it provides district lines for CD17 to CD27, which make up South Florida in his map. His map appears to have one fewer district in South Florida, compared to the enacted map.

The redistricting portal also states that, per Mr. Warren, he "did not use political, elections, or registration data in developing this plan, with the exception of comparing the benchmark, staff-drawn, and my CDs 20, 24, 25, 26, and 27 to ensure no diminishment of minority voters' ability to elect candidates of choice." **Attachment A**. The relevance of much of Mr. Warren's disclaimer is unclear; however, it seems that Mr. Warren was not taking into account all of the competing considerations that the legislature had to account for when doing its work.

In addition, while Plaintiffs complain of the enacted districts' low compactness scores compared to the overall map, Mr. Warren's alternative districts don't have meaningfully better scores than the enacted districts. The redistricting website provides the compactness scores for the

---

[1] The portal's website link is https://www.floridaredistricting.gov/.
[2] To get to this document, click "Submitted Plans" on the redistricting website. Then type "P000C0047" under "Plan Name" and click "search." Then click "P000C0047" under "Plan Name." Then under "Archive Records," click "Redistricting_Suggestion_Form.pdf."

enacted districts, **Attachment B**,[3] and Mr. Warren's districts, **Attachment C**.[4] Excerpted statistics from the website are provided here:

*Enacted Districts,* **Attachment B**

| District | Polygon Area (sq. mi) | Perimeter (mi) | Reock | Area/Convex Hull | Polsby Popper | Holes |
|---|---|---|---|---|---|---|
| D17 | 2148.7 | 261.96 | 0.28 | 0.77 | 0.39 | 0 |
| D18 | 7085.18 | 459.68 | 0.42 | 0.82 | 0.42 | 0 |
| D19 | 1896.77 | 248.65 | 0.33 | 0.78 | 0.39 | 0 |
| D20 | 2397.14 | 329.94 | 0.5 | 0.77 | 0.28 | 0 |
| D21 | 1888.21 | 218.95 | 0.5 | 0.82 | 0.49 | 0 |
| D22 | 345.34 | 101.59 | 0.44 | 0.74 | 0.42 | 0 |
| D23 | 254.27 | 105.32 | 0.5 | 0.79 | 0.29 | 0 |
| D24 | 182.83 | 68.92 | 0.48 | 0.9 | 0.48 | 0 |
| D25 | 236.65 | 88.29 | 0.42 | 0.81 | 0.38 | 0 |
| D26 | 2440.11 | 306.48 | 0.29 | 0.77 | 0.33 | 0 |
| D27 | 280.69 | 69.66 | 0.71 | 0.95 | 0.73 | 0 |
| D28 | 6709.61 | 591.41 | 0.22 | 0.55 | 0.24 | 0 |

*Mr. Warren's Districts,* **Attachment C**

| District | Polygon Area (sq. mi) | Perimeter (mi) | Reock | Area/Convex Hull | Polsby Popper | Holes |
|---|---|---|---|---|---|---|
| D17 | 2143.64 | 235.39 | 0.54 | 0.85 | 0.49 | 0 |
| D18 | 6052.07 | 366.21 | 0.43 | 0.93 | 0.57 | 0 |
| D19 | 4594.77 | 321.56 | 0.5 | 0.89 | 0.56 | 0 |
| D20 | 1848.69 | 285.25 | 0.52 | 0.77 | 0.29 | 0 |
| D21 | 491.87 | 164.12 | 0.57 | 0.79 | 0.23 | 0 |
| D22 | 305.65 | 107.94 | 0.46 | 0.8 | 0.33 | 0 |
| D23 | 602.32 | 160.41 | 0.26 | 0.73 | 0.29 | 0 |
| D24 | 133.79 | 65.9 | 0.39 | 0.74 | 0.39 | 0 |
| D25 | 550.7 | 113.43 | 0.42 | 0.91 | 0.54 | 0 |
| D26 | 6709.69 | 589.05 | 0.22 | 0.55 | 0.24 | 0 |
| D27 | 341.7 | 96.33 | 0.36 | 0.85 | 0.46 | 0 |
| D28 | 0 | 0 | 0 | 0 | 0 | 0 |

---

[3] To get to this document, click "Submitted Plans" on the redistricting website. Then click "Congressional Plan 2022." Then under "Archive Records," click "DistrictCompactnessReport.pdf."

[4] To get to this document, click "Submitted Plans" on the redistricting website. Then type "P000C0047" under "Plan Name" and click "search." Then click "P000C0047" under "Plan Name." Then under "Archive Records," click "DistrictCompactnessReport.pdf."

Mr. Warren's alternative congressional districts also look less visibly compact, even though it appears to have one fewer district, compared to the enacted map. The redistricting portal provides the enacted map, **Attachment D**,[5] and Mr. Warren's map, **Attachment E**.[6]

*Enacted Districts, **Attachment D***



---

[5] To get to this document, click "Submitted Plans" on the redistricting website. Then click "Congressional Plan 2022." The click "Web Map." Use the directional arrows on the top, left side of the window to navigate the map, along with the cursor.

[6] To get to this document, click "Submitted Plans" on the redistricting website. Then type "P000C0047" under "Plan Name" and click "search." Then click "P000C0047" under "Plan Name." The click "Web Map." Use the directional arrows on the top, left side of the window to navigate the map, along with the cursor.

*Mr. Warren's Districts,* **Attachment E**



Note the Pac-Man shape in CD21. His CD20 has three appendages, while the enacted CD20 only has two. Mr. Warren's CD24 has a long panhandle. His CD23 and CD25 are rectangular (just like the districts his clients now complain about), although his rectangles are stacked horizontally.

**D.** For the house districts, Plaintiffs also fail to offer an alternative plan that remedies the legislature's supposed errors. They may point to P000H0019 as an alternative map. Doc.31 ¶ 188. But it isn't. It's unclear how this map was created. Neither the complaint nor the redistricting website explains how this map was drawn, what data the mapmaker considered (or didn't consider), whether the mapmaker drew districts with race in mind, or whether the map satisfies the Equal Protection Clause, the state constitution, and the Voting Rights Act—i.e., the legal standards the legislature must satisfy when drawing districts.

According to the complaint, the only reason Plaintiffs prefer this map is that it "stack[s]" HD116, HD118, HD119 on top of each other. Doc.31 ¶ 188. That's it. Not because the districts are more compact. Not because there's fewer municipal splits. Not because an uninhabited airport is districted in a novel way. Plaintiffs prefer the map just because three districts are stacked together.

9

As such, Plaintiffs don't present an adequate alternative map. Like their challenge to the congressional districts, they offer no alternative that provides a complete map drawn to balance the sometimes-competing obligations imposed on the legislature.

## Conclusion

For these reasons, this Court should grant the Secretary's motion to dismiss.

Dated: July 9, 2024

Respectfully submitted by,

| | |
|---|---|
| Bradley R. McVay (FBN 79034) | /s/ Mohammad O. Jazil |
| brad.mcvay@dos.myflorida.com | Mohammad O. Jazil (FBN 72556) |
| Joseph S. Van de Bogart (FBN 84764) | mjazil@holtzmanvogel.com |
| joseph.vandebogart@dos.myflorida.com | Michael Beato (FBN 1017715) |
| Ashley Davis (FBN 48032) | mbeato@holtzmanvogel.com |
| ashley.davis@dos.myflorida.com | zbennington@holtzmanvogel.com |
| FLORIDA DEPARTMENT OF STATE | HOLTZMAN VOGEL BARAN |
| R.A. Gray Building | TORCHINSKY & JOSEFIAK PLLC |
| 500 S. Bronough St. | 119 S. Monroe St. Suite 500 |
| Tallahassee, FL 32399 | Tallahassee, FL 32301 |
| (850) 245-6536 | (850) 270-5938 |

*Counsel for the Secretary*

## LOCAL RULE 7.1(c) CERTIFICATION

The undersigned certifies that this motion to dismiss does not exceed twenty pages inclusive of all parts.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2024, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

/s/ Mohammad O. Jazil
Mohammad O. Jazil.