**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:24-cv-21983-Grant-Becerra-Ruiz/Torres

CUBANOS PA'LANTE, *et al.*,

    Plaintiffs,

v.

FLORIDA HOUSE OF REPRESENTATIVES
and CORD BYRD, in his official capacity as
Florida Secretary of State,

    Defendants.

_____/

**DEFENDANT FLORIDA HOUSE OF REPRESENTATIVES'**
**MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendant, the Florida House of Representatives, respectfully moves to dismiss Plaintiffs' First Amended Complaint (ECF No. 31) in part.

**INTRODUCTION**

Two years after the Florida Legislature enacted new congressional and state-legislative districts for the State, Plaintiffs bring this action to strip Hispanic voters of their constitutional rights under the Fair Districts Amendments to the Florida Constitution. After choosing not to participate in the Florida Supreme Court's constitutionally mandated review of the newly enacted state-legislative districts, *see* Fla. Const. art. III, § 16(c), Plaintiffs ask this Court to declare that the non-diminishment provision of the Fair Districts Amendments does not protect, but excludes Hispanic voters, ECF No. 31 ¶¶ 13–17, 194–218—despite the Florida Supreme Court's consistent, contrary application of the Florida Constitution.[1]

---

[1] Patterned after section 5 of the Voting Rights Act, *In re Senate Joint Resolution of Legis. Apportionment 1176*, 83 So. 3d 597, 623–25 (Fla. 2012), the non-diminishment provision requires that districts not "diminish" minorities' "ability to elect representatives of their choice." Fla. Const. art. III, §§ 20(a), 21(a).

Plaintiffs' claims are both legally and factually flawed. Race was not the dominant and controlling rationale in the Legislature's drawing of districts in South Florida. Nor did the Legislature subordinate traditional, race-neutral districting principles to racial considerations. Instead, it meticulously balanced all applicable redistricting standards—as evidenced by the Florida Supreme Court's unanimous approval of all 160 state-legislative districts under the Fair Districts Amendments. *See In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d 1282, 1290 (Fla. 2022).[2] Indeed, not a single person filed an objection with the Florida Supreme Court to any of the new state-legislative districts—including those challenged here. *Id.* at 1285. And Plaintiffs' keystone litigation position—that the non-diminishment provision does not protect Hispanic voters—hinges on fundamental misunderstandings of the legal principles behind that provision. The challenged districts are constitutional, as the House will establish at the appropriate time.

At the pleading stage, however, the House accepts—as it must—the amended complaint's well-pleaded factual allegations. Still, for two reasons, the Court should dismiss Plaintiffs' claims, at least in part.

*First*, the essence of a racial-gerrymandering claim is that the State separated voters of different races into different districts.[3] Here, Plaintiffs do not allege that, in drawing the State House districts, the Legislature placed Hispanic voters in some districts and non-Hispanic voters in other districts. At most, Plaintiffs take issue with how the Legislature configured districts within a predominantly Hispanic area of the State. Plaintiffs object that the challenged districts are majority Hispanic, but 69 percent of Miami-Dade County's total population is Hispanic. Plaintiffs do not plausibly allege the race-based segregation of voters into separate districts—or political apartheid—that characterizes racial-gerrymandering claims.

---

[2] All other challenges to Florida's new districts have also been rejected. *See Common Cause Fla. v. Byrd*, No. 4:22-cv-00109, 2024 WL 1308119 (N.D. Fla. Mar. 27, 2024) (three-judge court); *Sec'y of State Byrd v. Black Voters Matter Capacity Bldg. Inst., Inc.*, 375 So. 3d 335 (Fla. 1st DCA 2023), *rev. granted*, No. SC2023-1671, 2024 WL 370045 (Fla. Jan. 24, 2024).

[3] The House refers to "race" for simplicity, even though "Hispanic" is an ethnicity rather than a race.

*Second*, Plaintiffs do not plausibly allege that the Legislature elevated race above traditional, race-neutral districting principles when it drew HDs 112 and 113.[4] Plaintiffs cite statements in the legislative record indicating that the Legislature intentionally drew HDs 112 and 113 as majority-Hispanic districts. But as the Supreme Court has made clear, the mere fact that a legislature considers race and intentionally draws a majority-minority district does not establish that race predominated and that traditional, race-neutral districting principles were subordinated. And the remainder of Plaintiffs' allegations regarding HDs 112 and 113—including their allegation that the airport occupies a large, uninhabited area in HD 112—have nothing to do with race and do not raise Plaintiffs' claim to relief above the speculative level.

The Court should accordingly dismiss Plaintiffs' challenges to all seven State House districts. In the alternative, it should dismiss Plaintiffs' challenges to HDs 112 and 113.

### LEGAL STANDARD

In determining the sufficiency of a complaint, a court must first identify the elements the plaintiff must plead. *Ashcroft v. Iqbal*, 556 U.S. 662, 679–81 (2009). Next, the court must identify and disregard allegations that, as mere conclusions, formulaic recitations of the elements of a cause of action, or naked assertions devoid of factual enhancement, are not assumed to be true. *Id.* at 678–81; *accord McCullough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018). Finally, the court must decide whether the allegations that remain—the complaint's well-pleaded factual allegations—state a plausible entitlement to relief. *Iqbal*, 556 U.S. at 679–80. The plausibility standard requires more than the mere possibility of entitlement to relief; the complaint's well-pleaded factual allegations must elevate the plaintiff's entitlement to relief above the line from conceivable to the plausible. *Id.*; *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 570 (2007).

---

[4] In this motion, State House districts are designated "HD."

**ARGUMENT**

I. **PLAINTIFFS DO NOT PLAUSIBLY ALLEGE THAT THE LEGISLATURE SEPARATED VOTERS OF DIFFERENT RACES INTO DIFFERENT STATE HOUSE DISTRICTS.**

This Court should dismiss Plaintiffs' challenges to all State House districts because Plaintiffs do not allege the hallmark of a racial-gerrymandering claim: the separation of voters of different races into different districts. Plaintiffs do not allege, for example, that the Legislature packed Hispanic voters into certain districts and excluded Hispanic voters from other districts, artificially creating stark imbalances in the racial makeup of nearby districts. Rather, Plaintiffs allege that the challenged State House districts are majority Hispanic, but so is Miami-Dade County as a whole.[5] Because Plaintiffs do not allege a race-based sorting of voters, or political apartheid, their challenges to the State House districts are insufficient.

In a racial-gerrymandering case, the "plaintiff's burden is to show . . . that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller v. Johnson*, 515 U.S. 900, 916 (1995). The "essence" of a racial-gerrymandering claim "is that the State has used race as a basis for separating voters into districts." *Id.* at 911. "Just as the State may not, absent extraordinary justification, segregate citizens on the basis of race in its public parks, . . . it may not separate its citizens into different voting districts on the basis of race." *Id.* at 912. Equal protection prohibits the "race-based sorting of voters," *Cooper v. Harris*, 581 U.S. 285, 291 (2017), which "bears an uncomfortable resemblance to political apartheid," *Shaw v. Reno*, 509 U.S. 630, 647 (1993).

Thus, in *Cooper*, the Court noted that the challenged district's black population was two to three times greater than the black population in the excluded portions of the same counties. 581 U.S. at 300. And in *Bush v. Vera*, the Court explained that the challenged district's "corridors, wings, or fingers . . .

---

[5] *See* U.S. CENSUS BUREAU, QUICKFACTS, FLORIDA, https://www.census.gov/quickfacts/fact/table/miamidadecountyflorida,US. This Court may consider judicially noticeable facts at the motion-to-dismiss stage. *Baker v. City of Madison*, 67 F.4th 1268, 1276 (11th Cir. 2023). Census data are a paradigmatic example of judicially noticeable facts. *See, e.g.*, *United States v. Phillips*, 287 F.3d 1053, 1055 (11th Cir. 2002).

reach out to enclose black voters, while excluding nearby Hispanic residents." 517 U.S. 952, 973 (1996) (plurality opinion) (quoting Richard H. Pildes & Richard G. Niemi, *Expressive Harms, "Bizarre Districts," and Voting Rights: Evaluating Election-District Appearances After Shaw v. Reno*, 92 MICH. L. REV. 483, 556 (1993)). It is such "effort[s] to segregate voters into separate voting districts because of their race" that threatens to "balkanize" voters "into competing racial factions." *Shaw*, 509 U.S. at 657–58. The Supreme Court has therefore required plaintiffs to show that the legislature could have achieved "significantly greater racial balance" consistent with the legislature's race-neutral districting objectives. *Alexander v. S.C. State Conf. of NAACP*, 144 S. Ct. 1221, 1249 (2024) (quoting *Easley v. Cromartie*, 532 U.S. 234, 258 (2001)).

This focus on the differential treatment of voters of different races makes sense. After all, racial-gerrymandering claims are rooted in the Equal Protection Clause, the purpose of which is to prevent "governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992). Absent an allegation that voters of different races were separated into different districts because of race, Plaintiffs have not plausibly alleged that similarly situated voters were treated differently.

Plaintiffs make no such allegation. They do not claim that the Legislature concentrated Hispanic voters in particular districts and excluded them from other districts. They do not allege that the Legislature placed Hispanic and non-Hispanic voters into different districts in order to create "white" districts, "black" districts, and "Hispanic" districts. In fact, Plaintiffs do not allege *any* significant racial imbalances between adjacent districts. The amended complaint does not even set forth the Hispanic percentage of the population in each challenged State House district—let alone in adjacent districts. Plaintiffs do not allege "racial sorting," *Bethune-Hill v. Va. State Bd. of Elec.*, 580 U.S. 178, 187 (2017), "political apartheid," *Shaw*, 509 U.S. at 649, or a significant lack of "racial balance" between districts, *Easley*, 532 U.S. at 258.

At most, Plaintiffs allege that the challenged districts are majority Hispanic. *See, e.g.*, ECF No. 31 ¶ 49. But that should be no surprise: 69.1 percent of Miami-Dade County's population is Hispanic, while

5

only 13.9 percent is non-Hispanic, single-race white.[6] Plaintiffs do not allege that the Hispanic majorities in the challenged districts are excessive or materially different from the racial composition of neighboring districts. Nor do Plaintiffs allege that it would have been possible to draw the challenged districts *without* Hispanic majorities, given the county's supermajority Hispanic population. Indeed, the Florida Supreme Court has recognized that the "high percentages" of Hispanic residents in Miami-Dade County's State House districts are "attributable to the dense concentration of Hispanic voters in Miami-Dade County, not to impermissible line-drawing." *In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d 1282, 1289 (Fla. 2022) (citing *In re Senate Joint Resol. of Legis. Apportionment 1176*, 83 So. 3d 597, 645 (Fla. 2012)).

What Plaintiffs object to is not racial sorting, or an artificial imbalance in the racial makeup of nearby districts, or the segregation of voters of different races into different districts. Instead, Plaintiffs quarrel with the Legislature's chosen configuration of State House districts within Miami-Dade County's large, predominantly Hispanic population. Because Plaintiffs do not plausibly allege a race-based sorting of voters, their amended complaint fails to plead an equal-protection claim against the challenged State House districts.

## II. PLAINTIFFS DO NOT PLAUSIBLY ALLEGE THAT RACE WAS THE LEGISLATURE'S PREDOMINANT MOTIVE IN DRAWING HDs 112 AND 113.

Plaintiffs fail to plausibly allege that race was the Legislature's predominant motive in drawing HDs 112 and 113. Plaintiffs rely chiefly on statements in the legislative record indicating that, in drawing those districts, the Legislature sought to comply with the Florida Constitution's non-diminishment provision. ECF No. 31 ¶¶ 55, 57, 62, 66, 69, 70. But the fact that a legislature intentionally draws a majority-minority district—or intentionally draws a district to comply with voting-rights requirements such as the non-diminishment provision—does not, without more, establish that the legislature elevated race above

---

[6] *See* U.S. CENSUS BUREAU, QUICKFACTS, FLORIDA, https://www.census.gov/quickfacts/fact/table/miamidadecountyflorida,US.

race-neutral districting principles and made race its "dominant and controlling rationale." *Miller*, 515 U.S. at 913.

### A. The Intentional Creation of a Majority-Minority District Does Not, By Itself, Establish Racial Predominance.

To plead racial gerrymandering, a plaintiff must plausibly allege that race was the "predominant" motive in drawing districts. *Id.* at 916. This burden is a "demanding one." *Easley*, 532 U.S. at 241 (quoting *Miller*, 515 U.S. at 928 (O'Connor, J., concurring)). It is not enough to allege that the legislature was "aware of racial demographics," *Miller*, 515 U.S. at 916, or that race was *one* of the legislature's motives, *Easley*, 532 U.S. at 241. A plaintiff must do more than allege that race was "*a* motivation for the drawing of a majority-minority district," *id.* (quoting *Vera*, 517 U.S. at 959 (plurality opinion)) (emphasis in *Vera*), or "a mere factor in the State's redistricting calculus," *Alexander*, 144 S. Ct. at 1241 n.6. Strict scrutiny applies only if "race played a *predominant* role comparatively speaking." *Easley*, 532 U.S. at 253 (emphasis in original).

For example, in *Vera*, the plaintiffs challenged three Texas congressional districts as racial gerrymanders. Texas conceded that one of its "goals in creating the three districts at issue was to produce majority-minority districts," but that did not end the predominance inquiry. 517 U.S. at 959 (plurality opinion). The Court explained that strict scrutiny does not apply "to all cases of intentional creation of majority-minority districts" and that, in a "mixed motive" case, a "careful review is . . . necessary" to determine whether race predominated and therefore whether strict scrutiny applies. *Id.* at 958–59 (plurality opinion). While the Court found racial predominance in *Vera*, it emphasized that Texas' decision to create majority-minority districts was only "one of several essential ingredients" and was neither "objectionable in and of itself" nor "independently sufficient to require strict scrutiny." *Id.* at 962 (plurality opinion).

In *Vera*, the Court cited *DeWitt v. Wilson*, 856 F. Supp. 1409 (E.D. Cal. 1994), for the proposition that the intentional creation of a majority-minority district does not, standing alone, demonstrate racial

7

predominance and trigger strict scrutiny. 517 U.S. at 958 (plurality opinion). In *DeWitt*, the plaintiffs claimed that districts drawn by three special masters were racial gerrymanders. The court concluded that although the special masters drew districts to comply with the Voting Rights Act, they engaged in a "judicious and proper balancing" of multiple redistricting criteria, "carefully analyzed and reconciled" the requirements of the Voting Rights Act and the State Constitution, and "showed depth and insight in considering race as a component of traditional redistricting principles." 856 F. Supp. at 1413–15. Because the special masters balanced race with race-neutral criteria, "strict scrutiny [was] not required." *Id.* at 1415.

More recently, in *Allen v. Milligan*, 599 U.S. 1 (2023), the plaintiffs alleged that section 2 of the Voting Rights Act required Alabama to create a second majority-black congressional district. *Id.* at 19–20. When the plaintiffs' expert produced alternative maps to show "that an additional majority-minority district could [have been] drawn," *id.* at 33, Alabama argued that the alternative maps were racial gerrymanders and should be disregarded, *id.* at 30. The plaintiffs' expert testified, however, that, "while it was necessary for him to consider race, he also took several other factors into account" and gave all factors "equal weighting." *Id.* at 31 (emphasis omitted). On that basis, the Supreme Court held that, even though the alternative maps were intentionally drawn to create a second majority-black district and to comply with the Voting Rights Act, "race did not predominate" in the assignment of voters to districts. *Id.* at 32.

### B. Plaintiffs' Allegations of Racial Predominance Fall Short—and Fail to Overcome the Presumption of Legislative Good Faith.

Here too, while Plaintiffs allege that race was a motivation in the creation of HDs 112 and 113, their well-pleaded allegations do not plausibly show that the Legislature elevated race to a predominant position. As to HDs 112 and 113, the statements of legislators and legislative staff referenced by Plaintiffs make the following points: (a) the predecessor districts were majority-Hispanic districts protected by the Florida Constitution's non-diminishment provision; (b) the new districts preserve the ability of

8

Hispanic voters to elect the candidates of their choice; (c) the Hispanic percentages in the new districts are similar to those in the predecessor districts; and (d) legislative staff performed a "functional analysis" to ensure compliance with Florida's non-diminishment provision. ECF No. 31 ¶¶ 55, 57, 62, 66, 69, 70.[7]

None of these statements plausibly shows that the Legislature prioritized race and subordinated race-neutral considerations—or failed to balance and harmonize all applicable redistricting standards. At most, these statements show that *one* of the Legislature's motives was to draw majority-Hispanic districts in compliance with the Florida Constitution's voting-rights requirements. But that showing is insufficient to plausibly allege racial predominance. Just as the deliberate creation of majority-minority districts under the Voting Rights Act was insufficient on its own to show that race predominated in *Allen*, *Vera*, and *DeWitt*, the Legislature's deliberate preservation of HDs 112 and 113 as majority-Hispanic districts does not plausibly show that race outranked traditional, race-neutral districting principles. Simply put, the statements in the legislative record are consistent with a proper consideration of race in redistricting, and Plaintiffs' allegations do not raise the "right to relief above the speculative level." *Twombley*, 550 U.S. at 555.

Plaintiffs' pleading burden is especially heavy. In a racial-gerrymandering case, which entails an inquiry into the legislature's motives, courts exercise "extraordinary caution," *Miller*, 515 U.S. at 916, and begin with a "presumption that the legislature acted in good faith," *Alexander*, 144 S. Ct. at 1233. That presumption applies at *all* stages of the litigation. *Miller*, 515 U.S. at 916–17 (citing Rule 12(b) and explaining that the "presumption of good faith" applies "at the various stages of litigation"). The presumption "reflects the Federal Judiciary's due respect for the judgment of state legislators, who are similarly

---

[7] A functional analysis is a review of election and population data to assess the voting strength of a district's racial or language minorities. This analysis is performed to ensure that the ability of racial or language minorities to elect representatives of their choice is not diminished. The Florida Supreme Court first described the functional analysis in *In re Senate Joint Resolution of Legislative Apportionment 1176*, 83 So. 3d at 625–26, and illustrated the functional analysis as applied to particular districts, *see, e.g., id.* at 668.

bound by an oath to follow the Constitution." *Alexander*, 144 S. Ct. at 1236. Of particular relevance here, it reflects a disposition to "be wary of plaintiffs who seek to transform federal courts into weapons of political warfare that will deliver victories that eluded them in the political arena." *Id.* (internal marks omitted).

In assessing racial-gerrymandering claims, therefore, courts are mindful that federal-court review of redistricting plans "represents a serious intrusion on the most vital of local functions." *Miller*, 515 U.S. at 915. After all, redistricting is a "most difficult subject"—a subject that presents a "complex interplay of forces" and demands the "political judgment" needed to "balance competing interests." *Id.* at 915–16. It requires legislatures to run a "legal obstacle course," *Abbott v. Perez*, 585 U.S. 579, 587 (2018), and to navigate "delicately balanced requirements regarding the consideration of race," *id.* at 585, which often pull in opposite directions, *id.* at 586 (explaining that, while equal protection limits the consideration of race, the Voting Rights Act "often insists that districts be created precisely because of race"). Thus, a redistricting plan that places voters of one race into one district "may reflect wholly legitimate purposes." *Shaw*, 509 U.S. at 646.

Against these background principles, the amended complaint falls woefully short of plausibly alleging that race predominated in the Legislature's assignment of voters to HDs 112 and 113. The allegation that the Legislature intentionally drew HDs 112 and 113 as majority-Hispanic districts "stops short of the line between possibility and plausibility of entitlement to relief," *Iqbal*, 556 U.S. at 678 (internal marks omitted), and fails to overcome the presumption that the Legislature acted in good faith.

### C. Plaintiffs' Additional Allegations Regarding HDs 112 and 113 Do Not Elevate Their Right to Relief Above the Speculative Level.

Plaintiffs attempt to bolster their predominance allegations with a few irrelevant observations about HDs 112 and 113. ECF No. 31 ¶¶ 92–95. None of these allegations "nudge[s] their claims across the line from conceivable to plausible." *Twombley*, 550 U.S. at 570.

*First*, Plaintiffs note that HD 112 includes population on both sides of the uninhabited Miami International Airport and the adjacent industrial zone. ECF No. 31 ¶ 94. But the airport and the industrial zone must go somewhere, and Plaintiffs fail to allege that their location in HD 112 has anything to do with race. Nor do Plaintiffs cite any race-neutral districting criteria that prohibit uninhabited areas—such as airports, industrial zones, business districts, lakes, parks, stadiums, golf courses, and conservation areas—from being placed centrally within a district, as in HD 112. *Cf. In re Constitutionality of House Joint Resol. 1987*, 817 So. 2d 819, 828 (Fla. 2002) (concluding that a district with Lake Okeechobee in the middle and land on both sides was "contiguous" under Florida's Constitution). Plaintiffs cannot plead a racial-gerrymandering claim by alleging the violation of a non-existent redistricting principle. The airport's location within HD 112 does not come close to showing that the Legislature "subordinated *traditional* race-neutral districting principles" to racial considerations. *Miller*, 515 U.S. at 916 (emphasis added).

*Second*, Plaintiffs allege that the City of Miami is split among five State House districts—including HDs 112 and 113—and that it was mathematically possible to split Miami fewer ways. ECF No. 31 ¶ 95.[8] But Plaintiffs do not allege that Miami's division into five districts had *anything* to do with race. They do not allege that HDs 112 and 113 meander into Miami to capture pockets of Hispanic voters. *See Miller*, 515 U.S. at 916 ("The plaintiff's burden is to show . . . that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district."). Without some allegation that the decision to divide Miami into "more parts than necessary" was racially motivated, ECF No. 31 ¶ 95, Plaintiffs have not alleged that the Legislature "subordinated

---

[8] According to last decennial census, Florida's population in 2020 was 21,538,187 people. U.S. CENSUS BUREAU, QUICKFACTS, FLORIDA, https://www.census.gov/quickfacts/fact/table/florida. The target population for each State House district was therefore 179,485 people (21,538,187 people ÷ 120 districts). Since Miami's population was 442,241 people, U.S. CENSUS BUREAU, QUICKFACTS, FLORIDA, https://www.census.gov/quickfacts/fact/table/miamicityflorida, Miami had to be split among at least three districts.

11

traditional race-neutral districting principles . . . *to racial considerations*," *Miller*, 515 U.S. at 916 (emphasis added).

An "obvious alternative explanation" accounts for the split of Miami and renders Plaintiffs' racial-predominance allegations is implausible. *See Iqbal*, 556 U.S. at 678 (quoting *Twombley*, 550 U.S. at 567). It is a truism that "crafting a plan consistent with traditional districting criteria requires accepting certain tradeoffs among priorities," *Bethune-Hill v. Va. State Bd. of Elections*, 368 F. Supp. 3d 872, 879 (E.D. Va. 2019); *see also In re Senate Joint Resol. of Legis. Apportionment 2-B*, 89 So. 3d 872, 888 (Fla. 2012) (noting "trade-offs" made by various maps), and that legislatures must always "balance" competing objectives, *In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d at 1286. For example, a decision to keep irregularly shaped municipalities "intact" can decrease a district's compactness. *In re Senate Joint Resol. of Legis. Apportionment 1176*, 83 So. 3d at 635–36. No redistricting plan can achieve perfection, and a court's role is not to conduct "endless beauty contests," *Vera*, 517 U.S. at 977 (plurality opinion) (internal marks omitted), and "select the best plan," *In re Senate Joint Resol. of Legis. Apportionment 1176*, 83 So. 3d at 608. Thus, even if Plaintiffs have identified one of the many race-neutral trade-offs in any redistricting plan, they have not plausibly alleged that, in drawing HDs 112 and 113, the Legislature sacrificed race-neutral districting principles *to race*.

*Third*, Plaintiffs allege that, according to mathematical measures of compactness, HDs 112 and 113 rank between the 22nd and 38th percentiles of all districts in the State House map. ECF No. 31 ¶¶ 94–95. But the Florida Supreme Court has already reviewed the State House districts under Florida's redistricting standards—including compactness—and found all 120 districts to be constitutionally valid. *In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d at 1285, 1287. The Court did not invalidate any district on compactness grounds—including districts that are *less* compact than HDs 112 and 113. Importantly, Plaintiffs sat out that proceeding and did not argue that HDs 112 and 113 are non-compact.

Plaintiffs' allegation that HDs 112 and 113 rank between the 22nd and 38th percentiles simply means that HDs 112 and 113 are *more compact* than 22 to 38 percent of all State House districts in Florida—in other words, that HDs 112 and 113 are more compact than 26 to 46 of the 120 districts that the Florida Supreme Court upheld. That allegation does not even suggest that, in drawing HDs 112 and 113, the Legislature subordinated traditional, race-neutral districting principles to *anything*—let alone race. Indeed, the Florida Supreme Court has explained some of the reasons—including the irregular shapes of the State and of its counties and municipalities, or a decision to follow geographical boundaries such as rivers, railways, interstates, and state roads—why districts cannot in all instances "achieve the highest mathematical compactness scores." *In re Senate Joint Resol. of Legis. Apportionment 1176*, 83 So. 3d at 635–36.

In fact, any reliance on *relative* measures of compactness, such as percentiles, is inherently flawed. In *every* district map, one district is the least compact, and all districts can be placed on a continuum from the most compact to the least compact. That does not mean that any district in the map is non-compact, or that the Legislature neglected traditional, race-neutral districting principles in drawing a single district.

Notably, Plaintiffs do not allege that HDs 112 and 113 contain bizarre features such as fingers or tendrils that string together far-flung, disparate minority communities. Nor do they allege that HDs 112 and 113 resemble Rorschach blots or snake through multiple counties in search of minority enclaves. HDs 112 and 113 bear no likeness, for example, to the three congressional districts challenged in *Vera*:



13

517 U.S. at 986 apps. A–C. Nor do they resemble the sprawling 1992 congressional district that wound through 14 counties in Florida and narrowed in places to 50 yards to combine black communities across half the State:



*Johnson v. Mortham*, 915 F. Supp. 1529, 1550, 1554 app. A (N.D. Fla. 1995); *see also Miller*, 515 U.S. at 908 (analyzing a district that stretched hundreds of miles across rural counties and narrow swamp corridors while splitting eight counties and five municipalities from Atlanta to the Atlantic Ocean). HDs 112 and 113 contain none of these visually non-compact features. Plaintiffs' reliance on relative compactness scores to show that HDs 112 and 113 are less compact than *some* districts—in a map the Florida Supreme Court upheld in its entirety—is insufficient to plausibly allege that traditional, race-neutral districting principles were subordinated to race.

The amended complaint therefore fails to plausibly allege that, in drawing HDs 112 and 113, the Legislature elevated race to a predominant position and subordinated traditional, race-neutral districting principles. The amended complaint's allegations are consistent with an appropriate consideration of race

14

in redistricting. Plaintiffs fail therefore to raise their entitlement to relief above the possible, conceivable, or speculative level—or to overcome the presumption of good faith to which the Legislature is entitled even at the motion-to-dismiss stage. Because Plaintiffs have not plausibly alleged that race predominated in the assignment of voters to HDs 112 and 113, this Court should dismiss Plaintiffs' challenges to those districts.

## CONCLUSION

The Court should accordingly dismiss Plaintiffs' challenges to all seven State House districts. In the alternative, it should dismiss Plaintiffs' challenges to HDs 112 and 113.

Dated July 9, 2024.                                       Respectfully submitted,

*/s/ Andy Bardos*
Andy Bardos (FBN 822671)
andy.bardos@gray-robinson.com
GRAYROBINSON, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32301-1724
Telephone: 850-577-9090
*Attorneys for Defendant, Florida House of Representatives*