IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 1:24-cv-21983-JB

CUBANOS PA'LANTE, *et al.*,

    *Plaintiffs*,

v.

FLORIDA HOUSE OF
REPRESENTATIVES, et al.,

    *Defendants*.

_____/

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT SECRETARY OF STATE'S SECOND MOTION TO DISMISS
PLAINTIFFS' FIRST AMENDED COMPLAINT**

The Florida Legislature violated the Fourteenth Amendment to the Constitution by drawing three congressional districts and seven State House Districts using race as the predominant factor in a manner not narrowly tailored to comply with any compelling government interest. In his Motion to Dismiss (ECF No. 32) ("Motion"), Defendant Secretary of State Cord Byrd ("the Secretary") mischaracterizes the nature of Plaintiffs' claims and pleading burden and ignores Plaintiffs' well-pleaded direct and circumstantial evidence of racial gerrymandering in South Florida during the 2021–2022 redistricting process. The Court should deny the Motion.

**FACTUAL AND PROCEDURAL BACKGROUND**

In 2022, the Florida Legislature adopted Plan H000H8013 to redraw Florida's State House districts and Plan P000C0109 to redraw Florida's congressional districts. First Amended Complaint ("Amended Complaint" or "FAC"), ECF No. 31 ¶¶ 2, 3. In adopting these plans, the Florida Legislature fell far short of the Fourteenth Amendment's exacting standard for three congressional and seven State House districts in South Florida. Plaintiffs—three individual residents of South Florida and three community membership organizations—challenge Congressional Districts ("CDs") 26, 27, and 28 (the "Challenged Congressional Districts"); and State House Districts ("HDs") 112, 113, 114, 115, 116, 118, and 119 (the "Challenged House Districts") (collectively, the "Challenged Districts") as racially gerrymandered in violation of the Fourteenth Amendment. *Id.* ¶ 4.

In developing the Challenged Districts, the Legislature strived to preserve them as "'Tier

1

One-protected'[1] majority-minority Hispanic districts," FAC ¶¶ 48, 96, and drew them "based on race" because the Legislature understood them to be "protected," FAC ¶ 8. The Challenged Districts also exhibit telltale signs of racial predominance in the ways in which they deviate from traditional redistricting criteria: transgressing major geographic boundaries like the Everglades, unnecessarily splitting political subdivisions like the City of Miami and Collier County, and forming noncompact shapes. *Id.* ¶ 5; *see also id.* ¶¶ 6, 7 (depicting the Challenged Districts). But the Legislature had no basis for concluding that it *needed* to draw the districts "based on race" to comply with "Tier One." In crafting the Challenged Districts, the Legislature ignored the diversity of the Hispanic community and falsely assumed that Hispanic voters in South Florida were politically homogenous and monolithic. *Id.* ¶ 16. Furthermore, the Legislature ignored that Florida's white majority did not usually vote in bloc to defeat Hispanic voters' preferred candidates. *Id.* ¶ 197.

On May 23, 2024, Plaintiffs commenced this lawsuit. ECF No. 1. On June 13, 2024, Defendant Florida House of Representatives filed a motion to dismiss for lack of jurisdiction. ECF No. 25. Defendant Secretary of State filed a separate motion to dismiss the same day. ECF Nos. 27. In response to the House's motion, Plaintiffs amended their complaint on June 25, 2024. ECF No. 31. Both Defendants separately filed second motions to dismiss on July 9, 2024. ECF Nos. 32, 33. Plaintiffs respond to the Secretary's Motion in this Opposition.

## STANDARD OF REVIEW

To overcome a Rule 12(b)(6) motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The complaint "need not contain 'detailed factual allegations'"; the allegations need only "'raise a right to relief above the speculative level.'" *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1244 (11th Cir. 2016) (quoting *Twombly*, 550 U.S. at 555).

"Asking for plausible grounds . . . does not impose a probability requirement at the

---

[1] "Tier One" is a shorthand reference to the legislative and congressional redistricting requirements contained in the Florida Constitution's Fair Districts Amendments, Fla. Const. Art. III, §§ 20(a), 21(a), which incorporate the minority vote-dilution and retrogression standards from Sections 2 and 5 of the federal Voting Rights Act ("VRA"). FAC ¶¶ 43, 47.

pleading stage," and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (cleaned up). In ruling on a Rule 12(b)(6) motion, the Court "take[s] the factual allegations in the complaint as true and construe[s] them in the light most favorable to the plaintiffs." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010).

## ARGUMENT

I. **Plaintiffs state a claim for unconstitutional racial gerrymandering.**

"The Equal Protection Clause of the Fourteenth Amendment limits racial gerrymanders in legislative redistricting plans [and] prevents a State, in the absence of 'sufficient justification,' from 'separating its citizens into different voting districts on the basis of race.'" *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (quoting *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017)) (alteration omitted). Courts apply a two-step analysis when assessing racial gerrymandering claims. First, a plaintiff must allege that race was the "predominant factor" motivating district line drawing. *Id.* (citing *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). Second, if race *was* the predominant factor motivating a district's design, the defendant must satisfy strict scrutiny by proving that its use of race "serves a 'compelling interest' and is 'narrowly tailored' to that end." *Id.* at 292 (quoting *Bethune-Hill*, 580 U.S. at 193).

At the pleading stage, Plaintiffs need only plausibly allege that the state subordinated other factors to racial considerations. *See GRACE, Inc. v. City of Miami* (*GRACE II*), --- F. Supp. 3d ---, No. 1:22-cv-24066-KMM, 2023 WL 7980153, at *13 (S.D. Fla. Nov. 17, 2023) (citing *Cooper*, 581 U.S. at 291). A plaintiff may prove that race predominated "either through circumstantial evidence of a district's shape and demographics or [through] more direct evidence going to legislative purpose." *Miller*, 515 U.S. at 916. "Direct evidence often comes in the form of a relevant state actor's express acknowledgment that race played a role in the drawing of district lines," for instance by "admit[ting] to considering race for the purpose of satisfying . . . the Voting Rights Act of 1965." *Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1234 (2024).

Here, Plaintiffs extensively allege both circumstantial and direct evidence that race predominated when the Legislature drew the Challenged House Districts.

3

### A. The Secretary mischaracterizes the nature of Plaintiffs' claims and pleading burden.

As a threshold matter, the Secretary mischaracterizes the nature of Plaintiffs' claims and their pleading burden. Plaintiffs raise racial-gerrymandering claims, *not* vote-dilution or other types of discriminatory-intent claims like the plaintiffs in *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977), *League of Women Voters of Florida Inc. v. Florida Secretary of State*, 66 F.4th 905 (11th Cir. 2023), and many of the other cases the Secretary invokes. And unlike the plaintiffs in *Alexander v. South Carolina State Conference of the NAACP*, Plaintiffs are not relying solely on circumstantial evidence or facing a partisan-gerrymandering defense in this case. The Secretary's reliance on these cases is misplaced.

*First*, the Secretary gets off on the wrong foot by faulting Plaintiffs for not citing the *Arlington Heights* factors in the Amended Complaint. Mot. at 4. But the *Arlington Heights* framework is only necessary in *vote-dilution* claims, *Hunt v. Cromartie*, 526 U.S. 541, 546 n.2 (1999); *Abbott v. Perez*, 585 U.S. 579, 603–07 (2018), and this is a *racial-gerrymandering* case.[2] Racial-gerrymandering claims are "analytically distinct" from vote-dilution claims and require a "different analysis." *See Shaw v. Reno* (*Shaw I*), 509 U.S. 630, 650, 652 (1993); *cf. Common Cause Fla. v. Byrd*, --- F. Supp. 3d ---, 2024 WL 1308119, at *2 (N.D. Fla. Mar. 27, 2024) ("The parties also agree that the proper legal framework to evaluate the plaintiffs' claims is set out in *Village of Arlington Heights* . . . . Both sides disavow that this is a constitutional racial gerrymandering case under *Shaw v. Reno*[.]" (quotation omitted)).

"[A] vote dilution claim alleges that the State has enacted a particular voting scheme as a purposeful device to minimize or cancel out the voting potential of racial or ethnic minorities. But the essence of the equal protection claim . . . is that the State has used race as a basis for separating

---

[2] Courts sometimes use the *Arlington Heights* factors as an analytical tool to evaluate circumstantial evidence or to "supplement[] [their] finding" about racial predominance, but that analysis is always supplementary to a review of the direct and circumstantial evidence of racial gerrymandering. *See GRACE, Inc. v. City of Miami* (*GRACE III*), --- F. Supp. 3d ---, No. 1:22-cv-24066-KMM, 2024 WL 1563066, at *4 (S.D. Fla. Apr. 10, 2024) ("In instances where there is an absence of direct evidence that single-member districts were drawn with race as the predominant consideration, courts may determine legislative intent through an examination of the *Arlington Heights* evidentiary factors," in addition to the traditional, redistricting-specific "types of circumstantial evidence" that "strongly suggest racial predominance." (cleaned up)).

voters into districts." *Nord Hodges v. Passidomo*, No. 8:24-cv-879-CEH-UAM, 2024 WL 2155684, at *2 (M.D. Fla. May 14, 2024) (internal citations omitted). This distinction is critically important because "the alleged harm in a vote-dilution claim is the electoral disadvantage resulting from a particular district configuration. But the alleged harm in a racial-gerrymandering claim is the racial classification itself." *Id.* Unlike in racial-gerrymandering cases—in which courts focus on whether race was a *predominant* motive—courts in vote-dilution cases focus on whether "discriminatory purpose was a motivating factor" in the adoption of a map. *Common Cause Fla.*, 2024 WL 1308119, at *27. The discriminatory-purpose showing in vote-dilution cases "implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Id.* at *26 (quoting *Fusilier v. Landry*, 963 F.3d 447, 463 (5th Cir. 2020)).

The Secretary cites a host of vote-dilution and other discriminatory-intent cases that ask whether the evidence reflected "the actions of a legislative body infected with racial animus," *id.* at *31, without acknowledging these key distinctions. *See* Mot. at 4 (citing *League of Women Voters*, 66 F.4th at 930 (noting "district court never stated that it found direct evidence of racial animus"); *Common Cause Fla.*, 2024 WL 1308119, at *2, 32 (finding after bench trial that "decision to give up the fight for preserving a Black-performing district in North Florida . . . did not amount to ratification of racial animus" and therefore "the plaintiffs' vote dilution claims fail," and noting "[b]oth sides disavow that this is a constitutional racial gerrymandering case under *Shaw v. Reno*"); *cf. Jacksonville Branch of NAACP v. City of Jacksonville* (*Jacksonville I*), 635 F. Supp. 3d 1229, 1281–82 (M.D. Fla. 2022) (finding testimony that focused on voter dilution in relation to VRA compliance "[did] not address the relevant question in this case—whether race predominated the drawing of the Challenged Districts").

The Secretary also repeatedly invokes *Alexander* to emphasize the "presumption of good faith" and an asserted alternative-map requirement. But *Alexander* is distinguishable for multiple reasons. For one, the "presumption of good faith" is nothing new and does not impose an insurmountable barrier to adequately pleading or proving a racial-gerrymandering claim. *See, e.g.*, *GRACE III*, 2024 WL 1563066, at *34 ("Though the Court presumes the good faith of the Commission, Plaintiffs have met their demanding burden of proving that race predominated in the 2021–2022 redistricting cycle."); *Singleton v. Allen*, --- F. Supp. 3d ---, Nos. 2:21-cv-01291-AMM, 2:21-cv-01530-AMM, 2024 WL 3384840, at *7 (N.D. Ala. July 11, 2024) ("Although the

legislature enjoys a good faith presumption that its map was driven by non-racial goals, the facts pleaded by the Singleton Plaintiffs asserting that racial concerns propelled the development of the Alabama map are enough at the motion-to-dismiss stage to overcome this good faith presumption."). The Secretary cites *League of Women Voters* for the proposition that the Court should not "'read' [legislators' statements] 'to demonstrate discriminatory intent' and then impute that intent to 'the state legislature.'" Mot. at 5 (quoting 32 F.4th at 1373–74). But *League of Women Voters* is a *discriminatory-intent case*, 66 F.4th at 942; "discriminatory intent" or "racial animus" is not an element of a racial gerrymandering claim; and courts routinely discern racial gerrymandering based on legislators' admissions that they drew lines based on race. *See, e.g.*, *Jacksonville Branch of NAACP v. City of Jacksonville* (*Jacksonville II*), No. 22-13544, 2022 WL 16754389, at *4 (11th Cir. Nov. 7, 2022) (finding "relevant, contemporaneous statements of key legislators are to be assessed when determining whether racial considerations predominated in redistricting processes"); *GRACE III*, 2024 WL 1563066, at *34 (finding racial considerations predominated where "Commissioners repeatedly instructed [mapmaker] to design a map containing three majority Hispanic, one majority Black, and one plurality 'Anglo' district").

    As to the asserted alternative-map "requirement": to the extent it even exists, the Secretary cannot point to a single case holding that plaintiffs in racial-gerrymandering cases must satisfy it at the pleading stage. And *Alexander* makes very clear that it would only apply when (1) a plaintiff relies solely on circumstantial evidence and (2) the state raises a partisan-gerrymandering defense. In *Alexander*, the district court held that South Carolina racially gerrymandered a congressional district, but the Supreme Court reversed and faulted the district court for "inferring bad faith based on the racial effects of a political gerrymander in a jurisdiction in which race and partisan preference [we]re very closely correlated." 144 S. Ct. 1221 at 1240–42. The plaintiffs relied entirely on "very weak" circumstantial evidence from various experts and "provided no direct evidence of a racial gerrymander[.]" *Id.* at 1240. The Court noted that not only is "[p]roving racial predominance with circumstantial evidence alone . . . much more difficult" than relying on direct evidence, "[a] circumstantial-evidence-only case is especially difficult when the State raises a partisan-gerrymandering defense[,]" as South Carolina did. *Id*. at 1234–35. The Court then criticized the district court for "failing to draw an adverse inference against the Challengers for not providing a substitute map" because "an alternative map of this sort can go a long way toward helping plaintiffs disentangle race and politics." *Id.* at 1249. "[W]hen all plaintiffs can muster is meager direct evidence

6

of a racial gerrymander," the Court explained, "only an alternative map of that kind can carry the day." *Id.* (cleaned up).

This case is squarely outside *Alexander*'s ambit. As discussed in more detail below, Plaintiffs have alleged direct evidence of racial predominance. And Plaintiffs do not expect Defendants to raise a partisan-gerrymandering defense for a straightforward reason: the Florida Constitution *prohibits* partisan gerrymandering. *See* Fla. Const. Art. III, §§ 20(a), 21(a). If the good faith of the Legislature is to be presumed, Plaintiffs can hardly be faulted for not preemptively rebutting a defense that the Legislature violated the Florida, rather than the federal, Constitution. In addition, as Plaintiffs alleged in detail in the Amended Complaint, race and partisan preferences are *not highly correlated* in the Challenged Districts, because Hispanic voters are *not* politically cohesive and white voters do *not* vote in bloc against their preferred candidates. FAC ¶¶ 194–201; *see Alexander*, 144 S. Ct. at 1241 (calling for "particular care when the defense contends that the driving force in its critical districting decisions (namely, partisanship) was a factor that is closely correlated with race").

And in any event, nothing in *Alexander* suggests plaintiffs must present alternative maps *at the pleading stage*.³ If anything, an alternative map is an evidentiary tool to be used at trial, *not* a pleading requirement. *See Alexander*, 144 S. Ct. at 1245, 1251 (faulting plaintiffs for their lack of "explan[ation of] why, if such a map can be created, the [plaintiffs'] experts did not produce one *during the trial*," because the plaintiffs "were on notice that the State would raise a partisan-gerrymandering defense *at trial*" (emphasis added)); *cf. Cooper*, 581 U.S. at 319 ("[A] plaintiff will sometimes need an alternative map, as a practical matter, to make his case. But in no area of our equal protection law have we forced plaintiffs to submit one particular form of proof to prevail. . . . An alternative map is merely an evidentiary tool to show that such a substantive violation has occurred; neither its presence nor its absence can itself resolve a racial gerrymandering claim.").

---

³ Defendants' puzzling reference to alternative maps submitted to the Legislature by members of the public, FAC ¶¶ 184–85, 188, fig. 14 & 15, does not change this evidentiary standard. Plaintiffs plausibly allege that "[o]ther alternative configurations exist that better comply with race-neutral traditional redistricting principles[,]" *id.* ¶ 190, and cite to these maps to provide *additional* circumstantial evidence of racial predominance in the Challenged Districts, *id.* ¶ 191.

### B. Plaintiffs' Amended Complaint exhaustively recounts direct evidence of racial predominance.

The Amended Complaint exhaustively recounts direct evidence of racial predominance by citing "relevant, contemporaneous statements of key legislators," *Jacksonville II*, 2022 WL 16754389, at *4, including bill sponsors, committee and subcommittee chairs, and committee staff directors whom the Legislature relied upon during the map-drawing process. *See, e.g.*, FAC ¶¶ 49–169. To pull just a few of many examples that the Amended Complaint features:

- House Redistricting Committee Chair Rep. Tom Leek admitted the Legislature drew certain districts "based on race," and not in a "race-neutral" manner. *See id.* ¶¶ 10, 12.

- Then-Subcommittee Chair Rep. (now Secretary of State) Cord Byrd introduced the Challenged House Districts as "performing Hispanic districts protected by Tier One of the Florida Constitution" that were drawn "to maintain existing majority-minority districts" and repeatedly noted the "Hispanic voting-age population" in the districts. *Id.* ¶¶ 62, 66.

- When asked on the House floor why the Challenged House Districts were not compact, Chair Byrd explained that it was because the mapmakers prioritized applying the Tier One standards. *Id.* ¶¶ 83, 84.

- Chair of the Senate Committee, Sen. Ray Rodrigues stated: "We started with a blank map, pulled in the demographics, and then drew until we had a Tier One-protected district. . . . Once we highlighted the racial population, we began drawing from there. . . . Once we had assured that we were Tier One-compliant, which trumps all the other Tier Two metrics," the Senate Committee then took into consideration the Tier Two standards. *Id.* ¶¶ 120–22.

- Republican Rep. Will Robinson—a member of the House Committee and the vice chair of the House Legislative Subcommittee—confirmed that the Legislature prioritized racial considerations (i.e., Tier One) over traditional redistricting criteria in what the Legislature believed to be Tier One-protected districts, including CDs 26, 27, and 28: "I couldn't help notice yesterday there were a lot of questions about whether we elevated Tier Two standards over Tier One standards. We also heard this line of questioning in the subcommittee, and I want to say firmly that that has never been the case. Tier One always outranks Tier Two. And in my opinion, that is firmly true in this map before us."

*Id.* ¶ 154.

This direct evidence, along with the circumstantial evidence detailed below, more than suffices for Plaintiffs to plausibly allege that the Legislature subordinated traditional redistricting criteria to racial considerations—all that is required at this stage. *See GRACE II*, 2023 WL 7980153, at *10 (denying motion to dismiss because "[t]he Operative Complaint contains extensive allegations that multiple Commissioners, over the course of six public meetings, expressed their intent that Districts 1, 3 and 4 be designed such that they would remain 'Hispanic districts'"; "The notion that a racial gerrymandering claim 'may proceed based upon alleged motives and statements of legislators' is hardly a novel concept[.]"); *Singleton*, 2024 WL 3384840, at *5 (denying a motion to dismiss racial-gerrymandering claim and acknowledging that "[d]irect evidence often comes in the form of a relevant state actor's express acknowledgment that race played a role in the drawing of district lines, or it can also be smoked out over the course of litigation" (cleaned up and citation omitted)); *see also GRACE, Inc. v. City of Miami* (*GRACE I*), 674 F. Supp. 3d 1141, 1154 (S.D. Fla. 2023) ("To prove that districting decisions were made with race as the predominant factor, a plaintiff is entitled to use direct evidence of legislative intent.").

Instead of grappling with these legislators' statements head-on, the Secretary appears to suggest that Plaintiffs need to allege direct evidence that applies to *every single* legislator. Mot. at 3. That is not the standard. Courts frequently rely upon the statements of key legislators and staff (such as mapmakers) as direct evidence of gerrymandering. *See, e.g.*, *Jacksonville I*, 635 F. Supp. 3d at 1291–94 (finding the contemporary statements and actions of a key legislator "to be important evidence relevant to the question of legislative intent"); *id.* at 1291 n.65 (distinguishing cases in which courts have found statements of individual legislators not probative of overall legislative intent); *Cooper*, 581 U.S. at 299–301, 310–16 (focusing on evidence of intent of the plan's legislative "architects" and "mapmakers"); *Ala. Legis. Black Caucus v. Alabama* (*ALBC*), 575 U.S. 254, 273–74 (2015) (examining evidence of intent of "[t]he legislators in charge of creating" the plan).

The Secretary ignores these cases. Instead, he resorts to snippets from easily distinguishable, non-gerrymandering cases from later stages in litigation. *See* Mot. at 3 (citing *Brnovich v. DNC*, 594 U.S. 647, 660, 689 (2021) (assessing under § 2 of Voting Rights Act after bench trial and on appeal the Arizona Legislature's discriminatory intent in passing an early mail-in voting regulation after viewing "racially-tinged" video); *United States v. O'Brien*, 391 U.S. 367, 370, 384 (1968) ("declin[ing] to void" legislation prohibiting the knowing destruction of Selective Service

9

registration certificates "essentially on the ground that it is unwise legislation" as "Congress had the undoubted power to enact [it] and which could be reenacted in its exact form if the same or another legislator made a 'wiser' speech about it")).

### C. Plaintiffs plead extensive circumstantial evidence demonstrating that race drove the Florida Legislature's decision-making.

The Amended Complaint also contains ample circumstantial allegations that—considered independently or alongside the direct evidence cited above—make out a plausible racial-gerrymandering claim. *See* FAC ¶¶ 73–95, 153–91. Plaintiffs allege that the Challenged Districts "deviate from traditional redistricting criteria" by "transgressing major geographic boundaries like the Everglades, unnecessarily splitting political subdivisions like the City of Miami and Collier County, and forming noncompact shapes." *Id.* ¶ 5. And then Plaintiffs meticulously demonstrate these deviations with well-pleaded facts. *See id.* ¶¶ 87–95; 155–56; 170–82 (recounting the compactness scores and other deviations from traditional redistricting criteria for each of the Challenged Districts). These allegations more than suffice at the pleading stage. *See Nord Hodges*, 2024 WL 2155684, at *1 (denying motion to dismiss racial gerrymandering claim where "[p]laintiffs allege that [the challenged districts] bear standard indicia of racial gerrymandering, like having districts traverse large bodies of water, splitting political communities, and forming noncompact shapes"); *Shaw v. Hunt* (*Shaw II*), 517 U.S. 899, 905–06 (1996) (finding that a "highly irregular and geographically non-compact" shape can demonstrate the predominance of racial motivations in drawing district boundaries).

But those well-pleaded facts apparently fall short of the Secretary's exacting standards. The Secretary insists that Plaintiffs don't explain "how or why" the irregular shapes, low compactness scores, and certain features of the districts "point to race as a predominant criterion." Mot. at 4. It's unclear what type of circumstantial evidence the Secretary *would* consider to be indicative of racial gerrymandering. Ultimately the Secretary's preferences are irrelevant, because courts have recognized what the Secretary will not—that "certain types of circumstantial evidence, such as a district's shape and demographics, or the splitting of neighborhoods, strongly suggest racial predominance[.]" *GRACE III*, 2024 WL 1563066, at *4 (cleaned up and citations omitted); *see also ALBC*, 575 U.S. at 272 (listing "respect for political subdivisions or communities defined by actual shared interests" as a "traditional race-neutral districting principles"); *Covington v. North Carolina*, 316 F.R.D. 117, 145 (M.D.N.C. 2016) (splitting of neighborhoods "strongly suggests" racial

10

predominance), *aff'd*, 137 S. Ct. 2211 (2017); *Bethune-Hill v. Va. State Bd. of Elections*, 326 F. Supp. 3d 128, 148 (E.D. Va. 2018) (split subdivisions indicate racial predominance). This category of circumstantial evidence is probative of racial predominance in part because the Legislature *could* have drawn districts aligning with traditional redistricting criteria, but decided not to do so. As explained in more specific detail in Plaintiffs' Memorandum in Opposition to Defendant Florida House of Representatives' Motion to Dismiss Plaintiffs' First Amended Complaint, the Legislature's race-based decisions drove it to unnecessarily separate communities of interest (such as splitting the City of Miami into more parts than necessary) or combine disparate "communities defined by actual shared interest" (including two separate areas on either side of the Miami International Airport). *See ALBC*, 575 U.S. at 272.

In any event, "[t]he Supreme Court has held that a conflict or inconsistency between the [challenged] plan and traditional redistricting criteria [like compactness] is not a threshold requirement or mandatory precondition in order for a challenger to establish a claim of racial gerrymandering." *GRACE II*, 2023 WL 7980153, at *13 (internal quotations and citations omitted); *see also Bethune-Hill*, 580 U.S. at 189 ("Race may predominate even when a reapportionment plan respects traditional principles[.]"); *Jacksonville I*, 635 F. Supp. 3d at 1244 ("[N]either a bizarre shape, nor a conflict with traditional principles are threshold requirements or mandatory preconditions necessary for a challenger to establish a claim of racial gerrymandering.") (cleaned up and citations omitted). "That is especially true in instances where, as here, Plaintiffs are alleging both circumstantial and direct evidence of racial gerrymandering. . . . The argument that dismissal is appropriate because Plaintiffs failed to allege that some districts were not compact utterly misconstrues what Plaintiffs are required to plead." *See GRACE II*, 2023 WL 7980153, at *13.

\*   \*   \*

"Eliminating racial discrimination means eliminating all of it." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 206 (2023). "[A] racially gerrymandered districting scheme, like all laws that classify citizens on the basis of race, is constitutionally suspect[,]" *Shaw II*, 517 U.S. at 904, because "[c]lassifications of citizens solely on the basis of race 'are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality[,]'" *Shaw I*, 509 U.S. at 643 (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)). "This is true whether or not the reason for the racial classification is benign or the purpose remedial." *Shaw II*, 517 U.S. at 904–05. Plaintiffs plausibly allege that the

11

Legislature drew each of the Challenged Districts predominantly based on race, and therefore made a racial classification. And that is all that is required at this stage of the case.

## CONCLUSION

For the foregoing reasons, the Court should deny the Secretary of State's second motion to dismiss.

Respectfully submitted July 23, 2024,

 /s/ *Nicholas L.V. Warren*

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida. Inc.**
1809 Art Museum Drive, Suite 203
Jacksonville, FL 32207
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida, Inc.**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Andrew Frackman*
**O'Melveny & Myers LLP**
1301 Avenue of the Americas
17th Floor
New York, NY 10019
(212) 326-2000
afrackman@omm.com

Jorge L. Vasquez, Jr.*
Esperanza Segarra (FBN 527211)
**Vasquez Segarra LLP**
5 West 37th Street, Suite 6003
New York, NY 10018
(212) 752-8459
jorge@vsllplaw.com
esperanza@vsllplaw.com

Brian P. Quinn*
Patrick J. Jones*
Emily Murphy*
Gabrielle S. Jackson*
**O'Melveny & Myers LLP**
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300
bquinn@omm.com
pjones@omm.com
emurphy@omm.com
gjackson@omm.com

*Admitted pro hac vice*

*Counsel for Plaintiffs*