IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 1:24-cv-21983-JB

CUBANOS PA'LANTE, *et al.*,

    *Plaintiffs*,

v.

FLORIDA HOUSE OF
REPRESENTATIVES, et al.,

    *Defendants*.

_____/

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANT FLORIDA HOUSE OF REPRESENTATIVES'
MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

    Defendant Florida House of Representatives (the "House") violated the Fourteenth Amendment to the Constitution by using race as the predominant factor in enacting its district map without sufficient justification. The House did not narrowly tailor its use of race to comply with any compelling government interest. In its Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 33) ("Motion" or "Mot."), the House never comes to grips with Plaintiffs' well-pleaded allegations describing that reality. Instead, the House resorts to misstating this Court's racial-gerrymandering jurisprudence. But the House's myopic reading of the law is wrong. And the First Amended Complaint (ECF No. 31) ("Amended Complaint" or "FAC") easily clears the plausibility threshold at the motion-to-dismiss stage. The Court should deny the Motion.

**FACTUAL AND PROCEDURAL BACKGROUND**

    In 2022, the Florida Legislature adopted Plan H000H8013 to redraw the 120 districts for the Florida House of Representatives. FAC ¶ 2. In adopting this plan, the Florida Legislature fell far short of the Fourteenth Amendment's exacting standard for seven House districts in South Florida. Plaintiffs—three individual South Florida residents and three community membership organizations—challenge House Districts ("HDs") 112, 113, 114, 115, 116, 118, and 119 (collectively the "Challenged House Districts") and Congressional Districts ("CDs") 26, 27, and 28 (together with the Challenged House Districts, the "Challenged Districts") as racially gerrymandered in violation of the Fourteenth Amendment. *Id.* ¶ 4.

    In developing the Challenged House Districts, the Legislature elevated race above all other

1

considerations in a bid to preserve them as "Tier One-protected majority-minority Hispanic districts," FAC ¶ 48,[1] and drew them "based on race" because the Legislature understood them to be "protected," FAC ¶ 8. Unsurprisingly, the Challenged House Districts also exhibit telltale signs of racial predominance in the ways in which they deviate from traditional redistricting criteria: they unnecessarily split political subdivisions like the City of Miami, connect disparate communities on opposite sides of Miami International Airport, and form noncompact shapes. *Id.* ¶¶ 5, 94–95; *see also id.* ¶ 76 & fig. 7 (depicting the Challenged House Districts). But the Legislature had no basis for concluding that it needed to draw the districts "based on race" to comply with "Tier One." In crafting the Challenged House Districts, the Legislature ignored the diversity of the Hispanic community and falsely assumed that Hispanic voters in South Florida were politically homogenous and monolithic. *Id.* ¶ 16. Furthermore, the Legislature ignored that Florida's white majority did not usually vote in bloc to defeat Hispanic voters' preferred candidates. *Id.* ¶ 197. In so doing, the Legislature violated the Fourteenth Amendment to the U.S. Constitution.

On May 23, 2024, Plaintiffs filed this action. ECF No. 1. On June 13, 2024, the House filed a motion to dismiss for lack of jurisdiction, while acknowledging that "[a]t the pleading stage, . . . the House accepts, as it must, Plaintiffs' well-pleaded factual allegations." ECF No. 25 at 2. Defendant Secretary of State Cord Byrd filed a separate motion to dismiss on the same day. ECF No. 27. In response to the House's motion, Plaintiffs amended their complaint on June 25, 2024. ECF No. 31. Both Defendants each filed a second motion to dismiss on July 9, 2024. ECF Nos. 32, 33. While the Secretary moved to dismiss the First Amended Complaint in its entirety, the House moved to dismiss only Count Two, which alleges that the Challenged House Districts are unconstitutional. Mot. at 2–3, 15. Plaintiffs respond to the House's Motion in this Opposition.

## STANDARD OF REVIEW

To overcome a Rule 12(b)(6) motion to dismiss, a complaint need only "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

---

[1] "Tier One" is a shorthand reference to the legislative and congressional redistricting requirements contained in the Florida Constitution's Fair Districts Amendments, Fla. Const. Art. III, §§ 20(a), 21(a), which incorporate the minority vote-dilution and retrogression standards from Sections 2 and 5 of the federal Voting Rights Act ("VRA"). FAC ¶¶ 43, 47.

The complaint "need not contain 'detailed factual allegations'"; the allegations need only "'raise a right to relief above the speculative level.'" *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1244 (11th Cir. 2016) (quoting *Twombly*, 550 U.S. 544, 555).

"Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage," and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (cleaned up). In adjuciating a Rule 12(b)(6) motion, the Court "take[s] the factual allegations in the complaint as true and construe[s] them in the light most favorable to the plaintiffs." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1291 (11th Cir. 2010).

## ARGUMENT

"The Equal Protection Clause of the Fourteenth Amendment limits racial gerrymanders in legislative districting plans [and] prevents a State, in the absence of 'sufficient justification,' from 'separating its citizens into different voting districts on the basis of race.'" *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (quoting *Bethune-Hill v. Va. State Bd. of Elections* (*Bethune-Hill II*), 580 U.S. 178, 187 (2017)) (alteration omitted). In racial-gerrymandering cases like this one, a plaintiff can carry its prima facie burden by showing that race served as the "predominant factor" motivating district line-drawing. *Id.* (citing *Miller v. Johnson*, 515 U.S. 900, 916 (1995)).

At the pleading stage, Plaintiffs need only plausibly allege that the state subordinated other factors to racial considerations. *See GRACE, Inc. v. City of Miami* (*GRACE II*), --- F. Supp. 3d ---, No. 1:22-cv-24066-KMM, 2023 WL 7980153, at *13 (S.D. Fla. Nov. 17, 2023) (citing *Cooper*, 581 U.S. at 291). A plaintiff may allege that race predominated "*either* through circumstantial evidence of a district's shape and demographics *or* more direct evidence going to legislative purpose." *Miller*, 515 U.S. at 916 (emphases added); *Alexander v. S.C. State Conf. of NAACP*, 144 S. Ct. 1221, 1234 (2024) (citing *Cooper*, 581 U.S. at 291). "Direct evidence often comes in the form of a relevant state actor's express acknowledgment that race played a role in the drawing of district lines," for instance by "admit[ting] to considering race for the purpose of satisfying . . . the Voting Rights Act of 1965." *Alexander*, 144 S. Ct. at 1234.

Here, Plaintiffs alleged ample direct and circumstantial evidence of racial predominance when the Legislature drew the Challenged House Districts. But the House largely ignores those facts. Instead, the House contends that Plaintiffs do not adequately plead "race-based sorting," and then attempts to distinguish HDs 112 and 113 from the other Challenged House Districts. Mot. at

3

4–5. But the House's "race-based sorting" argument is wrong on the law and the facts. And its attempt to carve out HDs 112 and 113 from the ambit of this case falls flat.

**I.    The House's attempt to limit racial-gerrymandering claims to instances of "racial sorting" or "political apartheid" is meritless.**

The House claims that "[b]ecause Plaintiffs do not allege a race-based sorting of voters, or political apartheid, their challenges to the State House districts are insufficient." Mot. at 4. That argument is wrong for at least three reasons.

*First*, Plaintiffs *do* allege race-based sorting of voters. FAC ¶ 20 ("The Legislature's *intentional sorting by race*, absent narrow tailoring to achieve a compelling governmental interest, violates the Equal Protection Clause and renders the Challenged Districts unconstitutional racial gerrymanders." (emphasis added)). The House asserts that "[a]t most, Plaintiffs allege that the challenged districts are majority Hispanic." Mot. at 5. But Plaintiffs not only contend that the Challenged Districts were majority Hispanic; they plausibly allege that the House drew the Challenged Districts *intentionally to create* majority-Hispanic districts out of a mistaken belief that the Florida Constitution "protected" those districts. *E.g.*, FAC ¶ 8 ("According to House Redistricting Committee Chair Rep. Tom Leek, the Legislature drew the Challenged Districts 'based on race' because the Legislature understood those districts to be 'protected.'").

To the extent that alleging racial predominance even requires a showing of "race-based sorting," Supreme Court precedent makes clear that it is sufficient to allege the legislature "purposefully established a racial target," such as ensuring that a minority group "should make up no less than a majority of the voting-age population." *Cooper*, 581 U.S. at 299; *see also Abbott v. Perez*, 585 U.S. 579, 620 (2018) (finding district was a racial gerrymander where Legislature intentionally drew it to have a 50% Latino population); *GRACE, Inc. v. City of Miami* (*GRACE I*), 674 F. Supp. 3d 1141, 1208 (S.D. Fla. 2023) (finding racial predominance where the commission had "[t]he intention of preserving Districts 1, 3, and 4 as majority-Hispanic districts"), *appeal dismissed*, No. 23-11854-D, 2023 WL 5624206 (11th Cir. July 13, 2023). That is *exactly* what the Florida Legislature did here in deliberately creating Hispanic majority-minority districts without sufficient justification. *See, e.g.*, FAC ¶¶ 62 (Subcommittee Chair Rep. Cord Byrd insisting that the Challenged House Districts were drawn "to maintain existing majority-minority districts"), 69 (Committee Chair Leek stating lines were drawn "to maintain existing majority-minority districts").

*Second*, the crux of a racial-gerrymandering claim is the *use* of race to draw a district, thereby *classifying* individuals on the basis of their race. *See Abbott*, 585 U.S. at 579 ("The Equal Protection Clause of the Fourteenth Amendment forbids 'racial gerrymandering,' that is, intentionally assigning citizens to a district on the basis of race without sufficient justification."); *Shaw v. Reno* (*Shaw I*), 509 U.S. 630, 643 (1993) ("Classifications of citizens solely on the basis of race are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality. They threaten to stigmatize individuals by reason of their membership in a racial group and to incite racial hostility." (internal quotations and citations omitted)); *GRACE, Inc. v. City of Miami* (*GRACE IV*), --- F. Supp. 3d ---, No. 1:22-cv-24066-KMM, 2024 WL 1563066, at *2 (S.D. Fla. Apr. 10, 2024) ("The harm [of the racial gerrymander] stems not from the City's objective, but rather, from the City's racial classification of every Miamian in pursuit of that goal."); *Ala. Legis. Black Caucus v. Alabama* (*ALBC*), 575 U.S. 254, 263 (2015) ("Those harms are personal. They include being personally subjected to a racial classification, as well as being represented by a legislator who believes his primary obligation is to represent only the members of a particular racial group." (cleaned up)).

True, "racial segregation" or "political apartheid" can be a *consequence* of racial gerrymandering. Mot. at 5. But Plaintiffs are not *required* to plead any "imbalance" between adjacent districts because "[a] racial gerrymandering claim . . . applies to the boundaries of individual districts." *See ALBC*, 575 U.S. at 262. As such, "[a] showing that race-based criteria did not significantly affect the drawing of *some* [] districts . . . would have done little to defeat a claim that race-based criteria predominantly affected the drawing of other [] districts, such as [South Florida's] majority-minority districts primarily at issue here." *See id.* at 264 ("remand[ing] for consideration of racial gerrymandering with respect to the individual districts subject to the appellants' racial gerrymandering challenges"); *Jacksonville Branch of NAACP v. City of Jacksonville*, 635 F. Supp. 3d 1229, 1282 n.55 (M.D. Fla. 2022) (rejecting government's argument that "racial packing has not occurred" because "Plaintiffs' equal protection claim does not require such a showing").

*Finally*, the House's argument regarding Miami-Dade County's racial composition misses the point. *See* Mot. at 5–6. The legal test is not whether "the challenged districts are excessive or materially different from the racial composition of neighboring districts," or if "it would have been possible to draw the challenged districts without Hispanic majorities." Mot. at 6. Applying race-neutral traditional redistricting principles that *result* in a particular racial composition is not

unlawful; rather, *intentionally* drawing a map to achieve a particular racial composition, without justification, contravenes the Fourteenth Amendment. *See GRACE, Inc. v. City of Miami* (*GRACE III*), No. 1:22-cv-24066-KMM, 2023 WL 8856325, at *7–8 (S.D. Fla. Dec. 21, 2023) (rejecting argument that "the Court cannot provide a remedy for the racial gerrymandering of Plaintiffs" because "any potential remedial map would result in similar racial demographics among the Districts," and explaining that "so long as the potential remedial districts are not-race based, or otherwise satisfy strict scrutiny, they could have any range of district-level demographics") (quotations omitted); *see also Bethune-Hill v. Va. State Bd. of Elections* (*Bethune-Hill IV*), 368 F. Supp. 3d 872, 883, 885 (E.D. Va. 2019) (ordering racial gerrymandering remedy that "slightly" decreased Black voting-age population in unconstitutional districts from a range of 55.19–57.24% to a range of 52.29–54.38%); *Perez v. Texas*, slip op. at 1–2, No. 5:11-cv-360 (W.D. Tex. May 28, 2019), ECF No. 1631 (ordering remedy that "eliminates the changes that led this Court to find racial gerrymandering" despite "maintain[ing] [the district's] majority [Hispanic] status").

A court in this District recently found the same argument "unavailing." *See GRACE II*, 2023 WL 7980153, at *10 ("Defendant's assertion that the districts are not racially gerrymandered because they reflect the demographic reality of the city is inapposite. . . . Plaintiffs are not claiming that no similar map could ever be constitutionally drawn, rather, they are simply stating that Defendant cannot draw a map with the deliberate intent to racially gerrymander the Commission Districts."). The same is true of the House's argument here.

## II.     Plaintiffs sufficiently allege that the Legislature elevated race above traditional race-neutral redistricting principles in drawing HDs 112 and 113.

The House's attempt to carve out HD 112 and HD 113 from the ambit of the case is just as unavailing as its "political apartheid" argument. Plaintiffs adequately plead that race predominated in the Legislature's drawing of HDs 112 and 113, and that the Legislature subordinated traditional, race-neutral redistricting considerations to race when drawing them, in violation of the Equal Protection Clause.

### A.     Plaintiffs plausibly allege that race predominated in the drawing of HDs 112 and 113.

The House correctly argues that "[i]t is not enough to allege that the legislature was 'aware of racial demographics' or that race was *one* of the legislature's motives[.]" Mot. at 7 (citations omitted). But if "[r]ace was the criterion that, in the State's view, could not be compromised," race

6

predominates – even if the "legislature addressed [other] interests" in the redistricting process. *Shaw v. Hunt* (*Shaw II*), 517 U.S. 899, 907 (1996). That is exactly what Plaintiffs allege here.

Plaintiffs plausibly allege that the Legislature's *express overriding goal* in drawing each of the Challenged House Districts—including HD 112 and 113—was to preserve them as "Tier One-protected" majority-minority Hispanic districts, and that traditional race-neutral redistricting criteria were subordinated to race. *See, e.g.*, FAC ¶¶ 48–49, 57, 62, 66, 69–70, 73–74. Key legislators repeatedly confirmed the primacy of race in the drawing of the Challenged Districts. For example, then-Subcommittee Chair (now Secretary of State) Rep. Cord Byrd introduced the Challenged House Districts as "performing Hispanic districts protected by Tier One of the Florida Constitution" that were drawn "to maintain existing majority-minority districts," and underscored "the Hispanic voting-age populations in these districts." *Id.* ¶ 62; *see also id.* ¶ 66 (reiterating same). House Redistricting Committee Chair Rep. Tom Leek went even further: he acknowledged that the House drew "protected" districts "predominantly based upon race." *Id.* ¶ 10 ("I believe the Governor used the term 'race-neutral' as a counterbalance to '*predominantly based upon race*.' And the maps are both race-neutral in areas, and, you know, [] also *based on race in the areas that are protected*. So it's not one or the other.").[2] Chair Leek also explained how the Redistricting Committee subordinated to race the traditional redistricting criteria embodied in Tier Two of Florida's Fair District Amendments when drawing a "protected district"—like HDs 112 and 113. FAC ¶ 74 ("If your primary concern is, as it should be, [] Tier One compliance—[] Tier Two is Tier Two for a reason. So, when it's a protected district, we focus much less on Tier Two."); *see also id.* ¶¶ 48–95 (cataloguing multiple legislators' admissions that race predominated in drawing the Challenged House Districts); *cf. ALBC*, 575 U.S. at 263 ("Voters, of course, can present statewide evidence in order to prove racial gerrymandering in a particular district.") (internal citations omitted).

Granted, race does not predominate *every* time a legislature creates a majority-minority district, Mot. at 7–8, but Plaintiffs' allegations plausibly establish predominance here. *Bush v. Vera*,

---

[2] While Chair Leek was speaking specifically about the congressional plan in this quote, the comment is relevant to the consistent approach the House took in both congressional and House redistricting, which are governed by the same legal standards. *See* FAC ¶¶ 8, 40–47. For the same reasons, comments about how HDs 114, 115, 116, 118, and 119 were drawn predominantly based on race and how they subordinated traditional criteria to racial considerations are relevant to how HDs 112 and 113 were drawn, too. *See, e.g., id.* ¶¶ 80–84.

7

517 U.S. 952 (1996), which the House cites, is instructive. In *Vera*, the Court held that a state cannot "subordinate traditional districting principles to race substantially more than is 'reasonably necessary' to avoid [VRA] liability." 517 U.S. at 979. After examining a "combination of . . . factors," including state officials' statements, a lack of compactness and regularity in the challenged districts, "bizarre district lines," and "objective evidence provided by the district plans and demographic maps," the Court held that the lower court drew upon "ample evidence" to conclude "race was the primary consideration in the construction of [the challenged district]," *Id.* at 962, 965–76. The state had "committed from the outset to creating majority-minority districts," and even though "[s]everal factors other than race were at work in the drawing of the districts," the Court found race predominated over other factors. *Id.* at 962–63. *Vera* fits this case like a glove—Plaintiffs allege a combination of direct and circumstantial evidence to show that the State subordinated traditional redistricting principles when it had the "overriding" goal of creating majority-minority districts. *Bethune-Hill II*, 580 U.S. at 190.

Defendant's reliance on *DeWitt v. Wilson,* 856 F. Supp. 1409 (E.D. Cal. 1994), is misplaced. In that case, the court found that the mapmakers "did not draw district lines based deliberately and solely on race" (applying a more stringent test than the Supreme Court's current predominance standard[3]), although the mapmakers did "consider[] the Voting Rights Act's objective of assuring that minority voters are not denied the chance to effectively influence the political process." *Id.* at 1413–14. The court noted the absence of any "bizarre boundaries" and the state's "effort to comply with the Voting Rights Act emphasized geographical compactness." *Id.* at 1413. Here, the Florida Legislature eschewed a "judicious and proper balancing of many factors appropriate to redistricting," *id.*, and instead subordinated traditional redistricting criteria to race.

*Allen v. Milligan*, 599 U.S. 1 (2023), is similarly inapposite. In *Milligan*, the plaintiffs challenged the state's choice not to create a district in which minority voters had an opportunity to elect preferred candidates under Section 2 of the Voting Rights Act ("VRA"), and the Supreme Court held that the lower court did not err in finding that race did not predominate when the *plaintiffs'* mapmaker drew an alternative map to prove the plaintiffs' VRA case. *See id.* at 31–32. The district

---

[3]  *Alexander*, 144 S. Ct. at 1234 ("[W]e require the plaintiff to show that race was the 'predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" (quoting *Miller*, 515 U.S. at 916)).

court found that the plaintiffs' mapmaker afforded "equal weight to all traditional redistricting criteria," *id.* at 31 (cleaned up), and the Supreme Court held that the district court did not err in declining to hold that race predominated given the state's "exceedingly thin" rebuttal evidence (for example, its expert "never reviewed" the plaintiffs' experts' exhibits, or even all of the alternative plans). *Id.* at 31–32.[4]

Here by contrast, the direct evidence described above and the circumstantial evidence detailed below suffices "to draw the reasonable inference that the defendant is liable for the misconduct alleged," *See Iqbal*, 556 U.S. at 678. The Amended Complaint plausibly shows that the Legislature subordinated traditional redistricting criteria to racial considerations—all that is required at this stage.

### B. Plaintiffs plead extensive circumstantial evidence demonstrating that the Legislature subordinated traditional race-neutral redistricting principles in HDs 112 and 113.

Plaintiffs also plead extensive circumstantial evidence supporting an inference that race predominated when the Legislature drew HDs 112 and 113. *See* FAC ¶¶ 73–95. The Amended Complaint alleges that "[t]he Challenged Districts [including HDs 112 and 113] feature tell-tale signs of racial predominance in the ways in which they deviate from traditional redistricting criteria: . . . unnecessarily splitting political subdivisions like the City of Miami . . . , and forming noncompact shapes." FAC ¶ 5; *id.* ¶ 92 ("HDs 112 and 113 also transgress traditional redistricting criteria, indicating racial predominance. Their shapes are necessarily driven by the race-based configuration of its neighbor, HD 114.").

Courts routinely discern racial predominance on the basis of similar circumstantial evidence. *See, e.g.*, *Nord Hodges v. Passidomo*, No. 8:24-cv-879-CEH-UAM, 2024 WL 2155684, at *1 (M.D. Fla. May 14, 2024) (denying motion to dismiss where Plaintiffs alleged "that [the districts] bear standard indicia of racial gerrymandering, like having districts traverse large bodies of water, splitting political communities, and forming noncompact shapes"); *Shaw II*, 517 U.S. at 906

---

[4]   In any event, this discussion in *Milligan* is about what plaintiffs must prove when bringing a VRA claim, and thus is of little relevance to the standard in a racial gerrymandering case. The Court's discussion was in the context of declining to impose a new rule prohibiting VRA plaintiffs from submitting illustrative maps "'based' on race," which would have required them to "not take race into account at all or . . . just not 'prioritize' race." 599 U.S. at 30.

(1996) (finding "highly irregular and geographically non-compact" district shapes capable of demonstrating racial predominance in drawing district boundaries); *GRACE IV*, 2024 WL 1563066, at *4 ("[C]ertain types of circumstantial evidence, such as a district's shape and demographics, or the splitting of neighborhoods, strongly suggest racial predominance[.]") (internal quotations and citations omitted). In the face of that precedent, the House grasps at straws.

*Miami International Airport and the adjacent industrial zone.* Plaintiffs allege that "HD 112 is essentially comprised of two separate pieces," with "a largely uninhabited, 4,300-acre area encompassing Miami International Airport and the adjacent industrial zone" lying in between the disconnected northern and southern pieces. FAC ¶ 94. Of course, "the airport and the industrial zone must go somewhere[,]" Mot. at 11, but the House misses the larger point. The northern and southern pieces of HD 112—in the Cities of Hialeah and Miami, respectively—are disparate communities that are naturally separated. Courts consider the union of disparate communities that are naturally separated—whether by a large body of water or a vast industrial or airport zone— to be circumstantial evidence of racial predominance. *See ALBC*, 575 U.S. at 272 (listing as a traditional redistricting principle "respect for . . . communities defined by actual shared interests"); *Agee v. Benson*, No. 1:22-cv-272, 2023 WL 8826692, at *13, 33–34 (W.D. Mich. Dec. 21, 2023), *stay denied sub nom. Mich. Indep. Citizens Redistricting Comm'n v. Agee*, 144 S. Ct. 715 (2024) (mem.) (finding mapmakers' grouping together adjacent but distinct communities in the Detroit area probative of racial predominance).

*Splitting of City of Miami.* Plaintiffs allege that the Legislature split the City of Miami "into more parts than necessary" by dividing it among five State House districts, including HDs 112 and 113. FAC ¶ 95. Courts recognize that traditional redistricting criteria seek to "adhere[] to" "geographic boundaries, precinct boundaries, or communities of interest [] political subdivisions, natural geographic boundaries, and communities of interest." *Bethune-Hill v. Va. State Bd. of Elections* (*Bethune-Hill I*), 141 F. Supp. 3d 505, 533–34, 538 (E.D. Va. 2015), *aff'd in part, vacated in part*, 580 U.S. 178 (2017); *see ALBC*, 575 U.S. at 272 (listing "respect for political subdivisions" as a "traditional race-neutral districting principle[]"). Plaintiffs plausibly allege that the Legislature unnecessarily divided Miami in service of race-based goals. *See Bethune-Hill v. Va. State Bd. of Elections* (*Bethune-Hill III*), 326 F. Supp. 3d 128, 148 (E.D. Va. 2018) (split subdivisions indicate racial predominance); *Covington v. North Carolina*, 316 F.R.D. 117, 145, 160 (M.D.N.C. 2016) (splitting of political subdivisions and neighborhoods "strongly suggests" racial predominance),

10

*aff'd*, 581 U.S. 1015 (2017); *Agee*, 2023 WL 8826692, at *42–52 (districts that contained pieces of different counties and municipalities indicate racial predominance).

For its part, the House rationalizes the division of Miami as the result of garden-variety legislative tradeoffs. Mot. at 12 (suggesting but not clearly identifying this "obvious alternative explanation" for the division of Miami). But the House does not even attempt to point to anything in the Amended Complaint to support its speculation. *See Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (noting that "courts may infer *from the factual allegations in the complaint* obvious alternative explanations which suggest lawful conduct") (cleaned up, emphasis added). And in light of the avalanche of facts suggesting racial predominance, the House's alternative explanation is far from obvious (or even plausible). *See SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1227 (11th Cir. 2023) (rejecting defendant's request to adopt "obvious alternative explanation" and explaining that the "inference does not strike us as so obvious that we should adopt it here").

The reasons underpinning the division of Miami present a quintessential factual dispute that cannot be resolved at the motion to dismiss stage. *See Rodolph v. L. Offs. of Maria Corvaia O'Donnell, P.A.*, No. 14-62550, 2015 WL 12857352, at *1 (S.D. Fla. Jan. 22, 2015) ("[A] complaint must be liberally construed, assuming the facts alleged therein as true and drawing all reasonable inferences from those facts in the plaintiff's favor." (citing *Twombly*, 550 U.S. at 555)). The Court will need to engage in a "holistic analysis" on the basis of a full record to afford the evidence "its proper weight." *Bethune-Hill II*, 580 U.S. 192. At that point, and now, a naked assertion that "legislatures must always 'balance' competing objectives," Mot. at 12 (quoting *In re Senate Joint Resol. of Legis. Apportionment 100* (*In re SJR 100*), 334 So. 3d 1282, 1286 (Fla. 2022)), would fail to rebut evidence that race predominated in the Legislature's map-drawing process.

**Compactness Scores.** Plaintiffs allege that the HDs 112 and 113 rank between the 22nd and 38th percentiles on various mathematical measures of compactness for all districts in the House map. Mot. at 12; FAC ¶¶ 94–95. Low-ranked compactness scores are probative because they show that districts drawn on the basis of race are outliers compared to other districts drawn by the same mapmakers which are not race-based, or that Plaintiffs otherwise concede are narrowly tailored. *Covington*, 316 F.R.D. at 140 ("[C]ompactness scores are most useful to show <u>relative</u> compactness, by comparing one district to alternative or benchmark versions of that district, or comparing scores to the statewide or nationwide average." (citing *Vera*, 517 U.S. at 960) (emphasis

11

in original)). A "highly irregular and geographically non-compact" shape can demonstrate the predominance of racial motivations in drawing district boundaries. *Shaw II*, 517 U.S. at 905–06.

Rather than acknowledge the problem, the House resorts to a whataboutism—it points to the Florida Supreme Court decision validating Senate Joint Resolution 100. *In re SJR 100*, 334 So. 3d at 1285. The Florida Supreme Court's ruling is irrelevant to the present case for two reasons. *First*, *In re SJR 100* was a non-adversarial facial review without the benefit of a factual record, that assessed the validity of the redistricting plans under the Florida Constitution. *Id.*; Fla. Const. Art. III, § 16(c) ("[T]he attorney general shall petition the supreme court of the state for a declaratory judgment determining the validity of the apportionment. The supreme court . . . shall permit adversary interests to present their views and, within thirty days from the filing of the petition, shall enter its judgment."); *see In re Senate Joint Resol. of Legis. Apportionment 1176* (*Apportionment I*), 83 So. 3d 597, 689 (Fla. 2012) (Lewis, J., concurring) ("This Court is not structurally equipped to conduct complex and multi-faceted analyses with regard to many factual challenges to the 2012 legislative reapportionment plan. . . . [W]e can only conduct a facial review of legislative plans and consider facts properly developed and presented in our record."). By contrast, the present case presents an as-applied challenge under the U.S. Constitution.

*Second*, the House misreads and aggrandizes the Florida Supreme Court's ruling. The Florida Supreme Court held that the 2022 map had "generally improved average [compactness] scores" relative to the previous map, declined to "comment on how meaningful those improvements" were, and did not comment on the compactness of any particular district. *In re SJR 100*, 334 So. 3d at 1287. That is, the court *did not* address the relatively lower compactness scores of the Challenged House Districts relative to other districts. *See GRACE I*, 674 F. Supp. 3d at 1152 ("When considering whether race was the predominant factor considered in the drawing of the districts, the Court considers each gerrymandering claim on a 'district-by-district basis.'"). And of course, the Florida Supreme Court certainly did not opine on whether any particular district's compactness would be probative of racial predominance, whether any district was drawn predominantly based on race, or whether any district violated the U.S. Constitution.

*Bizarre Shape.* The House faults Plaintiffs for not alleging that HDs 112 and 113 contain "bizarre features" or resemble Rorschach blots. Mot. at 13. So, what? The Supreme Court squarely rejected any specific "bizarreness" requirement:

> Shape is relevant not because bizarreness is a necessary element of

> the constitutional wrong or a threshold requirement of proof, but because it may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines. The logical implication . . . is that parties may rely on evidence other than bizarreness to establish race-based districting.

*Miller*, 515 U.S. at 913; *see also Jacksonville NAACP*, 635 F. Supp. 3d at 1244–45 ("[N]either a bizarre shape, nor a conflict with traditional principles are threshold requirements or mandatory preconditions necessary for a challenger to establish a claim of racial gerrymandering." (quoting *Bethune-Hill II*, 580 U.S. at 190) (cleaned up)). Even compact districts without *any* bizarre features may be unlawfully gerrymandered on the basis of race.

Attempting to provide support for its argument, the House offers images of four extremely bizarre districts invalidated as racial gerrymanders in the mid-1990s, arguing that HDs 112 and 113 "bear no likeness" to those shapes. Mot. at 13. Those images are certainly interesting as historical curios. But more relevant to *this* case are the following districts, also found to be unconstitutional racial gerrymanders, which bear more likeness to HDs 112 and 113:







13








14



From left to right and top to bottom, these are:

- Jacksonville City Council District 12, *Jacksonville NAACP*, 635 F. Supp. 3d 1229 (M.D. Fla. 2022); image from Corrected Expert Report of Anthony E. Fairfax on the Development of Comparison Maps and Tables of Redistricting Plans for Jacksonville,

15

- Florida, No. 3:22-cv-493 (M.D. Fla. Nov. 21, 2022), ECF No. 92-1 at 27.
- North Carolina House District 33, *Covington*, 316 F.R.D. at 160; map available at *North Carolina House District Plan: Enacted in 2011*, NORTH CAROLINA GENERAL ASSEMBLY, https://www.ncleg.gov/Redistricting/DistrictPlanMap/H2011E.
- Michigan Senate District 6, House District 1, and House District 14, *Agee*, 2023 WL 8826692, at *43, 47, 52.
- Virginia House Districts 92, 89, 69, and 71, *Bethune-Hill III*, 326 F. Supp. 3d at 154, 159, 164, 168–69; maps available at *House of Delegates District 92*, VIRGINIA PUBLIC ACCESS PROJECT (VPAP), https://www.vpap.org/offices/house-of-delegates-92/district-history/dist-143/ (click "Show Map"); *House of Delegates District 89*, VPAP, https://www.vpap.org/offices/house-of-delegates-89/district-history/dist-140/ (click "Show Map"); *House of Delegates District 69*, VPAP, https://www.vpap.org/offices/house-of-delegates-69/district-history/dist-120/ (click "Show Map"); *House of Delegates District 71*, VPAP, https://www.vpap.org/offices/house-of-delegates-71/district-history/dist-122/ (click "Show Map").
- North Dakota House Districts 4A and 9A, *Walen v. Burgum*, --- F. Supp. 3d ---, No. 1:22-cv-31, 2023 WL 7216070, at *2 (D.N.D. Nov. 2, 2023) (finding genuine dispute of material fact as to racial predominance).
- Miami City Commission District 3, *GRACE IV*, 2024 WL 1563066, at *30.
- Georgia Congressional Districts 10, 14, 2, and 6, Senate Districts 48 and 56, and House District 52, *Ga. State Conf. of NAACP v. Georgia*, No. 1:21-cv-05338, 2023 WL 7093025, at *10 (N.D. Ga. Oct. 26, 2023) (finding genuine dispute of material fact as to whether race predominated in drawing of congressional districts); *id.* at 12 (same for senate districts); *id.* at 14 (same for state house districts); maps available at *Georgia's 10th Congressional District*, BALLOTPEDIA, https://ballotpedia.org/Georgia%27s_10th_Congressional_District; *Georgia's 14th Congressional District*, BALLOTPEDIA, https://ballotpedia.org/Georgia%27s_14th_Congressional_District; *Georgia's 2nd Congressional District*, BALLOTPEDIA, https://ballotpedia.org/Georgia%27s_2nd_Congressional_District; *Georgia's 6th Congressional District*, BALLOTPEDIA, https://ballotpedia.org/Georgia%27s_6th_Congressional_District; *Georgia State Senate District 48*, BALLOTPEDIA, https://ballotpedia.org/Georgia_State_Senate_

16

District_48; *Georgia State Senate District 56*, BALLOTPEDIA, https://ballotpedia.org/ Georgia_State_Senate_District_56; *Georgia House of Representatives District 52*, BALLOTPEDIA, https://ballotpedia.org/Georgia_House_of_Representatives_District_52.

Clearly, "visual[]" bizarreness, Mot. at 14, is not an element of a racial-gerrymandering claim. *See e.g.*, *GRACE I*, 674 F. Supp. 3d at 1210 (preliminarily enjoining three districts as racial gerrymanders despite not finding them facially non-compact)

In any event, Plaintiffs *do* allege odd (if not "bizarre") features that appear to be motivated by race, including HD 112's "southern bulge extend[ing] into the City of Miami" from Miami International Airport and three different cities (Miami Springs, Virginia Gardens, and Hialeah) to the airport's north. FAC ¶ 94; *id.* fig. 8 (depicting HD 113's skinny north-south strip running along Biscayne Bay north of downtown Miami).

\*   \*   \*

Plaintiffs present ample allegations to show that the Legislature contravened traditional redistricting principles when it drew HDs 112 and 113, and they need not "demonstrate that a challenged plan departs from all traditional redistricting criteria" to carry their burden. *GRACE II*, 2023 WL 7980153, at *13; *Bethune-Hill II*, 580 U.S. at 179 ("[A] conflict or inconsistency may be persuasive circumstantial evidence tending to show racial predomination, but there is no rule requiring challengers to present this kind of evidence in every case."); *Jacksonville NAACP*, 635 F. Supp. 3d at 1244–45. ("[N]either a bizarre shape, nor a conflict with traditional principles are "threshold requirement[s]" or "mandatory precondition[s]" necessary "for a challenger to establish a claim of racial gerrymandering."). Plaintiffs need only plausibly allege that the House prioritized racial considerations over traditional redistricting principles. *See Bethune-Hill II*, 580 U.S. at 189 ("Race may predominate *even when* a reapportionment plan respects traditional principles.") (emphasis added). And the Amended Complaint presents direct and circumstantial evidence of racial predominance in spades.

## CONCLUSION

For the foregoing reasons, the Court should deny the House's Motion to Dismiss Plaintiffs' First Amended Complaint.

Respectfully submitted July 23, 2024,

/s/ *Nicholas L.V. Warren*

Nicholas L.V. Warren (FBN 1019018)
**ACLU Foundation of Florida. Inc.**
1809 Art Museum Drive, Suite 203
Jacksonville, FL 32207
(786) 363-1769
nwarren@aclufl.org

Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida, Inc.**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
dtilley@aclufl.org
cmcnamara@aclufl.org

Andrew Frackman*
**O'Melveny & Myers LLP**
1301 Avenue of the Americas
17th Floor
New York, NY 10019
(212) 326-2000
afrackman@omm.com

Jorge L. Vasquez, Jr.*
Esperanza Segarra (FBN 527211)
**Vasquez Segarra LLP**
5 West 37th Street, Suite 6003
New York, NY 10018
(212) 752-8459
jorge@vsllplaw.com
esperanza@vsllplaw.com

Brian P. Quinn*
Patrick J. Jones*
Emily Murphy*
Gabrielle S. Jackson*
**O'Melveny & Myers LLP**
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300
bquinn@omm.com
pjones@omm.com
emurphy@omm.com
gjackson@omm.com

*Admitted pro hac vice*

*Counsel for Plaintiffs*