UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:24-cv-21983-JB

CUBANOS PA'LANTE, *et al.*,

    Plaintiffs,

v.

FLORIDA HOUSE OF REPRESENTATIVES
and CORD BYRD, in his official capacity as
Florida Secretary of State,

    Defendants.
_____/

**DEFENDANT FLORIDA HOUSE OF REPRESENTATIVES' REPLY IN
SUPPORT OF MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

    Defendant, the Florida House of Representatives, respectfully replies in support of its Motion to Dismiss Plaintiffs' First Amended Complaint (ECF No. 33).

    Plaintiffs do not deny that their objective is to strip Hispanic voters of their state-constitutional rights under Florida's non-diminishment standard. To achieve that purpose, Plaintiffs insist that the non-diminishment standard protects only minorities who are "politically homogeneous and monolithic," and whose preferred candidates are usually defeated by a "white majority." ECF No. 39 at 2. Florida's Constitution does not impose that limitation, however—as the House will show at a later stage, if necessary.

    At this stage, however, the Court should grant the House's motion to dismiss with prejudice for two reasons. *First*, Plaintiffs do not plead—and deny their burden to plead—that the Legislature segregated voters of different races into different State House districts. Even the cases on which Plaintiffs rely demonstrate that the separation of voters of different races into different districts is the essence of a racial-gerrymandering claim. Here, Plaintiffs do not claim that the Legislature drew separate Hispanic and non-Hispanic districts, or separated Hispanic from non-Hispanic voters. Rather, they take issue with the way the Legislature configured the State House districts in a county that is predominantly Hispanic.

    *Second*, this Court should dismiss Plaintiffs' challenges to HDs 112 and 113. The direct evidence on which Plaintiffs rely—statements in the legislative record—do not support a claim of racial predominance in the creation of HDs 112 and 113. And the amended complaint fails to allege any nexus between Plaintiffs' circumstantial evidence—such as the location of the airport—and race. Plaintiffs cannot plead

a racial-gerrymandering claim without a plausible allegation that the Legislature not only neglected race-neutral principles, but neglected them for *racial* reasons. Because the amended complaint does not allege that *race* motivated the specific aspects of HDs 112 and 113 that Plaintiffs dislike, it fails to state a claim.

## ARGUMENT

### I. PLAINTIFFS DO NOT PLAUSIBLY ALLEGE THAT THE LEGISLATURE SEPARATED VOTERS OF DIFFERENT RACES INTO DIFFERENT STATE HOUSE DISTRICTS.

In their response, Plaintiffs point to no well-pleaded factual allegation that the Legislature segregated voters of different races into different districts. Plaintiffs do not claim that the Legislature created Hispanic districts and non-Hispanic districts, or separated Hispanic from non-Hispanic voters, or selectively included Hispanic populations in—or selectively excluded non-Hispanic populations from—the challenged districts. Tellingly, Plaintiffs cite no racial imbalance among districts in Miami-Dade County.

The reason is obvious: Miami-Dade County is nearly 70-percent Hispanic. Of course the State House districts in Miami-Dade County are majority-Hispanic. The creation of majority-Hispanic districts in Miami-Dade County does not require the separation of voters of different races into different districts. And without a plausible allegation of such race-based separation, Plaintiffs cannot state a plausible claim.

The essence of a racial-gerrymandering claim is not that the State has drawn majority-minority districts, even intentionally. Rather, the "essence" of a racial-gerrymandering claim is "that the State has used race as a basis for *separating voters* into districts." *Miller v. Johnson*, 515 U.S. 900, 916 (1995) (emphasis added). The question is whether the legislature elevated race "above traditional districting considerations in determining *which* persons were placed in appropriately apportioned districts." *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 273 (2015) (quoting Br. for United States as Amicus Curiae at 19). In other words, Plaintiffs must allege that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller*, 515 U.S. at 916.

Plaintiffs dispute these principles and argue that, while the separation of voters of different races into different districts might be a "consequence" of racial gerrymandering, it is not essential to a racial-gerrymandering claim. ECF No. 39 at 5. But none of the cases that Plaintiffs cite supports that argument.

For example, *Alabama Legislative Black Caucus* did not hold, as Plaintiffs imply, that each district must be evaluated in a vacuum. Rather, it held only that a racial-gerrymandering claim does not entail a statewide analysis of the State "as an undifferentiated 'whole.'" 575 U.S. at 262, 264. It thus rejected the district court's "undifferentiated statewide analysis" of a legislature's reliance of race in redistricting. That is the context in which the Court explained that a racial-gerrymandering claim "applies to the boundaries of individual districts." ECF No. 39 at 5 (quoting *Ala. Legis. Black Caucus*, 575 U.S. at 262). Plainly, that

2

passage does not change the "essence" of a racial-gerrymandering claim, which is the separation of voters of different races into different districts. *Miller*, 515 U.S. at 916.

Here, Plaintiffs do not allege any selective inclusion or exclusion of voters based on their race. They allege that the Legislature created seven majority-Hispanic districts in a majority-Hispanic county, but nowhere allege that the Legislature assigned Hispanic and non-Hispanic voters to different districts.

*GRACE, Inc. v. City of Miami*, 674 F. Supp. 3d 1141, 1154 (S.D. Fla. 2023), also refutes Plaintiffs' position. There, members of the city commission "frequently and explicitly emphasized over the course of six public meetings their intention to maintain three Hispanic districts, one Black district, and one Anglo district." Plaintiffs here allege no such division of voters into separate districts according to race.

Likewise, in *Bethune-Hill v. Virginia State Board of Elections*, 326 F. Supp. 3d 128 (E.D. Va. 2018), the court relied on evidence that geographical subdivisions "were split exactly along racial lines" and that "most significant concentrations of black voters were swept into one of the challenged districts." *Id.* at 146–47. For example, the legislature drew a narrow "bridge" to bypass predominantly white communities and unite "geographically distinct clusters of black voters." *Id.* The legislature consistently excluded concentrations of white voters from the challenged districts. *Id.* at 148–49. Plaintiffs here allege no race-based sorting of voters—only the creation of majority-Hispanic districts in a majority-Hispanic county.

Plaintiffs contend that, to allege racial predominance, nothing more is needed than to allege that the legislature sought to achieve a numerical threshold of minority voters in the challenged district. ECF No. 39 at 4. The House has already shown that a legislature's desire to draw a majority-minority district does not, standing alone, establish racial predominance. ECF No. 33 at 7–8. Plaintiffs concede that point elsewhere in their response. ECF No. 39 at 7. And the cases that Plaintiffs cite to support their position that an intent to draw a majority-minority district shows racial predominance turn sharply against them.

In *Cooper v. Harris*, the legislature "established a racial target: African-Americans should make up no less than a majority of the voting-age population." 581 U.S. 285, 299 (2017). But what established predominance in *Cooper* was not the numerical threshold standing alone, but rather the race-based contortions that were necessary to achieve that threshold and the resulting racial imbalance between districts. The legislature transferred "tens of thousands of additional African-American voters" to the challenged district, which had a "direct and significant impact" on the district's shape and resulted in "stark racial borders." *Id.* at 300. In fact, the district's black population was two to three times larger than the black population of the excluded portions of the same counties. *Id.* Race did not predominate simply because the legislature adopted a "racial target," but because, to meet that target, the legislature "subordinated other districting criteria and produced boundaries amplifying divisions between blacks and whites." *Id.*

3

Similarly, in *Abbott v. Perez*, 585 U.S. 579, 620 (2018), the Texas Legislature's desire to draw a majority-Hispanic district required it to remove a "predominantly African-American" community from the challenged district. When the legislature responded to public pressure and restored that community to the district, it moved additional "Latinos into the district to bring the Latino population back above 50%." *Id.* In light of these legislative "maneuvers," Texas did not dispute that race was the predominant factor motivating its decision to place a significant number of voters within or without the district. *Id.*

Plaintiffs make no similar allegation here. They do not allege that, to achieve a numerical target, the Legislature created racial divisions or imbalance or moved significant numbers of Hispanic voters into—or removed significant numbers of non-Hispanic voters from—the challenged districts. Rather, it simply established majority-Hispanic districts in a county with a nearly 70-percent Hispanic population.

Finally, Plaintiffs contend that their amended complaint *does* allege race-based sorting of voters. ECF No. 39 at 4. They point to a single, conclusory allegation that the Legislature engaged in "intentional sorting by race." *Id.* (quoting ECF No. 31 ¶ 20). But "labels and conclusions" will not suffice to plead a plausible claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That is especially true where, as here, courts must exercise extraordinary caution and presume the Legislature's good faith at all stages of the litigation. *See Alexander v. S.C. State Conf. of NAACP*, 144 S. Ct. 1221, 1233 (2024); *Miller*, 515 U.S. at 916.

Because it does not plausibly allege "an effort to segregate voters into separate voting districts because of their race," *Shaw v. Reno*, 509 U.S. 630 (1993), the complaint fails to plead that race predominated in the challenged State House districts. Plaintiffs' challenges to those districts should be dismissed.

## II. PLAINTIFFS DO NOT PLAUSIBLY ALLEGE THAT RACE WAS THE LEGISLATURE'S PREDOMINANT MOTIVE IN DRAWING HDS 112 AND 113.

Plaintiffs' response lays bare the shortcomings of their allegation that race predominated in the creation of HDs 112 and 113. Plaintiffs' direct evidence of racial predominance either concerns districts in a different map or suggests only that the Legislature drew majority-Hispanic districts—none of which shows racial predominance. And Plaintiffs' circumstantial evidence has nothing to do with race. They do not allege that *race* is why the airport is located in HD 112, why Miami is allegedly split more often than necessary, or why HDs 112 and 113 do not have higher compactness scores. Plaintiffs suggest they could have drawn better districts, but this proceeding is not a district-drawing competition. Plaintiffs have not overcome the presumption of legislative good faith and plausibly alleged racial predominance.

### A. Plaintiffs' Direct Evidence Does Not Show Racial Predominance.

To support their claim of racial predominance in HDs 112 and 113, Plaintiffs point to several statements in the legislative record that Plaintiffs claim "confirmed the primacy of race" in HDs 112 and

4

113. ECF No. 39 at 7. These statements do no such thing. The first statement—by then-Subcommittee Chair Cord Byrd—merely "confirmed" that the Legislature created the challenged districts as majority-minority districts to comply with the non-diminishment provision. *Id.* The House has demonstrated that the intentional creation of a majority-minority district does not, without more, show that race played an outsized, *predominant* role in the district's formation or that race-neutral principles were subordinated to race. ECF No. 33 at 7–8. In fact, Plaintiffs concede that point. ECF No. 39 at 7 ("Granted, race does not predominate every time a legislature creates a majority-minority district . . . ." (emphasis omitted)). Accordingly, Chair Byrd's statement does not move the needle on the question of racial predominance.

Next, Plaintiffs quote Committee Chair Tom Leek's statement that districts were drawn "based on race in the areas that were protected." *Id.* First, Plaintiffs distort Chair Leek's statement: Chair Leek did not say that "the House drew protected districts *predominantly* based upon race." *Id.* (emphasis added and internal marks omitted). But as importantly, Plaintiffs concede that Chair Leek was discussing an entirely different map: the *congressional* map. *Id.* at 7 n.2. In fact, Chair Leek made this statement eleven weeks *after* the Legislature adopted the State House districts. *See* ECF No. 31 ¶¶ 2, 9, 10. While Plaintiffs argue that statewide evidence can be "relevant" to a predominance inquiry, ECF No. 39 at 7,[1] they cite no support for the proposition that comments on *congressional* districts can show racial predominance in *state-legislative* districts. *See Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299, 1323 (11th Cir. 2021) (explaining that, in an equal-protection analysis, a court is "confined" to an analysis of the intent behind the challenged law, and that statements made about other legislation are not probative).

The final statement on which Plaintiffs rely—also by Chair Leek—comes with no context, does not mention HDs 112 and 113, and does not suggest that the Legislature placed predominant weight on race in drawing HDs 112 and 113. *Id.* Nor can any single statement—even that of a committee chair—establish the motivation of a bicameral, 160-member legislative body. *See League of Women Voters of Fla. Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 932 (11th Cir. 2023) ("As we have explained, a sponsor is only one vote out of many. . . . One senator does not speak for all the supporters of S.B. 90."); *Greater Birmingham*, 992 F.3d at 1324–25 ("The vote of a sponsor is only one vote of the 105 votes in the Alabama House of Representatives. . . . It stretches logic to deem a sponsor's 'intent' . . . as *the* legally dispositive intent of the entire body . . . . No reasonable fact-finder could find a discriminatory intent or purpose underlying Alabama's voter ID law from the statements identified by Plaintiffs." (emphasis in original)). Thus,

---

[1] The question here is not whether such evidence would be "relevant"—or admissible at trial—but whether it establishes a plausible claim that the Legislature racially gerrymandered HDs 112 and 113.

Plaintiffs have not plausibly alleged that race was the predominant factor that motivated the Legislature.

Plaintiffs' heavy reliance on these few statements highlights the dearth of direct evidence of racial predominance in HDs 112 and 113. Statements that do not specifically mention HDs 112 and 113—or that address an entirely different map—cannot overcome the presumption of legislative good faith and establish a plausible claim that the Legislature racially gerrymandered HDs 112 and 113. The Supreme Court's admonition that, at all stages of litigation, district courts should exercise "extraordinary caution" and recognize that federal-court review of redistricting plans "represents a serious intrusion on the most vital of local functions," *Miller*, 515 U.S. at 915–17, counsels for dismissal of tenuously supported claims.

### B. The Intentional Creation of a Majority-Minority District Does Not, By Itself, Establish Racial Predominance.

In its motion, the House cited *Vera*, *DeWitt*, and *Allen* for the proposition that the intentional creation of a majority-minority district does not establish that race predominated. ECF No. 33 at 7–8.[2] Plaintiffs concede that proposition, ECF No. 39 at 7, so their attempts to analogize to or distinguish the outcomes in *Vera*, *DeWitt*, and *Allen* are beside the point. But Plaintiffs' assertion that *Vera*—in which the Court ultimately found racial predominance—"fits this case like a glove" is especially egregious. ECF No. 39 at 8. Indeed, *Vera* perfectly illustrates why Plaintiffs here have failed to plead a plausible claim.

In *Vera*, the plaintiffs challenged three districts. One district contained "narrowly and bizarrely shaped tentacles," 517 U.S. at 965 (plurality opinion), that deliberately excluded "white neighborhoods" and incorporated dispersed minority communities, *id.* (plurality opinion) (quoting *Vera v. Richards*, 861 F. Supp. 1304, 1337–38 (S.D. Tex. 1994)). The other two were among the three least compact districts in the country. *Id.* at 973 (plurality opinion). They were so intertwined as to be visually indistinguishable, with "narrow corridors, wings, and fingers" "separating Hispanic voters from African-American voters on a block-by-block basis." *Id.* at 973, 975 (plurality opinion). To create these extremely non-compact districts, the Texas Legislature employed a computer program that offered significantly more sophisticated data on race than on any other characteristic. *Id.* at 961–62, 975 (plurality opinion). As a result, the boundaries of the contested districts correlated "almost perfectly with race." *Id.* at 975 (plurality opinion).

Plaintiffs discredit themselves when they claim that *Vera* "fits this case like a glove." ECF No. 39 at 8. In *Vera*, the Court found racial predominance not because the legislature drew majority-minority districts, but rather because the legislature relentlessly separated voters of different races into different congressional districts and drew grotesquely shaped districts along racial divides with surgical precision.

---

[2] *Allen v. Milligan*, 599 U.S. 1 (2023); *Bush v. Vera*, 517 U.S. 952, 973 (1996) (plurality opinion); *DeWitt v. Wilson*, 856 F. Supp. 1409 (E.D. Cal. 1994).

HDs 112 and 113 are nothing like the districts in *Vera*. They are regularly shaped districts located in a predominantly Hispanic area of the State. The Florida Supreme Court reviewed them for compliance with Florida's constitutional standards—which require districts to be compact and, where feasible, to utilize political and geographical boundaries, Fla. Const. art. III, § 20(b)—and upheld them. *In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d 1282, 1285 (Fla. 2022). Plaintiffs sat on the sidelines and never filed an objection to a single district in the Florida Supreme Court. Far from fitting like a glove, *Vera* shows why Plaintiffs here have failed to plausibly allege racial predominance in HDs 112 and 113.

### C. Plaintiffs' Circumstantial Evidence Does Not Show Racial Predominance.

Plaintiffs' circumstantial evidence fares no better. The most fundamental flaw in Plaintiffs' circumstantial evidence is that none of it relates to race. Plaintiffs attempt to plead a racial-gerrymandering claim by lodging seemingly random complaints against different aspects of the challenged districts—such as the location of the Miami International Airport—but never tie those alleged deficiencies to race.

Plaintiffs never allege, for example, that HD 112 extends to the other side of the airport in search of Hispanic voters, or that the City of Miami was split to bring more Hispanic voters into HDs 112 and 113, or that efforts to add Hispanic voters reduced the districts' compactness scores. Countless reasons that have nothing to do with race might explain the location of an airport, the splitting of a city, or a district's compactness scores. And it is Plaintiffs' burden to plead the nexus to race and plausibly allege that traditional, race-neutral districting principles were not only subordinated, but subordinated to race.

Absent a connection to race, even a total neglect of traditional, race-neutral districting principles cannot establish a plausible claim of racial gerrymandering. As the Supreme Court has noted, traditional, race-neutral districting principles such as compactness are not "constitutionally required," *Shaw v. Reno*, 509 U.S. 630, 647 (1993), and the "neglect" of those principles, while "necessary," is not "sufficient" to show racial predominance, *Vera*, 517 U.S. at 962 (plurality opinion). Rather, to show racial predominance, "traditional districting criteria must be *subordinated to race*." *Id.* (plurality opinion) (emphasis in original).

**The City of Miami.** For example, Plaintiffs complain that HDs 112 and 113 divide Miami more often than absolutely necessary—and cite *Bethune-Hill v. Virginia State Board of Elections*, 326 F. Supp. 3d 128 (E.D. Va. 2018), and *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016), for the proposition that splitting political subdivisions indicates racial predominance. But those cases revealed a clear nexus between race and the splitting of political subdivisions—a nexus that Plaintiffs have failed to allege here.

In *Bethune-Hill*, the legislature split ten cities and four towns in drawing the challenged districts. 326 F. Supp. 3d at 147–48. In each instance, the city or town was "divided according to race." *Id.* at 148. The portion of each city or town with the higher minority concentration was assigned to the challenged

districts, while the portion with the lower minority concentration was not. *Id.* at 147. For example, the part of Hampton that was assigned to a challenged district contained a black population of 61 percent, while the part assigned to an unchallenged district contained a black population of 28 percent. *Id.* at 162.

In *Covington*, a challenged district incorporated 53 percent of the City of Durham, but 77 percent of Durham's black population. 316 F.R.D. at 145. Two other challenged districts incorporated 36 percent of the City of Raleigh, but 67 percent of Raleigh's black population. *Id.* at 160. The evidence revealed a clear pattern that respect for political subdivisions was not only neglected, but also *subordinated to race*.

Plaintiffs here advance no such allegation. Their allegation regarding Miami states: "Along with HD 114, HDs 112 and 113 split the City of Miami into more parts than necessary. HD 113 takes in the portions of the City of Miami that HDs 112 and 114 do not (and that are not in unchallenged HDs 108 and 109)." ECF No. 31 ¶ 95. The amended complaint contains not one word to suggest that HDs 112 and 113 split Miami in search of Hispanic voters or to add concentrations of Hispanic voters. The fact that HDs 112 and 113 split a populous city that contains 2.5 times the target population of a State House district, *see* ECF No. 33 at 11 n.8—in a county that contains 34 municipalities[3]—is wholly unremarkable and does not raise Plaintiffs' claim of racial predominance above the line from conceivable to plausible.

The "reasons underpinning the division of Miami" are not, as Plaintiffs claim, a "quintessential factual dispute" to be resolved at later stages of this proceeding. ECF No. 39 at 11. Plaintiffs must *plead* that the Legislature subordinated traditional, race-neutral districting principles *to race*. An allegation that traditional, race-neutral districting principles were subordinated to *something*—maybe race, maybe not—will not do. Nor can Plaintiffs shift their pleading burden to the House and suggest that the House must cite allegations that *negate* racial predominance. *Id.* The burden is Plaintiffs', and they have not carried it.

**The Airport.** Plaintiffs also complain that the Miami International Airport is located in HD 112 and that HD 112 includes population on both sides of the airport. *Id.* at 10. But Plaintiffs never connect this allegation to race either. Plaintiffs do not allege, for example, that the Legislature extended HD 112 east of the airport in order to add Hispanic population to HD 112. Indeed, HD 112 could have extended in *any* direction to add Hispanic population. Plaintiffs also allege that HD 112 combines "disconnected populations on either side" of the airport, ECF No. 31 ¶ 54, and that the district encompasses Miami Springs, Virginia Gardens, and part of Hialeah north of the airport and extends into Miami east of the airport. *Id.* ¶ 94. But Plaintiffs make no attempt to attribute this feature of HD 112 to *racial* motivations.

---

[3] MIAMI-DADE COUNTY, MIAMI-DADE COUNTY MUNICIPALITIES, https://www.miamidade.gov/global/management/municipalities.page. This Court may take judicial notice of the number of municipalities in Miami-Dade County, as reported on Miami-Dade County's website. ECF No. 33 at 4 n.5.

The case that Plaintiffs cite is illustrative. In *Agee v. Benson*, No. 1:22-cv-00272, 2023 WL 8826692 (W.D. Mich. Dec. 21, 2023), a redistricting commission divided communities of interest and combined disparate communities of interest for the express purpose of reducing the black population of districts around Detroit—a city with an 80-percent black population—to no more than 45 percent. *Id.* at *1, *13, *33. The commission split black communities and combined them with mostly white suburbs outside of Detroit to artificially reduce the black population in each Detroit-area district. *Id.* In sharp contrast to the plaintiffs in *Agee*, Plaintiffs here fail to allege a racial motivation behind the placement of the airport.

Nor does the airport's placement in HD 112 violate any traditional, race-neutral districting principle. Plaintiffs claim it violates a communities-of-interest principle, ECF No. 39 at 10, but it does not. First, respect for communities of interest is not a constitutional standard in Florida. *See* Fla. Const. art. III, § 20. Second, the amended complaint does not contain any allegation regarding communities of interest around the airport. ECF No. 31 ¶¶ 54, 93–94. Third, respect for communities of interest means that a community of interest should not be divided—not, as Plaintiffs suppose, that distinct communities of interest may not be combined in the same district. With a target population of 179,485 people, ECF No. 33 at 11 n.8, each State House district inevitably contains multiple, discrete communities of interest.

**Compactness Scores.** Finally, Plaintiffs emphasize that HDs 112 and 113 have compactness scores that rank between the 22nd and 38th percentiles of all State House districts. ECF No. 39 at 11–12. But once again, Plaintiffs fail to connect their allegation to race. Plaintiffs do not allege, for example, that maneuvers to add Hispanic voters to HDs 112 and 113 reduced the districts' compactness scores. As the Florida Supreme Court recognized, any number of reasons wholly unrelated to race can influence a district's compactness. *In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d at 1287 (explaining that a "district's compactness can be affected by factors over which the line-drawer has no control," including the State's "unique geographical contours and the distribution of population within the state").

In *Bethune-Hill*, one of the challenged districts was non-compact because the legislature created a "lengthy, narrow appendage" through "white neighborhoods" to reach a corridor of significant black population, "separating white and black voters with remarkable precision." 326 F. Supp. 3d at 163–64 (internal marks omitted). Another resembled a sideways "S" and contained a "bridge" to bring in "the smallest possible number of whites" while extending to a large concentration of black voters. *Id.* at 167. The legislature drew irregularly shaped districts for racial reasons and subordinated compactness to race.

Here, Plaintiffs allege no well-pleaded facts to support a plausible inference that *race* affected the contours of HDs 112 and 113. Without a plausible, race-based explanation for the districts' boundaries, Plaintiffs' allegations do not raise the "right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

9

Plaintiffs also struggle to show that HDs 112 and 113 are actually non-compact. They ignore the House's argument that *relative* measures of compactness, such as percentiles, are inherently flawed. ECF No. 33 at 13. Just as a sprinter who ranks in the 30th percentile of Olympic track-and-field athletes is not *slow*, a state-legislative district that ranks in the 30th percentile of compact districts is not *non-compact*.

The Florida Supreme Court reviewed the State House districts and the quantitative measures of compactness and held that HDs 112 and 113 comply with Florida's constitutional standards. *In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d at 1285, 1287. Plaintiffs' attempts to dismiss the Florida Supreme Court's review and approval of the State House districts as "irrelevant" are unpersuasive. ECF No. 39 at 12. Contrary to Plaintiffs' contention, a broader "factual record" is not needed to determine whether a district is compact. *Id.* The compactness inquiry concerns a district's shape, *In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d at 1287—and no factual record will change a district's shape.

Finally, Plaintiffs claim it is irrelevant that HDs 112 and 113 do not have bizarre shapes. ECF No. 39 at 12–17. While a bizarre shape is not an element of a racial-gerrymandering claim, it is also far from irrelevant. "In general, legislatures that engage in impermissible race-based redistricting will find it necessary to depart from traditional principles in order to do so." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 190 (2017). Tellingly, the Supreme Court has never affirmed a predominance finding—or remanded for a determination of predominance—"without evidence that some district lines deviated from traditional principles." *Id.* Thus, a district's consistency with race-neutral principles may "defeat a claim that a district has been gerrymandered on racial lines." *Shaw*, 509 U.S. at 630. And when a plaintiff challenges a district that follows race-neutral principles, its burden becomes much heavier. To establish that race predominated in such a district, a plaintiff must offer "direct evidence of the legislative purpose and intent or other *compelling* circumstantial evidence." *Bethune-Hill*, 580 U.S. at 191 (emphasis added).

HDs 112 and 113 are not bizarre by any stretch. Their boundaries are consistent with traditional, race-neutral districting principles—and that consistency only increases Plaintiffs' pleading burden. Plaintiffs have not carried their heavy burden. Their direct evidence does not suggest racial predominance in the design of HDs 112 and 113, and their circumstantial evidence, far from being compelling, has no nexus to race. At bottom, Plaintiffs' claims boil down to this: Plaintiffs believe they can draw HDs 112 and 113 better than Florida did. That is no basis for federal intrusion in the State's redistricting function.

**WHEREFORE**, the House respectfully requests this Court to dismiss Plaintiffs' challenges to the State House districts or, in the alternative, their challenges to HDs 112 and 113. Because Plaintiffs have not requested leave to amend their complaint a second time, the Court's dismissal should be **with prejudice**. *See Wagner v. Daewoo Heavy Indus. Am. Corp.*, 314 F.3d 541, 542–43 (11th Cir. 2002) (en banc).

Dated August 13, 2024.                    Respectfully submitted,

 

                                                                   /s/ *Andy Bardos*

Christopher M. Kise (FBN 855545)          Andy Bardos (FBN 822671)
ckise@continentalpllc.com                 andy.bardos@gray-robinson.com
CONTINENTAL PLLC                          GRAYROBINSON, P.A.
101 North Monroe Street, Suite 750        301 South Bronough Street, Suite 600
Tallahassee, Florida 32301                Tallahassee, Florida 32301-1724
Telephone: 850-270-2211                   Telephone: 850-577-9090

Jesus M. Suarez (FBN 60086)
jsuarez@continentalpllc.com
Carmen Manrara Cartaya (FBN 73887)
ccartaya@continentalpllc.com
CONTINENTAL PLLC
255 Alhambra Circle, Suite 640
Coral Gables, Florida 33134
Telephone: 305-677-2707

*Attorneys for Defendant, Florida House of Representatives*