**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 1:24-21983-CIVIL BECERRA/TORRES**

CUBANOS PA'LANTE, et al.,

     *Plaintiffs*,

v.

FLORIDA HOUSE OF REPRESENTATIVES,
et al.,

     *Defendants*.

_____/

## DEFENDANT SECRETARY OF STATE'S THIRD MOTION TO DISMISS

For a third time, Plaintiffs fail to state a racial gerrymandering claim in their challenge to three congressional districts in South Florida and seven state-house districts also in South Florida. Doc.58 ¶ 4 (second amended complaint). This most recent attempt includes six alternative maps to nudge the claim over *Twombly-Iqbal*'s plausibility standard; however, Plaintiffs' most recent attempt still falls short of the mark. Doc.58 ¶ 186. In a racial gerrymandering case, Plaintiffs must plead facts that show direct or circumstantial evidence of race being the predominant factor in the drawing of districts. That's a difficult task because the legislature's redistricting plans come with a presumption of good faith. Statements from a handful of legislators and staff can neither establish that race predominated nor overcome the starting evidentiary presumption of good faith to which the legislature is entitled. Nor can pointing to a few factoids about portions of certain districts. Nor can alternative maps that come devoid of any allegations explaining why the alternatives show better-looking districts that could have been drawn consistent with race-neutral or constitutionally mandated redistricting objectives. This Court should thus dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6). It should do so with prejudice. Three complaints are enough.

### Motion to Dismiss Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Only factual

allegations are assumed to be true for purposes of a motion to dismiss; legal conclusions are not. *Id.* at 662-64.

## Argument

The facts, as alleged, don't state a claim for racial gerrymandering. Racial gerrymandering occurs when a legislature "gives race a predominant role in redistricting decisions." *Alexander v. S.C. State Conf. of the NAACP*, 144 S. Ct. 1221, 1233 (2024). Race predominates when it's "the criterion that, in the" legislature's "view, could not be compromised," *Shaw v. Hunt*, 517 U.S. 899, 907 (1996), subordinating race-neutral districting criteria, like "compactness, contiguity, and core preservation," *Alexander*, 144 S. Ct. at 1234. Plaintiffs can prove racial predominance through direct evidence, such as explicit legislative language making race the predominant criterion, *id.*; circumstantial evidence, such as a district's bizarre shape explained by race alone, *id.*; or circumstantial evidence presented through an assessment of the *Arlington Heights* factors, *see Jacksonville Branch of the NAACP v. City of Jacksonville*, 635 F. Supp. 3d 1229, 1244-45 (M.D. Fla. 2022) (collecting cases, including *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999)). Circumstantial evidence of racial predominance is a high bar; something like the legislature's creation of a "'strangely irregular twenty-eight-sided'" district is needed. *Alexander*, 144 S. Ct. at 1250 (quoting *Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960)).

Regardless of whether they present direct or circumstantial evidence, Plaintiffs must also overcome the starting evidentiary presumption of good faith to which the legislature is entitled. *Id.* at 1235-36. They can—and indeed must—do that through alternative maps showing that it was possible for the legislature to take the many varying but permissible considerations into account when drawing districts; the alternative maps, *together with appropriate allegations*, help establish that a racial gerrymandering claim is plausible. *Id.* at 1235 ("Without an alternative map, it is difficult for plaintiffs to defeat our starting presumption that the legislature acted in good faith."); *see also id.* at 1249 (concluding that the district court "critically erred by failing to draw an adverse inference against" plaintiffs "for not providing a substitute map that shows how the State could have achieved its legitimate political objectives" "while producing significantly greater racial balance" (cleaned up)).

I.      **The second amended complaint fails to include sufficient allegations concerning direct or circumstantial evidence that race predominated.**

In Count I of their second amended complaint, Plaintiffs allege that CD26, CD27, and CD28 are racial gerrymanders. *See also* Doc.58 ¶ 4. In Count II, Plaintiffs allege that HD112, HD113, HD114, HD115, HD116, HD118, and HD119 are racial gerrymanders. *See also* Doc.58 ¶ 4. But Plaintiffs fail to plead the requisite direct or circumstantial facts for either count—facts that, accepted as true, state a plausible claim.

**A.** Start with the congressional districts. As direct evidence of racial predominance, Plaintiffs rely on statements from a handful of legislators—those who both supported and opposed the congressional map—and legislative staffers. *E.g.*, Doc.58 ¶¶ 105, 117, 127, 148. Even if one could infer from these statements that race predominated for that individual, which is a stretch, these statements still fail to create a plausible inference that "the legislature *as a whole* was imbued with racial motives." *Brnovich v. DNC*, 594 U.S. 647, 689 (2021) (emphasis added). That's because "[w]hat motivates one legislator to make a speech about [a portion of] a statute is not necessarily what motivates scores of others to enact it." *United States v. O'Brien*, 391 U.S. 367, 384 (1968). And what motivates one staffer to explain one part of a broader congressional plan tells us nothing about the intent of the legislative body that voted for the plan. *See id.*

Plaintiffs fail to allege sufficient circumstantial facts as well. They say that one district has an odd western boundary, that the City of Miami is unnecessarily split, that another district "consists of two distinct population centers separated by the unpopulated Everglades," and that some districts have low compactness scores compared to other districts in the same map. *E.g.*, Doc.58 ¶¶ 156, 171, 174, 183. As an initial matter, any allegations that focus only on a particular portion of a district fail to establish much, because the Supreme Court has "made clear that redistricting analysis must take place at the district level," *Abbott v. Perez*, 585 U.S. 579, 616 (2018); the focus on a particular, isolated portion of a district must tie back to its significance on the district as a whole, *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 192 (2017).

Regardless, none of the alleged circumstantial facts—standing alone or considered together—can establish that race was "the criterion that, in the" legislature's "view, could not be compromised." *Shaw*, 517 U.S. at 907. After all, it's okay for a boundary to track the coastline at its western edge and include a chain of small islands. Doc.58 ¶ 173 & Fig. 12. The islands must be placed somewhere. So too with the Everglades. Some districts will inevitably have better or worse

compactness scores than others. And some cities must be split; that's necessarily true of large, populated cities like Miami. *E.g.*, *Common Cause v. Byrd*, 2024 U.S. Dist. LEXIS 54503, at \*64 (N.D. Fla. Mar. 27, 2024) (the City of Jacksonville had to be split in the congressional map to meet relevant population requirements imposed by federal law).

Nor does *Arlington Height*'s test for circumstantial evidence of intent offer a refuge. That test looks to the (1) impacts of the challenged law, (2) its historical background, (3) the sequence of events leading up to its passage, (4) any procedural and substantive departures in its enactment, (5) the contemporary statements and actions of key legislators, (6) the foreseeability of any impacts, (7) the knowledge of any impacts, and (8) the availability of less discriminatory alternatives. *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 66 F.4th 905, 922 (11th Cir. 2023). Plaintiffs' second amended complaint never mentions *Arlington Heights*. Allegations arguably relevant to the now-familiar factors are a mere afterthought; Plaintiffs focus instead on the supposed lack of political cohesion in South Florida's Hispanic community. *E.g.*, Doc.58 ¶¶ 15-17, 193-99. This is in keeping with Plaintiffs' mistaken belief that *Arlington Heights* and its progeny simply don't matter when assessing whether a legislature intended for race to predominate when enacting redistricting plans. *Compare* Doc.38 at 6, *with Jacksonville Branch of the NAACP*, 635 F. Supp. 3d at 1244 (collecting cases to the contrary and relying on *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363 (11th Cir. 2022), and *Greater Birmingham Ministries v. Sec'y of State for State of Ala.*, 992 F.3d 1299 (11th Cir. 2021)).

**B.** Allegations concerning the house districts fail for similar reasons. Plaintiffs' direct evidence again comes from the statements of a handful of legislators and legislative staff. *E.g.*, Doc.58 ¶¶ 56, 63, 70, 79. And again, those statements don't establish that race predominated. At best, they shed light on the intent of certain individuals and not the intent of the whole legislature.

Allegations concerning circumstantial evidence are similarly lacking. As alleged, the circumstantial evidence consists of rectangles stacked side by side; the inclusion of an airport within a district; the splitting-up of a large, densely populated city like Miami; and low compactness scores compared to the overall map. *E.g.*, Doc.58 ¶¶ 79, 80, 95, 96. But again, Plaintiffs fail to allege how or why shapes like rectangles point to race as the predominant criterion, as opposed to twisting-and-turning appendages that track racial demographics with surgical precision. They fail to allege how or why including the airport in a district matters when the legislature must include the airport in *a* district. They fail to allege how or why splitting a populous

city matters when the legislature must create districts throughout the state of roughly equal population, making it necessary to split large cities like Miami. And they fail to allege how or why the compactness numbers matter when Plaintiffs simply compare the numbers to the compactness scores for the overall plan, rather than some recognized floor for compactness. The relative-compactness point is particularly problematic for Plaintiffs, because the Florida Supreme Court has already said that the districts, on their face, are compact. *In re Senate Joint Resol. of Legislative Apportionment 100*, 334 So. 3d 1282, 1287 (Fla. 2022).

Finally, the *Arlington Heights*-related allegations are again missing. So, its factors can't help Plaintiffs allege that race predominated in the legislature's decision-making process.

## II.      The second amended complaint fails to overcome the presumption of good faith.

Plaintiffs may well respond that they have done enough to survive a motion to dismiss. They may say that it's okay at the pleading stage to include only a few quotes from the legislative record, to generally criticize the shapes of the districts, to note that the City of Miami is split, to note relative compactness, and to make a few points about the Everglades or the airport being included in a particular district. Not true. The presumption of good faith is a starting evidentiary burden that ratchets up with each successive stage of litigation, and, at this stage, the need to produce alternative plans makes the *Twombly-Iqbal* hurdle higher still for Plaintiffs. Given the dearth of other allegations, Plaintiffs should have provided alternative maps together with allegations explaining why the alternatives are workable or why the alternatives make it more likely that race predominated in the legislature's maps. They didn't do that.

**A.** The presumption of good faith plays an outsized role in redistricting cases. It imposes an "especially stringent" evidentiary requirement that "directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 144 S. Ct. at 1235-36. The presumption "ensures that 'race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines.'" *Id.* (quoting *Miller v. Johnson*, 515 U.S. 900, 913 (1995)). Importantly, the presumption avoids the judicial branch "quick[ly]" "hurl[ing]" race-based "accusations at the political branches." *Id.* In practice, when a court considers a statement from a legislator, for example, the presumption requires the court to presume that the statement was made in good faith, and shouldn't "read" it "to demonstrate discriminatory intent" and then impute that

intent to "the state legislature." *League of Women Voters of Fla.*, 32 F.4th at 1373-74. Nor should courts read discriminatory intent into the use of common shapes, the inclusion of certain places into districts, the splitting-up of large cities, or a series of compactness numbers without more.

Viewed through the "especially stringent" requirement that the Supreme Court has set for Plaintiffs, *Alexander*, 144 S. Ct. at 1235-36, no factual allegations or "reasonable inferences" from those allegations can save Plaintiffs' second amended complaint, *Sinaltrainal v. Coca-Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009). The relief they seek simply isn't plausible.

**B.** Plaintiffs' pleading deficiency is particularly pronounced, because they fail to provide viable alternative maps for the congressional and house districts. On the same day that Plaintiffs filed this case, the Supreme Court made clear that "[w]ithout an alternative map, it is difficult for plaintiffs to defeat [this Court's] starting presumption that the legislature acted in good faith." *Alexander*, 144 S. Ct. at 1235. An alternative map, the Supreme Court explained, can be easily drawn and "can perform the critical task of distinguishing between" permissible and impermissible motivations in drawing district lines. *Id.* at 1249-50. This alternative map becomes essential for plaintiffs in racial gerrymandering cases where there's a lack of weighty "direct evidence," or "some extraordinarily powerful circumstantial evidence." *Id.* In other words, given the lack of other allegations, "only an alternative map" "can carry the day" for Plaintiffs in this case; only with such a plan can they state a plausible claim for relief. *Id.* at 1249. Yet we have no viable, alternative congressional or house maps here.

Plaintiffs now, in their second amended complaint, present two new congressional maps and four new house maps. Doc.58 ¶ 186. Plaintiffs contend that their alternative maps "better comply with race-neutral traditional redistricting principles like compactness, respect for political subdivisions, and follow[] major geographic features." Doc.58 ¶ 190.

Critically, however, Plaintiffs fail to state *how* these maps better comply with race-neutral redistricting principles. The second amended complaint contains no compactness scores for the six new maps. Nor a count of how many times they cross county or municipal lines. Nor what geographic features they respect. Nor the racial composition of the new districts. The second amended complaint also fails to allege that the six new maps contain equal populations, comply with the Voting Rights Act, or adhere to the redistricting provisions of the Florida Constitution.

And because Plaintiffs' six new maps don't come from the legislature's website, a repository of *every* map submitted during the redistricting process, with *undisputed* map-specific

metrics for *each* map, the incorporation-by-reference doctrine can't save Plaintiffs' complaint. That doctrine allows for consideration of material *referenced* or *attached* in a plaintiff's complaint where the material is "(1) central to the plaintiff's claim[,] and (2) undisputed." *Horsely v. Feldt*, 304 F.3d 1125, 1134-35 (11th Cir. 2002). "'Undisputed' means that the authenticity of the document is not challenged," and Plaintiffs' maps are most definitely disputed. *Id*.; *see also Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997) ("where the plaintiff refers to certain documents in the complaint and those documents are central to the plaintiff's claim, then the Court may consider the documents part of the pleadings for purposes of Rule 12(b)(6) dismissal, and the defendant's attaching such documents to the motion to dismiss will not require conversion of the motion into a motion for summary judgment" (citations omitted)).

In sum, instead of presenting viable "substitute map[s] that show[] how the State could have achieved its legitimate political objectives" "while producing significantly greater racial balance," *Alexander*, 144 S. Ct. at 1249 (cleaned up), Plaintiffs present little more than undistinguished lines on a map. Plaintiffs don't even attempt to use the maps to "perform the critical task of distinguishing between racial" and permissible "motivations." *Id.*

## Conclusion

This Court should grant the Secretary's third motion to dismiss. Plaintiffs' factual allegations and legal conclusions are insufficient to overcome the motion. All this Court has before it are stray statements, allegations about parts of districts, allegations about whole districts that offer little more than interesting tidbits about points of interests within those districts, a willful disregard of the *Arlington Heights* factors, and unexplained lines on a map offered as alternatives. *Ashcroft*, 556 U.S. at 662-64. Three strikes, and Plaintiffs should be out (with prejudice).

Dated: October 7, 2024

Respectfully submitted by,

Bradley R. McVay (FBN 79034)
brad.mcvay@dos.myflorida.com
Joseph S. Van de Bogart (FBN 84764)
joseph.vandebogart@dos.myflorida.com
Ashley Davis (FBN 48032)
ashley.davis@dos.myflorida.com
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building
500 S. Bronough St.
Tallahassee, FL 32399
(850) 245-6536

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
mjazil@holtzmanvogel.com
Michael Beato (FBN 1017715)
mbeato@holtzmanvogel.com
zbennington@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St. Suite 500
Tallahassee, FL 32301
(850) 270-5938

*Counsel for the Secretary*

## LOCAL RULE 7.1(c) CERTIFICATION

The undersigned certifies that this motion to dismiss does not exceed twenty pages inclusive of all parts.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2024, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

/s/ Mohammad O. Jazil
Mohammad O. Jazil.