IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 1:24-21983-CIVIL BECERRA/TORRES

CUBANOS PA'LANTE, et al.,

    *Plaintiffs*,

v.

FLORIDA HOUSE OF REPRESENTATIVES,
et al.,

    *Defendants*.

_____/

### **THE SECRETARY'S REPLY IN SUPPORT OF HIS THIRD MOTION TO DISMISS**

    Plaintiffs must "present *sufficient* facts, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1244 (11th Cir. 2016) (emphasis added, quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Yet the allegations of direct evidence of racial predominance they present are insufficient. So are the allegations of circumstantial evidence of racial predominance, especially when Plaintiffs haven't provided allegations sufficient for an *Arlington Heights* analysis, and when their alternative maps provide nothing more than unexplained lines. Such insufficient allegations can't overcome a motion to dismiss. Plaintiffs' complaint should therefore be dismissed with prejudice.

### Argument

    Plaintiffs make five arguments to avoid dismissal. All five should be rejected.

    *First*, Plaintiffs contend that the Secretary mischaracterizes their claims. Doc.69 at 3-4. According to Plaintiffs, the Secretary treats their racial gerrymandering claim as a vote-dilution claim. That's because, say Plaintiffs, the Secretary faults them for failing to plead facts sufficient to establish circumstantial evidence of racial predominance through the *Arlington Heights* factors. Doc.69 at 3-4. Plaintiffs state that the factors are "necessary" in a vote-dilution claim, but merely could be "use[d]" in a racial gerrymandering claim. Doc.69 at 3-4 & 4 n.2. Even if the factors are required here, Plaintiffs contend that their complaint establishes them. Doc.69 at 3-6.

1

Plaintiffs make little movement with this argument. They, of course, concede the obvious: a plaintiff can use the *Arlington Heights* factors in a racial gerrymandering claim, Doc.69 at 4 n.2, particularly when, as here, the direct evidence of racial predominance is paltry at best.

The Supreme Court agrees. In a case that Plaintiffs cite in their response, the Supreme Court said that:

> The task of assessing a jurisdiction's motivation [in a racial gerrymandering case], however, is not a simple matter; on the contrary, it is an inherently complex endeavor, one requiring the trial court to perform a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, *supra*, at 266; see also *Miller*, *supra*, at 905, 914 (citing *Arlington Heights*); *Shaw I*, 509 U.S. at 644 (same).

*Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (cited on Doc.69 at 4). Those factors were also considered in another racial gerrymandering case, *Jacksonville Branch of the NAACP v. City of Jacksonville*, 635 F. Supp. 3d 1229, 1244 (M.D. Fla. 2022), which helpfully collected other Supreme Court cases that support the proposition.

All told, a plaintiff, in a racial gerrymandering case, can and should use the *Arlington Heights* factors to show that a redistricting body predominated race over other districting criteria. Regardless of whether the factors are mandatory or permissive—and they should be mandatory where direct evidence is lacking—Plaintiffs didn't make them out in their second amended complaint. Consider the following:

- *Historical Background.* Plaintiffs' second amended complaint doesn't contain this factor. Plaintiffs don't trace the history and previous district lines of the South Florida congressional and state house districts they challenge. *See, e.g.*, *Common Cause Fla. v. Byrd*, 2024 U.S. Dist. LEXIS 54503, at *14-17 (N.D. Fla. Mar. 27, 2024) (three-judge court) (explaining CD5's history).

- *Sequence of Events.* Plaintiffs' complaint states when maps were passed, *e.g.*, Doc.58 ¶ 2, and by what vote, *e.g.*, Doc.58 ¶ 125. But that doesn't establish that the Florida Legislature drew and passed maps for racially predominant reasons.

- *Procedural and Substantive Departures.* Plaintiffs' second amended complaint doesn't contain this factor. Plaintiffs don't allege that the Florida Legislature violated any rule, statute, or norm in passing its maps.

- *Contemporary Statements.* Plaintiffs quote a handful of legislators and staff, but those individuals speak only for themselves, not the entire legislative body. *League of Women Voters of Fla. v. Fla. Sec'y of State*, 66 F.4th 905, 932 (11th Cir. 2023).

- *Impact, Foreseeability of Impact, Knowledge of Impact.* "[I]mpact alone is not determinative." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977); *see also League of Women Voters*, 66 F.4th at 942. And statements from a bill's opponent (like statements from Senator Farmer, who opposed the enacted congressional map, Doc.58 ¶ 169), don't establish knowledge of potential impacts or legislative motive. *League of Women Voters*, 66 F.4th at 940.

- *Less Discriminatory Alternatives.* As explained in more detail below, Plaintiffs fail to show that their maps are viable alternatives.

As such, the *Arlington Heights* factors aren't established in Plaintiffs' second amended complaint. And, even if they were, the presumption of good faith prevents courts from drawing "negative inference[s]" from them. *Simpson v. Thurston*, 2023 U.S. Dist. LEXIS 92213, at *2-6 (E.D. Ark. May 25, 2023) (three-judge court) (granting a motion to dismiss in a vote-dilution case after concluding that the allegations weren't enough to overcome the legislative presumption of good faith).

*Second*, Plaintiffs contend that the presumption of good faith doesn't "impose an insurmountable barrier to adequately pleading or proving a racial-gerrymandering claim." Doc.69 at 6. They also argue that *Alexander* is distinguishable, because it concerned a situation where (1) only circumstantial evidence bolstered a racial gerrymandering claim and (2) the state used partisan preferences as a justification for district lines. Doc.69 at 6-7.

Plaintiffs are right that the presumption doesn't impose an insurmountable barrier. But even at the pleading stage, it raises the bar that Plaintiffs must clear to allege facts sufficient to state a claim for relief. *Simpson*, 2023 U.S. Dist. LEXIS 92213, at *2-6 (applying the presumption at the pleading stage). After all, the rationales that undergird the presumption apply at the pleading stage too. This initial stage of litigation changes nothing about the "Federal Judiciary's due respect for the judgment of state legislators, who are similarly bound by an oath to follow the Constitution"; an aversion to "quick[ly]" "hurl[ing]" race-based "accusations at the political branches"; and a "war[iness] of plaintiffs who seek to transform federal courts into weapons of political warfare."

*Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 11 (2024). In *Miller v. Johnson*, 515 U.S. 900, 916-17 (1995), another redistricting case, the Supreme Court made this point clear:

> Of course, courts must also recognize . . . the intrusive potential of judicial intervention into the legislative realm, when assessing under the Federal Rules of Civil Procedure the adequacy of a plaintiff's showing at the various stages of litigation and determining whether to permit discovery or trial to proceed. See, *e.g.*, Fed. Rules Civ. Proc. 12(b) & (e), 26(b)(2), 56; see also *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 327, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).

Plaintiffs never addressed this point in *Miller*, and their attempts to distinguish *Alexander* are unconvincing. The Supreme Court is capable of narrowing its own holdings. *E.g.*, *Schmerber v. California*, 384 U.S. 757, 772 (1966) ("It bears repeating, however, that we reach this judgment only on the facts of the present record."). Nothing in *Alexander*, however, suggests that it should be limited to cases where a plaintiff solely relies on circumstantial evidence or where a state relies on partisan justifications. As Plaintiffs rightly acknowledge, the presumption of good faith "is nothing new." Doc.69 at 6. It shouldn't therefore be unduly and unjustifiably narrowed now.

*Third*, Plaintiffs contend that they didn't need to present alternative maps in their second amended complaint, and even if they did, Plaintiffs contend that they presented such maps. Doc.69 at 8-9. Plaintiffs are wrong on both counts. Given the deficiencies with their direct and circumstantial evidence, the presumption required them to present something more. *Alexander*, 602 U.S. at 10 ("Without an alternative map, it is difficult for plaintiffs to defeat our starting presumption that the legislature acted in good faith."). The presumption starts at the pleading stage, *Simpson*, 2023 U.S. Dist. LEXIS 92213, at *2-6, which makes an alternative map necessary at the pleading stage, especially when Plaintiffs can't marshal other, sufficient allegations of racial predominance that outweigh the starting presumption of good faith.

Even so, Plaintiffs state that they "plausibly allege" in their second amended complaint that their six alternative maps "better comply with traditional race-neutral redistricting criteria." Doc.69 at 8 (citing Doc.58 ¶¶ 184-90). Again, Plaintiffs didn't allege this; they concluded it. They included no "supporting allegations." *McCullough v. Finley*, 907 F.3d 1324, 1334 (11th Cir. 2018). As the Secretary explained in his motion to dismiss:

> The second amended complaint contains no compactness scores for the six new maps. Nor a count of how many times they cross county or municipal lines. Nor what geographic features they respect. Nor the racial composition of the new districts. The second amended complaint also fails to allege that the six new maps

4

contain equal populations, comply with the Voting Rights Act, or adhere to the redistricting provisions of the Florida Constitution.

Doc.60 at 6. If the presumption of good faith means anything, and if it requires viable alternative maps, Plaintiffs must show that their maps are *viable*, and not merely "undistinguished lines on a map." Doc.60 at 7. Despite Plaintiffs' protestations, Doc.69 at 8, they *can* make such allegations; it's not difficult to run compactness numbers and political-subdivision splits. And it's not up to the Secretary to make Plaintiffs' supporting allegations for them. Doc.69 at 8 n.3.

Taking stock, the presumption's viable alternative map requirement makes sense. A viable alternative map can show that better districts could be drawn, absent purported racial motivation. But without supporting allegations—ones showing that the alternative map contains compact districts, or showing that some municipal splits aren't necessary, for example—mere lines on a map don't show or prove anything. Conclusory allegations are all that's left. They can't displace the starting presumption of good faith.

*Fourth*, Plaintiffs argue that four legislators can and do establish direct evidence for the entire legislative branch. Doc.69 at 9. They rely on cases like *Jacksonville Branch of the NAACP* and *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254 (2015). Doc.69 at 10. And they take aim at the Secretary's reliance on non-racial-gerrymandering cases like *Brnovich v. DNC*, 594 U.S. 647 (2021), *United States v. O'Brien*, 391 U.S. 367 (1968), and *League of Women Voters of Florida v. Florida Secretary of State*, 66 F.4th at 932. Doc.68 at 6, 10-11.

Plaintiffs' arguments don't carry much water. While the second amended complaint need not contain statements from each legislator, certainly relying on more than four—in a 120-person state house and 40-person state senate—is necessary. By contrast, consider *Jacksonville Branch of the NAACP*, where scores of statements, from at least ten councilmembers, in a nineteen-person municipal body, were considered.[1] *Alabama Legislative Black Caucus* included allegations that "Alabama expressly adopted and applied a policy of prioritizing mechanical racial targets above all other districting criteria (save one-person, one-vote)," which "provide[d]" direct "evidence that race motivated the drawing of particular lines in multiple districts in the State." 575 U.S. at 267.

---

[1] *E.g.*, 635 F. Supp. 3d at 1252 (Prestly Jackson), 1253 (Bowman), 1255 (Gaffney and Pittman), 1255-57 (Dennis), 1258 (DeFoor), 1261 (White), 1261 n.30 (Ferraro), 1263 (Becton), 1269 (Diamond); *see also id.* at 1256 ("The conversation continued with discussions of areas that Councilmembers would be willing to give up to meet District 8's population needs with most Councilmembers expressing a desire not to change anything about their districts.").

That kind of express, mechanical, legislature-wide policy is alleged nowhere in Plaintiffs' second amended complaint. They try to make up that deficiency with statements from only a few public officials—that works where the few (three of five members) constitute a majority of those drawing district lines, but not where the few (a handful of 160) are just a few. *E.g.*, *GRACE, Inc. v. City of Miami*, 702 F. Supp. 3d 1263, 1277 (S.D. Fla. 2023) (relying on statements from three of five councilmembers).

      Nor do Plaintiffs gain ground with their attempts to minimize *Brnovich*, *O'Brien*, and *League of Women Voters*. For Plaintiffs, these cases shouldn't apply because the cases don't concern racial gerrymandering claims. But so what? *Brnovich*, *O'Brien*, and *League of Women Voters* all assessed legislative decisionmaking, which is also the focus of a racial gerrymandering claim: "[t]he task of assessing a jurisdiction's motivation [in a racial gerrymandering case] . . . is an inherently complex endeavor, one requiring the trial court to perform a 'sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Hunt*, 526 U.S. at 546 (quoting *Arlington Heights*, 429 U.S. at 266). The district court in *Jacksonville Branch of the NAACP* didn't seem fazed by Plaintiffs' arguments; it relied on non-racial-gerrymandering cases, like *League of Women Voters*, in its racial gerrymandering discussion. *E.g.*, 635 F. Supp. 3d at 1244. Plaintiffs, as such, haven't established direct evidence of racial predominance.

      *Fifth*, Plaintiffs argue that they established circumstantial evidence of racial predomination. Doc.69 at 11. As they state in their second amended complaint, the challenged districts "deviate from traditional redistricting criteria" by "transgressing major geographic boundaries like the Everglades, unnecessarily splitting political subdivisions like the City of Miami and Collier County, and forming noncompact shapes." Doc.69 at 11 (quoting Doc.58 ¶ 5).

      These points, however, only underscore that a viable alternative map is necessary in a racial gerrymandering claim. Without such a map, it's unclear that more compact districts could be drawn, that a city and county can be split in fewer places, or whether it's possible to better situate the Everglades. Without that, it's not established that traditional districting criteria were violated, or that the criteria were violated for race-based reasons. The case in point is HD112, which contains the Miami International Airport. Plaintiffs make much of the fact that the airport is contained in

6

this district.[2] But Plaintiffs don't explain how sticking an airport in a house district was done for racial reasons, and they don't present a better-drawn district in a viable alternative map.

That's the rub. It's tough to establish circumstantial evidence of a racial gerrymander. *Alexander*, 602 U.S. at 35. But Plaintiffs can't transform simple redistricting realities—sticking the Everglades somewhere, splitting some cities and counties, having some districts more or less compact than others—into evidence of race-based redistricting, especially when they present no viable alternative maps.

\* \* \*

Pleading a racial gerrymandering claim is tough. But it's not impossible. Direct evidence of racial predominance can be shown in a few ways. A plaintiff can rely on statements from the majority of the redistricting body (which may be very doable in municipal or county redistricting cases). Or a plaintiff can point to a body-wide policy, establishing a hard-and-fast racial redistricting rule. *E.g.*, *Ala. Legis. Black Caucus*, 575 U.S. at 267. Sufficient circumstantial evidence can be alleged by a district's highly irregular shape—the twenty-eight-sided district comes to mind. When coupled with a viable alternative map, one that shows that a better district can be drawn, the irregular shape suggests a race-based motive. And, of course, a plaintiff could use *Arlington Heights* factors in its complaint.

Plaintiffs' third attempt pursues none of the viable means of pleading a racial gerrymandering case. They rely on statements from only a handful of legislators in a 160-person state legislature, and they don't point to a hard-and-fast racial redistricting rule used by the redistricting body. They can't point to highly irregular district maps, and they don't have a viable alternative map to show that traditional districting criteria were violated at all—or violated for race-based reasons. Nor have they made out the *Arlington Heights* factors. In this case then, the

---

[2] Doc.58 ¶ 55 ("Other Challenged House Districts split cities unnecessarily and connected disconnected populations on either side of Miami International Airport."), ¶ 94 ("Figure 8 below depicts HDs 112 and 113, including Miami International Airport. Figure 9 below depicts HD 112, with each registered voter represented by a blue dot mapped at their home address, areas with non-residential land uses represented in grey, and parks represented in green."), ¶ 95 ("HD 112 is essentially comprised of two separate pieces. Its northern section takes in Miami Springs, Virginia Gardens, and part of Hialeah. Its southern bulge extends into the City of Miami to the Tamiami Trail and east to 17th Avenue. In between lies a largely uninhabited, 4,300-acre area encompassing Miami International Airport and the adjacent industrial zone. HD 112 ranks in the thirty-sixth, twenty-ninth, and thirty-eighth percentile for Reock, Convex Hull, and Polsby-Popper scores, respectively.").

starting presumption of good faith isn't overcome, and Plaintiffs don't state a racial gerrymandering claim.

      This Court should thus grant the Secretary's third motion to dismiss and dismiss with prejudice the second amended complaint.

Dated: October 21, 2024                                     Respectfully submitted by,

Bradley R. McVay (FBN 79034)                    /s/ Mohammad O. Jazil
brad.mcvay@dos.myflorida.com                    Mohammad O. Jazil (FBN 72556)
Joseph S. Van de Bogart (FBN 84764)             mjazil@holtzmanvogel.com
joseph.vandebogart@dos.myflorida.com            Michael Beato (FBN 1017715)
Ashley Davis (FBN 48032)                        mbeato@holtzmanvogel.com
ashley.davis@dos.myflorida.com                  zbennington@holtzmanvogel.com
FLORIDA DEPARTMENT OF STATE                     HOLTZMAN VOGEL BARAN
R.A. Gray Building                              TORCHINSKY & JOSEFIAK PLLC
500 S. Bronough St.                             119 S. Monroe St. Suite 500
Tallahassee, FL 32399                           Tallahassee, FL 32301
(850) 245-6536                                  (850) 270-5938

*Counsel for the Secretary*

## LOCAL RULE 7.1(c) CERTIFICATION

The undersigned certifies that the foregoing does not exceed ten pages inclusive of all parts.

/s/ Mohammad O. Jazil
Mohammad O. Jazil

## CERTIFICATE OF SERVICE

I hereby certify that on October 21, 2024, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

/s/ Mohammad O. Jazil
Mohammad O. Jazil.