UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 24-cv-21983-JB

**CUBANOS PA'LANTE**, *et al.*,

　　Plaintiffs,

v.                                                                                  **THREE-JUDGE COURT**

**FLORIDA HOUSE OF REPRESENTATIVES**, *et al.*,

　　Defendants.
_____/

## ORDER ON MOTIONS TO DISMISS

Before GRANT, Circuit Judge, and RUIZ and BECERRA, District Judges.

RUIZ, District Judge:

In this case, Plaintiffs allege that the Florida Legislature racially gerrymandered three Congressional Districts—26, 27, and 28—and seven State House districts—112, 113, 114, 115, 116, 118, and 119—in violation of the Fourteenth Amendment.[1]  To show that race was the predominant factor in the design of these Challenged Districts, Plaintiffs have submitted statements from key legislators that referenced race, as well as circumstantial evidence regarding the districts' shape and compactness.

---

[1] State House Districts 112, 113, 114, 115, 116, 118, and 119 are collectively referred to as "Challenged House Districts."  Congressional Districts 26, 27, and 28 are collectively referred to as "Challenged Congressional Districts."  Together, the districts at issue are referred to as "Challenged Districts"; the Complaint also refers to the Congressional Districts as "CDs."

Defendants—the Florida Secretary of State and Florida House of Representatives—have each moved to dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6). *See* ECF Nos. 59, 60. For the reasons below, the Court **DENIES** the House of Representatives' Motion to Dismiss and **GRANTS IN PART** the Secretary of State's Motion to Dismiss. Plaintiffs present insufficient factual allegations to state a plausible claim that the Florida Legislature racially gerrymandered Congressional Districts 27 and 28, but their claims survive in all other respects at the pleading stage.

## BACKGROUND

The following alleged facts are taken as true from Plaintiffs' Second Amended Complaint. ECF No. 58 ("Complaint"); *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

The Florida Legislature, comprised of the House of Representatives ("House") and Senate (collectively, "Legislature"), redistricted its House and Congressional Districts after the 2020 Census.[2] Compl. ¶ 46. When creating redistricting plans, the Legislature was required to comply with the Florida State Constitution and the federal Voting Rights Act. Each imposes restrictions on the State's otherwise broad power over the redistricting process.

---

[2] Both the Florida House and Senate pass state legislative redistricting plans by joint resolution, and both the Florida House and Senate pass congressional redistricting plans by ordinary legislation subject to gubernatorial approval. Thus, though the Florida Senate is not a party to the suit, statements made in Senate committees or subcommittees are relevant to Plaintiffs' claims.

Under the Florida Constitution's Fair Districts Amendments, legislators must consider two sets of criteria (commonly referred to as "tiers") in assessing a proposed redistricting plan or legislative district.  Tier One limits the Legislature's discretion by: (1) banning partisan or incumbency gerrymandering; (2) prohibiting voting practices that discriminate on the basis of race or language; (3) prohibiting voting practices that diminish a minority group's ability to elect their preferred candidate; and (4) requiring that districts be contiguous.  Fla. Const. art. III, §§ 20(a), 21(a).  Tier Two sets out further requirements—districts must be "nearly equal in population as practicable," compact, and utilize existing geographic and political boundaries.  Fla. Const. art. III, §§ 20(b), 21(b).  Tier Two's requirements must be met unless they conflict with Tier One or federal law.

In late 2021, both the Florida House and Senate held numerous committee and subcommittee meetings with lawyers and legislative staff to hear explanations of state and federal redistricting law.  Compl. ¶ 46.  To ensure that a proposed district complied with the Fair Districts Amendments' "Tier One" minority-protection provisions, staff members explained that they conducted a "functional analysis" on each district that considered "minority population, minority voting-age population, minority voting registration, minority turnout in past elections by race, and election results."[3]  Compl. ¶ 47.  If lawmakers concluded that a proposed district was protected

---

[3] Plaintiffs allege that the Legislature's functional analysis was inadequate, as it assumed Hispanic voting cohesion in South Florida when it was ultimately lacking. Compl. ¶¶ 201–04. When asked about whether the functional analysis conducted on House districts involved analyses "to determine the level of minority cohesion, white voting bloc, and racially polarized voting," House Redistricting Committee Chair, Representative Tom

from minority diminishment or vote dilution under state or federal law, they referred to the district as "Tier One-protected." Compl. ¶ 48.

The Legislature passed a joint resolution approving redistricting plans for the House in February 2022. Two months later, Governor DeSantis approved the Legislature's redistricting plans for Florida's Congressional Districts. Compl. ¶¶ 2–3.

Plaintiffs are residents and community organizations based in South Florida.[4] Compl. ¶ 4. On May 23, 2024, Plaintiffs filed a Complaint against Defendants—the Florida House (tasked with redrawing legislative districts) and Florida's Secretary of State (who supervises and administers elections)—to challenge the redistricting plans. *See generally* ECF No. 1. After the Court granted Plaintiffs leave to amend, *see* ECF No. 57, Plaintiffs filed a Second Amended Complaint on September 26, 2024,

---

Leek "suggested some unspecified analysis had been 'performed by experts' and 'counsel,' but he could not identify which districts the analysis had been conducted in and did not make the analyses available to other representatives." Compl. ¶ 206. And "when asked whether the House had 'confirmed . . . or contradicted' the Supreme Court's finding in 2015 of 'a lack of Hispanic voting cohesion in the Miami-Dade area,' Chair Leek declined to answer." Further, "[w]hen asked whether the House 'considered the diversity within the Latino community when doing the functional analysis' he and others had repeatedly referred to, Chair Leek said it was 'not part of the data that's given to us, the census data, or the elections data.'" Compl. ¶ 208.

[4] Three Plaintiffs are membership organizations and associations. Plaintiffs Cubanos Pa'lante and Engage Miami, Inc., are nonprofit organizations based in Miami-Dade County. Compl. ¶¶ 21–22. Plaintiff FIU ACLU Club is a Florida International University student organization affiliated with the American Civil Liberties Union of Florida. Compl. ¶ 23. Four Plaintiffs are individuals that reside in the Challenged Districts. Plaintiff Cindy Polo is a Hispanic resident of Challenged House District 115 and Congressional District 27, Compl. ¶ 24; Plaintiff Luis Sorto is a Hispanic resident of Challenged House District 114 and Congressional District 27, Compl. ¶ 25; Plaintiff Genesis M. Castilla Falcon is a Hispanic resident of Challenged House District 118 and Congressional District 28, Compl. ¶ 26; and Plaintiff Diana Belbruno is a non-Hispanic white resident of Challenged District 26, Compl. ¶ 27.

which controls here. *See Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016).

Plaintiffs' Complaint includes two counts alleging that the Challenged Districts in both the congressional and House plans are racially gerrymandered in violation of the Fourteenth Amendment. Compl. ¶ 4. Count One alleges that the Challenged House Districts are racial gerrymanders, and Count Two alleges the same for the Challenged Congressional Districts. To support their allegations, Plaintiffs rely on statements from key lawmakers and legislators that referenced race, as well as circumstantial evidence regarding the shape and compactness of each Challenged District. Plaintiffs seek a declaratory judgment finding the Challenged Districts to be unconstitutional racial gerrymanders in violation of the Fourteenth Amendment, a permanent injunction preventing Defendants and their agents from using those Districts, and other relief. *See* Compl. at 38.

Defendants have filed separate motions to dismiss. The Florida House moves to dismiss Count Two of the Complaint; alternatively, the House moves to dismiss Count Two of the Complaint with respect to Challenged House Districts 112 and 113. ECF No. 59, at 15. The Secretary of State moves to dismiss the case in its entirety. ECF No. 60, at 1.

## LEGAL STANDARD

The Federal Rules require that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed R. Civ. P. 8(a)(2). Complaints need not contain "detailed factual allegations," but should at

least give defendants "fair notice of . . . what the claim is and the grounds for relief." *Twombly*, 550 U.S. at 555 (internal citation omitted).

When evaluating a motion to dismiss under Rule 12(b)(6), courts assess whether a plaintiff's complaint sufficiently provides grounds for their entitlement to relief in two steps. *McCollough v. Finley*, 907 F.3d 1324, 1333 (11th Cir. 2018). Courts must first identify and discard a complaint's conclusory allegations, which "are not entitled to the assumption of truth." *Id.*; *see Twombly*, 550 U.S. at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."). Then, courts must consider whether any remaining factual allegations in the complaint "plausibly give rise to an entitlement to relief." *McCollough*, 907 F.3d at 1333. "To state a plausible claim, factual allegations must allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted).

## ANALYSIS

The Equal Protection Clause bars state legislatures from relying on race as the predominant factor in drawing legislative districts. *See Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 7 (2024); *Cooper v. Harris*, 581 U.S. 285, 291 (2017); *Shaw v. Reno,* 509 U.S. 630, 642–49 (1993) (*Shaw I*). The Clause is designed to remedy the "harms caused by the use of unjustified racial classifications." *Bush v. Vera,* 517 U.S. 952, 980 (1996). Showing that the legislature used race when redistricting thus requires establishing that "race for its own sake, and not other

redistricting principles, was the legislature's dominant and controlling rationale in drawing its district lines." *Miller v. Johnson*, 515 U.S. 900, 913 (1995). "The distinction between being aware of racial considerations and being motivated by them may be difficult to make." *Id.* at 916. And this "evidentiary difficulty, together with the sensitive nature of redistricting and the presumption of good faith that must be accorded legislative enactments, requires courts to exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Id.*

Courts evaluate this showing in two steps. *Cooper*, 581 U.S. at 291. "First, the plaintiff must prove that 'race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Id.* (quoting *Miller*, 515 U.S. at 916). To show "predominance," a plaintiff must present evidence indicating that the legislature intentionally subordinated traditional and race-neutral redistricting criteria (like compactness, respect for political subdivisions, and partisan advantage) to divide citizens by race. *Alexander*, 602 U.S. at 7. Once a plaintiff demonstrates that race "drove the mapping of district lines," the burden will shift to the state to show that its use of race was necessary to further a compelling state interest. *Id.* at 11. We have no need to address the state's burden at this stage, as we are concerned only with assessing whether Plaintiffs' factual allegations plausibly state a racial-gerrymandering claim. *See GRACE, Inc. v. City of Miami*, 702 F. Supp. 3d 1263, 1278 n.15, 1279 (S.D. Fla. 2023) (declining to address whether the state had satisfied its burden on strict scrutiny on a motion to dismiss); *Singleton v. Allen*, No. 21-01291, 2024 WL

3384840, at *6 (N.D. Ala. July 11, 2024) (three-judge panel) (denying motion to dismiss racial-gerrymandering claim after holding that the complaint sufficiently alleged racial predominance).[5]

Either direct or circumstantial evidence can buttress Plaintiffs' racial-gerrymandering claims. *Miller*, 515 U.S. at 916. Direct evidence may come from a "relevant state actor's express acknowledgment that race played a role in the drawing of district lines." *Alexander*, 602 U.S. at 8. That said, "[s]uch concessions are not uncommon because States often admit to considering race" to satisfy state or federal law. *Alexander*, 602 U.S. at 8 (citing *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 259–60 (2015) (*ALBC*)). Plaintiffs may also present circumstantial evidence "of a district's shape and demographics," *Miller*, 515 U.S. at 916, though "proving racial predominance with circumstantial evidence alone is much more difficult."[6]

---

[5] Plaintiffs suggest that the Legislature did not satisfy its burden under *Thornburg v. Gingles*. 478 U.S. 30, 51 (1986). Under *Gingles*, a state may subordinate other, neutral factors to race if certain prerequisites exist. *See Cooper*, 581 U.S. at 301–02. These prerequisites include that (i) the minority group is large enough to constitute a majority, (ii) the minority group is politically cohesive and (iii) the majority votes sufficiently as a bloc to enable it to usually defeat the minority's preferred candidate. *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (citing *Gingles*, 478 U.S. at 51).

Plaintiffs' allegations may certainly help in rebutting a potential defense that the Florida Legislature permissibly considered race when redistricting. But assessing whether the Legislature's use of race was permissible—an analysis subject to strict scrutiny—is an unnecessary inquiry when reviewing a motion to dismiss a racial-gerrymandering claim. At this stage, we are concerned only with addressing whether Plaintiffs have sufficiently pled the substantive elements of the claim.

[6] Defendants contend *Alexander* mandates that Plaintiffs include alternative maps in their Complaint to adequately plead their claim. ECF No. 60, at 6. Not so. The existence of an alternative map is not a substantive requirement of a racial-gerrymandering claim, because the courts do not force "plaintiffs to submit one particular form of proof to prevail" in equal protection cases. *Cooper*, 581 U.S. at 319. In *Alexander*, the Court instead concluded that alternative maps are *helpful* "when the State raises a partisan-gerrymandering defense."

*Alexander*, 602 U.S. at 9. On a motion to dismiss, both types of evidence will render racial-gerrymandering claims more plausible by connecting a plaintiff's factual allegations to the Fourteenth Amendment violation at issue.

We evaluate the direct and circumstantial evidence Plaintiffs provide in combination. In some cases, overwhelming direct evidence, standing alone, may amount to a "confession of error." *Alexander*, 602 U.S. at 8; *see also Cooper*, 581 U.S. at 318 (noting that a plaintiff could find "scores of leaked e-mails instructing their mapmaker to pack as many black voters in a district" during discovery). Otherwise, circumstantial evidence alone may carry the day, for a district's shape may theoretically be "'so bizarre on its face that it discloses a racial design' absent any alternative explanation." *Alexander*, 602 U.S. at 8–9 (quoting *Miller*, 515 U.S. at 914); *see also Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960) (evaluating circumstantial evidence of a "strangely irregular twenty-eight-sided" district).

Often, both direct and circumstantial evidence will push a plaintiff's allegations from the notional to the plausible. *Vera*, 517 U.S. at 972–73; *Cooper*, 581 U.S. at 291; *see GRACE, Inc. v. City of Miami*, 702 F. Supp. 3d 1263, 1280

---

602 U.S. at 9. In that situation, Plaintiffs' production of an alternative map would "show[ ] that a rational legislature sincerely driven by its professed partisan goals would have drawn a map with greater racial balance." *Id.* at 10. We have no occasion to evaluate either the strength of Defendants' affirmative defenses or Defendants' burden on strict scrutiny given that we consider this case under a motion-to-dismiss standard. And even if we did, *Alexander*'s use of alternative maps as an evidentiary bar is easily distinguishable. The Court in *Alexander* considered a "circumstantial-evidence-only" racial-gerrymandering case where an alternative map would be necessary to rebut countervailing inferences that partisan gerrymandering motivated the South Carolina legislature. *Id.* at 9. Here, Plaintiffs present both direct and circumstantial evidence for their claim without Defendants having raised a partisan gerrymandering defense.

(S.D. Fla. 2023) (*GRACE II*) (denying motion to dismiss racial-gerrymandering claim based on both direct and circumstantial evidence). This is especially true when we evaluate Plaintiffs' claims on a motion to dismiss. When construing Plaintiffs' allegations in their favor, we must necessarily evaluate the direct and circumstantial evidence Plaintiffs provide and consider them as a whole. *Cf. Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 510–15 (2002) (noting that complaints need not take a specific route or meet evidentiary bars to plead facts required for a successful claim).

With the framework for evaluating racial-gerrymandering claims in mind, the Court begins by addressing Plaintiffs' allegations regarding the Challenged House Districts before turning to the Challenged Congressional Districts.

### I. Challenged House Districts

We begin by stating the well-pleaded facts in Plaintiffs' Complaint that support their general allegation that the Legislature "elevated race above all other considerations" when developing the Challenged Districts. Compl. ¶ 5.

Plaintiffs frame their direct evidence around the central allegation that "[t]he Legislature's express goal in drawing each of the Challenged House Districts was to preserve them as 'Tier One-protected' majority-minority Hispanic districts." Compl. ¶ 50. Key legislative staff referred to the challenged House districts in committee and subcommittee meetings as "all protected majority minority Hispanic districts where functional analysis is being performed to ensure the respective minority groups can elect candidates of their choice in each district, and that opportunity has not diminished." Compl. ¶ 56; *see also* Compl. ¶ 58. In subsequent

meetings, key legislators introduced the districts as "performing Hispanic districts protected by Tier One of the Florida Constitution" that were "drawn to maintain existing minority-majority districts" and noted "the Hispanic voting-age populations in these districts." Compl. ¶ 63; *see also* Compl. ¶¶ 70–71.

This direct evidence certainly shows that race played *a* role in legislative deliberations, but it does not, by itself, plausibly suggest that race was the predominant, "*overriding* factor causing neutral considerations to be cast aside." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 190 (2017) (emphasis added). Legislatures can—and routinely do—consider race to comply with state and federal law. *See, e.g.*, *Cooper*, 581 U.S. at 299–301; *Vera*, 517 U.S. at 969–70; *Miller*, 515 U.S. at 917–19. Yet "race consciousness does not lead inevitably to impermissible race discrimination." *Shaw I*, 509 U.S. at 646. Legislatures may be as aware of race as other demographic factors, like age, economic status, and religion. *See id.* Because "district lines may be drawn" for neutral, permissible reasons, including "to provide for compact districts of contiguous territory, or to maintain the integrity of political subdivisions," Plaintiffs must provide evidence supporting the inference that race pervaded redistricting discussions. *See id.*

Here, the allegation that legislators referred to the Challenged House Districts as "'Tier One-protected' majority-minority Hispanic districts" cannot on its own sustain the inference that race predominated in the Legislature's discussions. For one, the legislative statements Plaintiffs proffer apply with equal force to each Challenged House District. They veer into the kinds of generalized language that the

Court has rejected as insufficient when evaluating racial-gerrymandering claims on a "district-specific" basis. *ALBC*, 575 U.S. at 263. Simply put, the mere assertion that lawmakers explicitly referenced race when redistricting is not enough on its own to properly allege that race *predominated* over a litany of traditional, nonpartisan districting principles. "To understand this conclusion, recall what 'predominance' is about: A plaintiff pursuing a racial gerrymandering claim must show that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *ALBC*, 575 U.S. at 272 (quotation omitted). And to do that, it "must prove that the legislature subordinated *traditional race-neutral districting principles* to racial considerations." *Id.* (alterations adopted and quotation omitted).

Plaintiffs' circumstantial evidence can help link legislative statements to the enacted maps containing the Challenged Districts, and *ALBC* shows how. There, the Court noted that the Alabama legislature similarly "believed, and told their technical adviser, that a primary redistricting goal was to maintain existing racial percentages in each majority-minority district, insofar as feasible." 575 U.S. at 273. But the Court concluded that the district court misapplied the racial-predominance standard because it failed to acknowledge "considerable evidence" that the legislature's otherwise permissible goal "had a direct and significant impact on the drawing of at least some of [the challenged district's] boundaries." *Id.* at 274. In *ALBC*, the Court thus suggested that a plausible racial-gerrymandering claim should connect legislative statements or other relevant evidence concerning race with the

redistricting plan the legislature ultimately enacted. *Cf. Twombly*, 550 U.S. at 557 ("[W]hen allegations of parallel conduct are set out in order to make a § 1 claim, they must be *placed in a context* that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.") (emphasis added).

Plaintiffs make this connection with specific circumstantial evidence concerning each district's shape. For each Challenged House District, Plaintiffs provide compactness scores,[7] which provide "compactness ratios" that quantify how unusual (or "bizarre") a district's shape is. Plaintiffs allege that these scores are low relative to other House districts, suggesting that the Challenged Districts have more unusual shapes. *See* Compl. ¶ 95 (compactness scores for House District 112); Compl. ¶ 96 (compactness scores for House District 113); Compl. ¶ 91 (compactness scores for House District 114); Compl. ¶ 90 (compactness scores for House District 115); Compl. ¶ 92 (compactness scores for House District 116); Compl. ¶ 88 (compactness scores for House District 118); Compl. ¶ 89 (compactness scores for House District 119).

Plaintiffs also make observations as to the shape of each Challenged House District and provide maps as visual aids in support. For House District 112, Plaintiffs note that the District is "comprised of two separate pieces" split by the Miami

---

[7] Compactness is a numerical quantity that shows to what degree a shape is compact, or closely packed. Plaintiffs have provided three kinds of compactness scores for each Challenged District except Congressional Districts 27 and 28—the Reock measure, the Convex Hull measure, and the Polsby-Popper measure.

International Airport, Compl. ¶ 95, and that the only plausible explanation for the division is the "race-based configuration of its neighbor, HD 114." Compl. ¶ 93. Similarly, Plaintiffs allege that House District 113's shape is contingent on the "race-based configuration of its neighbor, HD 114." Compl. ¶ 93. Plaintiffs also allege that House Districts 114, 115, 116, 118, and 119 are "noncompact districts drawn to form long, skinny shapes running north-south." Compl. ¶ 76; *see* Compl. Fig. 7.

While the direct evidence by itself is not enough here, the specific, circumstantial factual allegations Plaintiffs provide for each Challenged House District's shape "nudge[ ] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. And though showing the "bizarreness" of a district is not a "threshold requirement of proof," evidence of a district's shape "may be persuasive circumstantial evidence that race for its own sake, and not other redistricting principles, was the legislature's dominant and controlling rationale." *Miller*, 515 U.S. at 913. The low compactness scores here, when evaluated alongside the Legislature's express acknowledgment that it considered the Challenged House Districts as "Tier One-protected majority-minority districts," make it plausible that the Legislature separated voters on the basis of race when redistricting. Count Two thus survives Defendants' respective Motions to Dismiss, and the Florida House's Motion to Dismiss, ECF No. 59, is **DENIED**.

## II. Challenged Congressional Districts

Our analytical framework is the same for the Challenged House Districts. We begin by stating the well-pleaded facts in Plaintiffs' Complaint that support their

general allegation that the Legislature "elevated race above all other considerations" when redistricting the Challenged Congressional Districts. Compl. ¶ 5.

Plaintiffs provide both direct and circumstantial evidence to support their claim that Congressional Districts 26, 27, and 28 were racially gerrymandered. But Plaintiffs' claim is plausible as to only Congressional District 26. Plaintiffs have not provided enough direct and circumstantial evidence to support their claims for Congressional Districts 27 and 28.

### *(a) Congressional District 26*

Plaintiffs allege that the Legislature's "express goal in drawing each of the Challenged Congressional Districts was to preserve them as 'Tier One-protected' majority-minority Hispanic districts." Compl. ¶ 99; *see* Compl. ¶ 105. When referring to Congressional District 26, legislators repeatedly noted that it was "Tier One-protected" and was "protected from diminishment under Tier One." Compl. ¶ 113. Per the Complaint, "[t]he Senate Committee followed this same approach when drawing its congressional maps." Compl. ¶ 124.

As with the Challenged House Districts, the direct evidence in support of Challenged Congressional District 26 is, on its own, insufficient to show that race predominated above other considerations when redistricting. To be sure, the direct evidence shows that race was considered. But it does not show that race was privileged above other neutral redistricting factors. *Alexander*, 602 U.S. at 7–8.

Even less persuasive is the suggestion that deliberations for Senate districts (unchallenged in this case) "tainted" or otherwise affected conversations surrounding

the Challenged Congressional Districts. And that assertion is in tension with the Supreme Court's insistence on "racial gerrymandering as a claim that race was improperly used in the drawing of the boundaries of one or more *specific electoral districts*." ALBC, 575 U.S. at 263; *see also Miller*, 515 U.S. at 916. Without more, it also verges on framing the Legislature's actions as "'offensive and demeaning' conduct" without evidence to back up that weighty claim. *Alexander*, 602 U.S. at 10–11 (quoting *Miller*, 515 U.S. at 912).

But each piece of circumstantial evidence Plaintiffs provide for Congressional District 26 is independently persuasive and—when considered with direct evidence—renders their racial-gerrymandering claim plausible. Providing various compactness scores for the District reduces the likelihood that mundane, permissible concerns motivated the District's shape. Compl. ¶ 171. And statements from key legislators suggest that race was on the minds of committee members drawing the District's shape. When asked about the shape of Congressional District 26 in a House Congressional Subcommittee meeting, *see* Compl. ¶¶ 161–62, the Governor's Deputy Chief of Staff (who helped draw the redistricting maps, *see* Compl. ¶ 138) stated that he shifted parts of the District across county lines "to make sure that in terms of the overall Hispanic voting-age population, [he] was staying very close to the benchmark seats, which [he] th[ought] [wa]s maybe a little more than 74%." Compl. ¶ 165; *see also* Compl. ¶ 160 (alleging that the shape of Congressional District 26 "result[s] in one more district than necessary crossing the Miami-Dade County line").

The Complaint further notes that the Deputy Chief of Staff moved 94,000 people from Congressional District 26 because he was *specifically* concerned with "maintain[ing] the same number of performing minority-majority seats," and that his proposal for Congressional District 26 would "still ha[ve] a Hispanic voting-age population of 73.22%." Compl. ¶ 136, *see* Compl. ¶ 142. Plaintiffs illustrate how the Deputy Chief of Staff's words manifested in the resultant district's demographics by showing how Congressional District 26 aggregates the Hispanic voting-age population of Collier County. Compl. ¶ 176 ("Collier County is split along racial lines, with more-Hispanic areas assigned to CD [Congressional District] 26."). Taken together and taken as true, the Complaint plausibly alleges that the decision to add and subtract voters from Congressional District 26 to maintain majority-minority districts is akin to the same kind of harm the Fourteenth Amendment prohibits by "segregat[ing] voters into separate voting districts because of their race." *Shaw I*, 509 U.S. at 637–38.

### *(b) Congressional Districts 27 and 28*

Plaintiffs' allegations specific to Congressional Districts 27 and 28 are, in comparison, scant. As with other Challenged Districts, lawmakers referred to Congressional District 27 as a "majority-minority Hispanic district[ ] that [is] protected from diminishment under Tier One." Compl. ¶ 114; *see also id.* ¶ 111. Plaintiffs also note that when asked how Congressional Districts 27 and 28 were drawn,[8] the Chair of the Senate Committee on Redistricting stated: "We started

---

[8] The Complaint states that this discussion was in the context of the full Florida Senate's

drawing from the bottom up there, keeping in mind this is a Tier One-protected district." Compl. ¶ 120. The Complaint then asserts that the Florida Senate employed a "race-centric approach to map-drawing in areas with a Tier One-protected district," Compl. ¶ 121, noting that the Committee Chair explained, "[o]nce we highlighted the racial population, we began drawing from there." Compl. ¶ 122. By itself, this direct evidence is insufficient; as we have explained above, these allegations are too generalized to support the inference that race motivated the Florida Legislature's redistricting efforts as to Congressional Districts 27 and 28.

Plaintiffs assert that "[t]he legislature [ ] subordinated traditional redistricting criteria to race when drawing CDs 27 and 28," but offer only conclusory allegations in place of the more specific circumstantial evidence offered for the Challenged House Districts and Congressional District 26. Compl. ¶ 177. Plaintiffs make sweeping references to the shape of Congressional District 28, alleging that it impermissibly "fingers up and over" certain geographical areas, but a review of the map demonstrates that the district is fairly contiguous, exhibiting none of the "bizarre" or "noncompact" features that would otherwise subject a district to closer review. Compl. ¶ 180; *see* Compl. Fig. 13.[9]

---

discussion of Plan 8060, which was a precursor to the Enacted Plan. During this discussion, lawmakers referred to Congressional Districts 26 and 27. *See* Compl. ¶¶ 111–23. However, the Complaint notes that "[e]xcept for swapping 180 people, CDs 26 and 27 in Plan 8060 are identical to CDs 28 and 27, respectively, in the Enacted Congressional Plan." Compl. ¶ 126.

[9] Plaintiffs suggest that "[a]lternative configurations for the Challenged Districts demonstrate that it is possible to better comply with the traditional redistricting criteria the Legislature adopted" and "have developed such alternative configurations" for our review. *See* Compl. ¶¶ 184–85, Figs. 14a–14f. The alternative maps in this case, however, do not move the needle in Plaintiffs' favor. All these maps show is that there are innumerable ways

Similarly, Plaintiffs claim that Congressional District 27 "connects Downtown Miami with far-flung portions of South Dade that CD 28 avoids," but an equally plausible explanation for the district's shape could be an emphasis on contiguity—Congressional District 27 comprises the south-central portion of metropolitan Miami. Compl. ¶ 181; *see* Compl. Fig. 13. And while Plaintiffs' allegations rebut alternative explanations by providing compactness scores for the Challenged House Districts and Congressional District 26, Plaintiffs provide no such scores for Congressional Districts 27 and 28. The use of compactness scores, of course, is not an evidentiary requirement when pleading a racial-gerrymandering claim. But compactness scores are certainly helpful in rebutting countervailing, equally plausible inferences. Factual allegations founded on describing the minutiae of a district's boundaries without connecting those boundaries' shapes to the impermissible use of race cannot survive a motion to dismiss.

Accordingly, the Secretary of State's Motion to Dismiss, ECF No. 60, is **GRANTED IN PART** as to Congressional Districts 27 and 28.

## CONCLUSION

For the foregoing reasons, Defendant Florida House of Representatives' Motion to Dismiss, ECF No. 59, is **DENIED** and Defendant Florida Secretary of State's Motion to Dismiss, ECF No. 60, is **GRANTED IN PART**. Should Plaintiffs wish to

---

to draw districts. Without data that *connects* these alternative maps to the racial-gerrymandering claims (including, but not limited to, compactness scores), the existence of these alternative maps is too general to advance the inferences Plaintiffs ask us to draw, even when drawn in their favor. The submission of these alternative maps, then, cannot overcome the dearth of other, circumstantial evidence Plaintiffs have provided for Congressional Districts 27 and 28.

proceed with their challenge to Congressional Districts 27 and 28, on or before **February 21, 2025**, they shall file a Third Amended Complaint consistent with this Order or advise the Court that they will only maintain their sufficiently pled racial-gerrymandering claims as to the Challenged House Districts and Congressional District 26.

    **DONE AND ORDERED** this 13th day of February, 2025.