IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 1:24-cv-21983-JB

CUBANOS PA'LANTE, *et al.*,

    *Plaintiffs*,

v.

FLORIDA HOUSE OF
REPRESENTATIVES, *et al.*,

    *Defendants*.

_____/

### **PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO STAY**

Nine months into this case, after the parties have already expended significant time and resources on briefing and arguing key legal issues, case investigation, document production, and written discovery, Defendants move to stay. ECF No. 93 ("Mot." or "Motion"). For the first time in this litigation, Defendants point to a forthcoming Florida Supreme Court ruling in *Black Voters Matter Capacity Building Institute, Inc. v. Secretary of State* (*BVM*), No. SC23-1671—a case that was fully briefed over eight months ago—as a basis to stay these proceedings. But the Florida Supreme Court has not been asked to answer any question in *BVM* that would affect this case. Delaying to wait for the Florida Supreme Court to decide issues that are not dispositive to this case serves no legitimate purpose and will prejudice Plaintiffs. For these reasons, and the reasons stated further below, the Court should deny Defendants' Motion.

### I. Background

**A. The Voting Rights Act and Florida's Tier One Standards**

The U.S. Supreme Court has outlined three preconditions for liability under Section 2 of the Voting Rights Act (VRA), known as the *Gingles* preconditions. *See Thornburg v. Gingles*, 478 U.S. 30, 34 (1986). "First, the minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district. . . . Second, the minority group must be able to show that it is politically cohesive. And third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it to defeat the minority's preferred candidate."[1] *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (cleaned up). "If a State has good

---

[1] Together, minority cohesion and white bloc voting are known as racially polarized voting.

reason to think that all of the '*Gingles* preconditions' are met, then so too it has good reasons to believe that § 2 requires drawing a majority-minority district. But if not, then not." *Cooper v. Harris*, 581 U.S. 285, 302 (2017) (citation omitted).

The Florida Supreme Court has likewise articulated preconditions for liability under the vote-dilution and non-diminishment requirements in Tier One of the Florida Constitution's Fair Districts Amendments, which "follow almost verbatim" Sections 2 and 5 of the VRA, respectively. *In re Sen. Jt. Resol. of Legis. Apportionment 1176* (*Apportionment I*), 83 So. 3d 597, 619–20 (Fla. 2012) (cleaned up). Thus, the "interpretation of Florida's corresponding provision is guided by prevailing United States Supreme Court precedent." *Id.* at 620. With respect to Tier One's Section 2 analog prohibiting minority vote dilution, the same three *Gingles* preconditions apply. *Id.* at 622.

With respect to Tier One's Section 5 analog prohibiting minority vote diminishment (also known as retrogression), the Florida Supreme Court has explained that establishing the second and third *Gingles* preconditions—minority "voting cohesion and polarized racial bloc voting"—"is the first step in any retrogression analysis." *League of Women Voters of Fla. v. Detzner* (*Apportionment VIII*), 179 So. 3d 258, 286 (Fla. 2015); *see also id.* n.11 (citing federal "jurisprudence interpreting Section 5" for the proposition that "[a]t the outset, a court addressing a proposed voting plan under Section 5 must determine whether there is cohesive voting among minorities and whether minority/White polarization is present" (quoting *Apportionment I*, 83 So. 3d at 625, and *Texas v. United States*, 831 F. Supp. 2d 244, 262–63 (D.D.C. 2011))). But the Florida Supreme Court never mentioned the first *Gingles* precondition—that the minority group can constitute a numerical majority in a district—as a precondition for Tier One's non-diminishment standard. *See Apportionment I*, 83 So. 3d at 625 ("[T]he Legislature cannot eliminate majority-minority districts *or weaken other historically performing minority districts . . . .*" (emphasis added)).

B. ***Black Voters Matter***

In 2022, the Florida Legislature enacted new congressional districts for the state. Civil-rights groups and voters sued the Secretary of State and both legislative chambers in state court under Tier One's non-diminishment standard, alleging that the new plan unconstitutionally dismantled a North Florida district that had enabled Black voters to elect their candidates of choice under the previous plan. *Black Voters Matter Capacity Bldg. Inst., Inc. v. Byrd*, No. 2022-CA-666, 2023 WL 5695485, at *1 (Fla. 2d Cir. Ct. Sep. 2, 2023). The trial court ruled for the plaintiffs, finding a straightforward violation of the non-diminishment requirement. *Id.* at *18. Notably, all

parties stipulated that Black voters in the benchmark district were politically cohesive and that voting was racially polarized, with white voters voting in opposition to Black voters. *Id.* at *4.

The First District Court of Appeal reversed, concluding that the non-diminishment standard requires proof of the <u>first</u> *Gingles* precondition and that the plaintiffs had failed to present any evidence to satisfy it. *Byrd v. Black Voters Matter Capacity Bldg. Inst., Inc.*, 375 So. 3d 335, 356 (Fla. 1st DCA 2023) (en banc). The court additionally noted that "[t]he protection afforded [] by both the VRA and the FDA . . . is of the voting power of a '*politically cohesive*, geographically insular minority group.'" *Id.* at 354 (emphasis added) (quoting *Gingles*, 478 U.S. at 49).

At the Florida Supreme Court, the BVM petitioners and the Secretary of State both acknowledged that minority voting cohesion is part of the retrogression analysis.[2] The House and Senate have made no arguments to the contrary. *See generally* Legislature's Answer Br., *BVM* (May 6, 2024).[3] Rather, the issues in *BVM* center on: (1) whether the <u>first</u> *Gingles* precondition is necessary for protection under the non-diminishment standard; and (2) whether the state's failure to maintain the minority-ability benchmark district was justified given the state's asserted concerns that doing so would be impermissible racial gerrymandering. Pet'rs' Initial Br. at 19–21, *BVM* (Feb. 28, 2024); Legislature's Answer Br. at 20, *BVM* (May 6, 2024); Sec'y's Answer Br. at 1–4, *BVM* (Apr. 29, 2024).

Merits briefing in *BVM* began on February 28, 2024 and concluded on June 5, 2024. The Florida Supreme Court heard arguments on September 12, 2024.

### C. Plaintiffs' Claims and This Case

Plaintiffs filed this action on May 23, 2024, challenging congressional and State House

---

[2] Pet'rs' Reply Br. at 2, *BVM* (June 5, 2024) ("In *Apportionment VIII*, this Court held the non-diminishment standard requires the State to preserve an existing district in which (1) 'the minority group votes cohesively,' (2) 'the minority candidate of choice is likely to prevail in the relevant contested party primary,' and (3) 'that candidate is likely to prevail in the general election.'" (quoting *Apportionment VIII*, 179 So. 3d at 286 n.11)); Sec'y's Answer Br. at 53 n.11, 54, *BVM* (Apr. 29, 2024) (explaining that "the requirement that the minority group be politically cohesive goes toward proving the group has the ability to elect" (cleaned up)), *id.* at 73–74 (contesting whether plaintiffs' evidence was sufficient to "show[] the district's black voters vote cohesively").

[3] Notably, in the Florida Supreme Court's 2022 facial review of state legislative districts, the House asked the court to "make clear" that *none* of the *Gingles* preconditions were prerequisites for the non-diminishment standard. House's Br. at 27 n.10, *In re Senate Jt. Resol. of Legis. Apportionment 100* (*In re SJR 100*), No. SC22-131 (Fla. Feb. 19, 2022). But the court declined to take the House up on its offer, *see generally In re SJR 100*, 334 So. 3d 1282 (Fla. 2022), and the House evidently opted not to renew this effort the next time redistricting reached the court, in *BVM*.

3

districts in South Florida (the "Challenged Districts") as racially gerrymandered in violation of the Fourteenth Amendment's Equal Protection Clause. Plaintiffs allege that lawmakers unlawfully drew the Challenged Districts with race as the predominant factor, subordinating race-neutral criteria to racial considerations. Plaintiffs further allege that the state's use of race was not narrowly tailored to any compelling interest in complying with Section 2 of the VRA or Tier One's minority vote dilution and non-diminishment requirements, because two of those provisions' preconditions—minority voting cohesion and white bloc voting—were not present. That is to say, the state did not have "'good reasons' to think that it would transgress the [VRA and Tier One] if it did *not* draw race-based district lines" because these preconditions were not met. *Cooper*, 581 U.S. at 293 (emphasis in original).

The parties submitted an initial scheduling report on July 16, 2024 (ECF No. 34)—over a month after briefing closed in *BVM*—jointly requesting that discovery conclude in February 2025, summary-judgment motions be due a month later, and trial be held in August 2025. Neither Defendant raised *BVM* as a basis for a stay in the scheduling report. The parties submitted an amended scheduling report on February 21, 2025 (ECF No. 92) and await a scheduling order.

## II.  Legal Standard

A district court may "exercise[] its discretion to stay a case pending the resolution of [a] related proceeding[] in another forum," either because of "principles of abstention" or "simply as a means of controlling the district court's docket and of managing cases before the district court." *Ortega Trujillo v. Conover & Co. Commc'ns*, 221 F.3d 1262, 1264 (11th Cir. 2000) (citations omitted). A stay must be properly limited in scope, and must not be "immoderate." *Id.* (quoting *CTI–Container Leasing Corp. v. Uiterwyk Corp.*, 685 F.2d 1284, 1288 (11th Cir. 1982)). "[I]nterests of judicial economy alone are insufficient to justify [] an indefinite stay." *Id.* at 1265. "'If there is even a fair possibility that the stay will work damage to someone else,' the party seeking the stay 'must make out a clear case of hardship or inequity in being required to go forward.'" *De Fernandez v. CMA CGM S.A.*, No. 21-cv-22778, 2022 WL 2713737, at *6 (S.D. Fla. July 12, 2022) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 255 (1936)) (cleaned up). "The party seeking a stay bears the burden of demonstrating its necessity." *Id.* (citing *Clinton v. Jones*, 520 U.S. 681, 708 (1997)).

### III. Argument

**A. The outcome of *Black Voters Matter* cannot affect this case and therefore cannot support a stay.**

Defendants argue a stay is warranted because the Florida Supreme Court is "poised" to "provide [] definitive guidance" on an issue "critical to Plaintiffs' framing of their claims." Mot. at 4. Defendants' representations are simply untrue. The questions the Supreme Court is considering in *BVM* are irrelevant to Plaintiffs' claims in this case. As explained above, *BVM* turns on (1) whether the <u>first</u> *Gingles* precondition (that the minority group is sufficiently large and geographically compact to constitute a majority in a reasonably configured district) is a prerequisite for the non-diminishment requirement, and (2) the state's defense that the minority district at issue in *BVM* was an unconstitutional racial gerrymander under the Fourteenth Amendment's Equal Protection Clause.

Neither issue impacts *this* case. As to the first issue, every Challenged District has a numerical Hispanic majority; Plaintiffs do not argue that the state lacked a compelling interest in drawing race-based districts because the <u>first</u> *Gingles* precondition was absent. Plaintiffs claim that the use of race to draw the Challenged Districts was unjustified because the <u>second</u> and <u>third</u> *Gingles* preconditions—minority voting cohesion and white bloc voting—were absent, and therefore the state had no interest in drawing race-based districts to comply with Section 2 of the VRA or Florida's vote-dilution and non-diminishment requirements. Defendants assert that *BVM* will "simplify and clarify the non-diminishment standard." Mot. at 4. But no party in *BVM* contests that minority cohesion and racially polarized voting are prerequisites for protection under the non-diminishment standard. As to whether the district at issue in *BVM* was a racial gerrymander under the Equal Protection Clause, that depends on *federal* caselaw, and the Florida Supreme Court's decision cannot change the *federal* standards by which this Court must assess whether the Challenged Districts accord with equal protection.

Moreover, federal courts measure states' tailoring of race against the law as it was at the time the legislature made its race-based districting decisions. This principle is most plain in the context of Section 5 of the VRA, which was rendered inoperable by *Shelby County v. Holder*, 570 U.S. 529 (2013). Yet the Supreme Court continues to assess tailoring against the Section 5 standard in place at the time the districts were drawn. *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 194 (2017) (assessing tailoring based on what § 5 required "at the time"); *id.* at 197 (Alito, J., concurring in part and concurring in the judgment) ("The districting plan at issue here was

5

adopted prior to our decision in *Shelby County v. Holder* [], and therefore it is appropriate to apply the body of law in effect at that time."), *on remand*, 326 F. Supp. 3d 128, 143, 175–76 (E.D. Va. 2018) (assessing tailoring based on what § 5 required "[a]t the time of the 2011 redistricting"); *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 279 (2015) (articulating that, where state justified race-based districting as necessary to comply with § 5, the narrow-tailoring inquiry should ask whether the legislature's decisions aligned with "§ 5's language, its purpose, the Justice Department Guidelines, and the relevant precedent"), *on remand*, 231 F. Supp. 3d 1026, 1061 (M.D. Ala. 2017) (finding § 5 compliance was a compelling interest and analyzing narrow-tailoring in relation to the law in effect when the challenged districts were drawn); *Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253, 264–65 (2016) (rejecting argument that § 5 compliance could not be a legitimate state interest following *Shelby County*); *see also Cooper*, 581 U.S. at 292 (analyzing a § 5 claim through how it operated "at the time of the districting in dispute…. [b]efore th[e] Court invalidated its coverage formula").

As discussed above, minority voting cohesion and racial bloc voting were plainly prerequisites to Florida's non-diminishment standard when the Challenged Districts were adopted. *Apportionment VIII*, 179 So. 3d at 286 & n.11 (describing "Hispanic voting cohesion and polarized racial bloc voting" as "the first step in any retrogression analysis"). So, any post-hoc change in what the Florida Supreme Court holds the non-diminishment standard requires is irrelevant to whether the Legislature's 2022 decisions were narrowly tailored to a compelling interest.

The Florida Supreme Court's decision in *BVM* would not have any impact on the Court's analysis of Plaintiffs' claims. Eleventh Circuit precedent is clear that a stay pending conclusion of a state-court proceeding is unwarranted when the "state action will not decide the issues presented in the federal case." *Am. Mfrs. Mut. Ins. Co. v. Edward D. Stone, Jr. & Assoc.*, 743 F.2d 1519, 1525 (11th Cir. 1984) (finding "no compelling reason for imposing a stay" where a state-court action "probably will not resolve the issues pending in the federal litigation"); *Marti v. Iberostar Hoteles y Apartamentos S.L.*, 54 F.4th 641, 649 (11th Cir. 2022) (vacating stay where other proceeding "[would] not control or inform the legal or factual issues of the case"). Any stay on such grounds is unwarranted, and any resultant delay would prejudice Plaintiffs.

### B.  A stay will prejudice Plaintiffs.

A stay will prejudice and cause undue hardship for Plaintiffs. They have already incurred great expense preparing their case and responding to Defendants' voluminous discovery

requests—which the House has continued to serve, even after moving for a stay. The harms Plaintiffs seek to remedy are serious—the Supreme Court has described racial gerrymandering as "odious to a free people whose institutions are founded upon the doctrine of equality." *Shaw v. Reno*, 509 U.S. 630, 643 (1993) (quoting *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943)); *see also Harris v. McCrory*, 159 F. Supp. 3d 600, 627 (M.D.N.C. 2016) ("[I]ndividuals…whose constitutional rights have been injured by improper racial gerrymandering have suffered significant harm. Those citizens are entitled to vote as soon as possible for their representatives under a constitutional apportionment plan." (cleaned up)), *aff'd sub nom. Cooper*, 581 U.S. 285.

While Defendants argue Plaintiffs "can't claim any harm due to a stay, since they waited two years after the redistricting cycle to file this lawsuit," Mot. at 4, "they" are not some platonic ideal of a civil rights litigant. Plaintiffs are real people and organizations alleging real harm. One individual plaintiff, Luis Sorto, moved into a Challenged District just a few months before filing this case. One organizational plaintiff, the FIU ACLU Club, did not even *exist* until a year and a half *after* the Challenged Districts were enacted. They *could not* have filed this case earlier. The prejudicial harm stemming from unwarranted delay in resolving Plaintiffs' claims and remedying their harms should not be measured against Plaintiffs' timing in initiating their case. *See, e.g.*, *Thomas v. Bryant*, 366 F. Supp. 3d 786, 804 (S.D. Miss.) (finding no unreasonable delay when plaintiffs filed redistricting case over eight years after the census), *stay denied in relevant part*, 919 F.3d 298 (5th Cir.), *and aff'd*, 931 F.3d 455 (5th Cir. 2019), *and vacated as moot on reh'g en banc sub nom. Thomas v. Reeves*, 961 F.3d 800 (5th Cir. 2020); *Jeffers v. Clinton*, 730 F. Supp. 196, 203 (E.D. Ark. 1989) (finding plaintiffs did not unreasonably delay by filing suit eight years after redistricting plan was enacted, and two years after Supreme Court issued *Gingles*), *aff'd*, 498 U.S. 1019 (1991) (mem.). For the same reason a stay would harm Plaintiffs, the interests of South Florida voters would also be harmed if Defendants' requested stay were granted.

### C. A stay would be against the public interest.

Additional reasons to counsel against a stay include the judiciary's interest in efficiency, economy, and fairness. *Bannister v. United States*, Nos. 09-81070-civ, 05-80063-cr, 2009 WL 4894500, at *1 (S.D. Fla. Dec. 18, 2009). *First*, while Defendants reference "federalism principles," Mot. at 4, they do *not* argue that any abstention doctrines are implicated here. *Cf. Ortega Trujillo*, 221 F.3d at 1264 (noting that abstention may support a stay). As stated above, *BVM* will not affect this case, since different legal principles govern. Additionally, the speculative

assertion that "the political branches of the State may react" to a *BVM* ruling is insufficient to warrant a stay, particularly given the lack of overlap between the North Florida district challenged in *BVM* and the South Florida districts at issue here. The two cases Defendants cite on this point are inapposite. *Growe v. Emison*, 507 U.S. 25, 32–37 (1993) (finding district court erred in redrawing Minnesota's legislative and congressional districts in the face of a similar pending state-court case requesting the state court do the same thing); *Chapman v. Meier*, 420 U.S. 1, 26–27 (1975) (finding district court, tasked with redrawing North Dakota legislative districts following legislative impasse, erred in drawing plan that included multi-member districts of insufficiently equal population).

*Second*, interests in judicial comity support denying a stay. Plaintiffs respectfully suggest the Court follow the example of its sister courts in *Common Cause Florida v. DeSantis*, No. 4:22-cv-109, 2022 WL 19978293 (N.D. Fla. Nov. 8, 2022) and *Nord Hodges v. Albritton*, No. 8:24-cv-879 (M.D. Fla.). As in this case, the *Common Cause* plaintiffs claimed a congressional district (the same one challenged in *BVM*, in fact) violated the Equal Protection Clause.[4] As in this case, the Secretary moved to stay pending *BVM*. And as Plaintiffs request the Court do in this case, the panel unanimously denied his request, determining that "a stay is not warranted just because a different set of plaintiffs are pursuing a state-court action challenging the [same] map," since "[d]ifferent legal principles [] will govern the two cases and the resolution of one action may not have much (or any) effect on the other." *Common Cause*, 2022 WL 19978293, at *6. The court also found it inappropriate to wait on U.S. Supreme Court rulings in two Section 2 cases, since *Common Cause* plaintiffs did not bring claims under Section 2. *Id.* The court concluded: "the defendants' position on Florida law will not affect how the Fourteenth and Fifteenth Amendment claims are ultimately resolved here." *Id.* The case was tried just a few months before the First District issued its decision in *BVM*. *Common Cause Fla. v. Byrd*, 726 F. Supp. 3d 1322, 1328 (N.D. Fla. 2024).

*Nord Hodges*, meanwhile, is a racial-gerrymandering challenge filed six weeks before this case. The *Nord Hodges* plaintiffs argue that two Florida Senate districts are racially gerrymandered because a Black-performing district protected by the Tier One non-diminishment standard could have been drawn to avoid diminishment while respecting race-neutral redistricting criteria.

---

[4]  The *Common Cause* plaintiffs brought their equal-protection claim under a different theory than the one in this case, asserting that the challenged district was enacted with a racially discriminatory purpose.

Compl., *Nord Hodges* (M.D. Fla. Apr. 10, 2024), ECF No. 1. Even though that case relates heavily to the meaning of Florida's Fair Districts Amendments, neither the Secretary nor his co-defendant the Florida Senate have moved to stay it, and a trial set for three months from now. Case Management & Scheduling Order, *Nord Hodges* (M.D. Fla. June 6, 2024), ECF No. 37.

*Third*, a stay is contradictory to the interest of judicial efficiency and convenience. Despite Defendants' postulation that a decision in *BVM* "should be reached soon," Mot. at 4, their requested stay pending a ruling in *BVM* is for "an indefinite period of time"—and is therefore "immoderate." *CTI-Container*, 685 F.2d at 1288 (finding stay pending another tribunal's ruling was indefinite and immoderate).

## IV. Conclusion

Defendants have not met their burden to establish the necessity of a stay. For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion to Stay.

Respectfully submitted March 5, 2025,

 /s/ Nicholas L.V. Warren

Nicholas L.V. Warren (FBN 1019018)
Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida, Inc.**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-1769
nwarren@aclufl.org
dtilley@aclufl.org
cmcnamara@aclufl.org

Jorge L. Vasquez, Jr.*
**Vasquez Attorneys at Law, PC**
141 Parkway Road, Suite 14
Bronxville, NY 10708
(212) 752-8408
jorge@vasquezpc.com


*Admitted pro hac vice*

Andrew Frackman*
**O'Melveny & Myers LLP**
1301 Avenue of the Americas
17th Floor
New York, NY 10019
(212) 326-2000
afrackman@omm.com

Brian P. Quinn*
Patrick J. Jones*
Emily Murphy*
Gabrielle S. Jackson*
Andrea Ojeda*
**O'Melveny & Myers LLP**
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300
bquinn@omm.com
pjones@omm.com
emurphy@omm.com
gjackson@omm.com
aojeda@omm.com

*Counsel for Plaintiffs*