**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**Case No. 1:24-cv-21983-JB**

CUBANOS PA'LANTE, *et al.*,

      Plaintiffs,

v.

FLORIDA HOUSE OF REPRESENTATIVES
and CORD BYRD, in his official capacity as
Florida Secretary of State,

      Defendants.

_____/

**DEFENDANT FLORIDA HOUSE OF
<u>REPRESENTATIVES' MOTION FOR SUMMARY JUDGMENT</u>**

      The Florida House of Representatives respectfully requests summary judgment in its favor as to each challenged district.

<u>**INTRODUCTION**</u>

      No longer bound by Plaintiffs' allegations, the House now presents in detail the considerations that motivated the configurations of the eight predominantly Hispanic districts that Plaintiffs challenge.

      The testimony of the House's Chief Map Drawer, Jason Poreda, confirms that race was not the predominant motive behind the challenged districts and that traditional race-neutral districting principles were not subordinated to race. On the contrary, the racial makeup of the challenged districts was *at most* an insignificant factor in their design. Each challenged district was shaped principally by district-specific, race-neutral considerations and external impacts that flowed from decisions made elsewhere in the map.

      Plaintiffs cannot carry their heavy burden. They must overcome the presumption of good faith that federal courts extend to state legislatures and the extraordinary caution that federal courts observe when faced with allegations of race-based motivation in a complicated legislative task. Plaintiffs failed to

substantiate their claims in discovery and cannot offer significantly probative evidence of racial predominance. This Court should enter summary judgment in Defendants' favor as to each challenged district.

## SUMMARY-JUDGMENT STANDARD

This Court's function on summary judgment is to determine whether a trial is truly necessary to resolve a genuine dispute as to a material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). The movant carries its burden by pointing out an absence of evidence to support the non-movant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The non-movant must respond with "significantly probative" evidence showing a genuine factual dispute—that is, evidence sufficient to support a judgment in its favor. *Anderson*, 477 U.S. at 248–50. The movant is entitled to judgment if the non-movant fails to "establish the existence of an essential element" on which it bears the burden of proof**Error! Bookmark not defined.**. *Celotex*, 477 U.S. at 322.

## LEGAL FRAMEWORK

**The Predominance Standard.** The essence of a racial-gerrymandering claim "is that the State has used race as a basis for separating voters into districts." *Miller v. Johnson*, 515 U.S. 900, 911 (1995). "Just as the State may not, absent extraordinary justification, segregate citizens on the basis of race in its public parks, . . . it may not separate its citizens into different voting districts on the basis of race." *Id.* at 912.

To prove its claim, a plaintiff must first establish—whether through direct evidence of legislative purpose or circumstantial evidence of a district's shape and demographics—that race was the "predominant factor motivating" a district's design—*i.e.*, "that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations." *Id.* at 916. Only if the plaintiff proves racial predominance must the State establish that the district is narrowly tailored to achieve a compelling interest. *Id.* at 920.

The predominance standard is "demanding." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (quoting *Miller*, 515 U.S. at 928 (O'Connor, J., concurring)). It is not enough to show that the legislative body was "aware of racial demographics." *Miller*, 515 U.S. at 916. The constitutional wrong occurs only when race is the "dominant and controlling rationale." *Id.* at 913.

A legislature *may* therefore constitutionally consider race in redistricting—and it follows that race *may* constitutionally affect a district's configuration. A plaintiff must do more than prove that race was a motivation, *Easley*, 532 U.S. at 241, or "a mere factor in the State's redistricting calculus," *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 19 n.6 (2024); *accord* ECF No. 88 at 11 ("Legislatures can— and routinely do—consider race to comply with state and federal law."). Strict scrutiny is triggered only if "race played a *predominant* role comparatively speaking." *Easley*, 532 U.S. at 253 (emphasis in original).

Thus, without more, evidence that a legislature intentionally created majority-minority districts does not establish racial predominance. *Allen v. Milligan*, 599 U.S. 1, 31–32 (2023); *Bush v. Vera*, 517 U.S. 952, 958–59, 962 (1996) (plurality opinion). In contrast, courts have found racial predominance when race-neutral criteria were transgressed and race exerted a "direct and significant impact" on a district's configuration. *Cooper v. Harris*, 581 U.S. 285, 300 (2017); *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 273–74 (2015).

While a bizarre shape is not an indispensable prerequisite to a finding of racial predominance, the Supreme Court has never "affirmed a predominance finding, or remanded a case for a determination of predominance, without evidence that some district lines deviated from traditional principles." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 179, 190 (2017). Where no party has asserted that partisanship motivated the drawing of the district, a "court can make real headway" in assessing racial predominance "by exploring the challenged district's conformity to traditional districting principles." *Cooper*, 581 U.S. at 308.

At the same time, a bizarre shape is insufficient in itself to prove racial predominance. *Vera*, 517 U.S. at 962 (plurality opinion). While traditional race-neutral districting principles "are objective factors

that may serve to defeat a claim that a district has been gerrymandered on racial grounds," they are not "constitutionally required." *Shaw v. Reno*, 509 U.S. 630, 647 (1993). What matters is not whether race-neutral districting principles were "coincidentally neglected," *Quilter v. Voinovich*, 981 F Supp. 1032, 1049 (N.D. Ohio 1997) (three-judge court), but whether they were "*subordinated to race*." *Vera*, 517 U.S. at 962 (plurality opinion) (emphasis in original); *accord Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 996 F. Supp. 2d 1353, 1365 (N.D. Ga. 2014) (finding no racial predominance even though the challenged district was intentionally drawn as a majority-minority district and its shape was "somewhat irregular").

A racial-gerrymandering claim challenges a single, separate district as a discrete unit—not the redistricting plan as a whole, *Ala. Legis. Black Caucus*, 575 U.S. at 262–63, nor only a portion of a district, *Bethune-Hill*, 580 U.S. at 191–92. It requires courts to consider the "districtwide context" and to conduct a "holistic analysis" of the district as the "basic unit of analysis." *Id.* at 192. A single boundary segment may not be divorced from the rest of the district. *Id.* at 191–92. For the same reason, a finding that one district was racially gerrymandered does not invalidate other districts—even adjacent districts—that were merely impacted by the unconstitutional district. *Sinkfield v. Kelley*, 531 U.S. 28, 30–31 (2000); *United States v. Hays*, 515 U.S. 737, 745 (1995); *Nord Hodges v. Albritton*, 774 F. Supp. 3d 1340, 1348 (M.D. Fla. 2025).

At the predominance stage of the analysis, it makes no difference *why* the legislature considered race. *Navajo Nation v. San Juan Cnty.*, 929 F.3d 1270, 1288 (10th Cir. 2019). The question is whether race predominated—not whether the legislature believed it was legally required to consider race or whether that belief was correct.

**The Challenger's Heavy Burden.** In proving predominance, a plaintiff's burden is especially heavy. A redistricting plan that places voters of one race into one district "may reflect wholly legitimate purposes." *Shaw*, 509 U.S. at 646. Given the "sensitive nature of redistricting" and the delicate nature of any inquiry into legislative motives, courts exercise "extraordinary caution" in resolving claims of racial gerrymandering, *Miller*, 515 U.S. at 916, and begin with a "presumption that the legislature acted in good

faith," *Alexander*, 602 U.S. at 6. That presumption applies at *all* stages of the litigation. *Miller*, 515 U.S. at 916–17.

Federal courts are mindful that their review of redistricting plans "represents a serious intrusion on the most vital of local functions." *Id.* at 915. After all, redistricting is a "most difficult subject"—one that presents a "complex interplay of forces" and demands "political judgment" to "balance competing interests." *Id.* at 915–16. States must traverse a "legal obstacle course," *Abbott v. Perez*, 585 U.S. 579, 587 (2018), and apply "delicately balanced requirements regarding the consideration of race," *id.* at 585–86.

The presumption of legislative good faith "directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 602 U.S. at 10. It shows "due respect for the judgment of state legislators," who, like judges, are "bound by an oath to follow the Constitution." *Id.* at 11. It urges restraint before a federal court saddles a coordinate branch of government with the "offensive and demeaning" imputation of race-based stereotyping. *Id.* And it protects courts from becoming "weapons of political warfare" that plaintiffs wield to secure "victories that eluded them in the political arena." *Id.* (internal marks omitted).

This presumption is entitled to more than lipservice. *Alexander*, 602 U.S. at 7; *Abbott*, 585 U.S. at 610–11. A plaintiff must establish that, in balancing the "myriad considerations" relevant to redistricting, and in making "difficult, contestable choices" throughout the map, *Allen*, 599 U.S. at 35, the State acted in bad faith and engaged in intentional discrimination, *Alexander*, 602 U.S. at 20–21; *Abbott*, 585 U.S. at 607, 610–12.

**Florida's Redistricting Standards.** Article III, sections 20 and 21 of the Florida Constitution set forth Florida's redistricting standards. These two sections govern congressional and state-legislative redistricting, respectively. The standards in the two sections are identical. *League of Women Voters of Fla. v. Fla. House of Representatives*, 132 So. 3d 135, 140 (Fla. 2013).

Both sections set forth two tiers of standards. The first tier—often called "tier one"—prohibits intentional partisan and incumbent favoritism, protects racial and language minorities, and requires that

districts be contiguous. Fla. Const. art. III, §§ 20(a), 21(a). The second tier—often called "tier two"—addresses the "population, shape, and boundaries" of districts. *In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d 1282, 1286 (Fla. 2022). It requires that districts be compact and as nearly equal in population as practicable and, where feasible, utilize existing political and geographical boundaries. Fla. Const. art. III, §§ 20(b), 21(b). Florida's tier-two standards are "meant to restrict the Legislature's discretion in drawing irregularly shaped districts." *In re Senate Joint Resol. of Legis. Apportionment 1176*, 83 So. 3d 597, 618 (Fla. 2012).

Only when standards in different tiers conflict do tier-one standards prevail over tier-two standards. Fla. Const. art. III, §§ 20(b), 21(b). Standards within the same tier have no priority over each other. *Id.* §§ 20(c), 21(c). Rather, "the Legislature retains the discretion to balance those standards." *In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d at 1286.

Compactness is a "geographical concept" evaluated, first and foremost, "by looking at the shape of a district." *In re Senate Joint Resol. of Legis. Apportionment 1176*, 83 So. 3d at 634 (internal marks omitted). A compact district "should not have an unusual shape, a bizarre design, or an unnecessary appendage." *Id.*; *accord id.* at 638 ("In a compactness analysis, we are reviewing the general shape of a district . . . .").

While compactness calls for a visual examination, quantitative measures can also "assist courts in assessing compactness." *Id.* at 635. The Constitution does not require districts to be as compact as possible—only that they be compact. *Id.* A decision to keep cities and counties whole or to follow rivers or municipal boundaries, some of which are notoriously irregular, can affect a district's compactness, as can Florida's unorthodox shape and the interplay between residential patterns and the equal-population mandate. *Id.*

For tier-two purposes, political boundaries are county and municipal boundaries, *In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d at 1288, while geographical boundaries are "rivers, railways, interstates, and state roads" and other "easily ascertainable and commonly understood" boundaries, *In re Senate Joint Resol. of Legis. Apportionment 1176*, 83 So. 3d at 638.

One of the tier-one provisions that protects racial and language minorities is the so-called Non-Diminishment Clause. *Black Voters Matter Capacity Bldg. Inst., Inc. v. Sec'y, Fla. Dep't of State*, --- So. 3d ----, No. SC2023-1671, 2025 WL 1982762, at *2 (Fla. July 17, 2025). That provision states that "districts shall not be drawn . . . to diminish [the] ability [of racial or language minorities] to elect representatives of their choice." Fla. Const. art. III, §§ 20(a), 21(a). The Non-Diminishment Clause applies to existing districts that have historically "performed" for minority voters—*i.e.*, districts in which a minority group has been able to elect representatives of its choice. *Black Voters Matter*, 2025 WL 1982762, at *3. In those instances, it prohibits diminishment of the minority group's voting ability when districts are redrawn. *Id.*

To determine whether a minority group is able to elect representatives of its choice, and whether a redrawn district diminishes that ability, the Florida Supreme Court requires the Legislature to perform a district-specific "functional analysis" of the voting behavior of racial groups in the protected district. *Id.* The functional analysis involves not only population data, but also election results and voter turnout and registration data. *See In re Senate Joint Resol. of Legis. Apportionment 1176*, 83 So. 3d at 625–27, 666–67.

## ARGUMENT

Mr. Poreda's testimony explains the considerations that shaped the challenged districts. It reveals that race was not the predominant motive in drawing the challenged districts—or even a significant and influential consideration. Instead, race was either a non-factor or a secondary consideration in shaping the challenged districts.

## I.   RACE DID NOT PREDOMINATE OVER TRADITIONAL RACE-NEUTRAL DISTRICTING PRINCIPLES IN DRAWING THE CHALLENGED STATE HOUSE DISTRICTS.

Mr. Poreda's testimony explains that, far from dictating the shapes of the challenged State House districts, race took a back seat to traditional race-neutral districting principles. Mr. Poreda did not even consider race until after those districts were drawn; only then did he conduct the functional analysis to determine their compliance with the Non-Diminishment Clause. Because race did not predominate, this Court should enter summary judgment against Plaintiffs and for the House as to each challenged district.

**Consideration of Race.** Mr. Poreda understood that the Non-Diminishment Clause protected the ability of Hispanic voters in the challenged State House districts to elect candidates of their choice. SF ¶ 10.[1] Still, he did not consider race while drawing those districts. SF ¶ 11. Given the high concentration of Hispanic voters in Miami-Dade County, Mr. Poreda was confident that, even without considering race, the districts would be heavily Hispanic. SF ¶¶ 12–14. So he set race aside, focused on race-neutral tier-two standards, and drew the challenged State House districts without attention to race. SF ¶¶ 11–12.

Only when he completed a district and found a configuration that he deemed tier-two compliant did Mr. Poreda turn to the Non-Diminishment Clause and perform a functional analysis to confirm that the district did not diminish the voting ability of Hispanic voters. SF ¶ 15. In other words, Mr. Poreda drew the challenged State House districts to ensure tier-two compliance and only afterwards confirmed that they also comply with the Non-Diminishment Clause. SF ¶ 16. As explained below, in only one of the challenged State House districts does Mr. Poreda recall that the district-specific, back-end functional analysis required even slight adjustments to avoid diminishment in the voting ability of Hispanic voters. SF ¶ 21. In the others, non-diminishment was achieved without considering race in the drawing process.

When drawing the challenged State House districts, therefore, Mr. Poreda did not display any data or color-coding on his computer monitor to identify where Hispanic voters live. SF ¶ 19. Nor did he draw those districts with a predetermination to achieve a specific Hispanic voting-age population. SF ¶ 20.

Staff's approach to the challenged districts reflects their approach more generally to districts protected by the Non-Diminishment Clause. In drawing congressional and state-legislative districts, House committee staff sought whenever possible to implement all state-law standards, without elevating some and subordinating others. SF ¶ 7. As a general rule, in drawing districts protected by the Non-

---

[1] "SF" refers to the Statement of Material Facts filed concurrently with this motion.

Diminishment Clause, staff sought to comply with tier-two standards to the maximum extent possible. SF ¶ 8. Staff often found that all standards could be implemented to the fullest extent possible and that compliance with the Non-Diminishment Clause did not compromise race-neutral tier-two principles. SF ¶ 9.

**External Constraints.** Several considerations external to the challenged State House districts influenced their configuration.

*First*, Mr. Poreda sought to minimize the number of State House districts in Southeast Florida that cross county boundaries. SF ¶ 25. Thus, only one district in the enacted map (District 104) includes population from both Broward and Miami-Dade Counties. SF ¶ 25. This decision to maintain the county boundary became an important driver of the configuration of districts in Miami-Dade County. SF ¶ 26.

*Second*, the Non-Diminishment Clause's protection of Black voters in Miami-Dade County heavily impacted the surrounding districts. SF ¶¶ 27–30, 88. In Miami-Dade County, these districts (Districts 107, 108, 109, and 117) were more difficult to draw than the majority-Hispanic districts. SF ¶ 88. When drawing protected districts with smaller minority populations, committee staff had less flexibility and usually paid closer attention to tier-one considerations than they did when drawing the challenged State House districts. SF ¶¶ 17–18. The districts that perform for Black voters drive the overall configuration of districts in Miami-Dade County much more than do the districts that are majority Hispanic. SF ¶ 88.

The Non-Diminishment Clause protected the voting ability of Black voters in Districts 107, 108, and 109 and Haitian-Creole speakers in District 108. SF ¶¶ 27–29. Mr. Poreda met extensively with state representatives elected in these areas to discuss the configurations of these districts. SF ¶ 29. With their help, he found a configuration that he believed protected the voting ability of minority voters. SF ¶ 29. These districts also became a key driver of the configuration of other districts within the county. SF ¶ 30.

*Third*, with the county boundary maintained and Districts 107, 108, and 109 in place, the State's geography required one district to fill the coastal areas south of the county boundary and east of Districts 107, 108, and 109. SF ¶ 31. Thus, District 106 moves south from the county boundary and ends where

it achieves the ideal district population: at the southern boundary of the City of Miami Beach. SF ¶ 32.[2]

These background constraints—adherence to the boundary between Broward and Miami-Dade Counties; the carefully crafted configuration of Districts 107, 108, and 109; and the geographical imperative of creating a coastal district—set the table for the drawing of the challenged State House districts.

**District 113.** Mr. Poreda's objective in drawing the district south of District 106—District 113—was to anchor the district within the City of Miami. SF ¶ 33. One way the House has implemented the tier-two mandate to utilize political and geographical boundaries where feasible is to draw State House districts wholly within counties and, to the extent possible, wholly within large, populous municipalities such as the City of Miami. SF ¶ 34. Given the City of Miami's large population, House committee staff sought to establish a district located predominantly, if not exclusively, within the City of Miami. SF ¶ 35.

District 113 became that Miami-based district: 91.9 percent of the district's population (167,896 of 182,742 people) resides in the City of Miami. SF ¶ 36. The only part of the district that is outside the city is the island of Key Biscayne, which could not neatly have been added to any other district. SF ¶ 37. District 113 therefore fulfilled the non-racial priority to draw a district that represents the City of Miami.

Mr. Poreda adhered to traditional, race-neutral districting principles in drawing District 113. The district utilizes political and geographical boundaries along 93 percent of its perimeter according to the Legislature's "boundary analysis," which calculates the percentage of a district's boundary that coincides with political and geographical boundaries.[3] SF ¶ 38. Its boundaries follow major roadways such as the Tamiami Trail (State Road 41), Coral Way (SW 22nd Street), and Biscayne Boulevard (U.S. Highway 1); the municipal boundaries of Miami, Coral Gables, and Miami Beach; and waterways such as the Miami

---

[2] The 2020 decennial census revealed that Florida's population had grown to 21,538,187 people. SF ¶ 3. The new ideal (or mean) population for each of Florida's 120 State House district is 179,485 people, while the ideal population for each of Florida's 28 congressional districts is 769,221 people. SF ¶ 3.

[3] The boundary analysis utilizes the United States Census Bureau's geographic information and the Bureau's designation of primary and secondary roads, railways, and significant water bodies. SF ¶ 38.

River and PortMiami's Main Channel. SF ¶ 39. Key Biscayne is kept whole in the district. SF ¶ 40. The only municipality the district splits is Miami, which has a population well above the ideal population. SF ¶ 40.

**District 114.** To the west of District 113, Mr. Poreda drew District 114 with similar objectives. District 114 encompasses all of Coral Gables and thus keeps Coral Gables whole. SF ¶ 42. Coral Gables is a large municipality with a north-south orientation. SF ¶ 42. Enclosing Coral Gables wholly within District 114 required the district to assume a similar north-south orientation. SF ¶ 42; *see also In re Senate Joint Resol. of Legis. Apportionment 1176*, 83 So. 3d at 635–36 (explaining that a desire to keep municipalities wholly intact in a district may decrease the district's compactness but "justify the shape of the district").

Mr. Poreda included the Cities of West Miami and South Miami wholly within District 114. SF ¶ 43. Situated to the west of Coral Gables, these cities are much smaller than Coral Gables. SF ¶ 43. Mr. Poreda also followed the Dolphin Expressway along the northern boundary of District 114. He considered the Dolphin Expressway to be an ideal district boundary; it offered a familiar and convenient east-west boundary centrally located in Miami-Dade County's populated area. SF ¶ 44. Four State House districts (Districts 111, 112, 114, and 116) border the Dolphin Expressway. SF ¶ 45. The need to achieve the ideal population of a State House district shaped the remainder of District 114's boundaries. SF ¶ 46.

District 114 utilizes political and geographical boundaries along 92 percent of its perimeter. SF ¶ 47. It follows major roadways such as the Dolphin Expressway and the Tamiami Trail (State Road 41); the municipal boundaries of West Miami, South Miami, Coral Gables, Pinecrest, and Palmetto Bay; the Snapper Creek Canal; and Biscayne Bay's coastline. SF ¶ 48. The only municipality it splits is Miami. SF ¶ 49.

**District 112.** To the north, District 112 utilizes political and geographical boundaries along 90 percent of its perimeter. SF ¶ 50. Its boundaries follow major roadways such as the Palmetto Expressway along its western boundary and the Dolphin Expressway and the Tamiami Trail (State Road 41) along its southern boundary; the municipal boundaries of Hialeah, Doral, Hialeah Gardens, and Medley; and

waterways such as the Little River Canal and the North Fork of the Miami River. SF ¶ 50. Miami Springs and Virginia Gardens are kept whole within the district. SF ¶ 51. The only municipalities that District 112 splits are Hialeah, which has a large population of 223,109 people, and Miami. District 112 is also impacted by Districts 107, 108, and 109, which are described above. SF ¶ 51. The triangular notch in District 112's western boundary represents the City of Medley, which is kept whole in District 111. SF ¶ 53.

The southeast corner of District 112 (southeast of Miami International Airport) is relatively small geographically but densely populated. SF ¶ 54. More than 50,000 people live in the portion of the district south of Northwest 36th Street and east of State Road 953 (LeJeune Road). SF ¶ 54. Mr. Poreda explains that, because of its large population, this area could not have been added to other, neighboring districts without overpopulating them or making them less compact or less adherent to political and geographical boundaries. SF ¶ 55. The decision to add this area to District 112 had nothing to do with race. SF ¶ 56.

**District 115.** Mr. Poreda drew District 115 to encompass Pinecrest, Palmetto Bay, and Cutler Bay. SF ¶ 57. These municipalities determine much of District 115's shape. SF ¶ 57. On its west side, District 115 is impacted by adjacent District 117, which was drawn in part to avoid diminishment in the voting ability of Black voters. SF ¶ 58. District 115 utilizes political and geographical boundaries along 92 percent of its perimeter. SF ¶ 59. Its boundaries follow major roadways such as the Tamiami Trail along its northern boundary, Kendall Drive (State Road 94), Galloway Road (87th Avenue or State Road 973), the Don Shula Expressway, and U.S. Highway 1; the municipal boundaries of Miami, West Miami, South Miami, Coral Gables, Pinecrest, Palmetto Bay, and Cutler Bay; the Cutler Drain Canal and the Black Creek Canal; and Biscayne Bay's coastline. SF ¶ 59. District 115 splits no municipalities. SF ¶ 60.

After staff drew District 115, the functional analysis revealed that the district did not sufficiently protect the ability of Hispanic voters to elect their preferred candidates. SF ¶ 61. Staff therefore extended the district slightly to the north, with incidental effects on its neighbors, Districts 114 and 116. SF ¶ 62.

Even while making this adjustment, staff adhered to race-neutral districting principles. SF ¶ 63. For example, staff followed major roadways in the northern part of the district, including the Tamiami Trail, which forms the district's northern boundary, and 67th Avenue and Galloway Road (87th Avenue or State Road 973)—four-lane roads with medians that form the eastern and western boundaries of the northern part of the district. SF ¶ 64. Mr. Poreda explains that, as a map-drawer, he likes to use the same boundary for three or more districts when possible. SF ¶ 65. District 115 does so at its northwest corner, where three districts meet at a point, and the district boundaries form a geometric "T" shape. SF ¶ 65. Mr. Poreda explains that, to the extent race affected District 115's boundaries, it did not predominate over, but was considered in harmony with race-neutral districting principles after the district was initially drawn. SF ¶ 66.

**District 116.** West of District 115 is District 116. District 116 is an especially boxy and compact district. SF ¶ 67. It is a rectangular shape bounded by well-known political and geographical boundaries. SF ¶ 67. It utilizes political and geographical boundaries along 93 percent of its perimeter. SF ¶ 68. Its boundaries follow major roadways such as the Dolphin Expressway along its northern boundary, the Florida Turnpike along its western boundary, the Don Shula Expressway and Kendall Drive (State Road 94) in the southern part of the district, and Galloway Road (87th Avenue or State Road 973) as its eastern boundary. SF ¶ 68. The district's northwest corner extends to the north to wholly encompass the City of Sweetwater, which would have been split without the northward extension. SF ¶ 69. With the extension, Sweetwater is kept whole within District 116, while the City of Doral, which borders Sweetwater to the north, is kept whole within District 111. SF ¶ 70. District 116 does not split any municipalities. SF ¶ 71.

**Districts 118 and 119.** Finally, Districts 118 and 119 divide a rectangular area vertically. SF ¶ 72. These parallel districts follow major roadways. SF ¶ 72. The Tamiami Trail forms the northern boundary of both districts. SF ¶ 73. Krome Avenue (State Road 997) is the western boundary of District 119, while the Florida Turnpike comprises much of District 118's eastern boundary. SF ¶ 73. Between the two

districts, the boundary tracks recognizable features such as the CSX rail line and two major thorough-fares: Southwest 137th Avenue (State Road 825), the relevant part of which has six lanes and a median, and Southwest 147th Avenue, which is a four-lane road with a median. SF ¶ 74. District 118 is impacted by District 117, which was drawn in part to protect the voting ability of Black voters. SF ¶ 75. Districts 118 and 119 consist of unincorporated areas and neither divide nor enclose any municipalities. SF ¶ 76.

Mr. Poreda considers Districts 118 and 119 to be compact because, as rectangular districts, they have regular, understandable shapes. SF ¶ 77. He explains that these districts do not have bizarre shapes or chaotic or disorderly boundary features, such as tails or tentacles. SF ¶ 77. In fact, many districts in Palm Beach, Broward, and Miami-Dade Counties are vertically oriented, including Districts 87, 92, 98, 100, 103, 106, 107, 108, and 109. SF ¶ 78. Most of these nine districts are not tier-one-protected districts. SF ¶ 78. A vertical configuration is therefore not uncommon and does not point to racial considerations.

Mr. Poreda explains that some quantitative compactness measures, such as the Reock measure, penalize shapes like rectangles that are not circular, while others, such as the Convex Hull measure, do not. SF ¶ 79. District 119 has the eleventh highest Convex Hull score in the State House map. SF ¶ 80. Staff considered compactness to be a balance of visual as well as mathematical assessment. SF ¶ 81. Mr. Poreda considered the rectangular shapes of Districts 118 and 119 visually and mathematically compact. SF ¶ 82.

Staff drew other orientations of Districts 118 and 119, but in Mr. Poreda's view, none balanced all legal requirements as well as the vertical arrangement. SF ¶ 83. In one alternative configuration, the districts were stacked; in another, one of the districts had an "L" shape. SF ¶ 84. Mr. Poreda considered the vertical configuration to be at least comparable in compactness to the alternative configurations, and a functional analysis revealed that the vertical configuration better assured the voting ability of Hispanic voters. SF ¶ 85. Because the vertical configuration was visually appropriate and balanced all redistricting criteria, Mr. Poreda considered that orientation to be the best option. SF ¶ 86. According to Mr. Poreda,

race did not predominate in drawing these districts; staff implemented all applicable criteria together. SF ¶ 87.

* * *

Mr. Poreda's testimony confirms that race did not predominate in the drawing of the challenged State House districts. In fact, committee staff did not even consider race until the districts were drawn. Instead, in drawing the challenged State House districts, staff were guided by Florida's race-neutral districting principles: contiguity, population equality, compactness, and utilization of political and geographical boundaries. Only when the districts were drawn did staff perform the functional analysis required by state law to ensure compliance with the Non-Diminishment Clause. In only one case (District 115) does Mr. Poreda recall that staff made slight adjustments because of the functional analysis. And even then, the adjustments were made in unison with the State's traditional race-neutral districting principles.

Mr. Poreda believes that, in drawing the challenged districts, staff balanced all legal requirements and that no single requirement predominated. SF ¶ 89. The districts are regularly shaped, keep municipalities whole where feasible, and respect political and geographical boundaries in a densely populated area of the State. SF ¶ 89.

Plaintiffs' burden is heavy: they must overcome the starting presumption that the Legislature acted in good faith and produce significantly probative evidence not only that "race was considered," but also that "race was privileged above other neutral redistricting factors." ECF No. 88 at 15. This they cannot do. Because Plaintiffs cannot produce evidence sufficient to support a judgment in their favor, this Court should grant summary judgment against Plaintiffs separately as to each challenged State House district.

## II.   RACE DID NOT PREDOMINATE OVER TRADITIONAL RACE-NEUTRAL DISTRICTING PRINCIPLES IN DRAWING CONGRESSIONAL DISTRICT 26.

Plaintiffs' challenge to Congressional District 26 also comes up short. That challenge revolves around Plaintiffs' contention that race was the predominant motive behind the Legislature's decision to

include portions of two neighboring counties—Collier and Miami-Dade—in District 26. ECF No. 58 ¶¶ 156–76. But that decision resulted first and foremost from the Legislature's configuration of districts to the north—and specifically its efforts to implement race-neutral, tier-two standards in those districts.

**The Collier County Decision.** In redistricting, each district impacts the boundaries of other districts—sometimes even districts at a great distance. SF ¶ 92. In drawing congressional districts, committee staff's configuration of Central Florida heavily influenced its configuration of South Florida. SF ¶ 92. District 8 combined two whole counties—Brevard and Indian River—and part of Orange County. SF ¶ 93. The next district to the south thus began at St. Lucie County's northern boundary. SF ¶ 93. To utilize political boundaries, staff then followed the western boundary of St. Lucie, Martin, Palm Beach, and Broward Counties. SF ¶ 94. Together with the Atlantic Ocean, this adherence to county boundaries for nearly 140 consecutive miles—the northern boundary of St. Lucie County and western boundaries of St. Lucie, Martin, Palm Beach, and Broward Counties—created a three-sided enclosure around much of Southeast Florida. SF ¶ 95.

District 20 occupied much of this enclosed area. SF ¶ 96. Mr. Poreda understood—as Plaintiffs concede, ECF No. 58 at 21 n.5—that Florida's Non-Diminishment Clause and section 2 of the federal Voting Rights Act protected the voting ability of District 20's Black voters. SF ¶ 96. Most of District 20's population lives in the district's two arms—one in Palm Beach County and one in Broward County. SF ¶ 97.

The Legislature's adherence to a 140-mile stretch of county boundaries meant that five districts could fit wholly within St. Lucie, Martin, Palm Beach, and Broward Counties. SF ¶ 98. It also made those districts more compact. SF ¶ 99. District 21, as it moved south from St. Lucie and Martin Counties into Palm Beach County, reached its ideal population in exactly the right place: east of District 20's northern arm. SF ¶ 99. Thus, no district wraps around District 20's northern arm. SF ¶ 99. While District 23 wraps around the southern arm, District 25 remains under the southern arm and has a regular shape. SF ¶ 100.

Once these districts were drawn, it was impossible to configure Miami-Dade County without a district that crossed into Collier County. SF ¶ 101. At least one district in Miami-Dade County (District 24, 26, 27, or 28) needed more population than Miami-Dade and Monroe Counties could provide. SF ¶ 101. And that district had nowhere to go other than Collier County. SF ¶ 101. Because of the tier-two priorities achieved in the four counties to the north, at least one district in Miami-Dade County needed to cross into Collier County to attain the ideal population required for a congressional district. SF ¶ 102.

**Alternative Configurations.** Mr. Poreda explains that, if the Legislature had not drawn a district that crossed into Collier County, then it would have been impossible to maintain the tier-two features achieved in St. Lucie, Martin, Palm Beach, and Broward Counties. SF ¶ 103. Without extending west, at least one district in Miami-Dade County would have had to extend north to attain its ideal population. SF ¶ 104. That would have made it impossible to maintain the 140-mile perimeter of county boundaries described above. Pushing a district north into (or further into) Broward County would have forced other districts along the coast to move north too, and eventually would have broken that perimeter. SF ¶ 104.

According to Mr. Poreda, the likely consequence would have been to force District 21 west. SF ¶ 105. To achieve its ideal population in sparsely populated counties, District 21 would have extended nearly to Port Charlotte, crossing the State to an even greater degree than enacted District 26. SF ¶ 105.

District 25 would have become less compact as well. SF ¶ 106. It would have been pushed north along the coast and assumed a reverse "L" shape south and east of District 20's southern arm. SF ¶ 106.

Committee staff experimented with different configurations of South Florida districts during the 2021–22 redistricting process. SF ¶ 107. For the reasons discussed above, staff concluded that South Florida's tier-two compliance was worse when District 26 did not extend into Collier County. SF ¶ 107.

Committee staff also performed a functional analysis on alternative South Florida configurations and determined that, without a district that crossed into Collier County, two of Miami-Dade County's majority-Hispanic districts, including District 26, became less likely to elect representatives preferred by Hispanic voters. SF ¶ 108. But that functional-analysis finding was not critical to their decision to extend

a district to Collier County in light of the race-neutral, tier-two considerations described above. SF ¶ 109.

**District 26's Configuration.** In drawing a district that crossed into Collier County, Mr. Poreda adhered to Florida's race-neutral, tier-two districting principles.

District 26 follows political and geographical boundaries along 91 percent of its perimeter. SF ¶ 110. In early maps published by House committee staff, the entire northern boundary of District 26 consisted of the northern boundaries of Collier and Miami-Dade Counties, from Interstate 75 in western Collier County to District 26's eastern boundary in Miami-Dade County. SF ¶ 111. In the enacted map, District 26 follows the same county boundaries, apart from a minor deviation around unincorporated Immokalee. SF ¶ 112. There, an area with a small but concentrated Hispanic population was transferred *out* of District 26 and *into* District 18—contrary to what a racial gerrymander would have done. SF ¶ 112. District 26's southern boundary in Collier County consists of the boundary between Monroe and Collier Counties. SF ¶ 113. In Miami-Dade County, its southern boundary follows the Tamiami Trail. SF ¶ 113.

Along its western boundary, District 26 follows major roadways such as Interstate 75 and Collier Boulevard and the municipal boundaries of Bonita Springs and Marco Island. SF ¶ 114. Along its eastern boundary, District 26 follows major roadways such as the Dolphin Expressway, the Airport Expressway, and the Palmetto Expressway and the municipal boundaries of Miramar, Miami Gardens, Miami Lakes, Hialeah, Opa-Locka, Miami, Doral, and Sweetwater. SF ¶ 115. Seven municipalities are wholly within the district. SF ¶ 115. The only municipality that District 26 splits is Miami. SF ¶ 115. District 26 is also impacted by District 24, in which the voting ability of Black voters is protected, ECF No. 58 at 21 n.5; SF ¶ 116.

Mr. Poreda did not draw District 26 to attain a specific Hispanic voting-age population. SF ¶ 117. Nor is he aware that anyone else did. SF ¶ 117. Staff performed a functional analysis on District 26 after it was drawn, but the functional analysis did not require any changes to ensure compliance with the Non-Diminishment Clause. SF ¶ 118. All congressional maps that House and Senate staff published for legislative consideration contained a district that united parts of Miami-Dade and Collier Counties. SF ¶ 91.

The Governor's office modified the legislatively drawn District 26 before its enactment, but the modified, enacted district did not differ fundamentally from the district initially drawn by the House. SF ¶ 119. Alex Kelly, the Governor's Deputy Chief of Staff, explained the modifications he made. SF ¶ 119. He began with a map drawn by legislative staff. SF ¶ 120. He found that, by splitting Polk County, which the Legislature had kept whole, he could keep whole two counties that the Legislature had split (Citrus and Sarasota). SF ¶ 121. These changes left District 18 underpopulated, so Mr. Kelly extended District 18 south into Collier County. SF ¶ 122. This change removed population from District 26 and left District 26 underpopulated; Mr. Kelly thus increased District 26's population along its western boundary. SF ¶ 124. Mr. Kelly did not change any of District 26's boundaries within Miami-Dade County. SF ¶ 125.

As he made these changes, Mr. Kelly was aware of District 26's status as a historically performing district and was "watching" the effect of his changes on the district's Hispanic voting-age population, which settled at 73 percent. SF ¶ 126. The Hispanic voting-age population of District 26, as modified by Mr. Kelly and enacted by the Legislature, is *less* than the Hispanic voting-age population of each analogous district in any map published by legislative staff during the 2021–22 redistricting process. SF ¶ 127.

* * *

Plaintiffs' contention that the Legislature drew District 26 predominantly for racial reasons rings hollow. Mr. Poreda's testimony details the race-neutral considerations that—like a series of dominos—emanated from Central Florida and rippled through South Florida. He explains that the tier-two decision to follow a 140-mile stretch of county boundaries around Southeast Florida required at least one Miami-Dade County district to cross into Collier County to reach the ideal population of a congressional district.

Mr. Kelly's legislative testimony similarly shows that, while Mr. Kelly was conscious of race when he modified District 26, race was not his predominant motive. Mr. Kelly explained that the changes he made to District 26 originated in race-neutral considerations—tier-two dominos from his efforts to keep Citrus and Sarasota Counties whole. His modified District 26 contains fewer voting-age Hispanics than

the analogous district in any map published by legislative staff—proof positive that race did not drive Mr. Kelly's work.

Here, Plaintiffs cannot climb the steep evidentiary hill before them. Plaintiffs cannot overcome Mr. Poreda's testimony, Mr. Kelly's explanation in the legislative record, or the presumption of legislative good faith. And without contrary evidence sufficient to create a genuine dispute as to any material fact, Plaintiffs' climb should end here. This Court should grant the House summary judgment as to District 26.

### CONCLUSION

The House respectfully requests summary judgment in the House's favor as to each challenged district.

### REQUEST FOR HEARING

Given the complexity of the subject matter, the number of challenged districts, and the public importance of the Court's decision, the House requests oral argument in accordance with this Court's Scheduling Order. *See* ECF No. 98 at 2. The House respectfully suggests that at least two hours be set aside for oral argument.

Dated August 4, 2025.                                    Respectfully submitted,


                                                         /s/ *Andy Bardos*
Christopher M. Kise (FBN 855545)                         Andy Bardos (FBN 822671)
ckise@continentalpllc.com                                andy.bardos@gray-robinson.com
CONTINENTAL PLLC                                         GRAYROBINSON, P.A.
101 North Monroe Street, Suite 750                       301 South Bronough Street, Suite 600
Tallahassee, Florida 32301                               Tallahassee, Florida 32301-1724
Telephone: 850-270-2211                                  Telephone: 850-577-9090

Jesus M. Suarez (FBN 60086)
jsuarez@continentalpllc.com
Carmen Manrara Cartaya (FBN 73887)
ccartaya@continentalpllc.com
CONTINENTAL PLLC
255 Alhambra Circle, Suite 640
Coral Gables, Florida 33134
Telephone: 305-677-2707


*Attorneys for Defendant*, *Florida House of Representatives*