UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:24-cv-21983-JB

CUBANOS PA'LANTE, *et al.*,

    Plaintiffs,

v.

FLORIDA HOUSE OF REPRESENTATIVES
and CORD BYRD, in his official capacity as
Florida Secretary of State,

    Defendants.

_____/

_____

**DEFENDANT FLORIDA HOUSE OF REPRESENTATIVES' STATEMENT OF
MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

_____

Defendant, the Florida House of Representatives, submits this Statement of Material Facts.

1. Maps of Florida's current congressional and State House districts are set forth at **Ex. A**.

2. In 2021 and 2022, Jason Poreda served on the staff of the House's Redistricting Committee and its two subcommittees, the Congressional Redistricting Subcommittee and the State Legislative Redistricting Subcommittee. He was the Chief Map Drawer and the House's primary drawer of congressional and State House districts. **Ex. B**, Poreda Decl. ¶ 2.

3. The 2020 census showed Florida's population had significantly grown to 21,538,187 people by 2020. As a result, the new ideal (or mean) population of a congressional district was 769,221 people, while the new ideal population of a State House district was 179,485 people. *Id.* ¶ 3.

4. Poreda followed the redistricting standards set forth in article III, sections 20 and 21 of the Florida Constitution. The two sections are identical; each contains two tiers of standards. *Id.* ¶ 4.

5. One of the tier-one provisions that protects racial and language minorities is the Non-Diminishment Clause ("NDC"). Poreda understood this provision to apply to districts that have historically "performed" for minority voters, in other words, districts in which a minority group has been able to elect representatives of its choice—and to prohibit diminishment of that minority group's voting ability when districts are redrawn. *Id.* ¶ 6.

6. To determine whether a minority group is able to elect representatives of its choice and whether a redrawn district diminishes that ability, House committee staff ("HCS") reviewed population and election data to perform a district-specific functional analysis of voting behavior in the district, as directed by the Florida Supreme Court. *Id.* ¶ 7.

7. HCS sought whenever possible to implement all state-law standards, without elevating some standards and subordinating others. *Id.* ¶ 8.

8. For example, in drawing districts protected by the NDC, HCS sought to comply with tier-two standards to the maximum extent possible. *Id.*

9. HCS often found that all standards could be implemented to the fullest extent possible and that compliance with the NDC did not compromise race-neutral tier-two principles. *Id.*

10. HCS knew that the NDC applied to the challenged State House districts ("Challenged HDs") and protected the voting ability of Hispanic voters in those districts. *Id.* ¶ 10.

11. HCS did not consider race while drawing the Challenged HDs, but rather focused on the Florida Constitution's non-racial, tier-two considerations: population equality, compactness, and utilization of existing political and geographical boundaries where feasible. *Id.*

12. HCS could set race aside when drawing the Challenged HDs because the concentration

of Hispanic voters in Miami-Dade County ("MDC") is so high. *Id.* ¶ 11; **Ex. C**, Poreda Dep. 142:3–13, 155:14–157:2, 162:4–164:4, 193:5–195:17, 219:25–220:11.

13.   The 2020 census found that 68.7% of MDC's population is Hispanic. Poreda Decl. ¶ 11.

14.   HCS knew that, even if race were not considered, the newly drawn districts would likely be majority-Hispanic districts, so HCS drew the MDC's majority-Hispanic districts without attention to race. *Id.*; Poreda Dep. at 142:3–13, 155:14–157:2, 162:4–164:4, 193:5–195:17, 219:25–220:11.

15.   Only when HCS completed a district and found a configuration HCS considered tier-two compliant did HCS turn to the NDC and perform a functional analysis to confirm that the district did not diminish the ability of Hispanic voters to elect representatives of their choice. Poreda Decl. ¶ 12.

16.   Rather than drawing the Challenged HDs with race in mind, HCS drew those districts to ensure tier-two compliance and only then confirmed that the districts complied with the NDC. *Id.*

17.   MDC's high concentration of Hispanic voters allowed HCS greater flexibility to draw tier-two-compliant boundaries than it usually has when it draws districts protected by the NDC. *Id.* ¶ 13.

18.   When drawing protected districts with smaller minority populations, HCS usually paid closer attention to tier-one considerations than it did when drawing the Challenged HDs. *Id.*

19.   When Poreda drew the Challenged HDs, he did not display any data or color-coding on his screen to identify where Hispanic voters live, even though HCS's map-drawing application had that functionality. *Id.* ¶ 14; Poreda Dep. at 93:16–19.

20.   Poreda did not draw the Challenged HDs with any predetermination to achieve a specific Hispanic voting-age population ("HVAP"). Poreda Decl. ¶ 14.

21.   Only in District 115 does Poreda recall that the district-specific, after-the-fact functional analysis required even slight adjustments to avoid diminishment in the voting ability of Hispanic voters. Poreda does not recall that the functional analysis performed on the other Challenged HDs required any changes. *Id.* ¶ 15.

22.   In the Challenged HDs besides District 115, Poreda recalls that HCS continued to make adjustments that had nothing to do with race, but rather were intended to enhance the visual appearance of the districts, including compactness and adherence to political and geographical boundaries. *Id.*

23.   Based on 2020 census data, HCS determined that Miami-Dade, Broward, and Monroe Counties together had the population necessary for 26 State House districts, without any district crossing over to a county outside this three-county region. *Id.* ¶ 16.

24.   As a practical matter, this meant that districts within the three-county region were drawn as part of one group. *Id.*

25. Within the three-county region, one of HCS's priorities was to limit, to the extent possible, the number of State House districts that cross county boundaries. Therefore, only District 104 includes population from both Broward and Miami-Dade Counties. *Id.* ¶ 17.

26. HCS's decision to maintain the boundary between Broward and Miami-Dade Counties was one of the key drivers of the configuration of districts in MDC. *Id.* ¶ 18.

27. HCS determined that the NDC protected the voting ability of Black voters in Districts 107, 108, and 109. *Id.* ¶ 19.

28. District 108 contains a large language-minority population: Haitian-Creole speakers. *Id.*

29. Several state representatives (including Democratic Representatives Marie Woodson, James Bush, and Dotie Joseph) provided their feedback to HCS on district configurations that would protect Haitian-Creole speakers. With their help, HCS eventually settled on a configuration that HCS believed protected the voting ability of Black voters and, in District 108, of Haitian-Creole speakers. *Id.*

30. Districts 107, 108, and 109 also became key drivers of the configuration of other districts in MDC. *Id.*

31. District 106 begins at MDC's northern boundary and moves south along the coastal areas east of Districts 107, 108, and 109. In the process, it takes in nine whole municipalities. *Id.* ¶ 20.

32. District 106 ends where it achieves the ideal population—at the southern boundary of the City of Miami Beach—and is therefore bracketed by the county boundary to the north and the City of Miami Beach to the south and consists almost entirely of whole municipalities. *Id.*

33. **District 113.** HCS's objective with District 113 was to anchor the district in the City of Miami. *Id.* ¶ 21.

34. One way in which the House has implemented the tier-two mandate to utilize political and geographical boundaries where feasible is to draw State House districts wholly within counties and, to the extent possible, wholly within large, populous municipalities such as the City of Miami. *Id.*

35. Given the City of Miami's large population, HCS considered it important and consistent with tier-two principles to draw at least one State House district located at least predominantly within the City of Miami. *Id.* ¶ 22.

36. District 113 achieved that objective: 91.9% of its population (167,896 of 182,742 people) lives in the City of Miami. *Id.*

37. The only part of District 113 that lies outside the City of Miami is Key Biscayne, which could not neatly be included in any other district because of its location off the coast. *Id.*

38. District 113 also utilizes political and geographical boundaries along 93% of its

3

perimeter according to the Legislature's "boundary analysis," which uses census geographic information and designations of primary and secondary roads, railways, and significant water bodies to calculate the percentage of each district's boundary that coincides with political and geographical boundaries. *Id.* ¶ 23.

39. District 113's boundaries follow major roadways such as the Tamiami Trail (State Road 41), Coral Way (Southwest 22nd Street), and Biscayne Boulevard (U.S. Highway 1); the municipal boundaries of Miami, Coral Gables, and Miami Beach; and waterways such as the Miami River and PortMiami's Main Channel. *Id.*

40. The only municipality that District 113 splits is the City of Miami, which has a population of 442,241 people and must be split to comply with the equal-population requirement. The Village of Key Biscayne is kept whole within the district. *Id.*

41. District 113 is also impacted by tier-one-protected Districts 107, 108, and 109. *Id.*

42. **District 114.** District 114 encompasses all of the City of Coral Gables and thus keeps it whole. Coral Gables is a large municipality with a north-south orientation. Enclosing Coral Gables required District 114 to assume a north-south orientation. *Id.* ¶ 24; Poreda Dep. 159:10–160:2.

43. While drawing a district around Coral Gables, HCS included the Cities of West Miami and South Miami wholly within District 114. Situated to the west of Coral Gables, these cities are much smaller than Coral Gables. Poreda Decl. ¶ 25.

44. HCS also followed the Dolphin Expressway along the northern boundary of District 114. Poreda considered the Dolphin Expressway an ideal district boundary: it offers a familiar and convenient east-west boundary centrally located in MDC's populated area. *Id.*

45. Four State House districts (Districts 111, 112, 114, and 116) use the Dolphin Expressway as a boundary line. *Id.*

46. The need to achieve the ideal population of a State House district shaped the remainder of District 114's configuration. *Id.*

47. District 114 utilizes political and geographical boundaries along 92% of its perimeter. *Id.* ¶ 26.

48. District 114's boundaries follow major roadways such as the Dolphin Expressway and the Tamiami Trail (State Road 41); the municipal boundaries of West Miami, South Miami, Coral Gables, Pinecrest, and Palmetto Bay; the Snapper Creek Canal; and the coastline along Biscayne Bay. *Id.*

49. The Cities of West Miami, South Miami, and Coral Gables are kept whole in District 114, and the only municipality that District 114 splits is the City of Miami, with its large population. *Id.*

50. **District 112.** District 112 utilizes political and geographical boundaries along 90% of its

4

perimeter. Its boundaries follow major roadways such as the Palmetto Expressway along its western boundary and the Dolphin Expressway and the Tamiami Trail (State Road 41) along its southern boundary; the municipal boundaries of Hialeah, Doral, Hialeah Gardens, and Medley; and waterways such as the Little River Canal and the North Fork of the Miami River. *Id.* ¶ 27.

51. Miami Springs and Virginia Gardens are kept whole within District 112. The only municipalities that District 112 splits are Hialeah, which has a large population of 223,109 people, and the City of Miami. *Id.*

52. District 112 is also impacted by tier-one-protected Districts 107, 108, and 109. *Id.*

53. The triangular notch in District 112's western boundary represents the City of Medley, which is kept whole in District 111. *Id.*

54. The southeast corner of District 112 (southeast of the Miami International Airport) is relatively small geographically, but densely populated. More than 50,000 people live in the part of District 112 that lies south of Northwest 36th Street and east of State Road 953 (LeJeune Road). *Id.* ¶ 28.

55. Because of its large population, this area could not have been added to other, nearby districts without overpopulating those districts or making them less compact or adherent to political and geographical boundaries. If this area had been added to District 114, then it would have been necessary to make District 114 less compact or to split Coral Gables and exclude part of it from District 114. *Id.*

56. HCS's decision to add this corner area to District 112 had nothing to do with race. *Id.*

57. **District 115.** HCS drew District 115 to encompass Cutler Bay, Palmetto Bay, and Pinecrest. These municipalities determine much of District 115's shape. *Id.* ¶ 29.

58. District 115 is impacted by District 117, which was drawn in part to avoid diminishment in the ability of Black voters to elect candidates of their choice. *Id.*

59. District 115 utilizes political and geographical boundaries along 92% of its perimeter. Its boundaries follow major roadways such as the Tamiami Trail (State Road 41) along its northern boundary, Kendall Drive (State Road 94), Galloway Road (87th Avenue), the Don Shula Expressway, and U.S. Highway 1; the municipal boundaries of Miami, West Miami, South Miami, Coral Gables, Pinecrest, Palmetto Bay, and Cutler Bay; the Cutler Drain Canal and the Black Creek Canal; and the coastline along Biscayne Bay. *Id.*

60. District 115 does not split any municipalities. *Id.*

61. After HCS first drew District 115, HCS performed a functional analysis and determined that the district did not sufficiently protect the voting ability of Hispanic voters. *Id.* ¶ 30.

62. As a result, HCS extended the district slightly to the north, with incidental effects on

5

District 115's neighbors, Districts 114 and 116. *Id.*

63. In making this adjustment to District 115, HCS considered and implemented race-neutral districting principles, such as adherence to political and geographical boundaries. *Id.*

64. HCS followed major roadways in the northern part of District 115, including the Tamiami Trail, which is the district's northern boundary, and 67th and 87th Avenues—four-lane roads with medians that form the eastern and western boundaries of the northern part of the district. *Id.*

65. As a map-drawer, when possible, Poreda liked to use the same boundary for multiple districts. HCS did so at the northwest corner of District 115, where three districts meet at a point, and the district boundaries form a geometric "T" shape. *Id.*

66. To the extent race had an effect on District 115's boundaries, it did not predominate over, but rather came after and were implemented by HCS in harmony with race-neutral principles. *Id.*

67. **District 116.** District 116 is an especially boxy and compact district. It is essentially a rectangle bounded by well-known political and geographical boundaries. *Id.* ¶ 31.

68. District 116 uses political and geographical boundaries along 93% of its perimeter. Its boundaries follow major roadways such as the Dolphin Expressway along its northern boundary, the Florida Turnpike along its western boundary, the Don Shula Expressway and Kendall Drive (State Road 94) in the southern part of the district, and Galloway Road (87th Avenue) as its eastern boundary. *Id.*

69. In the northwest corner of District 116, HCS extended the district to the north to wholly encompass the City of Sweetwater, which would have been split without the northward extension. *Id.*

70. With the extension, City of Sweetwater is whole within District 116 while the City of Doral, which abuts Sweetwater to the north, is kept whole within District 111. *Id.*

71. District 116 does not split any municipalities. *Id.*

72. **Districts 118 and 119.** Districts 118 and 119 divide a rectangular area vertically. These parallel districts are rectangular and therefore have regular, compact shapes. *Id.* ¶ 32.

73. Districts 118 and 119 follow major roadways: the Tamiami Trail (State Road 41) forms the northern boundary of both districts., Krome Avenue (State Road 997) is the western boundary of District 119, while the Florida Turnpike comprises much of District 118's eastern boundary. *Id.*

74. The boundary between Districts 118 and 119 tracks recognizable features such as the CSX rail line and two major thoroughfares: Southwest 137th Avenue, which is a six-lane road with a median, and Southwest 147th Avenue, which is a four-lane road with a median. *Id.*

75. District 118 is also impacted by tier-one-protected District 117. *Id.*

76. Districts 118 and 119 consist entirely of unincorporated areas and therefore neither split

nor enclose any municipalities. *Id.*

77. Poreda considers Districts 118 and 119 to be compact because, as rectangles, they have regular, understandable shapes. They do not have bizarre shapes or chaotic or disorderly boundary features, such as fingers, appendages, tails, or tentacles. *Id.* ¶ 33.

78. Many districts in Southeast Florida are vertically oriented, including Districts 87, 92, 98, 100, 103, 106, 107, 108, and 109, all in Palm Beach, Broward, and Miami-Dade Counties. *Id.* Only four of these nine districts are protected by the NDC. *Id.*

79. Some mathematical measures of compactness, such as the Reock score, tend to penalize shapes, like rectangles, that are not circular. Others, such as the Convex Hull score, do not. *Id.* ¶ 34.

80. District 119 has the eleventh highest Convex Hull score in the State House map. *Id.*

81. HCS treated compactness as a balance of visual and mathematical assessment. *Id.*

82. Poreda considered the regular, rectangular shapes of Districts 118 and 119 to be both visually and mathematically compact. *Id.*

83. HCS drew other orientations of Districts 118 and 119 but concluded that none balanced all legal requirements as well as the vertical orientation. *Id.* ¶ 35.

84. In one alternative configuration, Districts 118 and 119 were stacked; in another, one of the districts had an "L" shape. *Id.*

85. Poreda considered the vertical configurations of Districts 118 and 119 to be at least comparable in compactness to the alternative configurations, and a functional analysis revealed that the vertical configuration better assured the ability of Hispanic voters to elect candidates of their choice. *Id.*

86. Because the vertical configuration was visually appropriate and balanced all redistricting criteria, HCS considered the vertical orientation to be the best option. *Id.*

87. Race did not predominate in drawing these districts; rather, HCS implemented all criteria together and as part of a broader effort to draw districts in a three-county region. *Id.*

88. Districts 107, 108, 109, and 117 were more difficult to draw than the majority-Hispanic Challenged HDs. These districts that perform for Black voters drive the overall configuration of MDC's districts much more than the majority-Hispanic districts. *Id.* ¶ 36.

89. As to MDC's majority-Hispanic districts, Poreda believes that HCS balanced all legal requirements and that no single requirement predominated over others. He believes that these districts are regularly shaped, keep municipalities whole where feasible, and respect political and geographical boundaries in a densely populated area of the State. *Id.*

90. **Congressional District 26.** For Congressional District 26 ("CD 26") a combination of

factors, including race-neutral considerations, drove HCS's decision to connect portions of Miami-Dade and Collier Counties. *Id.* ¶ 37.

91. All of the congressional maps that House and Senate staff published for legislative consideration contained a district that united portions of Miami-Dade and Collier Counties. *Id.*

92. In redistricting, each district impacts the boundaries of other districts—sometimes even those at a great distance. In drawing congressional districts, HCS's configuration of Central Florida heavily influenced its configuration of South Florida. *Id.* ¶ 38.

93. For example, Congressional District 8 combined two whole counties—Brevard and Indian River Counties—and a small portion of Orange County. The next district to the south therefore began along the northern boundary of St. Lucie County. *Id.*

94. In HCS's effort to utilize political boundaries, HCS then followed the western boundary of St. Lucie, Martin, Palm Beach, and Broward Counties. *Id.*

95. Together with the Atlantic Ocean, this adherence to county boundaries for nearly 140 consecutive miles—along the northern boundary of St. Lucie County and the western boundaries of St. Lucie, Martin, Palm Beach, and Broward Counties—created a three-sided enclosure around much of Southeast Florida. *Id.*

96. District 20 occupied much of this enclosed area. HCS concluded that the NDC and section 2 of the federal Voting Rights Act protect the voting ability of the district's Black voters. *Id.* ¶ 39.

97. District 20's two arms—one in Palm Beach County and one in Broward County—contain most of District 20's population. *Id.*

98. HCS's adherence to a 140-mile stretch of county boundaries meant that five districts could fit wholly within St. Lucie, Martin, Palm Beach, and Broward Counties. *Id.* ¶ 40.

99. It also made those districts more compact. District 21, as it moved south from St. Lucie and Martin Counties into Palm Beach County, reached its ideal population in exactly the right place: east of District 20's northern arm. Thus, no district needed to wrap around District 20's northern arm. *Id.*

100. While District 23 wrapped around the southern arm, District 25 remained beneath the southern arm and therefore has a regular, compact shape. *Id.*

101. Once the five districts drawn wholly within St. Lucie, Martin, Palm Beach, and Broward Counties were drawn, it was impossible to configure MDC without a district that crossed into Collier County. At least one district in MDC (Districts 24, 26, 27, or 28) would need more population than was available in MDC and Monroe Counties. This district had nowhere to go but Collier County. *Id.* ¶ 41; Poreda Dep. 224:19–231:7, 291:23–295:5.

102. Because of HCS's tier-two priorities in the counties to the north, at least one district in MDC needed to extend into Collier County to attain its ideal population. Poreda Decl. ¶ 41.

103. If the Legislature had not drawn a district that crossed into Collier County, then it would have been impossible to maintain the tier-two features HCS achieved in St. Lucie, Martin, Palm Beach, and Broward Counties. *Id.* ¶ 42.

104. At least one district in MDC would have had to extend north into (or further into) Broward County to attain its ideal population. Pushing a district north into Broward County would have forced other districts along the east coast to move north as well and eventually would have broken the 140-mile county-boundary perimeter described in paragraphs 92 through 94 above. *Id.*

105. The likely result would have been to force District 21 to the west, but to achieve its ideal population in sparsely populated counties, District 21 would have extended west nearly to Port Charlotte, crossing the State to an even greater degree than CD 26. *Id.* ¶ 43.

106. District 25 would have become less compact as well and been pushed to the north along the coast. It would have assumed a reverse "L" shape to the south and east of District 20's southern arm and thus become less compact. *Id.* ¶ 44.

107. HCS experimented with different configurations of South Florida during the redistricting process. For the reasons described above, HCS concluded that the tier-two compliance of South Florida districts was worse when CD 26 did not cross into Collier County. *Id.* ¶ 45.

108. HCS also performed a functional analysis on alternative configurations and determined that, without a district that crossed into Collier County, two of MDC's majority-Hispanic districts, including CD 26, became less likely to elect candidates preferred by Hispanic voters. *Id.* ¶ 46.

109. The functional analysis was not critical to HCS's decision to extend a district to Collier County, given the race-neutral, tier-two considerations described in paragraphs 91 through 106. *Id.*

110. In drawing CD 26, HCS adhered to the race-neutral districting principles set forth in Tier Two, utilizing political and geographical boundaries along 91% of CD 26's perimeter. *Id.* ¶ 47.

111. In the early maps published by HCS, CD 26's entire northern boundary—from Interstate 75 in western Collier County to CD 26's eastern boundary in MDC—consisted of the northern boundaries of Collier and Miami-Dade Counties. *Id.*

112. Enacted CD 26 follows the same county boundaries, apart from a minor deviation around unincorporated Immokalee, where an area with a small but highly Hispanic population was transferred out of CD 26 and into District 18. *Id.*

113. CD 26's southern boundary consists of the boundary between Monroe and Collier

9

Counties and, in MDC, the Tamiami Trail. *Id.*

114. On its western boundary, CD 26 follows major roads such as Collier Boulevard (County Road 951) and Interstate 75 and the municipal boundaries of Bonita Springs and Marco Island. *Id.* ¶ 48.

115. Along its eastern boundary, CD 26 follows major roadways such as the Dolphin Expressway, the Airport Expressway, and the Palmetto Expressway and the municipal boundaries of Miramar, Miami Gardens, Miami Lakes, Hialeah, Opa-Locka, Miami, Doral, and Sweetwater. Seven municipalities (Miami Lakes, Hialeah, Hialeah Gardens, Medley, Doral, Miami Springs, and Virginia Gardens) are kept whole in the district; the only municipality that CD 26 splits is the City of Miami. *Id.*

116. CD 26 is also impacted by District 24, in which the NDC protects the voting ability of Black voters. *Id.*

117. Poreda did not draw the House's iterations of CD 26 to attain a specific HVAP, nor is he aware that anyone else attempted to draw iterations of CD 26 to attain a specific HVAP. *Id.* ¶ 49.

118. HCS performed a functional analysis on CD 26 after it was drawn. The functional analysis did not require any changes to ensure CD 26's compliance with the NDC. *Id.*

119. Through Alex Kelly, the Governor's Deputy Chief of Staff, the Governor's office proposed some modifications to CD 26 before its enactment, but the modified, enacted district did not differ fundamentally from the district initially drawn by the House. *Id.* ¶ 50; **Ex. D**, House Congressional Redistricting Subcommittee Tr. 15:3–5, 16:14–21(Apr. 19, 2022) ("House Tr.").

120. Kelly began with a map drawn by legislative staff. House Tr. 20:23–21:4.

121. Kelly found that by splitting Polk County, which the Legislature had kept whole, he could keep Citrus and Sarasota Counties whole. *Id.* at 26:2–7, 33:24–34:3, 34:20–25, 45:21–46:2, 55:17–24.

122. These changes left District 18 underpopulated, so Kelly extended District 18 south into norther Collier County. *Id.* at 46:3–7, 46:17–24, 71:23–72:7.

123. These changes to District 18 removed population from CD 26 and left CD 26 underpopulated. *Id.* at 46:25–47:6, 72:8–15, 73:2–19.

124. To compensate, Kelly increased CD 26's population along its western boundary. *Id.*

125. Kelly did not change any of CD 26's boundaries in MDC. *Id.* at 71:14–22, 72:16–23.

126. As Kelly made these changes to CD 26, Kelly was aware of CD's status as a historically performing district and was "watching" the effect of his changes on CD 26's HVAP, which remained around 73%. *Id.* at 47:5–6, 72:16–23, 73:19–74:4, 75:8–17.

127. CD 26's HVAP is lower than the HVAP of the analogous district in each map published by House or Senate staff during the 2021–22 redistricting process. Poreda Decl. ¶ 50.

Dated August 4, 2025.　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　/s/ *Andy Bardos*
Christopher M. Kise (FBN 855545)　　　　　Andy Bardos (FBN 822671)
ckise@continentalpllc.com　　　　　　　　andy.bardos@gray-robinson.com
CONTINENTAL PLLC　　　　　　　　　　　GRAYROBINSON, P.A.
101 North Monroe Street, Suite 750　　　　301 South Bronough Street, Suite 600
Tallahassee, Florida 32301　　　　　　　　Tallahassee, Florida 32301-1724
Telephone: 850-270-2211　　　　　　　　Telephone: 850-577-9090

Jesus M. Suarez (FBN 60086)
jsuarez@continentalpllc.com
Carmen Manrara Cartaya (FBN 73887)
ccartaya@continentalpllc.com
CONTINENTAL PLLC
255 Alhambra Circle, Suite 640
Coral Gables, Florida 33134
Telephone: 305-677-2707

*Attorneys for Defendant, Florida House of Representatives*