# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:24-cv-21983-JB

CUBANOS PA'LANTE, *et al.*,

    Plaintiffs,

v.

FLORIDA HOUSE OF REPRESENTATIVES
and CORD BYRD, in his official capacity as
Florida Secretary of State,

    Defendants.

_____/

## DECLARATION OF JASON POREDA

I, Jason Poreda, declare as follows:

1. My name is Jason Poreda. I am above the age of 18 and am competent to make this declaration.

**Background**

2. In 2021 and 2022, I served on the staff of the Florida House of Representatives' Redistricting Committee and its two subcommittees, the Congressional Redistricting Subcommittee and the State Legislative Redistricting Subcommittee. My title was Chief Map Drawer. In that capacity, I was the House's primary drawer of congressional and State House districts. Leda Kelly served as the Staff Director of the Redistricting Committee and its two subcommittees, while Kyle Langan, a Legislative Analyst, assisted me in drawing districts.

3. The 2020 census highlighted Florida's significant population growth. By 2020, the state's total population had grown to 21,538,187 people. As a result, when the Legislature redrew the State's congressional and State House districts during the 2021–22 redistricting process, the new ideal (or mean) population of a congressional district was 769,221 total population (21,538,187 total statewide population ÷ 28 districts), while the ideal population of

a State House district was 179,485 total population (21,538,187 total statewide population ÷ 120 districts).

4. The state-law standards that I followed in drawing districts are set forth in article III, sections 20 and 21 of the Florida Constitution. Section 20 governs congressional redistricting; section 21 governs state legislative redistricting. The two sections are identical in substance. Both set forth two tiers of standards. The first tier prohibits intentional partisan or incumbent favoritism, protects racial and language minorities, and requires districts to be contiguous. The second tier requires that districts be compact and as nearly equal in population as practicable and, where feasible, utilize existing political and geographical boundaries. I understand political boundaries to be county and municipal boundaries and geographical boundaries to consist of rivers, railways, interstates, state roads, and other easily ascertainable and commonly understood boundaries.

5. Only when the standards in the two tiers conflict do the standards in Tier One prevail over those in Tier Two. Fla. Const. art. III, §§ 20(b), 21(b).

6. One of the tier-one provisions that protects racial and language minorities is the Non-Diminishment Clause. That provision states that "districts shall not be drawn . . . to diminish [the] ability [of racial or language minorities] to elect representatives of their choice." *Id.* §§ 20(a), 21(a). I understand this provision to apply to districts that have historically "performed" for minority voters—*i.e.*, districts in which a minority group has been able to elect representatives of its choice—and to prohibit diminishment of that minority group's voting ability when districts are redrawn.

7. To determine whether a minority group is able to elect representatives of its choice and whether a redrawn district diminishes that ability, we review population and election data to perform a district-specific "functional analysis" of voting behavior in the district, as directed by the Florida Supreme Court.

8. In drawing congressional and state legislative districts in 2021 and 2022, House committee staff sought whenever possible to implement all state-law standards, without elevating some standards and subordinating others. For example, in drawing districts protected by the Non-Diminishment Clause, we sought to comply with tier-two standards to the

2

maximum extent possible. We often found that all standards could be implemented to the fullest extent possible and that compliance with the Non-Diminishment Clause did not compromise race-neutral tier-two principles.

9. Although I am not an attorney, I made every effort before I began to draw districts to inform myself of the legal standards that govern redistricting. The House also retained outside counsel to help guide our redistricting process.

### State House Districts

10. In the redistricting process, we knew that the Non-Diminishment Clause applied to the challenged State House districts and protected the ability of Hispanic voters in those districts to elect representatives of their choice. But we did not consider race in the drawing those districts. Instead, in drawing the challenged State House districts, we focused on the Florida Constitution's non-racial, tier-two considerations: population equality, compactness, and utilization of existing political and geographical boundaries where feasible.

11. We were able to set race aside in drawing the challenged State House districts because the concentration of Hispanic voters in Miami-Dade County is so high. According to the 2020 census, 68.7 percent of the population of Miami-Dade County is Hispanic. We knew that, even if we did not consider race, the newly drawn districts would likely result in majority-Hispanic districts. So we drew the county's majority-Hispanic districts without attention to race.

12. Only when we completed a district and found a configuration we considered tier-two compliant did we turn to the Non-Diminishment Clause and perform the necessary functional analysis to confirm that the district we had drawn did not diminish the ability of Hispanic voters to elect representatives of their choice. Rather than drawing the challenged State House districts with race in mind, we drew those districts to ensure tier-two compliance and only then confirmed that the districts also complied with the Non-Diminishment Clause.

13. The high concentration of Hispanic voters in Miami-Dade County allowed us greater flexibility to draw tier-two-compliant boundaries than we usually have when we draw districts protected by the Non-Diminishment Clause. When drawing protected districts with smaller minority populations, we usually pay closer attention to tier-one considerations than

3

we did when drawing the challenged State House districts. In this respect, drawing districts that preserve the voting ability of Hispanic voters in Miami-Dade County is less complicated.

14. When drawing predominantly Hispanic districts in Miami-Dade County, for example, I did not display any data or color-coding on my screen to identify where Hispanic voters live, even though our map-drawing application had that functionality. Nor did I draw these districts with any predetermination to achieve a specific Hispanic voting-age population.

15. In fact, in only one of the challenged State House districts (District 115) do I recall that our district-specific, after-the-fact functional analysis required even slight adjustments to protect the voting ability of Hispanic voters from diminishment. I do not recall that the functional analyses we performed on the other challenged State House districts required any changes. In these districts, I recall that we continued to make adjustments that had nothing to do with race, but rather were intended to enhance the visual appearance of the districts, including their compactness and adherence to political and geographical boundaries.

16. When House staff reviewed the 2020 census data, we determined that Miami-Dade, Broward, and Monroe Counties together had the population necessary for 26 State House districts, without any district crossing over to a county outside this three-county region. As a practical matter, this meant that districts within the three-county region were drawn as part of one group—or, as we called it, a "sandbox."

17. Within the three-county region, one of our priorities was to limit, to the extent possible, the number of State House districts that cross county boundaries. Only one district in the enacted map (District 104) includes population from both Broward and Miami-Dade Counties.

18. This decision to maintain the boundary between Broward and Miami-Dade Counties was one of the key drivers of the configuration of districts in Miami-Dade County.

19. Another was our configuration of Districts 107, 108, and 109. We determined that the Non-Diminishment Clause protected the voting ability of Black voters in these districts. Also, District 108 contains a large language-minority population: Haitian-Creole speakers. Several state representatives (including Democratic Representatives Marie Woodson, James Bush, and Dotie Joseph) provided their feedback on district configurations that would

4

protect Haitian-Creole speakers. With their help, we eventually settled on a configuration that we believed protected the voting ability of Black voters and Haitian-Creole speakers. These districts also became key drivers of the configuration of other districts in Miami-Dade County.

20. With Districts 107, 108, and 109 in place, District 106 basically drew itself. District 106 begins at the northern boundary of Miami-Dade County and moves south along the coastal areas east of Districts 107, 108, and 109. In the process, District 106 takes in nine whole municipalities: Golden Beach, Aventura, Sunny Isles Beach, Bal Harbour, Bay Harbor Islands, Indian Creek, Surfside, North Bay Village, and Miami Beach. The district ends where it achieves the ideal population for a State House district—at the southern boundary of the City of Miami Beach. District 106 is therefore bracketed by the county boundary to the north and the City of Miami Beach to the south and consists almost entirely of whole municipalities.

21. **District 113.** Our objective with the next district to the south—District 113—was to anchor the district in the City of Miami. One way in which the House has implemented the Florida Constitution's tier-two mandate to utilize political and geographical boundaries where feasible is to draw State House districts wholly within counties and, to the extent possible, wholly within large, populous municipalities such as the City of Miami. For example, residents of the City of Cape Coral comprise 99 percent of the total population of District 79.

22. Given the City of Miami's large population, House committee staff considered it important and consistent with the tier-two principles to draw at least one State House district located at least predominantly within the City of Miami. District 113 achieved that objective: 91.9 percent of the district's population (167,896 of 182,742 people) lives in the City of Miami. The only part of the district that lies outside the city is the island of Key Biscayne, which, because of its location off the coast, could not neatly have been included in any other district. District 113 fulfilled our priority to draw a district that represents the City of Miami.

23. District 113 utilizes existing political and geographical boundaries along 93 percent of its perimeter according to the Legislature's "boundary analysis," which calculates the percentage of each district's boundary that coincides with political and geographical

boundaries.[1] District 113's boundaries follow major roadways such as the Tamiami Trail (State Road 41), Coral Way (Southwest 22nd Street), and Biscayne Boulevard (U.S. Highway 1); the municipal boundaries of Miami, Coral Gables, and Miami Beach; and waterways such as the Miami River and PortMiami's Main Channel. The Village of Key Biscayne is kept whole within the district. The only municipality that District 113 splits is the City of Miami, which has a population of 442,241 people—well above the ideal population of a State House district—and which therefore must be split to comply with the equal-population requirement. District 113 is also impacted by three districts (Districts 107, 108, and 109) in which, as noted above, the ability of Black voters to elect representatives of their choice is protected from diminishment.

24. **District 114.** The district immediately to the west of District 113—District 114—was drawn with similar objectives. District 114 encompasses all of the City of Coral Gables and thus keeps it whole. Coral Gables is a large municipality with a north-south orientation. Enclosing Coral Gables required District 114 to assume a north-south orientation.

25. In the process of drawing a district around Coral Gables, we included the City of West Miami and the City of South Miami wholly within District 114. Situated to the west of Coral Gables, these cities are much smaller than Coral Gables. We also followed the Dolphin Expressway along the northern boundary of District 114. The Dolphin Expressway is an ideal district boundary; it offers a familiar and convenient east-west boundary centrally located in Miami-Dade County's populated area. In the State House map, no fewer than four districts (Districts 111, 112, 114, and 116) use the Dolphin Expressway as a boundary line. The need to achieve the ideal population of a State House district shaped the remainder of District 114's configuration.

26. District 114 utilizes political and geographical boundaries along 92 percent of its perimeter. Its boundaries follow major roadways such as the Dolphin Expressway and the Tamiami Trail (State Road 41); the municipal boundaries of West Miami, South Miami, Coral Gables, Pinecrest, and Palmetto Bay; the Snapper Creek Canal; and the coastline along

---

[1] The boundary analysis utilizes the U.S. Census Bureau's geographic information and its designation of primary and secondary roads, railways, and significant water bodies.

6

Biscayne Bay. The Cities of West Miami, South Miami, and Coral Gables are kept whole in the district. The only municipality that District 114 splits is Miami, with its large population.

27. **District 112.** To the north of District 114, District 112 is a compact district that utilizes political and geographical boundaries along 90 percent of its perimeter. Its boundaries follow major roadways such as the Palmetto Expressway along its western boundary and the Dolphin Expressway and the Tamiami Trail (State Road 41) along its southern boundary; the municipal boundaries of Hialeah, Doral, Hialeah Gardens, and Medley; and waterways such as the Little River Canal and the North Fork of the Miami River. Miami Springs and Virginia Gardens are kept whole within the district. The only municipalities that District 112 splits are Hialeah, which has a large population of 223,109 people, and Miami. District 112 is also impacted by Districts 107, 108, and 109, which are described above. The triangular notch in District 112's western boundary represents the City of Medley, which is kept whole in District 111.

28. The southeast corner of District 112—southeast of the Miami International Airport—is relatively small geographically, but densely populated. In fact, more than 50,000 people live in the portion of the district that lies south of Northwest 36th Street and east of State Road 953 (LeJeune Road). Because of its large population, this area could not have been added to other, nearby districts without overpopulating those districts or making them less compact or less adherent to political and geographical boundaries. If this area southeast of the airport had been added to District 114, then it would have been necessary either to make District 114 less compact or to split the City of Coral Gables and exclude part of Coral Gables from District 114. The decision to add this area to District 112 had nothing to do with race.

29. **District 115.** We drew District 115 to encompass Cutler Bay, Palmetto Bay, and Pinecrest. These municipalities determine much of District 115's shape. On its west side, District 115 is impacted by adjacent District 117, which was drawn in part to avoid diminishment in the ability of Black voters to elect candidates of their choice. District 115 utilizes political and geographical boundaries along 92 percent of its perimeter. Its boundaries follow major roadways such as the Tamiami Trail (State Road 41) along its northern boundary, Kendall Drive (State Road 94), Galloway Road (87th Avenue), the Don Shula Expressway,

7

and U.S. Highway 1; the municipal boundaries of Miami, West Miami, South Miami, Coral Gables, Pinecrest, Palmetto Bay, and Cutler Bay; the Cutler Drain Canal and the Black Creek Canal; and the coastline along Biscayne Bay. District 115 does not split any municipalities.

30. When we first drew District 115, the district did not extend quite as far north as in the enacted map. We performed a functional analysis and determined that the district did not sufficiently protect the ability of Hispanic voters to elect representatives of their choice. As a result, we extended the district slightly to the north, with incidental effects on District 115's neighbors, Districts 114 and 116. In the process, we considered and implemented race-neutral districting principles, such as adherence to political and geographical boundaries. For example, we followed major roadways in the northern part of the district, including the Tamiami Trail, which forms the district's northern boundary, and 67th and 87th Avenues—four-lane roads with medians that form the eastern and western boundaries of the northern part of the district. As a map-drawer, when possible, I like to use the same boundary for multiple districts; we accomplished that at the northwest corner of District 115, where three districts meet at a point, and the district boundaries form a geometric "T" shape. To the extent racial considerations had some effect on District 115's boundaries, they did not predominate over, but rather came after and were implemented in harmony with race-neutral principles.

31. **District 116.** We drew District 116 to the west of District 115. District 116 is an especially boxy and compact district. It is essentially a rectangle bounded by well-known political and geographical boundaries. It utilizes political and geographical boundaries along 93 percent of its perimeter. Its boundaries follow major roadways such as the Dolphin Expressway along its northern boundary, the Florida Turnpike along its western boundary, the Don Shula Expressway and Kendall Drive (State Road 94) in the southern part of the district, and Galloway Road (87th Avenue) as its eastern boundary. In the northwest corner of the district, we extended the district to the north to wholly encompass the City of Sweetwater, which would have been split without the northward extension. With the extension, the City of Sweetwater is whole within District 116, while the City of Doral, which abuts Sweetwater to the north, is kept whole within District 111. District 116 does not split any municipalities.

32. **Districts 118 and 119.** Finally, Districts 118 and 119 divide a rectangular area vertically. These parallel districts are rectangular and therefore have regular, compact shapes. Both follow major roadways. The Tamiami Trail (State Road 41) forms the northern boundary of both districts. Krome Avenue (State Road 997) is the western boundary of District 119, while the Florida Turnpike comprises much of District 118's eastern boundary. The boundary between the two districts tracks recognizable features such as the CSX rail line and two major thoroughfares: Southwest 137th Avenue, which is a six-lane road with a median, and Southwest 147th Avenue, which is a four-lane road with a median. District 118 is also impacted by District 117, which we drew in part to protect the voting ability of Black voters. Districts 118 and 119 consist entirely of unincorporated areas and therefore neither split nor enclose any municipalities.

33. I understand that the plaintiffs take issue with the vertical orientation of Districts 118 and 119. I consider these districts to be compact because, as rectangles, they have regular, understandable shapes. They do not have bizarre shapes or chaotic or disorderly boundary features, such as fingers, appendages, tails, or tentacles. Many districts in Southeast Florida are vertically oriented, including Districts 87, 92, 98, 100, 103, 106, 107, 108, and 109, all of which are located in Palm Beach, Broward, and Miami-Dade Counties. None of these nine districts was drawn to perform for Hispanic voters; only four were drawn to perform for Black voters.

34. Some mathematical measures of compactness, such as the Reock score, tend to penalize shapes, like rectangles, that are not circular. Others, such as the Convex Hull score, do not. District 119, for example, has the eleventh highest Convex Hull score in the State House map. We considered compactness to be a balance of visual as well as mathematical assessment. I considered the regular, rectangular shapes of Districts 118 and 119 to be both visually and mathematically compact.

35. We drew other orientations of Districts 118 and 119, but none balanced all legal requirements as well as the vertical orientation. In one alternative configuration, the districts were stacked; in another, one of the districts had an "L" shape. I considered the vertical configuration to be at least comparable in compactness to the alternative configurations, and

9

our functional analysis revealed that the vertical configuration better assured the ability of Hispanic voters to elect representatives of their choice. Because the vertical configuration was visually appropriate and balanced all of our redistricting criteria, we considered the vertical orientation to be the best option. Race did not predominate in drawing these districts; rather, we implemented all of our criteria together and as part of a broader effort to draw districts in a three-county region.

36. As explained above, in Miami-Dade County, the districts in which the voting ability of Black voters is protected (Districts 107, 108, 109, and 117) were more difficult to draw than the districts that are majority Hispanic. The districts that perform for Black voters drive the overall configuration of districts in the county much more than the districts that are majority Hispanic. As to the majority-Hispanic districts in Miami-Dade County, I believe that we balanced all legal requirements and that no single requirement predominated over others. The challenged districts are regularly shaped, keep municipalities whole where feasible, and respect political and geographical boundaries in a densely populated area of the State.

## Congressional District 26

37. I understand that the plaintiffs take exception to the Legislature's decision to connect portions of Miami-Dade and Collier Counties in Congressional District 26. A combination of factors, including race-neutral considerations, drove that decision. There are good reasons why all of the congressional maps that House and Senate staff published for legislative consideration contained a district that united portions of Miami-Dade and Collier Counties.

38. In redistricting, each district impacts the boundaries of other districts—sometimes even those at a great distance. In drawing congressional districts, our configuration of Central Florida heavily influenced our configuration of South Florida. District 8 combined two whole counties—Brevard and Indian River Counties—and a small portion of Orange County. The next district to the south therefore began along the northern boundary of St. Lucie County. In our effort to utilize political boundaries, we then followed the western boundary of St. Lucie, Martin, Palm Beach, and Broward Counties. Together with the Atlantic Ocean, this adherence to county boundaries for nearly 140 consecutive miles—along the

northern boundary of St. Lucie County and the western boundaries of St. Lucie, Martin, Palm Beach, and Broward Counties—created a three-sided enclosure around much of Southeast Florida.

39. District 20 occupied much of this enclosed area. We concluded that the Non-Diminishment Clause and section 2 of the federal Voting Rights Act protected the ability of Black voters to elect their preferred candidates in this district. District 20's two arms—one in Palm Beach County and one in Broward County—contain most of District 20's population.

40. Our adherence to a 140-mile stretch of county boundaries meant that five districts could fit wholly within St. Lucie, Martin, Palm Beach, and Broward Counties. It also made those districts more compact. District 21, as it moved south from St. Lucie and Martin Counties into Palm Beach County, reached the ideal population of a congressional district in exactly the right place: east of District 20's northern arm. As a result, no district needed to wrap around District 20's northern arm. While District 23 wrapped around the southern arm, District 25 remained beneath the southern arm and therefore has a regular, compact shape.

41. Once these districts were drawn, it was impossible to configure Miami-Dade County without a district that crossed into Collier County. At least one of the districts in Miami-Dade County (District 24, 26, 27, or 28) would need additional population above and beyond the population available in Miami-Dade and Monroe Counties. And the district would have nowhere to go besides Collier County. In other words, because of our tier-two priorities in the counties to the north, at least one district in Miami-Dade County needed to extend into Collier County to attain the ideal population required for congressional districts in Florida.

42. If the Legislature had not drawn a district that crossed into Collier County, then it would have been impossible to maintain the tier-two features we achieved in St. Lucie, Martin, Palm Beach, and Broward Counties. At least one district in Miami-Dade County would have had to extend north into (or further into) Broward County to attain its ideal population. That would have made it impossible to maintain the 140-mile county-boundary perimeter described above. Pushing a district north into Broward County would have forced other districts along the east coast to move north as well and eventually would have broken that perimeter.

11

43. The likely result would have been to force District 21 to the west. To achieve its ideal population in sparsely populated counties, District 21 would have extended west nearly to Port Charlotte, crossing the state to an even greater degree than enacted District 26.

44. District 25 would have become less compact as well. District 25 would have been pushed to the north along the coast. It would have assumed a reverse "L" shape to the south and east of District 20's southern arm and thus become less compact.

45. We experimented with different configurations of South Florida during the redistricting process. For the reasons explained above, we concluded that the tier-two compliance of our South Florida districts was worse when District 26 did not cross into Collier County.

46. We also performed a functional analysis on alternative configurations and determined that, without a district that crossed into Collier County, two of Miami-Dade County's majority-Hispanic districts, including District 26, became less likely to elect candidates preferred by Hispanic voters. But that finding was not critical to our decision to extend a district to Collier County, given the race-neutral, tier-two considerations described above.

47. In drawing District 26, we adhered to the race-neutral districting principles set forth in Tier Two. District 26 utilizes political and geographical boundaries along 91 percent of its perimeter. In the early maps published by House committee staff, the entire northern boundary of District 26—from Interstate 75 in western Collier County to District 26's eastern boundary in Miami-Dade County—consisted of the northern boundaries of Collier and Miami-Dade Counties. In the enacted map, District 26 follows the same county boundaries apart from a minor deviation around unincorporated Immokalee, where an area with a small but highly Hispanic population was transferred out of District 26 and into District 18. Enacted District 26's southern boundary consists of the boundary between Monroe and Collier Counties and, in Miami-Dade County, the Tamiami Trail.

48. Along its western boundary, District 26 follows major roadways such as Collier Boulevard (County Road 951) and Interstate 75 and the municipal boundaries of Bonita Springs and Marco Island. Along its eastern boundary, District 26 follows major roadways

such as the Dolphin Expressway, the Airport Expressway, and the Palmetto Expressway and the municipal boundaries of Miramar, Miami Gardens, Miami Lakes, Hialeah, Opa-Locka, Miami, Doral, and Sweetwater. Seven municipalities (Miami Lakes, Hialeah, Hialeah Gardens, Medley, Doral, Miami Springs, and Virginia Gardens) are all kept whole in the district. The only municipality that District 26 splits is the City of Miami. District 26 is also impacted by District 24, in which the Non-Diminishment Clause protects the voting ability of Black voters.

49. I did not draw the House's iterations of District 26 to attain any particular Hispanic voting-age population. Nor am I aware that anyone else attempted to do so. House committee staff performed a functional analysis on District 26 after it was drawn. The functional analysis did not require any changes to ensure compliance with the Non-Diminishment Clause.

50. The Governor's office proposed some modifications to District 26 before its enactment, but the enacted district did not differ fundamentally from the district initially drawn by the House. In fact, the Hispanic voting-age population of District 26, as modified by the Governor's office and enacted by the Legislature, is lower than the Hispanic voting-age population of the analogous district in any map published by House or Senate staff during the 2021–22 redistricting process.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 27, 2025.

_____
Jason Poreda