# Exhibit C

Jason Poreda
July 17, 2025

UNITED STATES DISTRICT COURT
FOR THE
SOUTHERN DISTRICT OF FLORIDA

Civil Action No. 1:24-cv-21983

CUBANOS PA'LANTE, et al.,

     Plaintiff,

vs.

FLORIDA HOUSE OF
REPRESENTATIVES, et al.,

     Defendant.
_____/

DEPOSITION OF
JASON PATTERSON POREDA

Thursday, July 17, 2025
9:39 a.m. - 6:40 p.m.

GrayRobinson, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32301

STENOGRAPHICALLY REPORTED BY:
JANE FAUROT
Registered Professional Reporter

JOB NO.: 410695

Jason Poreda
July 17, 2025

Page 2

```
 1    APPEARANCES:

 2

 3            ON BEHALF OF PLAINTIFF:

 4            Nicholas Warren
              4343 West Flagler Street, Suite 400
 5            Miami, Florida 33134-1585

 6            BY: NICHOLAS L. WARREN, ESQUIRE
              nwarren@aclufl.org
 7

 8

              ON BEHALF OF DEFENDANT:
 9
              GrayRobinson, P.A.
10            301 South Bronough Street, Suite 600
              Tallahassee, Florida 32301
11
              BY: ANDRE V. BARDOS, ESQUIRE
12            andy.bardos@gray-robinson.com

13

14            ALSO PRESENT:
              Adam Brink, General Counsel, Florida House
15               of Representatives
              Carmen Manrara Cartaya, Esquire,
16               for the Plaintiffs
              Daniel Tilley, Esquire,
17               for the Defendants
              Gabrielle Jackson, Esquire,
18               for the Defendants

19

20

21

22

23

24

25
```

Jason Poreda
July 17, 2025

Page 3

1                          I N D E X

2    WITNESS                                          PAGE

3    JASON PATTERSON POREDA

4    Direct Examination by Mr. Warren                  5
     Cross-Examination by Mr. Bardos                 282
5    Redirect Examination by Mr. Warren              297
     Recross-Examination by Mr. Bardos               302
6

7    CERTIFICATE OF OATH                             305
     CERTIFICATE OF REPORTER                         306
8    ERRATA SHEET                                    307
     READ AND SIGN LETTER                            308
9

10

11                     PLAINTIFF'S EXHIBITS

12   Number         Description                    Marked

13   No. 1     Enacted congressional plan, Plan 109   11

14   No. 2     Enacted state house plan               11

15   No. 3     2020 Cycle Redistricting Timeline      26

16   No. 4     Fair Districts Amendment               26

17   No. 5     Transcript of the November 2nd,        46
               2021, Redistricting Committee
18             Meeting

19   No. 6     Excerpt from the Florida Supreme       63
               Court's Apportionment 8 Decision
20
     No. 7     Memo from Ferrin to Rodrigues dated    72
21             10/18/21

22   No. 8     HB 7503, Map 8017                      108

23   No. 9     Map 8011                               108

24

25

Jason Poreda
July 17, 2025

Page 4

1                    PLAINTIFF'S EXHIBITS (continued)

2    Number            Description                     Marked

3    No. 10    Map 8015                                 109

4    No. 11    Map 8060                                 112

5    No. 12    Transcript of the December 2nd,          135
              2021, Congressional Redistricting
6             Subcommittee

7    No. 13    Transcript of the Legislative            138
              Redistricting Subcommittee from
8             December 3rd, 2021

9    No. 14    Transcript of the January 26th House     145
              Redistricting Committee
10
     No. 15    Transcript of the Florida House          149
11            Floor Session on February 1st, 2022

12   No. 16    Workshop A and B                         171

13   No. 17    Transcript of the 2/18/22                202
              Congressional Redistricting
14            Committee

15   No. 18    Excerpt from the Deposition of Alex      218
              Kelly
16
     No. 19    Excerpt of Hearing Transcript before     238
17            Judge Lewis

18   No. 20    Draft Potential Q&A                      276

19

20

21

22

23

24

25

Jason Poreda
July 17, 2025

Page 5

```
 1              The following proceedings began at 9:39 a.m.

 2              THE STENOGRAPHER:  Do you swear or affirm

 3     that the testimony you'll give will be the truth,

 4     the whole truth, and nothing but the truth?

 5              THE WITNESS:  I do.

 6                    JASON PATTERSON POREDA

 7     having been first duly sworn or affirmed, as hereinafter

 8     certified, testified as follows:

 9                    DIRECT EXAMINATION

10     BY MR. WARREN:

11         Q.   Good morning, Mr. Poreda.

12         A.   Good morning.

13         Q.   We just met, but my name is Nicholas Warren.  I

14     am with the ACLU of Florida and I represent the Plaintiffs

15     in this case.  With me is our paralegal, Joe.

16              MR. WARREN:  Counsel, could you state your

17     appearance for the record, please.

18              MR. BARDOS:  Yes.  Andy Bardos.  I'm with

19     the GrayRobinson law firm on behalf of the

20     Florida House of Representatives.  We also have

21     with us Adam Brink who is the general counsel for

22     the Florida House of Representatives, and my

23     co-counsel with the continental firm Carmen

24     Manrara Cartaya.

25              MS. CARTAYA:  Thank you.
```

Jason Poreda
July 17, 2025

1              MR. WARREN:  And I see also representing the

2        Plaintiffs listening in is Daniel Tilley and

3        Gabrielle Jackson.

4    BY MR. WARREN:

5        Q.   Mr. Poreda, have you been deposed before?

6        A.   Yes.

7        Q.   Just once?

8        A.   Yes.

9        Q.   That was in the congressional redistricting case

10   last decade?

11       A.   I believe so, yes.

12       Q.   Sometime around 2014?

13       A.   Yes.

14       Q.   Okay.

15       A.   That sounds right.  I don't remember the exact

16   year, but --

17       Q.   Certainly.  I'm asking just because it sounds

18   like it's been a while, so I'll refresh you with how the

19   deposition will proceed and some reminders.

20            First, the court reporter is of course

21   transcribing what we're saying, which means that we should

22   speak clearly and not talk over one another, which I'll

23   try my best to do, wait until you finish answering a

24   question before I start my next question and ask that you

25   wait to answer once I finish asking my question.

That make sense?
A. Yes.
Q. Next, I ask that you answer with a verbal yes or no or verbal response rather than a head nod or a uh-huh or an huh-uh, because those can't be transcribed.
Make sense?
A. I'll do my best.
Q. Great. You understand that you're under oath?
A. I do.
Q. And that you have to give truthful and honest answers to the questions I ask?
A. Yes.
Q. Great. If you don't understand a question, and I'll try my best to ask understandable questions, but if you don't understand a question, will you let me know so I can try to rephrase and clarify?
A. Yes.
Q. Great. If you want to take a break, just let me know. We will definitely be taking breaks, including a lunch break. I just ask that I finish a question, you finish an answer before we take a break, rather than take one in the middle of a question pending.
Does that make sense?
A. Yes.
Q. Great. If you want to talk to one of your

Jason Poreda
July 17, 2025

Page 8

 1   attorneys here, that's okay.  I just ask that if a

 2   question is pending, again, that you answer the question

 3   before speaking with your attorney unless you want to talk

 4   with them about a matter of privilege.  Does that make

 5   sense?

 6        A.   Yes.

 7        Q.   Sometimes, even though you've given what you

 8   felt was a complete answer, you remember some additional

 9   information that you forgot or perhaps a clarification of

10   an earlier answer.  If that happens, will you let me know

11   and clarify your answer when it comes to you?

12        A.   Yes.

13        Q.   Great.  So we can address it then while it's

14   right on your mind.

15             Relatedly, if you realize that an earlier answer

16   you gave was not completely accurate, you thought of

17   something that gives you pause, will you stop and let me

18   know when it comes to you?

19        A.   Yes, I will.

20        Q.   Great.  Is there any reason why you would not be

21   able to give full, complete, and accurate testimony today?

22        A.   No.

23        Q.   Excellent.  You mentioned that you were deposed

24   once before in the congressional redistricting case last

25   decade.  Have you ever testified otherwise in a trial or

Jason Poreda
July 17, 2025

Page 9

1    hearing?

2        A.    No.

3        Q.    And I should clarify.  So you testified in the

4    congressional redistricting case last decade?

5        A.    Yes.

6        Q.    I think you testified at the initial trial in

7    2014?

8        A.    Correct.

9        Q.    And you also testified in the remedial hearing

10   in 2015?

11       A.    Correct.

12       Q.    And otherwise you haven't testified in court?

13       A.    No other cases.

14       Q.    I'd like to ask you some questions about your

15   preparation for today's deposition.  Did you prepare for

16   the deposition today?

17       A.    Yes, I did.

18       Q.    How did you prepare?

19       A.    I reviewed some of the data packets, such as the

20   ones that are here in front of me, and had discussions

21   with counsel.

22       Q.    How many times did you meet with counsel?

23       A.    I don't remember the exact number.  It was -- I

24   don't remember the exact number.

25       Q.    Was it more than five?

Jason Poreda
July 17, 2025

Page 10

1      A.   Yes.

2      Q.   More than ten?

3      A.   I don't know if it was more than ten.  It was

4   probably approximately around that number.

5      Q.   Okay.  Were those meetings in person?

6      A.   Virtual.

7      Q.   There were no in-person meetings for deposition

8   preparation?

9      A.   There was one in-person meeting.

10      Q.   And when you say you met with counsel, who are

11   you referring to?

12      A.   I'm referring to Andy Bardos, Adam Brink, and

13   Carmen -- I apologize, Carmen, about your last name, but I

14   met with Carmen.

15      Q.   When was the first time you met to prepare for

16   the deposition?

17      A.   I don't recall.

18      Q.   Was it in 2025?

19      A.   I don't recall.

20      Q.   Okay.  Did you look at any documents to prepare?

21      A.   Yes.  The data packets and some other associated

22   maps that we had drawn during the process.

23           MR. WARREN:  And I think at this point we'll

24      mark the data packets you've been referring to as

25      Plaintiffs' Exhibit 1.  Plaintiffs' Exhibit 1

Jason Poreda
July 17, 2025

Page 11

1          will be the map and data packet for the enacted

2          congressional plan, Plan 109.

3                   (Exhibit No. 1 marked for identification.)

4                   MR. WARREN:  And Plaintiffs' Exhibit 2 will

5          be the map and data packet for the enacted state

6          house plan.

7                   (Exhibit No. 2 marked for identification.)

8    BY MR. WARREN:

9          Q.   So you said besides looking at the maps and data

10   packets you looked at some other materials?

11         A.   Yes.

12         Q.   What materials were those?

13         A.   Some of the other -- some of the other

14   productions that we made during the process.

15         Q.   That's documents that the House developed in the

16   redistricting process?

17         A.   Yet.

18         Q.   Not documents that the House produced in

19   discovery during this case?

20         A.   No.

21         Q.   Okay.  And those documents that the House

22   generated during the redistricting process -- and I should

23   clarify so we're all on the same page.  When I refer to

24   the redistricting process or the 2020 cycle, I'm referring

25   to the redistricting process of the Florida Legislature

Jason Poreda
July 17, 2025

Page 12

1    following the 2020 census that happened in 2021 and 2022.

2    If I talk about a different cycle or a different process

3    that happened at a different time I will specify.

4        A.    I understand.

5        Q.    Okay.  So those documents that the House

6    generated during the redistricting process, were all of

7    those publicly released documents?

8        A.    Some of them were, yes.

9        Q.    What were not publicly released documents?

10       A.    Some of the drafts that we had -- that I and my

11   map drawer, Kyle Langan, had produced during the process.

12       Q.    Okay.  Did you review any of the court filings

13   in this case?

14       A.    Yes.

15       Q.    Which ones?

16       A.    I don't recall specifically which ones.

17       Q.    Did you review the complaint or any of the

18   versions of the complaint that the Plaintiffs filed?

19       A.    Yes.

20       Q.    Did you review any of the parties' discovery

21   responses?

22       A.    Yes.

23       Q.    Which ones?

24       A.    Whichever ones counsel provided to me.  I don't

25   remember specifically which ones.

Jason Poreda
July 17, 2025

1      Q.    Were they responses from both sides or just the

2   House?

3      A.    I don't recall.

4      Q.    Did you review any transcripts of depositions?

5      A.    Yes.

6      Q.    Which ones?

7      A.    No.  I'm sorry.  Not transcripts of depositions.

8   Transcripts from the house and senate proceedings during

9   the process.

10     Q.    So those would be transcripts of house and

11  senate committee meetings?

12     A.    And floor actions, yes.

13     Q.    In both chambers?

14     A.    Yes.

15     Q.    Did you -- have you reviewed -- and now I'm

16  going to ask you generally, not just in preparation for

17  this deposition, but, in general, have you ever reviewed

18  any of the expert reports from this case?

19     A.    I don't believe so, no.

20     Q.    Okay.  What is your understanding of what this

21  case is about?

22     A.    My understanding, this case is about -- I

23  apologize, it's either seven or eight state house

24  districts and one congressional district in south Florida.

25     Q.    And what about those districts is contested in

Jason Poreda
July 17, 2025

Page 14

1    the case to your understanding?

2        A.   My understanding is that the contention is that

3    they were drawn improperly, predominantly with race.

4        Q.   Are you aware that you're listed on the House's

5    initial disclosures in this case as someone who the House

6    may call at trial to testify in support of this case?

7        A.   Yes.

8        Q.   When did you learn that testifying at trial in

9    this case was a possibility?

10       A.   I don't recall.

11       Q.   Do you remember when this complaint was filed?

12       A.   No.

13       Q.   This complaint was -- this case was filed in May

14   of last year, 2024.  At the time, did you learn that the

15   case was filed?

16       A.   Yes.

17       Q.   How did you learn that?

18       A.   Counsel informed me.

19       Q.   Okay.  Have you had any role in assisting the

20   House's defense of this case?

21            MR. BARDOS:  Object to form.

22       A.   I helped counsel review documents and responses

23   and helped to clarify answers to particular

24   interrogatories that were presented to us.

25

Jason Poreda
July 17, 2025

Page 15

1    BY MR. WARREN:

2        Q.   Thank you.  I'd like to talk briefly about your

3    professional background, and I don't want to go back to

4    kindergarten, so I'll start with, when did you move to

5    Florida?

6        A.   I moved to Florida in 2007.

7        Q.   And when you moved to Florida, what job did you

8    have?

9        A.   I was working at the Republican Party of

10   Florida.  I believe my position was political assistant or

11   something along those lines.

12       Q.   How long did you work as a political assistant

13   or something along those lines at RPOF?

14       A.   Until the beginning of 2009, I believe.

15       Q.   And in the beginning of 2009, what did you do

16   next?

17       A.   I began working with Enwright Consulting.

18       Q.   What is that?

19       A.   They're a political consulting and political

20   lobbyist firm.  Political consulting and lobbyist firm.

21   Sorry.

22       Q.   Is that E-N-W-R-I-G-H-T?

23       A.   Correct.

24       Q.   Okay.  How long were you at Enwright Consulting?

25       A.   I believe through the end of 2009.

Jason Poreda
July 17, 2025

Page 16

1        Q.   And then what did you do?

2        A.   I accepted a position as campaign manager for

3    Matt Gaetz's initial special election to the state House

4    of Representatives.

5        Q.   And that I presume lasted until the election?

6        A.   Yeah.  Because it was a special election, it was

7    in the beginning of 2010, I believe through March or April

8    of 2010.

9        Q.   What did you do after that?

10       A.   I rejoined the Republican Party of Florida.

11       Q.   As an employee?

12       A.   As an employee.

13       Q.   And doing the same work you were doing before?

14       A.   At that point, I believe my title was absentee

15   and early vote director.

16       Q.   And how long did you have that position at RPOF?

17       A.   Through December of 2010.

18       Q.   And then what did you do?

19       A.   I was hired by the Florida House of

20   Representatives redistricting committee.

21       Q.   What was your title at that time?

22       A.   Legislative analyst.

23       Q.   So, let's talk a little bit about your time as a

24   legislative analyst on the house redistricting committee

25   starting in 2010, after the 2010 census.  What were your

Jason Poreda
July 17, 2025

1   duties?

2        A.   My duties were really as assigned by the staff

3   director.  I had not done a redistricting cycle, so I was

4   doing a lot of research and reading a lot of material to

5   familiarize myself with the whole redistricting process.

6   I was familiarizing myself with all of the legal case

7   proceedings that would be relevant to redistricting

8   obviously, reading the new constitutional standards that

9   had been in place but had not been adjudicated.  And we

10  were helping to develop the My District Builder

11  application that the House used at that time that

12  developed internally, including all of the data that went

13  into the program.

14       Q.   You reported to the committee staff director?

15       A.   Correct.

16       Q.   Who was that?

17       A.   Alex Kelly.

18       Q.   Did you -- as the process proceeded into

19  mapmaking, did you have a particular map or maps that you

20  worked on?

21       A.   So, me, Jeff Takacs, the other map drawer, and

22  Alex Kelly have worked on all three maps.  However, my

23  primary focus was the congressional map and the state

24  senate map.

25       Q.   And Takacs is T-A --

Jason Poreda
July 17, 2025

Page 18

     1          A.    T-A-K-A-C-S.

     2          Q.    So you were one of the primary drafters of the

     3     congressional map in 2012?

     4          A.    Correct.

     5          Q.    And a non-primary drafter of the state house

     6     map?

     7          A.    Correct.

     8          Q.    Okay.  How much -- if you had to -- how much did

     9     you draft the state house map?

    10          A.    I don't know.

    11          Q.    Would you say you were only a little bit

    12     involved in drafting the state house map in 2012?

    13          A.    It didn't -- it's difficult to answer the

    14     question in those terms, because we all kind of -- we all

    15     worked together.  Jeff was the primary on that map like I

    16     was the primary on the congressional map, but that doesn't

    17     mean we weren't all involved.  So it would be difficult to

    18     quantify my involvement in that map.

    19          Q.    But you worked on the state house map in 2012?

    20          A.    Yes.

    21          Q.    And so at that time you were familiar with the

    22     state house map and its drafting?

    23          A.    Yes.

    24          Q.    When did you stop being a legislative analyst

    25     with the redistricting committee in the 2010 cycle?

Jason Poreda
July 17, 2025

Page 19

1    A.   When the -- when it switched -- when the new

2    speaker came on board, so when the administration -- one

3    administration ended and the other began.

4        Q.   After the 2012 election?

5        A.   Yes.

6        Q.   What did you do then?

7        A.   I became -- I actually don't remember what my

8    title was.  I believe it was an analyst in the house

9    majority whip office.

10       Q.   Do you remember who the whip was?

11       A.   Dana Young.

12       Q.   Okay.  And what did you do after that?

13       A.   I then -- so, in July of 2014, the case started

14   in Judge Lewis's court, and at that point I was moved to

15   the select committee on redistricting.

16       Q.   And you say you were moved.  How did that come

17   about?

18       A.   They needed someone to run the now redistricting

19   process for the litigation.  There was not -- nobody

20   existed, so I got moved to a conference room.

21       Q.   What happened to Alex Kelly?

22       A.   He had left the House by then.

23       Q.   And you were all alone?

24       A.   Me, Jeff Takacs, and a IT data guy who had

25   helped us in the -- who was on the redistricting staff

Jason Poreda
July 17, 2025

Page 20

1   previously by the name of Dave Silver.

2       Q.   Okay.

3       A.   I'm sorry.  Jeff Silver.

4       Q.   And that decision to move you back to the select

5   committee in 2014, who made that decision?

6       A.   The chief of staff.

7       Q.   For the speaker?

8       A.   Yes.

9       Q.   Who was that at the time?

10      A.   Kathy Mears.

11      Q.   Okay.  So during that litigation in 2014 over

12  the congressional map, were you present at that trial?

13      A.   Yes.

14      Q.   You testified at that trial?

15      A.   Yes.

16      Q.   You watched the whole thing?

17      A.   Yes.

18      Q.   Were you the House's party representative during

19  the trial?

20      A.   I don't remember, but I believe that that is

21  correct, yes.

22      Q.   Okay.  When Judge Lewis issued his ruling after

23  the 2014 trial, do you remember that?

24      A.   Yes.

25      Q.   Did you read that decision?

Jason Poreda
July 17, 2025

Page 21

```
1      A.   Yes.
2      Q.   And then there was an appeal and the Florida
3  Supreme Court issued a decision.  Do you remember that?
4      A.   Yes.
5      Q.   Let's call that Apportionment 7.  Did you read
6  that at the time?
7      A.   Yes.
8      Q.   And then there were more proceedings in trial
9  court?
10     A.   Yes.
11     Q.   I think you said you testified at the remedial
12  hearing in 2015.
13     A.   I believe I did, yes.
14     Q.   And did you attend the rest of that hearing?
15     A.   Yes.
16     Q.   And then Judge Lewis had another decision.  Did
17  you read that at the time?
18     A.   Yes.
19     Q.   And then there was another Florida Supreme Court
20  decision, which we'll call Apportionment 8.
21     A.   Yes.  Just as a quick correction, you said let's
22  call that Apportionment 7.  I believe that was
23  Apportionment 1, and then we went through other
24  proceedings that have other numbers.
25     Q.   Sure.  Let's go back to Apportionment 1.  So in
```

Jason Poreda
July 17, 2025

Page 22

1    2012 --

2         A.   Oh, I'm sorry.  Yeah.  No, you're correct.

3         Q.   But the history is good to talk about.

4              So in 2012 the Florida Supreme Court reviewed

5    the state house and state senate maps, and that resulted

6    in the Apportionment 1 decision?

7         A.   That is correct, yes.

8         Q.   And you read that at the time?

9         A.   Yes.

10        Q.   And then I think there was another state senate

11   map, and that resulted in Apportionment 2?

12        A.   Correct.

13        Q.   And you read that at the time?

14        A.   Yes.

15        Q.   Back to Apportionment 8.  So that was the final

16   Florida Supreme Court decision on the congressional map

17   from the 2010 cycle?

18        A.   I believe that that's the case, yes.

19        Q.   And you were familiar with that decision?

20        A.   Yes.

21        Q.   So after all of that redistricting, then what

22   did you do?

23        A.   What year are we at right now?

24        Q.   2015.

25        A.   So through the end of the Crisafulli

Jason Poreda
July 17, 2025

Page 23

1    administration, I was the staff director for the Office of

2    Redistricting.

3        Q.   What is the Office of Redistricting?

4        A.   It was an office that the Crisafulli

5    administration created because of all the pending

6    litigation for both congressional and senate redistricting

7    and not knowing when or what would be needed.

8        Q.   And forgive me, Speaker Crisafulli -- I won't

9    try to spell that right now -- was -- when was his

10   administration?

11       A.   I believe it was 2015 and 2016.

12       Q.   Okay.  So into 2016 you were working in the

13   House's Office of Redistricting?

14       A.   Correct.

15       Q.   Then what did you do?

16       A.   I then joined the public integrity and ethics

17   committee under Speaker Corcoran.

18       Q.   And that brings us to what year?

19       A.   2017, I think.

20       Q.   What was your title in that committee?

21       A.   Legislative analyst.

22       Q.   And then what did you do next?

23       A.   I stayed with the public integrity and ethics

24   committee throughout the Corcoran and Oliva

25   administrations.

Jason Poreda
July 17, 2025

Page 24

1        Q.    And that brings us to what year?

2        A.    It was before -- I was there for four years,

3    however you want to --

4        Q.    Okay.  What did you do next?

5        A.    From the public integrity and ethics committee,

6    I joined the next redistricting committee in preparation

7    for the 2022 redistricting.

8        Q.    When did you join that committee?

9        A.    I don't remember exactly.

10        Q.    Was it after the 2020 election?

11        A.    There was a transition period where I began

12    working, because I was already employed by the Florida

13    House, and that obviously needed to happen, so I started

14    doing some work prior to that, during the COVID time.

15        Q.    When you say that obviously needed to happen,

16    what are you referring to?

17        A.    Redistricting.

18        Q.    Oh.  Okay.  So -- okay.  We'll return to your

19    work on the redistricting committee in this cycle.  When

20    did you stop working for the house redistricting committee

21    this cycle?

22        A.    It would have been at the ends of the Sprowls

23    administration.

24        Q.    In late 2022?

25        A.    Yes, correct.

Jason Poreda
July 17, 2025

Page 25

1      Q.   What did you do after that?

2      A.   I joined the state affairs committee.

3      Q.   As what?

4      A.   Analyst.

5      Q.   And then what did you do after that?

6      A.   I joined the house budget committee.

7      Q.   And then what did you do?

8      A.   I'm now currently employed by the Office of

9   Budget and Policy in the Executive Office of the Governor.

10     Q.   When did you start that job?

11     A.   Monday.

12     Q.   Congratulations.

13     A.   Thank you.

14          MR. BARDOS:  The first surprise of the

15   deposition.

16          MR. WARREN:  Yeah.

17   BY MR. WARREN:

18     Q.   Why did you leave the House?

19     A.   I had been there for fourteen and a half years.

20   Change of scenery.

21     Q.   How long were you with the budget committee?

22     A.   One session.

23     Q.   Not into budget?

24     A.   I'm sorry?

25     Q.   You're not into the budget?

Jason Poreda
July 17, 2025

```
 1      A.    Well, I'm still with the budget, just from a
 2   different perspective.
 3      Q.    Sure.  Who do you currently report to?
 4      A.    Leda Kelly, and Erika -- I have to apologize.  I
 5   don't remember her last name.  I'm brand new up there.
 6      Q.    How long has Ms. Kelly been at the Governor's
 7   Office?
 8      A.    I don't know.
 9      Q.    Do you know who has the power to fire you?
10      A.    I don't know.
11      Q.    Someone in the Governor's Office?
12      A.    Presumably.
13            MR. WARREN:  Okay.  I'd like to talk more
14      about your work in the 2020 redistricting cycle,
15      and for reference I have a timeline which we will
16      mark as Exhibit 3, which may be helpful as we
17      talk about the process.
18            (Exhibit No. 3 marked for identification.)
19            MR. WARREN:  I also have for reference a
20      copy of the Fair Districts Amendment, which may
21      be helpful, and we will mark that Exhibit 4.
22            (Exhibit No. 4 marked for identification.)
23   BY MR. WARREN:
24      Q.    You don't have to use these, but if they're
25   helpful they're here for your reference.
```

Jason Poreda
July 17, 2025

```
 1              Now, could you describe your role in the 2020
 2   cycle redistricting process?
 3              MR. BARDOS:  I'm sorry, Nick.  Just before
 4         you go on, Exhibit 3, is that a document you
 5         created or --
 6              MR. WARREN:  Yes.
 7              MR. BARDOS:  Okay.  I think you might have
 8         said that, but I appreciate that.
 9   BY MR. WARREN:
10         Q.   So my question is, can you describe your role in
11   the 2020 cycle redistricting process?
12         A.   I was the chief map drawer for the House.
13         Q.   That was your title?
14         A.   That was my title.
15         Q.   Do you know who came up with that title?
16         A.   I do not.
17         Q.   But it wasn't you?
18         A.   No.
19         Q.   It's a very cool title.  What were your duties
20   as chief map drawer for the House?
21         A.   I was primarily responsible for making sure the
22   rest of our staff was aware of all the different
23   redistricting principles that we needed to take into
24   account, and was primarily responsible for drawing our
25   version of the congressional maps.  When I say our
```

Jason Poreda
July 17, 2025

Page 28

1   version, I mean the House's version of the congressional

2   map and the state house map, with Kyle Langan as our other

3   map drawer working under me.

4        Q.   Okay.  Besides Mr. Langan, who else did you work

5   with?

6        A.   So Leda Kelly was our staff director.  Sam

7   Wagner was an analyst on the committee, primarily doing

8   legal analysis and other research projects as assigned, as

9   well as doing a little map drawing, but that was not his

10  primary focus.  Karen Dearden was also on staff, and she

11  was primarily responsible at the external communications

12  side of what we were doing, so she managed a lot of our

13  public facing content and document creation, et cetera, et

14  cetera.  And DJ Ellerkamp was our AA, who kind of was

15  really the one who ran the show and kept us all in line.

16       Q.   Is that AA as in --

17       A.   Administrative assistant.

18       Q.   Any other committee staff besides the ones

19  you've mentioned?

20       A.   No, but our office was connected to the two

21  subcommittee chairs, Chair Sirois and Chair Byrd.  So we

22  worked with their aides directly, and then Chair Leek's

23  office was in our office, so we worked with him and his

24  aide.

25       Q.   And you mentioned the subcommittees.  The

Jason Poreda
July 17, 2025

Page 29

1    subcommittees didn't have any separate staff?

2        A.    No.

3        Q.    But the legislative aides of the chairs worked

4    with the committee on subcommittee business?

5        A.    Yes.

6        Q.    And the same was true of Chair Leek's aide?

7        A.    Yes.

8        Q.    And I think Chair Leek was the chair of the

9    redistricting committee?

10       A.    Correct.

11       Q.    Chair Sirois of the --

12       A.    Congressional subcommittee.

13       Q.    And Chair Byrd of the legislative subcommittee?

14       A.    Correct.

15       Q.    Did you work with the ranking members?  I'm

16   sorry.  Let me ask first, did you work with the vice

17   chairs?

18       A.    Yes.

19       Q.    Okay.  Going back, how did you become the chief

20   map drawer?

21       A.    I was asked to become the chief map drawer.

22       Q.    By who?

23       A.    By Leda Kelly, Michelle Davila, and Matt Ball.

24       Q.    What was the second name?

25       A.    Michelle Davila.

Jason Poreda
July 17, 2025

Page 30

1      Q.    Who is she?

2      A.    She was the -- at the time, she was the deputy

3   chief of staff, I believe.

4      Q.    In the speaker's office?

5      A.    Correct.

6      Q.    And Matt Ball was the chief of staff?

7      A.    Correct.

8      Q.    Did you know Leda Kelly before you were asked to

9   come back?

10     A.    No.  Well, I had met her.  We didn't know each

11   other very well, but because I had worked with her husband

12   Alex ten years ago I knew who she was.  I had met her.

13     Q.    Do you know how she became the staff director?

14     A.    I do not.

15     Q.    Were the other staff of the committee that you

16   mentioned already in place when you joined?

17     A.    I was the first hire after Leda was hired.

18     Q.    Were you involved in the hiring of the other

19   staff?

20     A.    Not directly, no.

21     Q.    But indirectly?

22     A.    I reviewed some resumés.

23     Q.    What was Leda Kelly's role in the redistricting

24   process?

25     A.    She was the staff director.

Jason Poreda
July 17, 2025

Page 31

1      Q.   What did that entail?

2      A.   She was the one that directed the kind of full

3  focus of the office, and -- but beyond that you'll have to

4  ask her.  I don't know specifically.

5      Q.   What were -- what did your interactions with her

6  entail?

7      A.   I mean, we worked together on everything.  It

8  would be difficult to pin down to a particular list of

9  things.  And her office was next to mine, so when she

10  needed me she just yelled through the wall.

11      Q.   Did that happen frequently?

12      A.   All the time.

13      Q.   What about Mr. Langan, what was his role?

14      A.   His role was primarily map drawing as well as

15  some other document creation that worked, as I said, sort

16  of under me, but then also with Leda, and our offices were

17  in a row, so we were going to each other's offices quite

18  frequently, and the walls were quite thin.

19      Q.   So all the committee staff worked closely

20  together throughout the process?

21      A.   Correct.

22      Q.   Were there particular maps that individual staff

23  members focused on drawing?

24      A.   No.

25      Q.   All map drawing staff were involved in drawing

Jason Poreda
July 17, 2025

Page 32

1    all house committee maps?

2        A.   Yes.

3        Q.   Is there any aspect of the committee's work that

4    you wouldn't know about because you weren't involved in

5    it?

6        A.   No.

7        Q.   There are no secrets that Ms. Kelly had that she

8    was keeping from you?

9             MR. BARDOS:  Object to form.

10       A.   You would have to ask her.

11   BY MR. WARREN:

12       Q.   Not that you're aware of?

13       A.   Not that I'm aware of.

14       Q.   And the same thing is true of Mr. Langan and

15   Mr. Wagner?

16       A.   Correct.

17       Q.   Et cetera.

18            Now, we've talked about the committee chairs and

19   vice chairs.  What was committee staff's relationships to

20   the chairs?

21       A.   Can you clarify the question?

22       Q.   How were the chairs involved in the

23   redistricting process?

24       A.   They ran the committee meetings for their

25   respective subcommittee meetings, and we periodically

Jason Poreda
July 17, 2025

Page 33

1    would have meetings with them to show them the work

2    product that we had at that particular time, ahead of

3    meetings.

4        Q.   Okay.  I think I asked about the ranking

5    members.  What were committee staff's interactions with

6    the ranking members?

7        A.   We met with them as the ranking members

8    effectively wanted to.  We invited them to our office on

9    multiple occasions.  I don't remember how often any of

10   them came in to meet with us.

11       Q.   So we talked about the committee staff and

12   chairs and vice chairs and their LAs.  Did anyone else

13   work with committee staff on developing maps?

14       A.   No.

15       Q.   What about counsel?

16       A.   We did talk about maps and send maps to Andy

17   Bardos.

18       Q.   And would he send things back to you?

19       A.   We would discuss things.  I don't believe he

20   ever sent anything different back to us or anything along

21   those lines.

22       Q.   And when you say you don't think he ever sent

23   anything different back to you, you're talking about maps?

24       A.   Or documents or anything.  We would discuss

25   things that we would send to him.

Jason Poreda
July 17, 2025

1      Q.   Okay.  Were there any outside analysts or

2   consultants that were involved in analyzing maps or

3   assisting the committee?

4      A.   Through GrayRobinson and Andy Bardos, we

5   employed Dr. John Alford, who was our outside expert.

6      Q.   And what did he do?

7      A.   He ran analysis and did much further in-depth

8   data analysis.

9      Q.   On what?

10     A.   On the -- on the data and on the maps.

11     Q.   What data?

12     A.   The election data or other demographic data that

13  we provided them.

14     Q.   Was that limited to -- for what purpose, I

15  guess?

16     A.   To do further analysis and to do -- yeah, to do

17  further analysis.  You'd have to ask Andy specifically.

18  We rarely talked with Dr. Alford directly.  The reports

19  that he would generate would go to Andy and periodically

20  be shared with us.

21     Q.   And how did those reports influence the

22  mapmaking process, if at all?

23     A.   We would discuss it with counsel, and -- but

24  generally didn't have been a direct impact on how we drew

25  the maps.  It was mostly just a kind of a reassurance as

Jason Poreda
July 17, 2025

Page 35

1   to what we were doing was -- and our analysis, it was kind

2   of a double-check on our own analysis.

3       **Q.   And the analysis that Dr. Alfred was doing that**

4   **was checking committee staff's own analysis, are we**

5   **talking about a functional analysis of minority protected**

6   **districts?**

7           MR. BARDOS:  Object to form.

8       A.   Yes, but also some further in more in-depth

9   analysis that we did not do.

10  BY MR. WARREN:

11      **Q.   On what?**

12      A.   On -- you'll have to clarify what you're asking.

13      **Q.   What analyses, what questions was Dr. Alford**

14  **answering?**

15      A.   He was doing some, again, more in-depth analysis

16  that we were not capable of doing in our office.  And as

17  far as cohesion and other more in-depth legal analyses.

18  Or not legal analyses, but more in-depth analyses that

19  could be used in legal proceedings.

20      **Q.   Did all of those analyses that Dr. Alford was**

21  **doing relate to the minority protection provisions?**

22      A.   I believe so, yes.

23      **Q.   Okay.  Do you have any reason to doubt that he**

24  **was doing some other type of analysis?**

25      A.   I don't know.

Jason Poreda
July 17, 2025

1    Q.    Okay.  Let's talk about the committee's work

2    before the first committee meetings.  You mentioned that

3    there was work that had to be done over COVID.  What

4    happened during that period before the first committee

5    meeting?

6    A.    From what period of committee meetings?

7    Q.    From when you joined the committee.

8    A.    Well, even before I technically joined the

9    committee there had to be work done.  The House had to

10   pick what redistricting software or application that they

11   were going to use, and we had to start preparing what data

12   we had, which was the election data and voter registration

13   data, that would eventually be used in the redistricting

14   process.  So that does not just happen overnight.  It

15   takes a long time to make sure that data is in a state

16   where it can be used effectively.

17   Q.    So, selecting the mapping application, compiling

18   the data that would be loaded into it.

19   A.    Uh-huh.

20   Q.    What else happened?

21   A.    It was all related to those types of activities.

22   All just preparing for the tools that we would then

23   eventually use in the redistricting process.

24   Q.    And that is the work that continued up until the

25   first committee meeting?

Jason Poreda
July 17, 2025

Page 37

1    A.    No.  That was all the work that was done

2    essentially prior to the committee's formation, and then,

3    once the committee actually formed, some other work

4    happened in trying to prepare for the committee meetings.

5    And trying to use all of that data and test the

6    application that we had chosen and try to figure out how

7    we were going to educate the legislators about

8    redistricting.

9          It is something that only happens once every ten

10   years.  None of the legislators that were then in the --

11   well, with the exception of maybe I think there was two or

12   three that had cycled back through, but effectively we had

13   to give them an education on this policy area that none of

14   them had ever taken part in.

15   **Q.    So you mentioned when the committee formed, that**

16   **would be when the speaker appointed the members of the**

17   **committees?**

18   A.    No.  That would be when the new administration

19   officially takes over, and then they can come up with a

20   committee structure.  Every time a new administration

21   comes in the speaker and the chief of staff and the

22   speaker's office, they decide on what they want their

23   committee structure to be.  Some committees get renamed,

24   some committees go away, some committees get formed.

25          Obviously because redistricting, one of the only

Jason Poreda
July 17, 2025

Page 38

1  two constitutionally mandated things that the Legislature

2  has to get done other than the budget, clearly a committee

3  had to be formed.  Staff had to be named to the committee.

4  At that point I was named to the committee.  This was

5  before members were assigned to the committee and at a

6  later date members were assigned.

7       Q.   I see.  So the committee formation happened when

8  the new Speaker Oliva came in in --

9       A.   Speaker Sprowls.

10      Q.   Speaker Sprowls.  I should have a list of them,

11  too.  When Speaker Sprowls came in after the 2020

12  election?

13      A.   Yes.  After organizational session that

14  November.

15      Q.   Okay.  And -- but there wasn't -- was there a

16  committee chair at that time?

17      A.   No.

18      Q.   So the leadership of the committee was

19  Ms. Kelly?

20      A.   And myself.

21      Q.   And you reported to Ms. Kelly and she reported

22  to who?

23      A.   The speaker's office.

24      Q.   The speaker's office.  And then in September the

25  speaker appointed the chairs and the other members of the

Jason Poreda
July 17, 2025

Page 39

1    committee?

2            MR. BARDOS:  Object to form.

3        A.   The next year, yes.

4    BY MR. WARREN:

5        Q.   2021?

6        A.   Yes.

7        Q.   Okay.

8        A.   So after the 2020 elections.  The Constitution

9    mandates that within two weeks the Legislature organize an

10   organizational session.  That's when the speaker and the

11   senate president are officially elected and all of the

12   members are seated and we proceed from there.  The

13   committee members were not named until the following

14   September, in 2021.

15       Q.   Okay.  So after that point when the committee

16   members were named through the initial meetings of the

17   committees before workshop maps were presented --

18       A.   Uh-huh.

19       Q.   -- what were you doing?

20       A.   So from when to when?  Can you clarify exactly?

21       Q.   So you mentioned that early on you were working

22   on the mapping application and the data.

23       A.   Yes.

24       Q.   And then you -- then the committee membership

25   was appointed and you started working on member education

Jason Poreda
July 17, 2025

Page 40

1    and some other things.

2         A.    (Nodding head.)

3         Q.    And so I'm interested in that period when you --

4    when the committee has members, you're starting to have

5    meetings.  What was the work in that period?

6         A.    So in that period of time we had decided to have

7    several committee meetings before we were going to be able

8    to even draw maps in order to try to educate them.  So we

9    had -- so Andy Bardos came in I believe once or twice to

10   kind of give a legal presentation.  We had some other

11   meetings to that effect where we would show them the

12   constitutional amendments and kind of the real, like, nuts

13   and bolts of how the redistricting process -- kind of like

14   what the guiding principles would be for the process once

15   we were able to start showing them maps, and allowed them

16   to ask questions.

17              I don't remember how many committee meetings

18   there was at that time, but it was -- I think we even had

19   some in the 2020 session.  Or no, we couldn't have.

20   Sorry.  The timeline is getting a little -- yeah.  But we

21   have -- we had several.  We had a legal proceeding.  We

22   had other ones where we kind of showed them this and did

23   some other very basic stuff, and then we showed them the

24   application.  Even before we had data we wanted them to

25   see the application to see how to draw maps and all that

Jason Poreda
July 17, 2025

Page 41

1   kind of stuff.

2       Q.   When did committee staff begin drawing maps?

3       A.   We began -- well, we began testing the program

4   using the old census data, because we wanted to begin --

5   familiar with the redistricting application that we had

6   chosen, but we did not begin actually drawing maps with

7   the new data until the new data was received, which I

8   believe was September or October of 2021, which was

9   delayed.  Typically, we would have received it in April of

10  2021 by law, but that obviously didn't happen because

11  COVID delayed the census.

12      Q.   If I told you that the Census Bureau released

13  the data in legacy format on August 12th, 2021, would that

14  ring a bell?

15      A.   I'll take your word for it.  It's on this list

16  here, but I would need to double-check that date for

17  accuracy.  But that is not when we -- the legacy format

18  data was not capable in a redistricting capable form, but

19  it did allow us to at that point have a better idea of how

20  many people were, like, in the state in total things like

21  that.  But all of the data was not disaggregated into the

22  census blocs that we would need to actually redistrict or

23  be associated with census geographies.

24      Q.   And that happened when the Census Bureau

25  released the data in easy-to-use format mid-September?

Jason Poreda
July 17, 2025

Page 42

1      A.   I would, again, have to double-check the date

2  since you had provided this document.  I would also object

3  to easy-to-use format, because we -- no, I'm serious.

4  Because we are provided a specific redistricting data set

5  from the Office of Redistricting within the Census Bureau,

6  and it's a very specific format with associated

7  geographies and it is not very easy to use.

8           But when we get that official data set is when

9  we can get it into a format to get it into our programs.

10  And it doesn't just easily go in.  It takes some further

11  processing to get it into the application so we can

12  actually use.  That's why in my head I believe it was

13  closer to October, November before we were actually able

14  to start drawing maps.

15      Q.   Okay.  So when committee staff started drawing

16  maps using 2020 data, had there already been committee

17  meetings at that time?

18      A.   As I told you before, yes, we had had some

19  committee meetings to begin educating the committee

20  members and subcommittee members on the basis of

21  redistricting.

22      Q.   Okay.  Let's talk now about the criteria that

23  were used in drawing the maps in the 2020 cycle.  I think

24  earlier you mentioned education, about all the principles

25  that the Legislature needed to take into account in

Jason Poreda
July 17, 2025

Page 43

1    drawing maps.  What principles, what criteria were those?

2        A.   So, the constitutional amendments that I have

3    here before me, all of the apportionment decisions that

4    kind of guided how some of the provisions in those

5    constitutional amendments are kind of interpreted, the --

6    and all of the other associated federal case law regarding

7    the Federal Voting Rights Act and other relevant --

8    relevant things impacting redistricting and how they all

9    balance together.

10       Q.   You mentioned that the Florida Supreme Court

11   apportionment decisions guided you.  How so?

12       A.   You'll have to be more specific.

13       Q.   Were you looking to -- I mean, in your words I

14   think you said that the apportionment decisions kind of

15   guided you, and I'm interested in, in what way did they

16   guide you?

17       A.   They gave us some clarity in how certain

18   provisions may have been -- well, were interpreted by the

19   Florida Supreme Court, which gave us a little bit more

20   guidance to how to proceed going forward.

21       Q.   So you looked to both Florida and federal case

22   law in service of implementing the Fair Districts

23   Amendments and other requirements of federal law?

24       A.   Correct.

25       Q.   Did you do so for any other purpose or to -- did

Jason Poreda
July 17, 2025

Page 44

1   you look to case law for guidance on anything besides the

2   Fair Districts Amendments and requirements of federal law?

3          MR. BARDOS:  Object to form.

4      A.   I don't understand the question.

5   BY MR. WARREN:

6      Q.   I guess, in your words, the principles that the

7   Legislature needed to take into account, did those include

8   anything besides the Fair Districts Amendments, the

9   requirements of federal law, and the case law that

10  interpreted them?

11         MR. BARDOS:  Object to form.

12     A.   I don't believe so, but I don't -- there is a

13  lot that goes into redistricting, so I don't want to

14  definitively say yes or no.  There's a lot of material

15  that goes into this.

16  BY MR. WARREN:

17     Q.   But did you consider any criteria outside of

18  state law and federal law?

19         MR. BARDOS:  Object to form.

20     A.   Such as?

21  BY MR. WARREN:

22     Q.   Such as a criteria to -- well, let's walk

23  through the criteria that you applied.  So you mentioned

24  the Fair Districts Amendments.  We have them in front of

25  us for easy reference.  You're familiar with Tier 1 and

Jason Poreda
July 17, 2025

Page 45

1    Tier 2?

2         A.   I am.

3         Q.   What are Tier 1 and Tier 2?

4         A.   Well, as you can see here in front of you,

5    Tier 1 is typically the racial provisions that tend to

6    mirror what was Section 5 of the federal Voting Rights

7    Act, and that no district or plan can essentially diminish

8    the voting strength of a minority protected district, and

9    it uses very similar language to what was in Section 5.

10             Section 2 refers more to the, I guess, more

11   common redistricting criteria that is used, like

12   compact -- well, first of all, population equality,

13   compactness, using particular district boundary lines when

14   you can, political and geographical boundaries, and other

15   things that are more practical in the drawing process,

16   rather than the racially protected provisions that are in

17   Tier 1.

18        Q.   You mentioned that Tier 1 includes the

19   diminishment standard, which is like Section 5.

20        A.   Yes.

21        Q.   It includes a vote dilution requirement that's

22   similar to Section 2?

23        A.   I believe it does, yes.

24        Q.   And I'll be referring to the vote dilution

25   requirement and the diminishment requirement or maybe

Jason Poreda
July 17, 2025

Page 46

1     retrogression.  You'll understand what I'm referring to?

2         A.   Yes.

3         Q.   And there's also in Tier 1 a prohibition on

4     drawing districts with the intent to favor or disfavor a

5     political party or an incumbent.

6         A.   Correct.

7         Q.   And contiguity.

8         A.   And contiguity.

9              MR. WARREN:  Okay.  And you mentioned some

10        of the Tier 2 standards.  The first -- the first

11        Tier 2 requirement is equal population, and then

12        the second is that districts shall be compact.

13             This exhibit, Plaintiffs' Exhibit 5, is a

14        transcript of the November 2nd, 2021,

15        redistricting committee meeting.

16             (Exhibit No. 5 marked for identification.)

17    BY MR. WARREN:

18        Q.   And if you could turn to the yellow tab, which

19    is page 15.  This is Mr. Bardos speaking, and at line 17

20    he says, quote, The second Tier 2 requirement is that

21    districts be compact.  This is a commonsense assessment in

22    the first place, a visual assessment of the district to

23    determine whether the district is regular in its shape or

24    is it bizarre or does it have appendages.  It is unusual

25    in the way -- is it unusual in the way that it looks.

Jason Poreda
July 17, 2025

Page 47

1    Districts that are more regular in their shape, more

2    circular, more square, more understandable in terms of the

3    geographical limitations of the state will be compact.

4           Did I read that correctly?

5    A.   Yes.

6    Q.   Is that how you understood compactness?

7    A.   Yes.

8    Q.   Did that understanding inform the committee's

9    mapmaking?

10   A.   I don't know what you mean by inform our

11   mapmaking.

12   Q.   Did you follow this understanding of what

13   compactness is in drawing the maps?

14   A.   I would say generally, yes, absolutely.  That's

15   why he said it in committee.

16   Q.   So this quote is what compactness means in the

17   Florida redistricting context?

18   A.   I mean, not entirely.  This is -- this is a part

19   of it, but, yes.

20   Q.   What else is part of it?

21   A.   There's mathematical measures of compactness

22   that -- I mean, also with the visual shape of a district.

23   That's kind of a subjective.  A district may look compact

24   to me might not look compact to you and vice versa, so it

25   is a little bit of a gray area.  But I think compactness

Jason Poreda
July 17, 2025

Page 48

1  is one of those things you'll see it when you know it kind

2  of deal.  But there are mathematical measures and other

3  items that need to be included in what is compactness.

4  But there should be no -- but it doesn't necessarily

5  always mean the exact same thing.

6      Q.    How did the committee, if at all, use

7  mathematical measures of compactness?

8      A.    We used primarily three different mathematical

9  scores, Reock, Polsby-Popper, and Convex Hull.  Those are

10  three different mathematical measures that the Florida

11  Supreme Court had used in their earlier apportionment

12  decisions, so those are the three that we adopted as the

13  three mathematical scores that we would look at throughout

14  the process, in addition to, you know, just simple visual

15  compactness, and other, I guess, more commonsense visual

16  interpretations, or the interocular test as the Court

17  referred to it.

18      Q.    Some committee chairs I think referred to the

19  eyeball test?

20      A.    Correct.

21      Q.    That's what you're referring to there?

22      A.    I'm sorry.  Yes.

23            MR. BARDOS:  For the record.

24            THE WITNESS:  For the record.

25

Jason Poreda
July 17, 2025

Page 49

1   BY MR. WARREN:

2       Q.   You said that you would look at the mathematical

3   scores.  How did looking at them impact the mapmaking

4   process, if at all?

5       A.   We would certainly look at them, and it just

6   kind of got factored into our analysis of districts, which

7   were never -- you know, it's never the same thing.  But

8   when we would look at districts that had lower scores or

9   higher scores and, you know, determine that maybe we would

10  need to make some adjustments to -- you know, to fix that

11  or whatever, because sometimes those mathematical scores

12  don't always necessarily line up with what may look

13  visually compact.  So it just goes into the further

14  analysis of balancing all of the standards that we had to

15  factor in.

16      Q.   This may be obvious, but did you try to draw

17  districts that were compact?

18      A.   Yes.

19      Q.   Did you try to draw districts that were as

20  compact as possible?

21      A.   Yes.

22      Q.   The next Tier 2 standard, if you look at page 16

23  of Exhibit 5, the November 2nd transcript, on line 5,

24  Mr. Bardos says, quote, Finally, the third Tier 2 standard

25  is the districts must where feasible utilize existing

Jason Poreda
July 17, 2025

1    political and geographical boundaries.  The court has

2    recognized county and city boundaries as being political

3    boundaries.  It has recognized rivers, railways,

4    interstates, and state roads as being geographical

5    boundaries.  There might be others as well.  The court has

6    referred to easily ascertainable and commonly understood

7    geographical boundaries.  The idea is that voters

8    recognize the boundaries as an immovable boundary, like a

9    state road or like an interstate.  It makes more sense to

10   use that as a district boundary than to simply draw a line

11   where there's no ability for a voter to recognize it or

12   refer to it as a geographical boundary does, close quote.

13            Did I read that correctly?

14   A.   Yes.

15   Q.   Is that how you understood the Tier 2 standard

16   on political and geographical boundaries?

17   A.   Yes.

18   Q.   Mr. Bardos mentioned interstates and state roads

19   as being geographic boundaries.  Are there any other roads

20   that are geographic boundaries besides interstates and

21   state roads?

22            MR. BARDOS:  Object to form.

23   A.   Yes.

24   BY MR. WARREN:

25   Q.   What are those?

Jason Poreda
July 17, 2025

1        A.   There could be county roads, there could be any

2    other road that is in a particular area, a commonly used

3    throughway in a particular area.

4        Q.   And that would depend on the particular

5    circumstance?

6        A.   Yes.

7        Q.   About whether it was a major boundary?

8        A.   Yes.

9        Q.   Did the committee categorically conclude that

10   all interstates were major roads?

11       A.   No.

12       Q.   Are there some interstates that are not major

13   roads?

14       A.   I don't believe so.

15       Q.   Same question for state roads.

16       A.   I don't believe we made any categorical

17   decisions one way or the other, other than we did create a

18   boundary analysis score that includes what the census

19   considered to be primary and secondary roads within that

20   analysis as a way of trying to mathematically determine a

21   boundary score for a particular district.  But, again,

22   that was just simply another tool in our analysis toolbox.

23       Q.   What are primary and secondary roads under the

24   census?

25       A.   Under the census's definition, primary and

Page 52

1    secondary roads are for the most part interstates and

2    state roads and a couple of other little things mixed in

3    with that.  But again, the Census Bureau is the one that

4    determines what roads were classified as primary and

5    secondary.

6         Q.   So for the boundary analysis tool that's in the

7    Legislature's redistricting application, the major roads

8    that were included in that were just the census primary

9    and secondary?

10        A.   So everything that was in the boundary analysis

11   score was geography that was provided by the Census

12   Bureau.  We did not want to add anything additional to

13   that, to keep it as clean as possible, so the only thing

14   would be the Census Bureau's designated primary and

15   secondary roads.  They have other roads as well, but we

16   were trying to come up with a way of creating the score,

17   so we chose only the Census Bureau designated primary and

18   secondary roads.

19        Q.   Okay.

20        A.   Among the other features.

21        Q.   And you mentioned that the boundary score was

22   one of the tools in the toolbox for analyzing plans.  How

23   so?  How was the boundary score incorporated into

24   mapmaking, if at all?

25        A.   It was displayed on our data reports, I believe,

Jason Poreda
July 17, 2025

Page 53

1  in both the House and the Senate as just another visual

2  number to look at to kind of to quantify how much of the

3  district boundary followed either a primary or secondary

4  road, waterway, railway, or I forget what the other

5  features that went into that particular analysis.

6      **Q.   Would the committee make mapmaking decisions**

7  **based on the boundary scores?**

8          MR. BARDOS:  Object to form.

9          Sorry.  Could you clarify what you mean by

10     committee?

11         MR. WARREN:  The house redistricting

12     committee.

13         MR. BARDOS:  Okay.  Staff or members?

14         MR. WARREN:  If he knows, anybody involved.

15     A.   Again, it was just another tool in the toolbox.

16 We would sometimes make adjustments for that particular

17 score like we would any of the other criteria that we

18 would take into account.

19 BY MR. WARREN:

20     **Q.   What are political boundaries?**

21     A.   As you just read, political boundaries refer to

22 county and municipalities, county lines and municipal

23 lines.

24     **Q.   How did the committee follow the directive to**

25 **utilize existing political and geographic boundaries?**

Jason Poreda
July 17, 2025

Page 54

1          MR. BARDOS:  Object to form.

2     A.   Can you clarify the question?

3  BY MR. WARREN:

4     Q.   For example, did following this directive mean

5  aligning perimeters of boundaries with recognized

6  boundaries?

7     A.   Sometimes, yes.

8     Q.   That would mean aligning the border of a

9  district with a county or a city limit, right?

10    A.   Yes.

11    Q.   Or with a major road?

12    A.   Yes.

13    Q.   Or waterway?

14    A.   Yes.

15    Q.   Would following this directive include keeping

16  cities or counties whole?

17    A.   Yes, where feasible.

18    Q.   Would you say that in drawing the enacted maps

19  there was a priority on keeping counties whole?

20    A.   Yes.

21    Q.   Would you say that in drawing the enacted maps

22  there was a priority on keeping cities whole?

23          MR. BARDOS:  Object to form.

24    A.   Yes.

25

Jason Poreda
July 17, 2025

Page 55

1   BY MR. WARREN:

2       Q.   Does following this directive include minimizing

3   the number of times a city or a county is split between

4   different districts?

5       A.   That depends on the circumstance.

6       Q.   What circumstances does it depend on?

7       A.   The population distribution, the other

8   geographic factors in the area, and if there are any

9   protected districts in the area, or any other factor that

10  may come into it.

11      Q.   So I'm just asking about the directive to

12  utilize where feasible political and geographic

13  boundaries.

14      A.   Okay.

15      Q.   And what -- how that manifests, I guess.

16      A.   Okay.

17      Q.   And so my question is, does that directive

18  include minimizing the number of times a city or county is

19  split?

20      A.   Sometimes.

21      Q.   And all things being equal, I guess, you know,

22  you said sometimes, and I asked in which circumstances is

23  it not, and you said there might be other factors like

24  Tier 1 considerations, and that might be an example of

25  where minimizing the number of times a county is split is

Jason Poreda
July 17, 2025

1    not feasible because of Tier 1.  Is that what I'm hearing?

2              MR. BARDOS:  Object to form.

3         A.   Yes, for counties and cities.  It really just

4    depends.  In balancing all of the standards that would

5    certainly be something we would try to do where we could,

6    but there would be situations where it just was not

7    feasible.

8    BY MR. WARREN:

9         Q.   When it was feasible, you would try to minimize

10   the number of times a county or city was split?

11        A.   If possible.

12        Q.   If possible you would try to minimize the number

13   of times a county or city was split?

14        A.   Yes.

15        Q.   You emphasized keeping counties and cities whole

16   where you could?

17        A.   Yes.

18        Q.   And where you could keep a city whole you did?

19        A.   When feasible or when possible.

20        Q.   When feasible or when possible to keep a city

21   whole you did so?

22        A.   We tried to.

23        Q.   Did you try to keep districts wholly within a

24   county?

25        A.   Particularly in the state house map, yes.  If we

Jason Poreda
July 17, 2025

Page 57

1   could that was another factor, like keeping counties and

2   cities whole.  If we could fit a district entirely within

3   a county that was another criteria that we used if

4   possible.  That's not really possible in a congressional

5   map except for south Florida.

6       Q.   So in south Florida there are certain

7   congressional districts that are entirely contained within

8   a single county?

9       A.   I believe that there are, yeah.

10      Q.   And that would be an example of following the

11  directive to utilize existing political boundaries?

12      A.   If we could put a district entirely within a

13  county that would be consistent with some of the other

14  criteria that we used throughout the house map and the

15  congressional map where possible.

16      Q.   You -- I think you said that where feasible you

17  would try to keep a county whole, you would try to keep a

18  city whole, you would try to keep a district entirely

19  within a county.  Was there a circumstance where it was

20  feasible to do one of those things but you chose not to?

21      A.   Yes.

22      Q.   What are some examples?

23      A.   Well, I mean, I can't give you every example,

24  but an example would be the decision to not keep Jefferson

25  County whole in the state house map because of its

Jason Poreda
July 17, 2025

Page 58

1    geography that splits the panhandle from the rest of the

2    state, because it goes from Georgia down to the Gulf.  We

3    could have kept Jefferson County whole, but we chose not

4    to, because it helped the -- all of the districts -- all

5    of the surrounding districts have a better -- you know,

6    follow all of those other criteria in a better way, so

7    that was a decision that was made, to split Jefferson

8    County as an example.

9         Q.   So using that as an example, is it true that it

10   was possible to keep Jefferson County whole --

11        A.   Yes.

12        Q.   -- but you chose not to because of other Tier 2

13   standards?

14        A.   Yes.

15        Q.   Like compactness?

16        A.   Or other -- yeah, any of the other criteria.

17        Q.   Okay.  So --

18        A.   Yeah.  Everything we're doing is trying to

19   balance everything, so I can't say definitively we always

20   did this or always did that.

21        Q.   Certainly.  And the things that you're trying to

22   balance are the constitutional criteria?

23        A.   And federal criteria as necessary.

24        Q.   Which are equal population?

25        A.   That's also in our state constitution.

Jason Poreda
July 17, 2025

Page 59

1      Q.   And the Voting Rights Act?

2      A.   The Voting Rights Act, yes.

3      Q.   Are there any other federal standards that you

4   applied?

5      A.   Any other relevant case law where some of those

6   provisions have been ruled on and interpreted, so we tried

7   to keep that all into consideration as we were drawing.

8      Q.   Okay.  You mentioned the boundary report score,

9   and I think you talked about how that was one tool in the

10   toolbox in evaluating the maps you were generating.  Would

11   you say the boundary score has any limitations?

12      A.   I think every criteria has a limitation.  None

13   of them are perfect.

14      Q.   What are the imperfections of that particular

15   metric?

16      A.   As an example, that particular metric would not

17   include county roads, and in certain parts of our state,

18   either the rural counties or even in the very high

19   populated areas like Dade, Broward, Palm Beach County,

20   there are some county roads or even roads that wouldn't

21   even be considered a county road that are multiple lanes

22   in each direction and divided, and for that region would

23   be considered a major road that would not have been

24   factored into the boundary analysis score.  So that is a

25   weakness of that particular metric.

Jason Poreda
July 17, 2025

Page 60

1      Q.   Any other weaknesses?

2      A.   Probably, but off the top of my head I don't

3   remember.

4      Q.   Okay.  You mentioned non-qualifying roads let's

5   call them that are nonetheless major roads in certain

6   areas.  How would committee staff know whether -- and I'm

7   not saying that's not true by any means.  I just want to

8   know, how would committee staff determine or get a sense

9   of whether a non-qualifying road was nonetheless a major

10   roadway?

11      A.   Several ways.  One of which when -- I can only

12   speak for myself, when I was drawing, I was primarily

13   using the satellite view as a background so you could see

14   exactly what the roads are.  There's also some local

15   knowledge, and I've never lived in south Florida or Tampa

16   or Orlando, but I have been to all of those places.  We

17   also have an advantage of the committee staff being from

18   around the state.  We get local knowledge from different

19   perspectives and different people who have traveled around

20   who have actually been there.  We receive input from

21   members' offices.  We get input from the public when they

22   would either write in to us or post on a Facebook page or

23   Twitter or something like that, or come to a committee

24   meeting, so we would take all of that input and try to use

25   it to the best of our ability.

Jason Poreda
July 17, 2025

1      Q.   The census has its primary and secondary road

2  classifications that are part of the boundary score.

3      A.   Yes.

4      Q.   I think that FDOT might have other road

5  classifications.

6      A.   They do.

7      Q.   Did the committee refer to those?

8      A.   No.  We chose to not incorporate any outside

9  data sets into our redistricting in order to keep what we

10  were doing just data received from the Census Bureau and

11  then the Department of State.

12      Q.   So the fact that FDOT classified a road in a

13  particular way did not impact the mapmaking?

14      A.   No.

15      Q.   Same question for I think in some county

16  transportation plans or land use plans they also classify

17  different roads.

18      A.   In different ways.

19      Q.   In different ways.  Same question.  Did the

20  committee rely on local government classifications of

21  roads in any way?

22      A.   I don't believe we did.  It's been several years

23  so I don't want to, you know, definitively say no, but I

24  don't believe that we did.

25      Q.   You don't remember looking up the transportation

Jason Poreda
July 17, 2025

Page 62

1    plan for Duval County?

2        A.   I don't remember doing it, but I can't say that

3    anyone else didn't do that as we were delving into getting

4    into some of that minutia when we were down.  I do

5    remember looking outside of our redistricting application

6    on, like, Google Maps, trying to get like what is this and

7    all of that kind of stuff.  We did do some outside

8    research, but I don't know what -- I don't remember

9    exactly what all of that was.

10       Q.   And that outside research would be how big is

11   this road, how many lanes does it have, where does -- that

12   kind of thing?

13       A.   Along those lines, yeah.

14       Q.   What is the actual geography of this area?

15       A.   Yeah.  Primarily why I use the satellite view

16   when I'm drawing, so you can see what is actually there

17   when you're drawing.  But, you know, different

18   applications will sometimes have more updated satellite

19   views of certain areas, you know, things like that.  So we

20   would occasionally do more than just look at our

21   application to try to get a better sense of the area that

22   we were drawing.

23       Q.   And that external reference would always be in

24   service of determining how to follow a major political or

25   geographic boundary?

Jason Poreda
July 17, 2025

Page 63

1      A.   Correct.

2           MR. WARREN:  I'm pulling out Plaintiffs'

3      Exhibit 6, which is a short excerpt from the

4      Florida Supreme Court's Apportionment 8 decision.

5           (Exhibit No. 6 marked for identification.)

6  BY MR. WARREN:

7      Q.   If you could turn -- and the front page is the

8  first page just so that you can see what it is.  If you

9  could turn to page 76.  Footnote 14 says, quote, An

10 uninhabited portion of far southwestern Hillsborough

11 County, which includes Egmont Key and a portion of the

12 Sunshine Skyway Bridge, is assigned to District 16 in the

13 senate plan.  Since District 16 includes no population

14 from Hillsborough County, it is not considered to include

15 part of the county for the purpose of counting splits,

16 close quote.

17          Did I read that correctly?

18     A.   You did.

19     Q.   Do you understand what this footnote is saying?

20     A.   Yes.

21     Q.   What is it saying?

22     A.   It's saying areas of no population essentially

23 could be split by a district, but effectively wouldn't

24 count as a split in that jurisdiction, whatever it may be.

25     Q.   Did that understanding of splits that are

Jason Poreda
July 17, 2025

Page 64

1  unpopulated factor into the House's mapmaking?

2      A.   Yes.

3      **Q.   How so?**

4      A.   There are some limited times where we took that

5  and took advantage of that, specifically in that area it's

6  talking about, where Hillsborough County technically has

7  what I would refer to like a tail that goes out to the

8  Skyway Bridge out to the Gulf.  Obviously that, for visual

9  compactness, mathematical compactness, just common sense,

10  it made sense to essentially cut that off and include that

11  in another district to -- and we did that in the state

12  house map.  And I don't remember if -- yeah, we did that

13  in the congressional map as well.

14      **Q.   Besides that one example in Hillsborough County**

15  **and Egmont Key, are there other instances in which the**

16  **House incorporated that approach?**

17      A.   I don't remember off the top of my head.  I know

18  that we tried -- I mean, this was, again, another tool in

19  the toolbox we could use, but one that we tried to use

20  very judiciously.  So we did not use it all the time, but

21  where it made sense to for I think primarily a visual

22  compactness way when, you know, we can cut out some zero

23  population and, you know, just that giant tail sticking

24  out, then that made sense and we wouldn't count.  And I

25  think there are one or two handful of other examples

Jason Poreda
July 17, 2025

Page 65

 1    throughout the map, but off the top of my head I don't

 2    remember.

 3         Q.   And this principle that the Apportionment 8

 4    decision discusses in the context of a county boundary, is

 5    it your understanding that it also applies to city

 6    boundaries?

 7         A.   Yes.

 8         Q.   And maybe there are more examples of taking

 9    advantage of this principle with city splits?

10         A.   Yes.

11         Q.   So in certain circumstances when it improved on

12    visual compactness or another Tier 2 criteria, the House

13    would create an unpopulated split of a city or county,

14    right?

15         A.   Yes.  Sorry.  You can keep going.

16              MR. BARDOS:  Could we take a break whenever

17         you have an opportunity.

18              MR. WARREN:  Yeah.  Just a couple --

19              MR. BARDOS:  I'm starting to get -- the BVM

20         decision just came out, and so --

21              MR. WARREN:  Of course.  Just a few more

22         questions on this.

23    BY MR. WARREN:

24         Q.   Okay.

25         A.   So, yeah, if you look at the data packet there

Jason Poreda
July 17, 2025

1   are some examples throughout where you'll see a zero

2   population split, like we have one at Gainesville.

3   There's another one -- that's the Hillsborough County one

4   that we referred to.  There's a handful throughout.

5           So if you look at the data packet and you see a

6   zero population split, or that packet and see a zero,

7   that's where we took advantage of it.  But you can see

8   that there's usually only -- you know, in this whole

9   packet there might be, you know, three or four.

10   **Q.   So is it -- let me try to sum up.  In multiple**

11   **instances when it would improve compactness or another**

12   **Tier 2 metric, the House created an unpopulated split of a**

13   **city or county and wasn't -- didn't feel that negatively**

14   **impacted the adherence to the criteria to utilize**

15   **political balance?**

16   A.   Yeah.  Again, we tried to do it as few times as

17   possible, but there are times where we kind of had to do

18   it.  There are some cities that are literally interlocked

19   with each other, sometimes with one of those unpopulated

20   areas.  So that would be another example where we felt it

21   was appropriate to do something like that.  I don't

22   remember if we did that specifically in the end, but that

23   would be another example.

24   **Q.   Okay.  Just one more example from the house map.**

25   **So some of these counties have flags, like Citrus**

Jason Poreda
July 17, 2025

Page 67

1    County --

2              MS. CARTAYA:  We can't hear you all.

3              MR. WARREN:  Oh, it's covering the mike.

4        Sorry, the map covered the mike.  Sorry, Carmen.

5              MS. CARTAYA:  Okay.  Thank you.

6    BY MR. WARREN:

7        Q.   So in Citrus County the census geography goes

8    out due west into the Gulf and there's this odd shape

9    there.

10       A.   Yes.

11       Q.   The House obviously chose to follow that county

12   boundary, notwithstanding the fact that it created this.

13       A.   Yes.

14       Q.   Would that be an example of where the House

15   might have said, well, let's cut off this census bloc and

16   make District 22 more compact -- well, sorry.  District

17   23.

18       A.   It would be District 23, yeah.

19            I mean, more compact is a term of art.  In this

20   particular case we chose to keep the county whole

21   regardless of that and we considered that compact.  Could

22   we have cut off the tail and added it to District 22?  It

23   may have improved the mathematical compactness, but since

24   that district is essentially an entirely whole county by

25   itself and then a little bit into Marion County, we just

Jason Poreda
July 17, 2025

Page 68

1  felt like it wasn't worth doing that in that particular

2  case.

3      Q.   But would you disagree, for example, if

4  Chair Byrd had come in and said, we've got to get rid of

5  this tail, take advantage of the fact that you can make

6  this unpopulated split, would that have been an

7  unjustifiable position?

8           MR. BARDOS:  Object to form.

9      A.   Yeah, I don't really follow the premise of the

10 particular question, but could there -- could we have

11 taken the tail off that particular district, yes, but we

12 chose not to, and I think both of those decisions are

13 equally valid.

14 BY MR. WARREN:

15     Q.   So there are other -- there may be other

16 instances where there's a tail, you could create an

17 unpopulated split to make the district more visually

18 compact, and that would be justifiable, just as it would

19 be justifiable to follow the county boundary.

20          MR. BARDOS:  Object to form.

21     A.   Potentially, based on the situation, yes.  I

22 don't think you could say anything -- I would not be able

23 to agree to that blanket statement without looking at a

24 particular district and its circumstances that you're

25 referring to.

Jason Poreda
July 17, 2025

Page 69

```
 1              MR. WARREN:  Okay.  I think this is a good
 2       time for a break.  Ten minutes?
 3              MR. BARDOS:  Okay.  Sounds good.
 4              (Recess taken from 11:04 a.m. to 11:15 a.m.)
 5    BY MR. WARREN:
 6       Q.   So we've walked through, I think, all of the
 7    Tier 1 and Tier 2 criteria that you say the committee
 8    applied in drawing the maps, right?
 9       A.   (Nodding head.)
10       Q.   Did you apply the criteria consistently?
11              MR. BARDOS:  Object to form.
12       A.   I believe that we did.
13    BY MR. WARREN:
14       Q.   Did you -- did the committee have a consistent
15    methodology for applying the constitutional criteria?
16              MR. BARDOS:  Object to form.
17       A.   I believe that we did, yes.
18    BY MR. WARREN:
19       Q.   What does it mean to have a consistent
20    methodology to you?
21       A.   A consistent methodology just means -- to me
22    means while drawing the districts you're trying -- you're
23    trying to balance all of the standards equally, and where
24    possible, like, for example, keeping city and counties
25    whole or adhering to those political and geographical
```

Jason Poreda
July 17, 2025

Page 70

1    boundaries we saw before -- while factoring in Tier 1 and

2    some of the other considerations, simply trying to make

3    similar decisions throughout the map, like, throughout the

4    entirety of the map where feasible.

5          There are certainly situations where you have to

6    alter that methodology slightly to fit into whatever's

7    happening demographically or geographically in a

8    particular area.  Like, for example, that Jefferson County

9    example I mentioned before.  That was mostly because the

10   county goes from one state border to the Gulf.  It makes

11   it very difficult, so geographically we made that

12   decision, which helped other surrounding districts.

13         And there are other examples like that

14   throughout the map, where we would slightly deviate

15   something to accommodate either that particular district

16   or the districts around it to make everything else be more

17   compliant and more consistent with everything else.  So we

18   would occasionally do that, but only where we had to.

19         And it's just making sure that you don't draw a

20   district that is so outside of the methodology you used to

21   draw the majority of the districts.  So there's this one

22   district that either looks or mathematically is just so

23   different and really cannot fall into the same methodology

24   that the rest of them were created with.  That's what it

25   means to me.

Jason Poreda
July 17, 2025

Page 71

1      Q.   That makes sense to me.  To your understanding

2   of following a consistent methodology, did the committee

3   do that just within a particular type of map or across the

4   different types of maps?

5      A.   Can I get you to clarify what you mean by

6   committee?

7      Q.   What does that mean to you?  I guess, what's

8   unclear.

9      A.   Well, there's committee staff and there's three

10   subcommittees and a big committee, and they all vote on

11   the map, and the committee staff, like we drew maps or

12   whatever.  So putting everything in one bucket can be a

13   little confusing.  So if you could be more specific about

14   what you mean, committee.

15      Q.   Sure.  What I'm mostly referring to, I think, is

16   the committee staff that drew the maps.

17      A.   Okay.

18      Q.   So, with that understanding, when committee

19   staff was applying a consistent methodology as you've

20   explained, was that within a particular type of map or

21   across different types of maps?

22      A.   We had -- the methodology that we primarily used

23   that we've kind of discussed here is something that we

24   used throughout the congressional house and

25   congressional -- the congressional map and the state house

Jason Poreda
July 17, 2025

Page 72

1  map, and is really a methodology that we began formulating

2  in the 2012 process and then was throughout the

3  apportionment decisions that kind of reaffirm some of our

4  methodology pieces that kind of built the bigger

5  methodology.  We continued that into this redistricting

6  cycle.

7      Q.   So in drawing both the house and congressional

8  maps this cycle, committee staff was applying its

9  consistent methodology of the constitutional standards?

10     A.   I believe that we did, yes.

11          MR. WARREN:  Now, on the senate side, senate

12     staff were given a memo to instruct them on

13     directives for mapmaking, and we have that memo.

14     It's Plaintiffs' Exhibit 7.

15          (Exhibit No. 7 marked for identification.)

16 BY MR. WARREN:

17     Q.   Are you aware of this memo?

18     A.   Yes.

19     Q.   When was the last time you reviewed it?

20     A.   I cannot recall.

21     Q.   Could you take a few seconds to flip through it.

22 My question is, does this memo align with your

23 understanding of the house committee staff's directives?

24          MR. BARDOS:  Take your time.

25     A.   I would have to, like, read it at length to

Jason Poreda
July 17, 2025

Page 73

1  know, but, no, this is the Senate's.  I mean, that had no

2  impact on the House.

3  BY MR. WARREN:

4      **Q.   Please take the time to read it.**

5      A.   (Viewing document.)

6           I think there are two of the same memo.

7      **Q.   I have no idea actually.**

8      A.   It's just two pages, correct?

9      **Q.   Yes.  Ready?**

10     A.   I believe I am.

11     **Q.   Okay.  So understanding that this was given to**

12 **senate staff, not house staff, does the explanation of the**

13 **Tier 1 and Tier 2 standards in this memo align with your**

14 **directives?**

15     A.   Some of them do, some of them not quite.

16     **Q.   Which ones not quite?**

17     A.   So, as an example, they have a paragraph here

18 that says, In accordance with the Tier 2 standard of

19 constitutional requirements related to equal population,

20 you are directed to prepare senate plans with district

21 population and deviations not to exceed 1 percent of the

22 ideal population of 538,455 people, and to prepare

23 congressional plans with population deviations plus or

24 minus one person of the ideal population of 769,221

25 people.

Jason Poreda
July 17, 2025

Page 74

1            So the congressional plan part, that aligns with

2   ours, that the equal population with congressional plans

3   and equal population quantity, plus or minus one person,

4   we also complied with.

5            The population deviations not to exceed one

6   percent, we did not set a specific percentage for

7   deviation.  Rather in the state house we took a -- we

8   tried to make the deviations as small as possible, but we

9   were trying to find -- in our drawing process we were

10  trying to find what deviations for both upper and lower

11  end of those deviations that fit into the map, meaning if

12  we were able to keep a city whole, but we had to push the

13  deviation to 6 percent, just as an example, or something

14  along those lines, we would factor that in.

15           Rather than picking an arbitrary percentage we

16  were trying to find -- and that's, I think, primarily

17  because state house districts are so much smaller that if

18  you're able to -- you know, if you stick to a certain

19  percentage you're going to box yourself in to certain

20  decisions that would have to be made throughout the map.

21           So we were trying to more organically find the

22  upper and lower end for those districts, and throughout

23  the process that kind of changed as we changed the map,

24  and we try to find that upper end and lower end of the

25  districts.  That is something that we employed in the 2012

Jason Poreda
July 17, 2025

Page 75

1    redistricting as well and we carried through into this.

2    So that was a slight deviation to what the Senate put out.

3           We also -- so they said that with respect to

4    municipal boundaries you were directed to explore concepts

5    that where feasible keep cities whole while also

6    considering the impermanent and changing nature of

7    municipal boundaries.  That part we did not consider.

8           We considered the census geography that was

9    presented to us, and we would keep municipalities whole

10   where feasible without considering whether or not the

11   boundaries were going to change.  Now, municipal

12   boundaries, unlike county boundaries, do tend to change a

13   little bit more often.  They also tend to be a little bit

14   more chaotic than county boundaries, for example, but we

15   didn't -- you know, we were presented with geography that

16   the census presented to us, and if we could keep them

17   whole regardless of their shape we would.  So we did not

18   really factor that part in.

19          They also say specifically -- well, in the next

20   paragraph you're further directed to examine the use of

21   existing geographic boundaries where feasible

22   specifically, and they outline certain things.  We did not

23   have a specific set of geography that we were specifically

24   told to look at.  It was just all of those -- all of those

25   features were kind of included, including some that we

Jason Poreda
July 17, 2025

Page 76

1    might not even -- you know, might not be listed here that

2    might be relevant in a particular area.

3           Again, we were trying not to box ourselves into

4    a specific thing.  And this does not include some of those

5    larger county or, you know, even other more rural roads

6    that might come into consideration.  For example, again,

7    because state house districts are so much smaller, like in

8    the Ocala National Forest there's a lot of forest service

9    roads that cut through the Ocala National Forest, and I

10   don't know if we ended up using any of those, but that

11   would be a potential boundary, because we are limited by

12   our approximately 180-ish thousand population districts.

13   So we're a little bit more boxed in to, you know, what we

14   can -- what we can do.

15          So, because of that, you know, we didn't feel it

16   necessary to box ourselves in.  As long as we were using

17   those highly visible political and geographical

18   boundaries, trying to keep cities whole where possible,

19   trying to keep counties whole where possible, or in a

20   state house map with smaller districts, districts within

21   counties and things along those lines, those would just

22   kind of naturally come.  And we did not feel that it was

23   necessary to specifically outline specific pieces of

24   geography, because there might be areas where there might

25   be something else that might be a better use of that.

Jason Poreda
July 17, 2025

Page 77

1           And for the most part I think those are some,

2     you know, slight differences between the House and Senate,

3     but we did not produce a memo like this for basically the

4     reasons that I'm telling you now.

5           Q.   Okay.  So, to sum up, looking at the senate

6     directives memo, the parts that in your words do not quite

7     align with the house committee understanding of its

8     directives are, number one, there was no equal population

9     threshold for the state house districts, right?

10          A.   No.  We were trying to draw districts as equal

11    as possible, but allowing to find that upper and lower end

12    a little bit more organically in the map depending on, you

13    know, if we had to push the upper end up a percent or two

14    in order to keep a city whole as an example, or follow

15    this county boundary as opposed to, like, oh, we're at the

16    threshold so we're going to cut this corner off here kind

17    of arbitrarily just to hit some percentage.

18          We felt it was better to find those boundaries

19    within the map that made more sense, and if we had to push

20    the percentage out a little bit more we felt that was more

21    appropriate and more explainable to our members.

22          Q.   Understood.  The second way in which the senate

23    directives memo does not quite align with the house

24    committee staff's directives is this piece about

25    discounting municipal boundaries in some way.

Jason Poreda
July 17, 2025

Page 78

1      A.   Correct.

2      Q.   And then the third way in which the senate

3  directives does not quite align with the house committee

4  staff's directives is that there was no specific limited

5  universe of major geographic boundaries that were

6  considered to the exclusion of others as part of --

7      A.   Correct.

8      Q.   -- geographic boundaries?

9      A.   Correct.  The senate guidelines do say where

10  feasible, so obviously they're allowing for some of that

11  flexibility, too, but we did not go into it with a more

12  specific set of boundaries.  But those are really the

13  minor -- I mean, we essentially used the same

14  methodologies I would say, but there are slight

15  differences that we just discussed.

16      Q.   Okay.  And there are that you can think of no

17  other differences in the senate versus house methodologies

18  of implementing the constitutional criteria?

19      A.   Not that I can recall.

20      Q.   Excellent.  Now, I'd like to talk about other

21  considerations that one could consider when drawing maps,

22  and specifically I'd like to ask whether you did, in fact,

23  consider them when drawing maps in the 2020 process.  When

24  drawing maps in the 2020 process, did you seek in any way

25  to favor or disfavor a political party?

Jason Poreda
July 17, 2025

Page 79

1      A.   No.

2      Q.   When drawing maps in the 2020 process, did you

3   seek in any way to favor or disfavor an incumbent?

4      A.   No.

5      Q.   When drawing maps in the 2020 process, did you

6   seek in any way to preserve the course of preexisting

7   districts?

8      A.   No.

9      Q.   Does that mean that you started with a blank map

10   when you were starting the 2020 process?

11     A.   Yes.

12     Q.   When drawing any of the maps in the 2020

13   process, did you rely in any way on districts drawn before

14   the benchmark plans?

15          MR. BARDOS:  Object to form.

16     A.   I don't understand the question.

17   BY MR. WARREN:

18     Q.   So I think you said you started with a blank map

19   when drawing maps in the 2020 cycle.

20     A.   Yes.

21     Q.   So you weren't starting with the benchmark

22   plans.  Do you understand what I mean by benchmark plans?

23     A.   You mean the map -- so for the state house

24   district the map drawn in 2012?

25     Q.   Correct.

Jason Poreda
July 17, 2025

Page 80

1    A.   No.

2    Q.   And for the congressional map the benchmark plan

3  is the map court-ordered --

4    A.   In 2016?

5    Q.   Correct.

6    A.   No.

7    Q.   So you didn't start with the benchmark plans for

8  either maps, right?

9    A.   We did not.

10    Q.   And I'm assuming that you didn't rely on maps

11  prior to the benchmark plans either?

12    A.   No.

13    Q.   Okay.  When drawing any of the maps in the 2020

14  process, did you seek in any way to rely on metropolitan

15  statistical areas, MSAs?

16    A.   No.

17    Q.   Same question for census designated places,

18  CDPs.

19    A.   No.

20    Q.   When drawing the maps in the 2020 cycle, was it

21  a goal of yours to in any way keep communities of interest

22  together?

23    A.   That is not a standard that we follow.  However,

24  particularly after receiving input either from the public

25  or members, if we could draw a compliant district with all

Jason Poreda
July 17, 2025

Page 81

1  of our other standards that we had, but maybe make slight

2  adjustments based on their input that might better align

3  with the interests of the community, and it wouldn't

4  affect any of the other constitutional criteria, where we

5  could, we did make some changes to that effect.

6      Q.   Okay.  Apart from the criteria relating to

7  county boundaries that we've already talked about, did you

8  have it as a goal to cross any particular county line?

9      A.   You're going to have to be more specific.

10     Q.   For example, as you're drawing maps you're

11 attempting to utilize existing political and geographic

12 boundaries that includes trying to keep counties whole

13 where feasible, it includes perhaps keeping districts

14 wholly within a county where feasible.

15          Separate and apart from that, did you have it as

16 a goal in any particular instance to say this county

17 boundary -- we are going to cross this particular county

18 boundary?

19     A.   No.

20     Q.   Okay.  So you didn't have it as a goal to cross

21 any particular county boundary?

22          MR. BARDOS:  Object to form.

23     A.   What do you mean by goal?

24 BY MR. WARREN:

25     Q.   As in, for example, in the state house map

Jason Poreda
July 17, 2025

Page 82

1    District 30 contains part of Volusia County and part of

2    Brevard County.

3         A.    Okay.

4         Q.    It crosses the Brevard, Volusia line.

5         A.    Okay.

6         Q.    As a starting place, did you think we need to

7    have a district that includes portions of both Volusia and

8    Brevard counties?

9         A.    No.

10        Q.    So that's an example of what I'm talking about.

11        A.    So, no, there was at no point throughout the map

12   did we have any preconceived goal of combining two

13   different counties.

14        Q.    So any district that includes portions of two

15   counties, the reason for that would be apart from an

16   independent goal of having a district that contains parts

17   of those two counties?

18        A.    Yes.

19             MR. BARDOS:  Object to form.

20        A.    Yes.  There are some examples in the map where,

21   I mean, some of the -- especially particularly the rural

22   counties were going to have to be connected to another

23   county.  So it wasn't a goal, but it was like

24   mathematically impossible.

25             An example would be Nassau County had to be

Jason Poreda
July 17, 2025

Page 83

1   connected to Duval County.  There's no other mathematical

2   way or geographical way to do that, but that was not a

3   predetermined goal.  That was simply a way -- same with

4   Monroe County that had to be connected to Dade County,

5   period.  But that was not a goal that we had set out prior

6   to that.

7   BY MR. WARREN:

8        Q.   And those are examples of crossing the county

9   boundary was not done for its own sake, but in service of

10  another criteria, in that case equal population?

11       A.   Correct.

12       Q.   Got it.  Not to linger on this too long, but the

13  inverse question to that, did you have it as a goal not to

14  cross any particular county boundary?

15            MR. BARDOS:  Object to form.

16       A.   Not before the drawing process, but as we

17  started drawing we did have some goals of -- well, when

18  your objective is to a keep a county whole or keep

19  districts entirely within a county, as you're organically

20  going throughout the redistricting process, some of those

21  items pop up and that becomes like, oh, we would like

22  to -- we discovered that we were able to do this, so we'd

23  like to do that.

24            An example of that would be keeping four

25  districts entirely within Polk County in the state house

Jason Poreda
July 17, 2025

Page 84

1   map.  We discovered mathematically you were able to do

2   that, so we attempted to do that and we were able to do

3   that.

4            There are examples where we had things like that

5   that we then later had to throw out because it just didn't

6   fit the rest of the districts around it.  It became too

7   limiting.

8            Another example is that we were -- in the state

9   house map we were trying to minimize the amount of

10  districts that cross the Dade County line to keep them all

11  within Miami-Dade as much as possible.  Obviously, Monroe

12  had to be connected to Dade, but then beyond that we had

13  set it out as a goal to try -- like as we learned the rest

14  of the map, we discovered that we could try to keep as

15  many districts as possible within Dade County and cross

16  the Dade, Broward line or Dade, Collier line as few times

17  as possible.  And we were, I think, able to accomplish

18  that.

19           And then there's, like, District 83 we were

20  able -- that is a district made up of entirely four whole

21  counties, and our goal, especially with Polk County above

22  it, keeping that, that became a goal to keep that district

23  intact.

24           However, as I said, there were other examples of

25  that throughout the drafting process that we realized

Jason Poreda
July 17, 2025

Page 85

1    boxed us in to a point where we couldn't do that.

2           So it was those things that kind of we

3    organically found in the map and were like, oh, that looks

4    really good and that district is mathematically and

5    visually compact, it really works.  It follows all the

6    other criteria.  Let's try to keep it.  But it limited us

7    too much with the neighboring districts, or the entire

8    region, or something along those lines, so we had to scrap

9    that idea and come up with new things.  So those things

10   kind of came up throughout the drawing process.

11   BY MR. WARREN:

12       **Q.   Okay.  I think you've already answered this,**

13   **because it sounds like this was a holistic process of**

14   **trying to figure out what worked in balancing all the**

15   **different criteria, but did you have it as a goal to**

16   **adhere to any particular county line over another?**

17       A.   We treated all county lines equally, but, as I

18   mentioned before, throughout the process, when you kind of

19   stumble in like that District 83, we realized the

20   combination of those four counties.  So then that

21   became -- like it became a goal to keep that district

22   intact, so the outside border of all of those we tried to

23   not break that where we could.  And then other examples

24   throughout the map.

25           During the drafting process, I forget exactly

Jason Poreda
July 17, 2025

Page 86

1  what the county combination was, but we had one up here

2  around District 20 -- 10, 20 and 22 and 21, and then we

3  discovered that we were limiting ourselves too much, and

4  if we broke whatever that county combination was we were

5  able to come up with the configuration that we have now,

6  which works considerably better than the one that we had

7  before.

8       And there is another example of the Pasco,

9  Hernando, Sumter districts.  We had a different

10 configuration for those, and then when we realized we

11 could take a district from Hernando down into the northern

12 part of Pasco and kind of everything fit into place where

13 you could fit three other districts within Pasco, and then

14 everything else just kind of fit together with that

15 particular county combination.  And those things were just

16 discovered throughout the drawing process.

17 **Q.   And I guess like using Polk as an example, where**

18 **there's four house districts entirely contained within it,**

19 **it's not -- it's not that the Polk boundary wasn't broken**

20 **because there's something --**

21      A.   Special about it?  Yeah.

22 **Q.   -- other than the population?**

23      A.   Yeah.  When we -- when we first discovered --

24 and one of the first processes even before we started to

25 draw, once we got, like, real redistricting data set, one

Jason Poreda
July 17, 2025

Page 87

1    of the most basic things is simply looking at the county

2    populations from top to bottom and overlaying our ideal

3    population of a district for both congressional and house

4    and figuring out if there are any counties that, like, hit

5    that number exactly, or a combination of counties that hit

6    that number exactly.

7              So it's a lot of math and Excel trying to create

8    these county combinations.  And obviously you can't

9    combine a county -- like, you can't combine Leon with Lee

10   County, because that doesn't really work.  So you had to

11   find neighboring counties that had those sorts of

12   combinations, and it's a lot of -- it's a lot of Excel and

13   math work trying to come up with possibles, and then we

14   would try them.

15             And, you know, then -- but that's kind of in

16   isolation just trying to find those mathematical

17   combinations or what we referred to as sandboxes, county

18   combinations where you could put districts entirely within

19   them.

20             But you found one sandbox and it really works

21   and you're drawing districts within it, and the advantage

22   of that is that you can put that sandbox on the map and it

23   won't affect any neighboring districts.  So you can kind

24   of draw it in isolation.  So it's a way of trying to

25   compartmentalize the map.

Jason Poreda
July 17, 2025

Page 88

1              But that doesn't always work, because sometimes

2     a county combination just doesn't allow the rest of the

3     map or really the rest of the region to fit together in a

4     way that either gets your proper population deviation or

5     proper compactness, because unfortunately our state is not

6     Iowa, we're not a box.  We have a lot of irregular

7     geography.  Our county lines are even very irregular, not

8     even to talk about our city lines.  So that's just an

9     organic process as we go through trying to come up with

10    those types of sandboxes, county combinations, where we

11    could put a certain number of districts within it.

12         Q.   Okay.  That makes sense.

13              I'm assuming that the principles we've just

14    discussed in the context of counties applies to cities as

15    well, that is to say you didn't have it as a goal to cross

16    any particular city line or keep any particular city whole

17    or split in and of itself?

18         A.   No, we did not.

19         Q.   Did you have it as a goal to avoid crossing any

20    particular geographic boundary?

21         A.   Nope.

22         Q.   For example, the Kissimmee River Basin?

23         A.   No.

24         Q.   Is there any other criterion that I haven't

25    asked you about that you employed when drawing maps as

Jason Poreda
July 17, 2025

Page 89

1    part of the 2020 process?

2         A.    I don't believe so.

3         Q.    Okay.  And just to confirm my understanding.

4    When you drew the maps in the 2020 process, you always

5    followed the directives from the Florida Constitution as

6    interpreted by case law and the federal standards as

7    interpreted by federal case law?

8         A.    I believe that we did.

9         Q.    Now, I'd like to talk about the process of

10   drawing the maps a little bit more specifically than what

11   we've discussed now.

12              Technically, when you had the map drawing

13   application up, what were you looking at?

14        A.    The map.

15        Q.    What layers did you have on?

16        A.    So as I said before, the base layer that I

17   primarily chose to draw with was the satellite view image.

18   Occasionally you have to switch to a different background

19   depending on what area I was drawing or what specifically

20   I was trying to work on, because sometimes the satellite

21   view and the district colors on top kind of made things a

22   little unclear, so you had to help yourself.  Particularly

23   in those areas where it was very -- you know, you're

24   zoomed in very, very far.  That can get a little -- a

25   little muddy, but I always primarily tried to draw in

Jason Poreda
July 17, 2025

Page 90

1    that.  Does that answer your question?

2        **Q.   I think so.  I guess additionally, what levels**

3    **of geography were you assigning or visible to you when you**

4    **were drawing?**

5        A.   So in our program, which was the ESRI

6    redistricting application, so as you zoomed in and out it

7    adjusted the census geographies that you could see on the

8    map in realtime, but you could also adjust at what levels

9    of zoom those geographies appear.  Because in some areas,

10   like the rural areas, you can zoom down -- in order to see

11   the census bloc level, the smallest unit of geography, you

12   had to zoom in pretty far, and that, like, wasn't

13   really -- doesn't really work for rural areas.  You needed

14   to see the blocs at a higher zoom level.

15        But in south Florida you had to zoom in really,

16   really far before you wanted the blocs, because there are

17   so many little blocs.  So it's just kind of dependent on

18   what area you were drawing in.

19        But the smallest unit of geography was census

20   blocs.  Up from there it was census bloc groups, then

21   census tracts, and then counties.  And those were the

22   primary four census geographies that we would use to draw.

23        We also had the ability to identify cities and

24   places, so -- specifically cities, but we could turn on

25   the CDPs and see them and other -- I think those are

Jason Poreda
July 17, 2025

1   really the only things that we could see.  Then we could

2   overlay any of the data points that we had in our data

3   grid on the bottom, and we also have other reports we

4   could run, but we could overlay any of that information

5   onto the census blocs.

6           And we could do two things, so we could -- you

7   could put on total population and a particular racial

8   breakdown, or however you wanted to do that.  You could

9   also turn on a heat map for either total population or any

10  of the other demographic information that you wanted to

11  within the program.

12       **Q.   And did you, in fact, turn on a heat map or**

13  **display the other data points that are visible in the data**

14  **grid as you were mapping?**

15       A.   Occasionally.

16       **Q.   What specific data points would you occasionally**

17  **turn those functionalities on for?**

18       A.   I mean, it wasn't one specifically.  At some

19  point we probably have looked at any and all of the data

20  points, depending on what we were doing or what area we

21  were drawing in.

22       **Q.   And just to summarize, what's the data that's**

23  **available for those functionalities?  Besides total**

24  **population, there would be the census voting age**

25  **population by race?**

Jason Poreda
July 17, 2025

Page 92

1    A.   Yeah.  You could see total voting age

2  population, you could see the Hispanic population,

3  Hispanic voting age population, Black population, Black

4  voting age population, single race White population, both

5  voting and otherwise, and then other, which was kind of

6  all of the other catchall for everything else.  I think

7  that was primarily it.  Those are the basic census

8  geographies that we had available to us.

9    Q.   And in what circumstances would you turn on, so

10  to speak, or have visible a heat map or the data points by

11  census geography on race?

12    A.   I would say I primarily just had the total

13  population for the blocs on more often than anything else.

14  Occasionally when we were looking at a minority district

15  that had like the candidate of their choice we would

16  occasionally turn on the heat map in the more difficult

17  areas just to get a better sense of where that population

18  was concentrated, or if it was more spread out in a

19  particular area.  Sometimes helpful, sometimes not

20  helpful, but we would occasionally turn it on.

21    Q.   Can you remember particular areas of the state

22  when you found it helpful and turned that information on?

23    A.   And we wouldn't leave it on like the entire

24  time.  It was something that was kind of like a reference.

25  Kind of turn it on and whatever and turn it on and off,

Jason Poreda
July 17, 2025

Page 93

1   and sometimes it wasn't as helpful as others.

2          You could also change how the colors were

3   displayed and kind of had to find a best way of doing

4   that.  But I can remember doing that in the Jacksonville

5   area, I can remember doing that in the Orlando area, the

6   Tampa area, and in the state house map in the Broward and

7   Palm Beach area specifically, and then for the Black

8   population in Dade County.

9          Q.   And for the Black population in Dade County,

10   that would be you're drawing house districts or a

11   congressional district in Dade County and you're referring

12   to the overlay of the Black population in the area as

13   you're drawing?

14          A.   Yeah.  Yeah, the concentration of the Black

15   population in particular areas.

16          Q.   Do you remember using that functionality to draw

17   any of the Hispanic performing districts in Dade County?

18          A.   We did not.  I did not.  I can't speak for

19   anyone else.  I did not.

20          Q.   Back to the layers of census geography.

21          A.   Uh-huh.

22          Q.   I think there's another setting in the

23   application where you turn on VTDs and draw by VTDs.  Do

24   you know --

25          A.   Yeah.  VTDs were an available data set but that

Jason Poreda
July 17, 2025

Page 94

1  we did not use.

2      Q.   Were you present at all of the committee and

3  subcommittee meetings?

4      A.   No.  Only because we sometimes held legislative

5  and a congressional subcommittee meeting at the same time

6  and Leda ran one of them and I ran the other one

7  downstairs, because we had limited time, so we ran them

8  concurrently, and so she'd be in one and I'd be in the

9  other.

10     Q.   Was there a particular subcommittee that you

11 would always do that for when they were concurrent?

12     A.   I mean, it wasn't always the same, but

13 especially early on during the educational stuff, I think

14 I primarily was in the congressional one and Leda was the

15 legislative one.  But then there were certainly times when

16 I was in the legislative one, and, you know, we just kind

17 of had to play it by ear.

18          And when we got into actual presentation of the

19 maps we had to make sure all the staff was in whatever

20 committee we were doing, so we made sure that there was no

21 congruent meetings for those types of things, so --

22     Q.   And when there was no congruent meetings you

23 were attending every meeting?

24     A.   Correct.

25     Q.   Same thing with the floor sessions when the

Jason Poreda
July 17, 2025

Page 95

1    plans were considered, were you in attendance?

2          A.    I was on the floor for all of those, yes.

3          Q.    You talked about -- I asked you questions about

4    communities of interest, and you mentioned how input on

5    communities of interest was considered to some extent from

6    the public and from members.  More generally, how was

7    input received during the mapmaking process?

8          A.    We received input -- member input, so members

9    would request to have meetings with us.  So me -- I'd say

10   I took the majority of those meetings, but there was

11   always another one of our staff in the room with us, and

12   we took them throughout the process.  We also received any

13   public input at any of our committee meetings, we received

14   input -- I remember Karen Dearden, she was running kind of

15   our external communications, so she would gather input

16   that was being received on social media sites, or whatever

17   other emails were being sent to the committee, or phone

18   calls or whatever else was coming in.  So all that that

19   way.

20         Q.    And during committee meetings members would give

21   input?

22         A.    Certainly.

23         Q.    And I think at some point in the process Chair

24   Leek said that staff had 37 individual members with --

25   individual meetings with members.  Does that sound about

Jason Poreda
July 17, 2025

Page 96

1   right?

2       A.   It may have been accurate at whatever period of

3   time that we were having, but myself and Kyle primarily,

4   and sometimes me and Leda, sometimes me and Sam.  I mean,

5   I met with -- I don't remember how many members.  It was a

6   lot of members.  It certainly at one point was a lot more

7   than 36.

8       Q.   I'm --

9       A.   And that would not include repeat meetings.

10  There were some members that we would meet with on a

11  pretty consistent, regular basis.

12      Q.   Who are some of those members?

13      A.   I met with Rep. Bush probably multiple times a

14  week throughout the process.

15      Q.   What was he interested in discussing?

16      A.   The area surrounding the district that he

17  currently represented, which would be most analogous to

18  District 109 today.

19      Q.   What other members did you meet with frequently?

20      A.   I had multiple meetings with Representative

21  Amphroy (phonetic), I had multiple meetings with -- I

22  would have to double-check.  But there was -- and

23  sometimes there was just one meeting, sometimes there was

24  two meetings.  Those two stand out as being, like, the

25  regulars so to speak.

Jason Poreda
July 17, 2025

Page 97

1          But we met with I would say by the end of the

2     day probably 75 percent of the Democratic caucus and

3     probably 50 percent of the Republican caucus at one point.

4          **Q.   And how, if at all, did member input from**

5     **meetings with staff influence the mapmaking?**

6          A.   I would say the member input from my perspective

7     influenced the mapmaking probably more than any other

8     input, because -- in some cases not.  We were unable to

9     accomplish what they were doing.  But specifically like

10    that 108, 109 district, when we originally produced it, it

11    was in a more horizontal fashion.

12          But we heard from -- like, so we heard from Rep.

13    Bush, Rep. Joseph, and multiple other members from, like,

14    the region about how that was not aligning with the Black

15    communities in that area.  There's also a heavy Haitian

16    population there, and we were orienting it this way,

17    combined communities that probably shouldn't have been

18    combined, so orienting them in a more vertical fashion

19    would be more, you know, aligning to those.

20          And that's where communities of interest came

21    in.  And because those are protected districts, we

22    obviously want to make sure that we kind of followed

23    through with protecting all of those communities,

24    including the language minority of the Haitian community

25    down there, so we adjusted that accordingly.

Jason Poreda
July 17, 2025

Page 98

1      Q.   And same question for public input.  How, if at

2   all, was public input, it impacted the mapmaking?

3      A.   Similarly.  I mean, we received -- the public

4   input came in, the way we received that more than any

5   other was they would submit maps to us.  Because they --

6   it was a public redistricting application, and the public

7   was allowed to submit maps to us.  And every map that was

8   submitted to us was reviewed by our staff, and

9   sometimes -- I wouldn't say like a whole map, but there

10   were sometimes pieces, or, like, this particular district

11   or this particular region was drawn in a way that kind of

12   piqued our interest.  So then we would -- we wouldn't take

13   it from those maps, but we would try to duplicate, to a

14   certain degree, the concept that the member of the public

15   had presented to us.

16           And we found in some cases, like, a slight

17   alteration or kind of, you know, not exactly what they

18   drew, but kind of something along those lines could help

19   us accomplish our goal.  And usually the public's drawn

20   maps were to align more with communities of interest,

21   right.  But if we could take a concept and kind of fit it

22   into our constitutional standards and our methodology

23   while also adhering to kind of what they were asking for,

24   we felt like that was appropriate where we could.

25      Q.   And would those decisions to incorporate public

Jason Poreda
July 17, 2025

Page 99

1    input be made by committee staff alone or involve

2    committee leadership?

3         A.    Primarily committee staff, but then we would

4    present all of those ideas and changes to committee

5    leadership and whatnot.

6         Q.    Okay.  You talked earlier about how committee

7    staff interacted and worked with the chairs and their LAs.

8    With respect to the development of the maps --

9         A.    Uh-huh.

10         Q.    -- what input, how did the chairs influence the

11    development of the maps, outside of public meetings?

12         A.    We would occasionally present them with kind of

13    multiple concepts.  Like, particularly before we were

14    developing the workshop maps for both the congressional

15    and senate maps, we ended up doing two workshop maps for

16    each map, but there was probably other -- I don't remember

17    how many, but there was probably other drafts, and we were

18    trying to -- our goal with the workshop maps was to

19    present as many decision points as possible to the

20    members.

21              So, like, we could -- you know, we could do this

22    in this region or we could do this in this region, and

23    that's going to kind of govern how -- we tried to put as

24    many of those types of decisions into two maps as

25    possible.  And we had to decide, you know, based on our

Jason Poreda
July 17, 2025

Page 100

1  other drafting and ideas, like, what particular concepts

2  would be important to try to incorporate into a single

3  map, which was difficult, because not all those concepts

4  could really fit together.

5          And so we'd present those options to the

6  committee chairs and I believe the vice chairs, and just

7  kind of, you know, sought their input and kind of how they

8  were -- how they saw those or what they thought was

9  important to show their members in the committee.

10      Q.   And then based on that discussion with chairs

11  and maybe vice chairs, staff would rework drafts and --

12      A.   Yeah.  Based on that input, we then would try to

13  narrow down all of the drafts into -- you know, at the

14  time we didn't know there would only be two workshop maps.

15  We thought there might be three, but we were able to -- or

16  four or more.  But we were able to incorporate as many of

17  those ideas as we could into as few maps as we could, and

18  it ended up being workshop A and workshop B for both, the

19  congressional and state house.

20      Q.   Maybe an obvious question.  In your view, was

21  every map committee staff presented as workshop options

22  constitutional?

23      A.   I believe so, yes.

24      Q.   And that's true of the house maps and the

25  congressional maps?

Jason Poreda
July 17, 2025

Page 101

1    A.   Yes.

2    Q.   So every district in every workshop map to your

3  understanding was fully compliant with the Tier 2 and Tier

4  1 standards?

5    A.   Yes.

6    Q.   I'm returning briefly to the relationship with

7  committee chairs.  Before each committee meeting, would

8  staff have pre-meetings with committee chairs?

9    A.   Yes.

10    Q.   What would you discuss at those pre-meetings?

11    A.   What we would be doing in the upcoming meeting.

12  So what information would be presented and . . .

13    Q.   So that staff and chairs could get in alignment

14  on how the meeting would go?

15    A.   Yeah.  Yes.

16    Q.   So staff and committee leadership were in

17  alignment on the process and purpose and intentions of the

18  redistricting process?

19         MR. BARDOS:  Object to form.

20    A.   Yes.

21  BY MR. WARREN:

22    Q.   What role, if any, did the Senate play in the

23  development of the state house plan?

24    A.   To my knowledge, none.

25    Q.   The only involvement the Senate had was voting

Jason Poreda
July 17, 2025

Page 102

1    to approve the plan the House drew?

2         A.   To the best of my knowledge, yes.

3         Q.   Who would have better knowledge than you about

4    that?

5         A.   I don't know.  But I can't speak for the Senate,

6    so I don't know what they -- I don't know.

7         Q.   But the House drew the house map?

8         A.   Correct.

9         Q.   Okay.  So walking through briefly the timeline

10   of how the workshop maps developed to the final product.

11   On the first subcommittee meetings in which workshop A and

12   workshop B were presented, that was the first presentation

13   of draft proposals, right?

14        A.   I believe so, yes.

15        Q.   That's in early December of 2021.

16             The next drafts were presented at the

17   January 21st legislative subcommittee.  That's when

18   Plan 8009 was presented, right?

19        A.   So it looks like the meetings on December 2nd

20   and 3rd of 2021 were subcommittee meetings where we

21   presented the two workshop maps for both maps.  It then

22   looks like we had a full redistricting committee meeting

23   where we presented all four of them to the main big

24   committee.  And then -- and again, I would have to

25   double -- I'm taking your word for these dates, but I

Jason Poreda
July 17, 2025

Page 103

1  believe that they are accurate.

2          On December -- I'm sorry, January 21st, it looks

3  like the legislative subcommittee met, and we presented --

4  that would have been the first -- first other version of

5  any other map that would have been, like, an official PCB

6  and the state legislative subcommittee, so the state house

7  map.

8          MR. BARDOS:  And for the record, the witness

9      was referencing Exhibit 3.

10          THE WITNESS:  Yes.  Sorry.  I'm referencing,

11      yeah, the timeline that was presented to me

12      earlier.

13  BY MR. WARREN:

14      **Q.   My question is, what led from the Workshop A and**

15  **B maps, 8005 and 8007 to 8009?  And, I suppose, to narrow**

16  **that in, because we've already covered a lot of ground,**

17  **anything -- did anything additional, besides member input**

18  **in private meetings, member input in committee meetings,**

19  **public input from the public, and staff reworking of how**

20  **to apply the constitutional criteria, go into 8009?**

21          MR. BARDOS:  Object to form.

22      A.   So all of the input that we received in during

23  the workshops we took into account.  We took into -- like,

24  after the workshop meetings that led to further meetings

25  or phone calls or virtual meetings with members and

Jason Poreda
July 17, 2025

Page 104

1   talking about the districts that are in the workshop maps,

2   further public input.  We received a new map and other

3   people would chime in.

4           And we tried to take all of that into

5   consideration, on top of which as we -- you know, as a map

6   drawer, you know, like most other pieces of art or work,

7   you're kind of never finished, or you kind of -- even

8   during the workshop period identified areas where we might

9   be able to improve.  And when I say improve, I may reduce

10  the number of city splits or improve compactness over

11  here, or, you know, I just wasn't a fan of how this region

12  came together.  Because, remember, the workshop maps were

13  trying to -- like, they weren't really intended to be

14  whole maps on their own, they were intended to show all of

15  the decision points throughout the map.  So some of it

16  didn't quite fit together.

17          So when we then identified what pieces of each

18  of the workshop maps -- members prefer, you know, kind of

19  like I said, all this works for this reason, this is more

20  compact.  Let's go with that on this map and then kind of

21  put them all together.  So we then had to take those

22  pieces, put them together, and then, you know, they didn't

23  all fit together exactly perfectly, so we had to make

24  further changes with that.  And then further refinements

25  in, you know, trying to reduce the number of city splits,

Jason Poreda
July 17, 2025

Page 105

1  trying to reduce, you know, county splits, trying to tweak

2  the visual compactness where we could.

3         I think that Polk County, four districts went

4  through a variety of different little changes with that to

5  make that just more visually compact while keeping all of

6  the variety of cities and lakes together in Polk County,

7  just as an example.  Just little things like that.

8         So once we kind of had the more overall

9  direction for certain regions, we would then take those

10  and try to make those concepts, you know, using all of our

11  methodology and just try to see if we can't further adhere

12  it to all of that methodology with whatever we were doing

13  in that particular region, including Tier 1 and Tier 2

14  stuff.

15  BY MR. WARREN:

16     **Q.   And further refinement happened to lead from**

17  **8009 to 8813?**

18     A.   Correct.

19     **Q.   In the same type of process?**

20     A.   Same type of process.  And one of those best

21  examples, which I already mentioned, was the change in --

22  I think in both of our workshop state house maps, 108 and

23  109 were horizontal and we switched them to vertical

24  because of the abundant, not just public, but member input

25  that we heard.  And by the way, of the members, the repeat

Jason Poreda
July 17, 2025

1  members, if she ever reads this, Representative Woodson

2  spent a long time in my office throughout the process, and

3  she actually helped a lot with that area.  So I have to

4  mention her, too.

5      Q.  Shout out?

6      A.  Yes.  She always comes up and gives me a big

7  hug, so I would be remiss if I did not mention her.

8      Q.  Very good.  Turning to the same kind of

9  walk-through of the congressional plan, and I know things

10  get a little different eventually, but the committee staff

11  starts with two workshop maps for the congressional plan

12  presented in early December, 8001 and 8003.  Am I right in

13  thinking that the next draft congressional plan is 8011?

14      A.  I believe that that is correct.  And looking

15  again at your Exhibit 3, the timeline you presented

16  earlier, have to verify the times, but, yeah, I believe on

17  the list, because we had some legislative committee

18  meetings and we were trying to lock down both the house

19  and senate maps, and the first time we returned to the

20  congressional map would be in February -- on February 18th

21  where we had the congressional subcommittee where we took

22  those workshop maps and did the same sort of combination

23  between the workshop maps and presented 8011 to the

24  committee.

25      Q.  And we'll skip over some procedural history, and

Jason Poreda
July 17, 2025

Page 107

1    I want to focus mostly on the south Florida district
2    configurations in the congressional map now.  I know there
3    were changes happening elsewhere, but from 8011 to the
4    next primary congressional map, 8017, further refinement
5    and adjustments made?

6         A.   Yes.

7         Q.   How, if at all, did the Senate's congressional
8    proposal influence the south Florida districts in 8011 and
9    8017?

10        A.   So, probably particularly with 8015 and 8017,
11   because those are pretty much identical maps with the
12   exception of the CD 5 in north Florida, if I'm remembering
13   correctly, and without seeing the maps I'd have to, you
14   know, double-check that.  But that was kind of toward the
15   beginning, because eventually that is the only map that
16   was really worked on by both chambers that we have to come
17   to an agreement like any other piece of legislation.  So
18   there has to be some sort of compromise between what we're
19   presenting and what the Senate is presenting to make the
20   map that both chambers can agree with.

21             So that was the first time at least from the
22   House's perspective that we tried to incorporate some of
23   the Senate's concepts into ours.

24        Q.   And with respect to south Florida, did 8015/17
25   largely draw from prior house work, like 8011?

Jason Poreda
July 17, 2025

Page 108

1      A.   I would have to look at them.

2      Q.   Let's look at them.  So this exhibit is

3  Exhibit 8.  This is 8017.  And the next exhibit is 8011.

4           MR. BARDOS:  And you say that 8 is 8017?

5           MR. WARREN:  Yeah.  Exhibit 8 is HB 7503,

6      which is Map 8017.

7           Could we go off the record for a second?

8           (Off the record briefly.)

9           (Exhibit No. 8 marked for identification.)

10          MR. WARREN:  The next exhibit, 9, is 8011.

11          (Exhibit No. 9 marked for identification.)

12          THE WITNESS:  8011.  Okay.

13  BY MR. WARREN:

14      Q.   And my question is comparing the south Florida

15  districts --

16      A.   Real quick.  Do you mind if I look at 8015, too,

17  since that's another one of the maps we're discussing?

18      Q.   I think that you said that they're identical in

19  south Florida, 15 and 17.

20      A.   They are.

21          MR. BARDOS:  I have 15 here.

22          MR. WARREN:  So I'll just be asking you

23      about south Florida.

24          THE WITNESS:  Okay.

25          MR. BARDOS:  Here's 15.

Jason Poreda
July 17, 2025

1          THE WITNESS:  Do you mind if I also look at

2      15, just so I can verify, because I said they're

3      identical, and that was my understanding, but

4      without being able to actually see it I'm using

5      only my previous memory from three years ago.

6          MR. WARREN:  I certainly do not mind.

7          THE WITNESS:  Okay.

8          MR. WARREN:  Let's mark that.

9          THE WITNESS:  You want to mark that?  Yeah.

10         MR. WARREN:  8015 is marked as Exhibit 10.

11         (Exhibit No. 10 marked for identification.)

12         THE WITNESS:  Sorry.  Thank you very much.

13         MR. WARREN:  Not at all.

14  BY MR. WARREN:

15      **Q.   Okay.  So the question is, between 8011 and**

16  **8015/17, looking at the south Florida districts, is it**

17  **fair to say that 0815/17 is based on 8011?**

18      A.   So --

19         MR. BARDOS:  Object to form.

20      A.   Okay.  So, yeah.  I mean, looking at 8011, this

21  is our combination of our workshop maps that we had

22  previously produced.  When we moved to 8015 and 17 there's

23  obviously a difference in north Florida, but we're

24  focusing on south Florida.  To me they do appear to be

25  identical, and Districts 27 and 28 were drawn primarily

Jason Poreda
July 17, 2025

Page 110

1  from the Senate's congressional -- I don't remember which

2  map it was, but during their process they had that 27

3  district that was a little bit more round.  It's very

4  similar population-wise to the district that we drew, but

5  it was more round in configuration.

6           And same with District 28.  It was a very

7  similar configuration, maybe slight differences, but fit

8  together.  And as a way of, again, we're having to -- like

9  other pieces of legislation join together with a concept

10  that can work for both, those two districts were drawn

11  pretty much almost identically from -- if not identically

12  from what the Senate had produced.

13           And then other tweaks were made to accommodate

14  that, and then I believe -- so we kind of -- in 8011 you

15  can see our District 26 does not include Hendry County.  I

16  would need to -- from my recollection, I believe the

17  Senate's districts did incorporate Hendry County so we

18  essentially took our district and tried to incorporate

19  Hendry County to accommodate the senate map and coming up

20  with a compromise.

21           But otherwise I think the District 20 from the

22  House in 2011 is kind of moved over and some of the other

23  districts were made with slight adjustments along those

24  lines.  And it looks like, yeah, you could see a slight

25  adjustment obviously from 18 from the Hendry County

Jason Poreda
July 17, 2025

Page 111

1  portion and then some of the others, but the county

2  boundary of the Indian River, Martin County line and the

3  District 21 that goes to Okeechobee, and then down on the

4  west side of Palm Beach and Broward County, that's the

5  same and throughout the maps.  And that's a concept that

6  was drawn from the house maps, because I believe that the

7  Senate had a little bit of Indian River County that was

8  broken, so that was a concept.  And again, in the

9  compromise of trying to merge all these things together,

10  and then, you know, 21, 22, 23, 24, 25, that was all kind

11  of incorporated together.

12          But that was kind of the merging of the very

13  similar -- I mean, you look at the maps and you'd be,

14  like, oh, there isn't that much different, but when you're

15  even -- when you're changing a little bit it can be more

16  difficult, so we were trying to put those all together.

17  BY MR. WARREN:

18      **Q.   Okay.  The general configuration of the**

19  **districts from St. Lucie south to the Keys generally**

20  **similar from 8011 to 8015/17?**

21      A.   Yeah.  I think you could actually -- so the

22  county line, the southern Indian River county line, the

23  Osceola southern line, and the Polk southern line, really

24  all of the districts are really -- Districts 18, 21, and

25  everything south should be identical.  Everything north of

Jason Poreda
July 17, 2025

Page 112

1   that might have slight alterations, because even when

2   you're changing something up in Jacksonville in a

3   congressional map because you're dealing with exact

4   population equality, it'll have a filter effect, so there

5   might be small changes.  But I think that county line

6   right there, the kind of south Polk and south Indian River

7   and Osceola line south, I believe, is identical.

8           MR. WARREN:  Now, very briefly, I'm handing

9       you Exhibit 11, which is 8060.  This is the map

10      that the Senate passed off the senate floor in

11      January 2022.

12          THE WITNESS:  Okay.

13          (Exhibit No. 11 marked for identification.)

14  BY MR. WARREN:

15      **Q.   A portion of it for south Florida.  And I see**

16  **what you reference there with the piece of Indian River**

17  **that's included in what the Senate numbered District 18.**

18      A.   Yep.

19      **Q.   And then you see the districts further south.  I**

20  **think I see what you referenced with District 27 in Dade**

21  **County --**

22      A.   Uh-huh.

23      **Q.   -- being more round and that boundary being**

24  **adopted into 8015/17.**

25      A.   Yes.

Jason Poreda
July 17, 2025

Page 113

1          Q.   So, same question.  Generally, the general

2    configuration of the districts from St. Lucie County south

3    through the Keys, 8060, 8011, 8015/17, are those

4    configurations generally similar?

5               MR. BARDOS:  Object to form.

6          A.   I mean, no, in that the 8016 has Hendry County

7    in their District 25.  In our District 26 in 8011 we don't

8    have that, so I would not characterize that as

9    substantially similar.  That's a whole new county.  I

10   think it's like 26,000 people different.  So, yeah,

11   they're more or less the same, but that's a big difference

12   in map drawer world.  Like, the District 27, I mean, they

13   obviously have a different configuration, but I believe

14   there's probably like 90 or over 90 percent similar

15   population in those two districts.  So even though they

16   look different, that's substantially the same.

17              I don't remember exactly how all the other kind

18   of pieces come together, but, yeah, it's the merging of

19   those two concepts into a single idea.  So, yeah, it's

20   almost like a different idea, but we kind of started with

21   these two as a base and then birthed this down here.

22              So I guess they're similar in that way, but

23   these would be in my opinion substantially different than

24   either of these, because these are the combinations of

25   these, so you're kind of working through a progression.

Jason Poreda
July 17, 2025

Page 114

1            MR. BARDOS:  For the record, these is --

2      A.   I'm sorry.  My apologies, because now I'm

3   pointing.  I'm getting into trouble.

4            So the combination of 8011 and the combination

5   of 8016 together came up with the concepts for 8017 and

6   8015.  So I wouldn't necessarily -- even though there are

7   some similarities, I would not say that 8011 and 8060 are

8   substantially similar to 8015 and 8017, because 8017 and

9   8015 are the combination of both of those other two maps.

10  So it's a whole new idea, even though there are, of

11  course, some similarities.

12  BY MR. WARREN:

13     Q.   Got it.  That makes sense.  Thank you.

14          Now, after the regular 2022 session, the next

15  congressional plan is Plan 109, which became the enacted

16  plan, right?

17     A.   (Nodding head.)

18     Q.   I think the parties have already stipulated to

19  this, but the configuration of south Florida in Plan

20  109 -- and by south Florida I mean St. Lucie County down

21  through the Keys.  Let's exclude the west coast for now.

22     A.   Okay.

23     Q.   Is identical.  Is that your understanding?

24     A.   I don't know if that's the case.

25     Q.   Okay.  Do you know whether the south Florida

Jason Poreda
July 17, 2025

Page 115

1    configuration in Plan 109 came from the Legislature as an

2    idea?

3            MR. BARDOS:  Object to form.

4        A.   I don't know.  You can read the transcript when

5    Alex Kelly presented that map to the house and senate

6    committees, but I didn't -- none of the legislative map

7    drawers drew that map, so I can't substantially say where

8    an idea from that map came from.

9    BY MR. WARREN:

10       Q.   Okay.  Well, let's compare Plan 8017 or 8015

11   with the enacted congressional plan.

12       A.   Sure.

13       Q.   Comparing 8017 to Plan 109, would you say that

14   the south Florida districts are similar or identical?

15       A.   When you say south Florida districts, can you

16   give me specific numbers?

17       Q.   Certainly.  21, 22, 23, 25, 24, 27, 28, and 20.

18            So, St. Lucie --

19       A.   So everything except for 26; is that what you're

20   saying?

21       Q.   Everything except for 26 on the east coast from

22   St Lucie County down through Dade and the Keys.

23       A.   They look substantially similar.  Now, I don't

24   know if there was -- you know, in map drawer world if one

25   census bloc gets moved, different map.  And without being

Jason Poreda
July 17, 2025

Page 116

1  able to see all that, I don't know exactly, but they do

2  look substantially similar.  I'll stipulate to that.

3      Q.  Okay.  And I'm not trying to nail you down on

4  anything in particular.  I just think it'll be helpful as

5  we start talking about what committee staff and members

6  are saying about the earlier plans in these districts,

7  that even though the plan number changed, maybe there were

8  some slight tweaks that we have an understanding that

9  we're not talking about completely different districts, if

10  that makes sense.

11      A.  I understand.

12      Q.  Great.  Okay.

13          MR. WARREN:  Could we go off the record for

14  one second?

15          THE STENOGRAPHER:  Yes, sir.

16          (Off the record briefly.)

17  BY MR. WARREN:

18      Q.  Now, I'd like to talk more in-depth about the

19  Tier 1 criteria relating to racial and language

20  minorities.  And just to remind us, I'm talking about in

21  the Fair Districts Amendments, Tier 1, the provision that,

22  quote, districts shall not be drawn with the intent or

23  result of denying or abridging the equal opportunity of

24  racial or language minorities to participate in the

25  political process, close quote, which I refer to as the

Jason Poreda
July 17, 2025

Page 117

1    vote dilution or Section 2 type provision.

2            And then also the provision that districts shall

3    not be drawn, quote, to diminish their ability to elect

4    representatives of their choice, end quote, which we refer

5    to as the diminishment or retrogression or Section 5 type

6    requirement.

7    A.    Okay.

8    Q.    Now, back to the November 2nd committee meeting

9    transcript, which this is when of course Mr. Bardos

10   presented on redistricting law.  If you go to the orange

11   tab --

12           MR. BARDOS:  That's Exhibit 5?

13           MR. WARREN:  Yes.

14   BY MR. WARREN:

15   Q.    Page 6 at line 11, Mr. Bardos explained the

16   three Gingles preconditions.  He says, quote, There are

17   three prerequisites, as Gingles calls them, or

18   preconditions, to the application of Section 2, close

19   quote.

20           And then further down at line 21 he says, quote,

21   Before we even get into that analysis, the three

22   preconditions must be satisfied.  Those preconditions are

23   more quantifiable, more objective than the ultimate

24   totality of the circumstances analysis.  The first

25   condition is that the minority population, close quote.

Jason Poreda
July 17, 2025

Page 118

```
 1                   I'll skip to the next page, page 7, where
 2      starting at Line 15 he says, quote, Criteria two and three
 3      relate to this concept of racially polarized voting.
 4      Number two is the minority population must be politically
 5      cohesive.  In other words, a minority population has a
 6      strong preference for one particular candidate over
 7      another.  They are not split between two candidates in a
 8      relatively even way.  If a minority population is
 9      cohesive, if it backs a single candidate consistently, and
10      then number three, the majority population usually votes
11      as a bloc to defeat the minority population's preferred
12      candidate, then we have racially polarized voting where
13      the minority population's preferred candidate is defeated
14      in most elections by the preference of the majority of the
15      electorate.  In that case, Section 2 might apply to
16      require that the Legislature to create a district in which
17      minority voters constitute a majority and are therefore
18      able to elect the candidates of their choice, close quote.
19                   Did I read that right?
20      A.   Yes.
21      Q.   To your knowledge, did the House examine whether
22      the second and third Gingles preconditions were present
23      for any minority groups in Florida?
24      A.   Yes.
25      Q.   How did the House examine that?
```

Jason Poreda
July 17, 2025

Page 119

1      A.   That is why through outside counsel we

2  contracted the services of Dr. Alford.  What is his first

3  name again, John?

4      Q.   John.

5      A.   John Alford from Rice University.

6      Q.   **And is it your understanding that Dr. Alford**

7  **examined whether the second and third Gingles**

8  **preconditions were present with respect to Hispanic voters**

9  **in south Florida?**

10      A.   It's my understanding that he did that for both

11  Hispanic and Black voters throughout the state.

12      Q.   **Do you know what his conclusions were?**

13      A.   He presented reports to us and concluded that we

14  would present him with the maps that we drew, and he

15  essentially confirmed that the districts we drew would

16  satisfy the conditions to my understanding of the reports.

17      Q.   **So what was the output from Dr. Alford that you**

18  **saw?**

19      A.   Through Andy Bardos we would receive kind of

20  analytical reports that he would produce that we would

21  then get to review.

22      Q.   **And what did those reports include?**

23      A.   His data analysis.

24      Q.   **Of draft maps?**

25      A.   Yes.

Jason Poreda
July 17, 2025

Page 120

1      Q.   With conclusions about whether they performed

2    for minority voters in protected districts?

3      A.   It was a little bit more complicated than that,

4    because, again, those two preconditions are pretty

5    specific with racially polarized voting or with cohesion

6    and they were more -- the analysis was more centered on

7    that, rather than the basic functional analysis that we

8    conduct as staff.

9      Q.   Did he produce any output before he received

10   draft maps from you?

11     A.   I don't remember.

12     Q.   Who else was any of the output that Dr. Alford

13   made shared with?

14     A.   I know that it was shared with me, with Leda

15   Kelly and Kyle Langan.  I don't know who else it was

16   shared with.

17     Q.   So Tier 1 protects the ability of certain racial

18   or language minority voters in their ability to elect

19   preferred candidates, right?

20     A.   Yes.

21     Q.   And for the diminishment standard, ability to

22   elect is gauged in reference to ability in the benchmark

23   district, right?

24     A.   I don't think so.

25          MR. BARDOS:  Are we talking about

Jason Poreda
July 17, 2025

Page 121

1          diminishment now?

2                MR. WARREN:  Yes.

3                THE WITNESS:  Well, diminishment in the

4          current district when in comparison to its

5          previous benchmark counterpart.

6    BY MR. WARREN:

7          Q.   Got it.  How are the districts that are

8    protected -- and do you understand what I mean when I say

9    protected district?

10         A.   I mean, if you could be more specific, because

11   that word -- like, there's a lot of different terms that

12   get used synonymously in redistricting and sometimes mean

13   a little bit different from me to you or whatever.  So if

14   you could be more specific that would be helpful.

15         Q.   Certainly.  So when I refer to a protected

16   district or a Tier 1 protected district, I'm referring to

17   a district in which the House concluded that racial or

18   language minorities' ability to elect could not be

19   diminished or diluted under the Tier 1 requirements.

20         A.   Okay.

21         Q.   Is that a similar terminology that the house

22   staff and members used during the process?

23         A.   I believe more or less, yes.

24                MR. BARDOS:  So just to clarify, diminished

25         or diluted?  So you're talking about either

Jason Poreda
July 17, 2025

Page 122

1   standard?

2              MR. WARREN:  Correct.

3              MR. BARDOS:  Okay.

4              MR. WARREN:  I'm happy to use the

5        terminology that everyone agrees on, I just want

6        to make sure we're all talking about the same

7        thing.

8   BY MR. WARREN:

9        Q.   So how were Tier 1 protected districts

10   identified in the benchmark plan?

11              MR. BARDOS:  Object to form.

12   BY MR. WARREN:

13        Q.   Do you understand my question?

14        A.   So -- I mean, so with the existing congressional

15   map that would have been enacted in 2016, 2015, 2016, we

16   then took the current new data, once we got it, and

17   overlaid the old map with the new data, right?  Including

18   all of our further electoral information that we

19   disaggregated into all the census blocs to do essentially

20   a functional analysis on all of those districts that had

21   been previously protected, according to the courts, in the

22   previous map.  So that would -- like, that would include

23   CD 5, for example, or any other district along those

24   lines.

25              And we would then use that as a base to

Jason Poreda
July 17, 2025

Page 123

1    determine if any of those districts may -- may still meet

2    those requirements with the new data, and if that district

3    essentially may be needed to be duplicated in a new map,

4    or maybe not, depending on how the demographic data has

5    changed over the ten years with the new census data.  And

6    then we would go into the -- with the blank map and, you

7    know, try to essentially recreate those districts where we

8    could, hopefully making them more compact than they

9    previously were in trying to balance all the standards

10   better.

11          We also, in a blank map using the heat map, we

12   actually looked for potential opportunities where either

13   those districts could change or where a new district might

14   suddenly pop up, based on how the population shifts had

15   changed on the new map.

16          So we weren't necessarily locked into -- just

17   because there was a benchmark district, we've got to carry

18   that over into the new map.  But certainly, as an example,

19   CD 20, that being, you know, the more serious section to

20   vote dilution part of that, that was certainly carried

21   over and it became pretty clear that that district was

22   going to have to be recreated in some way.  But we tried

23   to do different orientations with that.  And that was

24   pretty much how we went through that process.

25          Does that answer your question?

Jason Poreda
July 17, 2025

Page 124

1    Q.   It does.  I have a follow-up.  You said at the

2    beginning that the previous protected districts that had

3    been identified from the prior cycle --

4    A.   Yeah.

5    Q.   -- those were, let's call it, your list of the

6    Tier 1 protected districts from the benchmark plans; is

7    that accurate?

8         MR. BARDOS:  Object to form.

9    A.   I mean, they were certainly -- because we knew

10   what had been drawn protected previously, those were

11   certainly districts that we were going to look at

12   carefully this time.  That did not necessarily mean that

13   they were going to make the list again.  But we wanted to

14   do our due diligence and look at all of those districts,

15   and really less the districts and more the regions that

16   had those data district or districts to determine based on

17   how all the population shifts had changed.

18        This is where the heat maps came into a lot of

19   account because we could identify potentially new areas

20   where districts may have to shift to, or areas where

21   perhaps the Black or Hispanic population may have

22   dispersed themselves, so it became a little harder to

23   redraw.

24        Tampa is a good example of that, where they --

25   the Black population in Tampa had become a little bit

Jason Poreda
July 17, 2025

Page 125

1   more -- less concentrated, either by other populations

2   moving into those areas or Black populations moving to

3   other areas that had been traditionally more White or

4   Hispanic or something else.  Things along those lines.

5            There was an area in Broward County that looked

6   like it had an increased Black population that, you know,

7   there might be another opportunity to kind of do something

8   different there, so --

9   BY MR. WARREN:

10        Q.   Okay.  When you said that, you know, we looked

11   at the case law from the last decade and identified the

12   districts, who is the we?  Where is that information

13   coming from?

14        A.   Specifically, the redistricting committee staff

15   close-knit, so I often refer to us as a collective we.  So

16   that would be -- primarily be Leda Kelly, myself, and Kyle

17   Langan, but that could also include Sam Wagner and Karen

18   Dearden.

19        Q.   Were counsel involved in those discussions?

20        A.   Occasionally.

21        Q.   Okay.  Back to the November 2nd transcript,

22   Exhibit 5.  Further down at the red tab on page 11,

23   Mr. Bardos discusses potential conflicts between Tier 1

24   and Tier 2.  And at line 7 he says, quote, The standards

25   in Tier 1 prevail over those in Tier 2 if there is a

Jason Poreda
July 17, 2025

Page 126

1    conflict.  One example of that might be in order to

2    maintain a district in which minority voters have the

3    ability to elect, it might be a district that is

4    noncompact.  It might be in the benchmark plan.  Tier 2,

5    on the other hand, requires districts to be compact.  In

6    order to avoid diminishment, if it's necessary, that

7    district can be redrawn, even if it's not compact, in

8    order to avoid diminishing the ability of minority voters

9    to elect candidates of their choice.  That's one example

10   in which Tier 1 standards might conflict with Tier 2

11   standards and the Tier 1 standards will prevail in that

12   situation, close quote.

13           Did I get that right?

14       A.   You read that accurately.

15       Q.   Are there any instances in drawing the enacted

16   plans where there was a conflict between Tier 1 and Tier

17   2?

18       A.   Yes.

19       Q.   What are those?

20       A.   Which map are you referring to specifically?

21       Q.   Let's talk about 8013 and 109, and within 109

22   the south Florida districts that the Legislature drew.

23       A.   Can I talk about one map and then the other map,

24   rather than the collective thing?

25       Q.   Certainly.

Jason Poreda
July 17, 2025

1    A.   I mean, I don't know if I could give you a

2    comprehensive list, but I can point to some examples; is

3    that sufficient?

4         Q.   Sure.

5         A.   Okay.  So an example would be District 88.  That

6    is a district that is -- well, I would say that is as

7    compact as that district can be, given the Tier 1

8    circumstances with that district.  But that's an example

9    of where we would look at the benchmark districts, we

10   realized we would need to recreate it for Tier 1 reasons,

11   but we tried to make it more compact than its predecessor.

12        That district previously went, like, basically

13   down the highway, like almost to the Broward County

14   border.  We came up -- well, we tried to do that district

15   in a different, more compact way.  Now, looking at the

16   district in isolation, you would say it's not compact.  I

17   would say, looking at the full story of the district, that

18   district is as compact as feasible based on Tier 1.

19        District 117 is another good example of that,

20   similar to that.  Really even District 108 and 109 and

21   107, but I think those are much more compact.

22        The Jacksonville districts.  We were able to

23   create the Black protected districts which are 13 and 14,

24   and I would say in an extremely compact way now,

25   especially compared to their predecessors.

Jason Poreda
July 17, 2025

Page 128

1           District 8, that's all of Gadsden County and

2      then comes into Leon County.

3           District 62, that connects Tampa to St. Pete,

4      would be another example of that type of concept.

5           And there might be some examples -- like you

6      could -- I actually think we did the Orlando area, there

7      were some Black protected districts and then other

8      Hispanic districts there.  I think we did that very well,

9      but there's probably some compromise with Tier 2 in there

10     that might have been a little bit more compact, but I

11     think that's very well done.  But I'm obviously biased.

12          The districts in Broward County, 98 -- 97, 98,

13     and 99, there might be some compromises to Tier 2 with

14     those, and there's probably other examples throughout the

15     map as well, including the south Florida districts, where

16     we drew them as compact as possible, but there might be

17     slight deviations with all of that when and if necessary.

18     Q.   So while we still have the house map mostly in

19     front of us, I want to ask specifically about Dade County

20     in the house map, and this same question along the lines

21     of how Mr. Bardos explained that there might be places

22     where Tier 1 standards conflict with Tier 2 standards.  Is

23     that the case to your eye in the challenged house

24     districts in this case, which, as you may know, but which

25     I will remind you are 112, 113, 114, 115, 116, 118, and

Jason Poreda
July 17, 2025

Page 129

1    119.

2         A.   I would -- I mean, really I would say maybe very

3    slightly, but I think that all of the challenged districts

4    are as compact as feasible in that area considering the

5    other districts, 117, 108, 109, and the other geography

6    that exists down there.  I think they're very compact,

7    personally.

8         Q.   And you said very slightly there might be a

9    conflict?

10        A.   Yes.

11        Q.   Can you name some examples of those very slight

12   ways in which there's a conflict?

13        A.   So -- I mean, that's a very difficult area to

14   draw.  I would say there -- I think it's very compact, but

15   the area of 115 that follows -- I forget what road that is

16   that -- it's a very rectangular shape.  It actually shares

17   a border with 116 and creates a kind of T boundary with

18   two major roads between 114, 16, and 15, which I think is

19   very -- you know, following geographic roads or whatever.

20   But that might be a little slight extension.  Perhaps the

21   orientation of 118 and 19 to a degree, but those are both

22   basically rectangular regular shapes and very compact.

23             So, yeah, there's a -- we're keeping -- so,

24   like, 114 is, as an example, keeps Coral Gables entirely

25   whole along with two other cities, West and South Miami.

Jason Poreda
July 17, 2025

Page 130

1   113 is essentially entirely within the City of Miami,

2   where we couldn't keep the City of Miami whole, but we

3   were able to keep a district almost entirely within the

4   city.  District 106 is almost entirely made up of

5   incorporated cities along the coast and doesn't cross the

6   county line.  108, 109, and 107 are protected Black

7   districts, but they keep all the cities whole.  You kind

8   of see the tail on 107, that's actually the municipal

9   boundary of --

10          Q.   North Miami Beach?

11          A.   -- North Miami Beach or Miami Shores, I forget

12   which one.  And then even all the other districts, like,

13   112 has that little divot out of it.  I think that's

14   Melody, and then the other part is -- this part is the

15   Hialeah city line.  So even if the city wasn't whole, we

16   tried to use their municipal lines where we could, along

17   with other major -- major roadways in the area.  For

18   example, the top of 114 and into 116, that's the Dolphin

19   Expressway, I believe, right south of the airport.  And

20   that's a very recognizable and well-used throughway, so we

21   tried to keep that as kind of the cap for all of those

22   districts, while keeping all the Tier 1 considerations in

23   mind.  And the City of Sweetwater is wholly within 116.

24   That's why it has the little hat on there.

25          But otherwise, we tried to keep all of those

Jason Poreda
July 17, 2025

Page 131

1  shapes.  And then 115, the bottom part of it has three

2  cities entirely within it, Cutler Bay, Palmetto Bay, and

3  Pinecrest, I believe, kind of all on top of each other.

4  Kind of in between the, you know, more irregularly shaped

5  117, the protected Black district there.

6          So I think we did a tremendous job given the

7  circumstance.  And again, not just me, but Kyle and the

8  team, of coming up with concepts in that area to keep all

9  of those districts following and respecting political and

10  geographical boundaries where we can, keeping all the

11  cities whole except for, I think, the City of Miami, and

12  keeping all the shapes very regular for the most part.

13      **Q.   Okay.  So I think -- that's very helpful.  I**

14  **just want to recap your answers to the original question,**

15  **which was, are there any instances of conflict between**

16  **Tier 1 and Tier 2 in the challenged districts, just so**

17  **that I'm clear on what you said.**

18      A.   Yeah.

19      **Q.   And please correct me if I'm wrong.  You**

20  **mentioned in answer to that the northern extension of**

21  **District 115, potentially, right?**

22      A.   Potentially, but that's also done because we're

23  keeping those two cities whole in 114.  So there's always

24  going to be some awkward areas we're drawing where you're

25  going to have to make them as compact as you can,

Jason Poreda
July 17, 2025

Page 132

1   especially in a densely populated area such as this.  So

2   that might be something that I would identify, but I think

3   we did it in as compact a way as possible.

4       Q.   So you might identify some element of the shape

5   of 115 as exhibiting that type of conflict?

6       A.   Yes.

7       Q.   And neighboring -- we discussed 114; you said it

8   has that northern piece that goes around the top of 115.

9   Would the shape of 114 be a similar manifestation of a

10  potential conflict?

11      A.   No.

12      Q.   So your -- so when you reference the northern

13  piece of 114 going around the top of 115, that's not an

14  example of a potential conflict?

15      A.   Not in my opinion, no.

16      Q.   Okay.  And then I think the third thing you

17  mentioned was, in 118 and 119, the fact that they are side

18  by side as a potential conflict?

19      A.   No.  If I said that, I may have misspoke.  But

20  that's -- I mean, they're both basically rectangles.  And

21  I think that they're both incredibly compact shapes.  I

22  think 117 interacting with that area probably has a bigger

23  impact than anything with those other two districts.

24      Q.   So even slightly, you see no conflict between

25  Tier 1 and Tier 2 in Districts 118 and 119?

Jason Poreda
July 17, 2025

Page 133

1      A.    No.

2      Q.    Okay.  Now, back to the November 2nd transcript,

3   page 20, which is the blue tab, Mr. Bardos discusses the

4   functional analysis.  And at line 10 he says, quote, This

5   functional analysis is an assessment of elections data to

6   determine whether minorities are likely to be able to

7   elect the candidates of their choice in the districts that

8   the Legislature has drawn or the districts in the

9   benchmark plan.  It consists of election results.  It

10  consists of turnout data.  It consists of registration

11  data.  All of that is viewed in combination with the

12  voting age population.  All of that informs the primary

13  analysis that the Florida Supreme Court has required the

14  Legislature to conduct in drawing minority districts, and

15  that is, one, will minority voters be able to control the

16  primary election and nominate the candidates from the

17  primary that they prefer, two, will minority voters be

18  able to elect the candidates of their choice in the

19  general election?  So primary election, general election.

20  It requires us to look at the elections data from past

21  elections, registration data, and turnout data to

22  determine whether minority voters have sufficient numbers,

23  sufficient turnouts, sufficient registration in order to

24  control the primary and then ultimately the general

25  election, close quote.

Jason Poreda
July 17, 2025

1           Did I read that accurately?

2      A.   You did.

3      Q.   Is this your understanding of a functional

4  analysis?

5      A.   Yes.

6      Q.   Does this explanation capture what committee

7  staff did in conducting functional analyses?

8      A.   Yes.

9      Q.   Mr. Bardos references minority voters' candidate

10  of choice.  What does that term mean to you?

11      A.   It means the candidate that is preferred by the

12  minority community.

13      Q.   Okay.  In a given district in a draft map, how

14  did the House determine who that candidate was, who the

15  minority voters' candidate of choice was?

16      A.   Well, we looked at all of the previous election

17  results, specifically the statewide election results from

18  2012 through 2020.

19      Q.   And --

20      A.   And what?

21      Q.   And then did what with the statewide election

22  results?

23      A.   Well, we had all of those statewide election

24  results overlaid with every district in the map, and you

25  could then look at those statewide election results

Jason Poreda
July 17, 2025

Page 135

1   through the decade basically and determine that that

2   district's electoral performance throughout the decade and

3   who was -- who that district voted for, et cetera, et

4   cetera, et cetera.

5           And we also looked obviously in conjunction with

6   all of the other demographic data.  So the Hispanic

7   breakdown, Black breakdown, whatever district we were

8   looking at, and how -- and then all of the electoral

9   registration data, and how the electorate actually looked

10  in those for each election and each primary election as it

11  went through.

12      Q.   Okay.  I think a little later we may walk

13  through, just so I get a better --

14      A.   Fair enough.

15      Q.   But that's very helpful.  In the next few

16  minutes before lunch, I'd like to ask you some questions

17  about how the House went about drawing Tier 1 districts in

18  a little more granular level.

19      A.   Okay.

20           MR. WARREN:  Could I have -- this next

21      exhibit, Exhibit 12, is the transcript of the

22      December 2nd congressional redistricting

23      subcommittee.

24           (Exhibit No. 12 marked for identification.)

25

Jason Poreda
July 17, 2025

Page 136

1  BY MR. WARREN:

2       Q.   If you could turn to the blue tab, page 25, this

3  is Ms. Kelly discussing drawing Tier 1 districts.  At

4  line 9 she answers a question by saying, quote, It's a

5  very good question, and the reality is there's no one

6  right way to start.  I think a good starting point and one

7  of the first things we did look at is how the population

8  has shifted throughout the state.  That is kind of the

9  foundation for why we are required to redistrict is to

10  make sure we understand people move into Florida, and

11  unfortunately they don't just move to one city.  They

12  disperse amongst the state and obviously the population

13  shifts within the state as well.  I think that's one good

14  place and good consideration for everyone to keep in mind.

15  From there we obviously have federal and state legal

16  requirements to ensure that minority communities where

17  they're protected have the ability to elect

18  representatives of their district and then from there you

19  just start to build them out.

20            Did I read that correctly?

21       A.   You did.

22       Q.   Is this an accurate statement of the committee's

23  map-drawing process?

24       A.   I believe that it is.

25       Q.   This reflects your map-making process?

Jason Poreda
July 17, 2025

Page 137

1     A.    The process that the House, which Ms. Kelly was

2     part of, yes.

3     Q.    And let's turn to page 29, which is the next

4     sheet.

5           Mrs. Kelly says, in response to another question

6     at line 6, quote, Obviously, we have a legal requirement

7     under state and federal law to make sure that those groups

8     have the ability to elect.  So we look at our benchmark

9     map and understand where that may be a starting point.

10    But I would say it does evolve as you make sure that you

11    move throughout the region, and you make sure that as you

12    go where there may have been population shifts you've

13    accounted for that.  And as I mentioned earlier, you kind

14    of adjust as you build out the entirety of the map, close

15    quote.

16          Did I read that correctly?

17    A.    You did.

18    Q.    And is that an accurate statement of the

19    committee's map-drawing process?

20    A.    Yes, I believe it is.

21          MR. WARREN:  The next exhibit, Exhibit 13,

22          is the transcript of the legislative

23          redistricting subcommittee from the following

24          day, December 3rd, 2021.

25          (Exhibit No. 13 marked for identification.)

Jason Poreda
July 17, 2025

Page 138

1   BY MR. WARREN:

2       Q.   And I will ask you about page 44, which is the

3   blue tab.  This is Mrs. Kelly again, and she is answering

4   a question at line 11, quote, Really throughout the map,

5   obviously, our Tier 1 considerations take priority as we

6   know over Tier 2.  So once we have been able to establish

7   those, as far as being able to supply workshop options

8   that either keep cities or counties whole, I think you saw

9   throughout we tried to demonstrate different areas of the

10  state where those different options are possible, close

11  quote.

12           Did I read that correctly?

13      A.   You did.

14      Q.   Is that an accurate statement of the committee's

15  map-drawing process?

16      A.   Yes.

17      Q.   If you turn to the yellow tab on this same

18  transcript, page 53, this is Director Kelly again.

19  Starting at line 2 at the end she says, I think, even

20  looking in south Florida, whether it's Broward or

21  Miami-Dade, whenever you look at the population, you are

22  able to see where those Black populations are throughout

23  those counties.  And so we worked to ensure that they were

24  protected within their respective minority district, and

25  it obviously performed as required to under Tier 1, close

Jason Poreda
July 17, 2025

Page 139

1    quote.

2            Did I read that correctly?

3        A.   You did.

4        Q.   Is that an accurate statement of the committee's

5    map-drawing process?

6        A.   Yes.

7        Q.   And here Director Kelly is referring

8    specifically to drawing Black protected districts, right?

9        A.   I think, because it's Representative Chambliss

10   who's asking, I believe that's specifically in reference

11   to District 117.  But, yes, that would be applied to the

12   other Black districts as well.

13       Q.   Would that same -- would Director Kelly's same

14   explanation of drawing Tier 1 districts apply to drawing

15   Hispanic protected districts?

16       A.   Yes.

17            MR. WARREN:  Thank you.  We can put that

18       away, and I think it is time for lunch.

19            (Lunch recess taken from 1:01 p.m. to

20       2:13 p.m.)

21   BY MR. WARREN:

22       Q.   Okay.  Mr. Poreda, I'd like to ask you some more

23   specific questions about the challenged districts, which

24   we've reviewed the ones that are challenged in the house

25   plan, and in the congressional plan is District 26.

Jason Poreda
July 17, 2025

1              Do you -- did the committee understand the

2    challenged districts to be protected under Section 2 of

3    the Voting Rights Act?

4              MR. BARDOS:  Object to form.

5         A.   I believe so.

6    BY MR. WARREN:

7         Q.   And what about the Tier 1 minority protection

8    provisions?

9         A.   I believe we did, yes.

10        Q.   And would that be under the dilution Section 2

11   type requirement of Tier 1?

12        A.   As far as the state constitutional standard,

13   Tier 1, I don't think we really made a distinguishing -- a

14   large distinguishing factor between that, because it was

15   all part of Tier 1, so we put them in the same bucket, as

16   far as that concern.

17        Q.   So as far as the challenged districts are

18   concerned, the house committee considered them Tier 1

19   protected under the minority protection provision?

20             MR. BARDOS:  Object to form.

21        A.   Yes.

22   BY MR. WARREN:

23        Q.   How, if at all, did that determination influence

24   the mapmaking of the challenged districts?

25        A.   Because they all fit that criteria under Tier 1,

Jason Poreda
July 17, 2025

Page 141

1    all of those districts would require a functional analysis

2    that we would conduct.

3        Q.   Would any -- did the determination that those

4    districts -- we're now talking specifically about just the

5    challenged districts.

6        A.   Are we just talking about the house districts?

7        Q.   Both.  CD 26, the versions of it in the plans

8    the House developed.

9        A.   Okay.

10       Q.   And the specific seven challenged house

11   districts.  Apart from having to conduct a functional

12   analysis, did the determination that those districts were

13   Tier 1 protected influence the drawing of those districts?

14       A.   No.

15       Q.   You mentioned earlier that before engaging in

16   the mapmaking itself committee staff looked to the

17   benchmark plans and the court decisions from last decade

18   to identify where in the state there might be Tier 1

19   protected districts.  Is that accurate?

20       A.   Yes.

21       Q.   So the fact that the challenged districts were

22   Tier 1 protected, that knowledge maybe started with that

23   determination before the mapmaking process began?

24            MR. BARDOS:  Object to form.

25       A.   I suppose so, yes.

Jason Poreda
July 17, 2025

Page 142

1    BY MR. WARREN:

2        Q.   **Any way in which that's not quite right?**

3        A.   Well, we started with a blank map, as I

4    mentioned before, so even knowing that, the shapes of the

5    previous district did not really come into play in how we

6    were trying to draw those districts.  And in particular in

7    south Florida with such a high Hispanic population, we

8    didn't really have to look very carefully at the Hispanic

9    population breakdown or HVAP in order to draw majority

10   minority Hispanic districts.

11           So we were trying to draw good Tier 2 compliant

12   districts and later kind of went back to look at the

13   functional analysis based on Tier 1.

14       Q.   **Okay.  You had discussed earlier when you did**

15   **that before the mapmaking review of where there might be**

16   **Tier 1 protected districts in the state, you identified**

17   **regions of the state where there might be a certain number**

18   **of protected districts in the benchmark; is that accurate?**

19       A.   Yes.

20       Q.   **And so with respect to Dade County, before you**

21   **started drawing maps, the committee staff had knowledge**

22   **that X number of Black protected districts were in the**

23   **benchmark in Dade County, Y number of Hispanic protected**

24   **districts were in the benchmark in Dade County?**

25       A.   From the bench -- yes, we determined that number

Jason Poreda
July 17, 2025

Page 143

1    on the benchmark.  That does not necessarily mean that it

2    would exactly translate over to the new map once we

3    started drawing, but that was certainly kind of a baseline

4    where we started from.

5         Q.   And -- okay.

6         A.   And I should reiterate that that was the old map

7    using the new data.

8         Q.   Right.  Thank you.

9              As each draft was developed by committee staff,

10   staff performed a functional analysis on each of the

11   Tier 1 protected districts in each draft?

12        A.   No.

13        Q.   Some of the time?

14        A.   Yes.

15        Q.   When would staff not perform a functional

16   analysis on a new draft?

17        A.   Well, what do you mean by draft?

18        Q.   Let's -- good question.  Let's go with the

19   workshop maps, the ones that were published to the portal.

20        A.   Okay.  So when you say draft, you mean the

21   publicly produced maps that we -- the maps we were

22   preparing to be publicly produced.

23        Q.   Yes.

24        A.   Okay.  So, revising my answer, any map that we

25   were going to produce to the public we would conduct a

Jason Poreda
July 17, 2025

Page 144

1    full functional analysis on every protected district.

2         Q.   Okay.  Thank you.  And I think you've explained

3    this, but just to clarify, you referenced starting with a

4    blank map at the beginning of the process, right?

5         A.   Yes.

6         Q.   And you discussed the awareness of the benchmark

7    plans and the number of Tier 1 districts in different

8    regions of the state from the benchmark plans, right?

9         A.   Correct.

10        Q.   But the fact that there might be a particularly

11   shaped Tier 1 district in a benchmark plan in a particular

12   portion or portions of counties did not translate into

13   drawing on the blank map in the 2020 cycle; is that

14   accurate?

15             MR. BARDOS:  Object to form.

16        A.   Are you suggesting that we -- we did not try to

17   mimic previous districts I guess is the point, almost to

18   the contrary that where we had a -- what we identified as

19   a protected district in the benchmark map, and in the new

20   map as we were drawing it was determined that we had to

21   essentially recreate that, we made every effort possible,

22   I made every effort possible to make that district more

23   compact, so changed the shape of that district as much as

24   I feasibly could to better align it with Tier 2, with the

25   new demographic data available to us.

Jason Poreda
July 17, 2025

Page 145

1   BY MR. WARREN:

2       Q.   So that makes sense with respect to compactness.

3   With respect to utilizing political and geographic

4   boundaries were you doing the same thing?

5       A.   Yeah.  When I say -- well, yeah, more

6   compactness.  We tried to better align it with all of the

7   Tier 2 principles, so compactness following better

8   geographical, more recognizable geographical or political

9   boundaries, trying to minimize the number of, like, weird

10  appendages that may come off it, or, you know, anything

11  that may seem irregular in any way.

12      Q.   So, to sum up.  So for any Tier 1 protected

13  district that you're drawing in the 2020 cycle, you

14  started afresh, so to speak, and tried to apply the Tier 2

15  standards as we've discussed them previously?

16      A.   Yes.

17           MR. WARREN:  Now I'd like to ask you some

18           questions about specific statements that

19           different committee chairs and staff made about

20           some of these districts, and the first meeting is

21           Exhibit 14, the transcript of the January 26th

22           house redistricting committee.

23           (Exhibit No. 14 marked for identification.)

24  BY MR. WARREN:

25      Q.   If you turn to the only tab on page 30, this is

Jason Poreda
July 17, 2025

Page 146

1    Chair Byrd introducing what is now the enacted house plan

2    8013 in this house committee, and he says at line 15,

3    quote, Districts 110, 111, 112, 113, 114, 115, 116, 118,

4    and 119 in Miami-Dade County are all performing Hispanic

5    districts protected by Tier 1 of the Florida Constitution.

6    All nine of these districts are majority minority Hispanic

7    districts.  They are also all entirely within Miami-Dade

8    County.  The Hispanic voting age population in these

9    districts are similar compared to the benchmark districts

10   with slight changes, but are drawn in a consistent manner

11   with respect to Florida Supreme Court precedent to

12   maintain existing majority minority districts.  A

13   functional analysis conducted by staff ensures each of

14   these districts are Tier 1 compliant, close quote.

15           Did I read that correctly?

16   A.   You did.

17   Q.   Does this statement by Chair Byrd accurately

18   reflect the committee's mapmaking process?

19   A.   Yes.

20   Q.   How, if at all, did the fact that the Hispanic

21   voting age population or HVAP in these districts he's

22   discussing are similar compared to the benchmark

23   districts, how, if at all, did that fact influence the

24   mapmaking process?

25   A.   Can you clarify the question a little bit?

Jason Poreda
July 17, 2025

Page 147

1        Q.   Sure.  In drawing these districts, were you

2   looking for similarity in the HVAP to the benchmark

3   districts?

4        A.   No.

5        Q.   Did you refer to the HVAP of the benchmark

6   districts at all?

7        A.   No.

8        Q.   Why did he comment on that; do you know?

9        A.   When we were preparing these statements, because

10   we were -- he was introducing nine districts all at once,

11   it was simply the easiest way to have that statement apply

12   to all of the districts.  And in the end, all of those

13   districts did have a similar HVAP to their benchmark

14   districts, so it was an easier way to kind of explain all

15   of those districts in kind of a succinct way to the

16   committee.  We were not looking for a specific HVAP in any

17   specific district when we were drawing to compare to the

18   benchmark, it just happened to work out that way.

19        Q.   And similarity of HVAP to the benchmark would

20   have been relevant for the committee members to know?

21        A.   No.  It was simply a way of presenting that the

22   HVAPs in that area are similar to what they were before.

23   It was not a particular target or anything like that.  It

24   is just simply a way of presenting information and data

25   for nine districts all at once in a paragraph to make it a

Jason Poreda
July 17, 2025

Page 148

1  little easier to digest.

2      Q.   Because that would have been information and

3  data that would be relevant for the committee to know?

4           MR. BARDOS:  Object to form.

5      A.   I don't understand what you mean, relevant to

6  know.

7  BY MR. WARREN:

8      Q.   I guess what I'm asking is, if you say that you

9  weren't relying or referring to the HVAP of benchmark

10  districts in drawing the maps --

11     A.   Uh-huh.

12     Q.   -- but Chair Byrd is introducing them by

13  explaining that they have similar HVAPs to the benchmark

14  districts, my question is, why was that a notable enough

15  fact that it's included in the introduction of these

16  districts?

17          MR. BARDOS:  Object to form.

18     A.   It was only notable in that there were some

19  similarities and it was an easier way to write a sentence

20  to encompass the data for nine different districts all at

21  once.  It was a way for the members of the committee to

22  conceptualize how the region was -- ended up being

23  relatively similar to the benchmarks.  It wasn't a

24  relevant factor or a target that we were trying to meet.

25

Jason Poreda
July 17, 2025

Page 149

1   BY MR. WARREN:

2        Q.   Okay.  I think we're done with this transcript.

3             Turning now to --

4        A.   Do you want me to hold onto that?

5             MR. WARREN:  Exhibit 15 is the transcript of

6        the Florida house floor session on February 1st,

7        2022.  This was when the enacted house plan was

8        heard on second reading.

9             (Exhibit No. 15 marked for identification.)

10  BY MR. WARREN:

11       Q.   If you turn to the green tab --

12       A.   Dark green or light green?

13       Q.   Dark green.  Page 63.

14       A.   I'm suddenly glad I'm not colorblind.

15       Q.   I am colorblind.

16       A.   Oh.

17       Q.   So I'm jealous.

18       A.   I'm sorry.

19       Q.   But I can see most of these colors.

20             On page 63, Chair Leek, the chair of the big

21  redistricting committee, says at line 2, he's answering a

22  question about voting age populations in minority

23  districts, and he says, quote, I'm not sure I understand

24  the second part of the question.  I think I do understand

25  the first part of the question, and the error here is

Jason Poreda
July 17, 2025

Page 150

1   trying to pull one factor away from all the others, like

2   HVAP.  So we can tell you generally that you need to get

3   about 65 percent of Hispanics concentrated within an area

4   for it to perform, generally.  There is no threshold and

5   it is a district-by-district analysis that is ultimately

6   determined based on the performance of that district,

7   close quote.

8           Did I read that correctly?

9       A.   You did.

10      Q.   So Chair Leek's reference to that generally you

11  need to get about 65 percent Hispanic VAP for a district

12  to perform, do you agree with that statement?

13      A.   Not necessarily.  I think it is a generality.  I

14  don't think he spoke inaccurately, but I wouldn't

15  necessarily agree with that as being a threshold.

16      Q.   Did that as a generality that is generally true

17  influence the House's mapmaking at all?

18      A.   No.

19      Q.   Turning to the purple tab at page 83 -- we can

20  skip that one.  Turning to lime green, page 47.

21      A.   Page 47.  Okay.

22      Q.   Representative Driskell, D-R-I-S-K-E-L-L, asks

23  Chair Leek and maybe Byrd as well about some districts in

24  Dade County which include some of the challenged districts

25  here.  So I will read some of these questions and some of

Jason Poreda
July 17, 2025

Page 151

1    these answers.

2              Starting on page 47, line 8, Rep. Driskell says,

3    I have some questions about the compactness scores because

4    it looks like for, if you look at Reock and Polsby-Popper

5    compactness scores, it looks like these districts might be

6    outliers with respect to the rest of the map and they may

7    actually have the worst kind of compactness scores.  So,

8    for example -- and then she lists some compactness scores

9    of these districts.

10             And Chair Leek responds at line 16, so -- quote,

11   so you also have some protected districts, so there is

12   also another analysis that goes in that in addition to

13   compactness.  So remember it's a Tier 1 element, so we get

14   to compactness after Tier 1.  So we had to make sure that

15   the protected districts continue to perform within reason

16   as they have performed, close quote.

17             Did I read that excerpt accurately?

18        A.   You did.

19        Q.   Does this statement by Chair Leek, this

20   explanation, accurately reflect the mapmaking process?

21        A.   I think that is accurate for potentially some

22   districts, but I wouldn't say it is accurate across the

23   board, no.  Yeah.

24        Q.   Is it accurate for the districts that

25   Rep. Driskell was specifically asking about, which is 118,

Jason Poreda
July 17, 2025

1   for example?

2       A.   No.

3       Q.   In what way is it inaccurate for the districts

4   that Rep. Driskell is asking about?

5       A.   Well, first, let me go back to your -- in that

6   question from Rep. Driskell she's asking about one single

7   district.  Are you -- when you say districts, are you

8   referencing other districts as well?

9       Q.   Good question.  On the previous page, page 46,

10  Rep. Driskell opens for a series of questions by saying at

11  line 18, quote, I have some questions about districts down

12  in south Florida, specifically Districts 114, 115, 116,

13  118, and 119.  In looking at the district in 8013, these

14  districts that I just named are all long, skinny, vertical

15  districts and they are significantly greater in their

16  length than they are in their width.  Do you consider each

17  of those five districts to be compact, close quote.

18           So those are the particular districts that she's

19  asking about in this series.  So my understanding of Chair

20  Leek's response is in reference to those.

21      A.   So your question again is in what way is it not

22  accurate?

23      Q.   Yes.  My question is in what way is Chair Leek's

24  response that he gives starting at line 16 on page 47

25  inaccurate with respect to those districts.

Jason Poreda
July 17, 2025

Page 153

1     A.   I'm going to reread Chair Leek's statement here

2  real quick.  Can I read that silently, is that okay, or do

3  you want me to read it out loud?

4     **Q.   Silently is great.**

5     A.   Okay.  So Chair Leek's statement is accurate in

6  that Tier 2 where compactness is is subordinate to Tier 1,

7  and you have to take Tier 1 into account before you can --

8  you know, if Tier 1 is satisfied you can factor in Tier 2.

9          However, for these particular districts, I

10  actually disagree with her premise of the question.  I

11  don't think that these districts are un-compact.  She is

12  referring to a specific mathematical compactness score.

13  Reock, for example, does a very poor job.  All

14  mathematical compactness scores have flaws, and you have

15  to look at them all in that context and not focus on one

16  or the other or really any of the tests.  Compactness

17  really is more of an art than it is a specific science

18  unfortunately.  You cannot look at one or even two

19  specific scores.

20          The one score that she left off, Convex-Hull, I

21  bet if you looked at all of those districts they all score

22  extremely highly on that particular score.  The reason for

23  that is that a Reock score takes the district and you have

24  to -- and it fits the smallest bounding circle around each

25  individual district, and it's a ratio of the district

Jason Poreda
July 17, 2025

1  compared to the area of that circle that can fit around

2  it.  So it performs very poorly with rectangles.  Even a

3  square, perfect square only scores a .66 on that score.

4  Whereas, one would be the perfect score.  If you had a

5  district that was a perfect circle that would score one.

6          So it performs very poorly in regularly shaped

7  square or rectangle type districts.  So anytime you have a

8  rectangle, whether it be vertical or horizontal, Reock is

9  going to be very poor.  Polsby-Popper has some similar

10  deficiencies, but that's a little bit different.  But then

11  Convex-Hull, that's basically like putting a rubber band

12  around the district, and it performs very, very well with

13  rectangular or irregularly shaped districts.  There's

14  flaws to that, too, in that say if a district is one inch

15  tall and a hundred miles long it would be a perfect score

16  if there's no deviations in the line.

17          So, I mean, they all have their own flaws.  So

18  you have to use those compactness scores in context with

19  all of the other elements, including the interocular test

20  that the court has referred to, or the eyeball test, and

21  there are no weird appendages that stick off of them,

22  they're very regular shapes, it's a rectangle.

23          So I don't believe that any of those districts

24  in my opinion are un-compact.  I would not describe them

25  as tall and skinny.  They are rectangles, they are

Jason Poreda
July 17, 2025

Page 155

1   vertically shaped, but I believe that they compact.  So I

2   disagree with that premise of her question.

3           Chair Leek, in trying to refer to his question

4   to a multitude of districts, I don't think that he is

5   wrong in that we do have to satisfy Tier 1 before we can

6   get to Tier 2.  You got to make sure that that's

7   satisfied.  In the balancing of all of the tiers you need

8   to make sure that that happens.  However, in these

9   particular districts, I kind of disagree with the premise

10  of her question in this particular case.

11  **Q.   Understood.  Just to make sure I understand some**

12  **of what you said.**

13      A.   Uh-huh.

14  **Q.   So, in reference to Chair Leek saying we get to**

15  **compactness after Tier 1, you don't disagree with that**

16  **statement?**

17      A.   I mean, Tier 2 -- no, in the fact that Tier 2 is

18  subordinate to Tier 1.  However, when drawing -- the

19  actual drawing process, particularly in south Florida, I

20  don't think that we were drawing for Tier 1 before we got

21  to Tier 2.  In fact, I think it was the opposite.  We drew

22  for Tier 2 and then made sure the districts then complied

23  with Tier 1, partially because that area is so densely

24  populated and so such a high concentration of Hispanic

25  voting age population, it was not really necessary to draw

Jason Poreda
July 17, 2025

Page 156

1    first with Tier 1 principles in mind.  We tried to draw

2    really as Tier 2 compliant districts as we could and then

3    if we had to make slight changes to make sure that those

4    compact districts satisfied Tier 1.

5            So in that case I think maybe he was a little --

6    a little bit wrong, but he's not wrong in the fact that

7    Tier 1 just as an overall guiding principle is superior to

8    Tier 2.

9    Q.   And I think you said just now that you have to

10   make sure you satisfy Tier 1 before you get to Tier 2; is

11   that accurate?

12   A.   As far as the constitutional standards go, yes,

13   but not in the drawing -- in the actual drawing of the

14   districts, that's not necessarily the case.  You can draw

15   a district that is a Tier 2 compliant district, and then

16   you can make sure it complies to Tier 1.  And if that

17   compact district for whatever reason in the functional

18   analysis does not comply you then would need to make

19   adjustments to that district to compensate.

20           So I don't think that that is we don't satisfy

21   Tier 1 always and then get to Tier 2 in the actual drawing

22   of the districts.  There can be exceptions to that, but

23   certainly in this particular case with these challenged

24   districts, because the whole region is so heavily

25   Hispanic, it's really the opposite.  You satisfy Tier 2 as

Jason Poreda
July 17, 2025

Page 157

1    much as we can and then make adjustments to those

2    districts to make sure that they're compliant to Tier 1.

3         Q.   Okay.  Moving on to the next passage in the

4    February 1st transcript.  It's on the next -- two pages

5    next.

6         A.   That's pages --

7         Q.   51.

8         A.   51.

9         Q.   And Rep. Driskell is hitting this drum again.

10   She says, starting at line 10, I guess the challenge --

11   quote, I guess the challenge I have with these is that

12   looking at the districts that we have just been talking

13   about, close quote, referring to the series that we've

14   been discussing, quote, their scores are indicative that

15   they're outliers on the map.  And so their shapes are also

16   irregular such that indicates that it's not compact.  So

17   I'm trying to understand why.  If you could explain why

18   you consider these compact if their scores appear to be

19   outliers and their shapes indicate that they're not

20   compact, the eye test, close quote.

21            And then Chair Leek responds at Line 17, quote,

22   And remember, compactness is only one of the things that

23   we look at to determine whether a district is appropriate.

24   In some of those instances, and I think Representative

25   Byrd talked about this, it was necessary to keep cities

Jason Poreda
July 17, 2025

Page 158

1    whole, close quote.

2            So understanding that you disagree with

3    Rep. Driskell's premise --

4        A.   Yes.

5        Q.   -- and just focusing on Rep. Leek's response, is

6    that explanation accurate to your knowledge?

7        A.   I think it is accurate that compactness is only

8    one of the things that we look at to determine if a

9    district is appropriate.  And one of those other things is

10   keeping cities whole.  It may be not necessary to keep it

11   whole, but it is something that was part of our

12   methodology that where we could, where feasible, we would

13   keep a city whole.

14           And because municipal lines are not always the

15   most regular shapes, they can have a tendency,

16   particularly with the eyeball test, perhaps not look the

17   best compactness-wise.  So in that way they are -- when

18   you keep cities whole that sometimes does conflict with

19   some of the other scores.  It could even impact the

20   compactness scores.  For example, Polsby-Popper, a

21   weakness of that score is that if you have coastline or a

22   lot of, like, jagged edges, it will negatively impact that

23   score.  And municipal lines are notorious for being

24   jagged, so -- but it's still following political and

25   geographical lines.

Jason Poreda
July 17, 2025

1              So the part that I think Chair Leek may have

2    missed is that it's really just a -- compactness is not

3    one thing.  It's not a mathematical score.  There's a lot

4    of factors that can factor into compactness, like the

5    eyeball test, like keeping cities and counties whole,

6    which we heard from the public, and all of those factors

7    put together a district can be compact even if it doesn't

8    necessarily satisfy one of those elements according to

9    some.

10         **Q.   Talking specifically about Districts 114 through**

11    **119, except 117, that Rep. Driskell was asking about, were**

12    **there instances where the shapes of those districts were**

13    **necessary to keep cities whole?**

14         A.   So, in 114, the vast majority of the shape of

15    that district, including the little fingers that stick out

16    into 115, and the sharp edge on the eastern side, that is

17    entirely the municipal line of Coral Gables.  And then

18    Coral Gables is also kind of oddly shaped as it goes

19    north.  So the vast majority of that district is governed

20    by being able to keep Coral Gables wholly within that

21    district.  And then those other two smaller cities, I

22    believe West Miami and South Miami, are right next to

23    Coral Gables, and those are also included as well.

24              And I think part of the other slight deviation

25    further north is actually probably South Miami or maybe

Jason Poreda
July 17, 2025

1   it's West Miami, I forget exactly how they're oriented.

2   So that district is almost entirely shaped by that.  115,

3   the southern portion of 115, there's three stacked cities.

4   It's Cutler Bay, Pinecrest, and Palmetto Bay.  I don't

5   remember exactly what order they're in.  That governs the

6   southern part of that district entirely, and then a large

7   portion of the eastern border of that district as you go

8   north is dependent on the District 117.

9        Q.   And then moving further west, does Chair Leek's

10  comment that the shapes of those districts are necessary

11  to keep cities whole, does that comment apply to 118 and

12  119 as well?

13       A.   There's no municipalities in that part of

14  Miami-Dade County to the best of my recollection.

15       Q.   So that explanation does not apply to those

16  districts?

17       A.   It does not, specifically in reference to

18  cities.

19       Q.   Next page, 52, at line 10, Rep. Driskell asks,

20  quote, Was it necessary that those five districts be long

21  and skinny and non-compact to comply with Tier 1, close

22  quote.  And Chair Leek's answer at line 13 is, quote,

23  Tier 1 is a wholly separate analysis, right?  And so we're

24  not going to get to compactness until we are ensured that

25  Tier 1 is satisfied.  Once we get to Tier 2, then you can

Jason Poreda
July 17, 2025

1   start to take into account those types of factors, like is

2   it compact, does it keep a city whole.  And what you see

3   before you was the best configuration that we could come

4   up with in balancing all of those factors, close quote.

5              Is Chair Leek's response -- again, recognizing

6   that you disagree with the premise of Rep. Driskell's

7   question.  Is Chair Leek's response an accurate statement

8   of the mapmaking process?

9   A.   Yes.  So I'll reiterate again, I don't think

10  those five districts are long and skinny and non-compact.

11  I think if you wanted to we could go through a lot of

12  reasons why I think they're very compact.  However, taking

13  that into account and going into Chair Leek's analysis,

14  Chair Leek is speaking, I think, more holistically,

15  looking at the entire analysis of the constitutional

16  standards, and it is a wholly separate analysis.  However,

17  it is to be balanced with Tier 2, which I think we could

18  be a little bit better -- I don't think it's a Tier 1 and

19  before we get to Tier 2.  It is kind of a combination put

20  together.  Now, the functional analysis is entirely

21  independent of -- in Tier 1, and as long as that is

22  satisfied you can make the districts as compact as

23  possible.

24             So I think he's speaking more -- I know the

25  question that was asked about these five districts, I

Jason Poreda
July 17, 2025

Page 162

1    think his answer is more applicable in the more global

2    aspect of looking at all of the protected districts

3    throughout a map rather than a specific analysis.

4         **Q.   So do you agree or disagree that Chair Leek's**

5    **statement regarding not getting to Tier 2 until you ensure**

6    **Tier 1 is satisfied, do you agree or disagree that that**

7    **reflects the committee's drawing of the challenged**

8    **districts?**

9              MR. BARDOS:  Object to form.

10        A.   Again, I think he's more referring to, like, the

11   global part of it.  I can tell you in the drawing process

12   that's not -- that's not the -- we did not always, like,

13   draw a district to satisfy Tier 1 before getting to

14   Tier 2.  It was always a combination of the two together,

15   right.  And specifically in south Florida, with these

16   districts, it was basically the reverse.  We were trying

17   to draw Tier 2 compliant districts, trying to keep as many

18   cities whole as possible, find good major roads or other

19   geographical features to follow, and from there adjust

20   what we were drawing to then satisfy Tier 1, in as real

21   way as we possibly could.

22             So it was kind of the reverse, but the analysis

23   is still the same, because ultimately the thing that

24   mattered above Tier 2, even though we were drawing Tier 2

25   compliant districts, was making sure that the functional

Jason Poreda
July 17, 2025

Page 163

1   analysis on the Tier 1 side was satisfied, and if it

2   wasn't we would have to make adjustments to those other

3   districts.

4           But because the Hispanic voting age population

5   throughout Dade County is so high, we did not have to draw

6   any of those districts predominantly just looking at race

7   first.  In satisfying Tier 1 we were able to keep -- can

8   we draw a district to keep Coral Gables whole, and do

9   those sorts of things, and then be, like, oh, well, this

10  district we drew, let's do the functional analysis on it

11  and make sure it still complies.

12          So we kind of almost took a backward approach in

13  data specifically, except for the Black districts, which

14  had to be drawn almost the opposite.  We had to draw those

15  where we had the -- we drew those to, I think, maybe

16  satisfy more Tier 1 and then massaged them to get them to

17  be more compact, because those Black populations are more

18  concentrated in particular areas where the Hispanic

19  population is throughout multiple cities and multiple

20  areas.  So it was just kind of a different approach

21  depending on how you're looking at different protected

22  districts and different populations.

23          So there isn't one way that we always drew all

24  of the protected districts, even in Dade County, so it

25  is -- the end analysis is always the same.  They have to

Jason Poreda
July 17, 2025

Page 164

1   make sure they're -- you know, they perform in the

2   functional analysis and they satisfy Tier 1, and then they

3   satisfy Tier 2 stuff.  But in the actual drawing it was

4   more of an organic process.

5   BY MR. WARREN:

6        Q.   So one of the things you said among others is

7   that there were some instances in drawing Dade County

8   house districts where you were drawing based on Tier 2 and

9   then you looked to the functional analysis and you made

10  adjustments, right?

11       A.   Correct.

12       Q.   Were any of those instances one of the

13  challenged districts?

14       A.   I don't remember specifically because it's been

15  so long, but, yeah, I would have to imagine that the

16  challenged districts were part of that.  I can't remember

17  a specific example.  Well, I think probably 115 would

18  probably be one that would be in that list, where we drew

19  as compacted districts as we could, slightly difficult

20  because it's in between 117 and 114, so we're kind of only

21  going up.  But then as 116 came into focus and how those

22  two districts came into play, and trying to find a good

23  boundary to separate those two while also making sure they

24  both satisfied their functional -- their individual

25  functional analyses, there may have been some interplay

Jason Poreda
July 17, 2025

Page 165

1    there where we had to adjust the border of 115 to make

2    sure that the functional analysis was completely satisfied

3    while making it as compact as possible.

4        Q.   So to sum up, you started drawing house

5    districts in Dade based solely on the Tier 2 criteria,

6    right?

7        A.   Yes.

8        Q.   And then, at least in this one instance, ran a

9    functional analysis on 115, right?

10       A.   We ran a function analysis on all of them.

11       Q.   Certainly.

12       A.   Yeah.

13       Q.   And then the functional analysis indicated the

14   district might not perform for Hispanic voters anymore?

15       A.   So, in particularly Districts 113, 114, and 115,

16   those were districts that were -- at least in our analysis

17   when we were looking at our data they were -- all three of

18   them were very competitive districts, meaning they could

19   theoretically be won by either a Republican or a Democrat.

20   So sometimes the functional analysis, particularly in

21   Black districts, let's say in Jacksonville, it's pretty

22   clear that in Districts 13 and 14 a Democrat is going to

23   win those districts based on the electoral performance.

24   So you can look at just the Democratic side in the primary

25   to see how Democratic voters are broken down to see if

Jason Poreda
July 17, 2025

1   the -- in this case the Black population in Districts 13

2   and 14 can control the primary, the Democratic primary,

3   and it becomes an easier analysis relatively speaking.

4   Not an easy analysis, but relatively speaking.  113, 14,

5   and 15, because they were competitive, you have to do

6   essentially a functional analysis that looks at both the

7   Republican side and the Democratic side and try to draw a

8   district where theoretically Hispanics of either party

9   could control the primary and then make it to the general

10   to ensure that an Hispanic is elected regardless of if

11   they're a Republican or Democrat.

12           So that becomes more complicated, because you're

13   then trying to satisfy a functional analysis that doesn't

14   just mean one way or the other.  You're trying to draw a

15   competitive district and make sure that the Hispanic --

16   the Republican Hispanic candidate is going to -- like, the

17   Hispanic side of that equation is going to be able to

18   elect an Hispanic who then can make it to the general

19   election, and on the Democratic side that the Hispanic

20   Democratic voters are able to control their primary and

21   elect a minority candidate of choice, an Hispanic minority

22   candidate of choice that will make it to the general.  So

23   then in the general, whichever candidate happens to win a

24   competitive race will be a minority candidate of choice.

25       Q.   So -- that makes sense.  So specifically talking

Jason Poreda
July 17, 2025

Page 167

1    about an early draft of 115 where adjustments were made --

2         A.   Yeah.

3         Q.   -- in order to ensure Tier 1 compliance, was the

4    problem in the functional analysis that the draft 115 was

5    not competitive enough or that one of the party primaries

6    was not Hispanic enough --

7              MR. BARDOS:  Object to form.

8    BY MR. WARREN:

9         Q.   -- or another reason?

10        A.   Yeah.  I mean, we went through so many different

11   versions in drawing, I don't specifically remember what

12   the specific issue was, but it was either one side or the

13   other.  Again, I don't remember the specifics, it's three

14   years ago, and even if I were to look at the data now I

15   might do a different analysis than I did then.

16             But when you looked at the -- and it wasn't just

17   one other version of 115.  I want to be clear about that.

18   There's many different versions as you're trying to build

19   the map, but as we were trying to put the puzzle pieces

20   together so to speak and satisfy everything, some versions

21   of 115 in that area between 117, the Coral Gables side,

22   and trying to fit stuff together and make sure that we had

23   other districts that were performing, it became difficult

24   to kind of toe that line in the analysis to make sure that

25   you could elect a Republican and a Democrat Hispanic

Jason Poreda
July 17, 2025

Page 168

1    candidate.  So some adjustments were made in that way.

2         Q.   **That makes sense.**

3         A.   While keeping in respect to Tier 2 as much as we

4    could, obviously.

5         Q.   **Certainly.  So to sum that up, drafts of 115,**

6    **functional analysis, adjustments to ensure Tier 1**

7    **compliance, is that --**

8         A.   Correct.

9         Q.   **Okay.  Did those -- if you remember, did those**

10   **adjustments result in 115 extending further north with**

11   **that shape that you referenced?**

12        A.   Yeah.  Based on what we talked about earlier

13   it's my recollection that it's -- that's also part of why

14   we made a slight adjustment to 116, because the eastern

15   boundary of 115, or the eastern boundary of 116, those

16   were where the adjustments were mostly made.  A little bit

17   with 114, too, but that did result in 115 extending

18   slightly further north than it maybe originally had, to

19   make sure that there was that proper electoral balance for

20   both parties, because it was in our estimation a very

21   competitive district.

22        Q.   **Okay.  So ensuring Tier 1 compliance is the**

23   **reason why 115 extended as far north as it does?**

24        A.   Yes.

25        Q.   **And ensuring Tier 1 compliance in at least 115**

Jason Poreda
July 17, 2025

Page 169

```
 1   is the reason why the border between 115 and 116 is where

 2   it is?

 3       A.   That is my recollection, yes.

 4       Q.   Can you remember any other instances where a

 5   functional analysis on a draft challenged district in Dade

 6   County resulted in adjustments to ensure Tier 1

 7   compliance, besides the ones that we discussed?

 8       A.   That's the one that immediately jumps out to me

 9   as being something that -- I'm sure there were probably

10   smaller tweaks made, but that's certainly the one that was

11   the most relevant one that I can remember.  113 kind of

12   just fit right in Miami and there were maybe some small

13   adjustments that were made in there, but, no, I can't --

14   can you ask the question again?

15       Q.   Certainly.  Besides the changes to 115 that

16   we've discussed --

17       A.   Yes.

18       Q.   -- were there any other instances where

19   challenged house districts in Dade County were adjusted to

20   ensure Tier 1 compliance?

21       A.   Not that I can recall.

22       Q.   But some changes were made to 113 to ensure

23   Tier 1 compliance?

24       A.   I don't remember.  It's possible.

25       Q.   You think maybe?
```

Jason Poreda
July 17, 2025

Page 170

1        A.    I don't remember.

2        Q.    Do you think -- and I think we've talked about

3   116 being impacted by 115.  Do you remember any changes to

4   116 because of the result of a functional analysis in 115?

5        A.    Not in 116.  That was more a function of the

6   analysis in 115.

7        Q.    And same question for 118.

8        A.    No.  For 118 and 119, those were -- so we had --

9   so of the kind of larger rectangle that 118 and 119 are

10  in, we did have different versions of that that all were

11  similarly compact in both visual and mathematical

12  compactness, and we were satisfied with the multiple

13  options that we had.  Then running functional analysis in

14  all of those options, we went with the one that satisfied

15  the functional analysis the best, that had the better

16  performance numbers, to ensure that both of those

17  districts would elect an Hispanic candidate.

18       Q.    And when you're talking about versions of 118

19  and 119 in that box --

20       A.    Uh-huh.

21       Q.    -- and then you went with --

22       A.    That version.

23       Q.    -- that version, are we talking about non-public

24  drafts or are we talking about the workshop A and B?

25       A.    I don't remember what workshop A and B looked

Jason Poreda
July 17, 2025

Page 171

1   like.  I don't know if you have that, but there was also a

2   variety of internal drafts as we were trying to come up

3   with stuff, so that's certainly a part of this, yes.

4          MR. WARREN:  Okay.  I don't remember what

5       workshop A and B look like either.  But we will

6       mark workshop A and B as Exhibit 16.

7          (Exhibit No. 16 marked for identification.)

8   BY MR. WARREN:

9       Q.   This is an excerpt from the December 2nd, 2021,

10  legislative subcommittee meeting that shows the side by

11  side.

12          So again we're focusing on 118 and 119.  Would

13  it be fair to say that the workshop option that more

14  closely led to the enacted plan is workshop A in 118 and

15  119?

16      A.   No.

17      Q.   Would you say either of these options led to the

18  enacted plan more than the other?

19      A.   No.

20      Q.   Okay.  So the question was about -- first of

21  all, let me just make sure I'm straight on what you were

22  explaining.  There were versions, draft versions of 118

23  and 119 that had different options for their boundaries,

24  right?

25      A.   Yes.

Jason Poreda
July 17, 2025

Page 172

1    Q.   Functional analysis was performed on those

2  options?

3    A.   Yes.

4    Q.   And the committee staff picked the option that

5  had the strongest functional analysis?

6    A.   Let me clarify that we picked -- so the

7  compactness, the Tier 2 compliance for either -- it wasn't

8  just two options.  I think there was multiple.  But the

9  compactness scores that we referred to before, the visual

10 compactness, there are no cities in that particular area,

11 so really it just comes down to visual compactness and

12 mathematical compactness.  They were all in our estimation

13 fundamentally the same.  Okay?  So I don't remember

14 exactly what the scores were, but they were all basically

15 in the same ballpark, so we had in our estimation equally

16 compliant Tier 2 options.

17       So all things being equal, we then ran the

18 functional analysis on those options.  It could have been

19 two, it could have been three, I don't remember.  We then

20 picked the one where both 118 and -- because, again, the

21 functional analysis were not run both collectively, they

22 were run individually.

23       So we picked the one that -- where each

24 individual functional analysis performed -- I don't want

25 to say performed the best because that's not really what

Jason Poreda
July 17, 2025

Page 173

1    it is, but they were the ones that -- where an Hispanic

2    minority candidate of I think either party, I don't

3    remember the political breakdown of all of this, kind of

4    similar to before, would be able to be elected, but

5    ensuring that an Hispanic would be elected in either

6    district, which was the primary focus.

7            And you asked before which one of option A and B

8    fit more that, I don't think either one, because if you

9    look at the enacted map, we were also dealing with the

10   compactness scores of -- well, in this map it's 110 and

11   120 and 118.  As you see in workshop B, 119 has more of

12   the Everglades area, and we were trying to deal with all

13   of those compactness factors, because basically it was a

14   question.  Was it better to include all of that in one

15   district, like 120, which is where we ended up, a district

16   that was already lower in mathematical compactness because

17   it has the Keys, or was it better to, you know, kind of

18   shrink down 118 and 119, and what ended up being 111 into

19   a smaller geographic area, or was it better

20   compactness-wise like this 110.  It is like a rectangle,

21   but it goes further out.

22           After doing all of those sorts of analyses and

23   compactness scores or whatever and just visually, we

24   determined it was better to go with that.  So that kind of

25   shrunk everything down.  So we were trying to put as much

Jason Poreda
July 17, 2025

Page 174

1    of that empty area into 120 as we could and fit those

2    districts into different areas, which then condensed down

3    the area where 118 and 119 were and changed that a little

4    bit.

5            So I guess it's more similar to workshop A, and

6    you can see that the version of 119 and 118 were -- kind

7    of one is an L-shape and the other kind of fits on top of

8    it.  There was a similar -- a slightly different from

9    this.  In my brain I remember a similar option like that

10   in a more similar location that you see the current 118

11   and 119.  And there was a couple of other versions that we

12   looked through as well.

13           MR. BARDOS:  Sorry.  My Exhibit 16 looks

14       different than the witness's.

15           (Off the record briefly.)

16           THE WITNESS:  We had different versions of

17       the slides because you can see one of those, like

18       where we -- the one that he was looking at, like,

19       110 doesn't exist, so we would take out certain

20       districts in isolation to make the slides for

21       presentation purposes.  So it's probably just a

22       different actual page number.

23           So what is the page number on the corner

24       down there?

25           MR. WARREN:  1618.

Jason Poreda
July 17, 2025

Page 175

1            THE WITNESS:  And on the other one, the one

2      that is missing the top district?

3            MR. WARREN:  1620.

4            THE WITNESS:  Yeah.  So it's just a

5      different page number.

6  BY MR. WARREN:

7      Q.    Okay.  All showing the same workshop A, workshop

8  B in Dade County?

9      A.    Yes.

10      Q.    Just to sum up, so that I'm clear on what you're

11  saying about the 118, 119 process, staff had different

12  options, equally Tier 2 compliant options of 118 and 119,

13  right?

14      A.    Uh-huh.  Yes.  Sorry.

15      Q.    Performed functional analysis on those districts

16  and those options, right?

17      A.    Yes.

18      Q.    And then opted to advance the option that had

19  the stronger Hispanic ability to elect in 118 and 119?

20            MR. BARDOS:  Object to form.

21      A.    Yeah.  I don't know if I would use the word

22  stronger.  It was simply the one that we felt would be

23  most compliant I think is the best way to put it.

24  BY MR. WARREN:

25      Q.    Okay.  So staff selected the option that staff

Jason Poreda
July 17, 2025

Page 176

1    concluded would be the most Tier 1 compliant in 118 and

2    119?

3        A.    Yeah, the most legally -- yeah, legally

4    defensible or legally compliant version.

5        Q.    And the conclusion that it was more Tier 1

6    compliant was based on the fact that Hispanic voters'

7    ability to elect would not be diminished?

8        A.    Correct.

9        Q.    Okay.  Got it.  Back to the February 2nd -- or

10   February 1st.

11           MR. BARDOS:  I'm sorry.  Would you mind if I

12       go to the bathroom real quick?

13           THE WITNESS:  I could use a break, too.

14           (Recess taken from 3:11 p.m. to 3:16 p.m.)

15   BY MR. WARREN:

16       Q.    So, back to the February 1st house session

17   transcript.  On page 52, line 19, Rep. Driskell asks

18   another question, quote, Looking at those districts,

19   though, why couldn't, for example, Districts 118 and 119

20   just be stacked on top of each other like squares, close

21   quote.

22           Do you understand the question she's asking?

23       A.    Yes.

24       Q.    Do you have an answer to that question?

25       A.    I mean, not exactly.  I mean, it's kind of a

Jason Poreda
July 17, 2025

1  hypothetical question.  I would have to kind of speculate.

2  I know that we did look at different versions of that, but

3  off the top of my head I don't exactly remember why.  But,

4  again, to me rectangles, squares are basically the same.

5  Functionally, as far as compactness goes, they all score

6  relatively similar in the different compactness scores.

7         And, as I mentioned before, that may have been

8  one of the options that we even looked at.  I do remember

9  us looking at a version that was more stacked on top of

10  each other, although I seem to remember, and part of the

11  reason why, like, in workshop A 119 is more of an L that

12  goes around 118.

13         The population -- like, even though they look

14  like, you know, it's a bigger rectangle and there's a

15  skinny rectangle or a skinnier rectangle, then 119, the

16  population distribution there isn't equal, so you couldn't

17  just go across and have them also then be equal

18  population.

19         I think that's one of the reasons why in

20  workshop A 119 has to kind of go down and wrap around,

21  because I seem to remember that on the top east corner of

22  118 there was a -- I don't remember if it was an apartment

23  complex or multiple condo areas.  It's a much more densely

24  populated part of that rectangle.

25         So if you just drew a line straight across, I'm

Jason Poreda
July 17, 2025

Page 178

1    pretty sure the populations would be unequal or something

2    along those lines, on top of the functional analysis

3    information that we would look at before, but I seem to

4    remember it being something along those lines.

5         **Q.   Okay.  So you mentioned maybe drawing a draft**

6    **that had that type of --**

7         A.   Configuration.  We went through many -- we went

8    through many configurations to try to look at the

9    different Tier 2 compactness with that.  There's also not

10   a good -- I mean, even this version has that little bump

11   out of 119, because there is not a road specifically that

12   just goes right up.  And I believe the same is

13   horizontally, there really isn't a good divider, and

14   unless you wanted to split a neighborhood or split

15   something that probably shouldn't be split or something

16   along those lines.

17        So, yeah, I don't exactly remember what all of

18   the drafts look like, but I do remember we looked at --

19   once we settled on more of a configuration that you see in

20   the enacted map, there were still periods or still parts

21   of the map where we were trying to make tweaks.  And I

22   remember that being an area, and this configuration, both

23   being rectangles next to each other, was the most visually

24   compact version of the map that we could come up with that

25   also satisfied the Tier 1 to the best of our ability.

Jason Poreda
July 17, 2025

Page 179

1        Q.   So knowing that you perhaps explored a draft

2   configuration that stacked 118 and 119 on top of each

3   other, would that have been one of the drafts that

4   functional analysis was done on and then was one of the

5   options that was less Tier 1 compliant?

6             MR. BARDOS:   Object to form.

7        A.   I don't remember.

8   BY MR. WARREN:

9        Q.   Okay.  So in choosing not to have a,

10  quote/unquote, stacked orientation of those districts, do

11  you remember whether that decision was because that

12  stacked orientation had a Tier 1 deficiency?

13       A.   I don't remember.

14       Q.   Moving on to the next page, page 53 of the

15  February 1st transcript.

16       A.   Fifty-three?

17       Q.   Yes.  On line 7, Rep. Driskell asks a last

18  question about these series of house districts in south

19  Dade County.  At line 7 she asks, quote, Why wouldn't, for

20  example, District 115 lose its northern appendage up to

21  the Tamiami Trail and be more compact, taking up the

22  southern portion of 116 and trading the appendage with

23  116, close quote.  And Chair Leek defers to Chair Byrd,

24  and at line 13 Chair Byrd says, quote, Because that's a

25  Tier 1 standard that we applied, close quote.

Jason Poreda
July 17, 2025

Page 180

1          Is that an accurate explanation to why District

2    115 has that northern extension?

3          A.    I disagree with the characterization that it's

4    an appendage.  I can show you lots of examples of

5    districts where you would have an appendage.  I don't

6    think that that -- I disagree with that particular line of

7    that question.  However, you can look at the different

8    versions in the workshop of 116 and 115 that we did, and

9    there are different configurations there, and they're both

10   different than what we settled on although reasonably

11   similar.  But everything we did there was to draw as

12   Tier 2 compliant districts as we could while also making

13   them legally compliant to Tier 1.

14          So I don't think that that whole -- I also don't

15   remember exactly how many people, like, total

16   population-wise we're talking about there.  Obviously

17   District 116 is geographically smaller than 115, because

18   it's more densely populated than 116, so I don't -- I

19   don't know if you could -- that, you know, conceptually

20   you can say, well, that whole northern part of 115, just

21   put it in 116 or whatever.  Well, the total populations

22   may have not equaled out, but that's just me speculating.

23   I don't know.

24          Q.    Okay.  So Chair Byrd's response -- and I

25   completely understand you're not accepting the premise of

Jason Poreda
July 17, 2025

Page 181

1    these critiques, and that's totally fair.  I think

2    essentially Rep. Driskell is asking why is this district

3    shaped this way and why does it have this attribute to

4    make it maybe less value-laden.  And Chair Byrd's response

5    is because of Tier 1, and my question to you is, is that

6    an accurate explanation to the question as I phrased it?

7              MR. BARDOS:  Object to form.

8         A.   I think in that context then that's accurate,

9    yes.

10   BY MR. WARREN:

11        Q.   So it would be accurate that the reason why

12   District 115 is shaped this way and has this feature is

13   because of Tier 1?

14             MR. BARDOS:  Object to form.

15        A.   I think that was one of the considerations, yes.

16   I don't think that it is exclusively for that reason.

17   BY MR. WARREN:

18        Q.   Earlier you referenced an early draft of 115,

19   functional analysis performed, adjustments made, perhaps

20   it extending more northerly as a result to ensure Tier 1

21   compliance.  You remember that, right?

22        A.   Can you repeat that real quick?  Sorry.

23        Q.   Just referencing your earlier testimony about an

24   early draft of 115 on which a functional analysis was

25   performed and then adjustments to 115 to ensure Tier 1

Jason Poreda
July 17, 2025

Page 182

1    compliance.

2        A.   Yes.

3        Q.   Is Chair Byrd's explanation that District 115

4    has this feature because of a Tier 1 standard that we

5    applied, is that referencing that process?

6        A.   As I just previously stated, I believe that that

7    was a factor.  I don't know if it was exclusively the only

8    factor that was made.

9        Q.   That's not exactly my question, and apologies

10   for being unclear.

11            My question is, when Chair Byrd is explaining

12   that this district has this feature, has this attribute,

13   because of a Tier 1 standard that we applied, is that

14   referencing the process of concluding that District 115

15   needed adjustments to be Tier 1 compliant?

16            MR. BARDOS:  Object to form.

17       A.   And my answer stays the same.  I think that that

18   was a factor.  I do not think that was the only factor,

19   considering that the cities of South Miami and West Miami

20   are also right there with 114 and the road that we

21   selected to be that boundary that ended up being a

22   boundary for three districts, that probably -- that also

23   came into play.  I don't think that part of 115 is there

24   exclusively to satisfy Tier 1.

25

Jason Poreda
July 17, 2025

Page 183

1   BY MR. WARREN:

2        Q.   Would you stay Chair Byrd's response is

3   inaccurate or incomplete?

4        A.   No.  Well, I think it is part of the Tier 1

5   standard that we applied.  I don't think it's exclusive to

6   that.

7        Q.   So his response is incomplete?

8        A.   I don't -- I mean, I don't really know how to

9   answer that.  Sorry.

10       Q.   Okay.  No problem.

11            So after we've discussed these questions and

12   answers about the shapes of Districts 114 through 119,

13   except 117, if in your view it wasn't necessary for 118

14   and 119 to be shaped the way they are to comply with

15   Tier 1, would you have drawn them to be shaped that way?

16            MR. BARDOS:  Object to form.

17       A.   I'm sorry.  Can you ask the question again?

18   BY MR. WARREN:

19       Q.   Sure.  Let's start with 118 and 119.

20       A.   Okay.

21       Q.   You said that they're in a box, and there's a

22   line running through the box, and staff explored other

23   options for configuring those two districts.  And the

24   House enacted the enacted map with the configuration it

25   has.  Follow me?

Jason Poreda
July 17, 2025

Page 184

1      A.    Correct.

2      Q.    My question to you is, if in your view it wasn't

3    necessary to comply with Tier 1 for those two districts to

4    have that configuration, would you have drawn them that

5    way anyway?

6            MR. BARDOS:   Object to form.

7      A.    I don't know.

8    BY MR. WARREN:

9      Q.    What information would you need to be able to

10   know?

11     A.    I would have to go back in time and speculate.

12   I don't know what we would have done in that area had

13   Tier 1 not been a factor.  I think the districts we drew

14   are very Tier 2 compliant.  They're rectangles.  We may

15   have drawn exactly the same shapes, but I don't know.

16   It's speculation.

17     Q.    Okay.  And I may ask you to speculate.

18     A.    Ask away.

19     Q.    And I may ask you a hypothetical, and I'll give

20   you another one right now.  Focusing on 115 as we have

21   been, again, I think we've been through it enough, but one

22   more time.  If Tier 1 was not a factor at all, if it was

23   not necessary for 115 to have this shape to comply with

24   Tier 1, would you have drawn a district shaped like this?

25     A.    I don't know.

Jason Poreda
July 17, 2025

Page 185

```
 1          Q.   For the same reasons that you said?

 2          A.   Correct.

 3          Q.   Okay.  Staying on the same transcript, turning

 4    to the pink tab, page 68 at line 22.

 5          A.   I'm sorry.  What page number did you say?

 6          Q.   Sixty-eight.

 7          A.   Got it.

 8          Q.   At line 22 toward the bottom, Chair Leek is

 9    answering a question from Rep. Skidmore, and he says at

10    line 21, quote, So what you have before you is the one

11    that I can tell you for certain if your primary concern,

12    as it should be, is Tier 1 compliance, is Tier 1

13    compliance.  Tier 2 is Tier 2 for a reason.  So when it's

14    a protected district, we focus much less on Tier 2, close

15    quote.

16               Does that reflect your understanding of the

17    mapmaking process?

18               MR. BARDOS:  Form.

19               Yeah, take your time.

20          A.   Okay.  So that is the -- I didn't know if it

21    continued.  I was trying to read the next sentence, but

22    that actually, actually is the end of his sentence.

23               As I mentioned before, I mean, Tier 1, as far as

24    compliance goes, is superior to Tier 2, but as I've

25    mentioned, during the drawing process we didn't
```

Jason Poreda
July 17, 2025

Page 186

1  necessarily always draw for Tier 1 first and then Tier 2.

2  Sometimes in south Florida particularly it was the

3  opposite, and in a lot of cases it was a balance of the

4  two.  So we were trying to balance all of that together.

5          So I don't think that this is inaccurate,

6  because at the end of the day the legal analysis is Tier 1

7  is superior to Tier 2.  I think we can all agree that that

8  is the case.  But in the drawing process it's -- like the

9  actual drawing process is more organic than that.  You

10  cannot -- I don't think you could draw a map doing only

11  Tier 1 and going back to Tier 2.  I don't think that that

12  would work, or at least the way that I draw it's more

13  organic.

14      Q.   So with respect to drawing -- staff's drawing of

15  maps, Chair Leek's comment, when it's a protected district

16  we focus much less on Tier 2, is that inaccurate?

17      A.   I hate to disagree with my chair who I love very

18  much, but I would say that that is inaccurate.

19      Q.   With respect at least to the mapmaking process?

20      A.   Correct.

21      Q.   And I suppose I should ask you at this point,

22  I'm asking you a lot of questions about member

23  statements --

24      A.   You're fine.

25      Q.   Thank you.  And I just want to clarify, you're

Jason Poreda
July 17, 2025

Page 187

1    not a member of the Florida House?

2        A.   I am not a member of the Florida House.

3        Q.   You were not a member during the redistricting

4    process?

5        A.   I was not a member during the redistricting

6    process.

7        Q.   They have their own thoughts and ideas?

8        A.   Correct.

9        Q.   And they may be expressing them in these

10   transcripts?

11       A.   Correct.

12       Q.   And at the end of the day they're the ones that

13   vote on the legislation?

14       A.   At the end of the day we work for them.

15       Q.   Okay.  And you may disagree with them from time

16   to time.

17       A.   Correct.

18       Q.   And you may disagree with their approach to

19   redistricting.

20       A.   Or at least how they answered a question.

21       Q.   And you might not know, whether it's Chair Leek

22   or Rep. Driskell, whether what they're expressing is how

23   they feel versus --

24            MR. BARDOS:  Object to form.

25       A.   I don't know.

Jason Poreda
July 17, 2025

1    BY MR. WARREN:

2          Q.   Okay.  I get that.  I just thought it should be

3    put out there.

4               Okay.  The red tab, same document, page 77.

5    It's actually the one right after the red tab.  Page 77,

6    line 10.  Chair Leek is answering another question, and at

7    line 10 he says, quote, I can tell you that race was never

8    the predominant factor in drawing a district outside of

9    protecting the protected district, close quote.

10              In the mapmaking process, is it true that race

11   was never the predominant factor in drawing a district

12   outside of protecting the protected districts?

13              MR. BARDOS:  Object to form.

14         A.   I would go even further and say that race was

15   rarely the predominant factor even in the protected

16   districts.

17   BY MR. WARREN:

18         Q.   In what situations to your mind was race the

19   predominant factor in drawing protected districts?

20         A.   There were some districts where, because the

21   minority population that we were looking for was either so

22   small and so concentrated in specific areas we had to draw

23   the district looking -- you know, trying to be as Tier 2

24   compliant as we could, but we had to look at those

25   minority communities to make sure that they were being

Jason Poreda
July 17, 2025

Page 189

1   included properly.

2          A great example of that is District 117, amongst

3   all these challenged districts.  That was a district that

4   we had to look at, like the heat map, and figure out where

5   that Black population is in Florida City and Homestead and

6   that little pocket that kind of goes up the highways, and

7   in an attempt to make sure we included them all properly,

8   to make sure that district could perform as the way it did

9   before.

10      **Q.   So to sum up, would you say that race**

11   **predominated in the house committee's drawing of 117?**

12      A.   That was a factor.  It was probably the

13   predominant factor, while trying to draw the most

14   compliant district as we could.  And as you can see in the

15   workshop maps we did draw different versions of that, but

16   we heard a lot from Representative Chambliss, who

17   represents that area specifically, but then other members

18   as well, and a lot of the members of the public for that

19   district.  So, yes.

20      **Q.   So you tried to draw the most Tier 2 compliant**

21   **smooth boundary district that you could, but at the end of**

22   **the day race was elevated over other factors in 117?**

23      A.   In that particular district that's probably the

24   case, yes.

25      **Q.   Are there any other districts in the house map**

Jason Poreda
July 17, 2025

Page 190

 1    in which that's the case?

 2         A.   District 88.

 3         Q.   Any other districts?

 4         A.   Sixty-two.

 5         Q.   Any others?

 6         A.   A portion of 8.

 7         Q.   I understand.

 8         A.   Yeah.  And that's probably it, honestly.  Maybe

 9    21 a little bit too, actually.

10         Q.   And on the congressional map that was enacted,

11    are there any districts in which race predominated in the

12    drawing of those districts?

13         A.   Congressional District 20.

14         Q.   Any others?

15         A.   No.

16         Q.   Did you ever try to draw a more Tier 2 compliant

17    configuration of District 20?

18         A.   Yes.

19         Q.   What happened to that?

20         A.   Early on in the drawing process, Kyle and I

21    discovered that you were able to draw a Black district

22    over 50 percent entirely within Broward County in our

23    effort of trying to draw a more compact district that was

24    CD 20.  Unfortunately when you did that it impacted the

25    surrounding districts in such a way that it actually made

Jason Poreda
July 17, 2025

1    the whole region more un-compact, and believe it or not

2    the compactness scores of the enacted congressional

3    District 20 -- when I say compactness scores I mean the

4    mathematical compactness scores -- were actually higher on

5    this version of the map than the one that we put entirely

6    within Broward.  But we did make that attempt, and I think

7    that was even in one of our workshop congressional maps if

8    I'm not mistaken.

9         Q.   I think I remember something along those lines.

10             You mentioned you and Mr. Langan trying to draw

11   a 50 percent BVAP district wholly within Broward County

12   for District 20 was -- I think this is relevant to Section

13   2 -- was 50 percent BVAP a threshold that you were looking

14   for in drawing District 20?

15        A.   In relevance to Section 2 of the Voting Rights

16   Act, yes.

17        Q.   So District 20 in the enacted plan, which is

18   based off of District 20 in the House's versions, right?

19        A.   Yes.

20        Q.   So in the enacted District 20, 50 percent BVAP

21   was the target that you were looking to reach?

22        A.   Yes.

23        Q.   If you could have configured District 20 wholly

24   within Broward County without negatively impacting

25   surrounding districts' compactness scores, would you have

Jason Poreda
July 17, 2025

Page 192

1   presented that as an option?

2        A.   We did present that as an option in workshop B

3   or workshop A, but it actually was a less compact -- and

4   visually it did not look less compact, but mathematically

5   it was significantly less compact, and its impact to the

6   surrounding region just made it a nonviable option.

7        Q.   And I think you said this morning -- well, I

8   think you said this morning that every option that you

9   presented to the committee was constitutionally compliant,

10  right?

11       A.   Yes.

12       Q.   So that included the configuration with the

13  Broward only CD 20?

14       A.   Yes.

15       Q.   Okay.  And it was nonviable for reasons other

16  than it was not compliant with the constitutional

17  standards?

18       A.   Yeah.  It may have been compliant, but it was

19  probably pushing the boundaries a little bit.  But we had

20  another version, this version, which was essentially more

21  compliant or more defensible, it was more compact, and it

22  helped the entire region's compactness.  So it was -- you

23  know, there's always more than one way to draw a map, and

24  in redistricting there's probably thousands of ways to

25  draw a map.  So by saying that one was compliant, which I

Jason Poreda
July 17, 2025

Page 193

1    think it was, you know, there's always this is compliant,

2    that's compliant, but when you're looking at all the

3    different factors you can pick the one that might be

4    more -- not more compliant, but more legally defensible.

5         Q.   Makes sense.  We've discussed -- back to the

6    state house map in Dade County.  We've discussed a lot

7    about the different challenged districts in the house map

8    and the different considerations that went into why they

9    are the way they are.  And so I just -- I don't want -- we

10   don't need to retread all that, but besides what we've

11   discussed already, what else, if anything, explains the

12   shapes of those challenged districts, that is, 112 --

13        A.   112, 113, 14, 15, 16, 18, and 19, correct?

14        Q.   Right.

15        A.   I mean, as I mentioned before, we truthfully

16   drew all of those districts, looking more at Tier 2 first,

17   trying to fit them in amongst all the municipalities in

18   Dade County, which there are many, and all the various

19   roads that are down there, and trying to find good

20   recognizable boundaries that aren't going to split up

21   different neighborhoods or different towns and cities.

22             And when we had to split Miami-Dade -- or not

23   Miami-Dade, the City of Miami because of -- I mean, it had

24   to be split anyway.  It was one of the few cities that was

25   greatly above a state house population, but with

Jason Poreda
July 17, 2025

Page 194

1    Districts 108 and 109 taking a portion of it, we felt it

2    not necessary, but we really wanted to try to anchor a

3    district within Miami, and 113 was that district.

4            We also were trying to reduce the number of

5    districts that crossed other county boundaries other than

6    the one that has to come up from Monroe, and we were

7    trying to do that as best as we could and we accomplished

8    that by only having District 104 cross the boundary.

9            And because the math in Miami-Dade County had

10   changed from decade to decade, and I don't remember

11   exactly the math in breaking down, but they were

12   essentially going to lose a house district because of the

13   way the population distribution had changed throughout the

14   state, and we accomplished that by, instead of removing an

15   entire district, we removed half of two districts.  So

16   there was one district that went from Dade into Broward

17   along the coast, there was another district that was kind

18   of more the equivalent of 111 that also went over into

19   Collier.

20           And so instead of just removing an entire

21   district, we kind of removed those halves of those

22   districts to try to keep everything in Dade County.  And

23   that was kind of the -- you know, it didn't start that

24   way, but that kind of became the goal as we saw

25   different -- what was possible with the population

Jason Poreda
July 17, 2025

Page 195

1    distribution.

2           So that became -- that became a goal of ours.

3    And then to -- even though we had to split Miami, we were

4    going to try to keep as many of those other municipalities

5    wholly within a district as we could, and I think we

6    accomplished that.  With the exception of Homestead and

7    Florida City, which were split by the 117 district, I

8    don't think any other cities were split in Dade County.

9        Q.   Hialeah.

10       A.   Was Hialeah -- oh, Hialeah was too big, so that

11   had to be split, too.  Thank you.

12          So, yeah, we did the best we could with all of

13   that, and we tried to make them all follow as many, you

14   know, major political and geographical boundaries as we

15   could.  You know, keeping Coral Gables whole and following

16   as many of the other canals and streets as we could to

17   make it as -- as tight and as compact as possible.

18       Q.   Are there any other reasons that explain the

19   shapes of the challenged districts?

20          MR. BARDOS:  Object to form.

21       A.   I think we've covered it all.

22   BY MR. WARREN:

23       Q.   Okay.  Was there -- you mentioned member input

24   at different points, both in committee and outside

25   committee.  Did member input influence the shapes of the

Jason Poreda
July 17, 2025

Page 196

1    challenged districts, setting aside 108 and 109 that we've

2    already discussed?

3        A.   That we already discussed?  Yeah, I believe at

4    some point I met with every member of the Miami-Dade

5    delegation to talk about the region as a whole, but also,

6    you know, their area that they represent.  And we took all

7    of that input into consideration and considered it where

8    we could.

9        Q.   Is there any specific input that you remember

10   considering that resulted in the enacted district

11   configurations?

12       A.   Other than 108 and 109?

13       Q.   Right.

14       A.   I mean, there was -- I don't remember.  There

15   may have been.  Certainly 117, because we had that other

16   version of 117.  If we didn't get the member input that we

17   did I don't think we would have necessarily chosen this

18   version of it.  We probably would have chosen to keep

19   those cities whole, but we got a lot of -- not just from

20   Representative Chandler, we got a lot of input to kind of

21   keep a more similar orientation that had existed

22   previously.  So we took that into account.

23            I don't remember any other specific example.  I

24   don't -- again, I don't remember specifics, but there were

25   a couple of times where members would come in and ask for

Jason Poreda
July 17, 2025

Page 197

 1  changes that we couldn't do for a variety of reasons.  And

 2  we would literally show them what they were asking for us

 3  to do, and why it wouldn't work for a variety of reasons.

 4  And ultimately then they were like, okay, go with the

 5  version that you came up with. Some stuff like that.

 6     **Q.   Apart from member input, was there any public**

 7  **input or public submissions that you can remember that**

 8  **influenced the enacted districts?**

 9     A.   I don't remember a specific publicly submitted

10  map, but as I mentioned, we looked very closely at all of

11  them.  And there were some public ideas that we

12  incorporated into this.  Maybe not in Dade but a little

13  bit more in South Broward with how that was configured.

14  And I don't really remember how that impacted Dade other

15  than maybe keeping Coral Gables wholly within the

16  district.  I remember that.  We've seen that a couple of

17  times.

18         And then -- where's the -- yeah, so originally

19  we didn't -- originally we were going to split the City of

20  Sweetwater, mostly for visual compactness.  But then we

21  heard that Sweetwater, you know, they were a smaller city,

22  they wanted to be kept whole, and that's why we put the

23  little bump on 116.  I don't remember exactly where that

24  came from, but that was some sort of input that we heard

25  from the public.

Jason Poreda
July 17, 2025

Page 198

1      Q.   And any input that the committee chairs or vice

2    chairs gave?

3           MR. BARDOS:  Object to form.

4      A.   Yeah.  All of the comments I just referred to

5    with members and all that, that kind of all is

6    incorporated in that, too.  I was including them in the

7    global member -- I wasn't excluding them.

8    BY MR. WARREN:

9      Q.   They're members, too?

10     A.   Correct.

11     Q.   Got it.

12          Would you say that in the challenged districts

13   that we're looking at it in the house map, the population

14   distribution has a north/south orientation?

15          MR. BARDOS:  Object to form.

16     A.   In Dade, or just in -- or in all of those three

17   counties in general?

18   BY MR. WARREN:

19     Q.   In Dade.

20     A.   Yes.

21     Q.   Did that influence the development of the

22   challenged districts?

23     A.   No.

24     Q.   So the fact that Dade County may have a

25   north/south population distribution did not impact the

Jason Poreda
July 17, 2025

Page 199

1    development of the challenged districts?

2         A.   So the population is where it is, and we can

3    only draw it -- like, we can't move people around when

4    we're drawing districts, although that would make things

5    easier on occasion.  So ultimately the districts are going

6    to mirror where the people are.

7              But -- so in that respect, yes, because the

8    population distribution is for all three of the big three

9    counties, Dade, Broward, and Palm Beach, they're all

10   squished up against the coasts.  And a lot of the roadways

11   and major cities there are in a more north/south

12   orientation because they're densely squeezed to the coast.

13   That's going to influence the redistricting process,

14   because the people are where they are.

15             That being said, it wasn't like a predetermined,

16   we're going to do the districts in this way.  And an

17   example of that is the change in 108 and 109.  We actually

18   did look at maybe configuring the districts in a slightly

19   different way, but then as time went on and things evolved

20   in trying to keep more cities whole and all those cities

21   are basically oriented in that way, it just kind of

22   naturally fell into that orientation.

23        Q.   And in the 108 and 109 example, that change in

24   orientation was because of member input and a community of

25   interest concern around a language minority?

Jason Poreda
July 17, 2025

Page 200

1    A.   Right.

2    Q.   Okay.  Would you say in the area of Dade County

3  covered by the challenged districts the major roadways

4  follow a north/south orientation?

5    A.   I believe that that is correct, in my opinion.

6    Q.   In your opinion, are there fewer east/west major

7  roadways than north/south major roadways in this area?

8    A.   I think it -- I think that depends.  There are

9  so many different roads in that area.  What is or is not

10 considered a major road could be different from person to

11 person.  This is also an example of an area where the

12 boundary analysis score that we came up with is not really

13 that effective, because although there are interstates and

14 state roads that run through that area, there is also far

15 more city and county roads that could be three, four,

16 five, six lanes in each direction that anybody on the

17 ground would consider a major road, but would not be

18 factored into our boundary analysis score because the

19 Census Bureau didn't tag that road as a primary or

20 secondary road.

21         So what is or isn't a major road, particularly

22 in a densely populated area like this, can mean different

23 things to different people.  So is there a more east/west

24 than north/south, I don't know.  I would have to count

25 them up, really.  And then the number I come up with will

Jason Poreda
July 17, 2025

Page 201

1    be different than what you come with up with, because

2    we're going to be considering different roads in different

3    ways.

4           We tried to use as the most obvious major roads,

5    and that's part of why I used the satellite view when I

6    was drawing maps, so I could zoom in and see what a road

7    actually looks like.  And occasionally would determine

8    that, yeah, I think this road, even though it doesn't

9    qualify, is a pretty major road, or at least a road that

10   the people who live in the area are going to recognize as

11   that could be a boundary, whatever that road is, and used

12   that.  So that's much more difficult in this area than in

13   other parts of the state.

14       **Q.   Because there are a lot of roads, but they may**

15   **not all be state or interstate roads?**

16       A.   Correct.

17       **Q.   But there are a lot of major roads in Dade**

18   **County.**

19       A.   A lot of major roads, yes.

20       **Q.   And some of them run north/south and some of**

21   **them run east/west.**

22       A.   Yeah.

23           MR. WARREN:  Okay.  I'd like to transition

24       to the congressional map and ask you some

25       questions from the February 18th, 2022,

Jason Poreda
July 17, 2025

Page 202

1          congressional redistricting subcommittee.  The

2          transcript is Exhibit 17, and we'll start on the

3          red tab, which is page 10.

4               (Exhibit No. 17 marked for identification.)

5               THE WITNESS:  Can I grab another drink real

6          quick while we're getting straight?

7               MR. BARDOS:  Is it okay if we take a

8          five-minute break?

9               MR. WARREN:  Yes, take a break.

10               (Recess taken from 3:54 p.m. to 3:59 p.m.)

11   BY MR. WARREN:

12        Q.   So we are at page 10 of the February 18th

13   transcript, and Chair Sirois, S-I-R-O-I-S, is introducing

14   the congressional map presented at this committee, and he

15   says at line 21, quote, In each district the minority

16   groups' voting age population are similar when compared to

17   the benchmark districts with slight increases or decreases

18   as permitted by the Florida Supreme Court precedent, close

19   quote.  And he continues on the next page at line 6,

20   quote, These districts are also drawn in a consistent

21   manner with respect to Florida Supreme Court precedent to

22   maintain existing majority minority districts, close

23   quote.

24               This is a similar introduction as we discussed

25   with the house map?

Jason Poreda
July 17, 2025

Page 203

1        A.    Uh-huh.

2        Q.    Fair to say?

3        A.    That is correct.

4        Q.    So your explanation of the relevance or not of

5   the similarity in HVAP between these new congressional

6   districts and the benchmark applies?

7        A.    I would agree.

8        Q.    Okay.  And at the end of that statement, Chair

9   Sirois said that the districts were drawn in a consistent

10  manner with respect to precedent to maintain existing

11  majority minority districts.  Is that an accurate

12  statement of the mapmaking process?

13       A.    I believe so, yes.

14       Q.    Okay.  At the orange tab, page 23.  Chair Sirois

15  at line 10 says, quote, Congressional District 26, similar

16  in shape to the benchmark map, connects the part of

17  Collier County not included in Congressional District 19

18  with population in Miami-Dade County, close quote, and

19  then he continues explaining the district.

20       A.    Uh-huh.  Yes.

21       Q.    That comment that CD 26 in this map is similar

22  in shape to the benchmark map, is that the same type of

23  contextual observation that we discussed previously or is

24  there more meaning to that?

25       A.    No.  That's a contextual observation in an

Jason Poreda
July 17, 2025

Page 204

1  effort to present a large amount of information in a more

2  concise way.

3       Q.  Got it.  The next yellow tab, page 38.

4  Rep. Joseph is asking questions, and at line 10 she says,

5  quote, Let me move on to CD 26.  So looking at CD 26, was

6  that impacted by the fact that it's a Tier 1 protected

7  district for Latino voters or Hispanic voters, close

8  quote.  And Chair Sirois answers at line 16, quote, Yes,

9  close quote.

10         Is that an accurate answer to that question?

11      A.  I'm sorry.  I'm -- on line 15 and 16?

12      Q.  Correct.

13      A.  Sorry, I lost track of it.

14      MR. BARDOS:  So, 10 to 16.

15      MR. WARREN:  Yeah, 10 to 16.

16      THE WITNESS:  Yes.

17  BY MR. WARREN:

18      Q.  So CD 26 was impacted by the fact that it's a

19  Tier 1 protected district for Hispanic voters?

20      MR. BARDOS:  Object to form.

21      A.  Yes.

22  BY MR. WARREN:

23      Q.  On the same page, Rep. Joseph asks a follow-up

24  at line 17.  She says, quote, So looking at kind of the

25  image of it, it's kind of like an extruded stair step

Jason Poreda
July 17, 2025

Page 205

1    shape stretching up from the Gulf of Mexico all the way

2    over to a little finger that points just 700 yards short

3    of Biscayne Bay in Miami.  Was that shape necessary to

4    comply with Tier 1, or were there other factors that went

5    into just how it ends up looking there, close quote.

6            And Chair Sirois deferred to you, and you said

7    on page 39, line 6, quote, Yes.  The shape of District 26

8    was largely because not only it was a Tier 1 protected

9    district, but the other three districts in Miami-Dade

10   County, District 24, are protected Black districts, and

11   District 27 and 28 are also protected districts.  So

12   trying to balance all the Tier 2 issues that are there in

13   addition to first protecting all three of those districts

14   and their ability to elect, that largely impacted the

15   shapes of all four of those districts, close quote.

16           Is your answer an accurate answer to

17   Rep. Joseph's question, understanding that we may not all

18   accept her characterizations or premises?

19   A.    Yes, I believe it is.

20   Q.    Okay.  Do you have anything to add or clarify?

21         MR. BARDOS:  Object to form.

22   A.    The only thing that I would add now upon

23   reflection is that there were -- I would largely agree

24   with that, but there's also, especially because of CD 20

25   and that final shape that we chose with that, there's only

Jason Poreda
July 17, 2025

Page 206

1   so many people in Dade County, and in congressional

2   districts you have to achieve population equity.  So at

3   some point some district -- some other district from

4   Miami-Dade County is going to have to go somewhere,

5   whether it go north into Broward or west into Collier.

6           So in that respect, I probably should have

7   pointed that out at that time, but some district is going

8   to have to go over.  There's just not enough people in

9   Miami-Dade to support putting District 26 entirely within

10  Dade County, particularly because you have the concern of

11  CD 20, which is really the district that governs the shape

12  of really all of the surrounding districts in that area.

13          So that was probably a relevant factor that I

14  should have mentioned before, in addition to the other

15  protected districts in that area.

16  BY MR. WARREN:

17      Q.   So to sum up, and please correct me if I

18  misstate, in addition to the reasons that you gave on

19  page 39 in the transcript, an additional reason is meeting

20  necessary population to reach equal population?

21      A.   Correct.

22      Q.   Okay.  Turning to the green tab, dark green,

23  page 43.  Rep. Joseph is at it again, and she asks the

24  following question, starting at line 11, quote, If I'm not

25  mistaken, the Everglades boundary coincides with the

Jason Poreda
July 17, 2025

Page 207

1   political boundary where the Dade, Collier County boundary

2   is.  So with that in mind, looking at the Tier 2 factors

3   with CD 26, like this stairway to Immokalee shape, it

4   crosses those county lines, it splits Collier, which is

5   smaller than the ideal district size, it splits the City

6   of Miami in three ways, and Miami is smaller than ideal

7   district size, too.  And all those Tier 2 -- I don't want

8   to say deficiencies, but infirmities, if we can call it

9   that, were those necessary to maintain Tier 1 compliance,

10  close quote.

11         And Chair Sirois deferred to you again, and you

12  said, quote, As I mentioned earlier, that is primarily due

13  to Tier 1 considerations, in addition to the equal

14  population standard, close quote.

15         Is that an accurate answer to Rep. Joseph's

16  question?

17  A.   I mean, you left out a large portion of my

18  answer there in that equal population standard because the

19  boundaries within Collier County, for example, even though

20  Collier County -- there's lots of counties throughout the

21  map.  Walton County is another example, Citrus County,

22  where counties have to be split in a congressional map

23  because of equal population standard.  In addition, the

24  stair step thing that she's describing, we're following

25  county boundaries to create that stair step look that

Jason Poreda
July 17, 2025

Page 208

1    she's referring to.

2            So it isn't exactly just in the middle of

3    nowhere.  Those are following defined political

4    boundaries, and within Miami-Dade we're following the

5    Tamiami Trail until we're then following the Collier,

6    Monroe County line.  So that stair step thing that she's

7    referring to is actually following county boundaries.  I

8    don't know why I didn't mention that in the committee, but

9    it's all county boundaries there.

10           In addition to earlier in the question they

11   talked about the, quote/unquote, boundary of the

12   Everglades, which is a nondefined boundary.  There is no

13   definite boundary of where the Everglades start and end.

14   A lot of environmentalists and everyone will argue over

15   where the Everglades start and end.  So there really is no

16   definitive boundary there.

17           So in this particular case we're following

18   county boundaries and the Tamiami Trail to go into Collier

19   County.  So I don't -- yeah, I guess I would add that to

20   my answer.

21       Q.   Okay.  And the other elements of Rep. Joseph's

22   question about why CD 26 splits the City of Miami in three

23   ways, for example, would your answer that that is

24   primarily due to Tier 1 considerations apply to that

25   aspect of her question?

Jason Poreda
July 17, 2025

Page 209

1           MR. BARDOS:  Object to form.

2       A.   So City of Miami is split multiple times for

3    equal population reasons, and also because District 24 is

4    a protected Black district, so that takes part of Miami.

5    District 27 is a separately protected district by itself.

6    So, in essence, yes, it's Tier 1 considerations, but it's

7    also equal population in that area, because you only have

8    so much -- you know, congressional districts get -- you

9    can put more cities within a congressional district

10   because you have almost 800,000 people, but you're also

11   dealing with all of these other Tier 1 concerns, too.  So

12   I think it's a combination of all of those things.

13           But certainly all four of the districts in Dade,

14   24, 27, 28, and 26, are all protected districts, so that

15   certainly contributes to the shape or the splitting of

16   Miami.

17   BY MR. WARREN:

18       **Q.   Would you say, echoing your words from the**

19   **committee, that those Tier 1 considerations were a primary**

20   **reason for the way the City of Miami is split?**

21           MR. BARDOS:  Object to form.

22       A.   I would say it's our reason.  I don't know if I

23   would say it's primarily the reason.

24   BY MR. WARREN:

25       **Q.   What are the other reasons, setting aside for a**

Jason Poreda
July 17, 2025

Page 210

1    second equal population?

2        A.   Well, that would be the major one, equal

3    population, but -- yeah, equal population would probably

4    be the other major one.  But considering those are

5    protected districts, you know, one Black district and

6    three Hispanic districts, that's certainly a large

7    concern.  But without looking at it I wouldn't be able to

8    give you a definitive list of all of the other reasons,

9    but it's certainly a large contributing factor.

10       Q.   Okay.  Tier 1 was a large contributing factor in

11   the way the City of Miami was split?

12       A.   Correct.

13       Q.   Okay.  Moving on to page 47, a couple sheets --

14   one sheet later.  Rep. Fabricio, F-A-B-R-I-C-I-O, asks a

15   question on page 46 at line 4, quote, I'd like to consider

16   the compactness scores of District 26 vis-à-vis the

17   compactness scores of, say, District 3, close quote.  And

18   he lists out some compactness scores.

19            And Director Kelly answers at line 23, quote,

20   So, first of all, compactness is secondary to our Tier 1

21   requirement to ensure that a minority population has an

22   ability to elect a candidate of their choice.  So both of

23   the districts that you reference, Congressional District 3

24   in north Florida and then Congressional District 26 in

25   south Florida, are both Tier 1 protected districts.  The

Jason Poreda
July 17, 2025

Page 211

1    first item I'd like to point out is that Tier 3 -- I think

2    she meant District 3 -- is a protected Black district.

3    District 26 is a protected Hispanic district, close quote.

4            My question is, her answer that compactness is

5    secondary to our Tier 1 requirement, is that an accurate

6    reflection of your understanding?

7    A.   I'm sorry.  Can you repeat your question?  I'm

8    sorry.

9    Q.   Sure.  Director Kelly says, Compactness is

10   secondary to our Tier 1 requirement to ensure minority

11   population has an ability to elect.

12           Do you agree with that statement?

13   A.   I agree that Tier 1 is superior to Tier 2, yes.

14   So in that way, yes.  And it should be noted that they're

15   not referencing the enacted congressional map here,

16   they're referencing one of our earlier versions where the

17   congressional district -- they went from Jacksonville to

18   Tallahassee -- was Congressional District 3.

19   Q.   Certainly.  Thank you.

20   A.   Just to clarify for the record.

21   Q.   Yes.  Very helpful.  Thank you.

22           So Rep. Fabricio asks essentially why do

23   District 26 and District 3 have these low compactness

24   scores, or at least he thinks they're low.  And Director

25   Kelly's response is, you have to consider these are Tier 1

Jason Poreda
July 17, 2025

Page 212

1    districts and compactness is secondary to Tier 1.  Is that

2    an accurate paraphrase?

3        A.   Yes.

4        Q.   So were District 26 -- was the compactness of

5    District 26, whether it's low or however you want to

6    characterize it, was District 26's compactness secondary

7    to achieving Tier 1 compliance?

8             MR. BARDOS:  Object to form.

9        A.   I mean, its compactness scores, yes.  I don't

10   think its compactness was.  Again, compactness can be

11   several things.  It's more of an art than an exact

12   science, but if you're looking at the mathematical

13   compactness scores, I would agree with you.  But because

14   it is following -- the majority of that district is

15   following, like, county lines and things like that, and in

16   that way that is also a part of compactness.

17            So, yeah, I don't know if I completely agree

18   with the complete characterization of compactness as

19   holistically, but if you want to reference the three

20   mathematical compactness scores that we have used in the

21   process, they are certainly lower than other districts in

22   the map, but do a pretty good job of following county

23   boundaries.

24            The District 3 she's referencing to you could

25   say the same thing about.  Visually maybe not looking very

Jason Poreda
July 17, 2025

Page 213

1   compact, mathematical compactness scores, no, but that

2   district was made up of almost entirely whole counties

3   except for two little bits at the end, so -- and then one

4   other bit.

5   BY MR. WARREN:

6        Q.   So, to make sure I have this right, District

7   26's compactness scores were secondary to achieving Tier 1

8   compliance?

9             MR. BARDOS:  Object to form.

10       A.   That wasn't the -- I mean, Tier 1 was a concern

11  and the compactness scores were certainly secondary to

12  that.  So, yeah, I'd have to agree with that.

13  BY MR. WARREN:

14       Q.   Okay.  And relatedly --

15       A.   Relatively speaking, because, again, compactness

16  scores are not -- a seemingly low compactness score does

17  not necessarily mean low compactness.

18       Q.   Of course.  Relatedly, the fact that District 26

19  had lower compactness scores was because of Tier 1

20  compliance?

21            MR. BARDOS:  Object to form.

22       A.   And because we were following county boundaries.

23  BY MR. WARREN:

24       Q.   Okay.  And you were following those particular

25  county boundaries to achieve equal population?

Page 214

1          MR. BARDOS:  Object to form.

2     A.    That was part of it, yes.  We had to -- there

3  was a portion of Miami-Dade that was left without a

4  congressional district and it had to go somewhere.  We

5  followed a major road and county boundaries to get over to

6  Collier County.  We then -- at the time we're choosing the

7  most major roadways and other areas in Collier County to

8  achieve an equal population congressional district.  That

9  also happened to be a Tier 1 protected district, so we had

10  to take that into consideration as well.

11          But I think -- I would have to double-check.  I

12  think that district's boundary analysis scores would

13  probably be pretty high in comparison to some other

14  districts.  But that's me speculating.  I'd have to

15  double-check the numbers.

16  BY MR. WARREN:

17     Q.    If you could turn to page 63.  At line 19, you

18  are answering a question from Rep. Joseph about CD 24, and

19  she's asking you about the difference from the proposal

20  the committee is considering and the benchmark.  And you

21  answer at line 19, quote, That district is a protected

22  Black district.  Its Black voting age population and the

23  benchmark was about 43 percent, and the districts you see

24  before you, it's about 42 and a half percent, 42, I think,

25  .2 percent.  It was brought over to that population so it

Jason Poreda
July 17, 2025

Page 215

1   wouldn't impact Districts 26, 27, or 28, which are all

2   protected districts, in addition to adding population to

3   all three districts to achieve our new ideal population

4   for a congressional district, close quote.

5           In drawing the border between District 24 and

6   the adjacent Hispanic protected districts, was there a

7   concern -- did you have a concern about drawing that

8   border to not impact the Hispanic protected districts?

9           MR. BARDOS:  Object to form.

10     A.   I'm not sure if I understand the question.

11  BY MR. WARREN:

12     Q.   Let me rephrase it.

13     A.   Yeah.

14     Q.   I guess my question is, what did you mean when

15  you said CD 24 was brought over so it wouldn't impact 26,

16  27, or 28, which are all Hispanic protected districts?

17     A.   So, that question -- so there's a portion of the

18  question you left out and I read a little bit more.  The

19  question was more related to why did District 24 go all

20  the way to the coast, and why did District 24, a protected

21  Black district, encompass a lot of these municipalities

22  that are in House District 106, and the reason for that

23  was that's where the population was.  Also, because if you

24  start going the other way, some other district is going to

25  have to come up and take that population on the beaches up

Jason Poreda
July 17, 2025

Page 216

1    there.

2            So it's going to impact, like, the compactness,

3    but, yes, the potential functional analysis Tier 1

4    compliance of all of those other districts.  If you took

5    the district to the east rather than to the west, which is

6    what that question was specifically referring to, that's

7    why that was done in District 24, to essentially not have

8    District 27 or another district have to come up and take

9    that population and go that way.  Or if you had 25 come

10   down that way, then some other district would have to go

11   up north, and then so you're impacting everything in the

12   congressional district world.  When you move one district

13   you're moving six districts sometimes.  So that's why that

14   district went that way.

15           So, yes, it was for the Tier 1 compliance of

16   those districts, but really it's just that's where the

17   population was, and we had to achieve the equal population

18   number for everything.  So it was kind of a -- it's kind

19   of a regional balance of everything, and that population

20   had to go somewhere.  And it was less -- if we took this

21   district west, it was going to impact the performance in

22   Tier 1 for 26, 27, and 28, is that 27 would have to come

23   up and take that, and then this district would have to

24   come in there.  You know what I mean?  It would have one

25   of those pinwheel effects with everything and everything

Jason Poreda
July 17, 2025

Page 217

1  would be affected globally.  So that's what the question

2  was coming from.

3     Q.  So in drawing District 24 you were not -- am I

4  correct in thinking that you were not only concerned about

5  ensuring Tier 1 compliance in District 24, but also

6  avoiding negatively impacting the Tier 1 performance of

7  the adjacent Hispanic districts?

8     A.  Yeah.  And the same with 26 and 27 and 28, when

9  you're drawing those, you're going to try to draw those in

10  a way that's not going to negatively impact the

11  performance of District 24.  When you have projected

12  districts all up against each other you got to make sure

13  everything's all balanced together.  So in that way in the

14  drawing of all of those districts you're trying to make

15  sure they all can individually perform, but because

16  they're all neighboring districts, changing one district

17  is going to impact another in some way, shape, or form.

18        So if you're going to make those changes you

19  need to make sure that you're not impacting the other

20  district in its functional analysis or even its

21  compactness really.  But, like, you kind of have to

22  balance everything together.

23     Q.  I think Director Kelly elsewhere in this meeting

24  referred to the Tier 1 constraints of the region in

25  talking about drawing districts and Dade County.  Is

Jason Poreda
July 17, 2025

Page 218

1  that --

2      A.   Certainly so, yeah.  I mean, you can't ignore

3  CD 20, too, because that probably the -- because that

4  Section 2 protected county or district, it kind of is in

5  almost its own category compared to the other districts,

6  so --

7      Q.   Okay.

8      A.   And obviously that district isn't in Dade, but

9  because it's right up on the border it then impacts

10 everything else.

11         MR. WARREN:  So I'm handing you Exhibit 18,

12     which is an excerpt from the deposition of Alex

13     Kelly in 2023.

14         (Exhibit No. 18 marked for identification.)

15         THE WITNESS:  In this case?

16 BY MR. WARREN:

17     Q.   No.

18     A.   Oh, in the Black -- okay.  I see.  Never mind.

19     Q.   In Black Voters Matter and Common Cause jointly.

20         And I wanted to ask you about one answer of his

21 on page 277 of the transcript.  The question is starting

22 at line 12, quote, Would you agree with me then that the

23 way that the Legislature drew CD 24 and CD 26 was not race

24 neutral, close quote.

25         And Mr. Kelly's answer at line 19 is, quote, I

Jason Poreda
July 17, 2025

Page 219

1    would agree with you, it was not race neutral, close

2    quote.  And he continues, quote, Although I don't know if

3    I'm being picky, but 26, that district performs for

4    Hispanic Floridians, so an issue of ethnicity, not race,

5    close quote.

6            Would you agree with Mr. Kelly that the way the

7    Legislature drew CD 24 and CD 26 was not race neutral?

8            MR. BARDOS:  Object to form.

9        A.  I would agree that race was a factor for those

10   districts, yes.

11   BY MR. WARREN:

12       Q.  Is the same thing true of Districts 27 and 28?

13       A.  Yes.

14       Q.  And just so we're clear, the same thing is true

15   of the Hispanic protected districts in the state house

16   plan in Dade County?

17       A.  That I would say no to.

18       Q.  Why?

19       A.  Because -- so when you're dealing with

20   congressional districts, the state house districts, you're

21   dealing with districts that are about 180,000, and I think

22   it was 769,000 and change.  I think 769,221 was the exact

23   number in the state house map.  I think it was 184 and

24   change.  I forget the number.

25           So that inherently changes assumptions that you

Jason Poreda
July 17, 2025

Page 220

1   can make about the different districts in the map.  And in

2   the state house map, because you're dealing with such

3   smaller districts, as I mentioned before, we almost kind

4   of did the reverse.  We drew Tier 2 compliant districts

5   and then made adjustments if we had to to get Tier 1.  So

6   I would say the state house districts were primarily drawn

7   for Tier 2 compliance and keeping cities and counties --

8   or not counties, but keeping the municipalities whole and

9   made adjustments where we had to for the most part except

10  for the Black districts as I mentioned before, 117 and

11  something like that.

12          But in the congressional world, even in the

13  state senate, every time you change the ideal population

14  of the district you're fundamentally changing the overall

15  drawing equation, because you're dealing with like what

16  may have been a district that would be easier to draw in a

17  state house map might become incredibly difficult in a

18  senate map for a congressional ward or vice versa.

19          There might be a district in a congressional map

20  because of the population becomes easier that's much

21  harder in a state house map, just because the district

22  populations are so different.

23          So I think in this particular context that

24  applies to the congressional map only and not the state

25  house map.

Jason Poreda
July 17, 2025

Page 221

1          Q.    You referred earlier to minimizing the number of

2    times the Dade County boundary was crossed.

3          A.    In the state house map.

4          Q.    Was a goal in drawing the state house map.

5          A.    Ended up being a goal.  It wasn't a goal that we

6    started with, but as we continued to draw we realized that

7    that would be a thing -- a possibility that we could do

8    and it became a goal.

9          Q.    And that became a goal because that was in

10   service of the Tier 2 criteria to utilize existing

11   political boundaries?

12         A.    Yes.

13         Q.    One manifestation of following that criterion is

14   minimizing the number of times a county boundary is

15   breached?

16         A.    Where feasible, yes.

17         Q.    Okay.  I think you already mentioned in the

18   benchmark house plan there was a state house district, one

19   of five, I believe, that --

20         A.    Yeah, I don't remember the number.

21         Q.    That -- let's call it one of five -- that

22   extended -- that included portions of both Dade and

23   Collier counties.  Do you remember that district?

24         A.    Yes, yes.

25         Q.    And that district -- there was no longer such a

Jason Poreda
July 17, 2025

Page 222

1    district in the enacted state house map?

2        A.    Correct.

3        Q.    And that was a positive in the house committee's

4    view?

5        A.    Yes.

6        Q.    Because that achieved the goal of minimizing the

7    number of times the Dade County boundary was breached?

8        A.    Yes.

9        Q.    Return to the February 1st transcript,

10   Exhibit 15, to the yellow tab at the top, page 7.

11       A.    Exhibit 17?

12       Q.    Fifteen.

13       A.    Fifteen.  I don't have that.  Oh, here it is.

14   Sorry.

15       Q.    Yellow tab, page 7.

16       A.    Page 7.

17       Q.    Line 15, Chair Leek says, quote, Where feasible,

18   we also worked to improve visual compactness of districts

19   or the eyeball test, such as no longer having a district

20   that stretches from Miami-Dade County to Collier County,

21   close quote.  And he gives another example.

22       A.    Yes.

23       Q.    Is that what you're talking about?

24       A.    Yes.

25       Q.    So having a district that stretched from

Jason Poreda
July 17, 2025

Page 223

1    Miami-Dade to Collier County impaired the visual

2    compactness of districts?

3         A.   Which map are you referring to?

4         Q.   In this case the house map.

5         A.   Which state house map?

6         Q.   Well, that district was in the benchmark house

7    map.

8         A.   Okay.  So you're referring to the benchmark

9    state house map.  In that particular map, although I don't

10   remember if that was a protected district or not, but,

11   yeah, that was a district that, you know, visually looked

12   a little out of place I will admit.  But I believe --

13   yeah, anyway.

14        Q.   Now, in the enacted congressional map there is a

15   district that includes portions of both Dade and Collier

16   County, right?

17        A.   Correct.

18        Q.   And the Dade County boundary is crossed twice in

19   the congressional map, right?

20        A.   Three times.

21        Q.   Three times, because the Keys have to be

22   connected to Dade?

23        A.   Correct.

24        Q.   And I suppose it's two times in the house map,

25   too, if you're counting going into Monroe and then going

Jason Poreda
July 17, 2025

Page 224

1    into Broward?

2         A.    Correct.

3         Q.    But it's three in the congressional map?

4         A.    Correct.

5         Q.    Why?  Why not do a similar application of the

6    Tier 2 considerations we've been talking about in the

7    congressional map as in the house map?

8         A.    I believe that we did, and I believe in the

9    context when you're dealing again with different total

10   district populations it inevitably will lead to different

11   results.  And, as an example, we kept District 20 and

12   District 25 out of Dade, and we only crossed it just

13   barely with District 24 and obviously 26 that goes to

14   Collier, and then the other district.  When you're dealing

15   with district populations so high you have to make other

16   considerations, and I think we did limit the amount of

17   districts that crossed the Dade County line to the best of

18   our ability within the context of a congressional map.

19        Q.    Okay.  During the drafting process, did

20   committee staff ever draw a draft map that did not include

21   a district that crossed the Everglades?  And by crossing

22   the Everglades, I should clarify.  I mean, was there ever

23   a draft map that staff drew that didn't include a

24   congressional district that included both portions of

25   Collier and Dade counties?

Jason Poreda
July 17, 2025

Page 225

1    A.   Publicly -- when you say draft map, what are you

2    referring to?

3        Q.   **Something that staff drew.**

4    A.   So not necessarily public drafts?

5        Q.   **Correct.**

6    A.   Yes.

7        Q.   **Was that concept analyzed as an alternative or**

8    **possible alternative?**

9    A.   Every draft that we drew was analyzed as a

10   possible alternative.

11       Q.   **And do you remember why a concept congressional**

12   **map that followed the Dade County line in the same way as**

13   **the house map did not advance further in the process?**

14   A.   Yes, for a multitude of reasons.  The first is

15   that when you do that, when you hold that Dade County

16   line, so you're pushing all the population up to the

17   north, all the population -- and forget the county

18   breakdown between -- in District 26 with the population.

19   You're taking all that population that would be in Collier

20   County and pushing it up through Broward, which means all

21   the other remaining districts have to push and go around.

22   And in the version that -- or versions that we came up

23   with, because obviously you kind of end at District 21,

24   and District 21 then becomes underpopulated.

25           So where do you go?  So you kind of push west.

Jason Poreda
July 17, 2025

Page 226

1    So you go west into these rural unpopulated counties -- or

2    less populated counties of Okeechobee, Highlands,

3    whatever, and it essentially ended up being a district

4    that went from the Atlantic coast to the Peace River over

5    here, which is effectively going from coast to coast, but

6    through the middle of the map.

7           So you're basically getting a similar type

8    district, whether it be from Dade to Collier or kind of

9    over the top of the map, because everything kind of

10   shifted around District 20, because District 20 being that

11   protected Section 2 district, that stayed about the same

12   and everything went that way.

13          In addition to that -- so that ultimately, like,

14   we were -- we basically had come to the conclusion that we

15   were going to have a district that was going to

16   essentially go from coast to coast, regardless.  Do we

17   want it going through the middle of the map or on the

18   bottom side of the map.

19          In addition, the functional analysis that was

20   done on District 26 that included the southern portion of

21   Broward County became -- looking at the diminishment

22   standard anyway, I don't remember the vote dilution part

23   of it, but it significantly impacted that district's

24   ability to perform.  Meaning the minority candidate

25   just -- the minority community's ability to elect a

Jason Poreda
July 17, 2025

Page 227

1    candidate of their choice.  Because even though there's

2    some Hispanic population in South Broward County, it was

3    not populous enough to kind of counter losing the Collier

4    portion of that.

5           So that district -- and I think it also, because

6    we had to take -- again, I don't remember the exact draft,

7    it isn't like this map popped in, whatever, there's a lot

8    of differences, but it effectively hurt, like, I think two

9    of these three congressional districts with their

10   functional analyses, so it just made that -- that was a

11   separate Tier 1 consideration that we were then having to

12   deal with on top of the fact that we were trying to

13   prevent a district kind of going coast to coast.

14          And in the congressional district world, unlike

15   the house district world where we were able to achieve

16   that mathematically, and that was partially because, like

17   I've mentioned before, Dade County was losing a house

18   district.  So the math just sort of fit that ability to

19   take that district out of Collier by losing half a

20   district there, and then a half a district over here, it

21   just -- the puzzle pieces fell into place and we were able

22   to do that.

23          In the congressional district world, with the

24   way the population break down when you're dealing with

25   almost 800,000 people in the district, it just didn't

Jason Poreda
July 17, 2025

Page 228

1    mathematically work.  And that's why some concepts that

2    may work in a house map don't necessarily work in a

3    congressional map or a state senate map when you're

4    dealing with districts that differ in ideal populations.

5    And we felt it was a better visual choice to have a

6    district that went from Dade to Collier as opposed to one

7    that went from St. Lucie and Martin all the way over to

8    Cape Coral, and essentially have another district that

9    crossed and cut the state in half.

10           So it was kind of like -- that was probably --

11   honestly, that was probably the bigger reason why we

12   scrapped that idea rather than the Tier 1 considerations,

13   but that was obviously an equally big concern is that we

14   now had three -- two of the three Hispanic districts that

15   possibly had questionable functional analysis numbers.

16           But honestly we did not -- we didn't look at

17   those numbers in, like, more detail, because we kind of

18   scrapped that idea early on, earlier on than other

19   options.

20        Q.   Okay.

21        A.   And, in addition to just that, some of these

22   other districts kind of around District 20, like, we had a

23   lot more wraparound districts.  Like, 22 had to wrap

24   around that.  So it affected the visual compactness of,

25   like, pretty much all these districts.  And it just

Jason Poreda
July 17, 2025

Page 229

1   became -- not that wraparound districts are bad, but as a

2   personal choice, I don't like the way they look visually.

3   And we ended up having, like, three of them.  And it was

4   just -- to me it looked like a messy option, and then you

5   had all of the other major factors that I just went

6   through.

7        Q.   You said wrap around that.  I'm sorry.  Could

8   you clarify that for the record?

9        A.   Sorry.  So District 25 would then have to wrap

10  around the extensions of District 20.  District 23 kind of

11  removed -- which is not quite a wraparound district of

12  District 20, but that became more condensed up here, and

13  then District 22 had to wrap around the arm, the northern

14  arm of CD 20, and it just pushed everything further north,

15  and just made everything look more jumbled.  So the whole

16  region became less visually compact.

17       Q.   Okay.  I want to make sure I understand

18  everything that you've said, so please correct me if I'm

19  wrong.

20       A.   Sorry if I rambled.

21       Q.   No.  I'm with you.

22            So staff explored options for the congressional

23  map that followed the Dade, Collier County line and

24  separated those coasts at the south end of the state,

25  right?

Jason Poreda
July 17, 2025

Page 230

1     A.   We did.

2     Q.   That concept was scrapped, in your words, right?

3     A.   Uh-huh.  Correct.

4     Q.   And the reasons that concept was scrapped were,

5   number one, because it would negatively impact the

6   compactness of other districts?

7     A.   Correct.

8     Q.   Number two, you would have a district that

9   extended west anyway, just further north?

10    A.   Yes.  Further north, but it would extend

11  essentially the same way west.  So you would have a

12  district that would be from the Atlantic coast all the

13  way, effectively, to the Gulf coast, because you would be

14  to the Peace River, I think it was, which goes out to the

15  Gulf.  So you're having a coastal to the northern side,

16  that is correct.

17    Q.   So, number two, you would have a big district

18  that extended from the Atlantic almost all the way to the

19  Gulf coast?

20    A.   Correct.

21    Q.   And then, number three, that concept would

22  negatively impact the Hispanic performance of CD 26 and

23  CD 27?

24    A.   I don't remember which.  I know it was two of

25  the three.  I don't remember specifically which ones.  I

Jason Poreda
July 17, 2025

Page 231

1  know that 26 would have been a part of that, I don't

2  remember if it was 28 or 27.

3      Q.   Okay.  So the third reason is that concept of

4  eliminating that Collier, Dade district would have

5  negatively impacted Hispanic ability to elect in

6  District 26 and one of District 27 and 28?

7      A.   That is correct.

8      Q.   Are there -- those are three reasons, I think.

9      A.   I think so, yes.

10     Q.   Okay.  Are there any other reasons why staff

11  scrapped that idea?

12     A.   There may have been.  Those are the ones I

13  remember.

14     Q.   Okay.  Was that a decision that was made just by

15  committee staff, or did that include others?

16     A.   We may have called Andy Bardos to talk about it.

17  We would sometimes ask about different draft options as we

18  were to meet with Andy.  I don't remember if we spoke to

19  anyone else about it.  It may have been just us three, me,

20  Kyle, and Leda, because it seemed kind of an obvious

21  negative draft, when we had other drafts that were better.

22          And honestly, by going through that exercise,

23  because we recognized that what we were trying to do in

24  the house map was not going to be duplicated in the

25  congressional map, and that was kind of an effort of

Jason Poreda
July 17, 2025

Page 232

1    trying to do exactly what you're suggesting, trying to put

2    that in the congressional context, and we realized it just

3    wasn't really viable because of the larger districts.

4        Q.   And so members, including committee chairs,

5    would not have seen that concept?

6        A.   I don't know.

7        Q.   You don't know whether members or committee

8    chairs saw that concept?

9        A.   I don't remember if we shared it to the chairs

10   or vice chairs or anyone else.  I don't remember.

11       Q.   But you don't remember members or committee

12   chairs giving input on that concept?

13       A.   I don't remember.

14       Q.   Okay.  One question.  So we talked about the

15   three reasons why that concept was scrapped.  One of those

16   reasons is essentially you're going to have to have a

17   district that extends a long way across the state from the

18   Atlantic westward, right?

19       A.   Correct.

20       Q.   And it's either going to be in the middle of the

21   state or --

22       A.   At the bottom of the state.

23       Q.   -- at the bottom of the state.  So that's, like,

24   a tossup, basically?

25            MR. BARDOS:  Object to form.

Jason Poreda
July 17, 2025

1      A.   Yes and no.  I mean, effectively, yeah, you're

2  going to have a similar district on the center of that

3  side, but to us, visually, it was much better to have it

4  on the bottom.  I don't think it was like a tomato/tomahto

5  situation.  Because when you have a district that cuts

6  across the middle of the state, to me that looked -- well,

7  I guess I can just speak for me.  To me that looked almost

8  worse, like it just did not -- and I don't remember what

9  the compactness scores of that were or whatever, but

10  because you are essentially -- we also explored options

11  where District 28, the Monroe, Dade district would extend

12  into Collier, okay, and go up that way.

13          And that didn't work for other variety of

14  reasons, similar reasons, but then you have a wildly

15  visually un-compact district, and it just did not really

16  work for those sorts of reasons as well.

17          But it's been three years, so I don't exactly

18  remember what --

19  BY MR. WARREN:

20      Q.   Understandable.

21      A.   Yeah.

22      Q.   Let's say the populations worked out so that you

23  could configure the southeast part of the state on the

24  congressional map where you didn't have a district that

25  extended westward into the central part of the state,

Jason Poreda
July 17, 2025

Page 234

1    either on the south end or on the north end, and somehow

2    you didn't have negative impact to the other compactness

3    of other districts because of the wraparound.  But it

4    still would impair Hispanic ability to elect in two of the

5    three Hispanic performing districts.  Do you understand

6    this premise?

7        A.   I think so.

8        Q.   My question is, in that scenario would you still

9    reject that option because of the impairment on the Tier 1

10   districts?

11            MR. BARDOS:  Object to form.

12       A.   I don't know, because I would have to look more

13   closely at all of the other -- I would have to look at the

14   districts firstly, and then I would have to look at all of

15   the other districts' data, including the functional

16   analysis data for the districts that we're referring to

17   and how they were hurt, and it's all speculation.  And me

18   being the map drawer, I wouldn't -- I can't imagine that

19   district without actually trying to draw it and see it in

20   front of me and be able to see all of the data to draw an

21   opinion about that.

22            MR. WARREN:  Okay.  Let's take a short

23       break.

24            (Recess taken from 4:49 p.m. to 4:55 p.m.)

25

Jason Poreda
July 17, 2025

Page 235

1    BY MR. WARREN:

2        Q.    All right.  Earlier I asked you what explains

3    the shapes of the different challenged house districts and

4    I think we've covered a lot of that same ground with

5    CD 26.

6        A.    Uh-huh.

7        Q.    But I'll ask that same question, and feel free

8    to just refer in brief to other stuff we've already

9    covered.

10       A.    Okay.

11       Q.    So the question is, what explains the shape of

12   CD 26; why is it shaped this way?

13       A.    So it's shaped this way first and foremost for

14   equal population purposes.  Dade County only has so many

15   people.  There's two districts wholly within Dade and

16   another district that attaches to Monroe County, which

17   effectively has to be attached to Dade in the southern

18   part.  And that leaves a portion of Dade County that

19   doesn't have a congressional district, so it needs to go

20   somewhere.

21            So, ultimately, whether it goes west into

22   Collier or north into Broward, that is the biggest thing

23   that governs the shape of how all the districts are

24   configured in south Florida.

25            Second to that, we have one protected Black

Jason Poreda
July 17, 2025

Page 236

1   district and three protected Hispanic districts, in

2   addition to another protected Black district just to the

3   north in Broward and Palm Beach County.  So all of those

4   factors into consideration, that's what primarily governs

5   the shapes of those districts down there.

6       Q.   Any other reasons that are non-primary that you

7   didn't list?

8       A.   I think in the congressional district context

9   that pretty much sums it up.

10      Q.   Okay.

11      A.   Well, actually I will add, in addition to that,

12  especially with District 26, we were trying to not just go

13  west for no reason.  Again, we were following -- to get

14  out west we followed the northern Miami-Dade, Broward

15  County line, which is also shared by CD 20.  On the south

16  side we had to pick some sort of -- some sort of line to

17  get out there, so we picked the Tamiami Trail, which is a

18  pretty major thoroughfare in south Florida, until we got

19  to the southern Dade, Collier County line, and followed

20  that all the way, which is shared by District 28.  And

21  then on the northern side we followed the Collier County

22  line all the way across.

23           Now, in the version of the district that we

24  presented we followed the county -- the Collier County

25  line entirely until we tried to go down I-75 until where

Jason Poreda
July 17, 2025

Page 237

1    we had to deviate for equal population purposes.  The

2    currently inactive district takes a little bit out of

3    Immokalee, the area in Collier County around Immokalee and

4    makes some other changes, but that was done by Alex Kelly

5    and really the Governor's Office, whoever actually did

6    that when they presented that map.

7        Q.   Got it.  I'd like to ask you some more questions

8    about the Tier 1 requirements and the committee's

9    understanding of those requirements.  As a reminder, you

10   discussed that you were part of the 2015 committee when

11   there was litigation over that, right?

12       A.   Yes.

13       Q.   And you testified in that remedial hearing in

14   2015, right?

15       A.   I did indeed.

16       Q.   And you read Apportionment 8 when it came out?

17       A.   Of course.

18       Q.   And you maybe reviewed it during the 2020

19   process.

20       A.   It's been a few years, honestly, but, yes.

21       Q.   Okay.  It's been a few years since I've read the

22   whole thing, too.

23            Do you remember a dispute in the 2015 remedial

24   process over the Plaintiffs' proposed configuration of

25   Hispanic protected districts in south Florida?

Jason Poreda
July 17, 2025

Page 238

```
 1      A.   You'll have to refresh my memory.

 2           MR. WARREN:  I would be happy to do so.  I'm

 3      handing you Exhibit 19.  This is an excerpt of

 4      the evidentiary hearing transcript before Judge

 5      Lewis in the 2015 congressional remedial

 6      litigation.  This is Volume 2 of the hearing

 7      transcript.

 8           (Exhibit No. 19 marked for identification.)

 9

10  BY MR. WARREN:

11      Q.   If you turn to page 210, starting at line 15,

12  I'm going to read -- the Court is asking you questions at

13  this point, and you are answering them, and hopefully this

14  will refresh your memory about the dispute that you

15  discuss here.  So, quote:

16           Question:  The question is, has anybody asked

17  you to or have you on your own looked at any of the other

18  maps that have been presented to me; have you?

19           Answer:  I have looked at the other maps, yes.

20           Question:  Have you analyzed them in terms of

21  whether they better comply with the Supreme Court's

22  directions and the Constitution?

23           Answer:  Yes.

24           Question:  Okay.  Tell me about it.  Tell me

25  what your analysis was and what your conclusions were.
```

Jason Poreda
July 17, 2025

Page 239

1              Answer:  Okay.

2              Question:  You can start with anyone you want.

3              Answer:  Okay.  So I will start with CP 1.  The

4     District 27, 26 and 27 drawn there, I believe, have

5     significant problems with their functional analysis.  Both

6     of those districts are more Democratic than we drew, which

7     I would consider as tossup districts.  The districts drawn

8     in CP 1 --

9              Question:  Let me go back.  When you say

10    functional analysis, I thought you were talking about a

11    minority district and whether minorities could elect

12    somebody they --

13             Answer:  Yes.  But the first part of that

14    analysis is determining the districts, how they lean

15    politically.  At that point you can look at the Democratic

16    and Republican primaries, depending on if it leans

17    Democratic or leans Republican, to determine the Hispanic

18    community's influence over those particular primaries.

19    When you get to the general election, if you have a

20    Hispanic candidate who is Republican who cannot win a

21    general election because the district itself leans

22    Democratic, then that minority candidate would not have a

23    chance to win.  They would not elect a candidate of their

24    choice at the end, so you would -- so you have to look at

25    the first part of the functional analysis to determine how

Jason Poreda
July 17, 2025

Page 240

1    the district performs politically.

2            So in the districts we drew they are what I

3    would consider very 50/50 districts, where either party

4    would have a chance to elect any candidate that happened

5    to be running in that district.  And there is a really

6    good chance on the Republican side that a Hispanic

7    candidate will win that primary, and there's also a

8    chance -- not as good of a chance, but a chance that a

9    Hispanic Democrat would be elected.  And therefore you

10   would have two, potentially two Hispanic candidates in a

11   general election.  So either candidate winning would

12   result in a Hispanic candidate.

13           Specifically, the District 26 in CP 1 in my

14   opinion leans so heavily Democratic that a Republican

15   candidate would not be able to win regardless of whether

16   they're Hispanic or not.  I believe 27 as well follows in

17   that same line or right -- I could be wrong about that.

18   It could be one or the other, but one of those districts,

19   at least one of them, it could be both, leans much more

20   heavily Democratic.

21           Now, in that area more heavily Democratic would

22   just be one or two percentage points one way or the other,

23   and then you don't allow a Republican Hispanic candidate

24   to win that particular primary.  And on the Democratic

25   side then, because the Republican candidate can't win the

Jason Poreda
July 17, 2025

1    general, you have to look more closely at the Democratic

2    primary, and in that Democratic primary the Hispanic

3    candidates control in the low 20s percent of the Democrat

4    primary so they more than likely would not be able to

5    elect a Hispanic candidate in the Democratic primary and

6    would result in either a Black or a White Democrat winning

7    the Democratic primary, which then would dominate the

8    general election and therefore not elect a Hispanic

9    candidate of choice.  I believe that was a significant

10    problem in my opinion in the CP 26 and 27 for that.

11             Close quote.

12             Did I read that accurately?

13        A.   You read that accurately.

14        Q.   Do you now have a better memory of what you were

15    discussing in that excerpt?

16        A.   To the extent that you just read the excerpt,

17    yes.  I don't remember CP 1 really at all, but since this

18    was me speaking, I can have a fairly good sense of what we

19    were getting at, yes.  But I don't really remember what

20    the district specifically looked like, if that was what

21    your question was.

22        Q.   It is not, thankfully.  My question is,

23    essentially what were you expressing there as to walking

24    through the functional analysis of the district and

25    concluding that there was a problem with performance?

Jason Poreda
July 17, 2025

Page 242

1      A.   So that was just -- I mean, in the functional

2   analysis that I was evaluating here for the judge, that

3   was when you're dealing with a district that -- in these

4   south Florida districts, if you're dealing with a district

5   that can be won by either side, you have to look at the

6   Hispanic control in either primary to elect a Hispanic

7   candidate of choice, whether it be a Hispanic candidate or

8   a White or Black candidate that happens to be the

9   candidate of choice for that minority group getting to the

10  general election.

11          And in that particular case, apparently in that

12  district configuration, the analysis showed that the

13  Democratic side of -- the Democratic primary -- the

14  Hispanic in the Democratic primary, sorry, would only

15  control about 20-ish percent of the primary, which would I

16  guess in my opinion at the time be unlikely to see their

17  candidate of choice through the general election, so they

18  would be defeated.

19          And if it was a district that didn't lean so

20  heavily Democratic, whatever that district was or whatever

21  the actual numbers were, then a Republican would be easily

22  defeated regardless of whether or not they were Hispanic

23  or not.

24      Q.   Okay.  I'm going to try to condense that a

25  little bit.

Jason Poreda
July 17, 2025

Page 243

1       A.    Okay.

2       Q.    And correct me if I get it wrong.

3             So, in -- and I guess I should ask, is what you

4    walked through for Judge Lewis the same approach that the

5    committee took in the 2020 cycle when evaluating

6    functional analysis for Hispanic protected districts?

7             MR. BARDOS:  Object to form.

8       A.    I would say that each functional analysis in

9    every district, regardless of the type of map, is an

10   individual analysis.  So the data they just looked at and

11   the process that you go through might be slightly

12   different depending on the region of the state, depending

13   on the demographic breakdowns and all the other numbers.

14            However, that would be more or less the same

15   process of how you would evaluate the functionality of a

16   minority community's ability to elect a candidate of their

17   choice.  Again, depending on what specific data points

18   you're looking at, it's really district by district and

19   trying to figure all of that out and which data points

20   become relevant.

21   BY MR. WARREN:

22      Q.    So, talking about the 2020 cycle now.

23      A.    Uh-huh.

24      Q.    In Hispanic protected districts in south

25   Florida, both congressional and state house, you have a

Jason Poreda
July 17, 2025

Page 244

1    draft district, you are performing the functional

2    analysis, am I correct in saying that you start by looking

3    at the makeup of the primary elections?

4         A.   You start by looking at the overall electoral

5    performance of the district to determine if you need to

6    look at which primary you're going to look at, or if you

7    need to look at both.

8         Q.   Okay.  So the first step is looking at overall

9    general election performance of the district?

10        A.   And voter registration.

11        Q.   And voter registration.  To look for whether a

12   district is heavily one party or another?

13        A.   To see if -- yeah.  I mean, to see if the

14   district, based on registration, based on electoral

15   performance would tend to lean toward one party or

16   another.  That could be for a variety of reasons.  Once

17   you kind of make the determine that -- make the

18   determination that it's either a 50/50 and you kind of

19   need to do that analysis for both, or if it is more

20   Republican or more Democrat, to try to determine how each

21   of those individual parties and the Hispanics within those

22   parties either control or not control their -- you know,

23   the election.

24             And in south Florida in particular you're also

25   looking at the census data, too.  I mean, that's really

Jason Poreda
July 17, 2025

Page 245

1   the starting point.  You're looking at total population,

2   HVAP or whatever, but in south Florida there can be such a

3   discrepancy between Hispanic voting age population and the

4   registered voter counts for either party of Hispanics.

5           There can be sometimes five to ten to even

6   almost 20 percent dropoff between Hispanic voting age

7   population and the Hispanic registered voters overall or

8   for one party or the other.  It can be very significant.

9   So that would have -- that obviously comes into the

10  analysis greatly.  And changing a district ever so

11  slightly can alter those numbers a lot.

12          So it's -- and that's partially because it's so

13  densely populated, but also because the different types of

14  communities in Miami-Dade are all kind of intermingled

15  with each other.  So you can't just assume by adding this

16  neighborhood which is next to this neighborhood is going

17  to yield a similar result.

18      Q.   So let me try to walk through the steps just to

19  condense things down.  So, step one or maybe zero is

20  referring to census voting age population as a reference

21  point?

22      A.   Yeah, for the most part.

23      Q.   Step one is looking at the general election

24  results to determine the overall lean of a district?

25      A.   Along with voter registration.

Jason Poreda
July 17, 2025

Page 246

1        Q.   Along with voter registration.

2        A.   And kind of in conjunction with registration the

3   turnout in those elections, because sometimes, you know,

4   in a gubernatorial year or presidential year you're going

5   to have different turnout rates, and sometimes the racial

6   breakdown of lower or higher turnout elections can kind of

7   tell the story as to why the district performs in an

8   election one way or the other.  But that is kind of all

9   intermingled with that initial analysis, trying to

10   determine does this district perform for Republicans or

11   Democrats.

12        **Q.   Okay.  And once you've done step one, you**

13   **concluded is this district 50/50 or is this district**

14   **performing for one party or another, then you go to step**

15   **two, and if the district is 50/50, then you would look at**

16   **both party primaries, right?**

17        A.   Yes, but the only I'll add to when we're saying

18   50/50 does not necessarily mean an exact 50/50, like,

19   breakdown, because you're dealing with a -- you're dealing

20   with an analysis, right?  So you're dealing with anything

21   that could -- and that usually means looking at the

22   elections across decade.  You'll have some that are won by

23   Republicans and some that are won by Democrats, and maybe

24   the voter registration, and as it's gotten more --

25   especially in this last decade you have a lot more NPA

Jason Poreda
July 17, 2025

Page 247

1   voters involved, so you're dealing with registrations in

2   the 30 percents for each party and, you know, all of that.

3   So it becomes a more complicated analysis, but it's not

4   like necessarily 50/50.  It's just a district that could

5   feasibly be won by either party.

6       **Q.   Certainly.  Okay.  So, step 2A, if step one**

7   **concludes it's a district that could feasibly be won by**

8   **either party, then step 2A is look at both party**

9   **primaries, right?**

10      A.   Correct.

11      **Q.   And if step one results in this is a district**

12  **that is solidly one party or the other, then step 2B maybe**

13  **is looking to that particular party primary, right?**

14      A.   Yeah.  If I follow you, yeah.  I mean, so if you

15  determine that the district could be won -- could be

16  feasibly won by either party, then you kind of do the same

17  analysis for both parties.  If you determine that it leans

18  one way or the other, then it really doesn't become

19  necessary to look at either the Republican or Democratic

20  side.

21      **Q.   Right.  Okay.  I wish I had a diagram for this**

22  **already, but --**

23      A.   But it's also not necessarily that -- like,

24  yeah, it is like the same process, but depending on what

25  the data is showing it is not always the exact same

Jason Poreda
July 17, 2025

Page 248

1   analysis every time.  So it's not the same steps every

2   time.  An example of that would be the CD 10 analysis

3   where we saw a very clear trend line with voter

4   registration and population numbers that kind of led the

5   functional analysis to go in a slightly different

6   direction, because you have such a clear trend, which you

7   don't always see.

8           So sometimes the data, as you're looking at it,

9   that analysis will evolve based on the individual district

10  analysis.  But what you're talking about is kind of the

11  general, I guess, guided process, depending on each

12  individual district.

13      Q.   Understood.  And when you get to -- let's call

14  it step three, which is looking at the party primaries,

15  whichever one you determine is relevant --

16      A.   Yes.

17      Q.   -- at that point you're looking at minority

18  voters' control or influence over that relevant party

19  primary?

20      A.   Yes.

21      Q.   And specifically you're looking to make sure

22  that the minority group does, in fact, control that

23  relevant party primary?

24      A.   Yes.

25      Q.   Okay.  I think now it might be nice to walk

Jason Poreda
July 17, 2025

Page 249

1    through an example.

2         A.   Okay.

3         Q.   And we can use the congressional map Exhibit 1

4    data packet.  And I'd like to start with District 26.

5              So am I right in thinking maybe step zero,

6    second page -- what page are you on?

7         A.   Three.  I can go back and look at the chart.

8         Q.   No, that's fine.  Page 3.

9         A.   Well, Page 2.  Let's start with page 2.

10        Q.   Okay.  So page 2, step zero maybe with

11   District 26 referring to the HVAP --

12        A.   Sure, yes.

13        Q.   You see it's 73.

14        A.   Yes, 73.2.

15        Q.   Okay.  The next page, page 3, District 26,

16   Hispanic voter registration through the decade, right?

17        A.   Yep.  And at this step two you'd also look at

18   the Democratic and Republican registration.  I mean,

19   you're really kind of looking at total turnout

20   registration, and probably the election results really

21   kind of all congruently.  But all of those are relevant,

22   potentially relevant data points.

23        Q.   Okay.  Let's skip to the election results on

24   page 5.  For District 26, these are the general election

25   results from the decade.  What would you be -- what did

Jason Poreda
July 17, 2025

Page 250

1   you look for here?

2        A.   So in the election results -- I'm kind of

3   glancing through here.  I mean, I don't remember exactly

4   what we looked at before, so this example is me looking

5   now three or four years removed from everything.  So I

6   don't know if what we're doing is going to be identical to

7   what we did before, but just looking at the electoral

8   performance of the more recent elections, and you kind of

9   look back.  It does look like kind of earlier you go there

10  might be a little bit more Democratic performance, but

11  certainly in the more recent 2018 and 2020 elections there

12  was a pretty consistent Republican performance there.

13           But again, I would also look at -- so I would

14  see that, and then I also have to look at the registered

15  voter trend.  The Hispanic numbers look like they have

16  increased -- well, kind of stayed fairly consistent,

17  actually, the overall Hispanic registration in that area,

18  but you can see that it is, you know, anywhere between 10

19  and 13 percent less than the HVAP, so that tends -- so for

20  that district you'll probably see a consistent, you know,

21  13-ish percent drop from HVAP to registered voters.  It

22  looks like it's more Republican registration than

23  Democrat, but -- so Democrat registrations in the low 30s,

24  Republican registration looks to be fairly consistent

25  around 37/38, and then you obviously have the NPAs which

Jason Poreda
July 17, 2025

Page 251

1    you don't know about yet.

2              So in that initial analysis, I would say that

3    the district probably leans Republican.

4         Q.   And that initial analysis that this District 26

5    probably leans Republican means when you're going to the

6    next step, primaries, you're looking at the Republican

7    primary?

8         A.   Primarily, yes.  Although in these Hispanic

9    districts I probably also would glance at the Democratic

10   side just to get a -- you know, south Florida can be,

11   like, you never know.  So I probably would look at that.

12   But, yeah, I think the primary part of this analysis would

13   be looking at the Republican side of the primary.

14        Q.   Okay.  Before we move on to that, I want to ask

15   about District 27, since we're on these pages.

16        A.   Sure.

17        Q.   I don't think you need to go through every

18   single data point, but maybe staying on the election

19   results page, page 5 --

20        A.   Uh-huh.

21        Q.   -- can you do the same type of conclusion for

22   District 27?

23        A.   Yeah.  So District 27, if you look at some of

24   the earlier parts of the decade, you have a little bit

25   more consistent Republican performance.  But then as you

Jason Poreda
July 17, 2025

1    get closer to 20 -- and I do think that the more -- the

2    elections that happened more recently probably do carry a

3    little bit more weight, unless you see something very --

4    like, as you're -- not necessarily here, but just in

5    general, if you see something very different in the

6    2014 -- or the later ones.  But as you get closer to what

7    the actual population numbers are looking like now, the

8    more recent elections probably are weighted a little bit

9    differently, at least in my head.

10           So even though President Trump beat Biden, it

11   was very close.  And if you look -- Gillum beat DeSantis

12   in that district fairly substantially as well as all the

13   cabinet races underneath in 2018, and in 2016 Clinton beat

14   Trump substantially.

15           So -- but then you're going back into 2016, you

16   see that it's pretty close.  So I would say that 27 is

17   probably -- looking at the voter registration -- 27, it

18   actually looks like from 2012 to 2020 has actually

19   increased in Hispanic voter register -- or, I'm sorry,

20   that's turnout.

21           Okay.  So registration has actually decreased

22   from about 70 percent in 2012 closer down to 63 percent,

23   compared to a 74 percent overall HVAP.  So that's fairly

24   similar, but, you know, probably about 13, 14, 15 percent

25   dropoff between HVAP and Hispanic registration.

Jason Poreda
July 17, 2025

Page 253

1           It looks like there's a fairly consistent voter

2    registration percentage for Democrats.  It actually looks

3    like Republicans from 2012 to 2020 have actually dipped

4    from almost 37 percent to 33 percent, but the

5    corresponding change in NPA from 28 to 32.  So the

6    Republicans probably have switched to NPA.  Whether or not

7    they're still voting Republican or not, I don't know.

8           But in turnout, so in turnout the difference

9    between HVAP and Hispanic -- and why turnout is important

10   compared to registration, because those are the ones

11   actually voting, as opposed to just who are on the voter

12   rolls.  So sometimes you see a different gap.  And they

13   actually look like they've increased their gap.  So in

14   2012 only 58 percent of Hispanics actually turned out to

15   vote compared to 64 percent in 2020.

16          So it seems that they're performing -- they're

17   actually turning out to the polls more at a higher rate.

18   Very similar percents for all of the Democratic elections.

19   Actually looks like Republicans are turning out at a --

20   compared to, like, closer to 40 percent in 2012 and 2014.

21   It's now closer to 35, 36 percent, so there's a slight

22   dropoff in Republican turnout, but a corresponding bigger

23   gap in NPA.  So, again, that also generally would support

24   the conclusion that the Republicans that were there are

25   now coming out as NPAs.

Jason Poreda
July 17, 2025

1              And then we just talked about the voting, but

2    the voting percentage is all fairly, you know, either

3    fairly consistent for Democrat or, you know, fairly --

4    fairly close.  So I would say in this district, when

5    you're looking at the primaries, I would be more

6    comfortable looking at both.

7        Q.   Okay.  Let's move on to the primaries then,

8    which starts on page 7, and actually --

9        A.   Well, so, I mean, yes, the other part here -- so

10   the first page is the 2020 general election, and you can

11   do some analysis on -- to support your conclusions on the

12   electoral performance, you can look at the general --

13   general election registration and turnout to see if those

14   numbers kind of match some of the conclusions that you may

15   have made, just looking at the electorial performance.

16              So do you want me to do 26 or 27 first?

17       Q.   So I have a couple of questions maybe just to

18   narrow the focus.  So looking at page 6, the 2020 general

19   election --

20       A.   Yeah.

21       Q.   -- I want to focus on the composition of

22   Democratic and Republican voters --

23       A.   Sure.

24       Q.   -- and the share that are Hispanic.  So in

25   District 26, which we established the Republican

Jason Poreda
July 17, 2025

1    electorate would be relevant there, I see 57, almost 58

2    percent of registered Republicans are Hispanic, right?

3        A.   Correct.

4        Q.   Okay.  So does that tell you then, like, okay,

5    this is a majority, comfortably majority Hispanic

6    Republican electorate in this district?

7        A.   I would say that that would be a data point that

8    would potentially support that conclusion, yes.

9        Q.   Okay.  And in District 27 you have a very solid

10   majority, 73 percent, in the Republican voter registrants

11   are Hispanic, and then just over 50 percent of Democratic

12   registrants are Hispanic.

13       A.   Correct.

14       Q.   And would this indicate to you in this

15   competitive District 27 where both party primaries are

16   relevant, would this be kind of the first data point,

17   okay, Republican side, Hispanic controlled, Democratic

18   side, what would be your conclusion?

19       A.   Hispanic control.  Initially in the general

20   election the real number is going to be in the primary.

21   But, yes, that would lead me to the conclusion that in

22   District 27 that -- again, that's just registered voters.

23   If you look at the turnout, which is probably the more

24   relevant number for actually who's going to come out and

25   vote, the Republican voter turnout is -- and the

Jason Poreda
July 17, 2025

Page 256

1   Democratic voter turnout is somewhat similar to the

2   registered voter amounts.

3           And that's -- that just kind of supports the

4   same conclusion that you just drew.  Because sometimes

5   just looking at the registration, you're missing an

6   important data point on the turnout.  Because sometimes

7   those percentages can, for whatever reason, have a

8   difference either plus or minus.  So I would agree with

9   your -- that assessment there.

10      Q.   Okay.  And I think my understanding is you would

11  look at the other pages in this packet, look at the other

12  elections, and, in particular, actual voters who voted in

13  different party primaries, and the Hispanic share of

14  those --

15      A.   Correct.  Yeah, you're certainly not just

16  looking at 2020.  You're going to be looking at the

17  whole -- the whole thing.  I would do this using these,

18  usually on an Excel -- you can look at multiple, all of

19  these pages are kind of like together, so it's a little

20  faster.  But, yes --

21      Q.   Okay.

22      A.   -- the same dataset.  But, yeah.

23      Q.   Got it.  And then the ultimate end of that,

24  looking at the primary section for District 27, you would

25  be -- is there a Hispanic majority among Republican

Jason Poreda
July 17, 2025

Page 257

1    registrants and primary voters, right?

2        A.    Yeah.  And it would be important to note, like,

3    if you look at the primary page, we don't even list the

4    registration there, because the close-of-books

5    registration is the same for that.  So for primaries

6    you're just looking at the voter turnout.  So if you look

7    at 27 for the Democratic and Republican voter turnout, you

8    can see that Republicans keep that 76 percent, so it's

9    similar to their voter registration in the primary.

10           But on the Democratic side, you're in the 40s,

11    which isn't -- that's a little lower than I probably would

12    have preferred, but it still doesn't necessarily mean that

13    they don't have control of that primary in that area.

14    Because if you have 44 percent, it's very unlikely that

15    the other 55 percent that are turning out are going to be

16    all of the same race.  So you're probably -- you know,

17    there's different districts around the state that I could

18    point to that those percentages -- you don't always have

19    to hit 50.  You know what I mean?  So I would say they

20    would have, at minimum, a very heavy influence in who

21    elects that.  But more likely probably control of that

22    primary with a plurality that is probably what they have

23    in that district, so --

24        Q.    Okay.  That's very helpful.  Thank you.

25           My next question is -- it goes back to kind of

Jason Poreda
July 17, 2025

Page 258

1   how we talked about the Tier 1 standards to begin with,

2   which was avoiding diminishing minority voters' ability to

3   elect candidates of their choice, which is in a Hispanic

4   protected district in South Florida, how did you determine

5   who the Hispanic candidate of choice was?

6        A.   So we also did -- like, so for all of these

7   elections we looked at, particularly in certain areas,

8   before we even did map drawing when we were kind of

9   dealing with all the election data, another part of that

10  is we're collecting all of that.  Because we literally

11  will collect all of -- so we have a list of all the

12  candidates and we have all of their races and stuff next

13  to them so we can see who all of that is.  And we know who

14  won all of those elections, all the way down from

15  congressional districts to state house districts to state

16  senate districts, et cetera, et cetera, et cetera.

17          So we can try to do that analysis, and then also

18  that is where John Alford helps with trying to come up

19  with all of those other types of more detailed analyses on

20  who that candidate would be, because sometimes a district

21  where we could do that functional analysis and be like,

22  oh, well, you know, just as an example of Republican, like

23  the CD 26 example, Republicans control it, but if they

24  were electing me, who is a very white person, I would be

25  there -- if I was consistently being elected, then clearly

Jason Poreda
July 17, 2025

1    they have control of the primary so that would be the

2    candidate of choice for that group of people for whatever

3    reason.  And there are some examples of that.  It's I

4    think a little bit more rare, but it does happen

5    occasionally.

6         **Q.   Okay.  So conclusions about what the political**

7    **preferences of Hispanic voters in south Florida were came**

8    **from, number one, a detailed analysis that came from John**

9    **Alford, right?**

10        A.   Yes.

11        **Q.   And then, number two, staff conclusions looking**

12   **at past actual election results?**

13        A.   Correct.  In addition to the functional analysis

14   data and all of that, yeah, because when we were trying to

15   determine all of that stuff I was talking about before,

16   it's kind of like before we determine what districts were

17   protected, when we're kind of looking at the benchmark,

18   we're looking at the data, but we're also trying to factor

19   in all of the, like, actual what happened in these

20   districts, because occasionally that candidate of choice

21   might not be Hispanic.  And that's why John Alford was so

22   important.  And looking at who actually won, some of like

23   the history of the benchmark state house districts that

24   we're then going to redraw who has won those districts and

25   comparing it to the data that we're doing here.

Jason Poreda
July 17, 2025

Page 260

1              And identifying areas where our analysis

2    supports all of that or whatever or where there are

3    discrepancies and trying to figure out why.  And then

4    trying to figure out if that leads to a conclusion about

5    whether or not that district needs to be protected again

6    or not.  And then -- yeah, from there.

7         Q.   What would lead to a conclusion that the

8    district didn't need to be protected?

9         A.   I don't know.  That would be speculation.

10        Q.   So that never happened in the case of south

11   Florida?

12        A.   In the case of south Florida I can say it almost

13   certainly didn't happen, but -- I don't remember the

14   details, but there was a district in Alachua County, which

15   was a protected Black district ten years ago, which --

16        Q.   Volusia.

17        A.   Volusia.  What did I say?

18        Q.   Alachua.

19        A.   Did I say Alachua?  I meant Volusia.  Sorry.  I

20   thought I said Volusia.  Did I really say Alachua?

21             Okay.  So in Volusia County there was a Black

22   district that over the decade just -- all of the relevant

23   data points pointed to the fact that that district was no

24   longer going to elect the candidate of their choice, and

25   it would have been too difficult for us to even try to

Jason Poreda
July 17, 2025

1  redraw it, so that was -- it led to the conclusion that

2  that district no longer needed to be protected.

3      **Q.   Because it was no longer performing.**

4      A.   It was no longer performing.  I forget -- off

5  the top of my head I forget exactly who the candidates

6  were, but, yeah, that district stopped electing an actual

7  Black representative and all of the data trends showed

8  that district falling away, and it just became to a point

9  where it no longer needed to be protected.

10     **Q.   So if a district from the benchmark plan that**

11 **had been previously considered a Tier 1 protected district**

12 **over the decade failed to perform, that would be why you**

13 **would conclude that a district was no longer protected?**

14     A.   That would be one reason.  That would be the

15 beginning.  We then -- we'd try to redraw it anyway just

16 to see what would happen if we were trying to draw a

17 district that would be protected, and when you're

18 effectively unable to draw it like at all, even if you're

19 drawing like the squiggliest, like ugliest looking

20 district that you can possibly have and it still isn't

21 performing, then in addition to all of those other

22 relevant factors, then, yeah, it probably doesn't need to

23 be.

24         Drawing that district predominately using race,

25 and it's still not really -- like it just doesn't make

Jason Poreda
July 17, 2025

Page 262

1    sense, so it doesn't need to be protected, in our due

2    diligence in trying to figure that out.

3        Q.   Understood.  I'd like to turn quickly to the

4    house plan data packet, Exhibit 2, and quickly run through

5    the same type of functional analysis data points with one

6    district.

7        A.   All right.

8        Q.   Which will be 115.

9        A.   Dealer's choice.

10        Q.   Okay.  So starting with -- if you don't mind,

11    let's skip to the general election results.

12        A.   Okay.

13        Q.   Page 6.  Looking at the general election results

14    for District 115, what is your conclusion about the

15    overall lean of that district?

16        A.   Just reiterating, again, like before, I'm doing

17    a brand-new analysis.  This is not necessarily the same

18    analysis I did in whatever year it was, 2022 or 2021, I

19    guess, whatever it was.  So I would -- so in 115 I would

20    say, looking at these election results, it certainly had a

21    better Republican performance in the 2014 year, and then

22    got slowly more competitive as the years went on, and in

23    2018 was all won entirely by Democrats.  And then

24    President Trump beat President Biden there, but not by

25    very much.  So I would lead the conclusion that this is

Jason Poreda
July 17, 2025

Page 263

1    probably a district that could go either way, depending on

2    the circumstances.

3        Q.   Okay.  So this is one of those districts where

4    you would be looking at both party primaries?

5        A.   That would be correct.

6        Q.   Let's move on to that now.  Next page, 2020

7    election.  Let's start with Republicans and then do

8    Democrats.  What are your conclusions?

9        A.   So here -- so first looking at overall Hispanic.

10   So, yeah, this is another district where the voter

11   registration, like, per party is not really -- it's like

12   34, 35 split between Republican and Democrat with a

13   significant NPA percentage.  Hispanics are at 55 percent

14   of the total electorate, 64 percent of the Republican

15   electorate is Hispanic, but only 43 percent of the

16   Democrat.  But again, that kind of leaves -- it's under

17   50, you know, you might like it a little bit closer, but

18   in this particular district it might -- that plurality

19   they have might still allow them to control it without

20   just guessing at the moment.  But it's certainly less

21   than -- and a consistent -- those numbers are consistent

22   in turnout, too.

23        But again, we're talking about a general

24   election, where, if a Hispanic candidate is able to make

25   it through the primary, generally speaking Democrats are

Jason Poreda
July 17, 2025

Page 264

1    going to vote for the Democratic candidate whether they're

2    Hispanic or White anyway, so that might be a little less

3    relevant, but there's still a large plurality.

4        Q.   Okay.  If you remember your testimony in

5    answering Judge Lewis's questions in 2015 about the

6    Plaintiffs' proposed home district --

7        A.   Yeah.  The one of the CP 1 map?

8        Q.   Yes.

9        A.   Okay.

10       Q.   And you explained to him one of those districts,

11   which was purportedly supposed to be a Hispanic performing

12   district, or at least the Plaintiffs said that it was, I

13   think the thrust of your analysis was this district -- the

14   Legislature drew it to be politically competitive because

15   Hispanics control the Republican primary, Hispanics are a

16   lower share of the Democratic primary, and so it needs to

17   be at least politically competitive for the Hispanic

18   candidate to win the general election.  Is that --

19       A.   More or less, yeah.

20       Q.   Okay.  And then I think the thrust of the

21   critique of the PT --

22       A.   The Plaintiffs' district.

23       Q.   -- Plaintiffs' district is they made this

24   district too Democratic.  The Democratic primary is not

25   Hispanic enough to afford Hispanic Democrat success in the

Jason Poreda
July 17, 2025

1    nomination, and so you're going to end up with an overly

2    Democratic general in which a non-Hispanic Democratic

3    candidate is going to prevail.

4         A.   Most likely anyway.  It doesn't mean that that

5    wouldn't be an Hispanic candidate, but, yes, just looking

6    at the data that would support that conclusion.

7         Q.   Is -- so looking at 115 as an example.

8         A.   Sure.

9         Q.   Where at least in that most recent metric the

10   Democratic voters are 43 percent Hispanic, would the same

11   type of dynamic be present where you would be concerned

12   about making that district too Democratic lest the same

13   problem as you explained to Judge Lewis arise?

14         MR. BARDOS:  Object to form.

15         A.   Yeah, I don't quite follow the question.  I

16   mean, that whole area does have that, like, general

17   consistency, where if you -- the Democratic primaries tend

18   to have less control for the Hispanics there.  So that's

19   certainly a concern for all of these districts.  However,

20   that's not -- like, not knowing exactly what the numbers

21   were in that CP 1 district, and I don't remember what all

22   that was, it doesn't necessarily mean that that exact same

23   analysis and that exact same conclusion will apply to

24   other districts, depending on what the actual numbers are.

25

Jason Poreda
July 17, 2025

Page 266

1   BY MR. WARREN:

2        Q.   Got it.

3        A.   I made that conclusion back in 2015 looking

4   at -- and obviously looking closer at all those numbers

5   and everything else with that district, so I don't know.

6        Q.   Understood.  In a district like 115 --

7        A.   Yes.

8        Q.   -- where it is pretty politically competitive in

9   the generals --

10       A.   Correct.

11       Q.   -- but the Democratic share of registrants that

12  are Hispanic is in the mid to low 40s, would you be

13  concerned if that district became more Democrat?  If the

14  election results said, oh, this district is 57 to

15  65 percent range Democratic in generals, but holding

16  constant that Hispanic share of Democratic registrants or

17  voters, would that raise red flags in the functional

18  analysis?

19       A.   I mean, you're talking about a hypothetical.

20       Q.   Yes.

21       A.   And that may have been the case and why we made

22  some alterations to the district, to make it more

23  Democratic -- or, I'm sorry, to make it better for the

24  Hispanic portion of that Democratic primary.  Some of

25  those adjustments that we made may have been for that

Jason Poreda
July 17, 2025

Page 267

1    reason, because we were worried about the Democratic side

2    because we saw it was such a competitive district so we

3    would do more to -- whatever tweaks we may or may not have

4    done was probably to help the Democratic primary, to make

5    sure that Hispanics had a better chance on that primary,

6    to make sure that an Hispanic candidate would go through.

7            Which also doesn't necessarily -- again, none of

8    these are -- there's no exact bright line test, so just

9    because, like, if you look here at the 2020 primary in

10   that 115 example that you're looking at, they have a lower

11   percent.  They're down at like 35 percent, which would be

12   something I would be, like, in a vacuum concerned about,

13   but that 35 percent might actually be enough to control

14   the district.  There's examples of that throughout other

15   state house districts where a lower percentage like that

16   would give them a plurality that would allow them to

17   control.

18           Another interesting number is that there's 11

19   percent Black, which means that the total -- I mean, not

20   necessarily that they always vote combined, but, you know,

21   there's other racial factors in play in all of that.  So

22   each district -- and it's all kind of unique.  And then

23   looking further back, like, say, the 2018 primary, that

24   number was even lower.  It was about 28 percent, so -- and

25   then you look at --

Jason Poreda
July 17, 2025

Page 268

1          Q.    Let me stop you there.

2          A.    Yeah.

3          Q.    Okay.  That makes sense.

4          A.    Then -- go ahead.  Sorry.

5          Q.    No problem.  I think you said that sensitivity

6     to the Hispanic share of the Democratic electorate would

7     have been a reason to make adjustments to a draft district

8     115?

9          A.    Yes.  Well, potentially anyway, yes.

10         Q.    Sure.  And to your memory, the adjustments made

11    to District 115 to ensure that it was Tier 1 compliant

12    were to increase the Hispanic share of the Democratic

13    electorate?

14              MR. BARDOS:  Object to form.

15         A.    No.  I suggested that that may have been the

16    reason.  I don't remember what the reasons were.  It may

17    have been for both the Republican and Democratic side, but

18    that certainly -- I know in that region, looking at those

19    specific three districts, 13, 14, and 15 -- 113, 114, and

20    115, because they're all competitive, we were concerned

21    with both sides of the primary there.  So we may have made

22    adjustments for either side in all three of those

23    districts.  But any district that was that competitive,

24    we, as map drawers, were trying to ensure that a Hispanic

25    candidate would be elected in the district.  Whether it be

Jason Poreda
July 17, 2025

Page 269

1   Republican or Democrat, it was kind of -- like we had

2   to -- I don't want to say it didn't matter to us, but we

3   had to make sure that the primaries in each side could

4   potentially be won by a Hispanic candidate in the other

5   side, because electing a Hispanic in those three districts

6   specifically was the goal.

7   BY MR. WARREN:

8       Q.   So, to recap, in 113, 114, and 115 --

9       A.   There may have been others, too.  I just

10  remember those specifically.

11      Q.   Sure.  So, in at least 113, 114, and 115 you

12  were drawing the maps and making tweaks to ensure there

13  was an adequate Hispanic share in both party primary

14  electorates?

15           MR. BARDOS:  Object to form.

16      A.   I mean, I can't say definitively one way or the

17  other on that.  I don't remember.  It was three years ago.

18  But I do know that that was -- in those three districts

19  that was a concern.

20  BY MR. WARREN:

21      Q.   Okay.  In 113, 114, and 115 it was a concern to

22  have an adequate Hispanic share of both party primary

23  electorates?

24      A.   To the best of our ability.  I mean, regardless

25  of the share of the primaries, we were trying to ensure

Jason Poreda
July 17, 2025

Page 270

1    that a Hispanic candidate, regardless of party, could be

2    elected to ensure that minority communities could elect a

3    candidate of their choice.  That was our overall goal.

4         Q.   Certainly.  So just trying to make sure I have

5    this straight.  So in 113, 114, and 115 -- okay.  I think

6    I got it.

7         A.   Okay.

8         Q.   Related question.  We've been talking a lot

9    about the party primaries.  There's another part to that

10   which I think was your testimony to Judge Lewis, which is

11   that one way to solve or one way to ensure that the

12   Hispanic voters have the ability to elect their candidate

13   of choice is to ensure that Hispanic voters control both

14   party primaries in a competitive district, right?

15        A.   In that particular case.  That isn't like a

16   generalization -- sorry, generalization that can be

17   applied to all Hispanic districts, certainly not.

18   Whatever district we were talking about in that CP 1, that

19   conversation was relevant only to that specific analysis

20   that Judge Lewis was asking me about.

21        Q.   I appreciate that.  Relevant to that district,

22   another way to accommodate that concern was the

23   Legislature's -- well, I guess you were expressing a

24   concern that if a district like that is too Democratic or

25   could be too Republican, if the Republican primary doesn't

Jason Poreda
July 17, 2025

Page 271

1   have a sufficient Hispanic share, then that would be a

2   problem and thus that district would need to be

3   competitive.

4           MR. BARDOS:  Object to form.

5       A.  Okay.  Again, to that specific district.  That

6   is not a generalization that can be applied overall.  He

7   was asking me about a specific district on the Plaintiffs'

8   map, so that conclusion that I was drawing was only

9   relevant to that district and that case.

10  BY MR. WARREN:

11      Q.  Okay.  Using 115 as an example, if 115 had been

12  more Democratic, that 43 percent or lower number in the

13  Democratic primary, would that have caused concern about

14  the ability of 115 to perform at that low a share of the

15  Democratic primary if that district had been more

16  Democratic?

17          MR. BARDOS:  Object to form.

18      A.  I don't know.

19  BY MR. WARREN:

20      Q.  You don't know?

21      A.  I don't.

22      Q.  Okay.

23          MR. BARDOS:  We have 28 minutes left out of

24      our seven hours.

25

Jason Poreda
July 17, 2025

Page 272

1  BY MR. WARREN:

2      Q.   I think we may have covered some of this, but

3  you recall that minority voting cohesion and White bloc

4  voting, as Mr. Bardos stated in committee, are two of the

5  three Gingles preconditions, right?

6      A.   Correct.

7      Q.   And those are, as he explained, I think,

8  necessary preconditions for Section 2 or the vote dilution

9  standard of Fair District, right?

10     A.   I believe that's correct.

11     Q.   Is it your understanding that either of those,

12 minority voting cohesion and White bloc voting, are also

13 preconditions for protection under the non-diminishment

14 standard?

15     A.   I don't know.

16     Q.   But Dr. Alford was providing an analysis of

17 minority voting cohesion in protected districts?

18     A.   I believe that's what his reports were helping

19 us with, yes, among other things.

20     Q.   Among other things his reports were helping you

21 with other things or you were helped by other things

22 besides his report?

23          MR. BARDOS:  Object to form.

24     A.   From what I remember, again, three years ago,

25 his reports were primarily providing help for us on the

Jason Poreda
July 17, 2025

Page 273

1   cohesion and, yeah, on the relevant factors that you just

2   said.

3   BY MR. WARREN:

4       Q.   And he may have been providing help on other

5   things?

6       A.   No.  What I meant is that we would use the

7   reports that he provided to us.  We might have been able

8   to look at the data -- because he was looking at the same

9   data we were looking at, and it may have reinforced the

10  analysis that we had already done.  He didn't help us with

11  anything else, but looking at the reports he provided,

12  which were primarily provided to us for a specific reason,

13  it might help inform us on the other function analysis we

14  were doing in that they kind of supported those decisions.

15      Q.   Okay.

16      A.   But it wasn't anything that John Alford was

17  doing specifically.

18      Q.   Okay.  That makes sense.  Thank you.

19           A few more -- just a few more questions on what

20  staff was doing, so putting aside anything that Dr. Alford

21  provided, just what committee staff was doing, you said

22  that in looking at who would -- in this case the Hispanic

23  candidate of choice be in a particular district, or

24  whether Hispanic voters would be politically cohesive, and

25  I'm going to try to make a list of the things that staff

Jason Poreda
July 17, 2025

Page 274

1  looked at to investigate those things.  So one of those --

2  one of the things staff looked at to investigate who the

3  Hispanic candidate of choice was, or whether Hispanic

4  voters were cohesive, was past election results in those

5  protected districts, right?

6      A.   Yes.

7      Q.   And those would be the district level election

8  results, as in this candidate got this percent, this

9  candidate who lost got this other percent?

10     A.   Correct.

11     Q.   And you, as part of that, were looking at the

12  race of the prevailing candidate?

13     A.   Yes.

14     Q.   And then you were looking at other district

15  level statistics that are in the mapping application?

16     A.   I don't understand what you mean by that.

17     Q.   So besides election results in past -- so state

18  house election results are not in the mapping application?

19     A.   They are not.

20     Q.   So you were looking to those separately, which

21  you said.  My question is were you -- to analyze who the

22  Hispanic candidate of choice is and whether Hispanic

23  voters are cohesive, was there other data that you were

24  looking at besides past actual election results district

25  level in the benchmark districts?

Jason Poreda
July 17, 2025

Page 275

1          MR. BARDOS:  Object to form.

2     A.   I don't believe so, but that is also why we

3  contracted with Dr. Alford.  And we provided all of the

4  data to him to do all of his analyses.

5  BY MR. WARREN:

6     Q.   Okay.

7     A.   But, yeah, I don't -- I don't believe so, but I

8  don't remember.

9     Q.   Okay.  And again, I'm interested right now just

10 in what staff did, not the work product that Dr. Alford

11 produced.  I think the answer is no, but I just want to

12 confirm.  So did staff perform any ecological inference or

13 regression analyses?

14    A.   No.

15    Q.   Did staff produce any scatter plots to analyze

16 cohesion or bloc voting?

17    A.   No.

18    Q.   Did staff do -- besides looking at actual

19 historic district level election results in benchmark

20 Tier 1 protected districts, did staff do any other

21 analysis relating to White bloc voting or Hispanic voting

22 cohesion?

23    A.   No.

24         MR. WARREN:  Okay.  Let me confer with my

25         team.

Jason Poreda
July 17, 2025

Page 276

 1              (Recess taken from 5:54 p.m. to 6:02 p.m.)

 2              MR. WARREN:  I have just a few more

 3      questions for you.  I'm going to give you

 4      Exhibit 20.

 5              (Exhibit No. 20 marked for identification.)

 6  BY MR. WARREN:

 7      **Q.   This was a document that the House produced to**

 8  **us in discovery.  Does this look familiar?**

 9      A.   Yes.

10      **Q.   What is this?**

11      A.   I mean, it looks vaguely familiar, but I

12  actually don't know.  I mean, it's a draft potential Q&A,

13  but I don't remember why it was produced or for what or in

14  what context.  But it looks to be a Q&A that is kind of

15  more general following committee meetings and potential

16  Q&A from members I think maybe.  I don't -- I don't really

17  know.

18      **Q.   Is this, the format of this document familiar to**

19  **you?**

20      A.   In that it's a potential Q&A document, yes.

21      **Q.   What's a potential Q&A document?**

22      A.   Well, it can be different things.  It can either

23  be for staff or members, but sometimes staff will produce

24  potential Q&A for members for questions that may or may

25  not be asked after -- there's usually a press gaggle after

Jason Poreda
July 17, 2025

Page 277

1   committee meetings, and we try to prepare the chair or

2   other members for what potential questions might be asked

3   of them by members of the media or potential Q&A asked on

4   the floor by other members, or potential Q&A is there in

5   committee by other members, or by whoever.  So it's just

6   kind of helping to prepare members for questions they

7   might get and what staff would have told them if we could.

8   But, you know, in those -- in those press gaggles it's all

9   the members or even the questions in the committee it's

10  the members answering the questions, so we just try to

11  prepare them as much as we can.

12        Q.   And do they sometimes answer in ways that you

13  wish they didn't?

14        A.   No comment.

15        Q.   So this is a potential Q&A document that is of

16  the type that committee staff would prepare for a chair or

17  staff before a meeting?

18        A.   Yes, or just in general.  Sometimes we'd have a

19  running Q&A document that wouldn't be for any particular

20  meeting or purpose or floor action, it was just kind of a

21  running Q&A document that we would -- that we would have

22  so we could have something to draw from for one of those

23  types of documents.  So it's possible that one of our

24  staff or -- you know, that this was one of those documents

25  or it could have been for a specific purpose for all I

Jason Poreda
July 17, 2025

1    know.

2       Q.   On page 2 -- not page 2 numbered at the bottom,

3    so the first sheet, halfway down there's a section titled

4    Between Regular Session and Special Session.

5       A.   Yes.

6       Q.   So am I right in thinking that this potential

7    Q&A document would have been prepared for the special

8    session on redistricting in 2022?

9       A.   No, in that what I just said is that sometimes

10   we keep a running Q&A doc for all possible scenarios, and

11   that particular section may have been developed -- may

12   have been developed because we were expecting a special

13   session at some point for the congressional map, because

14   if the governor vetoed a congressional map, but without

15   seeing, you know, when this document was prepared or all

16   of that, I don't exactly know when or why this document

17   was prepared.  Or, again, if it was one of those running

18   documents where they were kind of adding sections and

19   questions as we went.  So this may have just been one of

20   those for all I know.

21      Q.   Okay.

22      A.   It also is specifically draft, so none of these

23   were meant to be -- you can see draft in big red.  None of

24   this -- you know, some of these would have been drawn on

25   if we were ever doing a final Q&A document, but the

Jason Poreda
July 17, 2025

Page 279

1   answers to this may have changed in the preparation of any

2   final document.

3   **Q.  Okay.  You don't remember preparing this**

4   **document?**

5   A.  I can tell you that collectively as a staff we

6   prepared lots of Q&A documents.  I don't remember this one

7   specifically, but it's been several years.  I know that on

8   any Q&A document given to any of our chairs Leda had me --

9   specifically had me and her and sometimes Kyle and Karen

10  Dearden, because she was doing a lot of our external

11  stuff, we all reviewed it generally before we did, like, a

12  final one.  So I probably did review -- well, I may not

13  have reviewed this document.  I may have reviewed whatever

14  the final product would have been, which may or may not

15  have been based on some of this.

16  **Q.  Okay.  Question 2 on the first page says, quote,**

17  **There is a UCLA report that states south Florida Hispanic**

18  **communities do not vote cohesively and therefore those**

19  **districts may not need to be protected.  What do you think**

20  **of this report/allegation, close quote.**

21  **Do you know what UCLA report that refers to?**

22  A.  Yeah.  There was a report that was published.

23  If I'm remembering correctly, it was right in the last,

24  like, couple of days -- it was either the last couple of

25  days right at the end of session or right before we were

Jason Poreda
July 17, 2025

1  going to pass the legislative maps, there was a report

2  done, I forget by who, but it was a UCLA professor I

3  believe.

4      Q.   And you were aware of that at the time that it

5  came out?

6      A.   I became aware of it.  Again, we were in the

7  middle of -- I remember we were in the middle of either

8  passing maps right at the end of session or something like

9  that.  I remember becoming aware of it at a particular

10  time, yes, but I don't exactly remember when.  It was

11  shortly after it was published, whatever date that was.

12     Q.   So before the special session when the final

13  congressional map was passed?

14     A.   I'm sorry.  All my stuff here.  What was that

15  date of that special session?

16     Q.   April 19th.

17     A.   My copy of that has gotten kind of

18  discombobulated.  Yeah, special session.  Yeah.  So

19  mid-April we passed -- so it would have been sometime in

20  between March 4th of 2022 and April 13th of 2022 that I

21  became aware of it.

22     Q.   Okay.  Did you read it?

23     A.   Yes.

24     Q.   Did you -- do you know if any other committee

25  staff read it?

Jason Poreda
July 17, 2025

1      A.    You'd have to talk to them.  I don't know.

2      **Q.    Did you share it with any other committee staff?**

3      A.    I did not share it.  I got it shared to me from

4    I forget who.  It might have been Leda.  I think I

5    actually found it on my own because we were just kind of

6    aware of it in general, but I specifically did not share

7    it with anyone else.

8      **Q.    Do you remember talking to anybody about it?**

9      A.    Yeah, the committee -- Leda and Kyle

10   specifically.  I may have talked about it with counsel.

11     **Q.    What were your conversations about it like?**

12          MR. BARDOS:  You can answer to the extent

13     you don't reveal attorney-client communications.

14     A.    I honestly don't remember.  It was three years

15   ago.  Sorry.

16   BY MR. WARREN:

17     **Q.    So the answer to the question number two on the**

18   **potential Q&A document is, quote, I haven't seen the**

19   **report, close quote.  And then it says, quote, If pushed,**

20   **listen, any person can write a report.  It doesn't mean**

21   **it's credible or that it wasn't produced for**

22   **partisan/improper motivations, close quote.**

23          **By the time this document was drafted, you had**

24   **seen the UCLA report.**

25     A.    I want to push back --

Jason Poreda
July 17, 2025

Page 282

1          MR. BARDOS:  Hold on.  What's the question?

2          THE WITNESS:  Yeah.  What is the question?

3    BY MR. WARREN:

4          **Q.   By the time this document was drafted had you**

5    **seen the UCLA report?**

6          MR. BARDOS:  Object to form.

7          A.   Well -- okay.  First, we don't know when this

8    document was prepared.  We also don't know under what

9    context or anything else.  This is also the answer, I

10   haven't seen the report.  These are answers for members in

11   whatever other context, and, as I said, we did not share

12   the report with anybody.  So the members would not have

13   seen the report unless they got it on their own, and I

14   don't know if they had or hadn't.  So whether or not staff

15   had seen the report or not is not relevant, because the

16   question or the answer to the question is not for staff.

17   And also we don't know when this document was or wasn't

18   produced.

19         MR. WARREN:  Fair enough.  I think that's

20   all my questions.  Thank you.

21         THE WITNESS:  Okay.

22         MR. BARDOS:  I do have a few questions.  It

23   won't take long.

24                    CROSS-EXAMINATION

25

Page 283

1  BY MR. BARDOS:

2      Q.   Mr. Poreda, do you recall in your testimony you

3  at different times discussed quotations that we saw in

4  legislative transcripts or elsewhere that said that Tier 1

5  takes priority or is superior to Tier 2, or that Tier 2 is

6  secondary?

7      A.   Yes.

8      Q.   Okay.  Take a look at Exhibit 4, which is here.

9  In the introductory language of subsection B in the Fair

10  Districts Amendments says unless compliance with the

11  standards in this subsection conflicts with the standards

12  in subsection -- it should be A -- or with federal law,

13  and then it goes on to list Tier 2 standards.

14          Is that what you're referring to when you say

15  that Tier 1 standards take priority or are superior or

16  that Tier 2 standards are secondary?

17     A.   Yes.  And section C, where it says the order in

18  which the standards within subsections 1A and 1B of this

19  section shall be not read to establish without -- but,

20  yeah, what you just read, yes.

21     Q.   Okay.  So is it your understanding that in case

22  of conflict the Florida Constitution gives priority to

23  Tier 1 over Tier 2?

24     A.   Correct.

25     Q.   Okay.  Now, where there's no conflict, was it

Jason Poreda
July 17, 2025

Page 284

1    your understanding and your endeavor while drawing

2    districts to implement all of the standards in the Fair

3    Districts Amendments?

4         A.   Yes.

5         Q.   Okay.  Without subordinating any to any others?

6              MR. WARREN:  Object to form.

7    BY MR. BARDOS:

8         Q.   In other words -- I'll rephrase.

9              When there was no conflict, did you in your mind

10   subordinate or prioritize any one standard over the others

11   if you could implement all of them?

12        A.   So when there was no conflict that generally

13   meant we were drawing a district that did not have any

14   racial issues, so Tier 1 was not applicable.  So Tier 2

15   would then become the guiding principle for the districts.

16        Q.   Okay.  Now, if you could draw a Tier 1 protected

17   district in a compact way that also utilizes political and

18   geographical boundaries, did you do that and fully

19   implement all of the standards?

20        A.   Yes.  We tried to balance both Tier 1 and Tier 2

21   to the extent feasible wherever we could.

22        Q.   Okay.  And there was also testimony about

23   statements such as, we get to compactness after Tier 1.

24   Do you recall that?

25        A.   Yes.

Jason Poreda
July 17, 2025

Page 285

1      Q.   And do you understand that to refer to what we

2   were just talking about, which is the constitutional

3   prioritization of Tier 1 over Tier 2 in case of conflict?

4      A.   Yes, and the strict language of the Constitution

5   in a more global application, yes.

6      Q.   And to be clear, do you or do you not understand

7   that sort of statement to mean that while you were drawing

8   maps chronologically you would address Tier 1 first before

9   you addressed Tier 2?

10     A.   I'm sorry.  Can you rephrase the question?

11     Q.   So, while you were drawing maps, did you address

12   Tier 1 before addressing Tier 2 chronologically, or did

13   you try to address all of the standards simultaneously

14   while drawing?

15     A.   No.  We tried to address all the standards.  I

16   wouldn't say they were always simultaneously.  As I

17   mentioned in south Florida, where we pretty much drew

18   Tier 2 districts and then adjusted for Tier 1, so during

19   the drawing process it was much more organic, but we were

20   certainly keeping both Tier 1 and Tier 2 standards in our

21   minds.  And obviously if we had a situation where Tier 1

22   was -- there was some problem with Tier 1, then fixing

23   that problem became a priority over fixing whatever other

24   problems with Tier 2 that may have existed.

25     Q.   You also mentioned that you started with a blank

Jason Poreda
July 17, 2025

1    map.  Do I remember that correctly?

2         A.    That is correct.

3         Q.    Okay.  And you talked about recreating the

4    Tier 1 districts when you had the blank map?

5         A.    Yes.

6         Q.    Okay.  Now, did you draw the Tier 1 districts

7    first before you drew the other districts, or did you

8    develop them concurrently?

9         A.    We developed them concurrently.

10        Q.    Okay.  Tell us a little bit about that.

11             MR. WARREN:  Object to form.

12        A.    So we drew the map particularly -- which map are

13   you referring to?

14   BY MR. BARDOS:

15        Q.    Either house or congressional.

16        A.    So, specifically in the state house map, the

17   first step was trying to figure out what county

18   combinations might work to complete a whole district.  For

19   example, in the state house map District 6 is entirely Bay

20   County only, so that was one district and that became

21   pretty obvious looking at the math.  Then other county

22   combinations, like CD -- or, I'm sorry, HD 5, where it's a

23   combination of five different counties.

24             The same with District 83 that I mentioned

25   before or other districts, like districts -- or other

Jason Poreda
July 17, 2025

Page 287

1   county combinations which we called sandboxes, like

2   Districts 52, 53, 54, 55, and 56, which is Pasco,

3   Hernando, and Sumter County combined, has five districts

4   among them.  And other examples like that throughout the

5   map.

6           That was the first step before we did anything

7   else.  And then, within that, even those county

8   combinations we had to then figure out how we were going

9   to address the districts that may be Tier 1 protected

10  within those other sandboxes.

11      Q.   And I think you testified when speaking about

12  the state house districts that you drew the challenged

13  districts with Tier 2 principles in mind before you did

14  the functional analysis.

15          Is that -- do I recall that correctly?

16      A.   That would be correct.

17      Q.   Okay.  And then you talked about making an

18  adjustment to House District 115 after performing the

19  functional analysis.  Do you recall that?

20      A.   Yes.

21      Q.   Okay.  And in making that adjustment, when you

22  made that adjustment did you at that point ignore Tier 2

23  principles or did you follow Tier 2 principles when making

24  those adjustments?

25          MR. WARREN:  Object to form.

Jason Poreda
July 17, 2025

1    A.    We followed Tier 2 principles to the best of our

2    ability.

3    BY MR. BARDOS:

4        Q.    Okay.  And how did you follow Tier 2 principles

5    in the portion of House District 115 that you were

6    adjusting after you performed the functional analysis?

7        A.    We tried to find as -- kind of what I mentioned

8    before with the satellite view or other ways.  We were

9    trying to find the most major throughways or roads

10   possible to complete 115 along with 116 and 114 that would

11   use the most obvious roads for the residents in the area

12   to determine what districts or where the boundary lines

13   were, up to and including using -- again, I forget which

14   road it was that became the boundary between 115 and 116

15   and then it's the same road that becomes the boundary

16   between 114 and 116.  So there's a nice square T section

17   there that, you know, it can be very obvious for anyone

18   driving down those roads that that is a border between

19   some districts, as an example.

20       Q.    And you mentioned the border between 115 and

21   116.  In drawing that boundary, did you consider Tier 2

22   principles?

23       A.    Yes.

24       Q.    Okay.  And elaborate on that, please.

25            MR. WARREN:  Object to form.

Jason Poreda
July 17, 2025

Page 289

1      A.   So, again, we tried to find as major roads as

2   possible.  I think there's even a little canal that we

3   used in that area.  We also adjusted the boundary between

4   115 and 116, because at one point 116 had a very sharp

5   point on it and we took that off for compactness reasons

6   while keeping Tier 1 principles in mind.  We made little

7   adjustments throughout that whole area while trying to

8   keep the Tier 1 implications of all of those districts in

9   mind as we were doing that, but primarily looking at major

10   roads, easily recognizable landmarks in those areas to

11   draw districts to make sure that we weren't cutting

12   through little neighborhoods and things like that.

13   BY MR. BARDOS:

14      Q.   Now, early on in your testimony you mentioned

15   that there was I believe a potential conflict between

16   Tier 1 and Tier 2 principles with respect to House

17   District 115.  Do you recall that?

18      A.   Yes.

19      Q.   And what you testified about subsequently

20   specifically making the adjustment to House District 115

21   after performing the functional analysis, is that what you

22   were referring to when you mentioned the potential

23   conflict?

24      A.   Yes.

25      Q.   Okay.  And as I understood your testimony, House

Jason Poreda
July 17, 2025

Page 290

1    District -- well, let me ask it this way.  Was House

2    District 115 the only one out of the state house districts

3    that sitting here today you can recall having made

4    adjustments to after performing the functional analysis?

5        A.   That is definitely not the only district we made

6    adjustments to.

7        Q.   I'm sorry.  Among the state house challenged

8    districts.

9        A.   Oh, just the challenged districts?

10       Q.   Yes.

11       A.   No.  I believe we made some small tweaks.  I

12   think I mentioned before 113, 14, 15, 116, because we did

13   that and included Sweetwater and did some other stuff, and

14   118 and 119 as well from the workshop maps throughout the

15   process.

16       Q.   Okay.  I'm saying specifically in response to

17   the functional analysis.

18       A.   Oh.

19       Q.   I think the --

20       A.   Yeah, I don't -- specifically, like having done

21   a functional analysis and making adjustments after, I

22   don't recall.  I believe the only district where something

23   like that probably happened was 115, because I can

24   remember it specifically.  The other districts, there were

25   adjustments made and functional analysis was performed to

Jason Poreda
July 17, 2025

 1   make sure that whatever Tier 2 changes we were making did

 2   not negatively affect the functional analysis.

 3        Q.   So the other districts besides 115, the

 4   adjustments that you remember -- that you remember making

 5   were made for Tier 2 reasons?

 6        A.   Correct.

 7        Q.   Okay.  Do you consider each of the challenged

 8   state house districts to be compact?

 9        A.   I do.

10        Q.   Do you think they utilized political and

11   geographical boundaries where feasible?

12        A.   I do.

13        Q.   And in your mind did race predominate over

14   other -- over non-racial considerations in drawing those

15   districts?

16        A.   No.

17        Q.   Take a look at Congressional District 26,

18   please.  And, I guess, let's look more broadly at south

19   Florida.  Does the -- in drawing the -- in drawing south

20   Florida, did the House endeavor to utilize county

21   boundaries as district boundaries?

22        A.   Where feasible, yes.

23        Q.   Okay.  And did it follow county boundaries along

24   the northern and western boundaries of District 21 and the

25   western boundary of District 20?

Jason Poreda
July 17, 2025

Page 292

1       A.   Yes.

2       **Q.   And was that -- did that influence the shape of**

3  **the districts to the south?**

4            MR. WARREN:  Object to form.

5       A.   Yes.

6  BY MR. BARDOS:

7       **Q.   Okay.  Explain how.**

8       A.   So, honestly, this was also mostly -- like, this

9  is also related to District 8, which is made up entirely

10  of Brevard and Indian River, and then just needed a little

11  bit -- I think it was something along the lines of, like,

12  two or 3,000 people more.  That's all it needed.  It could

13  be a little bit more than that, but off the top of my head

14  that's the number that's coming to me.  But again, it's

15  been three years.

16            So, in order to keep those two counties whole

17  with just a little bit more going into Orange or Volusia

18  and we chose to go into Orange, that kept the Indian River

19  County line with St. Lucie solid.  So if we're going to do

20  that, then everything had to go south from there.  And

21  also with CD 20 being a Section 2 Voting Rights Act

22  protected district, that district we knew was probably

23  going to be in Palm Beach and Broward after our version in

24  the workshop map and wholly in Broward didn't really work

25  for a variety of reasons, including being less

Jason Poreda
July 17, 2025

Page 293

1   mathematically compact than this district.

2           We knew that that Broward County, Palm Beach

3   County line was going to be whole, so we made the

4   decision, since that county border between Indian River

5   and St. Lucie was going to be kept, and the western edge

6   of the Palm Beach, Broward County line was going to be

7   kept up -- or be kept, it made sense to try to keep

8   St. Lucie and Martin whole and then push everything south

9   from there.  And that, going around the arms of

10  Congressional District 20, just District 21, 22, 23, all

11  kind of fell into place.

12          We also were very mindful about trying not to

13  wrap around the northern arm of CD 20, so we tried to find

14  a dividing line between District 21 and 22 there while

15  making changes to CD 20 and keeping it compliant and

16  keeping as many cities whole but getting enough people in

17  21 without having to come down too far.

18          And then that allowed 22 to have a nice shape.

19  Twenty-three had to go around a little bit of that

20  southern arm of Congressional District 20, but then we

21  were able to find a nice dividing line right in the Fort

22  Lauderdale area to allow District 25 in the southern part

23  of Broward County to kind of be a nice rectangular shape,

24  with some deviations for the City of Sunrise, kind of over

25  by I-75 -- or -- yeah, I-75.  The jaggedness there, that's

Jason Poreda
July 17, 2025

Page 294

1    the municipality of Sunrise, and there's other

2    municipalities within the arm that is CD 20.

3           And then CD 24 had to come up into Broward

4    County, but we were able to use a lot of major roads and

5    keep that -- keep that district.  It's just a neat little

6    rectangle that goes up in the -- I think just east of

7    Miramar and some of the other areas where it's nice --

8    uses nice major roads and it's nice, square, and kind of

9    keep that as nice as possible before going down into Dade

10   and doing other stuff that we discussed earlier.

11   **Q.   Okay.  And as a result of that did it become**

12   **inevitable that a district in Miami-Dade would have to**

13   **take some population from Collier?**

14   A.   One result of doing everything that I just

15   described is that with two districts -- well, one district

16   wholly within Dade, another district, 24, almost wholly

17   within Dade, and then 28 having Monroe and the rest in

18   Dade, there was inevitably going to be population that

19   needed to find a congressional district somewhere.  At

20   that point the only option was to go west.

21   **Q.   And your decision to follow county boundaries**

22   **along the northern and western sides of District 21 and**

23   **along the western side of District 20, was that based on**

24   **Tier 2?**

25   A.   Yes.

Jason Poreda
July 17, 2025

Page 295

1      Q.   Okay.  And your attempt to keep districts such

2   as 25, 22, and 23 from wrapping around the arms -- or to

3   do an L shape along the coast, was that based on Tier 2

4   principles as well?

5      A.   Yes.

6      Q.   Okay.  Now, the eastern boundary of District 26,

7   does that split any municipalities in Miami-Dade?

8      A.   I don't recall.

9      Q.   The border of -- the northern boundary of

10  District 26, does that follow county boundaries?

11     A.   Yes.

12     Q.   And what does the southern district -- the

13  southern boundary of District 26 follow?

14     A.   Largely the Tamiami Trail, until you get closer

15  to the City of Miami, and I don't -- might be the Dolphin

16  Expressway.  I don't remember what road is kind of the

17  boundary between 26 and 27, and then there's a slight

18  deviation for 28 that goes above the Tamiami Trail that

19  follows some other major roads, and that's primarily done

20  for equal population purposes.

21     Q.   And how about in Collier County, what do the

22  boundaries of District 26 follow?

23     A.   I can only speak to the version of the district

24  that I drew there.  The version in the enacted map was

25  altered by the Governor's Office a little bit and goes

Jason Poreda
July 17, 2025

Page 296

1    around Immokalee.  I don't know what boundaries were used

2    there, but in our version we kept the county line whole

3    and we went over to I-75 and went south, and then had to

4    find an area to jump off of I-75 to equalize population.

5         Q.   Now, in the enacted District 26, apart from the

6    area around Immokalee, does the northern boundary follow

7    the Collier County line?

8         A.   Yes.

9         Q.   And does the southern boundary of 26 follow the

10   Monroe, Collier line?

11        A.   Yes.

12        Q.   You were asked about cohesion and how you

13   determined cohesion.  Does the functional analysis provide

14   information about cohesion as well?

15             MR. WARREN:  Object to form.

16        A.   On a basic level, yes.  As an example, you

17   can -- if a particular racial group -- an easy example is

18   a lot of the Black districts you can see that they're, you

19   know, 90 percent registered Democrat, so that suggests

20   cohesion among that particular racial group.

21   BY MR. BARDOS:

22        Q.   At times you referred to the Hispanic candidate.

23   Were you referring there to the candidate preferred by

24   Hispanic voters?

25        A.   Yes.

Jason Poreda
July 17, 2025

Page 297

1      Q.   And could that include candidates who are not

2   Hispanic?

3      A.   Yes.

4      Q.   And then we also looked at this Exhibit 20 that

5   you were asked about, and you were asked about a question

6   and answer on the first page.  Do you know who authored

7   that question and answer?

8      A.   No.

9      Q.   Okay.  So it wasn't you?

10     A.   I don't -- I don't remember.

11     Q.   Okay.  And so, sitting here today, do you know

12   whether the person who authored this, whoever it was, did

13   or did not see the report at the time this was authored?

14     A.   I don't know.

15          MR. BARDOS:  Okay.  I have no further

16     questions.

17          MR. WARREN:  I just have a few.  Perhaps now

18     is a good time to stipulate that we all agree to

19     continue a few minutes past seven hours?

20          MR. BARDOS:  A few minutes.

21                    REDIRECT EXAMINATION

22   BY MR. WARREN:

23     Q.   Okay.  Mr. Poreda, you testified in response to

24   Mr. Bardos's questions about the house committee's

25   decision to configure the districts in southeast Florida.

Jason Poreda
July 17, 2025

Page 298

1    Do you remember that?

2        A.    Yes.

3        Q.    I believe you said that maybe a starting place

4    for the configuration of those districts was the county

5    boundary between St. Lucie and Indian River?

6        A.    Yes.

7        Q.    And then the population flowed south and then

8    west into Collier from there?

9        A.    Yes.

10       Q.    Was that explanation of why the southeast part

11   of the congressional districts -- was that explanation

12   shared with the redistricting committee members?

13       A.    Do you mean in a committee meeting?

14       Q.    In a committee meeting.

15       A.    I don't remember.

16       Q.    If it was, that would be reflected in the --

17       A.    In the transcripts.

18       Q.    Same thing with members generally on the house

19   floor, if that explanation was shared with them that would

20   be in the transcripts?

21       A.    If they said it.  Just because they didn't say

22   it doesn't mean it wasn't shared with them.

23       Q.    Because it could have been shared privately?

24       A.    I don't understand the question.

25       Q.    I guess -- well, my question is, if an

Jason Poreda
July 17, 2025

1   explanation to members about the configuration of these

2   districts wasn't shared in a public meeting, how else

3   could it have been shared to members?

4        A.   We had many meetings with members, as we've

5   talked about extensively, both with committee chairs and

6   with other members -- like, a lot of different members.

7   So that explanation could have been shared with them in

8   any of those meetings with other staff and other members

9   present, and just because they did not then say it in a

10  public meeting doesn't mean they were not aware of it.

11       Q.   Got it.  Do you remember any such conversations

12  with members outside of public meetings sharing that

13  explanation?

14       A.   It's three years on.  I don't remember any

15  specific meetings, but we had many meetings with

16  especially our chairs, but also other meetings.  When I

17  say chairs, I mean chairs, vice chairs, and whoever.

18  There was many others, and lots of explanations were

19  shared, and I can't remember if I specifically -- I or

20  anyone else in the committee specifically shared that

21  specific explanation.

22            I do remember, though, because, again, the

23  congressional map is something that we have to merge with

24  the Senate, and the Senate had broken that specific

25  boundary line, and it was important to us to -- and when

Jason Poreda
July 17, 2025

1    we collectively came together to use our version of that

2    that kept that line whole.  So I imagine at a certain

3    point talking about that boundary line and how it all

4    related down was shared.

5        Q.   Let's, since you brought it up, talk about the

6    senate map 8060, which is Exhibit 11.

7        A.   Yes.

8        Q.   And I see what you just referred to there, which

9    is the Senate did not start at the Indian River, St. Lucie

10   County boundary, and instead --

11       A.   Yeah.  I want to clarify, we didn't necessarily

12   start there, but because of District 8 and some of the

13   other configurations that we had that was just a relevant

14   factor.  So if I ever said that we started there, I don't

15   know if that was -- I don't know if that's true, but

16   certainly, kind of looking at that region, that's where I

17   start in kind of looking at how everything kind of flowed

18   down from there.

19       Q.   Thanks for that clarification.  That may have

20   been my poor paraphrase.

21       A.   That's okay.

22       Q.   So in the senate map 8060 they didn't snap to

23   that county line or respect that county border between

24   Indian River and St. Lucie, right?

25       A.   Correct.

Jason Poreda
July 17, 2025

Page 301

1      Q.   Looking further south, though, 8060 does have a
2   district that combines portions of northwest Miami-Dade
3   County and a portion of eastern Collier County, right?
4      A.   I'm sorry.  So you're referring to -- in their
5   map District 25?
6      Q.   Correct.
7      A.   Yes.
8      Q.   So, even though the Senate made a redistricting
9   choice not to align its southeast segment of districts at
10   the St. Lucie, Indian River county line, it has a
11   configuration of that Collier, Dade, and in this case
12   Hendry district?
13      A.   Yes.  But I'll point out that although they
14   don't hold that county line, the configurations of their
15   districts are very similar to ours, and that occlusion in
16   there is because they chose to do some other things with
17   Districts 17 and 19, if you look at our map.  We both
18   chose -- when I say both, I mean the House and the Senate
19   both in our maps chose to keep Polk County whole, which is
20   different than the inactive map that the Governor's Office
21   changed, so that county line on the southern part of Polk,
22   Osceola, and Indian River is essentially kept except for I
23   believe it was 2600 people that they broke the line.
24           So although they broke the line, they barely
25   broke the line.  And that was because of some of the other

Jason Poreda
July 17, 2025

Page 302

1   choices they had through here, including putting Hendry

2   County in District 25.  We just felt that that small

3   occlusion that they had in Indian River, because it was so

4   small, but otherwise effectively mirrored our districts,

5   we felt it was important to keep that other county whole

6   and pick up our number of counties whole.

7              I think there might have been something else.

8   So, yes, they didn't keep that there, but like I said in

9   my explanation, like I said, I don't know if I

10  specifically started there to go down.  But it was similar

11  enough that we felt in the House that it was necessary to

12  do that.  Which, again, their districts that they have

13  coming down similar to their District 20, they're all

14  very, very similar to ours in our map and what ends up

15  being in the enacted map, because the amount of people,

16  total population in that little occlusion, is not really

17  enough to change the overall configuration that I

18  described before.

19             MR. WARREN:  That's all I have.  Thank you.

20             MR. BARDOS:  I have just a couple of

21     additional questions.

22                      RECROSS-EXAMINATION

23  BY MR. BARDOS:

24     **Q.   Did you say that the -- where the senate map**

25  **deviates from the Indian River, St. Lucie County line and**

Jason Poreda
July 17, 2025

Page 303

1    takes District 18 north into Indian River, that the

2    District 18's piece of Indian River has only about 2600

3    people?

4         A.   I don't -- I specifically don't remember, but

5    I'm sure their data packet specifically shows the county

6    share of population in that, and it could be a little bit

7    more than that, but I remember it being such a small

8    amount of people.  Again, I think it was in the area of

9    3,000 people, but I could be wrong about that because I'm

10   trying to remember three years ago.  But it was such a

11   small occlusion that the House, me and Leda, we felt like

12   that that was not -- like, we could make that up somewhere

13   else and keep it whole.

14        Q.   And the two or 3,000 people, or whatever small

15   number it is that District 18 took out of Indian River,

16   that's not -- that would not make a difference between

17   going from Miami-Dade to Collier or not going over to

18   Collier?

19        A.   Correct.  That would not have changed that at

20   all.  In fact, I think that 3,000 people was reflected

21   because they kept, I think, the Pasco County line whole or

22   something along those -- like it literally was 3,000

23   people that went from some other portion of the state if

24   you look at their whole map, this is only a portion of the

25   map that I'm seeing here, that 3,000 people was moved all

Jason Poreda
July 17, 2025

Page 304

1    the way around to go up into Indian River as opposed to

2    like something -- I don't remember what it was, but that's

3    map drawing in the congressional world, when you have

4    3,000 people that you need to find a home for and they

5    literally moved all the districts around to do that.

6            But, no.  Again, it could be 13,000, it could be

7    3,000.  I don't remember the exact number, but it was

8    small enough where we felt that we could do that.

9            MR. BARDOS:  Great.  No further questions.

10       Thank you.

11           THE STENOGRAPHER:  Read?

12           MR. BARDOS:  Read, yes.  Read and order,

13       please.

14           (The proceedings concluded at 6:40 p.m.)

15

16

17

18

19

20

21

22

23

24

25

Jason Poreda
July 17, 2025

Page 305

1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA

4    COUNTY OF LIBERTY

5

6            I, JANE FAUROT, Notary Public, State of

7        Florida, certify that JASON PATTERSON POREDA

8        appeared before me on July 17, 2025, and was

9        duly sworn.

10

11           Dated this 22nd day of July, 2025.

12

13

14

15    _____

16    JANE FAUROT
      Notary Public, State of Florida
17    My Commission No. 131262
      Expires: 08/06/2025
18

19

20

21

22

23

24

25

Jason Poreda
July 17, 2025

Page 306

```
 1                    CERTIFICATE OF REPORTER

 2

 3   STATE OF FLORIDA

 4   COUNTY OF LIBERTY

 5

 6          I, JANE FAUROT, do hereby certify that I was

 7   authorized to and did stenographically report the

 8   foregoing deposition of JASON PATTERSON POREDA; that a

 9   review of the transcript was requested; and that the

10   transcript is a true record of my stenographic notes.

11          I FURTHER CERTIFY that I am not a relative,

12   employee, attorney, or counsel of any of the parties, nor

13   am I a relative or employee of any of the parties'

14   attorneys or counsel connected with the action, nor am I

15   financially interested in the action.

16          Dated this 22nd day of July, 2025.

17

18   _____

19   JANE FAUROT, RPR

20

21

22

23

24

25
```

Jason Poreda
July 17, 2025

Page 307

```
 1                          ERRATA SHEET

 2                  DO NOT WRITE ON THE TRANSCRIPT
                    ENTER CHANGED ON THIS SHEET
 3
        Re:        Cubanos Pa'Lante, et al.
 4      Deponent:  JASON PATTERSON POREDA
        Date of :  July 17, 2025
 5      Case No.:  Civil Action No. 1:24-cv-21983

 6      PAGE    LINE        REMARKS

 7      _____

 8      _____

 9      _____

10      _____

11      _____

12      _____

13      _____

14      _____

15      _____

16      _____

17      _____

18      _____

19      _____

20      Under penalties of perjury, I declare that I have
        read the foregoing document and that the testimony given
21      is true.

22      Signature of Witness _____

23      Dated this _____ day of _____, _____.

24      email to: fl.production@lexitaslegal.com

25      Job No.: 410695
```

Jason Poreda
July 17, 2025

Page 308

July 22, 2025

GrayRobinson, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32301
andy.bardos@gray-robinson.com

ATTN:  ANDRE V. BARDOS, ESQUIRE
Re:  Cubanos Pa'Lante, et al. vs. Florida House of
Representatives, et al.
Case No.: Civil Action No. 1:24-cv-21983
Deposition of JASON PATTERSON POREDA; July 17, 2025

The transcript of the above proceeding is now available
and requires signature by the witness.

Please e-mail fl.production@lexitaslegal.com for access to
a read-only PDF transcript and PDF-fillable errata sheet
via computer or use the errata sheet that is located at
the back of the transcript.

Once completed, please print, sign, and return to the
email address listed below for distribution to all
parties.

If you are in need of assistance, please contact Lexitas
Legal at 888-811-3408.

If the witness does not read and sign the transcript
within 30 days, the original transcript may be filed with
the Clerk of the court.

If the witness wishes to waive his signature now, please
have the witness sign in the blank at the bottom of this
letter and return to the email address listed below.

Very truly yours,

_____
JANE FAUROT, RPR
Lexitas
fl.production@lexitaslegal.com

I do hereby waive my signature.


_____
JASON PATTERSON POREDA
Job No.: 410695

Jason Poreda
July 17, 2025

---

**Exhibits**

---

410695JP
oreda071
725 Ex 0
01
  3:13
  10:25
  11:3
  249:3
410695JP
oreda071
725 Ex 0
02
  3:14
  11:4,7
  262:4
410695JP
oreda071
725 Ex 0
03
  3:15
  26:16,
  18 27:4
  103:9
  106:15
410695JP
oreda071
725 Ex 0
04
  3:16
  26:21,
  22
  283:8
410695JP
oreda071
725 Ex 0
05
  3:17

46:13,
16
49:23
117:12
125:22
410695JP
oreda071
725 Ex 0
06
  3:19
  63:3,5
410695JP
oreda071
725 Ex 0
07
  3:20
  72:14,
  15
410695JP
oreda071
725 Ex 0
08
  3:22
  108:3,
  5,9
410695JP
oreda071
725 Ex 0
09
  3:23
  108:11
410695JP
oreda071
725 Ex 0
10
  4:3
  109:10,
  11

410695JP
oreda071
725 Ex 0
11
  4:4
  112:9,
  13
  300:6
410695JP
oreda071
725 Ex 0
12
  4:5
  135:21,
  24
410695JP
oreda071
725 Ex 0
13
  4:7
  137:21,
  25
410695JP
oreda071
725 Ex 0
14
  4:9
  145:21,
  23
410695JP
oreda071
725 Ex 0
15
  4:10
  149:5,9
  222:10

410695JP
oreda071
725 Ex 0
16
  4:12
  171:6,7
  174:13
410695JP
oreda071
725 Ex 0
17
  4:13
  202:2,4
  222:11
410695JP
oreda071
725 Ex 0
18
  4:15
  218:11,
  14
410695JP
oreda071
725 Ex 0
19
  4:16
  238:3,8
410695JP
oreda071
725 Ex 0
20
  4:18
  276:4,5
  297:4

---

**0**

---

0815/17
  109:17

---

**1**

---

1
  10:25
  11:3
  21:23,
  25 22:6
  44:25
  45:3,5,
  17,18
  46:3
  55:24
  56:1
  69:7
  70:1
  73:13,
  21
  101:4
  105:13
  116:19,
  21
  120:17
  121:16,
  19
  122:9
  124:6
  125:23,
  25
  126:10,
  11,16
  127:7,
  10,18
  128:22
  130:22
  131:16
  132:25
  135:17
  136:3
  138:5,
  25
  139:14

140:7,
11,13,
15,18,
25
141:13,
18,22
142:13,
16
143:11
144:7,
11
145:12
146:5,
14
151:13,
14
153:6,
7,8
155:5,
15,18,
20,23
156:1,
4,7,10,
16,21
157:2
160:21,
23,25
161:18,
21
162:6,
13,20
163:1,
7,16
164:2
167:3
168:6,
22,25
169:6,
20,23
176:1,5
178:25
179:5,

Jason Poreda
July 17, 2025

12,25
180:13
181:5,
13,20,
25
182:4,
13,15,
24
183:4,
15
184:3,
13,22,
24
185:12,
23
186:1,
6,11
204:6,
19
205:4,8
207:9,
13
208:24
209:6,
11,19
210:10,
20,25
211:5,
10,13,
25
212:1,7
213:7,
10,19
214:9
216:3,
15,22
217:5,
6,24
220:5
227:11
228:12
234:9

237:8
239:3,8
240:13
241:17
249:3
258:1
261:11
264:7
265:21
268:11
270:18
275:20
283:4,
15,23
284:14,
16,20,
23
285:3,
8,12,
18,20,
21,22
286:4,6
287:9
289:6,
8,16

**10**
86:2
109:10,
11
133:4
157:10
160:19
188:6,7
202:3,
12
203:15
204:4,
14,15
248:2
250:18

**104**

194:8
**106**
130:4
215:22
**107**
127:21
130:6,8
**108**
97:10
105:22
127:20
129:5
130:6
194:1
196:1,
12
199:17,
23
**109**
11:2
96:18
97:10
105:23
114:15,
20
115:1,
13
126:21
127:20
129:5
130:6
194:1
196:1,
12
199:17,
23
**11**
112:9,
13
117:15
125:22

138:4
206:24
267:18
300:6
**110**
146:3
173:10,
20
174:19
**111**
146:3
173:18
194:18
**112**
128:25
130:13
146:3
193:12,
13
**113**
128:25
130:1
146:3
165:15
166:4
169:11,
22
193:13
194:3
268:19
269:8,
11,21
270:5
290:12
**114**
128:25
129:18,
24
130:18
131:23
132:7,

9,13
146:3
152:12
159:10,
14
164:20
165:15
168:17
182:20
183:12
268:19
269:8,
11,21
270:5
288:10,
16
**115**
128:25
129:15
131:1,
21
132:5,
8,13
146:3
152:12
159:16
160:2,3
164:17
165:1,
9,15
167:1,
4,17,21
168:5,
10,15,
17,23,
25
169:1,
15
170:3,
4,6
179:20
180:2,

8,17,20
181:12,
18,24,
25
182:3,
14,23
184:20,
23
262:8,
14,19
265:7
266:6
267:10
268:8,
11,20
269:8,
11,21
270:5
271:11,
14
287:18
288:5,
10,14,
20
289:4,
17,20
290:2,
23
291:3
**116**
128:25
129:17
130:18,
23
146:3
152:12
164:21
168:14,
15
169:1
170:3,
4,5

Jason Poreda
July 17, 2025

3

179:22,
23
180:8,
17,18,
21
197:23
288:10,
14,16,
21
289:4
290:12
**117**
127:19
129:5
131:5
132:22
139:11
159:11
160:8
164:20
167:21
183:13
189:2,
11,22
195:7
196:15,
16
220:10
**118**
128:25
129:21
132:17,
25
146:3
151:25
152:13
160:11
170:7,
8,9,18
171:12,
14,22

172:20
173:11,
18
174:3,
6,10
175:11,
12,19
176:1,
19
177:12,
22
179:2
183:13,
19
290:14
**119**
129:1
132:17,
25
146:4
152:13
159:11
160:12
170:8,
9,19
171:12,
15,23
173:11,
18
174:3,
6,11
175:11,
12,19
176:2,
19
177:11,
15,20
178:11
179:2
183:12,
14,19
290:14

**11:04**
69:4
**11:15**
69:4
**12**
135:21,
24
218:22
**120**
173:11,
15
174:1
**12th**
41:13
**13**
127:23
137:21,
25
160:22
165:22
166:1
179:24
250:19
252:24
268:19
**13,000**
304:6
**13-ish**
250:21
**13th**
280:20
**14**
63:9
127:23
145:21,
23
165:22
166:2,4
193:13
252:24

268:19
290:12
**15**
46:19
108:19,
21,25
109:2
118:2
129:18
146:2
149:5,9
166:5
193:13
204:11
222:10,
17
238:11
252:24
268:19
290:12
**16**
49:22
63:12,
13
129:18
151:10
152:24
171:6,7
174:13
193:13
204:8,
11,14,
15
**1618**
174:25
**1620**
175:3
**17**
46:19
108:19
109:22

157:21
202:2,4
204:24
222:11
301:17
**18**
110:25
111:24
112:17
152:11
193:13
218:11,
14
303:1,
15
**18's**
303:2
**180,000**
219:21
**180-ish**
76:12
**184**
219:23
**18th**
106:20
201:25
202:12
**19**
129:21
176:17
193:13
203:17
214:17,
21
218:25
238:3,8
301:17
**19th**
280:16

**1:01**
139:19
**1A**
283:18
**1B**
283:18
**1st**
149:6
157:4
176:10,
16
179:15
222:9

---

**2**

**2**
11:4,7
22:11
45:1,3,
10,22
46:10,
11,20
49:22,
24
50:15
58:12
65:12
66:12
69:7
73:13,
18
101:3
105:13
117:1,
18
118:15
125:24,
25
126:4,
10,17

128:9,
13,22
131:16
132:25
138:6,
19
140:2,
10
142:11
144:24
145:7,
14
149:21
153:6,8
155:6,
17,21,
22
156:2,
8,10,
15,21,
25
160:25
161:17,
19
162:5,
14,17,
24
164:3,8
165:5
168:3
172:7,
16
175:12
178:9
180:12
184:14
185:13,
14,24
186:1,
7,11,16
188:23
189:20

190:16
191:13,
15
193:16
205:12
207:2,7
211:13
214:25
218:4
220:4,7
221:10
224:6
226:11
238:6
249:9,
10
262:4
272:8
278:2
279:16
283:5,
13,16,
23
284:14,
20
285:3,
9,12,
18,20,
24
287:13,
22,23
288:1,
4,21
289:16
291:1,5
292:21
294:24
295:3

**20**
86:2
110:21
115:17

123:19
133:3
190:13,
17,24
191:3,
12,14,
17,18,
20,23
192:13
205:24
206:11
218:3
224:11
226:10
228:22
229:10,
12,14
236:15
245:6
252:1
276:4,5
291:25
292:21
293:10,
13,15,
20
294:2,
23
297:4
302:13

**20-ish**
242:15

**2007**
15:6

**2009**
15:14,
15,25

**2010**
16:7,8,
17,25
18:25

22:17
**2011**
110:22
**2012**
18:3,
12,19
19:4
22:1,4
72:2
74:25
79:24
134:18
252:18,
22
253:3,
14,20
**2014**
6:12
9:7
19:13
20:5,
11,23
252:6
253:20
262:21
**2015**
9:10
21:12
22:24
23:11
122:15
237:10,
14,23
238:5
264:5
266:3
**2016**
23:11,
12 80:4
122:15
252:13,

15
**2017**
23:19
**2018**
250:11
252:13
262:23
267:23
**2020**
11:24
12:1
24:10
26:14
27:1,11
38:11
39:8
40:19
42:16,
23
78:23,
24
79:2,5,
10,12,
19
80:13,
20
89:1,4
134:18
144:13
145:13
237:18
243:5,
22
250:11
252:18
253:3,
15
254:10,
18
256:16
263:6

267:9
**2021**
12:1
39:5,14
41:8,
10,13
46:14
102:15,
20
137:24
171:9
262:18
**2022**
12:1
24:7,24
112:11
114:14
149:7
201:25
262:18
278:8
280:20
**2023**
218:13
**2024**
14:14
**2025**
10:18
**20s**
241:3
**21**
86:2
111:3,
10,24
115:17
117:20
185:10
190:9
202:15
225:23,

Jason Poreda
July 17, 2025

24
291:24
293:10,
14,17
294:22

**210**
238:11

**21st**
102:17
103:2

**22**
67:16,
22 86:2
111:10
115:17
185:4,8
228:23
229:13
293:10,
14,18
295:2

**23**
67:17,
18
111:10
115:17
203:14
210:19
229:10
293:10
295:2

**24**
111:10
115:17
205:10
209:3,
14
214:18
215:5,
15,19,
20

216:7
217:3,
5,11
218:23
219:7
224:13
294:3,
16

**25**
111:10
113:7
115:17
136:2
216:9
224:12
229:9
293:22
295:2
301:5
302:2

**26**
110:15
113:7
115:19,
21
139:25
141:7
203:15,
21
204:5,
18
205:7
206:9
207:3
208:22
209:14
210:16,
24
211:3,
23
212:4,5

213:18
215:1,
15
216:22
217:8
218:23
219:3,7
224:13
225:18
226:20
230:22
231:1,6
235:5,
12
236:12
239:4
240:13
241:10
249:4,
11,15,
24
251:4
254:16,
25
258:23
291:17
295:6,
10,13,
17,22
296:5,9

**26's**
212:6
213:7

**26,000**
113:10

**2600**
301:23
303:2

**26th**
145:21

**27**
109:25
110:2
112:20
113:12
115:17
205:11
209:5,
14
215:1,
16
216:8,
22
217:8
219:12
230:23
231:2,6
239:4
240:16
241:10
251:15,
22,23
252:16,
17
254:16
255:9,
15,22
256:24
257:7
295:17

**277**
218:21

**28**
109:25
110:6
115:17
205:11
209:14
215:1,
16
216:22

217:8
219:12
231:2,6
233:11
236:20
253:5
267:24
271:23
294:17
295:18

**29**
137:3

**2:13**
139:20

**2A**
247:6,8

**2B**
247:12

**2nd**
46:14
49:23
102:19
117:8
125:21
133:2
135:22
171:9
176:9

———

**3**

———

**3**
26:16,
18 27:4
103:9
106:15
210:17,
23
211:1,
2,18,23
212:24

249:8,
15

**3,000**
292:12
303:9,
14,20,
22,25
304:4,7

**30**
82:1
145:25
247:2

**30s**
250:23

**32**
253:5

**33**
253:4

**34**
263:12

**35**
253:21
263:12
267:11,
13

**36**
96:7
253:21

**37**
95:24
253:4

**37/38**
250:25

**38**
204:3

**39**
205:7
206:19

Jason Poreda
July 17, 2025

6

**3:11**
176:14

**3:16**
176:14

**3:54**
202:10

**3:59**
202:10

**3rd**
102:20
137:24

---

**4**

4
26:21,
22
210:15
283:8

**40**
253:20

**40s**
257:10
266:12

**42**
214:24

**43**
206:23
214:23
263:15
265:10
271:12

**44**
138:2
257:14

**46**
152:9
210:15

**47**
150:20,
21
151:2
152:24
210:13

**4:49**
234:24

**4:55**
234:24

**4th**
280:20

---

**5**

5
45:6,9,
19
46:13,
16
49:23
107:12
117:5,
12
122:23
125:22
249:24
251:19
286:22

**50**
97:3
190:22
191:11,
13,20
255:11
257:19
263:17

**50/50**
240:3
244:18
246:13,

15,18
247:4

**51**
157:7,8

**52**
160:19
176:17
287:2

**53**
138:18
179:14
287:2

**538,455**
73:22

**54**
287:2

**55**
257:15
263:13
287:2

**56**
287:2

**57**
255:1
266:14

**58**
253:14
255:1

**5:54**
276:1

---

**6**

6
63:3,5
74:13
117:15
137:6
202:19

205:7
254:18
262:13
286:19

**62**
128:3

**63**
149:13,
20
214:17
252:22

**64**
253:15
263:14

**65**
150:3,
11
266:15

**66**
154:3

**68**
185:4

**6:02**
276:1

**6:40**
304:14

---

**7**

7
21:5,22
72:14,
15
118:1
125:24
179:17,
19
222:10,
15,16
254:8

**70**
252:22

**700**
205:2

**73**
249:13
255:10

**73.2**
249:14

**74**
252:23

**75**
97:2

**7503**
108:5

**76**
63:9
257:8

**769,000**
219:22

**769,221**
73:24
219:22

**77**
188:4,5

---

**8**

8
21:20
22:15
63:4
65:3
108:3,
4,5,9
128:1
151:2
190:6
237:16

292:9
300:12

**800,000**
209:10
227:25

**8001**
106:12

**8003**
106:12

**8005**
103:15

**8007**
103:15

**8009**
102:18
103:15,
20
105:17

**8011**
106:13,
23
107:3,
8,25
108:3,
10,12
109:15,
17,20
110:14
111:20
113:3,7
114:4,7

**8013**
126:21
146:2
152:13

**8015**
107:10
108:16
109:10,
22

114:6,
8,9
115:10
**8015/17**
107:24
109:16
111:20
112:24
113:3
**8016**
113:6
114:5
**8017**
107:4,
9,10
108:3,
4,6
114:5,8
115:10,
13
**8060**
112:9
113:3
114:7
300:6,
22
301:1
**83**
84:19
85:19
150:19
286:24
**88**
127:5
190:2
**8813**
105:17

—————
**9**
—————
**9**
108:10,
11
136:4
**90**
113:14
296:19
**97**
128:12
**98**
128:12
**99**
128:13
**9:39**
5:1

—————
**A**
—————
**a.m.**
5:1
69:4
**AA**
28:14,
16
**ability**
50:11
60:25
90:23
117:3
120:17,
18,21,
22
121:18
126:3,8
136:17
137:8
175:19

176:7
178:25
205:14
210:22
211:11
224:18
226:24,
25
227:18
231:5
234:4
243:16
258:2
269:24
270:12
271:14
288:2
**abridgin
g**
116:23
**absentee**
16:14
**absolute
ly**
47:14
**abundant**
105:24
**accept**
205:18
**accepted**
16:2
**acceptin
g**
180:25
**accommod
ate**
70:15
110:13,
19
270:22

**accompli
sh**
84:17
97:9
98:19
**accompli
shed**
194:7,
14
195:6
**accordan
ce**
73:18
**account**
27:24
42:25
44:7
53:18
103:23
124:19
153:7
161:1,
13
196:22
**accounte
d**
137:13
**accuracy**
41:17
**accurate**
8:16,21
96:2
103:1
124:7
136:22
137:18
138:14
139:4
141:19
142:18

144:14
151:21,
22,24
152:22
153:5
156:11
158:6,7
161:7
180:1
181:6,
8,11
203:11
204:10
205:16
207:15
211:5
212:2
**accurate
ly**
126:14
134:1
146:17
151:17,
20
241:12,
13
**achieve**
206:2
213:25
214:8
215:3
216:17
227:15
**achieved**
222:6
**achievin
g**
212:7
213:7
**ACLU**

5:14
**Act**
43:7
45:7
59:1,2
140:3
191:16
292:21
**action**
277:20
**actions**
13:12
**activiti
es**
36:21
**actual**
62:14
94:18
155:19
156:13,
21
164:3
174:22
186:9
242:21
252:7
256:12
259:12,
19
261:6
265:24
274:24
275:18
**Adam**
5:21
10:12
**add**
52:12
205:20,
22

208:19
236:11
246:17

**added**
67:22

**adding**
215:2
245:15
278:18

**addition**
48:14
151:12
205:13
206:14,
18
207:13,
23
208:10
215:2
226:13,
19
228:21
236:2,
11
259:13
261:21

**additional**
8:8
52:12
103:17
206:19
302:21

**additionally**
90:2

**address**
8:13
285:8,
11,13,

15
287:9

**addressed**
285:9

**addressing**
285:12

**adequate**
269:13,
22

**adhere**
85:16
105:11

**adherence**
66:14

**adhering**
69:25
98:23

**adjacent**
215:6
217:7

**adjudicated**
17:9

**adjust**
90:8
137:14
162:19
165:1

**adjusted**
90:7
97:25
169:19
285:18
289:3

**adjusting**
288:6

**adjustment**
110:25
168:14
287:18,
21,22
289:20

**adjustments**
49:10
53:16
81:2
107:5
110:23
156:19
157:1
163:2
164:10
167:1
168:1,
6,10,16
169:6,
13
181:19,
25
182:15
220:5,9
266:25
268:7,
10,22
287:24
289:7
290:4,
6,21,25
291:4

**administration**
19:2,3

23:1,5,
10
24:23
37:18,
20

**administrations**
23:25

**Administrative**
28:17

**admit**
223:12

**adopted**
48:12
112:24

**advance**
175:18
225:13

**advantage**
60:17
64:5
65:9
66:7
68:5
87:21

**affairs**
25:2

**affect**
81:4
87:23
291:2

**affected**
217:1
228:24

**affirm**
5:2

**affirmed**
5:7

**afford**
264:25

**afresh**
145:14

**age**
91:24
92:1,3,
4
133:12
146:8,
21
149:22
155:25
163:4
202:16
214:22
245:3,
6,20

**agree**
68:23
107:20
150:12,
15
162:4,6
186:7
203:7
205:23
211:12,
13
212:13,
17
213:12
218:22
219:1,
6,9
256:8
297:18

**agreement**
107:17

**agrees**
122:5

**ahead**
33:2
268:4

**aide**
28:24
29:6

**aides**
28:22
29:3

**airport**
130:19

**Alachua**
260:14,
18,19,
20

**Alex**
17:17,
22
19:21
30:12
115:5
218:12
237:4

**Alford**
34:5,18
35:13,
20
119:2,
5,6,17
120:12
258:18
259:9,
21
272:16
273:16,

20
275:3,
10
**Alfred**
35:3
**align**
72:22
73:13
77:7,23
78:3
81:2
98:20
144:24
145:6
301:9
**aligning**
54:5,8
97:14,
19
**alignment**
101:13,
17
**aligns**
74:1
**allowed**
40:15
98:7
293:18
**allowing**
77:11
78:10
**alter**
70:6
245:11
**alteration**
98:17

**alterations**
112:1
266:22
**altered**
295:25
**alternative**
225:7,
8,10
**Amendment**
26:20
**amendments**
40:12
43:2,5,
23
44:2,8,
24
116:21
283:10
284:3
**amount**
84:9
204:1
224:16
302:15
303:8
**amounts**
256:2
**Amphroy**
96:21
**analogous**
96:17
**analyses**
35:13,
17,18,

20
134:7
164:25
173:22
227:10
258:19
275:4,
13
**analysis**
28:8
34:7,8,
16,17
35:1,2,
3,4,5,
9,15,24
49:6,14
51:18,
20,22
52:6,10
53:5
59:24
117:21,
24
119:23
120:6,7
122:20
133:4,
5,13
134:4
141:1,
12
142:13
143:10,
16
144:1
146:13
150:5
151:12
156:18
160:23
161:13,
15,16,

20
162:3,
22
163:1,
10,25
164:2,9
165:2,
9,10,
13,16,
20
166:3,
4,6,13
167:4,
15,24
168:6
169:5
170:4,
6,13,15
172:1,
5,18,
21,24
175:15
178:2
179:4
181:19,
24
186:6
200:12,
18
214:12
216:3
217:20
226:19
228:15
234:16
238:25
239:5,
10,14,
25
241:24
242:2,
12

243:6,
8,10
244:2,
19
245:10
246:9,
20
247:3,
17
248:1,
2,5,9,
10
251:2,
4,12
254:11
258:17,
21
259:8,
13
260:1
262:5,
17,18
264:13
265:23
266:18
270:19
272:16
273:10,
13
275:21
287:14,
19
288:6
289:21
290:4,
17,21,
25
291:2
296:13
**analyst**
16:22,
24

18:24
19:8
23:21
25:4
28:7
**analysts**
34:1
**analytical**
119:20
**analyze**
274:21
275:15
**analyzed**
225:7,9
238:20
**analyzing**
34:2
52:22
**anchor**
194:2
**Andy**
5:18
10:12
33:16
34:4,
17,19
40:9
119:19
231:16,
18
**answering**
6:23
35:14
138:3
149:21
185:9
188:6

214:18
238:13
264:5
277:10

**answers**
7:11
14:23
131:14
136:4
151:1
183:12
204:8
210:19
279:1
282:10

**anymore**
165:14

**anytime**
154:7

**apartment**
177:22

**apologies**
114:2
182:9

**apologize**
10:13
13:23
26:4

**apparently**
242:11

**appeal**
21:2

**appearance**
5:17

**appendage**
179:20,
22
180:4,5

**appendages**
46:24
145:10
154:21

**applicable**
162:1
284:14

**application**
17:11
36:10,
17 37:6
39:22
40:24,
25 41:5
42:11
52:7
62:5,21
89:13
90:6
93:23
98:6
117:18
224:5
274:15,
18
285:5

**applications**
62:18

**applied**
44:23
59:4

69:8
139:11
179:25
182:5,
13
183:5
270:17
271:6

**applies**
65:5
88:14
203:6
220:24

**apply**
69:10
103:20
118:15
139:14
145:14
147:11
160:11,
15
208:24
265:23

**applying**
69:15
71:19
72:8

**appointed**
37:16
38:25
39:25

**apportionment**
21:5,
20,22,
23,25
22:6,
11,15

43:3,
11,14
48:11
63:4
65:3
72:3
237:16

**approach**
64:16
163:12,
20
187:18
243:4

**approve**
102:1

**approximately**
10:4
76:12

**April**
16:7
41:9
280:16,
20

**arbitrarily**
77:17

**arbitrary**
74:15

**area**
37:13
47:25
51:2,3
55:8,9
62:14,
21 64:5
70:8
76:2
89:19

90:18
91:20
92:19
93:5,6,
7,12
96:16
97:15
106:3
125:5
128:6
129:4,
13,15
130:17
131:8
132:1,
22
147:22
150:3
154:1
155:23
167:21
172:10
173:12,
19
174:1,3
178:22
184:12
189:17
196:6
200:2,
7,9,11,
14,22
201:10,
12
206:12,
15
209:7
237:3
240:21
250:17
257:13
265:16

288:11
289:3,7
293:22
296:4,6
303:8

**areas**
59:19
60:6
62:19
63:22
66:20
76:24
80:15
89:23
90:9,
10,13
92:17,
21
93:15
104:8
124:19,
20
125:2,3
131:24
138:9
163:18,
20
174:2
177:23
188:22
214:7
258:7
260:1
289:10
294:7

**argue**
208:14

**arise**
265:13

**arm**
229:13,

14
293:13,
20
294:2
**arms**
293:9
295:2
**art**
67:19
104:6
153:17
212:11
**ascertainable**
50:6
**asks**
150:22
160:19
176:17
179:17,
19
204:23
206:23
210:14
211:22
**aspect**
32:3
162:2
208:25
**assessment**
46:21,
22
133:5
256:9
**assigned**
17:2
28:8
38:5,6
63:12

**assigning**
90:3
**assistant**
15:10,
12
28:17
**assisting**
14:19
34:3
**assume**
245:15
**assuming**
80:10
88:13
**assumptions**
219:25
**Atlantic**
226:4
230:12,
18
232:18
**attached**
235:17
**attaches**
235:16
**attempt**
189:7
191:6
295:1
**attempted**
84:2
**attempting**
81:11

**attend**
21:14
**attendance**
95:1
**attending**
94:23
**attorney**
8:3
**attorney-client**
281:13
**attorneys**
8:1
**attribute**
181:3
182:12
**August**
41:13
**authored**
297:6,
12,13
**avoid**
88:19
126:6,8
**avoiding**
217:6
258:2
**aware**
14:4
27:22
32:12,
13
72:17
280:4,
6,9,21

281:6
299:10
**awareness**
144:6
**awkward**
131:24

___

**B**

**back**
15:3
20:4
21:25
22:15
29:19
30:9
33:18,
20,23
37:12
93:20
117:8
125:21
133:2
142:12
152:5
176:9,
16
184:11
186:11
193:5
239:9
249:7
250:9
252:15
257:25
266:3
267:23
281:25

**background**
15:3
60:13
89:18
**backs**
118:9
**backward**
163:12
**bad**
229:1
**balance**
43:9
58:19,
22
66:15
69:23
123:9
168:19
186:3,4
205:12
216:19
217:22
284:20
**balanced**
161:17
217:13
**balancing**
49:14
56:4
85:14
155:7
161:4
**Ball**
29:23
30:6
**ballpark**
172:15

**band**
154:11
**Bardos**
5:18
10:12
14:21
25:14
27:3,7
32:9
33:17
34:4
35:7
39:2
40:9
44:3,
11,19
46:19
48:23
49:24
50:18,
22
53:8,13
54:1,23
56:2
65:16,
19
68:8,20
69:3,
11,16
72:24
79:15
81:22
82:19
83:15
101:19
103:8,
21
108:4,
21,25
109:19
113:5
114:1

115:3
117:9,
12,15
119:19
120:25
121:24
122:3,
11
124:8
125:23
128:21
133:3
134:9
140:4,
20
141:24
144:15
148:4,
17
162:9
167:7
174:13
175:20
176:11
179:6
181:7,
14
182:16
183:16
184:6
185:18
187:24
188:13
195:20
198:3,
15
202:7
204:14,
20
205:21
209:1,
21

212:8
213:9,
21
214:1
215:9
219:8
231:16
232:25
234:11
243:7
265:14
268:14
269:15
271:4,
17,23
272:4,
23
275:1
281:12
282:1,
6,22
283:1
284:7
286:14
288:3
289:13
292:6
296:21
297:15,
20
302:20,
23
304:9,
12

**Bardos's**
297:24

**barely**
224:13
301:24

**base**
89:16

113:21
122:25

**based**
53:7
68:21
81:2
99:25
100:10,
12
109:17
123:14
124:16
127:18
142:13
150:6
164:8
165:5,
23
168:12
176:6
191:18
244:14
248:9
279:15
294:23
295:3

**baseline**
143:3

**basic**
40:23
87:1
92:7
120:7
296:16

**basically**
77:3
127:12
129:22
132:20
135:1

154:11
162:16
172:14
173:13
177:4
199:21
226:7,
14
232:24

**Basin**
88:22

**basis**
42:20
96:11

**bathroom**
176:12

**Bay**
131:2
160:4
205:3
286:19

**Beach**
59:19
93:7
111:4
130:10,
11
199:9
236:3
292:23
293:2,6

**beaches**
215:25

**beat**
252:10,
11,13
262:24

**began**
5:1
15:17

19:3
24:11
41:3
72:1
141:23

**begin**
41:2,4,
6 42:19
258:1

**beginning**
15:14,
15 16:7
107:15
124:2
144:4
261:15

**behalf**
5:19

**bell**
41:14

**bench**
142:25

**benchmark**
79:14,
21,22
80:2,7,
11
120:22
121:5
122:10
123:17
124:6
126:4
127:9
133:9
137:8
141:17
142:18,

23,24
143:1
144:6,
8,11,19
146:9,
22
147:2,
5,13,
18,19
148:9,
13
202:17
203:6,
16,22
214:20,
23
221:18
223:6,8
259:17,
23
261:10
274:25
275:19

**benchmarks**
148:23

**bet**
153:21

**biased**
128:11

**Biden**
252:10
262:24

**big**
62:10
71:10
102:23
106:6
113:11
149:20
195:10

Jason Poreda
July 17, 2025

13

199:8
228:13
230:17
278:23

**bigger**
72:4
132:22
177:14
228:11
253:22

**biggest**
235:22

**birthed**
113:21

**Biscayne**
205:3

**bit**
16:23
18:11
43:19
47:25
67:25
75:13
76:13
77:12,
20
89:10
110:3
111:7,
15
120:3
121:13
124:25
128:10
146:25
154:10
156:6
161:18
168:16
174:4
190:9

192:19
197:13
213:4
215:18
237:2
242:25
250:10
251:24
252:3,8
259:4
263:17
286:10
292:11,
13,17
293:19
295:25
303:6

**bits**
213:3

**bizarre**
46:24

**Black**
92:3
93:7,9,
12,14
97:14
119:11
124:21,
25
125:2,6
127:23
128:7
130:6
131:5
135:7
138:22
139:8,
12
142:22
163:13,
17

165:21
166:1
189:5
190:21
205:10
209:4
210:5
211:2
214:22
215:21
218:18,
19
220:10
235:25
236:2
241:6
242:8
260:15,
21
261:7
267:19
296:18

**blank**
79:9,18
123:6,
11
142:3
144:4,
13
285:25
286:4

**blanket**
68:23

**bloc**
67:15
90:11,
20
115:25
118:11
272:3,
12

275:16,
21

**blocs**
41:22
90:14,
16,17,
20 91:5
92:13
122:19

**blue**
133:3
136:2
138:3

**board**
19:2
151:23

**bolts**
40:13

**border**
54:8
70:10
85:22
127:14
129:17
160:7
165:1
169:1
215:5,8
218:9
288:18,
20
293:4
295:9
300:23

**bottom**
87:2
91:3
131:1
185:8
226:18

232:22,
23
233:4
278:2

**boundaries**
45:14
50:1,2,
3,5,7,
8,16,
19,20
53:20,
21,25
54:5,6
55:13
57:11
65:6
70:1
75:4,7,
11,12,
14,21
76:18
77:18,
25
78:5,8,
12
81:7,12
131:10
145:4,9
171:23
192:19
193:20
194:5
195:14
207:19,
25
208:4,
7,9,18
212:23
213:22,
25

214:5
221:11
284:18
291:11,
21,23,
24
294:21
295:10,
22
296:1

**boundary**
45:13
50:8,
10,12
51:7,
18,21
52:6,
10,21,
23
53:3,7
59:8,
11,24
61:2
62:25
65:4
67:12
68:19
76:11
77:15
81:17,
18,21
83:9,14
86:19
88:20
111:2
112:23
129:17
130:9
164:23
168:15
182:21,
22

Jason Poreda
July 17, 2025

14

189:21
194:8
200:12,
18
201:11
206:25
207:1
208:11,
12,13,
16
214:12
221:2,
14
222:7
223:18
288:12,
14,15,
21
289:3
291:25
295:6,
9,13,17
296:6,9
298:5
299:25
300:3,
10
**bounding**
153:24
**box**
74:19
76:3,16
88:6
170:19
183:21,
22
**boxed**
76:13
85:1
**brain**
174:9

**brand**
26:5
**brand-
new**
262:17
**breached**
221:15
222:7
**break**
7:18,
20,21
65:16
69:2
85:23
176:13
202:8,9
227:24
234:23
**breakdow
n**
91:8
135:7
142:9
173:3
225:18
246:6,
19
**breakdows
ns**
243:13
**breaking**
194:11
**breaks**
7:19
**Brevard**
82:2,4,
8
292:10
**Bridge**

63:12
64:8
**briefly**
15:2
101:6
102:9
108:8
112:8
116:16
174:15
**bright**
267:8
**brings**
23:18
24:1
**Brink**
5:21
10:12
**broadly**
291:18
**broke**
86:4
301:23,
24,25
**broken**
86:19
111:8
165:25
299:24
**brought**
214:25
215:15
300:5
**Broward**
59:19
84:16
93:6
111:4
125:5
127:13

128:12
138:20
190:22
191:6,
11,24
192:13
194:16
197:13
199:9
206:5
224:1
225:20
226:21
227:2
235:22
236:3,
14
292:23,
24
293:2,
6,23
294:3
**bucket**
71:12
140:15
**budget**
25:6,9,
21,23,
25  26:1
38:2
**build**
136:19
137:14
167:18
**Builder**
17:10
**built**
72:4
**bump**
178:10

197:23
**Bureau**
41:12,
24  42:5
52:3,
12,17
61:10
200:19
**Bureau's**
52:14
**Bush**
96:13
97:13
**business**
29:4
**BVAP**
191:11,
13,20
**BVM**
65:19
**Byrd**
28:21
29:13
68:4
146:1,
17
148:12
150:23
157:25
179:23,
24
182:11
**Byrd's**
180:24
181:4
182:3
183:2

_____

C
_____

**cabinet**
252:13
**call**
14:6
21:5,
20,22
60:5
124:5
207:8
221:21
248:13
**called**
231:16
287:1
**calls**
95:18
103:25
117:17
**campaign**
16:2
**canal**
289:2
**canals**
195:16
**candidat
e**
92:15
118:6,
9,12,13
134:9,
11,14,
15
166:16,
21,22,
23,24
168:1
170:17

173:2
210:22
226:24
227:1
239:20,
22,23
240:4,
7,11,
12,15,
23,25
241:5,9
242:7,
8,9,17
243:16
258:5,
20
259:2,
20
260:24
263:24
264:1,
18
265:3,5
267:6
268:25
269:4
270:1,
3,12
273:23
274:3,
8,9,12,
22
296:22,
23

**candidates**
118:7,
18
120:19
126:9
133:7,

16,18
240:10
241:3
258:3,
12
261:5
297:1

**cap**
130:21

**capable**
35:16
41:18

**Cape**
228:8

**capture**
134:6

**carefully**
124:12
142:8

**Carmen**
5:23
10:13,
14 67:4

**carried**
75:1
123:20

**carry**
123:17
252:2

**Cartaya**
5:24,25
67:2,5

**case**
5:15
6:9
8:24
9:4
11:19

12:13
13:18,
21,22
14:1,5,
6,9,13,
15,20
17:6
19:13
22:18
43:6,21
44:1,9
59:5
67:20
68:2
83:10
89:6,7
114:24
118:15
125:11
128:23,
24
155:10
156:5,
14,23
166:1
186:8
189:24
190:1
208:17
218:15
223:4
242:11
260:10,
12
266:21
270:15
271:9
273:22
283:21
285:3
301:11

**cases**
9:13
97:8
98:16
186:3

**catchall**
92:6

**categorical**
51:16

**categorically**
51:9

**category**
218:5

**caucus**
97:2,3

**caused**
271:13

**CD**
107:12
122:23
123:19
141:7
190:24
192:13
203:21
204:5,
18
205:24
206:11
207:3
208:22
214:18
215:15
218:3,
23
219:7
229:14
230:22,

23
235:5,
12
236:15
248:2
258:23
286:22
292:21
293:13,
15
294:2,3

**CDPS**
80:18
90:25

**census**
12:1
16:25
41:4,
11,12,
22,23,
24 42:5
51:18,
24
52:3,8,
11,14,
17
61:1,10
67:7,15
75:8,16
80:17
90:7,
11,19,
20,21,
22
91:5,24
92:7,11
93:20
115:25
122:19
123:5
200:19

244:25
245:20

**census's**
51:25

**center**
233:2

**centered**
120:6

**central**
233:25

**certified**
5:8

**cetera**
28:13,
14
32:17
135:3,4
258:16

**chair**
28:21,
22
29:6,8,
11,13
38:16
68:4
95:23
146:1,
17
148:12
149:20
150:10,
23
151:10,
19
152:19,
23
153:1,5
155:3,
14

Jason Poreda
July 17, 2025

16

157:21
159:1
160:9,
22
161:5,
7,13,14
162:4
179:23,
24
180:24
181:4
182:3,
11
183:2
185:8
186:15,
17
187:21
188:6
202:13
203:8,
14
204:8
205:6
207:11
222:17
277:1,
16

**chairs**
28:21
29:3,17
32:18,
19,20,
22
33:12
38:25
48:18
99:7,10
100:6,
10,11
101:7,
8,13

145:19
198:1,2
232:4,
8,9,10,
12
279:8
299:5,
16,17

**challenge**
157:10,
11

**challenged**
128:23
129:3
131:16
139:23,
24
140:2,
17,24
141:5,
10,21
150:24
156:23
162:7
164:13,
16
169:5,
19
189:3
193:7,
12
195:19
196:1
198:12,
22
199:1
200:3
235:3
287:12

290:7,9
291:7

**chambers**
13:13
107:16,
20

**Chamblis s**
139:9
189:16

**chance**
239:23
240:4,
6,8
267:5

**Chandler**
196:20

**change**
25:20
75:11,
12 93:2
105:21
123:13
199:17,
23
219:22,
24
220:13
253:5
302:17

**changed**
74:23
116:7
123:5,
15
124:17
144:23
174:3
194:10,
13

279:1
301:21
303:19

**changing**
75:6
111:15
112:2
217:16
220:14
245:10

**chaotic**
75:14

**characterization**
180:3
212:18

**characterizations**
205:18

**characterize**
113:8
212:6

**chart**
249:7

**checking**
35:4

**chief**
20:6
27:12,
20
29:19,
21
30:3,6
37:21

**chime**
104:3

**choice**
92:15
117:4
118:18
126:9
133:7,
18
134:10,
15
166:21,
22,24
210:22
227:1
228:5
229:2
239:24
241:9
242:7,
9,17
243:17
258:3,5
259:2,
20
260:24
262:9
270:3,
13
273:23
274:3,
22
301:9

**choices**
302:1

**choosing**
179:9
214:6

**chose**
52:17
57:20
58:3,12
61:8

67:11,
20
68:12
89:17
205:25
292:18
301:16,
18,19

**chosen**
37:6
41:6
196:17,
18

**chronologically**
285:8,
12

**circle**
153:24
154:1,5

**circular**
47:2

**circumstance**
51:5
55:5
57:19
131:7

**circumstances**
55:6,22
65:11
68:24
92:9
117:24
127:8
263:2

**cities**
54:16,
22

Jason Poreda
July 17, 2025

56:3,15
57:2
66:18
75:5
76:18
88:14
90:23,
24
105:6
129:25
130:5,7
131:2,
11,23
138:8
157:25
158:10,
18
159:5,
13,21
160:3,
11,18
162:18
163:19
172:10
182:19
193:21,
24
195:8
196:19
199:11,
20
209:9
220:7
293:16

**Citrus**
66:25
67:7
207:21

**city**
50:2
54:9

55:3,18
56:10,
13,18,
20
57:18
65:5,9,
13
66:13
69:24
74:12
77:14
88:8,16
104:10,
25
130:1,
2,4,15,
23
131:11
136:11
158:13
161:2
189:5
193:23
195:7
197:19,
21
200:15
207:5
208:22
209:2,
20
210:11
293:24
295:15

**clarific
ation**
8:9
300:19

**clarify**
7:16
8:11

9:3
11:23
14:23
32:21
35:12
39:20
53:9
54:2
71:5
121:24
144:3
146:25
172:6
186:25
205:20
211:20
224:22
229:8
300:11

**clarity**
43:17

**classifi
cations**
61:2,5,
20

**classifi
ed**
52:4
61:12

**classify**
61:16

**clean**
52:13

**clear**
123:21
131:17
165:22
167:17
175:10
219:14

248:3,6
285:6

**Clinton**
252:13

**close**
50:12
63:16
116:25
117:18,
25
118:18
126:12
133:25
137:14
138:10,
25
146:14
150:7
151:16
152:17
157:13,
20
158:1
160:21
161:4
176:20
179:23,
25
185:14
188:9
202:18,
22
203:18
204:7,9
205:5,
15
207:10,
14
210:17
211:3
215:4

218:24
219:1,5
222:21
241:11
252:11,
16
254:4
279:20
281:19,
22

**close-
knit**
125:15

**close-
of-books**
257:4

**closely**
31:19
171:14
197:10
234:13
241:1

**closer**
42:13
252:1,
6,22
253:20,
21
263:17
266:4
295:14

**co-
counsel**
5:23

**coast**
114:21
115:21
130:5
194:17
199:12

215:20
226:4,
5,16
227:13
230:12,
13,19
295:3

**coastal**
230:15

**coastlin
e**
158:21

**coasts**
199:10
229:24

**cohesion**
35:17
120:5
272:3,
12,17
273:1
275:16,
22
296:12,
13,14,
20

**cohesive**
118:5,9
273:24
274:4,
23

**cohesive
ly**
279:18

**coincide
s**
206:25

**collect**
258:11

Jason Poreda
July 17, 2025

collecting
258:10

collective
125:15
126:24

collectively
172:21
279:5
300:1

Collier
84:16
194:19
203:17
206:5
207:1,
4,19,20
208:5,
18
214:6,7
221:23
222:20
223:1,
15
224:14,
25
225:19
226:8
227:3,
19
228:6
229:23
231:4
233:12
235:22
236:19,
21,24
237:3
294:13

295:21
296:7,
10
298:8
301:3,
11
303:17,
18

colorblind
149:14,
15

colors
89:21
93:2
149:19

combination
85:20
86:1,4,
15 87:5
88:2
106:22
109:21
114:4,9
133:11
161:19
162:14
209:12
286:23

combinations
87:8,
12,17,
18
88:10
113:24
286:18,
22
287:1,8

combine
87:9

combined
97:17,
18
267:20
287:3

combines
301:2

combining
82:12

comfortable
254:6

comfortably
255:5

comment
147:8
160:10,
11
186:15
203:21
277:14

comments
198:4

committee
13:11
16:20,
24
17:14
18:25
19:15
20:5
23:17,
20,24
24:5,6,
8,19,20

25:2,6,
21
28:7,18
29:4,9
30:15
31:19
32:1,
18,19,
24
33:5,
11,13
34:3
35:4
36:2,4,
6,7,9,
25
37:3,4,
15,20,
23
38:2,3,
4,5,7,
16,18
39:1,
13,15,
24
40:4,7,
17 41:2
42:15,
16,19
46:15
47:15
48:6,18
51:9
53:6,
10,12,
24
60:6,8,
17,23
61:7,20
69:7,14
71:2,6,
9,10,

11,14,
16,18
72:8,23
77:7,24
78:3
94:2,20
95:13,
17,20
99:1,2,
3,4,6
100:6,
9,21
101:7,
8,16
102:22,
24
103:18
106:10,
17,24
116:5
117:8
125:14
134:6
140:1,
18
141:16
142:21
143:9
145:19,
22
146:2
147:16,
20
148:3,
21
149:21
172:4
192:9
195:24,
25
198:1
202:14

208:8
209:19
214:20
224:20
231:15
232:4,
7,11
237:10
243:5
272:4
273:21
276:15
277:1,
5,9,16
280:24
281:2,9
298:12,
13,14
299:5,
20

committee's
32:3
36:1
37:2
47:8
136:22
137:19
138:14
139:4
146:18
162:7
189:11
222:3
237:8
297:24

committees
37:17,
23,24
39:17

Jason Poreda
July 17, 2025

19

115:6

common
45:11
64:9
218:19

commonly
50:6
51:2

commonsense
46:21
48:15

communications
28:11
95:15
281:13

communities
80:21
95:4,5
97:15,17,20,23
98:20
136:16
188:25
245:14
270:2
279:18

community
81:3
97:24
134:12
199:24

community's
226:25
239:18

243:16

compact
45:12
46:12,21
47:3,23,24
49:13,17,20
67:16,19,21
68:18
85:5
104:20
105:5
123:8
126:5,7
127:7,11,15,16,18,21,24
128:10,16
129:4,6,14,22
131:25
132:3,21
144:23
152:17
155:1
156:4,17
157:16,18,20
159:7
161:2,12,22
163:17
165:3
170:11
178:24

179:21
190:23
192:3,4,5,21
195:17
213:1
229:16
284:17
291:8
293:1

compacted
164:19

compactness
45:13
47:6,13,16,21,25
48:3,7,15
58:15
64:9,22
65:12
66:11
67:23
88:5
104:10
105:2
145:2,6,7
151:3,5,7,8,13,14
153:6,12,14,16
154:18
155:15
157:22
158:7,

20
159:2,4
160:24
170:12
172:7,9,10,11,12
173:10,13,16,23
177:5,6
178:9
191:2,3,4,25
192:22
197:20
210:16,17,18,20
211:4,9,23
212:1,4,6,9,10,13,16,18,20
213:1,7,11,15,16,17,19
216:2
217:21
222:18
223:2
228:24
230:6
233:9
234:2
284:23
289:5

compactness-wise
158:17
173:20

compare
115:10
147:17

compared
127:25
146:9,22
154:1
202:16
218:5
252:23
253:10,15,20

comparing
108:14
115:13
259:25

comparison
121:4
214:13

compartmentalize
87:25

compensate
156:19

competitive
165:18
166:5,15,24
167:5
168:21
255:15

262:22
264:14,17
266:8
267:2
268:20,23
270:14
271:3

compiling
36:17

complaint
12:17,18
14:11,13

complete
8:8,21
212:18
286:18
288:10

completely
8:16
116:9
165:2
180:25
212:17

complex
177:23

compliance
167:3
168:7,22,25
169:7,20,23
172:7

Jason Poreda
July 17, 2025

20

181:21
182:1
185:12,
13,24
207:9
212:7
213:8,
20
216:4,
15
217:5
220:7
283:10
**compliant**
70:17
80:25
101:3
142:11
146:14
156:2,
15
157:2
162:17,
25
172:16
175:12,
23
176:1,
4,6
179:5
180:12,
13
182:15
184:14
188:24
189:14,
20
190:16
192:9,
16,18,

21,25
193:1,
2,4
220:4
268:11
293:15
**complica
ted**
120:3
166:12
247:3
**complied**
74:4
155:22
**complies**
156:16
163:11
**comply**
156:18
160:21
183:14
184:3,
23
205:4
238:21
**composit
ion**
254:21
**comprehe
nsive**
127:2
**compromi
se**
107:18
110:20
111:9
128:9
**compromi
ses**
128:13

**concentr
ated**
92:18
125:1
150:3
163:18
188:22
**concentr
ation**
93:14
155:24
**concept**
98:14,
21
110:9
111:5,8
118:3
128:4
225:7,
11
230:2,
4,21
231:3
232:5,
8,12,15
**concepts**
75:4
99:13
100:1,3
105:10
107:23
113:19
114:5
131:8
228:1
**conceptu
alize**
148:22
**conceptu
ally**

180:19
**concern**
140:16
185:11
199:25
206:10
210:7
213:10
215:7
228:13
265:19
269:19,
21
270:22,
24
271:13
**concerne
d**
140:18
217:4
265:11
266:13
267:12
268:20
**concerns**
209:11
**concise**
204:2
**conclude**
51:9
261:13
**conclude
d**
119:13
121:17
176:1
246:13
304:14

**conclude
s**
247:7
**concludi
ng**
182:14
241:25
**conclusi
on**
176:5
226:14
251:21
253:24
255:8,
18,21
256:4
260:4,7
261:1
262:14,
25
265:6,
23
266:3
271:8
**conclusi
ons**
119:12
120:1
238:25
254:11,
14
259:6,
11
263:8
**concurre
nt**
94:11
**concurre
ntly**
94:8

286:8,9
**condense**
242:24
245:19
**condense
d**
174:2
229:12
**conditio
n**
117:25
**conditio
ns**
119:16
**condo**
177:23
**conduct**
120:8
133:14
141:2,
11
143:25
**conducte
d**
146:13
**conducti
ng**
134:7
**confer**
275:24
**conferen
ce**
19:20
**configur
ation**
86:5,10
110:5,7
111:18
113:2,

13
114:19
115:1
161:3
178:7,
19,22
179:2
183:24
184:4
190:17
192:12
237:24
242:12
298:4
299:1
301:11
302:17

**configurations**
107:2
113:4
178:8
180:9
196:11
300:13
301:14

**configure**
233:23
297:25

**configured**
191:23
197:13
235:24

**configuring**
183:23
199:18

**confirm**

89:3
275:12

**confirmed**
119:15

**conflict**
126:1,
10,16
128:22
129:9,
12
131:15
132:5,
10,14,
18,24
158:18
283:22,
25
284:9,
12
285:3
289:15,
23

**conflicts**
125:23
283:11

**confusing**
71:13

**Congratulations**
25:12

**congressional**
6:9
8:24
9:4
11:2
13:24

17:23
18:3,16
20:12
22:16
23:6
27:25
28:1
29:12
57:4,7,
15
64:13
71:24,
25 72:7
73:23
74:1,2
80:2
87:3
93:11
94:5,14
99:14
100:19,
25
106:9,
11,13,
20,21
107:2,
4,7
110:1
112:3
114:15
115:11
122:14
135:22
139:25
190:10,
13
191:2,7
201:24
202:1,
14
203:5,
15,17

206:1
207:22
209:8,9
210:23,
24
211:15,
17,18
214:4,8
215:4
216:12
219:20
220:12,
18,19,
24
223:14,
19
224:3,
7,18,24
225:11
227:9,
14,23
228:3
229:22
231:25
232:2
233:24
235:19
236:8
238:5
243:25
249:3
258:15
278:13,
14
280:13
286:15
291:17
293:10,
20
294:19
298:11
299:23

304:3

**congruent**
94:21,
22

**congruently**
249:21

**conjunction**
135:5
246:2

**connected**
28:20
82:22
83:1,4
84:12
223:22

**connects**
128:3
203:16

**considerably**
86:6

**consideration**
59:7
76:6
104:5
136:14
196:7
214:10
227:11
236:4

**considerations**
55:24
70:2

78:21
130:22
138:5
181:15
193:8
207:13
208:24
209:6,
19
224:6,
16
228:12
291:14

**considered**
51:19
59:21,
23
63:14
67:21
75:8
78:6
95:1,5
140:18
196:7
200:10
261:11

**consistency**
265:17

**consistent**
57:13
69:14,
19,21
70:17
71:2,19
72:9
96:11
146:10
202:20

Jason Poreda
July 17, 2025

203:9
250:12,
16,20,
24
251:25
253:1
254:3
263:21
**consiste**
**ntly**
69:10
118:9
258:25
**consists**
133:9,
10
**constant**
266:16
**constitu**
**te**
118:17
**constitu**
**tion**
39:8
58:25
89:5
146:5
238:22
283:22
285:4
**constitu**
**tional**
17:8
40:12
43:2,5
58:22
69:15
72:9
73:19
78:18

81:4
98:22
100:22
103:20
140:12
156:12
161:15
192:16
285:2
**constitu**
**tionally**
38:1
192:9
**constrai**
**nts**
217:24
**consulta**
**nts**
34:2
**consulti**
**ng**
15:17,
19,20,
24
**containe**
**d**
57:7
86:18
**content**
28:13
**contenti**
**on**
14:2
**conteste**
**d**
13:25
**context**
47:17
65:4

88:14
153:15
154:18
181:8
220:23
224:9,
18
232:2
236:8
276:14
282:9,
11
**contextu**
**al**
203:23,
25
**contigui**
**ty**
46:7,8
**continen**
**tal**
5:23
**continue**
151:15
297:19
**continue**
**d**
36:24
72:5
185:21
221:6
**continue**
**s**
202:19
203:19
219:2
**contract**
**ed**
119:2
275:3

**contrary**
144:18
**contribu**
**tes**
209:15
**contribu**
**ting**
210:9,
10
**control**
133:15,
24
166:2,
9,20
241:3
242:6,
15
244:22
248:18,
22
255:19
257:13,
21
258:23
259:1
263:19
264:15
265:18
267:13,
17
270:13
**controll**
**ed**
255:17
**conversa**
**tion**
270:19
**conversa**
**tions**
281:11

299:11
**Convex**
48:9
**Convex-**
**hull**
153:20
154:11
**cool**
27:19
**copy**
26:20
280:17
**Coral**
129:24
159:17,
18,20,
23
163:8
167:21
195:15
197:15
228:8
**Corcoran**
23:17,
24
**corner**
77:16
174:23
177:21
**correct**
9:8,11
15:23
17:15
18:4,7
20:21
22:2,7,
12
23:14
24:25
29:10,

14
30:5,7
31:21
32:16
43:24
46:6
48:20
63:1
73:8
78:1,7,
9 79:25
80:5
83:11
94:24
102:8
105:18
106:14
122:2
131:19
144:9
164:11
168:8
176:8
184:1
185:2
186:20
187:8,
11,17
193:13
198:10
200:5
201:16
203:3
204:12
206:17,
21
210:12
217:4
222:2
223:17,
23
224:2,4

Jason Poreda
July 17, 2025

| | | | | | |
|---|---|---|---|---|---|
| 225:5 | 286:1 | 88:14 | 62:1 | 22 | 4,19, |
| 229:18 | 287:15 | 90:21 | 63:11, | 112:5, | 20,21, |
| 230:3, | **counsel** | 138:8, | 14,15 | 21 | 25 |
| 7,16,20 | 5:16,21 | 23 | 64:6,14 | 113:2, | 208:6, |
| 231:7 | 9:21,22 | 144:12 | 65:4,13 | 6,9 | 7,9,18, |
| 232:19 | 10:10 | 159:5 | 66:3,13 | 114:20 | 19 |
| 243:2 | 12:24 | 198:17 | 67:1,7, | 115:22 | 212:15, |
| 244:2 | 14:18, | 199:9 | 11,20, | 125:5 | 22 |
| 247:10 | 22 | 207:20, | 24,25 | 127:13 | 213:22, |
| 255:3, | 33:15 | 22 | 68:19 | 128:1, | 25 |
| 13 | 34:23 | 213:2 | 70:8,10 | 2,12,19 | 214:5, |
| 256:15 | 119:1 | 220:7,8 | 75:12, | 130:6 | 6,7 |
| 259:13 | 125:19 | 221:23 | 14 76:5 | 142:20, | 217:25 |
| 263:5 | 281:10 | 224:25 | 77:15 | 23,24 | 218:4 |
| 266:10 | **count** | 226:1,2 | 81:7,8, | 146:4,8 | 219:16 |
| 272:6, | 63:24 | 286:23 | 14,16, | 150:24 | 221:2, |
| 10 | 64:24 | 292:16 | 17,21 | 160:14 | 14 |
| 274:10 | 200:24 | 302:6 | 82:1,2, | 163:5, | 222:7, |
| 283:24 | **counter** | **counting** | 23,25 | 24 | 20 |
| 286:2 | 227:3 | 63:15 | 83:1,4, | 164:7 | 223:1, |
| 287:16 | **counterp** | 223:25 | 8,14, | 169:6, | 16,18 |
| 291:6 | **art** | **counts** | 18,19, | 19 | 224:17 |
| 300:25 | 121:5 | 245:4 | 25 | 175:8 | 225:12, |
| 301:6 | **counties** | **county** | 84:10, | 179:19 | 15,17, |
| 303:19 | 54:16, | 50:2 | 15,21 | 190:22 | 20 |
| **correcti** | 19 | 51:1 | 85:16, | 191:11, | 226:21 |
| **on** | 56:3,15 | 53:22 | 17 | 24 | 227:2, |
| 21:21 | 57:1 | 54:9 | 86:1,4, | 193:6, | 17 |
| **correctl** | 59:18 | 55:3, | 15 | 18 | 229:23 |
| **y** | 66:25 | 18,25 | 87:1,8, | 194:5, | 235:14, |
| 47:4 | 69:24 | 56:10, | 9,10,17 | 9,22 | 16,18 |
| 50:13 | 76:19, | 13,24 | 88:2,7, | 195:8 | 236:3, |
| 63:17 | 21 | 57:3,8, | 10 | 198:24 | 15,19, |
| 107:13 | 81:12 | 13,17, | 93:8,9, | 200:2, | 21,24 |
| 136:20 | 82:8, | 19,25 | 11,17 | 15 | 237:3 |
| 137:16 | 13,15, | 58:3,8, | 105:1, | 201:18 | 260:14, |
| 138:12 | 17,22 | 10 | 3,6 | 203:17, | 21 |
| 139:2 | 84:21 | 59:17, | 110:15, | 18 | 286:17, |
| 146:15 | 85:20 | 19,20, | 17,19, | 205:10 | 20,21 |
| 150:8 | 87:4,5, | 21 | 25 | 206:1, | 287:1, |
| 279:23 | 11 | 61:15 | 111:1, | 4,10 | 3,7 |
| | | | 2,4,7, | 207:1, | 291:20, |

23
292:19
293:2,
3,4,6,
23
294:4,
21
295:10,
21
296:2,7
298:4
300:10,
23
301:3,
10,14,
19,21
302:2,
5,25
303:5,
21

**couple**
52:2
65:18
174:11
196:25
197:16
210:13
254:17
279:24
302:20

**court**
6:20
9:12
12:12
19:14
21:3,9,
19
22:4,16
43:10,
19
48:11,

16
50:1,5
133:13
141:17
146:11
154:20
202:18,
21
238:12

**Court's**
63:4
238:21

**court-ordered**
80:3

**courts**
122:21

**covered**
67:4
103:16
195:21
200:3
235:4,9
272:2

**covering**
67:3

**COVID**
24:14
36:3
41:11

**CP**
239:3,8
240:13
241:10,
17
264:7
265:21
270:18

**create**
51:17

65:13
68:16
87:7
118:16
127:23
207:25

**created**
23:5
27:5
66:12
67:12
70:24

**creates**
129:17

**creating**
52:16

**creation**
28:13
31:15

**credible**
281:21

**Crisafulli**
22:25
23:4,8

**criteria**
42:22
43:1
44:17,
22,23
45:11
53:17
57:3,14
58:6,
16,22,
23
59:12
65:12
66:14
69:7,

10,15
78:18
81:4,6
83:10
85:6,15
103:20
116:19
118:2
140:25
165:5
221:10

**criterion**
88:24
221:13

**critique**
264:21

**critiques**
181:1

**cross**
81:8,
17,20
83:14
84:10,
15
88:15
130:5
194:8

**CROSS-EXAMINATION**
282:24

**crossed**
194:5
221:2
223:18
224:12,
17,21
228:9

**crosses**
82:4
207:4

**crossing**
83:8
88:19
224:21

**current**
121:4
122:16
174:10

**cut**
64:10,
22
67:15,
22 76:9
77:16
228:9

**Cutler**
131:2
160:4

**cuts**
233:5

**cutting**
289:11

**cycle**
11:24
12:2
17:3
18:25
22:17
24:19,
21
26:14
27:2,11
42:23
72:6,8
79:19
80:20
124:3

144:13
145:13
243:5,
22

**cycled**
37:12

---

**D**

---

**D-R-I-S-K-E-L-L**
150:22

**Dade**
59:19
83:4
84:10,
12,15,
16
93:8,9,
11,17
112:20
115:22
128:19
142:20,
23,24
150:24
163:5,
24
164:7
165:5
169:5,
19
175:8
179:19
193:6,
18
194:16,
22
195:8
197:12,
14

198:16,
19,24
199:9
200:2
201:17
206:1,
10
207:1
209:13
217:25
218:8
219:16
221:2,
22
222:7
223:15,
18,22
224:12,
17,25
225:12,
15
226:8
227:17
228:6
229:23
231:4
233:11
235:14,
15,17,
18
236:19
294:9,
16,17,
18
301:11
**Dana**
19:11
**Daniel**
6:2
**dark**
149:12,

13
206:22
**data**
9:19
10:21,
24
11:1,5,
9 17:12
19:24
34:8,
10,11,
12
36:11,
12,13,
15,18
37:5
39:22
40:24
41:4,7,
13,18,
21,25
42:4,8,
16
52:25
61:9,10
65:25
66:5
86:25
91:2,
13,16,
19,22
92:10
93:25
119:23
122:16,
17
123:2,
4,5
124:16
133:5,
10,11,
20,21

135:6,9
143:7
144:25
147:24
148:3,
20
163:13
165:17
167:14
234:15,
16,20
243:10,
17,19
244:25
247:25
248:8
249:4,
22
251:18
255:7,
16
256:6
258:9
259:14,
18,25
260:23
261:7
262:4,5
265:6
273:8,9
274:23
275:4
303:5
**dataset**
256:22
**date**
38:6
41:16
42:1
280:11,
15

**dates**
102:25
**Dave**
20:1
**Davila**
29:23,
25
**day**
97:2
137:24
186:6
187:12,
14
189:22
**days**
279:24,
25
**deal**
48:2
173:12
227:12
**Dealer's**
262:9
**dealing**
112:3
173:9
209:11
219:19,
21
220:2,
15
224:9,
14
227:24
228:4
242:3,4
246:19,
20
247:1
258:9

**Dearden**
28:10
95:14
125:18
279:10
**decade**
6:10
8:25
9:4
125:11
135:1,2
141:17
194:10
246:22,
25
249:16,
25
251:24
260:22
261:12
**December**
16:17
102:15,
19
103:2
106:12
135:22
137:24
171:9
**decide**
37:22
99:25
**decided**
40:6
**decision**
20:4,5,
25
21:3,
16,20
22:6,
16,19

57:24
58:7
63:4
65:4,20
70:12
99:19
104:15
179:11
231:14
293:4
294:21
297:25
**decisions**
43:3,
11,14
48:12
51:17
53:6
68:12
70:3
72:3
74:20
98:25
99:24
141:17
273:14
**decreased**
252:21
**decreases**
202:17
**defeat**
118:11
**defeated**
118:13
242:18,
22

Jason Poreda
July 17, 2025

26

| | | | | | |
|---|---|---|---|---|---|
| defense | delayed | 249:18 | demograp | depends | details |
| 14:20 | 41:9,11 | 250:10 | hically | 55:5 | 260:14 |
| defensib | delegati | 251:9 | 70:7 | 56:4 | determin |
| le | on | 253:18 | demonstr | 200:8 | ation |
| 176:4 | 196:5 | 254:22 | ate | deposed | 140:23 |
| 192:21 | delving | 255:11, | 138:9 | 6:5 | 141:3, |
| 193:4 | 62:3 | 17 | densely | 8:23 | 12,23 |
| deferred | Democrat | 256:1 | 132:1 | depositi | 244:18 |
| 205:6 | 165:19, | 257:7, | 155:23 | on | determin |
| 207:11 | 22 | 10 | 177:23 | 6:19 | e |
| defers | 166:11 | 264:1, | 180:18 | 9:15,16 | 46:23 |
| 179:23 | 167:25 | 16,24 | 199:12 | 10:7,16 | 49:9 |
| deficien | 240:9 | 265:2, | 200:22 | 13:17 | 51:20 |
| cies | 241:3,6 | 10,12, | 245:13 | 25:15 | 60:8 |
| 154:10 | 244:20 | 17 | denying | 218:12 | 123:1 |
| 207:8 | 250:23 | 266:11, | 116:23 | depositi | 124:16 |
| deficiency | 254:3 | 15,16, | Departme | ons | 133:6, |
| cy | 263:12, | 23,24 | nt | 13:4,7 | 22 |
| 179:12 | 16 | 267:1,4 | 61:11 | deputy | 134:14 |
| defined | 264:25 | 268:6, | depend | 30:2 | 135:1 |
| 208:3 | 266:13 | 12,17 | 51:4 | Desantis | 157:23 |
| definite | 269:1 | 270:24 | 55:6 | 252:11 | 158:8 |
| 208:13 | 296:19 | 271:12, | dependen | describe | 201:7 |
| definiti | Democrat | 13,15, | t | 27:1,10 | 239:17, |
| on | ic | 16 | 90:17 | 154:24 | 25 |
| 51:25 | 97:2 | Democrat | 160:8 | describi | 244:5, |
| definiti | 165:24, | s | dependin | ng | 17,20 |
| ve | 25 | 246:11, | g | 207:24 | 245:24 |
| 208:16 | 166:2, | 23 | 77:12 | designat | 246:10 |
| 210:8 | 7,19,20 | 253:2 | 89:19 | ed | 247:15, |
| definiti | 239:6, | 262:23 | 91:20 | 52:14, | 17 |
| vely | 15,17, | 263:8, | 123:4 | 17 | 248:15 |
| 44:14 | 22 | 25 | 163:21 | 80:17 | 258:4 |
| 58:19 | 240:14, | demograp | 239:16 | detail | 259:15, |
| 61:23 | 20,21, | hic | 243:12, | 228:17 | 16 |
| 269:16 | 24 | 34:12 | 17 | detailed | 288:12 |
| degree | 241:1, | 91:10 | 247:24 | 258:19 | determin |
| 98:14 | 2,5,7 | 123:4 | 248:11 | 259:8 | ed |
| 129:21 | 242:13, | 135:6 | 263:1 | | 142:25 |
| | 14,20 | 144:25 | 265:24 | | 144:20 |
| | 247:19 | 243:13 | | | 150:6 |

173:24
296:13

**determines**

52:4

**determining**

62:24
239:14

**develop**

17:10
286:8

**developed**

11:15
17:12
102:10
141:8
143:9
278:11,
12
286:9

**developing**

33:13
99:14

**development**

99:8,11
101:23
198:21
199:1

**deviate**

70:14
237:1

**deviates**

302:25

**deviation**

74:7,13
75:2
88:4
159:24
295:18

**deviations**

73:21,
23
74:5,8,
10,11
128:17
154:16
293:24

**diagram**

247:21

**differ**

228:4

**difference**

109:23
113:11
214:19
253:8
256:8
303:16

**differences**

77:2
78:15,
17
110:7
227:8

**differently**

252:9

**difficult**

18:13,
17 31:8

70:11
92:16
100:3
111:16
129:13
164:19
167:23
201:12
220:17
260:25

**digest**

148:1

**diligence**

124:14
262:2

**diluted**

121:19,
25

**dilution**

45:21,
24
117:1
123:20
140:10
226:22
272:8

**diminish**

45:7
117:3

**diminished**

121:19,
24
176:7

**diminishing**

126:8
258:2

**diminishment**

45:19,
25
117:5
120:21
121:1,3
126:6
226:21

**dipped**

253:3

**direct**

5:9
34:24

**directed**

31:2
73:20
75:4,20

**direction**

59:22
105:9
200:16
248:6

**directions**

238:22

**directive**

53:24
54:4,15
55:2,
11,17
57:11

**directives**

72:13,
23
73:14
77:6,8,

23,24
78:3,4
89:5

**directly**

28:22
30:20
34:18

**director**

16:15
17:3,14
23:1
28:6
30:13,
25
138:18
139:7,
13
210:19
211:9,
24
217:23

**disaggregated**

41:21
122:19

**disagree**

68:3
153:10
155:2,
9,15
158:2
161:6
162:4,6
180:3,6
186:17
187:15,
18

**disclosures**

14:5

**discombobulated**

280:18

**discounting**

77:25

**discovered**

83:22
84:1,14
86:3,
16,23
190:21

**discovery**

11:19
12:20
276:8

**discrepancies**

260:3

**discrepancy**

245:3

**discuss**

33:19,
24
34:23
101:10
238:15

**discussed**

71:23
78:15
88:14
89:11
132:7
142:14
144:6
145:15

Jason Poreda
July 17, 2025

28

| | | | | | |
|---|---|---|---|---|---|
| 169:7, 16 | **display** | 67:16, | 21 | 160:2, | 196:10 |
| 183:11 | 91:13 | 18,22, | 124:16 | 6,7,8 | 197:16 |
| 193:5, | **displaye** | 24 | 126:2, | 162:13 | 202:15 |
| 6,11 | **d** | 68:11, | 3,7 | 163:8, | 203:15, |
| 196:2,3 | 52:25 | 17,24 | 127:5, | 10 | 17,19 |
| 202:24 | 93:3 | 70:15, | 6,7,8, | 165:14 | 204:7, |
| 203:23 | **dispute** | 20,22 | 12,14, | 166:8, | 19 |
| 237:10 | 237:23 | 73:20 | 16,17, | 15 | 205:7, |
| 283:3 | 238:14 | 79:24 | 18,19, | 168:21 | 9,10,11 |
| 294:10 | **distingu** | 80:25 | 20 | 169:5 | 206:3, |
| **discusse** | **ishing** | 82:1,7, | 128:1,3 | 173:6, | 7,9,11 |
| **s** | 140:13, | 14,16 | 130:3,4 | 15 | 207:5,7 |
| 65:4 | 14 | 84:19, | 131:5, | 175:2 | 209:3, |
| 125:23 | **distribu** | 20,22 | 21 | 179:20 | 4,5,9 |
| 133:3 | **tion** | 85:4, | 134:13, | 180:1, | 210:5, |
| **discussi** | 55:7 | 19,21 | 24 | 17 | 16,17, |
| **ng** | 177:16 | 86:2,11 | 135:3,7 | 181:2, | 23,24 |
| 96:15 | 194:13 | 87:3 | 136:18 | 12 | 211:2, |
| 108:17 | 195:1 | 89:21 | 138:24 | 182:3, | 3,17, |
| 136:3 | 198:14, | 92:14 | 139:11, | 12,14 | 18,23 |
| 146:22 | 25 | 93:11 | 25 | 184:24 | 212:4, |
| 157:14 | 199:8 | 96:16, | 142:5 | 185:14 | 5,6,14, |
| 241:15 | **district** | 18 | 144:1, | 186:15 | 24 |
| **discussi** | 13:24 | 97:10 | 11,19, | 188:8, | 213:2, |
| **on** | 17:10 | 98:10 | 22,23 | 9,11,23 | 6,18 |
| 100:10 | 45:7,8, | 101:2 | 145:13 | 189:2, | 214:4, |
| **discussi** | 13 | 107:1 | 147:17 | 3,8,14, | 8,9,21, |
| **ons** | 46:22, | 110:3, | 150:6, | 19,21, | 22 |
| 9:20 | 23 | 4,6,15, | 11 | 23 | 215:4, |
| 125:19 | 47:22, | 18,21 | 152:7, | 190:2, | 5,19, |
| **disfavor** | 23 | 111:3 | 13 | 13,17, | 20,21, |
| 46:4 | 50:10 | 112:17, | 153:23, | 21,23 | 22,24 |
| 78:25 | 51:21 | 20 | 25 | 191:3, | 216:5, |
| 79:3 | 53:3 | 113:7, | 154:5, | 11,12, | 7,8,10, |
| **disperse** | 54:9 | 12 | 12,14 | 14,17, | 12,14, |
| 136:12 | 57:2, | 118:16 | 156:15, | 18,20, | 21,23 |
| **disperse** | 12,18 | 120:23 | 17,19 | 23 | 217:3, |
| **d** | 63:12, | 121:4, | 157:23 | 194:3, | 5,11, |
| 124:22 | 13,23 | 9,16,17 | 158:9 | 8,12, | 16,20 |
| | 64:11 | 122:23 | 159:7, | 15,16, | 218:4,8 |
| | | 123:2, | 15,19, | 17,21 | 219:3 |
| | | 13,17, | 21 | 195:5,7 | 220:14, |

Jason Poreda
July 17, 2025

| | | | | | |
|---|---|---|---|---|---|
| 16,19, 21 | 20,23 237:2 | 8,14, 15,22, | 287:18 288:5 | **districts** | 104:1 105:3 |
| 221:18, 23,25 | 239:4, 11,21 | 23 261:2, | 289:17, 20 | 13:24, 25 | 107:8 108:15 |
| 222:1, 19,25 | 240:1, 5,13 | 6,8,10, 11,13, | 290:1, 2,5,22 | 26:20 35:6 | 109:16, 25 |
| 223:6, 10,11, | 241:20, 24 | 17,20, 24 | 291:17, 21,24, | 43:22 44:2,8, | 110:10, 17,23 |
| 15 | 242:3, | 262:6, | 25 | 24 | 111:19, |
| 224:10, 11,12, | 4,12, 19,20 | 14,15 263:1, | 292:9, 22 | 46:4, 12,21 | 24 112:19 |
| 13,14, 15,21, | 243:9, 18 | 10,18 264:6, | 293:1, 10,14, | 47:1 49:6,8, | 113:2, 15 |
| 24 225:18, | 244:1, 5,9,12, | 12,13, 22,23, | 20,22 294:5, | 17,19, 25 | 115:14, 15 |
| 23,24 226:3, | 14 245:10, | 24 265:12, | 12,15, 16,19, | 55:4,9 56:23 | 116:6, 9,21,22 |
| 8,10, 11,15, | 24 246:7, | 21 266:5, | 22,23 295:6, | 57:7 58:4,5 | 117:2 119:15 |
| 20 227:5, | 10,13, 15 | 6,13, 14,22 | 10,12, 13,22, | 69:22 70:12, | 120:2 121:7 |
| 13,14, 15,18, | 247:4, 7,11,15 | 267:2, 14,22 | 23 296:5 | 16,21 74:17, | 122:9, 20 |
| 19,20, 23,25 | 248:9, 12 | 268:7, 11,23, | 300:12 301:2, | 22,25 76:7, | 123:1, 7,13 |
| 228:6, 8,22 | 249:4, 11,15, | 25 270:14, | 5,12 302:2, | 12,20 77:9,10 | 124:2, 6,11, |
| 229:9, 10,11, | 24 250:20 | 18,21, 24 | 13 303:1, | 79:7,13 81:13 | 14,15, 16,20 |
| 12,13 230:8, | 251:3, 4,15, | 271:2, 5,7,9, | 2,15 | 83:19, 25 | 125:12 126:5, |
| 12,17 231:4,6 | 22,23 252:12 | 15 272:9 | **district's** | 84:6, 10,15 | 22 127:9, |
| 232:17 233:2, | 254:4, 25 | 273:23 274:7, | 135:2 214:12 | 85:7 86:9, | 22,23 128:7, |
| 5,11, 15,24 | 255:6, 9,15,22 | 14,24 275:19 | 226:23 | 13,18 87:18, | 8,12, 15,24 |
| 234:19 235:16, | 256:24 257:23 | 284:13, 17 | **district -by-** | 21,23 88:11 | 129:3,5 130:7, |
| 19 236:1, | 258:4, 20 | 286:18, 19,20, | **district** | 93:10, 17 | 12,22 131:9, |
| 2,8,12, | 260:5, | 24 | 150:5 | 97:21 | 16 |

Jason Poreda
July 17, 2025

30

132:23,
25
133:7,
8,14
135:17
136:3
139:8,
12,14,
15,23
140:2,
17,24
141:1,
4,5,6,
11,12,
13,19,
21
142:6,
10,12,
16,18,
22,24
143:11
144:7,
17
145:20
146:3,
5,6,7,
9,12,
14,21,
23
147:1,
3,6,10,
12,13,
14,15,
25
148:10,
14,16,
20
149:23
150:23,
24
151:5,
9,11,

15,22,
24
152:3,
7,8,11,
12,14,
15,17,
18,25
153:9,
11,21
154:7,
13,23
155:4,
9,22
156:2,
4,14,
22,24
157:2,
12
159:10,
12
160:10,
16,20
161:10,
22,25
162:2,
8,16,
17,25
163:3,
6,13,
22,24
164:8,
13,16,
19,22
165:5,
15,16,
18,21,
22,23
166:1
167:23
169:19
170:17
174:2,

20
175:15
176:18,
19
179:10,
18
180:5,
12
182:22
183:12,
23
184:3,
13
188:12,
16,19,
20
189:3,
25
190:3,
11,12,
25
193:7,
12,16
194:1,
5,15,22
195:19
196:1
197:8
198:12,
22
199:1,
4,5,16,
18
200:3
202:17,
20,22
203:6,
9,11
205:9,
10,11,
13,15
206:2,

12,15
209:8,
13,14
210:5,
6,23,25
212:1,
21
214:14,
23
215:1,
2,3,6,
8,16
216:4,
13,16
217:7,
12,14,
16,25
218:5
219:10,
12,15,
20,21
220:1,
3,4,6,
10
222:18
223:2
224:17
225:21
227:9
228:4,
14,22,
23,25
229:1
230:6
232:3
234:3,
5,10,
14,16
235:3,
15,23
236:1,5
237:25

239:6,
7,14
240:2,
3,18
242:4
243:6,
24
251:9
257:17
258:15,
16
259:16,
20,23,
24
263:3
264:10
265:19,
24
267:15
268:19,
23
269:5,
18
270:17
272:17
274:5,
25
275:20
279:19
283:10
284:2,
3,15
285:18
286:4,
6,7,25
287:2,
3,9,12,
13
288:12,
19
289:8,
11

290:2,
8,9,24
291:3,
8,15
292:3
294:15
295:1
296:18
297:25
298:4,
11
299:2
301:9,
15,17
302:4,
12
304:5
**districts'**
191:25
234:15
**divided**
59:22
**divider**
178:13
**dividing**
293:14,
21
**divot**
130:13
**DJ**
28:14
**doc**
278:10
**document**
27:4
28:13
31:15
42:2
73:5

Jason Poreda
July 17, 2025

188:4
276:7,
18,20,
21
277:15,
19,21
278:7,
15,16,
25
279:2,
4,8,13
281:18,
23
282:4,
8,17

**documents**
10:20
11:15,
18,21
12:5,7,
9 14:22
33:24
277:23,
24
278:18
279:6

**Dolphin**
130:18
295:15

**dominate**
241:7

**double**
102:25

**double-check**
35:2
41:16
42:1
96:22

107:14
214:11,
15

**doubt**
35:23

**downstairs**
94:7

**draft**
18:9
102:13
106:13
119:24
120:10
134:13
143:9,
11,16,
17,20
167:1,4
169:5
171:22
178:5
179:1
181:18,
24
224:20,
23
225:1,9
227:6
231:17,
21
244:1
268:7
276:12
278:22,
23

**drafted**
281:23
282:4

**drafter**
18:5

**drafters**
18:2

**drafting**
18:12,
22
84:25
85:25
100:1
224:19

**drafts**
12:10
99:17
100:11,
13
102:16
168:5
170:24
171:2
178:18
179:3
225:4
231:21

**draw**
40:8,25
49:16,
19
50:10
70:19,
21
77:10
80:25
86:25
87:24
89:17,
25
90:22
93:16,
23
107:25
129:14
142:6,

9,11
155:25
156:1,
14
162:13,
17
163:5,
8,14
166:7,
14
180:11
186:1,
10,12
188:22
189:13,
15,20
190:16,
21,23
191:10
192:23,
25
199:3
217:9
220:16
221:6
224:20
234:19,
20
261:16,
18
277:22
284:16
286:6
289:11

**drawer**
12:11
17:21
27:12,
20 28:3
29:20,
21
104:6

113:12
115:24
234:18

**drawers**
115:7
268:24

**drawing**
27:24
28:9
31:14,
23,25
41:2,6
42:14,
15,23
43:1
45:15
46:4
47:13
54:18,
21 59:7
60:12
62:16,
17,22
69:8,22
72:7
74:9
78:21,
23,24
79:2,5,
12,19
80:13,
20
81:10
83:16,
17
85:10
86:16
87:21
88:25
89:10,
12,19

90:4,18
91:21
93:10,
13
126:15
131:24
133:14
135:17
136:3
139:8,
14
141:13
142:21
143:3
144:13,
20
145:13
147:1,
17
148:10
155:18,
19,20
156:13,
21
162:7,
11,20,
24
164:3,
7,8
165:4
167:11
178:5
185:25
186:8,
9,14
188:8,
11,19
189:11
190:12,
20
191:14
199:4

201:6
215:5,7
217:3,
9,14,25
220:15
221:4
258:8
261:19,
24
269:12
271:8
284:1,
13
285:7,
11,14,
19
288:21
291:14,
19
304:3

**drawn**
10:22
14:3
79:13,
24
98:11,
19
109:25
110:10
111:6
116:22
117:3
124:10
133:8
146:10
163:14
183:15
184:4,
15,24
202:20
203:9
220:6

239:4,7
278:24

**drew**
34:24
71:11,
16 89:4
98:18
102:1,7
110:4
115:7
119:14,
15
126:22
128:16
155:21
163:10,
15,23
164:18
177:25
184:13
193:16
218:23
219:7
220:4
224:23
225:3,9
239:6
240:2
256:4
264:14
285:17
286:7,
12
287:12
295:24

**drink**
202:5

**Driskell**
150:22
151:2,
25

152:4,
6,10
157:9
159:11
160:19
176:17
179:17
181:2
187:22

**Driskell's**
158:3
161:6

**driving**
288:18

**drop**
250:21

**dropoff**
245:6
252:25
253:22

**drum**
157:9

**due**
67:8
124:14
207:12
208:24
262:1

**duly**
5:7

**duplicate**
98:13

**duplicated**
123:3
231:24

**duties**

17:1,2
27:19

**Duval**
62:1
83:1

**dynamic**
265:11

————————

**E**

E-N-W-R-
I-G-H-T
15:22

**ear**
94:17

**earlier**
8:10,15
42:24
48:11
99:6
103:12
106:16
116:6
137:13
141:15
142:14
168:12
181:18,
23
207:12
208:10
211:16
221:1
228:18
235:2
250:9
251:24
294:10

**early**
16:15

39:21
94:13
102:15
106:12
167:1
181:18,
24
190:20
228:18
289:14

**easier**
147:14
148:1,
19
166:3
199:5
220:16,
20

**easiest**
147:11

**easily**
42:10
50:6
242:21
289:10

**east**
115:21
177:21
216:5
294:6

**east/
west**
200:6,
23
201:21

**eastern**
159:16
160:7
168:14,
15

295:6
301:3

**easy**
42:7
44:25
166:4
296:17

**easy-to-use**
41:25
42:3

**echoing**
209:18

**ecological**
275:12

**edge**
159:16
293:5

**edges**
158:22

**educate**
37:7
40:8

**educating**
42:19

**education**
37:13
39:25
42:24

**educational**
94:13

**effect**
40:11
81:5
112:4

**effective**
  200:13
**effectively**
  33:8
  36:16
  37:12
  63:23
  226:5
  227:8
  230:13
  233:1
  235:17
  261:18
  302:4
**effects**
  216:25
**effort**
  144:21,
  22
  190:23
  204:1
  231:25
**Egmont**
  63:11
  64:15
**elaborate**
  288:24
**elect**
  117:3
  118:18
  120:18,
  22
  121:18
  126:3,9
  133:7,
  18
  136:17

137:8
166:18,
21
167:25
170:17
175:19
176:7
205:14
210:22
211:11
226:25
231:5
234:4
239:11,
23
240:4
241:5,8
242:6
243:16
258:3
260:24
270:2,
12
**elected**
39:11
166:10
173:4,5
240:9
258:25
268:25
270:2
**electing**
258:24
261:6
269:5
**election**
16:3,5,
6 19:4
24:10
34:12
36:12

38:12
133:9,
16,19,
25
134:16,
17,21,
23,25
135:10
166:19
239:19,
21
240:11
241:8
242:10,
17
244:9,
23
245:23
246:8
249:20,
23,24
250:2
251:18
254:10,
13,19
255:20
258:9
259:12
262:11,
13,20
263:7,
24
264:18
266:14
274:4,
7,17,
18,24
275:19
**elections**
39:8

118:14
133:5,
20,21
244:3
246:3,
6,22
250:8,
11
252:2,8
253:18
256:12
258:7,
14
**electoral**
122:18
135:2,8
165:23
168:19
244:4,
14
250:7
254:12
**electorate**
118:15
135:9
255:1,6
263:14,
15
268:6,
13
**electorates**
269:14,
23
**electorial**
254:15
**elects**

257:21
**element**
132:4
151:13
**elements**
154:19
159:8
208:21
**elevated**
189:22
**eliminating**
231:4
**Ellerkamp**
28:14
**emails**
95:17
**emphasized**
56:15
**employed**
24:12
25:8
34:5
74:25
88:25
**employee**
16:11,
12
**empty**
174:1
**enacted**
11:1,5
54:18,
21
114:15
115:11
122:15

126:15
146:1
149:7
171:14,
18
173:9
178:20
183:24
190:10
191:2,
17,20
196:10
197:8
211:15
222:1
223:14
295:24
296:5
302:15
**encompass**
148:20
215:21
**end**
15:25
22:25
66:22
74:11,
22,24
77:11,
13 97:1
117:4
138:19
147:12
163:25
185:22
186:6
187:12,
14
189:21
203:8

208:13,
15
213:3
225:23
229:24
234:1
239:24
256:23
265:1
279:25
280:8

**endeavor**
284:1
291:20

**ended**
19:3
76:10
99:15
100:18
148:22
173:15,
18
182:21
221:5
226:3
229:3

**ends**
24:22
205:5
302:14

**engaging**
141:15

**ensure**
136:16
138:23
162:5
166:10
167:3
168:6
169:6,
20,22

170:16
181:20,
25
210:21
211:10
268:11,
24
269:12,
25
270:2,
11,13

**ensured**
160:24

**ensures**
146:13

**ensuring**
168:22,
25
173:5
217:5

**entail**
31:1,6

**entire**
85:7
92:23
161:15
192:22
194:15,
20

**entirety**
70:4
137:14

**environm
entalist
s**
208:14

**Enwright**
15:17,
24

**equal**
46:11
55:21
58:24
73:19
74:2,3
77:8,10
83:10
116:23
172:17
177:16,
17
206:20
207:13,
18,23
209:3,7
210:1,
2,3
213:25
214:8
216:17
235:14
237:1
295:20

**equaled**
180:22

**equality**
45:12
112:4

**equalize**
296:4

**equally**
68:13
69:23
85:17
172:15
175:12
228:13

**equation**
166:17
220:15

**equity**
206:2

**equivale
nt**
194:18

**Erika**
26:4

**error**
149:25

**ESRI**
90:5

**essence**
209:6

**essentia
lly**
37:2
45:7
63:22
64:10
67:24
78:13
110:18
119:15
122:19
123:3,7
130:1
144:21
166:6
181:2
192:20
194:12
211:22
216:7
226:3,
16
228:8
230:11
232:16
233:10
241:23

301:22

**establis
h**
138:6
283:19

**establis
hed**
254:25

**estimati
on**
168:20
172:12,
15

**ethics**
23:16,
23 24:5

**ethnicit
y**
219:4

**evaluate**
243:15

**evaluati
ng**
59:10
242:2
243:5

**eventual
ly**
36:13,
23
106:10
107:15

**Everglad
es**
173:12
206:25
208:12,
13,15
224:21,

22

**everythi
ng's**
217:13

**evidenti
ary**
238:4

**evolve**
137:10
248:9

**evolved**
199:19

**exact**
6:15
9:23,24
48:5
112:3
212:11
219:22
227:6
246:18
247:25
265:22,
23
267:8
304:7

**EXAMINAT
ION**
5:9
297:21

**examine**
75:20
118:21,
25

**examined**
119:7

**examples**
57:22
64:25

65:8
66:1
70:13
82:20
83:8
84:4,24
85:23
105:21
127:2
128:5,
14
129:11
180:4
259:3
267:14
287:4
**exceed**
73:21
74:5
**Excel**
87:7,12
256:18
**Excellent**
8:23
78:20
**exception**
37:11
107:12
195:6
**exceptions**
156:22
**excerpt**
63:3
151:17
171:9
218:12
238:3

241:15,
16
**exclude**
114:21
**excluding**
198:7
**exclusion**
78:6
**exclusive**
183:5
**exclusively**
181:16
182:7,
24
**Executive**
25:9
**exercise**
231:22
**exhibit**
10:25
11:3,4,
7
26:16,
18,21,
22 27:4
46:13,
16
49:23
63:3,5
72:14,
15
103:9
106:15
108:2,
3,5,9,

10,11
109:10,
11
112:9,
13
117:12
125:22
135:21,
24
137:21,
25
145:21,
23
149:5,9
171:6,7
174:13
202:2,4
218:11,
14
222:10,
11
238:3,8
249:3
262:4
276:4,5
283:8
297:4
300:6
**exhibiting**
132:5
**exist**
174:19
**existed**
19:20
196:21
285:24
**existing**
49:25
53:25
57:11

75:21
81:11
122:14
146:12
202:22
203:10
221:10
**exists**
129:6
**expecting**
278:12
**expert**
13:18
34:5
**explain**
147:14
157:17
195:18
292:7
**explainable**
77:21
**explained**
71:20
117:15
128:21
144:2
264:10
265:13
272:7
**explaining**
148:13
171:22
182:11
203:19
**explains**
193:11

235:2,
11
**explanation**
73:12
134:6
139:14
151:20
158:6
160:15
180:1
181:6
182:3
203:4
298:10,
11,19
299:1,
7,13,21
302:9
**explanations**
299:18
**explore**
75:4
**explored**
179:1
183:22
229:22
233:10
**expressing**
187:9,
22
241:23
270:23
**Expressway**
130:19
295:16

**extend**
230:10
233:11
**extended**
168:23
221:22
230:9,
18
233:25
**extending**
168:10,
17
181:20
**extends**
232:17
**extension**
129:20
131:20
180:2
**extensions**
229:10
**extensively**
299:5
**extent**
95:5
241:16
281:12
284:21
**external**
28:11
62:23
95:15
279:10
**extremely**

127:24
153:22

**extruded**
204:25

**eye**
128:23
157:20

**eyeball**
48:19
154:20
158:16
159:5
222:19

_____

**F**

**F-A-B-R-I-C-I-O**
210:14

**Fabricio**
210:14
211:22

**Facebook**
60:22

**facing**
28:13

**fact**
61:12
67:12
68:5
78:22
91:12
132:17
141:21
144:10
146:20,23
148:15
155:17,21

156:6
176:6
198:24
204:6,18
213:18
227:12
248:22
260:23
303:20

**factor**
49:15
55:9
57:1
64:1
74:14
75:18
140:14
148:24
150:1
153:8
159:4
182:7,8,18
184:13,22
188:8,11,15,19
189:12,13
206:13
210:9,10
219:9
259:18
300:14

**factored**
49:6
59:24
200:18

**factoring**
70:1

**factors**
55:8,23
159:4,6
161:1,4
173:13
189:22
193:3
205:4
207:2
229:5
236:4
261:22
267:21
273:1

**failed**
261:12

**fair**
26:20
43:22
44:2,8,24
109:17
116:21
135:14
171:13
181:1
203:2
272:9
282:19
283:9
284:2

**fairly**
241:18
250:16,24
252:12,23
253:1

254:2,3,4

**fall**
70:23

**falling**
261:8

**familiar**
18:21
22:19
41:5
44:25
276:8,11,18

**familiarize**
17:5

**familiarizing**
17:6

**fan**
104:11

**fashion**
97:11,18

**faster**
256:20

**favor**
46:4
78:25
79:3

**FDOT**
61:4,12

**feasible**
49:25
54:17
55:12
56:1,7,9,19,20
57:16,

20 70:4
75:5,10,21
78:10
81:13,14
127:18
129:4
158:12
221:16
222:17
284:21
291:11,22

**feasibly**
144:24
247:5,7,16

**feature**
181:12
182:4,12

**features**
52:20
53:5
75:25
162:19

**February**
106:20
149:6
157:4
176:9,10,16
179:15
201:25
202:12
222:9

**federal**
43:6,7,21,23
44:2,9,

18 45:6
58:23
59:3
89:6,7
136:15
137:7
283:12

**feel**
66:13
76:15,22
187:23
235:7

**fell**
199:22
227:21
293:11

**felt**
8:8
66:20
68:1
77:18,20
98:24
175:22
194:1
228:5
302:2,5,11
303:11
304:8

**fewer**
200:6

**Fifteen**
222:12,13

**Fifty-three**
179:16

Jason Poreda
July 17, 2025

**figure**
37:6
85:14
189:4
243:19
260:3,4
262:2
286:17
287:8
**figuring**
87:4
**filed**
12:18
14:11,
13,15
**filings**
12:12
**filter**
112:4
**final**
22:15
102:10
205:25
278:25
279:2,
12,14
280:12
**Finally**
49:24
**find**
74:9,
10,16,
21,24
77:11,
18
87:11,
16 93:3
162:18
164:22
193:19

288:7,9
289:1
293:13,
21
294:19
296:4
304:4
**fine**
186:24
249:8
**finger**
205:2
**fingers**
159:15
**finish**
6:23,25
7:20,21
**finished**
104:7
**fire**
26:9
**firm**
5:19,23
15:20
**firstly**
234:14
**fit**
57:2
70:6
74:11
84:6
86:12,
13,14
88:3
98:21
100:4
104:16,
23
110:7
140:25

154:1
167:22
169:12
173:8
174:1
193:17
227:18
**fits**
153:24
174:7
**five-
minute**
202:8
**fix**
49:10
**fixing**
285:22,
23
**flags**
66:25
266:17
**flaws**
153:14
154:14,
17
**flexibil
ity**
78:11
**flip**
72:21
**floor**
13:12
94:25
95:2
112:10
149:6
277:4,
20
298:19

**Florida**
5:14,
20,22
11:25
13:24
15:5,6,
7,10
16:10,
19
21:2,19
22:4,16
24:12
43:10,
19,21
47:17
48:10
57:5,6
60:15
63:4
89:5
90:15
107:1,
8,12,24
108:14,
19,23
109:16,
23,24
112:15
114:19,
20,25
115:14,
15
118:23
119:9
126:22
128:15
133:13
136:10
138:20
142:7
146:5,
11

149:6
152:12
155:19
162:15
186:2
187:1,2
189:5
195:7
202:18,
21
210:24,
25
235:24
236:18
237:25
242:4
243:25
244:24
245:2
251:10
258:4
259:7
260:11,
12
279:17
283:22
285:17
291:19,
20
297:25
**Floridia
ns**
219:4
**flowed**
298:7
300:17
**focus**
17:23
28:10
31:3
107:1

153:15
164:21
173:6
185:14
186:16
254:18,
21
**focused**
31:23
**focusing**
109:24
158:5
171:12
184:20
**follow**
47:12
53:24
58:6
62:24
67:11
68:9,19
77:14
80:23
162:19
183:25
195:13
200:4
247:14
265:15
287:23
288:4
291:23
294:21
295:10,
13,22
296:6,9
**follow-
up**
124:1
204:23

Jason Poreda
July 17, 2025

**footnote**
63:9,19

**foremost**
235:13

**forest**
76:8,9

**forget**
53:4
85:25
129:15
130:11
160:1
219:24
225:17
261:4,5
280:2
281:4
288:13

**forgive**
23:8

**forgot**
8:9

**form**
14:21
32:9
35:7
39:2
41:18
44:3,
11,19
50:22
53:8
54:1,23
56:2
68:8,20
69:11,
16
79:15
81:22
82:19

83:15
101:19
103:21
109:19
113:5
115:3
122:11
124:8
140:4,
20
141:24
144:15
148:4,
17
162:9
167:7
175:20
179:6
181:7,
14
182:16
183:16
184:6
185:18
187:24
188:13
195:20
198:3,
15
204:20
205:21
209:1,
21
212:8
213:9,
21
214:1
215:9
217:17
219:8
232:25
234:11

243:7
265:14
268:14
269:15
271:4,
17
272:23
275:1
282:6
284:6
286:11
287:25
288:25
292:4
296:15

**format**
41:13,
17,25
42:3,6,
9
276:18

**formation**
37:2
38:7

**formed**
37:3,
15,24
38:3

**formulating**
72:1

**Fort**
293:21

**forward**
43:20

**found**
85:3
87:20
92:22

98:16
281:5

**foundation**
136:9

**fourteen**
25:19

**free**
235:7

**frequently**
31:11,
18
96:19

**front**
9:20
44:24
45:4
63:7
128:19
234:20

**full**
8:21
31:2
102:22
127:17
144:1

**fully**
101:3
284:18

**function**
165:10
170:5
273:13

**functional**
35:5
120:7
122:20

133:4,5
134:3,7
141:1,
11
142:13
143:10,
15
144:1
146:13
156:17
161:20
162:25
163:10
164:2,
9,24,25
165:2,
9,13,20
166:6,
13
167:4
168:6
169:5
170:4,
13,15
172:1,
5,18,
21,24
175:15
178:2
179:4
181:19,
24
216:3
217:20
226:19
227:10
228:15
234:15
239:5,
10,25
241:24
242:1

243:6,8
244:1
248:5
258:21
259:13
262:5
266:17
287:14,
19
288:6
289:21
290:4,
17,21,
25
291:2
296:13

**functionalities**
91:17,
23

**functionality**
93:16
243:15

**Functionally**
177:5

**fundamentally**
172:13
220:14

---

G

**Gables**
129:24
159:17,
18,20,
23
163:8
167:21

Jason Poreda
July 17, 2025

39

195:15
197:15

**Gabrielle**
6:3

**Gadsden**
128:1

**Gaetz's**
16:3

**gaggle**
276:25

**gaggles**
277:8

**Gainesville**
66:2

**gap**
253:12,
13,23

**gather**
95:15

**gauged**
120:22

**gave**
8:16
43:17,
19
198:2
206:18

**general**
5:21
13:17
111:18
113:1
133:19,
24
166:9,
18,22,
23

198:17
239:19,
21
240:11
241:1,8
242:10,
17
244:9
245:23
248:11
249:24
252:5
254:10,
12,13,
18
255:19
262:11,
13
263:23
264:18
265:2,
16
276:15
277:18
281:6

**generality**
150:13,
16

**generalization**
270:16
271:6

**generally**
13:16
34:24
47:14
95:6
111:19
113:1,4

150:2,
4,10,16
253:23
263:25
279:11
284:12
298:18

**generals**
266:9,
15

**generate**
34:19

**generated**
11:22
12:6

**generating**
59:10

**geographic**
50:19,
20
53:25
55:8,12
62:25
75:21
78:5,8
81:11
88:20
129:19
145:3
173:19

**geographical**
45:14
47:3
50:1,4,
7,12,16
69:25

76:17
83:2
131:10
145:8
158:25
162:19
195:14
284:18
291:11

**geographically**
70:7,11
180:17

**geographies**
41:23
42:7
90:7,9,
22 92:8

**geography**
52:11
58:1
62:14
67:7
75:8,
15,23
76:24
88:7
90:3,
11,19
92:11
93:20
129:5

**Georgia**
58:2

**giant**
64:23

**Gillum**
252:11

**Gingles**
117:16,
17
118:22
119:7
272:5

**give**
5:3
7:10
8:21
37:13
40:10
57:23
95:20
115:16
127:1
184:19
210:8
267:16
276:3

**giving**
232:12

**glad**
149:14

**glance**
251:9

**glancing**
250:3

**global**
162:1,
11
198:7
285:5

**globally**
217:1

**goal**
80:21
81:8,
16,20,
23

82:12,
16,23
83:3,5,
13
84:13,
21,22
85:15,
21
88:15,
19
98:19
99:18
194:24
195:2
221:4,
5,8,9
222:6
269:6
270:3

**goals**
83:17

**good**
5:11,12
22:3
69:1,3
85:4
106:8
124:24
127:19
136:5,
6,13,14
142:11
143:18
152:9
162:18
164:22
178:10,
13
193:19
212:22
240:6,8

Jason Poreda
July 17, 2025

40

241:18
297:18

**Google**
62:6

**govern**
99:23

**governed**
159:19

**governme
nt**
61:20

**governor**
25:9
278:14

**Governor
's**
26:6,11
237:5
295:25
301:20

**governs**
160:5
206:11
235:23
236:4

**grab**
202:5

**granular**
135:18

**gray**
47:25

**Grayrobin
son**
5:19
34:4

**great**
7:8,13,
18,25
8:13,20

116:12
153:4
189:2
304:9

**greater**
152:15

**greatly**
193:25
245:10

**green**
149:11,
12,13
150:20
206:22

**grid**
91:3,14

**ground**
103:16
200:17
235:4

**group**
242:9
248:22
259:2
296:17,
20

**groups**
90:20
118:23
137:7

**groups'**
202:16

**gubernat
orial**
246:4

**guess**
34:15
44:6
45:10

48:15
55:15,
21 71:7
86:17
90:2
113:22
144:17
148:8
157:10,
11
174:5
208:19
215:14
233:7
242:16
243:3
248:11
262:19
270:23
291:18
298:25

**guessing**
263:20

**guidance**
43:20
44:1

**guide**
43:16

**guided**
43:4,
11,15
248:11

**guidelin
es**
78:9

**guiding**
40:14
156:7
284:15

**Gulf**
58:2
64:8
67:8
70:10
205:1
230:13,
15,19

**guy**
19:24

---

**H**

---

**Haitian**
97:15,
24

**half**
25:19
194:15
214:24
227:19,
20
228:9

**halfway**
278:3

**halves**
194:21

**hand**
126:5

**handful**
64:25
66:4

**handing**
112:8
218:11
238:3

**happen**
24:13,
15
31:11

36:14
41:10
259:4
260:13
261:16

**happened**
12:1,3
19:21
36:4,20
37:4
38:7
41:24
105:16
147:18
190:19
214:9
240:4
252:2
259:19
260:10
290:23

**happenin
g**
70:7
107:3

**happy**
122:4
238:2

**harder**
124:22
220:21

**hat**
130:24

**hate**
186:17

**HB**
108:5

**HD**
286:22

**head**
7:4
40:2
42:12
60:2
64:17
65:1
69:9
114:17
177:3
252:9
261:5
292:13

**hear**
67:2

**heard**
97:12
105:25
149:8
159:6
189:16
197:21,
24

**hearing**
9:1,9
21:12,
14 56:1
237:13
238:4,6

**heat**
91:9,12
92:10,
16
123:11
124:18
189:4

**heavily**
156:24
240:14,
20,21
242:20

Jason Poreda
July 17, 2025

41

244:12

**heavy**

97:15

257:20

**held**

94:4

**helped**

14:22, 23

19:25

58:4

70:12

106:3

192:22

272:21

**helpful**

26:16, 21,25

92:19, 20,22

93:1

116:4

121:14

131:13

135:15

211:21

257:24

**helping**

17:10

272:18, 20

277:6

**helps**

258:18

**Hendry**

110:15, 17,19, 25

113:6

301:12

302:1

**hereinafter**

5:7

**Hernando**

86:9,11

287:3

**Hialeah**

130:15

195:9, 10

**high**

59:18

142:7

155:24

163:5

214:13

224:15

**higher**

49:9

90:14

191:4

246:6

253:17

**Highlands**

226:2

**highly**

76:17

153:22

**highway**

127:13

**highways**

189:6

**Hillsborough**

63:10, 14

64:6,14

66:3

**hire**

30:17

**hired**

16:19

30:17

**hiring**

30:18

**Hispanic**

92:2,3

93:17

119:8, 11

124:21

125:4

128:8

135:6

139:15

142:7, 8,10,23

146:4, 6,8,20

150:11

155:24

156:25

163:4, 18

165:14

166:10, 15,16, 17,18, 19,21

167:6, 25

170:17

173:1,5

175:19

176:6

204:7, 19

210:6

211:3

215:6, 8,16

217:7

219:4, 15

227:2

228:14

230:22

231:5

234:4,5

236:1

237:25

239:17, 20

240:6, 9,10, 12,16, 23

241:2, 5,8

242:6, 7,14,22

243:6, 24

245:3, 6,7

249:16

250:15, 17

251:8

252:19, 25

253:9

254:24

255:2, 5,11, 12,17, 19

256:13, 25

258:3,5

259:7, 21

263:9, 15,24

264:2, 11,17, 25

265:5, 10

266:12, 16,24

267:6

268:6, 12,24

269:4, 5,13,22

270:1, 12,13, 17

271:1

273:22, 24

274:3, 22

275:21

279:17

296:22, 24

297:2

**Hispanics**

150:3

166:8

244:21

245:4

253:14

263:13

264:15

265:18

267:5

**historic**

275:19

**history**

22:3

106:25

259:23

**hit**

77:17

87:4,5

257:19

**hitting**

157:9

**hold**

149:4

225:15

282:1

301:14

**holding**

266:15

**holistic**

85:13

**holistically**

161:14

212:19

**home**

264:6

304:4

**Homestead**

189:5

195:6

**honest**

7:10

**honestly**

190:8

228:11, 16

231:22

237:20

281:14
292:8

**horizontal**
97:11
105:23
154:8

**horizontally**
178:13

**hours**
271:24
297:19

**house**
5:20,22
11:6,
15,18,
21 12:5
13:2,8,
10,23
14:5
16:3,
19,24
17:11
18:5,9,
12,19,
22
19:8,22
22:5
24:13,
20
25:6,18
27:12,
20 28:2
32:1
36:9
53:1,11
56:25
57:14,
25
64:12,

16
65:12
66:12,
24
67:11,
14
71:24,
25
72:7,23
73:2,12
74:7,17
76:7,20
77:2,7,
9,23
78:3,17
79:23
81:25
83:25
84:9
86:18
87:3
93:6,10
100:19,
24
101:23
102:1,7
103:6
105:22
106:18
107:25
110:22
111:6
115:5
118:21,
25
121:17,
21
128:18,
20,23
134:14
135:17
137:1

139:24
140:18
141:6,
8,10
145:22
146:1,2
149:6,7
164:8
165:4
169:19
176:16
179:18
183:24
187:1,2
189:11,
25
193:6,
7,25
194:12
198:13
202:25
215:22
219:15,
20,23
220:2,
6,17,
21,25
221:3,
4,18
222:1,3
223:4,
5,6,9,
24
224:7
225:13
227:15,
17
228:2
231:24
235:3
243:25
258:15

259:23
262:4
267:15
274:18
276:7
286:15,
16,19
287:12,
18
288:5
289:16,
20,25
290:1,
2,7
291:8,
20
297:24
298:18
301:18
302:11
303:11

**House's**
14:4,20
20:18
23:13
28:1
64:1
107:22
150:17
191:18

**hug**
106:7

**huh-uh**
7:5

**Hull**
48:9

**hundred**
154:15

**hurt**
227:8

234:17

**husband**
30:11

**HVAP**
142:9
146:21
147:2,
5,13,
16,19
148:9
150:2
203:5
245:2
249:11
250:19,
21
252:23,
25
253:9

**HVAPS**
147:22
148:13

**hypothetical**
177:1
184:19
266:19

———

**I**

———

**I-75**
236:25
293:25
296:3,4

**idea**
41:19
50:7
73:7
85:9
113:19,

20
114:10
115:2,8
228:12,
18
231:11

**ideal**
73:22,
24 87:2
207:5,6
215:3
220:13
228:4

**ideas**
99:4
100:1,
17
187:7
197:11

**identical**
107:11
108:18
109:3,
25
111:25
112:7
114:23
115:14
250:6

**identically**
110:11

**identification**
11:3,7
26:18,
22
46:16
63:5

Jason Poreda
July 17, 2025

43

72:15
108:9,
11
109:11
112:13
135:24
137:25
145:23
149:9
171:7
202:4
218:14
238:8
276:5
**identified**
104:8,
17
122:10
124:3
125:11
142:16
144:18
**identify**
90:23
124:19
132:2,4
141:18
**identifying**
260:1
**ignore**
218:2
287:22
**image**
89:17
204:25
**imagine**
164:15
234:18

300:2
**immediately**
169:8
**Immokalee**
207:3
237:3
296:1,6
**immovable**
50:8
**impact**
34:24
49:3
61:13
73:2
132:23
158:19,
22
192:5
198:25
215:1,
8,15
216:2,
21
217:10,
17
230:5,
22
234:2
**impacted**
66:14
98:2
170:3
190:24
197:14
204:6,
18
205:14

226:23
231:5
**impacting**
43:8
191:24
216:11
217:6,
19
**impacts**
218:9
**impair**
234:4
**impaired**
223:1
**impairment**
234:9
**imperfections**
59:14
**impermanent**
75:6
**implement**
284:2,
11,19
**implementing**
43:22
78:18
**implications**
289:8
**important**
100:2,9
253:9

256:6
257:2
259:22
299:25
302:5
**impossible**
82:24
**improperly**
14:3
**improve**
66:11
104:9,
10
222:18
**improved**
65:11
67:23
**in-depth**
34:7
35:8,
15,17,
18
116:18
**in-person**
10:7,9
**inaccurate**
152:3,
25
183:3
186:5,
16,18
**inaccurately**
150:14
**inactive**

237:2
301:20
**inch**
154:14
**include**
44:7
54:15
55:2,18
59:17
63:14
64:10
76:4
96:9
110:15
119:22
122:22
125:17
150:24
173:14
224:20,
23
231:15
297:1
**included**
48:3
52:8
75:25
112:17
148:15
159:23
189:1,7
192:12
203:17
221:22
224:24
226:20
290:13
**includes**
45:18,
21
51:18

63:11,
13
81:12,
13
82:7,14
223:15
**including**
7:19
17:12
75:25
97:24
105:13
122:17
128:15
154:19
159:15
198:6
232:4
234:15
288:13
292:25
302:1
**incomplete**
183:3,7
**incorporate**
61:8
98:25
100:2,
16
107:22
110:17,
18
**incorporated**
52:23
64:16
111:11
130:5

197:12
198:6

**increase**

268:12

**increased**

125:6
250:16
252:19
253:13

**increases**

202:17

**incredibly**

132:21
220:17

**incumbent**

46:5
79:3

**independent**

82:16
161:21

**Indian**

111:2,
7,22
112:6,
16
292:10,
18
293:4
298:5
300:9,
24
301:10,
22
302:3,
25

303:1,
2,15
304:1

**indicative**

157:14

**indirectly**

30:21

**individual**

31:22
95:24,
25
153:25
164:24
172:24
243:10
244:21
248:9,
12

**individually**

172:22
217:15

**inevitable**

294:12

**inevitably**

224:10
294:18

**inference**

275:12

**infirmities**

207:8

**influence**

34:21
97:5
99:10
107:8
140:23
141:13
146:23
150:17
195:25
198:21
199:13
239:18
248:18
257:20
292:2

**influenced**

97:7
197:8

**inform**

47:8,10
273:13

**information**

8:9
91:4,10
92:22
101:12
122:18
125:12
147:24
148:2
178:3
184:9
204:1
296:14

**informed**

14:18

**informs**

133:12

**inherently**

219:25

**initial**

9:6
14:5
16:3
39:16
246:9
251:2,4

**Initially**

255:19

**input**

60:20,
21,24
80:24
81:2
95:4,7,
8,13,
14,15,
21
97:4,6,
8 98:1,
2,4
99:1,10
100:7,
12
103:17,
18,19,
22
104:2
105:24
195:23,
25
196:7,
9,16,20
197:6,
7,24

198:1
199:24
232:12

**instance**

81:16
165:8

**instances**

64:15
66:11
68:16
126:15
131:15
157:24
159:12
164:7,
12
169:4,
18

**instruct**

72:12

**intact**

84:23
85:22

**integrity**

23:16,
23 24:5

**intended**

104:13,
14

**intent**

46:4
116:22

**intentions**

101:17

**interacted**

99:7

**interacting**

132:22

**interactions**

31:5
33:5

**interest**

80:21
95:4,5
97:20
98:12,
20
199:25

**interested**

40:3
43:15
96:15
275:9

**interesting**

267:18

**interests**

81:3

**interlocked**

66:18

**intermingled**

245:14
246:9

**internal**

171:2

**internally**

17:12

Jason Poreda
July 17, 2025

45

interocular
48:16
154:19

interplay
164:25

interpretations
48:16

interpreted
43:5,18
44:10
59:6
89:6,7

interrogatories
14:24

interstate
50:9
201:15

interstates
50:4,
18,20
51:10,
12 52:1
200:13

introducing
146:1
147:10
148:12
202:13

introduction
148:15

202:24

introductory
283:9

inverse
83:13

investigate
274:1,2

invited
33:8

involve
99:1

involved
18:12,
17
30:18
31:25
32:4,22
34:2
53:14
125:19
247:1

involvement
18:18
101:25

Iowa
88:6

irregular
88:6,7
145:11
157:16

irregularly
131:4
154:13

isolation
87:16,
24
127:16
174:20

issue
167:12
219:4

issued
20:22
21:3

issues
205:12
284:14

item
211:1

items
48:3
83:21

_____

J

Jackson
6:3

Jacksonville
93:4
112:2
127:22
165:21
211:17

jagged
158:22,
24

jaggedness
293:25

January

102:17
103:2
112:11
145:21

JASON
5:6

jealous
149:17

Jeff
17:21
18:15
19:24
20:3

Jefferson
57:24
58:3,7,
10 70:8

job
15:7
25:10
131:6
153:13
212:22

Joe
5:15

John
34:5
119:3,
4,5
258:18
259:8,
21
273:16

join
24:8
110:9

joined
23:16
24:6

25:2,6
30:16
36:7,8

jointly
218:19

Joseph
97:13
204:4,
23
206:23
214:18

Joseph's
205:17
207:15
208:21

judge
19:14
20:22
21:16
238:4
242:2
243:4
264:5
265:13
270:10,
20

judiciously
64:20

July
19:13

jumbled
229:15

jump
296:4

jumps
169:8

jurisdiction

63:24

justifiable
68:18,
19

_____

K

Karen
28:10
95:14
125:17
279:9

Kathy
20:10

keeping
32:8
54:15,
19,22
56:15
57:1
69:24
81:13
83:24
84:22
105:5
129:23
130:22
131:10,
12,23
158:10
159:5
168:3
195:15
197:15
220:7,8
285:20
289:6
293:15,
16

**Kelly**
17:17, 22
19:21
26:4,6
28:6
29:23
30:8
32:7
38:19, 21
115:5
120:15
125:16
136:3
137:1,5
138:3, 18
139:7
210:19
211:9
217:23
218:13
219:6
237:4

**Kelly's**
30:23
139:13
211:25
218:25

**Key**
63:11
64:15

**Keys**
111:19
113:3
114:21
115:22
173:17
223:21

**kind**
18:14
28:14
31:2
34:25
35:1
40:10, 12,13, 22 41:1
43:4,5, 14
47:23
48:1
49:6
53:2
62:7,12
66:17
71:23
72:3,4
74:23
75:25
76:22
77:16
85:2, 10,18
86:12, 14
87:15, 23
89:21
90:17
92:5, 24,25
93:3
94:16
95:14
97:22
98:11, 17,18, 21,23
99:12, 23

100:7
104:7, 18,20
105:8
106:8
107:14
110:14, 22
111:10, 12
112:6
113:17, 20,25
119:19
125:7
129:17
130:7, 21
131:3,4
136:8
137:13
142:12
143:3
147:14, 15
151:7
155:9
159:18
161:19
162:22
163:12, 20
164:20
167:24
169:11
170:9
173:3, 17,24
174:6,7
176:25
177:1, 20

189:6
194:17, 21,23, 24
196:20
198:5
199:21
204:24, 25
216:18
217:21
218:4
220:3
225:23, 25
226:8,9
227:3, 13
228:10, 17,22
229:10
231:20, 25
244:17, 18
245:14
246:2, 6,8
247:16
248:4, 10
249:19, 21
250:2, 8,9,16
254:14
255:16
256:3, 19
257:25
258:8
259:16,

17
263:16
267:22
269:1
273:14
276:14
277:6, 20
278:18
280:17
281:5
288:7
293:11, 23,24
294:8
295:16
300:16, 17

**kindergarten**
15:4

**Kissimmee**
88:22

**knew**
30:12
124:9
292:22
293:2

**knowing**
23:7
142:4
179:1
265:20

**knowledge**
60:15, 18
101:24
102:2,3

118:21
141:22
142:21
158:6

**Kyle**
12:11
28:2
96:3
120:15
125:16
131:7
190:20
231:20
279:9
281:9

---

**L**

**L-SHAPE**
174:7

**lakes**
105:6

**land**
61:16

**landmarks**
289:10

**lanes**
59:21
62:11
200:16

**Langan**
12:11
28:2,4
31:13
32:14
120:15
125:17
191:10

language
45:9
97:24
116:19,
24
120:18
121:18
199:25
283:9
285:4

large
140:14
160:6
204:1
207:17
210:6,
9,10
264:3

largely
107:25
205:8,
14,23
295:14

larger
76:5
170:9
232:3

LAS
33:12
99:7

lasted
16:5

late
24:24

Latino
204:7

Lauderdale
293:22

law
5:19
41:10
43:6,
22,23
44:1,2,
9,18
59:5
89:6,7
117:10
125:11
137:7
283:12

layer
89:16

layers
89:15
93:20

lead
105:16
224:10
255:21
260:7
262:25

leadership
38:18
99:2,5
101:16

leads
260:4

lean
239:14
242:19
244:15
245:24
262:15

leans
239:16,
17,21

240:14,
19
247:17
251:3,5

learn
14:8,
14,17

learned
84:13

leave
25:18
92:23

leaves
235:18
263:16

led
103:14,
24
171:14,
17
248:4
261:1

Leda
26:4
28:6
29:23
30:8,
17,23
31:16
94:6,14
96:4
120:14
125:16
231:20
279:8
281:4,9
303:11

Lee
87:9

Leek
29:8
95:24
149:20
150:23
151:10,
19
155:3,
14
157:21
159:1
161:14
179:23
185:8
187:21
188:6
222:17

Leek's
28:22
29:6
150:10
152:20,
23
153:1,5
158:5
160:9,
22
161:5,
7,13
162:4
186:15

left
19:22
153:20
207:17
214:3
215:18
271:23

legacy
41:13,
17

legal
17:6
28:8
35:17,
18,19
40:10,
21
136:15
137:6
186:6

legally
176:3,4
180:13
193:4

legislation
107:17
110:9
187:13

legislative
16:22,
24
18:24
23:21
29:3,13
94:4,
15,16
102:17
103:3,6
106:17
115:6
137:22
171:10
280:1
283:4

legislators
37:7,10

Legislature
11:25
38:1
39:9
42:25
44:7
115:1
118:16
126:22
133:8,
14
218:23
219:7
264:14

Legislature's
52:7
270:23

length
72:25
152:16

Leon
87:9
128:2

level
90:11,
14
135:18
274:7,
15,25
275:19
296:16

levels
90:2,8

Lewis
20:22
21:16
238:5
243:4

Jason Poreda
July 17, 2025

48

265:13
270:10,
20

Lewis's
19:14
264:5

light
149:12

lime
150:20

limit
54:9
224:16

limitation
59:12

limitations
47:3
59:11

limited
34:14
64:4
76:11
78:4
85:6
94:7

limiting
84:7
86:3

lines
15:11,
13
33:21
45:13
53:22,
23
62:13
74:14

76:21
85:8,17
88:7,8
98:18
110:24
122:24
125:4
128:20
130:16
158:14,
23,25
178:2,
4,16
191:9
207:4
212:15
288:12
292:11

linger
83:12

list
31:8
38:10
41:15
106:17
124:5,
13
127:2
164:18
210:8
236:7
257:3
258:11
273:25
283:13

listed
14:4
76:1

listen
281:20

listening
6:2

lists
151:8
210:18

literally
66:18
197:2
258:10
303:22
304:5

litigation
19:19
20:11
23:6
237:11
238:6

live
201:10

lived
60:15

loaded
36:18

lobbyist
15:20

local
60:14,
18
61:20

location
174:10

lock
106:18

locked
123:16

long
15:12,
24
16:16
25:21
26:6
36:15
76:16
83:12
106:2
152:14
154:15
160:20
161:10,
21
164:15
232:17
282:23

longer
221:25
222:19
260:24
261:2,
3,4,9,
13

looked
11:10
43:21
91:19
123:12
125:5,
10
134:16
135:5,9
141:16
153:21
164:9
167:16
170:25
174:12
177:8

178:18
197:10
223:11
229:4
233:6,7
238:17,
19
241:20
243:10
250:4
258:7
274:1,2
297:4

lose
179:20
194:12

losing
227:3,
17,19

lost
204:13
274:9

lot
17:4
28:12
44:13,
14  76:8
87:7,12
88:6
96:6
103:16
106:3
121:11
124:18
158:22
159:3
161:11
186:3,
22
189:16,
18

193:6
196:19,
20
199:10
201:14,
17,19
208:14
215:21
227:7
228:23
235:4
245:11
246:25
270:8
279:10
294:4
296:18
299:6

lots
180:4
207:20
279:6
299:18

loud
153:3

love
186:17

low
211:23,
24
212:5
213:16,
17
241:3
250:23
266:12
271:14

lower
49:8
74:10,
22,24

77:11
173:16
212:21
213:19
246:6
257:11
264:16
267:10,
15,24
271:12

**Lucie**
111:19
113:2
114:20
115:18,
22
228:7
292:19
293:5,8
298:5
300:9,
24
301:10
302:25

**lunch**
7:20
135:16
139:18,
19

---

**M**

---

**made**
11:14
20:5
51:16
58:7
64:10,
21,24
70:11
74:20

77:19
84:20
89:21
94:20
99:1
107:5
110:13,
23
120:13
130:4
140:13
144:21,
22
145:19
155:22
164:9
167:1
168:1,
14,16
169:10,
13,22
181:19
182:8
190:25
192:6
213:2
220:5,9
227:10
229:15
231:14
254:15
264:23
266:3,
21,25
268:10,
21
287:22
289:6
290:3,
5,11,25
291:5
292:9

293:3,7
301:8

**main**
102:23

**maintain**
126:2
146:12
202:22
203:10
207:9

**major**
51:7,
10,12
52:7
54:11
59:23
60:5,9
62:24
78:5
129:18
130:17
162:18
195:14
199:11
200:3,
6,7,10,
17,21
201:4,
9,17,19
210:2,4
214:5,7
229:5
236:18
288:9
289:1,9
294:4,8
295:19

**majority**
19:9
70:21
95:10

118:10,
14,17
142:9
146:6,
12
159:14,
19
202:22
203:11
212:14
255:5,
10
256:25

**make**
7:1,6,
23  8:4
36:15
49:10
53:6,16
67:16
68:5,17
70:2,16
74:8
81:1,5
94:19
97:22
104:23
105:5,
10
107:19
122:6
124:13
127:11
131:25
136:10
137:7,
10,11
144:22
147:25
151:14
155:6,
8,11

156:3,
10,16,
18
157:1,2
161:22
163:2,
11
164:1
165:1
166:9,
15,18,
22
167:22,
24
168:19
171:21
174:20
178:21
181:4
188:25
189:7,8
191:6
195:13,
17
199:4
213:6
217:12,
14,18,
19
220:1
224:15
229:17
244:17
248:21
261:25
263:24
266:22,
23
267:4,6
268:7
269:3
270:4

273:25
289:11
291:1
303:12,
16

**makes**
50:9
70:10
71:1
88:12
114:13
116:10
145:2
166:25
168:2
193:5
237:4
268:3
273:18

**makeup**
244:3

**making**
27:21
70:19
123:8
162:25
164:23
165:3
180:12
265:12
269:12
287:17,
21,23
289:20
290:21
291:1,4
293:15

**managed**
28:12

**manager**
16:2

Jason Poreda
July 17, 2025

50

| | | | | | |
|---|---|---|---|---|---|
| **mandated** 38:1 | 57:5, 14,15, 25 | 5,15,20 106:20 | 189:4, 25 | 233:24 234:18 | 47:9,11 49:3 |
| **mandates** 39:9 | 64:12, 13 65:1 | 107:2, 4,15,20 | 190:10 191:5 | 237:6 243:9 | 52:24 53:6 |
| **manifest ation** 132:9 221:13 | 66:24 67:4 70:3,4, 14 | 108:6 110:2, 19 112:3,9 | 192:23, 25 193:6,7 197:10 | 249:3 258:8 264:7 268:24 | 61:13 64:1 72:13 95:7 |
| **manifest s** 55:15 | 71:3, 11,20, 25 72:1 | 113:12 115:5, 6,7,8, 24,25 | 198:13 201:24 202:14, 25 | 271:8 278:13, 14 280:13 | 97:5,7 98:2 140:24 141:16, |
| **manner** 146:10 202:21 203:10 | 74:11, 20,23 76:20 77:12, 19 | 122:15, 17,22 123:3, 6,11, 15,18 | 203:16, 21,22 207:21, 22 211:15 | 286:1, 4,12, 16,19 287:5 | 23 142:15 146:18, 24 150:17 |
| **Manrara** 5:24 | 79:9, 18,23, 24 | 126:20, 23 128:15, | 212:22 219:23 220:1, | 292:24 295:24 299:23 | 151:20 161:8 185:17 |
| **map** 11:1,5 12:11 17:19, 21,23, 24 | 80:2,3 81:25 82:11, 20 84:1,9, 14 | 18,20 134:13, 24 137:9, 14 138:4 | 2,17, 18,19, 21,24, 25 221:3,4 222:1 | 300:6, 22 301:5, 17,20 302:14, 15,24 | 186:19 188:10 203:12 **mapping** 36:17 |
| 18:3,6, 9,12, 15,16, 18,19, 22 | 85:3,24 87:22, 25 88:3 89:12, 14 90:8 | 142:3 143:2, 6,24 144:4, 13,19, 20 | 223:3, 4,5,7, 9,14, 19,24 224:3, 7,18, | 303:24, 25 304:3 **map- drawing** 136:23 | 39:22 91:14 274:15, 18 **maps** |
| 20:12 22:11, 16 27:12, 20 | 91:9,12 92:10, 16 93:6 98:7,9 99:16 | 151:6 157:15 162:3 167:19 173:9, 10 | 20,23 225:1, 12,13 226:6, 9,17,18 227:7 | 137:19 138:15 139:5 **map- making** 136:25 | 10:22 11:9 17:19, 22 22:5 27:25 |
| 28:2,3, 9 29:20, 21 31:14, 25 56:25 | 100:3, 21 101:2 102:7 103:5,7 104:2, | 178:20, 21,24 183:24 186:10 | 228:2,3 229:23 231:24, 25 | **mapmakin g** 17:19 34:22 | 31:22 32:1 33:13, 16,23 34:2, 10,25 |

Jason Poreda
July 17, 2025

39:17
40:8,
15,25
41:2,6
42:14,
16,23
43:1
47:13
54:18,
21
59:10
62:6
69:8
71:4,
11,16,
21 72:8
78:21,
23,24
79:2,5,
12,19
80:8,
10,13,
20
81:10
88:25
89:4,10
94:19
98:5,7,
13,20
99:8,
11,14,
15,18,
24
100:14,
17,24,
25
102:10,
21
103:15
104:1,
12,14,
18

105:22
106:11,
19,22,
23
107:11,
13
108:17
109:21
111:5,
6,13
114:9
119:14,
24
120:10
124:18
142:21
143:19,
21
148:10
186:15
189:15
191:7
201:6
238:18,
19
269:12
280:1,8
285:8,
11
290:14
301:19

**March**
16:7
280:20

**Marion**
67:25

**mark**
10:24
26:16,
21
109:8,9

171:6
**marked**
11:3,7
26:18,
22
46:16
63:5
72:15
108:9,
11
109:10,
11
112:13
135:24
137:25
145:23
149:9
171:7
202:4
218:14
238:8
276:5

**Martin**
111:2
228:7
293:8

**massaged**
163:16

**match**
254:14

**material**
17:4
44:14

**materials**
11:10,
12

**math**
87:7,13
194:9,

11
227:18
286:21

**mathematical**
47:21
48:2,7,
8,10,13
49:2,11
64:9
67:23
83:1
87:16
153:12,
14
159:3
170:11
172:12
173:16
191:4
212:12,
20
213:1

**mathematically**
51:20
70:22
82:24
84:1
85:4
192:4
227:16
228:1
293:1

**Matt**
16:3
29:23
30:6

**matter**
8:4
218:19

269:2
**mattered**
162:24

**meaning**
74:11
165:18
203:24
226:24

**means**
6:21
47:16
60:7
69:21,
22
70:25
134:11
225:20
246:21
251:5
267:19

**meant**
211:2
260:19
273:6
278:23
284:13

**Mears**
20:10

**measures**
47:21
48:2,7,
10

**media**
95:16
277:3

**meet**
9:22
33:10
96:10,
19

123:1
148:24
231:18

**meeting**
10:9
36:5,25
46:15
60:24
94:5,23
96:23
101:7,
11,14
102:22
117:8
145:20
171:10
206:19
217:23
277:17,
20
298:13,
14
299:2,
10

**meetings**
10:5,7
13:11
32:24,
25
33:1,3
36:2,6
37:4
39:16
40:5,7,
11,17
42:17,
19
94:3,
21,22
95:9,
10,13,

20,25
96:9,
20,21,
24 97:5
99:11
102:11,
19,20
103:18,
24,25
106:18
276:15
277:1
299:4,
8,12,
15,16

**Melody**
130:14

**member**
39:25
95:8
97:4,6
98:14
103:17,
18
105:24
186:22
187:1,
2,3,5
195:23,
25
196:4,
16
197:6
198:7
199:24

**members**
29:15
31:23
33:5,6,
7 37:16
38:5,6,

25
39:12,
13,16
40:4
42:20
53:13
77:21
80:25
95:6,8,
20,24,
25
96:5,6,
10,12,
19
97:13
99:20
100:9
103:25
104:18
105:25
106:1
116:5
121:22
147:20
148:21
189:17,
18
196:25
198:5,9
232:4,
7,11
276:16,
23,24
277:2,
3,4,5,
6,9,10
282:10,
12
298:12,
18
299:1,
3,4,6,

8,12
**members'**
60:21
**membership**
39:24
**memo**
72:12,
13,17,
22
73:6,13
77:3,6,
23
**memory**
109:5
238:1,
14
241:14
268:10
**mention**
106:4,7
208:8
**mentioned**
8:23
28:19,
25
30:16
36:2
37:15
39:21
42:24
43:10
44:23
45:18
46:9
50:18
52:21
59:8
60:4

70:9
85:18
95:4
105:21
131:20
132:17
137:13
141:15
142:4
177:7
178:5
185:23,
25
191:10
193:15
195:23
197:10
206:14
207:12
220:3,
10
221:17
227:17
285:17,
25
286:24
288:7,
20
289:14,
22
290:12
**merge**
111:9
299:23
**merging**
111:12
113:18
**messy**
229:4
**met**
5:13

10:10,
14,15
30:10,
12 33:7
96:5,13
97:1
103:3
196:4
**methodologies**
78:14,
17
**methodology**
69:15,
20,21
70:6,
20,23
71:2,
19,22
72:1,4,
5,9
98:22
105:11,
12
158:12
**metric**
59:15,
16,25
66:12
265:9
**metropolitan**
80:14
**Mexico**
205:1
**Miami**
129:25
130:1,
2,10,11

131:11
159:22,
25
160:1
169:12
182:19
193:23
194:3
195:3
205:3
207:6
208:22
209:2,
4,16,20
210:11
295:15

**Miami-dade**
84:11
138:21
146:4,7
160:14
193:22,
23
194:9
196:4
203:18
205:9
206:4,9
208:4
214:3
222:20
223:1
236:14
245:14
294:12
295:7
301:2
303:17

**Michelle**
29:23,

25
**mid**
266:12
**mid-april**
280:19
**mid-september**
41:25
**middle**
7:22
208:2
226:6,
17
232:20
233:6
280:7
**mike**
67:3,4
**miles**
154:15
**mimic**
144:17
**mind**
8:14
108:16
109:1,6
130:23
136:14
156:1
176:11
188:18
207:2
218:18
262:10
284:9
287:13
289:6,9
291:13

**mindful**
293:12
**minds**
285:21
**mine**
31:9
**minimize**
56:9,12
84:9
145:9
**minimizing**
55:2,
18,25
221:1,
14
222:6
**minimum**
257:20
**minor**
78:13
**minorities**
116:20,
24
133:6
239:11
**minorities'**
121:18
**minority**
35:5,21
45:8
92:14
97:24
117:25
118:4,
5,8,11
13,17,

23
120:2,
18
126:2,8
133:14,
15,17,
22
134:9,
12,15
136:16
138:24
140:7,
19
142:10
146:6,
12
149:22
166:21,
24
173:2
188:21,
25
199:25
202:15,
22
203:11
210:21
211:10
226:24,
25
239:11,
22
242:9
243:16
248:17,
22
258:2
270:2
272:3,
12,17
**minus**
73:24

74:3
256:8
**minutes**
69:2
135:16
271:23
297:19,
20
**minutia**
62:4
**Miramar**
294:7
**mirror**
45:6
199:6
**mirrored**
302:4
**missed**
159:2
**missing**
175:2
256:5
**misspoke**
132:19
**misstate**
206:18
**mistaken**
191:8
206:25
**mixed**
52:2
**moment**
263:20
**Monday**
25:11
**Monroe**
83:4
84:11

194:6
208:6
223:25
233:11
235:16
294:17
296:10
**morning**
5:11,12
192:7,8
**motivations**
281:22
**move**
15:4
20:4
136:10,
11
137:11
199:3
204:5
216:12
251:14
254:7
263:6
**moved**
15:6,7
19:14,
16,20
109:22
110:22
115:25
303:25
304:5
**moving**
125:2
157:3
160:9
179:14
210:13
216:13

**MSAS**
80:15
**muddy**
89:25
**multiple**
33:9
59:21
66:10
96:13,
20,21
97:13
99:13
163:19
170:12
172:8
177:23
209:2
256:18
**multitude**
155:4
225:14
**municipal**
53:22
75:4,7,
11
77:25
130:8,
16
158:14,
23
159:17
**municipalities**
53:22
75:9
160:13
193:17
195:4

215:21
220:8
294:2
295:7

**municipality**
294:1

---

**N**

**nail**
116:3

**named**
38:3,4
39:13,
16
152:14

**narrow**
100:13
103:15
254:18

**Nassau**
82:25

**National**
76:8,9

**naturally**
76:22
199:22

**nature**
75:6

**neat**
294:5

**necessarily**
48:4
49:12
114:6
123:16

124:12
143:1
150:13,
15
156:14
159:8
186:1
196:17
213:17
225:4
228:2
246:18
247:4,
23
252:4
257:12
262:17
265:22
267:7,
20
300:11

**needed**
19:18
23:7
24:13,
15
27:23
31:10
42:25
44:7
90:13
123:3
182:15
261:2,9
292:10,
12
294:19

**negative**
231:21
234:2

**negatively**
66:13
158:22
191:24
217:6,
10
230:5,
22
231:5
291:2

**neighborhood**
178:14
245:16

**neighborhoods**
193:21
289:12

**neighboring**
85:7
87:11,
23
132:7
217:16

**neutral**
218:24
219:1,7

**nice**
248:25
288:16
293:18,
21,23
294:7,
8,9

**Nicholas**
5:13

**Nick**
27:3

**nod**
7:4

**nodding**
40:2
69:9
114:17

**nominate**
133:16

**nomination**
265:1

**non-compact**
160:21
161:10

**non-diminishment**
272:13

**non-hispanic**
265:2

**non-primary**
18:5
236:6

**non-public**
170:23

**non-qualifying**
60:4,9

**non-racial**
291:14

**noncompact**

126:4

**nondefined**
208:12

**nonetheless**
60:5,9

**nonviable**
192:6,
15

**north**
107:12
109:23
111:25
130:10,
11
159:19,
25
160:8
168:10,
18,23
206:5
210:24
216:11
225:17
229:14
230:9,
10
234:1
235:22
236:3
303:1

**north/south**
198:14,
25
199:11
200:4,
7,24

201:20

**northerly**
181:20

**northern**
86:11
131:20
132:8,
12
179:20
180:2,
20
229:13
230:15
236:14,
21
291:24
293:13
294:22
295:9
296:6

**northwest**
301:2

**notable**
148:14,
18

**note**
257:2

**noted**
211:14

**notorious**
158:23

**notwithstanding**
67:12

**November**
38:14

Jason Poreda
July 17, 2025

55

42:13
46:14
49:23
117:8
125:21
133:2

**NPA**
246:25
253:5,
6,23
263:13

**NPAS**
250:25
253:25

**number**
9:23,24
10:4
53:2
55:3,
18,25
56:10,
12 77:8
87:5,6
88:11
104:10,
25
116:7
118:4,
10
142:17,
22,23,
25
144:7
145:9
174:22,
23
175:5
185:5
194:4
200:25
216:18

219:23,
24
221:1,
14,20
222:7
230:5,
8,17,21
255:20,
24
259:8,
11
267:18,
24
271:12
281:17
292:14
302:6
303:15
304:7

**numbered**
112:17
278:2

**numbers**
21:24
115:16
133:22
170:16
214:15
228:15,
17
242:21
243:13
245:11
248:4
250:15
252:7
254:14
263:21
265:20,
24
266:4

**nuts**
40:12

_____

**O**

**oath**
7:8

**object**
14:21
32:9
35:7
39:2
42:2
44:3,
11,19
50:22
53:8
54:1,23
56:2
68:8,20
69:11,
16
79:15
81:22
82:19
83:15
101:19
103:21
109:19
113:5
115:3
122:11
124:8
140:4,
20
141:24
144:15
148:4,
17
162:9
167:7
175:20

179:6
181:7,
14
182:16
183:16
184:6
187:24
188:13
195:20
198:3,
15
204:20
205:21
209:1,
21
212:8
213:9,
21
214:1
215:9
219:8
232:25
234:11
243:7
265:14
268:14
269:15
271:4,
17
272:23
275:1
282:6
284:6
286:11
287:25
288:25
292:4
296:15

**objective**
83:18

117:23

**observation**
203:23,
25

**obvious**
49:16
100:20
201:4
231:20
286:21
288:11,
17

**Ocala**
76:8,9

**occasion**
199:5

**occasionally**
62:20
70:18
89:18
91:15,
16
92:14,
16,20
99:12
125:20
201:7
259:5,
20

**occasions**
33:9

**occlusion**
301:15
302:3,
16
303:11

**October**
41:8
42:13

**odd**
67:8

**oddly**
159:18

**office**
19:9
23:1,3,
4,13
25:8,9
26:7,11
28:20,
23 30:4
31:3,9
33:8
35:16
37:22
38:23,
24 42:5
106:2
237:5
295:25
301:20

**offices**
31:16,
17
60:21

**official**
42:8
103:5

**officially**
37:19
39:11

**Okeechobee**
111:3
226:2

Oliva
  23:24
  38:8
opens
  152:10
opinion
  113:23
  132:15
  154:24
  200:5,6
  234:21
  240:14
  241:10
  242:16
opportunities
  123:12
opportunity
  65:17
  116:23
  125:7
opposed
  77:15
  228:6
  253:11
  304:1
opposite
  155:21
  156:25
  163:14
  186:3
opted
  175:18
option
  171:13
  172:4
  173:7
  174:9
  175:18,

25
  192:1,
  2,6,8
  229:4
  234:9
  294:20
options
  100:5,
  21
  138:7,
  10
  170:13,
  14
  171:17,
  23
  172:2,
  8,16,18
  175:12,
  16
  177:8
  179:5
  183:23
  228:19
  229:22
  231:17
  233:10
orange
  117:10
  203:14
  292:17,
  18
order
  40:8
  61:9
  77:14
  90:10
  126:1,
  6,8
  133:23
  142:9
  160:5

167:3
283:17
292:16
304:12
organic
  88:9
  164:4
  186:9,
  13
  285:19
organically
  74:21
  77:12
  83:19
  85:3
organizational
  38:13
  39:10
organize
  39:9
orientation
  129:21
  179:10,
  12
  196:21
  198:14
  199:12,
  22,24
  200:4
orientations
  123:23
oriented
  160:1
  199:21

orienting
  97:16,
  18
original
  131:14
originally
  97:10
  168:18
  197:18,
  19
Orlando
  60:16
  93:5
  128:6
Osceola
  111:23
  112:7
  301:22
other's
  31:17
outliers
  151:6
  157:15,
  19
outline
  75:22
  76:23
output
  119:17
  120:9,
  12
overlaid
  122:17
  134:24
overlay
  91:2,4
  93:12

overlaying
  87:2
overly
  265:1
overnight
  36:14

———
P
———
p.m.
  139:19,
  20
  176:14
  202:10
  234:24
  276:1
  304:14
packet
  11:1,5
  65:25
  66:5,6,
  9 249:4
  256:11
  262:4
  303:5
packets
  9:19
  10:21,
  24
  11:10
pages
  73:8
  157:4,6
  251:15
  256:11,
  19
Palm
  59:19

93:7
111:4
199:9
236:3
292:23
293:2,6
Palmetto
  131:2
  160:4
panhandle
  58:1
paragraph
  73:17
  75:20
  147:25
paralegal
  5:15
paraphrase
  212:2
  300:20
part
  37:14
  47:18,
  20 52:1
  61:2
  63:15
  74:1
  75:7,18
  77:1
  78:6
  82:1
  86:12
  89:1
  123:20
  130:14
  131:1,

Jason Poreda
July 17, 2025

12
137:2
140:15
149:24,
25
158:11
159:1,
24
160:6,
13
162:11
164:16
168:13
171:3
177:10,
24
180:20
182:23
183:4
201:5
203:16
209:4
212:16
214:2
220:9
226:22
231:1
233:23,
25
235:18
237:10
239:13,
25
245:22
251:12
254:9
258:9
270:9
274:11
293:22
298:10
301:21

**partiall
y**
155:23
227:16
245:12
**particip
ate**
116:24
**parties**
114:18
168:20
244:21,
22
247:17
**parties'**
12:20
**partisan
/
improper**
281:22
**parts**
59:17
77:6
82:16
178:20
201:13
251:24
**party**
15:9
16:10
20:18
46:5
78:25
166:8
167:5
173:2
240:3
244:12,
15
245:4,8

246:14,
16
247:2,
5,8,12,
13,16
248:14,
18,23
255:15
256:13
263:4,
11
269:13,
22
270:1,
9,14
**Pasco**
86:8,
12,13
287:2
303:21
**pass**
280:1
**passage**
157:3
**passed**
112:10
280:13,
19
**passing**
280:8
**past**
133:20
259:12
274:4,
17,24
297:19
**PATTERSO
N**
5:6

**pause**
8:17
**PCB**
103:5
**Peace**
226:4
230:14
**pending**
7:22
8:2
23:5
**people**
41:20
60:19
73:22,
25
104:3
113:10
136:10
180:15
199:3,
6,14
200:23
201:10
206:1,8
209:10
227:25
235:15
259:2
292:12
293:16
301:23
302:15
303:3,
8,9,14,
20,23,
25
304:4
**percent**
73:21
74:6,13

77:13
97:2,3
113:14
150:3,
11
190:22
191:11,
13,20
214:23,
24,25
241:3
242:15
245:6
250:19,
21
252:22,
23,24
253:4,
14,15,
20,21
255:2,
10,11
257:8,
14,15
263:13,
14,15
265:10
266:15
267:11,
13,19,
24
271:12
274:8,9
296:19
**percenta
ge**
74:6,
15,19
77:17,
20
240:22

253:2
254:2
263:13
267:15
**percenta
ges**
256:7
257:18
**percents**
247:2
253:18
**perfect**
59:13
154:3,
4,5,15
**perfectl
y**
104:23
**perform**
143:15
150:4,
12
151:15
164:1
165:14
189:8
217:15
226:24
246:10
261:12
271:14
275:12
**performa
nce**
135:2
150:6
165:23
170:16
216:21
217:6,

11
230:22
241:25
244:5,
9,15
250:8,
10,12
251:25
254:12,
15
262:21

**performed**
120:1
138:25
143:10
151:16
172:1,
24,25
175:15
181:19,
25
288:6
290:25

**performing**
93:17
146:4
167:23
234:5
244:1
246:14
253:16
261:3,
4,21
264:11
287:18
289:21
290:4

**performs**
154:2,

6,12
219:3
240:1
246:7

**perimeters**
54:5

**period**
24:11
36:4,6
40:3,5,
6 83:5
96:2
104:8

**periodically**
32:25
34:19

**periods**
178:20

**permitted**
202:18

**person**
10:5
73:24
74:3
200:10,
11
258:24
281:20
297:12

**personal**
229:2

**personally**
129:7

**perspective**

26:2
97:6
107:22

**perspectives**
60:19

**Pete**
128:3

**phone**
95:17
103:25

**phonetic**
96:21

**phrased**
181:6

**pick**
36:10
193:3
236:16
302:6

**picked**
172:4,
6,20,23
236:17

**picking**
74:15

**picky**
219:3

**piece**
77:24
107:17
112:16
132:8,
13
303:2

**pieces**
72:4
76:23
98:10

104:6,
17,22
110:9
113:18
167:19
227:21

**pin**
31:8

**Pinecrest**
131:3
160:4

**pink**
185:4

**pinwheel**
216:25

**piqued**
98:12

**place**
17:9
30:16
46:22
82:6
86:12
136:14
223:12
227:21
293:11
298:3

**places**
60:16
80:17
90:24
128:21

**Plaintiffs**
5:14
6:2
12:18
264:12

**Plaintiffs'**
10:25
11:4
46:13
63:2
72:14
237:24
264:6,
22,23
271:7

**plan**
11:2,6
45:7
62:1
63:13
74:1
80:2
101:23
102:1,
18
106:9,
11,13
114:15,
16,19
115:1,
10,11,
13
116:7
122:10
126:4
133:9
139:25
144:11
146:1
149:7
171:14,
18
191:17
219:16
221:18

261:10
262:4

**plans**
52:22
61:16
73:20,
23 74:2
79:14,
22
80:7,11
95:1
116:6
124:6
126:16
141:7,
17
144:7,8

**play**
94:17
101:22
142:5
164:22
182:23
267:21

**plots**
275:15

**plurality**
257:22
263:18
264:3
267:16

**pocket**
189:6

**point**
10:23
16:14
19:14
38:4
39:15

41:19
82:11
85:1
91:19
95:23
96:6
97:3
127:2
136:6
137:9
144:17
186:21
196:4
206:3
211:1
238:13
239:15
245:1,
21
248:17
251:18
255:7,
16
256:6
257:18
261:8
278:13
287:22
289:4,5
294:20
300:3
301:13

**pointed**
206:7
260:23

**pointing**
114:3

**points**
91:2,
13,16,
20

92:10
99:19
104:15
195:24
205:2
240:22
243:17,
19
249:22
260:23
262:5

**polarized**
118:3,
12
120:5

**policy**
25:9
37:13

**political**
15:10,
12,19,
20
45:14
46:5
50:1,2,
16
53:20,
21,25
55:12
57:11
62:24
66:15
69:25
76:17
78:25
81:11
116:25
131:9
145:3,8

158:24
173:3
195:14
207:1
208:3
221:11
259:6
284:17
291:10

**politically**
118:4
239:15
240:1
264:14,
17
266:8
273:24

**Polk**
83:25
84:21
86:17,
19
105:3,6
111:23
112:6
301:19,
21

**polls**
253:17

**Polsby-popper**
48:9
151:4
154:9
158:20

**poor**
153:13
154:9
300:20

**poorly**
154:2,6

**pop**
83:21
123:14

**popped**
227:7

**populated**
59:19
132:1
155:24
177:24
180:18
200:22
226:2
245:13

**population**
45:12
46:11
55:7
58:24
63:13,
22
64:23
66:2,6
73:19,
21,22,
23,24
74:2,3,
5  76:12
77:8
83:10
86:22
87:3
88:4
91:7,9,
24,25
92:2,3,
4,13,17

93:8,9,
12,15
97:16
112:4
113:15
117:25
118:4,
5,8,10
123:14
124:17,
21,25
125:6
133:12
136:7,
12
137:12
138:21
142:7,9
146:8,
21
155:25
163:4,
19
166:1
177:13,
16,18
188:21
189:5
193:25
194:13,
25
198:13,
25
199:2,8
202:16
203:18
206:2,
20
207:14,
18,23
209:3,7
210:1,

3,21
211:11
213:25
214:8,
22,25
215:2,
3,23,25
216:9,
17,19
220:13,
20
225:16,
17,18,
19
227:2,
24
235:14
237:1
245:1,
3,7,20
248:4
252:7
294:13,
18
295:20
296:4
298:7
302:16
303:6

**population's**
118:11,
13

**population-wise**
110:4
180:16

**populations**
87:2
125:1,2

138:22
149:22
163:17,
22
178:1
180:21
220:22
224:10,
15
228:4
233:22

**populous**
227:3

**Poreda**
5:6,11
6:5
139:22
283:2
297:23

**portal**
143:19

**portion**
63:10,
11
111:1
112:15
144:12
160:3,7
179:22
190:6
194:1
207:17
214:3
215:17
226:20
227:4
235:18
266:24
288:5
301:3
303:23,

24

**portions**
82:7,14
144:12
221:22
223:15
224:24
301:2

**position**
15:10
16:2,16
68:7

**positive**
222:3

**possibility**
14:9
221:7

**possibles**
87:13

**possibly**
162:21
228:15
261:20

**post**
60:22

**potential**
76:11
123:12
125:23
132:10,
14,18
216:3
276:12,
15,20,
21,24
277:2,
3,4,15

278:6
281:18
289:15,
22

**potentially**
68:21
124:19
131:21,
22
151:21
240:10
249:22
255:8
268:9
269:4

**power**
26:9

**practical**
45:15

**pre-meetings**
101:8,
10

**precedent**
146:11
202:18,
21
203:10

**preconceived**
82:12

**preconditions**
117:16,
18,22
118:22
119:8

120:4
272:5,
8,13

**predecessor**
127:11

**predecessors**
127:25

**predetermined**
83:3
199:15

**predominant**
188:8,
11,15,
19
189:13

**predominantly**
14:3
163:6

**predominate**
291:13

**predominated**
189:11
190:11

**predominately**
261:24

**preexisting**
79:6

**prefer**
104:18
133:17

**preference**
118:6,
14

**preferences**
259:7

**preferred**
118:11,
13
120:19
134:11
257:12
296:23

**premise**
68:9
153:10
155:2,9
158:3
161:6
180:25
234:6

**premises**
205:18

**preparation**
9:15
10:8
13:16
24:6
279:1

**prepare**
9:15,18
10:15,
20 37:4
73:20,
22
277:1,
6,11,16

**prepared**
278:7,
15,17
279:6
282:8

**preparing**
36:11,
22
143:22
147:9
279:3

**prerequisites**
117:17

**present**
20:12
94:2
99:4,
12,19
100:5
118:22
119:8,
14
192:2
204:1
265:11
299:9

**presentation**
40:10
94:18
102:12
174:21

**presented**
14:24
39:17
75:9,
15,16

Jason Poreda
July 17, 2025

| | | | | | |
|---|---|---|---|---|---|
| 98:15 | 96:11 | 109:22 | 89:17, | 240:7, | 43:1 |
| 100:21 | 107:11 | 122:21 | 25 | 24 | 44:6 |
| 101:12 | 110:11 | 123:9 | 92:7,12 | 241:2, | 88:13 |
| 102:12, | 120:4 | 124:10 | 94:14 | 4,5,7 | 145:7 |
| 16,18, | 123:21, | 127:12 | 96:3 | 242:6, | 156:1 |
| 21,23 | 24 | 145:15 | 99:3 | 13,14, | 287:13, |
| 103:3, | 165:21 | 182:6 | 109:25 | 15 | 23 |
| 11 | 178:1 | 196:22 | 125:16 | 244:3,6 | 288:1, |
| 106:12, | 201:9 | 203:23 | 207:12 | 247:13 | 4,22 |
| 15,23 | 212:22 | 261:11 | 208:24 | 248:19, | 289:6, |
| 115:5 | 214:13 | **primaries** | 209:23 | 23 | 16 |
| 117:10 | 228:25 | | 220:6 | 251:7, | 295:4 |
| 119:13 | 236:9, | 167:5 | 236:4 | 12,13 | **prior** |
| 192:1,9 | 18 | 239:16, | 251:8 | 255:20 | 24:14 |
| 202:14 | 250:12 | 18 | 272:25 | 256:24 | 37:2 |
| 236:24 | 252:16 | 246:16 | 273:12 | 257:1, | 80:11 |
| 237:6 | 266:8 | 247:9 | 289:9 | 3,9,13, | 83:5 |
| 238:18 | 285:17 | 248:14 | 295:19 | 22 | 107:25 |
| **presenting** | 286:21 | 251:6 | **primary** | 259:1 | 124:3 |
| 107:19 | **prevail** | 254:5,7 | 17:23 | 263:25 | **prioritization** |
| 147:21, | 125:25 | 255:15 | 18:2, | 264:15, | 285:3 |
| 24 | 126:11 | 256:13 | 15,16 | 16,24 | **prioritize** |
| **preserve** | 265:3 | 257:5 | 28:10 | 266:24 | 284:10 |
| 79:6 | **prevailing** | 263:4 | 51:19, | 267:4, | **priority** |
| **president** | 274:12 | 265:17 | 23,25 | 5,9,23 | 54:19, |
| 39:11 | **prevent** | 269:3, | 52:4,8, | 268:21 | 22 |
| 252:10 | 227:13 | 25 | 14,17 | 269:13, | 138:5 |
| 262:24 | **previous** | 270:9, | 53:3 | 22 | 283:5, |
| **presidential** | 109:5 | 14 | 61:1 | 270:25 | 15,22 |
| 246:4 | 121:5 | **primarily** | 90:22 | 271:13, | 285:23 |
| **press** | 122:22 | 27:21, | 107:4 | 15 | **private** |
| 276:25 | 124:2 | 24 | 133:12, | **principle** | 103:18 |
| 277:8 | 134:16 | 28:7,11 | 16,17, | 65:3,9 | **privately** |
| **presume** | 142:5 | 31:14 | 19,24 | 156:7 | 298:23 |
| 16:5 | 144:17 | 48:8 | 135:10 | 284:15 | **privilege** |
| **pretty** | 152:9 | 60:12 | 165:24 | **principles** | 8:4 |
| 90:12 | **previously** | 62:15 | 166:2, | 27:23 | |
| | 20:1 | 64:21 | 9,20 | 40:14 | |
| | | 71:22 | 173:6 | 42:24 | |
| | | 74:16 | 185:11 | | |
| | | | 200:19 | | |
| | | | 209:19 | | |

Jason Poreda
July 17, 2025

62

**problem**
167:4
183:10
241:10,
25
265:13
268:5
271:2
285:22,
23

**problems**
239:5
285:24

**procedural**
106:25

**proceed**
6:19
39:12
43:20

**proceeded**
17:18

**proceeding**
40:21

**proceedings**
5:1
13:8
17:7
21:8,24
35:19
304:14

**process**
10:22
11:14,
16,22,
24,25
12:2,6,

11 13:9
17:5,18
19:19
26:17
27:2,11
30:24
31:20
32:23
34:22
36:14,
23
40:13,
14
45:15
48:14
49:4
72:2
74:9,23
78:23,
24
79:2,5,
10,13
80:14
83:16,
20
84:25
85:10,
13,18,
25
86:16
88:9
89:1,4,
9 95:7,
12,23
96:14
101:17,
18
105:19,
20
106:2
110:2
116:25

121:22
123:24
136:23,
25
137:1,
19
138:15
139:5
141:23
144:4
146:18,
24
151:20
155:19
161:8
162:11
164:4
175:11
182:5,
14
185:17,
25
186:8,
9,19
187:4,6
188:10
190:20
199:13
203:12
212:21
224:19
225:13
237:19,
24
243:11,
15
247:24
248:11
285:19
290:15

**processes**
86:24

**processing**
42:11

**produce**
77:3
119:20
120:9
143:25
275:15
276:23

**produced**
11:18
12:11
97:10
109:22
110:12
143:21,
22
275:11
276:7,
13
281:21
282:18

**product**
33:2
102:10
275:10
279:14

**productions**
11:14

**professional**
15:3

**professor**
280:2

**program**
17:13
41:3
90:5
91:11

**programs**
42:9

**progression**
113:25

**prohibition**
46:3

**projected**
217:11

**projects**
28:8

**proper**
88:4,5
168:19

**properly**
189:1,7

**proposal**
107:8
214:19

**proposals**
102:13

**proposed**
237:24
264:6

**protected**
35:5
45:8,16
55:9
97:21
120:2

121:8,
9,15,16
122:9,
21
124:2,
6,10
127:23
128:7
130:6
131:5
136:17
138:24
139:8,
15
140:2,
19
141:13,
19,22
142:16,
18,22,
23
143:11
144:1,
19
145:12
146:5
151:11,
15
162:2
163:21,
24
185:14
186:15
188:9,
12,15,
19
204:6,
19
205:8,
10,11
206:15
209:4,

5,14
210:5,
25
211:2,3
214:9,
21
215:2,
6,8,16,
20
218:4
219:15
223:10
226:11
235:25
236:1,2
237:25
243:6,
24
258:4
259:17
260:5,
8,15
261:2,
9,11,
13,17
262:1
272:17
274:5
275:20
279:19
284:16
287:9
292:22

**protecti
ng**
97:23
188:9,
12
205:13

**protecti
on**

35:21
140:7,
19
272:13

**protects**
120:17

**provide**
296:13

**provided**
12:24
34:13
42:2,4
52:11
273:7,
11,12,
21
275:3

**providin
g**
272:16,
25
273:4

**provisio
n**
116:21
117:1,2
140:19

**provisio
ns**
35:21
43:4,18
45:5,16
59:6
140:8

**PT**
264:21

**public**
23:16,
23  24:5
28:13

60:21
80:24
95:6,13
98:1,2,
3,6,14,
25
99:11
103:19
104:2
105:24
143:25
159:6
189:18
197:6,
7,11,25
225:4
299:2,
10,12

**public's**
98:19

**publicly**
12:7,9
143:21,
22
197:9
225:1

**publishe
d**
143:19
279:22
280:11

**pull**
150:1

**pulling**
63:2

**purple**
150:19

**purporte
dly**
264:11

**purpose**
34:14
43:25
63:15
101:17
277:20,
25

**purposes**
174:21
235:14
237:1
295:20

**push**
74:12
77:13,
19
225:21,
25
281:25
293:8

**pushed**
229:14
281:19

**pushing**
192:19
225:16,
20

**put**
57:12
75:2
87:18,
22
88:11
91:7
99:23
104:21,
22
111:16
139:17
140:15
159:7

161:19
167:19
173:25
175:23
180:21
188:3
191:5
197:22
209:9
232:1

**putting**
71:12
154:11
206:9
273:20
302:1

**puzzle**
167:19
227:21

_____

Q

**Q&a**
276:12,
14,16,
20,21,
24
277:3,
4,15,
19,21
278:7,
10,25
279:6,8
281:18

**qualify**
201:9

**quantifi
able**
117:23

**quantify**

18:18
53:2

**quantity**
74:3

**question**
6:24,25
7:13,
15,20,
22  8:2
18:14
27:10
32:21
44:4
51:15
54:2
55:17
61:15,
19
68:10
72:22
79:16
80:17
83:13
90:1
98:1
100:20
103:14
108:14
109:15
113:1
122:13
123:25
128:20
131:14
136:4,5
137:5
138:4
143:18
146:25
148:14
149:22,

Jason Poreda
July 17, 2025

64

24,25
152:6,
9,21,23
153:10
155:2,
3,10
161:7,
25
169:14
170:7
171:20
173:14
176:18,
22,24
177:1
179:18
180:7
181:5,6
182:9,
11
183:17
184:2
185:9
187:20
188:6
204:10
205:17
206:24
207:16
208:10,
22,25
210:15
211:4,7
214:18
215:10,
14,17,
18,19
216:6
217:1
218:21
232:14
234:8

235:7,
11
238:16,
20,24
239:2,9
241:21,
22
257:25
265:15
270:8
274:21
279:16
281:17
282:1,
2,16
285:10
297:5,7
298:24,
25

**questionable**
228:15

**questions**
7:11,14
9:14
35:13
40:16
65:22
95:3
135:16
139:23
145:18
150:25
151:3
152:10,
11
183:11
186:22
201:25
204:4

237:7
238:12
254:17
264:5
273:19
276:3,
24
277:2,
6,9,10
278:19
282:20,
22
297:16,
24
302:21
304:9

**quick**
21:21
108:16
153:2
176:12
181:22
202:6

**quickly**
262:3,4

**quotations**
283:3

**quote**
46:20
47:16
49:24
50:12
63:9,16
116:22,
25
117:3,
4,16,
19,20,
25
118:2,

18
125:24
126:12
133:4,
25
136:4
137:6,
15
138:4,
11
139:1
146:3,
14
149:23
150:7
151:10,
16
152:11,
17
157:11,
13,14,
20,21
158:1
160:20,
22
161:4
176:18,
21
179:19,
23,24,
25
185:10,
15
188:7,9
202:15,
19,20,
23
203:15,
18
204:5,
8,9,24
205:5,

7,15
206:24
207:10,
12,14
210:15,
17,19
211:3
214:21
215:4
218:22,
24,25
219:2,5
222:17,
21
238:15
241:11
279:16,
20
281:18,
19,22

**quote/ unquote**
179:10
208:11

———————

**R**

**race**
14:3
91:25
92:4,11
163:6
166:24
188:7,
10,14,
18
189:10,
22
190:11
218:23
219:1,

4,7,9
257:16
261:24
274:12
291:13

**races**
252:13
258:12

**racial**
45:5
91:7
116:19,
24
120:17
121:17
246:5
267:21
284:14
296:17,
20

**racially**
45:16
118:3,
12
120:5

**railway**
53:4

**railways**
50:3

**raise**
266:17

**rambled**
229:20

**ran**
28:15
32:24
34:7
94:6,7
165:8,
10

Jason Poreda
July 17, 2025

65

172:17

**range**
266:15

**ranking**
29:15
33:4,6,
7

**rare**
259:4

**rarely**
34:18
188:15

**rate**
253:17

**rates**
246:5

**ratio**
153:25

**reach**
191:21
206:20

**read**
20:25
21:5,17
22:8,13
47:4
50:13
53:21
63:17
72:25
73:4
115:4
118:19
126:14
134:1
136:20
137:16
138:12
139:2
146:15

150:8,
25
151:17
153:2,3
185:21
215:18
237:16,
21
238:12
241:12,
13,16
280:22,
25
283:19,
20
304:11,
12

**reading**
17:4,8
149:8

**reads**
106:1

**Ready**
73:9

**reaffirm**
72:3

**real**
40:12
86:25
108:16
153:2
162:20
176:12
181:22
202:5
255:20

**reality**
136:5

**realize**
8:15

**realized**
84:25
85:19
86:10
127:10
221:6
232:2

**realtime**
90:8

**reason**
8:20
35:23
82:15
104:19
151:15
153:22
156:17
167:9
168:23
169:1
177:11
181:11,
16
185:13
206:19
209:20,
22,23
215:22
228:11
231:3
236:13
256:7
259:3
261:14
267:1
268:7,
16
273:12

**reasons**
77:4
127:10

161:12
177:19
185:1
192:15
195:18
197:1,3
206:18
209:3,
25
210:8
225:14
230:4
231:8,
10
232:15,
16
233:14,
16
236:6
244:16
268:16
289:5
291:5
292:25

**reassura
nce**
34:25

**recall**
10:17,
19
12:16
13:3
14:10
72:20
78:19
169:21
272:3
283:2
284:24
287:15,
19

289:17
290:3,
22
295:8

**recap**
131:14
269:8

**receive**
60:20
119:19

**received**
41:7,9
61:10
95:7,8,
12,13,
16
98:3,4
103:22
104:2
120:9

**receivin
g**
80:24

**recent**
250:8,
11
252:8
265:9

**recently**
252:2

**recess**
69:4
139:19
176:14
202:10
234:24
276:1

**recogniz
able**
130:20

145:8
193:20
289:10

**recogniz
e**
50:8,11
201:10

**recogniz
ed**
50:2,3
54:5
231:23

**recogniz
ing**
161:5

**recollec
tion**
110:16
160:14
168:13
169:3

**record**
5:17
48:23,
24
103:8
108:7,8
114:1
116:13,
16
174:15
211:20
229:8

**recreate**
123:7
127:10
144:21

**recreate
d**
123:22

Jason Poreda
July 17, 2025

66

recreating
    286:3
RECROSS-
EXAMINATION
    302:22
rectangle
    154:7,
    8,22
    170:9
    173:20
    177:14,
    15,24
    294:6
rectangles
    132:20
    154:2,
    25
    177:4
    178:23
    184:14
rectangular
    129:16,
    22
    154:13
    293:23
red
    125:22
    188:4,5
    202:3
    266:17
    278:23
REDIRECT
    297:21

redistrict
    41:22
    136:9
redistricting
    6:9
    8:24
    9:4
    11:16,
    22,24,
    25 12:6
    16:20,
    24
    17:3,5,
    7 18:25
    19:15,
    18,25
    22:21
    23:2,3,
    6,13
    24:6,7,
    17,19,
    20
    26:14
    27:2,
    11,23
    29:9
    30:23
    32:23
    36:10,
    13,23
    37:8,25
    40:13
    41:5,18
    42:4,5,
    21 43:8
    44:13
    45:11
    46:15
    47:17

52:7
53:11
61:9
62:5
72:5
75:1
83:20
86:25
90:6
98:6
101:18
102:22
117:10
121:12
125:14
135:22
137:23
145:22
149:21
187:3,
5,19
192:24
199:13
202:1
278:8
298:12
301:8
redraw
    124:23
    259:24
    261:1,
    15
redrawn
    126:7
reduce
    104:9,
    25
    105:1
    194:4
refer
    11:23

50:12
53:21
61:7
64:7
116:25
117:4
121:15
125:15
147:5
155:3
235:8
285:1
reference
    26:15,
    19,25
    44:25
    62:23
    92:24
    112:16
    120:22
    132:12
    139:10
    150:10
    152:20
    155:14
    160:17
    210:23
    212:19
    245:20
referenced
    112:20
    144:3
    168:11
    181:18
references
    134:9

referencing
    103:9,
    10
    152:8
    181:23
    182:5,
    14
    211:15,
    16
    212:24
referred
    48:17,
    18 50:6
    66:4
    87:17
    154:20
    172:9
    198:4
    217:24
    221:1
    296:22
    300:8
referring
    10:11,
    12,24
    11:24
    24:16
    45:24
    46:1
    48:21
    68:25
    71:15
    93:11
    121:16
    126:20
    139:7
    148:9
    153:12
    157:13

162:10
208:1,7
216:6
223:3,8
225:2
234:16
245:20
249:11
283:14
286:13
289:22
296:23
301:4
refers
    45:10
    279:21
refinement
    105:16
    107:4
refinements
    104:24
reflect
    146:18
    151:20
    185:16
reflected
    298:16
    303:20
reflection
    205:23
    211:6
reflects
    136:25
    162:7
refresh
    6:18

238:1,
14

**region**
59:22
85:8
88:3
97:14
98:11
99:22
104:11
105:13
137:11
148:22
156:24
191:1
192:6
196:5
217:24
229:16
243:12
268:18
300:16

**region's**
192:22

**regional**
216:19

**regions**
105:9
124:15
142:17
144:8

**register**
252:19

**registered**
245:4,7
250:14,
21
255:2,
22

256:2
296:19

**registrants**
255:10,
12
257:1
266:11,
16

**registration**
36:12
133:10,
21,23
135:9
244:10,
11,14
245:25
246:1,
2,24
248:4
249:16,
18,20
250:17,
22,24
252:17,
21,25
253:2,
10
254:13
256:5
257:4,
5,9
263:11

**registrations**
247:1
250:23

**regression**
275:13

**regular**
46:23
47:1
96:11
114:14
129:22
131:12
154:22
158:15
278:4

**regularly**
154:6

**regulars**
96:25

**reinforced**
273:9

**reiterate**
143:6
161:9

**reiterating**
262:16

**reject**
234:9

**rejoined**
16:10

**relate**
35:21
118:3

**related**
36:21
73:19
215:19
270:8
292:9
300:4

**relatedly**
8:15
213:14,
18

**relating**
81:6
116:19
275:21

**relationship**
101:6

**relationships**
32:19

**released**
12:7,9
41:12,
25

**relevance**
191:15
203:4

**relevant**
17:7
43:7,8
59:5
76:2
147:20
148:3,
5,24
169:11
191:12
206:13
243:20
248:15,
18,23
249:21,
22
255:1,

16,24
260:22
261:22
264:3
270:19,
21
271:9
273:1
282:15
300:13

**rely**
61:20
79:13
80:10,
14

**relying**
148:9

**remaining**
225:21

**remedial**
9:9
21:11
237:13,
23
238:5

**remember**
6:15
8:8
9:23,24
12:25
14:11
19:7,10
20:20,
23 21:3
24:9
26:5
33:9
40:17
60:3
61:25

62:2,5,
8
64:12,
17 65:2
66:22
92:21
93:4,5,
16
95:14
96:5
99:16
104:12
110:1
113:17
120:11
151:13
157:22
160:5
164:14,
16
167:11,
13
168:9
169:4,
11,24
170:1,
3,25
171:4
172:13,
19
173:3
174:9
177:3,
8,10,
21,22
178:4,
17,18,
22
179:7,
11,13
180:15
181:21

Jason Poreda
July 17, 2025

68

191:9
194:10
196:9,
14,23,
24
197:7,
9,14,
16,23
221:20,
23
223:10
225:11
226:22
227:6
230:24,
25
231:2,
13,18
232:9,
10,11,
13
233:8,
18
237:23
241:17,
19
250:3
260:13
264:4
265:21
268:16
269:10,
17
272:24
275:8
276:13
279:3,6
280:7,
9,10
281:8,
14
286:1

290:24
291:4
295:16
297:10
298:1,
15
299:11,
14,19,
22
303:4,
7,10
304:2,7
**remembering**
107:12
279:23
**remind**
116:20
128:25
**reminder**
237:9
**reminders**
6:19
**remiss**
106:7
**removed**
194:15,
21
229:11
250:5
**removing**
194:14,
20
**renamed**
37:23
**Reock**
48:9
151:4

153:13,
23
154:8
**Rep**
96:13
97:12,
13
151:2,
25
152:4,
6,10
157:9
158:3,5
159:11
160:19
161:6
176:17
179:17
181:2
185:9
187:22
204:4,
23
205:17
206:23
207:15
208:21
210:14
211:22
214:18
**repeat**
96:9
105:25
181:22
211:7
**rephrase**
7:16
215:12
284:8
285:10

**report**
26:3
59:8
272:22
279:17,
21,22
280:1
281:19,
20,24
282:5,
10,12,
13,15
297:13
**report/**
**allegation**
279:20
**reported**
17:14
38:21
**reporter**
6:20
**reports**
13:18
34:18,
21
52:25
91:3
119:13,
16,20,
22
272:18,
20,25
273:7,
11
**represent**
5:14
196:6

**representative**
20:18
96:20
106:1
139:9
150:22
157:24
189:16
196:20
261:7
**representatives**
5:20,22
16:4,20
117:4
136:18
**represented**
96:17
**representing**
6:1
**represents**
189:17
**Republican**
15:9
16:10
97:3
165:19
166:7,
11,16
167:25
239:16,
17,20
240:6,
14,23,
25

242:21
244:20
247:19
249:18
250:12,
22,24
251:3,
5,6,13,
25
253:7,
22
254:22,
25
255:6,
10,17,
25
256:25
257:7
258:22
262:21
263:12,
14
264:15
268:17
269:1
270:25
**Republicans**
246:10,
23
253:3,
6,19,24
255:2
257:8
258:23
263:7
**request**
95:9
**require**
118:16
141:1

required
  133:13
  136:9
  138:25
requirement
  45:21, 25
  46:11, 20
  117:6
  137:6
  140:11
  210:21
  211:5, 10
requirements
  43:23
  44:2,9
  73:19
  121:19
  123:2
  136:16
  237:8,9
requires
  126:5
  133:20
reread
  153:1
research
  17:4
  28:8
  62:8,10
residents
  288:11
respect
  75:3
  99:8

107:24
119:8
142:20
145:2,3
146:11
151:6
152:25
168:3
186:14, 19
199:7
202:21
203:10
206:6
289:16
300:23
respecting
  131:9
respective
  32:25
  138:24
responds
  151:10
  157:21
response
  7:4
  137:5
  152:20, 24
  158:5
  161:5,7
  180:24
  181:4
  183:2,7
  211:25
  290:16
  297:23

responses
  12:21
  13:1
  14:22
responsible
  27:21, 24
  28:11
rest
  21:14
  27:22
  58:1
  70:24
  84:6,13
  88:2,3
  151:6
  294:17
result
  116:23
  168:10, 17
  170:4
  181:20
  240:12
  241:6
  245:17
  294:11, 14
resulted
  22:5,11
  169:6
  196:10
results
  133:9
  134:17, 22,24, 25
  224:11

245:24
247:11
249:20, 23,25
250:2
251:19
259:12
262:11, 13,20
266:14
274:4, 8,17, 18,24
275:19
resumés
  30:22
retread
  193:10
retrogression
  46:1
  117:5
return
  24:18
  222:9
returned
  106:19
returning
  101:6
reveal
  281:13
reverse
  162:16, 22
  220:4
review
  12:12, 17,20

13:4
14:22
119:21
142:15
279:12
reviewed
  9:19
  13:15, 17 22:4
  30:22
  72:19
  98:8
  139:24
  237:18
  279:11, 13
revising
  143:24
rework
  100:11
reworking
  103:19
Rice
  119:5
rid
  68:4
Rights
  43:7
  45:6
  59:1,2
  140:3
  191:15
  292:21
ring
  41:14
River
  88:22
  111:2, 7,22

112:6, 16
226:4
230:14
292:10, 18
293:4
298:5
300:9, 24
301:10, 22
302:3, 25
303:1, 2,15
304:1
rivers
  50:3
road
  50:9
  51:2
  53:4
  54:11
  59:21, 23 60:9
  61:1,4, 12
  62:11
  129:15
  178:11
  182:20
  200:10, 17,19, 20,21
  201:6, 8,9,11
  214:5
  288:14, 15
  295:16

roads
  50:4,
  18,19,
  21
  51:1,
  10,13,
  15,19,
  23
  52:1,2,
  4,7,15,
  18
  59:17,
  20
  60:4,5,
  14
  61:17,
  21
  76:5,9
  129:18,
  19
  162:18
  193:19
  200:9,
  14,15
  201:2,
  4,14,
  15,17,
  19
  288:9,
  11,18
  289:1,
  10
  294:4,8
  295:19
roadway
  60:10
roadways
  130:17
  199:10
  200:3,7
  214:7

role
  14:19
  27:1,10
  30:23
  31:13,
  14
  101:22
rolls
  253:12
room
  19:20
  95:11
round
  110:3,5
  112:23
row
  31:17
RPOF
  15:13
  16:16
rubber
  154:11
ruled
  59:6
ruling
  20:22
run
  19:18
  91:4
  172:21,
  22
  200:14
  201:20,
  21
  262:4
running
  95:14
  170:13
  183:22

240:5
277:19,
21
278:10,
17
rural
  59:18
  76:5
  82:21
  90:10,
  13
  226:1

─────────

S

S-I-R-O-
I-S
  202:13
sake
  83:9
Sam
  28:6
  96:4
  125:17
sandbox
  87:20,
  22
sandboxe
s
  87:17
  88:10
  287:1,
  10
satellit
e
  60:13
  62:15,
  18
  89:17,
  20

201:5
288:8
satisfie
d
  117:22
  153:8
  155:7
  156:4
  160:25
  161:22
  162:6
  163:1
  164:24
  165:2
  170:12,
  14
  178:25
satisfy
  119:16
  155:5
  156:10,
  20,25
  159:8
  162:13,
  20
  163:16
  164:2,3
  166:13
  167:20
  182:24
satisfyi
ng
  163:7
scatter
  275:15
scenario
  234:8
scenario
s
  278:10

scenery
  25:20
science
  153:17
  212:12
score
  51:18,
  21
  52:11,
  16,21,
  23
  53:17
  59:8,
  11,24
  61:2
  153:12,
  20,21,
  22,23
  154:3,
  4,5,15
  158:21,
  23
  159:3
  177:5
  200:12,
  18
  213:16
scores
  48:9,13
  49:3,8,
  9,11
  53:7
  151:3,
  5,7,8
  153:14,
  19
  154:3,
  18
  157:14,
  18
  158:19,

20
172:9,
14
173:10,
23
177:6
191:2,
3,4,25
210:16,
17,18
211:24
212:9,
13,20
213:1,
7,11,
16,19
214:12
233:9
scrap
  85:8
scrapped
  228:12,
  18
  230:2,4
  231:11
  232:15
seated
  39:12
secondar
y
  51:19,
  23
  52:1,5,
  9,15,18
  53:3
  61:1
  200:20
  210:20
  211:5,
  10
  212:1,6

213:7, 11
283:6, 16

**seconds**
72:21

**secrets**
32:7

**section**
45:6,9, 10,19, 22
117:1, 5,18
118:15
123:19
140:2, 10
191:12, 15
218:4
226:11
256:24
272:8
278:3, 11
283:17, 19
288:16
292:21

**sections**
278:18

**seek**
78:24
79:3,6
80:14

**seemingly**
213:16

**segment**
301:9

**select**
19:15
20:4

**selected**
175:25
182:21

**selecting**
36:17

**senate**
13:8,11
17:24
22:5,10
23:6
39:11
53:1
63:13
72:11
73:12, 20  75:2
77:2,5, 22
78:2,9, 17
99:15
101:22, 25
102:5
106:19
107:19
110:12, 19
111:7
112:10, 17
115:5
220:13, 18
228:3

258:16
299:24
300:6, 9,22
301:8, 18
302:24

**Senate's**
73:1
107:7, 23
110:1, 17

**send**
33:16, 18,25

**sense**
7:1,6, 23  8:5
50:9
60:8
62:21
64:9, 10,21, 24  71:1
77:19
88:12
92:17
114:13
116:10
145:2
166:25
168:2
193:5
241:18
262:1
268:3
273:18
293:7

**sensitivity**
268:5

**sentence**
148:19
185:21, 22

**separate**
29:1
81:15
160:23
161:16
164:23
227:11

**separated**
229:24

**separately**
209:5
274:20

**September**
38:24
39:14
41:8

**series**
152:10, 19
157:13
179:18

**service**
43:22
62:24
76:8
83:9
221:10

**services**
119:2

**session**
25:22
38:13
39:10
40:19
114:14
149:6
176:16
278:4, 8,13
279:25
280:8, 12,15, 18

**sessions**
94:25

**set**
42:4,8
74:6
75:23
78:12
83:5
84:13
86:25
93:25

**sets**
61:9

**setting**
93:22
196:1
209:25

**settled**
178:19
180:10

**shape**
46:23
47:1,22
67:8
75:17
129:16

132:4,9
144:23
159:14
168:11
184:23
203:16, 22
205:1, 3,7,25
206:11
207:3
209:15
217:17
235:11, 23
292:2
293:18, 23
295:3

**shaped**
131:4
144:11
154:6, 13
155:1
159:18
160:2
181:3, 12
183:14, 15
184:24
235:12, 13

**shapes**
129:22
131:1, 12
132:21
142:4
154:22

Jason Poreda
July 17, 2025

157:15,
19
158:15
159:12
160:10
183:12
184:15
193:12
195:19,
25
205:15
235:3
236:5
**share**
254:24
256:13
264:16
266:11,
16
268:6,
12
269:13,
22,25
271:1,
14
281:2,
3,6
282:11
303:6
**shared**
34:20
120:13,
14,16
232:9
236:15,
20
281:3
298:12,
19,22,
23
299:2,

3,7,19,
20
300:4
**shares**
129:16
**sharing**
299:12
**sharp**
159:16
289:4
**she'd**
94:8
**sheet**
137:4
210:14
278:3
**sheets**
210:13
**shift**
124:20
**shifted**
136:8
226:10
**shifts**
123:14
124:17
136:13
137:12
**Shores**
130:11
**short**
63:3
205:2
234:22
**shortly**
280:11
**Shout**
106:5

**show**
28:15
33:1
40:11
100:9
104:14
180:4
197:2
**showed**
40:22,
23
242:12
261:7
**showing**
40:15
175:7
247:25
**shows**
171:10
303:5
**shrink**
173:18
**shrunk**
173:25
**side**
28:12
72:11
111:4
132:17,
18
159:16
163:1
165:24
166:7,
17,19
167:12,
21
171:10,
11
226:18

230:15
233:3
236:16,
21
240:6,
25
242:5,
13
247:20
251:10,
13
255:17,
18
257:10
267:1
268:17,
22
269:3,5
294:23
**sides**
13:1
268:21
294:22
**signific
ant**
239:5
241:9
245:8
263:13
**signific
antly**
152:15
192:5
226:23
**silently**
153:2,4
**Silver**
20:1,3
**similar**
45:9,22

70:3
110:4,7
111:13,
20
113:4,
9,14,22
114:8
115:14,
23
116:2
121:21
127:20
132:9
146:9,
22
147:13,
22
148:13,
23
154:9
173:4
174:5,
8,9,10
177:6
180:11
196:21
202:16,
24
203:15,
21
224:5
226:7
233:2,
14
245:17
252:24
253:18
256:1
257:9
301:15
302:10,
13,14

**similari
ties**
114:7,
11
148:19
**similari
ty**
147:2,
19
203:5
**similarl
y**
98:3
170:11
**simple**
48:14
**simply**
50:10
51:22
70:2
83:3
87:1
147:11,
21,24
175:22
**simultan
eously**
285:13,
16
**single**
57:8
92:4
100:2
113:19
118:9
152:6
251:18
**sir**
116:15

Sirois
28:21
29:11
202:13
203:9,
14
204:8
205:6
207:11

sites
95:16

sitting
290:3
297:11

situation
68:21
126:12
233:5
285:21

situations
56:6
70:5
188:18

Sixty-eight
185:6

Sixty-two
190:4

size
207:5,7

Skidmore
185:9

skinnier
177:15

skinny
152:14

154:25
160:21
161:10
177:15

skip
106:25
118:1
150:20
249:23
262:11

Skyway
63:12
64:8

slides
174:17,
20

slight
75:2
77:2
78:14
81:1
98:16
110:7,
23,24
112:1
116:8
128:17
129:11,
20
146:10
156:3
159:24
168:14
202:17
253:21
295:17

slightly
70:6,14
129:3,8
132:24
164:19

168:18
174:8
199:18
243:11
245:11
248:5

slowly
262:22

small
74:8
112:5
169:12
188:22
290:11
302:2,4
303:7,
11,14
304:8

smaller
74:17
76:7,20
159:21
169:10
173:19
180:17
197:21
207:5,6
220:3

smallest
90:11,
19
153:24

smooth
189:21

snap
300:22

social
95:16

software
36:10

solely
165:5

solid
255:9
292:19

solidly
247:12

solve
270:11

sort
31:15
106:22
107:18
197:24
227:18
236:16
285:7

sorts
87:11
163:9
173:22
233:16

sought
100:7

sound
95:25

sounds
6:15,17
69:3
85:13

south
13:24
57:5,6
60:15
90:15
107:1,
8,24
108:14,
19,23
109:16,

24
111:19,
25
112:6,
7,15,19
113:2
114:19,
20,25
115:14,
15
119:9
126:22
128:15
129:25
130:19
138:20
142:7
152:12
155:19
159:22,
25
162:15
179:18
182:19
186:2
197:13
210:25
227:2
229:24
234:1
235:24
236:15,
18
237:25
242:4
243:24
244:24
245:2
251:10
258:4
259:7
260:10,

12
279:17
285:17
291:18,
19
292:3,
20
293:8
296:3
298:7
301:1

southeast
233:23
297:25
298:10
301:9

southern
111:22,
23
160:3,6
179:22
226:20
235:17
236:19
293:20,
22
295:12,
13
296:9
301:21

southwestern
63:10

speak
6:22
60:12
92:10
93:18
96:25
102:5

145:14
167:20
233:7
295:23

**speaker**
19:2
20:7
23:8,17
37:16,
21
38:8,9,
10,11,
25
39:10

**speaker'
s**
30:4
37:22
38:23,
24

**speaking**
8:3
46:19
161:14,
24
166:3,4
213:15
241:18
263:25
287:11

**special**
16:3,6
86:21
278:4,
7,12
280:12,
15,18

**specific**
42:4,6
43:12
71:13

74:6
75:23
76:4,23
78:4,12
81:9
91:16
115:16
120:5
121:10,
14
139:23
141:10
145:18
147:16,
17
153:12,
17,19
162:3
164:17
167:12
188:22
196:9,
23
197:9
243:17
268:19
270:19
271:5,7
273:12
277:25
299:15,
21,24

**specific
ally**
12:16,
25 31:4
34:17
64:5
66:22
75:19,
22,23

76:23
78:22
89:10,
19
90:24
91:18
93:7
97:9
125:14
126:20
128:19
134:17
139:8,
10
141:4
151:25
152:12
159:10
160:17
162:15
163:13
164:14
166:25
167:11
178:11
189:17
216:6
230:25
240:13
241:20
248:21
269:6,
10
273:17
278:22
279:7,9
281:6,
10
286:16
289:20
290:16,
20,24

299:19,
20
302:10
303:4,5

**specific
s**
167:13
196:24

**speculate**
177:1
184:11,
17

**speculating**
180:22
214:14

**speculation**
184:16
234:17
260:9

**spell**
23:9

**spent**
106:2

**split**
55:3,
19,25
56:10,
13 58:7
63:23,
24
65:13
66:2,6,
12
68:6,17
88:17
118:7
178:14,

15
193:20,
22,24
195:3,
7,8,11
197:19
207:22
209:2,
20
210:11
263:12
295:7

**splits**
58:1
63:15,
25 65:9
104:10,
25
105:1
207:4,5
208:22

**splitting**
209:15

**spoke**
150:14
231:18

**spread**
92:18

**Sprowls**
24:22
38:9,
10,11

**square**
47:2
154:3,7
288:16
294:8

**squares**
176:20

177:4

**squeezed**
199:12

**squiggli
est**
261:19

**squished**
199:10

**St**
111:19
113:2
114:20
115:18,
22
128:3
228:7
292:19
293:5,8
298:5
300:9,
24
301:10
302:25

**stacked**
160:3
176:20
177:9
179:2,
10,12

**staff**
17:2,14
19:25
20:6
23:1
27:22
28:6,
10,18
29:1
30:3,6,
13,15,

Jason Poreda
July 17, 2025

75

19,25
31:19,
22,25
33:11,
13
37:21
38:3
41:2
42:15
53:13
60:6,8,
17
71:9,
11,16,
19
72:8,12
73:12
94:19
95:11,
24 97:5
98:8
99:1,3,
7
100:11,
21
101:8,
13,16
103:19
106:10
116:5
120:8
121:22
125:14
134:7
141:16
142:21
143:9,
10,15
145:19
146:13
172:4
175:11,

25
183:22
224:20,
23
225:3
229:22
231:10,
15
259:11
273:20,
21,25
274:2
275:10,
12,15,
18,20
276:23
277:7,
16,17,
24
279:5
280:25
281:2
282:14,
16
299:8

**staff's**
32:19
33:5
35:4
72:23
77:24
78:4
186:14

**stair**
204:25
207:24,
25
208:6

**stairway**
207:3

**stand**
96:24

**standard**
45:19
49:22,
24
50:15
73:18
80:23
120:21
122:1
140:12
179:25
182:4,
13
183:5
207:14,
18,23
226:22
272:9,
14
284:10

**standard
s**
17:8
46:10
49:14
56:4
58:13
59:3
69:23
72:9
73:13
81:1
89:6
98:22
101:4
123:9
125:24
126:10,
11

128:22
145:15
156:12
161:16
192:17
258:1
283:11,
13,15,
16,18
284:2,
19
285:13,
15,20

**start**
6:24
15:4
25:10
36:11
40:15
42:14
80:7
116:5
136:6,
19
161:1
183:19
194:23
202:2
208:13,
15
215:24
239:2,3
244:2,4
249:4,9
263:7
300:9,
12,17

**started**
19:13
24:13
39:25

42:15
79:9,18
83:17
86:24
113:20
141:22
142:3,
21
143:3,4
145:14
165:4
221:6
285:25
300:14
302:10

**starting**
16:25
40:4
65:19
79:10,
21 82:6
118:2
136:6
137:9
138:19
144:3
151:2
152:24
157:10
206:24
218:21
238:11
245:1
262:10
298:3

**starts**
106:11
254:8

**state**
5:16
11:5

13:23
16:3
17:23
18:5,9,
12,19,
22
22:5,10
25:2
28:2
36:15
41:20
44:18
47:3
50:4,9,
18,21
51:15
52:2
56:25
57:25
58:2,25
59:17
60:18
61:11
64:11
70:10
71:25
74:7,17
76:7,20
77:9
79:23
81:25
83:25
84:8
88:5
92:21
93:6
100:19
101:23
103:6
105:22
119:11
136:8,

12,13,
15
137:7
138:10
140:12
141:18
142:16,
17
144:8
193:6,
25
194:14
200:14
201:13,
15
219:15,
20,23
220:2,
6,13,
17,21,
24
221:3,
4,18
222:1
223:5,9
228:3,9
229:24
232:17,
21,22,
23
233:6,
23,25
243:12,
25
257:17
258:15
259:23
267:15
274:17
286:16,
19
287:12

290:2,7
291:8
303:23
**stated**
182:6
272:4
**statement**
68:23
136:22
137:18
138:14
139:4
146:17
147:11
150:12
151:19
153:1,5
155:16
161:7
162:5
203:8,
12
211:12
285:7
**statements**
145:18
147:9
186:23
284:23
**states**
279:17
**statewide**
134:17,
21,23,
25
**statistical**

80:15
**statistics**
274:15
**stay**
183:2
**stayed**
23:23
226:11
250:16
**staying**
185:3
251:18
**stays**
182:17
**STENOGRAPHER**
5:2
116:15
304:11
**step**
204:25
207:24,
25
208:6
244:8
245:19,
23
246:12,
14
247:6,
8,11,12
248:14
249:5,
10,17
251:6
286:17
287:6
**steps**
245:18

248:1
**stick**
74:18
154:21
159:15
**sticking**
64:23
**stipulate**
116:2
297:18
**stipulated**
114:18
**stop**
8:17
18:24
24:20
268:1
**stopped**
261:6
**story**
127:17
246:7
**straight**
171:21
177:25
202:6
270:5
**streets**
195:16
**strength**
45:8
**stretched**
222:25
**stretches**
222:20

**stretching**
205:1
**strict**
285:4
**strong**
118:6
**stronger**
175:19,
22
**strongest**
172:5
**structure**
37:20,
23
**stuff**
40:23
41:1
62:7
94:13
105:14
164:3
167:22
171:3
197:5
235:8
258:12
259:15
279:11
280:14
290:13
294:10
**stumble**
85:19
**subcommittee**
28:21
29:4,

12,13
32:25
42:20
94:3,5,
10
102:11,
17,20
103:3,6
106:21
135:23
137:23
171:10
202:1
**subcommittees**
28:25
29:1
71:10
**subjective**
47:23
**submissions**
197:7
**submit**
98:5,7
**submitted**
98:8
197:9
**subordinate**
153:6
155:18
284:10
**subordinating**
284:5

subsection
283:9,
11,12
subsections
283:18
subsequently
289:19
substantially
113:9,
16,23
114:8
115:7,
23
116:2
252:12,
14
success
264:25
succinct
147:15
suddenly
123:14
149:14
sufficient
127:3
133:22,
23
271:1
suggested
268:15
suggesting
144:16

232:1
suggests
296:19
sum
66:10
77:5
145:12
165:4
168:5
175:10
189:10
206:17
summarize
91:22
sums
236:9
Sumter
86:9
287:3
Sunrise
293:24
294:1
Sunshine
63:12
superior
156:7
185:24
186:7
211:13
283:5,
15
supply
138:7
support
14:6
206:9
253:23
254:11

255:8
265:6
supported
273:14
supports
256:3
260:2
suppose
103:15
141:25
186:21
223:24
supposed
264:11
Supreme
21:3,19
22:4,16
43:10,
19
48:11
63:4
133:13
146:11
202:18,
21
238:21
surprise
25:14
surrounding
58:5
70:12
96:16
190:25
191:25
192:6
206:12
swear
5:2

Sweetwater
130:23
197:20,
21
290:13
switch
89:18
switched
19:1
105:23
253:6
sworn
5:7
synonymously
121:12

———————

T

T-A
17:25
T-A-K-A-
C-S
18:1
tab
46:18
117:11
125:22
133:3
136:2
138:3,
17
145:25
149:11
150:19
185:4
188:4,5
202:3
203:14

204:3
206:22
222:10,
15
tag
200:19
tail
64:7,23
67:22
68:5,
11,16
130:8
Takacs
17:21,
25
19:24
takes
36:15
37:19
42:10
153:23
209:4
237:2
283:5
303:1
taking
7:19
65:8
102:25
161:12
179:21
194:1
225:19
talk
6:22
7:25
8:3
12:2
15:2
16:23

22:3
26:13,
17
33:16
36:1
42:22
78:20
88:8
89:9
116:18
126:21,
23
196:5
231:16
281:1
300:5
talked
32:18
33:11
34:18
59:9
81:7
95:3
99:6
157:25
168:12
170:2
208:11
232:14
254:1
258:1
281:10
286:3
287:17
299:5
talking
33:23
35:5
64:6
82:10
104:1

Jason Poreda
July 17, 2025

78

116:5,
9,20
120:25
121:25
122:6
141:4,6
157:12
159:10
166:25
170:18,
23,24
180:16
217:25
222:23
224:6
239:10
243:22
248:10
259:15
263:23
266:19
270:8,
18
281:8
285:2
300:3

**tall**
154:15,
25

**Tallahas
see**
211:18

**Tamiami**
179:21
208:5,
18
236:17
295:14,
18

**Tampa**
60:15

93:6
124:24,
25
128:3

**target**
147:23
148:24
191:21

**team**
131:8
275:25

**technica
lly**
36:8
64:6
89:12

**telling**
77:4

**ten**
10:2,3
30:12
37:9
69:2
123:5
245:5
260:15

**tend**
45:5
75:12,
13
244:15
265:17

**tendency**
158:15

**term**
67:19
134:10

**terminol
ogy**

121:21
122:5

**terms**
18:14
47:2
121:11
238:20

**test**
37:5
48:16,
19
154:19,
20
157:20
158:16
159:5
222:19
267:8

**testifie
d**
5:8
8:25
9:3,6,
9,12
20:14
21:11
237:13
287:11
289:19
297:23

**testify**
14:6

**testifyi
ng**
14:8

**testimon
y**
5:3
8:21
181:23

264:4
270:10
283:2
284:22
289:14,
25

**testing**
41:3

**tests**
153:16

**thankful
ly**
241:22

**theoreti
cally**
165:19
166:8

**thin**
31:18

**thing**
20:16
32:14
48:5
49:7
52:13
62:12
76:4
94:25
122:7
126:24
132:16
145:4
159:3
162:23
205:22
207:24
208:6
212:25
219:12,
14

221:7
235:22
237:22
256:17
298:18

**things**
31:9
33:18,
19,25
38:1
40:1
41:20
43:8
45:15
48:1
52:2
55:21
57:20
58:21
62:19
75:22
76:21
84:4
85:2,9
86:15
87:1
89:21
91:1,6
94:21
105:7
106:9
111:9
125:4
136:7
157:22
158:8,9
163:9
164:6
172:17
199:4,
19
200:23

209:12
212:11,
15
245:19
272:19,
20,21
273:5,
25
274:1,2
276:22
289:12
301:16

**thinking**
106:13
217:4
249:5
278:6

**thinks**
211:24

**thorough
fare**
236:18

**thought**
8:16
100:8,
15
188:2
239:10
260:20

**thoughts**
187:7

**thousand**
76:12

**thousand
s**
192:24

**threshol
d**
77:9,16
150:4,

| | | | | | |
|---|---|---|---|---|---|
| 15 | 122:9 | 22,23 | 183:4, | 228:12 | 23 |
| 191:13 | 124:6 | 156:1, | 15 | 234:9 | 17:11 |
| **throughw** | 125:23, | 2,4,7, | 184:3, | 237:8 | 18:21 |
| **ay** | 24,25 | 8,10, | 13,14, | 258:1 | 20:9 |
| 51:3 | 126:4, | 15,16, | 22,24 | 261:11 | 21:6,17 |
| 130:20 | 10,11, | 21,25 | 185:12, | 268:11 | 22:8,13 |
| **throughw** | 16 | 157:2 | 13,14, | 275:20 | 24:14 |
| **ays** | 127:7, | 160:21, | 23,24 | 283:4, | 30:2 |
| 288:9 | 10,18 | 23,25 | 186:1, | 5,13, | 31:12 |
| **throw** | 128:9, | 161:17, | 6,7,11, | 15,16, | 33:2 |
| 84:5 | 13,22 | 18,19, | 16 | 23 | 36:15 |
| **thrust** | 130:22 | 21 | 188:23 | 284:14, | 37:20 |
| 264:13, | 131:16 | 162:5, | 189:20 | 16,20, | 38:16 |
| 20 | 132:25 | 6,13, | 190:16 | 23 | 40:6,18 |
| **Tier** | 135:17 | 14,17, | 193:16 | 285:3, | 42:17 |
| 44:25 | 136:3 | 20,24 | 204:6, | 8,9,12, | 64:20 |
| 45:1,3, | 138:5, | 163:1, | 19 | 18,20, | 69:2 |
| 5,17,18 | 6,25 | 7,16 | 205:4, | 21,22, | 72:19, |
| 46:3, | 139:14 | 164:2, | 8,12 | 24 | 24 73:4 |
| 10,11, | 140:7, | 3,8 | 207:2, | 286:4,6 | 92:24 |
| 20 | 11,13, | 165:5 | 7,9,13 | 287:9, | 94:5,7 |
| 49:22, | 15,18, | 167:3 | 208:24 | 13,22, | 96:3 |
| 24 | 25 | 168:3, | 209:6, | 23 | 100:14 |
| 50:15 | 141:13, | 6,22,25 | 11,19 | 288:1, | 106:2, |
| 55:24 | 18,22 | 169:6, | 210:10, | 4,21 | 19 |
| 56:1 | 142:11, | 20,23 | 20,25 | 289:6, | 107:21 |
| 58:12 | 13,16 | 172:7, | 211:1, | 8,16 | 124:12 |
| 65:12 | 143:11 | 16 | 5,10, | 291:1,5 | 139:18 |
| 66:12 | 144:7, | 175:12 | 13,25 | 294:24 | 143:13 |
| 69:7 | 11,24 | 176:1,5 | 212:1,7 | 295:3 | 184:11, |
| 70:1 | 145:7, | 178:9, | 213:7, | **tiers** | 22 |
| 73:13, | 12,14 | 25 | 10,19 | 155:7 | 185:19 |
| 18 | 146:5, | 179:5, | 214:9 | **tight** | 187:15, |
| 101:3 | 14 | 12,25 | 216:3, | 195:17 | 16 |
| 105:13 | 151:13, | 180:12, | 15,22 | **Tilley** | 199:19 |
| 116:19, | 14 | 13 | 217:5, | 6:2 | 206:7 |
| 21 | 153:6, | 181:5, | 6,24 | **time** | 214:6 |
| 120:17 | 7,8 | 13,20, | 220:4, | 10:15 | 220:13 |
| 121:16, | 155:5, | 25 | 5,7 | 12:3 | 242:16 |
| 19 | 6,15, | 182:4, | 221:10 | 14:14 | 248:1,2 |
| | 17,18, | 13,15, | 224:6 | 16:21, | 280:4, |
| | 20,21, | 24 | 227:11 | | 10 |

281:23
282:4
297:13,
18

**timeline**
26:15
40:20
102:9
103:11
106:15

**times**
9:22
55:3,
18,25
56:10,
13 64:4
66:16,
17
84:16
94:15
96:13
106:16
196:25
197:17
209:2
221:2,
14
222:7
223:20,
21,24
283:3
296:22

**title**
16:14,
21 19:8
23:20
27:13,
14,15,
19

**titled**
278:3

**today**
8:21
9:16
96:18
290:3
297:11

**today's**
9:15

**toe**
167:24

**told**
41:12
42:18
75:24
277:7

**tomato/
tomahto**
233:4

**tool**
51:22
52:6
53:15
59:9
64:18

**toolbox**
51:22
52:22
53:15
59:10
64:19

**tools**
36:22
52:22

**top**
60:2
64:17
65:1
87:2
89:21
104:5

130:18
131:3
132:8,
13
174:7
175:2
176:20
177:3,
9,21
178:2
179:2
222:10
226:9
227:12
261:5
292:13

**tossup**
232:24
239:7

**total**
41:20
91:7,9,
23
92:1,12
180:15,
21
224:9
245:1
249:19
263:14
267:19
302:16

**totality**
117:24

**totally**
181:1

**towns**
193:21

**track**
204:13

**tracts**
90:21

**trading**
179:22

**traditio
nally**
125:3

**Trail**
179:21
208:5,
18
236:17
295:14,
18

**transcri
bed**
7:5

**transcri
bing**
6:21

**transcript**
46:14
49:23
115:4
117:9
125:21
133:2
135:21
137:22
138:18
145:21
149:2,5
157:4
176:17
179:15
185:3
202:2,
13
206:19

218:21
222:9
238:4,7

**transcri
pts**
13:4,7,
8,10
187:10
283:4
298:17,
20

**transiti
on**
24:11
201:23

**translat
e**
143:2
144:12

**transpor
tation**
61:16,
25

**traveled**
60:19

**treated**
85:17

**tremendo
us**
131:6

**trend**
248:3,6
250:15

**trends**
261:7

**trial**
8:25
9:6
14:6,8

20:12,
14,19,
23 21:8

**trouble**
114:3

**true**
29:6
32:14
58:9
60:7
100:24
150:16
188:10
219:12,
14
300:15

**Trump**
252:10,
14
262:24

**truth**
5:3,4

**truthful**
7:10

**truthful
ly**
193:15

**turn**
46:18
63:7,9
90:24
91:9,
12,17
92:9,
16,20,
25
93:23
136:2
137:3
138:17

| | | | | | |
|---|---|---|---|---|---|
| 145:25 | 169:10 | 41:9 | 235:21 | 176:22 | 272:11 |
| 149:11 | 178:21 | 45:5 | **un-** | 180:25 | 283:21 |
| 214:17 | 267:3 | ___ | **compact** | 190:7 | 284:1 |
| 238:11 | 269:12 | **U** | 153:11 | 215:10 | **understo** |
| 262:3 | 290:11 | ___ | 154:24 | 229:17 | **od** |
| **turned** | **Twenty-** | **UCLA** | 191:1 | 234:5 | 47:6 |
| 92:22 | **three** | 279:17, | 233:15 | 274:16 | 50:6,15 |
| 253:14 | 293:19 | 21 | **unable** | 285:1,6 | 77:22 |
| **turning** | **Twitter** | 280:2 | 97:8 | 298:24 | 155:11 |
| 106:8 | 60:23 | 281:24 | 261:18 | **understa** | 248:13 |
| 149:3 | **type** | 282:5 | **unclear** | **ndable** | 262:3 |
| 150:19, | 35:24 | **ugliest** | 71:8 | 7:14 | 266:6 |
| 20 | 71:3,20 | 261:19 | 89:22 | 47:2 | 289:25 |
| 185:3 | 105:19, | **uh-huh** | 182:10 | 233:20 | **unequal** |
| 206:22 | 20 | 7:4 | **underneat** | **understa** | 178:1 |
| 253:17, | 117:1,5 | 36:19 | **h** | **nding** | **uninhabi** |
| 19 | 128:4 | 39:18 | 252:13 | 13:20, | **ted** |
| 257:15 | 132:5 | 93:21 | **underpop** | 22 | 63:10 |
| **turnout** | 140:11 | 99:9 | **ulated** | 14:1,2 | **unique** |
| 133:10, | 154:7 | 112:22 | 225:24 | 47:8,12 | 267:22 |
| 21 | 178:6 | 148:11 | **understa** | 63:25 | **unit** |
| 246:3, | 203:22 | 155:13 | **nd** | 65:5 | 90:11, |
| 5,6 | 226:7 | 170:20 | 7:8,13, | 71:1,18 | 19 |
| 249:19 | 243:9 | 175:14 | 15  12:4 | 72:23 | **universe** |
| 252:20 | 251:21 | 203:1, | 44:4 | 73:11 | 78:5 |
| 253:8, | 262:5 | 20 | 46:1 | 77:7 | **Universi** |
| 9,22 | 265:11 | 230:3 | 63:19 | 89:3 | **ty** |
| 254:13 | 277:16 | 235:6 | 79:16, | 101:3 | 119:5 |
| 255:23, | **types** | 243:23 | 22 | 109:3 | **unjustif** |
| 25 | 36:21 | 251:20 | 116:11 | 114:23 | **iable** |
| 256:1,6 | 71:4,21 | **ultimate** | 121:8 | 116:8 | 68:7 |
| 257:6,7 | 88:10 | 117:23 | 122:13 | 119:6, | **unlike** |
| 263:22 | 94:21 | 256:23 | 136:10 | 10,16 | 75:12 |
| **turnouts** | 99:24 | **ultimate** | 137:9 | 134:3 | 227:14 |
| 133:23 | 161:1 | **ly** | 140:1 | 152:19 | **unpopula** |
| **tweak** | 245:13 | 133:24 | 148:5 | 158:2 | **ted** |
| 105:1 | 258:19 | 150:5 | 149:23, | 185:16 | 64:1 |
| **tweaks** | 277:23 | 162:23 | 24 | 205:17 | 65:13 |
| 110:13 | **typicall** | 197:4 | 155:11 | 211:6 | 66:12, |
| 116:8 | **y** | 199:5 | 157:17 | 237:9 | |
| | | 226:13 | | 256:10 | |

Jason Poreda
July 17, 2025

82

19
68:6,17
226:1

**unusual**
46:24,
25

**upcoming**
101:11

**updated**
62:18

**upper**
74:10,
22,24
77:11,
13

**utilize**
49:25
53:25
55:12
57:11
66:14
81:11
221:10
291:20

**utilized**
291:10

**utilizes**
284:17

**utilizing**
145:3

_____

**V**

_____

**vacuum**
267:12

**vaguely**
276:11

**valid**

68:13

**value-laden**
181:4

**VAP**
150:11

**variety**
105:4,6
171:2
197:1,3
233:13
244:16
292:25

**vast**
159:14,
19

**verbal**
7:3,4

**verify**
106:16
109:2

**versa**
47:24
220:18

**version**
27:25
28:1
103:4
167:17
170:22,
23
174:6
176:4
177:9
178:10,
24
191:5
192:20
196:16,
18

197:5
225:22
236:23
292:23
295:23,
24
296:2
300:1

**versions**
12:18
141:7
167:11,
18,20
170:10,
18
171:22
174:11,
16
177:2
180:8
189:15
191:18
211:16
225:22

**versus**
78:17
187:23

**vertical**
97:18
105:23
152:14
154:8

**vertically**
155:1

**vetoed**
278:14

**viable**
232:3

**vice**
29:16
32:19
33:12
47:24
100:6,
11
198:1
220:18
232:10
299:17

**view**
60:13
62:15
89:17,
21
100:20
183:13
184:2
201:5
222:4
288:8

**viewed**
133:11

**viewing**
73:5

**views**
62:19

**virtual**
10:6
103:25

**vis-à-vis**
210:16

**visible**
76:17
90:3
91:13
92:10

**visual**
46:22
47:22
48:14,
15 53:1
64:8,21
65:12
105:2
170:11
172:9,
11
197:20
222:18
223:1
228:5,
24

**visually**
49:13
68:17
85:5
105:5
173:23
178:23
192:4
212:25
223:11
229:2,
16
233:3,
15

**Volume**
238:6

**Volusia**
82:1,4,
7
260:16,
17,19,
20,21
292:17

**vote**
16:15

45:21,
24
71:10
117:1
123:20
187:13
226:22
253:15
255:25
264:1
267:20
272:8
279:18

**voted**
135:3
256:12

**voter**
36:12
50:11
244:10,
11
245:4,
25
246:1,
24
248:3
249:16
250:15
252:17,
19
253:1,
11
255:10,
25
256:1,2
257:6,
7,9
263:10

**voters**
50:7
118:17

Jason Poreda
July 17, 2025

119:8, 11
120:2, 18
126:2,8
133:15, 17,22
165:14, 25
166:20
204:7, 19
218:19
245:7
247:1
250:21
254:22
255:22
256:12
257:1
259:7
265:10
266:17
270:12, 13
273:24
274:4, 23
296:24

**voters'**
134:9, 15
176:6
248:18
258:2

**votes**
118:10

**voting**
43:7
45:6,8
59:1,2

91:24
92:1,3, 4,5
101:25
118:3, 12
120:5
133:12
140:3
146:8, 21
149:22
155:25
163:4
191:15
202:16
214:22
245:3, 6,20
253:7, 11
254:1,2
272:3, 4,12,17
275:16, 21
292:21

**VTDS**
93:23, 25

———

**W**

———

**Wagner**
28:7
32:15
125:17

**wait**
6:23,25

**walk**
44:22

135:12
245:18
248:25

**walk-through**
106:9

**walked**
69:6
243:4

**walking**
102:9
241:23

**wall**
31:10

**walls**
31:18

**Walton**
207:21

**wanted**
33:8
40:24
41:4
90:16
91:8,10
124:13
161:11
178:14
194:2
197:22
218:20

**ward**
220:18

**Warren**
5:10, 13,16
6:1,4
10:23
11:4,8
15:1
25:16,

17
26:13, 19,23
27:6,9
32:11
35:10
39:4
44:5, 16,21
46:9,17
49:1
50:24
53:11, 14,19
54:3
55:1
56:8
63:2,6
65:18, 21,23
67:3,6
68:14
69:1,5, 13,18
72:11, 16 73:3
79:17
81:24
83:7
85:11
101:21
103:13
105:15
108:5, 10,13, 22
109:6, 8,10, 13,14
111:17
112:8, 14

114:12
115:9
116:13, 17
117:13, 14
121:2,6
122:2, 4,8,12
125:9
135:20
136:1
137:21
138:1
139:17, 21
140:6, 22
142:1
145:1, 17,24
148:7
149:1, 5,10
164:5
167:8
171:4,8
174:25
175:3, 6,24
176:15
179:8
181:10, 17
183:1, 18
184:8
188:1, 17
195:22
198:8, 18

201:23
202:9, 11
204:15, 17,22
206:16
209:17, 24
213:5, 13,23
214:16
215:11
218:11, 16
219:11
233:19
234:22
235:1
238:2, 10
243:21
266:1
269:7, 20
271:10, 19
272:1
273:3
275:5, 24
276:2,6
281:16
282:3, 19
284:6
286:11
287:25
288:25
292:4
296:15
297:17, 22

Jason Poreda
July 17, 2025

84

302:19

**watched**

20:16

**waterway**

53:4

54:13

**ways**

60:11

61:18,
19

129:12

192:24

201:3

207:6

208:23

277:12

288:8

**weakness**

59:25

158:21

**weaknesse
s**

60:1

**week**

96:14

**weeks**

39:9

**weight**

252:3

**weighted**

252:8

**weird**

145:9

154:21

**well-
used**

130:20

**west**

67:8

111:4

114:21

129:25

159:22

160:1,9

182:19

206:5

216:5,
21

225:25

226:1

230:9,
11

235:21

236:13,
14

294:20

298:8

**western**

291:24,
25

293:5

294:22,
23

**westward**

232:18

233:25

**whatever
's**

70:6

**whatnot**

99:5

**whicheve
r**

12:24

166:23

248:15

**whip**

19:9,10

**white**

92:4

125:3

241:6

242:8

258:24

264:2

272:3,
12

275:21

**wholly**

56:23

81:14

130:23

159:20

160:23

161:16

191:11,
23

195:5

197:15

235:15

292:24

294:16

**width**

152:16

**wildly**

233:14

**win**

165:23

166:23

239:20,
23

240:7,
15,24,
25

264:18

**winning**

240:11

241:6

**witness'
s**

174:14

**won**

165:19

242:5

246:22,
23

247:5,
7,15,16

258:14

259:22,
24

262:23

269:4

**Woodson**

106:1

**word**

41:15

102:25

121:11

175:21

**words**

43:13

44:6

77:6

118:5

209:18

230:2

284:8

**work**

15:12

16:13

24:14,
19

26:14

28:4

29:15,
16 32:3

33:1,13

36:1,3,

9,24

37:1,3

40:5

87:10,
13 88:1

89:20

90:13

104:6

107:25

110:10

147:18

186:12

187:14

197:3

228:1,2

233:13,
16

275:10

286:18

292:24

**worked**

17:20,
22

18:15,
19

28:22,
23 29:3

30:11

31:7,
15,19

85:14

99:7

107:16

138:23

222:18

233:22

**working**

15:9,17

23:12

24:12,
20 28:3

39:21,
25

113:25

**works**

85:5

86:6

87:20

104:19

**workshop**

39:17

99:14,
15,18

100:14,
18,21

101:2

102:10,
11,12,
21

103:14,
24

104:1,
8,12,18

105:22

106:11,
22,23

109:21

138:7

143:19

170:24,
25

171:5,
6,13,14

173:11

174:5

175:7

177:11,
20

180:8

189:15

191:7

192:2,3

Jason Poreda
July 17, 2025

290:14
292:24

**workshops**
103:23

**world**
113:12
115:24
216:12
220:12
227:14,
15,23
304:3

**worried**
267:1

**worse**
233:8

**worst**
151:7

**worth**
68:1

**wrap**
177:20
228:23
229:7,
9,13
293:13

**wraparound**
228:23
229:1,
11
234:3

**wrapping**
295:2

**write**
60:22
148:19
281:20

**wrong**
131:19
155:5
156:6
229:19
240:17
243:2
303:9

---

**Y**

---

**yards**
205:2

**year**
6:16
14:14
22:23
23:18
24:1
39:3
246:4
262:18,
21

**years**
24:2
25:19
30:12
37:10
61:22
109:5
123:5
167:14
233:17
237:20,
21
250:5
260:15
262:22
269:17
272:24
279:7

281:14
292:15
299:14
303:10

**yelled**
31:10

**yellow**
46:18
138:17
204:3
222:10,
15

**yield**
245:17

**Young**
19:11

---

**Z**

---

**zoom**
90:9,
10,12,
14,15
201:6

**zoomed**
89:24
90:6