Page 1

_____

Common Cause, et al.                    )
                                        )
v.                                      )  4:22-cv-109
                                        )
Cord Byrd                               )
_____     )


TRANSCRIPTION OF VIDEO RECORDING

HOUSE CONGRESSIONAL REDISTRICTING SUBCOMMITTEE

FEBRUARY 18, 2022


_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

HT_0004872
CUBANOS-0000004746

2/18/2022               Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 2

1    February 18, 2022

2              CHAIRMAN SIROIS:  Good morning, Members.

3    The Congressional Redistricting Subcommittee will

4    come to order.

5              DJ, please call the roll.

6              THE SECRETARY:  Chair Sirois?

7              CHAIRMAN SIROIS:  Here.

8              THE SECRETARY:  Vice-Chair Tuck?

9              VICE-CHAIR TUCK:  Here.

10             THE SECRETARY:  Ranking Member Skidmore?

11   Ranking Member Skidmore?

12             Representative Benjamin has been excused.

13             Brown?

14             REPRESENTATIVE BROWN:  Here.

15             THE SECRETARY:  Fabricio?

16             REPRESENTATIVE FABRICIO:  Here.

17             THE SECRETARY:  Fetterhoff?

18             REPRESENTATIVE FETTERHOFF:  Here.

19             THE SECRETARY:  Giallombardo?

20             REPRESENTATIVE GIALLOMBARDO:  Here.

21             THE SECRETARY:  Harding?

22             REPRESENTATIVE HARDING:  Here.

23             THE SECRETARY:  Hunschofky?  Hunschofky?

24   Joseph?

25             REPRESENTATIVE JOSEPH:  Here.

HT_0004873
CUBANOS-0000004747

Page 3

```
 1              THE SECRETARY:  Maggard?

 2              REPRESENTATIVE MAGGARD:  Here.

 3              THE SECRETARY:  Massullo has been excused.

 4      McClure?

 5              REPRESENTATIVE MCCLURE:  Here.

 6              THE SECRETARY:  Morales?

 7              REPRESENTATIVE MORALES:  Present.

 8              THE SECRETARY:  Perez?

 9              REPRESENTATIVE PEREZ:  Here.

10              THE SECRETARY:  Plakon?

11              REPRESENTATIVE PLAKON:  Here.

12              THE SECRETARY:  Silvers?  Silvers?  Toledo?

13              REPRESENTATIVE TOLEDO:  Here.

14              THE SECRETARY:  Trabulsy?

15              REPRESENTATIVE TRABULSY:  Here.

16              THE SECRETARY:  Williamson?

17              REPRESENTATIVE WILLIAMSON:  Here.

18              THE SECRETARY:  Ex-officio Clemons?

19              EX-OFFICIO CLEMONS:  Here.

20              THE SECRETARY:  Ex-officio Davis?

21              UNIDENTIFIED FEMALE:  On the way.

22              THE SECRETARY:  Members present, Mr. Chair.

23              CHAIRMAN SIROIS:  Thank you, DJ.

24              Members, a few reminders before we begin.

25      Please silence all electronic devices, and if you're
```

HT_0004874
CUBANOS-0000004748

2/18/2022                Common Cause, et al. v. Cord Byrd            Audio Transcription

Page 4

1    here today to give public testimony, please take

2    time now to fill out a speaker appearance form, and

3    turn it into the sergeant staff.  Also, Members, if

4    you wish to speak, please make sure that you turn

5    your microphone on.

6            On a personal note, I would ask the members

7    to bear with me.  My voice has been faltering all

8    week, one of the occupational hazards of being a

9    legislator.

10           Representative Fetterhoff, I would like to

11   recognise you for an introduction.

12           REPRESENTATIVE FETTERHOFF:  Thank you,

13   Chair.  Good morning.  I just wanted to introduce

14   our doctor of the today.  Doctor Steven Golden has

15   travelled up from Charlotte County to visit with us

16   today, so if we have need of him today during

17   Committee, he is here to help.  Thank you so much

18   for being here today, sir.

19           CHAIRMAN SIROIS:  Thank you, Doctor.  We're

20   glad to have you with us.

21           Thank you, Representative Fetterhoff.

22           Members, welcome back to our Congressional

23   Subcommittee.  I'm glad to see all of us together

24   again.  For those following along at home, a quick

25   recap of the last few weeks.  After we began

HT_0004875
CUBANOS-0000004749

2/18/2022                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 5

1    session, the Governor requested an advisory opinion

2    from the Florida Supreme Court centered around

3    Congressional District 5 in North Florida.  The

4    House paused the congressional redistricting process

5    once this request was issued.  Throughout this

6    process we've stated that we will follow the law.

7    And we knew if the Florida Supreme Court issued new

8    guidance, we would have to take that into account.

9          Last week the Supreme Court issued their

10   ruling, that they would decline to issue an advisory

11   opinion.  And with that notice being issued and no

12   additional guidance being provided, we have now

13   resumed our process.  The pause in our process was

14   the right thing to do to ensure that we continue to

15   follow all appropriate guardrails.  And again, I'm

16   glad to be back here with all of you today.

17         Today we will present and consider the PCB

18   for our state's proposed congressional districts.  I

19   want to refocus this Committee on the task at hand.

20   There's been noise outside of our process dealing

21   with the congressional map.  I would encourage all

22   members to put that noise aside.  Those external

23   influences need to stay external, and our personal

24   preferences cannot override our constitutional

25   responsibility to follow the law.

HT_0004876
CUBANOS-0000004750

2/18/2022                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 6

1           This Committee has undertaken several

2    months of education in order to understand the

3    redistricting process and uphold the high bar that

4    was set for this chamber last decade.  The Proposed

5    Committee Bill, CRS22-01, establishes congressional

6    districts that will be used in election cycles

7    beginning in 2022.  This PCB has been drafted by

8    Committee staff with the advice of legal counsel

9    based on data from the 2020 census and to be in

10   alignment with the Florida constitution, state and

11   federal law, and court president.  This map can also

12   be found on floridaredistricting.gov under the

13   planned name H000C8011.

14           You may have noticed the lengthy bill test

15   -- the bill text for the congressional map was not

16   included in the meeting materials for today's

17   meeting.  The bill text reflects the technical

18   census block, block group, and track numbers that

19   comprise each district.  These are the exact same

20   districts that are depicted in the printed map

21   before you.  However, to save all of our printers,

22   and 150 pages of paper, we have printed a copy of

23   the full bill text for the community's viewing, and

24   that can be found right here in front of DJ.

25           Now, it is my pleasure to hand the gavel

HT_0004877
CUBANOS-0000004751

Page 7

1    over to Vice-Chair Tuck.

2              VICE-CHAIR TUCK:  Thank you, Mr. Chair.

3              Members, up for consideration today is PCB

4    CRS22-01, establishing the congressional districts

5    of the state.  As a reminder we are holding

6    questions until the end of the PCB presentation to

7    ensure we have time to get through an explanation of

8    the entire state and no one region is rushed.

9              Chair Sirois, you're recognised to present

10   the PCB.

11             CHAIRMAN SIROIS:  Thank you, Vice-Chair

12   Tuck.

13             The Florida Legislature is directed to

14   redistrict every ten years, following the decennial

15   census, to account for growing and shifting

16   population across Florida.  A decade ago, the

17   Florida Houses process and methodology for drawing

18   maps was lauded by the Florida Supreme Court, and

19   I'd like to read a quote from the 2012 ruling.

20             "A review of the House plan, and the record

21   reveals that the House engage in a consistent and

22   reasoned approach, balancing the two tier standards

23   by endeavouring to make districts compact and as

24   nearly equal in population as possible in utilising

25   political and geographical boundaries where feasible

HT_0004878
CUBANOS-0000004752

Page 8

1   by endeavouring to keep counties and cities together

2   where possible.  In addition, the House approached

3   the minority voting protection provisions by

4   properly undertaking a functional analysis of voting

5   strength in minority districts."

6           As I mentioned earlier, this Committee has

7   undertaken several months of education in order to

8   understand the redistricting process and uphold the

9   high bar that was set for this chamber last decade.

10  Last week we released Proposed Committee Bill CRS22-

11  01, which proposes congressional districts that will

12  be used in election cycles starting in 2022.  As I

13  mentioned earlier this map, H000C8011, has been

14  drafted exclusively by Committee staff with the

15  advice of legal counsel based on data from the 2020

16  census, and to be in alignment with the Florida

17  constitution, state, and federal law, as well as

18  court president.

19          Members, I want to make sure that each of

20  you has a packet in front of you.  This contains a

21  printout of the proposed map itself, the state-wide

22  snapshot of statistics, the functional analysis data

23  used for protected minority districts, a list of

24  county shares of population, a list of city splits,

25  and finally the boundary analysis report.  These

HT_0004879
CUBANOS-0000004753

2/18/2022                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 9

1    items will be referenced throughout the presentation

2    today, so please feel free to refer to your packet

3    as needed.  This packet is also available under our

4    Subcommittee's webpage on myfloridahouse.gov.

5              Now, let's dive in, Members.  Excuse me.

6    Let's first take a look at the map as a whole.  When

7    compared to the benchmark congressional map, the new

8    proposed Congressional Districts have several points

9    of improvement throughout our Tier 2 standards.

10             When looking at a state-wide average of

11   each district's compactness score, we have been able

12   to recreate compact districts similar to our

13   benchmark metrics, even after the addition of a new

14   congressional district.  The proposed map state-wide

15   average compactness scores are a Reock score of

16   0.43, a Convex Hull score of 0.79, and a Polsby-

17   Popper score of 0.37.  Where feasible, we also work

18   to improve visual compactness of districts, or the

19   eyeball test, such as being able to keep Polk County

20   wholly within a single congressional district.

21             When looking at the number of county

22   splits, we've kept similar to the benchmark map with

23   18 counties split last decade and only 20 counties

24   split this decade.  The ideal population for this

25   decade's congressional districts after adding a

HT_0004880
CUBANOS-0000004754

Page 10

1  district to go from 27 districts to 28 is 769,211

2  people.  The overall deviation range is the same as

3  it was last decade with 27 districts being the exact

4  ideal population and one district having a single

5  person less than the ideal population.  We are also

6  proudly able to improve the number of city splits in

7  our proposed map.  In the benchmark map, there were

8  39 cities split, and in the proposed new

9  configurations, we've been able to decrease that to

10  just 27 cities split.

11          This proposed congressional map also allows

12  a district to be placed wholly within each of

13  Florida's top five largest counties:  Miami-Dade,

14  Broward, Palm Beach, Hillsborough, and Orange

15  respectively.  The proposed congressional districts

16  are also drawn in compliance with Tier 1 of the

17  Florida constitution.  The proposed map is inclusive

18  of three protected black districts and three

19  protected Hispanic districts.  This is the same

20  number of protected districts as are found in the

21  benchmark map.  In each district, the minority

22  group's voting age population are similar when

23  compared to the benchmark districts, with slight

24  increases or decreases as permitted by the Florida

25  Supreme Court president, which states, "slight

HT_0004881
CUBANOS-0000004755

2/18/2022          Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 11

1   changes in a minority group's voting age population

2   are acceptable so long as a functional analysis is

3   conducted to ensure the voting strength of the

4   minority group in both general and primary elections

5   is at a comparable level that existed in the

6   benchmark district."  These districts are also drawn

7   in a consistent manner with respect to Florida

8   Supreme Court president to maintain existing

9   majority-minority districts.

10          All six of these protected minority

11   districts have had an individual functional analysis

12   conducted on them to ensure the new district

13   figuration does not deny or abridge the equal

14   opportunity of racial or language minorities to

15   participate in the political process or to diminish

16   their ability to elect representatives of their

17   choice.  And as we move throughout the map, I will

18   highlight these districts as well.

19          All of our districts consist of contiguous

20   territory.  And as I'm sure you are aware, the

21   Committee has also implemented safe guards in order

22   to ensure that we do not draw districts with the

23   intent to favour or disfavour a political party or

24   in incumbent.

25          Members, as we move through the

HT_0004882
CUBANOS-0000004756

Page 12

1    presentation today, you will see an analysis tool

2    reference called boundary analysis.  This is a

3    report that is available in our map drawing

4    application and helps to quantify the percentage of

5    Tier 2 compliant boundaries that are used for each

6    district.  Similar to compactness scores, this tool

7    is to be viewed in context with other Tier 2 metrics

8    of districts and surrounding regions.  There is no

9    golden threshold to which we look when evaluating

10   each district, but it serves as another way to

11   understand the compliance of what is in front of us.

12          Members, now that we've looked at the

13   state-wide overview, let's begin to review each

14   region of the state, starting with Congressional

15   Districts 1 through 4.  Beginning in the panhandle,

16   Congressional District 1 has the entirety of

17   Escambia, Santa Rosa, and Oklaoosa County.  Walton

18   County is then split as Congressional District 1

19   achieves the equal population threshold here.

20          Again, Members, for congressional maps,

21   equal population for each district is plus or minus

22   one person.  And for this purpose, the boundary

23   between District 1 and 2 primarily uses State Road

24   83 for the majority of its length, except where it

25   deviates to ensure that the municipalities of

HT_0004883
CUBANOS-0000004757

2/18/2022                 Common Cause, et al. v. Cord Byrd                 Audio Transcription

Page 13

1    Freeport and Defuniak Springs are kept whole, with

2    Freeport within Congressional District 1, and

3    Defuniak Springs Congressional District 2.  The

4    shape of Congressional District 2 and 4 are largely

5    impacted by Congressional District 3 in this region,

6    so let's jump ahead to that district first.

7           Congressional District 3 has four whole

8    counties within it: Gadsden, Madison, Hamilton, and

9    Baker counties.  It also contains parts of four

10   others in Leon, Duval, Jefferson, and Colombia

11   counties.  It is also a performing black district

12   that was recreated similarly to the benchmark

13   district.  As noted before, the functional analysis

14   on this district that was conducted by staff ensures

15   the minority group's ability to elect is not

16   diminished.

17          Segueing back to Congressional District 2,

18   this district is made up mostly of whole counties.

19   It contains 15 whole counties along with the

20   remaining portion of Walton County not contained

21   within Congressional District 1 and the parts of

22   Leon, Jefferson, and Colombia Counties that are not

23   in Congressional District 3.  Its eastern boundary

24   is the county lines of Levy, Gilchrist, and Colombia

25   Counties.  This district achieves equal population

HT_0004884
CUBANOS-0000004758

Page 14

1    in Leon County, which it shares with Congressional

2    District 3 rather than having to split an additional

3    county.  Excuse me.

4              Congressional District 4 has all of Nassau

5    County, along with the remaining part of Duval

6    County that is not included in Congressional

7    District 3.  This leaves the district approximately

8    213,000 people short of the population needed for a

9    congressional district.  So the district must

10   continue south into St. Johns County for population

11   equality.  In doing so, it is able to keep all of

12   St. Augustine within the district, and all other

13   municipalities in St. Johns County remain whole.

14   The district configuration is similar to the current

15   district, and conversely, if Congressional District

16   4 instead went into Clay County instead of St. Johns

17   County, it would have created an irregular shaped

18   district that wraps around Congressional District 3.

19   This would have created a much more visually non-

20   compact district shape.

21             Moving on to Congressional Districts 5

22   through 7.  In this region we are able to keep seven

23   counties whole between three districts.

24   Congressional District 5 contains all of Union,

25   Bradford, Clay, Putnam, and Flagler counties, as

HT_0004885
CUBANOS-0000004759

Page 15

1    well as the remainder of St. Johns County that is

2    not a part of Congressional District 4, using major

3    roadways in the St. Augustine Municipal line as a

4    boundary line in St. Johns County.  In order for

5    this district to have equal population, it splits

6    Alachua County along mostly State Roads 20 and 24

7    and also includes a small part of Volusia County.

8    Congressional District 6 keeps Marion County whole

9    and finds the remainder of its population from the

10   remaining population in Alachua County and includes

11   both flags of Lake and Volusia County.

12           Congressional District 7 includes all of

13   Seminole County and a large part of Volusia County.

14   Its boundary lines going through Volusia County

15   follow along State Roads 11, 40, I-95 and includes

16   an area through the Tomoka Wildlife Management Area,

17   which separates population centers of Volusia

18   County.

19           Congressional Districts 8 through 11 and

20   16.  Congressional District 8 includes all of

21   Brevard and Indian River counties, which leaves the

22   district about 2,800 people short of the population

23   needed for a district.  In order to achieve

24   population equality required for congressional

25   districts, the remaining population is added to

HT_0004886
CUBANOS-0000004760

Page 16

1   Congressional District 8 by going north in the

2   Volusia County along I-95 and then includes the

3   entire municipality of Oak Hill and its 1,986

4   people, keeping it whole.

5              Congressional District 9 contains the

6   entirely of Osceola County, which was the fastest

7   growing county in the state this past decade.  The

8   district includes part of Orange County following I-

9   4 to go north, as well as using other primary

10  roadways such a Curried Ford Road, before using the

11  Econlockhatchee River, locally known as the Econ

12  River to go all the way to northern Orange County

13  boundary line.  This compact Tier 2 compliant

14  district also happens to be a new majority-minority

15  Hispanic district reflective of the Hispanic growth

16  in this region.

17             Congressional District 10 is kept wholly

18  within Orange County, similar to the benchmark map

19  where a district is kept wholly within the county.

20  This district is able to keep the municipalities of

21  Edgewood, Eatonville, Maitland, and Winter Park

22  whole within the district and has similar

23  demographic characteristics to the benchmark

24  district wholly within Orange County.

25             Congressional District 11 adds the

HT_0004887
CUBANOS-0000004761

Page 17

1    remaining population in Orange County, which is

2    about 280,000 people and goes west to include the

3    majority of Lake County, all of Sumter County, and

4    part of Citrus County, where it achieves equal

5    population.

6              Congressional District 16 keeps Polk County

7    whole in this map.  This is an improvement from the

8    benchmark map where Polk County was divided between

9    three districts.  Population growth this decade made

10   this possible and is approximately 44,000 people shy

11   of the ideal population of a congressional district.

12   Pairing Polk County with a small part of eastern

13   Hillsborough achieves the necessary population

14   needed for the population of a congressional

15   district while creating a very compactly shaped

16   district.

17             Moving on to Congressional Districts 12

18   through 15.  Now, looking at Congressional Districts

19   13 in the Tampa Bay area, which is kept wholly

20   within Pinellas County, its northern boundary

21   follows the municipal lines of the cities of

22   Dunnellon, Clearwater, and Safety Harbor to enable

23   every city within Pinellas County to remain whole.

24   Because Pinellas County has more people than it can

25   fit into a single congressional district, this

HT_0004888
CUBANOS-0000004762

2/18/2022                  Common Cause, et al. v. Cord Byrd                  Audio Transcription

Page 18

1   configuration of Congressional District 13 enables

2   connecting the remaining portions of the county over

3   land to another county rather than over water.

4           Congressional District 12 is the entirety

5   of Hernando County, the remainder of Citrus County,

6   part of Pasco County, which is divided primarily

7   along U.S Highway 41, State Road 54, and the

8   Suncoast parkway, as well as the portion of northern

9   Pinellas County not already included in

10  Congressional District 13.

11          Congressional District 14 is located wholly

12  within Hillsborough County.  Its boundary follows

13  the primary roads of Hillsborough avenue, Bush

14  Boulevard, and I-4 for its northern border, State

15  and County Road 39 on the east side, and County Road

16  672, Palm Road and Big Bend road on the southern

17  side.

18          Finishing at the Tampa Bay area,

19  Congressional District 15 then connects the

20  remaining part of Pasco County with the appropriate

21  amount of population from Hillsborough County to

22  complete the district's population.

23          Moving on to Congressional District 17

24  through 19.  Congressional district 17 is the last

25  of the four districts that have part of Hillsborough

HT_0004889
CUBANOS-0000004763

2/18/2022                   Common Cause, et al. v. Cord Byrd                   Audio Transcription

Page 19

1    County.  This district actually has the exact amount

2    of people on Hillsborough County: 112,723 people.

3    So that exactly 12 districts make up all of the

4    remaining population in the counties to the south of

5    the Polk, Osceola, and Indian River County line.

6    This ensures that no other district has to cross

7    these county lines and keeps the counties to the

8    east whole.  Congressional district 17 then

9    incorporates Manatee County and approximately

10   250,000 people in Sarasota County to complete its

11   population.  Every city in Sarasota County is kept

12   whole with Congressional District 17 utilising the

13   Venice Municipal line for part of its southern

14   border.

15          The remaining part of Sarasota County,

16   along with seven entire counties, Hardee, Desoto,

17   Charlotte, Highlands, Okeechobee, Glades, and Hendry

18   counties make up the majority of Congressional

19   District 18.  This leaves the district about 150,000

20   short of the ideal population, allowing it to cross

21   into Lee County to acquire this remaining

22   population, using primarily the Able Canal, the

23   Caloosahatchee river, and the Hancock Bridge

24   Parkway, Pine Island road and County Road 765 to do

25   so.

HT_0004890
CUBANOS-0000004764

2/18/2022                 Common Cause, et al. v. Cord Byrd              Audio Transcription

Page 20

```
 1              Congressional district 19 connects the rest
 2    of Lee County with Collier County, using primarily
 3    I-75, U.S.  41 and Collier Boulevard, except where
 4    it achieves equal population.  With the exception of
 5    Cape Coral, all other municipalities are kept whole
 6    in this region between these three districts.
 7              Moving on to Congressional Districts 20
 8    through 23, and 25.  Congressional District 20 is a
 9    performing majority-minority black district that was
10    recreated similarly to the benchmark district that
11    connects population in Palm Beach County to
12    population in Broward County.  As noted before, the
13    functional analysis on this district conducted by
14    staff ensures the minority group's ability to elect
15    is not diminished.  This decade we were able to
16    create this district in such a way that respects
17    more major roadways in the area, such as U.S.  441,
18    I-95, and the Florida Turnpike.  And it keeps more
19    cities whole, keeping the cities of Lake Park,
20    Margate, Tamarac, and others wholly within it, which
21    were split a decade ago.
22              Congressional District 21 includes all of
23    St. Lucie and Martin counties and includes just over
24    280,000 people in Palm Beach County in order to
25    achieve equal population for this district.  The
```

HT_0004891
CUBANOS-0000004765

Page 21

1    district boundary follows a railway in the northern

2    Palm Beach County to Okeechobee Boulevard where it

3    borders Congressional District 20 before going out

4    to the coast using Palm Beach inlet to complete its

5    southern border.

6            Congressional District 22 is kept wholly

7    within Palm Beach County.  Its boundary extends

8    north to Palm Beach Inlet to meet Congressional

9    District 21 before heading west to include the

10   entire city of Wellington, creating the rounded

11   point on the western side of the districts.  It then

12   uses the Loxahatchee National Wildlife Refuge to

13   continue south until it gets its population

14   necessary for a district without splitting other

15   cities in Palm Beach County.  It uses Boca Raton and

16   Highland Beach City Municipal line for much of its

17   boundary in this area.  This leaves approximately

18   200,000 people in south east Palm Beach County that

19   is then included in Congressional District 23.  This

20   district then connects this population with Broward

21   County, utilising many municipal lines in this area

22   for the boundary line, keeping the cities of Coral

23   Springs, Coconut Creek, and many others whole within

24   Broward County.  The district then travels down to

25   the Broward County line along the coast using

HT_0004892
CUBANOS-0000004766

Page 22

1    primarily Route 1 as its western border.

2              Congressional District 25 is kept wholly in

3    Broward County, giving Broward County a

4    congressional district wholly within the county for

5    the first time since the 1980 redistricting cycle.

6    The district utilises as many major roadways as

7    possible, such as I-75, the Sawgrass Expressway, the

8    Florida Turnpike, I-95, Davie Boulevard, Sunrise

9    Boulevard, among others.  It also uses the municipal

10   lines of Weston, Southwest Ranches, Pembroke Pines,

11   Miramar to the west, and the Broward Miami-Dade

12   County line on the southern side of the district.

13             Moving on to Congressional Districts 24,

14   and then 26 through 28.  Congressional District 24

15   is a performing black district.  As noted earlier,

16   the functional analysis on this district conducted

17   by staff ensures the minority group's ability to

18   elect is not diminished.  This is the only district

19   that crosses the Miami-Dade Broward County line,

20   which is an improvement over the benchmark map that

21   had two such districts.  This district also includes

22   many whole cities within the Miami-Dade County,

23   including Aventura, North Miami, Biscayne Park,

24   Miami Shores, Opa-locka, and others, and uses as

25   many major recognizable roadways in the area as

HT_0004893
CUBANOS-0000004767

Page 23

1   possible, including I-195, 27th Avenue, 47th Avenue

2   and others.

3          We're almost there, Members.

4   Congressional districts 26, 27, and 28 are all

5   performing majority-minority Hispanic districts,

6   where the functional analysis on each district

7   individually was conducted by staff to ensure that

8   minority groups' ability to elect is not

9   diminished.

10          Congressional District 26, similar in

11   shape to the benchmark map, connects the part of

12   Collier County not included in Congressional

13   District 19, with population in Miami-Dade County,

14   using Collier, Broward, and Miami-Dade County

15   Lines, as well as I-75, US-41, the Tamiami Trail

16   and the Dolphin Expressway.  It additionally

17   shares a boundary with Congressional District 24

18   line eastern side of the district.  This district

19   includes the municipalities of Hialeah, Hialeah

20   Gardens, Medley, Doral, and Miami Lakes in their

21   entirety.

22          Congressional District 27 uses the

23   Dolphin Expressway and the Florida Turnpike for

24   the vast majority of its boundary lines on the

25   northern and western sides, while using the

HT_0004894
CUBANOS-0000004768

Page 24

1    Palmetto Bay Municipal boundaries along its

2    southern border, creating a very compact district

3    wholly within Miami-Dade County.

4            Congressional District 28 includes all of

5    Monroe County and then connects with the remaining

6    population in southern Miami-Dade County, using

7    US-41 and the Florida Turnpike as its primary

8    boundary lines in Miami-Dade County.  The

9    municipalities of Color Bay, Florida City, and

10   Homestead are wholly within the district.

11           Madam Chair, that is the Proposed

12   Committee Bill.

13           VICE-CHAIR TUCK:  Thank you, Mr. Chair.

14           Members, we are in debate and questions

15   on the PCB.

16           Representative Brown, you're recognized.

17           REPRESENTATIVE BROWN:  Thank you, Madam

18   Chair.

19           I just have a few questions relating to

20   CD 10, and I want to sort of start with -- I know

21   it's in the meeting packet.  I know we previously,

22   I believe, did not mention it, but we --

23           CHAIRMAN SIROIS:  I'm sorry.  Excuse me.

24   I'm having difficulty hearing if -- thank you very

25   much.  If you won't mind starting and referencing.

HT_0004895

CUBANOS-0000004769

2/18/2022                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 25

1           I apologize, Madam Chair.  I'll go

2      through you next time.

3           REPRESENTATIVE BROWN:  Thank you,

4      Mr. Chair.  So as I was mentioning, I have a few

5      questions about CD 10.  And so at a starting

6      point, I know it's in the packet and I believe it

7      was mentioned or not mentioned earlier, but wanted

8      to just confirm.  CD 10 here, we're saying with

9      this map, it's not a district we consider

10     protected from aggression under Tier 1.  Is that

11     correct?

12          VICE-CHAIR TUCK:  Chair Sirois?

13          CHAIRMAN SIROIS:  Thank you, Madam Chair.

14          According to our analysis, Congressional

15     District 10 is not a black-performing district,

16     and that's according to our functional analysis.

17     I can tell you just kind of at a high-level review

18     of the Senate's proposal, they have a different

19     take on Congressional District 10.  They have

20     identified it according to their analysis as a

21     protected district.  So I expect, moving forward,

22     that is something that will be reconciled with the

23     Senate.  But, again, according to our analysis,

24     that has not been recognized as a protected

25     district.

HT_0004896
CUBANOS-0000004770

Page 26

1          VICE-CHAIR TUCK:  Representative Brown?

2          REPRESENTATIVE BROWN:  Thank you, Madam

3     Chair.

4          Is there sort of an explanation as to why

5     with our maps, as you mentioned, with the Senate,

6     they saw it as their -- and it's on record that

7     they saw it as one that was protected.  But is

8     there a reason why we didn't really come up with

9     that same sort of conclusion in our maps?

10          VICE-CHAIR TUCK:  Ms. Kelly, you're

11     recognized.

12          MS. KELLY:  Thank you, Madam Chair, and

13     thank you Representative for that question.  So

14     again I can't speak to the Senate analysis and,

15     you know, they are running a parallel process to

16     us, so I don't want to speak on their behalf.  But

17     as far as the Houses, whenever we run our

18     functional analysis, just to recap, you've

19     probably heard me say this before, but there's

20     four components that we look at.

21          So the first component that you start

22     with is your population data.  So this is what's

23     provided by the Census Bureau and specifically,

24     your voting age population data.  From there, we

25     continue on to analyze registered voters in the

HT_0004897
CUBANOS-0000004771

2/18/2022          Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 27

1   respective region we're looking at.  We

2   additionally look at voter turnout and the

3   statewide election results, and that's for

4   election cycles from 2012 through 2020, both

5   primary and general election cycles.

6              So when looking at Orange County

7   specifically -- and, Representative Brown, you

8   mentioned CD 10 -- in Orange County, over the

9   decade, the black population is essentially

10  stagnant.  There's some slight variations, but

11  it's essentially stagnant, which is the first

12  point, again, going back to our population as our

13  starting analysis point.  From there whenever you

14  start to look at registered voters, voter turnout,

15  you can see a consistent decrease over the decade,

16  about 10 percentage points between where it

17  started in the beginning of the decade to where it

18  is now, ultimately resulting in levels that we do

19  not believe that the black population would be

20  able to control their shares of the primary or the

21  general election, therefore not allowing them to

22  elect a candidate -- the ability to elect a

23  candidate of their choice.

24              I'd also like to put on record, you know,

25  going back through last decades of materials and

HT_0004898
CUBANOS-0000004772

2/18/2022                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 28

1    meetings, whenever this was recreated as part of

2    the remedial redistricting cycles, this district

3    wasn't created to be a black-performing district

4    either.  It was a result of some other changes

5    that happen in the congressional map.

6                So that, Madam Chair, concludes my

7    explanation.  Thank you.

8                VICE-CHAIR TUCK:  Thank you, Ms. Kelly.

9                Representative Brown?

10               REPRESENTATIVE BROWN:  Thank you, Madam

11   Chair.

12               So looking at the demographics of recent

13   Democratic primaries and benchmark CD 10, the

14   primary elect, they we're just plurality, and even

15   majority black.  So when we look at, in 2020,

16   we've seen 43 percent; in 2018, it was 47 percent;

17   2016, 51 percent; 53 percent in '14.  And, you

18   know, if we look even in 2012, 54 percent.  So it

19   seems as though the benchmark in CD 10 is a

20   district where a cohesive black electorate has an

21   ability to nominate a candidate of their choice in

22   a primary and elect that candidate of choice as

23   well in the general election, since Democratic

24   candidates prevail in general.

25               In the general, is that wrong?

HT_0004899
CUBANOS-0000004773

Page 29

1          VICE-CHAIR TUCK:  Ms. Kelly, you're

2     recognized.

3          MS. KELLY:  Thank you, Madam Chair.

4          Thank you, Representative.  So I guess my

5     first question is: can you re-reference which

6     exact data points that you're asking about?  And

7     the reason why I ask that is there's no one data

8     point within a functional analysis that

9     necessarily dictates whether a candidate can

10    prevail in the primary or in the general.  So

11    picking out and spot-checking specific data points

12    wouldn't be a holistic way to look at it.  But for

13    clarity, would you mind re-referencing which

14    categorical points you were referencing in your

15    questions?

16         REPRESENTATIVE BROWN:  The primary

17    electorate.  So within the primary in 2020, it was

18    43 percent.  In 2018, it was 47 percent.  And so

19    we're speaking directly to the black electorate.

20         VICE-CHAIR TUCK:  Ms. Kelly, you're

21    recognized.

22         MS. KELLY:  Thank you.

23         Representative, can I respond now, or did

24    you have additional --

25         REPRESENTATIVE BROWN:  No.  No, no, no.

HT_0004900
CUBANOS-0000004774

Page 30

1            MS. KELLY:  Okay.  Just making sure.  So

2   yes.  As you go through those data points -- and,

3   again, I want to emphasize there's not one

4   specific column or data point that indicates

5   whether something is performing.  But speaking

6   specifically to the ones that you mentioned in the

7   primary election, actually, what you described

8   demonstrated what I said previously is as we go

9   back throughout the decade, you know, in reverse

10  chronological order, we start the decade -- I

11  believe you mentioned it was at 43 percent.  And

12  as we go back throughout the decade, it actually

13  increased, which, as I explained, shows that over

14  the decade, that specific data point has continued

15  to have a consistent decrease in the black share

16  of the primary.  Whenever you look at the black

17  population's ability to elect a candidate of their

18  choice, specifically in the primary, you know, at

19  43 percent, there's still additional population

20  out there that wouldn't be able to necessarily get

21  them over, you know, that 50 percent marker that

22  would identify them as being able to elect a

23  candidate of their choice.

24            So I hope that provides some additional

25  context.  Thank you.

HT_0004901
CUBANOS-0000004775

Page 31

1          REPRESENTATIVE BROWN:  Thank you.

2          VICE-CHAIR TUCK:  Representative Brown?

3          REPRESENTATIVE BROWN:  Thank you, Madam

4     Chair.

5          So comparing the benchmarks of CD 10 and

6     also looking just with the HD 20, which was in

7     Ocala, Gainesville, HD 20 had similar statistics

8     as we see with CD 10.  So for example, the

9     Democratic primary in HD 20 had between 43 and

10    46.7 percent black in the past eight years.  It's

11    been 43 or 44 percent in the past two elections,

12    which is actually lower than CD 10, and both are

13    solidly Democratic in the general election.  The

14    (indiscernible) is similar too with 29 percent in

15    HD 20 and 27 percent in CD 10.  The black share of

16    registered voters as well is similar.

17         So benchmark HD 20 looks really similar,

18    but we consider HD 20 to be Tier 1 protected

19    against diminishing black voters' ability.  And we

20    went out of our way to sort of maintain HD 20 in

21    Gainesville and Ocala, even splitting both cities

22    to do so.

23         So can we explain why in HD 20, it's Tier

24    1 protected, but in CD 10, it's not?

25         VICE-CHAIR TUCK:  Chair Sirois?

HT_0004902

CUBANOS-0000004776

2/18/2022                 Common Cause, et al. v. Cord Byrd                 Audio Transcription

Page 32

1          CHAIRMAN SIROIS:  Thank you, Madam Chair.

2          You know, I would, I think, revisit

3    Ms. Kelly's remarks when we started this line of

4    questions.  Functional analysis is a holistic

5    analysis of a district.  So I don't know that

6    necessarily picking and choosing out which metrics

7    or criteria you want to look at and then applying

8    them provides an accurate depiction of the

9    district.  The functional analysis has to be a

10   holistic review of all the data points in terms of

11   making that determination.

12          Madam Chair, I would request that

13   Ms. Kelly perhaps might have something to add.

14          VICE-CHAIR TUCK:  Ms. Kelly, you're

15   recognized.

16          MS. KELLY:  Thank you, Madam Chair, and

17   thank you, Chair Sirois.

18          Representative, additionally, I just

19   wanted to clarify.  You're referencing House

20   District 20 and Congressional District 10,

21   correct?

22          REPRESENTATIVE BROWN:  Thank you.  Yes,

23   that's correct.

24          MS. KELLY:  Okay.  I just wanted to make

25   sure that that was accurate.  So again, and I

HT_0004903
CUBANOS-0000004777

2/18/2022                    Common Cause, et al. v. Cord Byrd                    Audio Transcription

Page 33

1    won't repeat what the Chair just said because that

2    was one of my things that I wanted to make sure

3    was clear.  I think, additionally, something to

4    think about, holistically, the Congressional

5    District 10 and its current configuration has only

6    existed since 2016 as part of the remedial process

7    when that area was reconfigured.  So again, as a

8    component of the functional analysis that you have

9    to look at -- that last component I talked about

10   was the election results -- House District 20 has

11   a very long timeline and proven record of

12   electing, you know, a black population's candidate

13   of choice.  CD 10 doesn't have some of those

14   additional trends that support that elongated data

15   patterns.  So that's one additional data point I'd

16   like to put out.  Thank you.

17            VICE-CHAIR TUCK:  Representative Brown?

18            REPRESENTATIVE BROWN:  Thank you, Madam

19   Chair.

20            So part of why I'm asking this is because

21   in the previous draft we had, which was I believe

22   the workshop map of 8001, we actually maintained

23   CD 10 basically, comparable to the benchmark and

24   what sort of the Senate did in their maps.  So

25   regardless of whether it's sort of Tier 1

HT_0004904
CUBANOS-0000004778

2/18/2022          Common Cause, et al. v. Cord Byrd          Audio Transcription

                                                              Page 34

1    protected or not, it seems to me we can kind of

2    choose the configuration of 8001 for Central

3    Florida.  Am I wrong with that?

4              VICE-CHAIR TUCK: Chair Sirois?

5              CHAIRMAN SIROIS:  Thank you, Vice-Chair.

6              And I'm sorry I missed the tail end of

7    that question.  If you could repeat for me a

8    little louder?  Thank you, Madam.

9              REPRESENTATIVE BROWN:  My apologies,

10   Mr. Chair.  So I was saying the reason I asked --

11   and I kind of referred to our draft plan in 8001.

12   We sort of maintain CD 10 comparable to those

13   benchmarks.  So I was saying regardless of whether

14   we're saying that CD 10 is protected by Tier 1 or

15   not, it seems that based off of just the ones

16   we've workshop, we could sort of choose to

17   configurate it, comparable to 8001.  Is that

18   correct?

19             VICE-CHAIR TUCK:  Chair Sirois?

20             CHAIRMAN SIROIS:  Thank you, Madam Chair.

21             So the difference that you would see, or

22   what I would characterize as improvement, you see

23   in the map that we have, overall, more alignment

24   with our methodology.  We have districts that we

25   improve where they are within the five biggest

HT_0004905
CUBANOS-0000004779

2/18/2022          Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 35

1    counties.  For example, Congressional District 20

2    in the map is more compact, and we have one less

3    split in Hillsborough County.  So initially, the

4    workshop maps were presented to this Committee as

5    pieces to demonstrate the real-world application

6    of our constitutional tiers.  And throughout that

7    process, subsequent discussions, follow-up,

8    feedback from Members, we were able to build and

9    improve upon the map to the product that you see

10   before you today.

11           VICE-CHAIR TUCK:  Members, any additional

12   questions?

13           Representative Joseph?

14           REPRESENTATIVE JOSEPH:  Thank you, Madam

15   Chair.

16           I wanted to follow up on a couple of

17   Representative Brown's questions with respect to

18   CD 10.  I understand that based on the review that

19   was presented, an evaluation of the criteria,

20   there's an expectation that the black-performing

21   district would just decrease in its performance

22   overtime.  That seems to be the underlying

23   assumption.  Even assuming without agreeing that

24   that assumption will play out correct, are we

25   prevented from keeping CD 10 closer to its

HT_0004906
CUBANOS-0000004780

Page 36

1    benchmark form under -- using just the Tier 2

2    criteria, which we're at liberty to do because it

3    does respect several of the geographical

4    boundaries if we kept it that way as opposed to

5    how we are.  I know we're still working through

6    our map, and this is the first iteration.  But I'm

7    just wondering about that.

8            VICE-CHAIR TUCK:  Chair Sirois?

9            CHAIRMAN SIROIS:  Thank you, Madam Chair.

10           Thank you, Representative Joseph, for the

11   question, and I think my answer would also provide

12   some further insight into Representative Brown's

13   line of question as well.  You know, I think it's,

14   really important for all of the Committee members

15   to understand that the PCB that we're looking at

16   today is at its first Committee stop.  And as we

17   move through the legislative process, the next

18   stop for this bill, if it's passed out of our

19   Committee today, of course, is the Full

20   Redistricting Committee.

21           I can assure Committee members that Chair

22   Leek and I remain committed, as we have been since

23   day one, to being open to your feedback,

24   accessible regarding questions that you may have,

25   suggestions that you can offer within the context

HT_0004907
CUBANOS-0000004781

2/18/2022          Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 37

1    of our two tiers that make it a better map.  And I

2    know that both of us continue to be open to

3    receiving that feedback.  The final point that I

4    would add of course is even after the House

5    process unfolds, we still have a reconciliation

6    with the Senate as well, where I think, you know,

7    additional issues will be brought up as well.

8              Thank you, Madam Chair.

9              VICE-CHAIR TUCK:  Follow-up?

10             REPRESENTATIVE JOSEPH:  Thank you, Madam

11   Chair.

12             And thank you, Mr. Chair, for the

13   explanation, and I look forward to that.  Like,

14   we've had good working relationships in the past

15   in my entire time in the Legislature, so I fully

16   anticipate that we'll be able to address that.  So

17   I think part of where I'm going to go with my

18   questions today is to do exactly that: to

19   highlight some of the issues that we have in

20   anticipation that ultimately, maybe not today, but

21   ultimately, we as the legislative body can stand

22   in unison behind some maps that we can actually be

23   proud of.  So I think we're ready to roll up our

24   sleeves with you.

25             So following up on CD 10 real quick,

HT_0004908
CUBANOS-0000004782

Page 38

1   looking at the data, I understand -- I mean, there

2   are a number of factors that may have contributed

3   to that decrease of performance, but I think we

4   can still use the Tier 2 factors to give that

5   district a fighting chance.  There's no reason we

6   need to take it away right away.  I think that as

7   a policy decision, we can look at, maybe, seeing

8   if it might perform and preserving it this round.

9   So that was one thing.

10          Let me move on to CD 26.  So looking at

11  CD 26, was that impacted by the fact that it's a

12  Tier 1-protected district for Latino voters or

13  Hispanic voters?

14          VICE-CHAIR TUCK:  Chair Sirois?

15          CHAIRMAN SIROIS:  Thank you, Madam Chair.

16          Yes.

17          REPRESENTATIVE JOSEPH:  Okay.  So looking

18  at kind of the image of it, it's kind of like an

19  extruded stair-step shape, stretching up from the

20  Gulf of Mexico all the way over to a little finger

21  that points just 700 yards short of Biscayne Bay

22  in Miami.  Was that shape necessary to comply with

23  Tier 1?  Or were there other factors that went

24  into just how it ends up looking there?

25          VICE-CHAIR TUCK:  Chair Sirois?

HT_0004909

CUBANOS-0000004783

2/18/2022                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 39

1           CHAIRMAN SIROIS:  Thank you, Madam Chair.

2    I'd like to ask Mr. Poreda to weigh in.

3           VICE-CHAIR TUCK:  Mr. Poreda, you're

4    recognized.

5           MR. POREDA:  Thank you, Madam Chair.

6           Yes.  The shape of District 26 was

7    largely because not only it was a Tier 1-protected

8    district, but the other three districts in Miami-

9    Dade County - District 24 are protected black

10   district.  And District 27 and 28 are also

11   protected districts.  So trying to balance all the

12   Tier 2 issues that are there in addition to,

13   first, protecting all three of those districts and

14   their ability to elect, that largely impacted the

15   shapes of all four of those districts.

16          VICE-CHAIR TUCK:  Follow-up?

17          REPRESENTATIVE JOSEPH:  Thank you, Madam

18   Chair.

19          And thank you for that response.  Yeah,

20   when you get to Miami-Dade, we got a lot of

21   protective folks.  So -- now, still sticking with

22   CD 26, I see that it crosses the large unpopulated

23   stretch of the Everglades between --it looks like

24   Miami-Dade County and Collier.  Would we consider

25   the Everglades in this area a major geographic

HT_0004910
CUBANOS-0000004784

Page 40

1    boundary?

2              VICE-CHAIR TUCK:  Chair Sirois?

3              CHAIRMAN SIROIS:  Thank you, Madam Chair,

4    and I'm going to ask Mr. Poreda to weigh in.

5              But I would add first that, you know,

6    there are still census block data available within

7    that territory.  And I think if you recall from

8    earlier presentations when we showed slides that

9    contained the population of our census blocks,

10   there were several areas within the state where

11   maybe just a few people lived.  You could count on

12   one hand the number of people identified in that

13   census block, but that doesn't change the fact

14   that they still have accounted for within our

15   congressional districts.

16             So you will see areas on the map -- the

17   Everglades is an example.  I think closer to

18   Miami, you have the Miami International Airport,

19   again, huge tract of land that you're talking

20   about there.  Along the East Coast, we have

21   wildlife refuges, military insulations, Kennedy

22   Space Center.  You see other large tracts of land

23   that are included in the census block data as

24   well.  So that's why you may see some variation

25   there.

HT_0004911
CUBANOS-0000004785

2/18/2022              Common Cause, et al. v. Cord Byrd              Audio Transcription

Page 41

1           But, Mr. Poreda, do you have anything

2     that you'd like to add?

3           VICE-CHAIR TUCK:  Mr. Poreda, you're

4     recognized.

5           MR. POREDA:  Thank you, Madam Chair.

6           Yeah.  I will echo what the Chair said

7     about all of the unpopulated census blocks but

8     also add that District 26, primarily along its

9     entire length, uses the Collier County and the

10    Miami-Dade Broward County line, in addition to US-

11    41, which is the Tamiami Trail to create that

12    extension.  And if you look at actually the

13    boundary analysis for District 26, it's only 5

14    percent of its boundaries that do not follow one

15    of the designated political or geographical

16    boundaries.  So it uses a lot of municipal lines,

17    actually, in that area that may look a little bit

18    more jagged against District 24.  I believe it

19    uses the Hialeah Municipal line along with some of

20    the others there, in addition to using county

21    lines and the Tamiami Trail for almost its entire

22    extension until it gets over into Collier County

23    where it achieves all equal population.

24          VICE-CHAIR TUCK:  Follow-up?

25          REPRESENTATIVE JOSEPH:  Thank you, Madam

HT_0004912
CUBANOS-0000004786

Page 42

1    Chair.

2              Thank you for that explanation.  I try to

3    play around in the system.  I try to be a geek,

4    but sometimes I can't hang.  So this is one of

5    these instances, so forgive me if my question is a

6    little weird.  So the Esri Mapping program, so it

7    includes the rivers as one of the options of the

8    boundaries, right?  But the Everglades is

9    literally a river of grass.  So it covers more

10   than like 4300 square miles?  And it's 100 miles

11   long, and it's up like 60 miles wide?  And did you

12   consider that a major geographic boundary?

13             VICE-CHAIR TUCK:  Chair Sirois?

14             CHAIRMAN SIROIS:  I would defer to Mr.

15   Poreda.

16             VICE-CHAIR TUCK:  Mr. Poreda, you're

17   recognized.

18             MR. POREDA:  The Everglades by itself,

19   no.  But that's why, through that area, we're

20   actually using US-41 and the county lines of

21   Collier and Miami-Dade County.  So those are the

22   geographical or really political boundaries that

23   we're using to get through that area.

24             REPRESENTATIVE JOSEPH:  All right.

25             MR. POREDA:  Because we have to include

HT_0004913
CUBANOS-0000004787

Page 43

1    all the census blocks.  Even those census blocks

2    in the Everglades, as the chair mentioned earlier,

3    that had very little population, they all have to

4    be accounted for.

5              VICE-CHAIR TUCK:  Follow-up?

6              REPRESENTATIVE JOSEPH:  Thank you, Madam

7    Chair.

8              And thank you for the response.  So I

9    agree about the county boundaries as an

10   alternative way to look at it.  I guess it's

11   because it also coincides -- if I'm not mistaken,

12   the Everglades boundary coincides with the

13   political boundary where the Dade-Collier County

14   boundary is.  So with that in mind, looking at the

15   Tier 2 factors with CD 6, like this stairway to a

16   mockley shape, it crosses those county lines.  It

17   splits Collier, which is smaller than the ideal

18   district size.  It splits the city of Miami in

19   three ways, and Miami is smaller than ideal

20   district size too.  All of those Tier 2 -- I don't

21   want to say deficiencies, but infirmities, if we

22   can call it that, were those necessary to maintain

23   Tier 1 compliance?

24             VICE-CHAIR TUCK:  Mr. Poreda.

25             Chair Sirois.

HT_0004914
CUBANOS-0000004788

2/18/2022                    Common Cause, et al. v. Cord Byrd                    Audio Transcription

Page 44

1            CHAIRMAN SIROIS:  Thank you very much,

2     Madam Chair.

3            Representative Joseph, I think that's an

4     excellent example of a different approach, a concept

5     that can be brought to Chair Leek, for further

6     examination at the next Committee stop.

7            Madam Chair, I'd ask if Mr. Poreda has

8     anything more technical to add.

9            VICE-CHAIR TUCK:  Mr. Poreda.

10            MR. POREDA:  As I mentioned earlier, that

11     is primarily due to Tier 1 considerations In

12     addition to the equal population standard because

13     the boundaries within Collier County, for example --

14     even though, Collier County, there's lots of

15     counties throughout the map.  Walton County is

16     another example; Citrus County, where counties have

17     to be split in a congressional map because of the

18     equal population standard.

19            VICE-CHAIR TUCK:  And, Representative, if

20     you don't mind, I'm going to move on to a couple

21     other members and come back to you unless you have a

22     follow-up.

23            REPRESENTATIVE JOSEPH:  Sure, that's fine.

24     Thank you.

25            VICE-CHAIR TUCK:  Representative Fabricio.

HT_0004915
CUBANOS-0000004789

2/18/2022          Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 45

1            REPRESENTATIVE FABRICIO:  Thank you, Madam
2    Chair and --
3            VICE-CHAIR TUCK:  Representative, one
4    second.  I'm sorry.
5            Chair.
6            CHAIRMAN SIROIS:  Thank you, Madam Chair.
7            Representative Brown's request -- her good
8    request, we're going to put the maps back up on the
9    screen when we're discussing specific areas just to
10   make it a little bit easier for everybody to follow
11   along.  Thank you, Madam Chair.
12           VICE-CHAIR TUCK:  Thank you.
13           Representative.
14           REPRESENTATIVE FABRICIO:  Thank you, Madam
15   Chair.
16           And I'm going to preface my question with
17   an apology for its rudimentary nature.  But in
18   looking at the CD 26 District and discussing Tier 1
19   requirements and Tier 2 requirements, how does the
20   factor of compactness scores factor into determining
21   the viability of a CD in light of the Tier 1
22   requirements?
23           VICE-CHAIR TUCK:  Chair Sirois.
24           CHAIRMAN SIROIS:  Thank you very much,
25   Representative, for the good question.

HT_0004916
CUBANOS-0000004790

Page 46

1           As you know and as we've discussed since

2    we've started, the Tier 1 standards take precedent,

3    in terms of looking at the districts.  And when

4    compactness becomes a factor -- you know, I don't

5    know that it's fair to say that compactness can be

6    viewed in the context of a single district in this

7    sense, that the other districts that surround the

8    district that you're referring to also have

9    different issues at play.  Whether it's following a

10   political boundary, keeping a city whole, for

11   example, that may affect the ability to keep

12   surrounding districts as compact as we would like

13   them to be.

14           The map is very much -- the districts are

15   very much tied into one another.  When you change or

16   try to pursue, perhaps, one outcome with one

17   district boundary, it has impact on the surrounding

18   districts.

19           And, Madam Chair, Mr. Poreda has something

20   that he'd like to add.

21           VICE-CHAIR TUCK:  Mr. Poreda.

22           MR. POREDA:  I'll just echo what the chair

23   said.

24           VICE-CHAIR TUCK:  Follow-up?

25           REPRESENTATIVE FABRICIO:  Thank you, Madam

HT_0004917

CUBANOS-0000004791

2/18/2022          Common Cause, et al. v. Cord Byrd          Audio Transcription

Page  47

1   Chair.

2          And thank you, Chair Sirois, for that

3   explanation.  I appreciate it.  It clarifies quite a

4   bit.  Because I'd like to consider the compactness

5   scores of District 26 vis-à-vis the compactness

6   scores of, say, District 3, where the Reock scores

7   in District 23 -- I'm sorry, District 26 are .3.

8   Whereas we look at CD 3 and we see a Reock score of

9   .11 and a Polsby-Popper score of .1 vis-à-vis CD 26.

10  And we see a Polsby-Popper score of .3, both low,

11  but CD 3 seems to be very low.

12          VICE-CHAIR TUCK:  Chair Sirois.

13          CHAIRMAN SIROIS:  Thank you, Madam Chair.

14          Ms. Kelly, if you'd like to jump in.

15          VICE-CHAIR TUCK:  Ms. Kelly, you're

16  recognized.

17          MS. KELLY:  Thank you, Madam Chair.

18          Thank you, Chair Sirois.

19          Thank you, Representative, for that

20  question.  So I'm going to go back to something I

21  referenced earlier, but this is a really important

22  concept to hone in because it applies to several

23  factors in the map.  So first of all, compactness is

24  secondary to our Tier 1 requirement to ensure that a

25  minority population has an ability to elect a

HT_0004918
CUBANOS-0000004792

Page 48

1    candidate of their choice.  So both of the districts

2    that you reference, Congressional District 3 in

3    North Florida and then Congressional District 26 in

4    South Florida are both Tier 1 protected districts.

5            The first item I'd like to point out is

6    that Tier 3 is a protected black district.  District

7    26 is a protected Hispanic district.  So again,

8    whenever we're going through that process of

9    functional analysis, those minority populations

10   interact differently with one another.  So comparing

11   their functional analysis postures would not

12   necessarily be a one-to-one comparison.  Not only

13   are they in different regions of the state, those

14   voters may perform differently or interact

15   differently, but they're also in different

16   geographical locations of the state.

17           So in North Florida, you have a lot of

18   rural counties, where you have less population.  So

19   you have to account for that, as you're not only

20   drawing down to plus or minus one person, but also

21   still ensuring that Tier 1 requirement, that they

22   have the ability to elect.  Similarly, in South

23   Florida, as other representatives have pointed out

24   as well, you have a lot of Everglades population.

25   And I guess I say that ironically because there's

HT_0004919
CUBANOS-0000004793

2/18/2022                  Common Cause, et al. v. Cord Byrd                  Audio Transcription

Page 49

1    not a lot of people that live in the Everglades, but

2    there is a lot of census blocks that we still have

3    to account for.  So even though they have a

4    different compactness scores, it also has to be done

5    in context of the geographical constraints of the

6    region, the Tier 1 constraints of the region, as

7    well as population of the region.  And I believe

8    that was all the points I wanted to make.  Thank

9    you.

10             VICE-CHAIR TUCK:  Follow-up?

11             REPRESENTATIVE FABRICIO:  Last follow-up,

12   and I appreciate your explanation.  Could you tell

13   me which congressional district has the lowest

14   overall compactness score?

15             VICE-CHAIR TUCK:  Ms. Kelly.

16             MS. KELLY:  I'm going to ask for a

17   clarification.  Do you mean a state-wide average or

18   an individual compactness score?

19             REPRESENTATIVE FABRICIO:  Thank you.

20             Which congressional district has the lowest

21   compactness score if you rank compactness scores

22   from top to bottom?

23             VICE-CHAIR TUCK:  Ms. Kelly.

24             MS. KELLY:  So it'll take me a second to go

25   through my list.  I will answer your question.  I

HT_0004920
CUBANOS-0000004794

2/18/2022                Common Cause, et al. v. Cord Byrd            Audio Transcription

Page 50

1  would like to say though, there's not one

2  compactness score that is superior to another, and

3  they're to be viewed in context of one another.  And

4  I'll further elaborate on that.  Each compactness

5  score, you can think of it as measuring a slightly

6  different component of the district.  So for

7  instance, if you remember back to some of the

8  presentations we did during the Interim Committee

9  weeks, the Reock score measures, you know, the more

10  circular a district is, the higher your Reock score

11  will be.  For Convex Hull score, you can think of it

12  as, perhaps, putting a rubber band around that

13  district.  And the more it's filled out, the higher

14  that score will be.

15          And the Polsby-Popper score oftentimes

16  measures a lot of the indentations in the overall

17  perimeter of the district.  So I do need a minute to

18  get that answer for you, and I will get that answer

19  for you, but I want to elaborate that whenever we're

20  ranking compactness scores, it's more just, I think,

21  as a data point and a much bigger plane of analysis.

22  But we'll get that answer for you right now.

23          REPRESENTATIVE FABRICIO:  Thank you.

24          VICE-CHAIR TUCK:  Members, additional

25  questions?

HT_0004921
CUBANOS-0000004795

2/18/2022                 Common Cause, et al. v. Cord Byrd                 Audio Transcription

Page 51

1          Thank you, Member Skidmore.

2          REPRESENTATIVE SKIDMORE:  Thank you, Madam

3   Chair.

4          I think we're very interested in CD 26

5   today.  A few weeks ago, when we took up the House

6   maps on the floor, Rep Joseph had a series of

7   questions, and I kind of want to revert back to some

8   of them.  I remember Chair Leek called the -- he

9   didn't want to go into a deep rabbit hole, but these

10   questions are not typical.

11          So Rep Joseph asked if the House analysis

12   involved ecological regression or inference analysis

13   to determine the level of minority cohesion and

14   white block voting, racially polarized voting.

15   Chair Leek said yes.  But he didn't say what the

16   outcome of those analyses were.  So as applied to

17   the congressional map, specifically, in South

18   Florida, does the House have an analysis of minority

19   cohesion, white block voting, and racially polarized

20   voting in the benchmark Latino majority districts of

21   South Florida or in the Miami-Dade area, just

22   generally speaking?

23          VICE-CHAIR TUCK:  Chair Sirois.

24          CHAIRMAN SIROIS:  Thank you, Madam Chair.

25   If I could just have a moment.

HT_0004922
CUBANOS-0000004796

Page 52

1          Represent Skidmore, could you -- I'm sorry,
2     Madam Chair.
3          VICE-CHAIR TUCK:  Representative Skidmore,
4     can you repeat your question?
5          CHAIRMAN SIROIS:  Thank you.
6          REPRESENTATIVE SKIDMORE:  Sure.  I won't go
7     through the whole setup, but the specific question
8     is, as applied to the congressional map in South
9     Florida, does the House have an analysis of minority
10    cohesion, white block voting, and racially polarized
11    voting in the benchmark Latino minority-majority
12    districts in South Florida or in Miami-Dade?
13    Generally speaking.
14          VICE-CHAIR TUCK:  Chair Sirois.
15          CHAIRMAN SIROIS:  Thank you very much,
16    Madam Chair.
17          You know, I want to begin by answering that
18    the Florida Supreme Court has recognized that the
19    only performance measure is the functional analysis
20    test.  The data that you're referring to, that Chair
21    Leek spoke to on the floor, is some of the advanced
22    statistical analysis that legal counsel has assisted
23    the House with conducting.
24          I would ask Madam Chair that Ms. Kelly may
25    have something to add on that subject.  Okay.  We're

HT_0004923
CUBANOS-0000004797

2/18/2022            Common Cause, et al. v. Cord Byrd            Audio Transcription

Page 53

1    good.   Thank you, Madam Chair.

2            VICE-CHAIR TUCK:  Follow-up?

3            REPRESENTATIVE SKIDMORE:   Thank you, Madam

4    Chair.

5            So the data exists, but we're just not

6    privy to it?

7            VICE-CHAIR TUCK:  Chair Sirois.

8            CHAIRMAN SIROIS:   Thank you, Madam Chair.

9            That data is an advanced statistical

10   analysis that was performed -- expert analysis that

11   was performed at the request of the legal counsel

12   that is advising the House on the redistricting

13   process.  So the information that is a part of that

14   relationship as a part of that contract is retained

15   by outside counsel.

16           VICE-CHAIR TUCK:  Follow-up?

17           CHAIRMAN SIROIS:  I would just add -- I'm

18   sorry -- that information is not retained with the

19   House of Representatives.

20           VICE-CHAIR TUCK:  Follow-up?

21           REPRESENTATIVE SKIDMORE:   Thank you, Madam

22   Chair.

23           So is there any cohesion of voting data

24   that is available to us?

25           VICE-CHAIR TUCK:  Chair Sirois.

HT_0004924
CUBANOS-0000004798

Page 54

1          CHAIRMAN SIROIS:  The functional analysis

2    performs exactly the kind of feedback that you're

3    referring to.  That's the analysis that the Court

4    requires to be performed is the functional analysis.

5    So beyond that, you know, I'm not able to answer

6    your question.

7          VICE-CHAIR TUCK:  Follow-up?

8          REPRESENTATIVE SKIDMORE:  Thank you, Madam

9    Chair.

10          Are there any reports, conclusions, or

11    analysis regarding cohesion that have been conducted

12    that would be able to be shared with us?  I know

13    Chair Leek said that it's not -- you know, the

14    average person isn't going to want to go through

15    this, but is there anything that has been reported

16    that -- or, you know, memos or anything that would

17    help us understand cohesion?

18          VICE-CHAIR TUCK:  Chair Sirois.

19          CHAIRMAN SIROIS:  There are no formal

20    reports that exist at this stage of the game in

21    anticipation of litigation.  What I would add is

22    that the Florida Supreme Court requires the

23    completion of a functional analysis.  We have done

24    that, and that information is contained in your

25    packet.

HT_0004925
CUBANOS-0000004799

Page 55

1          REPRESENTATIVE SKIDMORE:  Thank you.

2          VICE-CHAIR TUCK:  Additional questions,

3    Members?

4          Representative Fabricio.

5          REPRESENTATIVE FABRICIO:  Just following up

6    to see if the data that I requested was available.

7          VICE-CHAIR TUCK:  Ms. Kelly, if it's okay,

8    we'll go and take Representative Joseph's questions.

9    We can come back?

10         MS. KELLY:  Yes, absolutely.

11         VICE-CHAIR TUCK:  Representative Joseph.

12         REPRESENTATIVE JOSEPH:  Thank you, Madam

13   Chair.

14         I guess it's more of like a request.  We

15   can work on it later as we work through the map's

16   thing.  But I'd like to see how we can -- actually,

17   let me back up.  It seems that the House took away a

18   benchmark Hispanic district that or the new map

19   proposed, that crossed the Everglades from Dade to

20   Collier.  And I'd really like to see how we could

21   avoid crossing the Everglades because it's been a

22   practice of doing that since the 2016 court-ordered

23   Senate map.  And as we continue working on the maps,

24   I'd like to see how we can preserve that because I

25   actually think it would make it more Tier 2

HT_0004926
CUBANOS-0000004800

2/18/2022                    Common Cause, et al. v. Cord Byrd              Audio Transcription

Page 56

1    compliant.  So that's more of a request than a

2    question.  So there you go.

3                VICE-CHAIR TUCK:  Chair Sirois.

4                CHAIRMAN SIROIS:  Thank you, Madam Chair.

5                Congressional District 26 remains a

6    protected Hispanic district, so I'm not sure what it

7    is that you're referring to.

8                REPRESENTATIVE JOSEPH:  My apologies.

9    Thank you.  I described it wrong.  So when I say

10   that, I'm talking about the benchmark district that

11   crossed from the Everglades to Dade to Collier.  So

12   not that it eliminated, I totally misspoke on that.

13   I don't believe it eliminates the Hispanic district,

14   but I thought that something was moved, like there

15   was a Hispanic district that, maybe I'm mixing them

16   up.  There was a Hispanic district down south that

17   was moved somewhere else in Florida.

18               VICE-CHAIR TUCK:  Chair Sirois.

19               CHAIRMAN SIROIS:  Thank you very much,

20   Madam Chair.

21               And, I think that the district that you

22   were referring to was in the House map for State

23   Legislative Districts.

24               REPRESENTATIVE JOSEPH:  Just kidding.  All

25   right.

HT_0004927
CUBANOS-0000004801

2/18/2022          Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 57

1          CHAIRMAN SIROIS:  No, don't apologize.

2    Believe me when I tell you that I understand, you

3    know, all this stuff starts to run together after a

4    while.  So I appreciate where you come from.

5          REPRESENTATIVE JOSEPH:  So thank you.

6          VICE-CHAIR TUCK:  Follow-up?

7          REPRESENTATIVE JOSEPH:  What I'm really

8    trying to say, forget the House map and that

9    district moving, is preserving the lines and trying

10   to uphold or maximize the Tier 2 criteria.  I think

11   in doing so for there -- and I see staff shaking

12   their head -- I think we might be able to achieve a

13   map that does that in a way that protects that area

14   and does not have a negative impact on Tier 1 and

15   all of that good stuff.  So there you go.  Thank

16   you.

17         VICE-CHAIR TUCK:  Chair Sirois.

18         CHAIRMAN SIROIS:  Thank you very much,

19   Madam Chair.

20         I would welcome that conversation with

21   myself, staff, Chair Leek, and I think that's

22   something that, you know, we can look at as we move

23   forward through the Committee process.

24         VICE-CHAIR TUCK:  And, Ms. Kelly, you're

25   recognized to answer Representative Fabricio's

HT_0004928
CUBANOS-0000004802

2/18/2022             Common Cause, et al. v. Cord Byrd             Audio Transcription

Page 58

1    question.

2            MS. KELLY:  Thank you, Madam Chair, and

3    thank you for giving us time to pull that data.

4            So I'd like to go through each compactness

5    score.  We were able to identify the district that

6    has the lowest compactness scores and give it in

7    context of that region as a whole.  So whenever

8    we're looking at the lowest Reock score, we're

9    looking at CD 3, and it has a .11.  Its Polsby-

10   Popper score is .10, but I'd also like to point out

11   that its Convex Hull score is .63, which is right

12   around the average for the state.

13           Moving into the Convex Hull score, that

14   one's lowest rate is on CD 28 with a .56.  Again,

15   making sure I provide it in context, the Reock score

16   on that is .21 and then .24 for Polsby-Popper.

17   Going back to the Polsby-Popper score, again, CD 3

18   is there at .10.  And again, just to remind everyone

19   in context, its Convex Hull score is up near the

20   average of the rest of the state as well.  Thank

21   you.  Hopefully that answers your question.

22           VICE-CHAIR TUCK:  Members, additional

23   questions?

24           Ex officio, Davis.

25           REPRESENTATIVE DAVIS:  Thank you, Chair.

HT_0004929
CUBANOS-0000004803

2/18/2022                Common Cause, et al. v. Cord Byrd              Audio Transcription

Page 59

1   And thank you, Committee, for allowing me to be here

2   this morning.

3              Just a question, you may have answered it

4   along the way, but we are talking to the general

5   public.  So could you be clear in the sense of the

6   difference between the functional analysis and the

7   performance analysis for me, please?

8              VICE-CHAIR TUCK:  Chair Sirois.

9              CHAIRMAN SIROIS:  Thank you very much,

10  Madam Chair.

11             Representative, thank you for the question.

12  And I think it's important, you know, words do

13  matter because what we're talking about here is the

14  functional analysis.  And the functional analysis

15  provides information related to performance, and

16  that helps us understand as to whether or not our

17  obligation to identify and to protect -- protected

18  district's remains in effect.  So, you know, I'm

19  happy -- if you want some more detail on the

20  functional analysis process, I'm happy to provide

21  that.  But I think that answers your question.

22             VICE-CHAIR TUCK:  Follow-up?

23             REPRESENTATIVE DAVIS:  Somewhat.  I asked

24  for the difference between the functional analysis

25  and the performance analysis of a district.  So you

HT_0004930
CUBANOS-0000004804

2/18/2022                Common Cause, et al. v. Cord Byrd              Audio Transcription

Page 60

1    did answer the functional analysis, but the

2    performance analysis is what I'm waiting for now.

3              CHAIRMAN SIROIS:  Chair Sirois.

4              CHAIRMAN SIROIS:  Thank you, Madam Chair.

5              Thank you, Representative Davis.  It's the

6    same thing.

7              If I could, Madam Chair, ask Ms. Kelly to

8    elaborate.

9              VICE-CHAIR TUCK:  Ms. Kelly, you're

10   recognized.

11             MS. KELLY:  Thank you, Madam Chair.

12             Thank you, Chair Sirois.

13             Thank you, Representative.  Sometimes I

14   feel like those terms may be used interchangeably,

15   because the functional analysis alludes to the

16   performance ability of a minority group to elect a

17   candidate of its choice.  So Chair Sirois, just

18   piggybacking off of what you said, I believe what

19   you're asking about is, in fact, the same analysis,

20   the same data set.  It just may be commonly referred

21   to, differently.

22             REPRESENTATIVE DAVIS:  Thank you.  That

23   cleared it up.  Interchangeable terms, I appreciate

24   that.  So with that and we were talking about the

25   cohesiveness of the districts.  How did you apply

HT_0004931
CUBANOS-0000004805

Page 61

1   the non-vote dilution standard when drafting these

2   maps?

3          VICE-CHAIR TUCK:  Chair Sirois.

4          CHAIRMAN SIROIS:  I would ask Ms. Kelly.

5          VICE-CHAIR TUCK:  Ms. Kelly, you're

6   recognized.

7          MS. KELLY

                  :  So the provision that you're

8   alluding to is a provision that's in our Tier 1 of

9   requirements.  It says you cannot deny or diminish

10  the ability of a racial or language minority group

11  to elect a candidate of their choice.  So when doing

12  the functional analysis, you know, one of the

13  components of that is ensuring that that protected

14  district doesn't have a diluted ability to elect a

15  candidate of their choice.  Which is why, as we've

16  recreated these districts, we've recreated them at

17  several similar levels to where the benchmark

18  districts are.  The courts have said a lot over the

19  years as far as being able to drop different data

20  points too low or perhaps too high, and so we've

21  made an effort to make sure that those minority

22  populations don't have a diluted ability or

23  diminished ability to elect a candidate of their

24  choice, in complying with our Tier 1 standards.

25          Ms. Chair:  Follow-up?

HT_0004932
CUBANOS-0000004806

Page 62

1              REPRESENTATIVE DAVIS:  Just kind of a

2      variety of questions.

3              So with another process, what did you --

4      how did you identify the process by way of your

5      Voting Rights Act and Tier 1 protected districts in

6      the benchmark map?  And did you run that process on

7      all 28 Districts?

8              VICE-CHAIR TUCK:  Chair Sirois.

9              CHAIRMAN SIROIS:  Thank you, Madam Chair.

10             You know, Representative, I may ask you to

11     be more specific, but I will tell you that the PCB

12     that is presented before you today is in full

13     compliance with our state constitution, state and

14     federal law, judicial president ruling by the Court,

15     and that would include the Voting Rights Act.

16             VICE-CHAIR TUCK:  Follow-up?

17             REPRESENTATIVE DAVIS:  Thank you for that

18     answer, Chair.  And the question I was asking was

19     the process as to how we identified by way of the

20     using the Voting Rights Act and the Tier 1

21     protections to get to that.  I think you've answered

22     it, and I appreciate that, saying that you feel like

23     these maps are completely legal and compliant with

24     constitutional standards.  So thank you for that

25     answer.

HT_0004933
CUBANOS-0000004807

2/18/2022              Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 63

1          VICE-CHAIR TUCK:  Seeing no additional

2    question -- Representative Joseph?

3          REPRESENTATIVE JOSEPH:  Thank you, Madam

4    Chair.

5          For CD 24, I see that it's shifted all the

6    way east where it wasn't that way before.  Can you

7    walk us through, kind of, what went into that?  I

8    know it had to do with making sure that CD 27 was

9    okay in terms of meeting the Tier 1 criteria, but

10   talk to us a little bit more about what happened

11   there.

12         VICE-CHAIR TUCK:  Chair Sirois.

13         CHAIRMAN SIROIS:  Thank you, Madam Chair.

14         Thank you, Representative for the question.

15   I would ask Mr. Poreda to provide an explanation.

16         VICE-CHAIR TUCK:  Mr. Poreda, you're

17   recognized.

18         MR. POREDA:  Thank you, Madam Chair.

19         That district is a protected black

20   district.  Its black voting Age population in the

21   benchmark was about 43 percent.  And the district

22   you see before you, it's about 42 and a half percent

23   -- 42, I think, .2 percent.  It was brought over to

24   that population, so it wouldn't impact Districts 26,

25   27, or 28, which are all protected districts, in

HT_0004934
CUBANOS-0000004808

2/18/2022          Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 64

1    addition to adding population to all three districts

2    to achieve our new ideal population for a

3    Congressional District.

4              So that was simply where the population

5    was.  In an effort to also, where we could, take

6    those Tier 1 districts and make them a little bit

7    more Tier 2 compliant and create a more compact

8    shape.

9              VICE-CHAIR TUCK:  Seeing no more questions?

10   We are in amendments.

11             Are there any amendments?

12             Representative.

13             REPRESENTATIVE FABRICIO:  Thank you.  And I

14   apologize for jumping in late there.  In determining

15   the importance of the compactness scores, we have

16   Reock, Convex Hull, and the Polsby-Popper.  Does any

17   one of those three different compactness components

18   have any different kind of weight over another, or

19   are they looked at in the aggregate?

20             VICE-CHAIR TUCK:  Chair Sirois.

21             CHAIRMAN SIROIS:  Thank you,

22   Representative.  The answer to your question is no.

23   And that's why they have to be used in context and

24   looked at across the board.

25             VICE-CHAIR TUCK:  Follow-up?

HT_0004935
CUBANOS-0000004809

2/18/2022                Common Cause, et al. v. Cord Byrd              Audio Transcription

Page 65

1            REPRESENTATIVE FABRICIO:  So if you have a
2    particular congressional district that has two
3    compact scores that are exceedingly low and one that
4    happens to be about average, how would that analysis
5    weigh out?
6            VICE-CHAIR TUCK:  Chair Sirois.
7            CHAIRMAN SIROIS:  Thank you, Madam Chair.
8            You know, you have to look at in the
9    context of the entire map.  Yes.
10           And, Ms. Kelly, would you like to add
11   something?
12           VICE-CHAIR TUCK:  Ms. Kelly, you're
13   recognized?
14           MS. KELLY:  Thank you.  And I agree with
15   what Chair Sirois said.  I'd also like to add,
16   compactness is one of our Tier 2 standards, but it's
17   not the only Tier 2 standard.  So within that as
18   well, you have to balance political and geographical
19   boundaries.  So we're looking at riverways,
20   waterways, county lines, and corporate and
21   municipality lines.  So it's not just, again,
22   compactness scores as a sole analysis.  It's within
23   the context of our Tier 2 standards as well as the
24   consideration that that is secondary in nature
25   always to our Tier 1 standards.

HT_0004936
CUBANOS-0000004810

Page 66

1          VICE-CHAIR TUCK:  Follow-up?

2          REPRESENTATIVE FABRICIO:  And in that group

3     of additional Tier 2 standards, would one of the

4     other considerations be unnecessary appendages?

5          VICE-CHAIR TUCK:  Chair Sirois.

6          CHAIRMAN SIROIS:  Thank you, Madam Chair.

7     I think it's -- you know, I would ask you to explain

8     what you view as being an unnecessary appendage

9     because, oftentimes, when you see those in the

10    context of a congressional district, it may be a

11    municipal boundary or some kind of other feature

12    which requires us to incorporate into the district

13    boundary.

14          VICE-CHAIR TUCK:  Follow-up?

15          REPRESENTATIVE FABRICIO:  For example,

16    Gadsden County in the western edge of CD 3.

17          CHAIRMAN SIROIS:  I'm sorry, Representative

18    -- Madam Chair?

19          VICE-CHAIR TUCK:  You're recognized.

20          CHAIRMAN SIROIS:  Could you repeat that?

21          REPRESENTATIVE FABRICIO:  For example,

22    Gadsden County on the western edge of CD 3.

23          VICE-CHAIR TUCK:  Chair Sirois, you're

24    recognized.

25          CHAIRMAN SIROIS:  Thank you very much,

HT_0004937
CUBANOS-0000004811

2/18/2022          Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 67

1   Representative.  Gadsden County is a part of a

2   majority-minority protected district.  So I don't

3   understand -- in an effort to protect that district,

4   I don't understand how you view that as an

5   appendage.  Maybe you could elaborate.

6            REPRESENTATIVE FABRICIO:  I understand.  It

7   just seems that it's linked up through a very slim

8   sliver of land there.

9            CHAIRMAN SIROIS:  I'm sorry,

10  Representative.  Could you repeat that into the

11  microphone?

12           REPRESENTATIVE FABRICIO:  I'm sorry.  Can

13  you hear me now?

14           CHAIRMAN SIROIS:  Yes.

15           REPRESENTATIVE FABRICIO:  It seems to be

16  linked to the rest of CD 3 through a very slim

17  sliver of land.

18           VICE-CHAIR TUCK:  Representative, was there

19  a question in there?

20           REPRESENTATIVE FABRICIO:  I believe the

21  Chair asked me to elaborate why I considered the

22  Gadsden County portion of CD 3 to be a appendage.

23           VICE-CHAIR TUCK:  Chairs Sirois.

24           CHAIRMAN SIROIS:  Ms. Leda, would you like

25  to weigh in?

HT_0004938
CUBANOS-0000004812

Page 68

1          MS. KELLY:  Yes.  Thank you, Chair.

2          Thank you, Chair.

3          So as far as an appendage goes, whenever

4    you look at the Gadsden County connected to

5    Congressional District 3, Gadsden County in its

6    entirety is connected to Congressional District 3.

7          So usually, whenever you, in the context of

8    redistricting, talk about appendages, or, I believe,

9    the courts have used the frayed tortured shapes,

10   things that would be abnormal to the visual eyeball

11   test of compactness, a whole county being included

12   in a district is very in-line with the rest of the

13   methodology that we've applied across the map.

14   There's several districts that include the whole

15   counties.

16          And again, I'll reiterate.  District 3 has

17   Tier 1 protections.  Gadsden County is Florida's

18   only majority-minority black county in the entire

19   state, which goes into part of that Tier 1

20   consideration, which, again, outranks compactness as

21   a Tier 2 requirement.  Thank you.

22          VICE-CHAIR TUCK:  All right.  Seeing no

23   more questions, we are in amendments.

24          Are there any amendments on the PCB?

25          Representative Hunschofsky, any questions.

HT_0004939
CUBANOS-0000004813

2/18/2022                 Common Cause, et al. v. Cord Byrd                 Audio Transcription

Page 69

1          REPRESENTATIVE HUNSCHOFSKY:  Thank you very

2     much.  Going back to the section that my colleague

3     is so concerned about, Congressional District 3,

4     could you go again through how many counties were

5     kept whole and cities were kept whole in that

6     district, because those are also Tier 2, and I

7     wasn't sure how many were kept whole in that area?

8          VICE-CHAIR TUCK:  Mr. Poreda, you're

9     recognized.

10          MR. POREDA:  Thank you, Madam Chair.  That

11     district contains four whole counties.  Those are

12     the counties of Gadsden, Madison, Hamilton, and

13     Baker Counties.  In addition to that, it has

14     portions of Leon County, Jefferson County, Columbia

15     County, and then Duval County.  That district has

16     all of these municipalities that would be in those

17     whole counties.  It then also splits the city of

18     Tallahassee, the city of Lake City, and the city of

19     Jacksonville.

20          VICE-CHAIR TUCK:  Follow-up?

21          REPRESENTATIVE HUNSCHOFSKY:  And when we

22     were going through the Tier 1 and Tier 2, in the

23     Tier 1, I just want to confirm, is it true that Tier

24     1, they're all held equally, or we have to

25     prioritize one of the Tier 1 over another?

HT_0004940
CUBANOS-0000004814

Page 70

1          VICE-CHAIR TUCK:  Chair Sirois.

2          CHAIRMAN SIROIS:  Thank you, Representative

3     Hunschofsky.  They are equal within the tier.

4          VICE-CHAIR TUCK:  Follow-up?

5          REPRESENTATIVE HUNSCHOFSKY:  And the Tier 1

6     always comes before the Tier 2 when we are weighing

7     this, correct?

8          VICE-CHAIR TUCK:  Chair Sirois.

9          CHAIRMAN SIROIS:  Thank you very much,

10    Representative Hunschofsky.  Yes.

11         REPRESENTATIVE HUNSCHOFSKY:  Yeah, I was

12    paying attention to it.  And then lastly, I have

13    brought up several times ad nauseam on this

14    Committee, how important I think it is to keep

15    cities and counties as whole as possible having come

16    from municipal office.  So but is it true that when

17    we're looking at those Tier 2 standards, we can also

18    choose -- when looking at the totality of it and

19    what we're trying to accomplish, and that there's a

20    good representation in each of these districts, that

21    we can choose, for example, to prioritize keeping

22    counties and cities Whole over prioritizing

23    compactness?  Is that within our option on those

24    Tier 2 or do we have to go in the order that it

25    would -- that they were presented to us?

HT_0004941
CUBANOS-0000004815

Page 71

 1            VICE-CHAIR TUCK:  Chair Sirois.

 2            CHAIRMAN SIROIS:  Thank you very much,

 3     Madam Chair.  On the issue of city splits, and I

 4     know that that is important to you.  You've raised

 5     that consistently throughout this process, and I

 6     think you should proud of the progress that this map

 7     makes in that regard Because we improve -- in the

 8     benchmark map, there were 39 city splits.  In the

 9     PCB before you today, there are 27.  So we have made

10     some improvement in that regard.

11            If there are additional areas of the state

12     that you would like to make some recommendation in

13     terms of -- perhaps a way we could further reduce

14     the number of city splits, I'm happy, and I can

15     speak for Chair Leek in saying we're happy to

16     continue to have that conversation with you.

17            I would ask also, if you could repeat and

18     clarify the second part of your question?

19            REPRESENTATIVE HUNSCHOFSKY:  Yeah.  I just

20     wanted to make sure -- I'm asking that we are

21     allowed to prioritize in -- within the Tier 2, we

22     can make the choice to prioritize keeping more

23     counties and cities whole than compactness.  Are we

24     allowed to do that?

25            VICE-CHAIR TUCK:  Chair Sirois.

HT_0004942
CUBANOS-0000004816

Page 72

```
1           CHAIRMAN SIROIS:  Within Tier 2, each of
2    those receive equal consideration.
3           REPRESENTATIVE HUNSCHOFSKY:  Okay.  Thank
4    you.
5           VICE-CHAIR TUCK:  All right.  Last chance.
6    Seeing no more questions.
7           All right.  Members, we are in amendments.
8           Are there any amendments on the PCB?
9           Seeing none, we are now in public
10   testimony.  I'll remind all the speakers to keep
11   their comments on topic and to the constitutional
12   standards as the maps we are voting on today must be
13   in alignment with these standards.
14           First up, Robert Popper, Judicial Watch.
15   Thank you for being here.  You're recognized.
16           MR. POPPER:  Thank you, Madam Chair.  Good
17   morning.  My name is Robert Popper.  I am a voting
18   specialist at Judicial Watch.  Judicial Watch is a
19   Washington DC nonprofit devoted to transparency,
20   accountability, and fidelity to the rule of law.
21   I'm here to testify in particular about the
22   constitutional status and what I view as potential
23   infirmities of District 3.
24           I've been a litigator for 32 years, and
25   I've worked on voting issues for much of that time.
```

HT_0004943
CUBANOS-0000004817

2/18/2022                Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 73

1   I've submitted  written testimony, which I believe

2   was emailed to the Committee.  I also understand

3   that revised statistics were sent to the Committee,

4   not by me, but I do understand that that needs to be

5   emphasized as well.

6            To summarize my testimony in my written

7   statement, District 3 was drawn on the basis of

8   racial considerations, as I believe the Florida

9   Supreme Court acknowledged and as I believe this

10  Committee would frankly acknowledge.  That puts it

11  in a difficult position in terms of federal law.

12  Its boundaries correlate with African American

13  populations in Duval County and Leon.  And one of

14  the points I'd like to emphasize is that I believe

15  that it violates traditional districting criteria.

16  That is a specialty of mine.

17            I am the Popper of the Polsby-Popper

18  criterion.  Professor Polsby and I developed that

19  criterion 30 years ago to develop and understand the

20  non-compactness of gerrymandered districts.  Under

21  the Polsby-Popper criterion, that scores a 0.1 or a

22  10 percent.  That is extremely low.  That is low

23  nationally.  That is the lowest in Florida.  Below

24  20 percent for a landlocked district, which District

25  3 is, is extremely non-compact.  It is not the worst

HT_0004944
CUBANOS-0000004818

Page 74

1  district I've ever seen, but 10 is low.  And those

2  boundary lines do not contort as they would.  For

3  example, and if this was the district in the

4  Chesapeake Bay in my home state of Maryland, those

5  districts are manmade.  The contortions are manmade.

6  The district is 200 miles long.  It narrows to three

7  miles wide.  It runs through eight counties and

8  splits four of them.

9          In addition to the Polsby-Popper method of

10  measuring compactness, there is the Reock

11  measurement, which gives it an 11 percent or 0.11.

12  It is unusual for the Polsby-Popper and the Reock

13  method to agree.  Usually, the Reock method is more

14  forgiving.  The fact that they agree means that this

15  is non-compact on at least two kinds of scales.  The

16  indentations measured by Polsby-Popper, the length

17  to width typically flagged by Reock.  It is also the

18  third worst was my measurement.

19          Madam Chair, forgive me if I've not

20  calculated that accurately, but by my count, it was

21  the third worst scoring district in the state on

22  Convex Hull.

23          As a practitioner in the area of

24  traditional districting criteria, I do not believe

25  that Convex Hull is that useful of a measurement.

HT_0004945
CUBANOS-0000004819

Page 75

1   It doesn't see too much.  If you imagine a rubber

2   band stretched over the outward points of a

3   district, anything that happens internally that

4   doesn't affect the area just is not seen at all.

5   But that being said, it does not score well on

6   Convex Hull.  As I pointed out, it's a landlocked

7   district, which makes the non-compactness harder to

8   explain, and I think we know why the non-compactness

9   exists.  It was to connect particular communities to

10  create a particular result.

11          Now, as a race-based district under the

12  jurisprudence of Shaw vs.  Reno and Miller vs.

13  Johnson, the Supreme Court has determined that the

14  equal protection clause is potentially violated

15  unless the district meets strict scrutiny, unless

16  there is a compelling justification met by a

17  narrowly tailored remedy.

18          It has been held that Section 2 will not

19  serve as a justification where you cannot create a

20  greater than 50 percent minority voting age

21  population.  That is the case here.  It has been

22  held that Section 5 of the Voting Rights Act, prior

23  to its becoming unconstitutional, and Section 4

24  becoming unconstitutional, and Section 5 becoming

25  inoperative,  prior to that, you needed a

HT_0004946
CUBANOS-0000004820

Page 76

1    specialized finding of a particular harm in order to
2    justify that remedy.  And I would add that we in the
3    modern age have forgotten what those findings were,
4    including states of the union where minority voting
5    turnout was less than 10 percent.  We don't have
6    that now.  But I submit there have not been those
7    findings.
8              And this is the point I would particularly
9    like to emphasize to this Committee.  If this
10   district is not narrowly tailored, it will not
11   satisfy strict scrutiny.  If it is not compact, it
12   will not satisfy strict scrutiny.  The Supreme Court
13   has viewed extremely non-compact districts as not
14   required by federal law.  I understand that we are
15   discussing here today Tier 1 and Tier 2, and
16   compactness and traditional districting criteria are
17   Tier 2 under federal law.  They are not Tier 2 --
18   I'm sorry, Tier 2 under Florida law.  They're not
19   Tier 2 under federal law.  It will torpedo the
20   ability of Florida to submit a set of districts that
21   it can call narrowly tailored if the district is
22   submitted, I believe, in its present form.
23             We all know that in a state of this
24   importance, this district is going to end up.  The
25   entire map is going to end up in litigation.  We

HT_0004947
CUBANOS-0000004821

2/18/2022          Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 77

1   know that.  I respectfully submit that this

2   Committee and this House would want to be holding

3   the strongest hand that it could.  District 3 as

4   drawn will not permit that.

5          Madam Chair, I look forward to your

6   questions.

7          VICE-CHAIR TUCK:  Thank you, Mr. Popper,

8   and we do have a couple of questions.  We've had a

9   very transparent process throughout the entire last

10  four months or so, and I just wanted to give

11  Committee members a holistic view of the testimony

12  given here today.  So I just have a couple of

13  questions.  If you don't mind, other Committee

14  members do as well.  Were you asked to be here by

15  Governor DeSantis today?

16         MR. POPPER:  I was.

17         VICE-CHAIR TUCK:  And were you compensated

18  for being here today?

19         MR. POPPER:  I was not.

20         VICE-CHAIR TUCK:  Then can you share with

21  us who you collaborated with in order to prepare for

22  your testimony today?

23         MR. POPPER:  It was just -- I wrote my

24  testimony myself.  It's based on my experience.  I

25  did talk with lawyers from Holtzman Vogel and Josh

HT_0004948
CUBANOS-0000004822

2/18/2022                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 78

1   Pratt, but I wrote my testimony.

2         VICE-CHAIR TUCK:  Chair Sirois.

3         CHAIRMAN SIROIS:  Thank you, Madam Chair.

4         And good morning, sir.

5         MR. POPPER:  Morning.

6         CHAIRMAN SIROIS:  You know, in all my

7   reading, I've seen Polsby-Popper.  I expected

8   Professor Polsby to be here with you today, joined

9   at the hip.  I will see your names appearing

10  together, but thank you for being here this morning.

11        My question is:  you say that the district

12  is not narrowly tailored, but in your testimony, you

13  didn't propose an alternative.  Can you point us to

14  a district that does not diminish minority voting

15  ability but is more narrowly tailored?

16        MR. POPPER:  Thank you for the question.  I

17  would respond in a couple of ways.  The first is

18  that the requirement of showing a district that

19  accomplishes the same thing in a more efficient or

20  less compact -- or more compact way was a one-time

21  requirement in federal court.  It no longer is.  And

22  I suppose this is a prelude to saying, no, I cannot

23  propose such a district to you, but I would

24  respectfully submit that the Tier 2 requirements of

25  Florida law will be superseded by the narrow

HT_0004949
CUBANOS-0000004823

2/18/2022                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 79

1    tailoring requirement of meeting the strict scrutiny

2    required for this not to be an equal protection

3    violation.  I hope that answered your question.

4           CHAIRMAN SIROIS:  Yes, thank you.

5           VICE-CHAIR TUCK:  Representative Perez,

6    you're recognized in questions.

7           REPRESENTATIVE PEREZ:  Thank you, Madam

8    Chair.

9           As I was looking up your biography before

10   you spoke -- which, by the way, welcome.  Welcome to

11   the Committee.  Welcome to Florida.  I noticed that

12   you used to work for DOJ, and I think it's the early

13   2000s, mid 2000s.  Did you ever work with Eric

14   Holder?

15          MR. POPPER:  I've met Eric Holder.  I guess

16   you could call it working with him when one is

17   subordinate to a subordinate to a subordinate, but

18   yes.

19          REPRESENTATIVE PEREZ:  The reason that I

20   ask that is I'm sure you're aware, as many people

21   are aware, he's part of an organization now that

22   focuses on redistricting in a very partisan way,

23   specifically to make sure that that Democrats can

24   get elected or favorable redistricting measures in

25   different states.  Did you consult or have you

HT_0004950
CUBANOS-0000004824

2/18/2022                     Common Cause, et al. v. Cord Byrd                     Audio Transcription

Page 80

1    consulted with anyone from Eric Holder's group that

2    he currently works with prior to today?

3           MR. POPPER:  No, I have not.

4           REPRESENTATIVE PEREZ:  Thank you.

5           VICE-CHAIR TUCK:  Representative Clemons,

6    you may be recognized in questions.

7           REPRESENTATIVE CLEMONS:  Thank you.  And

8    I've read your report, your resume that you sent in

9    earlier, and you have a very impressive level of

10   expertise.

11          MR. POPPER:  Thank you, sir.

12          REPRESENTATIVE CLEMONS:  I'm just curious

13   though, what state do you reside in?

14          MR. POPPER:  Maryland.

15          REPRESENTATIVE CLEMONS:  Okay.  So you

16   reside in Maryland.  And then I think, previously,

17   you were asked if you were compensated, and you

18   responded that you were not.  Can you just share

19   with us today the expenses, your hotel, your travel?

20   Are you borne -- are you absorbing those expenses

21   yourself, or will you submit a reimbursement to

22   anyone for those travel expenses?

23          MR. POPPER:  Thank you.  I must clarify,

24   based on what you're saying, that's true.  It's my

25   understanding that we will be compensated.  I would

HT_0004951
CUBANOS-0000004825

2/18/2022                Common Cause, et al. v. Cord Byrd              Audio Transcription

Page 81

1   say that we offered to forego that, but yes.  We

2   would receive -- my understanding is that my flight

3   and my hotel will be compensated by the Governor's

4   office.  That's my understanding.

5           REPRESENTATIVE CLEMONS:  Follow-up, Madam

6   Chair.

7           There's no doubt that you are an expert in

8   these matters, and I do applaud you for being here

9   today.  My follow-up question would resolve in: have

10  you offered this level of testimony in any other

11  state, at any other redistricting committee to date?

12          MR. POPPER:  Missouri, long ago.  Not on

13  gerrymandering; on different topics, sir.

14          REPRESENTATIVE CLEMONS:  Follow-up.

15          So in the 2022 census and redistricting

16  throughout the nation, this is the only Committee

17  that you have testified in front of to share your

18  level of expertise?

19          MR. POPPER:  That is correct as far as

20  committees go, but we are suing the state of

21  Maryland over their gerrymandering.  And, in fact,

22  I'll be going to trial on March 15th.  So that will

23  be process I'll be engaged in.

24          REPRESENTATIVE CLEMONS:  And I think maybe

25  this is the last one.  So when you say "we," are you

HT_0004952
CUBANOS-0000004826

2/18/2022                  Common Cause, et al. v. Cord Byrd                 Audio Transcription

Page 82

1    talking about your law firm?

2           MR. POPPER:  I'm talking about Judicial

3    Watch.

4           REPRESENTATIVE CLEMONS:  Okay.  Judicial

5    Watch.  Okay.  Thank you.  That concludes my

6    questions.  Thank you, and thank you for being here.

7           MR. POPPER:  Thank you.

8           VICE-CHAIR TUCK:  Thank you,

9    Representative.

10          Mr. Popper, as you know, in the last

11   decade, we've had some landmark redistricting cases

12   in Florida law.  So as it relates to Florida case

13   law, do you agree with Chief Justice Kennedy's

14   dissenting opinion, what he describes as

15   diminishment?

16          MR. POPPER:  And you're talking about the

17   fair districting amendments and the Florida Supreme

18   Court's determination on those amendments?  I'm not

19   an expert in Florida law.  I understand the

20   decision.  I understand that it's meant to be in

21   many ways an analog or even governed by the Federal

22   Authority that pertains to Section 2 and Section 5

23   of the Voting Rights Act.  In that respect, if the

24   Florida courts follow the federal law, one would

25   expect that a non-compact district would not satisfy

HT_0004953
CUBANOS-0000004827

Page 83

1    the requirements of these state analogs of the

2    federal statute.  Now, I don't say that as a Florida

3    practitioner.  I'm not licensed in Florida.  I'm not

4    as familiar with Florida law.  My familiarity is

5    with federal law.

6              VICE-CHAIR TUCK:  Thank you for that

7    answer.  And so are you aware of any court's

8    interpretation of Section 5 that requires a district

9    to be compact?

10             MR. POPPER:  Thank you for the question.

11   No.  I'm not aware of any federal court decisions

12   that state that it must be compact, but I am aware

13   of Miller vs.  Johnson Supreme Court decision

14   indicating that a district that was not compact was

15   not required by federal law.  There's a lot of

16   interpretation from the fact that non-compact

17   districts were not permitted to fulfill certain

18   roles.  And I know of no exceedingly non-compact

19   district that has been used to justify a compelling

20   explanation or justification that's narrowly

21   tailored to allow a race-based district to be drawn

22   in a congressional race.

23             VICE-CHAIR TUCK:  Sure.  So just keeping

24   our focus on diminishment for a minute, do you agree

25   that going from the current CD 5 to the proposed

HT_0004954
CUBANOS-0000004828

Page 84

1    Governor's district diminishes the ability to elect?

2              MR. POPPER:  I'm sorry, I didn't hear that.

3              VICE-CHAIR TUCK:  Oh, sorry.  So just

4    focusing still on diminishment, do you agree that

5    going from the current CD 5 to the proposed

6    Governor's district will diminish the ability to

7    elect?

8              MR. POPPER:  I can't speak to that, Madam

9    Chair, as an attorney.  I can speak to it as an

10   individual.  When you're talking about less than 50

11   percent, it's not clear.  It's not clear to me as an

12   individual, not as an attorney.  But there is

13   federal case law suggesting that -- well, there's

14   federal case law stating that a crossover district,

15   in which there is a minority participation that's

16   less than 50 percent, does not satisfy Section 2 of

17   the Voting Rights Act.  That's Bartlett vs.

18   Strickland.  There's also an indication in Perry vs.

19   Perez that the same restrictions would apply to a

20   district drawn under Section 5.  But again, it's one

21   of those backwards implications where the court

22   simply says, these districts were not required.  And

23   there they're talking about a coalition district,

24   which is a couple of minority groups together

25   combining to exceed 50 percent.

HT_0004955
CUBANOS-0000004829

Page 85

1         The crossover district is a minority group

2    combining with white voters to exceed 50 percent.

3    If you just have a minority-minority district, I'm

4    not sure what that accomplishes.  As a practical

5    matter, it does create something of an influence

6    district, but does it diminish minority influence

7    and surrounding districts?  It's ambiguous, but

8    that's not my call.

9         VICE-CHAIR TUCK:  Thank you.  Chair Sirois.

10         CHAIRMAN SIROIS:  Thank you, Madam Chair.

11    Can you tell us, did you explore alternative

12    district configurations and performed the required

13    functional analysis to determine whether a more

14    compact district could have been drawn without

15    diminishing the minority's voting ability?

16         MR. POPPER:  Representative Sirois, I did

17    not.

18         CHAIRMAN SIROIS:  Thank you, Madam Chair.

19         VICE-CHAIR TUCK:  Representative Fabricio,

20    you're recognized.

21         REPRESENTATIVE FABRICIO:  Thank you, Madam

22    Chair.  Earlier in the question and answer that I

23    was involved in, I asked about the relevance of

24    compactness, and one of the responses that I heard

25    was that compactness is also a factor of the

HT_0004956
CUBANOS-0000004830

Page 86

1    surrounding districts.  And in light of CD 3 having

2    a Polsby-Popper score of .10, what would be your

3    analysis of that low score in the light of the

4    surrounding districts?

5           MR. POPPER:  Thank you for the question.

6    The surrounding districts are always affected by a

7    non-compact district, but they're not as directly

8    affected.  One can have non-compact districts

9    surrounded by compact districts.  There tends to be

10   some spillover, particularly as districts become

11   serrated and indented on a small scale.  But at the

12   same time, often, that's a smaller district

13   affecting a larger one, and the effect on

14   compactness is muted.

15           It's not always clear that changing a non-

16   compact district will affect the districts around

17   it.  That being said, it can, but where you have a

18   district that is so low, when you have an average of

19   -- I believe it was 30, 37 percent Polsby-Popper,

20   and you have a district scoring 10, you could

21   increase that district.  It doesn't have to just to

22   speak like someone who has sat at a computer and

23   tried to draw districts.  It doesn't have to be

24   jammed up against the border like that.  Those are

25   man-made district lines.  Look at District 1, also

HT_0004957
CUBANOS-0000004831

2/18/2022                 Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 87

1   jammed up against the border and against natural

2   boundary.  That's a compact district.  Did that

3   answer your question?

4            VICE-CHAIR TUCK:  And, Mr. Popper, does the

5   state of Florida's shape affect the compactness?

6            MR. POPPER:  It doesn't affect the

7   compactness, Madam Chair, of District 1.  I mean,

8   that's a flat border that it's pressed up -- I'm

9   sorry District 3.  That's a flat border.  I reside

10  in Maryland, and districts around the Chesapeake Bay

11  are naturally non-compact because the Chesapeake Bay

12  is non-compact.  At the same time, you can see

13  what's man-made.  There's a current district in

14  Maryland that goes across the Bay Bridge to connect

15  Anne Arundel County to the eastern portions of the

16  state.  That didn't have to happen.  And the

17  district we're looking at in District 3,

18  particularly the indentation in the western part of

19  the state heading north where it narrows, that

20  didn't have to be that way.

21           VICE-CHAIR TUCK:  Thank you.  And just

22  to provide full clarity for the Committee members

23  here.  We seem to be focusing on about two of the

24  three compactness score methodologies, even though

25  there's only over 30 measures of compactness.  So

HT_0004958
CUBANOS-0000004832

2/18/2022                 Common Cause, et al. v. Cord Byrd                 Audio Transcription

Page 88

1    can you provide any stats on all of these 30

2    measures of compactness?

3              MR. POPPER:  No.  But I -- no, Madam

4    Chair.  I can tell you that the social scientists

5    tended to focus on Polsby-Popper, Reock, sometimes,

6    total perimeter, and sometimes Convex Hull.  For the

7    reasons I've given, I don't believe Convex Hull is a

8    very good measure.  I do think that there are things

9    captured by Reock that are not captured by Polsby-

10   Popper.  I do believe there are things captured by

11   Polsby-Popper that are not captured by Reock.  I

12   believe, as a professional in this field, that one

13   should focus on those two measures.  But there are

14   many measures, and one can see -- if the chair has

15   any particular one in mind, one can see how they do

16   and don't work.  I mean, there's a measure that you

17   look at north south divided by east west.  Well,

18   that doesn't see a lot of convolutions that can

19   occur in the middle.

20             The Reock score doesn't necessarily see

21   serrations on a smaller level, while Polsby-Popper

22   does.  But the Reock score is particularly good at

23   picking up a district that stretches.  And as I

24   pointed out, it is unusual for those two scores to

25   agree to this extent.  Usually, the Reock score is

HT_0004959
CUBANOS-0000004833

Page 89

1    more forgiving.

2              VICE-CHAIR TUCK:  Now, are you aware of

3    which methodology was endorsed by the Supreme Court

4    in the last redistricting cycle?

5              MR. POPPER:  We're speaking about the

6    Florida Supreme Court?

7              VICE-CHAIR TUCK:  Correct.

8              MR. POPPER:  I was, Madam Chair.  I forget.

9              VICE-CHAIR TUCK:  That's fine.  Thank you.

10   Keep on going, if that's okay.

11             MR. POPPER:  Please.

12             VICE-CHAIR TUCK:  Representative

13   Giallombardo, you're recognized in questions?  Good?

14   okay.

15             Representative Harding, any questions?

16             REPRESENTATIVE HARDING:  Thank you, Madam

17   Chair.

18             And thank you for being here, and I

19   appreciate your experience and expertise you bring.

20   And I would also preface this question by saying I

21   come from a rural part of Florida, where we are the

22   large and long districts or something that we are

23   used to.  And it's definitely a different

24   perspective on this.

25             If you view current Congressional

HT_0004960
CUBANOS-0000004834

2/18/2022          Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 90

1    District 5 as racially gerrymandered, are you aware

2    of any court decision holding a state constitutional

3    provision that protects minority voting rights that

4    is insufficient to justify the use of race to draw a

5    district?

6              MR. POPPER:  Well, no.  But I am aware of

7    Miller versus Johnson talking about section two and

8    section five, DS versus Silver talking about section

9    two and section five, Cooper versus Harris talking

10   about section two.  And these are federal statutes

11   that didn't do the job under the supremacy clause.

12   I would imagine that the Tier 1, Tier 2 requirements

13   of federal law would be in an even weaker position,

14   but no.

15             VICE-CHAIR TUCK:  Representative

16   Hunschofsky, any questions?

17             REPRESENTATIVE HUNSCHOFSKY:  Thank you,

18   Madam Chair.  I'm not an attorney, so please forgive

19   me in my elementary way of asking this question.

20   You talk about compactness and how important it is

21   from a federal law standpoint.  When looking at

22   federal law, in your opinion, is compactness more

23   important than having an equal opportunity

24   representation in our districts?

25             MR. POPPER:  I suppose my answer would be

HT_0004961
CUBANOS-0000004835

2/18/2022                Common Cause, et al. v. Cord Byrd              Audio Transcription

Page 91

1    that I don't think that they're pitted against each
2    other in the same way that they are under Florida
3    law.  Compactness arises in the legal framework --
4    I'm talking about at the tail end of an analysis of
5    a race-based district violates the equal protection
6    clause unless it satisfies strict scrutiny.  It
7    satisfies strict scrutiny if there's a compelling
8    justification that is narrowly tailored to achieve
9    its object.
10            And there in the narrow tailoring is where
11   the Supreme Court has said this doesn't work.  So
12   they're not aligned in the same sentence or in the
13   same provision as they are in Article III, Section
14   20 of the Florida constitution.  So I can't really -
15   - as important is a difficult question.
16            VICE-CHAIR TUCK:  Follow up?
17            REPRESENTATIVE HUNSCHOFSKY:  Thank you,
18   Madam Chair.  So, again, I'm not an attorney, and
19   your focus on compactness is just  kind of as a
20   layperson, made me incredibly curious that that
21   seems to be -- and I understand, you know, with your
22   last name and everything -- why it is your focus.
23   But in the reality, we're here, big picture, trying
24   to weigh what is best for the residents of the state
25   of Florida and Florida's representation.

HT_0004962
CUBANOS-0000004836

Page 92

1            You mentioned the term "compelling

2    justification."  Do you believe there is a

3    compelling justification to have less access for

4    racial or language minorities to less access and

5    less ability to elect their representatives of

6    choice?  You believe there's a compelling

7    justification to have less of that in favor of more

8    compactness?

9            MR. POPPER:  Thank you for the question.  I

10   think I can address it both as a lawyer and as a

11   non-lawyer.  As a lawyer, under Section 2 of the

12   Voting Rights Act, even under Section 5, it is

13   possible to show the strong basis and evidence that

14   permits a compelling justification that, for

15   example, a district drawn to enhance and equalize

16   the opportunity of minority populations to elect

17   their candidates of choice.  This is all very much

18   as a lawyer.  That can justify a race-based

19   district.  It has been held to be that that can

20   happen.  I'm saying that it's unlikely to happen

21   with a district that looks like this.

22           As a layperson, I think that's an entirely

23   ambiguous question, just in the sense of 42 percent

24   black voting age population in District 3, or 44

25   percent, as I believe the state's figures.  Is that

HT_0004963
CUBANOS-0000004837

2/18/2022                Common Cause, et al. v. Cord Byrd              Audio Transcription

Page 93

1   going to lead to more representation of the kind

2   that you're talking about than 10 percent in 4

3   districts?  It's not clear, particularly when the 44

4   percent comes from other districts which now have

5   less black population.  That's not -- speaking as a

6   non-lawyer, it's not clear -- as a politician, I

7   guess -- it's not clear what that does.  So I don't

8   know that -- I wouldn't say that that's a compelling

9   explanation unless it's explained further.

10          VICE-CHAIR TUCK:  Follow up?

11          REPRESENTATIVE HUNSCHOFSKY:  I'm not an

12   attorney, but I too am just a regular person.  And

13   I'm asking this question because this is the

14   question that we're faced with when we are making

15   these decisions.  This is a balancing act, as I

16   think we've heard from everybody.  So I ask again,

17   if the two do come into conflict, that what we see

18   is the Tier 1, the opportunity of racial or language

19   minorities to participate in the political process

20   or to diminish their -- we're not allowed to deny

21   their -- or bridge the equal opportunity for racial

22   or language minorities to participate in the

23   political process or to diminish their ability to

24   elect a representative of choice, or districts shall

25   be compact.  If the two come in conflict, which wins

HT_0004964
CUBANOS-0000004838

2/18/2022                 Common Cause, et al. v. Cord Byrd                 Audio Transcription

Page 94

1    out in law, in your opinion?

2               MR. POPPER:  In law?  That's a matter of

3    Florida law.  I can't tell you.  I don't know, and I

4    think there's some speculation about what the

5    Florida Supreme Court would do with that question.

6    In federal law, the district is in trouble.  In

7    federal law, it's not going to come down to that

8    way.  And I shouldn't presume to be in your

9    difficult position making these difficult choices,

10   and I don't mean to do that and second guess you on

11   that.

12              When I talk as a politician, I think I'm

13   talking out of turn.  I should talk only as a

14   lawyer.  And talking as a lawyer, this district is

15   going to have problems in federal court.  If I had a

16   client, I would counsel them that way.  And it's

17   going to have problems as a question of narrow

18   tailoring.  And they, the federal court, are not

19   going to care to the same extent that the Florida

20   Supreme Court cares about Tier 1 and Tier 2.

21   They're going to view it as not narrowly tailored.

22   That's my prediction.  Did that answer your

23   question?

24              REPRESENTATIVE HUNSCHOFSKY:  Not really,

25   but thank you.

HT_0004965
CUBANOS-0000004839

2/18/2022              Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 95

1              MR. POPPER:  I would like to answer your

2      question.

3              Madam Chair.

4              VICE-CHAIR TUCK:  Representative, you're

5      good?  Hunschofsky?

6              REPRESENTATIVE HUNSCHOFSKY:  Madam Chair,

7      I've asked my question in several ways, and it's the

8      same answer.  So yes, I'm good.  Thank you.  And I

9      appreciate your indulgence on that.

10             VICE-CHAIR TUCK:  That's good.  Thank you.

11     Mr. Popper, do you agree that protecting minority

12     voting ability from diminishment is a compelling

13     state interest?

14             MR. POPPER:  It can be.  Yes.  If it's

15     accomplished, Madam Chair, with a narrowly tailored

16     remedy.  Yes.

17             VICE-CHAIR TUCK:  So in that case, do you

18     believe there should be any minority districts in

19     North Florida, whether protected by state law or

20     federal law?

21             MR. POPPER:  Madam Chair, you're asking me

22     to act as a politician.  I mean, I think my

23     testimony -- the thing that I am an expert in -- I

24     guess everyone's an expert in their own opinions.

25     But the thing that I am an expert in is traditional

HT_0004966
CUBANOS-0000004840

Page 96

1    districting criteria and narrow tailoring of

2    districts.  And there's a problem.  It's a difficult

3    weighing the kind of thing you all do.

4              VICE-CHAIR TUCK:  Thank you.

5              Representative Joseph, any questions?

6              REPRESENTATIVE JOSEPH:  Thank you, Madam

7    Chair.

8              So how many compact metrics are there that

9    you're aware of?

10             MR. POPPER:  There are a lot,

11   Representative Joseph.

12             REPRESENTATIVE JOSEPH:  Estimation?

13             MR. POPPER:  I believe 20, perhaps, or 30.

14             REPRESENTATIVE JOSEPH:  20 to 30?

15             MR. POPPER:  Yeah.

16             REPRESENTATIVE JOSEPH:  And some are better

17   than others, correct.

18             MR. POPPER:  One is best, but yes.

19             REPRESENTATIVE JOSEPH:  The one that you

20   believe is best, I would assume that's yours, yeah?

21             MR. POPPER:  It does happen to be that.

22   Yes.

23             REPRESENTATIVE JOSEPH:  Okay.  So since it

24   happens to be that and you believe that it's best,

25   why don't you tell me about some of the -- talk to

HT_0004967
CUBANOS-0000004841

2/18/2022                Common Cause, et al. v. Cord Byrd              Audio Transcription

Page 97

1    the Committee about some of the infirmities of that

2    particular method.

3           MR. POPPER:  Well, okay.  That's an

4    interesting question.

5           REPRESENTATIVE JOSEPH:  Yes, it is.

6           MR. POPPER:  I think what it does is a

7    number of things, and perhaps as I'm discussing what

8    it does, I can pick out the infirmities.  What it

9    definitely does is it arrays along a scale, so more

10   is more and less is less.  There are some measures

11   of compactness that just don't see certain kinds of

12   contortions.  For example, the Reock score, if a

13   district was generally compact but there was a spike

14   oriented down, it would score that as better because

15   the circumscribing circle would be smaller than if

16   that same spike were heading due east.  There's no

17   logical reason for that.  The person drawing a map

18   who's trying to gerrymander might want the spike to

19   point in any particular direction.  That's a problem

20   with the Reock score, but Polsby-Popper doesn't have

21   that problem.  That spike score is exactly the same

22   in both scenarios.

23          I suppose focusing on the Reock score, it

24   very much captures when a district is long, when a

25   district is wandering, just the whole district is

HT_0004968
CUBANOS-0000004842

2/18/2022                Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 98

1   shooting through the state.  Polsby-Popper may not

2   capture that as well.  Polsby-Popper captures

3   indentations, and Convex Hull doesn't capture them

4   at all.  In my opinion, barely captures them.

5              REPRESENTATIVE JOSEPH:  Thank you.

6              Follow up?

7              So you compared and contrasted the Reock

8   score with the Polsby-Popper score, what about its

9   infirmities compared to any of the other metrics for

10  compactness that can be used?  Are there any other

11  ones that are superior to yours, in your opinion, or

12  that you've heard or heard criticized about that

13  exceed your metric in any way, shape, or form?

14             MR. POPPER:  I do not believe so.  There's

15  one qualification I would make: no one has perfectly

16  compact districts.  It would do -- wreak havoc on

17  political subdivisions, on communities of interest.

18  You can't have a honeycomb of hexagons.  We can't be

19  silly about it, but if the minimum district length

20  were perfect, that would be a perfectly compact set

21  of districts.  That's the aggregate of all district

22  lines added up the total.

23             REPRESENTATIVE JOSEPH:  Thank you, Madam

24  Chair.

25             And thank you for the response.  My next

HT_0004969
CUBANOS-0000004843

Page 99

1   question is following up on that.  In your opinion,

2   none of the other ones come close to yours, it

3   sounds like, other than, maybe, Reock on that one

4   point of length.  To your knowledge, have there been

5   any individuals, entities, organizations, court

6   opinions, policy, folks who have criticized or

7   identified other infirmities in your metric versus

8   the other alternatives.

9          MR. POPPER:  No courts.  I would say that

10  courts typically rely on Polsby-Popper, Reock, and

11  Convex Hull.  And bear in mind, that's what the

12  Florida Legislature has done.  So I guess my

13  response as a professional would be that you're very

14  much in the right ballpark.  These are the ones that

15  you should be looking at.  I know of no court that's

16  criticized Reock or Polsby-Popper, or Convex Hull, I

17  think.

18         REPRESENTATIVE JOSEPH:  Aside from courts?

19         MR. POPPER:  Yeah, they're commentators.  I

20  mean, the commentators are all over the map.  There

21  are commentators who don't believe that there is

22  such a thing as gerrymandering.  Many of them have

23  advised the United States Supreme Court, but there

24  are state courts that think differently.  There are

25  commentators that have incredibly complicated

HT_0004970
CUBANOS-0000004844

2/18/2022                    Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 100

1    mathematical expressions of compactness involving

2    minimum distance from the center of gravity, and

3    then minimum distance from the center of gravity of

4    population.  And it can get absurd and certainly

5    well beyond my mathematical abilities.  Thank you

6    for allowing me to get this much in the weeds.  No

7    one else on earth would want to hear me talk about

8    these things, but I appreciate your interest.

9              VICE-CHAIR TUCK:  Representative Joseph, if

10   it's okay, we have two more members that want to ask

11   questions.  We need to move on.

12             REPRESENTATIVE JOSEPH:  Sure.  Yep.

13             VICE-CHAIR TUCK:  Representative Perez in

14   questions.

15             REPRESENTATIVE PEREZ:  Thank you, Madam

16   Chair.  I want to follow up on a question that was

17   asked by Representative Harding that had to do with

18   if there were any State Court decisions that said

19   race could not be used in drawing a district.  I

20   think he had asked you that question, I think you

21   had said that you were not aware of any.  Assuming

22   that that premise is correct, would it be fair to

23   say that the 14th Amendment would invalidate fair

24   district amendments, specifically the prohibition on

25   not diminishing the ability of minority communities

HT_0004971
CUBANOS-0000004845

2/18/2022          Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 101

1    to elect a candidate of their choice.  And if it

2    doesn't -- assuming that that isn't true, if it does

3    not, then why is complying with the Florida

4    constitution not a compelling state interest?

5          MR. POPPER:  It absolutely can be a

6    compelling state interest, just as it could have

7    been when it was operative, the compelling state

8    interest to comply with and enforce Section 5 of the

9    Voting Rights Act.  It could be.  It depends on the

10   remedy.

11         The remedy has to be narrowly tailored.  I

12   do not suggest, and my testimony is not to suggest

13   that the Fair Districts amendment would be

14   unconstitutional in all its applications.  It

15   absolutely wouldn't.  It could justify a race-based

16   district.  It could.  My testimony is just that it

17   doesn't, not with this district.

18         VICE-CHAIR TUCK:  Representative Davis in

19   questions?

20         REPRESENTATIVE DAVIS:  Thank you.  Kind of

21   a sidebar.  Thank you, Madam Chair.

22         You mentioned earlier, as I was noting,

23   that you reside in Maryland.

24         MR. POPPER:  I do.

25         REPRESENTATIVE DAVIS:  And so you were

HT_0004972
CUBANOS-0000004846

2/18/2022          Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 102

1    offered or told you would be compensated your flight

2    and hotel by the Governor's office, correct?

3              MR. POPPER:  That's right.

4              REPRESENTATIVE DAVIS:  Could you just tell

5    me, and I'm just curious, how often are you invited

6    to states to testify on the redistricting process

7    itself by a Governor?

8              MR. POPPER:  This would be the first.

9              VICE-CHAIR TUCK:  Follow up?

10             REPRESENTATIVE DAVIS:  Thank you, Madam

11   Chair.

12             Is that unusual, in your opinion, to be

13   asked to come and testify about a redistricting

14   process that you've heard my colleagues say that

15   we're trying to keep this as transparent as

16   possible.  Is this unusual, in your opinion, for a

17   Governor's office to reach out to you to testify on

18   the redistricting process itself?

19             MR. POPPER:  Representative, I don't

20   believe so.  I've testified on other bills, not

21   redistricting, other voting bills and other

22   legislatures, including every Judicial Watch,

23   including Pennsylvania.  But I am a person who can

24   offer expert testimony on this district, and so I

25   believe it would have been logical to think of me.

HT_0004973
CUBANOS-0000004847

Page 103

1          VICE-CHAIR TUCK:  Final question.  Chair

2    Sirois.

3          CHAIRMAN SIROIS:  Thank you very much,

4    Madam Chair.

5          Sir, in your written testimony that you

6    provided, that I had an opportunity to read earlier

7    this morning, I think you said that Florida's non-

8    diminishment standard protects only majority-

9    minority districts.  What is your strongest legal

10   authority for that proposition?  And didn't the

11   Florida Supreme Court say the exact opposite in its

12   first apportionment decision in 2012?

13         MR. POPPER:  Thank you.  And forgive me,

14   could you read back to me what I said again?  I

15   don't recall that.

16         CHAIRMAN SIROIS:  I don't have it in front

17   of me, sir, but it's your written testimony that you

18   provided this morning.

19         MR. POPPER:  And if I made a representation

20   about what the Florida Supreme Court would do; is

21   that correct?  I'm not --

22         CHAIRMAN SIROIS:  Yes, that's correct.  In

23   your written testimony.

24         MR. POPPER:  I don't recall that.  I should

25   not have been opining about what the Florida Supreme

HT_0004974
CUBANOS-0000004848

2/18/2022            Common Cause, et al. v. Cord Byrd            Audio Transcription

Page 104

1    Court would do.  May I have a look at my testimony?

2    Or is that not fruitful?

3            VICE-CHAIR TUCK:  Thank you.  We're going

4    to try to move on a little bit so we can get through

5    all public testimony and debate.  So we appreciate

6    you being here.  Thank you so much.

7            MR. POPPER:  Thank you for having me.

8    Thank you, Madam Chair.

9            VICE-CHAIR TUCK:  All right.  Next up,

10   Michael Johnson.  Is he here?  He's a proponent of

11   the bill.  Miranda Galindo?  And, Members, as a

12   reminder, we have about seven public appearance

13   cards left, and we need time for a debate.  So just

14   keep that in mind.

15           You're recognized.

16           MS. GALINDO:  Good morning.  Miranda

17   Galindo for Latino Justice, PRLDEF.  Thank you for

18   your hard work this redistricting season and for the

19   opportunity to present our opposition to the

20   proposed map, which unfairly represents your

21   constituents.

22           Florida's booming Latino population is

23   underrepresented.  The 2020 census counted nearly

24   one and a half million more Latinos in Florida than

25   it did a decade ago, and common sense dictates that

HT_0004975
CUBANOS-0000004849

Page 105

1    a protected class comprising over a quarter of

2    Florida's total population should enjoy a fair

3    number of Latino majority districts.  In 2010,

4    Latinos comprised about 22 percent of Florida's

5    total population and have grown substantially over

6    the last decade to now comprise over 26 percent of

7    Florida's total population.  While Latinos now

8    represent over a quarter of Florida's total

9    population, only 14.2 percent of the congressional

10   seats proposed in Map H-8011 are majority Hispanic

11   voting age population districts.  In contrast, non-

12   Hispanic white Floridians are approximately 53

13   percent of Florida's total population but are a

14   majority voting age population and 64 percent of the

15   congressional districts in H-8011.

16           The redistricting process should mitigate,

17   not exacerbate, the injustice of desperately low

18   Latino political power.  Congress passed the Voting

19   Rights Act of 1965 to protect our democratic process

20   from racial discrimination, and I'd like to note

21   that the Voting Rights Act exists in harmony with

22   the equal protection clause of the United States

23   Constitution.

24           Florida Legislature is entrusted with

25   enforcing this landmark Civil Rights Law to combat

HT_0004976
CUBANOS-0000004850

2/18/2022                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 106

1    discriminatory practices that have historically

2    disenfranchised black, brown, and indigenous

3    Floridians, including English-only electoral

4    practices, all-white primaries in malapportionment,

5    all of which undermined the ability of racial and

6    language minorities to elect their candidates of

7    choice.  The Voting Rights Act requires that where

8    Latino majority districts may be drawn feasibly and

9    consistent with Section 2, they must be drawn.

10           First, we urge the House to create an

11   additional Latino opportunity district in Central

12   Florida, which is supported by the census data.

13   Such a district would accurately reflect demographic

14   changes and provide districts that are more aligned

15   with the true voting strength of Latino Floridians.

16           Second, while proposed Congressional

17   District 9 create one new Latino majority district,

18   the House has drawn it with a barest Latino

19   majorities.  The Hispanic voting age population is

20   only 50.06 percent.  We urge the House to strengthen

21   the slim Latino majority in CD 9, a region that

22   accounts for some of the greatest Latino population

23   growth over the last 10 years.

24           Without an additional opportunity district

25   in Central Florida and a more robust Latino majority

HT_0004977
CUBANOS-0000004851

Page 107

1    in CD 9, H-8011 fails to meaningfully account for

2    the substantial Latino population growth that

3    largely fueled Florida's receipt of an additional

4    congressional seat after the 2020 Census.  Census

5    data does not support the creation of additional

6    white majority districts.  That benchmark map had 17

7    white majority voting age population districts, and

8    H-8011 increases that number to 18.  This is

9    fundamentally unfair.

10             District maps generally violate Section 2,

11   where they crack or fragment minority voters among

12   several districts, where black voting majority can

13   routinely outvote them.  The House has a duty to

14   evaluate how to avoid cracking geographically

15   compact Latino populations, yet H-8011 cracks many

16   more Latino communities than the Senate's adopted

17   map, Senate Plan H-8060.  The first egregious

18   example of H-8011 cracking is proposed Congressional

19   Districts 14 and 15, which split them Latino

20   populations in Hillsborough and Pasco County, near

21   the (Indiscernible) City Riverbend area.

22             In contrast, the Senate's adopted plan and

23   the benchmark map kept these communities whole.  H-

24   8011 also unnecessarily cracks Latino communities in

25   Hendry and Collier counties.  In contrast, the

HT_0004978
CUBANOS-0000004852

Page 108

1    Senate's adopted plan and the benchmark map largely

2    kept these communities whole.

3            Similarly, H-8011 unnecessarily cracks

4    black communities compared to the Senate's adopted

5    plan.  The most egregious example is the dismantling

6    of Congressional District 10, a benchmark district

7    in Orlando, which a geographically compact

8    population of black voters have had an opportunity

9    to elect candidates of choice.  We urge the House to

10   avoid cracking Orlando's black community across

11   three separate congressional districts, as was

12   achieved in the Senate's adopted plan.

13           We call upon the House to exercise its duty

14   to keep black and Latino communities whole where

15   possible, and we know this is possible because the

16   Senate's adopted plan did a better job of it.

17   Latino Justice reiterates its request for meaningful

18   opportunities for public participation in the form

19   of improved language access services, virtual

20   participation options for public hearings, and

21   regional public hearings outside of Tallahassee.

22   Floridians who are limited English proficient

23   impacted by the COVID-19 pandemic and reside far

24   away from Tallahassee are no less deserving of

25   having their voices heard in this forum.

HT_0004979
CUBANOS-0000004853

2/18/2022                 Common Cause, et al. v. Cord Byrd                 Audio Transcription

Page 109

1               We have repeatedly asked for translation of

2      the forms to submit public input in the "get

3      involved portion" of the floridaredistricting.gov

4      website.  The willful failure to provide these

5      minimal, yet fundamental, translations is an

6      inexcusable obstacle for your limited English-

7      proficient constituents and deprives the Legislature

8      and the redistricting process of complete

9      information on protected communities.

10              Finally, the earlier mention of performance

11     analysis data held by outside counsel but

12     unavailable to the members of this Committee and

13     unavailable to the public undermines the ability for

14     a meaningful public and your representatives'

15     evaluation of this map's compliance with anti-

16     discrimination laws.  We urge this Subcommittee to

17     release it immediately.  Where more information

18     exists, why hide it?  Thank you.

19              VICE-CHAIR TUCK:  Thank you for being here.

20              David Trotti.  You're recognized.

21              MR. TROTTI:  Good morning.  My name is

22     David Trotti, and thank you for allowing me to speak

23     in front of you this morning.  I'm a resident of

24     Jacksonville, Florida, but my physical office and my

25     residence is in District 3.  I am here today to

HT_0004980
CUBANOS-0000004854

2/18/2022                    Common Cause, et al. v. Cord Byrd                    Audio Transcription

Page 110

1    speak on behalf of what I do in my spare time, which

2    is represent veterans.  I'm the chairman of the

3    Veterans Council of Duval County.  That is a

4    Committee that was born of a mayor's executive order

5    since 1986.  Since 2016, I was the vice chairman,

6    and since 2020, I was Chairman.

7              There are over 80,000 veterans in Duval

8    County alone.  In St. Johns, Nassau, they count as a

9    120,000.  So the mass of veterans are in the east

10   side of the state, surrounding Jacksonville.  I

11   believe it's only about 15,000 veterans in Leon

12   County and 3400 in Gadsden County.  What we need is

13   we need representation in Jacksonville, Duval County

14   area that's going to be there, boots on the ground,

15   to hear what veterans need in Duval County.

16             In District 4, Councilman Rutherford, he's

17   there.  He's present.  He's at our meetings.  I'm

18   not speaking that Al Lawson doesn't do things for

19   veterans.  That's not what I'm here about.  It's

20   like having a football team in the Super Bowl for

21   your defensive coordinator or for the front team,

22   and it's not at your practices.  So I implore you to

23   reconsider the consolidation of District 3.  Let

24   Duval County, Jacksonville, stay consolidated as

25   one, or -- I believe the Governor has created a new

HT_0004981
CUBANOS-0000004855

Page 111

1    district.  I only saw that on Facebook a couple of

2    days ago.  And I was asking some of my veteran

3    friends, what do you think about having Jacksonville

4    and Duval County as one district?  I think it will

5    benefit veterans.  We're talking about

6    consolidation, best interest of our residents, and

7    things we have to consider.  I think we have to

8    consider the best interests of Jacksonville, Duval

9    County in that redistricting.  Thank you.

10            VICE-CHAIR TUCK:  Thank you for being here.

11            Jasmine Burney with Equal Ground Action

12   Fund.  You're recognized.

13            MS. BURNEY:  Thank you.  Good morning,

14   everyone.  I'd like to first say thank you all so

15   much for following the lead of the Supreme Court and

16   moving forward with a map drawing process that you

17   have all been constitutionally tasked to do so with.

18            Second, again, my name is Jasmine Burney-

19   Clark.  I am the founder and director of Equal

20   Ground Education and Action Fund.  We are created to

21   advocate for the voting rights of black voters,

22   specifically, along the I-4 corridor.  We work to

23   register, educate, and mobilize black voters.  We

24   were founded in 2019, and that's important because

25   it's two cycles after CD 10 was created and because

HT_0004982
CUBANOS-0000004856

2/18/2022                Common Cause, et al. v. Cord Byrd               Audio Transcription

Page 112

1   we were established to help break the barriers

2   facing black voters as we witnessed the acts of

3   voter suppression across the state of Florida.

4            Suppression tactics in the form of

5   legislation signed into law by this Governor and

6   other Governors in past years that have been proven

7   to diminish the black voter turnout.  I'm also here

8   as a resident of CD 10.  I ask that you learn from

9   the lessons of 2016 and don't make the same mistakes

10  that led to the redrawing of maps due to misconduct

11  and gerrymandering.  I also ask that you follow the

12  lead of the Senate when it comes to preserving CD 10

13  under the Tier 1 status or, as Rep Joseph pointed

14  out earlier, of the possibility of placing it under

15  Tier 2 standards in future iterations.

16            This district only provides election

17  performance for less than a decade compared to the

18  other districts designed with similar makeup.  And

19  so the general election book closing data, that I

20  had a chance to look up on black voters in Orange

21  County where they are largely situated in CD 10, saw

22  an increase in voter registration actually from

23  2016, 2018, and 2020 despite the turnout that

24  decreased as those years proceeded.  So the will of

25  the resident is to elect someone who represents them

HT_0004983
CUBANOS-0000004857

Page 113

1    in their district.  However, it's not something that

2    they are opposed to.  It does, however, appear that

3    the laws in this state have made it difficult for

4    them to actually access the ballot box.

5              So I ask that you give CD 10 and the voters

6    of CD 10 the same fighting chance over the course of

7    the next decade without diluting the voting power

8    before you've been given a decade of data to

9    accurately prove otherwise.  I am in opposition of

10   the current iteration of this map, and I thank you

11   for your time.

12             VICE-CHAIR TUCK:  Thank you for being here.

13   Kristen -- I apologize, Folulee (phonetic)?

14             MS. FORLULEE:  (Indiscernible)

15             VICE-CHAIR TUCK:  Thank you for being here.

16             Genesis Robinson?

17             GENESIS ROBINSON:  (Indiscernible).

18             VICE-CHAIR TUCK:  Thank you for being here.

19             Pastor Marcus McCoy with Equal Ground as

20   well.

21             PASTOR MCCOY:  (Indiscernible).

22             VICE-CHAIR TUCK:  Thank you for being here.

23             Cecile Scoon with the League of Women

24   Voters of Florida.

25             MS. SCOON:  Good morning.  My name is

HT_0004984
CUBANOS-0000004858

2/18/2022                     Common Cause, et al. v. Cord Byrd                     Audio Transcription

Page 114

1     Cecile Scoon.  I'm president of the League of Women

2     Voters of Florida, and I've been listening intently

3     to the testimony and the questioning that the

4     members have had.  It's been a very robust debate

5     and conversation.

6             I have my own comments, but I also wanted

7     to speak to some of the comments that Mr. Popper

8     made.  And if you listen very carefully to what

9     Mr. Popper said, he admitted to you under your

10    questioning which was very thorough, he had no case

11    to point to to support his comments.  He could not

12    point to one case on point.  He literally stated to

13    you that the analysis of narrowly construing and

14    protecting minority access districts did not appear

15    in the same sentence.  He literally is taking

16    ingredients for salad and mixing them up in a bowl

17    and says, oop, I like this new salad.  There is no

18    case law.  The United States Supreme Court and,

19    certainly, the Florida Supreme Court has not

20    supported, in any way, the statements that were made

21    before you today.  When you questioned him, he

22    backed up and said, no, I don't have a case.  Oh,

23    but there is some other things that we're

24    discussing, some other parameters.  Well, we

25    lawyers, we call that dicta, and those of us who

HT_0004985
CUBANOS-0000004859

Page 115

1   practice in court, which I do, I know that to build

2   my case on dicta, that does not directly support the

3   contention that I'm trying to make before the Court,

4   I'm just burning my client's money and time.  Dicta

5   that you mix up in a bowl, that does not even occur

6   in the same sentence, does not support going against

7   the well understood analysis of the Voting Rights

8   Act Section 2 and our Fair Districts.

9           Remember the point of our Fair Districts,

10  we basically poured Section 2 into our Tier 1.  So

11  there is a lot of closeness to our Tier 1 and

12  Section 2.  And it literally says -- and the case

13  law when you deal with race, whether it be in

14  employment matters, where I would consider myself

15  somewhat of an expert on employment discrimination,

16  the analysis is the same when you're dealing with

17  race, when you're dealing with women.  Because when

18  our nation started, there were only two groups that

19  were held down in writing.  Women were considered

20  Chattel.  They could not vote when our nation

21  started, and people of African descent were three-

22  fifths of a person.  Because in our founding

23  documents we started that way, as our nation grew,

24  and we tried to make real this concept of equal

25  rights, their concept of strict scrutiny came about.

HT_0004986
CUBANOS-0000004860

2/18/2022                 Common Cause, et al. v. Cord Byrd                 Audio Transcription

Page 116

1    And it said, because prior to that time, the laws

2    were against women, the laws held women down and

3    blacks down, so the law came out strict scrutiny.

4    When you have a law that touches those groups

5    because they started out under the heel of our

6    government, you have to have strict scrutiny.  If so

7    the idea of --

8                VICE TUCK CHAIR:  Ms. Scoon.

9                MS. SCOON: Yes, ma'am.

10               THE COURT:  We appreciate the passion but

11   if we could bring it back to the comments of the

12   bill --

13               MS. SCOON:  I just wanted to clarify -- and

14   I thank you for getting me back on point.  The point

15   is the strict scrutiny thing is not the way Mr.

16   Popper said it.  It's because of the history of

17   using it against these groups.  So it says when you

18   use strict scrutiny -- when you deal with race and

19   you deal with gender also, you have the government

20   needs to do it properly and narrowly.  So we have

21   our guidelines in our Fair Districts.  We have our

22   guidelines in our Voting Rights Act, and they were

23   written in a way that you could use strict scrutiny

24   to create the proper districts.  And by taking into

25   consideration the Gingles elements which are laid

HT_0004987
CUBANOS-0000004861

2/18/2022                Common Cause, et al. v. Cord Byrd            Audio Transcription

Page 117

1    out in the Supreme Court, as laid out.  That is

2    their methodology to doing the strict scrutiny.  So

3    it's not like, we're taking race into consideration.

4    Are we being discriminatory?  It's because you're

5    trying to remedy a historical problem, and you need

6    to do it following the guidelines.  And so taking

7    into consideration the ability of a minority,

8    racial, or language group to be able to select a

9    representative of their choice is not being

10   discriminatory.  And I have a few more comments that

11   I wanted to -- I just wanted to address some of the

12   things that he had said, and thank you for that.

13          The League would support the maintenance of

14   Congressional District 10, for reasons testified to

15   by Latino justice and Equal Ground and some of the

16   issues raised by some of your own representatives.

17   We believe that the voting record and the voting age

18   population and how they have actually functionally

19   performed demonstrates that the capacity for that

20   district to select a represent a representative of

21   their choice, who is African-American, they have

22   demonstrated that, and there's nothing like history,

23   you know, to show you that they can do that.  So

24   that district, we contend should be maintained.

25          I also wanted to point out that the United

HT_0004988
CUBANOS-0000004862

2/18/2022                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 118

```
 1    States Supreme Court in the Rucho v. Common Cause
 2    case, literally phrased Florida and literally quoted
 3    our Fair Districts in a footnote.  And because at
 4    the case, the people were going to the federal
 5    government to the United States Supreme Court, and
 6    they were saying, help me.  This particular state or
 7    the Governor is doing political gerrymandering.  Can
 8    the federal government step in?  And Rucho said,
 9    hey, the federal government is not laying out these
10    guidelines.  The State has the capacity to, and they
11    cited Florida.  And they told the rest of the
12    states, if you want guidelines in your state
13    constitution, to protect against political
14    gerrymandering, literally do what Fair Districts
15    says.  And this was established in the Supreme
16    Court, I mean, our Florida Supreme Court case that
17    everyone's been talking about in 2015.  And they
18    literally said Florida's Fair Districts' amendments
19    are clear.  They are enforceable.  And if other
20    states want to protect against political
21    gerrymandering, look and do what Florida has done.
22    They held us out to the rest of the nation.  So our
23    Fair Districts were looked at by our United States
24    Supreme Court.  Our Fair Districts were approved by
25    our United States Supreme Court.  So whatever
```

HT_0004989
CUBANOS-0000004863

Page 119

1    Mr. Popper was trying to tell you that our Fair

2    Districts don't stand up to muster, the Supreme

3    Court has looked at us.  They've held us out as an

4    example to the rest of the world.

5            And finally, I said that we have done a

6    good job, and I'm proud of us for that.  And the

7    last thing I wanted to like to say is we would also

8    like to be able to see the analysis that the outside

9    legal counsel has been doing with regards to data

10   analysis, that was utilized in providing legal

11   advice and assistance to you.  Thank you very much.

12           VICE-CHAIR TUCK:  Thank you for being here.

13           Members, we are going to be going into the

14   debate.  We have about 35 minutes left.  We need to

15   give Chair Sirois an opportunity to close and vote,

16   so please keep that in mind.

17           With that said, any members wishing to

18   debate?

19           Representative Harding, you're recognized.

20           REPRESENTATIVE HARDING:  Thank you, ma'am

21   Chair.  And first, I want to commend you today.

22   You've done a great job and also Chair Sirois.  And

23   the way that you've conducted this whole process,

24   it's been very educational.  And I think that it's

25   probably the most awesome responsibility that we

HT_0004990
CUBANOS-0000004864

2/18/2022                 Common Cause, et al. v. Cord Byrd           Audio Transcription

Page 120

1   have as a legislator and pretty unique that we get

2   to be a part of it here in our first term.  You

3   know, I've stated it earlier in one of my questions,

4   but I come from a rural part of Florida where we

5   have really large districts, and it's interesting --

6   and part of the educational part of this Committee

7   is listening on questions of districts that are

8   obviously much smaller than the areas that I come

9   from and that I see.  But it's an interesting banter

10  that I've learnt.

11          I'm going to support what is coming out of

12  this Committee today with this map, and I'm going to

13  do it for two reasons.  Number one, I trust and

14  believe this Committee, and I think that the product

15  that we have proposed.  And, number two, I trust the

16  process that this is the first Committee stop, and

17  there will be a process.  And I think that, you

18  know, as we've heard today, I would say on both

19  sides of this issue, there's always room for

20  improvement and discussion.

21          And I have full confidence in you, Chair,

22  and then also Chair Leek, that as this moves

23  forward, any things that are necessary or changes

24  that are needed will be addressed.  I look forward

25  to supporting the map, and again, I want to thank

HT_0004991
CUBANOS-0000004865

Page 121

1    all of you that have been a part of creating this.

2              VICE-CHAIR TUCK:  Thank you, Representative

3    Harding.

4              Ranking member Skidmore on debate?

5              REPRESENTATIVE SKIDMORE:  Thank you, Madam

6    Chair.

7              I too want to thank all the Committee

8    members for being so engaged in this process.  It's

9    been a little bit challenging and the work product

10   that we have today is one that we do hope will

11   change and be amended throughout the process so that

12   at some point along the way, we will be able to

13   support it.

14             I will say also that Mr. Popper almost

15   convinced me to vote for it in his testimony, but I

16   will be voting no today because there are still some

17   major concerns that we have in Central Florida and

18   in South Florida as well.  And we know that this is

19   just the beginning point of this process.  It is

20   nice.

21             We are happy to finally have a map that we

22   can discuss and appreciate the pause that was taken

23   to make sure we were all on the right track moving

24   forward.  So I will be a no vote today, but I do

25   also love and respect and admire the legislative

HT_0004992
CUBANOS-0000004866

Page 122

1    process that allows us to start at a point where we

2    might be in disagreement and at a point where we are

3    all on the same page.  So I'm looking forward to

4    that process.

5             Thank you, Mr. Chair, and thank you, Ma'am

6    Chair.

7             VICE-CHAIR TUCK:  Thank you, Ranking

8    Member.

9             Any other members?

10            Representative Brown?

11            REPRESENTATIVE BROWN:  Thank you, Madam

12   Chair, and thank you, Chair Sirois, for your

13   continuous conversations relating to the maps that

14   we see today but also those that we've workshopped

15   in the past.  I thank you for the open process and

16   for your continuous openness to sit down to hear

17   many of my concerns.

18            And I think I have been -- you know, I've

19   said several times just the concerns I have with CD

20   10 among other areas and just again questioning what

21   we were able to see, well, based off of my own

22   knowledge and understanding of that particular

23   community and those boundary make ups but also how

24   we weren't able to get to it, but it seems as though

25   the next chamber was able to see or have a different

HT_0004993
CUBANOS-0000004867

2/18/2022                    Common Cause, et al. v. Cord Byrd              Audio Transcription

Page 123

1    opinion.  And so it would be -- my ask, I will be a

2    no today, but just with the confidence that myself

3    along with staff and you to sort of sit down to sort

4    of figure out a different configuration of this

5    particular benchmark district.

6              Thank you again, and I appreciate staff and

7    Kelly.  But I look forward to, you know, being able

8    to see it in a different way once it goes to the

9    full Committee.  So thank you again, just for the

10   process and your understanding of my concerns, and I

11   look forward to working with you to see how we

12   rectify some of those issues.  Thank you.

13              VICE-CHAIR TUCK:  Ex-officio Davis in

14   debate.

15              REPRESENTATIVE DAVIS: Thank you, Chair, and

16   I won't be long because I definitely want to give

17   the time to Chair to make this close.  But I do want

18   to thank my colleagues for allowing me to be a part

19   of the Committee today.  But I definitely didn't

20   know that CD 3 on this map would be a focus of

21   conversation.  I appreciate the questions that was

22   asked of the person testifying, but one of the

23   speakers made the statement, and I actually wrote

24   the note myself.  There was through all of those

25   suggestions that the gentleman was making, he

HT_0004994
CUBANOS-0000004868

2/18/2022          Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 124

1   provided us with actually no functional analysis to

2   illustrate any of the testimony that he was sharing

3   with us.  And, Chair Sirois, that's why I was going

4   back and forth with you with that functional

5   analysis versus the performance analysis, to just

6   make sure I was clear with that.

7            So with that, as you've heard from my

8   colleagues, there are concerns with CD 10 because

9   the House is not in the same position as the Senate

10  with that District.  I know we can get to the middle

11  and find a common ground with that.  But I am glad

12  that in both of these maps, we do have an existence

13  of CD 3 in our map and CD 5 over in, I think, the

14  Senate map, and I would like to make sure I'm on

15  record to state that I appreciate wholeheartedly

16  that district being protected and being seen in both

17  maps and that we are not following the lead of an

18  administration who obviously has a different

19  mindset.  So just wanted to put that on record.

20           Today, I will be down on this map just

21  because simply I know we still have work to do.  And

22  I know the two Houses we'll get together and produce

23  maps that we eventually, hopefully, all can agree

24  on.  So with that, I'll turn it back over to Chair

25  to close, and we get on our way.  But today I will

HT_0004995
CUBANOS-0000004869

2/18/2022                    Common Cause, et al. v. Cord Byrd                    Audio Transcription

Page 125

1    be a no vote just because I know there's still work

2    to be done.  Thank you.

3            Representative Joseph in debate.

4            REPRESENTATIVE JOSEPH:  Thank you, Madam

5    Chair.

6            Let me say that I'm grateful to be in a

7    country that has certain constitutional protections

8    and provisions, where we have a form of government

9    where there are checks and balances, and there is a

10   separation of powers.  And the Legislature has its

11   function, and the Executive branch has its function.

12   And they're not the same.  Our job is to handle

13   these maps.  It is highly unusual for a Governor to

14   do what our Governor has been doing.

15           I look forward to ultimately getting to a

16   point where we have some maps that we all can be

17   proud of, and I'm hopeful that we can work towards

18   that.  And we've had some good conversations to get

19   that started, and we'd heard some testimony to help

20   guide us along that path.  I still have my

21   reservations about CD 10 and the things we talked

22   about.  We're going to work that through the

23   process, but that's literally our job.  Like, that's

24   what we're here to do is to work through that

25   process.  So I'm grateful for the opportunity to do

HT_0004996
CUBANOS-0000004870

2/18/2022          Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 126

1   what the people elected us to do.

2              My question for the Chair, if he would be

3   so kind as to address in debate if possible, is:

4   we've heard a lot of testimony, and we've gotten

5   some public feedback.  But as we're continuing to

6   cook the cake or bake the cake out, I would say,

7   what is the best way to get the input from the

8   public to staff without exposing members to any

9   issues?  I'm still a little unclear about how that

10  is ideally supposed to work in a way that does not

11  expose anybody to anything.

12             So there were some comments made, like I

13  want to know more about what's going on in 14 and 15

14  with respect to Latino districts.  I can kind of

15  just put it out there in the ether for them to send

16  those stuff.  But I want to figure out what's the

17  best way to do that so that we can communicate that

18  with staffs as we continue working on these maps.

19  So that's my question, and I thank you all for your

20  service.

21             Representative Hunschofsky in debate.

22             REPRESENTATIVE HUNSCHOFSKY:  Thank you,

23  Madam Chair.  And I'd first like to compliment you

24  on navigating this meeting so well.  Never been in a

25  meeting like this one today, and I think you did a

HT_0004997
CUBANOS-0000004871

2/18/2022                   Common Cause, et al. v. Cord Byrd                   Audio Transcription

Page 127

1    great job.  And I appreciate that.

2              I've appreciated learning in this process.

3    I didn't realize there was as much to learn when I

4    originally got assigned to this Subcommittee.  I

5    also appreciate the focus on cities being kept

6    whole.  That has been important to me, and there has

7    been improvement in that area.  I do still think

8    there is more room for improvement in this map, as

9    we've heard from my colleagues, and I do look

10   forward to the process continuing with the inclusion

11   of all these concerns that we've heard today from

12   members of the Subcommittee to make the map the best

13   map that can be.  So thank you.

14             Additional members in debate?

15             Seeing none, Chair Sirois, you're

16   recognized to close on the PCB.

17             CHAIRMAN SIROIS:  Thank you very much,

18   Madam Chair.

19             Members, I want to thank you for your

20   questions and your time and attention this morning

21   and over the previous weeks.  Some of you have said

22   redistricting might be the most complicated of all

23   of our constitutional duties both as a body and,

24   certainly, as individual members, and I want to say

25   I share that as well.  It's a historic task.  It's

HT_0004998
CUBANOS-0000004872

2/18/2022                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 128

1    one that happens every 10 years, and I'm personally

2    honored to have had the opportunity to work with all

3    of you through it.

4              The process, as you know, requires us to

5    set personal interests aside.  We had a lot to

6    learn.  The external pressures are significant.

7    When it comes to our communities and neighborhoods,

8    emotions run high.  But this process requires us to

9    follow the law, follow the law, specifically our

10   Tier 1 and Tier 2 constitutional standards.  And I

11   want to mention, you know, I enjoy so much working

12   with Representative Hunschofsky because I've learned

13   that she has a way about her where she can just cut

14   to the heart of the matter, and I think she did that

15   today with her question.

16             And I just wanted to -- I felt compelled

17   after hearing your question, Representative, to go

18   back to where we started our Committee meetings,

19   with a review of our constitutional standards, Tier

20   1 and Tier 2.  "No apportionment plan or individual

21   districts shall be drawn with the interest of favor

22   or disfavor a political party or incumbent.

23   Districts shall not be drawn with the intent or

24   result of denying or abridging the equal opportunity

25   of racial or language minorities to participate in

HT_0004999
CUBANOS-0000004873

2/18/2022                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 129

1    the political process or diminish their ability to

2    elect a representative of their choice.  Districts

3    shall consist of contiguous territory."  And then we

4    move on to Tier 2.  "Districts shall be as nearly

5    equal in population as practical.  Districts shall

6    be compact.  District shall where feasible utilizing

7    existing political and geographical boundaries

8            We have to follow the law.  Representative

9    Joseph, I appreciate your questions about receiving

10   that input, and I would remind Committee members

11   that we continue to be the vehicle for that input.

12   Those information, if there's something that you

13   hear, if there's something that you think adds to

14   the process, I encourage you to bring it forward.

15   But you have to be prepared, as we have said

16   consistently from the beginning of this process, to

17   disclose who brought it to you and be prepared to

18   back it up.

19           Individuals out there who wish to provide

20   input and feedback on this process have the ability

21   to do so, floridaredistricting.gov, where nearly 100

22   individuals have utilized the website to create and

23   to submit maps of their own.  In January, we noticed

24   a two-hour meeting to accept public input in

25   addition to public input at each of our meetings,

HT_0005000
CUBANOS-0000004874

Page 130

1    where we have received testimony.  As elected

2    members of this House of Representatives, it is our

3    constitutional duty and responsibility to present

4    the views of our constituents in the conduct of

5    their business.

6              Members, you're going to have an

7    opportunity as you have had today throughout our

8    Committee meetings, at Chair Leeks Committee, on the

9    floor, when we reconciled with the Senate throughout

10   this process.  You will have an opportunity to

11   provide that input, and I encourage you to get with

12   me and Chair Leek if there is something on your

13   mind.  But we have to follow law.  And once again, I

14   want to read to you the first line from the 2012

15   Supreme Court ruling that I started today's

16   presentation with.  And this is what the Court said

17   then, "A review of the House plan and the record

18   reveals that the House engage in a consistent and

19   reasoned approach."  Members, we hit that mark

20   again.  We hit that mark again, and I'm proud of

21   this Committee's work product.

22              Now, as I said, our PCB is going to work

23   through the normal process, just like any other

24   bill, and this PCB is going to move on to the Full

25   Redistricting Committee, where the conversation that

HT_0005001
CUBANOS-0000004875

Page 131

```
1    we started weeks ago will continue with our
2    colleagues.  If you have further policy points for
3    discussion, please, please, Members, don't wait.
4    Get with me and Chair Leek, and we are happy to hear
5    you and to continue this conversation.  But,
6    Members, I want to assuage any doubt that may be in
7    front of you today.  This is a legally sound map.
8    It's a constitutionally compliant map.  Please join
9    me in voting yes.
10             VICE-CHAIR TUCK:  Chair Sirois having
11   closed, Members, please remember to turn on your
12   mics when you vote.
13             DJ, please call the roll on PCB CRS 22-01
14   and announced the vote.
15             THE SECRETARY:  Chair Sirois?
16             CHAIRMAN SIROIS:  Yes
17             THE SECRETARY:  Representative Benjamin has
18   been excused.
19             Brown?
20             REPRESENTATIVE BROWN:  No.
21             THE SECRETARY:  Fabricio?
22             REPRESENTATIVE FABRICIO:  Yes.
23             THE SECRETARY:  Fetterhoff?
24             REPRESENTATIVE FETTERHOFF:  Yes.
25             THE SECRETARY:  Giallombardo?
```

HT_0005002
CUBANOS-0000004876

2/18/2022                  Common Cause, et al. v. Cord Byrd                  Audio Transcription

Page 132

1           REPRESENTATIVE GIALLOMBARDO:  Yes.

2           THE SECRETARY:  Harding?

3           REPRESENTATIVE HARDING:  Yes.

4           THE SECRETARY:  Hunschofky?

5           REPRESENTATIVE HUNSCHOFSKY: No.

6           THE SECRETARY:  Joseph?

7           REPRESENTATIVE JOSEPH: No.

8           THE SECRETARY:  Maggard?

9           REPRESENTATIVE MAGGARD:  Yes.

10          THE SECRETARY:  Massullo has been excused.

11          McClure?

12          REPRESENTATIVE MCCLURE:  Yes.

13          THE SECRETARY:  Morales?

14          REPRESENTATIVE MORALES:  No.

15          THE SECRETARY:  Perez?

16          REPRESENTATIVE PEREZ:  Yes.

17          THE SECRETARY:  Plakon?

18          REPRESENTATIVE PLAKON:  Yes.

19          THE SECRETARY:  Silvers?

20          REPRESENTATIVE SILVERS?  No.

21          THE SECRETARY:  Skidmore?

22          REPRESENTATIVE SKIDMORE:  No.

23          THE SECRETARY:  Toledo?

24          REPRESENTATIVE TOLEDO:  Yes.

25          THE SECRETARY:  Trabulsy?

HT_0005003
CUBANOS-0000004877

2/18/2022                Common Cause, et al. v. Cord Byrd            Audio Transcription

Page 133

1              REPRESENTATIVE TRABULSY:  Yes.

2              THE SECRETARY:  Tuck?

3              VICE-CHAIR TUCK:  Yes.

4              THE SECRETARY:  Williamson?

5              REPRESENTATIVE WILLIAMSON:  Yes.

6              THE SECRETARY:  Ex-officio Clemons?

7              REPRESENTATIVE CLEMONS:  Yes.

8              THE SECRETARY:  Ex-officio Davis?

9              REPRESENTATIVE DAVIS:  No.

10             THE SECRETARY:  14 yeas, 7 nays, Madam

11     Chair.

12             VICE-CHAIR TUCK:  Show the PCB reported

13     favorably.  Now, I'll pass the gavel back to Chair

14     Sirois.

15             CHAIR SIROIS:  Thank you very much,

16     Members.  I'd like to thank all the members of the

17     public that provided input today and the members of

18     the Committee for your questions as well.

19             I particularly want to thank Vice-Chair

20     Tuck.  You did an outstanding job, and I've been

21     proud to have you as my vice chair throughout this

22     process.

23             As a reminder, the proposed congressional

24     map has another Committee stop in the Full

25     Redistricting Committee.  If you have any questions

HT_0005004
CUBANOS-0000004878

Page 134

1   for myself, or Chair Leek, or staff, I encourage you

2   to reach out to us.  As this is most likely our last

3   Subcommittee meeting, I'd like to thank

4   Speaker Sprowls and Chair Leek and the Committee

5   members for this tremendous honor to lead you

6   through this process.

7         I'd also like to thank our redistricting

8   staff, Leda, Jason, Sam, Karen, DJ, for your help in

9   and your accommodation for this rookie chairman.

10  It's been a pleasure to work with you, our ranking

11  member as well.  Thank you very much.

12        That concludes our Committee meeting agenda

13  for today.  Representative Perez moves that we rise

14  without objection.

15              (END OF VIDEO RECORDING)

16

17

18

19

20

21

22

23

24

25

HT_0005005
CUBANOS-0000004879

2/18/2022                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 135

1               CERTIFICATE OF TRANSCRIPTIONIST

2          I certify that the foregoing is a true and

3    accurate transcript of the digital recording provided

4    to me in this matter.

5          I do further certify that I am neither a

6    relative, nor employee, nor attorney of any of the

7    parties to this action, and that I am not financially

8    interested in the action.

9

10

11

12

13    _____

14          Julie Thompson, CET-1036

15

16

17

18

19

20

21

22

23

24

25

HT_0005006
CUBANOS-0000004880