Page 1

_____

Common Cause, et al.                    )
                                        )
v.                                      )  4:22-cv-109
                                        )
Cord Byrd                               )
_____       )


TRANSCRIPTION OF VIDEO RECORDING

HOUSE CONGRESSIONAL REDISTRICTING SUBCOMMITTEE

APRIL 19, 2022


_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

HT_0000082
CUBANOS-0000005206

4/19/2022                    Common Cause, et al. v. Cord Byrd                    Audio Transcription

Page 2

1   APRIL 19, 2022

2          CHAIRMAN SIROIS:  The Congressional

3   Redistricting Subcommittee will come to order.

4          DJ, please call the roll.

5          THE CLERK:  Chair Sirois.

6          CHAIRMAN SIROIS:  Here.

7          THE CLERK:  Vice Chair Tuck.

8          VICE CHAIR TUCK:  Here.

9          THE CLERK:  Ranking Member Skidmore.

10         DEMOCRATIC RANKING MEMBER SKIDMORE:  Here.

11         THE CLERK:  Representatives Benjamin.

12         REPRESENTATIVE BENJAMIN:  Here.

13         THE CLERK:  Brown.

14         REPRESENTATIVE BROWN:  Here.

15         THE CLERK:  Fabricio.

16         REPRESENTATIVE FABRICIO:  Here.

17         THE CLERK:  Fetterhoff.

18         REPRESENTATIVE FETTERHOFF:  Here.

19         THE CLERK:  Harding.

20         REPRESENTATIVE HARDING:  Here.

21         THE CLERK:  Hunschofsky.

22         REPRESENTATIVE HUNSCHOFSKY:  Here.

23         THE CLERK:  Joseph.  Joseph.

24         Latvala.

25         REPRESENTATIVE LATVALA:  Here.

HT_0000083
CUBANOS-0000005207

4/19/2022                 Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 3

1          THE CLERK:  Maggard.

2          REPRESENTATIVE MAGGARD:  Here.

3          THE CLERK:  Massullo.  Massullo.

4          McClure.

5          REPRESENTATIVE MCCLURE:  I'm here.

6          THE CLERK:  Morales.

7          REPRESENTATIVE MORALES:  Present.

8          THE CLERK:  Perez.

9          REPRESENTATIVE PEREZ:  Here.

10          THE CLERK:  Plakon.

11          REPRESENTATIVE PLAKON:  Here.

12          THE CLERK:  Silvers has been excused.

13          Trabulsy.

14          REPRESENTATIVE TRABULSY:  Here.

15          THE CLERK:  Truenow.

16          REPRESENTATIVE TRUENOW:  Here.

17          THE CLERK:  Williamson.

18          REPRESENTATIVE WILLIAMSON:  Here.

19          THE CLERK:  Ex Officio Driskell.

20          REPRESENTATIVE DRISKELL:  Here.

21          THE CLERK:  Ex Officio Leek.

22          REPRESENTATIVE LEEK:  Here.

23          THE CLERK:  Quorum is present, Mr. Chair.

24          CHAIRMAN SIROIS:  Thank you very much, DJ.

25          Members, a few reminders before we begin.

HT_0000084
CUBANOS-0000005208

Page 4

1    Please silence all electronic devices, and if you're

2    here today to give public testimony, please take

3    time now to fill out an appearance form and turn it

4    into the Sergeant staff.

5            As a reminder for our members and speakers

6    today, please turn your microphone on when you are

7    speaking and off when you are finished.

8            Members, welcome back to special session.

9    We have a lot of work ahead of us today.  So let's

10   jump right in.

11           For those of you who may be tuning in for

12   the first time and as a refresher for the rest of

13   it, I'd like to first take a moment to recap.  We

14   began our redistricting process back in September of

15   2021.  Since then, we've debuted a website, a map

16   drawing application, and held numerous committee

17   meetings.

18           On March 4th, the House and Senate both

19   passed Committee Substitute for Senate Bill 102.

20   Now, from there, unlike what happens in our state

21   legislative redistricting maps that receive Florida

22   Supreme Court review, our congressional

23   redistricting maps do not receive court review and

24   instead move like a normal bill, which means they

25   are sent to the Governor for approval or veto.

HT_0000085
CUBANOS-0000005209

Page 5

1             On March 29th, the bill was sent to the

2    Governor, who vetoed it the same day, citing

3    concerns with the United States Constitution.  That

4    same day, he issued a proclamation, calling the

5    Legislature into special session to resolve these

6    concerns and established Florida's 28 congressional

7    districts to be used in the upcoming election cycle.

8             Chair Leek and I received a briefing from

9    the Governor's Office about their proposed map.  It

10   is my understanding that the Senator received a

11   similar briefing.  I'm glad to inform everyone that

12   the Governor's Office is joining us today to provide

13   that same briefing to all Committee members and the

14   public, as well as be available for questions about

15   the proposed map.

16            As the Speaker, as well as the Senate

17   President, have stated, our goal during special

18   session is to pass a new congressional map that will

19   both earn the Governor's signature and withstand

20   legal scrutiny, if challenged.  This elected body is

21   responsible to the citizens of Florida to complete

22   our constitutional obligation to pass a

23   congressional map.

24            Now, let's talk about the flow and the

25   roadmap for today's meeting.  We have one bill on

HT_0000086
CUBANOS-0000005210

Page 6

1    the agenda for consideration, House Bill 1-C by

2    Representative Leek.  I want to assure members and

3    the public that I intend to allow for enough time

4    for members to ask questions, to hear public

5    testimony, and to allow for debate.  I'll be

6    tracking our time closely this afternoon and will

7    keep the Committee informed as we move along.

8             Shortly, I will recognize Representative

9    Leek to explain his bill, which contains the

10   proposed congressional map, P-000C0109.  As you may

11   be aware, 10 districts of this map are from our

12   previously passed legislative map, and 18 of the

13   districts are being newly proposed by the Governor's

14   Office.

15            Seeing as the House did not have a role in

16   drawing those districts proposed by the Governor, we

17   have invited their team to be present today to

18   explain the map and answer questions from members

19   afterwards.  As is normal, we will move into public

20   testimony and member debate before taking a vote on

21   House Bill 1-C.

22            I'd like to take a moment to also address

23   decorum.  There's been a lot of chatter,

24   speculation, and name calling over the last several

25   weeks in anticipation of this special session and

HT_0000087
CUBANOS-0000005211

Page 7

1   the new proposed map that we'll be considering

2   today.  I want to be very clear.  Today's meeting

3   with proceed with professionalism, civility, and the

4   decorum that Floridians expect of this legislative

5   body.  Members of this Committee and the public

6   alike will keep their emotions and opinions

7   respectable and thoughtful and not engage in

8   personal or partisan attacks.

9           As we've talked about since last fall,

10  there is no single correct redistricting map.  There

11  is no such thing as the best map.  We are here to

12  consider the next map that will govern elections in

13  Florida for the next decade, and that is no small

14  feat.

15          The last housekeeping item before we

16  transition into our bill presentation is that,

17  members, in front of you is the data packet for map

18  P-000C0109.  Similar to the packet produced for

19  previous maps we reviewed, this packet contains

20  information such as county and city splits,

21  compactness scores, and functional analysis data.

22  The bill text is also here in front of DJ in this

23  binder if you would like to review it.

24          Members, up for consideration today is

25  House Bill 1-C, establishing congressional districts

HT_0000088
CUBANOS-0000005212

Page 8

1    of the state.  And as we've done for every other map

2    presentation, I will ask you to hold questions until

3    all districts have been explained to ensure we get

4    through a description of the entire state, and no

5    one region is rushed.

6              Representative Leek, you are now recognized

7    to present House Bill 1-C.

8              REPRESENTATIVE LEEK:  Thank you,

9    Chair Sirois.

10             Before I dive into the map itself, I want

11   to echo Chair Sirois' comments from earlier.  We as

12   legislators should feel a strong sense of

13   responsibility for passing redistricting maps out of

14   this body.  A narrative has started to proliferate

15   that the Legislature has somehow ceded its map

16   drawing responsibility to the Governor.  I find that

17   to be a false narrative and incorrect on its face.

18             We have not ceded any responsibility.  In

19   fact, we have not -- we have done a responsibility

20   once by passing maps during the regular session, and

21   we will complete it again during this special

22   session.  The Governor has also fulfilled his

23   responsibility and chose to veto our maps for

24   reasons I believe his team will elaborate on today.

25             Both branches of government have a role in

HT_0000089
CUBANOS-0000005213

Page 9

1    this process just like with any other bill.  The

2    only abdication of responsibility would be if we

3    threw our hands up and sent an impasse to the

4    courts, allowing them or third parties, all of whom

5    are unelected, to draw our maps.

6              Instead, we have chosen to stay at the

7    table, continue the conversation, and hear out the

8    Governor and work together because that is not only

9    -- not only our responsibility but what Floridians

10   expect of us as their legislators.

11             Our goal for special session is to produce

12   a work product that is legislatively passed and

13   executively signed.  It's through that lens that I

14   hope we will all move forward with today's meeting.

15             Now, on to the presentation.  Today, we

16   will be presenting map P-000C0109.  This is the map

17   reflected in the data packet in front of you, as

18   well as being posted on

19   www.FloridaRedistricting.gov.

20             As Chair Sirois mentioned, 10 of the

21   districts in this map are exact copies of districts

22   that the Legislature passed during the regular

23   session.  Those are Congressional Districts 1, 2,

24   20, 21, 22, 23, 24, 25, 27, and 28.  You can see

25   those here on our screen.

HT_0000090
CUBANOS-0000005214

Page 10

1        The new proposed districts that will be

2   presented by the Governor's Office today consists of

3   Congressional Districts 3-19 and 26, as now seen on

4   the screen.  Given the new proposed districts are

5   the focus of today's meeting, I would like to ask

6   Chair Sirois to recognize the Governor's Office to

7   explain these districts.

8        I'm more than happy to take questions on

9   the Legislature's districts after the presentation

10  but don't want to use our limited time redescribing

11  configurations we've all previously heard several

12  times.

13       CHAIRMAN SIROIS:  Thank you very much,

14  Representative Leek.

15       Representative Skidmore?

16       DEMOCRATIC RANKING MEMBER SKIDMORE:  Thank

17  you, Mr. Chair.

18       I'd like to move that the Governor's staff

19  be put under oath while testifying in the

20  Subcommittee today.

21       CHAIRMAN SIROIS:  Representative Skidmore,

22  first of all, that procedure would be different from

23  any of the testimony that we received in our

24  Committee thus far, and as far as my length of

25  service in the Legislature, I think that that would

HT_0000091
CUBANOS-0000005215

Page 11

1  be an extraordinary step that I don't feel is

2  necessary and, frankly, I find absurd to seek to put

3  a member of another branch of our government under

4  oath.

5            So that is not well received by me, and as

6  Chair, I will choose to decline your request.

7            DEMOCRATIC RANKING MEMBER SKIDMORE:

8  Follow-up?

9            UNIDENTIFIED FEMALE:  Mr. Chair, point of

10  --

11            CHAIRMAN SIROIS:  Representative Skidmore.

12            DEMOCRATIC RANKING MEMBER SKIDMORE:  Thank

13  you, Mr. Chair.

14            Pursuant to Rule 7.2, we have the ability

15  to move to have members or guests who are testifying

16  in Committee to be put under oath, and I feel that

17  it is a fair motion under the circumstances.  And

18  I'd like us to move through that process with a --

19  if we could get a second and a vote on it.

20            UNIDENTIFIED FEMALE:  I second.

21            CHAIRMAN SIROIS:  Thank you.

22            Representative Skidmore, again, I'm going

23  to voice that I think that that is an extraordinary

24  and unnecessary step for us to take.  But I will put

25  it to this Committee.

HT_0000092
CUBANOS-0000005216

Page 12

1          But as we move forward, I think it's a good

2    point to point out the tone for today's Committee

3    meeting.  This is a state house, not a courthouse,

4    and that's how I intend to proceed with this

5    Committee today.  So in the spirit of working with

6    you and moving our process forward, I will put that

7    to the vote of a Committee, and I will ask for a

8    voice vote.

9          Those in favor of putting the witness

10   providing testimony today under oath please indicate

11   so by saying aye.

12          (Multiple yeas).

13          And those opposed, please say no.

14          (Multiple nos)

15          CHAIRMAN SIROIS:  In the judgment of the

16   Chair, the nos have it.

17          We'll now proceed.

18          Representative Driskell.

19          REPRESENTATIVE DRISKELL:  (Indiscernible)

20          CHAIRMAN SIROIS:  All right.  On the motion

21   that we just voted on, seeing two hands on the

22   motion that we just had a voice vote on, DJ, I would

23   ask you to call the roll.

24          THE CLERK:  Chair Sirois.

25          CHAIRMAN SIROIS:  No.

HT_0000093
CUBANOS-0000005217

Page 13

1          THE CLERK:  Representatives Benjamin.

2          REPRESENTATIVE BENJAMIN:  Yes.

3          THE CLERK:  Brown.

4          REPRESENTATIVE BROWN:  Yes.

5          THE CLERK:  Fabricio.

6          REPRESENTATIVE FABRICIO:  No.

7          THE CLERK:  Fetterhoff.

8          REPRESENTATIVE FETTERHOFF:  No.

9          THE CLERK:  Harding.

10          REPRESENTATIVE HARDING:  No.

11          THE CLERK:  Hunschofsky.

12          REPRESENTATIVE HUNSCHOFSKY:  Yes.

13          THE CLERK:  Joseph.

14          REPRESENTATIVE JOSEPH:  Yes for

15    transparency.

16          THE CLERK:  Latvala.

17          REPRESENTATIVE LATVALA:  No.

18          THE CLERK:  Maggard.

19          REPRESENTATIVE MAGGARD:  No.

20          THE CLERK:  Massullo.

21          REPRESENTATIVE MASSULLO:  No.

22          THE CLERK:  McClure.

23          REPRESENTATIVE MCCLURE:  No.

24          THE CLERK:  Morales.  Morales.

25          UNIDENTIFIED FEMALE:  Daisy, you have to

HT_0000094
CUBANOS-0000005218

Page 14

1   vote.

2        THE CLERK:  Perez.

3        REPRESENTATIVE PEREZ:  No.

4        THE CLERK:  Plakon.

5        Silvers has been excused.

6        Skidmore.

7        DEMOCRATIC RANKING MEMBER SKIDMORE:  Yes.

8        THE CLERK:  Trabulsy.

9        REPRESENTATIVE TRABULSY:  No.

10        THE CLERK:  Truenow.

11        REPRESENTATIVE TRUENOW:  No.

12        THE CLERK:  Tuck.

13        VICE CHAIR TUCK:  No.

14        THE CLERK:  Williamson.

15        REPRESENTATIVE WILLIAMSON:  No.

16        THE CLERK:  Ex Officio Driskell.

17        REPRESENTATIVE DRISKELL:  Yes.

18        THE CLERK:  Ex Officio Leek.

19        REPRESENTATIVE LEEK:  No.

20        THE CLERK:  Six yeas, fifteen nays,

21   Mr. Chair.

22        CHAIRMAN SIROIS:  Thank you, DJ.

23        Members, the motion fails.

24        The Governor's Office is recognized, and if

25   you would please identify yourself, sir, for the

HT_0000095
CUBANOS-0000005219

Page 15

1   Committee and the record that would be appreciated.

2            ALEX KELLY:   Thank you, Mr. Chair.

3            I'm Alex Kelly with the Executive Office of

4   the Governor, and I'm a deputy chief of staff for

5   the Governor.  And I should say apologies for the

6   PowerPoint.  Obviously, I made the PowerPoint before

7   House Bill 1-C was filed.  So obviously, I'll be

8   speaking to House Bill 1-C and I guess obviously the

9   identical content of Senate Bill 2-C today.  But

10  that's it again.  Thank --

11           CHAIRMAN SIROIS:  Mr. Kelly, I'm sorry to

12  interrupt you.  If you could pull that microphone a

13  little bit closer and just speak up a little bit.

14           ALEX KELLY:   Thank you, my apology.

15           Again, thank you, member -- thank you --

16  thank you, Mr. Chair, members, and thank you for

17  this opportunity to present the views of the

18  Executive Office of the Governor on the -- the

19  proposed congressional reapportionment plan and to

20  discuss our work and our contributions to this

21  compromise plan.

22           Just to give you a very brief introduction,

23  you know.  Frequently today, I'll refer to

24  improvements in the plan, and I think obviously the

25  Chair and the -- and the sponsor gave a great

HT_0000096
CUBANOS-0000005220

Page 16

1    introduction to the plan.  I'll be really speaking

2    to just the 18 districts that are different,

3    although sometimes I'll very generically refer to

4    the plan as a whole.  But I really am really

5    referring to our specific and my specific

6    contributions to those 18 districts.

7            And oftentimes throughout the presentation,

8    I will compare very specifically this plan, Plan

9    0109, to the primary plan the Legislature passed,

10   Plan 8019.  Although there are some instances where

11   I'll refer to both, and I'll try to remember to

12   identify both when I'm making a comment that

13   definitely refers to both.

14           So for the purpose of my introduction, so I

15   am the map drawer of the 18 districts in this plan.

16   Obviously, I assumed that context would be helpful.

17   So I am the map drawer of these districts, and to

18   give you just a little bit of background of myself,

19   10 years ago, I was the staff director of the House

20   Redistricting Committee here in the Florida House of

21   Representatives.

22           Starting in January this year, I initially

23   served for our office in a role of just providing

24   guidance and oversight to our in-house counsel and

25   our contract counsel and also a contract map drawer

HT_0000097
CUBANOS-0000005221

Page 17

1   that we brought on board to help initially start our

2   engagement in this process.

3          For reference, that contract map drawer

4   that we brought on board -- his name is Adam Foltz

5   -- the initial map that we submitted on behalf of

6   our office, map 0079, was drawn by -- was authored

7   by Mr. Foltz.  For just a little context for his

8   background, he has been a map drawer for state

9   Legislatures in Wisconsin and Texas, and actually

10  currently he's drawing maps for the state of Texas

11  at this present time.

12         Much like your professional staff, myself,

13  our map drawer who drew our original map, map 0079,

14  we've only drawn maps on behalf of state government.

15  Adam Foltz and I collaborated on our office's second

16  contribution, map 0094, and, again, I alone authored

17  the 18 changes -- the 18 districts that are changed

18  in the map before you today and as to how they

19  compare to map 8019.

20         Some additional notes I'll point out at the

21  outset that will be helpful for today, one, no one

22  directed me to favor or disfavor a political party

23  or incumbent throughout this process, and I did not

24  draw any districts or make any districts or make any

25  contributions with the intent of favoring or

HT_0000098
CUBANOS-0000005222

Page 18

1    disfavoring a political party or an incumbent.

2              Two, in drawing any of the districts

3    submitted by our office, I did not consider or even

4    look at political data, including party

5    registration, voter data.  In other words, I do not

6    know the voting history or party registration

7    numbers for any of the districts that I have drawn.

8              With that said, the only time I did

9    reference political data in my work was early in the

10   process.  I did -- I did reference pollical data

11   early in the process when we were observing the work

12   of the Legislature and we were identifying whether

13   or not it was possible to draw a compact African

14   American performing district in Northeast -- in

15   Northeast Florida to both try to comply with the

16   U.S. Constitution and the State Constitution and

17   apply -- comply with the State Constitution in the

18   way that the Florida Supreme Court has interpreted

19   it and the way this Legislature has implemented it.

20             So essentially, I took a look at whether or

21   not it was possible to sort of check all the boxes,

22   so to speak, with complying with the U.S.

23   Constitution and the State Constitution in drawing a

24   more compact minority performing district.

25   Ultimately, I determined it was not possible to do

HT_0000099
CUBANOS-0000005223

Page 19

1   so.

2            Three, in drawing the compromised plan that

3   you -- that you have before you here today in this

4   legislation and contributing to office's two prior

5   proposals and in the totality of our office's

6   engagement in this process, I have not in any way

7   consulted with anyone outside the Executive Office

8   of the Governor, our contract counsel, our contract

9   map drawer, the Legislature, and its counsel.  So

10  I've only worked within the parties here in the

11  House, Senate, and our office and our contract

12  counsel.

13           In other words, I can confirm -- said

14  differently, I can confirm that I've had no

15  discussions with any political consultant, no

16  partisan operative, no political party official

17  concerning any plans proposed by our office and

18  plans considered by the Legislature.  In effect, I

19  have engaged in this process, including authoring

20  this proposed compromise plan, in a manner that

21  meets the same high standards that you set forth for

22  your professional staff.

23           And this plan that you're considering today

24  in House Bill 1-C, Plan 0109, is indeed a

25  compromise.  It is the product of consultation and

HT_0000100
CUBANOS-0000005224

Page 20

1    collaboration between our office and House and

2    Senate leadership, and it incorporates portions of

3    the plan passed by the Legislature.

4         As Chair Leek noted, Senate Bill 102,

5    Primary Plan 8019, concepts, of course, from 10

6    districts are included block for block in their

7    entirety in this map.  This compromise plan also

8    includes concepts from our two prior office's

9    submissions, Plan 0079 and 0094.

10         It also includes concepts from the map that

11   was actually referred out of this Subcommittee, map

12   -- or Plan 8011 prior to -- or I guess out of this

13   Subcommittee on its way to the full committee and

14   aligns in several other ways that I'll describe with

15   plans considered and the style of the House and

16   Senate's map drawing.

17         As we noted -- in fact, I think, Chair

18   Leek, you did a great job of really summarizing this

19   slide.  So I can probably just -- probably just skip

20   this.  But, you know, again, in general, the main

21   crux of it is that I'm going to really focus my

22   comments today on the 18 districts that did change.

23         First, in an effort to create a

24   collaborative product, I worked off the

25   Legislature's primary plan 8019.  So while I was

HT_0000101
CUBANOS-0000005225

Page 21

1    seeking to remedy the Governor's veto message and

2    make improvements throughout the map, I began my

3    work downloading Plan 8019 and subsequently making

4    changes.

5            Regarding the proposed plan before you

6    today, it maintains the same number of performing

7    majority-minority seats.  It retains the

8    Legislature's exact configuration as was shown in

9    the map of the Panhandle districts and also

10   Southeast Florida, essentially St. Lucie through

11   Monroe Counties.

12           For reasons set forth in the detailed

13   memorandum that -- I think it may have been

14   distributed to the members prior to the meeting --

15   the detailed memorandum that our general counsel

16   wrote to accompany the Governor's veto message, the

17   compromise proposal eliminates the racially

18   gerrymandered versions of Congressional District 5,

19   which were included in Senate Bill 102, both the

20   primary plan and the secondary plan.  Members, that

21   legal memorandum is included -- again, I think

22   hopefully it's been distributed.  That legal

23   memorandum is available.

24           In summary, Congressional District 5 in

25   both the primary and secondary maps enacted by the

HT_0000102
CUBANOS-0000005226

Page 22

1    Legislature violates the Equal Protection Clause of

2    the United States Constitution because it assigns

3    voters primarily on the basis of race but is not

4    narrowly tailored to achieving -- to achieve a

5    compelling state interest.

6              Again, that memorandum otherwise fully

7    explains the Governor's legal objections to both

8    versions of that district in the primary and

9    secondary maps as it passed the Legislature.

10             I will say because I am the map drawer, I

11   am not legal counsel to the Governor.  I'm going to

12   be careful to really focus my comments today on the

13   drawing of the map and not venture into that legal

14   world.  It's a little beyond -- it's probably a

15   little beyond my training.  So I'm really going to

16   -- going to focus on the map itself and those 18

17   districts.

18             Plan 0109 creates two new districts,

19   Districts 4 and 5, in Northeast Florida consistent

20   with maps previously proposed by our office with

21   some minor improvements.  These two districts are

22   race neutral and overall more compacts than

23   Districts 4 or 5 in the maps passed by the

24   Legislature.

25             In addition to resolving federal

HT_0000103
CUBANOS-0000005227

Page 23

1    constitutional objections raised by the Governor,

2    the proposed compromise plan makes overall

3    improvements with respect to Tier 2 redistricting

4    criteria relative to the maps passed by the

5    Legislature by bringing together some of the best

6    concepts from the Legislature's prior maps and our

7    office's maps.

8            Plan 0109 adjusts the congressional

9    districts in Tampa, for example, the Tampa Bay area

10   and the larger Gulf Region, stretching from Citrus

11   down to Lee Counties and impacting some inland

12   counties to create a hybrid compromise of the

13   Legislature's and our office's maps.

14           These changes improve overall visual

15   compactness, have a net effect of reducing a county

16   split, and significantly increase the usage of Tier

17   2 political and geographical boundary lines.

18           In the Central Florida region, Plan 0109

19   aligns more closely with the map that was referred

20   out of this Subcommittee, Plan 8011, with one

21   distinction that aligns with Senate Plan 8060 as it

22   passed the Senate.

23           With respect to the similarities with the

24   House's Plan 8011, specifically with respect to

25   Congressional District 10, we accept the position

HT_0000104
CUBANOS-0000005228

Page 24

1    articulated by the House's professional staff in

2    this Subcommittee in that meeting, that this

3    district is not subject to the Florida

4    Constitution's non-diminishment standard because the

5    benchmark district does not contain an African

6    American population sufficient enough, large enough

7    to reliably elect a candidate of their choice.

8            We understand that the House and Senate

9    disagree on this point.  However, because districts

10   cannot be drawn on the basis of race unless there is

11   a compelling reason to do so, the absence of

12   agreement between the House and Senate on the need

13   to treat District 10 as a minority protected

14   district under the State Constitution indicates that

15   a compelling basis for using race is lacking.

16   Essentially, the disagreement between the two

17   chambers, as articulated in the testimony, is a

18   reason for a lack of evidence.

19           Accordingly, the proposed plan defers to

20   the House's stated testimony in that Committee

21   meeting or Subcommittee meeting, and my changes to

22   the districts in Central Florida region, including

23   District 10, are drawn on race -- on race neutral

24   principles.

25           Again, these changes in Central Florida

HT_0000105
CUBANOS-0000005229

Page 25

1    result in Tier 2 improvements for the Central

2    Florida region.  And the combination of these

3    changes in Central Florida and the Gulf Coast

4    counties result in some additional Tier 2

5    improvements for other impacted districts like

6    Districts 3, 6, and 11.

7            Lastly, in-between the submission of our

8    office's second map, Plan 0094, and my drawing of

9    this plan, 0109, I received feedback from House and

10   Senate staff regarding our second maps overreliance

11   on the boundaries of census-designated places.  I

12   was encouraged to follow the House and Senate's

13   preferred methodology of boundary usage to increase

14   our usage of major roadways, waterways, and railways

15   for Tier 2 compliance.

16           Our second map closely adhered to county

17   and city lines.  So that was not a concern, although

18   less frequently to the other Tier 2 recognized

19   boundaries.  Therefore, throughout these 18 revised

20   districts, I adopted the Legislature's -- the House

21   and Senate's preferred and clear articulation of

22   Tier 2 compliance.  So even where I was trying to

23   articulate a general concept from one of our

24   office's prior maps, I made such revisions using the

25   Legislature's preferred approach to Tier 2

HT_0000106
CUBANOS-0000005230

Page 26

1    compliance.

2              In the next few slides, I'll just walk you

3    through some key points regarding those Tier 2

4    improvements.  First, the proposed plan reduces by

5    one the number of county splits from 18 to 17 by

6    keeping Citrus and Sarasota Counties whole in lieu

7    of Polk, effectively a two-for-one swap.

8              Furthermore, where there are county splits,

9    the number of ways in which those counties are split

10   is reduced.  For example, probably the most visible

11   of those changes in a larger county is reducing the

12   number of districts within a portion of Hillsborough

13   County from four to three.

14             Second, the proposed plan reduced reliance

15   on nongeographic and nonpolitical boundaries from

16   12.5 percent to 11.5 percent, not a significant

17   difference but nonetheless showing that effort to

18   again utilize more frequently, well-recognized

19   political and geographical boundary lines in that

20   Tier 2 manner.  In other words, when I mentioned

21   previously that I adopted the House and Senate's

22   preferred way to articulate compliance, this is the

23   result of that.

24             Third, although the mean compactness scores

25   are largely equivalent to each other when comparing

Page 27

1   my efforts in map 0109 and Plan 8019 as passed by

2   the Legislature, the proposed plan improves the

3   compactness score of the least compact district such

4   that Plan 0109 would be, I believe, the first map

5   considered by the Legislature where every district

6   has a Reock and Polsby-Popper score greater than

7   0.2.

8          I should say, moreover, visually we'll see

9   in a few moments many of the districts are plainly

10  just more circular, squared, more visually compact

11  shapes that are more easily understandable.

12         Lastly, my changes to Plan 0109 stayed

13  equal to the Legislature's achievement of only

14  splitting 16 cities in primary plan 8019.  There are

15  some differences about which cities are split when

16  comparing my revisions to the map passed by the

17  Legislature, specifically I keep Cape Coral, Plant

18  City, and Port Orange whole, whereas the Legislature

19  kept Lakeland, St. Pete, and Longboat Key whole.

20         What I did take care to do in each of those

21  cases was first to make sure that if there was a

22  city split in that sort of three cities for three

23  cities swap, to make sure that those cities

24  nonetheless were still only contained within two

25  districts, as the way the Legislature did, as the

HT_0000108
CUBANOS-0000005232

Page 28

1    way you did.

2            And additional -- and additionally, I tried

3    to make sure that those city splits still made

4    meaningful use of other Tier 2 metrics.  For

5    example, as you know, Longboat Key is one of four

6    cities in the state that is itself split across two

7    different county lines.  When I made the effort to

8    keep Sarasota County whole, that resulted in

9    splitting Longboat Key because both Manatee and

10   Sarasota were kept whole but kept whole in two

11   different districts, although certainly that was an

12   exchange of Tier 2 compliance that was well worth it

13   in order to keep an entire county whole.

14           I should say just as a disclaimer in saying

15   all of this, I don't mean to ever suggest -- and I

16   think, Chair Sirois, you got at this point -- I

17   don't ever mean to suggest there is a statistical

18   line in the sand for what Tier 2 -- Tier 2 compliant

19   compactness or county splits or city splits looks

20   like.

21           But at the same time, in authoring a

22   compromise plan, I recognized that I should author a

23   plan that recommends improvements and builds upon

24   the work of the Legislature, at the very least give

25   you a plan that never goes backwards and at least

HT_0000109
CUBANOS-0000005233

Page 29

1    improves upon the work the Legislature has done,

2    even though it's not necessarily, as you said,

3    Chair, it's not a competition of statistics.  And

4    that is exactly what I've done.

5              So with that, I'm just going to proceed

6    then to a more detailed visual explanation of the

7    proposed compromise plan.

                              Statewide, the next two

8    slides -- really, the next four slides -- give you

9    that view statewide.  I don't think I need to cover

10   these as much because you -- Chair, you covered

11   these very much or Chairs, I should say, covered

12   these very much in your opening.

13             But this is the statewide view, and then if

14   you just scroll to pulling back the district labels,

15   it was important for me, not just -- obviously we

16   talked about statistics, not just to improve upon

17   statistical goals in the map, like statistical

18   compactness, but I also wanted these changes just to

19   satisfy the eyeball test and offer some squaring up,

20   circling up of the districts and greater usage of

21   clear and visible boundary lines.  And so the look

22   and feel of the map mattered just as much as the

23   statistics.

24             As you zoom in on just the districts that

25   changed, I'll just skip a little bit again because

HT_0000110
CUBANOS-0000005234

Page 30

1    you just looked at something similar.  One of the

2    key facets of my work in the proposed plan was to

3    make sure that there was no collateral, unintended

4    consequences to my changes without making some sort

5    of equal or better Tier 2 change.

6              So as I changed one part of the map -- for

7    example, as you see, I split Polk County as part of

8    the swap for keeping Citrus and Sarasota Counties

9    whole.  I get a little more in-depth as to exactly

10   how that worked in a little bit.  In doing so, I

11   incorporated several Tier 2 changes to Polk County

12   to make sure the new lines were still very

13   meaningful.

14             And in saying that, two-thirds of the

15   residents in proposed District 18 on the right are

16   still coming from Polk County.  Clearly, the

17   Legislature was articulating options that centered a

18   district largely around Polk County.  And so even

19   though I've split the county in order to pick up

20   Sarasota and Citrus kept whole, I've done so in a

21   way where Polk County is still the predominant two-

22   thirds of the population of a district.

23             Shifting to Districts 4 and 5 on these next

24   couple slides, I already provided some context

25   previously about the newly proposed composition of

HT_0000111
CUBANOS-0000005235

Page 31

1    these two districts.  Just some other general points

2    that I didn't say earlier.  The boundary lines

3    between the two are mostly the St. Johns River.

4             As you know, Jacksonville is the one city

5    in the state that is larger than a congressional

6    district.  So you must split it, and the river,

7    which nearly equally divides the city, stands out as

8    a logical, recognizable Tier 2 boundary.  If you

9    have to split the city somewhere, it stands out as

10   maybe the most recognizable boundary to do so.

11            And in doing so, the maps on the right in

12   Plan 0109 were overall the combined -- when you

13   compare the compactness of the Districts 4 and 5

14   there compared to Districts 4 and 5 on the left,

15   combined, they still improve the overall compactness

16   of the two, even making the split through the river.

17            The southern boundaries of District 4 and 5

18   -- I should -- let me go back.  The southern

19   boundaries of Districts 4 and 5 are still exactly as

20   the Legislature proposed them.  So the use of the

21   Clay-Putnam line is the same as the Legislature

22   proposed it, and where the split occurs in St. Johns

23   County is exactly as the Legislature proposed it.

24   So we didn't change the southern boundary.  I didn't

25   change the southern boundary of Districts 4 and 5.

HT_0000112
CUBANOS-0000005236

Page 32

1            The last point about these two districts I

2     want to make sure and show you, make sure you see,

3     is that District 4 does need to cross the river at

4     some point for the purposes of equal population, and

5     that population difference was about 1500, 2000

6     residents.  So knowing the district has to cross at

7     some point, cross the St. Johns River, I tried to

8     make that a meaningful crossing of the river.

9            Our original iteration of this crossing, I

10    think, was less deliberate.  In this improvement

11    configuration, I used the bridges of the Arlington

12    Expressway and Interstate 295 to literally allow a

13    resident to not have to leave District 4 in order to

14    traverse District 4.  So again, just trying to use,

15    even in the zero population work on a district,

16    trying to use those boundaries in some kind of

17    meaningful way.

18            The next few slides, slides 14 through 21,

19    visualize my changes to the Gulf Counties from

20    Citrus down to Lee and how those districts impact

21    the counties inland to the east, north, and south.

22    And I'm showing this in a way that I thought about

23    it, trying to make Tier 2 improvements, how I

24    thought and went through the map to make those

25    changes.  And essentially this is again a hybrid of

HT_0000113
CUBANOS-0000005237

Page 33

1    the Legislature's maps and our office's prior plans

2    in this region.

3              In order to achieve worthwhile Tier 2

4    improvements to this region, I did have to revisit

5    how the entire region was drawn.  Slide 15, as this

6    slide illustrates, the Legislature's decision to

7    keep Broward, Osceola, and Polk Counties whole --

8    nothing wrong with that decision.  Obviously keeping

9    counties whole is a great decision -- but the

10   Legislature's decision to keep Broward, Osceola, and

11   counties (sic) whole places limitations on what

12   could be done in the Tampa Bay region and the

13   counties to the north and south of Tampa Bay.

14             Keeping Broward -- I'm sorry -- Broward,

15   Osceola, and Polk Counties whole creates effect --

16   in effect -- I'm sorry.  Go ahead -- in effect,

17   creates a wall across three-quarters of the state.

18   Breaking that wall in Polk County essentially gives

19   the map drawer more flexibility in considering

20   different options for drawing more compact districts

21   and more adherence to political and geographical

22   boundary lines in those Western Gulf Counties in the

23   state of Florida.

24             So in effect, Polk County -- freeing Polk

25   County up then allowed additional considerations.

HT_0000114
CUBANOS-0000005238

4/19/2022                Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 34

1    Otherwise, if it's kept whole, it limits what the

2    map drawer can do in along Tampa Bay and north and

3    south of Tampa Bay.

4              Slide 16, for example, this Congressional

5    District 12 now includes all of Citrus County.  In

6    the Legislature's configuration, Citrus County was

7    split.  So now, Citrus County is kept whole in this

8    district.  Of course, obviously, now District 12

9    takes a much more squared-up, linear shape.

10             Just a few details about the district and

11   the district just to the south of it, that pink

12   district, District 15, District 12 is actually still

13   a majority Pasco County seat, yielding about 141,000

14   Pasco County residents to District 15.  The

15   boundaries between 12 and 15 are almost entirely

16   defined by state roads and municipal boundary lines.

17   Zephyrhills is entirely included in District 15.

18   Saint Leo, San Antonio, and Dade City are entirely

19   included in District 12.

20             Taking a look then south of the Tampa Bay

21   region, going down to Sarasota County, the changes I

22   began in Polk also allowed keeping Sarasota County

23   whole in District 17, which, like District 12, now

24   includes two whole counties and portions of a third

25   to get equal population.

HT_0000115
CUBANOS-0000005239

Page 35

1           The southern portions of District 17 that

2    extend into Lee County only take unincorporated

3    communities, leaving all municipalities from Lee

4    County whole in District 19.  This is how I was able

5    to keep Cape Coral whole in District 19.  And the

6    boundaries are almost entirely city lines or

7    significant roadways, again, leaning on these Tier 2

8    principles.

9           Taking this approach to the north and south

10   of Tampa Bay then gave me a better chance to draw

11   visually compact districts in Tampa Bay and make

12   improved usage of Tier 2 political and geographical

13   boundaries.

14          Zooming in a little further on Pinellas

15   County in the bay, it's seen from the Legislature's

16   process that having a seat wholly in Pinellas County

17   was an important goal.  So I quite literally worked

18   my way west to east, starting with District 13,

19   while I also built my way south to north with

20   District 16, coming from Manatee County, which is

21   still kept whole in this plan.

22          Really leaning in heavily on Tier 2

23   standards of compactness and use of Tier 2

24   boundaries, I split Districts 13 and 14 in the north

25   with the use of the Pinellas-Hillsborough County

HT_0000116
CUBANOS-0000005240

Page 36

1    line, as the Legislature did, and I largely utilized

2    U.S. 19 as the southern divider.  I get my equal

3    population in that middle section of District 13, in

4    the unincorporated Feather Sound area just north of

5    St. Pete.

6            So while I split St. Pete, I'm doing so

7    making a clear use of Tier 2 boundaries.  As -- and

8    as I built District 14 eastward and northward in

9    Tampa Bay, again, I sought to ensure that the

10   boundaries of the district were defined by clear,

11   recognizable, Tier 2 boundaries like major roadways

12   and as I was trying to maintain something of a

13   square or rectangular shape to District 14 to keep

14   it compact.

15           You'll see in these next few slides where

16   some of the linkage along predominantly roadways

17   occurs between these districts, in this particular

18   case, between the northern portion of Districts 14

19   and 15 and even District 12 in Pasco County.  That's

20   largely the Suncoast Parkway -- that's -- I'm sorry.

21   It's largely the Suncoast Parkway squared off at a

22   county road, as it essentially takes Suncoast

23   Parkway south.

24           You meet up with a county road, and then

25   make a -- I guess if you were traveling south, you

HT_0000117
CUBANOS-0000005241

Page 37

1    make a left at Busch Boulevard, over to the

2    municipality of Temple Terrace.  And I have Temple

3    Terrace highlighted on the map.  The Legislature had

4    a very similar configuration around Temple Terrace

5    to accommodate the municipal boundaries wholly in a

6    district.

7            And you'll see that I continued on the

8    Suncoast Parkway into Pasco County, so if you take

9    Suncoast Parkway north into Pasco County and then

10   turn on State Road 54, which is a little curvy but

11   nonetheless a state road to divide Districts 12 and

12   13.

13           What you see here in the unincorporated

14   Brandon area is also a point of emphasis that I

15   achieved a few times when three districts would meet

16   at a point.  I essentially tried to make use of a

17   clear -- of clearly recognizable roadways in a Tier

18   2 manner to be distinguishable dividers between

19   districts.  So in this case, that juncture of U.S.

20   301 North and South and State Road 60 East and West

21   makes a clear boundary when these three districts

22   meet.

23           And as I was drawing District 16 from

24   Manatee County north into Hillsborough County, I

25   really wanted to hold State Road 60 as a clear

HT_0000118
CUBANOS-0000005242

Page 38

1    divider that could later be utilized in Polk County,

2    where Districts 15 and 18 would eventually meet.

3    The resulting District 15 also keeps Plant City

4    whole, and despite going into Pasco and Polk

5    Counties, is still approximately two-thirds

6    populated by Hillsborough County residents.

7            The next five slides visualize my changes

8    to the Central Florida region, again, largely

9    returning to the concepts that this Subcommittee

10   passed in Plan 8011 with one exception.

11           That one exception -- we'll start there.

12   That one exception being that I followed more

13   closely to the Senate's concept for Congressional

14   District 8 in that rather than taking the district

15   into southern Volusia to get the last bit of equal

16   population necessary, I turned the district into

17   eastern Orange.  That means this proposed plan only

18   splits Volusia County two ways rather than into

19   three different districts, bringing District 7 down

20   to the Volusia-Broward County line without

21   increasing the number of districts in Orange County.

22           Essentially, there as a turning of the

23   wheel, if you will, as to where these districts'

24   boundaries were to square them up, make them more

25   compact, but not actually have any negative impact

HT_0000119
CUBANOS-0000005243

Page 39

1   on the boundary usage of Orange County but have a

2   positive on the boundary usage in Volusia County.

3          Again, as I mentioned in my opening, I

4   authored District 10 in the House's plan to look

5   more -- I'm sorry -- this plan to look more like the

6   House's plan, Plan 8011, as it passed the

7   Subcommittee, very compactly keeping several cities

8   whole in either Districts 9, 10, or 11.

9          And as you zoom in, I highlighted the

10  municipality -- as you zoom in, I highlighted the

11  municipality of Edgewood, and right next to that is

12  Belle Isle, and both are kept whole in District 9.

13  That explains how District 9 extends upward just

14  slightly, again, utilizing predominantly major

15  roadways, but it's to accommodate these two

16  municipalities and either put them wholly in one

17  district or the other.  In this case, puts them

18  wholly in District 9.  Winter Park and Maitland are

19  kept whole in District 10, and Ocoee, Apopka, and

20  Winter Garden are kept whole in District 11.

21          The boundaries between these districts are

22  almost -- are also very much defined by Tier 2,

23  either keeping the aforementioned cities whole,

24  utilizing county boundaries -- like you look at

25  District 10.  That boundary is the Orange-Seminole

HT_0000120
CUBANOS-0000005244

Page 40

1    boundary line -- or utilizing major, well-recognized

2    roadways and waterways, except where necessary to

3    get equal population.

4              That western boundary, for example, between

5    Districts 10 and 11 is largely the Apopka-Vineland

6    Road, except where the road briefly discontinues

7    about halfway down the western border of the

8    district.

9              And then the southwestern border of

10   District 10 is another clear -- really clear usage

11   of significant roadways to separate Districts 9, 10,

12   and 11 using Interstate 4 and State Road 528, where

13   they all come together.  Again, that achieves really

14   giving those districts a clearly recognizable

15   boundary.

16             The combination of moving District 10 back

17   very compactly towards the middle of Orange County

18   along with keeping Citrus County whole in District

19   12 creates a visually improved, more compact

20   District 11, again, essentially turning the wheel,

21   if you will, of District 11, shifting from the

22   angled shape in Plan 8019 to a more circular shape

23   in Plan 0109 and still includes all of Sumpter

24   County.

25             The combination of reshaping District 7,

HT_0000121
CUBANOS-0000005245

Page 41

1    10, 11, and 12 then allowed me to reduce the number

2    of districts in Marion County from three to two.

3    The result is that both Districts 3 and 6's

4    boundaries follow State Road 301 north to south,

5    similar to the way the Legislature defined the

6    boundaries just a little further east -- the

7    Legislature just used different roadways -- 301

8    north to south, loop around the boundaries of Ocala,

9    and then -- which is wholly in District 3, and then

10   continue down Interstate 75, so again just using

11   very clear, Tier 2 boundaries.

12            The borders between Districts 6 and 11,

13   just for your reference, in the Lake County area is

14   mostly defined by city boundaries and waterways with

15   Lady Lake, Eustis, and Mount Dora entirely in

16   District 6, while Fruitland Park, Leesburg, and

17   Tavares are entirely in District 11.

18            The work to get equal population -- I

19   referenced that little piece that's in Lake County

20   of that eastern, northeastern piece of District 11

21   that's in Lake County, the work to get equal

22   population is largely done tracking right there

23   along State Road 46 as it exits Lake County, and

24   that work is largely in the unincorporated Sorrento

25   area.

HT_0000122
CUBANOS-0000005246

Page 42

1              The totality of this and other changes that
2     brought, for example, District 7 down to Volusia and
3     Broward, resulted in District 6 taking a more
4     compact, overall circular shape.  When you pull back
5     on the map, it has a much more circular shape.
6              Of course, several of these changes had
7     impacts on Polk County, and I wanted to make this --
8     those impacts beneficial in a -- in a Tier 2
9     context.  So I factored in how Districts 9, 11, and
10    15 share boundaries with District 18, which, again,
11    District 18 is actually about two-thirds of the
12    residents are from Polk County, one-third from six
13    whole rural counties.
14             First, regarding District 9, I did a couple
15    things that were both helpful in filling out and
16    smoothing this visual and statistical compactness as
17    well for District 9, including also picking up a
18    portion of incorporated Poinciana and the lake that
19    essentially represents that piece of Polk County
20    that otherwise sticks into Osceola County.  I also
21    extended District 9 out slightly at the northwest
22    Osceola border, utilizing Highway 27 and the Ronald
23    Reagan Parkway.
24             So the overall idea here was threefold.  It
25    creates -- as you pull back from the map, it creates

HT_0000123
CUBANOS-0000005247

Page 43

1    a visual smoothing of the line, about as smooth as

2    the Polk County-Osceola border will give you a

3    chance to do, but it creates a visual smoothing of

4    the line, which does help with statistical and

5    visual compactness.  It eliminates the visual and

6    noncompact effects of that inlet between Polk and

7    Osceola, which, again, contributes to the overall

8    compactness.

9              And I was trying to get the population just

10   right in Districts 9 and 18 so that District 11

11   could have that essentially sort of nearly flat,

12   very roadway-bounded eastern wall abutting up to

13   District 10 in Orange County.  So the visual effect

14   of what was achieved in Orange County and how the

15   Districts 9 and 18 interacted in Polk County all had

16   a -- all had a significant effect on each other, and

17   there was a lot of give and take to make that effect

18   work.

19             As I referenced the boundaries between

20   Districts 11 and 15 -- I'm sorry -- 11 and 18,

21   generally speaking, those boundaries focus around

22   Interstate 4.  However, you do see some extensions

23   on either side of Interstate 4 between Districts 11

24   and 18.

25             Polk City is entirely included in District

HT_0000124
CUBANOS-0000005248

Page 44

1    11, but there are a couple of pieces of Polk City

2    that go across Interstate 4.  Auburndale is included

3    entirely in District 18, but there are a couple

4    pieces of the city that go across the Interstate.

5    And I mentioned earlier, while Lakeland is split in

6    this map, I wanted to make sure it wasn't split in

7    more than two districts.

8             So as you get close to District 15 there,

9    where you see, again, another jumping across I-4,

10   those are just boundaries of the city of Lakeland

11   and then some of the zero-population work that I did

12   as well.

13            And then when you look at the boundaries of

14   District 11, 15, then back down to 18, U.S. Highway

15   98 is largely the vast majority of that boundary,

16   really extending out of Pasco County into Polk

17   County through Lakeland, utilizing U.S. Highway 98

18   for most of that.

19            The southern boundary, which I made

20   reference to before when looking at the Hillsborough

21   region, is State Road 60.  As I mentioned

22   previously, I wanted to hold that boundary line in

23   Hillsborough County with 15 north of that boundary,

24   16 south of it, taking that boundary out -- boundary

25   out of the county so that that southern connection

HT_0000125
CUBANOS-0000005249

Page 45

1    between 15 and 18 would still utilize State Road 60.

2    And then zero population work there was done just

3    north of the city boundaries of Mulberry in Polk

4    County.

5            Again, as I mentioned earlier in my

6    presentation, overall, this map equals the city

7    splits, 16, of the Legislature's primary plan, but,

8    of course, some of the splits are different.  And,

9    you know, and I referenced earlier that I made sure

10   that where there was a split, a city was only split

11   two days.

12           Furthermore, the resulting District 18 is

13   again still a two-thirds Polk County district.  I

14   could clearly see that the Legislature was

15   attempting to create in pretty much any map that was

16   considered a majority Polk district.  While this is

17   a different configuration, I've still achieved the

18   same overall goal of creating a majority Polk County

19   district in District 18 with numerous Tier 2

20   considerations and improvements around it.

21           Just moving on to the last couple slides,

22   looking at Southwest Florida, I had to make some

23   decisions as a result of those decisions I discussed

24   previously, largely in part due to the Tier 2

25   efforts to keep Sarasota whole and creating District

HT_0000126
CUBANOS-0000005250

Page 46

1    17 with all of Sarasota, all of Charlotte, and

2    incorporated portions of Lee Counties.

3              My newly composed District 17 required me

4    to equal -- equalize population for District 18

5    through the entirety of Hendry County and then

6    finding approximately another 4500 residents

7    elsewhere.

8              In our office's prior plan, I found those

9    residents in western Palm Beach County, in the

10   cities and around the cities around Belle Isle,

11   Pahokee, and that area.  However, in this compromise

12   plan, as we discussed earlier, as the Chair

13   discussed, we were not affecting some of the

14   Southeast Florida districts.  So I wanted to hold

15   the Palm Beach County line as the Legislature did in

16   its plan.

17             So zooming in a little more closely, as

18   you'll see on this last slide, I equalized the

19   population in Collier County, which was already

20   split once, extending District 18 along State Road

21   -- kind of that angle along State Road 82, down

22   State Road 29 North, and then east along County Road

23   846 to get those additional 4500 residents for

24   District 18 and balance the population.

25             And for District 26, I had to further

HT_0000127
CUBANOS-0000005251

Page 47

1    extend District 26's western boundaries closer

2    towards unincorporated East Naples, utilizing

3    roadways and waterways as boundaries between 26 and

4    19, except where necessary to equalize population.

5    The resulting District 26 still has a Hispanic

6    voting age population of 73.22 percent.

7              And with that said, Mr. Chair, that is my

8    explanation of the changes in House Bill 1-C.

9              REPRESENTATIVE LEEK:  Thank you, Mr. Kelly,

10   for that presentation.  Additionally, members, this

11   bill appropriates $1 million to the Department of

12   State for expenses related to the litigation of the

13   congressional map.  The bill also includes language

14   related to state courts.  It requires any state

15   court challenge to the congressional map to be filed

16   in Leon County.

17             All changes based on state law -- or excuse

18   me -- all challenges based on state law to be filed

19   in state court, rather than federal court, permits

20   any state court challenge to raise both state law

21   claims and, to the extent the circuit court has

22   jurisdiction, federal law claims, and finally makes

23   explicit that nothing in the bill precludes federal

24   courts from deciding challenges based on the federal

25   law.

HT_0000128
CUBANOS-0000005252

Page 48

1           Mr. Chairman, that is the bill.

2           CHAIRMAN SIROIS:  Thank you very much,

3    Chair Leek.

4           For the members of the audience, I noticed

5    several more folks have joined us.  Just as a matter

6    of housekeeping, if you would like to provide public

7    testimony today, please fill out a speaker form with

8    the Sergeant at Arms.  They have those available.

9           Members, we're now going to move into

10   questions on the bill.  I would ask that all

11   questions go through the Chair, and I want to offer

12   my reminder once again about my expectation for

13   decorum and civility in this Committee.

14          Members, again, just kind of looking at the

15   clock, we can remain in questions -- maybe we'll

16   give it to about 5:05, 5:10, see where we're at.  I

17   want to make sure that we have plenty of time

18   remaining to receive that public testimony.

19          Ladies and gentlemen, we appreciate you

20   being here today with us.

21          And with that, we will move into questions.

22          Representative Hunschofsky.

23          And, members, just kind of to roadmap

24   things out, what I'd like to do is give members a

25   couple of bites at the apple, perhaps a couple of

HT_0000129
CUBANOS-0000005253

Page 49

1    questions and a follow-up.  And then to make sure

2    everybody has had an opportunity, we'll rotate

3    through and then entertain a second round of

4    questions, time permitting.

5             Representative Hunschofsky, you are

6    recognized.

7             REPRESENTATIVE HUNSCHOFSKY:  Thank you,

8    Chair Sirois.  And how many questions is that, that

9    we're allowed in our first round?  Just out of

10   curiosity.

11            CHAIRMAN SIROIS:  Go for it.

12            REPRESENTATIVE HUNSCHOFSKY:  Okay.  I'll go

13   for it.

14            Thank you very much for presenting the map

15   that you drew.  You mentioned that this was a

16   compromise map.  Yet when we voted on the maps that

17   we passed, we had a map, and we had a secondary map,

18   one map, not -- so I'm not understanding how this is

19   a compromise.  Could you explain what you mean by

20   that?  Because I thought the secondary map was the

21   compromise and even the first map.

22            ALEX KELLY:  Chair?

23            CHAIRMAN SIROIS:  Sir, you're recognized.

24            ALEX KELLY:  Thank you.

25            At that time, our office had not agreed on

HT_0000130
CUBANOS-0000005254

Page 50

1    either of those two maps.  There were obviously

2    pieces of those two maps that we've incorporated

3    here, of course, 10 of those districts exactly from

4    8019, and there are concepts from those two maps

5    that we've sort of hybrided (sic) with concepts from

6    the maps that our office previously published.  But

7    we didn't come out and support either of those two

8    maps.

9              CHAIRMAN SIROIS:  And to offer further

10   clarification, the map that is being presented today

11   by Chair Leek and the Governor's Office has provided

12   us with commentary on includes many portions of what

13   the Legislature passed.

14              Representative Hunschofsky, you're

15   recognized.

16              REPRESENTATIVE HUNSCHOFSKY:  Thank you,

17   Chair Sirois.

18              So we had a whole bunch of meetings during

19   committee weeks about all the Tiers, and it was

20   drilled into us the Tier 1 and the Tier 2.  I

21   noticed in your presentation there was a strong

22   concentration on Tier 2, which we were all told in

23   every single committee meeting we've been in, that

24   those are only to be looked at after the Tier 1

25   standards have been satisfied.

HT_0000131
CUBANOS-0000005255

Page 51

1              And one of the Tier 1 standards that came

2       up when we had Mr. Popper (phonetic) was the fact

3       that districts shall not be drawn -- and I'm reading

4       this from what was presented to us from the House

5       staff as backup -- districts shall not be drawn with

6       the intent or result of denying or abridging the

7       equal opportunity of racial or language minorities

8       to participate in the political process or to

9       diminish their ability to elect representatives of

10      their choice.  A Tier 2 standard is districts shall,

11      where feasible, utilize existing political and

12      geographical boundaries.

13              So with that, I ask, why were the changes

14      made to Districts 4 and 5 looking solely at Tier 2

15      standard, even though a Tier 2 standard is after a

16      Tier 1 standard has been met, and yet the Tier 1

17      standard that I talked about doesn't seem to be met

18      with the line that you drew?  So what was -- why was

19      a Tier 2 standard given priority over a Tier 1

20      standard in that case?

21              CHAIRMAN SIROIS:  Mr. Kelly, you're

22      recognized.

23              ALEX KELLY:  Thank you.

24              And first and foremost, I did note in my

25      testimony that we didn't draw any districts with the

HT_0000132
CUBANOS-0000005256

Page 52

1    intent of favoring or disfavoring an incumbent or

2    political party, and that is a Tier 1 standard.  In

3    addition, all the districts that we've drawn are

4    contiguous, and that is a Tier 1 standard.

5           The other Tier 1 standard regarding

6    diminishment, of course, was the major focus of the

7    Governor's veto message and really the major focus

8    of discussion.  And after reviewing your work, the

9    work of the Legislature overall, it was clear that a

10   district couldn't be drawn to both satisfy the U.S.

11   Constitution and the court's and the Legislature's

12   understanding of the State Constitution.  In such a

13   situation, the federal Constitution has to prevail.

14          A plain language -- as I'm not -- as I'm

15   not an attorney, a sort of plain language way of

16   saying that is there was no obligation to redraw

17   District 5 as it was -- as it was drawn in the

18   benchmark.  There was no obligation.  There was no

19   lawfully drawn district to not diminish from.

20          REPRESENTATIVE HUNSCHOFSKY:  Chair?

21          CHAIRMAN SIROIS:  Representative

22   Hunschofsky, one final question, and then I'd like

23   to move on to make sure we have adequate time for

24   all members.

25          REPRESENTATIVE HUNSCHOFSKY:  All right.

HT_0000133
CUBANOS-0000005257

Page 53

1   One final question --

2          CHAIRMAN SIROIS:  We'll come back.

3          REPRESENTATIVE HUNSCHOFSKY:  -- for this

4   round.  I have a whole other round --

5          CHAIRMAN SIROIS:  Yes, ma'am.

6          REPRESENTATIVE HUNSCHOFSKY:  -- a whole

7   other section of the state.

8          CHAIRMAN SIROIS:  We'll get there.

9          REPRESENTATIVE HUNSCHOFSKY:  Why was the

10   decision made then not to put District 5 on top of

11   District 4, as opposed to go kind of meander around

12   it?  It would seem it would be more compact to have

13   one on top of the other than to meander around the

14   other.

15          And it doesn't seem like when compactness

16   is the argument, even though it is a Tier 2 argument

17   and still does not follow along the Tier 1 standard

18   -- not the one that you mentioned, but the one that

19   I mentioned -- I wondered why you wouldn't look to

20   keep it, if compactness is so important, compact in

21   that way so that you could not only meet your sub-

22   Tier 2 standard but also the Tier 1 standard that I

23   mentioned.

24          CHAIRMAN SIROIS:  You're recognized.

25          ALEX KELLY:  Thank you -- thank you,

HT_0000134
CUBANOS-0000005258

Page 54

1    Mr. Chair.

2            And obviously, you know, in terms of

3    compactness, as the Chair noted in the beginning,

4    there's no -- there's no one right redistricting

5    map.  That said, the districts that you're

6    referencing are significantly more compact,

7    significantly more compact in the benchmark.

8    Visually, statistically, they are more compact than

9    the maps that passed this Legislature.  So they are

10   more compact districts, and there was a rational

11   choice to be made.

12           As I noted in my comments about those

13   districts, Jacksonville is the lone city in the

14   entire state that is larger than a congressional

15   district.  So it's a city you're going to divide,

16   and a logical division to consider is the St. Johns

17   River, which happens to almost divide the city in

18   half on its own naturally.  So it's a very logical

19   dividing line.

20           It's clearly well-recognized in the

21   community.  So clearly, a constituent would have no

22   question -- are they a voter in District 4?  Are

23   they a voter in District 5? -- which is the point of

24   drawing a clear boundary line that follows a major

25   roadway, a highway, or so -- or a waterway and so

HT_0000135
CUBANOS-0000005259

Page 55

1   forth.  So it was a very logical and compact choice

2   to make, and we had already satisfied Tier 1

3   concerns.

4            CHAIRMAN SIROIS:  Thank you, sir.

5            Ranking Member Skidmore, you are recognized

6   in questions.

7            DEMOCRATIC RANKING MEMBER SKIDMORE:  Thank

8   you, Chair Sirois.

9            Thank you, Mr. Kelly, for being here today.

10  This is -- I'm going to go a little slow because

11  it's a lot to digest.  It was a lot of -- a lot of

12  changes.  So does 109 split as many counties as 8019

13  or more or less?

14           CHAIRMAN SIROIS:  Mr. Kelly, you're

15  recognized.

16           ALEX KELLY:  Thank you, Mr. Chair.

17           It splits one less county, and also in

18  addition to that, for those counties that are --

19  that are split, it splits those counties fewer

20  times.  So it makes a couple types of county

21  improvements.  It keeps Sarasota and Citrus whole in

22  exchange for splitting Polk.  So it picks up a

23  single county split -- or, I'm sorry, a single

24  county whole.  Sorry.

25           CHAIRMAN SIROIS:  Representative Skidmore,

HT_0000136
CUBANOS-0000005260

Page 56

1    you're recognized.

2           DEMOCRATIC RANKING MEMBER SKIDMORE:   Thank

3    you, Mr. Chair.

4           Thank you for the answer.   And does 109

5    reduce the city splits from 8019 or increase city

6    splits?

7           CHAIRMAN SIROIS:   Mr. Kelly?

8           ALEX KELLY:   Thank you, Mr. Chair.

9           It's equal.

10          DEMOCRATIC RANKING MEMBER SKIDMORE:   Equal.

11          CHAIRMAN SIROIS:   Ranking member.

12          DEMOCRATIC RANKING MEMBER SKIDMORE:   Thank

13   you, Mr. Chair.

14          Thank you for the answer.   So if the -- if

15   the Governor's veto was based on CD 5 and CD 4 and

16   the number of city splits did not change and the

17   number of county splits was reduced by one split,

18   why did you redraw 18 districts instead of just the

19   district that the Governor objected to?

20          CHAIRMAN SIROIS:   Mr. Kelly.

21          ALEX KELLY:   Thank you, Mr. Chair.

22          Of course, our office had previously

23   submitted two entirely different state maps for the

24   Legislature's consideration.   So it's no secret that

25   there were other preferences in the rest of the map.

HT_0000137
CUBANOS-0000005261

Page 57

1    There were other opportunities for Tier 2

2    improvements throughout the rest of the map.

3              And so a veto message, of course, the veto

4    message spoke to the Governor's most significant

5    concern throughout the map, but it wasn't a secret

6    that we had already published two complete maps

7    before and made other recommendations throughout the

8    rest of the map.

9              So with the opportunity to take a look at

10   the rest of the map, obviously we deferred to the

11   Legislature exactly block for block in 10 of those

12   seats, but as I articulated, there were a number of

13   opportunities, keeping counties whole -- sorry --

14   keeping counties whole, the visual compactness of

15   the map as well, and just overall a more clear

16   usage, a more consistent usage of political and

17   geographical boundary lines.  So there were a number

18   of improvements throughout the map.

19             CHAIRMAN SIROIS:  Thank you, Representative

20   Skidmore.  Let's do a follow-up.

21             And then we have Representative Benjamin

22   next on my list, and we'll come back to you in the

23   next round.

24             DEMOCRATIC RANKING MEMBER SKIDMORE:  Thank

25   you, Mr. Chair.

HT_0000138
CUBANOS-0000005262

Page 58

1          Thank you -- thank you for the response.

2    I'm going to pick -- I have to pick which question

3    I'm going to ask.  So the Governor's position is

4    that there was no compelling reason to keep CD 5,

5    but wasn't CD 5 actually drawn by the court?  And is

6    that not a compelling interest?

7          Thank you, Mr. Chair.

8          CHAIRMAN SIROIS:  Mr. Kelly.

9          ALEX KELLY:  Thank you, Mr. Chair.

10          The court got it wrong.

11          CHAIRMAN SIROIS:  Representative Benjamin.

12          REPRESENTATIVE BENJAMIN:  Thank you,

13    Mr. Chair.

14          CHAIRMAN SIROIS:  Representative Benjamin,

15    I apologize.

16          Ladies and gentlemen, there are many new

17    members of the audience that have joined us.  I just

18    want to offer a reminder again about the decorum

19    that we have in this Committee.  We don't have loud

20    reactions in this Committee.  We have business to

21    conduct.  We are pressed for time.

22          Representative Benjamin, you are

23    recognized.

24          REPRESENTATIVE BENJAMIN:  Thank you,

25    Mr. Chair.

HT_0000139
CUBANOS-0000005263

Page 59

1          You represented earlier that the law and

2   constitutional arguments are somewhat outside of

3   your purview, but yet you've told us now that the

4   court got it -- got it wrong.  And -- but in that

5   decision, the court was attempting to reconcile the

6   federal Constitution and the State Constitution.

7   Would that be a fair statement?

8          CHAIRMAN SIROIS:  Sir.

9          ALEX KELLY:  Mr. Chair.

10         I'm not aware, although I'm happy to defer

11  to counsel to fill out this answer, but I'm not

12  aware of where the state court -- the state Supreme

13  Court was attempting to reconcile something between

14  federal and state law.  But I'm happy to defer to

15  counsel if there is something I'm unaware of.

16         REPRESENTATIVE BENJAMIN:  Mr. Chair?

17         CHAIRMAN SIROIS:  Representative Benjamin.

18         REPRESENTATIVE BENJAMIN:  Thank you.

19         Can you then tell me how did the court get

20  it wrong?

21         ALEX KELLY:  Thank you, Mr. Chair.

22         CHAIRMAN SIROIS:  Mr. Kelly.

23         ALEX KELLY:  And I'll -- and I'll offer

24  sort of, you know, I think a two-part answer here.

25  One, I walked through in my testimony that that was

HT_0000140
CUBANOS-0000005264

Page 60

1    a seat drawn predominantly based on one criteria,

2    based on race.  It is a racial gerrymander, and

3    there was a failing to demonstrate that compelling

4    state interest in doing so.

5           The other side of this, I can speak to from

6    my time at that time working in the Legislature from

7    2009 to 2012.  The driving question behind Fair

8    Districts was a district -- the poster child

9    district was a district that sprawled from

10   Jacksonville to Orlando.  And in the end resolution

11   a few years later, the court drew a district that

12   sprawls from Jacksonville to Gadsden County.  It

13   didn't remedy the issue.  It just replaced one

14   gerrymandered district with another.

15           REPRESENTATIVE BENJAMIN:  Mr. Chair?

16           CHAIRMAN SIROIS:  (Indiscernible)

17           REPRESENTATIVE BENJAMIN:  Thank you.

18           CHAIRMAN SIROIS:  Representative Benjamin,

19   you're recognized.

20           REPRESENTATIVE BENJAMIN:  Thank you.

21           Are you aware that compliance with the

22   Voting Rights Act by the courts has been considered

23   a compelling state interest?

24           CHAIRMAN SIROIS:  Mr. Kelly.

25           ALEX KELLY:  Thank you, Mr. Chair.

HT_0000141
CUBANOS-0000005265

Page 61

1          That's a great question, and, again, you

2    know, I'm not counsel for the Governor.  But I'll

3    speak to the extent of my knowledge of the Voting

4    Rights Act.  The Voting Rights Act speaks to

5    districts where the minority community is 50 percent

6    or more of the total community in the district, so

7    in other words, if the African American or Hispanic

8    voting age population of the district is 50 percent

9    or more of the voting age population in the

10   district.

11         That's not the end of that analysis, but

12   that is a sort of introduction to that analysis.

13   The district in question does not meet that

14   threshold.  So I don't see any scenario in which the

15   Voting Rights Act is implicated by Congressional

16   District 5.

17         CHAIRMAN SIROIS:  Representative Benjamin,

18   let's have one follow-up in this round, and then

19   we're going to move to Representative Joseph.  Thank

20   you, sir.

21         REPRESENTATIVE BENJAMIN:  Okay.  Thank you,

22   Mr. Chair.

23         In determining that it's not -- it was not

24   narrowly tailored to be a compelling state interest,

25   was it that it wasn't narrowly tailored or was it

HT_0000142
CUBANOS-0000005266

Page 62

1   that it wasn't a compelling state interest?  Which

2   14th Amendment or strict scrutiny analysis are we

3   looking at?

4            CHAIRMAN SIROIS:  Mr. Kelly.

5            ALEX KELLY:  Mr. Chair.

6            I'm not sure I could answer that question

7   directly.  I can just say, in general, the

8   obligation to define that compelling state interest

9   is an obligation the map drawer has.  So I, as

10  someone who am saying that that district didn't

11  define that, whoever drew that district has to meet

12  that obligation, not me.

13           Counsel could probably elaborate a little

14  bit further on the question if you want.

15           REPRESENTATIVE BENJAMIN:  I would want.

16           CHAIRMAN SIROIS:  If you have -- if your

17  counsel is present --

18           ALEX KELLY:  Yeah.

19           CHAIRMAN SIROIS:  -- they can speak to the

20  remaining portion of Representative Benjamin's

21  question, and then we'll move on to Representative

22  Joseph.

23           ALEX KELLY:  Ryan Newman, the Governor's

24  general counsel will hopefully help answer the

25  remainder of the question.

Page 63

1          CHAIRMAN SIROIS:  Mr. Newman, you're

2     recognized.

3          RYAN NEWMAN:  Great.  Thank you.

4          Sure, I'd be happy to answer that.

5          CHAIRMAN SIROIS:  Forgive me.

6     Representative Benjamin.

7          REPRESENTATIVE BENJAMIN:  Mr. Chair, can

8     you have him go over the how the court got it wrong

9     more specifically (Indiscernible)

10          CHAIRMAN SIROIS:  If you would speak into

11     the microphone and offer that -- offer that question

12     please.

13          REPRESENTATIVE BENJAMIN:  Can you give us

14     more of a legal analysis as to the Governor's

15     constitutional challenge to the -- to the map?

16          RYAN NEWMAN:  Sure.  So --

17          CHAIRMAN SIROIS:  Mr. Newman, you're

18     recognized.

19          RYAN NEWMAN:  Thank you.

20          Sure.  On the issue of the federal

21     constitutionality of District 5 as it was originally

22     configured, the Florida Supreme Court never actually

23     addressed that question.  That question has never

24     been resolved by the federal -- by the -- by the

25     Florida Supreme Court as to whether or not District

HT_0000144
CUBANOS-0000005268

Page 64

1    5, as it was configured, complied or not with the

2    federal Constitution.

3           And so the -- so what we did in the memo

4    that we submitted -- and it lays out, I hope, in

5    sufficient detail the legal argument for why

6    compliance with the Florida Constitution in Northern

7    Florida -- and that's complying with the non-

8    diminishment standard of the Florida Constitution --

9    can't square with the Equal Protection Clause of the

10   United States Constitution.

11          And so just a step back to sort of walk

12   through the analysis, all right.  The Supreme Court

13   has made very clear that you cannot draw voting

14   districts based on race unless the state can satisfy

15   strict scrutiny.  So there must be a compelling

16   interest, and the district must be narrowly tailored

17   to achieve that compelling interest.

18          Now, the only time that the United States

19   Supreme Court has been willing to even countenance a

20   compelling interest in this context is when there is

21   good reason to believe that the district is

22   necessary to comply with either Section 2 or Section

23   5 of the Voting Rights Act.

24          And I need to point out, even on this

25   point, that is still an open question.  The U.S.

HT_0000145
CUBANOS-0000005269

Page 65

1   Supreme Court has only assumed that compliance with

2   the Voting Rights Act is a sufficient compelling

3   interest to justify a race-based district.  That's

4   very narrow, and the Supreme Court has only been

5   willing to assume that much.  It's never actually

6   definitively held that.

7           So with respect to compliance with the

8   Voting Rights Act, okay, there's two components to

9   the Voting Rights Act.  There's Section 2 of the

10  Voting Rights Act, and there's Section 5 of the

11  Voting Rights Act.  Section 5 of the Voting Rights

12  Act no longer applies in this context because of the

13  Shelby County case, right, which wiped out Section

14  4.

15          So Section 5 is no longer operative, but I

16  do want to make an important point here.  Section 5

17  never applied to the state of Florida as a whole.

18  It never has.  So there was never -- even back, you

19  know, in 1968 or whatever, you know, back when the,

20  you know, the evidentiary basis for the Voting

21  Rights Act of 1965 was being assembled, there was

22  never sufficient evidence to determine that the

23  entire state of Florida should be subject to the

24  Voting Rights Act.  It was only determined that five

25  counties, none of which are in Northern Florida,

HT_0000146
CUBANOS-0000005270

Page 66

1    were subject to the Voting Rights Act for Section 5.

2              So Section 5 of the Voting Rights Act, I

3    guess my point is, that's just out of the picture,

4    all right.  So that just leaves us then with Section

5    2, okay.  So does Section 2 of the Voting Rights Act

6    require that District 5 in Northern Florida be

7    drawn?  And the answer has to be no.  Why?  Because

8    of the Gingles preconditions that are required for

9    making out a Section 2 claim.

10             You can't even make out a Section 2 claim

11   unless you satisfy the Gingles precondition.  The

12   first precondition -- and this is what Alex was

13   trying to get to.  The first precondition is, is

14   there a minority population that's reasonably

15   compact, in a reasonably compact geographic location

16   that constitutes a majority of the district?

17             And District 5, notwithstanding the fact

18   that it's gerrymandered.  I mean, the district was

19   drawn for the specific purpose of connecting African

20   American populations in Jacksonville with the

21   African American population in Tallahassee and

22   Gadsden Counties.

23             And even then that district is not a

24   majority-minority district.  It only got up to 44

25   percent or so, 44, 45 percent if my -- if my memory

HT_0000147
CUBANOS-0000005271

Page 67

1    serves.  And that's even without respecting

2    traditional districting criteria.

3            So that district cannot be -- is not

4    required by the Voting Rights Act, and because it's

5    not required by the Voting Rights Act, it doesn't --

6    cannot serve as a compelling interest to justify the

7    drawing of a district in Northern Florida based on

8    race, okay.

9            So the only -- the only question then is

10   whether or not mere compliance with the Florida

11   Constitution alone by itself is a compelling

12   interest to justify a race-based district.

13           And in this context, where you're having to

14   ignore all traditional districting criteria, which

15   is what the federal courts look at to determine

16   whether or not, you know, the district is necessary,

17   it cannot be a compelling interest, for the same

18   reason that we would never say that, if Florida had

19   a law segregating the schools, that that would

20   somehow trump the Equal Protection Clause.  Why?

21   Because, you know, the Florida Constitution says so.

22           The only point -- my only point is mere

23   reliance on the Florida Constitution cannot by

24   itself be enough.  Now, don't get me wrong.  That's

25   not to say that there are other applications of the

HT_0000148
CUBANOS-0000005272

Page 68

1    Florida Constitution's non-diminishment standard

2    that could be or that could survive strict scrutiny.

3          One example would be if you had a

4    sufficiently compact African American community,

5    right, in a district.  You can't necessarily just

6    carve up that district.  That perhaps -- that

7    perhaps could satisfy strict scrutiny.

8          But what does not and cannot satisfy strict

9    scrutiny is trying to cobble together disparate

10   minority communities from across Northern Florida to

11   cobble together a district that might perform for

12   the minority community.

13         And I think that -- that's where District 5

14   goes wrong because it's clearly cobbled together.

15   It's clearly a gerrymander, not unlike the preceding

16   district that went from Jacksonville down to

17   Orlando, you know, as a salamander-type district

18   that went from Jacksonville down to Orlando.

19         But that's the -- that's the fundamental

20   problem.  There's no compelling interest here

21   because the Voting Rights Act does not require this

22   district to be drawn in Northern Florida, and mere

23   compliance alone without more of the non-

24   diminishment standard in the Florida Constitution

25   cannot satisfy strict scrutiny, at least as the

HT_0000149
CUBANOS-0000005273

Page 69

1  Supreme Court has explained it.

2           And just to put a bell on all of this, I

3  mean, the Supreme Court just spoke again just a

4  matter of weeks ago and slapped down a Wisconsin map

5  for containing, you know, improperly racially drawn

6  districts because the --

7           CHAIRMAN SIROIS:  Sir, if you'd -- if you'd

8  bring it in for a landing for us, we have members

9  with other questions.

10           RYAN NEWMAN:  Thank you.  I could go on and

11  on.  To -- yeah.  So the Wisconsin -- the Supreme

12  Court came in, sort of struck down the Wisconsin --

13  you know, a summary reversal of the Wisconsin maps

14  for not satisfying strict scrutiny.

15           So strict scrutiny is a very, very high --

16  very high standard, and it just wouldn't satisfy it

17  in this context.

18           CHAIRMAN SIROIS:  Thank you.

19           Representative Benjamin, I've put you on

20  the list for our second --

21           REPRESENTATIVE BENJAMIN:  Well --

22           CHAIRMAN SIROIS:  -- round of questions.

23           REPRESENTATIVE BENJAMIN:  -- I don't -- I

24  don't have -- well --

25           CHAIRMAN SIROIS:  Let me --

HT_0000150
CUBANOS-0000005274

Page 70

1              REPRESENTATIVE BENJAMIN:  -- just thank

2     you, Mr. Chair, because that's the heart and the

3     crux of the changes that were made, and I think that

4     analysis was much needed.  Thank you.

5              CHAIRMAN SIROIS:  Thank you, Representative

6     Benjamin.

7              Representative Joseph, you're recognized.

8              REPRESENTATIVE JOSEPH:  Thank you,

9     Mr. Chair.

10             Wow, so many questions.  Earlier, you were

11    asked in the Senate to define race neutral in your

12    approach in drawing these maps.  Can you define that

13    for us please?

14             CHAIRMAN SIROIS:  Mr. Kelly.

15             ALEX KELLY:  Thank you, Mr. Chair.

16             Essentially not factoring in race as I'm

17    drawing a district.

18             CHAIRMAN SIROIS:  Representative Joseph.

19             REPRESENTATIVE JOSEPH:  What, if any,

20    analysis did you do regarding retrogression in

21    creating these maps to analyze both black

22    representation and Hispanic representation or Latino

23    representation?

24             CHAIRMAN SIROIS:  Mr. Kelly.

25             ALEX KELLY:  Thank you, Mr. Chair.

HT_0000151
CUBANOS-0000005275

Page 71

1            Great question.  And I didn't have a need

2    to with the districts that I was drawing.  So I

3    didn't do any kind of analysis like that.  Like I

4    didn't do any kind of functional analysis.

5            CHAIRMAN SIROIS:  Representative Joseph.

6            REPRESENTATIVE JOSEPH:  Thank you,

7    Mr. Chair.

8            Looking at your version of, I guess, CD 26,

9    which spans from the Everglades to Collier County in

10   Miami all the way to Hialeah, talk to us about your

11   premise in drawing that particular map in crossing

12   over the way you did.

13           CHAIRMAN SIROIS:  Mr. Kelly.

14           ALEX KELLY:  Sure.  Thank you, Mr. Chair.

15           So that district -- if you -- and if you

16   think about it in the context of the district that

17   the Legislature drew and where I made changes, the

18   eastern boundaries of the district in Miami-Dade

19   County are identical to the boundaries that the

20   Legislature drew.  The western half of the county is

21   the portions of the -- portions of the district, I

22   should say, that I drew.

23           So as I was approaching that area with

24   District 18, I described earlier that I was in need

25   of population to complete District 18, and I

Page 72

1   assigned Hendry County, the totality of Hendry

2   County as a whole county, to district 18.  And using

3   some major roadways in the unincorporated Immokalee

4   area of northern Collier, I then moved a little bit

5   of Collier County into District 18 as well, again

6   though using those major roadways, not splitting any

7   cities in the process.

8           The result of that, I made changes to

9   District 26 exclusively in the -- in the Hendry

10  County side, pulling that district out of Hendry

11  County in its entirety and moving that district,

12  District 26 then, further east into unincorporated

13  East Naples basically and utilizing the major

14  roadways there.  There's a few waterways as well, so

15  trying to utilize some clear, natural boundaries.

16          Overall, as I mentioned earlier in my

17  testimony, the Hispanic voting age population of the

18  district is still quite high.  It's a little more

19  than 73 percent Hispanic voting age population.  So

20  again, I didn't change any of the boundaries in the

21  Miami-Dade County side of the district, just

22  exclusively in the Collier and Hendry side of the

23  district.

24          CHAIRMAN SIROIS:  Representative Joseph.

25          REPRESENTATIVE JOSEPH:  Thank you,

HT_0000153
CUBANOS-0000005277

Page 73

1    Mr. Chair.

2           So when you say you were in need of

3    population, you were specifically referring to the

4    Latino population to create this district.

5           CHAIRMAN SIROIS:  Mr. Kelly.

6           ALEX KELLY:  Thank you, Mr. Chair.

7           Really both.  I was in need of population

8    initially just because I was taking the district out

9    of Hendry County and then also out of part of the

10   Immokalee -- unincorporated Immokalee area.  The

11   total population shift there was roughly -- my math

12   may be a little bit off -- but about 45,000 people.

13          So, in effect, I needed people for equal

14   population, first and foremost, to complete the

15   district, which meant that I had to push a little

16   further, draw a little further into -- into sort of

17   the coastal side of Collier County but obviously not

18   that far.

19          That said, knowing that this is a

20   historically performing majority-minority Hispanic

21   seat, I was watching those numbers carefully to make

22   sure that in terms of the overall Hispanic voting

23   age population, I was staying very close to the

24   benchmark seat, which I think is maybe a little bit

25   more than 74 percent.

HT_0000154
CUBANOS-0000005278

Page 74

1           So the seat that I drew, the percentage is

2     around 73, still very high, still at a threshold

3     that should perform for Hispanic -- a majority

4     Hispanic voting age population seat.

5           CHAIRMAN SIROIS:  Representative Joseph,

6     let's do a follow-up, and then I'm going to move to

7     Representative Brown, and we'll try to come back.

8           REPRESENTATIVE JOSEPH:  Thank you.

9           So your analysis basically presumes that

10    the Latino voters vote cohesively.  And you may or

11    may not be aware of this, but in that area, you have

12    lots of different kind of Latino groups, and I don't

13    know if your analysis, based on what you're telling

14    me, you did not take that into account.

15          So my question for you is this map

16    basically takes the same approach as the House and

17    Legislature's previous maps for District 21, but

18    these two Latino electorates are separate in terms

19    of how they tend to perform.

20          So I guess what I'm asking is, is that

21    thinking correct, that this map basically takes the

22    same approach as the House and Legislature's

23    previous maps for District 21 and District 28.  And

24    in terms of CD 26 that I'm specifically asking

25    about, it's motivated by that same idea of Latino

HT_0000155
CUBANOS-0000005279

Page 75

1    cohesion in terms of how they perform?

2              CHAIRMAN SIROIS:  Mr. Kelly.

3              ALEX KELLY:  Thank you, Mr. Chair.

4              And I think I can answer the question,

5    although I will concede -- in terms of your

6    reference to the prior district numbers, I'm not

7    totally clear which maps you're referring to.

8              But in -- but in general, I was fairly

9    confident that a Hispanic voting age population

10   that's higher than 73 percent is still going to

11   maintain that historical performance for this

12   district that has performed Hispanic for, to my

13   knowledge, at least a couple decades.  So I was

14   fairly confident that with such a high Hispanic

15   voting age population, even though it was a slight

16   drop, that overall, it wouldn't -- it wouldn't

17   warrant any concerns.

18             And obviously I had to -- I had to get

19   equal population as well, and no matter what I did,

20   I was also wanting to make sure that if I was

21   assigning Hendry County to a different district, I

22   wanted to make sure that, one way or another, I kept

23   Hendry County whole.

24             CHAIRMAN SIROIS:  Thank you.

25             Representative Brown.

HT_0000156
CUBANOS-0000005280

Page 76

1           REPRESENTATIVE BROWN:  Thank you, Mr. --

2           CHAIRMAN SIROIS:  Questions.

3           REPRESENTATIVE BROWN:  Thank you,

4    Mr. Chair.

5           As it relates to -- I know there was -- in

6    your presentation, you talked about improving the

7    maps.  And so specifically to district 10 here, the

8    little barbell-shaped lob, I wanted to know -- can

9    you explain sort of the Orange County configuration

10   and whether or not -- or how it's more Tier 2

11   compliant than the other vetted alternatives that we

12   have done or developed or even debated?

13          And specifically recognizing the political

14   and geographical boundaries for its perimeter.  I

15   believe right now it's 63 percent, and I know for

16   the 8019 for CD 10, I believe it was 82 percent.  So

17   we're talking about improving.  It seems as though

18   it's going backwards.  When we look at even the 8060

19   map that we've also kind of reviewed, it also used

20   those boundaries, but it recognized it as a 92

21   percent, so I mean, stellar boundaries.  How is this

22   particular configuration compliant and an

23   improvement?

24          CHAIRMAN SIROIS:  Mr. Kelly.

25          ALEX KELLY:  Sure.  Thank you.

HT_0000157
CUBANOS-0000005281

Page 77

1            And would it help if we went to look at the

2     district?  Because there's some aspects that I think

3     the visual helps the explanation if that's okay.

4            CHAIRMAN SIROIS:  Yes.

5            ALEX KELLY:  Okay.  Thank you.  Actually, I

6     think I'm going to mess this up.  Is it okay if I

7     take control of the --

8            CHAIRMAN SIROIS:  Certainly.

9            ALEX KELLY:  So one of the things that I

10    did find out -- by the way, Representative, to your

11    roadway question, one of the things that I did

12    discover in the process is that that western

13    boundary of District 10, Apopka-Vineland Road,

14    essentially we don't get -- I don't think we get

15    credit for it.

16            It is predominantly one roadway, but I

17    think, as I understand, the roadways you get credit

18    for in terms of the statistics in the Legislature's

19    redistricting application, it picks up the roadways

20    that the Census Bureau recognizes.  But as you zoom

21    in on that district, you find out that it is

22    actually for the most part one solid roadway.

23            Really, the boundaries of that district,

24    you have the Seminole County-Orange County line to

25    the north.  You have where that part of District 9

HT_0000158
CUBANOS-0000005282

Page 78

1    comes up into District 10, and it's -- the wall of

2    that is a significant roadway.  And on this side and

3    on this side, in-between are two municipal

4    boundaries.  Some of the zero-population work is

5    done just to the north of that.

6            As you go east of those two municipalities,

7    it's just following one nice, clear roadway.  It

8    then follows -- I think it's actually the eastern

9    end of that Orange County section of leading out of

10   10, still follows major roadways and waterways as

11   well, but the eastern boundary between 10 and 8 is

12   predominantly roadways and waterways.

13           Most of these boundaries are defined in

14   Tier 2.  I don't know if the application picks up

15   all of them and gives us credit for the statistics

16   on all of them, but the boundaries of this district,

17   outside of equal population, are exclusively Tier 2

18   boundaries.  The district is very compact, and it

19   overall allowed some other districts around it to

20   become more compact.

21           One of the things that I did was the

22   portions of District 9 -- and obviously, you know,

23   you always have to look at any district, you know,

24   in respect to what it also causes around it.  The

25   portions of District 9 as the Legislature passed

HT_0000159
CUBANOS-0000005283

Page 79

1    them were more on the eastern side of that Orange

2    County.

3              Going north, I pulled those portions more

4    flat and spread across, which helps with your

5    circular test, so like a Reock test or a Polsby-

6    Popper.  It's not a massive difference, but it is a

7    little bit of a difference the way that it's drawn.

8    And again those are just predominantly absent some

9    of the zero population work, just major roadways

10   defining those boundaries.

11             The other visual effect here that I really

12   like is how District 11 now --  you know, District

13   11, when it comes from sort of the Lake-Seminole

14   area, it just follows along the Seimone County

15   border.  It then goes under the city boundaries of

16   Apopka.  Obviously, I didn't want to break the city

17   of Apopka.  It goes under the city of Apopka,

18   follows predominantly one roadway.  I did note in my

19   testimony that that roadway actually has a break in

20   it.  So you couldn't follow that roadway the

21   entirety of the western wall of District 10.

22             But, in effect, District 11 in the

23   configuration -- in fact, I'll take one step back.

24   In the configuration considered by the Legislature,

25   District 11, because 10 is centered really around

HT_0000160
CUBANOS-0000005284

Page 80

1    Apopka, I believe Ocoee, Winter Garden, that area,

2    District 11 has to then have this arm underneath

3    District 10.

4            Because I was able to create that more, you

5    know, flat use of boundary space between 7-11, 10-

6    11, 9-11, in effect, there's no arm then anymore to

7    District 11, and that contributed, along with what I

8    did in Citrus County, to being able to square up

9    District 11 as well.

10           So the changes that I made were never in

11   respect to just one district, although I did use

12   district -- I did use clear roadway boundaries and

13   municipal boundaries almost exclusively and county

14   boundaries with District 10, but the changes were

15   made in respect to all the districts so that all of

16   the districts took on a little more of a

17   statistical, aesthetic compactness and again overall

18   just tried to use those clear boundary lines between

19   them.

20           CHAIRMAN SIROIS:  Representative Brown,

21   before you continue, thank you, sir.

22           Members, just to kind of give you a sense

23   of where we're at.  We're coming up on a period

24   where we need to wrap up questions.  We have

25   significant public testimony, our citizens here with

HT_0000161
CUBANOS-0000005285

Page 81

1    us today at the capital.  We also have an amendment.

2    We have debate and want to give Chair Leek and

3    opportunity for final comments as well.

4              So Representative Brown, you are recognized

5    to continue in questions, but, members, please be

6    mindful of our time.

7              REPRESENTATIVE BROWN:  Thank you, Mr.

8    Chair.

9              And I definitely will keep that in mind

10   because I actually do have questions surrounding

11   when we're speaking of those surrounding districts.

12   I have quite a few questions based off of the

13   percentages and points there compared to 8060.  But

14   I'll just ask this question so that my other

15   colleagues can have an opportunity at this apple.

16             I know the Governor stated written

17   objection to 8019, and in that written statement, he

18   focused on 4 and 5.  And so why are we here messing

19   with the Orlando area, particularly District 10, in

20   ways that clearly worsen the compliance to the

21   constitutional criteria?

22             CHAIRMAN SIROIS:  Mr. Kelly, you're

23   recognized.

24             CHAIRMAN SIROIS:  Thank you, Mr. Chair.

25             And I should start maybe in reverse order

HT_0000162
CUBANOS-0000005286

Page 82

1   of the question.  I would disagree with the last

2   point that was made.  I do believe this composition

3   -- and this composition is very similar to what this

4   Subcommittee passed in Plan 8011.  I believe really

5   demonstrates strong compliance with the law, and I

6   believe actually this composition, again, similar to

7   the product passed out of this Subcommittee, I think

8   was actually better than the final product passed

9   out of the Legislature overall.

10          So going back to this Subcommittee work and

11  this Subcommittee's work was similar to the earlier

12  plans that we submitted out of our office.  Your

13  question is similar to that of which Representative

14  Skidmore asked earlier.  And while the Governor's

15  veto message was driven largely by what was

16  happening in Northeast Florida, we were never secret

17  about submitting maps.

18          We submitted public maps before out of our

19  office.  Those maps articulated thoughts and ideas

20  for consideration by the Legislature all around the

21  state.  And so obviously the major significant

22  constitutional concern centered around Districts 4

23  and 5 in Northeast Florida.

24          As though we looked at the Legislature's

25  final composition ideas that we had prior to that,

HT_0000163
CUBANOS-0000005287

Page 83

1    it was clear that I could go into the map and make

2    improvements and really in many cases taking some

3    hybrids of ideas that, as Chair Sirois said earlier,

4    some hybrids of ideas that really combine some of

5    the best work product of the Legislature and maps

6    that we proposed and really trying to pull those

7    ideas together to get the best out of these maps.

8              CHAIRMAN SIROIS:  All right.  Thank you,

9    Representative Brown.

10             Representative Driskell, you're recognized

11   in questions.

12             REPRESENTATIVE DRISKELL:  Thank you,

13   Mr. Chair.

14             Are you saying that because the Governor

15   doesn't like CD 5 as it currently exists that you

16   don't have to regard CD 5 as a benchmark district

17   for which a functional analysis is required?

18             CHAIRMAN SIROIS:  You're recognized.

19             ALEX KELLY:  Thank you, Mr. Chair.

20             Not exactly the way that you said that, but

21   the crux of the argument -- and Ryan laid out the

22   argument in detail well earlier -- the crux of the

23   argument is that the district violates the U.S.

24   Constitution.  So if the district violates federal

25   law, there's no district with which there is an

HT_0000164
CUBANOS-0000005288

Page 84

1    obligation to look at diminishment.  The district

2    was unlawful to begin with.

3              So at that point, the Legislature had no

4    obligation to consider that question.  At that

5    point, the Legislature just has Nassau County, Duval

6    County, Clay County, St. Johns County, which in

7    those four counties alone you could fit two whole

8    congressional districts plus start a third district

9    very compactly, very adherent to standards in the

10   State Constitution.

11             CHAIRMAN SIROIS:  Representative Driskell.

12             REPRESENTATIVE DRISKELL:  Thank you,

13   Mr. Chair.

14             But that's your opinion, correct?  That's

15   not actually the current legal standard.  The

16   current legal standard, as I understand it, is that

17   when there's a benchmark district, you're supposed

18   to perform a functional analysis; is that correct?

19             CHAIRMAN SIROIS:  Mr. Kelly.

20             ALEX KELLY:  Thank you, Mr. Chair.

21             No.  No.  There's no obligation to perform

22   a functional analysis on that district, and as our

23   general counsel noted, as the memorandum notes, as I

24   summarized earlier, that district as drawn in the

25   benchmark violates the Equal Protection Clause of

HT_0000165
CUBANOS-0000005289

Page 85

1   the United States Constitution.  Attempts to redraw

2   that district in various configurations violated the

3   Equal Protection Clause of the United States

4   Constitution.

5            So there's no need to do a functional

6   analysis for a district that, on its face, is

7   unlawful, and the Legislature was not obligated to

8   redraw.  And that's really the analysis that Mr.

9   Newman gave, our -- our legal memorandum gave.

10           REPRESENTATIVE DRISKELL:  I just -- I don't

11   want to beat a dead horse --

12           CHAIRMAN SIROIS:  Representative, just go

13   one more -- one last follow-up, and then we're going

14   to move on.

15           REPRESENTATIVE DRISKELL:  Okay.  Not a

16   follow-up, new question about Tampa Bay.

17           CHAIRMAN SIROIS:  You're recognized.

18           REPRESENTATIVE DRISKELL:  All right.  Thank

19   you, Mr. Chair.

20           So if we follow the map that you've

21   prepared and that we're reviewing today, it actually

22   follows the exact -- the net effect is that it looks

23   like it's following the exact same strategy that led

24   to what was determined to be a partisan gerrymander

25   that was struck down last decade, packing Democrats

HT_0000166
CUBANOS-0000005290

Page 86

1    into Tampa Bay CD 14.

2              So my question is, you know, how is

3    following the county lines not just a pretext for

4    partisan gerrymandering here?  Because it kind of

5    looks the same as it did about a decade ago.

6              CHAIRMAN SIROIS:  You're recognized.

7              ALEX KELLY:  Mr. Chair -- Thank you,

8    Mr. Chair.

9              I don't know the partisan breakdown of

10   those seats.  I don't know where, you know, where

11   District 13, 14, 15 -- I don't know how those seats

12   are affected.  I don't know the partisan data for

13   those seats.  So I don't know how to address that

14   question.  I can only address the question in the

15   context of how I drew the districts.

16             I wanted to draw -- because I could see

17   that the Legislature had an intent to draw a seat

18   wholly in Pinellas County.  So I drew a seat wholly

19   in Pinellas County, utilized very clear boundary

20   lines, a county line for the northern part of that,

21   a state road for the southern part of that, and

22   essentially moved to the east in a block-like

23   fashion and then came north out of Manatee County

24   into southern Hillsborough and essentially just had

25   those two seats, 13 and 16, and eventually meeting

Page 87

```
 1   15, just meet along major roadways.  So they're just
 2   nice, clean, compact seats that follow those major
 3   roadways.  I'm unaware of the data you're
 4   referencing.
 5           CHAIRMAN SIROIS:  Thank you.
 6           Representative Hunschofsky, you're
 7   recognized for one brief question.
 8           REPRESENTATIVE HUNSCHOFSKY:  I'll try my
 9   best, Chair Sirois.  Thank you.
10           I have a -- I'm going to put it kind of, I
11   guess, all together.  We talk constantly about the
12   Tier 2, and I keep going back to the Tier 1 that was
13   told to all of us from multiple times in our
14   committees.  And the Tier 2, we're picking bodies of
15   water in certain places, but in other places, it
16   doesn't seem to bother us that we cross bodies of
17   water.
18           My question is -- and this is all related
19   in one, Chair Sirois, how are you defining race
20   neutral, where did that term come from, and how do
21   you -- how do you explain CD 20, for example, when
22   you say that?
23           CHAIRMAN SIROIS:  Representative
24   Hunschofsky, I think the initial part of your
25   question has been asked and answered in the
```

HT_0000168
CUBANOS-0000005292

Page 88

1    testimony that's been offered.

2          Mr. Kelly, if you'd like to speak to

3    Congressional District 20, you're recognized.

4          ALEX KELLY:  Thank you, Mr. Chair.

5          And I really can't speak to Congressional

6    District 20.  We didn't draw Congressional District

7    20.  So I think I would have to defer to your

8    professional staff or the Legislature as a whole,

9    but we didn't draw Congressional District 20.

10         CHAIRMAN SIROIS:  Representative

11   Hunschofsky, can you repeat your question as it

12   relates to Congressional District 20?

13         REPRESENTATIVE HUNSCHOFSKY:  Yes.  I guess

14   my question, I keep going back to, as I did the last

15   time we had a map in front of us that we were voting

16   on, Tier 1 criteria, the one that I mentioned

17   before, versus the Tier 2 criteria.  You bring up

18   the term race neutral.  I'm not really sure what

19   that means, and I'm not really sure where that comes

20   from.

21         The map you presented to us has a district

22   that does move around and is obviously done so to

23   protect a racial group from being able to pick a

24   candidate of their choice.  So how do you explain

25   that as part of what you were talking about before?

HT_0000169
CUBANOS-0000005293

Page 89

1   I don't know if that's making sense.

2           CHAIRMAN SIROIS:  Staff is recognized.

3           Ms. Kelly.

4           LEDA KELLY:  Thank you, Mr. Chair.  And

5   thank you, Representative, for the question.

6           So for -- and I'll kind of piece together a

7   couple of things that have been mentioned today

8   already with regards to District 20.

9           So in the Legislature's perspective, that's

10  a protected black performing district.  So we

11  performed our functional analysis on the benchmark

12  district and then recreated it to ensure that that

13  minority group can elect a candidate of their

14  choice.

15          One difference that I'd say between

16  Congressional District 20 and, I guess, previous

17  iterations of Congressional District 5 is the

18  threshold of the voting age population.  So you've

19  heard the Governor's Office elude several times

20  today to the Voting Rights Act and Section 2

21  analysis.

22          The first condition of the Gingles

23  prerequisite is to have a majority-minority

24  district.  In the benchmark district and in the one

25  that's recreated in this plan and prior iterations,

HT_0000170
CUBANOS-0000005294

Page 90

1   CD 20 is above 50 percent and does meet that first

2   criteria for if someone was to bring a Section 2

3   violation against the map.  So we're obviously aware

4   of that and wanted to recreate it to be in alignment

5   with that law as well.  Thank you.

6              REPRESENTATIVE HUNSCHOFSKY:  Can I --

7              CHAIRMAN SIROIS:  Thank you very much.

8              Members, I apologize.  We have an amendment

9   -- we have an amendment that we need to take up.  We

10  have members of the public that have traveled here

11  today to be with us.  We need to -- we need to move,

12  Representative Joseph, into your amendment.

13             REPRESENTATIVE JOSEPH:  (Indiscernible)

14             CHAIRMAN SIROIS:  Representative Joseph,

15  you are recognized to present your amendment.

16             Members, this is amendment barcode 959221.

17             Representative Joseph, you are recognized.

18             REPRESENTATIVE JOSEPH:  Thank you,

19  Mr. Chair.

20             So in this bill, at lines 3627 through

21  3647, it creates Section 7, which limits venue for

22  legal actions challenging federal congressional

23  districts to state court.  That makes no sense to

24  me.  The question I would have asked had I had the

25  opportunity to do so was, what was the rationale for

HT_0000171
CUBANOS-0000005295

Page 91

1    that?

2          So this basically -- this amendment is

3    quite simple and straightforward.  It removes those

4    lines, such that these congressional federal seats

5    can be challenged in federal court.  That is the

6    amendment.

7          CHAIRMAN SIROIS:  Thank you very much.

8          Having explained the amendment, members,

9    are there questions on the amendment?  Questions on

10   the amendment?

11         Seeing none, is there public testimony on

12   the amendment?

13         We have none submitted, ma'am.  We're on

14   the amendment now, but we're going to get to public

15   testimony on the bill in just a moment.  I

16   appreciate you being here today.  Just one moment.

17         Seeing no public testimony on the

18   amendment, members, is there debate on the

19   amendment?

20         Ranking Member Skidmore, you are recognized

21   to debate on the amendment.

22         DEMOCRATIC RANKING MEMBER SKIDMORE:  Thank

23   you, Mr. Chair.

24         And thank you, Rep Joseph, for the

25   amendment.

HT_0000172
CUBANOS-0000005296

Page 92

1              I too was unsure why we needed to do this

2      and why we would want to try and circumvent the

3      federal courts and an opportunity for individuals to

4      work through that process?  I don't think it's --

5      this is necessary.  We've managed for hundreds of

6      years without, you know, weaponizing the process.

7      I'm not sure why we need to do it now.

8              We have only had these maps for a few

9      hours.  We are still trying to wrap our heads around

10     them.  We don't need to bog this whole process down

11     with this unnecessary language that gives us all a

12     lot of heartburn and is likely to be

13     unconstitutional for us to tell people whether they

14     can work through the federal court system or not.

15             So I support your amendment.  I think it's

16     a good one, and I would ask everyone else to vote up

17     on this amendment.

18             CHAIRMAN SIROIS:  Representative Benjamin,

19     recognized in debate.

20             REPRESENTATIVE BENJAMIN:  (Indiscernible)

21             CHAIRMAN SIROIS:  The amendment.

22             REPRESENTATIVE BENJAMIN:  Thank you,

23     Mr. Chair.

24             And just to reiterate that point, we've

25     been arguing now about a federal question, the 14th

HT_0000173
CUBANOS-0000005297

Page 93

1   Amendment -- how does the 14th Amendment apply in

2   this case?  And so if we're talking about a federal

3   question, whether or not our maps violate the 14th

4   Amendment, how can you preclude the federal court

5   from weighing in on that?  It's a federal question,

6   which is a requirement to enter into state -- enter

7   into federal court in the first place.  So we cannot

8   preclude the federal court from determining what is,

9   in essence, a federal question.  So that is my

10  debate.  We should vote down on this amendment -- I

11  mean, excuse me -- vote up on this amendment.

12           CHAIRMAN SIROIS:  Any other members in

13  debate?

14           Seeing none --

15           REPRESENTATIVE DRISKELL:  No.  No.

16           CHAIRMAN SIROIS:  Representative Driskell

17  in debate.

18           REPRESENTATIVE DRISKELL:  Sorry, Mr. Chair.

19  Just very, very, very briefly.

20           And, yeah, I just want to echo back to

21  something that we talked about when we were in

22  regular session, which is this concept of weaponing

23  procedure, and if we believe that, you know, the

24  maps that we pass are going to be constitutional, if

25  we believe that they're going to stand, there's no

HT_0000174
CUBANOS-0000005298

Page 94

1  need to weaponize procedure in this way.

2          Previously, it was -- first, it was the

3  statute of limitations and limiting that.  Now, it's

4  choice of venue.  What's next?  It's a very slippery

5  slope, and it's something that we should all be

6  concerned about.  And we need to be down on this,

7  thank you -- I mean, up on this amendment, thank

8  you.

9          CHAIRMAN SIROIS:  Members in debate?

10          Seeing none, Representative Joseph, you are

11  recognized to close on the amendment.

12          REPRESENTATIVE JOSEPH:  Thank you, Mr.

13  Chair.

14          This amendment is very straightforward.  I

15  mean, it's a federal question, federal courts.  It

16  really just makes sense.  So the portion restricting

17  the jurisdiction, it's in direct conflict with the

18  Voting Rights Act and 28 USC 1367, which provides

19  supplemental federal jurisdiction over state law

20  claims that are closely related to federal claims.

21          As such, the supremacy clause controls and

22  the state law must concede that federal law, which

23  states that federal courts have jurisdiction over

24  these maps.  I mean, it's not even complicated.

25  It's not even close.

HT_0000175
CUBANOS-0000005299

Page 95

1          So we have to ask ourselves what's really

2     going on.  Why would we want to limit challenging

3     federal congressional seats to state courts?  I

4     think many of us have ideas as to what the answer is

5     to that question, but even that notwithstanding,

6     let's talk about what the 14th Amendment is, which

7     is the basis for these new maps, as has been

8     espoused to us.  The 14th Amendment is one of those

9     remedial statutes in the Post-Reconstruction Era

10    that allowed for more black representation, and but

11    for that law and several others, we would have less

12    black representation.

13         So now, we have the Governor using that

14    same law to turn it on its face, and he wants you to

15    believe that somehow, under some universe, that he

16    is protecting us against segregation, which is

17    straight foolishness because I didn't get into all

18    of the questions that I --

19         CHAIRMAN SIROIS:  Representative Joseph, I

20    apologize for --

21         REPRESENTATIVE JOSEPH:  Okay.

22         CHAIRMAN SIROIS:  -- interrupting.  We are

23    very pressed for --

24         REPRESENTATIVE JOSEPH:  I understand.

25         CHAIRMAN SIROIS:  -- time.  Let's --

HT_0000176
CUBANOS-0000005300

Page 96

1           REPRESENTATIVE JOSEPH:  I'm trying to close

2    on my --

3           CHAIRMAN SIROIS:  -- you can close on the

4    amendment.

5           REPRESENTATIVE JOSEPH:  -- amendment.  You

6    shut off all my other questions.  So I'm trying to

7    get the point across.

8           So when we look at CD 26, which is

9    protected, as you heard, as Latino voters, which is

10   a Tier 1 criteria, why are we protecting Latino

11   voters and not black voters?  When we look at that,

12   there are infirmities that make that map worse in

13   terms of the Tier 2 criteria that we're alleging

14   that we're protecting, but we're not actually

15   protecting it.

16          So what are we really doing?  This is smoke

17   and mirrors.  This amendment directly just

18   eliminates the -- which court you're taking it to.

19   We shouldn't need this.  If your premise is under

20   the U.S. Constitution and the 14th Amendment, which

21   is what we heard legal counsel say, that that's the

22   basis for their claim, then let it play out in

23   federal courts.  If it's not, then tell us what

24   you're actually doing.  We're not asleep at the

25   wheel.  This amendment fixes that and allows us to

HT_0000177
CUBANOS-0000005301

Page 97

1    do what we're substantively able to do.

2            Thank you, Mr. Chair.

3            CHAIRMAN SIROIS:  Thank you, Representative

4    Joseph.

5            Having closed on the amendment, members in

6    favor of the amendment, please signify by saying

7    aye.

8            (Multiple ayes)

9            Those opposed, no.

10           (Multiple nos)

11           The amendment fails.

12           We are now on public testimony.

13           Ladies and gentlemen, we appreciate you

14   being here today for public testimony.  We have a

15   lot of public testimony to get through.  What I

16   would like to do is, once I call your name, please

17   approach the podium, if you'd like to speak.  I will

18   call the next person to speak as well.  They are on

19   deck if they would like to move forward in the room.

20   You are also welcome to waive in support or waive in

21   opposition in order to save time.

22           Members of the public joining us today, I'd

23   like to spend the next 40 to 45 minutes receiving

24   your public testimony, which is very important to us

25   to have, and then we'll move into member debate and

HT_0000178
CUBANOS-0000005302

Page 98

1    the bill sponsor's close.

2            With that, I'd like to ask LaShonda

3    Holloway, a citizen from Jacksonville, to please

4    approach the podium.  If you would please state your

5    name, I'm sure that I pronounced it incorrectly, and

6    then next on deck will be Nancy Staats from Atlantic

7    Beach.

8            You are recognized.

9            LASHONDA HOLLOWAY:  Thank you.

10           Good afternoon to this Committee.  First

11   and foremost, I want to thank you for your work, but

12   I must say that I am in utter shock that that last

13   amendment was not approved.

14           I would urge each of you to vote no on this

15   bill.  If congressional seats are federal, then the

16   Equal Protection should be -- law should be heard by

17   federal courts and not by the lower courts.

18   Moreover, as a fourth generation Floridian who is

19   not only a constituent in the 5th Congressional

20   District, I am a stakeholder as a candidate to

21   represent the people of the 5th Congressional

22   District.

23           Furthermore, understand that this

24   particular map that the Governor has proposed, it

25   uses Tier 2 metrics.  It does not even use the

HT_0000179
CUBANOS-0000005303

Page 99

1  federal standard.  It used the preferred standard.

2  So not only should we be using United States census

3  numbers, we should also be using Tier 1 standards,

4  and we all know that Tier 1 says you cannot favor a

5  political party.

6            CHAIRMAN SIROIS:  Thank you.  Thank you,

7  ma'am.  That's --

8            LASHONDA HOLLOWAY:  My two minutes are

9  up?

10            CHAIRMAN SIROIS:  Please continue.  My

11  mistake.  You have two minutes.  Proceed.

12            LASHONDA HOLLOWAY:  Thank you so -- thank

13  you so very much.

14            Furthermore, we know that Mr. Kelly stated

15  that this particular -- these particular maps affect

16  18 districts, and as a result of that, it would

17  favor 20 Republican districts and 8 Democratic

18  districts.

19            The citizens of the state of Florida voted

20  for Fair Districts.  So not only does it violate the

21  will of the people, it also violates the Equal

22  Protection Clause.  The second section of the 14th

23  Amendment strictly states that you must not prohibit

24  voting practices or procedures that discriminate on

25  the basis of race, color, or membership in one

HT_0000180
CUBANOS-0000005304

Page 100

1   minority language.

2          Last and not -- certainly not least, I

3   would say to you we must protect minority access

4   districts from retrogression.  We must protect

5   minority access districts from retrogression.  Black

6   people, minorities, people of color, and people of

7   minority language ethnicities should have

8   representation.  We are --

9          CHAIRMAN SIROIS:  Thank you.

10         LASHONDA HOLLOWAY:  -- a part of this

11  democracy, and we deserve to be heard.

12         CHAIRMAN SIROIS:  Thank you, ma'am.

13         LASHONDA HOLLOWAY:  Thank you.

14         CHAIRMAN SIROIS:  My apologies for

15  interrupting you.

16         Ms. Staats.  Next on deck is Judy Sheklin

17  of Jacksonville.

18         You are recognized, ma'am.

19         NANCY STAATS:  Good afternoon, everyone.

20  My name is Dr. Nancy Staats.  I'm a board-certified

21  medical doctor, but you don't need an advanced

22  degree to see what is happening here.  What we are

23  seeing is a blatant disenfranchisement of African

24  American communities and their representatives.

25         The Governor has many duties and

HT_0000181
CUBANOS-0000005305

Page 101

1    responsibilities, but drawing maps is not one of

2    them.  That is your job, and you are here working

3    hard doing that job.  But unfortunately the Governor

4    rejected all your hard work, then came up with us

5    his maps, which you appropriately, rightfully

6    rejected when he first proposed.  But now suddenly,

7    after vetoing yours, he's back with more nonsense,

8    and you have folded like a cheap suit, the

9    Republicans.

10          Now, what I would like to say --

11          CHAIRMAN SIROIS:  Ma'am, I'm going to

12   remind you.  I don't know if you were here when we

13   --

14          NANCY STAATS:  Yes.  Thank you.  I will.

15          CHAIRMAN SIROIS:  -- started the meeting --

16          NANCY STAATS:  I will.

17          CHAIRMAN SIROIS:  -- regarding decorum --

18          NANCY STAATS:  I will.  Yes.

19          CHAIRMAN SIROIS:  -- in the Committee room.

20          NANCY STAATS:  I will.  What happened in

21   those two months?  I'm just curious.  Were there

22   discussions about budgetary requests perhaps?  Was

23   there arm twisting?  I don't know.  Maybe someone

24   can clarify.  It's painfully clear to me that

25   everyone in this room and everyone outside of this

Page 102

1   room knows this entire special session is a farce

2   because there is not even another map being

3   considered.

4           As has been mentioned by others, our

5   Harvard-educated Governor must be well aware that

6   this map violates both the Florida Fair Districts

7   Amendment and the Voting Rights Act, but perhaps he

8   wants the attention.  Perhaps a Supreme Court case?

9   I don't know.

10          Everyone remembers back our American

11  history lesson that our government was formed in

12  response to an authoritarian ruler, King George.

13  Our Founding Fathers created a system of three

14  district, autonomous branches of government, yet

15  here we are today, seeking complete -- seeing

16  complete complicity on your part to a new king.

17          In closing, as a physician, I took an oath.

18  I pledged to uphold the Hippocratic Oath.  You too,

19  each of you, took an oath.  You have taken oaths to

20  uphold the State and U.S. Constitutions and to serve

21  your constituents, and many of you sadly seem to

22  have forgotten.  We will not.

23          CHAIRMAN SIROIS:  Thank you, ma'am.

24          Ms. Sheklin, you're up next, followed by

25  Juanita Powell-Williams of Jacksonville.

HT_0000183
CUBANOS-0000005307

Page 103

1           Ladies and gentlemen, if I'd just ask you,

2    when you come to the podium, if you would identify

3    yourself once again.  And we'll observe the two

4    minutes, but we may be pressed for time moving

5    forward.

6           Ma'am, you are recognized.

7           JUDY SHEKLIN:  My name is Judy Sheklin, and

8    I live in Jacksonville.  I'm speaking in opposition

9    to the Governor's proposed maps for several reasons.

10   It is the responsibility of the Legislature to

11   create congressional maps during redistricting

12   according to Article III of the Florida

13   Constitution.

14          The House and Senate, as the previous

15   speaker stated, created and approved maps that you

16   were satisfied with, which, as we know, were then

17   vetoed and redrawn by the Governor.  This is

18   unprecedented in state Legislatures throughout the

19   United States.

20          The Legislature here, quickly, the House

21   and Senate acquiesced to the Governor, and that

22   created a dramatic imbalance of power in our state

23   government.  This is troubling to me as a citizen.

24   The Governor's maps are a radical departure and

25   aren't in compliance with state and federal law.

HT_0000184
CUBANOS-0000005308

Page 104

1    These maps, as we've heard today, reduce the

2    likelihood of minorities to elect congressional

3    members of their choice, eliminating two minority

4    districts, and also violating the Voting Rights Act.

5            In 2010, Florida passed the Fair Districts

6    Amendment, and the citizens stated and deserve and

7    expect fairness in redistricting decisions.  The

8    Governor's plan that creates 20 Republican minority

9    -- majority districts out of -- and 8 majority

10   Democratic districts blatantly demonstrates partisan

11   gerrymandering.

12           Please stand up for all Floridians and

13   oppose these unfair maps.  Thank you.

14           CHAIRMAN SIROIS:  Thank you, ma'am.

15           Ms. Powell-Williams, you're up, followed by

16   Cristian Cardona.

17           You're recognized.

18           JUANITA POWELL-WILLIAMS:  Yes.  Thank you.

19           Good afternoon.  Juanita Powell-Williams

20   from Jacksonville, Florida.  We often in the law

21   consider knowledge and intent.  Ladies and

22   gentlemen, I present to you today that there is full

23   knowledge of what is being done here today within

24   Florida.

25           Florida has become a laughingstock,

HT_0000185
CUBANOS-0000005309

4/19/2022                Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 105

1   unfortunately, and with that, you as our leaders are

2   privy to that.  There is full knowledge, and with

3   that, intent, to do just what the Governor is doing.

4   He is taking away a right of a people.  We are

5   retrogressing back to the past, and you are allowing

6   that to happen.

7           I know this is falling on deaf ears,

8   unfortunately.  We're here from -- your constituents

9   are here from these various counties within Florida,

10  and we're speaking out regardless of some of you

11  already having made up your minds as to what's going

12  to come out of your mouth.

13          But we're here.  Ladies and gentlemen,

14  we're going to speak up.  We're going to vote, and

15  we will remember.  Thank you.

16          CHAIRMAN SIROIS:  Thank you, ma'am.

17          Cristian Cardona followed by Marsha Davis.

18          If I could remind members, if I call your

19  name second, if you could make your -- members of

20  the public, if you could make your way up, you're on

21  deck.  That will help us move things a little bit --

22  move along a little bit faster.

23          You are recognized.

24          CRISTIAN CARDONA:  Thank you.

25          Hello, everyone.  My name is Cristian

HT_0000186
CUBANOS-0000005310

Page 106

```
 1   Cardona.  I am opposed to the redistricting plan.  I
 2   am a worker and a leader with the Fight for $15 and
 3   the union.  Different movements are gathered here
 4   today because we stand against the elimination of
 5   protections that the Fair Districts Amendment
 6   provides.  This map is a direct attack on black
 7   representation and our democracy, and that ain't
 8   right.
 9           I want to share why -- I want to share my
10   experience as a voter and why this issue is
11   important to me.  I moved to Orlando, Florida, with
12   my family in 2009.  I gained citizenship and just in
13   time to vote for Amendment 2, which brought us one
14   step closer to a living wage, which is something I
15   have been organizing and speaking up about for
16   years.
17           This amendment has a direct impact on the
18   community around me, my family, my friends, and my
19   neighbors.  It felt powerful to organize and
20   campaign to raise the standard of living for
21   millions of Floridians.  The day I got to vote yes
22   for Amendment 2 was a day that I will always
23   remember.  After months of complaining and yelling
24   it out to the world, I finally had the chance to
25   cast my vote along with my community.
```

HT_0000187
CUBANOS-0000005311

Page 107

1           This is why it's so important that workers

2     have a strong voice and a vote.  Workers have never

3     been given rights.  We've had to fight for all of

4     the things that we won, ever little crumb, every

5     race, every right, and this fight is no different.

6           Governor DeSantis is trying to diminish our

7     ability to have our voices heard at the state level,

8     which we aren't going to let happen.  Thank you.

9           CHAIRMAN SIROIS:  Thank you.

10          Marsha Davis, followed by Rosemary McCoy of

11    Jacksonville, followed by Tameka Hobbs of

12    Jacksonville.

13          Ma'am, you are recognized.

14          MARSHA DAVIS:  Thank you.

15          Good afternoon.  I'm Marsha Davis from

16    Orlando, Florida.  I'm here to speak against

17    Governor DeSantis' legislative map.

18          Floridians passed the Fair District Act

19    amending the State Constitution to protect minority

20    voters, to ensure their access to representation,

21    and to limit legislators from drawing maps that are

22    unfair.  And this map is -- these maps are unfair.

23    It's just not right.  I hope your conscience is

24    twinging just a little bit.

25          Minority growth in the last -- this last

HT_0000188
CUBANOS-0000005312

Page 108

1   census is very clear.  That's why we got an

2   additional congressional seat.  That tells us that

3   we need more representation, not less.  So I would

4   ask you to consider that.  The plan is unfair, and I

5   believe the plan is unconstitutional.  So I would

6   ask for you to please think about all of your

7   constituents and vote no.  Thank you.

8           CHAIRMAN SIROIS:  Thank you, ma'am.

9           Rosemary McCoy, followed by Tameka Hobbs

10  and then Laura Cardona.

11          ROSEMARY MCCOY:  Good afternoon and thank

12  you so much for having us here and thank you so much

13  for being here.

14          We are living in a time of desperate

15  reaction, and we need your reaction in a positive

16  way.  Everyone here knows that we have a war, and

17  yes, I'm going to continue to speak about this here

18  war, Russia and Ukrainian.  It's a serious war

19  because it does affect us, whether we're in Florida

20  as a state or whether we are federal or whether we

21  are citizens, residents of the state of Florida.

22          I am a disabled veteran, and I believe in

23  this country.  I would go to war today for this

24  country, and you know what I'm asking you all to do?

25  I'm asking you to go to war right here in the state

HT_0000189
CUBANOS-0000005313

Page 109

1    of Florida.  I'm asking you to put down your party.

2    We're not here to be Republicans.  We're not here to

3    be Democrats or Independents.  We're here to serve

4    the people.  I have a nonprofit organization called

5    Harriet Tubman Freedom Fighters, freedom fighters.

6           I believe in freedom.  I am a Ukrainian.  I

7    have that spirit, and I pray that each one of you

8    do.  I pray that you do not bow down to a dictator.

9    We have to stop this.  When are we going to stop

10   this?

11          CHAIRMAN SIROIS:  Ma'am, I'm going to

12   caution you regarding --

13          ROSEMARY MCCOY:  Stop it now.  Stop it now.

14          CHAIRMAN SIROIS:  Our next speaker is

15   Tameka Hobbs, followed by Laura Cardona.

16          I'd like to remind members of the audience

17   as well regarding civility and decorum in the

18   Committee room.

19          Ma'am, you are recognized.

20          TAMEKA HOBBS:  Thank you.  Good evening.

21   My name is Dr. Tameka Hobbs.  I am a recent resident

22   of Jacksonville and Congressional District 5.  I am

23   a native of Florida.  I grew up not very far from

24   here in Suwannee County.  I am here to report to you

25   as a person who has lived the majority of my life

HT_0000190
CUBANOS-0000005314

Page 110

1   here in the state of Florida that I have never paid

2   as much attention to the proceedings of this

3   organization because I have never in my life been as

4   concerned as I have been over the last several

5   months.

6            I'm here to voice my opposition to the maps

7   that are being presented by the Governor to this

8   legislative body because, on its face, that is

9   outside of his scope and function.  This body has a

10  responsibility for bringing these maps, developing

11  these maps, as you have, for consideration.  And it

12  is a definite violation of the checks and balances

13  that are built into our Constitution, as I

14  understand them, for someone else to present those

15  to us.  So I will say that, number one.

16           I will also echo what's been said already

17  in that these proposed maps, this proposed map is

18  unconstitutional based on the Florida State

19  Constitution, based on the Fair Districts Amendment

20  from 2010, based on the Voter Rights Amendment

21  that's been -- Voting Rights Act, excuse me, that's

22  been presented here several times.

23           I'd also like to talk about what I heard in

24  the two times, both in the Senate and before this

25  body, that I have heard Mr. Kelly make his

HT_0000191
CUBANOS-0000005315

Page 111

1   representations about the way that the map that was

2   presented today was -- had come about.  He asserted

3   us that he was very interested in it being squared

4   and compact.  He described these very round

5   districts.  Visually, certainly, we can certainly

6   see that.

7          What he has used -- and I believe

8   mistakenly -- is the application of this idea that

9   these maps were constructed in a race neutral

10  fashion.  If it was race neutral, we would not be

11  dealing with the disillusionment, the dismantlement

12  of two of four seats -- congressional districts that

13  have put African Americans in the Congress.

14         CHAIRMAN SIROIS:  Ma'am, your time is

15  expired.  You want to just bring it in for a

16  landing.

17         TAMEKA HOBBS:  For two minutes?

18         CHAIRMAN SIROIS:  Ma'am, your time is

19  expired.

20         TAMEKA HOBBS:  Okay.

21         CHAIRMAN SIROIS:  If you'd like to wrap up

22  your comments.

23         TAMEKA HOBBS:  I would like to say that

24  that is on its face false.  I want to say to this

25  body that you have a choice before you.  As a

HT_0000192
CUBANOS-0000005316

Page 112

1   historian I have followed the racial history, very

2   painful --

3            CHAIRMAN SIROIS:  Thank you.

4            TAMEKA HOBBS:  -- history that has not been

5   considered here.

6            CHAIRMAN SIROIS:  Thank you, ma'am.  Thank

7   you.

8            TAMEKA HOBBS:  You have a choice about your

9   legacy today.

10           CHAIRMAN SIROIS:  Thank you very much.

11           Laura Cardona of Orlando and then

12   Christopher Nurse of Jacksonville waives in

13   opposition.  Our next speaker -- is Laura Cardona

14   coming up?  Christopher Nurse waives in opposition.

15   The next speaker Sheila Singleton of Jacksonville,

16   followed by Barney Roberts of Jacksonville.

17           Sheila Singleton?

18           Barney Roberts of Jacksonville, come on up,

19   sir.  And then our next speaker will be Trish Neely

20   of Tallahassee.

21           BARNEY ROBERTS:  Hi.  I'm Barney Roberts

22   from Jacksonville, Florida.  I'd like to challenge

23   you to build a future for our kids for tomorrow.  If

24   they look at Tallahassee as it has been for the last

25   couple years and they see the behavior that's

HT_0000193
CUBANOS-0000005317

Page 113

1    happening here, then they're going to say, hey, what

2    should we do about it?

3             Our kids deserve the best, and I hope that

4    you do that too with your decision that you make

5    today and tomorrow.  Thank you.

6             CHAIRMAN SIROIS:  Thank you, sir.

7             Trish Neely, Tallahassee, followed by Larry

8    Coleton (phonetic) of Orlando.

9             TRISH NEELY:  Thank you.

10            CHAIRMAN SIROIS:  Ma'am, you're recognized.

11            TRISH NEELY:  Thank you for the opportunity

12   to speak.  I'm Trish Neely, and I am with the League

13   of Women Voters.

14            I won't repeat what's already been said,

15   but I do have two points.  Number one, it was the

16   League of Women Voters against the State of Florida

17   that was the lawsuit that Mr. Kelly mentioned, and

18   we disagree that the court got it wrong.  We believe

19   they got it very right.

20            We urge you, urge you to carefully consider

21   what this map will do.  It cuts the voting power of

22   African Americans by 50 percent.  Think of that, by

23   50 percent, and this is very reminiscent of

24   Florida's voter suppression tactics of over 100

25   years ago.

HT_0000194
CUBANOS-0000005318

Page 114

1          Folks, we don't want to go backwards.  We

2    need to go be going forward.  We urge you to vote

3    this map down.  Thank you.

4          CHAIRMAN SIROIS:  Thank you, ma'am.

5          Larry Coleton -- I'm sorry.  I know I'm

6    mispronouncing that -- followed by Hedder Pierre-

7    Joseph of Orlando.

8          If you're going to speak and I mention your

9    name, please make your way forward in the interest

10   of time.

11         Hedder will be followed by Stacy Williams

12   of Orlando.

13         Sir, you're recognized.

14         LARRY COLETON:  Thank you, Mr. Chairman.

15   Larry Coleton from Orlando, Florida.

16         I find myself thinking that I'm back in the

17   1950s or 1940s.  This reminds me of basically,

18   pardon the language, but white supremacy.

19         CHAIRMAN SIROIS:  Sir, I'm --

20         LARRY COLETON:  And the fact of the matter

21   is it's ironic to me that the 14th Amendment would

22   be turned on its head when that was initiated to

23   protect Africans who were recently freed from

24   slavery, and we, me, an African descendant of

25   slavery, having people stand -- sit here and talk

HT_0000195
CUBANOS-0000005319

Page 115

1    about this as though -- and using it as a weapon

2    against the very people it was intended to protect.

3           This is a moment for profiles in either

4    courage or cowardice.  To be intimidated by the

5    Governor of this state to capitulate, this is not

6    this Committee's bill.  This is the Governor's bill.

7    You haven't done your job.  You aren't doing your

8    job, and we are not going to forget this.  And

9    history will speak to you.  It will speak about you.

10   You will be dealt with for your history and

11   hopefully at the ballot box.

12          CHAIRMAN SIROIS:  Thank you, sir.

13          Hedder Pierre-Joseph -- I apologize.  I'm

14   butchering the name -- followed by Stacy Williams.

15          HEDDER PIERRE-JOSEPH:  No worries.  Good

16   evening to the Committee and the Committee members.

17          My name is Hedder Pierre-Joseph.

18   Redistricting is the process by which new

19   congressional and state legislative districts are

20   drawn.  Federal law stipulates that districts must

21   have nearly equal population and must not

22   discriminate on the basis of race and ethnicity.

23          The current redistricting map, which

24   eliminates congressional House representation for

25   black people, is based on solely fear, fear that

HT_0000196
CUBANOS-0000005320

4/19/2022         Common Cause, et al. v. Cord Byrd         Audio Transcription

Page 116

1    black people are voting.  As black people who are

2    descendants of the enslaved Africans, we know our

3    history, and we have seen this devil before.

4          I implore you not to continue down the dark

5    path of your ancestors and deny black people their

6    constitutional right of representation.  I remind

7    all of you of the Boston Tea Party of 1773.

8          Finally, I ask you to look around and to

9    see the promise and the hope of the enslaved

10   Africans.  We are on the side of justice, and with

11   the God of Abraham, Isaac, Jacob, and our ancestors,

12   we shall always overcome.  Remember, there is

13   something called God and time.  Thank you for your

14   consideration.

15         CHAIRMAN SIROIS:  Thank you.  My apologies

16   for butchering your name.

17         Stacy Williams followed by Troy Squire.

18         Stacy Williams is not here.

19         Troy Squire of Jacksonville.  If I call

20   your name, if you'd make your way forward.

21   Following Troy will be Jonathan Webber of

22   Tallahassee.

23         TROY SQUIRE:  THANK YOU for letting me

24   speak.

25         I just have one question, but first, my

HT_0000197
CUBANOS-0000005321

Page 117

1    name is Troy Squire.  I live in Congressional

2    District 5, and as the regional breakdown for

3    Northern Florida states, your plan will split black

4    communities across three different congressional

5    districts, which results in the loss of the current

6    black opportunity district, linking Jacksonville and

7    Tallahassee.

8           So my question is to Governor Ronald Deon

9    DeSantis and this Subcommittee.  What are you saying

10   (sic) is that black votes does not matter to you?

11   That's my only question.  Thank you.

12          CHAIRMAN SIROIS:  Thank you, sir.

13          Jonathan Webber of Tallahassee, followed by

14   David Rucker of Orlando.  And after David will be

15   Genesis Robinson of Daytona Beach.

16          Sir, you are recognized.

17          JONATHAN WEBBER:  Thank you so much.

18          Good afternoon.  My name is Jonathan

19   Webber.  I'm the deputy director of Florida

20   Conservation Voters, and for the record, I do live

21   in CD 5, Al Lawson's district just south of

22   Apalachee here in Tallahassee.

23          Florida Conservation Voters strongly

24   believes that the health of our environment is

25   directly tied to the health of our republic, and

HT_0000198
CUBANOS-0000005322

Page 118

1   just as we monitor our water for pollution, we

2   monitor our government for signs of sickness.

3            Fair representation is one of the best

4   metrics we have to measure the health of our

5   government.  The census and ensuing redistricting

6   process is the test.  Today, we're asking ourselves

7   questions like, was this map drawn in complete

8   transparency?  Does it respect the rules set forth

9   in the Voting Rights Act, in the state and federal

10  Constitutions?  Were the people of Florida given

11  ample opportunity to participate and comment on this

12  map?  And most important, considering the profound

13  legacy of state-sponsored oppression in Florida,

14  does it protect or diminish the right of black

15  Floridians to elect the leaders of their choice.

16            You all know the answers to these

17  questions, and while fair representation is vial,

18  fear of doing the right thing is the ultimate

19  terminal sickness in democracy.  Our republic is

20  only as strong as the rights of the minority groups

21  to participate.  I love this country not so much for

22  its history but for its promise.  But that promise

23  must be guaranteed to everyone, not just the

24  powerful or the monied or the ruling class.

25            FCV stands in solidarity with our friends

HT_0000199
CUBANOS-0000005323

Page 119

1    and allies across the state in opposition to these

2    maps.  Thank you all for coming today.  Thank you.

3              CHAIRMAN SIROIS:  Thank you.

4              Next is David Rucker, followed by Genesis

5    Robinson.

6              Ladies and gentlemen, we have about 20

7    speaker cards left.  I'd like to move into debate at

8    6:00 p.m.  So following you, sir, I will be reducing

9    public testimony to one minute each.

10             Thank you, sir.

11             DAVID RUCKER:  You're giving me one minute?

12             CHAIRMAN SIROIS:  No, sir.  After you.

13             DAVID RUCKER:  Oh, after me.

14             CHAIRMAN SIROIS:  You have two minutes.

15             DAVID RUCKER:  Good.  My name is David

16   Rucker.  I live in Orlando.  I live in District 10,

17   and I am a super voter.  I started voting when I was

18   18.  That's in the Civil Rights in 1965.  I've only

19   missed two voting out of my whole time as being a

20   teenager and a young and old adult.

21             And what I like to do and have you guys,

22   before you even think about voting, we keep asking

23   you to vote and the things that we don't like about

24   what's happening with the Governor and what he's

25   talking about, I want you to go back.

HT_0000200
CUBANOS-0000005324

Page 120

1               Before you make this vote -- in 1975, a

2     song came out by the O'Jays, and it would say you

3     got to give the people what they want.  Before you

4     vote, I want you to listen to that song.  I want you

5     to listen to it all the way through and then come

6     back and vote.  All right.  That's what I need you

7     to do.  All right.

8               The next thing, there are four positions

9     that we have now.  The Governor want to cut them

10    down to two, all right.  You need to look at that

11    too.  We're talking about oppression of voters,

12    especially blacks at that time, in '65.  We need to

13    take heed and look at those things.  We don't want

14    to repeat history, all right.  We want to move

15    forward.

16              But what the Governor is trying to is to

17    try to repeat history, which is not good for all of

18    us in America, you know.  U.S. is us.  That means we

19    are here together, but remember, what I want you to

20    do, 1975, the O'Jays, the O'Jays, all right.  You

21    got to give the people what they want.  Thank you.

22              CHAIRMAN SIROIS:  Thank you, sir.

23              Genesis Robinson, followed by Gail Gardner,

24    one minute.

25              Sir, you are recognized.

HT_0000201
CUBANOS-0000005325

Page 121

1          GENESIS ROBINSON:  Mr. Chair, I would ask

2     that you reconsider to allow two minutes so I can

3     speak.

4          CHAIRMAN SIROIS:  Sir.  I have --

5          GENESIS ROBINSON:  I have somebody that's

6     going to yield his time.

7          CHAIRMAN SIROIS:  I have 20 speakers left.

8     One minute, sir.  You are recognized.

9          GENESIS ROBINSON:  Okay.  Thank you.  Good

10    afternoon, members.  Thank you, Mr. Chair, for the

11    opportunity to speak for one minute to address the

12    House Subcommittee.

13         My name is Genesis Robinson.  I am a

14    registered voter in the state of Florida.  I also

15    serve as the political director for Equal Ground

16    Action Fund.  We are a black-led voting rights

17    organization working to increase civic engagement in

18    black communities throughout the state.

19         We are here in opposition to this plan.

20    Obviously, you have abdicated your responsibility to

21    draw maps to the Governor, and as an organization

22    working to expand equity in the state, we believe

23    that this map is unconstitutional.

24         With minority growth that we saw in the

25    2020 census, it is critical that we have diverse

HT_0000202
CUBANOS-0000005326

Page 122

1   viewpoints and experiences represented at the

2   federal level of government.  The lived experiences

3   and perspectives of these individuals are a crucial

4   part in representing and reflecting the fullness of

5   our state.

6            It is unconscionable to think that maps

7   that govern our state for the next decade could give

8   us less minority representation than we currently

9   have.  When the history of this moment is written,

10  you do not want your name to be among those that

11  violated --

12           CHAIRMAN SIROIS:  Sir, your time --

13           GENESIS ROBINSON:  -- and voted to take --

14           CHAIRMAN SIROIS:  -- your time is expired.

15           GENESIS ROBINSON:  -- away minority

16  representation --

17           CHAIRMAN SIROIS:  Thank you.

18           GENESIS ROBINSON:  -- in the state of

19  Florida.  Thank you.

20           CHAIRMAN SIROIS:  Thank you.

21           Gail Gardner of Ocoee, followed by Cheryl

22  Jones of Winter Garden.

23           Ma'am, you're recognized.

24           GAIL GARDNER:  Good evening.  Gail Gardner

25  from District 10.

HT_0000203
CUBANOS-0000005327

Page 123

1          In the '60s, my ancestors who lived in the

2     North where I was born and grew up would board a

3     charter bus and head south where they were born and

4     grew up.  Well, now, I too boarded a charter bus

5     today for the same reason.

6          My experience has been that we are fighting

7     once again and repeating history.  Our ancestors did

8     this.  They defended their time.  They defended the

9     right to vote.  And so, therefore, we're asking that

10    the congressional redistricting map not just to draw

11    the line but hold the line and make this legislative

12    body accountable and not allow the persuasive

13    executive decision by the Governor to be a force to

14    diminish the black vote, of which those of you who

15    benefited from the Fair Districts Amendment 5 and 6

16    that prohibits politicians from drawing districts

17    that favor themselves and their parties, to ensure

18    that minorities will have the opportunity to elect

19    representatives of their choice.  Let's not allow

20    history to repeat itself.  Thank you.

21          CHAIRMAN SIROIS:  Thank you, ma'am.

22          Cheryl Jones, followed by Ebony Hardy-Allen

23    of Jacksonville.

24          Ma'am, you are recognized.

25          CHERYL JONES:  Hello.  I am Cheryl Jones

HT_0000204
CUBANOS-0000005328

Page 124

1    from Orlando.

2              I want to emphasize that our democracy is

3    under attack.  When you look at this redistricting

4    map, it is clearly and blatantly designed to oppress

5    black voters.

6              And I also want to address the fact that

7    you would not have the speaker under oath.  That

8    simply holds them accountable.  I don't know if

9    others in here have heard, but he's flip-flopped

10   back and forth a few times between here and the

11   Senate, and being under oath holds his word to his

12   record.  So we would like to make sure that as we

13   listen to the speakers, that they are held

14   accountable and that the redistricting map actually

15   does represent the citizens of our state.

16             I live in Orlando, which is currently

17   district 10, but the redistricting will put me in

18   District 11.  And some of the reasons that were

19   stated as to why it's being redistricted are

20   different from other counties.  Other counties are

21   held intact, and I believe that holding our

22   representatives accountable will make a difference.

23             CHAIRMAN SIROIS:  Your time is expired.

24   Thank you, ma'am.

25             Our next speaker is Ebony Hardy-Allen,

HT_0000205
CUBANOS-0000005329

Page 125

1    followed by Indesar Sabris (phonetic) of

2    Jacksonville, and then we'll have Gail Presley of

3    Orlando.

4            Ma'am, you're recognized.

5            EBONY HARDY-ALLEN:  Hello.  My name is

6    Ebony Hardy-Allen.  I'm a voter's right advocate.

7            Since I only have one minute, I'm only

8    going to take 30 seconds because I've sat here, and

9    I prepared a speech.  But I'm not going to use it.

10   I sat here, and I listened.  And I looked at

11   everybody's faces.

12           Three things, this reminds me of a poll

13   tax.  This reminds me of a literacy test.  This

14   reminds me of a paper bag test.  My skin is too

15   dark.  I will not have representation.  If you all

16   vote for this bill, we will remember.  We will vote

17   you out of office.  I am asking that you do not

18   strip us of our representation.  That's all I have

19   to say.  Literacy tests, poll tax, and a paper bag

20   test.

21           CHAIRMAN SIROIS:  Thank you, ma'am.

22           Indesar Sabris of Jacksonville, and then

23   we'll have Gail Presley of Orlando, followed by

24   Hazel Gillis of Jacksonville.

25           Ms. Presley?

Page 126

1          GAIL PRESLEY:  Yes?

2          Come on up.

3          Hazel Gillis will be next, followed by

4    Cecile Scoon.

5          Ma'am, you're recognized.

6          GAIL PRESLEY:  Well, thank you and good

7    afternoon.  Thank you, Chairman.  To all of our

8    House of Representatives, my name is Gail Presley,

9    and I am a proud member of Congressional District

10   Number 10, which is held by none other than our

11   House of Representative.

12          It is disheartening to me here today to

13   hear some of the information that was shared,

14   especially from the attorney today.  I come from a

15   family, who have -- back in the 1960s, listening to

16   some of the stories that they told me about voters

17   rights and how they had to fight so hard to become a

18   voter.  I feel like I'm back in the 1960s today, and

19   it is 2022.

20          I do oppose to the bill that is here today,

21   and I implore you -- because you took an oath to

22   serve the people.  And we are the people.  I am that

23   person, and I do represent Congress -- Congressional

24   District 10, and I do implore you, ladies and

25   gentlemen, to do the right thing --

HT_0000207
CUBANOS-0000005331

Page 127

1            CHAIRMAN SIROIS:  Your time is --

2            GAIL PRESLEY:  -- and vote the right way.

3            CHAIRMAN SIROIS:  Your time is expired.

4            GAIL PRESLEY:  Thank you, Chairman.

5            CHAIRMAN SIROIS:  Thank you very much.

6    Thank you, ma'am.

7            Hazel Gillis, followed by Cecile Scoon, and

8    then we'll have Allison Clark of Maitland.

9            Ma'am, you're recognized.

10            HAZEL GILLIS:  Good evening.  My name is

11    Hazel Gillis.  I am a member of the James Weldon

12    Johnson Branch of the ASALH, the Association for the

13    Study of African American Life and History, and I

14    live in Congressional District 5 in Jacksonville,

15    Florida.

16            Governor Ron DeSantis' rejection of Florida

17    Legislature-drawn maps is a direct attack on black

18    representation in our democracy.  By proposing a

19    congressional map that reduces Florida's black

20    representation in Congress by 50 percent, the

21    Governor is attempting to silence the voices of

22    hundreds of thousands of black voters.

23            We oppose any map that has been drawn by

24    Governor Ron DeSantis.  In 2010, Florida passed the

25    Fair Districts Amendments 5 and 6 that prohibits

HT_0000208
CUBANOS-0000005332

Page 128

1    politicians from drawing districts to favor

2    themselves and their parties and to ensure minority

3    voters have equal opportunity to participate in the

4    political process and have a fair opportunity to

5    elect representatives of their choice --

6               CHAIRMAN SIROIS:  Thank you, ma'am.

7               HAZEL GILLIS:  -- their party.

8               CHAIRMAN SIROIS:  Your time is expired.

9               HAZEL GILLIS:  We must end this

10   manipulation.  Thank you.

11              CHAIRMAN SIROIS:  Cecile Scoon of Panama

12   City.

13              Thank you, ma'am.

14              Cecile Scoon of Panama City, followed by

15   Allison Clark of Maitland, followed by ZsaZsa

16   Ingram-Fitzpatrick of Tallahassee.

17              Ma'am, you are recognized.

18              CECILE SCOON:  Thank you.  Cecile Scoon,

19   President of the League of Women Voters of Florida.

20              What a difference a day makes.  I was here

21   a few weeks ago, and I was really proud of this body

22   when you addressed Mr. Popper, Professor Popper, and

23   he came forth with this idea, turning things on its

24   head and telling you that following the law was

25   illegal.

HT_0000209
CUBANOS-0000005333

Page 129

1      And you literally asked him, do you have a

2  case on point?  And the man said no.  I don't.  And

3  that is the true fact.  You are ignoring Tier 1.

4  Tier 1 actually does not require intent, as Mr.

5  Kelly seemed to be implying and stating.  It goes by

6  impact.  If you do not protect the voting rights and

7  make sure that people have an opportunity to select

8  a representative of their choice if they are a

9  minority by race or language, you are violating Tier

10  1, and you are violating the Florida Supreme Court's

11  standing on the law.  And that's simply the case.

12      They are trying to change the law ahead of

13  time.  The Governor is supposed to enforce the law,

14  not change the law.  The people that write the law

15  are the legislators.  This is all backwards, and

16  it's hurting every single citizen of this state.

17      Yes.  Black people are being targeted, but

18  the destruction of our separation of powers is --

19      CHAIRMAN SIROIS:  Thank you, ma'am.

20      CECILE SCOON:  -- is affecting everyone.

21  Thank you.

22      CHAIRMAN SIROIS:  Thank you, ma'am.  Thank

23  you.

24      CECILE SCOON:  Please vote no.

25      CHAIRMAN SIROIS:  Thank you, ma'am.

HT_0000210
CUBANOS-0000005334

4/19/2022                Common Cause, et al. v. Cord Byrd              Audio Transcription

Page 130

1              Ms. Clark of Maitland, followed by ZsaZsa

2      Ingram-Fitzpatrick of Tallahassee, and then we'll

3      have Myrtle Lucas of Jacksonville.

4              Ma'am, you are recognized.

5              ALLISON CLARK:  Thank you, Mr. Chair.

6              I am Dr. Allison Clark, a native Floridian

7      born in Volusia County, and I live in District 7.  I

8      am here to voice my opposition to this bill.

9              I could cite historical data, statistics,

10     court cases, et cetera that demonstrate the

11     unconstitutionality of the vote that you are about

12     to take, but due to time, I will keep my statement

13     to this.

14             The purpose of this session is clear to the

15     nation and Floridians.  It is to establish a path

16     for the Governor's race for the White House in 2024,

17     and it is a path that is being built on the backs of

18     Florida's black voters.  I ask you to vote no to

19     this bill.

20             CHAIRMAN SIROIS:  Thank you, ma'am.

21             ZsaZsa Ingram-Fitzpatrick, followed by

22     Myrtle Lucas.

23             Ma'am, you are recognized.

24             ZSAZSA INGRAM-FITZPATRICK:  Thank you.

25             I am ZsaZsa Ingram-Fitzpatrick, and I come

HT_0000211
CUBANOS-0000005335

Page 131

1    to give you a brief statement.  It is about facts,

2    rights, and responsibility.  The fact is it is not

3    in the Governor's job description that he should be

4    putting forth maps on redistricting.

5            It is your right to tell him to stay in his

6    lane and do his job, and it is the responsibility of

7    us, the voters, the people who put you in office, to

8    come before you and let you know what we think when

9    we do not like what you're doing.

10           And today I am requesting that you look

11   closely at what is being put forth to dimmish black

12   voters and people of color, our voices within this

13   state, and that you also look at the census and know

14   that we are that sleeping giant because our numbers

15   are not diminishing.  They are growing.  Thank you

16   and vote against this bill.

17           CHAIRMAN SIROIS:  Thank you, ma'am.

18           Myrtle Lucas of Jacksonville, followed by

19   Haraka Carswell of Jacksonville, and then we'll have

20   Ingrid Montgomery.

21           MYRTLE LUCAS:  Okay.  My name is Myrtle

22   Lucas.  I am a member of the James Weldon Johnson

23   Branch of the ASALH, the Association for the Study

24   of African American Life and History, and I live in

25   the Congressional District 5 in Jacksonville,

HT_0000212
CUBANOS-0000005336

Page 132

1    Florida.

2            We oppose any map that has been drawn by

3    the Governor -- by Governor Ron DeSantis.

4    Legislators and Governors are doing this to unfairly

5    rule -- unfairly have it their way.  That's what I'm

6    really going to say.  Okay.  We must end this at the

7    cost to protect our democracy and black voters.  We

8    vote for legislation --

9            CHAIRMAN SIROIS:  Thank you, ma'am.

10           MYRTLE LUCAS:  -- to draw -- no.  I can't

11   sit -- to draw maps for Fair Districts, and we want

12   them to do their job.

13           CHAIRMAN SIROIS:  Thank you, ma'am.  Your

14   time is expired.

15           MYRTLE LUCAS:  Okay.  Enough for Governor

16   DeSantis.

17           CHAIRMAN SIROIS:  Thank you, ma'am.

18           Haraka Carswell, followed by Ingrid

19   Montgomery, and we'll -- no Haraka Carswell?

20           Ingrid Montgomery?

21           Yes, ma'am.

22           HARAKA CARSWELL:  (No audible response)

23           CHAIRMAN SIROIS:  Waive in opposition.

24   Thank you very much.

25           Ingrid Montgomery?

HT_0000213
CUBANOS-0000005337

Page 133

1           INGRID MONTOMERY:  (No audible response)

2           CHAIRMAN SIROIS:  Oh.  My apologies.  Thank

3    you, ma'am.

4           Jasmine Burney-Clark, an opponent of the

5    bill.

6           Odwan Whitfield (phonetic) of Jacksonville,

7    an opponent of the bill.  Are you here to speak?

8    Come on up, sir.  And then we'll have Gwendolyn

9    Colman of Jacksonville.

10          Sir, you are recognized.

11          ODWAN WHITFIELD:  My name is Odwan

12   Whitfield.  I'm in Congressional District 5.  I'm a

13   taxpayer, and I am a United States Army combat

14   veteran.  I fought over in district -- in foreign

15   territories only to come back here to fight for my

16   rights for representation.

17          It bothers me.  It bothers me that we rush

18   through this Committee hearing.  First, it was for

19   the interest of the people.  So you rush the

20   Representatives, and the people come up, and we rush

21   the Representatives.

22          CHAIRMAN SIROIS:  Sir, could you please

23   keep your comments to the legislation.

24          ODWAN WHITFIELD:  It's to you all.  And so

25   what's the rush?  The session is from the 19th until

HT_0000214
CUBANOS-0000005338

Page 134

1   the 22nd.  Why are we rushing so fast?  This affects

2   me and the people in my district.

3           The difference between you all saying that,

4   you know, well, my uncle, auntie, cousin, brother,

5   sister went to war, the difference is they don't

6   have to come back to this.  They don't have to.  Do

7   your jobs.

8           CHAIRMAN SIROIS:  Sir, your time is --

9           ODWAN WHITFIELD:  It isn't fair.

10          CHAIRMAN SIROIS:  Sir, your time is

11   expired.

12          ODWAN WHITFIELD:  Do your jobs.  That's all

13   (indiscernible).

14          CHAIRMAN SIROIS:  Your time is expired.

15   Thank you.

16          Gwendolyn Coleman, Jacksonville.

17          Thank you for your service.

18          Gwendolyn Coleman, an opponent of the bill.

19          Walter Smith of Jacksonville, an opponent

20   of the bill.

21          Kristin Fowailee of Maitland, an opponent

22   of the bill.

23          Dr. Carolynn Zonia, followed by Lisa Perry.

24   Lisa, are you here?  Next will be Joey McKinnon.

25          Ma'am, you are recognized.

HT_0000215
CUBANOS-0000005339

Page 135

1          DR. CAROLYNN ZONIA:  Okay.  Mr. Chairman,

2    Committee members, I'm Dr. Carolynn Zonia.  I'm

3    speaking against the Governor's maps.

4          I just wanted to point out in September

5    2021, the U.S. Department of Justice issued

6    guidelines for Section 2 of the Voting Rights Act,

7    and they clearly state that it's prohibited -- it

8    prohibits any procedure or practices that minimize

9    or cancel out the voting strength of members of

10   racial or language minority groups in the voting

11   population.

12         So whether you vote down the amendment,

13   whether, you know, you're keeping the language in

14   that says that you're limiting where this can be

15   challenge, it's going to be challenged, and it's

16   going to be overturned.  Please vote against the

17   Governor's maps.  Thank you.

18         CHAIRMAN SIROIS:  Thank you, ma'am.

19         Lisa Perry, followed by Joey McKinnon.

20         Mr. McKinnon, you are recognized.

21         JOEY MCKINNON:  Thank you, Chair.

22         CHAIRMAN SIROIS:  I'm sorry.  Excuse me.

23   Lisa Perry is an opponent of the bill.

24         Sir, you're recognized.

25         JOEY MCKINNON:  Thank you, Chair.

HT_0000216
CUBANOS-0000005340

4/19/2022                      Common Cause, et al. v. Cord Byrd                      Audio Transcription

Page 136

 1            My name is Joey McKinnon, and I'm a

 2    resident of the impacted CD 5.  And I'm opposed to

 3    this bill.

 4            During the regular legislative session,

 5    you, the Legislature, produced a map that was

 6    challenged to my knowledge by no one.  Until

 7    Governor DeSantis broke with democratic norms, and

 8    here we are.  And to be fair, I love many of you,

 9    but I didn't want to see you after Easter.

10            Stand by your maps.  You did a good job.

11    How often do people come to this podium and say

12    that?  But stand by your map.  After this past

13    session, it's time to turn down the heat.  We all

14    know that.

15            Today, you have the opportunity to protect

16    the Constitution of the great state of Florida by

17    upholding the Fair Districts Amendments, defend

18    democratic norms, and prioritize people over

19    partisanship, like you did with your maps.  So let's

20    do what's right.  Thank you.

21            Thank you.  We have Charletta Sowell of

22    Jacksonville, waiving in opposition.

23            And finally Joanne Brooks of Jacksonville,

24    waiving in opposition.

25            Members, we are now in debate.

HT_0000217
CUBANOS-0000005341

4/19/2022                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 137

1              Members wishing to debate.

2              Representative Benjamin, you are

3     recognized, followed by Representative Skidmore.

4              REPRESENTATIVE BENJAMIN:   Thank you,

5     Mr. Chair.

6              We're here at this special session and in

7     this Subcommittee to consider the Governor's veto

8     with regards to a map or maps that we sent him that

9     we believed at the time that we sent them that those

10    maps were constitutionally compliant and that those

11    maps were sufficient for representation in our --

12    for our congressional representation.

13             That map held that four seats from Florida

14    would hold black representation in our Congress.

15    And now we're here today discussing a map that will

16    change that representation from four to two.

17             And when we talk about the significance of

18    that, we're told that the contested seating was, in

19    fact, not legal in its iteration.  However, it was

20    not challenged.  It was provided to us by the courts

21    and was never challenged.  That makes it benchmark.

22    That means it had to be analyzed.  That means it was

23    subject to Title 3, or our Fair District Amendment,

24    and that we codify Section 5 of the VRA, which says

25    that we have to protect our representation in our

HT_0000218
CUBANOS-0000005342

Page 138

1    state from regression.

2              We believe that when we did that Title that

3    regression was something that we wanted to protect

4    our state from, and we have long recognized that in

5    the law that we can give greater protections than

6    the federal government.  And it was said by counsel

7    that adhering to state law was not a compelling

8    state interest.

9              Yeah.  I believe that -- and that's not

10   case law.  That's his opinion, and I believe that

11   there is no greater state interest than upholding

12   our Constitution, our Constitution that gives

13   greater protections.  And so we have now decided

14   that we would compromise with the Governor after

15   we've given him constitutionally compliant (sic),

16   but where is the compromise?  He's given us an

17   offer, but where is our counteroffer?  Where is our

18   counter discussions as to what we believe should be

19   right.

20             You've heard a lot of testimony giving here

21   today.  I don't believe that the court got it wrong.

22   I believe that we're getting it wrong now, that

23   black folks matter.  Black representation matters.

24   We sought to ensure that we would not go backwards.

25   Our State Constitution ensured that we would

HT_0000219
CUBANOS-0000005343

Page 139

1   continue to take Florida forward, and in doing so,

2   we enshrined it in law.

3              And so there could be no greater state

4   interest -- there could be no greater compelling

5   interest than to ensure that our laws are upheld

6   when -- especially when they give greater benefit.

7              And so we should vote this down because

8   black votes matter.  Black voters matter.  Black

9   representation matters, and we should give the

10  people what they want.

11             CHAIRMAN SIROIS:  Thank you, Representative

12  Benjamin.

13             Members, just checking in on time,

14  according to my phone, we're at 6:02 now.  I'd like

15  -- my goal is for us to vote or to have a close from

16  Chair Leek at about 6:25.  So if you'd help me stay

17  on track.

18             Representative Skidmore, you are

19  recognized.

20             DEMOCRATIC RANKING MEMBER SKIDMORE:  Thank

21  you, Mr. Chair.

22             I want to thank the folks that traveled

23  from around the state who came to testify today.  We

24  heard they came from all parts of Florida.

25             You know, I just feel that this map clearly

HT_0000220
CUBANOS-0000005344

Page 140

1   violates the Florida Constitution.  Whether it was

2   devised with the intent of denying of abridging the

3   equal opportunity of racial or language minorities

4   to participate in the political process or to

5   diminish the ability to elect representatives of

6   their choice, the fact of the matter is the result

7   is it does.  And that violates the Constitution.

8           If the Governor believes, as he has stated,

9   that a racially gerrymandered district is tantamount

10  to segregation, then why did he leave Congressional

11  District 20 alone?  When all of his objection was on

12  Congressional District 5 and they redrew 18 other

13  districts but they left a racially gerrymandered

14  district alone, that is -- it doesn't jive with what

15  it is that he is saying.

16          And this bill, this map, is

17  unconstitutional because whether it was devised with

18  the intent to favor a political party, the fact of

19  the matter is the result is it does.  Mr. Kelly

20  testified that -- in his testimony that his cleanup

21  of the Legislature's map randomly resulted in a

22  partisan makeup of 20 Republican seats and 8

23  Democratic seats, as widely reported in the media.

24          Members, it's an Easter miracle, and all he

25  was worried about was race neutral.  But remarkably

HT_0000221
CUBANOS-0000005345

Page 141

1    this map has 20 Republican performing seats and 8

2    Democratic seats.  There are so many things wrong

3    with this map.  There are so many things that are

4    wrong with this process and wrong with the

5    Governor's insertion of himself in this map to

6    benefit his Presidential election.

7            I am telling you this is going to come back

8    and bite you.  You should vote no on this.  I don't

9    care how many times we have to come back to get it

10   right.  I will come back.  I will come back.  I will

11   come back.  And you should too.

12           CHAIRMAN SIROIS:  Representative Brown, you

13   are recognized in debate.

14           REPRESENTATIVE BROWN:  Thank you, Mr.

15   Chair.

16           Frankly, I cannot tell you what the purpose

17   of this Committee is -- here is today because it

18   seems as though there are folks within this room

19   that are sort of content with the Governor's

20   decision to run a one-man show with these

21   congressional maps.

22           Not only has this move been unprecedented,

23   but it is unnecessary meddling in its finest on

24   behalf of the Governor.  I find it an honor and a

25   privilege and it is an honor and a privilege that

HT_0000222
CUBANOS-0000005346

Page 142

1   Floridians have elected us to represent them and to

2   really participate in this redistricting process.

3   But it's also our constitutional duty as legislators

4   to do so.

5            And so I refuse to sit here and neglect

6   that.  I refuse to sit here and ignore my

7   constitutional duty, my moral duty, of the people of

8   the state of Florida, who entrusted us to ensure

9   that their voices are heard.

10           They voted some years ago on the Fair

11  District Amendments, and they voted for every

12  legislator in this room.  Our biggest obligation to

13  them, members, is to do what's right.  The biggest

14  obligation is to them and not the Governor.

15           His pride, as it was mentioned by Rep

16  Skidmore, his pride and his ambition to become

17  President by any means necessary only hurts us as a

18  collective, and it hurts us as Floridians.  And we

19  have continually seen this time and time again, just

20  with the many bills that we have been asked to vote

21  on.  We've seen it with SB-90.  We've seen it with

22  last year election's police bill, and all these

23  bills disenfranchise voters.

24           I feel that we should not be allowing

25  someone to bully both chambers and do his bidding

HT_0000223
CUBANOS-0000005347

Page 143

1    without a fight, and so today, on behalf of the many

2    folks that have come here, those that have been

3    silent, those who have not been able to make it here

4    to Tallahassee, I'm here to fight for you as a

5    constituent.  I will be voting no, absolutely.  I'm

6    not here to work for the Governor or his ambition,

7    and so I ask my colleagues, I implore my colleagues,

8    not only in this room but also in the other chambers

9    and the 120 of us to do the same and do what the

10   folks of Florida sent us here to do.

11          CHAIRMAN SIROIS:  Thank you.

12          Representative Harding in debate.

13          REPRESENTATIVE HARDING:  Thank you,

14   Chairman.

15          And, first, I just want to say that I will

16   be supporting House Bill 1-C today, one, because I

17   believe that, as it's been outlined throughout this

18   process today, that I believe it's constitutional,

19   and I believe it's the right result.  But, number

20   two, because there's a process.

21          And today we've talked about -- we've used

22   the term veto several times, but we haven't talked

23   about -- I'm sorry -- we've inserted the term about

24   the Governor proposing a map, but we haven't talked

25   about in the process the Governor has the ability to

HT_0000224
CUBANOS-0000005348

Page 144

1    veto.  That is part of the process.

2             When you get elected, oftentimes, we were

3    told, you know, the first time you have a bill that

4    you want to run, the idea that it's going to pass on

5    its first time is pretty slim.  It does happen, but

6    it's the exception.  It may not work through the

7    process for a variety of reasons, or it may be

8    vetoed.  And you have to come back and reconvene on

9    how do we work to move forward?  And that's what

10   we're doing is moving forward.

11            When I got elected, I tried to do three

12   things when I was running and then also as I've

13   served.  I've tried to be straightforward, try to

14   represent the people that have sent me here, and

15   I've also tried to stay true to my values.

16            And on the straightforward piece, I went

17   back, and there's been discussion today in Committee

18   that the previous map was just this harmonious map

19   that we all loved.  And it was so great.  The fact

20   was that there was not a single Democrat member that

21   voted for the previous map.  So when we point to

22   that as the example, then why did you not support

23   that map?

24            And the second thing I want to point out is

25   that, just as I mentioned previously, there's a

HT_0000225
CUBANOS-0000005349

Page 145

1    process.  We were -- we knew going into

2    redistricting that one of the jobs we had was we

3    could propose our own maps.  That didn't happen.  I

4    have not seen Democrat members that are opposing the

5    bill today propose their own maps in the process.

6              So I want to -- last thing is just to the

7    audience members, I want to thank you for being

8    here.  Whether we agree or disagree, it takes

9    courage to be here, and the term courage was pointed

10   out.  And I like that word courage because it takes

11   courage to speak.  It takes courage to run for

12   office.  It takes courage.

13             But I would implore you to hold the folks

14   accountable that you are celebrating today in

15   opposing this bill by having the courage to propose

16   their own maps, which hasn't happened.

17             So I'll be supporting this bill.  Thank you

18   for being here and speaking, whether we agree or

19   disagree.

20             CHAIRMAN SIROIS:  Representative Joseph in

21   debate.

22             REPRESENTATIVE JOSEPH:  Thank you,

23   Mr. Chair.

24             Black representation matters.  Even if that

25   means you might have a better chance at getting a

HT_0000226
CUBANOS-0000005350

Page 146

1   seat in Congress.  When we think about the amendment

2   that I proposed, right now, even in the bill, there

3   is a little subclause that says federal questions

4   can be addressed in federal court.  So why would we

5   need to add that it needs to go to state courts?

6          Well, if you haven't been following the

7   jurisprudence, the federal courts have relegated

8   dealing with these kinds of redistricting

9   gerrymandering cases in cases where there's

10  partisanship.  They say we're not touching that.  So

11  partisanship is the carrot.

12         We also have indications from the U.S.

13  Supreme Court with questions raised in other

14  litigation about what constitutes a compelling

15  interest.  I would posit that making sure that

16  minority representation exists is a compelling state

17  interest.  Some may disagree.  Some people want us

18  to be race neutral.

19         What race neutral means is that I have the

20  opportunity to ignore the impact on racial

21  minorities when I make a decision that is factually

22  neutral.  That means, on its face, it doesn't take

23  into account race, but in practice, the impact, the

24  effect is that it eliminates, diminishes, decreases,

25  and has the effect of discrimination.

HT_0000227
CUBANOS-0000005351

Page 147

 1              And what we're saying when we pass these

 2      policies, whether it's in this context or in the

 3      context of education or in the context of employment

 4      is we see the pain, but we don't want to see the

 5      pain.  So we're just going to pretend like your pain

 6      does not exist.

 7              It is disgraceful that this legislative

 8      body would be willing to sacrifice black

 9      representation at the alter of this Governor's

10      political ambitions and maybe some of your own.

11      People, Floridians, voters, Americans should have

12      the right to choose their representatives and not

13      the other way around.

14              We should not be stacking the cards --

15      Republicans should not be stacking the cards in

16      their favor 20 to 8 and then have the nerve to come

17      up here and try to say that it was not in

18      consideration of partisanship.

19              All that does is empowers one particular

20      group to continue to ignore the needs of Floridians.

21      Floridians, both Republicans and Democrats, care

22      about things that help us to be healthy, prosperous

23      and safe, whether that means fixing our broken

24      Unemployment Compensation system -- and a number of

25      things that I'm not even going to get into.

HT_0000228
CUBANOS-0000005352

Page 148

1          CHAIRMAN SIROIS:  Representative Joseph,

2    let's try to keep it, you know, within the framework

3    of the bill.

4          REPRESENTATIVE JOSEPH:  Understood.

5          CHAIRMAN SIROIS:  And let's bring it in for

6    a landing because there's others that want to

7    participate.

8          REPRESENTATIVE JOSEPH:  I will do my

9    darndest right now.

10          These maps are not it.  They're not even

11    our maps.  They're the Governor's maps.  This is

12    absurd.  I was so proud of us last time that we even

13    at least made the effort.  It doesn't mean that

14    those maps were perfect.  We identified issues.

15    We're going to have issues.  Just because something

16    isn't perfect doesn't mean it wasn't better.  The

17    other ones were better than this.

18          And I'm disappointed that this is the route

19    that we have decided to go, we, to be clear, my

20    colleagues who will be voting in favor of this map.

21    That's who I mean by we.  But we who are still

22    fighting for the people, whether you're Democrat or

23    Republican, whether you're black or white, we are

24    disappointed with this process, with this

25    legislation, and with the result of decreasing black

HT_0000229
CUBANOS-0000005353

Page 149

1    representation, which will be difficult to challenge

2    in advance of the next elections.

3              CHAIRMAN SIROIS:  Representative Driskell

4    in debate.

5              REPRESENTATIVE DRISKELL:  Thank you,

6    Mr. Chair.

7              Members, no problem can be solved from the

8    same consciousness that created it.  That's Albert

9    Einstein.  And when I look at what we're doing with

10   the redistricting process, it seems to me that we're

11   trying to roll back the clock to the same

12   consciousness that created the problems such that we

13   would need a Voting Rights Act and Fair District

14   Amendments in the first place.

15             I know sometimes our debates get heated in

16   here, and we have very deep issues and values that

17   cause us to disagree.  But I actually have love in

18   my heart for each and every one of you, and when I

19   go back home, people ask me, how is that possible

20   when you hear these bills that are just -- my

21   constituents, many of them perceive to be so mean

22   spirited.  And I say because I'm able to connect

23   with my colleagues on a human level.

24             But I think that we've missed something in

25   the process when we can have people come before us

HT_0000230
CUBANOS-0000005354

Page 150

1   and bare their souls and their fears and their

2   frustrations, and we cannot connect with them on a

3   human level.  What about their humanity?  What do we

4   say to the voters of Gadsden County, the only

5   majority-minority district that we have in the state

6   of Florida?  I'm sorry.  We're taking your

7   representation.  What about their humanity?  I'm

8   worried about our consciousness.  I'm worried that

9   we are going backwards with these maps.

10          Just to address a couple of things.  I know

11   the point was raised that the Democrats in large

12   part did not vote in favor of the congressional maps

13   when we had them before us in regular session.

14   Well, there were some real things wrong with that,

15   starting with we introduced two maps, and the

16   primary map was closer to what the Governor was

17   proposing then, which we thought was

18   unconstitutional.

19          The secondary map was closer to what many

20   of us had worked on with Chair Sirois, and there was

21   starting to be a consensus around.  And I'm not even

22   sure that passing two maps was constitutional,

23   right.  So the only flip that I see -- Democrats,

24   let's be clear, have been real consistent.  The only

25   flip that I see was not from our caucus.

HT_0000231
CUBANOS-0000005355

Page 151

1                    And to the point that was made earlier in

2          testimony, that the Governor, you know, it's no

3          secret that he's, you know, been putting information

4          about there about these maps and what he thinks,

5          that's right.  And guess what?  The Legislature

6          close to ignore that for the most part.  Some of his

7          feedback was taken into the primary map that was

8          passed, but we looked at what the Governor was

9          doing.  We were saying no.  This is wrong.  It's

10         unconstitutional.  The Governor is the executive

11         branch.  That is to execute the law, not to

12         legislate it and to pass it.  That's our job.

13                    Another thing, second, the current law

14         matters.  I heard in testimony today, well, the

15         court got it wrong.  Well, we can opine that all

16         that we want, but the law is the law.  The rule of

17         law matters, and I don't see anything that we've

18         done here that suggests to me that we actually are

19         following in a legal way redistricting principles.

20                    I know.  I got to bring it in for a

21         landing.  Thank you, Mr. Chair.

22                    The third point is just I see so much

23         inconsistency in what's been presented before us

24         where we focused on certain principles for certain

25         regions of the state but not for South Florida.  I

HT_0000232
CUBANOS-0000005356

Page 152

1    don't understand the inconsistency.  It's

2    problematic.  It is rushed.  We need more time,

3    Mr. Chair.  We absolutely just need more time to

4    consider this.  This process is not enough.  I'm

5    down.  Thank you.

6              CHAIRMAN SIROIS:  Representative

7    Hunschofsky.

8              REPRESENTATIVE HUNSCHOFSKY:  Thank you,

9    Mr. Chair.

10             I have to say when I asked to be on this

11   Committee, I was very excited.  I find it an

12   incredible honor to be able to serve in this Florida

13   House of Representatives.  Wherever the outcomes

14   end, I feel so -- it weighs tremendously on me that

15   every vote I make, every decision I make impacts

16   someone's life, and not just their life today but

17   their future.

18             It also is about a sense of trust that we

19   have been entrusted to be the voice and to speak up

20   for the people we represent.  So I was super excited

21   when I got to be on this Committee, and we were told

22   really early on not to talk to people about the

23   maps, not to listen to people about the maps.  And

24   we were given rules to follow.

25             And I followed them.  I listened at every

HT_0000233
CUBANOS-0000005357

Page 153

1   Committee meeting.  Every time something came up, I

2   always went back to the Tier 1 and Tier 2 that the

3   leadership here and the staff here told us this is

4   what we are supposed to follow.  I didn't follow

5   Twitter.  I didn't follow newspapers.  I followed

6   exactly what I was told to follow.

7          This map doesn't follow what I was told we

8   are supposed to follow.  It doesn't matter what the

9   intent is.  It's the result of whether we are

10  denying or abridging the equal opportunity of racial

11  or language minorities to participate in the

12  political process or to diminish their ability to

13  elect representatives of their choice, not the

14  intent but the result.

15         That's a Tier 1 standard, which must come

16  before the Tier 2 standards.  And I, as a local

17  person, always talked about I want to keep our

18  cities together, ad nauseum.  But it's --

19         CHAIRMAN SIROIS:  Representative, if you

20  could -- if you could wrap up your comments please.

21         REPRESENTATIVE HUNSCHOFSKY:  I will --

22         CHAIRMAN SIROIS:  There are others.

23         REPRESENTATIVE HUNSCHOFSKY:  I understand.

24         So what I'm saying is we talk about being

25  race neutral.  I didn't see anywhere in my

HT_0000234
CUBANOS-0000005358

Page 154

1   directions that I'm supposed to be race neutral.  I

2   see that I'm supposed to make sure that we're not

3   diluting representation.

4          There are also concerns in here that now

5   we're picking which courts the challenges come.  We

6   didn't do that in our last maps, and we even put in

7   a $1 million of an appropriation in here for that,

8   that we didn't do prior.  And those are all concerns

9   I have with this map.

10         I don't understand why -- where the

11  difference is that some bodies of water take

12  precedent over other bodes of water, that some

13  weird-shaped districts take priority over some --

14  why 200 miles is worse than 180, and these are all

15  my concerns with this map.

16         CHAIRMAN SIROIS:  Thank you.

17         Representative Latvala.

18         REPRESENTATIVE LATVALA:  Thank you, Mr.

19  Chairman.

20         I think it's slightly disingenuous to say

21  that you were proud of something that you voted

22  against.  The last Speaker, one of the last Speakers

23  said that there was virtually -- and my -- just for

24  the record, I was not referring to Representative

25  Hunschofsky.

HT_0000235
CUBANOS-0000005359

Page 155

1              One of the last Speakers said that the last

2    map had no opposition.  Well, it was apposed by the

3    nonpartisan organization the League of Women Voters,

4    and it was also opposed by every one of my

5    Democratic colleagues.  But other than that, it

6    didn't have any opposition.

7              And, you know, we passed a map, members.

8    the Governor didn't like it, and I remember the day

9    that we passed it on the floor.  One of my

10   Democratic colleagues stood up on the floor and said

11   you all are passing this map for the Governor.

12             We were accused of passing the map for the

13   Governor then, and I didn't agree with that.  And I

14   guess the Governor also didn't think that we passed

15   the map for him because he vetoed it, which is part

16   of his constitutional duties.  He's allowed to do

17   that.

18             Gadsden County was brought up.  We're

19   keeping Gadsden County whole in this map.  We're not

20   including Gadsden County with a county that's 10

21   counties away.

22             I thank all the people that were here to

23   speak to us today.  I thought it was interesting

24   that we had people from Tallahassee and people from

25   Jacksonville that were here, and they were all in

HT_0000236
CUBANOS-0000005360

Page 156

1   the same congressional district.  I grew up in

2   Jacksonville.

3           I voted in -- the first election that I

4   voted in was in 2000.  Back then, my Congressperson

5   represented me, and her congressional district was

6   in Jacksonville.  And it stretched all the way from

7   Jacksonville to Orlando.  Part of it had one side of

8   the street but not the other because it was a, as

9   somebody from the Governor's Office's mentioned, it

10  was a small skinny salamander.  That's called

11  gerrymandering.

12          And so this is a good map.  I will be

13  supporting it.  I will have no regrets, and I think

14  history will judge me just fine, as it will everyone

15  else that votes yes.  Thank you.

16          CHAIRMAN SIROIS:  Representative Leek, you

17  are recognized to close.

18          REPRESENTATIVE LEEK:  Thank you, Mr. Chair.

19          In the interest of time, I'll waive close.

20          CHAIRMAN SIROIS:  Thank you.

21          DJ, please call the roll.

22          THE CLERK:  Chair Sirois.

23          CHAIRMAN SIROIS:  Yes.

24          THE CLERK:  Representatives Benjamin.

25          REPRESENTATIVE BENJAMIN:  No.

HT_0000237
CUBANOS-0000005361

Page 157

```
 1              THE CLERK:  Brown.

 2              REPRESENTATIVE BROWN:  No.

 3              THE CLERK:  Fabricio.

 4              REPRESENTATIVE FABRICIO:  Yes.

 5              THE CLERK:  Fetterhoff.

 6              REPRESENTATIVE FETTERHOFF:  Yes.

 7              THE CLERK:  Harding.

 8              REPRESENTATIVE HARDING:  Yes.

 9              THE CLERK:  Hunschofsky.

10              REPRESENTATIVE HUNSCHOFSKY:  No.

11              THE CLERK:  Joseph.

12              REPRESENTATIVE JOSEPH:  No.

13              THE CLERK:  Latvala.

14              REPRESENTATIVE LATVALA:  Yes.

15              THE CLERK:  Maggard.

16              REPRESENTATIVE MAGGARD:  Yes.

17              THE CLERK:  Massullo.

18              REPRESENTATIVE MASSULLO:  Yes.

19              THE CLERK:  McClure.

20              REPRESENTATIVE MCCLURE:  Yes.

21              THE CLERK:  Morales.

22              REPRESENTATIVE MORALES:  No.

23              THE CLERK:  Perez.

24              REPRESENTATIVE PEREZ:  Yes.

25              THE CLERK:  Plakon.
```

HT_0000238
CUBANOS-0000005362

4/19/2022                Common Cause, et al. v. Cord Byrd                Audio Transcription

Page 158

1           REPRESENTATIVE PLAKON:  Yes.

2           THE CLERK:  Silvers has been excused.

3           Skidmore.

4           DEMOCRATIC RANKING MEMBER SKIDMORE:  No.

5           THE CLERK:  Trabulsy.

6           REPRESENTATIVE TRABULSY:  Yes.

7           THE CLERK:  Truenow.

8           REPRESENTATIVE TRUENOW:  Yes.

9           THE CLERK:  Tuck.

10          VICE CHAIR TUCK:  Yes.

11          THE CLERK:  Williamson.

12          REPRESENTATIVE WILLIAMSON:  Yes.

13          THE CLERK:  Ex Officio Driskell.

14          REPRESENTATIVE DRISKELL:  No.

15          THE CLERK:  Ex Officio Leek.

16          REPRESENTATIVE LEEK:  Yes.

17          THE CLERK:  15 yeas, 7 nays, Mr. Chair.

18          CHAIRMAN SIROIS:  Thank you, DJ.

19          Please show the bill reported favorably.

20          Members, I'd like to thank you for your

21   work today.  I'd like to thank the members of the

22   public that joined us as well.

23          Without objection, the meeting is

24   adjourned.

25                (END OF VIDEO RECORDING)

HT_0000239
CUBANOS-0000005363

Page 159

1                    CERTIFICATE OF TRANSCRIPTIONIST

2          I certify that the foregoing is a true and

3   accurate transcript of the digital recording

4   provided to me in this matter.

5          I do further certify that I am neither a

6   relative, nor employee, nor attorney of any of the

7   parties to this action, and that I am not

8   financially interested in the action.

9

10

11

12

13

14

15

16

17

18

19

20

21

22   _____

23          Julie Thompson, CET-1036

24

25