Page 1

```
_____

Common Cause, et al.      )
                          )
                          )
v.                        ) 4:22-cv-109
                          )
Cord Byrd                 )
_____  )
```

TRANSCRIPTION OF AUDIO RECORDING

HOUSE SESSION - THE FLORIDA  CHANNEL

APRIL 20, 2022

10:00 A.M.

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

HT_0001538
CUBANOS-0000005396

Page 2

1   APRIL 20, 2022

2            MR. SPEAKER:  Members of the House will

3   come to order.  Members, please take your seats.

4   Members and visitors in the gallery, please rise for

5   the prayer.  The prayer today will be given by

6   Representative Payne.

7            Representative Payne, you may approach the

8   wall.

9            REPRESENTATIVE PAYNE:  Thank you, Speaker.

10  Members, please join me in prayer.

11           Father, today we come before you this

12  morning anticipating for what you have in store for

13  us today.  Let us not forget to praise, honor, and

14  worship you.  We are expecting to hear your voice,

15  and we will be willing to be used by you in order to

16  fulfill our faithful duties.  Father, we ask your

17  blessing on all the members of the Legislature, our

18  House and Senate colleagues, our speaker, our senate

19  president, upon our governor, cabinet members and

20  their families.

21           Lord, we are grateful to be living in a

22  democracy, where so many play a part of making sure

23  the needs of Floridians are met.  As we work

24  together to find solutions to difficult problems, we

25  ask that you guide our words so that we speak with

HT_0001539
CUBANOS-0000005397

Page 3

1    respect and humility to one another.

2            And, Father, finally, we ask a special

3    blessing and prayer for those suffering in the war-

4    torn regions of the Ukraine.  Help there be an end

5    to the suffering and violence soon.  Protect those

6    in harm's way.  All these things we ask in your holy

7    name.  Amen.

8            MR. SPEAKER:  Amen.  Thank you,

9    Representative Payne.

10           The clerk will unlock the machine, and

11   members will record their presence.

12           Have all members recorded their presence?

13   All members recorded their presence.

14           Clerk will lock the machine after presence

15   of a quorum.

16           THE CLERK:  One hundred and six members

17   voting in quorum as present, Mr. Speaker

18           MR. SPEAKER:  Members and visitors in the

19   gallery, please remain standing for the pledge.  The

20   pledge this morning will be embedded by

21   Representative Tant from her desk.

22           REPRESENTATIVE TANT:  I pledge allegiance

23   to the flag of the United States of America and to

24   the Republic for which it stands, one nation under

25   God, indivisible, with liberty and justice for all.

HT_0001540
CUBANOS-0000005398

                                                        Page 4

 1              MR. SPEAKER:  Are there corrections to the

 2    journal?

 3              Hearing none.  Show the journal approved.

 4    Are there matters on induction in reference?

 5              THE CLERK:  None on the desk, Mr. Speaker.

 6              MR. SPEAKER:  Are there communications?

 7              THE CLERK:  None on the desk, Mr. Speaker.

 8              MR. SPEAKER:  Are there messages from the

 9    Senate?

10              THE CLERK:  None on the desk, Mr. Speaker.

11              MR. SPEAKER:  Are there reports of the

12    standing committees and subcommittees.

13              THE CLERK:  On the desk, Mr. Speaker.

14              MR. SPEAKER:  Read the report.

15              THE CLERK:  The Honorable Chris Sprowls,

16    speaker, House of Representative.  Dear Mr. Speaker,

17    your rules committee herewith submits a special

18    order for Wednesday, April 20, 2022.

19              Reading of the report, Mr. Speaker.

20              MR. SPEAKER:  Representative Renner, you're

21    recognized in the report?

22              REPRESENTATIVE RENNER:  Mr. Speaker, the

23    report sets the special order calendar and

24    allocation of times for questions and debate

25    contained in the letter, and I move the adoption of

HT_0001541
CUBANOS-0000005399

Page 5

1    the special order report for today, April 20, 2022.

2              MR. SPEAKER:  Are there questions?  Are

3    there questions?  Is there a debate?  All in favor

4    of adoption of the special order calendar, say yea.

5              (Multiple yays)

6              MR. SPEAKER:  All opposed, no.

7              (Multiple nos)

8              MR. SPEAKER:  Show the special order

9    calendar as adopted.  Are there motions relating to

10   committee and subcommittee references?

11             Representative Geller, you're recognized.

12             REPRESENTATIVE GELLER:  Thank you,

13   Mr. Speaker.  I rise to make a motion.

14             MR. SPEAKER:  You're recognized.

15             REPRESENTATIVE GELLER:  I rise pursuant to

16   -- thank you, Mr. Speaker.  I rise to -- pursuant to

17   House Rule 11.12 and now move to refer House Bill

18   1C, establishing the congressional districts to the

19   state to the full redistricting committee and to the

20   appropriations committee.  And with your permission,

21   Mr. Speaker, at the time, I'd like to debate the

22   motion.

23             MR. SPEAKER:  All right.  Members,

24   Representative Geller has moved to move the

25   redistricting bill, which is 1C, to the larger

HT_0001542
CUBANOS-0000005400

Page 6

1    redistricting committee.  This is a debatable

2    motion.  It will pass or not pass by a majority

3    vote.

4              It is debatable.  However, it is only

5    debatable as -- I think as you know, Representative

6    Geller, as to the propriety of the reference.  That

7    is the motion.

8              Representative Geller, you're recognized to

9    debate.

10             REPRESENTATIVE GELLER:  Thank you,

11   Mr. Speaker.  As to the propriety of the reference

12   to both full redistricting and to appropriations,

13   the appropriations is because there's a million-

14   dollar appropriation included in this bill and that

15   should be heard by the appropriations committee.

16   House Bill 1C is a significant bill and it will

17   alter the electoral landscape of this state for up

18   to 10 years for 22 million people.  It's 140 pages,

19   13 sections, in addition to that, a million-dollar

20   appropriation.

21             It was heard yesterday in the congressional

22   redistricting subcommittee, where speakers from

23   across the state came to testify on its impact.  At

24   the end, because of time constraints, some of those

25   members of the public were given very short periods

HT_0001543
CUBANOS-0000005401

Page 7

1   of time, I believe, 60 seconds, and there was just

2   the one hearing.  And I understand that in one

3   hearing, there is a limit, but the bill should be

4   treated as every other bill that we've seen.

5           I don't believe there is a rule.  It's up

6   to the discretion of the House, but I can't recall a

7   bill that's gone directly from subcommittee to rules

8   and special order without going through a full

9   committee.  That's why we have committees.  That's

10  the purpose of it.  And the principle -- the

11  jurisdiction here is the full redistricting

12  committee.  Not referring it and having it heard

13  there is a departure from our customs and practice.

14          There is time it could have been done.  It

15  could still be done.  And some of us on full

16  redistricting have spent many months preparing for

17  this exact thing, and we have questions.  We studied

18  this process and debate that should be heard.  An

19  assumption of a rule that we adopted this year on

20  time management, were for the first time, beginning

21  in this -- well, I would say this term last year --

22          MR. SPEAKER:  Representative Geller, we're

23  getting outside the propriety of the reference.

24  Just keep your debate to the propriety of the

25  reference.

HT_0001544
CUBANOS-0000005402

Page 8

1          REPRENTATIVE GELLER:  Yes, Mr. Speaker.

2     The assumption we make about full committee is that

3     after subcommittee, full committees will completely

4     vet issues, and that's why limiting time is now a

5     rule that we have.  If this is supposed to be an

6     open and transparent, publicly accessible practice,

7     we need to have it heard in accordance with what we

8     have always done heretofore, and it belongs in those

9     full committees.

10          And, therefore, I asked the House,

11     consistent with our practice, procedure, and

12     tradition, to refer this bill to the full

13     redistricting committee and to the appropriations

14     committee.  I believe we could get that squeezed in,

15     if that was the choice that the House makes.  And I,

16     therefore, ask for your favorable support in this

17     motion.

18          MR. SPEAKER:  All right.  Members,

19     Representative Geller having closed on his motion

20     under Rule 11.12, members, now we will vote as a

21     majority vote whether or not to send those bills --

22          Representative Joseph, we just did -- he

23     just closed on his motion.

24          REPRESENTATIVE JOSEPH:  (Indiscernible)

25          MR. SPEAKER:  On the propriety of the

HT_0001545
CUBANOS-0000005403

Page 9

1    reference.  I went to Representative Geller because

2    I didn't see any other microphones, so he just

3    closed on his motion.

4          REPRESENTATIVE JOSEPH:  (Indiscernible)

5          Representative Joseph, would you like to be

6    recognized and debate?

7          REPRENTATIVE JOSEPH:  I would.

8          MR. SPEAKER:  You're recognized.

9          REPRESENTATIVE JOSEPH:  Thank you.  Thank

10   you, Mr. Speaker, and I apologize for interjecting.

11   We just didn't have the opportunity to debate.  I

12   was waiting for that time.  This is a highly unusual

13   process that we're in right now.  The Legislature

14   has a constitutional duty to draw our redistricting

15   maps.

16         MR. SPEAKER:  Representative Joseph, you

17   have to keep your debate to the propriety of the

18   reference.

19         REPRESENTATIVE JOSEPH:  I understand.

20         MR. SPEAKER:  You're recognized.

21         REPRESENTATIVE JOSEPH:  Thank you,

22   Mr. Speaker.  I understand.  I'm just trying to

23   explain that.  So as far as making sure that we re-

24   reference it, part of the purpose is so that we can

25   fully do our jobs.  That's one.  Because as a member

HT_0001546
CUBANOS-0000005404

Page 10

```
 1   of the sub-committee that addressed these
 2   congressional redistricting maps, we were cut off in
 3   questions.  Our debate was limited.  The comments
 4   from the public was limited.  That does not comport
 5   to procedural nor substantive due process, which is
 6   what this whole thing is supposed to be about.  We
 7   are not giving the public a reasonable opportunity
 8   to participate.  We're not giving people --
 9           MR. SPEAKER:  Representative Joseph, would
10   you like to debate on the propriety of the
11   reference?  That is not what you're doing.  If you
12   would like to confine your debate to the propriety
13   of the reference, I'll recognize you.  You're
14   recognized.
15           REPRESENTATIVE JOSEPH:  Thank you,
16   Mr. Speaker.  So for all of those reasons, I believe
17   that it should be re-referenced to at least the
18   first committee.  But because there is also a $1
19   million appropriation that attaches to it, it should
20   also, as is the practice, be assigned to an
21   appropriations committee.
22           When we look at the information that was
23   provided to us, as far as the impact, we don't have
24   that.  So for those reasons, I rise in support of
25   the motion and ask that members would consider
```

HT_0001547
CUBANOS-0000005405

Page 11

1  voting up, if not for us, then for the people of

2  Florida to allow the public to have a reasonable

3  opportunity to participate and to have our members

4  have an opportunity to fully execute our duties and

5  to fully vet what we're about to vote on.  Thank

6  you.

7          MR. SPEAKER:  Is there additional debate?

8  Is there additional debate?

9          Seeing none, members will now proceed to

10  vote, please.

11          Representative Robinson, you're recognized

12  in debate on the propriety of the reference.

13          REPRESENTATIVE ROBINSON:  Thank you,

14  Mr. Speaker.  And I just wanted to be on record

15  saying I truly agree that we should, I mean, just

16  follow the process.  We come up here, and we have

17  all these different pieces of legislations that we

18  file and then -- now, I'm a freshman member, but it

19  appears that we pick and choose which one of the

20  pieces of legislation is going to actually follow

21  the full process.

22          I believe that this is something that's

23  hugely -- that's going to affect all Floridians, and

24  it should go through appropriations.  Besides, they

25  have a million dollars on it.  And yes, it should go

HT_0001548
CUBANOS-0000005406

Page 12

1    to the full redistricting committee.  Everyone

2    should be able to voice their opinion and really

3    truly vet this particular piece of legislation.  So

4    I hope that all of my colleagues truly would.  Let's

5    just follow the process.  It's the process we do for

6    everything else.  Let's not change on this

7    particular piece of legislation.

8              MR. SPEAKER:  Any additional debate,

9    members?  Any additional debate?

10             Seeing none, all in favor of adoption of

11   Representative Geller's motion say yea.

12             (Multiple yeas)

13             MR. SPEAKER:  All opposed, no.

14             (Multiple nos)

15             MR. SPEAKER:  Show the motion fails.

16             Are there matters on reconsideration?

17             THE CLERK:  None on the desk, Mr. Speaker.

18             MR. SPEAKER:  Are there bills on joint

19   resolutions on third reading?

20             THE CLERK:  None on the desk, Mr. Speaker.

21             MR. SPEAKER:  Are there bills on the

22   special order calendar?

23             THE CLERK:  On the desk, Mr. Speaker.

24             MR. SPEAKER:  Read the first bill.

25             THE CLERK:  By Representative Leek, House

HT_0001549
CUBANOS-0000005407

Page 13

1    Bill 1C, a bill to be entitled, an act establishing

2    the congressional districts of the state.

3              MR. SPEAKER:  Before we get there,

4    Representative Leek, I forgot to mention today is

5    Representative Fine's birthday.

6              Happy birthday, Representative Fine.

7              I'd ask everybody to be nice to

8    Representative Fine today, but let's be honest,

9    that's not going to happen.

10             MR. SPEAKER:  Representative Leek, you're

11   recognized.

12             REPRESENTATIVE LEEK:  Thank you,

13   Mr. Speaker.

14             Members, today we will be presenting Map

15   P000C0109.  This is the map reflected in the data

16   packet in front of you as well as being posted on

17   the Florida redistricting.gov website.  This

18   congressional map is an improvement upon the

19   benchmark map with regard to Tier 2 metrics.

20             This map improves county splits by keeping

21   50 counties whole as opposed to the 49 from last

22   decade.  It allows 396 cities to remain whole as

23   opposed to 373 in the benchmark map, and it improves

24   upon all three mathematical measures of compactness

25   with respective scores of 0.47 for REOC, 0.81 for

HT_0001550
CUBANOS-0000005408

Page 14

1    the convex hull, and 0.43 for Polsby-Popper.

2           This map also satisfies the appropriate

3    population deviation at plus or minus a single

4    person.  As you may be aware, there are 10 districts

5    in this map that are the exact copies of districts

6    that the Legislature passed during regular session.

7    Those are Congressional Districts 1, 2, 20, 21, 22,

8    23, 24, 25, 27, and 28.  You can see those here on

9    the screen.  The remaining 18 districts have been

10   newly proposed by the Governor's office and consist

11   of the Congressional Districts 3 through 19 and 26

12   as now seen on the screen.

13          Given that these 18 districts are the new

14   content for this body to review, I would like to

15   focus the majority of my presentation today on those

16   districts.  I am more than happy to take questions

17   on the Legislature's districts as well, but I don't

18   want to belabor the explanation of districts that

19   we've already extensively reviewed.

20          Districts 4 and 5.  Let's begin in

21   Northeast Florida with Districts 4 and 5.  As

22   described yesterday in committee by the Governor's

23   map drawer, Plan P000C0109 creates two new districts

24   in Northeast Florida, consistent with maps

25   previously proposed by the Governor's office.  These

HT_0001551
CUBANOS-0000005409

Page 15

 1   two districts are race neutral and overall more

 2   compact than the configuration of Districts 4 or 5

 3   that were previously passed by the Legislature.

 4           The boundary lines between the two

 5   districts are mostly the St. Johns River.  As you

 6   know, Jacksonville is the one city in the state that

 7   is larger than a congressional district.  It has

 8   over 900,000 people and must be split.  And the

 9   river, which nearly equally divides the city, stands

10   out as a recognizable boundary for these two

11   districts.  The southern boundaries of Districts 4

12   and 5 are still exactly as the Legislature proposed

13   them, previously using the Clay Putnam County lines,

14   and where the split occurs within St. John's County

15   is the same.

16           District 6 through 16 and 18.  The next

17   several slides visualized changes the central

18   Florida region and on the west coast from Citrus

19   County down to Lake County.  As described yesterday

20   in committee by the Governor's map drawer, looking

21   holistically at the region in keeping Brevard,

22   Osceola, and Polk Counties all whole, as was the

23   case of the legislatively passed maps, in effect

24   creates a wall across three quarters in the state.

25   Breaking that wall in Polk County essentially gives

HT_0001552
CUBANOS-0000005410

Page 16

1  more flexibility and considering the different

2  options for creating more compact districts and more

3  adherence to political and geographical boundary

4  lines in those northwestern Gulf counties of the

5  state.  So in effect, splitting Polk County allowed

6  for additional considerations.  For example, one

7  Tier 2 improvement that was made by splitting Polk

8  County was being able to keep Citrus and Sarasota

9  Counties whole.

10          District 9 was improved by smoothing its

11  visual and mathematical compactness, including

12  picking up portions of Poinciana, and Polk, and

13  Osceola counties, including the lake that

14  essentially represents that piece of Polk County

15  that, otherwise, sticks into Osceola County.

16  District 9 also extends out slightly at the

17  northwest Osceola border utilizing Highway 27 Ronald

18  Reagan Parkway.  This helps with statistical and

19  visual compactness of several districts in the

20  region.

21          These changes also helped create a visually

22  more compact District 11 by essentially turning the

23  wheel of the population.  District 11 shifts from

24  the angle shape present in the previous legislative

25  version to a more circular shape, and in

HT_0001553
CUBANOS-0000005411

Page 17

1   combination, by reshaping Districts 7, 10, 11, and

2   12 allowed for a one less county split in Marion

3   County from three splits down to two splits within

4   the county.

5           District 6 through 11.  The next slide

6   shows changes in district 6 through 11 found in the

7   Greater Orlando region.  As described yesterday in

8   committee by the Governor's map drawer, these

9   changes return to House concepts found in Plan 8011

10   and also follow more closely with Senate concepts in

11   regards to CD 8.

12           For CD 8, instead of taking the district

13   into southern Volusia County to get the last bit of

14   population, District 8 instead goes into Eastern

15   County.  This means this proposed plan only splits

16   Volusia County twice rather than three times.  This

17   brings the configuration of District 7 down to the

18   Volusia Brevard County line without increasing the

19   number of districts in Orange County.

20           Essentially, there was a turning of the

21   population wheel in order to not have any negative

22   impact around Orange County while also decreasing

23   the amount of splits in Volusia County.

24           District 10 in this plan is similar to Plan

25   8011 that passed the Congressional redistricting

HT_0001554
CUBANOS-0000005412

Page 18

```
 1   subcommittee and is very compact, keeping several

 2   cities whole within either Districts 9, 10, or 11.

 3   The City of Maitland is kept whole in District 10,

 4   and the cities of Apopka and Winter Garden are kept

 5   whole in District 11.

 6             The boundaries between these districts are

 7   very much defined by keeping the aforementioned

 8   cities whole, utilizing county boundaries.  For

 9   example, District 10 uses a seminal Orange County

10   line or utilizes major well-recognized roadways and

11   waterways except where necessary to get equal

12   population.  The western boundary of District 10

13   between Districts 10 and 11 is largely the Apopka

14   Vineland Road.

15             The borders between District 6 and 11 in

16   the Lake County area is mostly defined by city

17   boundaries and waterways with Lady Lake, Eustis,

18   Mount Dora entirely in District 6, and Fruitland

19   Park, Leesburg, and Tavares entirely in District 11.

20             Moving now over to the west coasts in

21   Districts 11 through 17.  As described yesterday in

22   committee by the Governor's map drawer,

23   Congressional District 12 now includes all of Citrus

24   and Hernando Counties, which helps provide a much

25   more squared up shape, improving visual compactness.
```

HT_0001555
CUBANOS-0000005413

Page 19

1            District 12 is actually still the majority

2    of Pasco County, yielding about 141,000 Pasco County

3    residents in District 15.  The boundaries between

4    Districts 12 and 15 are almost entirely defined by

5    state roads and municipal boundary lines.

6    Zephyrhills is entirely included in District 15 and

7    St. Leo, San Antonio, and Dade City are entirely

8    within District 12.

9            District 13 is wholly within Pinellas

10   County.  Starting in the western part of the county

11   and working east, Districts 13 and 14 largely

12   utilize US 19 as a divider within Pinellas County

13   except where equal population is achieved in the

14   unincorporated Feather Sound area just north of St.

15   Pete.

16           District 14 starts eastward and moves

17   northward in Tampa Bay.  The boundaries of the

18   district are defined by clear recognizable

19   boundaries like major roadways while trying to

20   maintain something of a square or rectangular shape

21   for District 13 to keep it visually and

22   mathematically compact.  The linkage of districts in

23   this area are predominantly along roadways including

24   in the northern portion of Districts 14 and 15.

25           Similarly, District 12 and Pasco County

HT_0001556
CUBANOS-0000005414

Page 20

```
 1  uses a large portion of the Suncoast Parkway squared
 2  off at a county road that essentially takes the
 3  Suncoast Parkway south before heading east over to
 4  the municipality of Temple Terrace.  Temple Terrace
 5  is kept whole within District 15.
 6              Districts 16 and 17 keep both Manatee and
 7  Sarasota County's whole.  District 16 uses State
 8  Road 62 as a clear divider.  That is also utilized
 9  in Polk County where Districts 15 and 18 come
10  together.  This also allows Plant City to be kept
11  whole in District 15.  And despite going into three
12  counties, approximately two-thirds of district 15 is
13  populated by Hillsborough County residents.
14              Largely, due to the Tier 2 decision of
15  keeping Sarasota County whole and creating District
16  17 with all of Sarasota, all of Charlotte and
17  unincorporated portions of Lake Counties, the newly
18  composed District 17 required moving the entirety of
19  Hendry County in District 18 and then finding
20  approximately 4,500 residents elsewhere.  This plan
21  equalizes the population of District 18 and Collier
22  County, which was already split once.
23              District 18 extends along State Road 82
24  down State Road 29 North, and then east along County
25  Road 46 to get those additional 3500 residents of
```

HT_0001557
CUBANOS-0000005415

Page 21

1   District 18 to balance out the population.

2           District 26 had to further extend the

3   western boundaries closer towards unincorporated

4   East Naples, utilizing roadways and waterways as

5   boundaries between 26 and 19 in order to balance the

6   population between all of these cities.  Even though

7   Polk County is now split in this map, District 18 --

8   it's actually, about two-thirds of the residents are

9   from Polk and one-third from six rural counties.

10          Additionally, this bill appropriates $1

11  million to the Department of State for expenses

12  related to litigation of the congressional map.

13  This bill also includes language relating to state

14  courts.  It requires any state court challenge to

15  the congressional map to be filed in Leon County.

16  It requires all challenges based on state law to be

17  filed in state court rather than in federal court.

18          Under the 11th Amendment to the United

19  States Constitution, the State is immune from suit

20  and federal court on state law grounds.  This

21  provision reaffirms the State's immunity under the

22  11th Amendment and makes clear that the State does

23  not waive that immunity.  This provision also

24  permits any state court challenge to raise both

25  state law claims and to the extent the Circuit Court

HT_0001558
CUBANOS-0000005416

Page 22

1   has jurisdiction federal law claims.  And finally,

2   it makes it explicit that nothing in the bill

3   precludes federal courts from deciding challenges

4   based on federal law.

5            Mr. Speaker, that is the bill.

6            MR. SPEAKER:  Members, we are now in

7   questions on the bill.  Questions on the bill.

8            Representative Willhite, you're recognized.

9            REPRESENTATIVE WILLHITE:  Thank you,

10  Mr. Speaker.  Would you recognize Representative

11  Geller?

12           MR. SPEAKER:  Representative Geller? You're

13  recognized.

14           REPRESENTATIVE GELLER:  Thank you,

15  Mr. Speaker, and thank you for recognizing the

16  motion before.  I appreciate that.

17           Chair Leek, how are you this morning?  I

18  have a number of questions, Chair.  Let me ask you.

19  I understand this is not really necessarily for you

20  to answer, but do you know why we're not going

21  through the full committee?

22           MR. SPEAKER:  Representative Geller, I

23  think you answered your own question by saying it's

24  probably not appropriate to ask.  You're recognized.

25           REPRESENTATIVE GELLER:  Thank you,

HT_0001559
CUBANOS-0000005417

4/20/2022                 Common Cause, et al. v. Cord Byrd              Audio Transcription

                                                                    Page 23

1    Mr. Speaker.

2              Chair, who drew this map?

3              MR. SPEAKER:  Chairman Leek, you're

4    recognized.

5              REPRESENTATIVE LEEK:  The Governor's

6    office.

7              MR. SPEAKER:  Representative Geller, you're

8    recognized.

9              REPRESENTATIVE GELLER:  Thank you,

10   Mr. Speaker.

11             And who specifically?

12             MR. SPEAKER:  Representative Leek.

13             REPRESENTATIVE LEEK:  Yesterday, in

14   committee, Mr. Alex Kelly said that he drew the map.

15             MR. SPEAKER:  Representative Geller.

16             REPRESENTATIVE GELLER:  Do you know with

17   whom Mr. Kelly consulted in the drawing of the map?

18             MR. SPEAKER:  Representative Leek.

19             REPRESENTATIVE LEEK:  Thank you.

20             Yesterday, Mr. Kelly said that he was the

21   only one who drew this map.  I can't tell you who,

22   you know -- and let's talk about this generally.

23   You know, just like we couldn't speak to the Senate

24   process, I can't speak to the Governor's entire

25   process.  I can only tell you what Mr. Kelly said.

HT_0001560
CUBANOS-0000005418

Page 24

1          MR. SPEAKER:  Representative Geller.

2          REPRESENTATIVE GELLER:  Thank you,

3    Mr. Speaker.

4          Did he acknowledge having consulted with

5    some out-of-state consultants who worked with other

6    states in map drawing?

7          MR. SPEAKER:  Representative Leek.

8          REPRESENTATIVE LEEK:  Thank you,

9    Mr. Speaker.  Yes.

10         MR. SPEAKER:  Representative Geller.

11         REPRESENTATIVE GELLER:  Did he identify who

12   those people were?

13         MR. SPEAKER:  Representative Leek.

14         REPRESENTATIVE LEEK:  Yes.

15         MR. SPEAKER:  I think we know the next

16   question.  Representative Geller.

17         REPRESENTATIVE GELLER:  Thank you,

18   Mr. Speaker.  And I think I forgot my "Thank you,

19   Mr. Speaker" on the previous questions.  So thank

20   you for both.

21         And who did he identify those people as

22   being by name, sir?

23         MR. SPEAKER:  Representative Leek.

24         REPRESENTATIVE LEEK:  Thank you,

25   Mr. Speaker.

HT_0001561
CUBANOS-0000005419

Page 25

1          I believe his name was Adam Foltz, who he

2     also explained had only ever drawn for state

3     governments.

4          MR. SPEAKER:  Representative Geller.

5          REPRESENTATIVE GELLER:  Do we have any

6     information that would lead us to know one way or

7     another whether or not, in that consultation or in

8     that drawing, our constitutional standards that the

9     map could not be drawn for the purposes of

10    protecting any incumbent or advancing the interests

11    of any political party were in fact observed?

12         MR. SPEAKER:  Representative Leek.

13         REPRESENTATIVE LEEK:  Thank you,

14    Mr. Speaker.

15         I'll do the best I can with the question.

16    I'm not sure I entirely understand.  The evidence

17    that you have is before you in this map and in the

18    testimony that Mr. Kelly gave in committee.

19         MR. SPEAKER:  Representative Geller.

20         REPRESENTATIVE GELLER:  Thank you,

21    Mr. Speaker.

22         Well, of course, Chair Leek, I actually

23    don't have before me the testimony from the

24    subcommittee.  I'm not a member.  That's why I'm

25    asking you whether or not there was something

HT_0001562
CUBANOS-0000005420

Page 26

1   presented, since it was your bill, and you were

2   present.

3            MR. SPEAKER:  Representative Leek.

4            REPRESENTATIVE LEEK:  This was presented.

5   The testimony was presented.  There is no testimony

6   that would make me conclude that what you're

7   suggesting happened.

8            MR. SPEAKER:  Representative Geller.

9            REPRESENTATIVE GELLER:  Thank you,

10  Mr. Speaker.

11           Looking at the map itself, what infirmity

12  in previous maps past led us to decide that changes

13  were necessary in Tampa Bay?

14           MR. SPEAKER:  Representative Leek.

15           REPRESENTATIVE LEEK:  Thank you,

16  Mr. Speaker.

17           I don't believe that's in the map before

18  you.  So what we're going through today is the map

19  that's before you, not prior maps.

20           MR. SPEAKER:  Representative Geller.

21           REPRESENTATIVE GELLER:  Thank you,

22  Mr. Speaker.

23           But my question is: we had a map that we

24  deemed constitutional -- well, I did not, but the

25  Chamber apparently deemed it constitutional.  As to

HT_0001563
CUBANOS-0000005421

Page 27

1    the Tampa Bay area, what required a change there?

2              MR. SPEAKER:  Representative Leek.

3              REPRESENTATIVE LEEK:  Thank you,

4    Mr. Speaker.

5              I don't know that anything required a

6    change.  And as we have said many, many times

7    before, that there are innumerable number of maps

8    that can be illegally compliant.  So this map is

9    simply different than the map that you saw before.

10             MR. SPEAKER:  Representative Geller.

11             REPRESENTATIVE GELLER:  Thank you,

12   Mr. Speaker.

13             Is there a theory at play here that since

14   two is twice the number of one, that Tier 2

15   standards have become twice as important as Tier 1

16   standards?

17             MR. SPEAKER:  Representative Leek.

18             REPRESENTATIVE LEEK:  Thank you,

19   Mr. Speaker.

20             No.

21             MR. SPEAKER:  Representative Geller.

22             REPRESENTATIVE GELLER:  Why then do we

23   constantly hear about Tier 2 standards as if

24   compactness or political boundaries mattered most

25   when we're flagrantly ignoring the requirement of

HT_0001564
CUBANOS-0000005422

Page 28

1    protecting minority districts and going against

2    explicit language?

3             MR. SPEAKER:  Representative Geller --

4    Representative Geller, we're getting to your --

5    sounds like your debate for tomorrow.  Do you have a

6    specific question about as it relates to aspects of

7    this map?  You're recognized.

8             REPRESENTATIVE GELLER:  Thank you,

9    Mr. Speaker.

10            Why are we not emphasizing the Tier 1

11   standards and seem to be ignoring them in favour of

12   Tier 2 standards?

13            MR. SPEAKER:  I think it's going to be

14   difficult for Chairman Leek to answer that question,

15   Representative Geller.  Can you point to a specific

16   part of the map that you're referencing?

17            REPRESENTATIVE GELLER:  I'm done,

18   Mr. Speaker.  Thank you very much.

19            MR. SPEAKER:  Additional questions?

20            Representative Willhite.

21            REPRESENTATIVE WILLHITE:  Thank you,

22   Mr. Speaker.  Would you recognize Representative

23   Driskell?

24            MR. SPEAKER:  Representative Driskell,

25   you're recognized.

HT_0001565
CUBANOS-0000005423

Page 29

1          REPRESENTATIVE DRISKELL:  Thank you,

2     Mr. Speaker.

3          Good morning, Chair Leek.  I had some

4     questions about Tampa Bay.  So I was curious we

5     talked about it a little bit in committee yesterday,

6     but weren't really able to get into the details with

7     the time limits.  But it looks like what we have in

8     this map actually follows a similar strategy that

9     was used about a decade ago that was -- resulted in

10    the maps being struck down in Tampa Bay, that the

11    Court determined it was a partisan gerrymander.

12    And I'm just looking at CD 14, and it looks like

13    there are so many democrats packed in there that it

14    could lead to the same partisan gerrymander.  Could

15    you explain for me how we have arisen to the CD 14

16    that's now in the map before us today?

17          MR. SPEAKER:  Representative Leek.

18          REPRESENTATIVE LEEK:  Thank you,

19    Mr. Speaker.

20          I can't speak to the Governor's map

21    drawer's process.  What I can tell you is the facts

22    that were, you know, unique to the case that

23    occurred many years ago are just that, unique to

24    that case.  This map stands on its own.

25          MR. SPEAKER:  Representative Driskell.

HT_0001566
CUBANOS-0000005424

Page 30

1          REPRESENTATIVE DRISKELL:  Thank you,

2    Mr. Speaker.

3          I also wanted to try to understand because

4    in the intro to the presentation, we heard that the

5    -- I thought we heard that the county splits were

6    made better.  But as best I can tell, looking at

7    8060 and 8019, it's the same number of county

8    splits.  So how is this an improvement?

9          MR. SPEAKER:  Representative Leek.

10          REPRESENTATIVE LEEK:  By one less county

11    split.

12          MR. SPEAKER:  Representative Driskell.

13          REPRESENTATIVE DRISKELL:  Thank you,

14    Mr. Speaker.

15          And in terms of cities in the area of Tampa

16    Bay, your map adds or creates a new city split in

17    St. Pete and Lakeland but which were both kept hold

18    in 8019.  Can you explain how this is more Tier 2

19    compliant?

20          MR. SPEAKER:  Representative Leek.

21          REPRESENTATIVE LEEK:  Thank you,

22    Mr. Speaker.  No.  I can't speak to why the

23    Governor's map drawer chose, you know, this road or

24    that river over another road or another river.  What

25    I can tell you is that they are both equally Tier 2

HT_0001567
CUBANOS-0000005425

Page 31

1  compliant.

2          MR. SPEAKER:  Representative Driskell.

3          REPRESENTATIVE DRISKELL:  Thank you,

4  Mr. Speaker.

5          And given that the Legislature seems to be

6  following the Governor's direction at this, from

7  what I understood from the Governor, his only

8  complaints were about Northeast Florida, really

9  about CD 5 and maybe CD 4.  That being the case, why

10  are we making adjustments to CD 14 and CD 15 in

11  Tampa Bay?

12          MR. SPEAKER:  Representative Leek.

13          REPRESENTATIVE LEEK:  Thank you,

14  Mr. Speaker.

15          Again, not speaking to the Governor's

16  process but I don't think that's a fair premise.

17  You know, if you looked back at the various maps

18  that have come through, they have changed over and

19  over and over again.  And it is still true that you

20  cannot change one line without changing most lines.

21  And so in this instance, we were -- the Governor was

22  able to pick up ten of our districts that we had

23  drafted.  So I don't think that it's fair to say

24  that the Governor's premise was only on CD 5 in the

25  northeast area.  I think that what this map

HT_0001568
CUBANOS-0000005426

Page 32

1    represents is an entire improvement on the map.

2              MR. SPEAKER:  Representative Driskell.

3              REPRESENTATIVE DRISKELL:  Thank you,

4    Mr. Speaker.

5              So I noticed that here there's a lot of

6    talk about following county lines and trying to

7    minimize county splits, but how is following county

8    lines not just a pretext for partisan gerrymandering

9    here?  8019 splits pretty much just as many counties

10   as your map.  So if 8060 were adapted to make CD 5

11   just in Duvall, it would actually split two fewer

12   counties than your map.  So how is what we're seeing

13   today by following county lines not really just a

14   pretext for the partisan gerrymandering, as we see

15   that the map that the Governor has presented results

16   in a significant Republican advantage over the

17   benchmark maps?

18             MR. SPEAKER:  Representative Leek.

19             REPRESENTATIVE LEEK:  Thank you,

20   Mr. Speaker.

21             As is the case with the prior maps, I'm not

22   -- we haven't done a performance analysis to know

23   those types of things.  Maybe you guys have, but we

24   have not, so I can't speak to the partisan

25   performance of it.

HT_0001569
CUBANOS-0000005427

Page 33

1            MR. SPEAKER:  Representative Willhite.

2            Representative Brown, you're recognized.

3            REPRESENTATIVE BROWN:  Thank you,

4     Mr. Speaker.

5            We heard yesterday there was a compromise

6     by -- that this was a compromising product.  Can you

7     speak to that compromise?  What were some of the

8     compromises?

9            MR. SPEAKER:  Representative Leek.

10           REPRESENTATIVE LEEK:  Thank you,

11    Mr. Speaker.

12           I want to make one thing clear.  Governor's

13    office drew the map.  Our folks did not draw the

14    map.  It is apparent that the Governor's office drew

15    a map that was informed by the prior maps that we

16    have driven.  You can see that because of the 10

17    exactly identical districts that we had in our prior

18    maps.  I believe that that's what the Governor's

19    office meant by compromise.

20           MR. SPEAKER:  Representative Willhite.

21           REPRESENTATIVE WILLHITE:  Thank you,

22    Mr. Speaker.

23           Do you recognize Representative Davis?

24           MR. SPEAKER:  Representative Davis, you're

25    recognized.

HT_0001570
CUBANOS-0000005428

Page 34

1             REPRESENTATIVE DAVIS:  Thank you,

2   Mr. Speaker.

3             Representative, will either District 4 or 5

4   perform for black candidates of choice?

5             MR. SPEAKER:  Representative Leek.

6             REPRESENTATIVE LEEK:  Thank you,

7   Mr. Speaker.

8             No.

9             MR. SPEAKER:  Representative Davis.

10           REPRESENTATIVE DAVIS:  Thank you,

11   Mr. Speaker.

12           Has any analysis been done to prove yes or

13   no?

14           MR. SPEAKER:  Representative Leek.

15           REPRESENTATIVE LEEK:  Thank you,

16   Mr. Speaker.

17           Yes.  Recall on the prior maps that we did

18   a functional analysis on CD 5.

19           MR. SPEAKER:  Representative Davis.

20           REPRESENTATIVE DAVIS:  Thank you,

21   Mr. Speaker.

22           So no analysis, again, just for clarity,

23   has been performed on these maps -- on this map?

24           MR. SPEAKER:  Representative Leek.

25           REPRESENTATIVE LEEK:  Thank you,

HT_0001571
CUBANOS-0000005429

Page 35

1    Mr. Speaker.

2              Yes.  On CD 4, our staff did a functional

3    analysis and confirmed that it does not perform.

4              MR. SPEAKER:  Representative Davis.

5              REPRESENTATIVE DAVIS:  Thank you,

6    Mr. Speaker.

7              In terms of compactness, have you looked at

8    whether the Governor's version or the version where

9    Districts 4 and 5 stack up on top of each other with

10   the line going straight through Duvall, and would it

11   be better on compactness?

12             MR. SPEAKER:  Representative Leek.

13             REPRESENTATIVE LEEK:  Thank you,

14   Mr. Speaker.

15             I'm not sure I understand that question.

16   Can you rephrase it?

17             MR. SPEAKER:  Representative Davis.

18             REPRESENTATIVE DAVIS:  I would.  And

19   looking at the Governor's versions of the map, the

20   version where CD 4 and CD 5 are stacked on top of

21   each other with the line going straight through,

22   would it be a difference if we reconfigured that for

23   compactness?

24             MR. SPEAKER:  Representative Leek.

25             REPRESENTATIVE LEEK:  Thank you,

HT_0001572
CUBANOS-0000005430

Page 36

1    Mr. Speaker.

2            We can't do that hypothetically, so we

3    would have to see an exact configuration.  Remember,

4    each district will result in a unique compactness

5    score.

6            MR. SPEAKER:  Representative Davis.

7            REPRESENTATIVE DAVIS:  Thank you,

8    Mr. Speaker.  I think this is my last question for

9    now.

10           When we were -- when we charged the

11   Governor's office with the ability to draw these

12   constitutional maps using the constitutional

13   criteria, do you have any idea of the hierarchy,

14   because these are the Governor's maps, with the

15   geographic boundaries?  For example, did we say that

16   it was more important to follow the major roads and

17   highways as boundaries?

18           MR. SPEAKER:  Representative Leek.

19           REPRESENTATIVE LEEK:  Thank you,

20   Mr. Speaker.

21           I don't want to give the indication that

22   I'm accepting your premise, but I can tell you what

23   they told us yesterday in committee about the

24   hierarchy.  And they said they came in more in

25   alliance with -- alignment with the House and

HT_0001573
CUBANOS-0000005431

Page 37

1   Senate's use of Tier 2 criteria than they had

2   previously.

3            MR. SPEAKER:  Representative Davis.

4            REPRESENTATIVE DAVIS:  Thank you,

5   Mr. Speaker.  And last question.

6            Because the Governor drew -- Governor's

7   office drew these maps, were these maps ever

8   presented to you or your team prior to being here

9   today or prior to being in the committee room

10  yesterday?

11           MR. SPEAKER:  Representative Leek.

12           REPRESENTATIVE LEEK:  Thank you,

13  Mr. Speaker.

14           Yes.  I believe, as has been indicated, I

15  got a preview of the maps, the map that you are

16  seeing today, the Governor's office explained those

17  maps to me, to Chair Seroy (phonetic), and to Ms.

18  Kelly.  I think the Senate has also indicated that

19  that same week, they got the same briefing on those

20  maps, but it is the map that you see today without

21  changes.

22           MR. SPEAKER:  Representative Willhite.

23           REPRESENTATIVE WILLHITE:  Thank you,

24  Mr. Speaker.  Would you recognize Representative

25  Williams?

HT_0001574
CUBANOS-0000005432

Page 38

```
1                 MR. SPEAKER:  Representative Williams,

2     you're recognized.

3                 REPRESENTATIVE WILLIAMS:  Thank you,

4     Mr. Speaker.

5                 Chair Leek, when you spoke of the Tiers,

6     you said we're using Tier 2 now instead of Tier 1.

7     Could you tell why are we choosing to go to Tier 2

8     instead of Tier 1?

9                 MR. SPEAKER:  Representative Leek.

10                REPRESENTATIVE LEEK:  Thank you,

11    Mr. Speaker.

12                No.  I did not say that.

13                MR. SPEAKER:  Representative Williams.

14                REPRESENTATIVE WILLIAMS:  Are we using Tier

15    2 now instead of Tier 1?

16                MR. SPEAKER:  Representative Leek.

17                REPRESENTATIVE LEEK:  Thank you,

18    Mr. Speaker.

19                No.

20                MR. SPEAKER:  Representative Williams.

21                REPRESENTATIVE WILLIAMS:  You spoke of

22    unique compacts in each one of these districts.  Can

23    you tell me why?

24                MR. SPEAKER:  Representative Leek.

25                REPRESENTATIVE LEEK:  Thank you,
```

HT_0001575
CUBANOS-0000005433

Page 39

1   Mr. Speaker.

2            Very simply, with the redrawing of any

3   district, it would likely result in a different

4   compactness score based on whichever test you use.

5            MR. SPEAKER:  Representative Williams.

6            REPRESENTATIVE WILLIAMS:  The difference

7   are -- what was the difference?  I'm sorry, I didn't

8   understand.

9            MR. SPEAKER:  Representative Leek.

10           REPRESENTATIVE LEEK:  Thank you,

11  Mr. Speaker.

12           When you change the shape in any way of a

13  district, it can result in a different compactness

14  score.  So any variation in a district may result in

15  a different compactness score.  I hope that answers

16  your question.

17           MR. SPEAKER:  Representative Williams.

18           REPRESENTATIVE WILLIAMS:  Was it taken into

19  consideration that we would be eliminating a seat

20  that would usually be held by a black candidate?

21           MR. SPEAKER:  Representative Leek.

22           REPRESENTATIVE LEEK:  Thank you,

23  Mr. Speaker.

24           Was what taken into consideration and what?

25           MR. SPEAKER:  Representative Williams.

HT_0001576
CUBANOS-0000005434

Case 1:24-cv-21983-JB   Document 126-14   Entered on FLSD Docket 08/19/2025   Page 40 of
103
4/20/2022             Common Cause, et al. v. Cord Byrd          Audio Transcription

Page 40

1          REPRESENTATIVE WILLIAMS:  When the decision

2    was made to use Tier 2 instead of Tier 1 and/or the

3    uniqueness of the compact in each one of the

4    districts.

5          MR. SPEAKER:  Representative Leek.

6          REPRESENTATIVE LEEK:  Thank you,

7    Mr. Speaker.

8          Those things aren't related.

9          MR. SPEAKER:  Representative Williams?

10   Okay.

11          Representative Willhite.

12          REPRESENTATIVE WILLHITE:  Thank you,

13   Mr. Speaker.  Do you recognize Representative

14   Joseph?

15          MR. SPEAKER:  Representative Joseph, you're

16   recognized.

17          REPRESENTATIVE JOSEPH:  Thank you,

18   Mr. Speaker.

19          Chair Leek, the Latino Policy and Politics

20   Initiative at UCLA released a report analyzing

21   Latino voting patterns in South Florida,

22   specifically regarding redistricting.  Are you

23   familiar with that report?

24          MR. SPEAKER:  Representative Leek.

25          REPRESENTATIVE LEEK:  Thank you,

HT_0001577
CUBANOS-0000005435

Page 41

1    Mr. Speaker.

2              No.  I am not.

3              MR. SPEAKER:  Representative Joseph.

4              REPRESENTATIVE JOSEPH:  Would you happen to

5    know if the Governor's office is familiar with that

6    report?

7              MR. SPEAKER:  Representative Leek.

8              REPRESENTATIVE LEEK:  Thank you,

9    Mr. Speaker.

10             No.  I do not.

11             MR. SPEAKER:  Representative Joseph.

12             REPRESENTATIVE JOSEPH:  Thank you,

13   Mr. Speaker.

14             So the report finds that a separate --

15   there are separate and distinct Latino voting blocks

16   in South Florida and throughout Florida that vary by

17   geography and ethnicity, and that it clearly shows

18   that Latino voters do not vote in the same way in

19   South Florida.  Continuing to draw the lines based

20   on that faulty assumption denies all Latino voters

21   the ability to elect candidates of their choice --

22             MR. SPEAKER:  Representative Joseph, do you

23   have a question about the map?  You're recognized.

24             REPRESENTATIVE JOSEPH:  Thank you, Mr.

25   Speaker.  Yeah, it's coming.  That's the next thing.

HT_0001578
CUBANOS-0000005436

Page 42

1              So right now, I want to draw your attention

2      to the maps that we have before us, specifically as

3      regards to CD 26, which I asked a little bit about

4      in committee yesterday.  In committee, the

5      Governor's office testified that part of their

6      rationale in drawing that particular district, CD

7      26, was because they wanted to maintain Hispanic

8      voters there, and he had to go around and get

9      different population.

10             My question for you is, do you know -- so

11     knowing what I just said about the Latino report

12     that came out of the Latino Policy and Politics

13     Initiative at UCLA and the denial of Latino voters

14     of their voting rights, looking at CD 26, what would

15     you say would be the impact of that, had the

16     Governor's office had that information?  Would we

17     have adjusted the map, or would we just leave it the

18     way it is?

19             MR. SPEAKER:  Representative Joseph, I

20     think you're asking Representative Leek to comment

21     on the veracity of a report he's already said he

22     hasn't read.  So do you have a question about that

23     specific district?  You're recognized.

24             REPRESENTATIVE JOSEPH:  Thank you, Mr.

25     Speaker.

HT_0001579
CUBANOS-0000005437

Page 43

1           I'm not asking for about the veracity of

2    the report.

3           Just knowing that you should not lump all

4    Latino voters together, which is the point of the

5    report, so forget the report for a second. But if

6    we're accepting the premise that not all Latino

7    voters, whether they're coming from Cuba, other

8    parts of Central and South America, they may not

9    vote the same way.  Would it be appropriate to lump

10   them all into one congressional district such as CD

11   26, which is before us?

12           MR. SPEAKER:  Representative Leek.

13           REPRESENTATIVE LEEK:  Thank you,

14   Mr. Speaker.

15           I'll try.  I think your premise is

16   accepting the veracity of the report, which I have

17   not read.  And I think your question is asking the

18   hypothetical, what would someone else have done with

19   that information, which I cannot answer.

20           MR. SPEAKER:  Representative Joseph.

21           REPRESENTATIVE JOSEPH:  Mr. Speaker, let me

22   try to ask it a different way.

23           Would you acknowledge that not all Hispanic

24   voters vote consistently Republican or consistently

25   Democrat in the state of Florida?

HT_0001580
CUBANOS-0000005438

Page 44

1        MR. SPEAKER: Representative Leek.

2        REPRESENTATIVE LEEK: Thank you,

3 Mr. Speaker.

4        If you're asking me to get to the legal

5 conclusion about cohesion, I can't get there with

6 you, right. If you're asking me whether people vote

7 differently and race is not necessarily a

8 determinant on how they vote, I would agree with

9 that.

10        MR. SPEAKER: Representative Joseph.

11        REPRESENTATIVE JOSEPH: Thank you.

12        Yes. I was looking for the second answer

13 to the second question, not the first. Not looking

14 for a legal conclusion. Now, in terms of -- our

15 counsel, the House counsel, it's my understanding,

16 asked the Florida Supreme Court to overturn the

17 requirement that minority groups be politically

18 cohesive in order to be protected from diminishment.

19 And it's my understanding that the Supreme Court

20 declined to accept the House lawyer's invitation to

21 overturn that precedent. Is that correct? Did I

22 understand that correctly?

23        MR. SPEAKER: Representative Leek.

24        REPRESENTATIVE LEEK: Thank you,

25 Mr. Speaker.

HT_0001581
CUBANOS-0000005439

Page 45

1          I think you're talking about the Governor's

2     request for an advisory opinion in which the House

3     joined.  And yes.  The Supreme Court declined to

4     give an advisory opinion.

5          MR. SPEAKER:  Representative Joseph.

6          REPRESENTATIVE JOSEPH:  Thank you.

7          So going back to CD 26, let's focus on the

8     Tier 2 analysis and some of the drawbacks that we

9     see it because we identified some drawbacks in the

10    prior maps that the House had drawn for CD 26, which

11    we addressed in committee, and I think staff made an

12    attempt to address.  But now, in the Governor's map,

13    we still have some Tier 2 deficiencies.  So looking

14    at the map, I see that there is an additional split

15    of Collier, and it cuts the Immokalee community in

16    half following local streets like County Road 846,

17    which isn't our geographic boundaries database.

18         So considering those infirmities with the

19    current map that we have as it relates to CD 26,

20    have you or anybody concluded that those Tier 2

21    drawbacks are necessary to maintain Tier 1

22    compliance to keep that Hispanic voting group

23    together?

24         MR. SPEAKER:  Representative Leek.

25         REPRESENTATIVE LEEK:  Thank you,

HT_0001582
CUBANOS-0000005440

Page 46

1    Mr. Speaker.

2         Again, I can't tell you what the map drawer

3    was thinking when he chose this particular Tier 2

4    criteria over that particular Tier 2 criteria.  I

5    can tell you a review of the map shows that it is --

6    this map is equally Tier 2 compliant.

7         MR. SPEAKER:  Representative Joseph.

8         REPRESENTATIVE JOSEPH:  Thank you,

9    Mr. Speaker.

10        When you say it's equally Tier 2 compliant,

11   tell me what analysis you're relying on to state

12   that answer here today.

13        MR. SPEAKER:  Representative Leek.

14        REPRESENTATIVE LEEK:  Thank you,

15   Mr. Speaker.

16        The review of the Governor's map by our

17   staff.

18        MR. SPEAKER:  Representative Joseph.

19        REPRESENTATIVE JOSEPH:  Thank you,

20   Mr. Speaker.

21        Because I just identified the deficiencies,

22   and I don't see anything to make sure that they're

23   equal because it looks like it's clearly deficient

24   under Tier 2, not even Tier 1 criteria.

25        MR. SPEAKER:  Representative Leek.

HT_0001583
CUBANOS-0000005441

Page 47

1            REPRESENTATIVE LEEK:  Thank you,

2   Mr. Speaker.

3            I suspect the answer lies that we don't

4   agree it's deficient.

5            MR. SPEAKER:  Representative Joseph.

6            REPRESENTATIVE JOSEPH:  Thank you,

7   Mr. Speaker.

8            So Section 7 of the bill at lines 36

9   through 27, and lines 36 through 47 limits venue for

10   actions challenging federal congressional districts

11   to state courts.  Can you tell me what your

12   rationale was for that limitation and restriction of

13   venue?

14            MR. SPEAKER:  Representative Leek.

15            REPRESENTATIVE LEEK:  Thank you,

16   Mr. Speaker.  Let me address the issue of venue

17   globally, and then we can get into the specifics.

18   You know, globally, the idea is that -- and first of

19   all, it's not new, right.  Most actions against the

20   state have to come through Tallahassee.  That is a

21   prerogative in this case would be the Department of

22   State that gets sued; that is the prerogative of the

23   state to have that done.  This specifies that.

24   Also, we had a carve out, which we discussed

25   yesterday, that says any federal issue can be

HT_0001584
CUBANOS-0000005442

Page 48

1    brought in federal court.

2            MR. SPEAKER:  Representative Joseph.

3            REPRESENTATIVE JOSEPH:  Thank you,

4    Mr. Speaker.

5            Well, any federal issue can always be

6    brought in federal court.  That's a matter for the

7    supremacy clause.  I guess my question for you is

8    why specifically choose state courts as opposed to

9    federal courts as the venue for federal

10   congressional districts?  And so that I ask -- maybe

11   flesh out the question a little bit more, why not

12   just leave it the way it is now?  What's the impetus

13   for having to even make that specific restriction?

14           MR. SPEAKER:  Representative Leek.

15           REPRESENTATIVE LEEK:  Thank you,

16   Mr. Speaker.

17           The rationale for having the venue clause

18   is that all of the challenges should be brought

19   within the same court.  And we believe that court

20   should be a state court as this is an act of the

21   State.  The rationale for having them want to be

22   brought in the same state court is so you don't end

23   up with disparate decisions by different judges

24   across the state.

25           MR. SPEAKER:  Representative Joseph.

HT_0001585
CUBANOS-0000005443

Page 49

1              REPRESENTATIVE JOSEPH:  I agree that it

2     would be good to have one court manage most of those

3     claims, but there are going to be times where

4     specifically considering the fact that the

5     Governor's basis for drawing these maps as he's

6     espoused is to set up a challenge to the Voting

7     Rights Act based on the 14th Amendment, which is a

8     federal question.  So knowing that, why not allow

9     federal courts to address that federal

10    constitutional issue as the primary basis?  There's

11    always supplemental jurisdiction, as you're aware.

12    So why federal court as opposed to state court based

13    on your rationale?

14              MR. SPEAKER:  Representative Leek.

15              REPRESENTATIVE LEEK:  Thank you,

16    Mr. Speaker.

17              This language would allow precisely what

18    you're saying.

19              MR. SPEAKER:  Representative Joseph.

20              REPRESENTATIVE JOSEPH:  Thank you,

21    Mr. Speaker.

22              Yesterday, the presenter from the

23    Governor's office made reference to the

24    Legislatures' preferred approach to Tier 2

25    compliance, and I don't know where that came from.

HT_0001586
CUBANOS-0000005444

Page 50

1    I don't remember specifically hearing that in

2    committee, because in committee, we had talked about

3    the prioritization of Tier 1 versus Tier 2, and I

4    know staff had focused on Tier 2.  So to the extent

5    that there is some kind of policy decision that was

6    made by the Congressional Redistricting Committee --

7    the larger Congressional Redistricting Committee

8    that I may not be aware of, can you espouse that for

9    us today?  Like, what is the basis for the

10   preference of Tier 2 over Tier 1 to the extent it

11   even is a preference?

12           MR. SPEAKER:  Representative Leek.

13           REPRESENTATIVE LEEK:  Thank you,

14   Mr. Speaker.

15           First of all, there is no preference for

16   Tier 2 over Tier 1.  What the Governor's office was

17   talking about was whether to use communities of

18   interest or what they call CDPs as opposed to Tier 2

19   standards.  We have decided in our process to use

20   Tier 2 standards.  And initially, I think the

21   Governor's map relied more on communities of

22   interest.  And now, with the most recent map, they

23   rely on Tier 2 standards.

24           MR. SPEAKER:  Representative Joseph.

25           REPRESENTATIVE JOSEPH:  Thank you,

HT_0001587
CUBANOS-0000005445

Page 51

1    Mr. Speaker.

2           And thank you for the response.  There's a

3    million-dollar allocation attached to this

4    particular item which was not in the maps we

5    previously considered.  Can you tell me how that

6    million dollars was calculated?  What's the basis

7    for that?

8           MR. SPEAKER:  Representative Leek.

9           REPRESENTATIVE LEEK:  Thank you,

10   Mr. Speaker.

11          The million dollars is -- well, first of

12   all, the state was always going to have to pay for

13   the litigation regardless of whether we put it in

14   this bill or not.  The million dollars is a rough

15   estimate of what it would cost for this litigation.

16          MR. SPEAKER:  Representative Joseph.

17          REPRESENTATIVE JOSEPH:  Thank you.

18          In light of those anticipated litigation

19   costs, I guess I'm just wondering how that rough

20   estimate came about.  You know, you and I both serve

21   as counsel for various government entities, and

22   sometimes we get a quote from outside counsel.  Is

23   it based on particular billable hours?  Like, what

24   is the basis for that estimate?

25          MR. SPEAKER:  Representative Leek.

HT_0001588
CUBANOS-0000005446

Page 52

1          REPRESENTATIVE LEEK:  Thank you,

2    Mr. Speaker.

3          I don't have the formula that was used, but

4    that's what the folks tell us.

5          MR. SPEAKER:  Representative Joseph

6          REPRESENTATIVE JOSEPH:  All right.  Last

7    question on that point.  It didn't go through

8    appropriations committee, so how are we coming at a

9    million?  Like, why couldn't it be 500 -- and I'm

10   not trying to be facetious.  I'm really just trying

11   to get a gauge as to how that number popped up.  And

12   if there is no answer --

13         MR. SPEAKER:  Representative Joseph, I

14   think it's asked and answered.  Do you have an

15   additional question?

16         All right.  Representative Willhite.

17         REPRESENTATIVE WILLHITE:  Thank you,

18   Mr. Speaker.  Do you recognize Representative

19   Alexander?

20         MR. SPEAKER:  Representative Alexander,

21   you're recognized.

22         REPRESENTATIVE ALEXANDER:  Thank you,

23   Mr. Speaker.

24         And thank you, Chairman Leek.  In the

25   Governor's advisory opinion request to the Supreme

HT_0001589
CUBANOS-0000005447

Page 53

1  Court on February 1st, he spoke specifically to

2  geography as a justification for some of his

3  concerns.  Am I correct in understanding that the

4  proposed CD 2 stretches 180 miles?

5          MR. SPEAKER:  Representative Leek.

6          REPRESENTATIVE LEEK:  Thank you,

7  Mr. Speaker.

8          That's not one of the measures that we

9  have.  We don't measure that.  So I can't answer

10  your question.

11          MR. SPEAKER:  Representative Alexander.

12          REPRESENTATIVE ALEXANDER:  Thank you,

13  Mr. Speaker.

14          Am I correct that the Governor is proposing

15  this map that we're going to be voting on tomorrow?

16          MR. SPEAKER:  Representative Leek.

17          REPRESENTATIVE LEEK:  Thank you,

18  Mr. Speaker.

19          Yes.

20          MR. SPEAKER:  Representative Alexander.

21          REPRESENTATIVE ALEXANDER:  Mr. Speaker.

22          So I'm speaking, Chairman Leek, to the

23  advisory opinion, which I think sets the predicate

24  and the premise for his proposed map.  He spoke

25  specifically to geography, to the existing CD 5.  So

HT_0001590
CUBANOS-0000005448

Page 54

1    I'm asking just for clarification in regards to the

2    actual size based off mileage -- of miles for the

3    proposed CD 2.

4              MR. SPEAKER:  Representative Leek.

5              REPRESENTATIVE LEEK:  Thank you,

6    Mr. Speaker.

7              I'll do the best -- I cannot -- I believe I

8    have heard the Governor say it's 180 miles.  I

9    haven't validated that number.  I don't know if it's

10   an estimate or how accurate it is.

11             MR. SPEAKER:  Representative Alexander.

12             REPRESENTATIVE ALEXANDER:  Thank you,

13   Mr. Speaker.

14             And based off, I think, the information

15   provided, I think you are correct.  And I do believe

16   the existing CD 5 expands around about 198 miles, so

17   they're pretty similar.  I'm going to continue on --

18   in reference to the proposed map, would you suggest

19   that it is a very unique situation in the 67

20   counties in Florida, that a county would have a

21   majority African American population?

22             MR. SPEAKER:  Representative Leek.

23             REPRESENTATIVE LEEK:  Thank you,

24   Mr. Speaker.

25             I actually don't know the answer to that

HT_0001591
CUBANOS-0000005449

Page 55

1    question.

2              MR. SPEAKER:  Representative Alexander.

3              REPRESENTATIVE ALEXANDER:  Thank you,

4    Mr. Speaker.

5              I'll try to ask it in a different way.  In

6    regards to the proposed map, there is only one based

7    off what is been presented to us, one county in the

8    State of Florida that has a majority African

9    American population, Gadsden County.  Based off of

10   that in the Tier 1 standard, does this proposed map

11   diminish those citizens from electing a

12   representative of their choice?

13             MR. SPEAKER:  Representative Leek.

14             REPRESENTATIVE LEEK:  Thank you,

15   Mr. Speaker.

16             And the diminishment question is one the

17   Court's ultimately going to have to answer.

18   However, I do not believe Gadsden County has

19   population sufficient to constitute a congressional

20   district without knowing for certain, but I don't

21   believe they do.

22             MR. SPEAKER:  Representative Alexander.

23             REPRESENTATIVE ALEXANDER:  Thank you,

24   Mr. Speaker.

25             And I recognize that aspect of it, Chairman

HT_0001592
CUBANOS-0000005450

Page 56

1    Leek.  But what I'm trying to get an understanding

2    of is, the only majority county that is African

3    American in the State of Florida, will they have the

4    opportunity to elect the representative of their

5    choice, based off the proposed map?

6              MR. SPEAKER:  Representative Leek.

7              REPRESENTATIVE LEEK:  Thank you,

8    Mr. Speaker.

9              And I can't begin to speak to what the

10   citizens of Gadsden County -- who they will vote

11   for.  I think somebody made the point earlier.  You

12   can't assume by race they will vote the same.  I

13   think that that's probably true.  So I can't begin

14   to tell you what those citizens would do, given the

15   -- you know, the variations in candidates and the

16   like.  There's just no way I can tell you that.

17             MR. SPEAKER:  Representative Alexander.

18             REPRESENTATIVE ALEXANDER:  Thank you,

19   Mr. Speaker.

20             And we won't get into that aspect of it.

21   And I do believe that is appropriate.  Let's just

22   move on real quick so I can understand the proposed

23   map, because the premise -- and I'm having this

24   challenge here because on the state maps, we kept

25   talking about minority protected districts.  We kept

HT_0001593
CUBANOS-0000005451

Page 57

1   talking about black protected districts.  We're

2   talking about Tier 1 standard, and poof, it just

3   disappeared.  And so I'm trying to wrap my mind

4   around that to understand the core essence of this.

5   And so based off of that methodology and that

6   perspective, the proposed map will have how many

7   minority access seats, since we've already

8   established that there are minority access seats in

9   the State of Florida?

10         MR. SPEAKER:  Representative Leek.

11         REPRESENTATIVE LEEK:  Thank you,

12   Mr. Speaker.

13         One, I have to dispute your premise.  Tier

14   1 is still a viable option in here.  There are

15   protected districts in here.  It didn't disappear,

16   right.  But your specific question is: under the

17   Governor's map, how many protected districts do we

18   have?  We have two black and three Hispanic

19   protected districts.

20         MR. SPEAKER:  Representative Alexander.

21         REPRESENTATIVE ALEXANDER:  Thank you,

22   Mr. Speaker.  So there are two black protected

23   districts, and so that was suggested.  There is an

24   underlying rationale that there are and there is a

25   need to have those type of districts in the State of

HT_0001594
CUBANOS-0000005452

Page 58

1   Florida; is that correct?

2          MR. SPEAKER:  Representative Leek.

3          REPRESENTATIVE LEEK:  Thank you,

4   Mr. Speaker.

5          Yes.

6          MR. SPEAKER:  Representative Alexander.

7          REPRESENTATIVE ALEXANDER:  Thank you,

8   Mr. Speaker.

9          I'm going to try to wrap it up.  And so

10  based off of that, let me get some clarification.

11  We are now currently at four black protected

12  districts.  And so the Governor's proposed map will

13  decrease it to two; is that correct?

14         MR. SPEAKER:  Representative Leek.

15         REPRESENTATIVE LEEK:  Thank you,

16  Mr. Speaker.

17         Actually, we were at three in the House.

18  Then the Governor's map has two.

19         MR. SPEAKER:  Representative Alexander.

20         REPRESENTATIVE ALEXANDER:  Thank you,

21  Mr. Speaker.

22         I'm talking about currently in the State of

23  Florida, not in a proposal.  I believe there are

24  four, correct?

25         MR. SPEAKER:  Representative Leek.

HT_0001595
CUBANOS-0000005453

Page 59

1            REPRESENTATIVE LEEK:  Thank you,

2     Mr. Speaker.

3            Actually, no.  There are only three current

4     black protected districts.

5            MR. SPEAKER:  Representative Alexander.

6            REPRESENTATIVE ALEXANDER:  Thank you,

7     Mr. Speaker.

8            For the record, can you tell me what those

9     three are?

10           MR. SPEAKER:  Representative Leek.

11           REPRESENTATIVE LEEK:  Thank you,

12    Mr. Speaker.

13           In the benchmark map, it's 5, 20, and 24.

14           MR. SPEAKER:  Representative Alexander.

15           REPRESENTATIVE ALEXANDER:  Thank you,

16    Mr. Speaker.

17           Can we speak to the rationale?  And I'm

18    almost done, Mr. Speaker.  And thank you for your --

19    for the graciousness in the back and forth.  I have

20    the utmost respect for Chairman Leek.  What was the

21    premise of having racial or minority access

22    districts in the first place?  Can you speak to

23    that?

24           MR. SPEAKER:  Representative Leek.

25           REPRESENTATIVE LEEK:  Thank you,

HT_0001596
CUBANOS-0000005454

Page 60

1    Mr. Speaker.

2            I want to be careful here because minority

3    access district is not a phrase used in the law.

4    It's commonly used by media.  But I think the --

5    that premise is echoed in the Tier 1 standards.

6            MR. SPEAKER:  Representative Alexander.

7            REPRESENTATIVE ALEXANDER:  Mr. Speaker.

8            And the Tier 1 standards are in the

9    constitution, correct?

10           MR. SPEAKER:  Representative Leek.

11           REPRESENTATIVE LEEK:  Thank you,

12   Mr. Speaker.

13           They are in the Florida Constitution.  They

14   are not of the United States Constitution.

15           MR. SPEAKER:  Representative Alexander.

16           REPRESENTATIVE ALEXANDER:  Thank you,

17   Mr. Speaker.

18           Are there any federal laws that speak to

19   this type of representation as well, like civil

20   rights act of anything?

21           MR. SPEAKER:  Representative Leek.

22           REPRESENTATIVE LEEK:  Thank you, Mr.

23   Speaker.

24           I think you're referring to the Voting

25   Rights Act.  The Voting Rights Act does, and, of

HT_0001597
CUBANOS-0000005455

Page 61

1    course, the 14th Amendment that doesn't allow you to

2    discriminate on the basis of race.

3              MR. SPEAKER:  Representative Alexander.

4              REPRESENTATIVE ALEXANDER:  Thank you,

5    Mr. Speaker.

6              And so, based off of that -- I'm trying to

7    get clarification because I believe that history is

8    important.  And I appreciate the time.  So during

9    the period of reconstruction, how many black

10   representatives were there in the State of Florida?

11             MR. SPEAKER:  Represent Leek.

12             REPRESENTATIVE LEEK:  Thank you,

13   Mr. Speaker.

14             I don't know.

15             MR. SPEAKER:  Representative Alexander.

16             REPRESENTATIVE ALEXANDER:  Thank you,

17   Mr. Speaker.

18             And it was one.  And from 1871, there was

19   only one.  And then it took until 1992 to get three.

20             I'm done with my questions.

21             REPRESENTATIVE LEEK:  All right.

22             MR. SPEAKER:  Representative Willhite.

23             REPRESENTATIVE WILLHITE:  Thank you,

24   Mr. Speaker.  I'm sorry, where was I going next?

25   Representative Learned, I'm sorry.

HT_0001598
CUBANOS-0000005456

Page 62

1         MR. SPEAKER:  Representative Learned,

2    you're recognized.

3         REPRESENTATIVE LEARNED:  Thank you,

4    Mr. Speaker.

5         And thank you, Chairman Leek.  That was an

6    enlightening series of questions.  I wanted to ask

7    first, because earlier in one of your answers, you

8    were talking about how this map was better because

9    it divided one last county.  But my understanding in

10   looking at it is it divides Saint Pete in the way

11   that Saint Petersburg has never been divided before;

12   is that correct?

13        MR. SPEAKER:  Representative Leek.

14        REPRESENTATIVE LEEK:  Thank you,

15   Mr. Speaker.

16        I don't know the history of the division of

17   Saint Pete.

18        MR. SPEAKER:  Representative Learned.

19        REPRESENTATIVE LEARNED:  Thank you,

20   Mr. Speaker.

21        So Saint Petersburg in the maps that we

22   passed and that, you know, we all agreed were good

23   at the time, was in one district.  Now, it's in two.

24   And that's because this district appears to cross

25   Tampa Bay.  I wanted to make sure that I understand

HT_0001599
CUBANOS-0000005457

Page 63

1    correctly that District 14, as you've drawn it in

2    this -- or that the Governor drew in this map, does,

3    in fact, cross Tampa Bay in a way that we all

4    collectively decided we didn't want to do with our

5    map.

6           MR. SPEAKER:  Representative Leek.

7           REPRESENTATIVE LEEK:  Thank you,

8    Mr. Speaker.

9           I'm sorry, I'm having a little trouble

10   here.  I'm only used to talking to Representative

11   Learned on an amendment.  So we've said it from the

12   beginning, there is no one single legally compliant

13   map.  And the fact that a district looked different

14   in a prior map doesn't mean that it looks different

15   now is inappropriate.  So I'm not sure the basis of

16   your question, but this map has Saint Pete drawn the

17   way you suggest.

18          MR. SPEAKER:  Representative Learned.

19          REPRESENTATIVE LEARNED:  Thank you,

20   Mr. Speaker.

21          My question really is getting at, you know,

22   I feel like there's a conflict in the logic that's

23   being applied to this process versus the process we

24   used, you know, just three weeks ago.  So when we

25   were debating before, we were talking about Tier 1

HT_0001600
CUBANOS-0000005458

Page 64

```
 1   and Tier 2, and the logic when it pertained to

 2   Congressional District 5 was, well, we are adding

 3   more black voters there.  So we're more Voting

 4   Rights Act compliant.  And this district, the one

 5   that I'm kind of focused on right now, District 14,

 6   it appears that you're packing more people into that

 7   district and packing more African American voters.

 8   Is that because you're trying to be more Tier 1

 9   compliant with District 14?  Is that what you're

10   doing here?

11            MR. SPEAKER:  Representative Leek.

12            REPRESENTATIVE LEEK:  Thank you.

13            I'll do the best I can with that.  Again, I

14   can't speak to the map drawers, you know, reason for

15   choosing this road and that waterway over that road

16   and the other waterway.  So I can't speak to the

17   rationale of why it now goes across when we didn't

18   do it.  When we did it before, we thought it was

19   legally compliant.  And by legally compliant, we

20   thought also compliant with Tier 2.  And what our

21   review of this one is that it is equally compliant

22   with Tier 2.

23            MR. SPEAKER:  Representative Learned.

24            REPRESENTATIVE LEARNED:  Thank you,

25   Mr. Speaker.
```

HT_0001601
CUBANOS-0000005459

Page 65

1            But that's not our charge here, right.

2    We're not charged to be Tier 2 compliant.  We're

3    charged to be Tier 1 compliant.  My question was

4    about Tier 1 compliance, which our understanding is

5    -- which what I understand is what makes this map

6    unconstitutional, right, because we are effectively

7    disenfranchising these voters.  And my question

8    really is about this idea that if you can pack more

9    and more black voters into fewer and fewer

10   districts, is that Voting Rights Act compliant?

11   Because we are, in essence, increasing minority

12   population within those districts and those

13   districts alone.

14            MR. SPEAKER:  There's a lot of conclusions

15   packed into that question.  Do you have a question

16   about a specific district you'd like to ask

17   Representative Leek?

18            REPRESENTATIVE LEARNED:  Yes, Mr. Speaker.

19   I mean, that's my question.  Is this the intent that

20   we can pack more and more black voters into fewer

21   and fewer districts in order to maximize Voting

22   Rights Act compliance?  Is that the logical

23   conclusion that I'm supposed to be drawing from

24   this?

25            MR. SPEAKER:  Representative Leek.

HT_0001602
CUBANOS-0000005460

Page 66

1          REPRESENTATIVE LEEK:  Thank you,

2   Mr. Speaker.

3          It's certainly not our intent, and we have

4   no reason to believe that was the Governor's map

5   drawer's intent.

6          MR. SPEAKER:  Representative Learned.

7          REPRESENTATIVE LEARNED:  Thank you,

8   Mr. Speaker.

9          What evidence are we using to understand

10   the Governor's intent if his actions are speaking

11   louder than words?

12          MR. SPEAKER:  Representative Learned, you

13   would like to ask a question without making

14   conclusions.

15          Representative Willhite, you're recognized.

16          REPRESENTATIVE WILLHITE:  Thank you,

17   Mr. Speaker.  Will you recognize Representative

18   Campbell?

19          MR. SPEAKER:  Representative Campbell,

20   you're recognized.

21          REPRESENTATIVE CAMPBELL:  Thank you,

22   Mr. Speaker.

23          Representative Leek, as I understand it,

24   Alex Kelly was the person that drew these maps,

25   correct?

HT_0001603
CUBANOS-0000005461

Page 67

 1            MR. SPEAKER:  Representative Leek.

 2            REPRESENTATIVE LEEK:  Thank you,

 3   Mr. Speaker.

 4            Yes.  That was his testimony yesterday.

 5            MR. SPEAKER:  Representative Campbell.

 6            REPRESENTATIVE CAMPBELL:  Thank you,

 7   Mr. Speaker.

 8            And, Representative, did he consult with

 9   anyone else in the drawing of these maps?

10            MR. SPEAKER:  Representative Campbell, I

11   believe that was answered previously, and I think

12   Representative Leek talked about Mr. Kelly's

13   testimony yesterday.  Additional questions?

14            REPRESENTATIVE CAMPBELL:  Thank you,

15   Mr. Speaker.

16            What was the methods that he used to

17   establish these maps?

18            MR. SPEAKER:  Representative Leek.

19            REPRESENTATIVE LEEK:  Thank you,

20   Mr. Speaker.

21            And I believe that question has also been

22   asked.  But he used the Tier 1, Tier 2 standards,

23   and the United States Constitutional standards.  I

24   believe that was his testimony.

25            MR. SPEAKER:  Representative Campbell.

HT_0001604
CUBANOS-0000005462

Page 68

1            REPRESENTATIVE CAMPBELL:  Hey, Mr. Speaker.

2            How was the census used in the development

3    of these maps?

4            MR. SPEAKER:  Representative Leek.

5            REPRESENTATIVE LEEK:  Thank you,

6    Mr. Speaker.

7            Again, didn't develop these maps but census

8    data is the fundamental underpinning of any map.

9            MR. SPEAKER:  Represent Campbell.

10           REPRESENTATIVE CAMPBELL:  Thank you,

11   Mr. Speaker.

12           Yesterday, we heard from Counsel yesterday

13   about strict scrutiny and the Gingles test.  What

14   analysis did he use to determine whether or not the

15   Gingle tests were met?

16           MR. SPEAKER:  Representative Leek.

17           REPRESENTATIVE LEEK:  Thank you.

18           Again, I can't speak to his analysis other

19   than what he testified to yesterday.  I will point

20   out that the Gingles test only comes into play upon

21   a challenge to the maps.

22           MR. SPEAKER:  Representative Campbell.

23           REPRESENTATIVE CAMPBELL:  Thank you,

24   Mr. Speaker.

25           Lastly, where can the public access the

HT_0001605
CUBANOS-0000005463

Page 69

1    data points to the development of these maps?

2            MR. SPEAKER:  Representative Leek.

3            REPRESENTATIVE LEEK:  Thank you,

4    Mr. Speaker.

5            There is a data packet in front of you now.

6    There's also a data packet on the website.

7            MR. SPEAKER:  Representative Campbell.

8            REPRESENTATIVE CAMPBELL:  Mr. speaker.

9    What website would that be?

10           MR. SPEAKER:  Representative Leek.

11           REPRESENTATIVE LEEK:  Thank you,

12   Mr. Speaker.

13           Floridaredistricting.gov.

14           MR. SPEAKER:  Representative Campbell.

15           REPRESENTATIVE CAMPBELL:  That's it.

16           MR. SPEAKER:  Representative Willhite.

17           REPRESENTATIVE WILLHITE:  Mr. Speaker,

18   would you recognize Representative Diamond?

19           MR. SPEAKER:  Representative Diamond,

20   you're recognized.

21           REPRESENTATIVE DIAMOND:  Thank you,

22   Mr. Speaker.

23           Good morning.  I just wanted to follow up

24   on Representative Joseph's questions, specifically

25   with regard to CD 26.  I want to further understand

HT_0001606
CUBANOS-0000005464

Page 70

1    this issue of establishing voter cohesion because my

2    understanding from the case law is that that's the

3    first step in any retrogression analysis.  And,

4    specifically, the question is relating to Hispanic

5    voting cohesion in the South Florida.  Given what

6    the Florida Supreme Court has said about that issue,

7    are we taking into account, in this map,

8    particularly around CD 26, how those Latinos -- the

9    voting cohesion of those Latino voters in that part

10   of the state?

11           MR. SPEAKER:  Representative Leek.

12           REPRESENTATIVE LEEK:  Thank you,

13   Mr. Speaker.

14           I believe you're talking about the Gingles

15   test, which, once again, is only performed upon a

16   challenge.  So the Gingles test is a plaintiff's

17   obstacle declare to bring a claim.

18           MR. SPEAKER:  Representative Diamond.

19           REPRESENTATIVE DIAMOND:  But I just want to

20   understand that thinking.  So, I mean, the Gingles

21   test, that is the law of the Supreme Court, right,

22   the United States Supreme Court.  So, I mean, we

23   have to look at that and make certain that we are

24   meeting that test in producing this map.  Do we not?

25           MR. SPEAKER:  Representative Leek.

HT_0001607
CUBANOS-0000005465

Page 71

1          REPRESENTATIVE LEEK:  Thank you,

2    Mr. Speaker.

3          It is the law of the Florida Supreme Court

4    for plaintiffs who are bringing a claim to challenge

5    the maps -- excuse me, US Supreme Court.

6          MR. SPEAKER:  Representative Diamond.

7          REPRESENTATIVE DIAMOND:  But I guess I'm

8    just trying to establish.  I mean, as I understand

9    these cases, and you've studied them far more than I

10   have, Mr. Chairman, but we have to -- if we're going

11   to draw these districts in -- for instance, like CD

12   26, where we're making these assumptions about

13   Latino voting populations.  Let me ask it this way.

14   Has there been any analysis done on CD 26, with

15   regard to the Latino voting population, that there

16   will be sort of a cohesiveness necessary in that

17   voting population in order to defend that district

18   under that test?

19         MR. SPEAKER:  Representative Leek.

20         REPRESENTATIVE LEEK:  Thank you,

21   Mr. Speaker.

22         Remember, the only analysis that we are

23   required to perform is the functional analysis,

24   which has been done.  We have not performed the

25   analysis that you're talking about on the Governor's

HT_0001608
CUBANOS-0000005466

Page 72

```
 1   test --

 2           MR. SPEAKER:  Representative Diamond.

 3           REPRESENTATIVE DIAMOND:  Mr. Speaker.

 4           And do you know if the drafter has

 5   performed that analysis?  You've said earlier that

 6   the drafter was in the Governor's office.

 7           MR. SPEAKER:  Representative Leek.

 8           REPRESENTATIVE LEEK:  Thank you,

 9   Mr. Speaker.

10           No, I do not.

11           MR. SPEAKER:  Representative Diamond.

12           REPRESENTATIVE DIAMOND:  In terms of the

13   drafter, I mean, you know, when you established the

14   process that we used during regular session for the

15   drafting of the maps, you established certain

16   processes in terms of retention of records and, you

17   know, efforts to make certain that we were meeting

18   the Tier 1 compliance.  What questions did you ask

19   of the drafters to build the same assurances in this

20   process?

21           MR. SPEAKER:  Representative Leek.

22           REPRESENTATIVE LEEK:  Thank you,

23   Mr. Speaker.

24           Recall that this map, as all of the other

25   Governor's maps, were submitted through the portal.
```

HT_0001609
CUBANOS-0000005467

Page 73

1  To get through the portal, you have to fill out a

2  form that requires you to answer those kinds of

3  questions.

4          MR. SPEAKER:  Representative Diamond.

5          REPRESENTATIVE DIAMOND:  So earlier you

6  mentioned that there had been a briefing -- a

7  private briefing for you and Chairman Seroy and your

8  staff from the Governor's office with regard to the

9  map that we're about to vote out today.  Were any

10 questions asked in that private briefing about just

11 sort of to provide additional assurances in addition

12 to whatever that form may require?

13         MR. SPEAKER:  Representative Leek.

14         REPRESENTATIVE LEEK:  Thank you,

15 Mr. Speaker.

16         I mean, bluntly, the form asked the very

17 questions you're asking about.  And so with that

18 form being filled out, we know the answer to those

19 questions.  I can't recall whether we ask any

20 additional questions or whether there's any

21 additional flavor.  But the form itself takes care

22 of what you're asking about.

23         MR. SPEAKER:  Representative Diamond.

24         REPRESENTATIVE DIAMOND:  Thank you,

25 Mr. Speaker.

HT_0001610
CUBANOS-0000005468

Page 74

1            And it's been reported that this map will

2    result in a congressional delegation from Florida of

3    20 Republican seats and 8 Democratic seats.  Are you

4    aware of those reports?

5            MR. SPEAKER:  Representative Leek.

6            REPRESENTATIVE LEEK:  Thank you,

7    Mr. Speaker.  I have heard the same because it's

8    hard to turn on the news and escape it.  But I can

9    tell you that we can't validate those reports.

10           MR. SPEAKER:  Representative Diamond.

11           REPRESENTATIVE DIAMOND:  Do you know if the

12   drafter of this map is aware of those reports?

13           MR. SPEAKER:  Representative Leek.

14           REPRESENTATIVE LEEK:  Thank you,

15   Mr. Speaker.

16           No.  I do not.

17           MR. SPEAKER:  Representative Diamond.

18           REPRESENTATIVE DIAMOND:  So I guess my

19   question, when I hear about those reports is, you

20   know, how can it not be evidence of partisan intent

21   if there is such a substantial difference between

22   the partisan configuration of the state and the

23   partisan effect of this map?

24           MR. SPEAKER:  Representative Leek.

25           REPRESENTATIVE LEEK:  Thank you,

HT_0001611
CUBANOS-0000005469

Page 75

1    Mr. Speaker.

2            Let me do the best I can with that.  Of

3    course, the US Supreme Court has told us that the

4    mere fact that you have a map that produces -- you

5    know, that favors one party over another is not in

6    itself evidence of partisan intent.  So I would say,

7    you know, as far as your premise is concerned, I

8    think you're off.  I don't think that is the law.

9    And the fact that -- well, I guess you would have to

10   accept then the performance data that you're talking

11   about.  But to do so, meaning that you know the

12   performance data, that your argument in and of

13   itself would be tainted in some way, because you

14   know the performance data.  I'm not sure I accept

15   that premise either.

16           MR. SPEAKER:  Representative Diamond.

17           REPRESENTATIVE DIAMOND:  Thank you very

18   much, Mr. Speaker.

19           In your presentation of the map, you

20   mentioned waterways in different parts of the state.

21   Like for instance, in Northeast Florida, we use the

22   Saint John's River as a natural dividing line.  In

23   our county, in Pinellas County, the dividing line

24   was not Tampa Bay, as you know, but was -- us was

25   34th Street, US-19.  Can you speak to why the

HT_0001612
CUBANOS-0000005470

Page 76

1   drafter did not use Tampa Bay as the dividing line,

2   but instead chose to use a street?

3          MR. SPEAKER:  Representative Leek.

4          REPRESENTATIVE LEEK:  Thank you,

5   Mr. Speaker.

6          Again, and let me just say this again.  If

7   the question begins with, "Why did the drafter do

8   this," the answer is always going to be I can't tell

9   you precisely why the drafter did this.  But I can

10  tell you that the Tier 2 boundaries that the drafter

11  used are as legally compliant as the Tier 2

12  boundaries that we used in our prior maps.

13         MR. SPEAKER: Representative Willhite.

14         REPRESENTATIVE WILLHITE:  Who did I say

15  next?  I'm sorry.  Mr. Speaker, do you recognize

16  Representative Humphrey?

17         MR. SPEAKER:  Representative Humphrey,

18  you're recognized.

19         REPRESENTATIVE HUMPHREY:  Thank you very

20  much, Mr. Speaker.

21         It's interesting to see you on the wall and

22  in person at the same time.  But anyways, I have a

23  question for -- thank you for recognizing me,

24  Mr. Speaker.

25         And, Chair Leek, man, do I have to say I'm

HT_0001613
CUBANOS-0000005471

Page 77

1   sorry, and I'll explain that in debate tomorrow, and

2   not in regards to my questions, by the way.  So we

3   have funds set aside in this bill to deal with any

4   legal matters that should come up in reference to

5   this bill.  My question is: what happens when this

6   map is challenged?

7          My next question is: if you could just

8   detail the steps of what happens when this map is

9   challenged, and whether or not we'll have to have a

10  special election if the outcome is that these maps

11  are deemed invalid in areas.

12         My third question is --

13         MR. SPEAKER:  My recommendation is let's

14  just take one at a time, if we can.

15         Representative Leek.

16         REPRESENTATIVE LEEK:  Thank you,

17  Mr. Speaker.

18         I don't know that I can describe the

19  universe of things that could happen if these maps

20  are challenged because I think, you know, the

21  challenges are unknown at this point.  But it will

22  go to court, and the Court will make a ruling on

23  whether the challenge is upheld or not.

24         MR. SPEAKER:  Representative Humphrey.

25         REPRESENTATIVE HUMPHREY:  Thank you,

HT_0001614
CUBANOS-0000005472

Page 78

1    Mr. Speaker.

2            Chair Leek, in the past, when the maps were

3    challenged, did we have to have a special election?

4    I wasn't here for it, and I'm not asking this

5    because I know the answer.  I'm really asking

6    because I don't know.

7            MR. SPEAKER:  Representative Leek.

8            REPRESENTATIVE LEEK:  Thank you,

9    Mr. Speaker.

10           No.  We didn't have to have a special

11   election.

12           MR. SPEAKER:  Representative Humphrey.

13           REPRESENTATIVE HUMPHREY:  Thank you,

14   Mr. Speaker.

15           Chair Leek, did the creators of the map

16   explain why the two seats that sit in South Florida,

17   the black protected seats, were not touched?

18           MR. SPEAKER:  Representative Leek.

19           REPRESENTATIVE LEEK:  Thank you,

20   . Speaker.

21           I'm trying to recall back to the testimony,

22   which is available.  If you'd like -- I think you

23   might have actually been in the committee room as

24   well.  But my recollection is they felt that those

25   seats were Tier 1, Tier 2 compliant, met a

HT_0001615
CUBANOS-0000005473

Page 79

1    compelling state need and were narrowly tailored.

2              MR. SPEAKER:  Representative Humphrey.

3              REPRESENTATIVE HUMPHREY:  Thank you very

4    much, Mr. Chair.  Thank you, Mr. Speaker.

5              MR. SPEAKER:  Representative Willhite.

6              REPRESENTATIVE WILLHITE:  Will you

7    recognize Representative Gottlieb?

8              MR. SPEAKER:  Representative Gottlieb,

9    you're recognized.

10             REPRESENTATIVE GOTTLIEB:  Thank you,

11   Mr. Speaker.

12             I just have one question, Rep Leek, and

13   that is, having listened to your answers, which is

14   that the Governor's office drew these maps, and this

15   body did not.  How does that not violate the

16   separation of powers?

17             MR. SPEAKER:  Representative Leek.

18             REPRESENTATIVE LEEK:  Thank you,

19   Mr. Speaker.

20             Of course, the Governor's always had a role

21   in it from day.  And this narrative that we are

22   somehow abdicating our responsibility because the

23   Governor had no role in it is just plainly false.

24   So the Governor always had the opportunity to draw a

25   map, just like the ACLU, just like the League of

HT_0001616
CUBANOS-0000005474

Page 80

1    Women Voters, just like, you know, the hundreds of

2    citizens who drew maps.  Looking at their maps, even

3    taking up their maps is not an abdication of our

4    responsibility, nor is it a violation of separation

5    of powers.  It's just simply part of the process

6    that is permissible.

7              MR. SPEAKER:  Representative Willhite.

8              REPRESENTATIVE WILLHITE:  Mr. Speaker, will

9    you recognize Representative Smith?

10             MR. SPEAKER:  Representative Smith, you're

11   recognized.

12             REPRESENTATIVE SMITH:  Thank you,

13   . Speaker.

14             Chair Leek, are these maps race neutral as

15   the Governor has requested?

16             MR. SPEAKER:  Representative Leek.

17             REPRESENTATIVE LEEK:  Thank you.

18             I believe the Governor used the term, "race

19   neutral" as a counterbalance to predominantly based

20   upon race.  And the maps are both race neutral in

21   areas, and, you know, protected -- also based on

22   race in the areas that are protected.

23             MR. SPEAKER:  Representative Smith.

24             REPRESENTATIVE LEEK:  So it's not one or

25   the other.

HT_0001617
CUBANOS-0000005475

Page 81

1            MR. SPEAKER:  Representative Smith.

2            REPRESENTATIVE SMITH:  Thank you,

3    Mr. Speaker.

4            So what is the distinction between which

5    areas of the state we've decided to have race

6    neutral and which areas of the state are not race

7    neutral?

8            MR. SPEAKER:  Representative Leek.

9            REPRESENTATIVE LEEK:  Thank you,

10   Mr. Speaker.

11            All of those protected districts are not

12   race neutral.

13            MR. SPEAKER:  Representative Smith.

14            REPRESENTATIVE SMITH:  The Governor's

15   counsel stated in his memo that equal opportunity

16   districts for minority voters are tantamount to

17   segregation.  He used that argument to eliminate CD

18   5.  Is it also the position of the House that equal

19   opportunity districts for minority voters are

20   tantamount to segregation?

21            MR. SPEAKER:  Representative Leek.

22            REPRESENTATIVE LEEK:  Thank you,

23   Mr. Speaker.

24            I don't recall hearing the Governor's

25   office say those words, but the answer is no.  And

HT_0001618
CUBANOS-0000005476

Page 82

1    that's why these districts also contain protected

2    districts.

3              MR. SPEAKER:  Representative Smith.

4              REPRESENTATIVE SMITH:  Thank you,

5    . Speaker.

6              I'm hoping that you can explain a little

7    bit further the difference between these districts.

8    The Governor said that districts need to be compact,

9    and they shouldn't have tendrils or spill into other

10   -- or into the middle of other districts.  If you

11   look at CD 20, can you explain why the tendrils of

12   CD 20 that extend eastward, especially the one that

13   cuts into the heart of CD 23, are acceptable in

14   South Florida if they are prohibited in North

15   Florida?

16             MR. SPEAKER:  Representative Leek.

17             REPRESENTATIVE LEEK:  Thank you,

18   Mr. Speaker.

19             You're overstating the law and letter.

20   Remember the first thing is population, right, plus

21   or minus one person.  So you're necessarily going to

22   have to go different places to get to that zero

23   population, that equal population.  And I think what

24   you're seeing is that one -- the CD 20 is certainly

25   more compact than CD 5 was.

HT_0001619
CUBANOS-0000005477

Page 83

1          MR. SPEAKER:  Representative Smith.

2          REPRESENTATIVE SMITH:  Thank you,

3    Mr. Speaker.

4          And I'm not trying to denigrate CD 20.  I'm

5    just trying to get you to explain to us and explain

6    to me the inconsistency there.  Why is that tendril

7    cutting into CD 23?  What is the purpose of that

8    tendril?

9          MR. SPEAKER:  Representative Leek.

10          REPRESENTATIVE LEEK:  Thank you,

11    Mr. Speaker.

12          And again, Representative Smith, you're

13    putting too much emphasis on uniformity.  The

14    purpose of that is equal population.

15          MR. SPEAKER:  Representative Smith.

16          REPRESENTATIVE SMITH:  Thank you,

17    Mr. Speaker.

18          So just to clarify, the purpose of that

19    tendril is not to protect the strength of racial and

20    language minorities in that district?

21          MR. SPEAKER:  You couldn't hear it?

22          REPRESENTATIVE LEEK:  Yeah.

23          MR. SPEAKER:  Representative Smith, can you

24    repeat the question.

25          REPRESENTATIVE SMITH:  Thank you,

HT_0001620
CUBANOS-0000005478

Page 84

1    Mr. Speaker.

2              Chair Leek, you just stated that the

3    purpose of that tendril was to ensure equal

4    population.  So what you're also saying is the

5    purpose of that tendril in Congressional District 20

6    is not to ensure the ability of racial or language

7    minorities to elect the candidate of their choice?

8              MR. SPEAKER:  Representative Leek.

9              REPRESENTATIVE LEEK:  Thank you,

10   Mr. Speaker.

11             No.  I don't think you can draw all that

12   corollary.  CD 20 is a protected district.

13             MR. SPEAKER:  Representative Smith.

14             REPRESENTATIVE SMITH:  Thank you,

15   Mr. Speaker.

16             I also want to jump back to the Governor's

17   office, and how they drew the map.  I'm curious.

18   Did they keep records to prove they were not drawn

19   in a way that was driven by partisan intent?  And

20   did you request that they keep records to prove that

21   or disprove it in a court of law?

22             MR. SPEAKER:  I think Chairman Leek

23   answered that in response to Representative

24   Diamond's questions.

25             Is there any additional information you'd

HT_0001621
CUBANOS-0000005479

Page 85

1   like to add, Representative Leek?

2            REPRESENTATIVE LEEK:  (Shakes head).

3            MR. SPEAKER:  You have additional

4   questions, Representative Smith?

5            REPRESENTATIVE SMITH:  No, nothing else.

6            MR. SPEAKER:  Representative Willhite.

7   Yield back the 23 seconds?

8            REPRESENTATIVE WILLHITE:  Yes, sir.

9            MR. SPEAKER:  All right.  Representative

10  Eskamani, you're recognized for your question.

11           REPRESENTATIVE ESKAMANI:  Thank you,

12  Mr. Speaker.

13           Very quick question for you, Chair Leek.  I

14  know that one of the arguments being made by the

15  Governor's office with CD 5 is that there is no

16  apparent state interest in keeping it to be minority

17  access, But the courts disagree with that.  I mean,

18  does the weight of the courts not compel the state

19  to have an interest?

20           MR. SPEAKER:  Representative Leek.

21           REPRESENTATIVE LEEK:  Thank you,

22  Mr. Speaker.

23           Actually, there is no court opinion

24  precisely on that issue.

25           MR. SPEAKER:  All right, members.  Time

HT_0001622
CUBANOS-0000005480

Page 86

1    having expired in questions, we are in amendments.

2              Are there amendments?

3              THE CLERK:  On the desk, Mr. Speaker.

4              MR. SPEAKER:  Take up the First Amendment.

5              THE CLERK:  Representative Jenne offered

6    the following amendment with title, Amendment,

7    Barcode 717833.  Remove lines 95 through 3647 and

8    insert in amendment.

9              MR. SPEAKER:  Leader Jenne, you're

10   recognized on your amendment.

11             REPRESENTATIVE JENNE:  Thank you,

12   Mr. Speaker.  Good to see you.

13             Members, essentially what this amendment

14   does is it adopts plan 80/60, which was the Senate

15   plan in place of this proposed map.  This particular

16   plan has the following characteristics: divides the

17   state into 28 congressional districts with a

18   population of 769,221 people.  Each district will

19   grow by 42,876 people, compared to the pre-existing

20   map.

21             It establishes four protected African-

22   America districts, CD 5, 10, 20, and 24.  It

23   maintains the Gadsden to Duval configuration known

24   as CD 5.  It establishes three protected Hispanic

25   districts, CD 25, 26, and 27.  The plan, we believe,

HT_0001623
CUBANOS-0000005481

Page 87

1    improves on most Tier 2 metrics compared to the

2    underlying benchmark plan.  It does also reduce city

3    splits and improves compactness.

4            Mr. Speaker, that is the amendment.

5            MR. SPEAKER:  Are there questions on the

6    amendment?  Are there questions?

7            Representative Robinson.

8            REPRESENTATIVE ROBINSON:  Thank you,

9    Mr. Speaker.

10           Representative, I just wanted to ask.  And

11   this particular map was drawn by who?

12           MR. SPEAKER:  Representative Jenne.  Leader

13   Jenne.

14           REPRESENTATIVE JENNE:  The specific

15   individual, not sure, but I know this was the map

16   that was approved by the Senate and with bipartisan

17   support.

18           REPRESENTATIVE ROBINSON:  Follow-up.

19           MR. SPEAKER:  Representative Robinson.

20           REPRESENTATIVE ROBINSON:  So this map was

21   draw by the Legislature as part of our duty,

22   correct?

23           MR. SPEAKER:  Leader Jenne.

24           REPRESENTATIVE JENNE:  Yes, it was.  This

25   was crafted by our colleagues across the hall in the

HT_0001624
CUBANOS-0000005482

Page 88

1   Senate.  And this was a plan that they did vote on

2   and overwhelmingly had bipartisan support.

3           MR. SPEAKER:  Representative Geller.

4           REPRESENTATIVE GELLER:  Thank you, Mr.

5   Speaker.

6           And thank you for this good amendment,

7   Leader.  In addition to keeping the current

8   configuration from Gadsden to Duval, does this map

9   also provide for the continued election of an

10  African-American congressional representative in the

11  Orlando area?

12          MR. SPEAKER:  Leader Jenne.

13          REPRESENTATIVE JENNE:  Yes.  Thank you,

14  Mr. Speaker.

15          And thank you, Representative Geller, for

16  that particular question.  Yes, it does.  And that

17  was a difference between the two chambers. I'm not

18  casting aspersions, but that was a difference.  The

19  Senate treated CD 10 as a protected seat.  The

20  House, we did not do so.

21          MR. SPEAKER:  Representative Geller.

22          REPRESENTATIVE GELLER:  Thank you,

23  Mr. Speaker.

24          Leader Jenne, does this map preserve the

25  previous configuration of what has been the existing

HT_0001625
CUBANOS-0000005483

Page 89

 1    district that involves representation in Pinellas

 2    County as opposed to the new map that we're looking

 3    at today?

 4              MR. SPEAKER:  Leader Jenne.

 5              REPRESENTATIVE JENNE:  Yes, sir.  It's much

 6    closer.

 7              MR. SPEAKER:  Representative Geller.

 8              REPRESENTATIVE GELLER:  Thank you,

 9    Mr. Speaker.

10              Does this map continue as the map in front

11    of us does to provide for the election of an

12    African-American representative to congress in

13    Broward in Palm Beach County, by making certain

14    deviations from compactness so that that protected

15    district can remain protected?

16              MR. SPEAKER:  Representative Jenne.

17              REPRESENTATIVE JENNE:  Yes, sir.  It does.

18              MR. SPEAKER:  Representative Geller.

19              REPRESENTATIVE GELLER:  Thank you,

20    Mr. Speaker.

21              Do you know the vote by which this map

22    passed the Senate?

23              MR. SPEAKER:  Representative Jenne.

24              REPRESENTATIVE JENNE:  Yes, sir.  I do.  I

25    have it here.  I believe the count was 36 to 4.  36

HT_0001626
CUBANOS-0000005484

Page 90

1　to 4.

2　　　　　MR. SPEAKER:  Representative Geller.

3　　　　　REPRESENTATIVE GELLER:  Thank you,

4　Mr. Speaker.

5　　　　　So in addition to having overwhelming

6　bipartisan support, in your estimation, Leader

7　Jenne, does the map that you are proposing as an

8　amendment comply with the Florida Constitution Fair

9　District's provision, as well as the Voting Rights

10　Act of 1965?

11　　　　　MR. SPEAKER:  Leader Jenne.

12　　　　　REPRESENTATIVE JENNE:  Thank you,

13　Mr. Speaker.

14　　　　　Representative Geller.  Yes, it does.  I

15　believe it does.  I believe if you look at the

16　statistics of each of these districts, I believe you

17　will find that to be the absolute case.

18　　　　　MR. SPEAKER:  Additional questions,

19　members?  Additional questions?  I see no additional

20　questions.  We are in -- are there amendments to the

21　amendment?

22　　　　　THE CLERK:  None on the desk, Mr. Speaker.

23　　　　　MR. SPEAKER:  Are there substitutes?

24　　　　　THE CLERK:  None on the desk, Mr. Speaker.

25　　　　　MR. SPEAKER:  We are in debate.  Members

Page 91

1    who wish to be recognized in debate.

2            Representative Geller.

3            REPRESENTATIVE GELLER:  Thank you,

4    Mr. Speaker.  Members, I urge you to support this

5    map for a lot of reasons.  This amendment is a

6    better plan.  This amendment does not require a

7    million dollars to be appropriated in for

8    anticipated litigation.  This amendment complies

9    with the Florida and Federal Constitution.  This

10   amendment does not fly in the face of them.  If

11   someone thinks that not only the Florida

12   constitution, but the Voting Rights Act of 1965, the

13   law for almost 60 years in this country, is

14   unconstitutional, they have a right to take that to

15   court.

16           If someone thinks that the 14th Amendment

17   prohibits anything race-based, which I heard today

18   and is wrong; if someone thinks that the 14th

19   Amendment does not have language that would, as

20   interpreted by the courts, allow consideration if

21   there is a compelling state interest, and you use

22   the most narrowly tailored means possible to achieve

23   the result, remembering that that amendment was

24   passed as a remedial measure and its very name says

25   it was equal protection.  It's designed to protect.

HT_0001628
CUBANOS-0000005486

Page 92

1    But we should not ignore the constitution of the

2    state and federal law in anticipation that someone

3    might challenge those things and take them and maybe

4    get them reversed.  We should comply with the law as

5    it exists, as it's been interpreted for almost 60

6    years.  We should comply with it, and anyone who

7    doesn't agree is free to raise that challenge.  We

8    should not ignore what 63 percent of the voters of

9    Florida said for us to do.

10            Members, this map, which passed the Senate

11   36 to 4, is -- doesn't that say something?  Isn't

12   that a statement to all of us?  Members, we should

13   adopt this amendment.  We should comply with the

14   very clear dictates of Tier 1, which is more

15   important than Tier 2, and of the federal Voting

16   Rights Act.  And if somebody wants to take those to

17   court, and say they're wrong, we've been wrong in

18   interpreting the 14th Amendment for 150 years, well,

19   by God, this is America.  They have a right to do

20   that.  God bless anybody who wants to raise a

21   challenge and get it determined.  But until the

22   courts change that, we must comply with the law as

23   it is written, as our voters told us to do.

24            Please adopt this amendment.  Thank you.

25            MR. SPEAKER:  Additional debate?

HT_0001629
CUBANOS-0000005487

Page 93

1    Additional debate?

2            Seeing none, Leader Jenne.  You're

3    recognized to close.

4            REPRESENTATIVE JENNE:  Mr. Speaker, thank

5    you as always.

6            Members, it's a simple amendment.  It's a

7    request to take the Senate plan.  It is not my plan.

8    I do not claim any authorship over it.  I claim

9    nothing other than someone who has to be anything

10   other than someone who has reviewed these maps.

11           I put this forward in the spirit of

12   compromise.  Because, members, having been through

13   this redistricting process now for a second time, I

14   can tell you that it's very difficult, if not

15   outright impossible, to make a perfect map in which

16   every single line is in its proper place.  But I

17   believe, and I think my caucus also believes, that

18   this is infinitely better than the map that is

19   actually in front of us today, especially in terms

20   of Tier 1.

21           But what about Tier 1?  We spent months

22   discussing the maps.  And Tier 1 was the absolute

23   apex of our guidelines.  But now it has been cast

24   aside like democracy's detritus.  Why?  Because of

25   an abrupt change in philosophy.  I will not condemn

HT_0001630
CUBANOS-0000005488

Page 94

1    that change.  I will not comment on that change, but

2    it is due to an abrupt change in philosophy.

3              When we convened here earlier this year,

4    the VRA meant something.  The Fair Districts

5    Amendment meant something.  Tier 1 meant something.

6    These guided the entire process, and now they're

7    being tossed aside.  Well, members, for me

8    personally, those things, the VRA, Fair Districts

9    Amendment, Tier 1, that still means something to me.

10   That still means something to a lot of members on

11   this floor today.

12             So I ask your favorable support of this.

13   Members, the car is not in neutral.  The car is

14   speeding ahead.  We have one last exit before we

15   ride over the cliff.  I suggest we put on that turn

16   signal and get off right now.  Thank you.

17             MR. SPEAKER:  Members, Representative Jenne

18   having closed on his amendment, all in favor of

19   adoption of the amendment say yea.

20             (Multiple yeas)

21             MR. SPEAKER:  All opposed, no.

22             (Multiple nos)

23             MR. SPEAKER:  Show the amendment fails.

24   Read the next amendment.

25             THE CLERK:  Representative Joseph offered

HT_0001631
CUBANOS-0000005489

Page 95

1    the following amendment with title, Amendment

2    Barcode 799545.  Remove lines 3627 through 3647, and

3    insert in amendment.

4            MR. SPEAKER:  Representative Joseph, you're

5    recognized to explain your amendment.

6            REPRESENTATIVE JOSEPH:  Thank you,

7    Mr. Speaker.

8            Section 7 of the bill before us, there's a

9    couple of things.  One of which is it selects venue

10   in Leon County, right here, and it presets that.

11   And I'm just going to read it. "An action

12   challenging the state's congressional districts on

13   state constitution or state law grounds must be

14   brought in state court."

15           And earlier during questioning, you heard

16   some of the rationale as to why.  And the purpose of

17   this amendment is just to do what I think is more

18   appropriate, which is to allow litigants to choose

19   which venue is more appropriate depending on the

20   nature and the crux of their case.  It is not

21   unusual to have questions of law that both involve

22   state and federal issues.  That's why you have

23   supplemental jurisdiction.  It's not complicated.

24   That is a decision that I believe should be made,

25   and we should allow for that flexibility,

HT_0001632
CUBANOS-0000005490

Page 96

1    considering that these are federal congressional

2    seats that we're talking about.  We're not talking

3    about state House seats or state Senate seats.

4    We're talking about our federal congressional seats.

5    So I think it would be more than appropriate to

6    eliminate just that section.  So the amendment is

7    really simple and straightforward.  And all it does

8    is it removes lines 3627 through 3647 from the bill

9    and leaves the law in its place, and to the extent

10   that the bill sponsored talked about how federal

11   questions can be addressed in federal court.  That's

12   always the case.  That's the whole point of the

13   supremacy clause.

14           So that is the amendment.  I ask that

15   members support it.  There's a lot of things that

16   we're doing that are novel.  There's no need to

17   introduce this additional component into the

18   process.  And that is the amendment, Madam Speaker.

19           MADAM SPEAKER:  Having explained the

20   amendment, are there questions of the sponsor?  Are

21   there questions?

22           Seeing no questions, is there an amendment

23   to the amendment?

24           THE CLERK:  None on the desk, Madam

25   Speaker.

HT_0001633
CUBANOS-0000005491

Page 97

1          MADAM SPEAKER:  Is there a substitute

2     amendment?

3          THE CLERK:  None on the desk, Madam

4     Speaker.

5          MADAM SPEAKER:  And debate, is there a

6     debate on the amendment?

7          Representative Eskamani, you are

8     recognized.

9          REPRESENTATIVE ESKAMANI:  Thank you so

10    much, Madam Speaker.  I just want to say thank you

11    to the Representative for bringing forth this good

12    amendment.  This is just an example of good

13    government.  Let's ensure people have concerns, have

14    the time to make those concerns expressed.  If folks

15    feel like these maps are in good legal standing,

16    they should not have an issue with this amendment.

17         Thank you, Madam Speaker.

18         MADAM SPEAKER:  Additional debate?

19         Representative Driskell.

20         REPRESENTATIVE DRISKELL:  Thank you, Madam

21    Speaker.  And happy birthday to you -- or belated

22    birthday.

23         Members, this is a drum I'll continue to

24    beat in terms of thinking about how we use procedure

25    and making sure that we are not using procedure as a

HT_0001634
CUBANOS-0000005492

Page 98

1  weapon against the people of the State of Florida.

2  It's problematic, okay.  There's procedure, and

3  there's substance in the law.  Two distinct things.

4  But what happens sometimes -- what I'm noticing is a

5  dangerous trend in this Legislature, which is that

6  we are now amending legislation, or amending bills,

7  or adding procedural weapons to these bills, and I

8  really don't like it.  We need to give the people

9  the opportunity to be heard in court.  There's no

10 reason why this can't be heard in federal court.

11        And I understand there's a provision at the

12 end of 1(c) that talks about this does not preclude

13 any action being brought in federal court.  But,

14 actually, it's internally inconsistent to me, that

15 provision of the bill and then the prior provision

16 saying that you can't bring this in federal court.

17 So I don't understand what we're doing here.

18        And I thank you, Rep Joseph, for this

19 amendment, because you really are trying to hold us

20 accountable and making sure that we are meeting with

21 due process in a procedural way that we need to for

22 the people of Florida.

23        So thank you for this.  I'll be up on your

24 amendment today.

25        MADAM SPEAKER:  Additional debate?

HT_0001635
CUBANOS-0000005493

Page 99

1    Members, additional debate?

2            Representative Joseph, you're recognized to

3    close on the amendment.

4            REPRESENTATIVE JOSEPH:  Thank you, Madam

5    Speaker.  So the portion of the House bill that's an

6    issue with the redistricting bill is it's a

7    jurisdiction of federal courts.  And it conflicts

8    with the Voting Rights Act in 28 USC 1367, which

9    provides supplemental federal jurisdiction over

10   state law claims that are closely related to federal

11   claims.  It takes precedent.  So the supremacy

12   clause should control, and state law must concede to

13   federal law, which states that federal courts have

14   jurisdiction over these maps.

15           And as a practical matter, I know that

16   there are few attorneys in the room, but state

17   courts and federal courts are different.  They just

18   are.  In terms of their susceptibility to a number

19   of things -- and I'm not here to impugn the court,

20   but there's a reason that we have these things in

21   federal court.  And as we're seeing these attacks

22   that are being mounted on, you know -- effectively

23   what we're complaining about, what the crux of a lot

24   of folks are complaining about, is the delusion of

25   these maps proposed by the Governor of black votes.

HT_0001636
CUBANOS-0000005494

Page 100

1    That's the underlying concern.  So if we are

2    decreasing representation based on the 14th

3    Amendment -- so people may not be too familiar with

4    the 14th Amendment, and I want to keep it tied to

5    the reason for my amendment is there was a US

6    Supreme Court case called Dred Scott.  Some of you

7    may not be familiar with it, but it held that the

8    black man had no right that the white man had to

9    accept.  And that black people could never be

10   citizens of these United States.  That was basically

11   the premise of that case.  That led to the passage

12   of a couple of things.  But after the 13th

13   Amendment, the United States thought that we were

14   good.  Slaves are free.  But it wasn't so because

15   the states who were resisting these new rights that

16   were being exercised and allotted to black people

17   were just not falling in line.

18           So Republicans, interestingly enough, led

19   by Thaddeus Stevens at the time, who proposed the 14

20   Amendment -- Republicans proposed the 14th Amendment

21   to ensure that black people had all the privileges

22   and immunities, had equal protection under the law

23   that other folks did.  It was really that simple.

24   So the purpose of the 14th Amendment is to just make

25   sure that we're equal.

HT_0001637
CUBANOS-0000005495

Page 101

1           And many of you may be familiar with the

2    Three-fifths clause that exists in the Constitution,

3    which counted black people as three-fifth of a

4    person.  Another thing the 14th Amendment did was

5    take care of that.  It made us a full person.  So

6    when I look at these maps who are trying to make

7    people, black people, count as less --

8           MR. SPEAKER:  Representative Joseph, your

9    time has expired.  I'll just give you a moment to

10   conclude.

11          REPRESENTATIVE JOSEPH:  Mr. Speaker, that's

12   very kind.  When I hear 14th amendment being used to

13   make our voices and our representation be slashed by

14   practically 50 percent, that's offensive to the

15   whole point of the 14th amendment.  And that

16   Republican body recognizes it.  And I hope at some

17   point, these Republicans are Republicans because I

18   don't think it's a Republican versus Democrat issue.

19   This is not and doesn't need to be.

20          With that, I ask for your favorable support

21   on this amendment to keep it in federal courts where

22   it actually belongs. Thank you.

23          MR. SPEAKER:  Representative Joseph having

24   closed on her amendment, all in favor of adoption of

25   amendment, say yea.

HT_0001638
CUBANOS-0000005496

Page 102

1               (Multiple yeas)

2               THE COURT:  All opposed, no.

3               (Multiple nos)

4               THE COURT:  Show the amendment fails.

5               Read the next amendment.

6               COURT CLERK: None on the desk, Mr. Speaker.

7               MR. SPEAKER:  Read the next Bill.

8               COURT CLERK:  By Representative Fine and

9      others, House Bill 3C, a bill to be entitled "An Act

10     relating to independent special districts."

11              MR. SPEAKER:  Representative Fine, you're

12     recognized to explain your bill.

13              REPRESENTATIVE FINE:  Thank you,

14     Mr. Speaker, and thank you for acknowledging my

15     birthday earlier.  Normally, I would be spending

16     today at Disney World.  I don't think that's going

17     to be happening.

18              So with that, I'm pleased to present House

19     Bill 3C.  This is a very simple bill that would

20     expire or sunset all special districts created

21     before 1968 when the Florida Constitution was

22     established on June 1st of next year.  And that is

23     the bill.

24              MR. SPEAKER:  Members, we are in questions.

25              Representative Willhite.

HT_0001639
CUBANOS-0000005497

Page 192

1              CERTIFICATE OF TRANSCRIPTIONIST

2          I certify that the foregoing is a true and

3    accurate transcript of the digital recording provided

4    to me in this matter.

5          I do further certify that I am neither a

6    relative, nor employee, nor attorney of any of the

7    parties to this action, and that I am not financially

8    interested in the action.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23    _____

24          Julie Thompson, CET-1036

25

HT_0001729
CUBANOS-0000005587