**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:24-cv-21983-JB

CUBANOS PA'LANTE, *et al.*,

    *Plaintiffs*,

v.

FLORIDA HOUSE OF
REPRESENTATIVES, *et al.*,

    *Defendants*.

_____/

### PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT

The House's Motion for Summary Judgment (ECF No. 122) should be denied because it ignores nearly the entire record in this case, including numerous material facts that create a genuine dispute as to whether race predominated in drawing Congressional District 26 and State House Districts 112, 113, 114, 115, 116, 118, and 119 (the "Challenged Districts").

The Motion challenges only one element of Plaintiffs' claims—whether race predominated in the Legislature's drawing of the Challenged Districts—but ignores all the statements of the Legislature's members confirming that they drew the districts based on race. The House relies entirely on cherry-picked statements from two staffers, one legislative and one executive, who assisted the Legislature in drafting the maps, ignoring the statements of the legislators who actually enacted the maps and statements from the same staffers that contradict the Motion's one-sided narrative. As reflected in a host of contemporaneous statements of legislators, and corroborated by evidence developed during discovery, the Legislature elevated race above all other considerations and drew the Challenged Districts to be majority-minority districts "based on race" because the Legislature understood them to be "protected," 4/20 H. Tr. 80:21–22.[1] Having drawn each Challenged District "based on race" with the express intent to create majority-minority districts, the House cannot simply ignore the record and hide behind a carefully-worded declaration and tidbits of testimony from staffers who assisted the Legislature in drawing the maps. Nothing compels this Court to take the word of a couple staffers over the statements of the legislators who actually oversaw the redistricting process and enacted the Challenged Districts into law. Even if

---

[1]   Exhibits attached to Plaintiffs' Statement of Material Facts (ECF No. 126) are cited using the abbreviations noted in the table in the Statement.

the House intends to run away from the statements of its members in this litigation, it cannot seriously contend that those statements are not material facts. In any event, even the staffers confirm (in portions of testimony the House ignores) that the House's "overall goal" was to ensure districts were drawn to "elect[] a Hispanic" in several of the Challenged House Districts, ECF No. 123-3 (Poreda Dep.) 269:5–6, 269:21–270:3, and that adjustments to Congressional District 26 were made intentionally to "maintain[] the same number of performing majority-minority seats," 4/19 H. Tr. 21:6–7.

Circumstantial evidence—which the House also ignores—corroborates all of the direct evidence of predominance. At trial, Plaintiffs will present testimony from Dr. Cory McCartan showing alternative configurations of the districts without the enacted maps' infirmities, including configurations that eliminate the Challenged Districts' noncompact shapes, improve the maps' adherence to major political and geographic boundaries, and reduce the number of split municipalities and counties. Plaintiffs will also present testimony from Dr. Carolyn Abott showing large and systematic racial disparities between the Challenged Districts and adjacent districts, suggesting they were drawn to concentrate and balance Hispanic voters.

To prevail on its Motion, the House must demonstrate that there is not a single genuine factual dispute as to racial predominance in any district, and that the undisputed facts entitle the House to judgment as a matter of law. Considering all the evidence and viewing it in the light most favorable to Plaintiffs—as the Court must, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 261 (1986)—the House has not met its burden, and the Motion should be denied.

## BACKGROUND

Following a redistricting process in late 2021 and early 2022, the Florida Legislature adopted Plan H000H8013 ("Enacted House Plan") to redraw Florida's State House districts and Plan P000C0109 ("Enacted Congressional Plan") to redraw Florida's congressional districts. Redistricting Committee Chair Tom Leek, Congressional Redistricting Subcommittee Chair Tyler Sirois, and Legislative Subcommittee Chair Cord Byrd (now Defendant Secretary of State, who does not join the House's Motion) oversaw this process, with assistance from their committee staff including Staff Director Leda Kelly, Chief Map Drawer Jason Poreda, and Analysts Kyle Langan and Sam Wagner. Poreda Dep. 28:19–6, 31:13–18; 9/22 Tr. 4:7–18. The Senate had no role in developing the Enacted House Plan. Poreda Dep. 101:22–24. The Enacted Congressional Plan was adopted by both chambers, with some adjustments to District 26's border in Collier County made

by Deputy Chief of Staff Alex Kelly with the Executive Office of the Governor (EOG). Stip. re EOG ¶¶ 5–7; 4/19 H. Tr. 20:4–7, 20:23–21:4; Poreda Dep. 106:8–14, 107:3–6, 111:18–25.

Plaintiffs challenge one congressional and seven State House districts in South Florida as racially gerrymandered. Notwithstanding the House's post-hoc characterization of race as "*at most an insignificant factor in their design*," Motion at 1, *at the time they were drawn*, the key legislators and staffers described above expressly stated that they drew the Challenged Districts to be Tier One-protected majority-minority Hispanic districts. 12/3 Tr. 37:20; 1/26 Tr. 30:16–20; 2/1 Tr. 8:3–14, 22:9–12; 2/18 Tr. 23:4–5. Chair Leek further confirmed that the House drew them "based on race" because the Legislature understood them to be "protected." 4/20 H. Tr. 80:21–22.

The Legislature was guided in the redistricting process by—and apparently believed it was compelled to draw majority-minority Hispanic districts in South Florida due to—the Florida Constitution's Fair Districts Amendments. Those Amendments' "Tier One" standards prohibit the diminishment or dilution of racial and language minority voters' ability to elect representatives of their choice, under certain conditions. Fla. Const. art. III, §§ 21(a) 22(a). Section 2 of the Voting Rights Act similarly imposes a prohibition on minority vote dilution. 52 U.S.C. § 10301. The Fair Districts Amendments' "Tier Two" standards enshrine in the Florida Constitution several "traditional race-neutral districting principles," *see Miller v. Johnson*, 515 U.S. 900, 916 (1995), requiring that districts (1) be as nearly equal in population as is practicable; (2) be compact; and (3) where feasible, utilize existing political and geographical boundaries. Fla. Const. art. III, §§ 20(b), 21(b). The Legislature must adhere to the Tier Two requirements, unless doing so would violate a Tier One requirement or federal law, and may deviate from the Tier Two requirements only to the extent necessary to comply with Tier One's provisions or federal law.

Plaintiffs allege the Legislature had no basis for concluding that it needed to draw the districts "based on race" to comply with Tier One of the Fair District Amendments or the Voting Rights Act. Those laws prohibit "dilution" and "diminishment" of minority votes, but *only* when the legislature determines that (1) the minority group votes cohesively and (2) the majority bloc voting is sufficient to defeat the minority group's candidate of choice. *Black Voters Matter Capacity Bldg. Inst. v. Sec'y, Fla. Dep't of State*, --- So.3d ---, No. SC2023-1671, 2025 WL 1982762, at *3 (Fla. July 17, 2025). Those preconditions were utterly absent here, and in crafting the Challenged Districts, the Legislature ignored the diversity of the Hispanic community and falsely assumed that Hispanic voters in South Florida were politically homogenous and monolithic.

Furthermore, the Legislature ignored that Florida's white majority did not usually vote in bloc to defeat Hispanic voters' preferred candidates. The House's Motion does not challenge Plaintiffs' contention that the preconditions for drawing districts to avoid racial dilution or diminishment were not met here and provides no alternative explanation for the Legislature's intentional decision to draw each Challenged District as a majority-minority Hispanic district.

**LEGAL STANDARDS**

### I.  Summary Judgment Standard

The House must show that there is "no genuine dispute as to any material fact" such that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "An issue of fact is material and genuine if a rational factfinder could find for the nonmoving party on a fact necessary to establish an element of the claim under applicable substantive law." *Ross Neely Sys., Inc. v. Occidental Fire & Cas. Co. of N.C.*, 196 F.3d 1347, 1350 (11th Cir. 1999). At summary judgment, "all factual inferences are drawn in favor of the non-moving party." *Laremore v. Holiday CVS, LLC*, No. 20-CIV-61650-RAR, 2021 WL 3053348, at *1 (S.D. Fla. July 20, 2021) (citing *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)). "If there are any factual issues, summary judgment must be denied, and the case proceeds to trial." *Id.* at *2. "Further, when the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts, summary judgment may be inappropriate." *Id.* (cleaned up).

### II.  Racial Gerrymandering Standard

"The Equal Protection Clause of the Fourteenth Amendment limits racial gerrymanders in legislative districting plans [and] prevents a State, in the absence of 'sufficient justification,' from 'separating its citizens into different voting districts on the basis of race.'" *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (quoting *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017)). A racial-gerrymandering plaintiff must prove that race served as the "predominant factor" motivating district line-drawing. *Id.* (citing *Miller*, 515 U.S. at 916). When race is the predominant factor in the government's decision-making, strict scrutiny is triggered and "[t]he burden thus shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper*, 581 U.S. at 292 (quoting *Bethune-Hill*, 580 U.S. at 193). "When a State invokes the VRA to justify race-based districting, it must show (to meet the 'narrow tailoring' requirement) that it had 'a strong basis in evidence' for concluding that the statute required its action." *Id.* (quoting *Ala. Legis. Black Caucus v. Alabama* (*ALBC*), 575 U.S.

254, 278 (2015)). "Or said otherwise, the State must establish that it had 'good reasons' to think that it would transgress the [VRA] if it did *not* draw race-based district lines." *Id.* at 293. "If a State has good reason to think that all the '*Gingles* preconditions' are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district. But if not, then not." *Id.* at 302. (citations omitted).

## ARGUMENT

The House can prevail only if it shows the absence of a genuine factual dispute as to racial predominance in each Challenged District. *Tyson Foods*, 121 F.3d at 646. Its Motion does not come close. To show racial predominance, "a plaintiff must prove that the State 'subordinated' race-neutral districting criteria such as compactness, contiguity, and core preservation to 'racial considerations.'" *Alexander v. S.C. State Conf. of NAACP*, 602 U.S. 1, 7 (2024) (quoting *Miller*, 515 U.S. at 916). A plaintiff can establish predominance "through some combination of direct and circumstantial evidence." *Id.* at 8. The House disregards the mountain of direct and circumstantial evidence that, viewed in the light most favorable to Plaintiffs, creates a genuine issue on predominance. *See Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("Where the non-movant presents direct evidence that, if believed by the jury, would be sufficient to win at trial, summary judgment is not appropriate even where the movant presents conflicting evidence.").

I.  **Ample direct evidence demonstrates that race drove the drawing of the Challenged Districts, but the House ignores it.**

Direct evidence "often comes in the form of a relevant state actor's express acknowledgment that race played a role in the drawing of district lines." *Alexander*, 602 U.S. at 8; *see also Cooper*, 581 U.S. at 299–301, 310–16 (focusing on evidence of intent of map "architects," including legislative committee chairs). "[R]elevant, contemporaneous statements of key legislators are to be assessed when determining whether racial considerations predominated in redistricting processes[.]" *Jacksonville Branch of NAACP v. City of Jacksonville* (*Jacksonville II*), No. 22-13544, 2022 WL 16754389, at *4 (11th Cir. Nov. 7, 2022). Here, statements of key legislators and staff undoubtedly show "race played a role in the drawing of" the Challenged Districts and that the use of race crossed the threshold from mere "consciousness" to "predominance." *See Alexander*, 602 U.S. at 8; *Allen v. Milligan*, 599 U.S. 1, 33 (2023).[2] The

---

[2]  In this Court's order denying Defendants' motions to dismiss, it found that the direct evidence

House neglects to address *any* contemporaneous statements of legislators in its Motion. Instead, it points to Poreda's post hoc rationalizations and personal motivations for the configuration of the Challenged Districts, supplemented with statements that a single executive branch staffer, Alex Kelly, made in one subcommittee meeting. The House not only elides and downplays other evidence *supporting* racial predominance—including from those two individual witnesses—but its narrative of *legislative* intent omits a critical element entirely: *legislators*. *See Alexander*, 602 U.S. at 7 ("[W]e require the plaintiff to show that race was the 'predominant factor motivating the *legislature's* decision to place a significant number of voters within or without a particular district.'" (emphasis added) (quoting *Miller*, 515 U.S. at 916)).

### A. Legislators repeatedly stated that race predominated in the drawing of the Challenged House Districts.

The legislative record establishes that race played an overriding role in the drawing of the Challenged House Districts, with the express purpose of creating majority-minority Hispanic districts to comply with Tier One, and that the Legislature subordinated traditional redistricting principles embodied in Tier Two.

In 2022, Legislative Subcommittee Chair Byrd repeatedly introduced the Challenged House Districts as "performing Hispanic districts protected by Tier One of the Florida Constitution" that were not incidentally majority-Hispanic, but were instead drawn "**to maintain existing majority-minority districts.**" 1/21 Tr. 23:17–22; 1/26 Tr. 30:15–20; 2/1 Tr. 22:8–10. Redistricting Committee Chair Leek explicitly admitted that the Legislature subordinated race-neutral Tier Two criteria to race in what it considered to be Tier One protected districts: "[I]f your primary concern, as it should be, is Tier One compliance . . . Tier Two is Tier Two for a reason. **So when it's a protected district, we focus much less on Tier Two.**" 2/1 Tr. 68:22–23; *see also* Motion at 6 (acknowledging that when "standards in different tiers conflict . . . tier-one standards prevail over tier-two standards"). Byrd also repeatedly noted the "Hispanic voting-age population" in the districts, and that it was similar compared to the benchmark districts. 1/21 Tr. 23:20–21; 1/26 Tr. 30:18–19; *see also* 2/1 22:11–12, 8:12–14 (Leek: "These districts are also drawn . . . to

---

Plaintiffs alleged in the complaint "certainly shows that race played a role in legislative deliberations," but stopped short of holding that it, by itself, suggested that race predominated. *Cubanos Pa'lante v. Fla. House of Representatives*, 766 F. Supp. 3d 1204, 1212 (S.D. Fla. 2025). As described herein, a more fulsome review of the legislative record than the excerpts included in the complaint establishes that race did, in fact, predominate.

maintain existing majority-minority districts."). These statements are evidence the House "purposefully established a racial target: [Hispanics] should make up no less than a majority of the voting-age population." *Cooper*, 581 U.S. at 299; *see also Abbott v. Perez*, 585 U.S. 579, 620 (2018) (finding district was a racial gerrymander where Legislature intentionally drew it to have a 50% Latino population); *GRACE, Inc. v. City of Miami* (*GRACE I*), 674 F. Supp. 3d 1141, 1208 (S.D. Fla. 2023) (finding racial predominance where the commission had "[t]he intention of preserving Districts 1, 3, and 4 as majority-Hispanic districts").

Legislators did not just speak about the Challenged House Districts in the abstract—they specifically confirmed that the shapes of each district were dictated by race. And they confirmed that—contrary to the House's contention based on Poreda's 2025 declaration, *see* Motion at 8—the House in 2022 *first* considered whether each district contained a sufficient number of Hispanic voters for purposes of Tier One, *then* considered whether the district's shape adhered to traditional redistricting principles embodied in Tier Two. This makes sense, given the House's express goal of creating majority-minority Hispanic districts in its (mistaken) belief it was required to do so under Tier One. For example, Rep. Fentrice Driskell asked Leek and Byrd on the House floor why HDs 114, 115, 116, 118, and 119 were noncompact and had elongated, north-south shapes. 2/1 Tr. 46:18–53:9.[3] Leek and Byrd pointed to Tier One—race—as the reason why these districts are shaped the way they are:

> *Leek*: "So you also have some protected districts, so there is also another analysis that goes in that, in addition to compactness. So, remember that's a Tier One element. **So we get to compactness after Tier One. So we had to make sure that the protected districts continue to perform within reason, as they had performed.**" *Id.* 47:16–19.

> *Driskell*: "[W]as it necessary that those five districts be long and skinny and noncompact to comply with Tier One?" *Id.* 52:10–11.

> *Leek*: "**Tier One is a wholly separate analysis, right. And so we're not going to get to compactness until we are ensured that Tier One is satisfied.** Once we get

---

[3]   *E.g.*, 2/1 Tr. 51:11–15: "Their scores are indicative that they're outliers on the map. And so, the shapes are also irregular such that indicates that it's not compact. So I'm trying to understand why, if you could explain why you consider these compact if their scores appear to be outliers and their shapes indicate that they're not compact to the eye test."

to Tier Two, then you can start to take into account those types of factors, like is it compact, does it keep a city whole." *Id.* 52:13–16.

*Driskell*: "Why wouldn't, for example, District 115 lose its northern appendage up to the Tamiami Trail and be more compact, taking up the southern portion of 116 and trading the appendage with 116?" *Id.* 53:7–9.

*Byrd*: "**Because that's a Tier One standard that we applied.**" *Id.* 53:13.

Notwithstanding Poreda's 2025 declaration, committee staff's descriptions in 2022 of how they drew minority-protected districts also confirms that race predominated in drawing the Challenged House Districts. For example, as Staff Director Leda Kelly explained when asked about the methodology used to draw the House map: "throughout the map, obviously, our Tier One considerations take priority, as we know, over Tier Two." 12/3 Tr. 44:11–12; *see also id.* 44:12–14 (explaining that Tier Two options were explored only "once we have been able to establish those" Tier One protected districts); Poreda Dep. 138:14–16 (confirming accuracy).[4]

### B. Legislators repeatedly stated that race predominated in the drawing of CD 26.

Legislators' race-focused approach rang true for Congressional District 26 too. Discussing the congressional map, Leek stated expressly: "All of those protected districts"—including CD 26—"are not race neutral." 4/20 H. Tr. 81:4–12 (Rep. Smith: "So what is the distinction between which areas of the state we've decided to have race neutral and which areas of the state are not race neutral?" Leek: "All of those protected districts are not race neutral."). Leek confirmed that

---

[4]    12/2 Tr. 25:15–17 (Leda Kelly explaining, "From there we obviously have federal and state legal requirements to ensure that minority communities where they're protected have the ability to elect representatives of their district and then from there you just start to build them out."), 29:6–11 ("Obviously we have a legal requirement under federal and state law to make sure that those groups have the ability to elect so we look at our benchmark map and understand where that may be a starting point but I would say it does evolve as you make sure that you move throughout the region and you make sure that as you go where there may have been population shifts you've accounted for that. And as I mentioned earlier you kind of adjust as you build out the entirety of the map."); *see also* Poreda Dep. 136:22–137:2, 137:18–20 (confirming those quotes accurately state the committee's map-drawing process); 12/3 Tr. 52:18–53:6 (Leda Kelly answering question about whether staff had to "pull out certain Black communities and put them into other districts to meet the threshold" by explaining, "whenever you look at the population, you are able to see where those Black populations are throughout those counties, and so we work to ensure that they were protected within their respective minority district and it obviously performed as required to under Tier One"); Poreda Dep. 139:4–16 (confirming Kelly's explanation of drawing Tier One districts applied to Hispanic protected districts too).

by "not race neutral," he meant that the congressional map was "**based on race in the areas that are protected**," contrasting the term "race neutral" with the term "predominantly based upon race." *Id.* at 80:18–22; *see id.* at 80:18-25 ("I believe the Governor used the term 'race-neutral' as a counterbalance to 'predominantly based upon race.' And the maps are both race-neutral in areas, and, you know, [] also based on race in the areas that are protected. . . . So it's not one or the other."). This express acknowledgment from the committee chair and bill sponsor that the Tier One-protected districts including CD 26 were "based on race" is direct evidence of predominance.

Other legislators confirmed and reiterated Leek's statements that the boundaries of CD 26 were drawn based on race. The next day, another key legislator, House Legislative Subcommittee Vice Chair and Redistricting Committee Member Will Robinson, confirmed that the Legislature prioritized racial considerations (*i.e.*, Tier One) over traditional redistricting criteria in what the Legislature believed to be Tier One-protected districts, including CD 26. 4/21 Tr. 53:11–18 ("I couldn't help notice yesterday there were a lot of questions about whether we elevated Tier Two standards over Tier One standards. We also heard this line of questioning in the subcommittee, and I want to say firmly that that has never been the case. Tier One always outranks Tier Two. And in my opinion, that is firmly true in this map before us.") Reps. Dotie Joseph and Tom Fabricio also asked about why CD 26 had its shape, including why it had "Tier Two infirmities" like crossing from Miami-Dade into Collier County. Again, staff (including Poreda) and key legislators answered that the shape was due to race-based Tier One considerations:

> *Joseph*: "**[L]ooking at CD 26, was that impacted by the fact that it's a Tier 1-protected district for Latino voters or Hispanic voters?**" 2/18 Tr. 38:10–13.

> *Sirois*: "**Yes.**" *Id.* 38:16.

> *Joseph*: "[I]t's kind of like an extruded stair-step shape, stretching up from the Gulf of Mexico all the way over to a little finger that points just 700 yards short of Biscayne Bay in Miami. **Was that shape necessary to comply with Tier 1?** Or were there other factors that went into just how it ends up looking there?" *Id.* 38:17–24.

> *Poreda*: "**Yes. The shape of District 26 was largely because not only it was a Tier 1-protected district, but the other three districts in Miami-Dade County** – District 24 are protected black district[s]. And District 27 and 28 are also protected

districts. So trying to balance all the Tier 2 issues that are there in addition to, **first, protecting all three of those districts and their ability to elect, that largely impacted the shapes of all four of those districts.**" *Id.* 39:6–15.

*Joseph*: "[I]f I'm not mistaken, the Everglades boundary coincides with the political boundary where the Dade-Collier County boundary is. So with that in mind, looking at the Tier 2 factors with CD [2]6, like this stairway to [Immokalee] shape, it crosses those county lines. It splits Collier, which is smaller than the ideal district size. It splits the city of Miami in three ways, and Miami is smaller than ideal district size too. **All of those Tier 2 – I don't want to say deficiencies, but infirmities, if we can call it that, were those necessary to maintain Tier 1 compliance?**" *Id.* 43:11–23.

*Poreda*: "As I mentioned earlier, **that is primarily due to Tier 1 considerations** [i]n addition to the equal population standard . . . ." *Id.* 44:10–12.

*Fabricio*: "[I]n looking at the CD 26 District and discussing Tier 1 requirements and Tier 2 requirements, how does the factor of compactness scores factor into determining the viability of a CD in light of the Tier 1 requirements?" *Id.* 45:17–22.

*Sirois*: "As you know and as we've discussed since we've started, the Tier 1 standards take precedent, in terms of looking at the districts." *Id.* 46:1–3.

*Fabricio*: "I'd like to consider the compactness scores of District 26 vis-à-vis the compactness scores of, say, District 3 . . . both low, but CD 3 seems to be very low." *Id.* 47:4–11.

*Leda Kelly*: "So first of all, **compactness is secondary to our Tier 1 requirement to ensure that a minority population has an ability to elect a candidate of their choice. So both of the districts that you reference, Congressional District 3 in North Florida and then Congressional District 26 in South Florida are both Tier 1 protected districts.** The first item I'd like to point out is that [District] 3 is a protected black district. District 26 is a protected Hispanic district." *Id.* 47:23–48:7.

*Joseph*: "It seems that the House took away a benchmark Hispanic district that or the new map proposed, that crossed the Everglades from Dade to Collier. I'd really like to see how we could avoid crossing the Everglades because it's been a practice of doing that since the 2016 court-ordered Senate map. And as we continue working on the maps, I'd like to see how we can preserve that because I actually think it would make it more Tier 2 compliant." *Id.* 55:17–56:1; *see also id.* 57:7–16.

*Sirois*: "District 26 remains a protected Hispanic district, so I'm not sure what it is that you're referring to." *Id.* 56:5–7.

The development of CD 26 on the Senate side evinces racial predominance, as well. In early drafts with a similar general configuration to the enacted CD 26,[5] Senate Reapportionment Committee Staff Director Jay Ferrin explained the boundary of CD 26 (numbered 25 in early Senate drafts) followed some highways and canals, but "departs from these geographic features when necessary to equalize population and to maintain the ability to elect in this and neighboring Tier 1 districts." 11/16 S. Tr. 34:4–7; *see also id.* 36:2–5 (describing how adjacent CD 27 "departs from [] geographic boundaries when necessary to equalize population and maintain the ability to elect in this and in neighboring Tier 1 protected districts"), 29:4–7 (describing how "in Collier County the shape of [CD 19] is the result of the configuration of District 25 which is a Hispanic majority/minority district protected from diminishment under Tier 1"); 1/13 S. Tr. 12:23–13:1 ("District 19 . . . is affected by the neighboring District 25, which is a Tier One protected district."). Ferrin explained how the fact that South Florida "contains five Tier One protected districts" "has a significant impact on the configuration of the region." *Id.* 13:8–9. Finally, Chair Rodrigues confirmed on the Senate floor that a "**[b]ig consideration in drafting CD 26 . . . is that 26 is a Tier One protected district.**" 4/19 S. Sess. Tr. 66:16–19; *see also id.* 67:13–15 ("District 26 retains its minority-majority status, and that particular seat is a minority-majority district for Hispanics. It was under both of the maps that we passed previously. It remains in this map as well.").

---

[5]    The drafts discussed on November 16, 2021 (Plans 8002 and 8004) had identical configurations for CD 25 (later renumbered 26). SAC ¶ 105. CD 25 in Plans 8002 and 8004 were similar to later Senate drafts, and to CD 26 in the enacted plan. *Id.* ¶¶ 109, 116–117; ECF No. 126-23 (maps of Congressional Plans 8002, 8004, 8040, 8060); ECF No. 123-1 at 18–19 (maps of Enacted CD 26).

    For brevity, citations to the Second Amended Complaint (SAC) encompass the corresponding paragraphs in the House's Answer, ECF No. 94.

As for the portion of CD 26 which the governor's office altered from the House's version (the border in Collier County), Alex Kelly told a House subcommittee that as he made his adjustments, "knowing that this is a historically performing majority-minority Hispanic seat, **I was watching those numbers carefully to make sure that in terms of the overall Hispanic voting age population, I was staying very close to the benchmark seat, which I think is maybe a little bit more than 74 percent.**" 4/19 H. Tr. 73:19–25. As he redrew the district to account for ripple effects elsewhere, he was in need of "[r]eally both" total population *and* Latino population specifically. *Id.* 73:2–7. In the end, he reached his target: as he told the committee, the enacted CD 26 has a 73% HVAP, "still very high," just a point under the benchmark HVAP which Kelly tried to "stay[] very close to." *Id.* 74:1–4; *see also id.* 75:8–17 ("I was fairly confident that a Hispanic voting age population that's higher than 73 percent is still going to maintain that historical performance for this district that has performed Hispanic for, to my knowledge at least a couple decades. So I was fairly confident that with such a high Hispanic voting age population, even though it was a slight drop, that overall it wouldn't warrant any concerns."). Underscoring Kelly's "careful" attention to CD 26's HVAP, of the 18 districts the governor's office altered from the plan he vetoed, CD 26 was the *only* district for which he cited a racial population percentage when he walked through the changes. *Id.* 15:2–47:8. Overall, Kelly's goal was to "maintain[] the same number of performing majority-minority seats." *Id.* 21:6–7; 4/19 S. Comm. Tr. 10:25–9:1.

These "relevant, contemporaneous statements of key legislators" and staff manifest a racial prioritization in the Legislature's development and enactment of each Challenged District. *See Jacksonville II*, 2022 WL 16754389, at *4; *see also Nord Hodges v. Albritton*, 774 F. Supp. 3d 1340, 1345–46 (M.D. Fla. 2025) (finding genuine dispute of fact as to racial predominance based on "general statements that apply to all districts," "bolster[ed]" with contemporaneous statements that race was the reason for the challenged district's configuration), *on reconsideration in part*, 2025 WL 1181305 (M.D. Fla. Apr. 23, 2025).[6]

---

[6] Yesterday, the court in *Nord Hodges v. Albritton* issued its post-trial decision, finding the challenged district was not drawn predominantly based on race. No. 8:24-cv-879, 2025 WL 2391348, at *1 (M.D. Fla. Aug. 18, 2025). The direct and circumstantial evidence of racial predominance on *this* summary judgment record is stronger than even the trial record in *Nord Hodges*. For instance, here, there is direct evidence the Legislature altered districts for race-based reasons and selected district configurations over alternatives for race-based reasons. The legislative record is replete with legislators' express acknowledgment that the districts were "based on race" and that race—not other factors—was the reason the districts assumed their configurations.  And

### C.  Poreda's deposition testimony confirms racial predominance, too.

Not only does the House ignore the direct evidence of racial predominance in the legislative record, it ignores most of the testimony of the one witness it relies on—Jason Poreda. The portions of his deposition testimony the House ignores, standing alone and in combination with the other direct and circumstantial evidence, create a genuine dispute of fact as to predominance.

To start, the House's contention that "Mr. Poreda did not even consider race until after th[e] districts were drawn" is false, and Poreda's testimony directly contradicts it. Motion at 7. In portions of testimony the House ignores, Poreda testified that before he began drawing maps, the House identified where the Tier One-protected districts would be drawn, Poreda Dep. 141:15–25, establishing that from the very outset, race factored into the redistricting process. Specific to Miami-Dade, Poreda testified that knowing the number of benchmark Hispanic protected districts "was certainly kind of a baseline where we started from." *Id.* 143:3–4. Poreda claimed that the House then made *some* determination that Hispanic voters were cohesive in the Challenged Districts.[7] *Id.* 274:1–13, 275:18–23. Once staff concluded a district was a Tier One-protected district, they would conduct a "functional analysis" to determine whether the relevant minority group enjoyed the ability to elect preferred candidates in that redrawn district. *Id.* 140:23–141:2. To conduct the "functional analysis," staff first concluded whether the district leaned toward one political party, or was politically competitive. *Id.* 245:23–246:11. If the district performed for one party, staff would then look at the racial makeup of that party's primary electorate. *Id.* 247:11–20. If instead the district could be feasibly won by either party, staff would examine both party primaries. *Id.* 247:6–10. In either case, staff looked at the party primaries to make sure that the minority group controlled one or both relevant party primaries. *Id.* 248:13–24.

Not only did staff use their knowledge of the number of benchmark Hispanic protected districts as a "baseline" from which they "started" drawing each Challenged District, *id.* 143:3–4, Poreda testified how running the functional analysis and ensuring Hispanic performance drove the drawing of the Challenged Districts. In particular, the House concluded HDs 113, 114, and 115

---

in this case, Dr. McCartan's alternative maps are "race neutral maps that merely followed the legislature's own criteria," *id.* at *23–24, produced without considering race and not based on any specific instructions different from those provided to the Legislature's mapmakers.

[7]  If Defendants choose to contest the second step of Plaintiffs' racial gerrymandering claim—narrow tailoring—they must of course defend the soundness and sufficiency of this conclusion as part of their strict scrutiny case at trial. *See Cooper*, 581 U.S. at 302.

were all politically competitive, so Hispanic voters had to control both party primaries. *Id.* 268:18–21. Poreda testified: "**[E]lecting a Hispanic in those three districts specifically was the goal.**" *Id.* 269:5–6. He continued: "In 113, 114, and 115, it was a concern to have an adequate Hispanic share of both party primary electorates" "[t]o the best of our ability." *Id.* 269:21–24. "[W]e were trying to ensure that a Hispanic candidate, regardless of party, could be elected to ensure that minority communities could elect a candidate of their choice. **That was our overall goal.**" *Id.* 269:25–270:3.

That "overall goal" had tangible impacts on how the Legislature designed the Challenged Districts. HD 115, which has an irregular appendage stretching northward from the main body of the district, was originally drafted more compactly. But after staff performed a "functional analysis" to check for Hispanic performance, staff concluded they needed to change the district to ensure the district would perform for Hispanic voters. *Id.* 164:6–165:3, 166:25–169:3. Poreda testified that "ensuring Tier 1 compliance is the reason why 115 extended as far north as it does," and "why the border between 115 and 116 is where it is." *Id.* 168:2–169:3; *cf. Bethune-Hill*, 580 U.S. at 192 ("[A] legislature's race-based decisionmaking may be evident in a notable way in a particular part of a district."). Those adjustments "to make sure that you could elect a Republican and a Democrat Hispanic candidate" prompted adjustments to HD 115's border with HD 114, too. Poreda Dep. 167:24–25, 168:16–17; *see also id.* 180:24–181:9 (agreeing Byrd's response to Driskell that HD 115 is shaped the way it is because of Tier One was accurate). Staff may have made similar changes to draft maps to improve Hispanic performance in HD 113, too. *Id.* 169:4–14, :22–24.

Poreda also testified as to "conflicts" between the Tier One standards and the race-neutral Tier Two criteria. He identified not only HD 115 as exhibiting a potential conflict between the tiers, but also HDs 118 and 119. *Id.* 128:18–129:22, 131:13–132:6. Indeed, when staff selected the final configuration of HDs 118 and 119 from among different options, they ran "functional analysis in all of those options," then "**went with the one that satisfied the functional analysis the best, that had the better performance numbers, to ensure that both of those district would elect an Hispanic candidate.**" *Id.* 170:13–17; *see also id.* 172:17–173:6, 175:10–176:8. Yet again, "**ensuring that an Hispanic would be elected in either district [] was the primary focus.**" *Id.* 173:5–6. The perceived need to attain that race-based goal explains why HDs 118 and 119 are "vertically shaped," *id.* 155:1, not "stacked on top of each other," *id.* 177:9–10. As Poreda

explained the House's approach, "obviously if we had a situation where [] there was some problem with Tier 1, then fixing that problem became a priority over fixing whatever other problems with Tier 2 that may have existed." *Id.* 285:21–24.

As for the congressional map specifically, Poreda confirmed that "CD 26 was impacted by the fact that it's a Tier 1 protected district for Hispanic voters." *Id.* 204:18–21. He affirmed his prior statement in committee that CD 26's shape "was largely because" of Tier One concerns.[8] He explained that Tier 1 considerations were "our reason" for the way the City of Miami was split between CD 26 and other districts. *Id.* 209:22. Indeed, "**Tier 1 was a large contributing factor in the way the City of Miami was split**" and "certainly a large concern." *Id.* 210:6–7, :10–12. He explained that the border of CDs 24 and 26—why CD 24 includes coastal Miami-Dade rather than shifting further west into the area assigned to CD 26—was due to concerns about impacting the Tier One compliance of CD 26 and the other Hispanic protected districts. *Id.* 215:14–217:22. He acknowledged that CD 26 had lower compactness scores at least in part because of Tier One compliance, and moreover that CD 26's compactness scores "were certainly secondary" to Tier One concerns. *Id.* 213:6–12, 213:18–22. One of the reasons staff "scrapped" a draft configuration that did *not* extend CD 26 into Collier County was that it "**would have negatively impacted Hispanic ability to elect in District 26 and one of District 27 and 28.**" *Id.* 231:3–7. Besides Tier One, the only other reason for CD 26's shape Poreda could name was equal population. *Id.* 209:25–210:4. Equal population and the region's Tier One considerations were "**what primarily governs the shapes of those districts down there.**" Poreda Dep. 235:11–236:5.

Collectively, the statements from the legislative record, supplemented by Poreda's deposition testimony, evince the Legislature's race-based purpose in drawing the Challenged Districts and its explicit sacrificing of race-neutral criteria like compactness, respect for political subdivisions, and adherence to major natural and manmade boundaries. "Race was the criterion that, in the State's view, could not be compromised;" other criteria "came into play only after the

---

[8]   Poreda added one other reason for CD 26's shape and why it extends from Miami-Dade to Collier: "meeting necessary population to reach equal population." Poreda Dep. 206:17–21. Explanations here and elsewhere that certain mapmaking decisions were made to equalize population do nothing to undermine the evidence that race predominated. This is because "an equal population goal is not one factor among others to be weighed against the use of race to determine whether race 'predominates.' Rather, it is part of the redistricting background, taken as a given, when determining whether race, or other factors, predominate in a legislator's determination as to *how* equal population objectives will be met." *ALBC*, 575 U.S. at 272.

race-based decision had been made." *Shaw v. Hunt*, 517 U.S. 899, 907 (1996).

## II. Ample circumstantial evidence corroborates the direct evidence.

In addition to the direct evidence of predominance, "circumstantial evidence of [the] district[s'] shape and demographics" point to racial predominance as well. *Miller*, 515 U.S. at 916. As the Court has previously noted, the Challenged Districts are outliers in terms of their compactness scores. *Cubanos Pa'lante*, 766 F. Supp. 3d at 1214 ("The low compactness scores here, when evaluated alongside the Legislature's express acknowledgment that it considered the Challenged House Districts as 'Tier One-protected majority-minority districts,' make it plausible that the Legislature separated voters on the basis of race when redistricting."). Even more probative of racial predominance, Plaintiffs have put forward expert evidence in the form of (1) alternative maps without the infirmities of the enacted maps and (2) statistical analyses showing racial disparities across district boundaries and that the probability that the Legislature could have drawn the districts the way it did without race driving the line-drawing is extremely low.

***Deviations from Race-Neutral Criteria.*** With respect to the Challenged House Districts, contrary to the House's goal to "try to minimize the number of times a county or city was split" "if possible," HDs 112, 113, and 114 split Miami into more parts than necessary. Poreda Dep. 56:12–14; McCartan Rep. ¶¶ 17–18 (alternative Plans B and C1–C4 split Miami between four rather than five districts). HDs 114, 115, 116, 118, and 119 are all noncompact districts drawn to form long, skinny shapes running north-south. ECF No. 123-1 at 3. Their low compactness and "boundary analysis" scores reveal them to be outliers compared to the rest of the map.[9] CD 26 is similarly an outlier on compactness: it has the third-worst Reock score and fifth-worst Polsby-Popper score in the Enacted Congressional Plan, and its Convex Hull score is also worse than the plan average. SAC ¶ 171. CD 26 crosses the state to connect Miami-Dade to Collier County,

---

[9] HD 118 has the second-worst Reock score (second only to a district protected under Tier One for Black voters), the second-worst boundary score, and is in the 13th percentile for Polsby-Popper and the 29th for Convex Hull. SAC ¶ 88. HD 119 has the plan's seventh-worst Reock score and its 13th-worst boundary score. *Id.* ¶ 89. HD 115 runs over 15.5 miles north-south but is only 1.8 miles at its narrowest point, and has the plan's seventh-, 11th-, and 12th-worst Reock, Convex Hull, and Polsby-Popper scores, respectively. *Id.* ¶ 90. HD 114's compactness scores are in the 13th, 14th, and 18th percentiles for Convex Hull, Reock, and Polsby-Popper, respectively. *Id.* ¶ 91. HD 116's Reock score is in the 14th percentile, tied with HD 114. *Id.* ¶ 92. HD 112 is in the 36th, 29th, and 38th percentile for Reock, Convex Hull, and Polsby-Popper scores, respectively. *Id.* ¶ 95. HD 113 is in the 32nd percentile for Polsby Popper and 22nd for Convex Hull. *Id.* ¶ 96.

unnecessarily splits the City of Miami, breaches the Miami-Dade County line more times than necessary,[10] and splits the region along racial lines. McCartan Rep. ¶¶ 24–29 (all alternative plans unite Miami in one district and cross the Miami-Dade County line twice, instead of three times); Abott Rep. ¶¶ 16–29 (CD 26 divides region along racial lines); *cf. Nord Hodges*, 774 F. Supp. 3d at 1346 (circumstantial evidence supported dispute of fact as to predominance where district shape contradicted legislature's professed race-neutral goals). Lawmakers expressly acknowledged that these "infirmities" in the Challenged Districts' adherence to the race-neutral Tier Two criteria was due to Tier One—racial—reasons. *See supra* pp. 7–11.

**Plaintiffs' Alternative Maps.** Alternative maps produced in this litigation by Plaintiffs' expert Dr. Cory McCartan demonstrate that the Legislature's choices were not simply natural consequences of Florida's demographics and geography, but rather made for racial reasons. *See* McCartan Rep.; McCartan Rebuttal Rep. Rather than drawing maps "based on race in the areas that are protected," 4/20 H. Tr. 80:18–22, McCartan drew his in a completely race-blind manner, applying only the race-neutral Tier Two criteria, McCartan Rep. ¶¶ 13–14. These alternative maps yield districts that do a better job of respecting those race-neutral principles:

- *Compactness:* The alternative maps eliminate the problematic, noncompact shapes that the Legislature adopted to achieve its racial goals. CD 26 does not stretch across the peninsula from the Gulf to Biscayne Bay but instead sits compact in Miami-Dade County. The "long and skinny" House districts (HDs 114, 115, 116, 118, and 119)

---

[10] The fact that the congressional map breaches the Miami-Dade County line more times than necessary is an example of the Legislature departing from its "consistent" application of the Tier Two criteria when it deemed it necessary to achieve its racial goals. *See* Poreda Dep. 69:10–17, 72:7–10. The House eliminated a historic majority-Hispanic House district that crossed from Miami-Dade into Collier County. Poreda Dep. 221:1–222:8; 1/21 Tr. 6:23–7:2; ECF No. 126-23 (map of benchmark HD 105 and its racial statistics, *In re SJR 100* Pet. App'x Excerpt). Legislative Subcommittee member Rep. Jenna Persons Mulicka commented favorably on how the House map "do[es]n't have that coast-to-coast district, but rather only two districts [] cross the Miami-Dade County line" (one to include Monroe and one into Broward) 2/2 Tr. 31:5–6; *see also* 2/1 Tr. 7:15–16 (Leek: "Where feasible, we also worked to improve visible compactness of districts or the eyeball test, such as no longer having a district that stretches from Miami-Dade County to Collier County[.]"); 1/21 Tr. 6:23–7:2 (Byrd making same point). In contrast, the congressional map has *three* districts cross that county line (one to include Monroe, one into Broward, and CD 26 into Collier), and CD 26 "stretches from Miami-Dade County to Collier County" despite the damage to the "eyeball test." As Poreda testified, "If we could put a district entirely within a county that would be consistent with some of the other criteria that we used throughout the house map and the congressional map where possible." Poreda Dep. 57:12–15.

become compact, squarer shapes. For example, HD 115 loses its northern extension which the House added for explicitly racial reasons. Mathematical compactness scores confirm a visual assessment: the alternative maps generally improve on the Enacted House Plan and Enacted Congressional Plan across all three compactness metrics. *Id.* ¶¶ 42–47.

- *Boundary utilization:* Based on the Legislature's "boundary score" metric, which quantifies district lines' adherence to major boundaries, every alternative House map improves on the Enacted House Plan. *Id.* ¶¶ 38–40. The alternative congressional maps are either similar to or improve on the Enacted Congressional Plan. *Id.* ¶ 41.

- *Splitting municipalities and counties:* Five of the alternative House maps reduce both the total number of municipality splits and the number of municipalities split across more than two districts; the other two alternative maps match the Enacted House Plan on those metrics. *Id.* ¶¶ 32–33. The alternative House maps introduce no new county splits. *Id.* ¶ 32. Every single alternative congressional map improves on the number of total municipality splits, with three of the maps reducing that number from 20 to 13 or 14. *Id.* ¶ 36. Three of the six alternative congressional plans improve on the number of total county splits; two plans match the Enacted Congressional Plan on that metric. *Id.* Most significantly of course, McCartan's plans no longer divide Collier County along racial lines or group more-Hispanic portions of eastern Collier with majority-Hispanic parts of Miami-Dade.

In sum, McCartan's race-neutral maps confirm what legislators and staff admitted when asked about the Challenged Districts' Tier Two "infirmities": they are attributable to the Legislature's racial goals. [11] The alternative maps are thus circumstantial evidence that the Legislature subordinated race-neutral principles to race.

***Statistical Analyses of District Demographics and Shapes.*** Plaintiffs' expert Dr. Carolyn Abott's analysis lends further support to a finding of racial predominance. *See* Abott Rep.; Abott Rebuttal Rep. She examined the districts' shapes and demographics and observed "substantial disparities in the distribution of Hispanic populations across district lines," which she concluded "is consistent with the claim that mapmaking was driven by racial considerations." Abott Rep. ¶ 54

---

[11] Another expert confirmed that McCartan's maps continue to comply with applicable Tier One requirements in adjacent districts which McCartan altered. Walker Rep. ¶¶ 78–117.

("At every geographic level of analysis, it is evident that areas with higher Hispanic concentrations are included in these districts, while areas with lower Hispanic concentrations are excluded from them."). Take just one example: the portion of Collier County assigned to CD 26 has a Hispanic concentration nearly *two-and-a-half times higher* than the remainder of the county. *Id.* ¶ 22. Furthermore, "the distribution of demographics within the Hispanic-protected districts suggests an effort to optimize and balance the Hispanic population of all these districts at a uniformly high level." *Id.* ¶ 54; *see also id.* ¶ 18 ("The three Hispanic protected districts have a remarkably uniform Hispanic VAP, varying by only a single percentage point. One might expect such a uniform Hispanic VAP to reflect a uniformly Hispanic sub-region in which the three districts are located. But examining the distribution of Hispanic populations *within* the Hispanic protected districts suggests that this district-level uniformity is not merely a function of the demographics of the region."); *cf. GRACE, Inc. v. City of Miami*, 730 F. Supp. 3d 1245, 1281–82 (S.D. Fla. 2024) (finding race predominated in three supermajority-Hispanic districts with concentrated, evenly balanced Hispanic populations). Moreover, "a comparison with Plaintiffs' alternative plans reveals that the demographic realities of the region do not dictate the challenged districts' racial composition." Abott Rep. ¶ 37.

Examining the manner in which the Challenged Districts' borders cut through various levels of geography—counties, census-designated places including cities, and voting tabulation districts (VTDs)—Abott calculated the statistical probability that the VTDs inside the districts designated as "Hispanic protected" would have a consistently higher Hispanic concentration than those on the outside if race were *not* driving the line-drawing decisions. *Id.* ¶¶ 27–29. This probability—1 in 95,801 for CD 26—is an extraordinary statistical anomaly and compelling evidence that CD 26 was drawn to divide the region along racial lines, separating more- from less-Hispanic areas.[12] *Id.* ¶ 29. *See Jacksonville Branch of NAACP v. City of Jacksonville*, 635 F. Supp. 3d 1229, 1273–76, 1284 (expert analysis concluding "district lines are consistently drawn in a manner such that the precincts in [protected Black districts] have higher BVAP than the neighboring precincts on the other side of the line" was "strong evidence" of predominance);

---

[12]   For comparison, the risk of dying from a lightning strike in one's lifetime is 1 in 79,746. FLORIDA MUSEUM, Annual Risk of Death During One's Lifetime, https://www.floridamuseum.ufl.edu/sharkattacks/odds/compare-risk/death/.

*GRACE I*, 674 F. Supp. 3d at 1193–94 & n.15, 1209–11 (crediting similar analysis and finding predominance).

*           *           *

Plaintiffs' direct and circumstantial evidence suffices to establish a genuine issue of material fact as to whether race predominated in the drawing of the Challenged Districts and overcomes a presumption of legislative good faith (*i.e.*, the presumption that the Legislature engaged in policymaking without regard to race). *See, e.g.*, *McClure v. Jefferson Cnty. Comm'n*, No. 2:23-cv-443, 2025 WL 88404, at *2 (N.D. Ala. Jan. 10, 2025) (denying cross-motions for summary judgment in racial gerrymandering case and noting that "[s]ummary judgment in redistricting cases presents particular challenges due to the fact-driven nature of the legal tests required by the Supreme Court and Eleventh Circuit precedent" (alterations in original omitted) (quoting *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1348 (11th Cir. 2015))); *Ga. State Conf. of NAACP v. Georgia*, No. 1:21-cv-5338, 2023 WL 7093025, at *8–14 (N.D. Ga. Oct. 26, 2023); *Walen v. Burgum*, 700 F. Supp. 3d 759, 769–70 (D.N.D. 2023), *aff'd in part, appeal dismissed in part*, 145 S. Ct. 1041 (2025) (mem.).

For example, the court in *Georgia State Conference* denied summary judgment regarding Congressional Districts 2 and 8 (the former a majority-minority district drawn to comply with the VRA; the latter an adjacent district) based on the plaintiffs' expert's opinion that a single county "was split between these two districts based on 'minutely race conscious decisions.'" 2023 WL 7093025, at *10. The *Walen* court similarly found "a genuine issue of material fact as to whether race was the predominate motivating factor" in the drawing of two North Dakota legislative districts despite competing interpretations of the evidence offered by the parties. 700 F. Supp. 3d at 770. ("The record contains ample evidence that VRA compliance and avoiding litigation from Native American voters was a motivating factor in the decision to draw the subdistricts.").[13] As in these cases, Plaintiffs here have established a factual dispute on racial predominance sufficient to go to trial.

**CONCLUSION**

The House has not met its summary judgment burden. The Court should deny the Motion.

---

[13] *Walen* granted summary judgment for the state on the grounds that, even if race predominated, the use of race survived strict scrutiny as a matter of law. 700 F. Supp. 3d at 775.

Respectfully submitted August 19, 2025,

 /s/ Nicholas L.V. Warren

Andrew Frackman*
**O'Melveny & Myers LLP**
1301 Avenue of the Americas, 17th Floor
New York, NY 10019
(212) 326-2000
afrackman@omm.com

Brian P. Quinn*
Patrick J. Jones*
Emily Murphy*
Gabrielle S. Jackson*
Andrea Ojeda*
**O'Melveny & Myers LLP**
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300
bquinn@omm.com
pjones@omm.com
emurphy@omm.com
gjackson@omm.com
aojeda@omm.com

Nicholas L.V. Warren (FBN 1019018)
Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida, Inc.**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-1769
nwarren@aclufl.org
dtilley@aclufl.org
cmcnamara@aclufl.org

Jorge L. Vasquez, Jr.*
**Vasquez Attorneys at Law, PC**
141 Parkway Road, Suite 14
Bronxville, NY 10708
(212) 752-8408
jorge@vasquezpc.com

*Admitted pro hac vice*

*Counsel for Plaintiffs*