UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:24-cv-21983-JB

CUBANOS PA'LANTE, *et al.*,

     Plaintiffs,

v.

FLORIDA HOUSE OF REPRESENTATIVES
and CORD BYRD, in his official capacity as
Florida Secretary of State,

     Defendants.

_____/

_____

**DEFENDANT FLORIDA HOUSE OF REPRESENTATIVES'
REPLY STATEMENT OF MATERIAL FACTS**

_____

The House replies to Plaintiffs' Additional Facts (ECF No. 126 at 11–15):

128.  Undisputed.

129.  Undisputed.

130.  Disputed. Undisputed that Mr. Kelly made adjustments to CD 26's border in Collier County. Disputed as to the remainder of this paragraph. The sources that Plaintiffs cite do not establish that CD 26 was "largely the House's work product" or to what extent CD 26 reflects the Senate's work product.

131.  Disputed that CD 25 in Plans S000C8002 and S000C8004 was identical to enacted CD 26. ECF No. 126-23; ECF No. 123-1 at 18–19. Otherwise, undisputed.

132.  Disputed. Among other differences, CD 25 in Plans S000C8002 and S000C8004 contained an entire county (Hendry) that enacted CD 26 does not. ECF No. 126-23; ECF No. 123-1 at 18–19.

133.  Disputed that the cited sources reference any "desire." Undisputed that Chairs Leek, Byrd, and Sirois described the districts as performing majority-Hispanic districts protected by Tier One.

134.  Disputed. Mr. Ferrin stated that CD 25's "boundary departs from these geographic features when necessary to equalize the population and to maintain the ability to elect in this and neighboring Tier 1 districts," ECF No 126-2 at 34:3–7, but he repeated the same general statement with respect to other districts with substantial minority populations, *id.* at 20:23–23:2, 30:17–20, 32:21–33:7, 35:23–36:5. He also stated that "South Florida . . . contains five Tier One protected districts" and that "[t]his has a significant impact on the configuration of the region," but did not explain how Tier One influenced the boundary of CD 26 (then CD 25) specifically. ECF No. 126-5 at 13:8–9. The other sources that Plaintiffs cite do not contain any statements explaining how racial considerations influenced CD 26's boundaries.

135.  Disputed. In the statements that Plaintiffs reference, Ms. Kelly explained the legal principle that Tier One takes priority over Tier Two when the standards in the two tiers conflict. For example, on December 2, 2021, Ms. Kelly explained: "we have a legal requirement under state and federal law and make sure that those groups have the ability to elect, so we look at our benchmark map and understand where that may be a starting point, but I would say it does evolve as you make sure you move throughout the region . . . you kind of adjust as you build out the entirety of the map." ECF No. 126-3 at 29:5–11.

136.  Undisputed, with the caveat that the House understands Plaintiffs' reference to "January 1" to mean "January 21," as the citation indicates.

137.  Disputed as to Plaintiffs' vague reference to "other districts." Undisputed that, on January 21 and January 26, 2022, Chair Byrd noted that the challenged State House districts are majority Hispanic and that their Hispanic voting-age populations are similar to those of the benchmark districts.

138.  Disputed that the quoted language applies generally to the entire process. ECF No. 126-8 at

67:1–68:23. Undisputed that Chair Leek said the quoted language on February 1, 2022, when specifically discussing unchallenged HD 88. *Id.*

139.   Disputed that Chair Leek's statement referred to the challenged districts specifically rather than all majority-minority districts throughout the State House map. *Id.* at 8:3–18. Otherwise, undisputed.

140.   Disputed. Chairs Leek and Byrd discussed numerous race-neutral reasons for the shapes of HDs 114, 115, 116, 118, and 119, including trying to keep municipalities whole. *Id.* at 46:18–53:13. The Chairs consistently maintained that these districts were compact and legally compliant. *Id.*

141.   Disputed. Rep. Sirois, Ms. Kelly, and Mr. Poreda did not say race was the reason for CD 26's shape. They pointed to numerous reasons, including following political and geographical boundaries and the equal-population standard. ECF No. 126-10 at 41:6–44:18, 46:3–18, 48:17–49:9. Only Rep. Joseph, who voted against the plan, *see* https://www.flhouse.gov/Sections/Bills/floorvote.aspx?VoteId=21211 &BillId=75748&&, claimed that CD 26 had "infirmities," ECF No. 126-10 at 43:21.

142.   Disputed that Chair Rodrigues made the statement in the first sentence of paragraph 142, but undisputed that he agreed with it. ECF No. 126-13 at 66:15–19. Undisputed as to the second sentence of paragraph 142.

143.   Disputed. On the contrary, Mr. Kelly explained that he modified CD 26 as a result of tier-two improvements made to districts to the north. He explained that he made changes to keep Citrus and Sarasota Counties whole. ECF No. 126-11 at 26:2–7, 33:24–34:3, 34:20–25, 45:21–46:2, 55:17–24. This left CD 18 underpopulated, so Mr. Kelly extended CD 18 south into Collier County. *Id.* at 46:3–7, 46:17–24, 71:23–72:7. This change removed population from CD 26 and left CD 26 underpopulated; Mr. Kelly thus increased CD 26's population along its western boundary. *Id.* at 46:25–47:6, 72:8–15, 73:2–18.

144.   Disputed. Chair Leek did not draw the maps or claim to. *See* Poreda Dep. at 32:22–33:3, 99:6–100:19 (ECF No. 123-3). He stated: "The maps are both race neutral in areas, and you know, protected -- also based on race in the areas that are protected." ECF No. 126-14 at 80:20–22. Alex Kelly explained that "race neutral" means "not factoring in race as I'm drawing a district." ECF No. 126-11 at 70:8–17.

145.   Disputed that Rep. Robinson's statement had specific reference to any challenged district, but undisputed that Rep. Robinson made the quoted statement regarding the congressional map as a whole. Undisputed that, as Rep. Robinson stated, some legislators and members of the public repeatedly criticized the Legislature because, in their view, the Legislature had neglected race and "elevated Tier Two standards over Tier One standards"—*i.e.*, elevated non-racial considerations over race. *See* ECF No. 126-5 at 15:12–18:11; ECF No. 126-6 at 50:20–53:6, 53:22–54:10; ECF No. 126-7 at 54:21–56:15, 59:2–13, 64:7–13, 70:18–73:12, 78:4–7, 81:10–12; ECF No. 126-8 at 53:18–54:19, 56:23–57:4, 60:15–61:14, 81:5–

19; ECF No. 126-9 at 9:13–11:14, 13:19–23, 20:12–21:6, 24:2–17, 25:3–26:5; ECF No. 126-10 at 104:16–108:25; ECF No. 126-12 at 22:11–17; ECF No. 126-14 at 27:22–28:12.

146.   Disputed. Mr. Poreda testified that, before he began to draw districts, he identified the districts in the benchmark plan where racial minorities were able to elect representatives of their choice, Poreda Dep. at 122:9–125:8, 141:15–25, 142:14–143:4, as directed by the Florida Supreme Court, *Black Voters Matter Capacity Bldg. Inst., Inc. v. Sec'y, Fla. Dep't of State*, --- So. 3d ----, No. SC2023-1671, 2025 WL 1982762, at *3 (Fla. July 17, 2025) ("The first step is to identify districts in the benchmark plan where racial or language minorities were able to elect representatives of their choice . . . ."). He testified that he "started with a blank map" and that "the shapes of the previous district did not come into play in how we were trying to draw those districts. . . . So we were trying to draw good Tier 2 compliant districts and later kind of went back to look at the functional analysis based on Tier 1." Poreda Dep. at 142:2–13.

147.   Disputed. Mr. Poreda's complete testimony is that the number of ability-to-elect districts in the benchmark would "not necessarily . . . exactly translate over to the new map." *Id.* at 143:1–3. Mr. Poreda started with a blank map, did not attempt to mimic the benchmark districts, and tried to draw "good Tier 2 compliant districts" and only afterwards performed the functional analysis. *See supra* ¶ 146.

148.   Disputed. Mr. Poreda testified that the "overall goal" of the Non-Diminishment Clause is not to elect Democrats or Republicans, but rather to ensure that a minority group is able to elect its preferred candidates. *Id.* at 268:10–269:6, 269:21–270:3.

149.   Disputed. Mr. Poreda never testified this was a "general" approach. *Id.* at 285:11–24.

150.   Disputed. Mr. Poreda testified that, because HDs 113, 114, and 115 were competitive districts, staff's functional analysis considered "both sides of the primary" because "we had to make sure that the primaries in each side could potentially be won by a Hispanic candidate." *Id.* at 268:10–269:6.

151.   Disputed. Mr. Poreda did not testify that the early draft of HD 115 was "drafted more compactly" than enacted HD 115. Undisputed that, after conducting a functional analysis on HD 115, staff extended the district "slightly further north than it maybe originally had, to make sure that there was that proper electoral balance for both parties," and to "make sure that the functional analysis was completely satisfied while making it as compact as possible." *Id.* at 164:6–165:3, 168:9–21.

152.   Undisputed.

153.   Undisputed.

154.   Disputed. Mr. Poreda did not recall any changes to HD 113 to ensure tier-one compliance. *Id.* at 169:15–170:1.

155.   Disputed that "race-based goals" explain the shapes of HDs 118 and 119, but undisputed that

the quoted language accurately reflects select portions of Mr. Poreda's testimony. Staff prepared different versions of HDs 118 and 119 and considered those options "fundamentally the same" and "equally compliant" from a tier-two perspective. *Id.* at 170:2–17, 172:4–16. Staff performed a functional analysis and, "all things being equal," selected the option that was "most legally . . . defensible or legally compliant" under the Non-Diminishment Clause. *Id.* at 170:2–17, 172:17–22, 175:10–176:4; ECF No. 123-2 ¶¶ 32–35; Poreda Dep. at 132:16–133:1 (no conflict between Tiers 1 and 2 in HDs 118 and 119).

156.   Disputed. Mr. Poreda's errata sheet makes clear that Tier One was "one reason"—not "our reason"—for splitting the City of Miami. Ex. D, Attach. at 3 of 4. In discussing the way Miami was split, Mr. Poreda was referring collectively to tier-one considerations in four districts—not CD 26 alone. Poreda Dep. at 209:2–210:9. He discussed many race-neutral goals that drove the shape of CD 26. *Id.* at 206:17–208:20, 209:25–210:9, 213:18–214:10, 224:19–231:7, 291:23–295:5; ECF No. 123-2 ¶¶ 37–46.

157.   Disputed. Mr. Poreda was asked why, unlike benchmark CD 24, new CD 24 was drawn all the way to the east coast. Mr. Poreda explained that, if CD 24 stopped short of the east coast, "some other district is going to have to come up and take that population on the beaches," which would "impact . . . compactness" as well as "the potential functional analysis Tier 1 compliance of all of those other districts." Poreda Dep. at 215:14–217:22. It was a "regional balance of everything." *Id.* at 216:19.

158.   Disputed. Mr. Poreda testified that CD 26 also had lower compactness scores "because we were following county boundaries," *id.* at 213:18–22, and explained the tier-two considerations (such as maintaining a 140-mile county-boundary perimeter along CDs 20 and 21) that were the primary reason staff scrapped an alternative configuration, *id.* at 224:19–231:7, 291:23–295:5; ECF No. 123-2 ¶¶ 37–46. Mr. Poreda testified that, while compactness *scores* were secondary, *compactness* was not, and that a "low compactness score does not necessarily mean low compactness." Poreda Dep. at 212:4–16, 213:6–20.

159.   Disputed. Mr. Poreda explained the tier-two reasons for CD 26's shape, *id.* at 224:19–231:7, 291:23–295:5; ECF No. 123-2 ¶¶ 37–49, and pointed out CD 26's use of preexisting boundaries, like county lines and major roadways, Poreda Dep. at 208:2–20, 214:2–10, 236:11–22; ECF No. 123-2 ¶ 42.

160.   Disputed. The cited source does not claim the Legislature split Miami more often than necessary to achieve its goals. Two of Dr. McCartan's maps also split Miami five ways, ECF No. 126-16 ¶ 17, and yet Plaintiffs deny that those maps split Miami more often than necessary, Ex. G at 2 (RFAs 4–7).

161.   Disputed. HDs 114, 115, 116, 118, and 119 are compact and regularly shaped and, where feasible, utilize political and geographical boundaries. *See* Ex. C at 2–3; ECF No. 123-1 at 4–6, 10–11, 14–16 (maps); ECF No. 123-2 ¶¶ 31–36; ECF No. 126-6 at 23:17–24:20; ECF No. 126-7 at 30:9–31:11, 32:1–4; ECF No. 126-8 at 22:20–23:9, 47:21–22, 48:6, 48:23, 49:18, 50:2, 50:22. The Florida Supreme

4

Court reviewed these districts under Florida's tier-one and tier-two standards and unanimously upheld them. *See In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d 1282, 1285 (Fla. 2022).

162.   Disputed. Compactness is primarily a visual, not a mathematical measure. Moreover, CD 26's Convex Hull score (0.79) is near the statewide mean (0.81). ECF No. 126-16 at 35–36 tbl. 14; ECF No. 94 ¶ 171. Mr. Poreda explained the race-neutral, tier-two reasons for CD 26's shape. *See supra* ¶ 159.

163.   Disputed. Due to Tier Two factors, once districts to the north were drawn, "it was impossible to configure Miami-Dade County without a district that crossed into Collier County." ECF No. 123-2 ¶¶ 40–42; *accord* Poreda Dep. at 235:11–237:6. Dr. McCartan admitted that, if the 140-mile perimeter of county boundaries described in Mr. Poreda's declaration is adhered to, ECF No. 123-2 ¶ 38—a perimeter that Dr. McCartan's maps breach, *id.* at 155:25–156:6—then at least one district *must* cross from Miami-Dade into Collier County. Ex. F at 159:10–162:9. Dr. McCartan admitted that, as a consequence of his changes to CD 26, his maps split Sarasota County, which the enacted map keeps whole. *Id.* at 158:1–16. Dr. Abott conceded that, along CD 26's boundary, the Legislature routinely excluded from CD 26 areas with higher Hispanic concentrations and included in CD 26 areas with lower Hispanic concentrations. Ex. B at 91:10–23, 104:2–105:14. CD 26 was not drawn to attain any particular Hispanic voting-age population, and the Legislature adhered to the race-neutral, tier-two principles (*e.g.*, utilizing county lines, major roadways, and similar boundaries along 91 percent of its perimeter). ECF No. 123-2 ¶¶ 47–50.

164.   Undisputed.

165.   Disputed that the comparison is apt, given the much larger populations of congressional districts. Undisputed that the quoted language reflects Rep. Persons-Mulicka's statement.

166.   Disputed. Tables 1 through 4 of Dr. McCartan's report show that the tier-two metrics of Dr. McCartan's maps are similar to those of the enacted maps—sometimes slightly better, sometimes slightly worse. ECF No. 126-16 at 15–18. Meanwhile, Dr. McCartan packs more than 100,000 additional voting-age Hispanics into CD 26 in five of his six maps, Ex. E at 7–8 (RFAs 48–53), increasing their Hispanic voting-age populations from 73.2 percent in enacted CD 26 to 89.5 or 91.1 percent, ECF No. 126-18 at 11 tbl. 2. Similarly, in the enacted State House map, the challenged districts contain a combined 850,388 voting-age Hispanics; in Dr. McCartan's maps, that figure ranges from 849,238 to 854,696. Ex. A at 1–2.

167.   Disputed. Dr. Abott admitted she has no opinion as to whether race predominated and agreed there "may very well be other explanations" for the challenged districts' configurations. Ex. B at 26:21–28:16, 31:7–24, 33:8–34:15. She did not assess the influence of non-racial considerations or potential alternative explanations for the shapes of the districts and therefore cannot opine on the relative weight or importance of racial and non-racial factors. *Id.* at 36:3–14, 75:1–77:16.

Dated September 8, 2025.                                    Respectfully submitted,


                                                           /s/ *Andy Bardos*
Christopher M. Kise (FBN 855545)                           Andy Bardos (FBN 822671)
ckise@continentalpllc.com                                  andy.bardos@gray-robinson.com
CONTINENTAL PLLC                                           GRAYROBINSON, P.A.
101 North Monroe Street, Suite 750                         301 South Bronough Street, Suite 600
Tallahassee, Florida 32301                                 Tallahassee, Florida 32301-1724
Telephone: 850-270-2211                                    Telephone: 850-577-9090


Jesus M. Suarez (FBN 60086)
jsuarez@continentalpllc.com
Carmen Manrara Cartaya (FBN 73887)
ccartaya@continentalpllc.com
CONTINENTAL PLLC
255 Alhambra Circle, Suite 640
Coral Gables, Florida 33134
Telephone: 305-677-2707


*Attorneys for Defendant, Florida House of Representatives*

6