```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF FLORIDA

 3               Case No. 1:24-cv-21983-JB

 4    --------------------------------X

 5    CUBANOS PA'LANTE, et al.,           :

 6              Plaintiffs,               :

 7         v.                             :

 8    FLORIDA HOUSE OF REPRESENTATIVES :

 9    and CORD BYRD, in his official      :

10    capacity as Florida Secretary       :

11    of State,                           :

12              Defendants.               :

13    --------------------------------X

14

15

16         DEPOSITION OF CORY MCCARTAN, Ph.D.

17              CONDUCTED VIRTUALLY

18             TUESDAY, JULY 15, 2025

19                9:33 a.m. EST

20

21

22

23    Job No.:  588374

24    Pages 1 - 218

25    Reported by:  APRIL REID, RPR, CRR (Stenographer)
```

Exhibit F

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                        2

```
 1       A P P E A R A N C E S

 2

 3     ON BEHALF OF THE PLAINTIFFS:

 4     ANDREW FRACKMAN, ESQ.

 5     ANDREA M. OJEDA, ESQ.

 6     O'MELVENY & MYERS LLP

 7     1625 Eye Street, NW

 8     Washington, DC  20006

 9     (202) 383-5112

10   and

11     NICHOLAS L.V. WARREN, ESQ.

12     ACLU Foundation of Florida

13     4343 West Flagler Street

14     Suite 400

15     Miami, FL  33134

16     (786) 363-2700

17

18     ON BEHALF OF THE DEFENDANTS:

19     ANDY BARDOS, ESQ.

20     GRAYROBINSON, P.A.

21     301 South Bronough Street

22     Suite 600

23     Tallahassee, FL  32301-1724

24     (850) 577-9090

25
```

```
 1    A P P E A R A N C E S   cont'd

 2

 3    ON BEHALF OF THE DEFENDANTS:

 4    CARMEN MANRARA CARTAYA, ESQ.

 5    CONTINENTAL PLLC

 6    255 Alhambra Circle

 7    Suite 640

 8    Coral Gables, FL  33134

 9    (305) 677-2707

10

11    ALSO PRESENT:

12    JOE DYE

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                          4

```
 1                      I N D E X

 2
     CORY MCCARTAN, PH.D.                         PAGE
 3
     Examination by Mr. Bardos                       7
 4

 5                    E X H I B I T S

 6   NUMBER              DESCRIPTION            PAGE

 7   Exhibit 1       Expert Report of Cory         9

 8                   McCartan, Ph.D., March 21,

 9                   2025

10   Exhibit 2       Assignment for Expert Report  15

11                   of Cory McCartan, Ph.D., May

12                   21, 2024

13   Exhibit 3       Addendum to Assignment for    23

14                   Expert Report of Cory

15                   McCartan, Ph.D., February 28,

16                   2025

17   Exhibit 4       Memorandum to Mr. Jay Ferrin  23

18                   from Senator Ray Rodrigues,

19                   October 18, 2021

20   Exhibit 5       Plaintiffs' Responses to      50

21                   Defendant's Third Set of

22                   Interrogatories

23   Exhibit 6       Plaintiffs' Responses to      52

24                   Defendant's Sixth Set of

25                   Interrogatories
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                         5

```
 1                   E X H I B I T S
 2    NUMBER              DESCRIPTION             PAGE
 3    Exhibit 31     House Map B2                   72
 4    Exhibit 13     Document from ALARM Project,   87
 5                   titled "Florida Congressional
 6                   Districts"
 7    Exhibit 14     Expert Report of Cory          92
 8                   McCartan, Ph.D., July 1, 2024
 9                   (Grace)
10    Exhibit 15     Expert Report of Cory          99
11                   McCartan, Ph.D., August 11,
12                   2023 (Nairne)
13    Exhibit 22     Table with Reock, Convex Hull 132
14                   and Polsby-Popper scores
15    Exhibit 29     Congressional Map A           136
16    Exhibit 27     Enacted Congressional Map     140
17    Exhibit 30     Map B1                        145
18    Exhibit 32     Map C1                        150
19    Exhibit 33     Map C2                        151
20    Exhibit 34     Map D                         152
21    Exhibit 28     State House Districts 2022    168
22    Exhibit 35     Cubanos_nd_a1                 171
23    Exhibit 36     Cubanos_nd_a2                 171
24    Exhibit 37     Cubanos_nd_b                  171
25
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    6

```
 1              E X H I B I T S

 2   NUMBER            DESCRIPTION              PAGE

 3   Exhibit 38    Cubanos_nd_c1                171

 4   Exhibit 44    Rebuttal Report of Cory      184

 5                 McCartan, Ph.D.

 6   Exhibit 42    Expert Report of Alfredo     186

 7                 Gonzalez

 8   Exhibit 45    Expert Report of Sean Trende 190

 9   Exhibit 25    Federal Election Commission  200

10                 document re: donations by

11                 Cory McCartan, Ph.D.

12   Exhibit 26    Bluesky post dated April 5,  204

13                 2025 on Bluesky

14   Exhibit 43    July 3, 2025 Bluesky post by 207

15                 Cory McCartan, Ph.D.

16

17

18

19

20

21

22

23

24

25
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    7

```
1                    P R O C E E D I N G S
2              THE STENOGRAPHER:  As we begin this
3         proceeding, I will ask our witness to please
4         raise your right hand.
5              THE WITNESS:  (Complies).
6              THE STENOGRAPHER:  Do you swear or
7         affirm that the testimony you are about to
8         give will be the truth, the whole truth, and
9         nothing but the truth?
10             THE WITNESS:  I do.
11             THE STENOGRAPHER:  Thank you.
12    THEREUPON:
13                  CORY MCCARTAN, PH.D.
14              being first duly sworn or affirmed to
15        testify to the truth, the whole truth, and
16        nothing but the truth, was examined and
17        testified as follows:
18             THE STENOGRAPHER:  We may begin.
19                      EXAMINATION
20    BY MR. BARDOS:
21        Q.   Good morning, Dr. McCartan.  My name is
22    Andy Bardos.  I represent the Florida House of
23    Representatives in the Cubanos Pa'Lante
24    litigation.
25             Are you -- I understand you're an expert
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                          8

1    retained by the plaintiffs in that case.

2            We'll go over some initial ground rules

3    at the very beginning of the deposition that

4    you're probably already familiar with.

5            It's important for the court reporter to

6    be able to take down a clear transcript of what we

7    say here.  So, for that reason, I would ask that

8    we not interrupt each other or talk over each

9    other.

10           If you could let me finish my questions

11   and I'll try to do my best to let you finish your

12   answers before I start, and then that will make

13   for --

14       A.   Okay.

15       Q.   -- a cleaner transcript.

16       A.   Fine.  Okay.

17       Q.   Likewise, when you --

18           MR. BARDOS:  Andrew, sorry, we can hear

19       you.  Andrew.

20           THE STENOGRAPHER:  Mr. Frackman, can you

21       hear us?

22           MR. BARDOS:  Let's--

23           (Recess in proceedings.)

24   BY MR. BARDOS:

25       Q.   When you answer questions, if you could

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              9

1    avoid nodding your head or shaking you or saying
2    "uh-huh."  You know, if you answer in words, that
3    will make the transcript clearer as well.
4             If you need a break at any time, just
5    let me know.  And if there's a question pending,
6    I'll ask you to answer before we take the break.
7    But, otherwise, you know, we'll accommodate any
8    requests for a break that you have.
9             And you are, of course, under oath to
10   tell the truth, as you would be if you were
11   testifying in court.
12            Does all of that sound fair to you?
13        A.   Yes.
14        Q.   Okay.  Are you aware of any reason why
15   you would not be able to answer questions fully
16   and truthfully today?
17        A.   No.
18        Q.   Okay.  All right.  I will begin by
19   providing an exhibit.  This will be Exhibit 1 to
20   the deposition.  It is your initial expert report
21   in this case.
22            (Exhibit 1 was marked for identification
23            and is attached to the transcript.)
24        Q.   And while I do that, let me ask you:  Do
25   you have any information, such as printouts or

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    10

1    documents, available to you as you're sitting here

2    this morning?

3        A.   No.

4        Q.   Okay.  So you don't have a printout of

5    your report?

6        A.   No.

7        Q.   Okay.  So -- so, then, you can access

8    this electronic version.  So I'm about to add

9    that.

10           If I add documents to the chat, will you

11   be able to download them and access them from

12   there?

13       A.   Yes.  I have a copy on -- electronically

14   of the report on my computer as well, so.

15       Q.   Okay.  Are there any other documents or

16   applications that you have open on your computer

17   right now, other than the Zoom platform?

18       A.   No.

19       Q.   Okay.  All right.

20           So I just added your initial report to

21   the chat.  This will be Exhibit 1.

22           MR. BARDOS:  And, Andrew, some of your

23       colleagues have not been able to access

24       documents in the chat.  It might be a setting

25       with your firm.  Are you able to see and

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    11

1          access documents that I'm adding to the chat?
2              Do you see Exhibit 1, for example?
3              MR. FRACKMAN:  I'm sorry, Andy.  You
4     were asking me?
5              MR. BARDOS:  Yes.
6              MR. FRACKMAN:  Yeah.  I -- it does look
7     like access to file is restricted, but I have
8     his reports, so --
9              MR. BARDOS:  Okay.
10             MR. FRACKMAN:  -- so for the time being,
11    we're okay.
12             MR. BARDOS:  As we go through other
13    exhibits, either I or one of my colleagues
14    will e-mail them to you, if you're not able
15    to access them in the chat.
16             MR. FRACKMAN:  Okay.  Thank you very
17    much.
18             MR. BARDOS:  Sure.
19       Q.   All right.  And at the very beginning,
20    Dr. McCartan, I would like to agree on some
21    nomenclature, so as we are talking about these
22    maps and districts, we are using the same
23    terminology, or at least I understand -- or you
24    understand what I'm saying when I use certain
25    terms.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    12

```
1            So if I refer to the "enacted state
2    house" or "congressional districts" or the
3    "enacted state house or congressional map," I will
4    be referring to the districts or the maps that
5    were enacted by the Florida Legislature in 2022.
6            Does that make sense?
7        A.   Yes.
8        Q.   Okay.  If I refer to the "benchmark
9    state house" or "congressional maps or districts,"
10   I'll be referring to the maps that were in effect
11   immediately before the 2022 maps, the enacted
12   maps, took effect.
13           Does that make sense?
14       A.   Yes.
15       Q.   Okay.  I might also use the acronym VAP,
16   which is voting age population, or HVAP to refer
17   to Hispanic voting age population.
18           Will you understand that as well?
19       A.   I will.
20       Q.   Okay.  And, for shorthand, I might use
21   the terms -- the acronym "CD" to refer to
22   congressional districts.  Is that fair?
23       A.   It is.
24       Q.   All right.  So let's begin -- let me
25   begin by asking you whether you've served as an
```

```
1    expert witness before in litigation.
2         A.   Yes, I have.
3         Q.   Okay.  In what cases have you served as
4    an expert witness?
5         A.   I'm not going to have all the -- the
6    cites off the top of my head.
7              But there was a case involving Louisiana
8    state house districts, another involving Louisiana
9    congressional districts, one involving Miami city
10   council districts, one involving Florida state
11   senate districts in the Tampa area, and one
12   involving county commission districts in -- in and
13   around Birmingham, Alabama.
14        Q.   Okay.  So would that be five cases,
15   thereabouts?
16        A.   That sounds right.
17        Q.   Okay.  And were you deposed in each of
18   those cases?
19        A.   I was.
20        Q.   Okay.  Did you testify at trial as well
21   in each of those cases?
22        A.   I did.
23        Q.   Okay.  Did you work with the ACLU or any
24   local or state chapters of the ACLU in those other
25   cases?
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    14

```
 1        A.   Some of them.
 2        Q.   Okay.  Do you recall which ones?
 3        A.   I was retained by the ACLU in the
 4   Louisiana state house, state senate case; the two
 5   Florida cases.
 6        Q.   Okay.  The Louisiana case that you're
 7   referring to, is that -- is that Callais,
 8   C-A-L-L-A-I-S?
 9        A.   I was on that case, but, no, the one I'm
10   referring to is the state -- state map -- the
11   state house, state senate, which I think was
12   Nairne.
13        Q.   Okay.  N-A-I-R-N-E?
14        A.   That's right.
15        Q.   Okay.  So this is your third case for
16   the ACLU?
17        A.   That's right.
18        Q.   Okay.
19        A.   No.  I'm sorry.  I'm sorry.  That would
20   be four.
21        Q.   Four.  Okay.
22             When were you retained in this case,
23   Cubanos?
24        A.   Spring 2024, I believe.
25        Q.   All right.  And how were you retained?
```

1          Did someone call you or how did that

2    come about?

3          A.   The possibility of this, being retained

4    for this case, had been mentioned to me in

5    connection with another case in Miami.  And then,

6    we executed the paperwork in spring 2024.

7          Q.   Okay.  The Miami case was the Grace

8    case?

9          A.   That's correct.

10         Q.   Yeah.

11              So the same lawyers who were working

12   with you on that case spoke with you about being

13   involved in this, in the Cubanos case?

14         A.   That's right.

15         Q.   Okay.  All right.  Let me add the next

16   exhibit to the chat.  And this is Exhibit 2.

17              (Exhibit 2 was marked for identification

18              and is attached to the transcript.)

19              MR. BARDOS:  And, Andrew, I just sent

20         that to you by e-mail.

21         Q.   All right.  So, Dr. McCartan, do you see

22   Exhibit 2?

23         A.   Yes.

24         Q.   Okay.  Is this the -- well, you tell me

25   what this is.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              16

1       A.   This looks to be a copy of the initial

2   letter with instructions in this matter.

3       Q.   Okay.  So is this the first written set

4   of instructions that you received from counsel in

5   this case?

6       A.   Yes.

7       Q.   Okay.  And, in general, what were you

8   instructed to do in this letter?

9       A.   I was provided with copies of the

10  enacted plan with certain districts removed and

11  asked to redraw those areas and any other areas

12  that were needed to have a set of districts that

13  were compliant with the Florida constitutional

14  standards.

15      Q.   Walk me through, at a high level,

16  chronologically, what you -- what you did in this

17  case after you received these instructions.

18           How did your work proceed from here?

19      A.   So I was provided with the -- the shade

20  files with the districts removed, and I loaded

21  those into map drawing software and started

22  exploring options and configurations.

23           That was an iterative process.

24           And over the course of several months, I

25  ended up with a set of, I believe, six

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                      17

1    congressional plans and seven house plans, you

2    know, per my instructions.

3               And I then wrote a report about that

4    process.

5               And after I completed the initial draft

6    of that report, I was asked to append to the

7    report some additional maps showing Hispanic

8    population in the areas that I understand now to

9    be challenged.

10              Several months after submitting that

11   report, then I was contacted about a rebuttal

12   report regarding two of, I believe, defendants'

13   experts.  And I read their reports and produced a

14   rebuttal report in response.

15        Q.   Okay.  You mentioned six congressional

16   districts and seven -- I'm sorry, six

17   congressional maps and seven state house maps.

18   Did you draw any other maps besides those 13 maps?

19        A.   Yes.  There would have been intermediate

20   maps that were produced, or edited, as I went over

21   that -- over that period of coming up with the --

22   the final maps that made it into the report.

23        Q.   Okay.  Did you -- do you know whether

24   any of those intermediate maps leading up to the

25   six congressional and state house -- seven state

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    18

```
1    house maps were produced to the defendants in this
2    litigation?
3         A.   Not specifically.
4              It -- I may have heard secondhand that
5    some version, I'm not sure exactly which, was
6    included or was -- that the picture was included
7    in an initial complaint in this case and
8    presumably, then, that would have been something
9    the defendants saw.
10        Q.   Okay.  Did you ever draw any maps that
11   you considered to be final, other than those six
12   congressional or seven state house maps, or -- or
13   is everything else sort of a -- kind of an
14   intermediate step toward the final product?
15        A.   Everything else was an intermediate step
16   toward the final product.
17        Q.   Okay.  Who did you communicate with
18   while you were performing your work on the --
19   on -- in drawing the maps or in preparing your
20   report subsequently?
21        A.   Counsel for the plaintiffs and some
22   staff for the plaintiffs.
23        Q.   Okay.  To the best of your recollection,
24   could you name those counsel and staff?
25        A.   Yeah.  I'm not going to remember
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    19

1    everything.  It's -- 'cause it was around a

2    year-plus ago that most of the map drawing

3    happened.

4            So -- I mean, the -- the folks on this

5    call, so Andrew Frackman, Andrea Ojeda, Nicholas

6    Warren, Joe Dye.

7            I think there were several other

8    O'Melveny or ACLU attorneys on calls at various

9    points, but I don't remember exactly who.

10       Q.   Okay.  So that's everyone you can

11   remember at the moment?

12       A.   That's right.

13       Q.   Okay.  Did you at any point discuss your

14   work on this case with other experts retained by

15   the plaintiffs?

16       A.   No.  Not to my knowledge.

17       Q.   Okay.  How about any colleagues or

18   students or anyone else besides counsel for --

19   counsel and staff for the plaintiffs, whom you've

20   mentioned before?

21       A.   It's possible at some point I mentioned

22   to people that I know that I was retained in some

23   case involving, but never the substance of -- of

24   any work.

25       Q.   Okay.  So you produced two reports in

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    20

1    this case, and we'll look in more detail at those,

2    but did you -- did you author those reports

3    entirely yourself?

4         A.   Yes.

5         Q.   Okay.  What materials did you review

6    in -- to educate yourself about the criteria or

7    standards that apply to redistricting maps in

8    Florida?

9         A.   Well, the plain language of the

10   Constitution was included in my instruction

11   letter.

12        The letter was also -- attached to the

13   letter was also a memo.  I forget, actually, at

14   this point who it was sent from or to, but Jay

15   Ferrin, who was the senate map drawer.  And that

16   memo described the senate staff's interpretation

17   in more detail of these -- actually, I think it

18   was to Ferrin from Rodrigues.  And it describes

19   sort of the -- in more detail how those

20   constitutional standards could be interpreted.

21        So those were the primary materials I

22   reviewed in interpreting these standards.

23        Q.   Do you recall any other materials that

24   you reviewed regarding the standards or the

25   criteria that apply?

1       A.    No, not at this time.

2       Q.    Did you review any court decisions

3   interpreting those standards?

4       A.    Not during the drawing of the maps.

5             The -- in the rebuttal phase, there was

6   a dispute about what counted as a split.  And

7   counsel for plaintiffs assisted me in finding a, I

8   believe, Florida Supreme Court decision that

9   touched on that matter.  And I could -- and I

10  cited that in my report.

11            But beyond that, which happened after

12  the maps were drawn, to my recollection, no, no

13  court cases.

14      Q.    Okay.  Did you review any redistricting

15  maps other than the maps that you were provided

16  with some of the districts reviewed -- removed?

17      A.    No.

18      Q.    Okay.  So you didn't go on the

19  Legislature's website to look at other maps that

20  had been considered or submitted during the

21  redistricting process?

22      A.    Well, to be specific, in this other

23  litigation in Tampa, I was asked to look at those

24  maps; however, the portions of those maps that I

25  was instructed to look at were specifically chosen

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                               22

1    by counsel in those cases to not overlap with --

2    with the -- with the districts at issue here.

3            So I never looked at, for instance,

4    southern Florida and the congressional map or the

5    Miami area and the house map.

6        Q.   Okay.  Sitting here today, do you recall

7    any other materials that you reviewed, whether

8    maps or laws or court decisions or memos, or

9    anything like that, that would inform you in your

10   drawing of districts?

11       A.   No.

12       Q.   What is your understanding of what the

13   plaintiffs claim or allege in this litigation?

14       A.   To be honest, I'm not -- I'm not very

15   sure.

16           I have not read the Complaint.

17           At this point, I understand this to be a

18   racial gerrymandering claim.  And I can infer what

19   parts of the state it's -- you know, we're

20   challenging here.  But that's the level of detail

21   I know about, about the claims here.

22       Q.   All right.  Do you know which districts

23   the plaintiffs are challenging?

24       A.   Presumably, the ones that were removed

25   in my instructions.  The set that were removed

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    23

1    were amended at a later point in the drawing.

2         Q.   Okay.  Let me ask you about -- about

3    that.

4              I'll add a couple of additional exhibits

5    to the chat here.  We'll go ahead and add Number 3

6    and Number 4.

7              (Exhibit 3 was marked for identification

8              and is attached to the transcript.)

9              (Exhibit 4 was marked for identification

10             and is attached to the transcript.)

11        Q.   Okay.  Let's start with Exhibit 4.  If

12   you'll take a look at that.

13             Is this the memo that you mentioned

14   was -- that was provided to you along with the

15   initial instruction letter that we looked at

16   previously as Exhibit 2?

17        A.   Yes.

18        Q.   Okay.  And so you reviewed this memo in

19   its entirety began -- before you began to draw?

20        A.   Yes.

21        Q.   Okay.  Now let's take a look at

22   Exhibit 3.  And I believe you just testified that

23   at some point the -- the number of districts that

24   were removed from the maps that were provided to

25   you changed.  Is that accurate?

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    24

1        A.    Yes.

2        Q.    Okay.  And is this the -- or did you

3   receive this instruction letter at that time?

4        A.    Yes.

5        Q.    And what was the change that was made to

6   the map that was provided to you?

7        A.    Previously, Districts 19, 26, 27, and 28

8   were removed.  In the new instructions, only

9   District 26 was removed.

10       Q.    Okay.  So at this time, they -- counsel

11  provided you with a new shade file that had the

12  entire map except Congressional District 26?

13       A.    That's right.

14       Q.    Okay.  Now, before you received this new

15  shade file in February of 2025, had you already

16  drawn congressional maps?

17       A.    Yes.  Yes.

18       Q.    And so what did you do when you received

19  this instruction letter?

20             Did you start over or did you modify the

21  maps you had already worked on?

22       A.    The latter.  Yeah, the latter.

23       Q.    Okay.  So did you use the shape files

24  that counsel provided that had only one district

25  removed?

1      A.    In -- in that -- when a single district

2    is removed, obviously, you know -- you know, it's

3    like changing the color of the district from color

4    to transparent or something.

5             So I consulted -- I used it and looked

6    at -- and consulted the -- the new shade file to

7    better understand the choice that we made outside

8    of the challenged district and whether those

9    boundaries were, you know, consistent with my

10   choices.  And that led to adjustments in the map

11   in the Miami area.

12     Q.    Okay.  All right.  But you -- but at

13   that point, you were simply modifying the

14   congressional maps that you were already preparing

15   before you received the February 2025 instruction?

16     A.    That's right.

17             So modifications that were then

18   consistent with my superseding set of

19   instructions.

20     Q.    Right.  Okay.

21             When the redistricting process was going

22   on in Florida in 2021 and 2022, were you following

23   the process?

24     A.    Not beyond what showed up in the

25   national news.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    26

1       Q.   Okay.  So we've looked at two letters in

2   which you were provided with instructions on

3   drawing districts.

4            Were you provided with any other

5   instructions that were not -- that were not

6   written?

7       A.   No.

8       Q.   Okay.  So, for example, were you

9   instructed to not cross the Everglades with a

10  district from Miami-Dade over to Collier County?

11      A.   I see.

12           No, not specifically.

13      Q.   Okay.  And when you say "not

14  specifically," what do you mean?

15      A.   I was never specifically instructed not

16  to cross the Everglades.

17      Q.   Okay.  Was there any general discussion

18  about the Everglades?

19      A.   I believe there would have been.

20      Q.   Okay.  Tell me a little bit about that.

21      A.   Well, there was certainly some

22  discussion of the Everglades in the context of the

23  rebuttal reports or -- I'm sorry, the defendants'

24  expert reports that we received.

25           Prior to that, in earlier drafts of my

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    27

```
 1   maps, I think plaintiffs' counsel shared that I

 2   was, like -- I don't know how to put this.  I'm

 3   not super familiar and I wasn't super familiar

 4   with the geography of South Florida and the

 5   extent -- the geographical extent of the

 6   Everglades.

 7            So plaintiffs' counsel shared some

 8   information of that nature, which helped me

 9   understand sort of the extent of that, of that

10   natural boundary, and informed, in future maps,

11   how I drew districts in that area of the state.

12       Q.   Okay.  So in the earlier drafts, did you

13   have a district that crossed the Everglades?

14       A.   I think one of the earliest maps that I

15   drew looked at, you know, would it be possible to

16   not have to change any -- any district assignments

17   outside of the erased area.  This was back when

18   four or so districts had been removed from the

19   map.  And that configuration -- it's been awhile.

20   I think there might have been a district that --

21   that -- that spanned the Everglades.

22            And then as I came to understand the

23   nature of that geographical boundary, it became

24   clear to me that that configuration wasn't

25   consistent with the Tier 2 constitutional
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                        28

1    standards, and that changes outside of the erased

2    area would be required to fully comply.

3        Q.   Okay.  And when you -- when you had that

4    district that spanned the Everglades in the

5    earlier map, can you describe what that district

6    looked like?

7             Was it similar to enacted CD 26 or were

8    there differences?

9        A.   I -- I can't be sure.  I didn't see the

10   shape of CD 26 until I got the new file months or

11   a year later with 26 removed.  And at that point,

12   this map we're talking about was, you know, very

13   transitory, you know, a month or two, year prior.

14   So I couldn't really say.

15       Q.   Okay.  And at the time that you drew

16   this map, the early map with the district that

17   span the Everglades, had you already read the memo

18   that we talked about, Exhibit 4, and the

19   constitutional provisions that were provided to

20   you?

21       A.   Yes.

22       Q.   Okay.  And so having read that and --

23   and then drawing -- having drawn this district,

24   what was it that convinced you that the -- a

25   district that crosses the Everglades is, I think

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              29

1    you said, not consistent with the Tier 2

2    standards?

3        A.    I think a better study of the sort of

4    distribution of the population and the extent of

5    that natural feature and the lack of boundaries in

6    that area.

7              So my first map was a pretty rough

8    sketch, just quickly fill in and see what that

9    looked like.  And upon spending more time with

10   the -- with the facts on the ground, as it were, I

11   realized that we weren't really connecting these

12   two disparate areas, and that wasn't across this

13   major geographical boundary, and that wasn't

14   really consistent with my instructions.

15       Q.    Okay.  Was -- when you kind of came to

16   believe that crossing the Everglades is not

17   consistent with Tier 2 standards, were -- was --

18   was -- did you have conversations with counsel

19   that also contributed to your kind of subsequent

20   belief that was not -- that that was not

21   consistent with Tier 2?

22       A.    Well, as I -- as I just testified,

23   counsel shared some of the -- you know, pointed

24   out some of these geographical features to me.  So

25   to the extent that that contributed, then -- then

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                30

1    yes.

2         Q.   And did you understand that they did not

3    want a district crossing the Everglades?

4         A.   I -- I wouldn't say specifically.

5              The -- I had been very sort of limited

6    in my view as to sort of the larger claims or the

7    strategy or anything in this case, so I couldn't

8    really speculate.

9         Q.   Okay.  Is that something that you

10   inferred from the information that they shared

11   with you regarding the geography of the Everglades

12   area?

13        A.   Sorry.  What's the -- what's the

14   inference I'm hypothetically drawing?

15        Q.   The inference that -- that counsel did

16   not want the district crossing the Everglades.

17        A.   No.

18             As I say, I didn't reach that

19   conclusion, that they didn't want that.  Because I

20   just didn't have visibility into -- so I did reach

21   the conclusion that my district shouldn't cross

22   the Everglades, but not because I specifically

23   intuited some preference on -- by plaintiffs'

24   counsel.

25        Q.   Okay.  And when you say that the

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    31

1    district crossing the Everglades is not consistent

2    with Tier 2 standards, which Tier 2 standard are

3    you referring to specifically?

4         A.   Sure.

5              This is the requirements that district

6    shall, where feasible, utilize existing political

7    and geographic boundaries.

8         Q.   Okay.  And in what way does a district

9    crossing the Everglades not utilize, where

10   feasible, existing political and geographical

11   boundaries?

12        A.   Sure.

13             The Everglades is a significant

14   geographical boundary.  And by spanning it, you're

15   not utilizing that boundary versus a configuration

16   that keeps the populations across that boundary

17   separate, that respects and uses that geographic

18   boundary as a natural boundary between -- between

19   two of the districts on the east and the west

20   coast.

21        Q.   Okay. So your -- your view is that the

22   Everglades is a geographical boundary, as that

23   term is used in the Tier 2 standards?

24        A.   Yes.

25        Q.   Okay.  And it sounds like your

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    32

1    understanding, also, is the districts should not

2    cross geographical boundaries?

3         A.    I would say where feasible.

4              If there's a configuration that has the

5    border follow or use those boundaries versus one

6    that crosses them, then the Tier 2 standards would

7    mandate, but the former would be a more

8    appropriate configuration.

9         Q.    Okay.  What -- what else would qualify,

10   in your mind, as a geographical boundary, besides

11   the Everglades?

12        A.    Well, some states have mountains.

13   That's a very common one.  But Florida doesn't.

14   So in Florida, major rivers, bays, other sort of

15   estuaries or swamplands, if you will.  Those would

16   be -- major canals, possibly.

17        Q.    Anything man-made, like roads or

18   railroads -- railways?

19        A.    Sure.  So highways, major county roads,

20   major railroads.  Sure.

21        Q.    Okay.  And so is it your view that a

22   district shouldn't cross any of those geographical

23   boundaries, such as rivers, bays, major roads,

24   railways?

25        A.    Shouldn't cross any?  No.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              33

1       Q.    Okay.  I mean, because your districts

2   also cross highways; right?

3       A.    Yes.

4       Q.    Okay.  And they cross major roads?

5       A.    Yes.

6       Q.    And they cross rivers?

7       A.    Yes.

8       Q.    And -- and they cross railways?

9       A.    I assume.

10      Q.    Yeah.

11            Is there something about the Everglades

12  that makes it more important that we not cross the

13  Everglades than all of the other geographical

14  boundaries?

15      A.    Well, I think there's some space in

16  between these two things you're talking about

17  because refusing to cross any geographical

18  boundary is not the same as where possible, where

19  feasible, using those boundaries.

20            So I think I did, where feasible,

21  utilize those other forms of boundaries, roads,

22  railways, et cetera.

23            The Everglades is also substantially

24  larger.  And it's not a linear feature, like a

25  road or a railroad.  It is an aerial feature that

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                           34

1    really puts a lot of distance between major

2    population centers.

3           So because of the geographical nature of

4    redistricting, just that size and that area it

5    spans on the map is going to necessitate different

6    configurations.  It's going to have a different

7    impact on -- on the map drawing than a smaller

8    linear feature, like a -- like a stub of a railway

9    or a short road.

10       Q.   Okay.  So the Everglades -- do you know

11   how large the Everglades is?

12       A.   We're talking, you know, the national

13   park, the -- there's a couple different

14   definitions, as we discussed in rebuttal.  It

15   occupies a substantial portion of southeast

16   Florida.

17       Q.   Uh-hmm.

18           Do you have an opinion on kind of where

19   its boundaries are, if you want to describe it

20   descriptively?

21           Like, is it everything south of Lake

22   Okeechobee?

23           Or how would you describe sort of where

24   the Everglades is?

25       A.   I think it's easier to spot on a

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                     35

1    satellite view than anything, really.  You can see

2    where there's really a lack of population and

3    where you have this particular sort of ecological

4    system.

5              I can't really describe it well exactly

6    in words.

7              It clearly coincides -- you know,

8    overlaps the interpolitical boundaries of the

9    county borders inside the state.  And no matter

10   where exactly you draw the margins, you still end

11   up, at the end of the day, with the Everglades as

12   a boundary separating populations on the east and

13   west coast.

14             So the implication for how you configure

15   the districts is, I think, very similar,

16   regardless of exactly where you draw the margin of

17   the Everglades.

18       Q.   How far north does the Everglades go?

19       A.   I think some people would say it goes to

20   Lake Okeechobee.

21             I think once the population starts to

22   sort of -- there'd be more population, then the

23   strength of that geographical boundary as regards,

24   you know, what -- what districts follows is

25   probably weakened.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    36

1        Q.   And would you agree that it goes as far

2   north as Lake Okeechobee?

3             Do you have an opinion on that?

4        A.   I'm not offering an opinion on that.

5        Q.   Okay.  And so you would agree, then,

6   that the Everglades is very different from a

7   linear boundary, such as a road?

8        A.   It's different.

9        Q.   Okay.  And so -- and so, I guess,

10  your -- your view is that the -- that a district

11  shouldn't cross the Everglades.

12            Are there other -- are there other

13  geographical boundaries in Florida that you would

14  say that districts shouldn't cross?

15       A.   Well, just to be clear, I think my view

16  is that given the configuration of the districts

17  and the geography and the population, that a

18  configuration that didn't span the Everglades,

19  that will comply with the Tier 2 standards, and so

20  that's what I produced.

21            It's possible if you drew a map from a

22  completely blank slate, that you might come to a

23  different conclusion.  So I just want to emphasize

24  the contextual.

25            It's not an absolute rule, in my

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    37

1   opinion, that you can never cross the Everglades.

2           So, similarly, if in drawing another

3   portion of the map, another portion of the state,

4   you know, there was a major federal highway and it

5   spanned, you know, several counties and it was

6   possible to configure a district that, you know,

7   used that as a significant portion of its

8   boundary, then I think that would also be

9   compliant with Tier 2.

10      Q.   Okay.  What about Interstate 95?

11          So you have districts that cross

12  interstate 95; right?

13      A.   I believe so.

14      Q.   All right.  So what's the difference, in

15  your mind, between crossing Interstate 95, which

16  you did, and crossing the Everglades, which you

17  say it violates the Constitution?

18      A.   I think the keyword in the Constitution

19  is the word "feasible."

20          So I explored a number of

21  configurations.  I didn't end up finding a

22  configuration that, for instance, never crossed

23  I-95 that also complied with the other

24  constitutional standards.

25      Q.   Okay.  So how do you -- you know,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              38

1    obviously, you would agree that there are many

2    different ways the districts can be drawn;

3    correct?

4         A.   Yes.

5         Q.   Okay.  So if you wanted to, you could

6    draw a district that -- well, that used I-95 or

7    I-75 as a separator and never crossed the

8    interstate; correct?  If that was important to

9    you.

10        A.   I haven't tried that configuration

11   specifically as you outline it, but I wouldn't be

12   shocked if it were possible to just do something

13   like that.

14        Q.   Okay.  So why didn't you prioritize

15   other geographical boundaries as the thing that

16   you didn't want to cross or breach with your

17   districts?

18        A.   I don't think I can agree with the

19   premise of your question now.

20        Q.   Okay.  In what way?

21        A.   I wouldn't say that there was a

22   prioritization or a hierarchy of which boundaries

23   were more or less important.

24             What is true is that the requirements

25   within Tier 2 are co-equal.  So in trying to, for

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                          39

```
 1   instance, not cross I-95, you produce a district
 2   that's very non-compact or can't satisfy the
 3   population constraints.  Then to insist on not
 4   crossing I-95 would actually, at that point, then
 5   violate the Tier 2 standards.
 6        Q.   I guess, I'm trying to figure out --
 7   obviously, there are many major roads and highways
 8   and rivers and railways in Florida.  I'm wondering
 9   why you chose the Everglades as a thing that you
10   wanted to highlight and not cross as opposed to
11   all of the other geographical boundaries.
12        A.   I guess, I wouldn't say that's a point
13   that I highlight.  I think it's a configuration
14   choice that I made.  I also respected other
15   political and geographic boundaries.  So, I guess,
16   that's -- to me, a special decision, I'm not sure
17   that I agree with that.
18        Q.   All right.  Well, you would agree as a
19   prominent part of your report you talk quite a bit
20   about the Everglades in your reports?
21        A.   I discuss the Everglades.  It's a long
22   report.
23             I discuss a little bit more in the
24   rebuttal report, I think.
25        Q.   So why did you make the choice to not
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    40

```
1    cross the Everglades at the same time that your
2    districts do cross major roads, highways, rivers,
3    railways?
4        A.   Well, my districts also, in many cases,
5    respect other major roads, rivers, railways,
6    county boundaries.
7             So, you know, there are other natural
8    parts of Florida I'm sure that the districts also
9    cross.  So, again, I just -- I just -- I'm not
10   sure I agree with the premise.
11       Q.   So you're not saying that the Everglades
12   has some sort of, you know, superior position or
13   superior importance relative to other geographical
14   boundaries?
15       A.   No.
16            To the extent I'm differentiating it at
17   all, the reason it's discussed in my report would
18   be that -- recognizing that boundary is something
19   that should be respected, and it is possible to be
20   respected under Tier 2, that then does have
21   implications for how much the rest of the map has
22   to be redrawn, given the configuration of the
23   existing districts and the population in Florida.
24            So because it's just sort of this domino
25   effect from there, I discuss that, you know, as
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                      41

1    you say, prominently in the report, but certainly

2    as regards the constitutional standards it has no

3    special constitutional significance.

4         Q.   Okay.  So -- so, just to be clear, for

5    the record, you're not saying that it's more

6    important to avoid crossing the Everglades than it

7    is to avoid crossing other geographical limits?

8         A.   No.

9         Q.   Okay.  I think I've read in some of your

10   past work, maybe in some of your past depositions,

11   that -- you've said that there are more ways to

12   draw a redistricting map than there are atoms in a

13   universe.  Is that --

14        A.   Yes.

15        Q.   Is that something you've said?

16        A.   Yes.

17        Q.   Okay.  And is that -- do you know that

18   to be literally true?

19        A.   In some states, yeah.

20             Florida's a hard one to answer.  I

21   wouldn't -- it wouldn't shock me.  There's so many

22   additional standards, though, in Florida.  But --

23   but, yeah.

24             An example I go to is in Montana.

25   It's -- if you ask, let's draw a map with exactly

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    42

1   equal populations only as whole counties -- so

2   whole counties, not a single -- single person

3   deviation between those districts, there's 36,000

4   ways to do that.  And there's only, like, 40

5   counties in Montana.

6            So there are lots of ways to draw maps,

7   certainly.

8       Q.   Okay.  What data did you consult in

9   drawing the maps that you produced in this case?

10      A.   Would have been basically just the

11  population data and the map drawing software and

12  toll -- toll population data, the underlying

13  background map, as it were, showing, you know,

14  cities, roads, et cetera.

15           It also would have shown county

16  boundaries, municipal boundaries.

17           I would have consulted a census map that

18  showed which incorporated -- sorry, which census

19  places were incorporated versus not incorporated.

20           That's all that comes to mind.

21      Q.   Okay.  How about Reock scores and Convex

22  Hull scores and Polsby-Popper scores?

23      A.   Sorry.  What about them?

24      Q.   Did you review those or consult those

25  while drawing your maps?

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    43

```
1        A.   Oh.  No, not while drawing my maps.
2        Q.   Okay.  Is that something you looked at
3   after you completed the maps?
4        A.   Yeah.  After completing the maps, I then
5   used software to calculate those, yeah.
6        Q.   Okay.  What other data did you look at
7   after you completed the drawing of the maps?
8        A.   Sure.
9             I loaded the maps into the Legislature
10  software at the end and -- or maybe I did it
11  myself, I can't remember.  Anyway, I created these
12  boundary scores.  I think it was the Legislature
13  software, compactness Legislative software.
14            I would have then also computed counts
15  of municipality splits, county splits.
16            Separately from -- from the map drawing,
17  I was also asked, at the end of all this, to
18  produce maps showing HVAP in certain parts of the
19  state.  So I would have consulted HVAP data, or at
20  least imported it into software at that point.
21       Q.   Okay.  So my understanding from your
22  reports and your testimony is that in drawing your
23  maps, you did not, at any point, review either
24  political or racial data.  Is that accurate?
25       A.   Yes.
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    44

1        Q.   Okay.  And that would include HVAP or

2   black VAP, correct?

3        A.   That's correct.

4        Q.   And that would include -- in terms of

5   political data, it would include registration

6   data, turnout data, and election results?

7        A.   That's right.  I didn't use any of that.

8        Q.   Okay.  Was it your understanding, when

9   you were drawing the maps, that at least some of

10  the districts in South Florida are protected by

11  Florida's constitutional provisions that secure

12  minority voting rights?

13       A.   Yes.

14            I think my instruction letters mention

15  specific districts, since I wouldn't have

16  otherwise known.

17       Q.   Okay.  And were those -- was it your

18  understanding that those districts -- the minority

19  group in those districts was black voters?

20       A.   No.  I don't think I knew or know,

21  necessarily, which districts or if they're

22  coalition districts or what.

23       Q.   Okay.  Let's take a look at your

24  instruction letter.  This is Exhibit 2.

25            Are you referring to paragraph 9 in the

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    45

1    instruction letter?

2         A.   Yes.

3         Q.   Okay.  And so what are the districts

4    that you were told in your instruction letter are

5    protected under Florida's minority protection

6    provisions?

7         A.   House Districts 108, 109, 117, and Cs 20

8    and 24.

9         Q.   Now, did you make any changes to those

10   five districts in the maps that you generated?

11        A.   Some of the districts in some of the

12   maps.

13        Q.   Okay.  And when you modified those

14   districts, did you use any political or racial

15   data to assess the impact of what your -- the

16   changes that you were making?

17        A.   No.

18        Q.   Okay.  And do you know whether some --

19   another expert retained by the plaintiffs did a

20   subsequent analysis on those districts?

21        A.   That's my understanding from -- from

22   this paragraph, yes.

23        Q.   Okay.  But you, yourself, didn't use any

24   black voting age population data or Hispanic

25   voting age population data when you modified those

1    districts?

2         A.    No.

3         Q.    Okay.  What -- what software did you use

4    when you were drawing the districts?

5         A.    Dave's Redistricting App.

6         Q.    Okay.  And then at some point, I think,

7    you said that you took the maps and you imported

8    them into the Legislature's map drawing

9    application?

10        A.    That's correct.

11        Q.    After that point, what -- from the

12   moment that you imported them into the

13   Legislature's map drawing application, did you

14   make any subsequent changes to the districts in

15   your map?

16        A.    I don't recall, exactly.

17             I think perhaps, because there was this

18   lag -- the maps were pretty close to their final

19   form around September of '24.  And then, I think,

20   the complaint was -- anyway, I got a new set of

21   instructions and some adjustments were made.  And

22   so I think I would have run the boundary scores

23   around September of '24 and -- in drafting the

24   initial version of my report.

25             And then I would have run them again

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    47

1    based on any changes that I made after the new set
2    of instructions.
3        Q.   Okay.  So did you make -- so did you
4    make changes to the district when -- in the
5    Legislature's map drawing application?
6        A.   Not in the Legislature's map drawing
7    application.
8             Sorry.  If that was your question.
9        Q.   Okay.  So you might have made changes
10   after you -- after that point in time when you
11   first imported them into the map drawing
12   application, but any changes would have been made
13   in Dave's Redistricting App?
14       A.   That's right.
15       Q.   Okay.  Now, when you were drawing the
16   districts, what units of geography did you use?
17            For example, were you drawing at the
18   block level or the VTD, voting tabulation
19   district, level or some other level of geography?
20       A.   Both.  And, also, I would say cities and
21   counties.  So it depended on the -- you can sort
22   of pick what you're filling in at the time.  And
23   sometimes the whole county, if you want to assign.
24            At the end of the day, it's transmitted
25   back to the block level, right, so the smallest

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                48

1    unit drab is the census block.
2         Q.   Okay.  To your knowledge, who -- who
3    reviewed your maps before they were provided to
4    the defendants in this case?
5         A.   All I would be aware of is the people
6    who were on -- you know, I mentioned earlier, you
7    know, who I discussed the maps with during this
8    process.
9              Any comments they had about areas to
10   consider for improving Tier 2 compliance or
11   anything like that would have been provided at
12   that time.  So if it was reviews that happened
13   outside of those meetings, I wouldn't know.
14        Q.   Okay.  So -- so you don't know of anyone
15   having reviewed your maps other than the list of
16   folks who we discussed before?
17        A.   Right.
18             Or anyone who was there that I didn't
19   remember.
20        Q.   Right.
21             Okay.  And did all of your
22   communications with counsel take place remotely,
23   like this Zoom setting, or phone call?
24        A.   Yes, to the best of my recollection.
25        Q.   Okay.  Now, did you make any changes to

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    49

```
1    your maps in response to conversations that you

2    had with counsel?

3         A.   Yes.

4         Q.   Okay.  What were those?

5         A.   Those changes?

6         Q.   Yes.

7         A.   I don't recall, specifically.

8              The general type of discussion would be,

9    "Dr. McCartan, could you look at, you know, Tier 2

10   compliance in this area; can you explore a

11   configuration that maybe doesn't, you know, split

12   so many cities in this county" or -- or things of

13   that nature, so...

14             At which point I would go explore some

15   configurations and -- and see what changes should

16   be made.

17             And so I don't recall any specific -- I

18   don't believe there were any specific, you know,

19   "please adjust this boundary to this location"

20   or -- or things of that nature.

21        Q.   Did you have any -- in drawing your

22   maps, did you have any sort of resource

23   constraints, whether it was time or anything else?

24             Did you, for example, say I wish I had

25   this or had this in order to draw these maps?
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    50

1        A.    Well, you always get frustrated with the

2   software sometimes.  But, no.  No, no constraints.

3        Q.    Okay.  And in the actual drawing of

4   maps, you did that alone, you didn't receive

5   assistance from anyone else in drawing the maps

6   other than, of course, comments and feedback after

7   review?

8        A.    That's correct.

9        Q.    All right.  Let's take a look at the

10  next exhibit.  This is Exhibit 5.

11             I'll go ahead and add Exhibit 6 as well.

12             (Exhibit 5 was marked for identification

13             and is attached to the transcript.)

14       Q.    Okay.  Do you have Exhibit 5 open?

15       A.    Yes.

16       Q.    Okay.  Take a look at this document.  Is

17  this something that you have seen before?  Do you

18  recognize it?

19       A.    I believe I have seen a portion of this

20  document yesterday.

21       Q.    Okay.  All right.

22             So this is an interrogatory that the

23  defendants served on the plaintiffs.  And it asks

24  for certain information about alternative maps

25  that the plaintiffs have produced in the

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    51

```
1    litigation.
2              And this was provided in -- on page 6,
3    you'll see the date, it's February 10th of 2025.
4    So before you would have produced the maps with
5    your report, which was in March.
6              And so, you know, I'll represent to you
7    that we did receive some maps back in September of
8    last year.
9              So is -- if you look at the supplemental
10   response that begins on page 4, is there any --
11   anything that you need to change or correct or add
12   or subtract in order to make these answers
13   complete and accurate?
14             I just want to confirm that what's
15   provided here is the full -- you know, full,
16   truthful answer, correct answer.
17             So, you know, take a minute to -- to
18   read through this and let me know if there's
19   anything in this that's inaccurate or incomplete,
20   if you would.
21       A.   Sure.
22           MR. FRACKMAN:  Andy, your question is
23       about Exhibit 5 or Exhibit 6?
24           MR. BARDOS:  Currently we're on 5, but
25       then I'll ask the same question about
```

1      Exhibit 6.

2      A.   Okay.  So, obviously, there's some

3   portions of the responses that I don't have

4   personal knowledge of.  I don't know who this

5   Dr. Walker is, for instance, or what happened

6   outside.

7           But -- and I'm not sure what these

8   exhibit numbers are, as far as criteria.

9           But other than that, nothing here

10  appears incorrect to me today.

11     Q.   Okay.  If you would, take a look at

12  Exhibit 6 as well.

13          (Exhibit 6 was marked for identification

14          and is attached to the transcript.)

15     Q.   And just read through that.

16          This is information that we received in

17  response to a similar interrogatory.  This one was

18  provided after we received the maps that you

19  provided with your report.

20     A.   Okay.

21          All right.  So with the same caveats,

22  nothing here appears incorrect to me today.

23     Q.   Okay.  Good.  All right.

24          So in drawing these districts -- I think

25  I know the answer to this, but can you confirm

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                        53

1    that you did all of the map drawing yourself as

2    opposed to -- and I'm thinking here about as

3    opposed to having, say, an algorithm draw these

4    maps?

5              These were all you as a human being

6    deciding where to put the district boundaries?

7         A.   That's correct.

8              I did write a small amount of computer

9    code to help me identify, at the end, combinations

10   of blocks that would exactly cancel the

11   populations and balance out.  So, to the extent

12   that was computer-assisted.  But, no, everything

13   else was done by me.

14        Q.   Okay.  And that -- that algorithm was to

15   help you equalize populations at the -- kind of

16   the tail end of the drafting process?

17        A.   Yeah.

18             So several dozen people and -- had

19   boundaries being moved at a time.

20        Q.   Okay.  And so, then, your maps reflect

21   choices and decisions that -- that you made in

22   your preferences in establishing the district

23   boundaries?

24        A.   Yes.

25        Q.   You mentioned that you didn't use racial

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                54

1    data in drawing the districts.  Is it also fair to

2    assume that you didn't use any information

3    regarding national origin, such as Columbian or

4    Nicaraguan, or any information along those lines?

5         A.   Yes.

6         Q.   Okay.

7              MR. BARDOS:  All right.  So we've been

8         going for about an hour.  If it's okay with

9         everyone, I'd like to take a quick break,

10        maybe ten minutes, and then we can reconvene.

11             THE WITNESS:  Sure.

12             MR. FRACKMAN:  Okay.  So it's 10:30,

13        10:40.

14             MR. BARDOS:  Sounds good.  See you then.

15             MR. FRACKMAN:  All right.

16             (Recess in Proceedings.)

17   BY MR. BARDOS:

18        Q.   All right.  Dr. McCartan, so in your

19   maps, I noticed that there's a nomenclature.  So

20   you have an A, a B, a C, and then sometimes there

21   will be a B1 or a B2, something along those lines.

22   Tell me about that nomenclature.

23             How do you -- why would you have, like,

24   more than one B or more than one C as opposed to

25   simply A, B, C, D, E, F?

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    55

```
1        A.    Sure.
2              In the congressional plans, the left are
3  mostly reported in terms of the size of the
4  changes to the overall congressional map, outside
5  of the immediately challenged areas.  And the
6  numbers for them would be sort of variations that
7  roughly change about the same amount of the
8  enacted map.
9              On the house side, I think, it's more --
10 not dissimilar to A, B, C, D, different
11 configurations.  Or A, B, C, sorry.  To do
12 different configurations.
13             And then, within any one of those
14 configurations, there might be, you know, some
15 more -- some more versions sort of also growing
16 out of this, but the order in which I produced or
17 more iteratively refined these maps.
18       Q.    Would you agree that in drawing district
19 boundaries, map drawers must balance many
20 competing constraints and criteria?
21       A.    Yes.
22       Q.    Would you agree that redistricting
23 criteria are not independent of one another and
24 that map drawer -- the map drawer determines how
25 those tradeoffs happen?
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              56

1        A.    In general, yes.

2        Q.    Okay.  I want to ask you a few more

3   questions about your understanding of the

4   political and geographical boundaries requirement.

5             But first, let me ask you:  Are you --

6   are you offering an opinion as an expert on what

7   the legal requirements are and what the law

8   requires, or are you simply explaining what your

9   understanding of it is as someone who drew maps in

10  this case?

11       A.    I would say mostly the latter.

12             I am not a court which would make

13  judgments on what the law requires in a particular

14  case.

15       Q.    All right.  So let's talk about the

16  political and geographical boundaries standard and

17  what you understand it to require.

18             Do you understand it to require the

19  Legislature, or whoever draws the map, subject to

20  these criteria, to keep counties and

21  municipalities whole to the extent feasible?

22       A.    It is a little tricky because, as we

23  talked about, I'm not making a judgment on that.

24  And it may depend on whether or not doing so is

25  possible with the other -- you know, keeping the

```
1    other -- the other Tier 2 criteria intact.
2              But, yeah, in general, if there's a
3    configuration that satisfies all the other
4    criteria and keeps a county or municipality whole,
5    then that would be more compliant with Tier 2 than
6    one that splits those -- those units.
7         Q.   Okay.  And then, another way to look at
8    the same standard would be that the district's
9    boundary must coincide with or -- or trace an
10   existing boundary, such as following the road or
11   following a river.  Is that also your
12   understanding of what that requires or do you not
13   see that as -- as part of the -- the Tier 2
14   requirement?
15        A.   To me, that is part of the Tier 2
16   requirements.
17             I -- I would not interpret "utilize" to
18   only mean that you're utilizing if you exactly --
19   the boundary exactly coincides.
20             So, you know, if the plan is drawn to
21   include a whole county or municipality, either the
22   boundary is not completely coincident -- to me,
23   that would still be utilizing that boundary to
24   configure the district.  Certainly, if the
25   boundary is coincident, then at least in that
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    58

1    portion of the boundary you're utilizing existing

2    geographic political boundaries complying with

3    Tier 2.

4         Q.   Okay.  So, just so I understand what you

5    understand it to mean, if you have a district that

6    includes a municipality and keeps it whole, and

7    say that municipality is within the district and

8    not along its perimeter, but it's within the

9    district not touching the boundary, that's sort of

10   a Tier 2 value; right?

11            To keep that municipality whole, if

12   possible, but also coincide -- coincidence of

13   boundaries is also a Tier 2 value.  Is that -- is

14   that your understanding?

15        A.   Yes.  Broadly.

16            If you can imagine two districts, both

17   of which contain, you know, hypothetical

18   districts, both contain municipality, if one's

19   boundary is coincident with another municipality

20   or the other one's coincident with nothing and its

21   just reaping all over the place, certainly those

22   are different, so the boundary's part of it.

23            But the fact that they both keep the

24   municipality whole also relates to the Tier 2

25   standards, in my opinion.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    59

1        Q.    Okay.  Then we talked about some

2    boundaries that are linear, like roads and rivers,

3    and then some that are not.  And -- and we have,

4    of course, municipalities that are not linear, we

5    have counties that are not linear, and we have the

6    Everglades.

7              Now, with counties and municipalities,

8    my understanding is you think that Tier 2 would

9    counsel for keeping those whole, whereas with the

10   Everglades it sounds like you're saying it

11   shouldn't be kept whole; is that correct?

12       A.    So there's a couple of parts to your

13   question, I guess.

14             So as regards to linear features,

15   certainly all you can do with linear features is

16   examine to what extent, you know, without an

17   external side.

18             Within aerial features, how we described

19   the other ones, I'm guided by, in part, the Ray

20   Rodrigues memo, which, you know, does state that

21   keeping, you know, these geographicals whole is,

22   you know, compliant with Tier 2.

23             I think that reflects, in general, the

24   traditional registrant criteria you see not only

25   in Florida, but elsewhere as well.  Redistricting

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                      60

```
1    to that people and keeping people in a unit
2    together is -- you know, serves those -- those
3    purposes.
4              The Everglades don't have people in
5    them.  That's partly why they're a geographic
6    boundary.  So, I think, to consistently apply
7    Tier 2 standards to Everglades actually requires
8    treating it different than a city or county that
9    contains people and has clear -- very clear, you
10   know, survey boundaries.  Yeah.
11       Q.   Okay.  Now, when we talk about linear
12   boundaries, let's say you have a district that --
13   whose boundary allegedly coincides with political
14   and geographical boundaries for the full extent of
15   the district's perimeter 100 percent but it
16   does -- the district does cross various major
17   roads and interstates.  Is that a Tier 2 concern
18   or is it, you know, for you -- since the boundary
19   follows political and geographical boundaries for
20   the full extent, is that compliant with Tier 2?
21       A.   I think it depends on the context.
22              So, I mean, geographically -- sorry,
23   redistricting is an intensely local and
24   geographical process.
25              So, yeah, I think you could imagine
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              61

1    situations where that's, you know, really what --

2    the spirit of the law and the constitution and

3    produces a reasonable configuration of districts,

4    and then you can also imagine scenarios where, you

5    know, that would produce a district that would --

6    that would not be as compliant.

7            So I think there is some judgment there

8    that would depend on the specific example.

9        Q.   Okay.  So -- so in addition to trying to

10   keep municipalities and counties whole, trying to

11   trace existing boundaries, coincidence of

12   boundaries, is there also a component of the

13   political and geographic boundary standard that,

14   in your mind, counsels against crossing political

15   and geographical boundaries?

16       A.   Yeah.  I mean, I think that's partly

17   what motivated, you know, our earlier discussion

18   about the Everglades.  Again, you know, the

19   constitutional language is pretty terse and

20   there's a reason we have a -- you know, this memo

21   which tries to expand on that and interprets that

22   utilization requirement in a number of different

23   ways.

24           So depending on the context, crossing a

25   particular road, political, geographical boundary,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    62

1    whatever, may be consistent.  In other cases it

2    may be very inconsistent with the bigger picture

3    of the Tier 2 standards.

4         Q.   Okay.  And how would you differentiate

5    situations in which it's consistent from those in

6    which it's inconsistent?

7         A.   Again, I don't -- I don't have a

8    hard-and-fast rule.

9              I think I'd have to look at it, a

10   particular example, like one, you know, with my

11   maps, like I discuss in my report, with the way

12   the rest of the map is configured, having a

13   district that expands the full Everglades, when

14   there exists alternatives that don't and are still

15   complying with the other Tier 2 standards, that

16   would be a case where -- where crossing such a

17   geographical boundary would be inconsistent, in my

18   opinion.

19        Q.   Okay.  What if -- what if eliminating

20   the district that crosses the Everglades produces

21   a split of a county somewhere nearby, is that --

22   how does that balance out, in your mind?

23        A.   Well, I think it would be, you know,

24   warranted in that case to look at if there were

25   other changes that could be made elsewhere in the

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                63

1    map to further reduce the number of county splits.

2    And if you could, across the board, improve, then

3    that would be an option that you could -- would

4    also want to consider, I think.

5             You know, recently, after drawing these

6    maps, I heard testimony of Mr. Ferrin himself, and

7    he described a similar process of producing

8    several options that maybe put some of these

9    harder decisions up in front of the

10   decision-makers.  And then, ultimately, there's a

11   decision that's made by, you know, the

12   representatives or the court or what have you.

13       Q.   Okay.  Do you have any opinion on other

14   natural boundaries in Florida that are not linear?

15            So, for example, you know, the

16   Everglades.  Are there others that you can name in

17   Florida that you would consider to be a

18   geographical boundary but that is natural and is

19   not linear?

20       A.   Well, as we discussed earlier, so, you

21   know bays, lakes, some rivers are sort of wide

22   enough, that are open to estuaries and so on.

23   Right?

24            So, I think, you know, like the way the

25   census -- you know, the census might have a block

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              64

1   that's fully in a particular water feature versus

2   just using that water feature as a boundary.

3   That's kind of -- so, like in Jacksonville, you

4   might have some -- you know, the river might be

5   wide enough that that counts as an aerial feature.

6   So, yeah, lakes, bays, large rivers.

7        Q.   Are you familiar with the Kississimme

8   River Basin between Orlando, south of Orlando and

9   Lake Okeechobee?

10       A.   No.

11       Q.   Have you been to Florida before?

12       A.   Yes.

13       Q.   Okay.  When were you -- when did you

14  last visit Florida?

15       A.   In June, for the Tampa case.

16       Q.   Okay.  How about before that?

17       A.   The preceding January, I think, for the

18  Miami case.

19       Q.   Okay.  You visit us to litigate.

20            How about -- how about before that?

21       A.   I've been to Miami and the Keys before.

22  I've been to Orlando before.

23       Q.   Okay.

24       A.   That's all I can recall.

25       Q.   Okay.  But you've never lived in

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    65

1    Florida; correct?

2         A.   That's right.

3         Q.   Let's talk about compactness.

4              I believe you say, maybe in your

5    rebuttal report, that compactness is primarily a

6    visual test.  Do you agree with that statement?

7         A.   Yes, generally.

8         Q.   Okay.  And that the mathematical

9    measures of compactness are secondary in the

10   assessment to the visual examination.  Would you

11   agree with that?

12        A.   Yeah.  That's my understanding as

13   regards Florida.

14        Q.   Yeah.

15             Among the mathematical measures, would

16   you agree that each one has certain pros and cons?

17        A.   Each one is sensitive to different parts

18   of geography in a different way.  So depending on

19   what you're measuring, those could be pros or

20   cons.  But if you're measuring something else, the

21   pros could become a con.

22        Q.   Okay.  And do you have a preferred

23   mathematical measure of compactness?

24        A.   It depends on the work I'm doing.  So

25   when I do algorithms, there's a different measure

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              66

1    than if I'm trying to -- like I say, it depends on

2    what you're trying to measure as well.

3           So if you want to be sensitive to --

4    with boundaries versus the overall shape and so

5    on.

6         Q.    Let's say for purposes of this case,

7    between the three compactness scores that we've

8    utilized in this litigation, so Reock --

9           MR. BARDOS:   And for the court reporter,

10      that's R-E-O-C-K.

11        Q.    -- the Convex Hull measure, and the

12   Polsby-Popper measure, P-O-L-S-B-Y-P-O-P-P-E-R, do

13   you have a preference out of those, one that you

14   like better than the others?

15        A.    No.

16        Q.    Okay.  Any that you think are -- that

17   you like less than the others?

18        A.    Not particularly.

19           If the goal is to assess the compactness

20   portion of the constitutional standards, then I

21   think each of them might be sensitive in different

22   ways to parts of districts that might not actually

23   be problematic under the constitutional standards,

24   but when that's the case is -- is

25   district-specific, I would say.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                 67

1        Q.    Okay.  Do you have any rule of thumb as

2   to whether -- when a difference in compactness

3   scores becomes meaningful?

4        A.    Not a hard rule.

5              And generally, you can look at sort of

6   the range of scores that exist, and that can kind

7   of give you a benchmark scale for, you know,

8   what -- what might -- you might personally

9   consider to be meaningful or not.

10             Ultimately, what counts as meaningful is

11  contextual to what we're talking about.  Right?

12  So...

13             But, you know, in general, unless you

14  have a map that's, you know, extremely unusual,

15  you know, differences on these scores on the order

16  of one part in a thousand is usually -- usually

17  the range you see in the districts themselves.

18  It's much larger.  So that would usually, for

19  instance, not be meaningful.

20       Q.    Okay.  Uh-huh.

21             What about, you know, the Reock score,

22  there's a difference in a Reock score of 100th of

23  a point.  Is that something that you would

24  consider meaningful or does it depend?

25       A.    Like 100, like .01 or .0001?

1      Q.   .001.

2      A.   All right.

3           Yeah.  I mean, it depends.  You would

4  have to look at sort of what the range of Reock

5  scores you see in that area or plant-wide or...

6           Sometimes when I do simulations, you can

7  use the range from those.

8      Q.   Um-hmm.

9           So, I believe you said in your report

10  that you used redistmetrics to calculate the

11  compactness scores; is that correct?

12     A.   That's right.

13     Q.   Okay.  And -- and what is redistmetrics?

14     A.   It's software that a high-end academic

15  team have developed, which takes in plans in

16  computer format and it will actually calculate a

17  number of different redistricting metrics.  Not

18  just compactness.  Population, you know, if you

19  have partisan data, partisan metrics, things of

20  that sort.

21     Q.   Is there any reason that you didn't use

22  either Dave's Redistricting App or the

23  Legislature's map drawing application to calculate

24  compactness scores?

25     A.   Yes.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    69

1        Q.    What are those reasons?

2        A.    Dave's, I -- I just have not -- I

3    haven't really looked at their -- how they

4    calculate these -- these numbers.  They have an

5    open-source library, but I haven't dived into it.

6            So I've written the code in

7    redistmetrics myself and know that it produces --

8    we've tested the specific numbers against, for

9    instance, the papers that develop these metrics in

10   the first place.  So I'm confident in those.

11           As for the Legislature's software, the

12   output is a PDF file.  It's kind of hard to

13   summarize and put in my own table and so on.

14           So, like I say, used a tool that I know

15   produces the right answer I've developed.

16       Q.    Do you have an opinion as to whether all

17   of the 13 maps that you produced in this

18   litigation are compliant with Florida's

19   redistricting standards?

20       A.    Yes.

21       Q.    Okay.  So your opinion is that they are

22   compliant?

23       A.    Yes.

24       Q.    Okay.  Do you have -- say, out of the

25   six congressional maps that you produced, do you

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                          70

1   have one that you prefer, that you think is the

2   best out of the six?

3        A.   No, not particularly.

4             I mean, there's features of different

5   maps that I locally prefer, but I haven't really

6   thought about overall if I had a magic wand and my

7   goal was maximum compliance, you know, what I

8   would pick.

9        Q.   What about the State House maps, any

10  preference among the maps?

11       A.   No.

12       Q.   Okay.  In drawing the maps, did you

13  encounter situations where you had to make

14  tradeoffs between the different Tier 2 criteria?

15       A.   Probably.  I don't recall specific

16  instances.

17            Generally, at that point, I would look

18  for backtracking a little more and see if you

19  could draw things in a way that didn't force a

20  tradeoff or create another version, like B1, B2,

21  to present different ways of interpreting that

22  tradeoff.

23       Q.   Are there situations in which utilizing

24  political and geographical boundaries could be

25  intentioned with the compactness requirement?

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    71

1       A.   Hypothetically, yeah.

2            I think we talked about, you know, what

3    if you tried to hide the coast and be bounded by

4    I-95, you know, could that cause problems.  So, it

5    might.

6       Q.   Okay.  But you think in all of the 13

7    maps that you produced you were able to harmonize

8    the standards in a way that your maps comply with

9    the redistricting criteria?

10      A.   In my -- in my judgment, yeah.

11      Q.   Okay.  And now when you say that you

12   didn't use racial data or political data, would

13   that include when you're drawing using a heat map

14   or some other, like, shading on the -- on the --

15   on the screen that you're looking at that would

16   indicate where concentrations of minority

17   populations are?

18      A.   Yes.

19           I used no such heat map.

20      Q.   Okay.  Okay.

21           Let's take a look at -- let's take a

22   look at some maps.

23           Okay.  We'll go out of order with some

24   of these exhibits, so...

25      A.   Okay.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                      72

1        Q.   We might come back to the ones that we

2   skip over for now.

3             Okay.  Dr. McCartan, do you see

4   Exhibit 31?

5             (Exhibit 31 was marked for

6             identification and is attached to the

7             transcript.)

8        A.   Yes.

9        Q.   Do you recognize this document?

10       A.   I haven't seen this specific document

11  before.

12       Q.   Okay.  So I'll represent to you that

13  this is the map, congressional map B2 that you

14  drew.  And it's in a kind of map-and-data package

15  that the Legislature generates.

16            So if you look on the second page,

17  you'll see that the Hispanic voting age population

18  for Congressional Districts 26, 27, 28 are all

19  within the range of about 71.6 percent to 74.2

20  percent.

21            Do you see that?

22       A.   Yes.

23       Q.   Okay.  Now, in drawing those districts,

24  since you weren't using racial data, I take it

25  that you weren't trying to balance the HVAPs in

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              73

1    those three districts; correct?

2         A.   That's right.

3         Q.   Okay.  Tell me how you -- you went about

4    drawing the South Florida area in this particular

5    map.

6         A.   B2.  Yeah, I don't -- I don't recall

7    exactly because this would have -- this may have

8    been one of the ones that saw more changes after

9    February.  I don't recall.

10             This might be the one where I tried to

11   keep 27 from changing too much.  I can't remember

12   exactly.

13             But anyway, in general, this map would

14   have come out of earlier maps.  It also would have

15   started with the same premise, if you will, which

16   was to respect the Tier 2 standards.  We don't

17   want to have District 26, I think, cross -- span

18   the Everglades.

19             So I would have brought the districts

20   out to the road mark 997 or, in this map,

21   further -- further east, and then made adjustments

22   south to balance populations, and then made

23   adjustments north and so on to further balance

24   populations.

25        Q.   All right.  We can close this for now.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    74

1    We might come back to it.

2            Let's take a look at Exhibit 1, which is

3    your report.  And if you would go to paragraph 15.

4        A.   15.  Okay.

5        Q.   And part of -- I guess, let's go to

6    Figure 1, which is on page 5.

7        A.   Okay.

8        Q.   Now, in this map, does it appear that at

9    least most water blocks are unassigned?

10       A.   Could you describe who unassigned them,

11   then?

12       Q.   So are there water blocks off the coast

13   of the State of Florida that are not assigned to

14   any particular district in Figure 1?

15       A.   All blocks were assigned in all my

16   plans.  Figure 1 doesn't show periods outside the

17   census coastline file.

18       Q.   Okay.  Do you know whether Figure 1

19   shows the census blocks off the coast that don't

20   have population in them?

21       A.   It -- it's clipped.  Like, you know, the

22   two -- what the census defines as the coastline.

23   So there would probably be water blocks that are

24   wholly contained outside the census coastline

25   boundary that would not be shown in Figure 1.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                          75

1        Q.    Okay.  And were those water blocks that
2   are not shown in Figure 1, were they, in your map,
3   assigned to a district?
4        A.    Yes.
5        Q.    Okay.  They simply don't show up on --
6   in this particular figure?
7        A.    That's right.
8        Q.    Okay.  And so when you calculated
9   redistricting -- I'm sorry, compactness scores in
10  redistmetrics, was it calculating compactness
11  scores based on the shape that included those
12  water blocks or on a shape that did not include
13  those water blocks?
14       A.    A shape that included the water blocks.
15       Q.    Okay.  So this is simply kind of a
16  visual description, but the version that you used
17  to calculate compactness scores took account of
18  water blocks up -- off the coast?
19       A.    That's right.
20       Q.    Okay.  All right.  What is the ALARM
21  Project?
22       A.    It's an academic operation/team that I
23  helped start and am now an affiliate of at Harvard
24  University, generally studying the application of
25  algorithmic redistricting tools to study

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              76

1   legislative redistricting in the U.S. and abroad.
2        Q.   Okay.  When did you start or help start
3   the ALARM Project?
4        A.   Around 2021, I believe.
5        Q.   Were you a student at that time?
6        A.   Yes.  A Ph.D. student.
7        Q.   Okay.  And what are redistricting
8   simulations?
9        A.   Redistricting plans that have been
10  randomly generated according to a particular
11  computer algorithm.  And it can be applied to
12  answer questions about redistricting and to
13  explore sort of the space of possible
14  configurations in a map.
15       Q.   Okay.  How are -- how are they generally
16  used?
17            How would you, like -- say expert
18  witness work, how would you use redistricting
19  simulations?
20       A.   Most commonly in litigation, experts use
21  redistricting simulations to examine whether
22  features of a particular, for instance, benchmark
23  or enacted map are unusual compared to a set of
24  simulations.
25            The simulations in those cases are

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    77

1    usually fed no information about, for instance,

2    politics or race.  And then you can compare on a

3    political or racial metric how the enacted or

4    benchmark plan compares to simulations.  And if

5    there's discrepancies, discrepancies -- that can

6    be taken as evidence that those factors may have

7    influenced the drawing of -- of the maps.

8         Q.   Okay.  So my understanding of

9    simulation, correct me if I'm wrong, is if you're

10   testing to determine whether a particular factor,

11   like race or politics, influence the enacted map,

12   then you could run simulations that don't utilize

13   that factor and then you can compare the output to

14   the enacted map in an attempt to determine whether

15   the enacted map did utilize that factor.  Is that

16   a fair summary?

17        A.   It's a pretty -- pretty fair summary.

18        Q.   Okay.  And in doing that you would you

19   want to -- the simulations to -- to stimulate the

20   other factors, the ones you're not testing for,

21   that were applicable to the enacted map; correct?

22        A.   Correct.

23        Q.   Okay.  So why -- why would you want to

24   do that?

25             Why would you want simulations to be

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    78

1    subject to the same constraints minus the one that
2    you're testing for?
3        A.   If the goal is -- it's this particular
4    kind of test that you're mentioning, then you want
5    an apples-to-apples comparison so that the
6    difference can be attributed only to the one
7    factor, which would be the one you're testing.
8        Q.   Okay.  How would you determine how many
9    simulated plans to generate?
10       A.   That's a statistical judgment.  The more
11   plans, the more confidence you can say
12   statistically that there's a difference.  We call
13   it power, so that the test is more powerful if you
14   have more simulations, in general.  There's
15   diminishing returns as you go.  And generating
16   more takes more time, computing time.  So there's
17   a tradeoff.
18            There's some numerical measures you can
19   use to determine if you have sufficient number of
20   simulations.
21       Q.   Okay.  What's -- what's kind of a
22   typical range for the number of simulations that
23   you would find to be sufficient?
24       A.   It actually depends on the algorithm
25   that you use to generate the simulations in

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    79

1    question.

2         Q.   What's maybe the -- what's the low end

3    of the range?

4         A.   Some -- some tests, some questions

5    you're asking are -- the evidence is so clear that

6    it's as few as 500 or a thousand maps with certain

7    algorithms might be enough to get you a reliable

8    answer.

9         Q.   Okay.  And did -- as part of the ALARM

10   Project, did you generate maps, simulated maps

11   to -- to use to compare against enacted maps in

12   different states?

13        A.   At the congressional level, using

14   certain sets of criteria, yes.

15        Q.   Okay.  Did you generate simulated maps

16   for Florida congressional districts?

17        A.   The -- our ALARM team did, that's right,

18   yes.

19        Q.   And were you part of the ALARM team at

20   the time that that was happening?

21        A.   Yes.

22        Q.   What was your role at that time with the

23   ALARM team?

24        A.   I was still a student.  The project that

25   produced these congressional maps had a number of

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    80

1    undergraduate students as well.  So undergraduate

2    students would usually generate the first set of

3    simulations.  They would produce a report showing

4    aspects of these simulations.

5             Myself or another graduate student would

6    review these reports, and there would be some

7    iteration to ensure there was some quality checks.

8    So my role, as regards these simulations in

9    various states, was with the quality check phase.

10       Q.   Okay.  Who designed the algorithm for

11   the ALARM Project?

12       A.   The algorithm we used in the

13   congressional simulations is the one I developed

14   in the paper with my adviser a year or two before

15   that.

16       Q.   Okay.  And so in the ALARM Project, how

17   many simulated maps did you generate for each

18   State's congressional maps?

19       A.   It varied.  It's always at least 5,000.

20   Some states required more.

21       Q.   Okay.

22       A.   And then we would take a sample from

23   them, the total number down to 5,000.

24       Q.   And so why do you need so many?  Why not

25   five or ten?

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              81

```
 1        A.     Like I say, it's a statistical judgment.
 2               So we have found that with that
 3    algorithm, the types of questions people usually
 4    want to ask about these maps, 5,000 usually gives
 5    you enough to have statistical confidence in
 6    differences that are out there.
 7               So in some states, if you want to probe
 8    smaller differences, you might need more.  Or if
 9    you have a particular question about a very
10    localized region, you might need more.
11               But we found 5,000 to be a good tradeoff
12    between the questions that people ask, the
13    statistical power and statistical demand and our
14    computational and storage constraints.
15        Q.     And in practical terms, do you need a
16    large number so that you can have a high level of
17    confidence that your simulated maps are displaying
18    the fuller range of possibilities that come out of
19    a map-drawing exercise subject to particular
20    constraints?
21        A.     The range, as you put it, is part of it.
22    Although, that's not really the primary.  So the
23    example I would give is polling.  Right?  So if
24    you ask opinion polling, there's certainly a very
25    wide range of beliefs out there, and you don't
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                      82

1    need to sample a million people and get the most
2    extreme right-winger and left-winger to have an
3    accurate poll.  You just want to have enough to
4    understand the average.  Right?  So opinion polls
5    are usually at least a thousand people, if not
6    more.
7         Q.   Okay.
8         A.   It's actually a very similar reason why
9    we're in the several thousands range, just to get
10   that kind of accuracy.
11        Q.   Okay.  So did you say you generated
12   5,000 simulated maps as part of the ALARM Project
13   for congressional districts in Florida?
14        A.   At least 5,000.
15             Florida's a larger state with more
16   constraints, and many of the constitutional
17   standards we didn't even, you know, fully
18   incorporate into the simulations, to be honest.
19   So we had to do more -- could be as many as
20   100,000, and then we discarded randomly for a
21   final set of 5,000.
22        Q.   Okay.  Why didn't you use the
23   simulations in your work in this case?
24        A.   So the congressional simulations were
25   nationwide.  So the goal is to be able to ask

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    83

1    questions about the nation as a whole with, you

2    know, the budget and manpower that we had.  That

3    meant we couldn't do as detailed a interpretation

4    and calibration of the simulations to the local

5    requirements of every state.

6          So we did our best.  We did a lot better

7    than the status quo, but I wouldn't say that any

8    of our simulations were litigation quality, as it

9    were, in that there were, in many cases, pretty

10   clear discrepancies between the rules that we fed

11   in and the rules that actually apply to districts

12   drawn in a particular state.

13         So we think the answers were good to ask

14   questions about, you know, what's the total amount

15   of gerrymandering in the U.S. Congress nationally

16   because a lot of those things would cancel.

17         But if you want to go into a particular

18   state and ask particular questions and really get

19   a precise answer that you can be confident with,

20   for instance, in litigation, you know, that's a

21   different question entirely, so...

22         Yeah.

23         And I think -- I think we say something

24   to that effect, you know, when we release these to

25   the public.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    84

1      Q.    Okay.  And in the simulations that you
2   generated as part of your ALARM Project for
3   Florida congressional districts, did the
4   simulation take account of race in any way?
5      A.    Yeah, it would have.
6            Again, like the hard -- the hardest
7   thing in the South is the Voting Rights Act.  And
8   Florida, that's additionally part of the
9   Constitution, and interpreting that, as you well
10  know, often involves extensive litigation with
11  experts.
12           So a simulation can do a very rough
13  approximation.  And, you know, we use race in that
14  way to try to, you know, roughly respect the
15  Voting Rights Act.  But that's certainly, like,
16  the biggest limitation of our national simulation
17  work, is the use of race, and specifically with
18  the Voting Rights Act.
19     Q.    Okay.  Do you recall in the simulations
20  how -- what the simulation algorithm was designed
21  to do, if anything, with respect to Hispanic
22  populations in South Florida?
23     A.    I don't recall.
24           I do remember that we did run, I
25  believe, a separate set of simulations in South

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    85

1   Florida as part of building up the whole map.  I

2   don't believe there were specific instructions

3   about HVAP versus BVAP versus coalition districts

4   in general in this project.  We observed sort of

5   lumped minorites together, which is obviously less

6   justified in South Florida.  So I don't remember,

7   specifically.

8       Q.   Would it be possible to create -- I

9   think you said "litigation quality."

10           Would it be possible to create

11  litigation quality simulations for districts in

12  Florida?

13      A.   I would never say never.  I think it

14  would be one of the hardest things to do, in my

15  experience.

16           I was in a case in Ohio helping out,

17  that was up there in difficulty, and I think

18  that's due to the number of constitutional

19  criteria.  So if you compare it to Texas, where

20  there's nothing written down, or Illinois, where

21  there's nothing written down, and Florida has

22  rules and they have -- about race and they both

23  interact, so it would be difficult.

24           I was in a case in Louisiana where I

25  testified about -- you know, I'm not even sure it

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    86

1    would be possible to generate simulations that

2    would be, you know, reliable and trustworthy,

3    given the constraints in this case.

4            So, I'm not sure.  It may be possible.

5    I would like to do so.  We try to build tools that

6    are powerful like that, but I can't be sure, one

7    way or the other.

8        Q.   So the challenge would be in developing

9    an algorithm that faithfully implements the

10   criteria that Florida has?

11       A.   Yeah.

12           And as we talked about, there are

13   tradeoffs and there are tiers.  And it's one thing

14   to work with that as a human.  It's another to

15   explain to a computer how exactly to navigate

16   those.  And so it would, at minimum, take a long

17   time, I think, to refine the instructions to the

18   algorithm, as it were, to reflect your best

19   understanding of those -- of those criteria.

20       Q.   As part of your work on this case, did

21   you at any point go back and refer to the

22   simulations, or review them, the simulations that

23   you had done for the ALARM Project for Florida

24   congressional districts?

25           Had you had -- you know, did you have

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    87

1    any -- on any prior occasion review them or

2    consult them in any way?

3         A.   No.

4         Q.   Did you, as part of your work on this

5    case, at any point generate any simulations?

6         A.   No.

7         Q.   Okay.  Did you do any analyses as part

8    of your work on this case that are not reflected

9    in your two expert reports?

10        A.   No, not that I can recall.

11        Q.   Let me show you an exhibit.  This will

12   be Exhibit 13.

13             (Exhibit 13 was marked for

14             identification and is attached to the

15             transcript.)

16        Q.   And once you've had a chance to open it,

17   let me know whether you recognize this document.

18        A.   It appears to be a printout of a page on

19   the ALARM Project website.

20        Q.   Okay.  And so is this a page that

21   discusses the Florida congressional district

22   simulations that the ALARM Project generated?

23        A.   Yes.

24        Q.   Take a look at page 4, if you would.

25        A.   Okay.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                 88

1        Q.   Okay.  And under the heading,

2   Traditional Redistricting Criteria, beginning with

3   the third sentence, it says, "As far as

4   compactness, Florida's enacted plan scores a 0.35

5   more than 100 percent of all simulated plans.  A

6   higher score means more compact."

7             Do you see that?

8        A.   Yes.

9        Q.   And is this using the Polsby-Popper

10  measure of compactness?

11       A.   Yes.

12       Q.   Okay.  And -- and so is it accurate to

13  say that the enacted plans mean Polsby-Popper

14  score was higher than the mean Polsby-Popper score

15  in any of the simulated plans that the ALARM

16  Project generated for Florida congressional

17  districts?

18       A.   Yeah.  In this set of 5,000, yes.

19       Q.   Okay.  And what was the -- can you tell

20  from this document or can you tell what the mean

21  impactness score was, the Polsby-Popper score was

22  for the simulated plans?

23       A.   No, not beyond eyeballing the chart in

24  front of me.

25       Q.   Okay.  When you eyeball it, can you come

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    89

1  up with an educated, you know, guess or estimate?

2  Not guess, but can you estimate what the means

3  Polsby-Popper score was in the simulated plans.

4       A.   Say the .207 plus or minus .101.

5       Q.   Okay.  Had the -- on the first page of

6  this document, it says that the ALARM Project

7  generated 5,000 sets of randomly simulated

8  districts.

9            Do you see that?

10           MR. FRACKMAN:  Yeah.  Sorry to

11      interrupt, Andy.  I haven't gotten a copy.

12      Did you send me one?

13           MR. BARDOS:  I thought I sent it.  Let

14      me see who I sent it to.

15           MS. CARTAYA:  I've been sending -- I've

16      been sending it to Mr. Frackman.

17           MR. FRACKMAN:  Yeah, I haven't gotten

18      either yet.  Sometimes our -- always our

19      security takes awhile.

20           MS. CARTAYA:  Yeah.

21           MR. BARDOS:  Oh.  You know what it is?

22      It is 26 megabytes, so it's probably -- let

23      me see if I can reduce the file size here.

24           MR. FRACKMAN:  It will come eventually.

25      Just give me a second to catch up to you.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    90

1       MS. CARTAYA:  Andy, I've been sending, I
2   believe, all the exhibits as well.  So I
3   don't know if we're both sending it.
4       MR. FRACKMAN:  Yeah, you've both been
5   sending it.
6       MS. CARTAYA:  Okay.
7       MR. BARDOS:  Andrew has two sets of
8   exhibits.  All right.  Let me see if I can
9   reduce this size.
10      THE WITNESS:  The link is also -- you
11  know, it's still on the website, like this
12  page, and that would load faster.
13      MS. CARTAYA:  Thank you.
14      Maybe that's easier, Andy.  Just to
15  share that, I think.
16      MR. BARDOS:  Well, it went down to 19
17  megs.  I don't know whether that will get to
18  you, Andrew, but I'll try.
19      MR. FRACKMAN:  Not a problem.
20      You may proceed.
21      MR. BARDOS:  Okay.  I just re-sent it.
22      MR. FRACKMAN:  What page are you on,
23  Andy?
24      MR. BARDOS:  Well, my last question was
25  about page 1.

```
1              MR. FRACKMAN:  Okay.  I'm with you.

2              MR. BARDOS:  Do you have it now?

3              MR. FRACKMAN:  Yes, I do.

4              MR. BARDOS:  Okay.  Good.

5    BY MR. BARDOS:

6         Q.   So, Dr. McCartan, do you see on page 1

7    it says that the ALARM Project generated 5,000

8    sets of randomly simulated districts for Florida's

9    congressional districts?

10        A.   I see that, yes.

11        Q.   Okay.  And so on the Polsby-Popper

12   measure, the enacted plan outranked all 5,000 maps

13   generated by the ALARM Project?

14        A.   That's right.

15        Q.   Okay.  And then if we go back to

16   page 4 --

17             MR. BARDOS:  And, Andrew, we're under

18        the heading Traditional Redistricting

19        Criteria.

20        Q.   -- the last sentence of that paragraph

21   says, "It," referring to the enacted plan, "split

22   17 counties compared to an average of 18 counties

23   for our simulated plans."

24             Do you see that?

25        A.   Yes.
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    92

1        Q.    Okay.  So the average out of the 5,000
2    simulated plans generated by the ALARM Project,
3    the average plan split 17 counties?
4        A.    Yes.
5              So it's measuring it as like how many
6    counties were split once or more.  There's some
7    other ways you can measure it, but if you use that
8    metric, then the average you'll see is 18 compared
9    to 17 for the enacted.
10       Q.    Okay.  And I misspoke, I said 17.
11             So 18 is the average for the simulated
12   plans and the enacted plan split 17?
13       A.    In this set of simulations, yes, that's
14   right.
15       Q.    Okay.  All right.  Let's close this.
16             And I would like to share with you your
17   report in the Grace litigation.  This is Exhibit
18   14.
19       A.    Okay.
20             (Exhibit 14 was marked for
21             identification and is attached to the
22             transcript.)
23       A.    Okay.
24       Q.    Okay.  Turn to paragraph 5, please.
25       A.    Okay.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    93

1        Q.    And in the -- on the third line, there's
2    a sentence that reads, "One effort that I led as
3    part of the ALARM Project involved collecting
4    every congressional district drawn in the 2021 to
5    2022 redistricting cycle and generating over
6    200,000 algorithmic redistricting plans which
7    complied with all relevant state laws and
8    constitutions."
9            Do you see that?
10       A.    Yes.
11       Q.    Okay.  So are you representing here in
12   this report, in the Grace case, that all of the
13   200,000 algorithmic redistricting plans, including
14   the 5,000 that the ALARM Project generated for
15   Florida congressional districts, complied with all
16   the relevant state laws and constitutions?
17       A.    Yeah.
18            I should have been more precise in this
19   Qualification and Experience section in the Grace
20   report, as it was going to qualifications and
21   experience.  I may have been more concise than --
22   than may be warranted.
23            So, I guess, to answer your question
24   directly, I wouldn't represent today that it's the
25   case that every single one of the 200,000 plans

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                      94

1    complies with all relevant state laws and

2    constitutions or necessarily even the federal

3    Voting Rights Act.

4         Q.   Okay.  And would that same thing be true

5    for the -- specifically for the 5,000 simulated

6    plans of the ALARM Project generated for Florida

7    congressional districts?

8         A.   Yes.

9              And as we discussed earlier, I think

10   there's more reasons to be -- there's more wiggle

11   room, potentially, between the simulations and

12   various interpretations of the Florida

13   Constitutional standards in Florida compared to

14   other states.

15        Q.   Okay.  So if you were rewriting what you

16   wrote here in paragraph 5 of the report in the

17   Grace case, how would you -- how would you change

18   that sentence?

19        A.   Something along the lines of one effort

20   that I led ... in generating over 200,000

21   algorithmic redistricting plans which attempted to

22   comply with all relevant state laws and

23   constitutions.

24        Q.   I see.

25             Okay.  Are there any particular

1    requirements, legal requirements that you feel

2    confident the algorithm was able to appropriately

3    implement for Florida?

4         A.   So certainly things like the districts

5    are all contiguous.  The algorithm can't generate

6    exactly equi-populous districts, but to the extent

7    that you're okay with, you know, half a percent or

8    tenth of a percent, then that would also -- that

9    would also be compliant.

10             I have to go through some of those

11   standards in more detail, but I think, on average,

12   we produce plans across the nation that are, you

13   know -- give the right answers on the partisan --

14   certain metrics that we were mostly interested in

15   that project.

16        Q.   Okay.  And so I think you said that

17   you're not certain whether you could have designed

18   an algorithm for Florida redistricting that

19   complies with all of the redistricting standards.

20        A.   Yeah.  To the level that I would feel

21   comfortable, for instance, you know, putting my

22   name on a litigation report.

23        Q.   Okay.  And that's not something that you

24   attempted to do in this litigation?

25        A.   Correct.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                           96

1        Q.    Okay.  And if you had been able to do

2    that, to generate a simulation that appropriately

3    complies with Florida's redistricting standards,

4    what would that simulation have been able to tell

5    us about the use of race in the enacted plans?

6        A.    That's a bit of a hypothetical.

7              When you design simulations, and I

8    testified to this before, you -- that's

9    hand-in-hand with the question you're trying to

10   ask about, the enacted plans.

11             I'm not familiar with the legal claims

12   at issue in this case or the facts in question, so

13   I don't know exactly what those simulations would

14   look like or what questions they'd be able to

15   answer or be designed to answer.  That's just not

16   something I was -- that is outside the scope of my

17   assignment.

18       Q.    Do you agree that a properly implemented

19   simulation would be able to at least indicate

20   whether race was a consideration in drawing the

21   enacted map?

22       A.    So that -- that's always one of the

23   trickiest ones.  Because when you're in a state

24   that's subject to the Voting Rights Act, race is

25   always a consideration, and so there's a question

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    97

1    of to what extent was race a consideration above

2    and beyond that required by the Voting Right Act

3    and that's very thorny very quickly.

4            If you can get all the parties to agree

5    on what exactly the extent of race you were trying

6    to measure, then, in principal, you could -- you

7    could get an answer to that kind of question.

8            Or if the question was, you know, was

9    race at all, you don't need simulations for that.

10           But you could -- you could put no racial

11   information in and then pretty readily establish,

12   I imagine, that race did influence the drawing of

13   certain districts.

14       Q.   And simulations tell us whether

15   particular configurations of districts are likely

16   to result from a compliant drawing of districts?

17       A.   Sorry.  Could you just say that again or

18   maybe rephrase.

19       Q.   Sure.

20           So would a simulation be able to tell us

21   whether, in a redistricting plan drawn according

22   to the applicable standards, you would expect to

23   see districts with a particular configuration?

24       A.   I see.

25           MR. FRACKMAN:  I'll object to the form

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              98

1          of the question.
2          A.    I mean, expect -- it's one -- it's hard
3     to prove a negative with simulations, but
4     certainly you could -- again, like earlier, you
5     could just, you know, determine whether or not a
6     particular configuration is -- would be very
7     unusual among compliant plans or not and,
8     conversely, not unusual.
9          Q.    Okay.  So a simulation might be able to
10    tell us, for example, whether a map drawer who is
11    complying with the standards, you know, how -- how
12    usual or unusual it would be for a map drawer
13    complying with the standards to draw a district
14    that connects Miami-Dade County with Collier
15    County?
16         A.    Right.
17               So if you had a set of simulations that
18    incorporated all of the Tier 2 standards in a way
19    that you felt you had converted the English to
20    computer code in a fair way, then, yeah, you could
21    use simulations for that purpose.
22         Q.    Now, in this case, correct me if I'm
23    wrong, but my -- I don't read your reports to be
24    offering an opinion as to whether race was the
25    predominant factor in drawing the enacted

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    99

1   districts.  Is that correct?

2         A.   That's correct.

3         Q.   Okay.  Let me show you a report that you

4   prepared in one of the Louisiana cases.  This will

5   be Exhibit 15.

6              (Exhibit 15 was marked for

7              identification and is attached to the

8              transcript.)

9         A.   Okay.

10        Q.   Okay.  Let's go to paragraph 71, please.

11        A.   Okay.

12        Q.   And here it looks like you're rebutting

13   the opinions of a -- of an expert, Dr. Barber.  Do

14   you recall what opinion Dr. Barber offered and

15   what your rebuttal position was?

16        A.   It's been awhile.

17             I believe there was an illustrative plan

18   issued by plaintiffs.  In that case, Dr. Barber

19   offered the opinion that the illustrative plan was

20   drawn with race as a predominant factor.  And I --

21   and on the basis mainly of -- of simulations that

22   he attempted to conduct.  And I didn't think that

23   his evidence supported those conclusions.

24        Q.   Okay.  Okay.  Go down to paragraph 73,

25   please.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    100

```
 1        A.    Okay.

 2        Q.    And as I understand it, Dr. Barber

 3   generated simulated maps and, based on those

 4   simulated maps, concluded that race was the

 5   predominant motive in whatever map was being

 6   challenged in that case?

 7        A.    I think he was making a claim about the

 8   illustrative plans offered by plaintiffs.

 9              This was, I believe, a voting rights act

10   case.  So this would have been, like, a jingles

11   prong that he was arguing about promise for.  I

12   don't believe -- I don't recall if he also applied

13   his methodology into the stated and enacted plan.

14        Q.    Okay.  And Dr. Barber apparently made

15   some sort of analogy to baking a cake with eggs

16   and baking a cake without eggs.  Do you recall

17   that?

18        A.    Yes.

19        Q.    Okay.  And what was the -- what was that

20   analogy?

21              What was his point?

22        A.    It was what we discussed earlier, the

23   general idea of simulations.  By removing a

24   particular factor from the simulations, you can

25   hopefully evaluate the impact of that factor on --
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    101

1    on plans that -- that didn't have that factor

2    removed.

3         Q.   Okay.  So analogy-wise, if you bake a

4    cake without eggs, then you can compare to a cake

5    made with eggs and you can tell whether X, you

6    know, made a -- made a difference in the -- in the

7    baking of the cake or whether eggs were used in

8    the baking of the cake?

9         A.   That's right.

10        Q.   Okay.  All right.  So in paragraph 73,

11   in your rebuttal report, you say, "Dr. Barber goes

12   too far, however, in concluding that race is,

13   therefore, the predominant factor in the drawing

14   of the illustrative plan.  For eggs to predominate

15   in the baking of a cake requires more than just

16   the eggs are important or even critical to the

17   cake's structure.  Flour, sugar, butter and other

18   ingredients would have to take a secondary

19   position compared to the amount and impact of the

20   eggs.  Such a claim simply cannot be made on the

21   basis of a single alternative cake.  Similarly, a

22   single set of redistricting simulations cannot

23   establish the predominance of racial factors."

24            Do you see that?

25        A.   Yes.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    102

1      Q.   Okay.  And what are you saying there?

2      A.   That predominance is a different

3  question from:  Was race used?  Is there a

4  difference on a racial metric?  That predominance

5  is fundamentally about a comparison of different

6  factors and, as such, the evidence you need to

7  bear to justify predominance requires looking

8  at -- at other factors at least with regards to

9  districting simulations.

10     Q.   Okay.  And so -- so using the analogy

11 even if eggs were important or critical in baking

12 the cake, it might -- it might or might not be

13 predominant because we -- that, by itself, doesn't

14 tell us what role flour, sugar, butter and other

15 ingredients had in the baking of the cake; would

16 that be fair to say?

17     A.   Yeah.  It's what I wrote there.

18     Q.   Great.  Okay.

19          And same, so the application of that to

20 a redistricting plan would be that even if race

21 was important or even critical to the drawing of

22 the districts, that by itself wouldn't tell us

23 whether it was the predominant factor; is that

24 also fair?

25     A.   Not quite.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                           103

1          I was -- this analogy was in the context

2     of redistricting simulations.  So simulation might

3     establish that race played a role.  The difference

4     in a racial metric might even be quite large.  But

5     that alone, without other context, other factors

6     provided by other simulation analyses, wouldn't --

7     would no longer establish predominance.

8          Q.   Okay.  And that's because you need -- in

9     order to establish predominance, you need to know

10    not only that the factor that you're assessing was

11    important or critical, you would need to know its

12    importance relative to other factors that were

13    involved in preparing the map?

14         A.   In general, that's -- that's how I

15    interpret predominance.

16          You know, in this case there's a lot of

17    discussion about what that meant, obviously.  You

18    know, the court makes the ultimate decision in

19    litigation.  But in my opinion, predominance

20    necessarily does relate to the role that other

21    factors played in comparison to the -- you know,

22    the factor question.

23         Q.   Okay.  Let's go down to paragraph 75.

24    In paragraph 75 you say, "Had Dr. Barber conducted

25    multiple additional valid simulation studies

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    104

1    measuring the effect of other redistricting

2    criteria on the number of HVAP majority districts

3    and other traditional redistricting criteria, he

4    may have been able to distinguish that some

5    factors had larger effects than others.  He did

6    not.  Even if he had done so, however, he still

7    could not have concluded that race predominated

8    over other factors.  All of the factors of

9    criteria that go into a redistricting plan

10   necessarily interact with one another and multiple

11   factors may be important without one predominated.

12   Claiming that race is the predominant factor in a

13   particular plan with us always require more

14   evidence than simply establishing that racial

15   information had an impact on the way the plan

16   looks."

17           Do you see that?

18       A.   Yes.

19       Q.   Okay.  And so specifically the -- with

20   respect to the last sentence there, do you stand

21   by the statement here that "all of the factors or

22   criteria that go into a redistricting plan

23   necessarily interact with one another and multiple

24   factors may be important without one

25   predominated"?

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              105

1          A.    Yes.  I think that's generally true.

2          Q.    And, likewise, the -- the last sentence,

3     do you -- do you stand by the assertion in this

4     report that -- claiming that "race is the

5     predominant factor in a particular plan will

6     always require more evidence than simply

7     establishing that racial information had an impact

8     on the way the plan looks"?

9          A.    Yeah.

10               And, again, that's sort of my

11    understanding of what predominant means to me,

12    but...

13               Yes.

14         Q.    Okay.  All right.  We can close that

15    exhibit.

16               All right.  Are you offering any

17    opinions in this case on the subjective

18    motivations of the Legislature in enacting either

19    the congressional or state house maps?

20         A.    No.

21         Q.    Okay.  And you don't claim to have any

22    personal knowledge about what motivated

23    legislators or their staff's -- staff members in

24    drawing the districts that the plaintiffs

25    challenge here?

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    106

1         A.   I don't.

2         Q.   Okay.  All right.  Let's look back at

3    Exhibit 2 which was the initial set of

4    instructions that you received.

5         A.   Okay.

6         Q.   And let's go to paragraph 5.  So

7    paragraph 5 says, "Alter surrounding districts

8    fully to the extent necessary to follow these

9    instructions and comply with the Florida

10   constitutional mandates."

11             Do you see that?

12        A.   Yes.

13        Q.   Okay.  Do you -- do you believe that in

14   drawing the -- let's say specifically the

15   congressional maps, the six congressional maps

16   that you prepared, that you complied with that

17   instruction?

18        A.   Yes.

19        Q.   Okay.  So you -- you believe that it

20   would not have been possible to draw a map that

21   complies -- that follows the instructions you were

22   given and complies with the Florida constitutional

23   mandates while altering surrounding districts to a

24   lesser extent than you did?

25             MR. FRACKMAN:  Object to the form of the

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              107

1         question.

2         A.    Yes, I agree with that.

3         Q.    Okay.  How many districts -- let's go by

4    each map.

5              Do you know in congressional map A how

6    many districts you altered?

7         A.    Look at -- look that up here.

8              MR. FRACKMAN:  Just tell us what exhibit

9         you're looking at.

10             THE WITNESS:  Oh.  I'm sorry.

11        A.    This is my report with the -- the visual

12   of the map in Fig. 4.  Gosh, I think -- sorry.  I

13   lost track.  Hold on.

14             I think 12.

15        Q.    Could it have been 13 districts,

16   Districts 16 through 28?

17        A.    It very well might have been.

18             Yeah.  So I -- I don't recall changing

19   20, but it's possible that I changed a couple

20   small blocks of 20 in this map.  I think that's 12

21   versus 13.

22        Q.    How about map B1, did you change 15

23   districts, specifically District 11 and then 15

24   through 28?

25        A.    I believe so.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    108

```
1        Q.    Okay.  And same for map B2?
2        A.    I believe so.
3        Q.    And map C1, did you change 18 districts,
4   those being Districts 8 through 11 and 15 through
5   28?
6        A.    I believe so.
7        Q.    Okay.  And the same for map C2?
8        A.    Yes.
9        Q.    And map D, did you change 20 districts,
10  specifically Districts 6 through 11 and 15 through
11  28?
12       A.    Six, I don't recall exactly.  It's
13  certainly possible I changed 6, so...
14              I believe -- I believe that sounds about
15  right.
16       Q.    Okay.  So based on that, it seems like
17  the -- the smallest number of districts that you
18  thought needed to be changed was 13 -- 12 or 13 in
19  map A?
20       A.    Right.
21              So the instruction sort of has two parts
22  which is before alternating and also complying
23  with the standards.  And so, as we talked about,
24  the standards are a judgment call.
25              So I presented some options that sort
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    109

1   of, you know, comply in my opinion, more or less,

2   with the standards overall and -- and then trade

3   that off, if you will, against the changes of the

4   original map.

5          So at minimum, I think 12 or 13

6   districts had to be changed.

7      Q.   Okay.  So, in your view, there was no

8   way to alter fewer districts while still following

9   the instructions in Exhibit 2 and complying with

10  Florida's constitutional mandates?

11     A.   Correct.

12     Q.   Okay.  And -- and, then, what about the

13  other maps, you know, if they alter 15, 18 or 20

14  districts, doesn't that make greater alterations

15  than necessary to follow the instructions and

16  comply with the Florida constitutional mandates

17  since you showed it could be done altering only 13

18  districts?

19     A.   Well, as I said, the other plans, I

20  think, better comply with parts of or -- or

21  more -- parts of the -- the -- the Tier 2

22  standards.

23          And so, again, I just made a judgment

24  call as to what -- what counts as fully complying

25  with these -- with those standards.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

1           And so in the event that I am presenting

2     options and stuff, if, you know, a decision maker

3     or person wants to look at, okay, could you better

4     comply, what would that look like and -- here's

5     what I think the minimum number of changes would

6     be in that scenario.

7           So some of the plans have fewer splits

8     of counties and municipalities and then so on.  So

9     I don't -- I don't think the fact that I produced

10    the range is inconsistent with my instructions.

11         Q.   So why would it -- if -- and the -- the

12    map that you were ultimately given, the shape file

13    that you were ultimately given in February of 2025

14    had only one district removed; correct?

15         A.   Yes.

16         Q.   Okay.  So why would it be necessary in

17    redrawing that district to redraw a minimum of 12

18    or 13 districts or as many as 20?

19         A.   Sure.

20               The existing districts have basically

21    all used sort of the north-south set of county

22    boundaries that sort of line up along the middle

23    of the -- of the spine of South Florida.  So once

24    I judged that having a district span the

25    Everglades was inconsistent with the Tier 2

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                               111

```
1    standards, you then had this population excess on
2    one side and gap on the other so there needs to be
3    some adjustment.  There needs to be some net
4    movement of boundaries so the population is equal
5    as on the two coasts.  And you can't do that
6    across those existing county boundaries without
7    creating what's, in my opinion, not consistent
8    with the Tier 2 standards.
9            Instead, you had to sort of flow the
10   districts up through sort of the Tampa latitude or
11   the splits that had already been -- that had
12   already been judged that those splits were going
13   to be there.
14           So sort of the pop- -- the balance of
15   the populations, I think, mandated those, like I
16   say, domino effect, to comply fully with -- with
17   the standards.
18       Q.   Okay.  Were there any -- were there any
19   ways in which -- that you observed in which the
20   enacted congressional plan complied with or
21   implemented the Tier 2 standards that when you'd
22   redo congressional district 26 you were not able
23   to do in your map?
24           MR. FRACKMAN:  Object to the form of the
25       question.
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    112

1          A.     Nothing specific comes to mind.  But if

2     there's a specific question, maybe I might have an

3     opinion.

4          Q.     Well, we'll get to that.

5                 Let's go back to Exhibit 1 which is your

6     report.

7          A.     Okay.

8          Q.     And turn please to paragraph 32.

9          A.     Okay.

10         Q.     All right.  So -- specifically, Table 1.

11    Just -- I want you to just make sure I understand

12    clearly what -- what the table references.

13                So the column that says -- that has the

14    heading Split 1+, do you see that?

15         A.     Yes.

16         Q.     Okay.  So would that be the number of

17    counties in the map that are split regardless of

18    how many times but the number of counties that are

19    split?

20         A.     Yeah.

21                Specifically by "split" I mean a county

22    for -- it's municipalities, actually.  So it's a

23    municipality for which there is census-reported

24    population in more than one district within a

25    municipality.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    113

1         Q.   Okay.  And then municipalities Split 2+,

2    what specifically does that refer to?

3         A.   The number of municipalities that have

4    census-reported population in more than two

5    districts within their boundaries.

6         Q.   Okay.  So there are at least three

7    districts that have some population from that

8    municipality?

9         A.   That's correct.

10        Q.   And then Total Splits, how do you count

11   that?

12        A.   So every time the boundary -- like you

13   have a district boundary sort of cross into and

14   take a portion, that would count as a split, so...

15             If it's -- if -- for instance, if a

16   county falls into the Split 2+ column but not the

17   Split 1+ column, there should be two splits that

18   are going to be counting toward that Total Splits

19   number.

20        Q.   Okay.  So if you have a municipality

21   and, let's say, there's a district boundary that

22   runs straight through the middle, is that -- does

23   that count one time in your total splits because

24   there's one line running through it or does it

25   count twice because there's two districts in that

1    municipality?

2         A.   It should count once.  Because if it

3    hasn't gone to the double duty, one district with

4    one municipality map, that would count as no

5    splits, so it should count once.

6         Q.   Okay.  And, then, if you have a

7    municipality with two lines running through it

8    with three districts, that would count as two in

9    your Total Splits column?

10        A.   Yes, it should.

11        Q.   Okay.  In maps A1 and A2, you split the

12   City of Miami five ways, and I'm wondering if you

13   can explain why.  And I'm happy to -- if you want

14   to look at it, I'm happy to show you maps A1 and

15   A2.

16        A.   All right.  Let me take a quick look

17   here.

18        Q.   Congressional maps.

19        A.   So to be clear, this would involve

20   Districts 108, 109, 112, 113 and 114.

21             I'm sorry.  They're the congressional

22   maps, not the house maps.

23        Q.   Congressional maps, yes.

24        A.   Oh, okay.  I'm sorry.  I thought you

25   said A1 and A2.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                          115

1          Q.   No.  I'm sorry.  You're right.  State
2    house maps.
3          A.   State house.  Okay.
4               So I see that there are five house
5    districts that contain some population in the City
6    of Miami.
7          Q.   Okay.  Yeah.
8               Could you walk me through why --
9               MR. FRACKMAN:  What -- what -- sorry to
10         interrupt, Andy.  What page are we looking
11         at?
12              THE WITNESS:  Five.
13              MR. BARDOS:  So -- yeah, we're looking
14         at 5.
15              I can make the map itself an exhibit, if
16         you all prefer.
17              MR. FRACKMAN:  Not necessary.
18              MR. BARDOS:  Okay.
19              MR. FRACKMAN:  I just wanted to be on
20         the right page.
21              MR. BARDOS:  Sure.
22         A.   Could you repeat the question?  I'm
23    sorry.
24         Q.   Sure.
25              So in maps -- state house maps A1 and

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                116

1    A2, I think we agree that the City of Miami is

2    split into five different districts.  Can you kind

3    of walk me through why the City of Miami is split

4    into five districts.

5         A.    Sure.

6              So some of the -- like 108 and 109 were

7    not originally erased in -- in my map, and that

8    creates some splits.

9              And I'll cover the whole city.

10             The other boundaries were set trying to

11   incorporate other major municipalities, major

12   roads in the area, the airport, the highways.  You

13   have the sort of various peninsulas and the bay.

14   And so in juggling all those these two

15   configurations ended up with five districts.

16             Other maps I drew had Miami in fewer

17   pieces.

18        Q.    So was this an example of balancing

19   different standards and trying to harmonize them

20   but recognizing that there are tradeoffs?

21        A.    Yes.

22        Q.    Okay.  You mentioned the airport.  Did

23   you have any -- was the airport in any way

24   significant to your map drawing in the state house

25   maps?

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    117

1          Did you have any particular idea about

2     what you wanted to do with the map -- with the

3     airport?

4          A.   I wouldn't say particularly.

5               It impacted the maps to the extent that

6     it's a large geographic area, not populated,

7     bounded by highways on -- on multiple sides.  So

8     that impacts how the districts are going to look.

9     But I didn't have, to use your words, any

10    particular ideas about the airport.

11         Q.   Okay.  Now, the City of Miami was split

12    five ways.  There are multiple other

13    municipalities in Miami-Dade that you did keep

14    whole.  Is there -- is there some difference

15    between the City of Miami and other municipalities

16    in Miami-Dade that Miami-Dade ended up being --

17    or, I'm sorry, the City of Miami ended up being

18    split five times but others were either not split

19    or were split fewer times?

20         A.   Well, Miami is much larger, so I don't

21    believe you can fit the whole city in a single

22    house district.

23         Q.   All right.  Let's go to page --

24    paragraph 34 of your report.  So we're back on

25    Exhibit 1.  And you write that "the illustrative

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    118

```
1    plans respect municipal boundaries at least as

2    well as the enacted plan and in some cases

3    better."

4            Do you see that?

5        A.   Yes.

6        Q.   Okay.  And here are we talking about

7    state house districts?

8        A.   Yes.

9        Q.   Okay.  So how would you -- how would you

10   compare the performance of the illustrative maps

11   to the enacted map as it relates to

12   municipalities?

13           You know, how would you evaluate?

14           Would you say it's comparable, better,

15   worse?  Kind of what characterization would you

16   put on -- on that?

17       A.    Well, I think, as I write here, I would

18   say in comparable and in some cases some of the

19   maps do better than the enacted map.

20       Q.    Uh-hmm.

21           Okay.  And are you taking a position on

22   the significance of that difference?

23           You know, are you -- when you say do

24   better, are you saying -- are you opining on,

25   like, the magnitude of that difference or that
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              119

```
1    improvement or -- or not?
2         A.   Unless I'm misunderstanding you, knowing
3    that there is a difference, knowing that it's in
4    the direction of additional compliance with the
5    Tier 2 standards and the numbers and the tables
6    that speak for themselves.
7         Q.   All right.  Are you offering any opinion
8    on whether the enacted maps' treatment of
9    municipalities indicates a consideration of race
10   by the Florida Legislature?
11        A.   No.
12        Q.   And does that go for both the
13   congressional and house district maps?
14        A.   That's right.  I looked at no racial
15   data.
16        Q.   And, likewise, are you taking any
17   position on whether the congressional and state
18   house maps and the -- or districts in the enacted
19   maps, whether their treatment of counties
20   indicates the consideration of race by the
21   Legislature?
22        A.   No, I'm not.
23        Q.   Okay.  Now, as to compactness, are you
24   offering any opinion as to whether the compactness
25   of districts in the enacted maps suggest the
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                      120

```
1    consideration of race by the literature?

2         A.   No.

3         Q.   And similarly, as to geographical

4    boundaries, are you offering an opinion as to

5    whether the way that the Legislature treated

6    geographical boundaries in the enacted

7    congressional and state house maps indicates the

8    Legislature's consideration of race?

9         A.   No.

10        Q.   I believe in your report, in paragraphs

11   29 and 55, you mentioned that you, in some of your

12   maps, split municipalities in Polk County that

13   were not split in the enacted map.  Do you recall

14   that?

15        A.   Let me just briefly review paragraphs 29

16   and 55.

17        Q.   Sure.

18        A.   Yes, I see that.  I see that discussion.

19        Q.   So why did you split the municipalities

20   in Polk County?

21        A.   Those municipalities are some of the

22   most irregularly-shaped municipalities in the

23   country, partly due to the -- the lakes and the

24   area, but I think also just the history of the

25   annexations and so on.  So in some cases don't
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    121

1   even have, you know, fully contiguous

2   municipalities.

3          So in the interest of balancing and

4   keeping co-equal the Tier 2 standards, my

5   judgment, you could -- you could do that, but the

6   cost in some cases and some configurations was --

7   splits through some of these municipalities.  In

8   some cases those splits were through unpopulated

9   regions which wouldn't -- wouldn't count as a

10  split by my other calculations.

11      Q.   Okay.  So is it fair to say that you

12  split those municipalities in order to make the

13  districts in that area more compact?

14      A.   Yes.  In order to balance those two

15  criteria across the whole map.

16          Almost every map is going to have to

17  split some districts.  And by splitting -- sorry,

18  some municipalities.  And by splitting those

19  municipalities in that area, I thought I could

20  better balance and comply with the Tier 2

21  standards.

22      Q.   And that would be an example of a

23  situation in which the Tier 2 standards are in

24  some tension with each other; correct?

25      A.   I would disagree with that.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    122

```
 1            MR. FRACKMAN:  Object to the form of the
 2      question.
 3      Q.   And you resolved that in favor of
 4  compactness at the expense of keeping the
 5  municipalities whole in Polk County?
 6      A.   In Polk County, in the particular --
 7  some of the illustrative examples, that's correct.
 8      Q.   Okay.  And that's an example of the
 9  sorts of tradeoffs that any map drawer, whether
10  it's the Legislature or anybody else drawing maps,
11  has to make when balancing the Tier 2 criteria;
12  correct?
13      A.   Yes.
14      Q.   Now, in paragraph 32, there's some -- I
15  believe that's where you discuss -- maybe you
16  don't discuss it there, but the calculations, I
17  think, reflect it.
18            So you split certain counties and
19  municipalities in a way that -- that one portion
20  of that, of the county or municipality, had zero
21  population.  Do you recall that?
22      A.   Just to make sure I'm clear, some of my
23  districts that I drew had boundaries that are
24  regions that overlap another county but that was
25  regions that are unpopulated, that's right.
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              123

1        Q.    Okay.  And so -- and that -- and that

2    would be true in both your state house maps and

3    congressional maps, you have those -- that type of

4    split occur?

5        A.    I believe so.

6        Q.    And I believe you explained in your

7    rebuttal report that you understand from the

8    Florida Supreme Court precedent that a split that

9    results in no population in one of the fragments

10   doesn't really count against the map drawer, it

11   doesn't violate the Tier 2 standards; is that

12   correct?

13       A.    That's my understanding.

14       Q.    Okay.  So in those situations, why did

15   you split the county or the municipality?

16            And I'm talking in about situations

17   where the split results in one piece that has no

18   population.  Why did you make those splits?

19       A.    Sure.

20            I -- a full answer probably depends on a

21   specific example we're discussing.

22            In general, it was often possible to

23   create boundaries that better respected static

24   geographic and -- and natural and political

25   features by, you know, drawing the way that may

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    124

1    have, you know, cut off an unpopulated portion.

2              And so that was a way to comply with

3    both -- you know, both parts of that Tier 2

4    standard respecting boundaries, respecting both

5    the municipal county boundary and the national

6    geographic or other political boundaries.

7         Q.   Okay.  Were there also situations in

8    which you created such lists in order to make the

9    district for compact?

10        A.   Probably.

11        Q.   Okay.  Do you know, for example -- and

12   we can look at the map, if you'd like, but Hendry

13   County, whether it had that little narrow

14   triangular piece that goes up into Lake

15   Okeechobee?

16             Do you recall that feature?

17        A.   Yes.

18             So reassigning that through the district

19   both respects sort of the coastline of that lake

20   as well as increasing the compactness visually and

21   according to some of the compactness measures.

22        Q.   Do you know whether the Legislature,

23   notwithstanding the Florida Supreme Court's

24   opinion, tried to avoid splits that resulted in an

25   unpopulated tract?

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    125

1        A.    No.  I don't at this moment recall
2    specifically knowing that, one way or another.
3        Q.    If the Legislature tried to avoid such
4    splits, would it be fair to say that the
5    Legislature subjected itself to a constraint that
6    you did not subject yourself to in drawing your
7    maps?
8              MR. FRACKMAN:  Objection to form.
9        A.    I would -- I would say rather that if
10   that were true -- and, again, I don't -- that --
11   that it might be the case, the Legislature and I
12   have slightly different interpretations of what it
13   means to respect political and geographical
14   boundaries in that -- in that narrow way.
15             I wouldn't describe it as an additional
16   constraint.  I think it's an interpretation of --
17   of that portion of the Tier 2 standards.
18       Q.    Okay.  But you wouldn't see it as a
19   constraint or -- well -- and let me -- let me go
20   back.
21             So what I'm asking you to hypothesize is
22   not that the Legislature interpreted the standards
23   that way, but it basically held itself to a
24   standard above what the law required.  It wasn't
25   going to split municipalities or counties in a way

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    126

1    that resulted in unpopulated fragment even if

2    it -- even if the law allows it.  So that's --

3    that's kind of what I'm hypothesizing.

4            So if that were the case and if that's

5    how the Legislature drew its maps, would you agree

6    that the Legislature placed itself under certain

7    limitations or constraints that you were not bound

8    by in drawing the maps?

9            MR. FRACKMAN:  Objection to form.

10       A.   So if I understand the question

11   correctly, that's definitionally true.  If the

12   hypothesis had additional criteria, then the

13   answer would be yes, they had additional criteria

14   that I did not.

15       Q.   And the -- just to be clear, the data

16   that you present in Tables 1 and 2 of your initial

17   report, where you summarize split counties and

18   county splits and split municipalities and

19   municipality splits, those do not include county

20   and municipal -- and municipal splits that

21   resulted in an unpopulated fragment?

22       A.   That's correct.

23       Q.   And so if we were to count those, some

24   of the numbers at least in Tables 1 and 2 would be

25   different?

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

127

```
 1    A.    I believe so.
 2          MR. BARDOS:  Andrew, what are you
 3    thinking or what's your preference in terms
 4    of lunch?
 5          MR. FRACKMAN:  Well, it's really up to
 6    you and Cory.
 7          Cory, you want to break now?
 8          THE WITNESS:  I don't know, Mr. Bardos,
 9    what your questioning looks like.  I can go
10    for another 15, 20 minutes before I need a
11    break, so...
12          MR. BARDOS:  Okay.  Are you -- what time
13    zone are you in, Dr. McCartan?
14          THE WITNESS:  Eastern.
15          MR. BARDOS:  Okay.  All right.  So
16    you're on the same lunch schedule that we're
17    on.
18          THE WITNESS:  Yes.
19          MR. BARDOS:  This might be a good time
20    to take a break, if it works for everybody.
21          Do we want to reconvene in, what, 45
22    minutes or an hour?
23          MR. FRACKMAN:  Cory, up to you.  45
24    minutes enough?
25          THE WITNESS:  Yeah.  I think that should
```

```
 1        be enough.

 2              MR. BARDOS:  Okay.  All right.  Let's

 3        convene at -- let's say --

 4              MR. FRACKMAN:  Let's shoot for 1:05.

 5              MR. BARDOS:  1:05.

 6              MR. FRACKMAN:  1:00.  1:00 is good.

 7        We'll shoot for 1.  We'll do that.

 8              MS. CARTAYA:  Thank you.

 9              MR. BARDOS:  1:00, it is.

10              Thanks, Everyone.

11              (Recess in proceedings.)

12   BY MR. BARDOS:

13        Q.   And, Dr. McCartan, during the break, did

14   you discuss your testimony with anybody?

15        A.   Yeah.  Mr. Frackman called and just said

16   you're doing a good job and it's going to get

17   tiring in the afternoon.

18        Q.   Yeah.  All right.

19              So nobody else besides Mr. Frackman?

20        A.   That's right.

21        Q.   All right.  Turn to page 38 of your

22   report, please.

23        A.   Okay.

24        Q.   I'm sorry.  Paragraph, paragraph 38.

25        A.   Oh.  Paragraph 38.
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                      129

1        Q.    Yeah.

2        A.    Okay.

3        Q.    And this is when you begin discussing

4    the boundary utilization scores.

5        A.    Yes.

6        Q.    And on the next page, on page 17, you

7    have a Table 3 that displays the average

8    utilization scores for a group of districts.  Do

9    you see that?

10       A.    Yes.

11       Q.    Okay.  What I'd like to do is focus

12   specifically on Congressional District 26 and its

13   boundary utilization scores.  So turn, please, to

14   page 28 which is part of the appendix to your

15   report.

16       A.    Okay.

17       Q.    All right.  Now, here you have, in Table

18   8, which begins on page 28, the boundary scores

19   for your six congressional maps as well as the

20   inactive congressional map; is that correct?

21       A.    Yes.

22       Q.    Okay.  And there's a column called --

23   called Other.  Do you see that?

24       A.    Yes.

25       Q.    And what do you understand Other to

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              130

1    refer to?

2         A.   The portion of the total perimeter which

3    does not coincide with city, county, road, water

4    or rail boundaries as to the software.

5         Q.   Okay.  And so the theory is that the

6    lower that -- the number is under Other the

7    better; correct?

8         A.   This is one way of quantifying

9    compliance with -- with Tier 2.

10             A lot of tradeoffs there.  But if you

11   buy into this metric then smaller Other score is

12   better compliance with Tier 2.

13        Q.   Okay.  And -- and so let's go through

14   and look at the scores achieved by Congressional

15   District 26.

16             Could you walk us through that and let

17   us -- and kind of just recite for the record in

18   each of the maps -- your six maps and the enacted

19   map the -- the score achieved by Congressional

20   District 26.

21        A.   Map CDA other 15 percent, CDB1 17

22   percent, CDB2 4 percent, CDC1 15 percent, CDC2 15

23   percent, CDD 15 percent, CD enacted 9 percent.

24        Q.   And so would you agree that apart from

25   map D2, the enacted map has a lower boundary score

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    131

1    for CD26 than in -- than in your enacted -- or,

2    I'm sorry, your alternative maps?

3         A.   Yes.

4         Q.   Okay.  And now let's do the same thing

5    looking specifically at the column called County.

6              And what do you understand that column

7    to be referring to?

8         A.   One moment.  Sorry.  I'm scrolling back

9    up.

10             That would be the portion of the total

11   perimeter that coincides with county boundaries.

12        Q.   Okay.  And so let's go through that same

13   exercise looking at the -- the portion of the

14   district boundary that coincides with county

15   boundaries for Congressional District 26 in each

16   of your six maps and the enacted maps.

17        A.   CDA 13 percent, CDB1 7 percent, CDB2 16

18   percent, CDC1 13 percent, CDC2 13 percent, CDD 13

19   percent, CD enacted 54 percent.

20        Q.   And so would you agree that the boundary

21   of enacted Congressional District 26 coincides

22   with county boundaries to a greater extent than

23   the boundary of Congressional District 26 in your

24   maps?

25        A.   Yes.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    132

1        Q.    Let's turn to paragraph 43 of your

2    report.

3        A.    Paragraph -- okay.

4        Q.    And here you're discussing compactness.

5    And in Table 4 you show the difference in the

6    average compactness scores for the various maps.

7              Do you see that?

8        A.    Yes.

9        Q.    Okay.  And what I'd like to do is look

10   at the compactness scores of three South Florida

11   districts in particular.  And to do that I will

12   provide Exhibit 22.  But I want you to feel free

13   to reference the -- the data in your appendix.

14             MR. BARDOS:  I'll make sure Mr. Frackman

15        has this exhibit as well.

16             (Exhibit 22 was marked for

17             identification and is attached to the

18             transcript.)

19        A.    Okay.  If it's all right, I'm just going

20   to spot check this document to make sure I

21   understand what this document is showing.

22        Q.    Yeah.  And, in fact, that was going to

23   be my next question.

24             Can you confirm the accuracy of the

25   scores in the document which is Exhibit 22?

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    133

1          A.    Okay.  So I'm just checking a couple of
2     numbers because it would take a long time to check
3     every single one.
4               But this appears to be a rearrangement
5     of the compactness tables in my appendix rounded
6     to two decimal places.
7          Q.    Okay.  So -- so this Exhibit 22 shows
8     the Reock, Convex Hull and Polsby-Popper scores
9     for Congressional Districts 24, 25 and 27 in the
10    enacted map and in -- and in your six illustrative
11    maps.
12              Would you agree that the compactness
13    scores in your maps for these three districts are
14    all lower than the compactness scores in the
15    enacted map with the exception of CD27 and map B2
16    where two of the scores are the same?
17         A.    That appears to be the case.
18         Q.    Okay.  Now, do you consider the
19    differences between the compactness scores in the
20    enacted map for these three districts and the
21    compactness scores in your maps for these three
22    districts to be meaningful?
23              MR. FRACKMAN:  Object to the form of the
24         question.
25         A.    "Meaningful" in what sense?  Sorry.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    134

```
 1        Q.   Just in whatever -- whatever sense or
 2   whatever opinion you're giving in this case.
 3             Are -- is -- are you -- would you
 4   consider this to be meaningful or significant, the
 5   differences, or -- or not significant or
 6   meaningful?
 7        A.   Sure.
 8             I would, you know, want to contextualize
 9   some of these numbers in the context of the full
10   tables to make a definitive opinion.
11             Some of these differences are certainly
12   larger than others.  And in many cases the
13   differences are -- you know, between enacted and
14   the illustrative plans are bigger than any
15   illustrative plans themselves.  So I just suspect
16   some of these differences could be -- I might
17   consider meaningful.
18        Q.   Do you have a -- and I think we talked
19   about this before, but you don't have a -- a
20   bright line rule that says, for example, if
21   it's -- if the difference is more than a tenth
22   than that's a, you know, kind of substantively
23   meaningful difference?
24             You don't have that kind of bright line
25   rule?
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    135

```
1        A.    That's right.
2        Q.    Are you offering -- going back to your
3   report.
4              Are you offering an opinion as to
5   whether the differences in compactness scores
6   reported in Table 4 of your report on page 18 are
7   meaningful or significant or are you simply
8   reporting the data?
9        A.    Let me flip back to Table 4.
10             I think my opinion in my report is that
11   the numbers are higher, lower or comparable, and
12   that my districts are or are not visually compact
13   or just generally compact.
14             The numbers in Table 4 are averages
15   across 28 districts.  And so those are going to be
16   measured on a different scale than looking at one
17   particular district in its -- in its -- its
18   metrics, for instance.
19        Q.    Okay.  So where -- where the scores in
20   your map as reported on Table 4 are higher or
21   lower than the enacted map, are you rendering an
22   opinion there about the significance of that
23   difference or just reporting that -- that they
24   are, in fact, higher or lower?
25        A.    In my report, it offers that it's higher
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                136

1    or comparable or lower, not that a certain

2    magnitude quantifies, to use your word,

3    significantly.

4        Q.   All right.  Let's take a look at some of

5    your maps.

6             And we'll start with -- let's see.

7    Start with congressional map A which is about to

8    become Exhibit 29.

9             (Exhibit 29 was marked for

10               identification and is attached to the

11               transcript.)

12       A.   Okay.

13       Q.   Okay.  And I'd like to ask you about the

14   visual compactness of some of the districts in the

15   map.

16            So let me catch up to you.

17            All right.  Let's take a look at

18   District 21 in map A.

19       A.   All right.

20       Q.   Do you consider District 21 to be

21   visually compact?

22       A.   Broadly, yes.

23       Q.   Okay.  "Broadly, yes," is that -- does

24   that indicate some -- some qualification of that

25   opinion?

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    137

1          A.    Well, in my alchemist-favored

2    redistricting, you know, we think of compactness

3    as a continuum, so I'm always low to, you know,

4    make a bright-line distinction.

5                I understand the judgment as regards

6    Tier 2 standards is maybe compact or not and so,

7    you know, if pressed, I would say yeah, 20 -- 21

8    is compact visually.

9          Q.    Okay.  And you consider that visually

10   compact notwithstanding the -- the protuberance at

11   the northwest corner of District 21?

12         A.    Again, you know, if you kind of factor

13   that you didn't have that, you could ask is it

14   more or less compact.  Right now, I don't have an

15   answer.  But taken together, yes.

16         Q.    Okay.  How about District 18, would you

17   consider that to be compact?

18         A.    Yes.

19         Q.    And what about District 24, is -- and

20   on -- on the right side of the first page there's

21   a -- kind of an enlargement of that southeast

22   Florida area, if that's helpful.

23         A.    Yes, I see.

24         Q.    And do you consider District 24 to be

25   visually compact?

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    138

1        A.   I would say it's less compact than, for

2   instance, 26 or 27, but broadly, yes, I would say

3   24 is visually compact.

4        Q.   Notwithstanding its horizontal

5   orientation?

6        A.   That's -- well, the fact it is wider

7   than it is tall, yes.

8        Q.   Okay.  And there's no difference between

9   the -- in terms of compactness the particular

10  orientation of a district, whether it's horizontal

11  or vertical; correct?

12           It's just really the shape of the

13  district that determines compactness?

14       A.   Well, certainly, numerical scores are

15  what we call rotation variants.  But some people

16  have studied this and find that judges, for

17  instance, actually are sensitive to the direction.

18  There's some metrics of compactness that do take

19  into account orientation.

20           So I can't undo exactly what's going on

21  in my brain, but when I look at 24 that's visually

22  compact.

23       Q.   If we rotate District 24 90 degrees,

24  would it still be visually compact?

25       A.   Yes.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                139

1      Q.    Okay.  What about District 25, just to
2  the north of it, do you consider that to be
3  visually compact?
4      A.    That's more borderline for me because of
5  the impact to District 20.
6      Q.    And District 20, is that drawn the way
7  that it is because of the minority voting
8  protections that you were told about in the
9  instruction letter?
10     A.    That was my inference based on the two
11 protrusions, that the only reasonable way you can
12 figure that district for that reason or to look
13 like that is because those areas contain protected
14 voters.
15     Q.    Okay.  So why does District 25 go up the
16 coast north of Fort Lauderdale and through Pompano
17 Beach?
18     A.    Well, it needs to have the same
19 population as the other district and there isn't
20 enough in the area line below the arm of 20, if
21 you will, so it has to extend up the coast.  The
22 only way to not have it look like that would be to
23 reconfigure 20 substantially.
24     Q.    Do you know whether the Legislature's
25 District 25 has this L shape?

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              140

1      A.   Well, the Legislature's numbers aren't
2  going to correspond exactly the same as to this
3  map because of the sort of counterclockwise
4  movement of population.  So if I had to guess, I
5  would say 25 is probably located further south and
6  that a different district involves the sort of
7  stretch from Pompano to Fort Lauderdale beach
8  rather than District 25.
9      Q.   Okay.  Let's look at the enacted
10 congressional map.  I'll add that to the chat.
11          And are you able to kind of look at two
12 maps at once side by side?
13     A.   I should be able to.
14     Q.   Okay.  All right.  So here comes Exhibit
15 27.
16          (Exhibit 27 was marked for
17          identification and is attached to the
18          transcript.)
19     Q.   And let me know once you have 27 open.
20     A.   I do, side by side here.
21     Q.   Okay.  Perfect.
22          So in the -- do you see District 25 in
23 the Legislature's map?
24     A.   Yes.
25     Q.   Okay.  And you agree that District 25

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                      141

1    doesn't go north of Fort Lauderdale in the

2    Legislature's map; correct?

3         A.   Yes.

4         Q.   Okay.  So why did District 25 turn north

5    and go up the coast in your map?

6         A.   Well, because of what I just mentioned,

7    the movement of population.  So 26 takes a

8    different set of population so the districts

9    around it get moved.

10             To keep 25 with equal populous, as is

11   required by the Constitution, requires taking the

12   population north, the -- the only alternative is

13   refiguring District 20.

14        Q.   Okay.  So let's talk about District 26

15   and its -- its impact.

16             So would you agree with me that when

17   District 26 moved entirely within Miami-Dade

18   County as it did in your map, then some other

19   district in Miami-Dade County must at least in

20   part move out of Miami-Dade County?

21             MR. FRACKMAN:  I'm going to object to

22        the form of that question.

23        A.   I think that follows if you basically

24   maintain the other county boundaries that are

25   not -- that are not split and that would be

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    142

```
 1    consistent with Tier 2.
 2              So if you want to maintain consistent
 3    with Tier 2, then you're going to have to move
 4    some district in Miami-Dade, a larger portion of
 5    that district is going to include areas outside
 6    Miami-Dade.
 7         Q.   Right.
 8              So, just as a matter of equal
 9    population, if District 26 is taking more of
10    Miami-Dade's population, some other district has
11    to take less; right?
12         A.   That's correct.
13         Q.   Okay.  So in your map, once you move to
14    Miami-Dade -- I'm sorry, moved Congressional
15    District 26 entirely into Miami-Dade, which
16    district did -- in other words, which district
17    took less of Miami-Dade's population?
18         A.   CD24.
19         Q.   Okay.  So CD24 moved -- took less
20    population from Miami and took more population --
21    Miami-Dade and took more population from Broward
22    than in the enacted map?
23         A.   That's correct.
24         Q.   Okay.  So, basically, it moved a little
25    bit to the north?
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    143

```
 1          A.   That's right.
 2          Q.   Okay.  And is it that movement of
 3   District 24 to the north taking more population
 4   from Broward that required District 25 to go north
 5   along the coast as well to take population along
 6   the coast?
 7          A.   That's right.
 8          Q.   Okay.  And, then, how did that impact
 9   Districts 23 and 22?
10          A.   Those also move northward.  So 23 was
11   configured to not wrap around the arm of -- of 20
12   so it became -- it became visually compact, for it
13   being not visually compact in my judgment.  And
14   then 22 was pushed north as well and had to wrap
15   around the arm of 20 and became less compact.
16   They both moved north.
17          Q.   Okay.  So instead of 23 wrapping around
18   the southern arm of 20, we have 22 wrapping around
19   the northern arm?
20          A.   Yes.  Well, wrapping more around the
21   northern arm.  It had extended up to West Palm
22   Beach, a very -- sliver of it had, in the enacted
23   map.
24          Q.   Yeah.
25               But in the enacted map it doesn't really
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    144

1    wrap around the northern arm; right?

2            It sort of ends where the northern arm

3    sort of comes closest to the coast?

4        A.   That's right.

5            It's more like 25 has kind of like this

6    L thing going on.

7        Q.   And north of that, do you see in the

8    enacted map that District 21 follows county

9    boundaries along the west and northern boundaries?

10       A.   Yes.

11       Q.   Okay.  And in your map, because these

12   districts are being pushed to the north, were you

13   able to maintain District 21's adherence to those

14   county boundaries?

15       A.   Well, it follows them in the west and

16   almost to all of the south and most of the north

17   but then crosses the county boundary into, I

18   believe, Polk County.

19       Q.   Okay.  But it was not -- it no longer

20   follows the western boundary of Martin and St.

21   Lucie counties; correct?

22       A.   That's right.  It follows the western

23   boundaries of Highlands and Glades instead.

24       Q.   Okay.  And, then -- and, then, at a

25   point it does deviate from county boundaries,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                        145

1    District 21; correct?  In your map.

2         A.   Yes.

3         Q.   And that's within Polk County?

4         A.   Yes.

5         Q.   Okay.  And those changes were required

6    by your move of District 26 entirely within

7    Miami-Dade County?

8         A.   They followed from that move to maintain

9    compliance with Tier 2 standards.

10        Q.   Okay.  And to ensure equal population;

11   right?

12        A.   Yeah.

13        Q.   Okay.

14        A.   That's part of the Tier 2 standards that

15   I'm -- well, it's related.

16        Q.   And you actually are -- yeah, you're

17   right about that.

18             Okay.  All right.  Let's close this one.

19             Let me show you Exhibit 30.

20             (Exhibit 30 was marked for

21             identification and is attached to the

22             transcript.)

23        A.   Okay.

24        Q.   So this is map B1.  And similar question

25   here.  Do you consider District -- District 25 to

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                          146

1    be visually compact?

2        A.    25.   Yeah.   That's the more borderline

3    sort of L shape, but -- but it's on the margin.

4        Q.    Okay.  And then 24, I guess the

5    configuration is somewhat similar but not exactly

6    the same, do you consider that to be visually

7    compact in this map?

8        A.    Yes.

9        Q.    And that would be true even if we rotate

10   it 90 degrees?

11       A.    Yes.

12       Q.    And what about District 22 which wraps

13   around the northern arm of District 20, does that

14   visually compact?

15       A.    No.

16       Q.    And what about 18, do you consider that

17   to be visually compact?

18       A.    It's a little more of a close call.  I

19   would say yes.

20       Q.    Okay.  Why does District 18 have that

21   extension to the west?

22       A.    It's just -- I think the population's

23   equal.  There's not a lot of population in that --

24   well, I can't read the county name, but that --

25   that eastern portion of that county, there's not a

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    147

1    lot of population there and so -- and so to
2    balance the population, to take a little more
3    closer to the bay there.
4        Q.    Okay.  Now, District 21 here, on the
5    east side it begins at the Atlantic Ocean;
6    correct?
7        A.    Yes.
8        Q.    And on the west it goes about as far
9    west as Port Charlotte.  Do you see that?
10            Or do you know -- I guess, you might not
11   know where Port Charlotte is.
12       A.    It approaches that area, yeah.
13       Q.    Okay.  Which is near the west coast of
14   Florida; correct?
15       A.    Yeah.  In the -- so the closest part is
16   to the inlet, I guess.
17       Q.    Yeah.
18            Do you agree that west to east District
19   21 is longer than enacted Congressional District
20   26?
21       A.    Let me pull it up.
22            It's not enacted again.  It's about 27.
23   It appears to be east-west a little longer.
24       Q.    Okay.  And do you know whether the
25   Kississimme River flows south through the middle

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

148

1    of District 21 in your map B1?

2         A.   No, I don't particularly.

3         Q.   Do you know whether there's much

4    population in the Kississimme River Basin?

5         A.   My recollection in drawing this area is

6    that, if you're referring to this area sort of in

7    the center north of 21, that's more sparsely

8    populated than sort of the coasts.

9         Q.   Do you know whether in the middle of

10   District 21, where the Kississimme River flows

11   south, whether there are conservation lands set

12   aside where there's little or no population?

13        A.   I can see on this map, I think that

14   there are some that overlap with District 21, in

15   that area.

16        Q.   Is that something that you looked at and

17   considered when drawing District 21, whether it's

18   bisected by the Kississimme River basin that has

19   little or no population?

20        A.   My recollection in drawing this area

21   wasn't -- wasn't completely devoid of population.

22             And I produced some other maps that --

23   that configure this -- this -- this issued

24   boundary differently.  So I would say that the

25   overall population density and the -- you know,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                               149

```
1    the features in this area were -- were a factor in

2    my drawing these illustrative maps.

3         Q.    Okay.  Do you know how many people live

4    around the Kississimme River?

5         A.    Well, I don't know, sir, what area

6    specifically that corresponds to close to the --

7    to the river, so -- so, no.

8         Q.    All right.  Let's take a look at Exhibit

9    31 which I circulated earlier in the deposition.

10   Let me know if you have that.

11        A.    I have that still.

12              31.  I'm ready when you are.

13        Q.    Okay.  So do you see that this map has

14   the same District 18 as map B1 does?

15        A.    Yes.

16              I think the only things that changed in

17   this map are the 20 and the northern Miami-Dade

18   counties.

19        Q.    Okay.  So, then, your answers regarding

20   visual compactness, the visual compactness of

21   Districts 18, 22 and 25, would be the same as they

22   were for map B1?

23        A.    That's right.

24        Q.    Okay.  Now, if you look at Districts 26

25   and 24 --
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    150

```
1          A.    26 and 24.  Okay.

2          Q.    -- do you see that they are oriented

3    horizontally?

4          A.    Yes.

5          Q.    Okay.  And do you consider those

6    districts to be visually compact?

7          A.    Yes.

8          Q.    And if those two districts together were

9    rotated 90 degrees, would they still be visually

10   compact?

11         A.    I don't know what you mean by

12   "together," but yeah.  My judgment of each of

13   their compactness is not dependent on their

14   orientation horizontally.

15         Q.    Okay.  Okay.  I'll somehow you Exhibit

16   C1 which will be Exhibit 32.

17               (Exhibit 32 was marked for

18               identification and is attached to the

19               transcript.)

20         A.    Okay.

21         Q.    Okay.  In map C1, take a look at

22   District 17.  Do you consider District 17 to be

23   visually compact?

24         A.    Yes.

25         Q.    Okay.  And that's despite the kind of
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    151

1       tripod shape of District 17?

2               MR. FRACKMAN:  I'll object to the form

3           of the question.

4           A.    Yeah.  The shape of 17 is impacted by

5       the -- the coastline and -- and so on.  But, yeah,

6       I would judge it visually compact.

7           Q.    And how about District 18?

8           A.    Likewise, compact.

9           Q.    And District 20 -- District 24 and 25

10      look similar to some of the Districts 24 and 25

11      that we've looked at in previous maps, so would

12      your answers about the visual compactness of those

13      be the same?

14          A.    Yes.

15          Q.    Okay.  All right.  Let's take a look at

16      map C2.  This will be Exhibit Number 33.

17              (Exhibit 33 was marked for

18               identification and is attached to the

19               transcript.)

20          A.    Okay.

21          Q.    Take a look at District 17 in your map

22      C2.

23          A.    Okay.

24          Q.    Do you consider that to be visually

25      compact?

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              152

```
 1        A.    Yes.
 2        Q.    And is that -- so even though along the
 3   northern boundary it has this sort of stair step
 4   or stairway shape?
 5        A.    Yeah.  It's a very regular feature there
 6   in the stair step so, yes.
 7        Q.    Okay.  That's it for that map.
 8              We'll do --
 9        A.    Excuse me.
10        Q.    Map D is next.  That will be Exhibit 34.
11              (Exhibit 34 was marked for
12              identification and is attached to the
13              transcript.)
14        A.    Okay.
15        Q.    Okay.  Take a look at District 18.
16        A.    Okay.
17        Q.    And do you consider District 18 to be
18   compact?
19        A.    Yes.
20        Q.    And along the eastern boundary do you
21   see that stair-step shape going up from the
22   southern end to maybe Apollo Beach in Hillsborough
23   County?
24        A.    Sorry.  We're looking at --
25              MR. FRACKMAN:  I'm looking at a
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              153

```
 1          different map.
 2          A.    That's southwest.
 3          Q.    All right.  So this is map D, Exhibit
 4    34.
 5          A.    Uh-hmm.
 6          Q.    On District 18.  And I might have said
 7    east, but I am referring to the -- sort of the
 8    western boundary of 18 as it goes up at front,
 9    right angles --
10          A.    I agree.
11          Q.    -- from the southern end of the district
12    up to the kind of western most part of the
13    district.
14          A.    Yes.  I see that.
15          Q.    Okay.  Do you think that renders the
16    district non-compact?
17          A.    I do not.
18          Q.    Okay.  Now, what about District 8 in
19    this map, do you think that's compact?
20          A.    Yes.
21          Q.    Okay.  Notwithstanding the kind of thin
22    vertical orientation of that district?
23          A.    Yeah.
24                And this kind of depends on a few -- to
25    what extent you visually judge the water blocks to
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              154

1    be part of -- part of the district.  So it is a

2    little more borderline than some other cases.  But

3    it's very close to a rectangle in some sense.  So

4    I would say it's visually compact.

5        Q.   Okay.  So you would consider a rectangle

6    to be compact even if it's somewhat thin?

7        A.   I mean, you -- I think you have to judge

8    compactness in the context of where you are in the

9    map.

10            So 8, where it is, that part of the

11   state where it is, to me, that looks compact.

12   That's just my visual judgment.

13            I think we discussed earlier, you know,

14   a hypothetical district that was even longer than

15   8 and snap to the -- you know, I-95.  You know, it

16   might also look like a rectangle, but I don't

17   think I would judge that to be compact.

18       Q.   So when you're looking at visual

19   compactness, what -- what are the things that you

20   look for?

21       A.   I mean, I don't know.  It's a, you know,

22   I-know-it-when-I-see-it-type question.

23            And so if there's, you know, sort of the

24   extremely irregular boundaries that aren't

25   obviously following any, for instance, river,

1    there's excessive, you know, protuberances, if

2    it's non-convex, substantially non-convex, if it's

3    substantially elongated along some axis -- and

4    that also is a conversation with what's happening

5    around it.  So we discussed earlier when 20 is

6    extending into 22 and 22 is wrapping around it or

7    23 or whatever, that's clearly different than if

8    that protuberance was along a peninsula, for

9    instance, at least to my eye.

10        Q.   Okay.  And what about District 21 just

11   to the south of it, is that compact?

12        A.   Yes.

13        Q.   Now, looking back at the enacted

14   congressional map --

15        A.   Okay.

16        Q.   -- do you see that Districts 20 and 21,

17   along their western --

18        A.   Yes.

19        Q.   -- along their western boundary, for the

20   entirety of their western boundary follow county

21   lines and then 21 along the northern boundary

22   follows county -- a county line?

23             Do you see that?

24        A.   Yes.

25        Q.   Okay.  Now, did your -- in any of your

1    six congressional maps, did you maintain that

2    adherence to this -- the -- that county line, the

3    same county line that is the western boundary of

4    Broward, Palm Beach, Martin and St. Lucie counties

5    and the northern boundary of St. Lucie?

6        A.   No, not exactly that set of boundaries.

7        Q.   Okay.  And is that because District 26,

8    when it moved entirely within Miami-Dade, as we

9    talked about, pushed the districts to the north

10   and that prevented the maintenance of that county

11   boundary that we just discussed?

12       A.   That's a natural consequence, yes.

13       Q.   Okay.  Let's look back at your -- the

14   latest map of yours that we looked at, so map D.

15       A.   Okay.

16       Q.   And, I guess, the counties are not

17   marked on this map.

18            But are you aware of whether your six

19   congressional maps all split Sarasota County?

20       A.   Give me a second to -- still learning

21   some of these county names.  Sarasota.

22            MR. FRACKMAN:  Can we get the exhibit

23       number, Andy?

24            MR. BARDOS:  So I'm looking at

25       Exhibit --

```
1              MR. FRACKMAN:  If that would be okay.
2              MR. BARDOS:  I'm looking at Exhibit 34
3        right now.
4        A.   I'm on 34 and also 27 which has the
5   counties labeled.
6              I believe the Sarasota boundary would be
7   split in some portion or in whole in all of my
8   illustrative maps.
9        Q.   Okay.  And to confirm, you have -- do
10  you know if you, like, look in your report, or
11  somewhere elsewhere, where you could kind of
12  definitively determine whether Sarasota County is
13  split in each of your six congressional maps?
14       A.   I just have to pull up the ones we just
15  went through.  So I could do that, if you'd like.
16       Q.   Okay.
17       A.   28.  Wait.  Exhibit 28 is not a map?
18  I'm just going to the -- I don't have a 28.
19       Q.   Yeah.  28 is a -- we haven't used 28
20  yet.
21       A.   Okay.
22             So the -- actually, the boundaries
23  aren't marked, but it appears that all of them
24  don't maintain the northern border of Sarasota
25  County but Manatee.
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              158

1        Q.    Okay.  So Sarasota County is split in
2    each of the six congressional maps you drew?
3        A.    It appears that way.  Again, that -- you
4    know, I don't have it labeled on here, but yes.
5        Q.    Okay.  And in the enacted map Sarasota
6    County is whole?
7        A.    That's right.
8        Q.    All right.  And do you know why Sarasota
9    County would have been split in your maps?
10       A.    It wasn't a specific choice.  It would
11   have followed from the same considerations we
12   discussed of populations moving and needing to
13   keep each district equal populous.
14       Q.    Okay.  So would that have been a
15   consequence of the -- of your redraw District 26?
16       A.    Ultimately, yes.
17       Q.    And I don't think you're contending
18   this, but do you contend that it's more important
19   to keep Collier County whole than it is to keep
20   Sarasota County whole?
21       A.    You're right, I'm not -- I'm not
22   contending that.
23       Q.    Okay.  So in -- in the enacted map that
24   we looked at which was map -- I'm sorry, Exhibit
25   27, now we looked at the county boundary along the

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    159

1    western boundary of Districts 20 and 21 and the

2    northern boundary of District 21, if the

3    Legislature decided to follow that boundary, can

4    you tell or do you have an opinion as to whether

5    it would have been possible to draw a map that

6    doesn't connect part of Miami-Dade to Collier

7    County in one district?

8          A.   I don't have an opinion on that.  I

9    haven't thought about all those configurations.

10         Q.   So as you -- as you look at the enacted

11   map -- so we see that -- that county boundary

12   that -- that we talked about, northern end of St.

13   Lucie and then the western side of St. Lucie,

14   Martin, Palm Beach and Broward, within that that

15   sort of forms a -- kind of a pocket if you

16   consider the Atlantic Ocean as a boundary on the

17   east side as well.  Then we have District 21 kind

18   of moving north to south, District 21, 20, 22, 23

19   and 25, so -- and then we have 24, 27 and 28 in

20   Miami-Dade.  28 comes around to Monroe.  And 26

21   goes west to Collier.

22              I mean, looking at that, is there any

23   way that you can think of that the Legislature

24   could have maintained that county boundary along

25   the western side of Districts 20 and 21 and the

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    160

1    northern side of 21 without taking a district down

2    to Collier?

3              MR. FRACKMAN:  Objection to form.

4        A.   As I said, I haven't thought through all

5    these combinations specifically.

6              To what extent Monroe could play in that

7    particular hypothetical, it's not obvious to me,

8    one way or another, whether it's absolutely

9    impossible or that it's absolutely possible.

10       Q.   So would you agree that in the enacted

11   map Monroe is wholly within District 28?

12       A.   Yes.

13       Q.   Okay.  So if we look at the portion of

14   District 26 that's in Collier County, where else

15   could 26 go to get population since it can't go

16   to --

17       A.   I'm assuming we're continuing your

18   hypothetical here.

19             Again, possibly 26 stays inside

20   Miami-Dade.  27, 28 is adjusted.  28 takes some

21   population from Collier and -- some portion of

22   Collier.

23             Yeah, there's a couple permutations I'd

24   want to go through, but...

25       Q.   Okay.  So in that situation, if 28 goes

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                          161

1    into Collier, 28 would still be partially in

2    Miami-Dade County; correct?

3        A.   It would depend on the balance

4    populations.

5            Again, it wouldn't shock me if that has

6    to be the case, given the Keys are not that

7    heavily populated, but it's a hypothetical I

8    haven't gone through.  I -- I don't want to make a

9    definitive yes/no on that.

10       Q.   Would it help you to see the -- the

11   population of different counties?

12           Turn to -- go to page 16 of this

13   exhibit.

14       A.   Okay.

15       Q.   And do you see where -- this Miami-Dade

16   and specifically District 28?

17       A.   Yeah.

18       Q.   Do you see that 680,347 people who live

19   in District 28 are located in Miami-Dade County?

20       A.   I do.

21       Q.   Okay.  And that's much smaller [sic]

22   than the portion of District 26 that is in Collier

23   County; right?  I'm sorry, much larger.

24       A.   It's about three times as large.

25       Q.   Right.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              162

```
1            So if Miami-Dade -- if 26 were to move
2    entirely within 20 -- into Miami-Dade, that
3    wouldn't push 28 wholly out of Miami-Dade; right?
4        A.   I believe not.
5        Q.   Okay.  And so even if it's Miami -- if
6    it's 28 that goes up into Collier, you would still
7    have a district that includes both Collier and
8    Miami-Dade?
9        A.   Seems very well reasoned.
10       Q.   And so is there any scenario that you
11   can think of, sitting here, that -- in which the
12   Legislature, if it wanted to follow this county
13   boundary along the northern end of St. Lucie and
14   the western side of St. Lucie, Martin and Palm
15   Beach and Broward counties, could have drawn a
16   district that doesn't include Miami-Dade and
17   Collier counties?
18            MR. FRACKMAN:  Objection to form.
19       A.   If it made that judgment, which may or
20   may not be consistent with the constitutional
21   standards, then, as we've discussed, I don't think
22   it is positive to both insist on that entire
23   boundary and avoid any district containing both
24   population in Collier and Miami-Dade.
25       Q.   Okay.  All right.  So we can close that
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    163

1    exhibit.

2            Do you know -- I know you didn't look at

3    population data when you were drawing the

4    districts, but do you know, sitting here today,

5    what the Hispanic voting age population of your

6    Congressional Districts 26 is, I guess, for the

7    six different maps?

8            Do you know what the age maps are?

9        A.   No.

10       Q.   Okay.  Do you know whether at least

11   in -- well, let me ask you this.  How many

12   different configurations of District 26 are

13   contained in your six maps?

14       A.   Sorry.  I should amend my last question.

15           I think we did -- you showed me earlier

16   that one of mine -- I forget which, maybe it was

17   B1, had an HVAP somewhere in the low 70s.  So

18   that's my only -- that's my only knowledge of

19   that, to correct that answer.

20       Q.   Yes, sir.

21       A.   As far as configurations of 26, it's not

22   six.  I want to say it's maybe two or three.

23       Q.   Okay.  And -- and so you know now based

24   on our earlier conversation in this deposition

25   that one of them has an HVAP in the -- in the

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    164

1    lower 70 percent range.

2           Do you know what the HVAP is for the

3    other District 26 or Districts 26 that you drew?

4        A.   No.

5        Q.   Would it surprise you if the HVAP is in

6    the range of 90 percent?

7        A.   Maybe a little bit.  Only because I

8    maybe grasped that it was -- there was that much

9    residential segregation in that portion of the

10   county, but I'm not as -- I know the broad sort of

11   patterns of Miami-Dade, but I'm not as familiar

12   with the demographics to really be surprised, one

13   way or the other, if that were true or not.  I

14   don't know.

15       Q.   Okay.  Do you have an opinion on whether

16   if you are drawing, you know, a map and -- and you

17   had a district, a congressional district with a 90

18   percent Hispanic voting age population, does

19   that -- you know, do you have any concerns about

20   that, the way that that -- that would be drawn?

21       A.   Could you be more specific?  Like, what

22   kind of terms specifically?

23       Q.   Packing.

24           Are you familiar with the term of

25   "packing"?

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                      165

1      A.   In the context of, like, a racial

2  gerrymandering type of claim.

3      Q.   What's your understanding of the term

4  "packing"?

5      A.   Well, you can use it for not just race

6  but -- but partisanship.

7           But the way I use it in my work is when

8  you have a district that has a substantially

9  higher concentration of a group than you would

10  otherwise expect in, for instance, a neutral set

11  of simulations.

12           So as to answer your original question,

13  90 percent -- it would depend, for instance, if

14  you're drawing -- many parts of the country where

15  you draw maps you're going to have extremely

16  concentrated groups in one race.  For instance,

17  you're going to have 90 percent white in huge

18  counts.  So it really depends on the local

19  geography.  So I don't know what's typical in this

20  area.

21           And as to racial gerrymandering or -- or

22  racial rights, that consideration would depend on

23  factors like racially polarized voting, which I

24  haven't analyzed.

25      Q.   Is the fact itself that the HVAP of the

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                      166

```
1    district is in the range of 90 percent, that by

2    itself wouldn't cause you concerns?

3         A.   Given my current state of knowledge

4    about local voting patterns and demographics, you

5    know, without additional background, I wouldn't --

6    I wouldn't make a judgment necessarily, one way or

7    the other.

8         Q.   Okay.  What about in the state house

9    map, if you drew districts in which certain

10   maps -- in which three of the districts that you

11   redrew had Hispanic voting age populations of

12   approximately 90 percent or greater, would that

13   fact in itself cause you any concern?

14        A.   It would surprise me a little less

15   probably just because of the size of the district

16   is featured in drama homogenous districts that are

17   smaller.

18             As I say, as far as concern, I would

19   need more local context and background to -- to

20   form a concern or lack thereof, one way or

21   another.

22        Q.   Okay.  Do you know whether your -- apart

23   from map B2, whether your -- your Congressional

24   Districts 26 each have at least 100,000 more

25   Hispanics of voting age than the enacted District
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              167

```
 1   26 does?
 2        A.   I'm sorry.  The question is:  Do I know
 3   that he to be true?
 4        Q.   Right.  Right.
 5        A.   No, I don't know that, one way or the
 6   other.
 7        Q.   Do you have any thoughts on whether that
 8   proves or disproves that the enacted Congressional
 9   District 26 is racially gerrymandered?
10        A.   So if I understand your question
11   correctly, does the fact alone hypothetically that
12   the illustrative plans have a hundred thousand
13   ballpark more Hispanic voting age population or
14   citizen, I don't know which, does that increase --
15   make -- make me reevaluate some understanding of
16   racial gerrymandering in the action plan?  Again,
17   without -- without a context and other factors,
18   I -- it doesn't really tell me anything.
19        Q.   Okay.  Focusing now on the state house
20   maps.  And we can -- let me share the enacted map.
21   This is the exhibit that you were asking about
22   before, Exhibit 28.
23             (Exhibit 28 was marked for
24             identification and is attached to the
25             transcript.)
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

168

```
1        A.   All right.

2        Q.   All right.  So do you recall that House

3   District 117 was one of the -- the districts that

4   in the instruction letter you received, Exhibit 2,

5   was identified as having been drawn to comply with

6   Florida's minority protection provisions?

7        A.   Sorry.  That was 116?

8        Q.   117.

9        A.   117.

10            Yes, I do remember that.

11       Q.   Okay.  Did you make any changes to 117

12   as drawn in the enacted map?

13       A.   I don't believe so.

14       Q.   Okay.  Do you know whether there were

15   some unpopulated blocks near the northern end of

16   117 that you moved out of the district or into the

17   district.

18       A.   It's possible, though I thought at some

19   point I tried to clean those up.  But it is

20   possible that there are a couple of unpopulated

21   blocks at some corners of the north end that are

22   different.

23       Q.   Okay.  So there wasn't any sort of, you

24   know, design or -- or attention associated -- I

25   guess intention maybe isn't -- the wrong word.
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    169

1          But there's no particular reason why you
2     did that?
3          A.   If, in fact, there were changes -- and,
4     I'm sorry, I don't remember at the moment -- it
5     would be -- it would have been, I think, to
6     regularize the borders around -- sort of the
7     districts around -- for instance, snapping to a
8     different medium to -- because of the way the
9     blocks are configured or something like that.
10         Q.   Okay.  Now, in looking at the enacted
11    map, do you see the -- the boundary that runs
12    along the west side of 111 and then continues
13    along the west side 119 and then turns east and
14    forms the southern boundary of 119 and then 118
15    before it hits 117?
16         A.   Yes.
17         Q.   Okay.  Did you, in your seven state
18    house maps, follow that same boundary?
19         A.   Let me just quickly refresh myself here
20    in my report.
21              I believe -- yes, I do.
22         Q.   Okay.  And why did you choose to follow
23    that same boundary in your maps?
24         A.   Well, first of all, it minimizes changes
25    to -- to 120, consistent with my instructions.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

170

1           It's a pretty substantial road boundary

2     that has marks, it looks like, since the edge of

3     civilization in that part of the county.  So just

4     consistent with my instructions in the charging

5     criteria not to make changes past that, past that

6     boundary.

7           Q.   And then, on the other side of 117, do

8     you see the northern boundary of 120 as it goes

9     east first along District 115 and touching

10    District 114 and then District 113?

11          A.   Yes.

12          Q.   Okay.  In maps -- your maps A1, A2, B

13    and C1, do -- do you follow that same boundary?

14          A.   I don't remember.

15          Q.   Okay.  Do you have those exhibits

16    available?

17          A.   I don't think we've looked at the --

18          Q.   Oh.  I'm sorry.  You're right.  I

19    haven't given you those yet.

20          A.   All right.

21          Q.   Too many maps.

22          A.   Sorry.  These look like these are

23    congressional maps.

24          Q.   Okay.  Let me try this again.

25          A.   No problem.  There are a lot of maps.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    171

```
1        Q.   Yeah.

2             So this will be -- just so I'm straight,

3   this will be Exhibits 35 through 38.

4        A.   Excellent.

5             (Exhibit 35 was marked for

6             identification and is attached to the

7             transcript.)

8             (Exhibit 36 was marked for

9             identification and is attached to the

10            transcript.)

11            (Exhibit 37 was marked for

12            identification and is attached to the

13            transcript.)

14            (Exhibit 38 was marked for

15            identification and is attached to the

16            transcript.)

17       A.   Okay.  Let me look at those.

18       Q.   Okay.

19       A.   Those appear to have the same northern

20   boundary in 120 and region we were just

21   discussing.

22       Q.   Okay.

23            MR. BARDOS:  Let me just make sure that

24       Mr. Frackman has all of these.

25       Q.   So in those four maps why did you not
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    172

1  change that boundary?

2        A.    These were all a bit ago.

3              I think, from memory, there's not a ton

4  of water blocks in that area.  There were fewer

5  options of where you're going to draw the

6  boundary.  So this particular set sort of keeps

7  the districts relatively compact and in some cases

8  it follows municipal boundaries and avoids

9  altering 120.  So together, I think it was no

10 reason to do something different than in these

11 particular maps.

12       Q.   Do you have any understanding of the --

13 of the political preferences of Hispanics who live

14 in Miami-Dade and South Florida, I guess,

15 generally?

16       A.   I do a little research on sort of

17 racially polarized voting in that area and how

18 it's changed recently, but pretty high level.

19       Q.   Okay.  Do you know -- do you have an

20 opinion on whether Hispanics in southeast

21 Florida -- let me say South Florida, I mean, are

22 Republican or Democrat?

23       A.   My understanding is it changes a lot

24 from election to election and there's segregated

25 by country of Hispanic origin.

1      Q.   Is there overall a leaning, one way or

2  the other, to your -- in your -- to your

3  understanding?

4      A.   Even the last presidential -- again, I

5  should caveat that, like, actually no one knows

6  because of the secret ballot, and our methods are

7  actually -- anyway, I could go on for a long time

8  about how little we know about this.

9           But I think our best estimates are at

10  least in the last presidential, in this region

11  Hispanics voted more Republican than Democratic.

12      Q.   But in this case you're not offering an

13  opinion on this?

14      A.   No.

15           As I say, like, this is what I recall

16  and haven't -- you know, I'm not -- I wouldn't

17  wager on any of those statements.

18      Q.   Okay.  In drawing maps, did you -- did

19  you consider census designated places or did you

20  draw without regard to them?

21      A.   I considered census designated places

22  that were described by census as incorporated

23  municipalities.

24           So I suppose to the extent there were

25  municipal boundary changes post census or

1    discrepancies between the file Florida sent to the

2    census and the actual, I might have missed those,

3    but incorporated census places did not factor into

4    my map drawing.

5        Q.   Okay.

6             MR. FRACKMAN:  Andy, maybe we can have a

7        coffee break at some point.

8             MR. BARDOS:  Let's do that.  That's a

9        good idea.  How much time do you propose?

10            MR. FRACKMAN:  Five minutes.

11            MR. BARDOS:  Five minutes.  Okay.

12            MR. FRACKMAN:  Whatever you want.  I was

13       just seeking to --

14            MR. BARDOS:  Let's say ten minutes,

15       2:20.

16            MR. FRACKMAN:  Sure.  Sounds good.

17            (Recess in proceedings.)

18   BY MR. BARDOS:

19       Q.   Dr. McCartan, turn to Exhibit 1, your

20   initial report.

21       A.   Got it.

22       Q.   Page 19, part 6.

23       A.   Okay.

24       Q.   And in this section of your report you

25   discuss comparisons between your maps and

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    175

1    different maps enacted by the Legislature.

2              What is the -- the point that you're

3    trying to make in this section of your report?

4         A.   Should point out, similarities between

5    decisions I made that were consistent with a

6    similar type of approach that had been taken

7    elsewhere in the state.

8         Q.   Okay.  And how did you -- how did you

9    find or -- the maps that you're comparing your

10   maps to or were you provided those?

11        A.   As in, like, the enacted plans at the

12   congressional and senate and state and house

13   levels?

14        Q.   Yes.

15        A.   Yeah.  I guess at the time I wrote this

16   section, which would have been after drafting the

17   plans, I think I would have been provided with

18   copies of those maps or maybe I would have found

19   them on the Legislature's -- they have a -- they

20   show all their maps on their website.  I don't

21   remember exactly which.

22        Q.   Okay.  And the similarities that you

23   found between your maps and the congressional

24   state house congressional state maps, how did you

25   find those similarities?

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                           176

```
 1        A.   I don't recall exactly.

 2             I would have reviewed the -- oh, I

 3   guess -- okay.  So, I guess, some of these are

 4   historical plans, so -- I'm sorry, it's been

 5   awhile since I put this together, so.

 6             So if they were historical plans, I

 7   would have found them on the Legislature's

 8   website.  And I would have, you know, I think,

 9   probably reviewed side by side and looked at

10   places where the Legislature was, you know,

11   splitting or changes that were being made.

12             I don't recall exactly the process, to

13   be honest.

14        Q.   Okay.  Did you receive any assistance in

15   doing this analysis?

16        A.   Any specific comparisons would have been

17   my work.  I don't remember -- it's -- it's

18   possible some plans or some districts might have

19   been suggested to me to look at or make a

20   comparison to by plaintiffs' counsel.  Or maybe

21   not.  I don't really remember, actually.

22        Q.   Okay.  But you drafted this part six of

23   your report yourself?

24        A.   Yes.

25        Q.   Did you also look for dissimilarities
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    177

1    between your maps and the legislatures maps?

2         A.   Well, I certainly would have noticed

3    differences -- I mean, these are different maps,

4    after all.  Populations have changed.

5              I think it's harder to look at the maps

6    and point to differences and styles or

7    interpretations or -- or judgments, so...

8              I didn't discuss terms of that sort in

9    this section.

10        Q.   Okay.  But you would agree that there

11   are both similarities and dissimilarities between

12   your maps and the maps you were comparing yours

13   to?

14        A.   Sure.

15             I mean, I made some comparisons to

16   senate districts which are different sizes and --

17   and congressional or house districts.

18        Q.   And, you know, that's an obvious

19   example.  There have been congressional as well

20   state house districts in the past that have

21   crossed the Everglades and gone to Collier County;

22   correct?

23        A.   That's my understanding.

24             I know it was, I think, Dr. Trende,

25   mentioned some of these -- some of them,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                          178

```
 1    obviously, predated the constitutional standards
 2    in their current form.
 3         Q.   Okay.  When did the constitutional
 4    standards take effect?
 5         A.   My understanding is they were adopted
 6    around 2010 and so were, I believe, in effect for
 7    the 2010 cycle.
 8              Certainly, I know there was some
 9    litigation that sort of happened automatically as
10    part of that process.
11         Q.   Okay.  All right.  So you would agree
12    that in -- in some respects you found similarities
13    in the maps and in other respects there would be
14    dissimilarities?
15         A.   That's fair.
16         Q.   Okay.  And, likewise, there are -- are
17    similarities and dissimilarities between the
18    enacted congressional map and the enacted state
19    house map and these other maps from past cycles or
20    senate maps that -- that you were looking at?
21         A.   That's fair.
22         Q.   Do you think that comparing
23    congressional districts to state house districts
24    or senate districts to congressional districts is
25    a -- is sort of an apples-to-apples comparison
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    179

1   given the different populations of those

2   districts?

3        A.   Well, I suppose it depends what features

4   of the apples you're comparing.

5             So, obviously, for instance, if we're

6   comparing populations, it's kind of nonsensical.

7   But given that all three have to follow the same

8   tiers of criteria, if you can see choices that

9   were made that reflect interpretations of those

10  criteria, I believe those could be comparable

11  across the types of maps.

12       Q.   What about, for example, you -- you note

13  that the senate map doesn't contain a district

14  that crosses over to -- from southeast Florida to

15  the -- to the west coast.

16            You would agree that a state senate

17  district has fewer people than a congressional

18  district; correct?

19       A.   Yes.

20       Q.   Okay.  And so does that impact the --

21  any comparisons you would make between a senate

22  dis- -- a senate map that doesn't contain a

23  district but goes from Miami-Dade to the west to

24  Collier and a congressional map that does?

25       A.   It would have an effect, certainly,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    180

1    because the populations are different.  I don't

2    think it -- I don't think the populations are so

3    small that it completely rules out that censorship

4    could exist.  So I think it is still probative

5    that the Legislature choose not to do that.

6              But I would agree that part of that

7    context is the -- the difference in population

8    between the districts.

9        Q.   In the features that you point out in

10   these various state house, state senate and

11   congressional maps, did you examine whether there

12   were any -- any specific factors peculiar to that

13   map or that kind of district that might have

14   been -- that might have explained why the

15   districts were configured the way that they were?

16       A.   So that's sort of a very specific, yet

17   vague question.

18             So nothing off the top of my head falls

19   into that category.

20             I tried to placidly review all the maps

21   and draw comparisons that -- that I thought were

22   helpful and draw parallels between -- between

23   choices that were made.

24             If there's a specific example, I -- I

25   might have a different opinion.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                   181

1        Q.    Okay.  And maybe I'll -- I'll ask it
2    this way.  Was your -- were your comparisons that
3    are contained in part six of your report based
4    solely on a visual exam comparison of the
5    districts or did you look beyond that to determine
6    why the districts might have been configured the
7    way that they were?
8        A.    I didn't do numerical analysis.  I
9    didn't -- I didn't load these, for instance, in a
10   different software and do like every detailed
11   bookmark on a boundary or something like that.
12       Q.    Okay.  So it is simply based on a visual
13   comparison?
14       A.    That's right.
15       Q.    Going back to simulations, I have one
16   more question I wanted to ask you about.
17             So, as I understand it, simulations, I
18   think you compared it to a poll, it functions like
19   a poll.  So it gives you some indication as to
20   what would be typical or atypical in a larger
21   universe of the possibilities.  Is that accurate?
22       A.    Yeah.
23             And just like a poll, the universe of
24   possibilities are something that you design or
25   pick.  So if I poll Republicans, that's different

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                          182

1    from polling adults which is different from

2    polling citizens.  So, likewise, the universe

3    defines the algorithm, changes your answers.  But

4    it's a similar function.

5         Q.   Okay.  Now, can that same function be

6    performed by six or seven maps drawn by an

7    individual?

8         A.   The "function" being --

9              MR. FRACKMAN:  I'll object.  Sorry,

10        carry.  I object.  Sorry.

11             MR. BARDOS:  That's okay.

12        Q.   So the "function" being, can the six or

13   seven maps drawn by an individual as opposed to

14   the perhaps 5,000 maps drawn by an algorithm tell

15   you what features in the enacted map are typical

16   or atypical in the universe of possibilities?

17        A.   No.

18             So a set of maps drawn by a person can't

19   fulfill that -- that same goal, the way you can

20   make a statistical plan with some great certainty

21   from a simulation algorithm.

22        Q.   Okay.  And why not?

23        A.   To say something's typical, you either

24   have to go and list all the possible plans which

25   is -- as we've discussed, we'll be here for a very

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                   183

1    long time or you'd have to use statistics and

2    sampling to -- to -- so there's no systematic bias

3    in the plans you're picking.

4            And a human is not random.  So a human

5    cannot sub in for a computer's judgment about what

6    is typical or atypical.  They can show something

7    exists, they can show a plan or configuration, or

8    options in the space, or possibilities in the

9    universe, but, you know, typicality is something

10   you have to use statistics for.

11       Q.   Okay.  And so even if a human being

12   would draw 5,000 maps and -- you know, like a

13   simulation draws 5,000, would you -- would your

14   answer still be the same, that a human being,

15   because the human being's map drawing is not

16   random, can't be -- the 5,000 maps drawn by a

17   human being can't be used to -- as an indication

18   of what would be typical or atypical in the

19   universe of possibilities?

20       A.   Yeah.

21            Unless your universe were restricted

22   enough that those 5,000 contained a pretty

23   substantial set or what your universe was defined

24   in terms of what a human would specifically do.

25   You know, those are different things.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    184

```
 1              But in the way that -- in the type of
 2     universe with your answer of simulations, no
 3     number of human-drawn maps is really going to be
 4     comparable.
 5          Q.   Okay.  All right.  Let me ask you a few
 6     questions now about your rebuttal report.
 7          A.   Okay.
 8          Q.   I'm going to add this to -- this will be
 9     Exhibit 44.
10              (Exhibit 44 was marked for
11              identification and is attached to the
12              transcript.)
13          Q.   All right.  And part two of your
14     rebuttal report addresses the expert report of
15     Alfredo Gonzalez; correct?
16          A.   Yes.
17          Q.   Okay.  Now, in Figures 1 and 2 of your
18     report -- well, why don't -- instead of me
19     characterizing it, why don't you tell me what
20     Figures 1 and 2 depict.
21          A.   Figures 1 and 2 show South Florida and
22     Miami area, respectfully, an overlay on -- on that
23     area, a set of boundaries that correspond to what
24     Mr. Gonzalez has described as commonly understood
25     and ascertainable in his report.
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                          185

```
 1        Q.   Okay.  And which boundaries are those?
 2             Are there certain categories within
 3   that?
 4        A.   So roads, rivers, railroads,
 5   municipalities, county boundaries, I believe.
 6        Q.   Is there some limitation on which roads
 7   are included?
 8        A.   Yes.
 9             So Mr. Gonzalez describes his
10   classification of what counts as major and minor
11   and gives specific examples.  And from that I
12   match those up to these classifications from F. --
13   sorry, the Florida Department of Transportation.
14   So it's their -- what they classify to be
15   principal arterials, minor arterials and major
16   collectors.
17        Q.   Okay.  So those are the three categories
18   of roads that are depicted in Figures 1 and 2?
19        A.   That's right.
20        Q.   Okay.  All right.  Let me add Mr.
21   Gonzalez' report to the chat this.  Will be
22   Exhibit 42.
23             (Exhibit 42 was marked for
24             identification and is attached to the
25             transcript.)
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              186

1      A.    Okay.

2      Q.    And I'd like you to take a look at Mr.

3  Gonzalez' report.

4            And before you do that, let me ask you:

5  So is it your understanding that Mr. Gonzalez

6  opined that all principal arterial, minor arterial

7  and major collector roads are clearly

8  ascertainable and commonly understood?

9      A.    I'm sorry.  Could you just say that one

10 more time.

11     Q.    Sure.

12           So is it your understanding that Mr.

13 Gonzalez opined that all principal arterial, minor

14 arterial and major collector roads are clearly

15 ascertainable and commonly understood?

16     A.    Not directly, but that was my

17 understanding of professionally what corresponded

18 to his -- his definition of commonly understood

19 and ascertainable after reading his report and his

20 appendices.

21     Q.    I see.

22           Okay.  So when you say "not directly,"

23 what do you mean?

24     A.    Well, what I recall is not a specific

25 sentence in his report that says in my opinion the

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    187

1     assessed roads are...

2              Of course, rather, he lists a bunch of

3     different types of roads and maps and then goes

4     through and classifies a whole bunch of different

5     boundary segments as something -- or not.

6              Based on the ones he classified in the

7     definitions of his report, that, to me,

8     corresponded to my -- you know, my -- my set of

9     roads that I -- that I plotted on this -- on this

10    map.

11        Q.   Okay.  All right.

12             So, just to be clear, you would agree,

13    then, that Mr. Gonzalez doesn't say in his report

14    that all principal arterial, minor arterial and

15    major collector roads are clearly ascertainable

16    and commonly understood?

17        A.   He doesn't say that directly, but the

18    boundaries he describes as commonly understood,

19    ascertainable, the only way to make that

20    consistent across the map would be if that were

21    the case.

22        Q.   Does he, in his report, discuss other

23    factors besides those classifications when

24    discussing specific roads?

25        A.   He often, when discussing specific

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                188

```
 1   roads, does mention other local features.
 2   Obviously, roads are often located close to other
 3   map features.
 4        Q.   Okay.  So -- okay.
 5             So he doesn't -- he doesn't say in his
 6   report that the only thing that he's relying on or
 7   looking to is this particular classification of
 8   roads as principal arterial, minor arterial or
 9   major collector roads?
10        A.   That's right, he doesn't say that.
11        Q.   All right.  Then we -- I don't think
12   we'll need to look at 42, but let me ask you:  Are
13   you -- so do you recall that in his report he
14   mentions specific roads by name and then has some
15   discussion or description of those roads?
16             Do you recall that?
17        A.   Yes.
18        Q.   Okay.  Are you disputing -- as to those
19   roads that he specifically mentions by name, are
20   you disputing that those roads are currently
21   ascertainable and commonly understood?
22        A.   Excuse me.  I'm not offering an opinion
23   on -- on those directly.
24             I didn't line-by-line review those
25   particular other than to gain an understanding of
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                189

1    what generally types of roads he was classifying

2    this way.

3              So, again, the -- simply, I'm offering

4    the opinion, would be that my understanding of

5    his -- his classification as far as principal

6    sectional line roads differs from the Legislature

7    software and probably my own understanding.  But

8    I'm not offering opinions on specific named roads

9    in this report.

10        Q.   Okay.  All right.

11             So if he says Krome Avenue is clearly

12   ascertainable and commonly understood, you're not

13   saying that these -- for purposes of this case

14   that it's not?

15        A.   That's right.

16        Q.   Okay.  And you don't dispute that county

17   and municipal boundaries are considered political

18   boundaries for Tier 2?

19        A.   No.

20        Q.   And you don't dispute that railway lines

21   and rivers are also considered -- are considered

22   geographic boundaries for purposes of Tier 2?

23        A.   No.

24        Q.   Let me see if I can streamline this.  I

25   think we've already covered a lot of this ground.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    190

1              Oh.  Turn, if you would, in your

2    rebuttal report to paragraph 28.

3         A.   Okay.

4         Q.   You see that paragraph 28 says, "Dr.

5    Trende does consult Dave's Redistricting App for a

6    count of total county splits, but DRA employs

7    split rules that are contrary to Florida law and

8    inappropriate to use here as a result"?

9              Did I get that correctly?

10        A.   Yes.

11        Q.   Now, are you referring -- do you have

12   Dr. Trende's report?

13             Have I provided that?  I don't think so.

14        A.   Not yet.

15        Q.   Okay.  This is not marked, but we can

16   make this Exhibit 45.

17             (Exhibit 45 was marked for

18             identification and is attached to the

19             transcript.)

20        A.   Okay.

21        Q.   And turn please to page 40 of Dr.

22   Trende's report.

23        A.   I'm sorry.  Page 40 in terms of he

24   numbered the pages or 40 in terms of the total

25   number of?

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                         191

```
1          Q.   Good question.  Let's see.
2          A.   So I see 30 in the corner of my page 40,
3    but I can go the other way.
4          Q.   So it's 40 on -- on his page numbering.
5          A.   Ah.  I see.  Okay.  I'm there.
6               MR. FRACKMAN:  5.5.  Section 5.5.
7               MR. BARDOS:  Yes.
8          Q.   So we're in -- I'll be asking questions
9    about 5.4 which is at the top of page 40.
10         A.   Okay.  Correct.
11         Q.   So in paragraph 28 of your rebuttal
12   report, is this -- this first paragraph that's on
13   page 40, is that what you're referring to?
14         A.   I believe so.
15         Q.   Okay.  And is his count of splits
16   different from the count that you had in your
17   report?
18         A.   Let me consult my report here.
19              These numbers appear to correspond to my
20   Total Splits column.
21         Q.   Okay.  So in 28, when you -- where you
22   critique Dr. Trende's count of total county
23   splits, what -- what are you referring to there?
24         A.   One moment.
25              So I think I was looking at the table on
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    192

1    page 39.  And I think, then, that the paragraph 28

2    in the rebuttal should not refer to total county

3    splits but split counties.

4        Q.   Okay.  So do you dispute that the

5    counties listed in Fig. 20 are, in fact, split?

6        A.   I believe, yes.

7             For instance -- I'm not going to get

8    them off the top of my head, but I could -- the

9    number in each column is not corresponding to my

10   column labeled Split 1+ in my Table 2 from my

11   original report, I don't believe.

12            Wait.  Maybe I counted wrong.

13            Yeah.  So I -- I think he ends up with

14   one more split on all these than I do.  So I think

15   that goes to the unpopulated region.

16            It is possible I made a mistake here.

17   This is a compressed timeline, on the rebuttal

18   report.

19       Q.   All right.  So is -- is the only

20   difference between your account in Figure -- in

21   Table 2 of your report and Dr. Trende's Figure 20

22   that he is counting Hendry County with that split

23   and you're not counting Hendry County?

24       A.   I believe that's the case, yes.

25       Q.   Okay.  And that would be the only -- the

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    193

1    explanation for that difference would be that the

2    split of Hendry County resulted in an unpopulated

3    fragment which you are not including but he is

4    including in Fig. 20; correct?

5         A.   Yes.

6         Q.   Okay.  All right.

7              So would you agree that even if we don't

8    count Hendry County, your -- each of your maps

9    splits at least as many counties as the enacted

10   congressional map does?

11        A.   As in counties which were split one or

12   more times, yes.

13        Q.   And that -- and -- I'm sorry?

14        A.   I'm sorry.

15             As or more, yeah.

16        Q.   Okay.  And, then, five of your six maps,

17   even if we don't count Hendry County, split more

18   counties than the enacted map does?

19        A.   In terms of the number of counties that

20   are split, right.

21             So, like, they split fewer counties more

22   than twice in fewer total splits in some cases,

23   but, yeah, in terms of the number that are split,

24   five split more.

25        Q.   Okay.  Now, in paragraph 28 of your

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    194

1    rebuttal report where you say Dave's Redistricting

2    App employs split rules that are contrary to

3    Florida law, what are you referring to there?

4         A.   So my recollection from looking at

5    municipalities -- again, this is my recollection

6    from what it counts as split -- that those counted

7    unpopulated splits as splits, the -- which is

8    different from the rule -- from the League of

9    Women Voters case that I mentioned in paragraph

10   24.

11        Q.   Next in paragraph 29 of your rebuttal

12   report, reading from the third line, there you

13   say, "But as noted in my report changes in

14   District 46 required additional changes to other

15   districts to comply with the Florida's

16   constitutional standards.  Rather than having a

17   budget to spend elsewhere and choosing to split

18   additional counties, these additional splits were

19   a natural result of redrawing District 26 - the

20   district I was instructed to redraw consistent

21   with Florida's Constitutional standards."

22             MR. FRACKMAN:  Excuse me.  Excuse me.

23        Andy, I don't -- I couldn't hear that.  I

24        don't know whether the witness could.  Maybe

25        you had something over your mic or over the

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    195

```
1        computer -- the sound --
2             MR. BARDOS:  I'm -- I can read it again.
3        Q.   Dr. McCartan, did you hear it?
4        A.   I heard the question.  Although, I agree
5   with Andrew the audio quality has gone down
6   recently.  But I heard the question.  Well, sorry,
7   I heard you read it out.
8             Is the question whether it was accurate?
9        Q.   So I'll reask the question so everyone
10  hears it.  I'll try to be better.  And let me know
11  if you're still having trouble understanding.
12            So paragraph 29, beginning on the third
13  line, this is on your rebuttal report, you write,
14  "But as noted in my report changes in District 46
15  required additional changes to other districts to
16  comply with the Florida's constitutional
17  standards.  Rather than having a budget to spend
18  elsewhere and choosing to split additional
19  counties, these additional splits were a natural
20  result of redrawing District 26 - the district I
21  was instructed to redraw consistent with Florida's
22  Constitutional standards."
23            Do you see that?
24       A.   Yes.
25            (Off-the-Record Discussion).
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                               196

```
 1    BY MR. BARDOS:
 2        Q.   All right.  So, Dr. McCartan, in
 3    paragraph 29 of your report, you -- you refer to
 4    additional splits that were a natural result of
 5    redraw- -- redrawing District 26.  Which splits
 6    are you referring to there?
 7        A.   I believe the ones that Dr. Trende
 8    refers to, any ones above what you would have had
 9    by eliminating the split across the
10    Collier-Miami-Dade line.  So I think above and
11    beyond that would be additional.
12        Q.   Okay.  So that's -- are you talking
13    about the split counties in Fig. 20?
14        A.   Sorry.  I'm quoting Dr. Trende on page
15    40 here.  Let me just...
16             So, yeah, on page 40 Dr. Trende claims
17    that "I start out with two county splits," and I
18    believe he's referring to total splits.  And -- so
19    anything above.  So that inaction plan has --
20    sorry.
21             The inaction plan has 29.  Then "too
22    few" would take you to 27, so...
23             Taking his argument face value, anything
24    above 27 I am claiming there in paragraph 29 is
25    not intentionally additional but, rather, just a
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    197

```
 1   consequence of having to comply with Florida's
 2   constitutional standards.
 3        Q.   Okay.  And a consequence of redrawing
 4   District 26?
 5        A.   Yes.
 6             And, of course, in CDD, actually have 27
 7   total splits which there are no additional splits
 8   in that case.
 9        Q.   Okay.  In paragraph 40 of your report
10   you say that Dr. Trende also exams the
11   illustrative house maps I provided in my report.
12   He simultaneously finds that the illustrative maps
13   substantially reconfigure the enacted districts
14   but also that the changes are limited.
15             Do you see that?
16        A.   Yes.
17        Q.   Okay.  And let's go -- you're citing
18   page 104 of Dr. Trende's report.  Let's take a
19   look at that.
20             And if you could review his report and
21   tell me whether he's saying the changes are
22   limited or something else is limited.
23        A.   My -- my plain reading of -- of the
24   third paragraph of this section 9 is that little
25   changes in terms of configuration of the
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                        198

1    districts.

2         Q.   Great.

3              In paragraph -- in that paragraph, in

4    the following paragraph, is he talking about

5    Tier 2 metrics rather than the configuration of

6    the districts?

7              MR. FRACKMAN:  Object to the form of the

8         question.

9         A.   Later in this -- in this section, yeah,

10   later in that paragraph he does talk about Tier 2

11   metrics.

12        Q.   Okay.  Those are all the questions that

13   I have regarding the rebuttal report.

14             Have you, since preparing your reports,

15   identified any errors that require correction?

16        A.   Well, I guess, today I would further

17   edit to clean up paragraph 28 in the rebuttal,

18   referring to the splits issue we talked about and

19   what that's referring to.

20             Beyond that, in reports in this case,

21   no, nothing comes to mind as far as errors.

22        Q.   Have you reviewed the expert reports

23   prepared by the plaintiffs' other experts?

24        A.   No, not to my knowledge.  No.

25             I'm not sure who the plaintiffs' experts

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              199

```
 1   are, but I haven't seen any reports except for
 2   Dr. Gonzalez and Mr. Trende -- Dr. Trende's.
 3        Q.   If I could have just a minute here.
 4             Okay.  Just a few more questions.
 5             Are you a registered Democrat?
 6        A.   In Pennsylvania, I believe so.
 7        Q.   Okay.  Is that where you currently live,
 8   in Pennsylvania?
 9        A.   Yes.
10        Q.   Okay.  Have you ever voted for a
11   Republican?
12        A.   So Washington state, I think, all the
13   offices are officially non- -- to be honest, I
14   can't remember exactly.  But there was a Secretary
15   of State candidate who was not the Democratic
16   nominee, I believe was still affiliated with the
17   Republican party at that time.
18             So I believe the answer's yes.
19        Q.   And is it -- was that a partisan race?
20        A.   I'd have to check.
21             I know the primaries are -- are open,
22   but I -- I think -- I think the way it appears on
23   the voter's pamphlet is, you know, so and so
24   "prefers Republican party, prefers Democratic
25   party."  I think that's the only -- there's no
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

1   official party system in Washington state.  So I

2   believe it was analogous to a partisan race in

3   other states.

4        Q.   Okay.  All right.  Let me show you an

5   exhibit.  This is Exhibit 25.

6             (Exhibit 25 was marked for

7             identification and is attached to the

8             transcript.)

9        A.   Okay.  I have that up.

10       Q.   Okay.  And these are from the Federal

11  Elections -- Election Commission website.  And

12  these are -- these look like political

13  contributions.  Is this you?

14       A.   Let me go through these.

15            Yeah, these appear to be me.

16       Q.   So on March 1st, 2016 you made a one

17  dollar contribution through ActBlue to Bernie

18  2016?

19       A.   Yes.

20       Q.   Okay.  And what was "Bernie 2016"?

21       A.   It's the presidential campaign of

22  Bernard Sanders.

23       Q.   Okay.  A/k/a Bernie Sanders?

24       A.   That's correct.

25       Q.   Okay.  What is ActBlue?

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                          201

1      A.    I'm not going to get this exactly right,
2   but basically a payment processor for political
3   donations.
4            I think they process donations for the
5   Democratic party affiliate campaigns and some of
6   their associated 501(c)(3)s and (c)(4)s -- sorry,
7   probably just (c)(4)s.
8      Q.    Okay.  And, then, if you go to page 3,
9   does this reflect a ten dollar contribution that
10  you made to Bernie 2020 on January 23rd, 2020,
11  also through ActBlue?
12     A.    Yes, it looks like it.
13     Q.    Okay.  And was this -- is Bernie 2020
14  the Bernie Sanders presidential campaign?
15     A.    Yes.
16     Q.    Okay.  So this says, "Belleveu,
17  Washington."
18            Is that where you're from?
19     A.    That's where I grew up.
20            In January, that's where I was located.
21     Q.    Is that -- that's right across from
22  Seattle, across from -- across from Lake
23  Washington?
24     A.    That's right.
25     Q.    All right.  Page 5.  Does this reflect a

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                      202

1    one dollar contribution to Bernie 2020 on January

2    26th, 2020, through ActBlue?

3         A.   It appears to.

4         Q.   Okay.  Page 7.  Did you make a $2.70

5    contribution on February 29th of 2020 to Bernie

6    2020, also through ActBlue?

7         A.   It looks like it.

8              I honestly don't remember these one

9    dollar and 2.70 donations, but, I mean, it's the

10   FEC, so I must have, but...

11        Q.   Okay.  Were you -- did you support

12   Bernie Sanders in his 2020 presidential race?

13        A.   Define.

14             MR. FRACKMAN:  Obviously, not very

15        energetically.

16        Q.   Did you want him to win?  I guess, that

17   would be --

18        A.   I'm sorry.  So what's the question or

19   what do you mean by "support"?

20        Q.   Support, like were you -- did you want

21   him to win?

22             Was he your preferred candidate?

23        A.   Yeah.

24        Q.   Okay.  Page 9, does this reflect a $7.30

25   contribution to Bernie 2020 on March 2nd, 2020,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    203

1    through ActBlue?

2         A.   Yes.

3              I'm suspecting that somehow these were

4    split by ActBlue.  I just -- I can't imagine a

5    reason I would have done it in cents.  And if you

6    add 2.70 and 7.30 you get a whole number, so...

7              Anyway, the record shows a March 2nd

8    donation in that amount, yes.

9         Q.   Okay.  And on page 11, is this a ten

10   dollar contribution from you to Fetterman for PA,

11   Pennsylvania, on August 16th, 2022, through

12   ActBlue?

13        A.   Yes, it is.

14        Q.   Okay.  Do you have a Bluesky account?

15        A.   Yes.

16        Q.   All right.  What is Bluesky?

17        A.   Social media network.

18        Q.   All right.  Is it -- does it cater to a

19   particular audience?

20        A.   Not that I'm aware.

21        Q.   Does it appeal to people of a particular

22   political persuasion?

23        A.   I think people of all political

24   persuasions use it.  It's a pretty broad social

25   network at this point.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                204

```
1        Q.   Okay.
2             MR. FRACKMAN:  Even I have a Bluesky
3        account.  Although, I can't figure out
4        exactly what to do with it, so.
5             MR. BARDOS:  Maybe we'll learn in -- in
6        looking at these next two exhibits.
7             (Exhibit 26 was marked for
8             identification and is attached to the
9             transcript.)
10       A.   Okay.  I have this up.
11       Q.   Okay.  So is this a -- one of your posts
12  on Bluesky?
13       A.   Yes, it is.
14       Q.   And the post says, "Great turnout in
15  State College to tell the fascists hands off our
16  freedom and our government."
17            Do you see that?
18       A.   I do.
19       Q.   Okay.  And did you post this on -- did
20  you post this on April 5th of 2025?
21       A.   Yes, at 1:10 Eastern.
22       Q.   Okay.  And you see there's a picture
23  here, it looks like a picture of a protest?
24       A.   I see that.
25       Q.   And was this part of the April 5th
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    205

1    protests, like it was an organized set of protests

2    called the "April 5th Protests"?

3         A.   Yes.

4         Q.   Okay.  What was being protested on April

5    5th?

6         A.   I wasn't involved in organizing.

7              I think a lot of people came out for a

8    lot of reasons.  Nexus as it were, was the

9    unlawful dismantling of federal agencies and the

10   violation of federal laws.

11        Q.   So it was protesting President Trump and

12   his administration and his policies?

13        A.   Yeah.  Specifically, the violation of

14   federal laws part.

15        Q.   Okay.  And you refer to State College.

16   Is State College where Penn State is located?

17        A.   Actually, Penn State is in University

18   Park which is a different zip code.  It's a very

19   interesting story, you should look at it.

20             But it is immediately adjoining State

21   College and I reside in State College.

22        Q.   Gotcha.  Okay.

23             And so who are the fascists?

24        A.   That I'm referring to here?

25        Q.   Yes.

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              206

```
1          A.    I would like to put myself back in that
2     state of mind.
3               I think I was probably referring broadly
4     to most members of the Republican party and the
5     presidential administration.
6          Q.    Okay.  And when you say "most members of
7     the Republican party," are you talking about
8     elected officials or, like, all Republican voters
9     or who -- how would you define that?
10         A.    Well, I think it would depend.  Some of
11    them have different views.  I wouldn't say all
12    Republican voters would -- I don't think I was --
13    I was thinking of that when I wrote this.
14    Although, this was just a couple months ago.
15         Q.    Okay.  So "fascist" generally refers to
16    most Republicans?
17         A.    Well, "fascist" refers to people who
18    practice fascism which, in my opinion, is
19    expressed in this post, as we've just discussed,
20    would cover many, if not most, Republican-elected
21    officials.
22         Q.    Okay.  Do you have an opinion on how
23    many Republican voters would -- that would cover?
24         A.    No, I don't have an opinion on that.
25         Q.    Okay.  All right.  We can take that down
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    207

```
1    and we'll look at one more.
2              This is Exhibit 43.
3              (Exhibit 43 was marked for
4              identification and is attached to the
5              transcript.)
6       A.   All right.
7       Q.   All right.  Do you have 43 open?
8       A.   I do.
9       Q.   Okay.  Is this a post by you on July 3rd
10   of this year?
11      A.   Yes, it is.
12      Q.   Okay.  And your post says, "The NYT
13   comments section gets it."
14             Do you see that?
15      A.   Yes.
16      Q.   And does "NYT" stand for New York Times?
17      A.   Yes, it does.
18      Q.   And below that there's a -- an image of
19   a -- of what appears to be the comment in the
20   comment section that you're referring to.  Is that
21   accurate?
22      A.   Yes.
23      Q.   Okay.  And the comment that you're
24   responding to here was posted by someone named
25   R.M. in California.
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    208

```
 1              Do you see that?
 2        A.   Yes.
 3        Q.   And R.M. says, "I don't care if he
 4   identifies as part extraterrestrial, the gentleman
 5   will be the next mayor of New York City, proving
 6   that at least some of the residents haven't
 7   bargained away their souls to the Christo-fascists
 8   taking over every corner of our once great
 9   country."
10              Do you see that?
11        A.   I do see that.
12        Q.   And this is something that when you say
13   the New York Times comment section gets it, that
14   you're expressing agreement with; correct?
15        A.   Well, not the whole comment necessarily.
16        Q.   Okay.
17        A.   This comment is about a particular
18   article which was the subject of much -- of much
19   debate for a couple days there in early July.
20              So both these things are referring to
21   that article and the journalistic practices behind
22   it.  So I'm not necessarily expressing agreement
23   with whoever this R.M. person is who I, obviously,
24   never met.
25        Q.   Okay.  But this is the one comment that
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    209

```
1    you displayed in -- within your post; correct?

2         A.   Yes.

3         Q.   Okay.  And you say, "The New York Times

4    comment section gets it."

5              Right?

6         A.   Yes, referring to the correct response

7    in my opinion at that point to this article and

8    the journalistic practices and so on.

9         Q.   Okay.  So in your mind, who are the --

10   what are -- well, first of all, what is a

11   Christo-fascist?

12             What does that mean to you?

13        A.   I don't know.  These are not -- these

14   are not my words.

15             MR. FRACKMAN:  I was going to say -- I

16        was going to object to the form of the

17        question.  It's not his post.  R.M. is not

18        Cory McCartan, so...

19        Q.   Does that --

20             MR. FRACKMAN:  Calls for speculation to

21        be more precise as an objection.

22             MR. BARDOS:  Okay.

23        Q.   Does the term "Christo-fascist" mean

24   anything to you?

25        A.   I suspect something about fascists who
```

1    are also half Christian nationalism as a part of

2    that, you know, fascist ideology.

3         Q.   Okay.  So I think you said you agreed or

4    disagreed with some part of this post.  How

5    much -- what -- what did you agree with in this

6    comment?

7         A.   So this comment is responding to an

8    article in the New York Times about the mayoral

9    candidate.  And the Times attained some hacked

10   documents about his college admissions and wrote a

11   story about this.

12             And myself, and including Mr. or Mrs.

13   R.M. here, didn't think that was good use of

14   journalistic resources or fair coverage.  And so

15   this R.M. person expressed their disagreement with

16   the Times editorial decision in this particular

17   way.  And I agree with them that how this person

18   checked boxes on his or her college admission is

19   not relevant to their campaign for the -- for the

20   mayoral race in New York City.

21        Q.   Okay.  Now, the comment itself doesn't

22   mention any of that; right?

23        A.   Any of what?  I'm sorry.

24        Q.   It doesn't mention in the documents

25   that, whatever was marked on the application or

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    211

1   the documents that you mentioned, it doesn't talk

2   about that?

3        A.   Well, it's a comment on the same web

4   page where those things are discussed, so...

5             No, it doesn't directly, but it is

6   associated.  It's a comment on the article in

7   question.

8        Q.   Yeah.

9             Do you think that Christo-fascists are

10  taking over every corner of our once great

11  country?

12       A.   I don't agree with that statement.

13       Q.   You don't?

14       A.   No.

15       Q.   Okay.  What part of this statement do

16  you agree with?

17            MR. FRACKMAN:  I'll object as asked and

18       answered.  He just answered that question.

19       A.   Yeah.

20            So, repeat my answer, which is the first

21  part of this as a political opinion about the

22  propriety of this article is the reason I shared

23  and agreed with it.

24       Q.   Okay.  So you -- the part that you agree

25  with is the statement that the gentleman will be

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              212

1    the next mayor of New York City?

2        A.    Again, I'm not -- sorry.  I should -- so

3    my agreement is not on factual matters raised by

4    Mr. or Mrs. R.M.  It is with the political opinion

5    expressed by Mr. or Mrs. R.M. which I don't think

6    can be reduced to a particular clause or subclause

7    in this one-sentence comment.

8        Q.    So you can't point to anything within

9    R.M.'s post that you agree with?

10       A.    In a factual sense?  I mean, like, do I,

11   in particular --

12       Q.    I mean, you say here that "the comments

13   section gets it."  I just want to know which part

14   of this comment you agreement with.

15            MR. FRACKMAN:  No, no.  It's not that --

16       Andy, that totally mischaracterizes this.  It

17       is the New York Times comment section gets

18       it.  Not R.M. comments get it.  That's not

19       fair.

20            MR. BARDOS:  Let the witness answer the

21       questions.  And you can make nonspeaking,

22       concise, non-argumentative objections.

23       A.    So, to reiterate, I was agreeing with

24   the political opinions expressed in this post.

25            If you want to ask me about specific

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

213

1    clauses and whether or not that's a separate

2    matter out of context, I agree or disagree with

3    them, I'm happy to give you an answer about those.

4        Q.   Okay.  And the political opinion that

5    you're saying this post expresses is that it

6    wasn't right for the paper to divulge these, what

7    was it, college applications?

8        A.   And to do so based on hacked documents

9    passed to the paper by a neogenesis, yes.

10       Q.   Okay.  And so that's what you were

11   agreeing with even though R.M.'s post doesn't talk

12   about that?

13       A.   That's what I was agreeing with because

14   R.M.'s post is in response and it is attached to

15   the web page that this exact article's -- so it's

16   the same page.

17            Unlike in a court of law, on a social

18   media network there's no full document you can

19   excerpt and screenshot and not have to have the

20   entire document in order to have people understand

21   what you're saying.

22       Q.   So when you posted this did you choose

23   R.M. or was that something that was just kind of

24   automatically populated into that -- into

25   whatever, you know, box is appearing here in your

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    214

1    post?

2         A.   Let me remember.  So I'm reading the

3    article.  The comment section is there.  I see

4    this comment which I think succinctly expresses

5    the views of all of the comments I was seeing on

6    this New York Times article, as I think as a board

7    we're discussing, and so I took a picture of that

8    portion of the page as an example of the type of

9    opinion which was being shared by the readers in

10   the New York Times comment section which I thought

11   aptly understood the issues and the journalism at

12   play.

13        Q.   Okay.  So you selected R.M.'s comment to

14   be displayed on -- within your post?

15        A.   So that's correct.

16        Q.   Okay.  All right.

17             MR. BARDOS:  If we can take a

18        five-minute break.  I think I'm done.  I just

19        want to go over my notes.

20             And, then, if we can reconvene at, say,

21        3:30, I'm -- I might be finished.

22             MR. FRACKMAN:  Good.

23             MR. BARDOS:  Okay.  Thanks so much.

24             (Recess in Proceedings.)

25

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                     215

```
 1   BY MR. BARDOS:
 2        Q.   What did you do to prepare for today's
 3   deposition?
 4        A.   I had a two-hour meeting with counsel
 5   for the plaintiffs yesterday.
 6        Q.   Okay.  Anything else?
 7        A.   No.  No.
 8        Q.   Did you review any documents?
 9        A.   Not outside the meeting.
10        Q.   What is your hourly rate in this case?
11        A.   $125 an hour.
12        Q.   Do you know how many hours you have
13   worked so far?
14        A.   Not exactly.
15        Q.   Okay.  Do you know roughly how many
16   hours you've worked?
17        A.   Not really, no.
18        Q.   Do you know whether it's more than a
19   hundred hours?
20        A.   More than a hundred would put me at
21   12,500 which, I think, is outside the cap of my
22   retainer.  So I think it's less than a hundred.
23        Q.   Okay.  Have you been paid so far?
24        A.   I bill monthly usually.  So mostly, yes.
25        Q.   Okay.  And -- and who has paid you for
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    216

```
 1    your work?
 2         A.   I think generally O'Melveny but some of
 3    the payments have been split with the ACLU of
 4    Florida, if I remember right.
 5         Q.   Okay.  And what is the cap in your
 6    agreement?
 7         A.   I believe it's $10,000.
 8         Q.   Okay.  All right.
 9              MR. BARDOS:  I have no further
10         questions.
11              MR. FRACKMAN:  Okay.
12              MR. BARDOS:  All right.
13              MR. FRACKMAN:  Anyone -- anyone else for
14         the defendants?
15              Okay.  I have no, no questions at this
16         time.
17              MR. BARDOS:  Well, thank you, Everybody.
18              April, we'll be ordering a copy of the
19         transcript.
20              THE STENOGRAPHER:  And do you want the
21         exhibits attached?
22              MR. BARDOS:  Yes, please.
23              MR. FRACKMAN:  As do we, April.  Thank
24         you.
25
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                              217

```
 1              AND FURTHER THIS DEPONENT SAITH NOT.

 2                SIGNATURE RIGHTS RESERVED.

 3           (Deposition concluded at 3:34 p.m.)

 4

 5                      *  *  *  *  *

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    218

1    STATE OF FLORIDA:

2    COUNTY OF ORANGE:

3           I, April Reid, Registered Professional

4    Reporter, Certified Realtime Reporter and Notary

5    Public in and for the State of Florida,

6    and whose commission expires August 22, 2027,

7    do certify that the aforementioned appeared

8    before me, was sworn by me, and was thereupon

9    examined by counsel; and that the foregoing is a

10   true, correct, and full transcript of the

11   testimony adduced.

12          I further certify that I am neither

13   related to nor associated with any counsel or

14   party to this proceeding, nor otherwise interested

15   in the event thereof.

16          Given under my hand and notarial seal in

17   Orlando, Florida, this 28th day of July, 2025.

18

19

20   _____

21      April Reid, RPR, CRR, Notary Public

22      State of Florida, County of Orange

23       Commission No. 455787/HH 436060

24

25

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                219

| A | | | |
|---|---|---|---|
| **a1**<br>114:11, 114:14, 114:25, 115:25, 170:12 | **accurate**<br>23:25, 43:24, 51:13, 82:3, 88:12, 181:21, 195:8, 207:21 | 23:5, 50:11, 51:11, 140:10, 184:8, 185:20, 203:6 | **adults**<br>182:1 |
| **a2**<br>114:11, 114:15, 114:25, 116:1, 170:12 | **achieved**<br>130:14, 130:19 | **added**<br>10:20 | **adviser**<br>80:14 |
| | **aclu**<br>2:12, 13:23, 13:24, 14:3, 14:16, 19:8, 216:3 | **addendum**<br>4:15 | **aerial**<br>33:25, 59:18, 64:5 |
| **able**<br>8:6, 9:15, 10:11, 10:23, 10:25, 11:14, 71:7, 82:25, 95:2, 96:1, 96:4, 96:14, 96:19, 97:20, 98:9, 104:4, 111:22, 140:11, 140:13, 144:13 | | **adding**<br>11:1 | **affiliate**<br>75:23, 201:5 |
| | **acronym**<br>12:15, 12:21 | **addition**<br>61:9 | **affiliated**<br>199:16 |
| | **across**<br>29:12, 31:16, 63:2, 95:12, 111:6, 121:15, 135:15, 179:11, 187:20, 196:9, 201:21, 201:22 | **additional**<br>17:7, 23:4, 41:22, 103:25, 119:4, 125:15, 126:12, 126:13, 166:5, 194:14, 194:18, 195:15, 195:18, 195:19, 196:4, 196:11, 196:25, 197:7 | **affirm**<br>7:7 |
| | | | **affirmed**<br>7:14 |
| **above**<br>97:1, 125:24, 196:8, 196:10, 196:19, 196:24 | | | **aforementioned**<br>218:7 |
| | **act**<br>84:7, 84:15, 84:18, 94:3, 96:24, 97:2, 100:9 | **additionally**<br>84:8 | **after**<br>16:17, 17:5, 17:10, 21:11, 43:3, 43:4, 43:7, 46:11, 47:1, 47:10, 50:6, 52:18, 63:5, 73:8, 175:16, 177:4, 186:19 |
| **abroad**<br>76:1 | | **addresses**<br>184:14 | |
| **absolute**<br>36:25 | **actblue**<br>200:17, 200:25, 201:11, 202:2, 202:6, 203:1, 203:4, 203:12 | **adduced**<br>218:11 | |
| **absolutely**<br>160:8, 160:9 | | **adherence**<br>144:13, 156:2 | |
| **academic**<br>68:14, 75:22 | **action**<br>167:16 | **adjoining**<br>205:20 | **afternoon**<br>128:17 |
| **access**<br>10:7, 10:11, 10:23, 11:1, 11:7, 11:15 | **actual**<br>50:3, 174:2 | **adjust**<br>49:19 | **again**<br>40:9, 46:25, 61:18, 62:7, 84:6, 97:17, 98:4, 105:10, 109:23, 125:10, 137:12, 147:22, 158:3, 160:19, 161:5, 167:16, 170:24, 173:4, 189:3, 194:5, 195:2, 212:2 |
| | **actually**<br>20:13, 20:17, 39:4, 60:7, 66:22, 68:16, 78:24, 82:8, 83:11, 112:22, 138:17, 145:16, 157:22, 173:5, 173:7, 176:21, 197:6, 205:17 | **adjusted**<br>160:20 | |
| **accommodate**<br>9:7 | | **adjustment**<br>111:3 | |
| **according**<br>76:10, 97:21, 124:21 | | **adjustments**<br>25:10, 46:21, 73:21, 73:23 | |
| | | **administration**<br>205:12, 206:5 | |
| **account**<br>75:17, 84:4, 138:19, 192:20, 203:14, 204:3 | | **admission**<br>210:18 | **against**<br>61:14, 69:8, 79:11, 109:3, 123:10 |
| | **add**<br>10:8, 10:10, 15:15, 23:4, | **admissions**<br>210:10 | |
| **accuracy**<br>82:10, 132:24 | | **adopted**<br>178:5 | **age**<br>12:16, 12:17, 45:24, 45:25, |

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

220

72:17, 163:5,
163:8, 164:18,
166:11, 166:25,
167:13
**agencies**
205:9
**ago**
19:2, 172:2,
206:14
**agree**
11:20, 36:1,
36:5, 38:1,
38:18, 39:17,
39:18, 40:10,
55:18, 55:22,
65:6, 65:11,
65:16, 96:18,
97:4, 107:2,
116:1, 126:5,
130:24, 131:20,
133:12, 140:25,
141:16, 147:18,
153:10, 160:10,
177:10, 178:11,
179:16, 180:6,
187:12, 193:7,
195:4, 210:5,
210:17, 211:12,
211:16, 211:24,
212:9, 213:2
**agreed**
210:3, 211:23
**agreeing**
212:23, 213:11,
213:13
**agreement**
208:14, 208:22,
212:3, 212:14,
216:6
**ah**
191:5
**ahead**
23:5, 50:11
**airport**
116:12, 116:22,
116:23, 117:3,
117:10
**al**
1:5

**alabama**
13:13
**alarm**
5:4, 75:20,
76:3, 79:9,
79:17, 79:19,
79:23, 80:11,
80:16, 82:12,
84:2, 86:23,
87:19, 87:22,
88:15, 89:6,
91:7, 91:13,
92:2, 93:3,
93:14, 94:6
**alchemist-favored**
137:1
**alfredo**
6:6, 184:15
**algorithm**
53:3, 53:14,
76:11, 78:24,
80:10, 80:12,
81:3, 84:20,
86:9, 86:18,
95:2, 95:5,
95:18, 182:3,
182:14, 182:21
**algorithmic**
75:25, 93:6,
93:13, 94:21
**algorithms**
65:25, 79:7
**alhambra**
3:6
**allege**
22:13
**allegedly**
60:13
**allows**
126:2
**almost**
121:16, 144:16
**alone**
50:4, 103:5,
167:11
**along**
23:14, 54:4,
54:21, 58:8,

94:19, 110:22,
143:5, 144:9,
152:2, 152:20,
155:3, 155:8,
155:17, 155:19,
155:21, 158:25,
159:24, 162:13,
169:12, 169:13,
170:9
**already**
8:4, 24:15,
24:21, 25:14,
28:17, 111:11,
111:12, 189:25
**also**
3:11, 12:15,
20:12, 20:13,
29:19, 32:1,
33:2, 33:23,
37:8, 37:23,
39:14, 40:4,
40:8, 42:15,
43:14, 43:17,
47:20, 54:1,
55:15, 57:11,
58:12, 58:13,
58:24, 61:4,
61:12, 63:4,
73:14, 90:10,
95:8, 95:9,
100:12, 102:24,
108:22, 120:24,
124:7, 143:10,
154:16, 155:4,
157:4, 176:25,
189:21, 197:10,
197:14, 201:11,
202:6, 210:1
**alter**
106:7, 109:8,
109:13
**alterations**
109:14
**altered**
107:6
**altering**
106:23, 109:17,
172:9

**alternating**
108:22
**alternative**
50:24, 101:21,
131:2, 141:12
**alternatives**
62:14
**although**
81:22, 195:4,
204:3, 206:14
**always**
50:1, 80:19,
89:18, 96:22,
96:25, 104:13,
105:6, 137:3
**amend**
163:14
**amended**
23:1
**among**
65:15, 70:10,
98:7
**amount**
53:8, 55:7,
83:14, 101:19,
203:8
**analogous**
200:2
**analogy**
100:15, 100:20,
102:10, 103:1
**analogy-wise**
101:3
**analyses**
87:7, 103:6
**analysis**
45:20, 176:15,
181:8
**analyzed**
165:24
**andrea**
2:5, 19:5
**andrew**
2:4, 8:18,
8:19, 10:22,
15:19, 19:5,
90:7, 90:18,
91:17, 127:2,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

195:5
**andy**
2:19, 7:22,
11:3, 51:22,
89:11, 90:1,
90:14, 90:23,
115:10, 156:23,
174:6, 194:23,
212:16
**angles**
153:9
**annexations**
120:25
**another**
13:8, 15:5,
37:2, 37:3,
45:19, 55:23,
57:7, 58:19,
70:20, 80:5,
86:14, 104:10,
104:23, 122:24,
125:2, 127:10,
160:8, 166:21
**answer**
8:25, 9:2, 9:6,
9:15, 41:20,
51:16, 52:25,
69:15, 76:12,
79:8, 83:19,
93:23, 96:15,
97:7, 123:20,
126:13, 137:15,
163:19, 165:12,
183:14, 184:2,
211:20, 212:20,
213:3
**answer's**
199:18
**answered**
211:18
**answers**
8:12, 51:12,
83:13, 95:13,
149:19, 151:12,
182:3
**any**
9:4, 9:7, 9:14,
9:25, 10:15,

13:23, 16:11,
17:18, 17:24,
18:10, 19:13,
19:17, 19:24,
20:23, 21:2,
21:14, 22:7,
26:4, 26:17,
27:16, 32:22,
32:25, 33:17,
43:23, 44:7,
45:9, 45:14,
45:23, 46:14,
47:1, 47:12,
48:9, 48:25,
49:17, 49:18,
49:21, 49:22,
51:10, 54:2,
54:4, 55:13,
63:13, 66:16,
67:1, 68:21,
70:9, 74:14,
83:7, 84:4,
86:21, 87:1,
87:2, 87:5,
87:7, 88:15,
94:25, 105:16,
105:21, 111:18,
116:23, 117:1,
117:9, 119:7,
119:16, 119:24,
122:9, 134:14,
154:25, 155:25,
159:22, 162:10,
162:23, 164:19,
166:13, 167:7,
168:11, 168:23,
172:12, 173:17,
176:14, 176:16,
179:21, 180:12,
196:8, 198:15,
199:1, 210:22,
210:23, 215:8,
218:13
**anybody**
122:10, 128:14
**anyone**
19:18, 48:14,
48:18, 50:5,

216:13
**anything**
22:9, 30:7,
32:17, 35:1,
48:11, 49:23,
51:11, 51:19,
84:21, 167:18,
196:19, 196:23,
209:24, 212:8,
215:6
**anyway**
43:11, 46:20,
73:13, 173:7,
203:7
**apart**
130:24, 166:22
**apollo**
152:22
**app**
46:5, 47:13,
68:22, 190:5,
194:2
**apparently**
100:14
**appeal**
203:21
**appear**
74:8, 171:19,
191:19, 200:15
**appeared**
218:7
**appearing**
213:25
**appears**
52:10, 52:22,
87:18, 133:4,
133:17, 147:23,
157:23, 158:3,
199:22, 202:3,
207:19
**append**
17:6
**appendices**
186:20
**appendix**
129:14, 132:13,
133:5
**apples**
179:4

**apples-to-apples**
78:5, 178:25
**applicable**
77:21, 97:22
**application**
46:9, 46:13,
47:5, 47:7,
47:12, 68:23,
75:24, 102:19,
210:25
**applications**
10:16, 213:7
**applied**
76:11, 100:12
**apply**
20:7, 20:25,
60:6, 83:11
**approach**
175:6
**approaches**
147:12
**appropriate**
32:8
**appropriately**
95:2, 96:2
**approximately**
166:12
**approximation**
84:13
**april**
1:25, 6:12,
204:20, 204:25,
205:2, 205:4,
216:18, 216:23,
218:3, 218:21
**aptly**
214:11
**area**
13:11, 22:5,
25:11, 27:11,
27:17, 28:2,
29:6, 30:12,
34:4, 49:10,
68:5, 73:4,
116:12, 117:6,
120:24, 121:13,
121:19, 137:22,
139:20, 147:12,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

222

| | | | |
|---|---|---|---|
| 148:5, 148:6, 148:15, 148:20, 149:1, 149:5, 165:20, 172:4, 172:17, 184:22, 184:23 | **ascertainable** 184:25, 186:8, 186:15, 186:19, 187:15, 187:19, 188:21, 189:12 | **assuming** 160:17 | **automatically** 178:9, 213:24 |
| **areas** 16:11, 17:8, 29:12, 48:9, 55:5, 139:13, 142:5 | **aside** 148:12 | **atlantic** 147:5, 159:16 | **available** 10:1, 170:16 |
| | **asked** 16:11, 17:6, 21:23, 43:17, 211:17 | **atoms** 41:12 | **avenue** 189:11 |
| **aren't** 140:1, 154:24, 157:23 | **asking** 11:4, 12:25, 79:5, 125:21, 167:21, 191:8 | **attached** 9:23, 15:18, 20:12, 23:8, 23:10, 50:13, 52:14, 72:6, 87:14, 92:21, 99:7, 132:17, 136:10, 140:17, 145:21, 150:18, 151:18, 152:12, 167:24, 171:6, 171:9, 171:12, 171:15, 184:11, 185:24, 190:18, 200:7, 204:8, 207:4, 213:14, 216:21 | **average** 82:4, 91:22, 92:1, 92:3, 92:8, 92:11, 95:11, 129:7, 132:6 |
| **arguing** 100:11 | | | **averages** 135:14 |
| **argument** 196:23 | **asks** 50:23 | | **avoid** 9:1, 41:6, 41:7, 124:24, 125:3, 162:23 |
| **arm** 139:20, 143:11, 143:15, 143:18, 143:19, 143:21, 144:1, 144:2, 146:13 | **aspects** 80:4 | | |
| | **assertion** 105:3 | | **avoids** 172:8 |
| | **assess** 45:15, 66:19 | | **aware** 9:14, 48:5, 156:18, 203:20 |
| **around** 13:13, 19:1, 46:19, 46:23, 76:4, 141:9, 143:11, 143:15, 143:17, 143:18, 143:20, 144:1, 146:13, 149:4, 155:5, 155:6, 159:20, 169:6, 169:7, 178:6 | **assessed** 187:1 | **attained** 210:9 | **away** 208:7 |
| | **assessing** 103:10 | **attempt** 77:14 | **awhile** 27:19, 89:19, 99:16, 176:5 |
| | **assessment** 65:10 | **attempted** 94:21, 95:24, 99:22 | **axis** 155:3 |
| | **assign** 47:23 | **attention** 168:24 | **B** |
| | **assigned** 74:13, 74:15, 75:3 | **attorneys** 19:8 | **b1** 5:17, 54:21, 70:20, 107:22, 145:24, 148:1, 149:14, 149:22, 163:17 |
| **arterial** 186:6, 186:13, 186:14, 187:14, 188:8 | **assignment** 4:12, 4:15, 96:17 | **attributed** 78:6 | |
| | **assignments** 27:16 | **atypical** 181:20, 182:16, 183:6, 183:18 | **b2** 5:3, 54:21, 70:20, 72:13, 73:6, 108:1, 133:15, 166:23 |
| **arterials** 185:15 | **assistance** 50:5, 176:14 | **audience** 203:19 | |
| **article** 208:18, 208:21, 209:7, 210:8, 211:6, 211:22, 214:3, 214:6 | **assisted** 21:7 | **audio** 195:5 | **back** 27:17, 47:25, 51:7, 72:1, 74:1, 86:21, 91:15, 106:2, |
| | **associated** 168:24, 201:6, 211:6, 218:13 | **august** 5:11, 203:11, 218:6 | |
| **article's** 213:15 | **assume** 33:9, 54:2 | **author** 20:2 | |

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

223

112:5, 117:24,
125:20, 131:8,
135:2, 135:9,
155:13, 156:13,
181:15, 206:1
**background**
42:13, 166:5,
166:19
**backtracking**
70:18
**bake**
101:3
**baking**
100:15, 100:16,
101:7, 101:8,
101:15, 102:11,
102:15
**balance**
53:11, 55:19,
62:22, 72:25,
73:22, 73:23,
111:14, 121:14,
121:20, 147:2,
161:3
**balancing**
116:18, 121:3,
122:11
**ballot**
173:6
**ballpark**
167:13
**barber**
99:13, 99:14,
99:18, 100:2,
100:14, 101:11,
103:24
**bardos**
2:19, 4:5,
7:20, 7:22,
8:18, 8:22,
8:24, 10:22,
11:5, 11:9,
11:12, 11:18,
15:19, 51:24,
54:7, 54:14,
54:17, 66:9,
89:13, 89:21,
90:7, 90:16,

90:21, 90:24,
91:2, 91:4,
91:5, 91:17,
115:13, 115:18,
115:21, 127:2,
127:8, 127:12,
127:15, 127:19,
128:2, 128:5,
128:9, 128:12,
132:14, 156:24,
157:2, 171:23,
174:8, 174:11,
174:14, 174:18,
182:11, 191:7,
195:2, 196:1,
204:5, 209:22,
212:20, 214:17,
214:23, 215:1,
216:9, 216:12,
216:17, 216:22
**bargained**
208:7
**based**
47:1, 75:11,
100:3, 108:16,
139:10, 163:23,
181:3, 181:12,
187:6, 213:8
**basically**
42:10, 110:20,
125:23, 141:23,
142:24, 201:2
**basin**
64:8, 148:4,
148:18
**basis**
99:21, 101:21
**bay**
116:13, 147:3
**bays**
32:14, 32:23,
63:21, 64:6
**beach**
139:17, 140:7,
143:22, 152:22,
156:4, 159:14,
162:15
**bear**
102:7

**became**
27:23, 143:12,
143:15
**because**
30:19, 30:22,
33:1, 33:17,
34:3, 40:24,
46:17, 56:22,
73:7, 83:16,
96:23, 102:13,
103:8, 113:23,
113:25, 114:2,
133:2, 139:4,
139:7, 139:13,
140:3, 141:6,
144:11, 156:7,
164:7, 166:15,
169:8, 173:6,
180:1, 183:15,
213:13
**become**
65:21, 136:8
**becomes**
67:3
**been**
10:23, 15:4,
17:19, 18:8,
21:20, 26:19,
27:18, 27:19,
27:20, 30:5,
42:10, 47:12,
48:11, 54:7,
64:11, 64:21,
64:22, 73:8,
76:9, 89:15,
89:16, 90:1,
90:4, 93:18,
93:21, 96:1,
96:4, 99:16,
100:10, 104:4,
106:20, 107:15,
107:17, 111:11,
111:12, 158:9,
158:14, 159:5,
168:5, 169:5,
175:6, 175:16,
175:17, 176:4,
176:16, 176:19,

177:19, 180:14,
181:6, 215:23,
216:3
**before**
8:12, 9:6,
12:11, 13:1,
19:20, 23:19,
24:14, 25:15,
48:3, 48:16,
50:17, 51:4,
64:11, 64:16,
64:20, 64:21,
64:22, 72:11,
80:14, 96:8,
108:22, 127:10,
134:19, 167:22,
169:15, 186:4,
218:8
**began**
23:19
**begin**
7:2, 7:18,
9:18, 12:24,
12:25, 129:3
**beginning**
8:3, 11:19,
88:2, 195:12
**begins**
51:10, 129:18,
147:5
**behalf**
2:3, 2:18, 3:3
**behind**
208:21
**being**
7:14, 11:10,
15:3, 15:12,
53:5, 53:19,
100:5, 108:4,
117:16, 117:17,
143:13, 144:12,
176:11, 182:8,
182:12, 183:11,
183:14, 183:17,
205:4, 214:9
**being's**
183:15
**belief**
29:20

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

224

beliefs
81:25
believe
14:24, 16:25,
17:12, 21:8,
23:22, 26:19,
29:16, 37:13,
49:18, 50:19,
65:4, 68:9,
76:4, 84:25,
85:2, 90:2,
99:17, 100:9,
100:12, 106:13,
106:19, 107:25,
108:2, 108:6,
108:14, 117:21,
120:10, 122:15,
123:5, 123:6,
127:1, 144:18,
157:6, 162:4,
168:13, 169:21,
178:6, 179:10,
185:5, 191:14,
192:6, 192:11,
192:24, 196:7,
196:18, 199:6,
199:16, 199:18,
200:2, 216:7
belleveu
201:16
below
139:20, 207:18
benchmark
12:8, 67:7,
76:22, 77:4
bernard
200:22
bernie
200:17, 200:20,
200:23, 201:10,
201:13, 201:14,
202:1, 202:5,
202:12, 202:25
besides
17:18, 19:18,
32:10, 128:19,
187:23
best
8:11, 18:23,

48:24, 70:2,
83:6, 86:18,
173:9
better
25:7, 29:3,
66:14, 83:6,
109:20, 110:3,
118:3, 118:14,
118:19, 118:24,
121:20, 123:23,
130:7, 130:12,
195:10
between
31:18, 33:16,
34:1, 37:15,
42:3, 64:8,
66:7, 70:14,
81:12, 83:10,
94:11, 117:15,
133:19, 134:13,
138:8, 174:1,
174:25, 175:4,
175:23, 177:1,
177:11, 178:17,
179:21, 180:8,
180:22, 192:20
beyond
21:11, 25:24,
88:23, 97:2,
181:5, 196:11,
198:20
bias
183:2
bigger
62:2, 134:14
biggest
84:16
bill
215:24
birmingham
13:13
bisected
148:18
bit
26:20, 39:19,
39:23, 96:6,
142:25, 164:7,
172:2

black
44:2, 44:19,
45:24
blank
36:22
block
47:18, 47:25,
48:1, 63:25
blocks
53:10, 74:9,
74:12, 74:15,
74:19, 74:23,
75:1, 75:12,
75:13, 75:14,
75:18, 107:20,
153:25, 168:15,
168:21, 169:9,
172:4
bluesky
6:12, 6:13,
6:14, 203:14,
203:16, 204:2,
204:12
board
63:2, 214:6
bookmark
181:11
border
32:5, 157:24
borderline
139:4, 146:2,
154:2
borders
35:9, 169:6
both
47:20, 58:16,
58:18, 58:23,
85:22, 90:3,
90:4, 119:12,
123:2, 124:3,
124:4, 124:19,
143:16, 162:7,
162:22, 162:23,
177:11, 208:20
bound
126:7
boundaries
25:9, 29:5,

31:7, 31:11,
32:2, 32:5,
32:23, 33:14,
33:19, 33:21,
34:19, 35:8,
36:13, 38:15,
38:22, 39:11,
39:15, 40:6,
40:14, 42:16,
53:6, 53:19,
53:23, 55:19,
56:4, 56:16,
58:2, 58:13,
59:2, 60:10,
60:12, 60:14,
60:19, 61:11,
61:12, 61:15,
63:14, 66:4,
70:24, 110:22,
111:4, 111:6,
113:5, 116:10,
118:1, 120:4,
120:6, 122:23,
123:23, 124:4,
124:6, 125:14,
130:4, 131:11,
131:15, 131:22,
141:24, 144:9,
144:14, 144:23,
144:25, 154:24,
156:6, 157:22,
172:8, 184:23,
185:1, 185:5,
187:18, 189:17,
189:18, 189:22
boundary
27:10, 27:23,
29:13, 31:14,
31:15, 31:16,
31:18, 31:22,
32:10, 33:18,
35:12, 35:23,
36:7, 37:8,
40:18, 43:12,
46:22, 49:19,
57:9, 57:10,
57:19, 57:22,
57:23, 57:25,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                   225

58:1, 58:9,
58:19, 60:6,
60:13, 60:18,
61:13, 61:25,
62:17, 63:18,
64:2, 74:25,
113:12, 113:13,
113:21, 124:5,
129:4, 129:13,
129:18, 130:25,
131:14, 131:20,
131:23, 144:17,
144:20, 148:24,
152:3, 152:20,
153:8, 155:19,
155:20, 155:21,
156:3, 156:5,
156:11, 157:6,
158:25, 159:1,
159:2, 159:3,
159:11, 159:16,
159:24, 162:13,
162:23, 169:11,
169:14, 169:18,
169:23, 170:1,
170:6, 170:8,
170:13, 171:20,
172:1, 172:6,
173:25, 181:11,
187:5
boundary's
58:22
bounded
71:3, 117:7
box
213:25
boxes
210:18
brain
138:21
breach
38:16
break
9:4, 9:6, 9:8,
54:9, 127:7,
127:11, 127:20,
128:13, 174:7,
214:18

briefly
120:15
bright
134:20, 134:24
bright-line
137:4
broad
164:10, 203:24
broadly
58:15, 136:22,
136:23, 138:2,
206:3
bronough
2:21
brought
73:19
broward
142:21, 143:4,
156:4, 159:14,
162:15
budget
83:2, 194:17,
195:17
build
86:5
building
85:1
bunch
187:2, 187:4
butter
101:17, 102:14
buy
130:11
bvap
85:3
byrd
1:9

C

c)(3)s
201:6
c)(4)s
201:6, 201:7
c-a-l-l-a-i-s
14:8
c1
5:18, 108:3,
150:16, 150:21,

170:13
c2
5:19, 108:7,
151:16, 151:22
cake
100:15, 100:16,
101:4, 101:7,
101:8, 101:15,
101:21, 102:12,
102:15
cake's
101:17
calculate
43:5, 68:10,
68:16, 68:23,
69:4, 75:17
calculated
75:8
calculating
75:10
calculations
121:10, 122:16
calibration
83:4
california
207:25
call
15:1, 19:5,
48:23, 78:12,
108:24, 109:24,
138:15, 146:18
callais
14:7
called
128:15, 129:22,
129:23, 131:5,
205:2
calls
19:8, 209:20
came
27:22, 29:15,
205:7
campaign
200:21, 201:14,
210:19
campaigns
201:5
can't
28:9, 35:5,

39:2, 43:11,
73:11, 86:6,
95:5, 111:5,
138:20, 146:24,
160:15, 182:18,
183:16, 183:17,
199:14, 203:4,
204:3, 212:8
canals
32:16
cancel
53:10, 83:16
candidate
199:15, 202:22,
210:9
cannot
101:21, 101:22,
183:5
cap
215:21, 216:5
capacity
1:10
care
208:3
carmen
3:4
carry
182:10
cartaya
3:4, 89:15,
89:20, 90:1,
90:6, 90:13,
128:8
case
1:3, 8:1, 9:21,
13:7, 14:4,
14:6, 14:9,
14:15, 14:22,
15:4, 15:5,
15:7, 15:8,
15:12, 15:13,
16:5, 16:17,
18:7, 19:14,
19:23, 20:1,
30:7, 42:9,
48:4, 56:10,
56:14, 62:16,
62:24, 64:15,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

226

64:18, 66:6,
66:24, 82:23,
85:16, 85:24,
86:3, 86:20,
87:5, 87:8,
93:12, 93:25,
94:17, 96:12,
98:22, 99:18,
100:6, 100:10,
103:16, 105:17,
125:11, 126:4,
133:17, 134:2,
161:6, 173:12,
187:21, 189:13,
192:24, 194:9,
197:8, 198:20,
215:10
**cases**
13:3, 13:14,
13:18, 13:21,
13:25, 14:5,
21:13, 22:1,
40:4, 62:1,
76:25, 83:9,
99:4, 118:2,
118:18, 120:25,
121:6, 121:8,
134:12, 154:2,
172:7, 193:22
**catch**
89:25, 136:16
**categories**
185:2, 185:17
**category**
180:19
**cater**
203:18
**cause**
19:1, 71:4,
166:2, 166:13
**caveat**
173:5
**caveats**
52:21
**cd**
12:21, 28:7,
28:10, 130:23,
131:1, 131:19,

133:15, 142:18,
142:19
**cda**
130:21, 131:17
**cdb1**
130:21, 131:17
**cdb2**
130:22, 131:17
**cdc1**
130:22, 131:18
**cdc2**
130:22, 131:18
**cdd**
130:23, 131:18,
197:6
**censorship**
180:3
**census**
42:17, 42:18,
48:1, 63:25,
74:17, 74:19,
74:22, 74:24,
173:19, 173:21,
173:22, 173:25,
174:2, 174:3
**census-reported**
112:23, 113:4
**center**
148:7
**centers**
34:2
**cents**
203:5
**certain**
11:24, 16:10,
43:18, 50:24,
65:16, 79:6,
79:14, 95:14,
95:17, 97:13,
122:18, 126:6,
136:1, 166:9,
185:2
**certainly**
26:21, 41:1,
42:7, 57:24,
58:21, 59:15,
81:24, 84:15,
95:4, 98:4,

108:13, 134:11,
138:14, 177:2,
178:8, 179:25
**certainty**
182:20
**certified**
218:4
**certify**
218:7, 218:12
**cetera**
33:22, 42:14
**challenge**
86:8, 105:25
**challenged**
17:9, 25:8,
55:5, 100:6
**challenging**
22:20, 22:23
**chance**
87:16
**change**
24:5, 27:16,
51:11, 55:7,
94:17, 107:22,
108:3, 108:9,
172:1
**changed**
23:25, 107:19,
108:13, 108:18,
109:6, 149:16,
172:18, 177:4
**changes**
28:1, 45:9,
45:16, 46:14,
47:1, 47:4,
47:9, 47:12,
48:25, 49:5,
49:15, 55:4,
62:25, 73:8,
109:3, 110:5,
145:5, 168:11,
169:3, 169:24,
170:5, 172:23,
173:25, 176:11,
182:3, 194:13,
194:14, 195:14,
195:15, 197:14,
197:21, 197:25

**changing**
25:3, 73:11,
107:18
**chapters**
13:24
**characterization**
118:15
**characterizing**
184:19
**charging**
170:4
**charlotte**
147:9, 147:11
**chart**
88:23
**chat**
10:10, 10:21,
10:24, 11:1,
11:15, 15:16,
23:5, 140:10,
185:21
**check**
80:9, 132:20,
133:2, 199:20
**checked**
210:18
**checking**
133:1
**checks**
80:7
**choice**
25:7, 39:14,
39:25, 158:10
**choices**
25:10, 53:21,
179:8, 180:23
**choose**
169:22, 180:5,
213:22
**choosing**
194:17, 195:18
**chose**
39:9
**chosen**
21:25
**christian**
210:1
**christo-fascist**
209:11, 209:23

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                                227

christo-fascists
208:7, 211:9
chronologically
16:16
circle
3:6
circulated
149:9
cited
21:10
cites
13:6
cities
42:14, 47:20,
49:12
citing
197:17
citizen
167:14
citizens
182:2
city
13:9, 60:8,
114:12, 115:5,
116:1, 116:3,
116:9, 117:11,
117:15, 117:17,
117:21, 130:3,
208:5, 210:20,
212:1
civilization
170:3
claim
22:13, 22:18,
100:7, 101:20,
105:21, 165:2
claiming
104:12, 105:4,
196:24
claims
22:21, 30:6,
96:11, 196:16
classification
185:10, 188:7,
189:5
classifications
185:12, 187:23
classified
187:6

classifies
187:4
classify
185:14
classifying
189:1
clause
212:6
clauses
213:1
clean
168:19, 198:17
cleaner
8:15
clear
8:6, 27:24,
36:15, 41:4,
60:9, 79:5,
83:10, 114:19,
122:22, 126:15,
187:12
clearer
9:3
clearly
35:7, 112:12,
155:7, 186:7,
186:14, 187:15,
189:11
clipped
74:21
close
46:18, 73:25,
92:15, 105:14,
145:18, 146:18,
149:6, 154:3,
162:25, 188:2
closer
147:3
closest
144:3, 147:15
co-equal
38:25, 121:4
coalition
44:22, 85:3
coast
31:20, 35:13,
71:3, 74:12,
74:19, 75:18,

139:16, 139:21,
141:5, 143:5,
143:6, 144:3,
147:13, 179:15
coastline
74:17, 74:22,
74:24, 124:19,
151:5
coasts
111:5, 148:8
code
53:9, 69:6,
98:20, 205:18
coffee
174:7
coincide
57:9, 58:12,
130:3
coincidence
58:12, 61:11
coincident
57:22, 57:25,
58:19, 58:20
coincides
35:7, 57:19,
60:13, 131:11,
131:14, 131:21
colleagues
10:23, 11:13,
19:17
collecting
93:3
collector
186:7, 186:14,
187:15, 188:9
collectors
185:16
college
204:15, 205:15,
205:16, 205:21,
210:10, 210:18,
213:7
collier
26:10, 98:14,
158:19, 159:6,
159:21, 160:2,
160:14, 160:21,
160:22, 161:1,

161:22, 162:6,
162:7, 162:17,
162:24, 177:21,
179:24
collier-miami-da-
de
196:10
color
25:3
columbian
54:3
column
112:13, 113:16,
113:17, 114:9,
129:22, 131:5,
131:6, 191:20,
192:9, 192:10
combinations
53:9, 160:5
come
15:2, 36:22,
72:1, 73:14,
74:1, 81:18,
88:25, 89:24
comes
42:20, 112:1,
140:14, 144:3,
159:20, 198:21
comfortable
95:21
coming
17:21
comment
207:19, 207:20,
207:23, 208:13,
208:15, 208:17,
208:25, 209:4,
210:6, 210:7,
210:21, 211:3,
211:6, 212:7,
212:14, 212:17,
214:3, 214:4,
214:10, 214:13
comments
48:9, 50:6,
207:13, 212:12,
212:18, 214:5
commission
6:9, 13:12,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

228

200:11, 218:6,
218:23
**common**
32:13
**commonly**
76:20, 184:24,
186:8, 186:15,
186:18, 187:16,
187:18, 188:21,
189:12
**communicate**
18:17
**communications**
48:22
**compact**
88:6, 121:13,
124:9, 135:12,
135:13, 136:21,
137:6, 137:8,
137:10, 137:14,
137:17, 137:25,
138:1, 138:3,
138:22, 138:24,
139:3, 143:12,
143:13, 143:15,
146:1, 146:7,
146:14, 146:17,
150:6, 150:10,
150:23, 151:6,
151:8, 151:25,
152:18, 153:19,
154:4, 154:6,
154:11, 154:17,
155:11, 172:7
**compactness**
43:13, 65:3,
65:5, 65:9,
65:23, 66:7,
66:19, 67:2,
68:11, 68:18,
68:24, 70:25,
75:9, 75:10,
75:17, 88:4,
88:10, 119:23,
119:24, 122:4,
124:20, 124:21,
132:4, 132:6,
132:10, 133:5,

133:12, 133:14,
133:19, 133:21,
135:5, 136:14,
137:2, 138:9,
138:13, 138:18,
149:20, 150:13,
151:12, 154:8,
154:19
**comparable**
118:14, 118:18,
135:11, 136:1,
179:10, 184:4
**compare**
77:2, 77:13,
79:11, 85:19,
101:4, 118:10
**compared**
76:23, 91:22,
92:8, 94:13,
101:19, 181:18
**compares**
77:4
**comparing**
175:9, 177:12,
178:22, 179:4,
179:6
**comparison**
78:5, 102:5,
103:21, 176:20,
178:25, 181:4,
181:13
**comparisons**
174:25, 176:16,
177:15, 179:21,
180:21, 181:2
**competing**
55:20
**complaint**
18:7, 22:16,
46:20
**complete**
51:13
**completed**
17:5, 43:3,
43:7
**completely**
36:22, 57:22,
148:21, 180:3

**completing**
43:4
**compliance**
48:10, 49:10,
70:7, 119:4,
130:9, 130:12,
145:9
**compliant**
16:13, 37:9,
57:5, 59:22,
60:20, 61:6,
69:18, 69:22,
95:9, 97:16,
98:7
**complied**
37:23, 93:7,
93:15, 106:16,
111:20
**complies**
7:5, 94:1,
95:19, 96:3,
106:21, 106:22
**comply**
28:2, 36:19,
71:8, 94:22,
106:9, 109:1,
109:16, 109:20,
110:4, 111:16,
121:20, 124:2,
168:5, 194:15,
195:16, 197:1
**complying**
58:2, 62:15,
98:11, 98:13,
108:22, 109:9,
109:24
**component**
61:12
**compressed**
192:17
**computational**
81:14
**computed**
43:14
**computer**
10:14, 10:16,
53:8, 68:16,
76:11, 86:15,

98:20, 195:1
**computer's**
183:5
**computer-assisted**
53:12
**computing**
78:16
**con**
65:21
**concentrated**
165:16
**concentration**
165:9
**concentrations**
71:16
**concern**
60:17, 166:13,
166:18, 166:20
**concerns**
164:19, 166:2
**concise**
93:21, 212:22
**concluded**
100:4, 104:7,
217:3
**concluding**
101:12
**conclusion**
30:19, 30:21,
36:23
**conclusions**
99:23
**conduct**
99:22
**conducted**
1:17, 103:24
**confidence**
78:11, 81:5,
81:17
**confident**
69:10, 83:19,
95:2
**configuration**
27:19, 27:24,
31:15, 32:4,
32:8, 36:16,
36:18, 37:22,
38:10, 39:13,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

229

40:22, 49:11,
57:3, 61:3,
97:23, 98:6,
146:5, 183:7,
197:25, 198:5
**configurations**
16:22, 34:6,
37:21, 49:15,
55:11, 55:12,
55:14, 76:14,
97:15, 116:15,
121:6, 159:9,
163:12, 163:21
**configure**
35:14, 37:6,
57:24, 148:23
**configured**
62:12, 143:11,
169:9, 180:15,
181:6
**confirm**
51:14, 52:25,
132:24, 157:9
**congress**
83:15
**congressional**
5:5, 5:15,
5:16, 12:2,
12:3, 12:9,
12:22, 13:9,
17:1, 17:15,
17:17, 17:25,
18:12, 22:4,
24:12, 24:16,
25:14, 55:2,
55:4, 69:25,
72:13, 72:18,
79:13, 79:16,
79:25, 80:13,
80:18, 82:13,
82:24, 84:3,
86:24, 87:21,
88:16, 91:9,
93:4, 93:15,
94:7, 105:19,
106:15, 107:5,
111:20, 111:22,
114:18, 114:21,

114:23, 119:13,
119:17, 120:7,
123:3, 129:12,
129:19, 129:20,
130:14, 130:19,
131:15, 131:21,
131:23, 133:9,
136:7, 140:10,
142:14, 147:19,
155:14, 156:1,
156:19, 157:13,
158:2, 163:6,
164:17, 166:23,
167:8, 170:23,
175:12, 175:23,
175:24, 177:17,
177:19, 178:18,
178:23, 178:24,
179:17, 179:24,
180:11, 193:10
**connect**
159:6
**connecting**
29:11
**connection**
15:5
**connects**
98:14
**cons**
65:16, 65:20
**consequence**
156:12, 158:15,
197:1, 197:3
**conservation**
148:11
**consider**
48:10, 63:4,
63:17, 67:9,
67:24, 133:18,
134:4, 134:17,
136:20, 137:9,
137:17, 137:24,
139:2, 145:25,
146:6, 146:16,
150:5, 150:22,
151:24, 152:17,
154:5, 159:16,
173:19

**consideration**
96:20, 96:25,
97:1, 119:9,
119:20, 120:1,
120:8, 165:22
**considerations**
158:11
**considered**
18:11, 21:20,
148:17, 173:21,
189:17, 189:21
**consistent**
25:9, 25:18,
27:25, 29:1,
29:14, 29:17,
29:21, 31:1,
62:1, 62:5,
111:7, 142:1,
142:2, 162:20,
169:25, 170:4,
175:5, 187:20,
194:20, 195:21
**consistently**
60:6
**constitution**
20:10, 37:17,
37:18, 61:2,
84:9, 141:11
**constitutional**
16:13, 20:20,
27:25, 28:19,
37:24, 41:2,
41:3, 44:11,
61:19, 66:20,
66:23, 82:16,
85:18, 94:13,
106:10, 106:22,
109:10, 109:16,
162:20, 178:1,
178:3, 194:16,
194:21, 195:16,
195:22, 197:2
**constitutions**
93:8, 93:16,
94:2, 94:23
**constraint**
125:5, 125:16,
125:19

**constraints**
39:3, 49:23,
50:2, 55:20,
78:1, 81:14,
81:20, 82:16,
86:3, 126:7
**consult**
42:8, 42:24,
87:2, 190:5,
191:18
**consulted**
25:5, 25:6,
42:17, 43:19
**cont'd**
3:1
**contacted**
17:11
**contain**
58:17, 58:18,
115:5, 139:13,
179:13, 179:22
**contained**
74:24, 163:13,
181:3, 183:22
**containing**
162:23
**contains**
60:9
**contend**
158:18
**contending**
158:17, 158:22
**context**
26:22, 60:21,
61:24, 103:1,
103:5, 134:9,
154:8, 165:1,
166:19, 167:17,
180:7, 213:2
**contextual**
36:24, 67:11
**contextualize**
134:8
**contiguous**
95:5, 121:1
**continental**
3:5
**continues**
169:12

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

230

| | | | |
|---|---|---|---|
| continuing | 51:16, 53:7, | 21:9, 38:5, | 114:5, 114:8, |
| 160:17 | 59:11, 65:1, | 49:9, 60:25, | 121:9, 123:10, |
| continuum | 68:11, 73:1, | 62:25, 63:2, | 126:23, 190:6, |
| 137:3 | 77:9, 77:21, | 63:3, 65:19, | 191:15, 191:16, |
| contrary | 77:22, 95:25, | 65:21, 70:19, | 191:22, 193:8, |
| 190:7, 194:2 | 98:22, 99:1, | 70:24, 71:4, | 193:17 |
| contributed | 99:2, 109:11, | 74:10, 77:12, | counted |
| 29:19, 29:25 | 110:14, 113:9, | 82:19, 95:17, | 21:6, 192:12, |
| contribution | 121:24, 122:7, | 97:6, 97:7, | 194:6 |
| 200:17, 201:9, | 122:12, 123:12, | 97:10, 97:17, | counterclockwise |
| 202:1, 202:5, | 126:22, 129:20, | 98:4, 98:5, | 140:3 |
| 202:25, 203:10 | 130:7, 138:11, | 98:20, 104:7, | counties |
| contributions | 141:2, 142:12, | 107:15, 109:17, | 37:5, 42:1, |
| 200:13 | 142:23, 144:21, | 110:3, 115:8, | 42:2, 42:5, |
| convene | 145:1, 147:6, | 115:22, 121:5, | 47:21, 56:20, |
| 128:3 | 147:14, 161:2, | 121:19, 130:16, | 59:5, 59:7, |
| conversation | 163:19, 177:22, | 134:16, 137:13, | 61:10, 91:22, |
| 155:4, 163:24 | 179:18, 184:15, | 157:11, 157:15, | 92:3, 92:6, |
| conversations | 191:10, 193:4, | 159:24, 160:6, | 110:8, 112:17, |
| 29:18, 49:1 | 200:24, 208:14, | 160:15, 162:15, | 112:18, 119:19, |
| conversely | 209:1, 209:6, | 164:21, 173:7, | 122:18, 125:25, |
| 98:8 | 214:15, 218:10 | 179:10, 180:4, | 126:17, 144:21, |
| converted | correction | 186:9, 192:8, | 149:18, 156:4, |
| 98:19 | 198:15 | 194:24, 197:20, | 156:16, 157:5, |
| convex | correctly | 199:3 | 161:11, 162:15, |
| 5:13, 42:21, | 126:11, 167:11, | couldn't | 162:17, 192:3, |
| 66:11, 133:8 | 190:9 | 28:14, 30:7, | 192:5, 193:9, |
| convinced | correspond | 83:3, 194:23 | 193:11, 193:18, |
| 28:24 | 140:2, 184:23, | council | 193:19, 193:21, |
| copies | 191:19 | 13:10 | 194:18, 195:19, |
| 16:9, 175:18 | corresponded | counsel | 196:13 |
| copy | 186:17, 187:8 | 16:4, 18:21, | counting |
| 10:13, 16:1, | corresponding | 18:24, 19:18, | 113:18, 192:22, |
| 89:11, 216:18 | 192:9 | 19:19, 21:7, | 192:23 |
| coral | corresponds | 22:1, 24:10, | country |
| 3:8 | 149:6 | 24:24, 27:1, | 120:23, 165:14, |
| cord | cory | 27:7, 29:18, | 172:25, 208:9, |
| 1:9 | 1:16, 4:3, 4:9, | 29:23, 30:15, | 211:11 |
| corner | 4:13, 4:16, 5:7, | 30:24, 48:22, | counts |
| 137:11, 191:2, | 5:10, 6:4, 6:11, | 49:2, 59:9, | 43:14, 64:5, |
| 208:8, 211:10 | 6:15, 7:13, | 176:20, 215:4, | 67:10, 109:24, |
| corners | 127:6, 127:7, | 218:9, 218:13 | 165:18, 185:10, |
| 168:21 | 127:23, 209:18 | counsels | 194:6 |
| correct | cost | 61:14 | county |
| 15:9, 38:3, | 121:6 | count | 13:12, 26:10, |
| 38:8, 44:2, | could | 113:10, 113:14, | 32:19, 35:9, |
| 44:3, 46:10, | 8:10, 8:25, | 113:23, 113:25, | 40:6, 42:15, |
| 50:8, 51:11, | 18:24, 20:20, | 114:2, 114:4, | 43:15, 47:23, |

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

49:12, 57:4,
57:21, 60:8,
62:21, 63:1,
98:14, 98:15,
110:21, 111:6,
112:21, 113:16,
120:12, 120:20,
122:5, 122:6,
122:20, 122:24,
123:15, 124:5,
124:13, 126:18,
126:19, 130:3,
131:5, 131:11,
131:14, 131:22,
141:18, 141:19,
141:20, 141:24,
144:8, 144:14,
144:17, 144:18,
144:25, 145:3,
145:7, 146:24,
146:25, 152:23,
155:20, 155:22,
156:2, 156:3,
156:10, 156:19,
156:21, 157:12,
157:25, 158:1,
158:6, 158:9,
158:19, 158:20,
158:25, 159:7,
159:11, 159:24,
160:14, 161:2,
161:19, 161:23,
162:12, 164:10,
170:3, 177:21,
185:5, 189:16,
190:6, 191:22,
192:2, 192:22,
192:23, 193:2,
193:8, 193:17,
196:17, 218:2,
218:22
**couple**
23:4, 34:13,
59:12, 107:19,
133:1, 160:23,
168:20, 206:14,
208:19
**course**
9:9, 16:24,

50:6, 59:4,
187:2, 197:6
**court**
1:1, 8:5, 9:11,
21:2, 21:8,
21:13, 22:8,
56:12, 63:12,
66:9, 103:18,
123:8, 213:17
**court's**
124:23
**cover**
116:9, 206:20,
206:23
**coverage**
210:14
**covered**
189:25
**create**
70:20, 85:8,
85:10, 123:23
**created**
43:11, 124:8
**creates**
116:8
**creating**
111:7
**criteria**
20:6, 20:25,
52:8, 55:20,
55:23, 56:20,
57:1, 57:4,
59:24, 70:14,
71:9, 79:14,
85:19, 86:10,
86:19, 88:2,
91:19, 104:2,
104:3, 104:9,
104:22, 121:15,
122:11, 126:12,
126:13, 170:5,
179:8, 179:10
**critical**
101:16, 102:11,
102:21, 103:11
**critique**
191:22
**cross**
26:9, 26:16,

30:21, 32:2,
32:22, 32:25,
33:2, 33:4,
33:6, 33:8,
33:12, 33:17,
36:11, 36:14,
37:1, 37:11,
38:16, 39:1,
39:10, 40:1,
40:2, 40:9,
60:16, 73:17,
113:13
**crossed**
27:13, 37:22,
38:7, 177:21
**crosses**
28:25, 32:6,
62:20, 144:17,
179:14
**crossing**
29:16, 30:3,
30:16, 31:1,
31:9, 37:15,
37:16, 39:4,
41:6, 41:7,
61:14, 61:24,
62:16
**crr**
1:25, 218:21
**cs**
45:7
**cubanos**
1:5, 7:23,
14:23, 15:13
**cubanos_nd_a1**
5:22
**cubanos_nd_a2**
5:23
**cubanos_nd_b**
5:24
**cubanos_nd_c1**
6:3
**current**
166:3, 178:2
**currently**
51:24, 188:20,
199:7
**cut**
124:1

**cycle**
93:5, 178:7
**cycles**
178:19

| D |
| --- |

**d2**
130:25
**data**
42:8, 42:11,
42:12, 43:6,
43:19, 43:24,
44:5, 44:6,
45:15, 45:24,
45:25, 54:1,
68:19, 71:12,
72:24, 119:15,
126:15, 132:13,
135:8, 163:3
**date**
51:3
**dated**
6:12
**dave's**
46:5, 47:13,
68:22, 69:2,
190:5, 194:1
**day**
35:11, 47:24,
218:17
**days**
208:19
**dc**
2:8
**debate**
208:19
**decided**
159:3
**deciding**
53:6
**decimal**
133:6
**decision**
21:8, 39:16,
63:11, 103:18,
110:2, 210:16
**decision-makers**
63:10

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

232

decisions
21:2, 22:8,
53:21, 63:9,
175:5
defendant's
4:23, 4:26
defendants
1:12, 2:18,
3:3, 17:12,
18:1, 18:9,
26:23, 48:4,
50:23, 216:14
define
202:13, 206:9
defined
183:23
defines
74:22, 182:3
definition
186:18
definitionally
126:11
definitions
34:14, 187:7
definitive
134:10, 161:9
definitively
157:12
degrees
138:23, 146:10,
150:9
demand
81:13
democrat
172:22, 199:5
democratic
173:11, 199:15,
199:24, 201:5
demographics
164:12, 166:4
density
148:25
department
185:13
depend
56:24, 61:8,
67:24, 161:3,
165:13, 165:22,

206:10
depended
47:21
dependent
150:13
depending
61:24, 65:18
depends
60:21, 65:24,
66:1, 68:3,
78:24, 123:20,
153:24, 165:18,
179:3
depict
184:20
depicted
185:18
deponent
217:1
deposed
13:17
deposition
1:16, 8:3,
9:20, 149:9,
163:24, 215:3,
217:3
depositions
41:10
describe
28:5, 34:19,
34:23, 35:5,
74:10, 125:15
described
20:16, 59:18,
63:7, 173:22,
184:24
describes
20:18, 185:9,
187:18
description
4:8, 5:2, 6:2,
75:16, 188:15
descriptively
34:20
design
96:7, 168:24,
181:24
designated
173:19, 173:21

designed
80:10, 84:20,
95:17, 96:15
despite
150:25
detail
20:1, 20:17,
20:19, 22:20,
95:11
detailed
83:3, 181:10
determine
77:10, 77:14,
78:8, 78:19,
98:5, 157:12,
181:5
determines
55:24, 138:13
develop
69:9
developed
68:15, 69:15,
80:13
developing
86:8
deviate
144:25
deviation
42:3
devoid
148:21
difference
37:14, 67:2,
67:22, 78:6,
78:12, 101:6,
102:4, 103:3,
117:14, 118:22,
118:25, 119:3,
132:5, 134:21,
134:23, 135:23,
138:8, 180:7,
192:20, 193:1
differences
28:8, 67:15,
81:6, 81:8,
133:19, 134:5,
134:11, 134:13,
134:16, 135:5,

177:3, 177:6
different
34:5, 34:6,
34:13, 36:6,
36:8, 36:23,
38:2, 55:10,
55:12, 58:22,
60:8, 61:22,
65:17, 65:18,
65:25, 66:21,
68:17, 70:4,
70:14, 70:21,
79:12, 83:21,
102:2, 102:5,
116:2, 116:19,
125:12, 126:25,
135:16, 140:6,
141:8, 153:1,
155:7, 161:11,
163:7, 163:12,
168:22, 169:8,
172:10, 175:1,
177:3, 177:16,
179:1, 180:1,
180:25, 181:10,
181:25, 182:1,
183:25, 187:3,
187:4, 191:16,
194:8, 205:18,
206:11
differentiate
62:4
differentiating
40:16
differently
148:24
differs
189:6
difficult
85:23
difficulty
85:17
diminishing
78:15
direction
119:4, 138:17
directly
93:24, 186:16,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

233

186:22, 187:17,
188:23, 211:5
**dis**
179:22
**disagree**
121:25, 213:2
**disagreed**
210:4
**disagreement**
210:15
**discarded**
82:20
**discrepancies**
77:5, 83:10,
174:1
**discuss**
19:13, 39:21,
39:23, 40:25,
62:11, 122:15,
122:16, 128:14,
174:25, 177:8,
187:22
**discussed**
34:14, 40:17,
48:7, 48:16,
63:20, 94:9,
100:22, 154:13,
155:5, 156:11,
158:12, 162:21,
182:25, 206:19,
211:4
**discusses**
87:21
**discussing**
123:21, 129:3,
132:4, 171:21,
187:24, 187:25,
214:7
**discussion**
26:17, 26:22,
49:8, 61:17,
103:17, 120:18,
188:15, 195:25
**dismantling**
205:9
**disparate**
29:12
**displayed**
209:1, 214:14

**displaying**
81:17
**displays**
129:7
**disproves**
167:8
**dispute**
21:6, 189:16,
189:20, 192:4
**disputing**
188:18, 188:20
**dissimilar**
55:10
**dissimilarities**
176:25, 177:11,
178:14, 178:17
**distance**
34:1
**distinction**
137:4
**distinguish**
104:4
**distribution**
29:4
**district's**
57:8, 60:15
**district-specific**
66:25
**districting**
102:9
**dived**
69:5
**divulge**
213:6
**document**
5:4, 6:10,
50:16, 50:20,
72:9, 72:10,
87:17, 88:20,
89:6, 132:20,
132:21, 132:25,
213:18, 213:20
**documents**
10:1, 10:10,
10:15, 10:24,
11:1, 210:10,
210:24, 211:1,
213:8, 215:8

**doing**
56:24, 65:24,
77:18, 128:16,
176:15
**dollar**
200:17, 201:9,
202:1, 202:9,
203:10
**domino**
40:24, 111:16
**donation**
203:8
**donations**
6:10, 201:3,
201:4, 202:9
**done**
53:13, 86:23,
104:6, 109:17,
203:5, 214:18
**double**
114:3
**down**
8:6, 80:23,
85:20, 85:21,
90:16, 99:24,
103:23, 160:1,
195:5, 206:25
**download**
10:11
**dozen**
53:18
**dr**
7:21, 11:20,
15:21, 49:9,
52:5, 54:18,
72:3, 91:6,
99:13, 99:14,
99:18, 100:2,
100:14, 101:11,
103:24, 127:13,
128:13, 174:19,
177:24, 190:4,
190:12, 190:21,
191:22, 192:21,
195:3, 196:2,
196:7, 196:14,
196:16, 197:10,
197:18, 199:2

**dra**
190:6
**drab**
48:1
**draft**
17:5
**drafted**
176:22
**drafting**
46:23, 53:16,
175:16
**drafts**
26:25, 27:12
**drama**
166:16
**draw**
17:18, 18:10,
23:19, 35:10,
35:16, 38:6,
41:12, 41:25,
42:6, 49:25,
53:3, 70:19,
98:13, 106:20,
159:5, 165:15,
172:5, 173:20,
180:21, 180:22,
183:12
**drawer**
20:15, 55:24,
98:10, 98:12,
122:9, 123:10
**drawers**
55:19
**drawing**
16:21, 18:19,
19:2, 21:4,
22:10, 23:1,
26:3, 28:23,
30:14, 34:7,
37:2, 42:9,
42:11, 42:25,
43:1, 43:7,
43:16, 43:22,
44:9, 46:4,
46:8, 46:13,
47:5, 47:6,
47:11, 47:15,
47:17, 49:21,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

234

50:3, 50:5,
52:24, 53:1,
54:1, 55:18,
63:5, 68:23,
70:12, 71:13,
72:23, 73:4,
77:7, 96:20,
97:12, 97:16,
98:25, 101:13,
102:21, 105:24,
106:14, 116:24,
122:10, 123:25,
125:6, 126:8,
148:5, 148:17,
148:20, 149:2,
163:3, 164:16,
165:14, 173:18,
174:4, 183:15
**drawn**
21:12, 24:16,
28:23, 38:2,
57:20, 83:12,
93:4, 97:21,
99:20, 139:6,
162:15, 164:20,
168:5, 168:12,
182:6, 182:13,
182:14, 182:18,
183:16
**draws**
56:19, 183:13
**drew**
27:11, 27:15,
28:15, 36:21,
56:9, 72:14,
116:16, 122:23,
126:5, 158:2,
164:3, 166:9
**due**
85:18, 120:23
**duly**
7:14
**during**
21:4, 21:20,
48:7, 128:13
**duty**
114:3
**dye**
3:12, 19:6

**E**

**e-mail**
11:14, 15:20
**each**
8:8, 13:17,
13:21, 65:16,
65:17, 66:21,
80:17, 107:4,
121:24, 130:18,
131:15, 150:12,
157:13, 158:2,
158:13, 166:24,
192:9, 193:8
**earlier**
26:25, 27:12,
28:5, 48:6,
61:17, 63:20,
73:14, 94:9,
98:4, 100:22,
149:9, 154:13,
155:5, 163:15,
163:24
**earliest**
27:14
**early**
28:16, 208:19
**easier**
34:25, 90:14
**east**
31:19, 35:12,
73:21, 147:5,
147:18, 153:7,
159:17, 169:13,
170:9
**east-west**
147:23
**eastern**
127:14, 146:25,
152:20, 204:21
**ecological**
35:3
**edge**
170:2
**edit**
198:17
**edited**
17:20

**editorial**
210:16
**educate**
20:6
**educated**
89:1
**effect**
12:10, 12:12,
40:25, 83:24,
104:1, 111:16,
178:4, 178:6,
179:25
**effects**
104:5
**effort**
93:2, 94:19
**eggs**
100:15, 100:16,
101:4, 101:5,
101:7, 101:14,
101:16, 101:20,
102:11
**either**
11:13, 43:23,
57:21, 68:22,
89:18, 105:18,
117:18, 182:23
**elected**
206:8
**election**
6:9, 44:6,
172:24, 200:11
**elections**
200:11
**electronic**
10:8
**electronically**
10:13
**eliminating**
62:19, 196:9
**elongated**
155:3
**else**
18:13, 18:15,
19:18, 32:9,
49:23, 50:5,
53:13, 65:20,
122:10, 128:19,

160:14, 197:22,
215:6, 216:13
**elsewhere**
59:25, 62:25,
157:11, 175:7,
194:17, 195:18
**emphasize**
36:23
**employs**
190:6, 194:2
**enacted**
5:16, 12:1,
12:3, 12:5,
12:11, 16:10,
28:7, 55:8,
76:23, 77:3,
77:11, 77:14,
77:15, 77:21,
79:11, 88:4,
88:13, 91:12,
91:21, 92:9,
92:12, 96:5,
96:10, 96:21,
98:25, 100:13,
111:20, 118:2,
118:11, 118:19,
119:8, 119:18,
119:25, 120:6,
120:13, 130:18,
130:23, 130:25,
131:1, 131:16,
131:19, 131:21,
133:10, 133:15,
133:20, 134:13,
135:21, 140:9,
142:22, 143:22,
143:25, 144:8,
147:19, 147:22,
155:13, 158:5,
158:23, 159:10,
160:10, 166:25,
167:8, 167:20,
168:12, 169:10,
175:1, 175:11,
178:18, 182:15,
193:9, 193:18,
197:13
**enacting**
105:18

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                              235

encounter
70:13
end
35:10, 35:11,
37:21, 43:10,
43:17, 47:24,
53:9, 53:16,
79:2, 152:22,
153:11, 159:12,
162:13, 168:15,
168:21
ended
16:25, 116:15,
117:16, 117:17
ends
144:2, 192:13
energetically
202:15
english
98:19
enlargement
137:21
enough
63:22, 64:5,
79:7, 81:5,
82:3, 127:24,
128:1, 139:20,
183:22
ensure
80:7, 145:10
entire
24:12, 162:22,
213:20
entirely
20:3, 83:21,
141:17, 142:15,
145:6, 156:8,
162:2
entirety
23:19, 155:20
equal
42:1, 111:4,
141:10, 142:8,
145:10, 146:23,
158:13
equalize
53:15
equi-populous
95:6

erased
27:17, 28:1,
116:7
errors
198:15, 198:21
esq
2:4, 2:5, 2:11,
2:19, 3:4
est
1:19
establish
97:11, 101:23,
103:3, 103:7,
103:9
establishing
53:22, 104:14,
105:7
estimate
89:1, 89:2
estimates
173:9
estuaries
32:15, 63:22
et
1:5, 33:22,
42:14
evaluate
100:25, 118:13
even
82:17, 85:25,
94:2, 101:16,
102:11, 102:20,
102:21, 103:4,
104:6, 121:1,
126:1, 126:2,
146:9, 152:2,
154:6, 154:14,
162:5, 173:4,
183:11, 193:7,
193:17, 204:2,
213:11
event
110:1, 218:15
eventually
89:24
ever
18:10, 199:10
everglades
26:9, 26:16,

26:18, 26:22,
27:6, 27:13,
27:21, 28:4,
28:17, 28:25,
29:16, 30:3,
30:11, 30:16,
30:22, 31:1,
31:9, 31:13,
31:22, 32:11,
33:11, 33:13,
33:23, 34:10,
34:11, 34:24,
35:11, 35:17,
35:18, 36:6,
36:11, 36:18,
37:1, 37:16,
39:9, 39:20,
39:21, 40:1,
40:11, 41:6,
59:6, 59:10,
60:4, 60:7,
61:18, 62:13,
62:20, 63:16,
73:18, 110:25,
177:21
every
83:5, 93:4,
93:25, 113:12,
121:16, 133:3,
181:10, 208:8,
211:10
everybody
127:20, 216:17
everyone
19:10, 54:9,
128:10, 195:9
everything
18:13, 18:15,
19:1, 34:21,
53:12
evidence
77:6, 79:5,
99:23, 102:6,
104:14, 105:6
exact
213:15
exactly
18:5, 19:9,

35:5, 35:10,
35:16, 41:25,
46:16, 53:10,
57:18, 57:19,
73:7, 73:12,
86:15, 95:6,
96:13, 97:5,
108:12, 138:20,
140:2, 146:5,
156:6, 175:21,
176:1, 176:12,
199:14, 201:1,
204:4, 215:14
exam
181:4
examination
4:5, 7:19,
65:10
examine
59:16, 76:21,
180:11
examined
7:16, 218:9
example
11:2, 26:8,
41:24, 47:17,
49:24, 61:8,
62:10, 63:15,
81:23, 98:10,
116:18, 121:22,
122:8, 123:21,
124:11, 134:20,
177:19, 179:12,
180:24, 214:8
examples
122:7, 185:11
exams
197:10
excellent
171:4
except
24:12, 199:1
exception
133:15
excerpt
213:19
excess
111:1

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                      236

excessive
155:1
excuse
152:9, 188:22,
194:22
executed
15:6
exercise
81:19, 131:13
exhibits
11:13, 23:4,
71:24, 90:2,
90:8, 170:15,
171:3, 204:6,
216:21
exist
67:6, 180:4
existing
31:6, 31:10,
40:23, 57:10,
58:1, 61:11,
110:20, 111:6
exists
62:14, 183:7
expand
61:21
expands
62:13
expect
97:22, 98:2,
165:10
expense
122:4
experience
85:15, 93:19,
93:21
expert
4:9, 4:12,
4:16, 5:7, 5:10,
6:6, 6:8, 7:25,
9:20, 13:1,
13:4, 26:24,
45:19, 56:6,
76:17, 87:9,
99:13, 184:14,
198:22
experts
17:13, 19:14,

76:20, 84:11,
198:23, 198:25
expires
218:6
explain
86:15, 114:13
explained
123:6, 180:14
explaining
56:8
explanation
193:1
explore
49:10, 49:14,
76:13
explored
37:20
exploring
16:22
expressed
206:19, 210:15,
212:5, 212:24
expresses
213:5, 214:4
expressing
208:14, 208:22
extend
139:21
extended
143:21
extending
155:6
extension
146:21
extensive
84:10
extent
27:5, 27:9,
29:4, 29:25,
40:16, 53:11,
56:21, 59:16,
60:14, 60:20,
95:6, 97:1,
97:5, 106:8,
106:24, 117:5,
131:22, 153:25,
160:6, 173:24
external
59:17

extraterrestrial
208:4
extreme
82:2
extremely
67:14, 154:24,
165:15
eye
2:7, 155:9
eyeball
88:25
eyeballing
88:23

F
face
196:23
fact
58:23, 110:9,
132:22, 135:24,
138:6, 165:25,
166:13, 167:11,
169:3, 192:5
factor
77:10, 77:13,
77:15, 78:7,
98:25, 99:20,
100:24, 100:25,
101:1, 101:13,
102:23, 103:10,
103:22, 104:12,
105:5, 137:12,
149:1, 174:3
factors
77:6, 77:20,
101:23, 102:6,
102:8, 103:5,
103:12, 103:21,
104:5, 104:8,
104:11, 104:21,
104:24, 165:23,
167:17, 180:12,
187:23
facts
29:10, 96:12
factual
212:3, 212:10
fair
9:12, 12:22,

54:1, 77:16,
77:17, 98:20,
102:16, 102:24,
121:11, 125:4,
178:15, 178:21,
210:14, 212:19
faithfully
86:9
falls
113:16, 180:18
familiar
8:4, 27:3,
64:7, 96:11,
164:11, 164:24
far
35:18, 36:1,
52:8, 88:3,
101:12, 147:8,
163:21, 166:18,
189:5, 198:21,
215:13, 215:23
fascism
206:18
fascist
206:15, 206:17,
210:2
fascists
204:15, 205:23,
209:25
faster
90:12
favor
122:3
feasible
31:6, 31:10,
32:3, 33:19,
33:20, 37:19,
56:21
feature
29:5, 33:24,
33:25, 34:8,
64:1, 64:2,
64:5, 124:16,
152:5
featured
166:16
features
29:24, 59:14,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

237

59:15, 59:18,
70:4, 76:22,
123:25, 149:1,
179:3, 180:9,
182:15, 188:1,
188:3
**february**
4:17, 24:15,
25:15, 51:3,
73:9, 110:13,
202:5
**fec**
202:10
**fed**
77:1, 83:10
**federal**
6:9, 37:4,
94:2, 200:10,
205:9, 205:10,
205:14
**feedback**
50:6
**feel**
95:1, 95:20,
132:12
**felt**
98:19
**ferrin**
4:19, 20:15,
20:18, 63:6
**fetterman**
203:10
**few**
56:2, 79:6,
153:24, 184:5,
196:22, 199:4
**fewer**
109:8, 110:7,
116:16, 117:19,
172:4, 179:17,
193:21, 193:22
**fig**
107:12, 192:5,
193:4, 196:13
**figure**
39:6, 74:6,
74:14, 74:16,
74:18, 74:25,

75:2, 75:6,
139:12, 192:20,
192:21, 204:3
**figures**
184:17, 184:20,
184:21, 185:18
**file**
11:7, 24:11,
24:15, 25:6,
28:10, 69:12,
74:17, 89:23,
110:12, 174:1
**files**
16:20, 24:23
**fill**
29:8
**filling**
47:22
**final**
17:22, 18:11,
18:14, 18:16,
46:18, 82:21
**find**
78:23, 138:16,
175:9, 175:25
**finding**
21:7, 37:21
**finds**
197:12
**fine**
8:16
**finish**
8:10, 8:11
**finished**
214:21
**firm**
10:25
**first**
7:14, 16:3,
29:7, 47:11,
56:5, 69:10,
80:2, 89:5,
137:20, 169:24,
170:9, 191:12,
209:10, 211:20
**fit**
117:21
**five**
13:14, 45:10,

80:25, 114:12,
115:4, 115:12,
116:2, 116:4,
116:15, 117:12,
117:18, 174:10,
174:11, 193:16,
193:24
**five-minute**
214:18
**fl**
2:15, 2:23, 3:8
**flagler**
2:13
**flip**
135:9
**florida**
1:2, 1:8, 1:10,
2:12, 5:5, 7:22,
12:5, 13:10,
14:5, 16:13,
20:8, 21:8,
22:4, 25:22,
27:4, 32:13,
32:14, 34:16,
36:13, 39:8,
40:8, 40:23,
41:22, 44:10,
59:25, 63:14,
63:17, 64:11,
64:14, 65:1,
65:13, 73:4,
74:13, 79:16,
82:13, 84:3,
84:8, 84:22,
85:1, 85:6,
85:12, 85:21,
86:10, 86:23,
87:21, 88:16,
93:15, 94:6,
94:12, 94:13,
95:3, 95:18,
106:9, 106:22,
109:16, 110:23,
119:10, 123:8,
124:23, 132:10,
137:22, 147:14,
172:14, 172:21,
174:1, 179:14,

184:21, 185:13,
190:7, 194:3,
216:4, 218:1,
218:5, 218:17,
218:22
**florida's**
41:20, 44:11,
45:5, 69:18,
82:15, 88:4,
91:8, 96:3,
109:10, 168:6,
194:15, 194:21,
195:16, 195:21,
197:1
**flour**
101:17, 102:14
**flow**
111:9
**flows**
147:25, 148:10
**focus**
129:11
**focusing**
167:19
**folks**
19:4, 48:16
**follow**
32:5, 106:8,
109:15, 155:20,
159:3, 162:12,
169:18, 169:22,
170:13, 179:7
**followed**
145:8, 158:11
**following**
25:22, 57:10,
57:11, 109:8,
154:25, 198:4
**follows**
7:17, 35:24,
60:19, 106:21,
141:23, 144:8,
144:15, 144:20,
144:22, 155:22,
172:8
**force**
70:19
**foregoing**
218:9

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

238

**forget**
20:13, 163:16
**form**
46:19, 97:25,
106:25, 111:24,
122:1, 125:8,
126:9, 133:23,
141:22, 151:2,
160:3, 162:18,
166:20, 178:2,
198:7, 209:16
**format**
68:16
**former**
32:7
**forms**
33:21, 159:15,
169:14
**fort**
139:16, 140:7,
141:1
**found**
81:2, 81:11,
175:18, 175:23,
176:7, 178:12
**foundation**
2:12
**four**
14:20, 14:21,
27:18, 171:25
**frackman**
2:4, 8:20,
11:3, 11:6,
11:10, 11:16,
19:5, 51:22,
54:12, 54:15,
89:10, 89:16,
89:17, 89:24,
90:4, 90:19,
90:22, 91:1,
91:3, 97:25,
106:25, 107:8,
111:24, 115:9,
115:17, 115:19,
122:1, 125:8,
126:9, 127:5,
127:23, 128:4,
128:6, 128:15,

128:19, 132:14,
133:23, 141:21,
151:2, 152:25,
156:22, 157:1,
160:3, 162:18,
171:24, 174:6,
174:10, 174:12,
174:16, 182:9,
191:6, 194:22,
198:7, 202:14,
204:2, 209:15,
209:20, 211:17,
212:15, 214:22,
216:11, 216:13,
216:23
**fragment**
126:1, 126:21,
193:3
**fragments**
123:9
**free**
132:12
**freedom**
204:16
**front**
63:9, 88:24,
153:8
**frustrated**
50:1
**fulfill**
182:19
**full**
51:15, 60:14,
60:20, 62:13,
123:20, 134:9,
213:18, 218:10
**fuller**
81:18
**fully**
9:15, 28:2,
64:1, 82:17,
106:8, 109:24,
111:16, 121:1
**function**
182:4, 182:5,
182:8, 182:12
**functions**
181:18

**fundamentally**
102:5
**further**
63:1, 73:21,
73:23, 140:5,
198:16, 216:9,
217:1, 218:12
**future**
27:10

**G**

**gables**
3:8
**gain**
188:25
**gap**
111:2
**general**
16:7, 26:17,
49:8, 56:1,
57:2, 59:23,
67:13, 73:13,
78:14, 85:4,
100:23, 103:14,
123:22
**generally**
65:7, 67:5,
70:17, 75:24,
76:15, 105:1,
135:13, 172:15,
189:1, 206:15,
216:2
**generate**
78:9, 78:25,
79:10, 79:15,
80:2, 80:17,
86:1, 87:5,
95:5, 96:2
**generated**
45:10, 76:10,
82:11, 84:2,
87:22, 88:16,
89:7, 91:7,
91:13, 92:2,
93:14, 94:6,
100:3
**generates**
72:15

**generating**
78:15, 93:5,
94:20
**gentleman**
208:4, 211:25
**geographic**
31:7, 31:17,
39:15, 58:2,
60:5, 61:13,
117:6, 123:24,
124:6, 189:22
**geographical**
27:5, 27:23,
29:13, 29:24,
31:10, 31:14,
31:22, 32:2,
32:10, 32:22,
33:13, 33:17,
34:3, 35:23,
36:13, 38:15,
39:11, 40:13,
41:7, 56:4,
56:16, 60:14,
60:19, 60:24,
61:15, 61:25,
62:17, 63:18,
70:24, 120:3,
120:6, 125:13
**geographically**
60:22
**geographicals**
59:21
**geography**
27:4, 30:11,
36:17, 47:16,
47:19, 65:18,
165:19
**gerrymandered**
167:9
**gerrymandering**
22:18, 83:15,
165:2, 165:21,
167:16
**give**
7:8, 67:7,
81:23, 89:25,
95:13, 156:20,
213:3

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

239

**given**
36:16, 40:22,
86:3, 106:22,
110:12, 110:13,
161:6, 166:3,
170:19, 179:1,
179:7, 218:16
**gives**
81:4, 181:19,
185:11
**giving**
134:2
**glades**
144:23
**go**
8:2, 11:12,
21:18, 23:5,
35:18, 41:24,
49:14, 50:11,
71:23, 74:3,
74:5, 78:15,
83:17, 86:21,
91:15, 95:10,
99:10, 99:24,
103:23, 104:9,
104:22, 106:6,
107:3, 112:5,
117:23, 119:12,
125:19, 127:9,
130:13, 131:12,
139:15, 141:1,
141:5, 143:4,
160:15, 160:24,
161:12, 173:7,
182:24, 191:3,
197:17, 200:14,
201:8, 214:19
**goal**
66:19, 70:7,
78:3, 82:25,
182:19
**goes**
35:19, 36:1,
101:11, 124:14,
147:8, 153:8,
159:21, 160:25,
162:6, 170:8,
179:23, 187:3,

192:15
**going**
13:5, 18:25,
25:21, 34:5,
34:6, 54:8,
93:20, 111:12,
113:18, 117:8,
121:16, 125:25,
128:16, 132:19,
132:22, 135:2,
135:15, 138:20,
140:2, 141:21,
142:3, 142:5,
144:6, 152:21,
157:18, 165:15,
165:17, 172:5,
181:15, 184:3,
184:8, 192:7,
201:1, 209:15,
209:16
**gone**
114:3, 161:8,
177:21, 195:5
**gonzalez**
6:7, 184:15,
184:24, 185:9,
185:21, 186:3,
186:5, 186:13,
187:13, 199:2
**good**
7:21, 52:23,
54:14, 81:11,
83:13, 91:4,
127:19, 128:6,
128:16, 174:9,
174:16, 191:1,
210:13, 214:22
**gosh**
107:12
**gotcha**
205:22
**gotten**
89:11, 89:17
**government**
204:16
**grace**
5:9, 15:7,
92:17, 93:12,

93:19, 94:17
**graduate**
80:5
**grasped**
164:8
**grayrobinson**
2:20
**great**
102:18, 182:20,
198:2, 204:14,
208:8, 211:10
**greater**
109:14, 131:22,
166:12
**grew**
201:19
**ground**
8:2, 29:10,
189:25
**group**
44:19, 129:8,
165:9
**groups**
165:16
**growing**
55:15
**guess**
36:9, 39:6,
39:12, 39:15,
59:13, 74:5,
89:1, 89:2,
93:23, 140:4,
146:4, 147:10,
147:16, 156:16,
163:6, 168:25,
172:14, 175:15,
176:3, 198:16,
202:16
**guided**
59:19

────────────
**H**
────────────
**hacked**
210:9, 213:8
**half**
95:7, 210:1
**hand**
7:4, 218:16

**hand-in-hand**
96:9
**hands**
204:15
**happen**
55:25
**happened**
19:3, 21:11,
48:12, 52:5,
178:9
**happening**
79:20, 155:4
**happy**
114:13, 114:14,
213:3
**hard**
41:20, 67:4,
69:12, 84:6,
98:2
**hard-and-fast**
62:8
**harder**
63:9, 177:5
**hardest**
84:6, 85:14
**harmonize**
71:7, 116:19
**harvard**
75:23
**head**
9:1, 13:6,
180:18, 192:8
**heading**
88:1, 91:18,
112:14
**hear**
8:18, 8:21,
194:23, 195:3
**heard**
18:4, 63:6,
195:4, 195:6,
195:7
**hears**
195:10
**heat**
71:13, 71:19
**heavily**
161:7

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                240

| | | | |
|---|---|---|---|
| **held** | 172:18 | **horizontal** | **human-drawn** |
| 125:23 | **high-end** | 138:4, 138:10 | 184:3 |
| **help** | 68:14 | **horizontally** | **hundred** |
| 53:9, 53:15, | **higher** | 150:3, 150:14 | 167:12, 215:19, |
| 76:2, 161:10 | 88:6, 88:14, | **hour** | 215:20, 215:22 |
| **helped** | 135:11, 135:20, | 54:8, 127:22, | **hvap** |
| 27:8, 75:23 | 135:24, 135:25, | 215:11 | 12:16, 43:18, |
| **helpful** | 165:9 | **hourly** | 43:19, 44:1, |
| 137:22, 180:22 | **highlands** | 215:10 | 85:3, 104:2, |
| **helping** | 144:23 | **hours** | 163:17, 163:25, |
| 85:16 | **highlight** | 215:12, 215:16, | 164:2, 164:5, |
| **hendry** | 39:10, 39:13 | 215:19 | 165:25 |
| 124:12, 192:22, | **highway** | **house** | **hvaps** |
| 192:23, 193:2, | 37:4 | 1:8, 5:3, 5:21, | 72:25 |
| 193:8, 193:17 | **highways** | 7:22, 12:2, | **hypothesis** |
| **here** | 32:19, 33:2, | 12:3, 12:9, | 126:12 |
| 8:7, 10:1, | 39:7, 40:2, | 13:8, 14:4, | **hypothesize** |
| 16:18, 22:2, | 116:12, 117:7 | 14:11, 17:1, | 125:21 |
| 22:6, 22:20, | **hillsborough** | 17:17, 17:25, | **hypothesizing** |
| 22:21, 23:5, | 152:22 | 18:1, 18:12, | 126:3 |
| 51:15, 52:9, | **himself** | 22:5, 45:7, | **hypothetical** |
| 52:22, 53:2, | 63:6 | 55:9, 70:9, | 58:17, 96:6, |
| 89:23, 93:11, | **hispanic** | 105:19, 114:22, | 154:14, 160:7, |
| 94:16, 99:12, | 12:17, 17:7, | 115:2, 115:3, | 160:18, 161:7 |
| 104:21, 105:25, | 45:24, 72:17, | 115:4, 115:25, | **hypothetically** |
| 107:7, 114:17, | 84:21, 163:5, | 116:24, 117:22, | 30:14, 71:1, |
| 118:6, 118:17, | 164:18, 166:11, | 118:7, 119:13, | 167:11 |
| 129:17, 132:4, | 167:13, 172:25 | 119:18, 120:7, | |
| 140:14, 140:20, | **hispanics** | 123:2, 166:8, | **I** |
| 145:25, 147:4, | 166:25, 172:13, | 167:19, 168:2, | **i-know-it-when-i-** |
| 158:4, 160:18, | 172:20, 173:11 | 169:18, 175:12, | **-see-it-type** |
| 162:11, 163:4, | **historical** | 175:24, 177:17, | 154:22 |
| 169:19, 182:25, | 176:4, 176:6 | 177:20, 178:19, | **idea** |
| 190:8, 191:18, | **history** | 178:23, 180:10, | 100:23, 117:1, |
| 192:16, 196:15, | 120:24 | 197:11 | 174:9 |
| 199:3, 204:23, | **hits** | **however** | **ideas** |
| 205:24, 207:24, | 169:15 | 21:24, 101:12, | 117:10 |
| 210:13, 212:12, | **hold** | 104:6 | **identification** |
| 213:25 | 107:13 | **huge** | 9:22, 15:17, |
| **here's** | **homogenous** | 165:17 | 23:7, 23:9, |
| 110:4 | 166:16 | **hull** | 50:12, 52:13, |
| **hh** | **honest** | 5:13, 42:22, | 72:6, 87:14, |
| 218:23 | 22:14, 82:18, | 66:11, 133:8 | 92:21, 99:7, |
| **hide** | 176:13, 199:13 | **human** | 132:17, 136:10, |
| 71:3 | **honestly** | 53:5, 86:14, | 140:17, 145:21, |
| **hierarchy** | 202:8 | 183:4, 183:11, | 150:18, 151:18, |
| 38:22 | **hopefully** | 183:14, 183:15, | 152:12, 167:24, |
| **high** | 100:25 | 183:17, 183:24 | 171:6, 171:9, |
| 16:15, 81:16, | | | |

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                241

171:12, 171:15,
184:11, 185:24,
190:18, 200:7,
204:8, 207:4
**identified**
168:5, 198:15
**identifies**
208:4
**identify**
53:9
**ideology**
210:2
**illinois**
85:20
**illustrative**
99:17, 99:19,
100:8, 101:14,
117:25, 118:10,
122:7, 133:10,
134:14, 134:15,
149:2, 157:8,
167:12, 197:11,
197:12
**image**
207:18
**imagine**
58:16, 60:25,
61:4, 97:12,
203:4
**immediately**
12:11, 55:5,
205:20
**impact**
34:7, 45:15,
100:25, 101:19,
104:15, 105:7,
139:5, 141:15,
143:8, 179:20
**impacted**
117:5, 151:4
**impactness**
88:21
**impacts**
117:8
**implement**
95:3
**implemented**
96:18, 111:21

**implements**
86:9
**implication**
35:14
**implications**
40:21
**importance**
40:13, 103:12
**important**
8:5, 33:12,
38:8, 38:23,
41:6, 101:16,
102:11, 102:21,
103:11, 104:11,
104:24, 158:18
**imported**
43:20, 46:7,
46:12, 47:11
**impossible**
160:9
**improve**
63:2
**improvement**
119:1
**improving**
48:10
**inaccurate**
51:19
**inaction**
196:19, 196:21
**inactive**
129:20
**inappropriate**
190:8
**include**
44:1, 44:4,
44:5, 57:21,
71:13, 75:12,
126:19, 142:5,
162:16
**included**
18:6, 20:10,
75:11, 75:14,
185:7
**includes**
58:6, 162:7
**including**
93:13, 193:3,

193:7, 210:12
**incomplete**
51:19
**inconsistent**
62:2, 62:6,
62:17, 110:10,
110:25
**incorporate**
82:18, 116:11
**incorporated**
42:18, 42:19,
98:18, 173:22,
174:3
**incorrect**
52:10, 52:22
**increase**
167:14
**increasing**
124:20
**independent**
55:23
**indicate**
71:16, 96:19,
136:24
**indicates**
119:9, 119:20,
120:7
**indication**
181:19, 183:17
**individual**
182:7, 182:13
**infer**
22:18
**inference**
30:14, 30:15,
139:10
**inferred**
30:10
**influence**
77:11, 97:12
**influenced**
77:7
**inform**
22:9
**information**
9:25, 27:8,
30:10, 50:24,
52:16, 54:2,

54:4, 77:1,
97:11, 104:15,
105:7
**informed**
27:10
**ingredients**
101:18, 102:15
**initial**
8:2, 9:20,
10:20, 16:1,
17:5, 18:7,
23:15, 46:24,
106:3, 126:16,
174:20
**inlet**
147:16
**inside**
35:9, 160:19
**insist**
39:3, 162:22
**instance**
22:3, 37:22,
39:1, 52:5,
67:19, 69:9,
76:22, 77:1,
83:20, 95:21,
113:15, 135:18,
138:2, 138:17,
154:25, 155:9,
165:10, 165:13,
165:16, 169:7,
179:5, 181:9,
192:7
**instances**
70:16
**instead**
111:9, 143:17,
144:23, 184:18
**instructed**
16:8, 21:25,
26:9, 26:15,
194:20, 195:21
**instruction**
20:10, 23:15,
24:3, 24:19,
25:15, 44:14,
44:24, 45:1,
45:4, 106:17,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    242

108:21, 139:9,
168:4
**instructions**
16:2, 16:4,
16:17, 17:2,
22:25, 24:8,
25:19, 26:2,
26:5, 29:14,
46:21, 47:2,
85:2, 86:17,
106:4, 106:9,
106:21, 109:9,
109:15, 110:10,
169:25, 170:4
**intact**
57:1
**intensely**
60:23
**intention**
168:25
**intentionally**
196:25
**intentioned**
70:25
**interact**
85:23, 104:10,
104:23
**interest**
121:3
**interested**
95:14, 218:14
**interesting**
205:19
**intermediate**
17:19, 17:24,
18:14, 18:15
**interpolitical**
35:8
**interpret**
57:17, 103:15
**interpretation**
20:16, 83:3,
125:16
**interpretations**
94:12, 125:12,
177:7, 179:9
**interpreted**
20:20, 125:22

**interpreting**
20:22, 21:3,
70:21, 84:9
**interprets**
61:21
**interrogatories**
4:24, 4:27
**interrogatory**
50:22, 52:17
**interrupt**
8:8, 89:11,
115:10
**interstate**
37:10, 37:12,
37:15, 38:8
**interstates**
60:17
**intuited**
30:23
**involve**
114:19
**involved**
15:13, 93:3,
103:13, 205:6
**involves**
84:10, 140:6
**involving**
13:7, 13:8,
13:9, 13:10,
13:12, 19:23
**irregular**
154:24
**irregularly-shap-
ed**
120:22
**issue**
22:2, 96:12,
198:18
**issued**
99:18, 148:23
**issues**
214:11
**iteration**
80:7
**iterative**
16:23
**iteratively**
55:17

**itself**
102:13, 102:22,
115:15, 125:5,
125:23, 126:6,
165:25, 166:2,
166:13, 210:21

**J**

**jacksonville**
64:3
**january**
64:17, 201:10,
201:20, 202:1
**jay**
4:19, 20:14
**jingles**
100:10
**job**
1:23, 128:16
**joe**
3:12, 19:6
**journalism**
214:11
**journalistic**
208:21, 209:8,
210:14
**judge**
151:6, 153:25,
154:7, 154:17
**judged**
110:24, 111:12
**judges**
138:16
**judgment**
56:23, 61:7,
71:10, 78:10,
81:1, 108:24,
109:23, 121:5,
137:5, 143:13,
150:12, 154:12,
162:19, 166:6,
183:5
**judgments**
56:11, 177:7
**juggling**
116:14
**july**
1:18, 5:8,

6:14, 207:9,
208:19, 218:17
**june**
64:15
**justified**
85:6
**justify**
102:7

**K**

**keep**
56:20, 58:11,
58:23, 61:10,
73:11, 117:13,
141:10, 158:13,
158:19
**keeping**
56:25, 59:9,
59:21, 60:1,
121:4, 122:4
**keeps**
31:16, 57:4,
58:6, 172:6
**kept**
59:11
**keys**
64:21, 161:6
**keyword**
37:18
**kind**
18:13, 29:15,
29:19, 34:18,
53:15, 64:3,
67:6, 69:12,
72:14, 75:15,
78:4, 78:21,
82:10, 97:7,
116:2, 118:15,
126:3, 130:17,
134:22, 134:24,
137:12, 137:21,
140:11, 144:5,
150:25, 153:12,
153:21, 153:24,
157:11, 159:15,
159:17, 164:22,
179:6, 180:13,
213:23

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                   243

**kississimme**
64:7, 147:25,
148:4, 148:10,
148:18, 149:4
**knew**
44:20
**knowing**
119:2, 119:3,
125:2
**knowledge**
19:16, 48:2,
52:4, 105:22,
163:18, 166:3,
198:24
**known**
44:16
**knows**
173:5
**krome**
189:11

**L**

**labeled**
157:5, 158:4,
192:10
**lack**
29:5, 35:2,
166:20
**lag**
46:18
**lake**
34:21, 35:20,
36:2, 64:9,
124:14, 124:19,
201:22
**lakes**
63:21, 64:6,
120:23
**lands**
148:11
**language**
20:9, 61:19
**large**
34:11, 64:6,
81:16, 103:4,
117:6, 161:24
**larger**
30:6, 33:24,

67:18, 82:15,
104:5, 117:20,
134:12, 142:4,
161:23, 181:20
**last**
51:8, 64:14,
90:24, 91:20,
104:20, 105:2,
163:14, 173:4,
173:10
**later**
23:1, 28:11,
198:9, 198:10
**latest**
156:14
**latitude**
111:10
**latter**
24:22, 56:11
**lauderdale**
139:16, 140:7,
141:1
**law**
56:7, 56:13,
61:2, 125:24,
126:2, 190:7,
194:3, 213:17
**laws**
22:8, 93:7,
93:16, 94:1,
94:22, 205:10,
205:14
**lawyers**
15:11
**leading**
17:24
**league**
194:8
**leaning**
173:1
**learn**
204:5
**learning**
156:20
**least**
11:23, 43:20,
44:9, 57:25,
74:9, 80:19,

82:5, 82:14,
96:19, 102:8,
113:6, 118:1,
126:24, 141:19,
155:9, 163:10,
166:24, 173:10,
193:9, 208:6
**led**
25:10, 93:2,
94:20
**left**
55:2
**left-winger**
82:2
**legal**
56:7, 95:1,
96:11
**legislative**
43:13, 76:1
**legislators**
105:23
**legislature**
12:5, 43:9,
43:12, 56:19,
72:15, 105:18,
119:10, 119:21,
120:5, 122:10,
124:22, 125:3,
125:5, 125:11,
125:22, 126:5,
126:6, 159:3,
159:23, 162:12,
175:1, 176:10,
180:5, 189:6
**legislature's**
21:19, 46:8,
46:13, 47:5,
47:6, 68:23,
69:11, 120:8,
139:24, 140:1,
140:23, 141:2,
175:19, 176:7
**legislatures**
177:1
**less**
38:23, 66:17,
85:5, 109:1,
137:14, 138:1,

142:11, 142:17,
142:19, 143:15,
166:14, 215:22
**lesser**
106:24
**let's**
12:24, 23:11,
23:21, 41:25,
44:23, 50:9,
56:15, 60:12,
65:3, 66:6,
71:21, 74:2,
74:5, 92:15,
99:10, 103:23,
106:2, 106:6,
106:14, 107:3,
112:5, 113:21,
117:23, 128:2,
128:3, 128:4,
130:13, 131:4,
131:12, 132:1,
136:4, 136:6,
136:17, 140:9,
141:14, 145:18,
149:8, 151:15,
156:13, 174:8,
174:14, 191:1,
197:17, 197:18
**let's-**
8:22
**letter**
16:2, 16:8,
20:11, 20:12,
20:13, 23:15,
24:3, 24:19,
44:24, 45:1,
45:4, 139:9,
168:4
**letters**
26:1, 44:14
**level**
16:15, 22:20,
47:18, 47:19,
47:25, 79:13,
81:16, 95:20,
172:18
**levels**
175:13

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

244

library
69:5
likely
97:15
likewise
8:17, 105:2,
119:16, 151:8,
178:16, 182:2
limitation
84:16, 185:6
limitations
126:7
limited
30:5, 197:14,
197:22
limits
41:7
line
93:1, 110:22,
113:24, 134:20,
134:24, 139:20,
155:22, 156:2,
156:3, 189:6,
194:12, 195:13,
196:10
line-by-line
188:24
linear
33:24, 34:8,
36:7, 59:2,
59:4, 59:5,
59:14, 59:15,
60:11, 63:14,
63:19
lines
54:4, 54:21,
94:19, 114:7,
155:21, 189:20
link
90:10
list
48:15, 182:24
listed
192:5
lists
124:8, 187:2
literally
41:18

literature
120:1
litigate
64:19
litigation
7:24, 13:1,
18:2, 21:23,
22:13, 51:1,
66:8, 69:18,
76:20, 83:8,
83:20, 84:10,
85:9, 85:11,
92:17, 95:22,
95:24, 103:19,
178:9
little
26:20, 39:23,
56:22, 70:18,
124:13, 142:24,
146:18, 147:2,
147:23, 148:12,
148:19, 154:2,
164:7, 166:14,
172:16, 173:8,
197:24
live
149:3, 161:18,
172:13, 199:7
lived
64:25
llp
2:6
load
90:12, 181:9
loaded
16:20, 43:9
local
13:24, 60:23,
83:4, 165:18,
166:4, 166:19,
188:1
localized
81:10
locally
70:5
located
140:5, 161:19,
188:2, 201:20,

205:16
location
49:19
long
39:21, 86:16,
133:2, 173:7,
183:1
longer
103:7, 144:19,
147:19, 147:23,
154:14
look
11:6, 20:1,
21:19, 21:23,
21:25, 23:12,
23:21, 43:6,
44:23, 49:9,
50:9, 50:16,
51:9, 52:11,
57:7, 62:9,
62:24, 67:5,
68:4, 70:17,
71:21, 71:22,
72:16, 74:2,
87:24, 96:14,
106:2, 107:7,
110:3, 110:4,
114:14, 114:16,
117:8, 124:12,
130:14, 132:9,
136:4, 136:17,
138:21, 139:12,
139:22, 140:9,
140:11, 149:8,
149:24, 150:21,
151:10, 151:15,
151:21, 152:15,
154:16, 154:20,
156:13, 157:10,
159:10, 160:13,
163:2, 170:22,
171:17, 176:19,
176:25, 177:5,
181:5, 186:2,
188:12, 197:19,
200:12, 205:19,
207:1
looked
22:3, 23:15,

25:5, 26:1,
27:15, 28:6,
29:9, 43:2,
69:3, 119:14,
148:16, 151:11,
156:14, 158:24,
158:25, 170:17,
176:9
looking
71:15, 102:7,
107:9, 115:10,
115:13, 131:5,
131:13, 135:16,
152:24, 152:25,
154:18, 155:13,
156:24, 157:2,
159:22, 169:10,
178:20, 188:7,
191:25, 194:4,
204:6
looks
16:1, 99:12,
104:16, 105:8,
127:9, 154:11,
170:2, 201:12,
202:7, 204:23
lost
107:13
lot
34:1, 83:6,
83:16, 103:16,
130:10, 146:23,
147:1, 170:25,
172:23, 189:25,
205:7, 205:8
lots
42:6
louisiana
13:7, 13:8,
14:4, 14:6,
85:24, 99:4
low
79:2, 137:3,
163:17
lower
130:6, 130:25,
133:14, 135:11,
135:21, 135:24,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                245

136:1, 164:1
**lucie**
144:21, 156:4,
156:5, 159:13,
162:13, 162:14
**lumped**
85:5
**lunch**
127:4, 127:16

**M**

**made**
17:22, 24:5,
25:7, 39:14,
46:21, 47:1,
47:9, 47:12,
49:16, 53:21,
62:25, 63:11,
73:21, 73:22,
100:14, 101:5,
101:6, 101:20,
109:23, 162:19,
175:5, 176:11,
177:15, 179:9,
180:23, 192:16,
200:16, 201:10
**magic**
70:6
**magnitude**
118:25, 136:2
**mainly**
99:21
**maintain**
141:24, 142:2,
144:13, 145:8,
156:1, 157:24
**maintained**
159:24
**maintenance**
156:10
**major**
29:13, 32:14,
32:16, 32:19,
32:20, 32:23,
33:4, 34:1,
37:4, 39:7,
40:2, 40:5,
60:16, 116:11,

185:10, 185:15,
186:7, 186:14,
187:15, 188:9
**majority**
104:2
**make**
8:12, 9:3,
12:6, 12:13,
39:25, 45:9,
46:14, 47:3,
47:4, 48:25,
51:12, 56:12,
70:13, 109:14,
112:11, 115:15,
121:12, 122:11,
122:22, 123:18,
124:8, 132:14,
132:20, 134:10,
137:4, 161:8,
166:6, 167:15,
168:11, 170:5,
171:23, 175:3,
176:19, 179:21,
182:20, 187:19,
190:16, 202:4,
212:21
**maker**
110:2
**makes**
33:12, 103:18
**making**
45:16, 56:23,
100:7
**man-made**
32:17
**manatee**
157:25
**mandate**
32:7
**mandated**
111:15
**mandates**
106:10, 106:23,
109:10, 109:16
**manpower**
83:2
**manrara**
3:4

**many**
38:1, 39:7,
40:4, 41:21,
49:12, 55:19,
78:8, 80:17,
80:24, 82:16,
82:19, 83:9,
92:5, 107:3,
107:6, 110:18,
112:18, 134:12,
149:3, 163:11,
165:14, 170:21,
193:9, 206:20,
206:23, 215:12,
215:15
**map-and-data**
72:14
**map-drawing**
81:19
**march**
4:10, 51:5,
200:16, 202:25,
203:7
**margin**
35:16, 146:3
**margins**
35:10
**mark**
73:20
**marked**
9:22, 15:17,
23:7, 23:9,
50:12, 52:13,
72:5, 87:13,
92:20, 99:6,
132:16, 136:9,
140:16, 145:20,
150:17, 151:17,
152:11, 156:17,
157:23, 167:23,
171:5, 171:8,
171:11, 171:14,
184:10, 185:23,
190:15, 190:17,
200:6, 204:7,
207:3, 210:25
**marks**
170:2

**martin**
144:20, 156:4,
159:14, 162:14
**match**
185:12
**materials**
20:5, 20:21,
20:23, 22:7
**mathematical**
65:8, 65:15,
65:23
**matter**
16:2, 21:9,
35:9, 142:8,
213:2
**matters**
212:3
**maximum**
70:7
**maybe**
41:10, 43:10,
49:11, 54:10,
63:8, 65:4,
79:2, 90:14,
97:18, 112:2,
122:15, 137:6,
152:22, 163:16,
163:22, 164:7,
164:8, 168:25,
174:6, 175:18,
176:20, 181:1,
192:12, 194:24,
204:5
**mayor**
208:5, 212:1
**mayoral**
210:8, 210:20
**mccartan**
1:16, 4:3,
4:10, 4:13,
4:17, 5:8, 5:11,
6:5, 6:11, 6:15,
7:13, 7:21,
11:20, 15:21,
49:9, 54:18,
72:3, 91:6,
127:13, 128:13,
174:19, 195:3,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

246

| | | | |
|---|---|---|---|
| 196:2, 209:18 | **meetings** | 135:18, 138:18, | 103:4, 107:17, |
| **mean** | 48:13 | 198:5, 198:11 | 112:2, 125:11, |
| 19:4, 26:14, | **megabytes** | **miami** | 127:19, 134:16, |
| 33:1, 57:18, | 89:22 | 2:15, 13:9, | 147:10, 153:6, |
| 58:5, 60:22, | **megs** | 15:5, 15:7, | 154:16, 174:2, |
| 61:16, 68:3, | 90:17 | 22:5, 25:11, | 176:18, 180:13, |
| 70:4, 88:13, | **members** | 64:18, 64:21, | 180:14, 180:25, |
| 88:14, 88:20, | 105:23, 206:4, | 114:12, 115:6, | 181:6, 214:21 |
| 98:2, 112:21, | 206:6 | 116:1, 116:3, | **million** |
| 150:11, 154:7, | **memo** | 116:16, 117:11, | 82:1 |
| 154:21, 159:22, | 20:13, 20:16, | 117:15, 117:17, | **mind** |
| 172:21, 177:3, | 23:13, 23:18, | 117:20, 142:20, | 32:10, 37:15, |
| 177:15, 186:23, | 28:17, 59:20, | 162:5, 184:22 | 42:20, 61:14, |
| 202:9, 202:19, | 61:20 | **miami-dade** | 62:22, 112:1, |
| 209:12, 209:23, | **memorandum** | 26:10, 98:14, | 198:21, 206:2, |
| 212:10, 212:12 | 4:19 | 117:13, 117:16, | 209:9 |
| **meaningful** | **memory** | 141:17, 141:19, | **mine** |
| 67:3, 67:9, | 172:3 | 141:20, 142:4, | 163:16 |
| 67:10, 67:19, | **memos** | 142:6, 142:14, | **minimizes** |
| 67:24, 133:22, | 22:8 | 142:15, 142:21, | 169:24 |
| 133:25, 134:4, | **mention** | 145:7, 149:17, | **minimum** |
| 134:6, 134:17, | 44:14, 188:1, | 156:8, 159:6, | 86:16, 109:5, |
| 134:23, 135:7 | 210:22, 210:24 | 159:20, 160:20, | 110:5, 110:17 |
| **means** | **mentioned** | 161:2, 161:15, | **minor** |
| 88:6, 89:2, | 15:4, 17:15, | 161:19, 162:1, | 185:10, 185:15, |
| 105:11, 125:13 | 19:20, 19:21, | 162:2, 162:3, | 186:6, 186:13, |
| **meant** | 23:13, 48:6, | 162:8, 162:16, | 187:14, 188:8 |
| 83:3, 103:17 | 53:25, 116:22, | 162:24, 164:11, | **minorites** |
| **measure** | 120:11, 141:6, | 172:14, 179:23 | 85:5 |
| 65:23, 65:25, | 177:25, 194:9, | **miami-dade's** | **minority** |
| 66:2, 66:11, | 211:1 | 142:10, 142:17 | 44:12, 44:18, |
| 66:12, 88:10, | **mentioning** | **mic** | 45:5, 71:16, |
| 91:12, 92:7, | 78:4 | 194:25 | 139:7, 168:6 |
| 97:6 | **mentions** | **middle** | **minus** |
| **measured** | 188:14, 188:19 | 110:22, 113:22, | 78:1, 89:4 |
| 135:16 | **met** | 147:25, 148:9 | **minute** |
| **measures** | 208:24 | **might** | 51:17, 199:3 |
| 65:9, 65:15, | **methodology** | 10:24, 12:15, | **minutes** |
| 78:18, 124:21 | 100:13 | 12:20, 27:20, | 54:10, 127:10, |
| **measuring** | **methods** | 36:22, 47:9, | 127:22, 127:24, |
| 65:19, 65:20, | 173:6 | 55:14, 63:25, | 174:10, 174:11, |
| 92:5, 104:1 | **metric** | 64:4, 66:21, | 174:14 |
| **media** | 77:3, 92:8, | 66:22, 67:8, | **mischaracterizes** |
| 203:17, 213:18 | 102:4, 103:4, | 71:5, 72:1, | 212:16 |
| **medium** | 130:11 | 73:10, 74:1, | **missed** |
| 169:8 | **metrics** | 79:7, 81:8, | 174:2 |
| **meeting** | 68:17, 68:19, | 81:10, 98:9, | **misspoke** |
| 215:4, 215:9 | 69:9, 95:14, | 102:12, 103:2, | 92:10 |

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

247

mistake
192:16
misunderstanding
119:2
modifications
25:17
modified
45:13, 45:25
modify
24:20
modifying
25:13
moment
19:11, 46:12,
125:1, 131:8,
169:4, 191:24
monroe
159:20, 160:6,
160:11
montana
41:24, 42:5
month
28:13
monthly
215:24
months
16:24, 17:10,
28:10, 206:14
more
20:1, 20:17,
20:19, 29:9,
32:7, 33:12,
35:22, 38:23,
39:23, 41:5,
41:11, 54:24,
55:9, 55:15,
55:17, 56:2,
57:5, 70:18,
73:8, 78:10,
78:11, 78:13,
78:14, 78:16,
80:20, 81:8,
81:10, 82:6,
82:15, 82:19,
88:5, 88:6,
92:6, 93:18,
93:21, 94:10,
95:11, 101:15,

104:13, 105:6,
109:1, 109:21,
112:24, 113:4,
121:13, 134:21,
137:14, 139:4,
142:9, 142:20,
142:21, 143:3,
143:20, 144:5,
146:2, 146:18,
147:2, 148:7,
154:2, 158:18,
164:21, 166:19,
166:24, 167:13,
173:11, 181:16,
186:10, 192:14,
193:12, 193:15,
193:17, 193:21,
193:24, 199:4,
207:1, 209:21,
215:18, 215:20
morning
7:21, 10:2
most
19:2, 74:9,
76:20, 82:1,
120:22, 144:16,
153:12, 206:4,
206:6, 206:16,
206:20
mostly
55:3, 56:11,
95:14, 215:24
motivated
61:17, 105:22
motivations
105:18
motive
100:5
mountains
32:12
move
141:20, 142:3,
142:13, 143:10,
145:6, 145:8,
162:1
moved
53:19, 141:9,
141:17, 142:14,

142:19, 142:24,
143:16, 156:8,
168:16
movement
111:4, 140:4,
141:7, 143:2
moving
158:12, 159:18
much
11:17, 40:21,
67:18, 73:11,
117:20, 148:3,
161:21, 161:23,
164:8, 174:9,
208:18, 210:5,
214:23
multiple
103:25, 104:10,
104:23, 117:7,
117:12
municipal
42:16, 118:1,
124:5, 126:20,
172:8, 173:25,
189:17
municipalities
56:21, 59:4,
59:7, 61:10,
110:8, 112:22,
113:1, 113:3,
116:11, 117:13,
117:15, 118:12,
119:9, 120:12,
120:19, 120:21,
120:22, 121:2,
121:7, 121:12,
121:18, 121:19,
122:5, 122:19,
125:25, 126:18,
173:23, 185:5,
194:5
municipality
43:15, 57:4,
57:21, 58:6,
58:7, 58:11,
58:18, 58:19,
58:24, 112:23,
112:25, 113:8,

113:20, 114:1,
114:4, 114:7,
122:20, 123:15,
126:19
must
55:19, 57:9,
141:19, 202:10
myers
2:6
myself
43:11, 69:7,
80:5, 169:19,
206:1, 210:12

N

n-a-i-r-n-e
14:13
nairne
5:12, 14:12
name
7:21, 18:24,
63:16, 95:22,
146:24, 188:14,
188:19
named
189:8, 207:24
names
156:21
narrow
124:13, 125:14
nation
83:1, 95:12
national
25:25, 34:12,
54:3, 84:16,
124:5
nationalism
210:1
nationally
83:15
nationwide
82:25
natural
27:10, 29:5,
31:18, 40:7,
63:14, 63:18,
123:24, 156:12,
194:19, 195:19,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

248

| | | | |
|---|---|---|---|
| 196:4 | neutral | nonsensical | notwithstanding |
| **nature** | 165:10 | 179:6 | 124:23, 137:10, |
| 27:8, 27:23, | **never** | **nonspeaking** | 138:4, 153:21 |
| 34:3, 49:13, | 19:23, 22:3, | 212:21 | **number** |
| 49:20 | 26:15, 37:1, | **north** | 4:8, 5:2, 6:2, |
| **navigate** | 37:22, 38:7, | 35:18, 36:2, | 23:5, 23:6, |
| 86:15 | 64:25, 85:13, | 73:23, 139:2, | 23:23, 37:20, |
| **near** | 208:24 | 139:16, 141:1, | 61:22, 63:1, |
| 147:13, 168:15 | **new** | 141:4, 141:12, | 68:17, 78:19, |
| **nearby** | 24:8, 24:11, | 142:25, 143:3, | 78:22, 79:25, |
| 62:21 | 24:14, 25:6, | 143:4, 143:14, | 80:23, 81:16, |
| **necessarily** | 28:10, 46:20, | 143:16, 144:7, | 85:18, 104:2, |
| 44:21, 94:2, | 47:1, 207:16, | 144:12, 144:16, | 108:17, 110:5, |
| 103:20, 104:10, | 208:5, 208:13, | 148:7, 156:9, | 112:16, 112:18, |
| 104:23, 166:6, | 209:3, 210:8, | 159:18, 168:21 | 113:3, 113:19, |
| 208:15, 208:22 | 210:20, 212:1, | **north-south** | 130:6, 151:16, |
| **necessary** | 212:17, 214:6, | 110:21 | 156:23, 184:3, |
| 106:8, 109:15, | 214:10 | **northern** | 190:25, 192:9, |
| 110:16, 115:17 | **news** | 143:19, 143:21, | 193:19, 193:23, |
| **necessitate** | 25:25 | 144:1, 144:2, | 203:6 |
| 34:5 | **next** | 144:9, 146:13, | **numbered** |
| **need** | 15:15, 50:10, | 149:17, 152:3, | 190:24 |
| 9:4, 51:11, | 129:6, 132:23, | 155:21, 156:5, | **numbering** |
| 80:24, 81:8, | 152:10, 194:11, | 157:24, 159:2, | 191:4 |
| 81:10, 81:15, | 204:6, 208:5, | 159:12, 160:1, | **numbers** |
| 82:1, 97:9, | 212:1 | 162:13, 168:15, | 52:8, 55:6, |
| 102:6, 103:8, | **nexus** | 170:8, 171:19 | 69:4, 69:8, |
| 103:9, 103:11, | 205:8 | **northward** | 119:5, 126:24, |
| 127:10, 166:19, | **nicaraguan** | 143:10 | 133:2, 134:9, |
| 188:12 | 54:4 | **northwest** | 135:11, 135:14, |
| **needed** | **nicholas** | 137:11 | 140:1, 191:19 |
| 16:12, 108:18 | 2:11, 19:5 | **notarial** | **numerical** |
| **needing** | **nobody** | 218:16 | 78:18, 138:14, |
| 158:12 | 128:19 | **notary** | 181:8 |
| **needs** | **nodding** | 218:4, 218:21 | **nw** |
| 111:2, 111:3, | 9:1 | **note** | 2:7 |
| 139:18 | **nomenclature** | 179:12 | **nyt** |
| **negative** | 11:21, 54:19, | **noted** | 207:12, 207:16 |
| 98:3 | 54:22 | 194:13, 195:14 | |
| **neither** | **nominee** | **notes** | **O** |
| 218:12 | 199:16 | 214:19 | **o'melveny** |
| **neogenesis** | **non** | **nothing** | 2:6, 19:8, |
| 213:9 | 199:13 | 7:9, 7:16, | 216:2 |
| **net** | **non-argumentative** | 52:9, 52:22, | **oath** |
| 111:3 | 212:22 | 58:20, 85:20, | 9:9 |
| **network** | **non-compact** | 85:21, 112:1, | **object** |
| 203:17, 203:25, | 39:2, 153:16 | 180:18, 198:21 | 97:25, 106:25, |
| 213:18 | **non-convex** | **noticed** | 111:24, 122:1, |
| | 155:2 | 54:19, 177:2 | |

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

249

**133:23, 141:21,**
151:2, 182:9,
182:10, 198:7,
209:16, 211:17
**objection**
125:8, 126:9,
160:3, 162:18,
209:21
**objections**
212:22
**observed**
85:4, 111:19
**obvious**
160:7, 177:18
**obviously**
25:2, 38:1,
39:7, 52:2,
85:5, 103:17,
154:25, 178:1,
179:5, 188:2,
202:14, 208:23
**occasion**
87:1
**occupies**
34:15
**occur**
123:4
**ocean**
147:5, 159:16
**october**
4:21
**off-the-record**
195:25
**offered**
99:14, 99:19,
100:8
**offering**
36:4, 56:6,
98:24, 105:16,
119:7, 119:24,
120:4, 135:2,
135:4, 173:12,
188:22, 189:3,
189:8
**offers**
135:25
**offices**
199:13

**official**
1:9, 200:1
**officially**
199:13
**officials**
206:8, 206:21
**often**
84:10, 123:22,
187:25, 188:2
**oh**
43:1, 89:21,
107:10, 114:24,
128:25, 170:18,
176:2, 190:1
**ohio**
85:16
**ojeda**
2:5, 19:5
**okeechobee**
34:22, 35:20,
36:2, 64:9,
124:15
**once**
35:21, 87:16,
92:6, 110:23,
114:2, 114:5,
140:12, 140:19,
142:13, 208:8,
211:10
**one**
11:13, 13:9,
13:10, 13:11,
14:9, 24:24,
27:14, 32:5,
32:13, 41:20,
52:17, 54:24,
55:13, 55:23,
57:6, 62:10,
65:16, 65:17,
66:13, 67:16,
70:1, 73:8,
73:10, 78:1,
78:6, 78:7,
80:13, 85:14,
86:6, 86:13,
89:12, 93:2,
93:25, 94:19,
96:22, 98:2,

99:4, 104:10,
104:11, 104:23,
104:24, 110:14,
111:2, 112:24,
113:23, 113:24,
114:3, 114:4,
122:19, 123:9,
123:17, 125:2,
130:8, 131:8,
133:3, 135:16,
145:18, 159:7,
160:8, 163:16,
163:25, 164:12,
165:16, 166:6,
166:20, 167:5,
168:3, 173:1,
173:5, 181:15,
186:9, 191:24,
192:14, 193:11,
200:16, 202:1,
202:8, 204:11,
207:1, 208:25
**one's**
58:18, 58:20
**one-sentence**
212:7
**ones**
14:2, 22:24,
59:19, 72:1,
73:8, 77:20,
96:23, 157:14,
187:6, 196:7,
196:8
**only**
24:8, 24:24,
42:1, 42:4,
57:18, 59:24,
78:6, 103:10,
109:17, 110:14,
139:11, 139:22,
141:12, 149:16,
163:18, 164:7,
187:19, 188:6,
192:19, 192:25,
199:25
**open**
10:16, 50:14,
63:22, 87:16,

140:19, 199:21,
207:7
**open-source**
69:5
**operation**
75:22
**opined**
186:6, 186:13
**opining**
118:24
**opinion**
34:18, 36:3,
36:4, 37:1,
56:6, 58:25,
62:18, 63:13,
69:16, 69:21,
81:24, 82:4,
98:24, 99:14,
99:19, 103:19,
109:1, 111:7,
112:3, 119:7,
119:24, 120:4,
124:24, 134:2,
134:10, 135:4,
135:10, 135:22,
136:25, 159:4,
159:8, 164:15,
172:20, 173:13,
180:25, 186:25,
188:22, 189:4,
206:18, 206:22,
206:24, 209:7,
211:21, 212:4,
213:4, 214:9
**opinions**
99:13, 105:17,
189:8, 212:24
**opposed**
39:10, 53:2,
53:3, 54:24,
182:13
**option**
63:3
**options**
16:22, 63:8,
108:25, 110:2,
172:5, 183:8
**orange**
218:2, 218:22

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

250

order
49:25, 51:12,
55:16, 67:15,
71:23, 103:9,
121:12, 121:14,
124:8, 213:20
ordering
216:18
organized
205:1
organizing
205:6
orientation
138:5, 138:10,
138:19, 150:14,
153:22
oriented
150:2
origin
54:3, 172:25
original
109:4, 165:12,
192:11
originally
116:7
orlando
64:8, 64:22,
218:17
other
8:8, 8:9,
10:15, 10:17,
11:12, 13:24,
16:11, 17:18,
18:11, 19:7,
19:14, 20:23,
21:15, 21:19,
21:22, 22:7,
26:4, 32:14,
33:13, 33:21,
36:12, 37:23,
38:15, 39:11,
39:14, 40:5,
40:7, 40:13,
41:7, 43:6,
47:19, 48:15,
50:6, 52:9,
56:25, 57:1,
57:3, 58:20,

59:19, 62:1,
62:15, 62:25,
63:13, 71:14,
77:20, 86:7,
92:7, 94:14,
101:17, 102:8,
102:14, 103:5,
103:6, 103:12,
103:20, 104:1,
104:3, 104:8,
109:13, 109:19,
111:2, 116:10,
116:11, 116:16,
117:12, 117:15,
121:10, 121:24,
124:6, 129:23,
129:25, 130:6,
130:11, 130:21,
139:19, 141:18,
141:24, 142:10,
142:16, 148:22,
154:2, 164:3,
164:13, 166:7,
167:6, 167:17,
170:7, 173:2,
178:13, 178:19,
187:22, 188:1,
188:2, 188:25,
191:3, 194:14,
195:15, 198:23,
200:3
others
63:16, 66:14,
66:17, 104:5,
117:18, 134:12
otherwise
9:7, 44:16,
165:10, 218:14
out
29:24, 39:6,
53:11, 55:16,
62:22, 66:13,
69:24, 70:2,
71:23, 73:14,
73:20, 81:6,
81:18, 81:25,
85:16, 92:1,
141:20, 162:3,

168:16, 175:4,
180:3, 180:9,
195:7, 196:17,
204:3, 205:7,
213:2
outline
38:11
output
69:12, 77:13
outranked
91:12
outside
25:7, 27:17,
28:1, 48:13,
52:6, 55:4,
74:16, 74:24,
96:16, 142:5,
215:9, 215:21
over
8:2, 8:8,
16:24, 17:20,
17:21, 24:20,
26:10, 58:21,
72:2, 93:5,
94:20, 104:8,
179:14, 194:25,
208:8, 211:10,
214:19
overall
55:4, 66:4,
70:6, 109:2,
148:25, 173:1
overlap
22:1, 122:24,
148:14
overlaps
35:8
overlay
184:22
own
69:13, 189:7

| P |
| --- |

p-o-l-s-b-y-p-o--
p-p-e-r
66:12
pa
203:10

pa'lante
1:5, 7:23
package
72:14
packing
164:23, 164:25,
165:4
page
4:3, 4:8, 5:2,
6:2, 51:2,
51:10, 72:16,
74:6, 87:18,
87:20, 87:24,
89:5, 90:12,
90:22, 90:25,
91:6, 91:16,
115:10, 115:20,
117:23, 128:21,
129:6, 129:14,
129:18, 135:6,
137:20, 161:12,
174:22, 190:21,
190:23, 191:2,
191:4, 191:9,
191:13, 192:1,
196:14, 196:16,
197:18, 201:8,
201:25, 202:4,
202:24, 203:9,
211:4, 213:15,
213:16, 214:8
pages
1:24, 190:24
paid
215:23, 215:25
palm
143:21, 156:4,
159:14, 162:14
pamphlet
199:23
paper
80:14, 213:6,
213:9
papers
69:9
paperwork
15:6
paragraph
44:25, 45:22,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                             251

| | | | |
|---|---|---|---|
| 74:3, 91:20, 92:24, 94:16, 99:10, 99:24, 101:10, 103:23, 103:24, 106:6, 106:7, 112:8, 117:24, 122:14, 128:24, 128:25, 132:1, 132:3, 190:2, 190:4, 191:11, 191:12, 192:1, 193:25, 194:9, 194:11, 195:12, 196:3, 196:24, 197:9, 197:24, 198:3, 198:4, 198:10, 198:17 **paragraphs** 120:10, 120:15 **parallels** 180:22 **park** 34:13, 205:18 **part** 39:19, 57:13, 57:15, 58:22, 59:19, 67:16, 74:5, 79:9, 79:19, 81:21, 82:12, 84:2, 84:8, 85:1, 86:20, 87:4, 87:7, 93:3, 129:14, 141:20, 145:14, 147:15, 153:12, 154:1, 154:10, 159:6, 170:3, 174:22, 176:22, 178:10, 180:6, 181:3, 184:13, 204:25, 205:14, 208:4, 210:1, 210:4, 211:15, 211:21, 211:24, 212:13 **partially** 161:1 | **particular** 35:3, 56:13, 61:25, 62:10, 64:1, 73:4, 74:14, 75:6, 76:10, 76:22, 77:10, 78:3, 81:9, 81:19, 83:12, 83:17, 83:18, 94:25, 97:15, 97:23, 98:6, 100:24, 104:13, 105:5, 117:1, 117:10, 122:6, 132:11, 135:17, 138:9, 160:7, 169:1, 172:6, 172:11, 188:7, 188:25, 203:19, 203:21, 208:17, 210:16, 212:6, 212:11 **particularly** 66:18, 70:3, 117:4, 148:2 **parties** 97:4 **partisan** 68:19, 95:13, 199:19, 200:2 **partisanship** 165:6 **partly** 60:5, 61:16, 120:23 **parts** 22:19, 40:8, 43:18, 59:12, 65:17, 66:22, 108:21, 109:20, 109:21, 124:3, 165:14 **party** 199:17, 199:24, 199:25, 200:1, 201:5, 206:4, 206:7, 218:14 **passed** 213:9 | **past** 41:10, 170:5, 177:20, 178:19 **patterns** 164:11, 166:4 **payment** 201:2 **payments** 216:3 **pdf** 69:12 **peculiar** 180:12 **pending** 9:5 **peninsula** 155:8 **peninsulas** 116:13 **penn** 205:16, 205:17 **pennsylvania** 199:6, 199:8, 203:11 **people** 19:22, 35:19, 48:5, 53:18, 60:1, 60:4, 60:9, 81:3, 81:12, 82:1, 82:5, 138:15, 149:3, 161:18, 179:17, 203:21, 203:23, 205:7, 206:17, 213:20 **percent** 60:15, 72:19, 72:20, 88:5, 95:7, 95:8, 130:21, 130:22, 130:23, 131:17, 131:18, 131:19, 164:1, 164:6, 164:18, 165:13, 165:17, 166:1, 166:12 **perfect** 140:21 | **performance** 118:10 **performed** 182:6 **performing** 18:18 **perhaps** 46:17, 182:14 **perimeter** 58:8, 60:15, 130:2, 131:11 **period** 17:21 **periods** 74:16 **permutations** 160:23 **person** 42:2, 110:3, 182:18, 208:23, 210:15, 210:17 **personal** 52:4, 105:22 **personally** 67:8 **persuasion** 203:22 **persuasions** 203:24 **ph** 1:16, 4:3, 4:10, 4:13, 4:17, 5:8, 5:11, 6:5, 6:11, 6:15, 7:13, 76:6 **phase** 21:5, 80:9 **phone** 48:23 **pick** 47:22, 70:8, 181:25 **picking** 183:3 **picture** 18:6, 62:2, 204:22, 204:23, 214:7 |

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

252

piece
123:17, 124:14
pieces
116:17
place
48:22, 58:21,
69:10
placed
126:6
places
42:19, 133:6,
173:19, 173:21,
174:3, 176:10
placidly
180:20
plain
20:9, 197:23
plaintiffs
1:6, 2:3, 4:22,
4:25, 8:1,
18:21, 18:22,
19:15, 19:19,
21:7, 22:13,
22:23, 27:1,
27:7, 30:23,
45:19, 50:23,
50:25, 99:18,
100:8, 105:24,
176:20, 198:23,
198:25, 215:5
plan
16:10, 57:20,
77:4, 88:4,
91:12, 91:21,
92:3, 92:12,
97:21, 99:17,
99:19, 100:13,
101:14, 102:20,
104:9, 104:13,
104:15, 104:22,
105:5, 105:8,
111:20, 118:2,
167:16, 182:20,
183:7, 196:19,
196:21
plans
17:1, 55:2,
68:15, 74:16,

76:9, 78:9,
78:11, 88:5,
88:13, 88:15,
88:22, 89:3,
91:23, 92:2,
92:12, 93:6,
93:13, 93:25,
94:6, 94:21,
95:12, 96:5,
96:10, 98:7,
100:8, 101:1,
109:19, 110:7,
118:1, 134:14,
134:15, 167:12,
175:11, 175:17,
176:4, 176:6,
176:18, 182:24,
183:3
plant-wide
68:5
platform
10:17
play
160:6, 214:12
played
103:3, 103:21
please
7:3, 49:19,
92:24, 99:10,
99:25, 112:8,
128:22, 129:13,
190:21, 216:22
pllc
3:5
plotted
187:9
plus
89:4
pocket
159:15
point
19:13, 19:21,
20:14, 22:17,
23:1, 23:23,
25:13, 28:11,
39:4, 39:12,
43:20, 43:23,
46:6, 46:11,

47:10, 49:14,
67:23, 70:17,
86:21, 87:5,
100:21, 144:25,
168:19, 174:7,
175:2, 175:4,
177:6, 180:9,
203:25, 209:7,
212:8
pointed
29:23
points
19:9
polarized
165:23, 172:17
policies
205:12
political
31:6, 31:10,
39:15, 43:24,
44:5, 45:14,
56:4, 56:16,
58:2, 60:13,
60:19, 61:13,
61:14, 61:25,
70:24, 71:12,
77:3, 123:24,
124:6, 125:13,
172:13, 189:17,
200:12, 201:2,
203:22, 203:23,
211:21, 212:4,
212:24, 213:4
politics
77:2, 77:11
polk
120:12, 120:20,
122:5, 122:6,
144:18, 145:3
poll
82:3, 181:18,
181:19, 181:23,
181:25
polling
81:23, 81:24,
182:1, 182:2
polls
82:4

polsby-popper
5:14, 42:22,
66:12, 88:9,
88:13, 88:14,
88:21, 89:3,
91:11, 133:8
pompano
139:16, 140:7
pop
111:14
populated
117:6, 148:8,
161:7, 213:24
population
12:16, 12:17,
17:8, 29:4,
34:2, 35:2,
35:21, 35:22,
36:17, 39:3,
40:23, 42:11,
42:12, 45:24,
45:25, 68:18,
72:17, 74:20,
111:1, 111:4,
112:24, 113:4,
113:7, 115:5,
122:21, 123:9,
123:18, 139:19,
140:4, 141:7,
141:8, 141:12,
142:9, 142:10,
142:17, 142:20,
142:21, 143:3,
143:5, 145:10,
146:23, 147:1,
147:2, 148:4,
148:12, 148:19,
148:21, 148:25,
160:15, 160:21,
161:11, 162:24,
163:3, 163:5,
164:18, 167:13,
180:7
population's
146:22
populations
31:16, 35:12,
42:1, 53:11,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

253

53:15, 71:17,
73:22, 73:24,
84:22, 111:15,
158:12, 161:4,
166:11, 177:4,
179:1, 179:6,
180:1, 180:2
**populous**
141:10, 158:13
**port**
147:9, 147:11
**portion**
34:15, 37:3,
37:7, 50:19,
58:1, 66:20,
113:14, 122:19,
124:1, 125:17,
130:2, 131:10,
131:13, 142:4,
146:25, 157:7,
160:13, 160:21,
161:22, 164:9,
214:8
**portions**
21:24, 52:3
**position**
40:12, 99:15,
101:19, 118:21,
119:17
**positive**
162:22
**possibilities**
81:18, 181:21,
181:24, 182:16,
183:8, 183:19
**possibility**
15:3
**possible**
19:21, 27:15,
33:18, 36:21,
37:6, 38:12,
40:19, 56:25,
58:12, 76:13,
85:8, 85:10,
86:1, 86:4,
106:20, 107:19,
108:13, 123:22,
159:5, 160:9,

168:18, 168:20,
176:18, 182:24,
192:16
**possibly**
32:16, 160:19
**post**
6:12, 6:14,
173:25, 204:14,
204:19, 204:20,
206:19, 207:9,
207:12, 209:1,
209:17, 210:4,
212:9, 212:24,
213:5, 213:11,
213:14, 214:1,
214:14
**posted**
207:24, 213:22
**posts**
204:11
**potentially**
94:11
**power**
78:13, 81:13
**powerful**
78:13, 86:6
**practical**
81:15
**practice**
206:18
**practices**
208:21, 209:8
**precedent**
123:8
**preceding**
64:17
**precise**
83:19, 93:18,
209:21
**predated**
178:1
**predominance**
101:23, 102:2,
102:4, 102:7,
103:7, 103:9,
103:15, 103:19
**predominant**
98:25, 99:20,

100:5, 101:13,
102:13, 102:23,
104:12, 105:5,
105:11
**predominate**
101:14
**predominated**
104:7, 104:11,
104:25
**prefer**
70:1, 70:5,
115:16
**preference**
30:23, 66:13,
70:10, 127:3
**preferences**
53:22, 172:13
**preferred**
65:22, 202:22
**prefers**
199:24
**premise**
38:19, 40:10,
73:15
**prepare**
215:2
**prepared**
99:4, 106:16,
198:23
**preparing**
18:19, 25:14,
103:13, 198:14
**present**
3:11, 70:21,
126:16
**presented**
108:25
**presenting**
110:1
**president**
205:11
**presidential**
173:4, 173:10,
200:21, 201:14,
202:12, 206:5
**pressed**
137:7
**presumably**
18:8, 22:24

**pretty**
29:7, 46:18,
61:19, 77:17,
83:9, 97:11,
170:1, 172:18,
183:22, 203:24
**prevented**
156:10
**previous**
151:11
**previously**
23:16, 24:7
**primaries**
199:21
**primarily**
65:5
**primary**
20:21, 81:22
**principal**
97:6, 185:15,
186:6, 186:13,
187:14, 188:8,
189:5
**printout**
10:4, 87:18
**printouts**
9:25
**prior**
26:25, 28:13,
87:1
**prioritization**
38:22
**prioritize**
38:14
**probably**
8:4, 35:25,
70:15, 74:23,
89:22, 123:20,
124:10, 140:5,
166:15, 176:9,
189:7, 201:7,
206:3
**probative**
180:4
**probe**
81:7
**problem**
90:19, 170:25

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

254

problematic
66:23
problems
71:4
proceed
16:18, 90:20
proceeding
7:3, 218:14
proceedings
8:23, 54:16,
128:11, 174:17,
214:24
process
16:23, 17:4,
21:21, 25:21,
25:23, 48:8,
53:16, 60:24,
63:7, 176:12,
178:10, 201:4
processor
201:2
produce
39:1, 43:18,
61:5, 80:3,
95:12
produced
17:13, 17:20,
18:1, 19:25,
36:20, 42:9,
50:25, 51:4,
55:16, 69:17,
69:25, 71:7,
79:25, 110:9,
148:22
produces
61:3, 62:20,
69:7, 69:15
producing
63:7
product
18:14, 18:16
professional
218:3
professionally
186:17
project
5:4, 75:21,
76:3, 79:10,

79:24, 80:11,
80:16, 82:12,
84:2, 85:4,
86:23, 87:19,
87:22, 88:16,
89:6, 91:7,
91:13, 92:2,
93:3, 93:14,
94:6, 95:15
prominent
39:19
prominently
41:1
promise
100:11
prong
100:11
properly
96:18
propose
174:9
propriety
211:22
pros
65:16, 65:19,
65:21
protected
44:10, 45:5,
139:13
protection
45:5, 168:6
protections
139:8
protest
204:23
protested
205:4
protesting
205:11
protests
205:1, 205:2
protrusions
139:11
protuberance
137:10, 155:8
protuberances
155:1
prove
98:3

proves
167:8
provide
132:12
provided
16:9, 16:19,
21:15, 23:14,
23:24, 24:6,
24:11, 24:24,
26:2, 26:4,
28:19, 48:3,
48:11, 51:2,
51:15, 52:18,
52:19, 103:6,
175:10, 175:17,
190:13, 197:11
providing
9:19
proving
208:5
provisions
28:19, 44:11,
45:6, 168:6
public
83:25, 218:5,
218:21
pull
147:21, 157:14
purpose
98:21
purposes
60:3, 66:6,
189:13, 189:22
push
162:3
pushed
143:14, 144:12,
156:9
put
27:2, 53:6,
63:8, 69:13,
81:21, 97:10,
118:16, 176:5,
206:1, 215:20
puts
34:1
putting
95:21

Q

qualification
93:19, 136:24
qualifications
93:20
qualify
32:9
quality
80:7, 80:9,
83:8, 85:9,
85:11, 195:5
quantifies
136:2
quantifying
130:8
question
9:5, 38:19,
47:8, 51:22,
51:25, 59:13,
79:1, 81:9,
83:21, 90:24,
93:23, 96:9,
96:12, 96:25,
97:7, 97:8,
98:1, 102:3,
103:22, 107:1,
111:25, 112:2,
115:22, 122:2,
126:10, 132:23,
133:24, 141:22,
145:24, 151:3,
154:22, 163:14,
165:12, 167:2,
167:10, 180:17,
181:16, 191:1,
195:4, 195:6,
195:8, 195:9,
198:8, 202:18,
209:17, 211:7,
211:18
questioning
127:9
questions
8:10, 8:25,
9:15, 56:3,
76:12, 79:4,
81:3, 81:12,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

255

83:1, 83:14,
83:18, 96:14,
184:6, 191:8,
198:12, 199:4,
212:21, 216:10,
216:15
**quick**
54:9, 114:16
**quickly**
29:8, 97:3,
169:19
**quite**
39:19, 102:25,
103:4
**quo**
83:7
**quoting**
196:14

**R**

**r-e-o-c-k**
66:10
**race**
77:2, 77:11,
84:4, 84:13,
84:17, 85:22,
96:5, 96:20,
96:24, 97:1,
97:5, 97:9,
97:12, 98:24,
99:20, 100:4,
101:12, 102:3,
102:20, 103:3,
104:7, 104:12,
105:4, 119:9,
119:20, 120:1,
120:8, 165:5,
165:16, 199:19,
200:2, 202:12,
210:20
**racial**
22:18, 43:24,
45:14, 53:25,
71:12, 72:24,
77:3, 97:10,
101:23, 102:4,
103:4, 104:14,
105:7, 119:14,

165:1, 165:21,
165:22, 167:16
**racially**
165:23, 167:9,
172:17
**rail**
130:4
**railroad**
33:25
**railroads**
32:18, 32:20,
185:4
**railway**
34:8, 189:20
**railways**
32:18, 32:24,
33:8, 33:22,
39:8, 40:3, 40:5
**raise**
7:4
**raised**
212:3
**random**
183:4, 183:16
**randomly**
76:10, 82:20,
89:7, 91:8
**range**
67:6, 67:17,
68:4, 68:7,
72:19, 78:22,
79:3, 81:18,
81:21, 81:25,
82:9, 110:10,
164:1, 164:6,
166:1
**rate**
215:10
**rather**
125:9, 140:8,
187:2, 194:16,
195:17, 196:25,
198:5
**ray**
4:20, 59:19
**rd**
201:10
**re-sent**
90:21

**reach**
30:18, 30:20
**read**
17:13, 22:16,
28:17, 28:22,
41:9, 51:18,
52:15, 98:23,
146:24, 195:2,
195:7
**readers**
214:9
**readily**
97:11
**reading**
186:19, 194:12,
197:23, 214:2
**reads**
93:2
**ready**
149:12
**realized**
29:11
**really**
28:14, 29:11,
29:14, 30:8,
34:1, 35:1,
35:2, 35:5,
61:1, 69:3,
70:5, 81:22,
83:18, 123:10,
127:5, 138:12,
143:25, 164:12,
165:18, 167:18,
176:21, 184:3,
215:17
**realtime**
218:4
**reaping**
58:21
**rearrangement**
133:4
**reask**
195:9
**reason**
8:7, 9:14,
40:17, 61:20,
68:21, 82:8,
139:12, 169:1,

172:10, 203:5,
211:22
**reasonable**
61:3, 139:11
**reasoned**
162:9
**reasons**
69:1, 94:10,
205:8
**reassigning**
124:18
**rebuttal**
6:4, 17:11,
17:14, 21:5,
26:23, 34:14,
39:24, 65:5,
99:15, 101:11,
123:7, 184:6,
184:14, 190:2,
191:11, 192:2,
192:17, 194:1,
194:11, 195:13,
198:13, 198:17
**rebutting**
99:12
**recall**
14:2, 20:23,
22:6, 46:16,
49:7, 49:17,
64:24, 70:15,
73:6, 73:9,
84:19, 84:23,
87:10, 99:14,
100:12, 100:16,
107:18, 108:12,
120:13, 122:21,
124:16, 125:1,
168:2, 173:15,
176:1, 176:12,
186:24, 188:13,
188:16
**receive**
24:3, 50:4,
51:7, 176:14
**received**
16:4, 16:17,
24:14, 24:18,
25:15, 26:24,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

256

52:16, 52:18,
106:4, 168:4
**recently**
63:5, 172:18,
195:6
**recess**
8:23, 54:16,
128:11, 174:17,
214:24
**recite**
130:17
**recognize**
50:18, 72:9,
87:17
**recognizing**
40:18, 116:20
**recollection**
18:23, 21:12,
48:24, 148:5,
148:20, 194:4,
194:5
**reconfigure**
139:23, 197:13
**reconvene**
54:10, 127:21,
214:20
**record**
41:5, 130:17,
203:7
**rectangle**
154:3, 154:5,
154:16
**redistmetrics**
68:10, 68:13,
69:7, 75:10
**redistricting**
20:7, 21:14,
21:21, 25:21,
34:4, 41:12,
46:5, 47:13,
55:22, 59:25,
60:23, 68:17,
68:22, 69:19,
71:9, 75:9,
75:25, 76:1,
76:7, 76:9,
76:12, 76:18,
76:21, 88:2,

91:18, 93:5,
93:6, 93:13,
94:21, 95:18,
95:19, 96:3,
97:21, 101:22,
102:20, 103:2,
104:1, 104:3,
104:9, 104:22,
137:2, 190:5,
194:1
**redo**
111:22
**redraw**
16:11, 110:17,
158:15, 194:20,
195:21, 196:5
**redrawing**
110:17, 194:19,
195:20, 196:5,
197:3
**redrawn**
40:22
**redrew**
166:11
**reduce**
63:1, 89:23,
90:9
**reduced**
212:6
**reevaluate**
167:15
**refer**
12:1, 12:8,
12:16, 12:21,
86:21, 113:2,
130:1, 192:2,
196:3, 205:15
**reference**
132:13
**references**
112:12
**referring**
12:4, 12:10,
14:7, 14:10,
31:3, 44:25,
91:21, 131:7,
148:6, 153:7,
190:11, 191:13,

191:23, 194:3,
196:6, 196:18,
198:18, 198:19,
205:24, 206:3,
207:20, 208:20,
209:6
**refers**
196:8, 206:15,
206:17
**refiguring**
141:13
**refine**
86:17
**refined**
55:17
**reflect**
53:20, 86:18,
122:17, 179:9,
201:9, 201:25,
202:24
**reflected**
87:8
**reflects**
59:23
**refresh**
169:19
**refusing**
33:17
**regard**
173:20
**regarding**
17:12, 20:24,
30:11, 54:3,
149:19, 198:13
**regardless**
35:16, 112:17
**regards**
35:23, 41:2,
59:14, 65:13,
80:8, 102:8,
137:5
**region**
81:10, 171:20,
173:10, 192:15
**regions**
121:9, 122:24,
122:25
**registered**
199:5, 218:3

**registrant**
59:24
**registration**
44:5
**regular**
152:5
**regularize**
169:6
**reid**
1:25, 218:3,
218:21
**reiterate**
212:23
**relate**
103:20
**related**
145:15, 218:13
**relates**
58:24, 118:11
**relative**
40:13, 103:12
**relatively**
172:7
**release**
83:24
**relevant**
93:7, 93:16,
94:1, 94:22,
210:19
**reliable**
79:7, 86:2
**relying**
188:6
**remember**
18:25, 19:9,
19:11, 43:11,
48:19, 73:11,
84:24, 85:6,
168:10, 169:4,
170:14, 175:21,
176:17, 176:21,
199:14, 202:8,
214:2, 216:4
**remotely**
48:22
**removed**
16:10, 16:20,
21:16, 22:24,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

257

22:25, 23:24,
24:8, 24:9,
24:25, 25:2,
27:18, 28:11,
101:2, 110:14
**removing**
100:23
**rendering**
135:21
**renders**
153:15
**reock**
5:13, 42:21,
66:8, 67:21,
67:22, 68:4,
133:8
**repeat**
115:22, 211:20
**rephrase**
97:18
**report**
4:9, 4:12,
4:16, 5:7, 5:10,
6:4, 6:6, 6:8,
9:20, 10:5,
10:14, 10:20,
17:3, 17:6,
17:7, 17:11,
17:12, 17:14,
17:22, 18:20,
21:10, 39:19,
39:22, 39:24,
40:17, 41:1,
46:24, 51:5,
52:19, 62:11,
65:5, 68:9,
74:3, 80:3,
92:17, 93:12,
93:20, 94:16,
95:22, 99:3,
101:11, 105:4,
107:11, 112:6,
117:24, 120:10,
123:7, 126:17,
128:22, 129:15,
132:2, 135:3,
135:6, 135:10,
135:25, 157:10,

169:20, 174:20,
174:24, 175:3,
176:23, 181:3,
184:6, 184:14,
184:18, 184:25,
185:21, 186:3,
186:19, 186:25,
187:7, 187:13,
187:22, 188:6,
188:13, 189:9,
190:2, 190:12,
190:22, 191:12,
191:17, 191:18,
192:11, 192:18,
192:21, 194:1,
194:12, 194:13,
195:13, 195:14,
196:3, 197:9,
197:11, 197:18,
197:20, 198:13
**reported**
1:25, 55:3,
135:6, 135:20
**reporter**
8:5, 66:9,
218:4
**reporting**
135:8, 135:23
**reports**
11:8, 17:13,
19:25, 20:2,
26:23, 26:24,
39:20, 43:22,
80:6, 87:9,
98:23, 198:14,
198:20, 198:22,
199:1
**represent**
7:22, 51:6,
72:12, 93:24
**representatives**
1:8, 7:23,
63:12
**representing**
93:11
**republican**
172:22, 173:11,
199:11, 199:17,

199:24, 206:4,
206:7, 206:8,
206:12, 206:23
**republican-elect-
ed**
206:20
**republicans**
181:25, 206:16
**requests**
9:8
**require**
56:17, 56:18,
104:13, 105:6,
198:15
**required**
28:2, 80:20,
97:2, 125:24,
141:11, 143:4,
145:5, 194:14,
195:15
**requirement**
56:4, 57:14,
61:22, 70:25
**requirements**
31:5, 38:24,
56:7, 57:16,
83:5, 95:1
**requires**
56:8, 56:13,
57:12, 60:7,
101:15, 102:7,
141:11
**research**
172:16
**reserved**
217:2
**reside**
205:21
**residential**
164:9
**residents**
208:6
**resolved**
122:3
**resource**
49:22
**resources**
210:14

**respect**
40:5, 73:16,
84:14, 84:21,
104:20, 118:1,
125:13
**respected**
39:14, 40:19,
40:20, 123:23
**respectfully**
184:22
**respecting**
124:4
**respects**
31:17, 124:19,
178:12, 178:13
**responding**
207:24, 210:7
**response**
17:14, 49:1,
51:10, 52:17,
209:6, 213:14
**responses**
4:22, 4:25,
52:3
**rest**
40:21, 62:12
**restricted**
11:7, 183:21
**result**
97:16, 190:8,
194:19, 195:20,
196:4
**resulted**
124:24, 126:1,
126:21, 193:2
**results**
44:6, 123:9,
123:17
**retained**
8:1, 14:3,
14:22, 14:25,
15:3, 19:14,
19:22, 45:19
**retainer**
215:22
**returns**
78:15
**review**
20:5, 21:2,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                     258

21:14, 42:24,
43:23, 50:7,
80:6, 86:22,
87:1, 120:15,
180:20, 188:24,
197:20, 215:8
**reviewed**
20:22, 20:24,
21:16, 22:7,
23:18, 48:3,
48:15, 176:2,
176:9, 198:22
**reviews**
48:12
**rewriting**
94:15
**right-winger**
82:2
**rights**
44:12, 84:7,
84:15, 84:18,
94:3, 96:24,
100:9, 165:22,
217:2
**river**
57:11, 64:4,
64:8, 147:25,
148:4, 148:10,
148:18, 149:4,
149:7, 154:25
**rivers**
32:14, 32:23,
33:6, 39:8,
40:2, 40:5,
59:2, 63:21,
64:6, 185:4,
189:21
**road**
33:25, 34:9,
36:7, 57:10,
61:25, 73:20,
130:3, 170:1
**roads**
32:17, 32:19,
32:23, 33:4,
33:21, 39:7,
40:2, 40:5,
42:14, 59:2,

60:17, 116:12,
185:4, 185:6,
185:18, 186:7,
186:14, 187:1,
187:3, 187:9,
187:15, 187:24,
188:1, 188:2,
188:8, 188:9,
188:14, 188:15,
188:19, 188:20,
189:1, 189:6,
189:8
**rodrigues**
4:20, 20:18,
59:20
**role**
79:22, 80:8,
102:14, 103:3,
103:20
**room**
94:11
**rotate**
138:23, 146:9
**rotated**
150:9
**rotation**
138:15
**rough**
29:7, 84:12
**roughly**
55:7, 84:14,
215:15
**rounded**
133:5
**rpr**
1:25, 218:21
**rule**
36:25, 62:8,
67:1, 67:4,
134:20, 134:25,
194:8
**rules**
8:2, 83:10,
83:11, 85:22,
180:3, 190:7,
194:2
**run**
46:22, 46:25,

77:12, 84:24
**running**
113:24, 114:7
**runs**
113:22, 169:11

---
**S**

**s**
144:13, 212:9,
213:11, 213:14,
214:13
**said**
29:1, 41:11,
41:15, 46:7,
68:9, 85:9,
92:10, 95:16,
109:19, 114:25,
128:15, 153:6,
160:4, 210:3
**saith**
217:1
**same**
11:22, 15:11,
33:18, 40:1,
51:25, 52:21,
55:7, 57:8,
73:15, 78:1,
94:4, 102:19,
108:1, 108:7,
127:16, 131:4,
131:12, 133:16,
139:18, 140:2,
146:6, 149:14,
149:21, 151:13,
156:3, 158:11,
169:18, 169:23,
170:13, 171:19,
179:7, 182:5,
182:19, 183:14,
211:3, 213:16
**sample**
80:22, 82:1
**sampling**
183:2
**sanders**
200:22, 200:23,
201:14, 202:12
**sarasota**
156:19, 156:21,

157:6, 157:12,
157:24, 158:1,
158:5, 158:8,
158:20
**satellite**
35:1
**satisfies**
57:3
**satisfy**
39:2
**saw**
18:9, 73:8
**say**
8:7, 26:13,
28:14, 30:4,
30:18, 30:25,
32:3, 35:19,
36:14, 37:17,
38:21, 39:12,
41:1, 47:20,
49:24, 53:3,
56:11, 58:7,
60:12, 65:4,
66:1, 66:6,
66:25, 69:14,
69:24, 71:11,
76:17, 78:11,
81:1, 82:11,
83:7, 83:23,
85:13, 88:13,
89:4, 97:17,
101:11, 102:16,
103:24, 106:14,
111:16, 113:21,
117:4, 118:14,
118:18, 118:23,
121:11, 125:4,
125:9, 128:3,
137:7, 138:1,
138:2, 140:5,
146:19, 148:24,
154:4, 163:22,
166:18, 172:21,
173:15, 174:14,
182:23, 186:9,
186:22, 187:13,
187:17, 188:5,
188:10, 194:1,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

259

194:13, 197:10,
206:6, 206:11,
208:12, 209:3,
209:15, 212:12,
214:20
**saying**
9:1, 11:24,
40:11, 41:5,
59:10, 102:1,
118:24, 189:13,
197:21, 213:5,
213:21
**says**
88:3, 89:6,
91:7, 91:21,
106:7, 112:13,
134:20, 186:25,
189:11, 190:4,
201:16, 204:14,
207:12, 208:3
**scale**
67:7, 135:16
**scenario**
110:6, 162:10
**scenarios**
61:4
**schedule**
127:16
**scope**
96:16
**score**
67:21, 67:22,
88:6, 88:14,
88:21, 89:3,
130:11, 130:19,
130:25
**scores**
5:14, 42:21,
42:22, 43:12,
46:22, 66:7,
67:3, 67:6,
67:15, 68:5,
68:11, 68:24,
75:9, 75:11,
75:17, 88:4,
129:4, 129:8,
129:13, 129:18,
130:14, 132:6,

132:10, 132:25,
133:8, 133:13,
133:14, 133:16,
133:19, 133:21,
135:5, 135:19,
138:14
**screen**
71:15
**screenshot**
213:19
**scrolling**
131:8
**seal**
218:16
**sean**
6:8
**seattle**
201:22
**second**
72:16, 89:25,
156:20
**secondary**
65:9, 101:18
**secondhand**
18:4
**secret**
173:6
**secretary**
1:10, 199:14
**section**
93:19, 174:24,
175:3, 175:16,
177:9, 191:6,
197:24, 198:9,
207:13, 207:20,
208:13, 209:4,
212:13, 212:17,
214:3, 214:10
**sectional**
189:6
**secure**
44:11
**security**
89:19
**see**
10:25, 11:2,
15:21, 26:11,
28:9, 29:8,

35:1, 49:15,
51:3, 54:14,
57:13, 59:24,
67:17, 68:5,
70:18, 72:3,
72:17, 72:21,
88:7, 89:9,
89:14, 89:23,
90:8, 91:6,
91:10, 91:24,
92:8, 93:9,
94:24, 97:23,
97:24, 101:24,
104:17, 106:11,
112:14, 115:4,
118:4, 120:18,
125:18, 129:9,
129:23, 132:7,
136:6, 137:23,
140:22, 144:7,
147:9, 148:13,
149:13, 150:2,
152:21, 153:14,
155:16, 155:23,
159:11, 161:10,
161:15, 161:18,
169:11, 170:8,
179:8, 186:21,
189:24, 190:4,
191:1, 191:2,
191:5, 195:23,
197:15, 204:17,
204:22, 204:24,
207:14, 208:1,
208:10, 208:11,
214:3
**seeing**
214:5
**seeking**
174:13
**seems**
108:16, 162:9
**seen**
50:17, 50:19,
72:10, 199:1
**segments**
187:5
**segregated**
172:24

**segregation**
164:9
**selected**
214:13
**senate**
13:11, 14:4,
14:11, 20:15,
20:16, 175:12,
177:16, 178:20,
178:24, 179:13,
179:16, 179:21,
179:22, 180:10
**senator**
4:20
**send**
89:12
**sending**
89:15, 89:16,
90:1, 90:3, 90:5
**sense**
12:6, 12:13,
133:25, 134:1,
154:3, 212:10
**sensitive**
65:17, 66:3,
66:21, 138:17
**sent**
15:19, 20:14,
89:13, 89:14,
174:1
**sentence**
88:3, 91:20,
93:2, 94:18,
104:20, 105:2,
186:25
**separate**
31:17, 84:25,
213:1
**separately**
43:16
**separating**
35:12
**separator**
38:7
**september**
46:19, 46:23,
51:7
**served**
12:25, 13:3,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

50:23
**serves**
60:2
**set**
4:23, 4:26,
16:3, 16:12,
16:25, 22:25,
25:18, 46:20,
47:1, 76:23,
80:2, 82:21,
84:25, 88:18,
92:13, 98:17,
101:22, 106:3,
110:21, 116:10,
141:8, 148:11,
156:6, 165:10,
172:6, 182:18,
183:23, 184:23,
187:8, 205:1
**sets**
79:14, 89:7,
90:7, 91:8
**setting**
10:24, 48:23
**seven**
17:1, 17:16,
17:17, 17:25,
18:12, 169:17,
182:6, 182:13
**several**
16:24, 17:10,
19:7, 37:5,
53:18, 63:8,
82:9
**shade**
16:19, 24:11,
24:15, 25:6
**shading**
71:14
**shaking**
9:1
**shall**
31:6
**shape**
24:23, 28:10,
66:4, 75:11,
75:12, 75:14,
110:12, 138:12,

139:25, 146:3,
151:1, 151:4,
152:4, 152:21
**share**
90:15, 92:16,
167:20
**shared**
27:1, 27:7,
29:23, 30:10,
211:22, 214:9
**shock**
41:21, 161:5
**shocked**
38:12
**shoot**
128:4, 128:7
**short**
34:9
**shorthand**
12:20
**should**
32:1, 40:19,
49:15, 93:18,
113:17, 114:2,
114:5, 114:10,
127:25, 140:13,
163:14, 173:5,
175:4, 192:2,
205:19, 212:2
**shouldn't**
30:21, 32:22,
32:25, 36:11,
36:14, 59:11
**show**
74:16, 75:5,
87:11, 99:3,
114:14, 132:5,
145:19, 175:20,
183:6, 183:7,
184:21, 200:4
**showed**
25:24, 42:18,
109:17, 163:15
**showing**
17:7, 42:13,
43:18, 80:3,
132:21
**shown**
42:15, 74:25,

75:2
**shows**
74:19, 133:7,
203:7
**sic**
161:21
**side**
55:9, 59:17,
111:2, 137:20,
140:12, 140:20,
147:5, 159:13,
159:17, 159:25,
160:1, 162:14,
169:12, 169:13,
170:7, 176:9
**sides**
117:7
**signature**
217:2
**signature-bi6ds**
218:18
**significance**
41:3, 118:22,
135:22
**significant**
31:13, 37:7,
116:24, 134:4,
134:5, 135:7
**significantly**
136:3
**similar**
28:7, 35:15,
52:17, 63:7,
82:8, 145:24,
146:5, 151:10,
175:6, 182:4
**similarities**
175:4, 175:22,
175:25, 177:11,
178:12, 178:17
**similarly**
37:2, 101:21,
120:3
**simply**
25:13, 54:25,
56:8, 75:5,
75:15, 101:20,
104:14, 105:6,

135:7, 181:12,
189:3
**simulated**
78:9, 79:10,
79:15, 80:17,
81:17, 82:12,
88:5, 88:15,
88:22, 89:3,
89:7, 91:8,
91:23, 92:2,
92:11, 94:5,
100:3, 100:4
**simulation**
77:9, 84:4,
84:12, 84:16,
84:20, 96:2,
96:4, 96:19,
97:20, 98:9,
103:2, 103:6,
103:25, 182:21,
183:13
**simulations**
68:6, 76:8,
76:19, 76:21,
76:24, 76:25,
77:4, 77:12,
77:19, 77:25,
78:14, 78:20,
78:22, 78:25,
80:3, 80:4,
80:8, 80:13,
82:18, 82:23,
82:24, 83:4,
83:8, 84:1,
84:19, 84:25,
85:11, 86:1,
86:22, 87:5,
87:22, 92:13,
94:11, 96:7,
96:13, 97:9,
97:14, 98:3,
98:17, 98:21,
99:21, 100:23,
100:24, 101:22,
102:9, 103:2,
165:11, 181:15,
181:17, 184:2
**simultaneously**
197:12

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

261

since
44:15, 60:18,
72:24, 109:17,
160:15, 170:2,
176:5, 198:14
single
25:1, 42:2,
93:25, 101:21,
101:22, 117:21,
133:3
sir
149:5, 163:20
sitting
10:1, 22:6,
162:11, 163:4
situation
121:23, 160:25
situations
61:1, 62:5,
70:13, 70:23,
123:14, 123:16,
124:7
six
16:25, 17:15,
17:16, 17:25,
18:11, 69:25,
70:2, 106:15,
108:12, 129:19,
130:18, 131:16,
133:10, 156:1,
156:18, 157:13,
158:2, 163:7,
163:13, 163:22,
176:22, 181:3,
182:6, 182:12,
193:16
sixth
4:26
size
34:4, 55:3,
89:23, 90:9,
166:15
sizes
177:16
sketch
29:8
skip
72:2

slate
36:22
slightly
125:12
sliver
143:22
small
53:8, 107:20,
180:3
smaller
34:7, 81:8,
130:11, 161:21,
166:17
smallest
47:25, 108:17
snap
154:15
snapping
169:7
social
203:17, 203:24,
213:17
software
16:21, 42:11,
43:5, 43:10,
43:13, 43:20,
46:3, 50:2,
68:14, 69:11,
130:4, 181:10,
189:7
solely
181:4
somehow
150:15, 203:3
someone
15:1, 56:9,
207:24
something
18:8, 25:4,
30:9, 33:11,
38:12, 40:18,
41:15, 43:2,
50:17, 54:21,
65:20, 67:23,
83:23, 94:19,
95:23, 96:16,
148:16, 169:9,
172:10, 181:11,

181:24, 183:6,
183:9, 187:5,
194:25, 197:22,
208:12, 209:25,
213:23
something's
182:23
sometimes
47:23, 50:2,
54:20, 68:6,
89:18
somewhat
146:5, 154:6
somewhere
62:21, 157:11,
163:17
sorry
8:18, 11:3,
14:19, 17:16,
26:23, 30:13,
42:18, 42:23,
47:8, 55:11,
60:22, 75:9,
89:10, 97:17,
107:10, 107:12,
114:21, 114:24,
115:1, 115:9,
115:23, 117:17,
121:17, 128:24,
131:2, 131:8,
133:25, 142:14,
152:24, 158:24,
161:23, 163:14,
167:2, 168:7,
169:4, 170:18,
170:22, 176:4,
182:9, 182:10,
185:13, 186:9,
190:23, 193:13,
193:14, 195:6,
196:14, 196:20,
201:6, 202:18,
210:23, 212:2
sort
18:13, 20:19,
27:9, 29:3,
30:5, 30:6,
32:14, 34:23,

35:3, 35:22,
40:12, 40:24,
47:21, 49:22,
55:6, 55:15,
58:9, 63:21,
67:5, 68:4,
68:20, 76:13,
85:4, 100:15,
105:10, 108:21,
108:25, 110:21,
110:22, 111:9,
111:10, 111:14,
113:13, 116:13,
124:19, 140:3,
140:6, 144:2,
144:3, 146:3,
148:6, 148:8,
152:3, 153:7,
154:23, 159:15,
164:10, 168:23,
169:6, 172:6,
172:16, 177:8,
178:9, 178:25,
180:16
sorts
122:9
souls
208:7
sound
9:12, 195:1
sounds
13:16, 31:25,
54:14, 59:10,
108:14, 174:16
south
2:21, 27:4,
34:21, 44:10,
64:8, 73:4,
73:22, 84:7,
84:22, 84:25,
85:6, 110:23,
132:10, 140:5,
144:16, 147:25,
148:11, 155:11,
159:18, 172:14,
172:21, 184:21
southeast
34:15, 137:21,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

262

172:20, 179:14
**southern**
1:2, 22:4,
143:18, 152:22,
153:11, 169:14
**southwest**
153:2
**space**
33:15, 76:13,
183:8
**span**
28:17, 36:18,
73:17, 110:24
**spanned**
27:21, 28:4,
37:5
**spanning**
31:14
**spans**
34:5
**sparsely**
148:7
**speak**
119:6
**special**
39:16, 41:3
**specific**
21:22, 44:15,
49:17, 49:18,
61:8, 69:8,
70:15, 72:10,
85:2, 112:1,
112:2, 123:21,
158:10, 164:21,
176:16, 180:12,
180:16, 180:24,
185:11, 186:24,
187:24, 187:25,
188:14, 189:8,
212:25
**specifically**
18:3, 21:25,
26:12, 26:14,
26:15, 30:4,
30:22, 31:3,
38:11, 49:7,
84:17, 85:7,
94:5, 104:19,

106:14, 107:23,
108:10, 112:10,
112:21, 113:2,
125:2, 129:12,
131:5, 149:6,
160:5, 161:16,
164:22, 183:24,
188:19, 205:13
**speculate**
30:8
**speculation**
209:20
**spend**
194:17, 195:17
**spending**
29:9
**spine**
110:23
**spirit**
61:2
**split**
21:6, 49:11,
62:21, 91:21,
92:3, 92:6,
92:12, 112:14,
112:17, 112:19,
112:21, 113:1,
113:14, 113:16,
113:17, 114:11,
116:2, 116:3,
117:11, 117:18,
117:19, 120:12,
120:13, 120:19,
121:10, 121:12,
121:17, 122:18,
123:4, 123:8,
123:15, 123:17,
125:25, 126:17,
126:18, 141:25,
156:19, 157:7,
157:13, 158:1,
158:9, 190:7,
192:3, 192:5,
192:10, 192:14,
192:22, 193:2,
193:11, 193:17,
193:20, 193:21,
193:23, 193:24,

194:2, 194:6,
194:17, 195:18,
196:9, 196:13,
203:4, 216:3
**splits**
43:15, 57:6,
63:1, 110:7,
111:11, 111:12,
113:10, 113:17,
113:18, 113:23,
114:5, 114:9,
116:8, 121:7,
121:8, 123:18,
124:24, 125:4,
126:18, 126:19,
126:20, 190:6,
191:15, 191:20,
191:23, 192:3,
193:9, 193:22,
194:7, 194:18,
195:19, 196:4,
196:5, 196:17,
196:18, 197:7,
198:18
**splitting**
121:17, 121:18,
176:11
**spoke**
15:12
**spot**
34:25, 132:20
**spring**
14:24, 15:6
**st**
144:20, 156:4,
156:5, 159:12,
159:13, 162:13,
162:14
**staff**
18:22, 18:24,
19:19, 105:23
**staff's**
20:16, 105:23
**stair**
152:3, 152:6
**stair-step**
152:21
**stairway**
152:4

**stand**
104:20, 105:3,
207:16
**standard**
31:2, 56:16,
57:8, 61:13,
124:4, 125:24
**standards**
16:14, 20:7,
20:20, 20:22,
20:24, 21:3,
28:1, 29:2,
29:17, 31:2,
31:23, 32:6,
36:19, 37:24,
39:5, 41:2,
41:22, 58:25,
60:7, 62:3,
62:15, 66:20,
66:23, 69:19,
71:8, 73:16,
82:17, 94:13,
95:11, 95:19,
96:3, 97:22,
98:11, 98:13,
98:18, 108:23,
108:24, 109:2,
109:22, 109:25,
111:1, 111:8,
111:17, 111:21,
116:19, 119:5,
121:4, 121:21,
121:23, 123:11,
125:17, 125:22,
137:6, 145:9,
145:14, 162:21,
178:1, 178:4,
194:16, 194:21,
195:17, 195:22,
197:2
**start**
8:12, 23:11,
24:20, 75:23,
76:2, 136:6,
136:7, 196:17
**started**
16:21, 73:15
**starts**
35:21

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                                    263

state
1:11, 5:21,
12:1, 12:3,
12:9, 13:8,
13:10, 13:24,
14:4, 14:10,
14:11, 17:17,
17:25, 18:12,
22:19, 27:11,
35:9, 37:3,
43:19, 59:20,
70:9, 74:13,
82:15, 83:5,
83:12, 83:18,
93:7, 93:16,
94:1, 94:22,
96:23, 105:19,
115:1, 115:3,
115:25, 116:24,
118:7, 119:17,
120:7, 123:2,
154:11, 166:3,
166:8, 167:19,
169:17, 175:7,
175:12, 175:24,
177:20, 178:18,
178:23, 179:16,
180:10, 199:12,
199:15, 200:1,
204:15, 205:15,
205:16, 205:17,
205:20, 205:21,
206:2, 218:1,
218:5, 218:22
state's
80:18
stated
100:13
statement
65:6, 104:21,
211:12, 211:15,
211:25
statements
173:17
states
1:1, 32:12,
41:19, 79:12,
80:9, 80:20,

81:7, 94:14,
200:3
static
123:23
statistical
78:10, 81:1,
81:5, 81:13,
182:20
statistically
78:12
statistics
183:1, 183:10
status
83:7
stays
160:19
stenographer
1:25, 7:2, 7:6,
7:11, 7:18,
8:20, 216:20
step
18:14, 18:15,
152:3, 152:6
still
35:10, 57:23,
62:14, 79:24,
90:11, 104:6,
109:8, 138:24,
149:11, 150:9,
156:20, 161:1,
162:6, 180:4,
183:14, 195:11,
199:16
stimulate
77:19
storage
81:14
story
205:19, 210:11
straight
113:22, 171:2
strategy
30:7
streamline
189:24
street
2:7, 2:13, 2:21
strength
35:23

stretch
140:7
structure
101:17
stub
34:8
student
76:5, 76:6,
79:24, 80:5
students
19:18, 80:1,
80:2
studied
138:16
studies
103:25
study
29:3, 75:25
studying
75:24
stuff
110:2
styles
177:6
sub
183:5
subclause
212:6
subject
56:19, 78:1,
81:19, 96:24,
125:6, 208:18
subjected
125:5
subjective
105:17
submitted
21:20
submitting
17:10
subsequent
29:19, 45:20,
46:14
subsequently
18:20
substance
19:23
substantial
34:15, 170:1,

183:23
substantially
33:23, 139:23,
155:2, 155:3,
165:8, 197:13
substantively
134:22
subtract
51:12
succinctly
214:4
sufficient
78:19, 78:23
sugar
101:17, 102:14
suggest
119:25
suggested
176:19
suite
2:14, 2:22, 3:7
summarize
69:13, 126:17
summary
77:16, 77:17
super
27:3
superior
40:12, 40:13
superseding
25:18
supplemental
51:9
support
202:11, 202:19,
202:20
supported
99:23
suppose
173:24, 179:3
supreme
21:8, 123:8,
124:23
sure
11:18, 18:5,
22:15, 28:9,
31:4, 31:12,
32:19, 32:20,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

264

39:16, 40:8,
40:10, 43:8,
51:21, 52:7,
54:11, 55:1,
85:25, 86:4,
86:6, 97:19,
110:19, 112:11,
115:21, 115:24,
116:5, 120:17,
122:22, 123:19,
132:14, 132:20,
134:7, 171:23,
174:16, 177:14,
186:11, 198:25
**surprise**
164:5, 166:14
**surprised**
164:12
**surrounding**
106:7, 106:23
**survey**
60:10
**suspect**
134:15, 209:25
**suspecting**
203:3
**swamplands**
32:15
**swear**
7:6
**sworn**
7:14, 218:8
**system**
35:4, 200:1
**systematic**
183:2

**T**

**table**
5:13, 69:13,
112:10, 112:12,
129:7, 129:17,
132:5, 135:6,
135:9, 135:14,
135:20, 191:25,
192:10, 192:21
**tables**
119:5, 126:16,

126:24, 133:5,
134:10
**tabulation**
47:18
**tail**
53:16
**take**
8:6, 9:6,
23:12, 23:21,
44:23, 48:22,
50:9, 50:16,
51:17, 52:11,
54:9, 71:21,
72:24, 74:2,
80:22, 84:4,
86:16, 87:24,
101:18, 113:14,
114:16, 127:20,
133:2, 136:4,
136:17, 138:18,
142:11, 143:5,
147:2, 149:8,
150:21, 151:15,
151:21, 152:15,
178:4, 186:2,
196:22, 197:18,
206:25, 214:17
**taken**
77:6, 137:15,
175:6
**takes**
68:15, 78:16,
89:19, 141:7,
160:20
**taking**
118:21, 119:16,
141:11, 142:9,
143:3, 160:1,
196:23, 208:8,
211:10
**talk**
8:8, 39:19,
56:15, 60:11,
65:3, 141:14,
198:10, 211:1,
213:11
**talked**
28:18, 56:23,

59:1, 71:2,
86:12, 108:23,
134:18, 156:9,
159:12, 198:18
**talking**
11:21, 28:12,
33:16, 34:12,
67:11, 118:6,
123:16, 196:12,
198:4, 206:7
**tall**
138:7
**tallahassee**
2:23
**tampa**
13:11, 21:23,
64:15, 111:10
**team**
68:15, 75:22,
79:17, 79:19,
79:23
**tell**
9:10, 15:24,
26:20, 54:22,
73:3, 88:19,
88:20, 96:4,
97:14, 97:20,
98:10, 101:5,
102:14, 102:22,
107:8, 159:4,
167:18, 182:14,
184:19, 197:21,
204:15
**ten**
54:10, 80:25,
174:14, 201:9,
203:9
**tension**
121:24
**tenth**
95:8, 134:21
**term**
31:23, 164:24,
165:3, 209:23
**terminology**
11:23
**terms**
11:25, 12:21,

44:4, 55:3,
81:15, 127:3,
138:9, 164:22,
177:8, 183:24,
190:23, 190:24,
193:19, 193:23,
197:25
**terse**
61:19
**test**
65:6, 78:4,
78:13
**tested**
69:8
**testified**
7:17, 23:22,
29:22, 85:25,
96:8
**testify**
7:15, 13:20
**testifying**
9:11
**testimony**
7:7, 43:22,
63:6, 128:14,
218:11
**testing**
77:10, 77:20,
78:2, 78:7
**tests**
79:4
**texas**
85:19
**th**
51:3, 67:22,
202:2, 202:5,
203:11, 218:17
**thank**
7:11, 11:16,
90:13, 128:8,
216:17, 216:23
**thanks**
128:10, 214:23
**themselves**
67:17, 119:6,
134:15
**theory**
130:5

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025                    265

thereabouts
13:15
therefore
101:13
thereof
166:20, 218:15
thereupon
7:12, 218:8
they'd
96:14
thin
153:21, 154:6
thing
38:15, 39:9,
84:7, 86:13,
94:4, 131:4,
144:6, 188:6
things
33:16, 49:12,
49:20, 68:19,
70:19, 83:16,
85:14, 95:4,
149:16, 154:19,
183:25, 208:20,
211:4
thinking
53:2, 127:3,
206:13
third
4:23, 14:15,
88:3, 93:1,
194:12, 195:12,
197:24
thorny
97:3
thought
70:6, 89:13,
108:18, 114:24,
121:19, 159:9,
160:4, 168:18,
180:21, 214:10
thoughts
167:7
thousand
67:16, 79:6,
82:5, 167:12
thousands
82:9

three
66:7, 73:1,
113:6, 114:8,
132:10, 133:13,
133:20, 133:21,
161:24, 163:22,
166:10, 179:7,
185:17
through
11:12, 16:15,
51:18, 52:15,
95:10, 107:16,
107:24, 108:4,
108:10, 111:10,
113:22, 113:24,
114:7, 115:8,
116:3, 121:7,
121:8, 124:18,
130:13, 130:16,
131:12, 139:16,
147:25, 157:15,
160:4, 160:24,
161:8, 171:3,
187:4, 200:14,
200:17, 201:11,
202:2, 202:6,
203:1, 203:11
thumb
67:1
tier
27:25, 29:1,
29:17, 29:21,
31:2, 31:23,
32:6, 36:19,
37:9, 38:25,
39:5, 40:20,
48:10, 49:9,
57:1, 57:5,
57:13, 57:15,
58:3, 58:10,
58:13, 58:24,
59:8, 59:22,
60:7, 60:17,
60:20, 62:3,
62:15, 70:14,
73:16, 98:18,
109:21, 110:25,
111:8, 111:21,

119:5, 121:4,
121:20, 121:23,
122:11, 123:11,
124:3, 125:17,
130:9, 130:12,
137:6, 142:1,
142:3, 145:9,
145:14, 189:18,
189:22, 198:5,
198:10
tiers
86:13, 179:8
time
9:4, 11:10,
21:1, 24:3,
24:10, 28:15,
29:9, 40:1,
47:10, 47:22,
48:12, 49:23,
53:19, 76:5,
78:16, 79:20,
79:22, 86:17,
113:12, 113:23,
127:12, 127:19,
133:2, 173:7,
174:9, 175:15,
183:1, 186:10,
199:17, 216:16
timeline
192:17
times
112:18, 117:18,
117:19, 161:24,
193:12, 207:16,
208:13, 209:3,
210:8, 210:9,
210:16, 212:17,
214:6, 214:10
tiring
128:17
titled
5:5
today
9:16, 22:6,
52:10, 52:22,
93:24, 163:4,
198:16
today's
215:2

together
60:2, 85:5,
137:15, 150:8,
150:12, 172:9,
176:5
told
45:4, 139:8
toll
42:12
ton
172:3
took
12:12, 46:7,
75:17, 142:17,
142:19, 142:20,
142:21, 214:7
tool
69:14
tools
75:25, 86:5
top
13:6, 180:18,
191:9, 192:8
total
80:23, 83:14,
113:10, 113:18,
113:23, 114:9,
130:2, 131:10,
190:6, 190:24,
191:20, 191:22,
192:2, 193:22,
196:18, 197:7
totally
212:16
touched
21:9
touching
58:9, 170:9
toward
18:14, 18:16,
113:18
trace
57:9, 61:11
track
107:13
tract
124:25
trade
109:2

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

266

**tradeoff**
70:20, 70:22,
78:17, 81:11
**tradeoffs**
55:25, 70:14,
86:13, 116:20,
122:9, 130:10
**traditional**
59:24, 88:2,
91:18, 104:3
**transcript**
8:6, 8:15, 9:3,
9:23, 15:18,
23:8, 23:10,
50:13, 52:14,
72:7, 87:15,
92:22, 99:8,
132:18, 136:11,
140:18, 145:22,
150:19, 151:19,
152:13, 167:25,
171:7, 171:10,
171:13, 171:16,
184:12, 185:25,
190:19, 200:8,
204:9, 207:5,
216:19, 218:10
**transitory**
28:13
**transmitted**
47:24
**transparent**
25:4
**transportation**
185:13
**treated**
120:5
**treating**
60:8
**treatment**
119:8, 119:19
**trende**
6:8, 177:24,
190:5, 196:7,
196:14, 196:16,
197:10, 199:2
**trende's**
190:12, 190:22,

191:22, 192:21,
197:18, 199:2
**trial**
13:20
**triangular**
124:14
**trickiest**
96:23
**tricky**
56:22
**tried**
38:10, 71:3,
73:10, 124:24,
125:3, 168:19,
180:20
**tries**
61:21
**tripod**
151:1
**trouble**
195:11
**true**
38:24, 41:18,
94:4, 105:1,
123:2, 125:10,
126:11, 146:9,
164:13, 167:3,
218:10
**trump**
205:11
**trustworthy**
86:2
**truth**
7:8, 7:9, 7:15,
7:16, 9:10
**truthful**
51:16
**truthfully**
9:16
**try**
8:11, 84:14,
86:5, 90:18,
170:24, 195:10
**trying**
38:25, 39:6,
61:9, 61:10,
66:1, 66:2,
72:25, 96:9,

97:5, 116:10,
116:19, 175:3
**tuesday**
1:18
**turn**
92:24, 112:8,
128:21, 129:13,
132:1, 141:4,
161:12, 174:19,
190:1, 190:21
**turnout**
44:6, 204:14
**turns**
169:13
**twice**
113:25, 193:22
**two**
14:4, 17:12,
19:25, 26:1,
28:13, 29:12,
31:19, 33:16,
58:16, 74:22,
80:14, 87:9,
90:7, 108:21,
111:5, 113:4,
113:17, 113:25,
114:7, 114:8,
116:14, 121:14,
133:6, 133:16,
139:10, 140:11,
150:8, 163:22,
184:13, 196:17,
204:6
**two-hour**
215:4
**type**
49:8, 123:3,
165:2, 175:6,
184:1, 214:8
**types**
81:3, 179:11,
187:3, 189:1
**typical**
78:22, 165:19,
181:20, 182:15,
182:23, 183:6,
183:18
**typicality**
183:9

**U**

**uh-hmm**
34:17, 118:20,
153:5
**uh-huh**
9:2, 67:20
**ultimate**
103:18
**ultimately**
63:10, 67:10,
110:12, 110:13,
158:16
**um-hmm**
68:8
**unassigned**
74:9, 74:10
**under**
9:9, 40:20,
45:5, 66:23,
88:1, 91:17,
126:6, 130:6,
218:16
**undergraduate**
80:1
**underlying**
42:12
**understand**
7:25, 11:23,
11:24, 12:18,
17:8, 22:17,
25:7, 27:9,
27:22, 30:2,
56:17, 56:18,
58:4, 58:5,
82:4, 100:2,
112:11, 123:7,
126:10, 129:25,
131:6, 132:21,
137:5, 167:10,
181:17, 213:20
**understanding**
22:12, 32:1,
43:21, 44:8,
44:18, 45:21,
56:3, 56:9,
57:12, 58:14,
59:8, 65:12,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

267

77:8, 86:19,
105:11, 123:13,
165:3, 167:15,
172:12, 172:23,
173:3, 177:23,
178:5, 186:5,
186:12, 186:17,
188:25, 189:4,
189:7, 195:11
**understood**
184:24, 186:8,
186:15, 186:18,
187:16, 187:18,
188:21, 189:12,
214:11
**undo**
138:20
**unit**
48:1, 60:1
**united**
1:1
**units**
47:16, 57:6
**universe**
41:13, 181:21,
181:23, 182:2,
182:16, 183:9,
183:19, 183:21,
183:23, 184:2
**university**
75:24, 205:17
**unlawful**
205:9
**unless**
67:13, 119:2,
183:21
**unlike**
213:17
**unpopulated**
121:8, 122:25,
124:1, 124:25,
126:1, 126:21,
168:15, 168:20,
192:15, 193:2,
194:7
**until**
28:10
**unusual**
67:14, 76:23,

98:7, 98:8,
98:12
**use**
11:24, 12:15,
12:20, 24:23,
32:5, 44:7,
45:14, 45:23,
46:3, 47:16,
53:25, 54:2,
68:7, 68:21,
71:12, 76:18,
76:20, 78:19,
78:25, 79:11,
82:22, 84:13,
84:17, 92:7,
96:5, 98:21,
117:9, 136:2,
165:5, 165:7,
183:1, 183:10,
190:8, 203:24,
210:13
**uses**
31:17
**using**
11:22, 33:19,
64:2, 71:13,
72:24, 79:13,
88:9, 102:10
**usual**
98:12
**usually**
67:16, 67:18,
77:1, 80:2,
81:3, 81:4,
82:5, 215:24
**utilization**
61:22, 129:4,
129:8, 129:13
**utilize**
31:6, 31:9,
33:21, 57:17,
77:12, 77:15
**utilized**
66:8
**utilizing**
31:15, 57:18,
57:23, 58:1,
70:23

|     |  V  |     |
| --- | --- | --- |

**vague**
180:17
**valid**
103:25
**value**
58:10, 58:13,
196:23
**vap**
12:15, 44:2
**variants**
138:15
**variations**
55:6
**varied**
80:19
**various**
19:8, 60:16,
80:9, 94:12,
116:13, 132:6,
180:10
**version**
10:8, 18:5,
46:24, 70:20,
75:16
**versions**
55:15
**versus**
31:15, 32:5,
42:19, 64:1,
66:4, 85:3,
107:21
**vertical**
138:11, 153:22
**view**
30:6, 31:21,
32:21, 35:1,
36:10, 36:15,
109:7
**views**
206:11, 214:5
**violate**
39:5, 123:11
**violates**
37:17
**violation**
205:10, 205:13

**virtually**
1:17
**visibility**
30:20
**visit**
64:14, 64:19
**visual**
65:6, 65:10,
75:16, 107:11,
136:14, 149:20,
151:12, 154:12,
154:18, 181:4,
181:12
**visually**
124:20, 135:12,
136:21, 137:8,
137:9, 137:25,
138:3, 138:21,
138:24, 139:3,
143:12, 143:13,
146:1, 146:6,
146:14, 146:17,
150:6, 150:9,
150:23, 151:6,
151:24, 153:25,
154:4
**voted**
173:11, 199:10
**voter's**
199:23
**voters**
44:19, 139:14,
194:9, 206:8,
206:12, 206:23
**voting**
12:16, 12:17,
44:12, 45:24,
45:25, 47:18,
72:17, 84:7,
84:15, 84:18,
94:3, 96:24,
97:2, 100:9,
139:7, 163:5,
164:18, 165:23,
166:4, 166:11,
166:25, 167:13,
172:17
**vtd**
47:18

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

268

## W

**wager**
173:17
**wait**
157:17, 192:12
**walk**
16:15, 115:8,
116:3, 130:16
**walker**
52:5
**wand**
70:6
**want**
30:3, 30:16,
30:19, 34:19,
36:23, 38:16,
47:23, 51:14,
56:2, 63:4,
66:3, 73:17,
77:19, 77:23,
77:25, 78:4,
81:4, 81:7,
82:3, 83:17,
112:11, 114:13,
127:7, 127:21,
132:12, 134:8,
142:2, 160:24,
161:8, 163:22,
174:12, 202:16,
202:20, 212:13,
212:25, 214:19,
216:20
**wanted**
38:5, 39:10,
115:19, 117:2,
162:12, 181:16
**wants**
110:3
**warranted**
62:24, 93:22
**warren**
2:11, 19:6
**washington**
2:8, 199:12,
200:1, 201:17,
201:23
**water**
64:1, 64:2,

74:9, 74:12,
74:23, 75:1,
75:12, 75:13,
75:14, 75:18,
130:3, 153:25,
172:4
**way**
31:8, 38:20,
57:7, 62:11,
63:24, 65:18,
70:19, 71:8,
84:4, 84:14,
86:7, 87:2,
98:18, 98:20,
104:15, 105:8,
109:8, 116:23,
120:5, 122:19,
123:25, 124:2,
125:2, 125:14,
125:23, 125:25,
130:8, 139:6,
139:11, 139:22,
158:3, 159:23,
160:8, 164:13,
164:20, 165:7,
166:6, 166:20,
167:5, 169:8,
173:1, 180:15,
181:2, 181:7,
182:19, 184:1,
187:19, 189:2,
191:3, 199:22,
210:17
**ways**
38:2, 41:11,
42:4, 42:6,
61:23, 66:22,
70:21, 92:7,
111:19, 114:12,
117:12
**we'll**
8:2, 9:7, 20:1,
23:5, 71:23,
112:4, 128:7,
136:6, 152:8,
182:25, 188:12,
204:5, 207:1,
216:18

**we're**
11:11, 22:19,
28:12, 34:12,
51:24, 67:11,
82:9, 90:3,
91:17, 115:13,
117:24, 123:21,
127:16, 152:24,
160:17, 179:5,
191:8, 214:7
**we've**
26:1, 54:7,
66:7, 69:8,
151:11, 162:21,
170:17, 182:25,
189:25, 206:19
**weakened**
35:25
**web**
211:3, 213:15
**website**
21:19, 87:19,
90:11, 175:20,
176:8, 200:11
**went**
17:20, 73:3,
90:16, 157:15
**weren't**
29:11, 72:24,
72:25
**west**
2:13, 31:19,
35:13, 143:21,
144:9, 144:15,
146:21, 147:8,
147:9, 147:13,
147:18, 159:21,
169:12, 169:13,
179:15, 179:23
**western**
144:20, 144:22,
153:8, 153:12,
155:17, 155:19,
155:20, 156:3,
159:1, 159:13,
159:25, 162:14
**whatever**
62:1, 100:5,

134:1, 134:2,
155:7, 174:12,
210:25, 213:25
**whereas**
59:9
**whether**
12:25, 17:23,
22:7, 25:8,
45:18, 49:23,
56:24, 67:2,
69:16, 74:18,
76:21, 77:10,
77:14, 87:17,
90:17, 95:17,
96:20, 97:14,
97:21, 98:5,
98:10, 98:24,
101:5, 101:7,
102:23, 119:8,
119:17, 119:19,
119:24, 120:5,
122:9, 124:13,
124:22, 135:5,
138:10, 139:24,
147:24, 148:3,
148:9, 148:11,
148:17, 156:18,
157:12, 159:4,
160:8, 163:10,
164:15, 166:22,
166:23, 167:7,
168:14, 172:20,
180:11, 194:24,
195:8, 197:21,
213:1, 215:18
**white**
165:17
**whoever**
56:19, 208:23
**whole**
7:8, 7:15,
42:1, 42:2,
47:23, 56:21,
57:4, 57:21,
58:6, 58:11,
58:24, 59:9,
59:11, 59:21,
61:10, 83:1,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

269

85:1, 116:9,
117:14, 117:21,
121:15, 122:5,
157:7, 158:6,
158:19, 158:20,
187:4, 203:6,
208:15
**wholly**
74:24, 160:11,
162:3
**wide**
63:21, 64:5,
81:25
**wider**
138:6
**wiggle**
94:10
**win**
202:16, 202:21
**wish**
49:24
**within**
38:25, 55:13,
58:7, 58:8,
59:18, 72:19,
112:24, 113:5,
141:17, 145:3,
145:6, 156:8,
159:14, 160:11,
162:2, 185:2,
209:1, 212:8,
214:14
**without**
59:16, 100:16,
101:4, 103:5,
104:11, 104:24,
111:6, 160:1,
166:5, 167:17,
173:20
**witness**
7:3, 7:5, 7:10,
13:1, 13:4,
54:11, 76:18,
90:10, 107:10,
115:12, 127:8,
127:14, 127:18,
127:25, 194:24,
212:20

**women**
194:9
**wondering**
39:8, 114:12
**word**
37:19, 136:2,
168:25
**words**
9:2, 35:6,
117:9, 142:16,
209:14
**work**
13:23, 16:18,
18:18, 19:14,
19:24, 41:10,
65:24, 76:18,
82:23, 84:17,
86:14, 86:20,
87:4, 87:8,
165:7, 176:17,
216:1
**worked**
24:21, 215:13,
215:16
**working**
15:11
**works**
127:20
**worse**
118:15
**wouldn't**
30:4, 38:11,
38:21, 39:12,
41:21, 44:15,
48:13, 83:7,
93:24, 102:22,
103:6, 117:4,
121:9, 125:15,
125:18, 161:5,
162:3, 166:2,
166:5, 166:6,
173:16, 206:11
**wrap**
143:11, 143:14,
144:1
**wrapping**
143:17, 143:18,
143:20, 155:6

**wraps**
146:12
**write**
53:8, 117:25,
118:17, 195:13
**written**
16:3, 26:6,
69:6, 85:20,
85:21
**wrong**
77:9, 98:23,
168:25, 192:12
**wrote**
17:3, 94:16,
102:17, 175:15,
206:13, 210:10

**Y**

**yeah**
11:6, 15:10,
18:25, 24:22,
33:10, 41:19,
41:23, 43:4,
43:5, 53:17,
57:2, 60:10,
60:25, 61:16,
64:6, 65:12,
65:14, 68:3,
71:1, 71:10,
73:6, 83:22,
84:5, 86:11,
88:18, 89:10,
89:17, 89:20,
90:4, 93:17,
95:20, 98:20,
102:17, 105:9,
107:18, 112:20,
115:7, 115:13,
127:25, 128:15,
128:18, 129:1,
132:22, 137:7,
143:24, 145:12,
145:16, 146:2,
147:12, 147:15,
147:17, 150:12,
151:4, 151:5,
152:5, 153:23,
157:19, 160:23,

161:17, 171:1,
175:15, 181:22,
183:20, 192:13,
193:15, 193:23,
196:16, 198:9,
200:15, 202:23,
205:13, 211:8,
211:19
**year**
28:11, 28:13,
51:8, 80:14,
207:10
**year-plus**
19:2
**yesterday**
50:20, 215:5
**york**
207:16, 208:5,
208:13, 209:3,
210:8, 210:20,
212:1, 212:17,
214:6, 214:10
**yourself**
20:3, 20:6,
45:23, 53:1,
125:6, 176:23

**Z**

**zero**
122:20
**zip**
205:18
**zone**
127:13
**zoom**
10:17, 48:23

**$**

**$10,000**
216:7
**$125**
215:11
**$2.70**
202:4
**$7.30**
202:24

**.**

**.0001**
67:25

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

270

.001
68:1
.01
67:25
.101
89:4
.207
89:4

**0**

0.35
88:4
00
128:6, 128:9
05
128:4, 128:5

**1**

1
128:4, 128:5,
128:6, 128:9,
204:21
1+
112:14, 113:17,
192:10
10
51:3, 54:12,
54:13, 204:21
100
60:15, 67:22,
67:25, 88:5
100,000
82:20, 166:24
104
197:18
108
45:7, 114:20,
116:6
109
45:7, 114:20,
116:6
11
5:11, 107:23,
108:4, 108:10,
203:9
111
169:12
112
114:20

113
114:20, 170:10
114
114:20, 170:10
115
170:9
116
168:7
117
45:7, 168:3,
168:8, 168:9,
168:11, 168:16,
169:15, 170:7
118
169:14
119
169:13, 169:14
12
107:14, 107:20,
108:18, 109:5,
110:17
12,500
215:21
120
169:25, 170:8,
171:20, 172:9
13
5:4, 17:18,
69:17, 71:6,
87:12, 87:13,
107:15, 107:21,
108:18, 109:5,
109:17, 110:18,
131:17, 131:18
132
5:13
136
5:15
14
5:7, 92:18,
92:20
140
5:16
145
5:17
15
1:18, 4:12,
5:10, 74:3,

74:4, 99:5,
99:6, 107:22,
107:23, 108:4,
108:10, 109:13,
127:10, 130:21,
130:22, 130:23
150
5:18
151
5:19
152
5:20
16
107:16, 131:17,
161:12, 203:11
1625
2:7
168
5:21
17
91:22, 92:3,
92:9, 92:10,
92:12, 129:6,
130:21, 150:22,
151:1, 151:4,
151:21
171
5:22, 5:23,
5:24, 6:3
1724
2:23
18
4:21, 91:22,
92:8, 92:11,
108:3, 109:13,
135:6, 137:16,
146:16, 146:20,
149:14, 149:21,
151:7, 152:15,
152:17, 153:6,
153:8
184
6:4
186
6:6
19
24:7, 90:16,
174:22

190
6:8
1:-cv--jb
1:3
1st
200:16

**2**

2
174:15
2+
113:1, 113:16
2.70
202:9, 203:6
20
45:7, 107:19,
107:20, 108:9,
109:13, 110:18,
127:10, 137:7,
139:5, 139:6,
139:20, 139:23,
141:13, 143:11,
143:15, 143:18,
146:13, 149:17,
151:9, 155:5,
155:16, 159:1,
159:18, 159:25,
162:2, 174:15,
192:5, 192:21,
193:4, 196:13
200
6:9
200,000
93:6, 93:13,
93:25, 94:20
20006
2:8
2010
178:6, 178:7
2016
200:16, 200:18,
200:20
202
2:9
2020
201:10, 201:13,
202:1, 202:2,
202:5, 202:6,

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

271

202:12, 202:25
**2021**
4:21, 25:22,
76:4, 93:4
**2022**
5:21, 12:5,
12:11, 25:22,
93:5, 203:11
**2023**
5:12
**2024**
4:14, 5:8,
14:24, 15:6
**2025**
1:18, 4:11,
4:18, 6:13,
6:14, 24:15,
25:15, 51:3,
110:13, 204:20,
218:17
**2027**
218:6
**204**
6:12
**207**
6:14
**21**
4:10, 4:14,
136:18, 136:20,
137:7, 137:11,
144:8, 144:13,
145:1, 147:4,
147:19, 148:1,
148:7, 148:10,
148:14, 148:17,
155:10, 155:16,
155:21, 159:1,
159:2, 159:17,
159:18, 159:25,
160:1
**218**
1:24
**21983**
1:3
**22**
5:13, 132:12,
132:16, 132:25,
133:7, 143:9,

143:14, 143:18,
146:12, 149:21,
155:6, 159:18,
218:6
**23**
4:15, 4:19,
143:9, 143:10,
143:17, 155:7,
159:18, 201:10
**24**
1:3, 45:8,
46:19, 46:23,
133:9, 137:19,
137:24, 138:3,
138:21, 138:23,
142:18, 142:19,
143:3, 146:4,
149:25, 150:1,
151:9, 151:10,
159:19, 194:10
**25**
6:9, 133:9,
139:1, 139:15,
139:25, 140:5,
140:8, 140:22,
140:25, 141:4,
141:10, 143:4,
144:5, 145:25,
146:2, 149:21,
151:9, 151:10,
159:19, 200:5,
200:6
**255**
3:6
**26**
6:12, 24:7,
24:9, 24:12,
28:7, 28:10,
28:11, 72:18,
73:17, 89:22,
111:22, 129:12,
130:15, 130:20,
131:1, 131:15,
131:21, 131:23,
138:2, 141:7,
141:14, 141:17,
142:9, 142:15,
145:6, 147:20,

149:24, 150:1,
156:7, 158:15,
159:20, 160:14,
160:15, 160:19,
161:22, 162:1,
163:6, 163:12,
163:21, 164:3,
166:24, 167:1,
167:9, 194:19,
195:20, 196:5,
197:4, 202:2,
204:7
**27**
5:16, 24:7,
72:18, 73:11,
133:9, 133:15,
138:2, 140:15,
140:16, 140:19,
147:22, 157:4,
158:25, 159:19,
160:20, 196:22,
196:24, 197:6
**2700**
2:16
**2707**
3:9
**28**
4:17, 5:21,
24:7, 72:18,
107:16, 107:24,
108:5, 108:11,
129:14, 129:18,
135:15, 157:17,
157:18, 157:19,
159:19, 159:20,
160:11, 160:20,
160:25, 161:1,
161:16, 161:19,
162:3, 162:6,
167:22, 167:23,
190:2, 190:4,
191:11, 191:21,
192:1, 193:25,
198:17, 218:17
**29**
5:15, 120:11,
120:15, 136:8,
136:9, 194:11,

195:12, 196:3,
196:21, 196:24,
202:5
**2nd**
202:25, 203:7

**3**

**3**
214:21, 217:3
**30**
5:17, 54:12,
145:19, 145:20,
191:2, 214:21
**301**
2:21
**305**
3:9
**31**
5:3, 72:4,
72:5, 149:9,
149:12
**32**
5:18, 112:8,
122:14, 150:16,
150:17
**32301**
2:23
**33**
1:19, 5:19,
151:16, 151:17
**33134**
2:15, 3:8
**34**
5:20, 117:24,
152:10, 152:11,
153:4, 157:2,
157:4, 217:3
**35**
5:22, 171:3,
171:5
**36**
5:23, 171:8
**36,000**
42:3
**363**
2:16
**37**
5:24, 171:11

Transcript of Cory McCartan, Ph.D.
Conducted on July 15, 2025

272

**38**
6:3, 128:21,
128:24, 128:25,
171:3, 171:14
**383**
2:9
**39**
192:1
**3rd**
207:9

**4**

**40**
42:4, 54:13,
190:21, 190:23,
190:24, 191:2,
191:4, 191:9,
191:13, 196:15,
196:16, 197:9
**400**
2:14
**42**
6:6, 185:22,
185:23, 188:12
**43**
6:14, 132:1,
207:2, 207:3,
207:7
**4343**
2:13
**436060**
218:23
**44**
6:4, 184:9,
184:10
**45**
6:8, 127:21,
127:23, 190:16,
190:17
**455787**
218:23
**46**
194:14, 195:14

**5**

**5,000**
80:19, 80:23,
81:4, 81:11,

82:12, 82:14,
82:21, 88:18,
89:7, 91:7,
91:12, 92:1,
93:14, 94:5,
182:14, 183:12,
183:13, 183:16,
183:22
**5.4**
191:9
**5.5**
191:6
**50**
4:22
**500**
79:6
**501**
201:6
**5112**
2:9
**52**
4:25
**54**
131:19
**55**
120:11, 120:16
**577**
2:24
**588374**
1:23
**5th**
204:20, 204:25,
205:2, 205:5

**6**

**600**
2:22
**640**
3:7
**677**
3:9
**680,347**
161:18

**7**

**7.30**
203:6
**70**
163:17, 164:1

**71**
99:10
**71.6**
72:19
**72**
5:3
**73**
99:24, 101:10
**74.2**
72:19
**75**
38:7, 103:23,
103:24
**786**
2:16

**8**

**850**
2:24
**87**
5:4

**9**

**9**
1:19
**90**
138:23, 146:10,
150:9, 164:6,
164:17, 165:13,
165:17, 166:1,
166:12
**9090**
2:24
**92**
5:7
**95**
37:10, 37:12,
37:15, 37:23,
38:6, 39:1,
39:4, 71:4,
154:15
**99**
5:10
**997**
73:20