UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:24-cv-21983-JB

CUBANOS PA'LANTE, *et al.*,

    Plaintiffs,

v.

FLORIDA HOUSE OF REPRESENTATIVES
and CORD BYRD, in his official capacity as
Florida Secretary of State,

    Defendants.
_____/

_____

**DEFENDANT FLORIDA HOUSE OF REPRESENTATIVES'
REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

_____

## INTRODUCTION

The House's evidence provided a clear and cogent explanation of the design of each challenged district. In fact, Plaintiffs do not dispute the districts' many race-neutral, tier-two accomplishments. ECF No. 130-7 at 3–6 (RFAs 13–37). Instead, they point out that the Legislature considered race—which the Constitution permits—and nitpick perceived imperfections of the challenged districts. Worse, Plaintiffs discuss districts and even maps interchangeably, shunning the district-by-district analysis that precedent requires and masking the insufficiency of their evidence. They present a mishmash of factual assertions and leave the Court to disentangle those assertions and to conduct the proper district-by-district analysis.

Below, the House first shows that Plaintiffs' generalized evidence—evidence not directed to any particular district's unique circumstances—does not suggest predominance. It then reviews Plaintiffs' limited, district-specific evidence and shows that, when that evidence is disentangled, Plaintiffs fail to overcome the presumption of good faith and to carry their burden to produce significantly probative evidence from which a fact-finder could conclude that race predominated on a district-by-district basis. The House therefore respectfully requests summary judgment in its favor as to each challenged district.

## LEGAL STANDARD

Contrary to their argument, Plaintiffs bear the heavy burden—not the House. The House's only burden is to point out the absence of evidence of racial predominance. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Plaintiffs must then adduce evidence to establish the existence of that essential element. *Id.* at 322. If a fair-minded fact-finder could not find for Plaintiffs on the summary-judgment evidence, then the House is entitled to summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## ARGUMENT

**I.     RACE DID NOT PREDOMINATE IN THE DRAWING OF THE CHALLENGED STATE HOUSE DISTRICTS.**

**A.     Plaintiffs' Generalized Evidence Does Not Suggest Racial Predominance.**

As to State House districts, Plaintiffs' generalized evidence reveals only what is undisputed: that the Legislature considered race as one factor and that the Florida Constitution confers legal protections on minority voters. But it does not suggest predominance—*i.e.*, that race was elevated above traditional race-neutral districting principles "comparatively speaking." *Easley v. Cromartie*, 532 U.S. 234, 253 (2001).

**Statements in the Legislative Record.** Plaintiffs cull several statements from the voluminous legislative record, but even those choice passages do not indicate racial predominance. Some statements, for example, merely describe attributes or characteristics of the newly drawn districts and do not address legislative motivation at all. When Chair Byrd "noted the Hispanic voting-age population of the districts"

1

and commented that their Hispanic voting-age populations were "similar compared to the benchmark districts," ECF No. 127 at 6, he did nothing more than state factual information about the new districts.

Chair Byrd also stated that the districts were "performing Hispanic districts" drawn "to maintain existing majority-minority districts," *id.*, but this Court already explained that this precise statement "does not, by itself, plausibly suggest" predominance—only that "race played *a* role in legislative deliberations," ECF No. 88 at 11. This Court recognized that legislatures "can—and routinely do—consider race to comply with state and federal law" and that the consideration of race does not prove predominance. *Id.*

At his deposition, Mr. Poreda explained that the House did not establish any "particular target" for Hispanic population; Chair Byrd's statements reflected "simply a way of presenting information and data for nine districts all at once" and an "easier way to . . . explain all of those districts in . . . a succinct way to the committee." Poreda Dep. at 145:25–148:24;[1] *accord id.* ("It was a way for the members of the committee to conceptualize how the region . . . ended up being relatively similar to the benchmarks.").

Chair Leek's statement that, "when it's a protected district, we focus much less on Tier Two," ECF No. 127 at 6, comes from a discussion of unchallenged District 88. ECF No. 126-8 at 67:1–68:23. District 88 is an unusually shaped district in Palm Beach County, ECF No. 123-1 at 4, drawn to protect the voting ability of Black voters, ECF No. 126-8 at 67:12–19. At his deposition, Mr. Poreda discussed the peculiar circumstances of that district, testifying that racial and non-racial considerations conflicted in the drawing of District 88. Poreda Dep. at 126:15–127:18, 189:20–190:2. But Chair Leek's discussion of District 88 does not imply that race predominated in the design of largely Hispanic districts 75 miles away. *See Nord Hodges v. Albritton*, --- F. Supp. 3d ----, No. 8:24-cv-00879, 2025 WL 2391348, at *11 (M.D. Fla. Aug. 18, 2025) (concluding that a legislator's explanation of a district in Jacksonville, though phrased as a generalization, did not imply predominance in a district in Tampa). Mr. Poreda explained that, while Chair Leek's statement was correct in the sense that state law prioritizes Tier One when the standards in the two tiers conflict, "during the drawing process we didn't necessarily always draw for Tier 1 first and then Tier 2. Sometimes in south Florida particularly it was the opposite, and in a lot of cases it was a balance of the two. So we were trying to balance all of that together." Poreda Dep. at 185:8–186:13.

Next, Plaintiffs focus on an extensive colloquy between Representative Driskell and Chairs Leek and Byrd. ECF No. 127 at 7–8. From that colloquy, Plaintiffs cherry-pick three references to Tier One to suggest that the Chairs conceded racial predominance. But throughout the same colloquy, the Chairs repeatedly affirmed that the districts at issue were drawn in harmony with tier-two principles. Time and

---

[1] *See* ECF No. 123-3. The page references are to the original pagination on the transcript.

2

again, the Chairs explained that the districts are compact. ECF No. 126-8 at 47:21–22 ("So yes, I would consider those within the legal limits [of compactness], yes."); *id.* at 48:6 ("The short answer is yes, it is compact within the legal limits."); *id.* at 48:23 ("Yes, it is compact within the legal limits."); *id.* at 49:18 ("The short answer is yes. They are compact . . . ."); *id.* at 50:2 ("It's the same answer."); *id.* at 50:22 ("So the answer is yes, they are not only compact, but legally compliant."). They also pointed out the districts' adherence to preexisting boundaries. *Id.* at 49:12–13 ("So when you look at Districts 114 and 115, we're trying to keep the city of Coral Gables whole . . . ."); *id.* at 51:18–19 ("[In] some of those instances . . . it was necessary to keep cities whole."); *id.* at 53:1–5 ("Mr. Langan . . . can tell you, for instance, why this line is drawn here. And in most cases, it's going to be that's a major roadway, or that's a waterway.").

Plaintiffs cannot manufacture predominance through selective quotations. The legislative record is replete with explanations of the tier-two motivations behind the challenged districts. Plaintiffs simply ignore them. But those explanations provide essential context to Plaintiffs' claims of predominance. *See, e.g.,* ECF No. 126-4 at 38:5–39:2, 39:10–40:3 (discussing the major roads and municipal boundaries that the challenged districts utilize and the municipalities they keep whole); ECF No. 126-6 at 23:17–24:20 (noting the significant improvement in boundary scores and compactness scores relative to Miami-Dade County's benchmark districts); ECF No. 126-7 at 30:9–31:11, 32:1–4 (noting improvements in boundary scores and compactness scores and improved utilization of roadways and municipal boundaries in the challenged State House districts); ECF No. 126-8 at 21:14–22:1, 22:20–23:9 (same; noting that "many of the districts in the region take a more vertical or north-south orientation" because of "the north-south nature of the population distribution and the development of the major roadways in this area").

Chair Leek's references to Tier One in his colloquy with Representative Driskell do not establish predominance. Mr. Poreda understood Chair Leek's statement that "we get to compactness after Tier One" to mean that, under the Florida Constitution, Tier One is "superior" when the standards in the two tiers conflict. Poreda Dep. at 155:14–156:8; *see also* Fla. Const. art. III, § 21(b). Mr. Poreda explained, however, that in "the actual drawing process, particularly in south Florida, I don't think that we were drawing for Tier 1 before we got to Tier 2. In fact, I think it was the opposite. We drew for Tier 2 and then made sure the districts then complied with Tier 1, partially because that area is so densely populated [with] such a high concentration of Hispanic voting age population, it was not really necessary to draw first with Tier 1 principles in mind." Poreda Dep. at 155:14–157:2; *accord id.* at 160:19–164:4 ("Again, I think he's more referring to . . . the global part of it. I can tell you in the drawing process . . . we did not always . . . draw a district to satisfy Tier 1 before getting to Tier 2. It was always a combination of the two together, right. And specifically in south Florida, with these districts, it was basically the reverse.").

3

Plaintiffs' quotations from the colloquy with Representative Driskell deftly omit an important comment that refutes their assertions. *See* ECF No. 127 at 7–8. After discussing the relationship between the two tiers, Chair Leek concluded: "And what you see before you was the best configuration that we could come up with *in balancing all of those factors*." ECF No. 126-8 at 52:13–17 (emphasis added). Thus, Chair Leek made clear that the map-drawers did not subordinate non-racial considerations, but rather *balanced* racial and non-racial considerations—as the law permits, *Allen v. Milligan*, 599 U.S. 1, 31 (2023) (affirming finding of no predominance where expert gave racial and non-racial factors equal weighting).

Finally, Plaintiffs point to Ms. Kelly's statement that, "throughout the map, obviously, our Tier One considerations take priority, as we know, over Tier Two." ECF No. 127 at 8. Again, this statement refers to the Florida Constitution's prioritization of Tier One in case of conflict. But that constitutional prioritization does not mean that a conflict arose in every case—or that race predominated. Ms. Kelly's statement is the sort of "generalized language that the [Supreme] Court has rejected as insufficient when evaluating racial-gerrymandering claims on a 'district-specific' basis." *See* ECF No. 88 at 11–12 (quoting *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 263 (2015)). It does not refer specifically to the districts at issue, but broadly to districts throughout the map, and merely states an explicit state-law legal principle.

The statements in the legislative record do not prove or even suggest that race predominated in the design of any challenged State House district. With the exception of District 115, which Mr. Poreda's declaration explains, ECF No. 123-2 ¶ 30, none of the statements suggests *how* or *where* race played *any* role—let alone a predominant role—in drawing the challenged districts. To be sure, these unelaborated comments show that the Legislature considered race, but they are insufficient to support a finding that the Legislature did not act in good faith and that race predominated in the drawing of any specific district.

**The Functional Analysis.** In Part I.C., Plaintiffs' response describes the functional analysis the House performed to ensure compliance with the Non-Diminishment Clause. In the process, Plaintiffs latch onto the word "baseline," as though it proves predominance. ECF No. 127 at 13–14. But Plaintiffs' own evidence shows only that the House performed the exact analysis the Florida Supreme Court has prescribed under the Non-Diminishment Clause. Nothing in federal law forbids that analysis. *See* ECF No. 88 at 11 ("Legislatures can—and routinely do—consider race to comply with state and federal law.").

The Florida Supreme Court has explained that, to determine whether a district diminishes the ability of racial minorities to elect representatives of their choice, one must first assess the predecessor (or benchmark) map: "The first step is to identify districts in the benchmark plan where racial or language minorities were able to elect representatives of their choice—call them 'ability-to-elect districts.' " *Black Voters Matter Capacity Bldg. Inst., Inc. v. Sec'y, Fla. Dep't of State*, --- So. 3d ----, No. SC2023-1671, 2025 WL

4

1982762, at *3 (Fla. July 17, 2025) (internal marks omitted); *accord id.* at *8 (reiterating that the "first step" is to identify ability-to-elect districts in the benchmark map). This establishes the *baseline* against which diminishment is measured: "The second step is to determine whether, *relative to that benchmark*, the new plan diminishes minority voters' ability to elect representatives of their choice." *Id.* at *3 (emphasis added).

Mr. Poreda performed this initial review of the benchmark map before he drew the new districts. Poreda Dep. at 122:9–125:8, 141:15–25, 142:14–143:4. This analysis gave Mr. Poreda an "awareness" of the "number of Tier 1 districts in different regions of the state from the benchmark plans." *Id.* at 144:6–9. When he began to draw, however, Mr. Poreda began with a blank map and did not attempt to "mimic" or replicate the benchmark districts; in fact, he endeavored to draw the new districts consistent with tier-two principles and, relative to the benchmark, to improve their compactness and adherence to political and geographical boundaries. *Id.* at 79:5–80:9, 142:1–13, 144:2–5, 144:10–145:16. Mr. Poreda did not draw the ability-to-elect districts first, but rather developed all of the districts organically. *Id.* at 286:6–9.

Mr. Poreda's "awareness" of the benchmark map's tier-one characteristics in no way falsifies the assertion that, in the drawing process, Mr. Poreda did not consider race until he conducted a functional analysis of the new districts. ECF No. 127 at 13; ECF No. 123-2 ¶¶ 10, 12 ("But we did not consider race in . . . drawing those districts. . . . Rather than drawing the challenged State House districts with race in mind, we drew those districts to ensure tier-two compliance and only then confirmed that the districts also complied with the Non-Diminishment Clause."). Instead, it demonstrates that Mr. Poreda followed precedent to a tee and correctly ascertained the baseline against which diminishment would be measured.

Finally, Plaintiffs discuss the mechanics of the functional analysis. ECF No. 127 at 13–14. As explained in the House's motion, the functional analysis defined by the Florida Supreme Court requires consideration of population data, election results, voter turnout, and registration data. ECF No. 122 at 7. Plaintiffs seize on Mr. Poreda's statement that the election of a candidate preferred by Hispanic voters was the "goal" or "overall goal," ECF No. 127 at 14, but they overlook the context of those statements.

As the Florida Supreme Court has explained, the functional analysis evaluates in part "whether the minority candidate of choice is likely to prevail in *the relevant contested party primary.*" *Black Voters Matter*, 2025 WL 1982762, at *8 (emphasis added). Mr. Poreda explained that, in competitive districts that could elect either major-party candidate, *both* party primaries are relevant and should be analyzed. Poreda Dep. at 268:10–269:6, 269:21–270:3. This is because the *goal* of the Non-Diminishment Clause is not to elect a Democrat or a Republican, but rather to enable the minority group to elect the candidate of *its* choice. *Id.* at 268:25–269:6 ("Whether it be Republican or Democrat, . . . I don't want to say it didn't matter to us, but we had to make sure that the primaries in each side could potentially be won by a Hispanic

5

candidate in the other side, because electing a Hispanic in those three districts specifically was the goal.").

The context of Mr. Poreda's testimony thus explains his reference to an "overall goal." The goal of the Non-Diminishment Clause is to enable the minority group to elect representatives of its choice—not to elect a Democrat or a Republican per se. Nothing in Mr. Poreda's testimony supports Plaintiffs' reading that Mr. Poreda's "goal" was to elevate race and subordinate race-neutral districting principles.

**Dr. McCartan's Maps.** Next, Plaintiffs compare the overall metrics of seven State House maps prepared by their expert, Dr. McCartan, to the enacted State House districts. ECF No. 127 at 17–18. Plaintiffs claim that Dr. McCartan's maps are mathematically superior and thus prove that the Legislature racially gerrymandered the challenged State House districts. That argument does not withstand scrutiny.

*First*, Plaintiffs' data do not prove that Dr. McCartan's maps are "better." Dr. McCartan presents these data in three tables—Tables 1, 3, and 4—set forth in his expert report. ECF No. 126-16 at 15–18. The data show that Dr. McCartan's maps are slightly better by some metrics and slightly worse by others:

- The number of municipalities in Miami-Dade County that are split at least once or at least twice, and the number of times that municipalities in Miami-Dade County are split, are virtually indistinguishable across the maps. ECF No. 126-16 at 15 tbl. 1. Sometimes the enacted map fares better, and sometimes some of Dr. McCartan's maps do, but not by much. Dr. McCartan's assessment is tepid: "the illustrative maps respect municipal boundaries at least as well as the enacted plan, and in some cases better." *Id.* at 15 ¶ 34.

- The differences in mean boundary scores for eleven districts that Dr. McCartan analyzed (including the seven challenged State House districts) are miniscule. *Id.* at 17 tbl. 3. In the enacted State House map, 16.7 percent of the total perimeter of the eleven districts' boundaries does *not* use political or geographical boundaries. In three of Dr. McCartan's maps, this number ranges from 15.2 to 15.5 percent. *Id.* This microscopic difference—barely one percentage point—in no way supports an inference of racial gerrymandering.

- Dr. McCartan calculated the difference between the mean compactness scores of the enacted map and the mean compactness scores of his alternative maps. *Id.* at 18 tbl. 4. These differences are infinitesimal. The *largest* improvement that Dr. McCartan eked out in any of his alternative maps is *one one-hundredth* of a point, *id.*—hardly a difference at all.

The fact that the alternative maps' overall metrics are similar to those of the enacted map—sometimes slightly better, sometimes slightly worse—lends no weight to Plaintiffs' claims of racial gerrymandering. If anything, the smallness of the differences proves that the enacted map was not racially gerrymandered.

Tellingly, Dr. McCartan's maps hardly alter the racial composition of the challenged State House districts. In the enacted map, these districts contain a combined 850,388 Hispanics of voting age; in Dr. McCartan's maps, that number ranges from 849,238 to 854,696. ECF No. 130-1 at 1–2. While Plaintiffs would carve up Miami-Dade County differently, their own maps refute their allegations of racial sorting.

*Second*, even if Dr. McCartan's maps were somewhat "better," it would not matter. Because it is

6

*always* possible to improve on any redistricting map, courts have long rejected the argument that a state legislature must draw the "best" plan—or that a plan is legally infirm if a challenger posits a better one. Because district maps are "integrated bundles of compromises, deals, and principles," *Sanchez v. State of Colorado*, 97 F.3d 1303, 1329 (10th Cir. 1996), there is "no conceivable map that would not be subject to nitpicking on some basis," *League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 177 (W.D. Tex. 2022). A court's duty is "not to select the best plan, but rather to decide whether the one adopted by the legislature is valid." *In re Senate Joint Resol. of Legis. Apportionment 1176*, 83 So. 3d 597, 608 (Fla. 2012).

For example, the Supreme Court has rejected as "impossibly stringent" one court's view that a race-predominant district must have "the least possible amount of irregularity in shape" to survive strict scrutiny. *Bush v. Vera*, 517 U.S. 952, 977 (1996) (plurality opinion). A reasonably shaped district need not "defeat rival districts designed by plaintiffs' experts in endless beauty contests." *Id.* (internal marks omitted). And in *Gaffney v. Cummings*, 412 U.S. 735 (1973), the Court explained that a district map can satisfy the equal-population mandate even if a litigant can produce a "marginally 'better' " map. *Id.* at 750–51. Otherwise, a map would be invalid whenever a "resourceful mind hits upon a . . . better" one. *Id.* at 750.

In *Alabama Legislative Black Caucus v. Alabama*, 231 F. Supp. 3d 1026 (M.D. Ala. 2017) (three-judge court), in a decision authored by now-Chief Judge Pryor, the court repeatedly rejected arguments that "better" maps prepared by challengers proved racial predominance. The plaintiffs' alternative maps "established that District 99 could be drawn more compactly," but the court concluded that "these plans do not prove that race predominated in the enacted district." *Id.* at 1333. Similarly, the court noted that the challengers' maps "improve on the enacted districts" by reducing the number of counties in District 24 from eight to seven and the number of counties split by District 24 from six to two, but concluded that the difference is "not suspicious by itself" and that the enacted configuration "was sensible." *Id.* at 1113. The challenged districts' imperfections did not prove that the legislature subordinated race-neutral principles to race: "The shapes of the districts are not so bizarre as to give rise to an inference of gerrymandering." *Id.* at 1068; *see also NAACP v. Snyder*, 879 F. Supp. 2d 662, 679 (E.D. Mich. 2012) (three-judge court) (rejecting an equal-protection claim of discriminatory intent because, even if the plaintiffs presented a better plan, the enacted plan did not disregard traditional race-neutral districting principles).

The fact that an expert can draw a mathematically similar or even slightly better map—with three years of hindsight and in the comfort of his faculty office, at a safe distance from the legislative process—says nothing about the Legislature's consideration of race when it enacted Florida's State House districts.

**Dr. Abott's Report.** As to State House districts, the only part of Dr. Abott's expert report that Plaintiffs discuss is her bottom-line conclusion that the districts' shape and demographics are "consistent

7

with the claim that mapmaking was driven by racial considerations." ECF No. 127 at 18 (quoting ECF No. 126-18 ¶ 54). For good reason, Plaintiffs do not cite her specific and deeply flawed analyses of State House districts, and this Court need not delve into uncited portions of her report. Fed. R. Civ. P. 56(c)(3).

Suffice it to say, even Dr. Abott's bottom-line conclusion does not suggest racial predominance in the drawing of the challenged State House districts. Dr. Abott testified that she has no opinion as to whether race predominated—only that it cannot be ruled out. ECF No. 130-2 at 26:21–28:16, 31:7–24. She does not even opine that race was *one* of the factors—only that the evidence "strongly suggests" it was. *Id.* at 28:17–29:9, 32:18–33:7. While she believes race was likely "at least one explanation," she agreed there "may very well be other explanations" of the challenged districts' configurations. *Id.* at 33:8–34:15. Dr. Abott did not review—and was not asked to consider or address—the influence of non-racial considerations or potential alternative explanations for the shapes of the districts, and cannot therefore opine on the "relative weight or importance" of racial and non-racial factors. *Id.* at 36:3–14, 75:1–77:16. She also testified that the evidence and her analysis are "consistent with the idea that *politics* predominated" in the design of the challenged districts, rather than race. *Id.* at 174:22–175:11 (emphasis added).

Plaintiffs' glancing reference to Dr. Abott's bottom-line conclusion is not significantly probative evidence that can save their claims from summary judgment. If Plaintiffs intended to rely on Dr. Abott's analyses, then it was incumbent on Plaintiffs to present it and not simply telegraph her report's existence.

### B. Plaintiffs' District-Specific Evidence Does Not Warrant a Trial.

The evidence discussed above is insufficient for yet another reason: courts do not measure racial predominance statewide, or even regionally, but on a "district-by-district" basis. *Ala. Legis. Black Caucus*, 575 U.S. at 262; *accord Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 191 (2017) ("[T]he basic unit of analysis . . . for the racial predominance inquiry . . . is the district."). Plaintiffs never conduct district-by-district analyses, however, and most of their evidence is generalized—not district-specific. Below, the House demonstrates that Plaintiffs' district-specific evidence is insufficient to overcome the presumption of legislative good faith and to avoid summary judgment as to the challenged State House districts.

**District 112.** Plaintiffs' response mentions District 112 in a substantive way only twice:

*First*, it notes that the enacted map splits the City of Miami "into more parts than necessary" and that District 112 is one of five districts that split Miami. ECF No. 127 at 16. But Plaintiffs offer no facts to suggest the Legislature split Miami because of race. And two of Dr. McCartan's maps do exactly the same thing and *also* split Miami five ways. ECF No. 130-7 at 2 (RFAs 4–7). Yet when Dr. McCartan does it, Plaintiffs sing a different tune and somehow insist that Miami is *not* split more often than necessary. *Id.*

*Second*, Plaintiffs note that District 112's three compactness scores are in the 36th, 29th, and 38th

8

percentiles. ECF No. 127 at 16 n.9. In other words, District 112's compactness scores are *better* than the compactness scores of many of the 120 State House districts the Florida Supreme Court has reviewed for compactness and unanimously upheld. *See In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d 1282, 1285 (Fla. 2022). If anything, these data establish that District 112 is *not* an outlier—unlike most districts that the Supreme Court has determined to be racial gerrymanders. *See, e.g., Bush*, 517 U.S. at 960 (plurality opinion) (affirming a finding that race predominated in three districts that "ranked . . . among the 28 least regular congressional districts nationwide"); *Shaw v. Hunt*, 517 U.S. 899, 906 (1996) (same as to a "serpentine district [that] has been dubbed the least geographically compact district in the Nation"). Nor do Plaintiffs present any evidence that racial considerations impacted District 112's compactness or offer the Court any absolute or objective measure to distinguish high from low compactness scores.

As to District 112, therefore, the sum total of Plaintiffs' district-specific evidence is that Miami is split five ways and that District 112's compactness scores outrank approximately one-third of districts in the map. These are state-law claims: if Plaintiffs allege that District 112 violates Tier Two's compactness and boundary requirements, then they must bring their state-law claims in state court. These claims do not become federal claims merely because the district happens to have a mostly minority population. On this record, no reasonable fact-finder could rule for Plaintiffs and find that race was predominant in the design of District 112. As to District 112, the Court should grant summary judgment to the House.

**District 113.** Plaintiffs' district-specific evidence with respect to District 113 is equally meager.

*First*, Plaintiffs claim Mr. Poreda "may" have adjusted District 113 in response to the functional analysis, ECF No. 127 at 14, but Plaintiffs base this assertion solely on Mr. Poreda's testimony that he does not recall whether he did or not. *See* Poreda Dep. at 169:15–170:1 ("**Q.** . . . Besides the changes to 115 . . . were there any other instances where challenged house districts in Dade County were adjusted to ensure Tier 1 compliance? **A.** Not that I can recall. **Q.** But some changes were made to 113 to ensure Tier 1 compliance? **A.** I don't remember. It's possible. **Q.** You think maybe? **A.** I don't remember.").

*Second*, District 113 is one of five districts that split Miami, but two of Dr. McCartan's maps do the same, ECF No. 126-16 ¶ 17, and Plaintiffs present no evidence of racial motivations behind the split.

*Third*, Plaintiffs note that District 113's Convex Hull and Polsby-Popper scores are in the 22nd and 32nd percentiles. ECF No. 127 at 16 n.9. Just as District 112's compactness scores do not suggest predominance, neither do District 113's. Further, District 113's Reock score (0.55) is 18th *highest* among 120 districts (81st percentile), well above the mean Reock score statewide (0.45). ECF No. 130-3 at 2–3.

From this evidence, no fact-finder can reasonably conclude that Plaintiffs have established racial predominance. Thus, as to District 113, the Court should grant summary judgment in favor of the House.

9

**District 114.** Plaintiffs' district-specific evidence as to District 114 fares no better.

*First*, Plaintiffs contend that the adjustments made to adjacent District 115 in response to staff's functional analysis of District 115 "prompted adjustments to HD 115's border with HD 114." ECF No. 127 at 14. But the Supreme Court has squarely rejected this "impact" theory of predominance. If District 115's functional analysis required changes to District 115, then the downstream impacts on District 114 do not make District 114 a racial gerrymander. *Sinkfield v. Kelley*, 531 U.S. 28, 30–31 (2000); *United States v. Hays*, 515 U.S. 737, 745 (1995); *Nord Hodges v. Albritton*, 774 F. Supp. 3d 1340, 1348 (M.D. Fla. 2025).

*Second*, District 114 is one of five districts that split Miami, but two of Dr. McCartan's maps do the same, ECF No. 126-16 ¶ 17, and Plaintiffs present no evidence of racial motivations behind the split.

*Third*, Plaintiffs claim that District 114 is "noncompact" and has low compactness scores, ECF No. 127 at 16 & n.9, but present no evidence of racial motives behind the district's shape. Meanwhile, Mr. Poreda explained that District 114 was drawn to encompass Coral Gables, which itself is vertically oriented, and to keep South Miami and West Miami whole. ECF No. 123-2 ¶¶ 24–26. A visual review of District 114 enclosing these municipalities confirms Mr. Poreda's account. *See* ECF No. 123-1 at 10.

Plaintiffs present no evidence to explain District 114's shape, while Mr. Poreda's explanation—which the legislative record supports, ECF No. 126-8 at 49:12–13—is convincing. On this record, no reasonable fact-finder could find for Plaintiffs, and summary judgment is appropriate as to District 114.

**District 115.** As to District 115, Plaintiffs focus on the adjustment that Mr. Poreda made to the district's northern boundary in response to his district-specific functional analysis. ECF No. 127 at 14. But this evidence is insufficient. Equal protection does not bar a legislature from considering race as a "factor in the State's redistricting calculus." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 19 n.6 (2024). If race may constitutionally be a factor, then it may constitutionally impact a district's boundaries.

What Plaintiffs have not shown is that race was the "dominant and controlling rationale" in the design of District 115, *Miller v. Johnson*, 515 U.S. 900, 913 (1995), and had a "direct and significant impact" on District 115's configuration, *Cooper v. Harris*, 581 U.S. 285, 300 (2017) (quoting *Ala. Legis. Black Caucus*, 575 U.S. at 274); *accord Miller*, 515 U.S. at 916 (asking whether race was the predominant reason why the legislature placed "a *significant number* of voters within or without a particular district" (emphasis added)).

Here, the evidence indicates only that, after conducting their functional analysis of District 115, staff "extended the district slightly to the north." ECF No. 123-2 ¶ 30; Poreda Dep. at 128:18–129:22 (explaining that District 115's functional analysis resulted in a "little slight extension" of District 115); *id.* at 168:9–21 (explaining that the functional analysis resulted in District 115 "extending slightly further north than it maybe originally had"). Plaintiffs present no evidence of the scope or magnitude of that

10

adjustment, such as the district's pre-adjustment shape or the extent to which its boundary moved north. And far from being an "irregular appendage," ECF No. 127 at 14, the northern part of District 115 is highly regular and consonant with tier-two principles. As the map reveals, the northern part of District 115 is a rectangle consisting of straight lines and right angles and carefully avoids splitting municipalities. *See* ECF No. 123-1 at 11. Nothing in the record suggests that race had a "direct and significant impact" on District 115's configuration. *Cooper*, 581 U.S. at 300 (quoting *Ala. Legis. Black Caucus*, 575 U.S. at 274).

In the predominance analysis, a court "should not divorce any portion of the lines . . . from the rest" or "confine its analysis to the . . . portions of the lines" that reflect tension between racial and non-racial considerations. *Bethune-Hill*, 580 U.S. at 191–92. "That is because the basic unit of analysis for racial gerrymandering claims in general, and for the racial predominance inquiry in particular, is the district." *Id.* at 191. "The ultimate object of the inquiry . . . is the legislature's predominant motive for the design of the district as a whole." *Id.* at 192. The court "must consider all of the lines of the district," and any explanation for a particular portion of the lines must account for the "districtwide context." *Id.*

Plaintiffs simply ignore most of the district, including the Legislature's efforts to keep Pinecrest, Palmetto Bay, and Cutler Bay whole within District 115 and West Miami, South Miami, and Coral Gables whole in District 114; the impact of District 117, a district that performs for Black voters; and the evident care taken to avoid splitting four adjacent municipalities (Miami, West Miami, South Miami, and Coral Gables). *See* ECF No. 123-1 at 11. The mere fact that Mr. Poreda made a slight adjustment to the district to ensure compliance with the Non-Diminishment Clause does not support a finding that race was "the legislature's predominant motive for the design of the district as a whole." *Bethune-Hill*, 580 U.S. at 192.

Finally, Plaintiffs comment on District 115's compactness but, apart from the slight adjustment of the northern boundary, make no attempt to connect District 115's shape to racial motivations. ECF No. 127 at 16 & n.9. Sandwiched between Coral Gables and an ability-to-elect district (District 117), District 115 adheres to tier-two principles, as explained in Mr. Poreda's declaration. ECF No. 123-2 ¶ 29.

**District 116.** Plaintiffs present almost no district-specific evidence with respect to District 116. They note that the adjustment to District 115 in response to District 115's functional analysis impacted District 116, ECF No. 127 at 14, but, as explained above, this impact theory of racial predominance has been rejected. *Sinkfield*, 531 U.S. at 30–31; *Hays*, 515 U.S. at 745; *Nord Hodges*, 774 F. Supp. 3d at 1348.

Last, Plaintiffs claim that District 116 is "noncompact" and that its Reock score is low, ECF No. 127 at 16 & n.9, but a visual examination proves them wrong, *see* ECF No. 123-1 at 11. Mathematically, the district's Convex Hull and Polsby-Popper scores rank high: its Convex Hull score (0.88) ranks 33rd of 120 districts and compares favorably to the mean Convex Hull score (0.82), while its Polsby-Popper

11

score (0.51) is 37th of 120 and exceeds the mean Polsby-Popper score (0.45). ECF No. 130-3 at 2–3.

Plaintiffs present no evidence that the Legislature subordinated race-neutral districting principles in drawing District 116. If Plaintiffs believe District 116 is not compact, then state court is the proper venue for their claim. This Court should grant summary judgment in the House's favor as to District 116.

**Districts 118 & 119.** Plaintiffs inaccurately claim that Mr. Poreda testified to "potential conflicts" between racial and non-racial considerations in drawing Districts 118 and 119. ECF No. 127 at 14. His testimony was the opposite: "**Q.** Okay. And then I think the third thing you mentioned was, in 118 and 119, the fact that they are side by side as a potential conflict? **A.** No. If I said that, I may have misspoke. But that's—I mean, they're both basically rectangles. And I think that they're both incredibly compact shapes. . . . **Q.** So even slightly, you see no conflict between Tier 1 and Tier 2 in Districts 118 and 119? **A.** No." Poreda Dep. at 132:16–133:1. Mr. Poreda then testified that staff prepared "different versions" of these districts and were "satisfied" with each of them. *Id.* at 170:2–17. As to Tier Two, staff considered these options "equally compliant" and "fundamentally the same." *Id.* at 172:4–16. Staff performed a functional analysis and, "all things being equal," selected the option that was "most legally . . . defensible or legally compliant" under the Non-Diminishment Clause. *Id.* at 170:2–17, 172:4–173:6, 175:10–176:4.

That is not predominance. When race-neutral principles are in equipoise, equal protection does not force a State to select the option that is *less* likely to comply with legal protections for racial minorities. A legislature's efforts to comply with minority voting-rights protections do not, by themselves, establish racial predominance, ECF No. 88 at 11; ECF No. 59 at 7; *Allen*, 599 U.S. at 31–32, especially where, as here, the map-drawer considered the different options in other respects equal, Poreda Dep. at 172:4–16. In these circumstances, race-neutral principles are not subordinated to—or even balanced against—race.

Plaintiffs criticize the compactness scores of Districts 118 and 119, ECF No. 127 at 16 n.9, but while mathematical scores can assist courts or confirm their impressions, compactness turns on a visual examination of the districts. *See In re Senate Joint Resol. of Legis. Apportionment 100*, 334 So. 3d at 1287; *In re Senate Joint Resol. of Legis. Apportionment 1176*, 83 So. 3d at 634–35. Districts 118 and 119 are rectangular and do not have bizarre features, contorted borders, or unusually gerrymandered shapes. Poreda Dep. at 177:3–4 ("[A]gain, to me rectangles, squares are basically the same."). And while District 119 has the seventh-lowest Reock score (0.28), it has the eleventh-highest Convex Hull score (0.92), while its Polsby-Popper score (0.47) exceeds the mean and median. ECF No. 130-3 at 2–3. District 118's Convex Hull score (0.79) is near the mean (0.82). *Id.* Nothing in these districts' shapes suggests racial gerrymandering.

A district-by-district assessment confirms that Plaintiffs have failed to present evidence sufficient to overcome the presumption of legislative good faith and to support a finding of racial predominance.

This Court should grant summary judgment against Plaintiffs as to each challenged State House district.

## II. RACE DID NOT PREDOMINATE IN THE DRAWING OF CONGRESSIONAL DISTRICT 26.

For similar reasons, the record is insufficient to enable a fair-minded fact-finder to conclude that Plaintiffs have rebutted the presumption of good faith and that race predominated in District 26's design.

*First*, many of the statements on which Plaintiffs rely to show that Tier One played a role refer collectively to *four* and sometimes *five* districts—not specifically to District 26. Thus, when Mr. Poreda stated that Tier One was a "large concern" or a "large contributing factor" in splitting the City of Miami, he was referring aggregately to four ability-to-elect districts. Poreda Dep. at 209:2–210:9.[2] Plaintiffs fail to disentangle those Tier One considerations and to show that racial considerations *specific to District 26* predominated in its design. To the extent racial considerations in other districts merely impacted District 26, they do not establish predominance in District 26. *Sinkfield*, 531 U.S. at 30–31; *Hays*, 515 U.S. at 745.

*Second*, Plaintiffs misstate the record. For example, Plaintiffs point to Mr. Poreda's testimony that compactness scores were "certainly secondary" to Tier One, ECF No. 127 at 15, but Mr. Poreda testified that, while compactness *scores* were certainly secondary, *compactness* was not. Poreda Dep. at 212:4–16. He explained that a "low compactness score does not necessarily mean low compactness." *Id.* at 213:6–20.

Similarly, Plaintiffs suggest that, when he modified District 26, Mr. Kelly sought to increase the district's Hispanic voting-age population (HVAP) and, in "the end, reached his target." ECF No. 127 at 12. But the record reveals the exact opposite: Mr. Kelly carefully watched the district's HVAP because his changes—which were motivated by tier-two factors, ECF No. 122 at 19—were *reducing* that figure. In fact, the HVAP in enacted District 26, as modified by Mr. Kelly (73.2 percent), is *less* than the HVAP in *any* other version of District 26 the Legislature considered. ECF No. 130-5 at 5–7 (RFAs 34, 37–44).

Plaintiffs also misstate Mr. Poreda's testimony regarding the drivers of District 26's shape. ECF No. 127 at 15. According to Plaintiffs, Mr. Poreda offered no explanation of District 26's shape besides Tier One and equal population. In fact, Mr. Poreda explained at length the race-neutral considerations that drove the decision to extend District 26 into Collier County and that convinced staff to "scrap" an alternative configuration. Poreda Dep. at 224:19–231:7, 291:23–295:5; *accord* ECF No. 123-2 ¶¶ 37–46.

Plaintiffs also routinely ignore portions of the legislative record. That record discusses the race-neutral determinants of District 26's shape. *See* ECF No. 126-2 at 33:17–35:13 (discussing utilization of major roadways and canals and county boundaries); ECF No. 126-3 at 23:15–21 (discussing utilization

---

[2] Mr. Poreda's errata sheet makes clear that Tier One was "one reason"—not "our reason"—for splitting Miami. ECF No. 130-4 at 4.

13

of major roadways and county boundaries and preservation of municipalities); ECF No. 126-10 at 23:10–21, 39:17–44:18 (explaining that tier-one considerations relative to four districts and an effort to "balance all the Tier 2 issues" shaped District 26 and noting District 26's adherence to major roadways and county boundaries and strong boundary score). So does Mr. Poreda's testimony. Poreda Dep. at 206:17–208:20, 213:18–214:10 (discussing the utilization of major roadways and county boundaries); *id.* at 224:19–231:7, 291:23–295:5 (explaining race-neutral factors that shaped District 26). Plaintiffs' recitation of a colloquy with Reps. Joseph and Fabricio, ECF No. 127 at 9–11, diligently removes key passages that provide race-neutral reasons for District 26's shape, *see* ECF No. 126-10 at 41:6–42:23, 46:3–18, 48:17–49:9, 56:8–23.

*Third*, Plaintiffs' assertions that race "impacted" District 26's boundaries are both irrelevant and hopelessly vague. ECF No. 127 at 15. Race is not a prohibited consideration. *Alexander*, 602 U.S. at 19 n.6. And Plaintiffs offer no evidence to show *where*, *how*, and *to what extent* racial considerations in District 26—not in other districts—impacted its shape. Rather than show which neighborhoods were included or excluded based on race or how map-drawers used demographic data to manipulate specific boundary lines, Plaintiffs rely on nebulous—and innocuous—assertions that legislators considered race to comply with the Non-Diminishment Clause. Plaintiffs' amorphous evidence is insufficient to carry their burden.

*Fourth*, Dr. McCartan's six congressional maps fatally undermine Plaintiffs' claims. Dr. McCartan packs more than **_100,000_** additional voting-age Hispanics into District 26. Enacted District 26 contains 456,512 voting-age Hispanics, while District 26 contains either 565,289 or 574,334 voting-age Hispanics in five of Dr. McCartan's six maps. ECF No. 130-5 at 7–8 (RFAs 48–53). In other words, Dr. McCartan increases District 26's Hispanic voting-age population from **73.2** percent to **89.5** or **91.1** percent in five of his maps, *see* ECF No. 126-18 at 11 tbl. 2—a striking refutation of Plaintiffs' claims of predominance.

It is no surprise that Dr. McCartan sends District 26's Hispanic population through the roof: he keeps District 26 wholly within Miami-Dade County. ECF No. 127 at 17. Miami-Dade County is 68.7 percent Hispanic, while Collier County is only 27.2 percent Hispanic. ECF No. 123-2 ¶ 11; U.S. CENSUS BUREAU, https://data.census.gov/table/DECENNIALPL2020.P2?g=050XX00US12021&tid=DECENNIALPL2020.P2. While Plaintiffs portray the Legislature's decision to cross into Collier County as proof that race predominated, no competent racial gerrymanderer would extend a district from a 68.7-percent Hispanic county to a 27.2-percent Hispanic county. If the Legislature had intended to racially gerrymander District 26, then it would have kept District 26 in Miami-Dade County, as Dr. McCartan did. Notably, no member of the Legislature—Democrat or Republican—ever introduced for legislative consideration a version of District 26 that did not enter Collier County. ECF No. 130-5 at 6 (RFA 35).

Plaintiffs claim that Dr. McCartan's iterations of District 26 are more compact, but Plaintiffs do

14

not assert a state-law compactness claim, and Mr. Poreda has already explained the district's shape and its many tier-two-compliant features, including its extensive use of political and geographical boundaries.

*Fifth*, Plaintiffs take a quick glance at Dr. Abott's report. ECF No. 127 at 18–19. Plaintiffs note that the Hispanic concentration of the part of Collier County assigned to District 26 is 2.5 times greater than the Hispanic concentration of the remainder of the county. *Id.* at 19. But Dr. Abott admitted that, in Collier County, the predominantly white, non-Hispanic population lives on the west coast—and that any district that moves west into Collier County will reach that population last. ECF No. 130-2 at 71:14–25. Dr. Abott could not explain why the Legislature crossed into Collier County at all, given its smaller Hispanic population. *Id.* at 69:12–21. Moreover, the part of Collier County assigned to District 18 has a much higher Hispanic concentration than that assigned to District 26 (84.2 percent versus 31.8 percent), ECF No. 130-1 at 5 (RFAs 33 & 34), and Dr. Abott conceded that that the Legislature could have added this high concentration of Hispanics to enacted District 26, but did not, ECF No. 130-2 at 70:18–71:13.

Dr. Abott's "statistical probability" calculation rests on the same analysis that the Middle District debunked in *Nord Hodges*. There, Dr. Matthew Barreto found a less-than-one-percent chance that a race-neutral draw would divide racial communities as the challenged district did. 2025 WL 2391348, at *17. But his calculation assumed "a theoretical world where people are sorted 50/50" and therefore assumed a "50/50 chance" that areas excluded from the district would have a higher minority concentration than areas included in the district, and *vice versa*. *Id.* at *17–18, *24. The court pointed out Dr. Barreto's obvious error: "in the real world, Hispanic people, Black people, and people of other races and ethnicities are not evenly distributed, and the lines that divide neighborhoods are often major boundaries like interstates, waterways, municipal lines, etc." *Id.* at *24. "[A] district line could consistently place a higher percentage of Black people on one side simply because it follows a main road or keeps a neighborhood whole." *Id.*

Dr. Abott made the same mistake here. She assumed that, when drawing without regard to race, included and excluded areas would each have the higher Hispanic concentration half the time. ECF No. 130-2 at 105:25–106:13. She did not consider any alternative explanations for the patterns she observed, *id.* at 75:1–77:16, such as District 26's adherence to county boundaries and major roadways, or efforts to preserve the voting ability of Black voters in District 24, *id.* at 90:24–94:21, 108:13–112:24. Thus, Dr. Abott's analysis, like Dr. Barreto's, "cannot distinguish between a map drawer who follows an existing boundary for racial reasons and one who follows a boundary for nonracial reasons." *Nord Hodges*, 2025 WL 2391348, at *25. At best, it is only a scintilla of evidence—not enough to avoid summary judgment.

**WHEREFORE**, the House respectfully requests the Court to enter summary judgment in its favor as to each challenged district.

15

Dated September 8, 2025.                                Respectfully submitted,

/s/ *Andy Bardos*
Andy Bardos (FBN 822671)

Christopher M. Kise (FBN 855545)                        andy.bardos@gray-robinson.com
ckise@continentalpllc.com                               GRAYROBINSON, P.A.
CONTINENTAL PLLC                                        301 South Bronough Street, Suite 600
101 North Monroe Street, Suite 750                      Tallahassee, Florida 32301-1724
Tallahassee, Florida 32301                              Telephone: 850-577-9090
Telephone: 850-270-2211

Jesus M. Suarez (FBN 60086)
jsuarez@continentalpllc.com
Carmen Manrara Cartaya (FBN 73887)
ccartaya@continentalpllc.com
CONTINENTAL PLLC
255 Alhambra Circle, Suite 640
Coral Gables, Florida 33134
Telephone: 305-677-2707

*Attorneys for Defendant, Florida House of Representatives*