LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# EL PASO DIVISION

<table>
<tr><td>

**LEAGUE OF UNITED LATIN
AMERICAN CITIZENS**, *et al.*,

*Plaintiffs*,

**ALEXANDER GREEN**, *et al.*,

*Plaintiff-Intervenors*,
v.

**GREG ABBOTT**, *in his official capacity as
Governor of the State of Texas*, *et al.*,

*Defendants*.

</td><td>

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

</td><td>

**EP-21-CV-00259-DCG-JES-
JVB**
**[Lead Case]**

**&**

**All Consolidated Cases**

</td></tr>
</table>

## DISSENT FROM THE MEMORANDUM OPINION AND
## ORDER GRANTING PRELIMINARY INJUNCTION

JERRY E. SMITH, *Circuit Judge*, dissenting:

"Fasten your seatbelts.  It's going to be a bumpy night!"[1]

I dissent from the entirety of Judge Brown's opinion granting a
preliminary injunction.

\* \* \* \* \*

## PRELIMINARY STATEMENT

I append this Preliminary Statement to dispel any suspicion that I'm
responsible for any delay in issuing the preliminary injunction or that I am or saw
slow-walking the ruling.  I also need to highlight the pernicious judicial
misbehavior of U.S. District Judge Jeffrey Vincent Brown.[2]

---

[1] Bette Davis (as Margo Channing), *All About Eve* (20th Century Fox 1950).

[2] When misbehavior, or even irregular procedural behavior, occurs, there's ample precedent
for bringing it to the attention of the public. *See Grutter v. Bollinger*, 288 F.3d 732, 810-14 (6th Cir.
2002) (en banc) (Boggs, J., dissenting) (describing the misbehavior of the Chief Judge in

Exhibit B

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

In my 37 years on the federal bench, this is the most outrageous conduct by a judge that I have ever encountered in a case in which I have been involved.

In summary, Judge Brown has issued a 160-page opinion without giving me any reasonable opportunity to respond. I will set forth the details. The readers can judge for themselves.

This three-judge district court held a nine-day evidentiary hearing/trial on the motion for preliminary injunction. That hearing was concluded Friday October 10. The judges immediately retired to confer. Judges Brown and Guaderrama voted to grant the preliminary injunction. I voted to deny. It was understood that the majority judges would begin putting together an opinion.

During the next 26 days, there was silence—nary a word from either judge.

On Wednesday November 5, Judge Brown sent me a 13-page outline of the expected majority opinion "so that you and your chambers might be able to begin preparing your dissenting opinion."

Nothing else for a week.

On Wednesday November 12, Judge Brown sent a message stating, "We currently anticipate issuing our injunction on Saturday, November 15. We will endeavor to get you a draft before we issue it. Sadly, we do not believe we can wait for a dissenting opinion before we rule—the fuse is simply too short in light of *Purcell*. We will, however, note on the opinion that you are dissenting. We are not trying to cut you out, we just don't have the time. Ideally, of course, we'd have liked to have seen your dissent before we issue our opinion, but that will also be impossible."

---

manipulating en banc court proceedings); *see also Dunn v. Price*, 587 U.S. 929, 933 (2019) (arguing that the Supreme Court's decision to vacate a stay without full discussion was improper); *see also id.* ("To proceed in this matter in the middle of the night without giving all Members of the Court the opportunity for discussion tomorrow morning is, I believe, unfortunate."); *see Department of State v. Aids Vaccine Advocacy Coalition*, 606 U.S. ___ (2025) (contending that a stay should not be granted "with scant briefing, no oral argument, and no opportunity to deliberate in conference.").

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

Yes, you heard it right. To summarize, in case the reader doesn't get the point: Judge Brown was announcing that he would issue an opinion three days later—an opinion that I hadn't even seen and might not be furnished before its issuance. That is unthinkable, but it occurred—and not accidentally.

A day later, at 10:31pm Thursday November 13, Judge Brown sent a message stating, "I've attached a complete draft of our memorandum opinion and order granting the injunction. We still have revisions to make, but we wanted to get this to you to assist in the preparation of your dissent." The draft was 168 pages, 655 footnotes, and departed noticeably from the outline I had received. Again, this was the very first actual opinion draft that I had been allowed to see (five calendar days before the actual opinion was sprung).

I was out of town on Thursday and Friday, November 13 and 14, to attend the funeral of (coincidentally) a District Judge of the Western District of Texas, having driven all day Thursday. In my absence, my staff continued working. I drove back home Friday, arriving after midnight, so that my staff and I could spend all day Saturday and Sunday working on the dissent.

Early Sunday morning, November 16, Judge Brown sent a message stating, "I've attached a newly revised draft of our majority opinion. We're still making revisions, but this is pretty close to the final version. We are now intending/hoping to issue it on Tuesday, November 18." That second draft was 161 pages and contained some substantial revisions from the first (November 13) draft.

I replied that I had been out of town; was writing the dissent all weekend; and would be on the road all of the next day (Monday) to attend graveside services for the deceased federal judge. I said Judge Brown had no business issuing an opinion as soon as Tuesday.

At 11:27am Tuesday November 18, Judge Brown wrote the following: "I've attached a final version. We still intend to issue it today. I'm sorry that we can't wait on your dissent. *Purcell* compels us to get the ruling out as soon as we possibly can. It turns out that's today." That third version, 160 pages, was issued

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

a few minutes later (with a small number of additional changes) and was signed "So ORDERED and SIGNED on Galveston Island this 18th day of November 2025."

This outrage speaks for itself. Any pretense of judicial restraint, good faith, or trust by these two judges is gone. If these judges were so sure of their result, they would not have been so unfairly eager to issue the opinion *sans* my dissent, or they could have waited for the dissent in order to join issue with it. What indeed are they afraid of?

Judges on multi-judge courts understand how important is the deliberative process to fair and accurate judicial decisionmaking. As I say later in this dissent, judges get paid to disagree as well as to find common ground. Judges in the majority don't get to tell a dissenting judge or judges that they can't participate. If the two judges on this panel get away with what they have done, it sets a horrendous precedent that "might makes right" and the end justifies the means.

The majority might even say "We don't need to wait for your dissent and wouldn't read it if we did." Here, that sort of happened: The entry on the district court docket brings up only Judge Brown's opinion; the reader has no access to this dissent without opening a separate, non-consecutive docket entry. So this majority has "won" in terms of diminishing the impact of the dissent and the public's access to it. In the interest of justice, one can hope it is only a Pyrrhic victory.

When I was a newer on the bench, a friend asked me, "Now that you've been a judge for a few years, do you have any particular advice?" I replied, "Always sit with your back to the wall."

\* \* \* \* \*

## DISSENT

The main winners from Judge Brown's opinion are George Soros and Gavin Newsom. The obvious losers are the People of Texas and the Rule of Law.

I dissent.

4

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

\* \* \* \* \*

In the interest of time, this dissent is, admittedly, disjointed. Usually, in dissenting from an opinion of this length, I would spend more days refining and reorganizing the dissent for purposes of impact and readability. But that approach is not reasonably possible here because these two judges have not allowed it.

The resulting dissent is far from a literary masterpiece. If, however, there were a Nobel Prize for Fiction, Judge Brown's opinion would be a prime candidate.

\* \* \* \* \*

Judge Brown could have saved himself and the readers a lot of time and effort by merely stating the following:

> I just don't like what the Legislature did here. It was unnecessary, and it seems unfair to disadvantaged voters. I need to step in to make sure wiser heads prevail over the nakedly partisan and racially questionable actions of these zealous lawmakers. Just as I did to the lawmakers in Galveston County in *Petteway*, I'm using my considerable clout as a federal district judge to put a stop to bad policy judgments. After all, I get paid to do what I think is right.

\* \* \* \* \*

In 37 years as a federal judge, I've served on hundreds of three-judge panels. This is the most blatant exercise of judicial activism that I have ever witnessed.

There's the old joke: What's the difference between God and a federal district judge? Answer: God doesn't think he's a federal judge. Or a different version of that joke: An angel rushes to the head of the Heavenly Host and says, "We have a problem. God has delusions of grandeur." The head angel calmly replies, "What makes you say that?" The first angel whispers, "He's wearing his robe and keeps imagining he's a federal judge."

Only this time, it isn't funny.

5

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

I dissent.

\* \* \* \* \*

Judge Brown is no stranger to a spirited attack on a legislative body's exercise of its duly-elected power to redistrict. Before being roundly reversed by the Fifth Circuit sitting en banc, Judge Brown, imagining himself to be a legislator, wrote the following:

> The 2021 redistricting process . . . occurred within a climate of ongoing discrimination affecting Black and Latino voting participation.
>
> . . .
>
> . . . Black and Latino residents of Galveston County bear the effects of discrimination . . . .
>
> . . .
>
> Anglo commissioners are evidently not actively engaged in specific outreach to Galveston County's minority residents.
>
> . . .
>
> Black residents in Galveston County are more likely to be arrested, and Black and Latino residents comprise a disproportionate percentage of jail and prison inmates . . . .
>
> . . .
>
> [T]he plaintiffs do not need to initially show that partisan affiliation does not cause divergent voting patterns.
>
> . . .
>
> . . . Practices exist in Galveston County, including voter purges and racially disparate access to polling places.
>
> . . .
>
> . . . [I]t is stunning how completely the county extinguished the Black and Latino communities' voice on its commissioners court during 2021's redistricting."
>
> . . .
>
> This is not a typical redistricting case. What happened here was stark and jarring. The commissioners court transformed

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

Precinct 3 from the precinct with the highest percentage of Black and Latino residents to that with the lowest percentage. The circumstances and effect of the enacted plan were "mean-spirited" and "egregious" given that "there was absolutely no reason to make major changes to Precinct 3.

*Petteway v. Galveston Cnty.*, 698 F. Supp. 3d 952, passim (S.D. Tex. 2023) (Brown, J.), *rev'd*, 111 F.4th 596 (5th Cir. 2024) (en banc).

Concluding that the district court "was wrong," the en banc court remanded "for the district court to consider the intentional discrimination and racial gerrymandering claims . . . ." 111 F.4th at 614. Today, as a legislator/activist jurist, Judge Brown finds a likelihood of success on the instant racial gerrymandering claims.

In regard to the Galveston County matter: Stay tuned for what Judge Brown will rule on remand. In regard to the preliminary injunction in the case at hand, read on.

\* \* \* \* \*

The ultimate question is whether unrestrained ideological judicial zeal should prevail over legislative choice. This isn't my first rodeo. Fourteen years ago, dissenting from a flawed three-judge redistricting order in this very court, I wrote the following:

. . . "[R]eapportionment is primarily a matter for legislative consideration and determination." *White v. Weiser*, 412 U.S. 783, 794 . . . (1973). Accordingly, district courts are bound to "follow the policies and preferences of the State, . . . in the reapportionment plans proposed by the state legislature, whenever adherence to state policy does not retract from the requirements of the Federal Constitution." *Id.* at 795 . . . (emphasis added). The aim of giving such due regard to plans proposed by the State is so the court will "not preempt the legislative task nor intrude upon state policy any more than necessary." *Id.*

. . .

Justice Samuel Alito, in a recent debate discussing "activist

7

judges," explained that judges are not theorists or social reformers. . . . Because the conscientious and well-intentioned majority has ventured far beyond its proper role . . ., I respectfully dissent . . ., in the hope that on appeal, the Supreme Court will provide appropriate and immediate guidance.[ ]

Two weeks later, the High Court noted probable jurisdiction and set a special oral argument. Less than two weeks after argument, the Court unanimously vacated the order from which I had dissented.

Unfortunately, here we go again.

I dissent.

\* \* \* \* \*

Speaking of fortune: Just a few weeks ago, the Fifth Circuit answered the main question at hand, holding that "[t]he most obvious reason for mid-cycle redistricting, of course, is partisan gain."[3] The question for this three-judge district panel is whether the Texas Legislature did its mid-decade congressional redistricting to gain political advantage or, instead, because the main goal of Texas's Republican legislators is to slash the voting rights of persons of color.

*Once again*, here we go again: Criticizing the behavior of DOJ lawyers in last decade's redistricting battle, I noted the following:

> It was obvious, from the start, that the DoJ attorneys viewed state officials and the legislative majority and their staffs as a bunch of backwoods hayseed bigots who bemoan the abolition of the poll tax and pine for the days of literacy tests and lynchings. And the DoJ lawyers saw themselves as an expeditionary landing party arriving here, just in time, to rescue the state from oppression . . . . The [DoJ] moreover views Texas redistricting litigation as the potential grand prize and lusts for the day when it can reimpose preclearance via Section 3(c).[4]

Although the United States is no longer participating in the instant case, the

---

[3] *Jackson v. Tarrant Cnty.*, No. 25-11055, --- F.4th ---, ---, 2025 WL 3019284, at \*14 (5th Cir. Oct. 29, 2025) (citing Justice Stevens).

[4] *Perez v. Abbott*, 253 F. Supp. 3d 864, 988 (W.D. Tex. 2017) (three-judge redistricting court) (Smith, J., dissenting), *affirmed in part and reversed in part*, 138 S. Ct. 2305 (2018).

same attitudes about Texas Republican legislators have been reflected in the testimony of multiple experts and witnesses presented by these plaintiffs and, occasionally but not always, by their talented counsel and the statements of some parties.[5]

Because the "obvious reason" for the 2025 redistricting "of course, is partisan gain," Judge Brown commits grave error in concluding that the Texas Legislature is more bigoted than political.

I dissent.

\* \* \* \* \*

It's all politics, on both sides of the partisan aisle. George and Alex Soros have their hands all over this.

One of the plaintiffs' top experts is Matt Barreto. He is a paid Soros operative and does not attempt to hide it. His CV confirms it. He expects to receive $2.5 million[6] from George and Alexander Soros.[7] Nor is this something new. Soros has been pumping money into Barreto's UCLA Voting Rights Project for years.[8] And this steady supply of money won't stop until 2026, at the earliest. Unsurprisingly, Barreto has been on quite a road show for years, parading across the country opposing Republican redistricting.[9]

That is the tip of the iceberg. The lawyers are involved as well.[10]

---

[5] Just a few days ago, plaintiff Congressman Al Green described the 2025 redistricting as "corrupt racist election rigging." *Houston Chronicle*, Nov. 12, 2025, at A1.

[6] Brooks Ex. 269 (Barreto-CV 8) (receiving a $2.5 million Open Society Foundation Grant over a 36-month term ending in February 2026).

[7] Open Society Foundations, opensocietyfoundations.org/who-we-are. The Open Society Foundation was founded by George Soros, and Alex Soros is the chair of its Board of Directors.

[8] Tr. 10/4/2025 AM 22:7-8 (acknowledging that Barreto is the faculty director of the UCLA Voting Rights Project).

[9] *Pierce v. N.C. State Bd. of Elections*, 713 F. Supp. 3d 195, 229 (E.D.N.C.), *affirmed but criticized*, 97 F.4th 194 (4th Cir. 2024) (noting "profound discrepancies between the methods of analysis [Barreto] performed in his initial report and in his supplemental declaration" and finding his "belated explanation" to be "unpersuasive").

[10] Before describing the connections of these attorneys, I emphasize that all of them serve, as officers of this court, with integrity and professionalism. Their partisan circumstance does not detract from the fact that they meet the highest standards of the profession and assist this court in

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

To his credit, the lead counsel for plaintiffs does not try to hide it, either. Chad Dunn acknowledged so in open court—he works with Barreto at the same Voting Rights Project[11] that receives Soros funding. Dunn is a respected attorney in Texas election law cases, most recently serving as counsel in the *Jackson* case,[12] in which the Fifth Circuit squarely declared the political nature of mid-decade redistricting. Mr. Dunn, along with his Voting Rights Project colleague Sonni Waknin, also represented the plaintiffs before Judge Brown in the *Petteway* case, which was overturned by the en banc Fifth Circuit.[13]

Mark Gaber also appeared in *Petteway* and *Jackson*. He is the Senior Redistricting Director at Campaign Legal Center, a Soros-funded group.[14]

It does not stop there. The Elias Law Group draws from the Soros coffers, too. Counsel for the instant Gonzales plaintiffs, David Fox, is a partner at Elias, which "has collected more than $104 million" from Democrat Party committees and donors, including Mr. Soros.[15] Firm Chair Marc Elias formed entities, "tucked inside large existing nonprofits," that "raised tens of millions of dollars from some of the richest donors on the left—including from foundations funded by Mr. Soros."[16]

On a silver platter, Judge Brown hands Soros a victory at the expense of the People of Texas and the Rule of Law.[17] Judge Brown won't tell you that. I

the administration of justice. The same is true of the State's counsel in this case.

[11] Tr. 10/4/2025 AM 26:3-11.

[12] *Jackson v. Tarrant Cnty.*, No. 25-11055, --- F.4th ---, ---, 2025 WL 3019284, at *14 (5th Cir. Oct. 29, 2025) (noting that "[t]he most obvious reason for mid-cycle redistricting, of course, is partisan gain") (citing Justice Stevens).

[13] *Petteway v. Galveston Cnty.*, 698 F. Supp. 3d 952 (S.D. Tex. 2023), *reversed and remanded*, *Petteway v. Galveston Cnty.*, 111 F.4th 596 (5th Cir. 2024) (en banc).

[14] How the Open Society Foundations Support Election Integrity, opensocietyfoundations.org/newsroom/how-the-open-society-foundations-support-election-integrity.

[15] *Vogel Kenneth P.*, Democratic Lawyer Stymied Trump in 2020. Other Efforts Played into G.O.P. Hands, www.nytimes.com/2024/10/30/us/politics/democratic-lawyer-stymied-trump-in-2020-other-efforts-played-into-gop-hands.html.

[16] *Id.*

[17] The point is that it's all about politics. These plaintiffs, and their counsel, and their experts, are welcome, in this court, to present their partisan views, as is the State of Texas. But if we

10

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

just did.[18]

Relatedly, Gavin Newsom took a victory lap in Houston to celebrate the Democrat redistricting win with Proposition 50.[19]  Indeed, he did so "on rival Gov. Greg Abbott's home turf Saturday and called on other blue states to push back on a GOP effort to retain control of the U.S. House."[20]  And after the improperly premature issuance of Judge Brown's opinion, the *Houston Chronicle* pointed that that Governor Newsom quickly tweeted, "Donald Trump and Greg Abbott played with fire, got burned -- and democracy won . . . This ruling is a win for Texas, and for every American who fights for free and fair elections."[21]

That tells you all that you need to know—this is about partisan politics, plain and simple.

I dissent.

\* \* \* \* \*

Regardless of one's political slant, it's obvious what Texas is trying to do in 2025.  The Republicans' national margin in the House of Representatives is

---

are to tell it like it is, we must recognize that the well-funded machinery that I have just identified is all about that political crusade that these parties are free to pursue under the First Amendment.  And the public is entitled to know who's really driving this bus.

"The most obvious reason for mid-cycle redistricting, of course, is partisan gain."  That is the core of this case, and I will repeat it *ad nauseam*.  Judge Brown won't tell you that.  I just did.

[18] I suppose someone will say that in making these comments about the Soros connections, I'm expressing a political view, not the proper role of a federal judge.  To the contrary:  As I say above, the political branches engage in policy and politics.  It's our job as judges to let that happen, but it's also our duty to recognize the societal and political effects of what we do, regardless of whether we approve of those downstream results.  Today's ruling has dramatic political consequences by meddling in the orderly processes of a duly-elected state government.  It's not "political" for me to point that out by describing the political dynamics that are inherent in the litigation of redistricting cases.

[19] Deguzman, Colleen, "You woke us up": California Gov. Gavin Newsom, energized by Prop 50 redistricting win, thanks Texas, https://www.texastribune.org/2025/11/08/texas-california-gavin-newsom-congress-redistricting-map/

[20] *Id.*

[21] John C. Moritz, *Texas' GOP-drawn Congressional map blocked by court in stunning blow to Republican hopes for 2026*, THE HOUSTON CHRONICLE, Nov. 18, 2025 (last updated at 2:00 pm) (https://www.houstonchronicle.com/news/politics/elections/article/texas-congress-redistricting-court-case-21118138.php).

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

so slim that squeezing out a majority might even depend, day-to-day, on whether some seats are vacant because of deaths or resignations.

In 2021, the Texas Legislature, with both houses controlled by Republicans, devised a strategy of creating safe seats for both Republicans and Democrats, but with a decided majority of the state's delegation still Republican. Whether (as a matter of political clout) that was the wisest strategy is disputed and indeed was fulsomely debated in 2021.

In mid-2025, the strategy changed: The new plan was to make more seats winnable for Republicans by moving some Democrats incumbents from their districts and rendering other districts unwinnable by Democrats. That sacrificed the wider margins in some of the old districts. The tradeoff is obvious.

There is some speculation that this new strategy will backfire on Republicans in 2026 because, if they do poorly in the mid-terms, the new Republican seats created in 2025 will be a Pyrrhic victory, because they will lose elections in the closer districts. That is purely a matter of political strategy that federal judges have no business touching.

The challenge faced by these plaintiffs and Judge Brown is to explain how it could be that the Republicans would sacrifice their stated goal of political gain for racial considerations. It makes no sense to advance the notion that the Republican Legislature would draw districts for the purpose of disadvantaging racial and ethnic minorities if, by doing so, they lessen the number of new Republican seats they might gain.

The plaintiffs' theory is both perverse and bizarre. They actually contend that if the Republicans are sincere about gaining more seats, they could have drawn not five, but six, seven, or eight additional seats and that the reason they did not is that the real reason is racial animus. The absurdity of that notion speaks for itself. Yet it's all that the plaintiffs and Judge Brown have to offer to defeat the State's claim that the 2025 lines were drawn for the sake of politics and not race.

That's the central dispute in this case. But "[t]he most obvious reason

for mid-cycle redistricting, of course, is partisan gain."

I dissent.

\* \* \* \* \*

Judge Brown rushes to issue this injunction before the tension between Section 2 of the Voting Rights Act and racial-gerrymandering jurisprudence is resolved by the Supreme Court in the currently-pending *Callais* case.[22] Given Judge Brown's creative read of the facts and novel approach to the law, he should have considered denying this injunction for that reason alone, recognizing that a fundamental shift in voting-rights jurisprudence is not unlikely. Because the power to stay proceedings "is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants," it would have been well within the authority of this three-judge court.[23]

The fact that *Callais* may fundamentally change the nature of this case also weighs in favor of a stay. It is reckless for this court to proceed with opining on the merits, which amounts to nothing more than a general guess as to whether existing voting-rights jurisprudence will survive *Callais*.

\* \* \* \* \*

Judge Brown has a lingering habit. He correctly recites *part* of a legal principle, then veers off track along a spectrum—intentionally misleading at best to false at worst. The opinion is replete with *selectively* copying and pasting parts of legal rules or standards. Beyond that, things get dicey.

This holds especially for Judge Brown's discussion of the standard for preliminary injunctions.

Judge Brown admits that the first factor—likelihood of success on the

---

[22] *Louisiana v. Callais*, 3:24-cv-00122-DCJ-CES-RRS (W.D. La. Aug. 1, 2024), *probable jurisdiction noted*, 145 S. Ct. 434 (2025), *restored to the calendar for reargument*, 145 S. Ct. 2608 (2025), argued Oct. 15, 2025.

[23] *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936).

merits—is the "most important" and that granting a preliminary injunction is "an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion."[24]

Then, the opinion entirely goes off the rails.

Judge Brown quibbles with the omission of the word "substantial" next to the phrase "likelihood of success on the merits" in the Fifth Circuit mid-decade redistricting opinion from just a few weeks ago,"[25] claiming that the omission suggests that "the plaintiff need only show '*a* likelihood of success on the merits.'"[26] This is intentionally misleading at best and disingenuously false at worst.

How does he get there?

Judge Brown justifies his wish-list formulation of the first factor by noting the factual similarities between *Jackson* and the instant case: Both involve Texas mid-decade redistricting at the preliminary-injunction stage. But surely he knows that the phrase "extraordinary and drastic remedy" never appears in *Jackson*. Judge Brown, relying on the factual and procedural analogies between the two cases, would lead the reader to think that that gives him carte blanche authority to excise the "extraordinary and drastic remedy" from his opinion, as well. Nevertheless, he keeps the phrase "extraordinary and drastic remedy" in the standard because he knows he cannot remove the phrase at will.

Judge Brown, no stranger to inconsistency, is wrong.

He should give less consideration to the *omission* and more consideration to the *actual* words on the page. Judge Brown accurately cuts and pastes the following: A preliminary injunction is "an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion," and the likelihood of success on the merits is "*the most important*"

---

[24] Brown Op. at 53.

[25] *Jackson v. Tarrant County*, --- F.4th ---, ---, 2025 WL 3019284, at *3 (5th Cir. Oct. 29, 2025) (a mid-decade redistricting case with a preliminary-injunction posture).

[26] *See* Brown Op. at 53 n.159 (emphasis in original).

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

factor of the framework.

But the cut-and-paste job is selective. Judge Brown left out the fact that, giving attention to the relevant cases cited in *Jackson*, "*the most important*" factor language in *Jackson*[27] is a direct quote from *Mock v. Garland*.[28] And any cursory reading of *Mock* easily reveals that the word "substantial"[29] (the word Judge Brown tries to avoid) is part of the first factor in no uncertain terms: "a substantial likelihood of success on the merits."[30][31]

Judge Brown doesn't tell you that. I just did.

The opinion is caught in an illogical straitjacket from which it cannot escape.

Knowing that his argument is weak, Judge Brown declares that the omission of the word "substantial" does not matter anyway because of the Fifth Circuit's sliding-scale[32] approach to the first factor, which is likelihood of success.[33] With a magic wand, the quibble with the omission of "substantial" is no longer consequential and vanishes into the ether. This is part of the activist, result-oriented bag of tricks that tinkers with the allegedly "most important" first factor, such that the quibbles that he proclaimed mattered no longer do.

Judge Brown says "'[w]here the other factors are strong,' the movant need only show 'some likelihood of success on the merits" to obtain a

---

[27] *See Jackson*, --- F.4th at ---, 2025 WL 3019284, at *8 n.19 (emphasis added).

[28] *Mock v. Garland*, 75 F.4th 563, 587 n.60 (5th Cir. 2023) ("There is authority that the first factor—likelihood of success on the merits—is the most important of the preliminary injunction factors.").

[29] *Id.* at 577 (noting that the moving party must satisfy four factors, the first of which is "a *substantial* likelihood of success on the merits") (emphasis added).

[30] *Id.*

[31] Indeed, the language "substantial likelihood of success on the merits" is not a new formulation. It is supported by decades of precedent in the Fifth Circuit, including the case Judge Brown's opinion quotes (Brown Op. at 53 n.161). *See Canal Authority Auth. of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) (noting that the first perquisite for the extraordinary relief of preliminary injunction is "a *substantial* likelihood that plaintiff will prevail on the merits") (emphasis added).

[32] To be clear, I do not deny that a sliding scale exists. I want to highlight Judge Brown's inconsistent and disjointed reasoning.

[33] *See* Brown Op. at 53 n.159 (emphasis in original).

preliminary injunction."[34]    This is intentionally misleading at best, disingenuously false at worst.

There he goes again.

Judge Brown overlooks what immediately follows the passage on which he relies:

> Where other factors are strong, a showing of some likelihood of success on the merits will *justify temporary injunctive relief*.  But when a plaintiff applies for a *mandatory preliminary injunction*, such relief should not be granted except in rare instances in which the facts and law are clearly in favor of the moving party.

*TitleMax, Inc. v. City of Dallas*, 142 F.4th 322, 328 (5th Cir. 2025) (internal quotations omitted) (emphasis added).

Judge Brown is wrong on multiple levels.  *First*, he claimed that the first factor alone suffices, indicating that the other factors do not matter.  *Second*, the other factors, discussed below, are extraordinarily week in this case.  *Third*, *TitleMax* differentiates between temporary injunctive relief and the narrower category of a mandatory preliminary injunction.  Judge Brown must surely know that, which is likely why he cherry-picked the language he liked ("some likelihood of success on the merits"), omitted the language he didn't ("temporary injunctive relief"), and inserted what he wanted—a preliminary injunction.  If this is not judicial activism, I am not sure what would be.  *Fourth*, Judge Brown is issuing a mandatory preliminary injunction because he is enjoining the implementation of the 2025 Texas Congressional Map and requiring Texas to use the 2021 map.  *Fifth*, the facts and law are not clearly in favor of the moving party.

If this were a law school exam, the opinion would deserve an "F."

Remember that recent Fifth Circuit redistricting case, the one that Judge Brown said was procedurally and factually analogous to the instant one. Judge Brown conveniently omits the key sentence in that mid-decade redistricting

---

[34] Brown Op. at 55.

case: The "most obvious reason for mid-cycle redistricting, of course, is *partisan gain*."[35] Judge Brown doesn't even *pretend* to grapple with Justice Stevens's relevant quote. It is far from a mere coincidence that the opinion goes to the mats over the omission of one word, when it suits the results-driven outcome, but overlooks the most significant sentence about the most obvious reason for mid-decade redistricting, which is partisan gain.

The combined weight of the procedural and substantive law is against what these plaintiffs and Judge Brown are trying to do. Not only do plaintiffs have to show *clearly* that they are entitled to the drastic and extraordinary remedy of an injunction, but they must also do so when Supreme Court and Fifth Circuit precedent is stacked against them. Nothing in any bag of results-oriented tricks can save that wished-for result.

Judge Brown is an unskilled magician. The audience knows what is coming next.

Moving past the recitation of the preliminary-injunction factors: Judge Brown does not hesitate to make excuses for plaintiffs (and their "experts") for failing to produce an *Alexander* map. He has no other choice on the merits. He claims that "they [the experts] didn't have time"[36] and that it would be too much to ask plaintiffs to produce an *Alexander* map at this stage in the litigation. This is not how the law works for a preliminary injunction.

Judge Brown overlooks that plaintiffs seeking a preliminary injunction *bear the burden* of proving that they are entitled to it. With nothing more than meager direct evidence in the instant case, *Plaintiffs* must produce an *Alexander* map, plain and simple. They either cannot or don't want to—because it's really all about politics. In any event, this court has no business coming to the rescue by giving students who didn't do their homework a homework pass. Nor should Judge Brown make excuses for them for failing to show their work.

---

[35] *See Jackson*, --- F.4th at ---, 2025 WL 3019284, at *32 n.33 (citing Justice Stevens) (emphasis added).

[36] Brown Op. at 134.

The last time I checked, a preliminary injunction is an extraordinary and drastic remedy. This is serious business that we are about.[37]

Judge Brown boasts that "Plaintiff groups have successfully shown *a likelihood of success* on their racial-gerrymandering challenges . . . [and] that *alone suffices* to preliminarily enjoin the 2025 Map."[38] Yes, you read that right. Judge Brown is so determined to issue an injunction that he does not need *any* help from the other factors.[39]

How could that be? Because Judge Brown said so.

With his creative formulation of the preliminary-injunction standard, Judge Brown is intentionally misleading at best and disingenuously false. He engages in several layers of sophistry to water down the potency of the most important, first factor and to grease the skids for an injunction. He doesn't even make it clear which articulation of the first factor he uses.

Consider this bizarre multiple-choice question from hell: Which formulation of the first factor is he using? Is it the "likelihood of success" factor that is the (*i*) watered-down formulation because of the omission of the word "substantial," (*ii*) the watered-down formulation because of the sliding scale, (*iii*) the watered-down formulation because of both the sliding scale and omission of the word "substantial," (*iv*) the "substantial" formulation with the sliding scale, (*v*) the "substantial" formulation without the sliding scale, (*vi*) whatever Judge Brown thinks the law should be, or (*vii*) something else?

---

[37] Plaintiffs, during the preliminary injunction hearing, presented the testimony of six experts. However, Judge Brown, in his 161-page opinion, omits *any* discussion of the following five plaintiffs' experts: David Ely, Stephen Ansolabehere, Loren Collingwood, Matt Barreto, and Daniel Murray. Their collective testimony spanned several days, and they submitted hundreds of pages of expert reports. Yet, Judge Brown, despite his *best* efforts, fails to make a single, fleeting reference to these five experts in his lengthy opinion. This dissent, in a footnote, tells you more about these plaintiffs' experts than does Judge Brown's entire opinion does. And the reason is obvious—their testimony is unhelpful at best, or their analysis is flawed at worst. Judge Brown won't tell you that. I just did.

[38] Brown Op. at 54 (emphasis added).

[39] Unsurprisingly, that's not the law. *See Mock*, 75 F.4th at 587 n.60 ("Still, even with a strong likelihood of success, a district court cannot give the other factors short shrift.").

Confused yet?  You can thank Judge Brown for that.

*If* we were to take him at his word that the first factor is dispositive (it is not)[40] to grant a preliminary injunction, it is not apparent why Judge Brown feels the need to discuss the other factors.  His mind is made up on the first factor alone.  But I will move on from that to discuss them anyway.

Judge Brown claims that the "Plaintiff Groups have made a very strong showing on the irreparable-injury factor."[41]  Not so fast.  First, plaintiffs are unlikely to succeed on the merits of their racial gerrymandering claim, so they are unlikely to suffer harm.  Second, plaintiffs, bearing the burden of clearly showing they are entitled to an extraordinary and drastic remedy, cannot use circular reasoning to bootstrap their alleged likelihood of success from factor one into showing irreparable harm with factor two.  Indeed, "[w]hen a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws."[42]

He caps off the section by returning to the sliding scale again (the same one he claimed was not necessary) to reiterate his preferred standard that plaintiffs "need to show more than just 'some likelihood of success on the merits' to obtain a preliminary injunction, *but not much more*."[43]  This is wrong, again.

Judge Brown gets creative with the final two factors, balance of equities and public interest, and stands the *Purcell* framework on its head.  He wants a "federal court to swoop in and re-do a State's election laws in the period close to an election"[44] and issue a "late-breaking injunction"[45] with disastrous,

---

[40] *Mock*, 75 F.4th at 587 n.60 ("Still, even with a strong likelihood of success, a district court cannot give the other factors short shrift.").

[41] Brown Op. at 55 (emphasis added).

[42] *Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir. 2014).

[43] *See id.* (quoting *TitleMax, Inc. v. City of Dallas*, 142 F.4th 322, 328 (5th Cir. 2025) (emphasis added)).

[44] *See Merrill v. Milligan*, 142 S.Ct. 879, 881 (Kavanaugh, J., concurring).

[45] *See id.*

unintended consequences for "candidates, political parties, [] voters,"[46] the State, counties, and local officials. This injunction will affect down-ballot races because those interesting in running for Congress must make plans not to run for State House and Senate seats. And others are sure to run for the newly-vacant state seats. This trickle-down effect is only the tip of the iceberg. Judge Brown's injunction is the epitome of judicial tinkering.

The 2025 map is the *status quo*. Counties have begun preparations with 2025 map and educating local officials about the current law. Although Judge Brown acknowledges that the State has the prerogative to "toy with its election laws,"[47] he quickly contradicts himself that the State "invited this issue by enacting a new map within *Purcell*'s range."[48] Contrary to what Judge Brown wants to hear, the State, which has the prerogative to redistrict mid-decade, is in a fundamentally different position from that of a federal court, which must exercise extraordinary caution before intermeddling with an intimately vital local prerogative such as redistricting.[49]

Judge Brown parrots plaintiffs' argument that the State is using the 2021 map in some limited circumstances.[50] But Judge Brown doesn't attempt to grapple with what the Fifth Circuit has made clear: A duly enacted Texas congressional districting map is the "status quo."[51] There, the Fifth Circuit said in no uncertain terms that "the Texas Legislature's duly enacted law" creating a new congressional districting map "became the new 'status quo'" under Texas law.

Instead, Judge Brown cherry-picks the "status quo" language[52] out of

---

[46] *See id.*

[47] Brown Op. at 146.

[48] Brown Op. at 147.

[49] *See Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 6 (2024).

[50] Brown Op. at 145.

[51] *See Tex. All. for Retired Americans v. Hughs*, 976 F.3d 564, 568 (5th Cir. 2020) (noting that it was the "*district court's* eleventh-hour injunction that alter[ed] the status quo, not the Texas legislature's 2017 duly enacted law") (emphasis in original).

[52] Brown Op. at 157 n.619; Brown Op. at 159 n.628.

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

another Fifth Circuit case,[53] where the court made it clear that "the Supreme Court has instructed that we should carefully guard against *judicially altering* the status quo on the eve of an election." Whether Judge Brown likes it, he needs to acknowledge two realities. *First*, the duly enacted 2025 Texas Congressional Map *is* the status quo. But true to form, Judge Brown prefers living in fantasyland. *Second*, Judge Brown's late-breaking, eleventh-hour injunction is the precisely the kind of "judicial tinkering"[54] and judicial altering[55] that the Court has repeatedly warned us about. I guess Judge Brown needs another reminder.

Whether Judge Brown likes it, gravity exists. So does the weight of *Purcell* against *his* late-breaking, eleventh-hour injunction.

There's more.

Judge Brown fails to recognize that some of these plaintiffs are seeking an equitable remedy, namely a preliminary injunction, with unclean hands. Contrary to his inventive contention that the State is to blame for the delay, some plaintiffs broke quorum and delayed the passage of the 2025 map for weeks.[56] Judge Brown contradicts himself again, claiming that *Purcell* does not bar him from issuing and injunction and then turns around to wag his finger at the State for the cause of the delay. He is mistaken. Plaintiffs should not get the benefit of the delay that *they* caused by breaking quorum. But, Judge Brown has no problem giving plaintiffs an equitable remedy, even though they have unclean hands. The so-called *Purcell* exception, which Judge Brown is eager to invoke, does not apply: Plaintiffs caused undue delay, the merits are not remotely in their favor, and plaintiffs have not suffered an irreparable injury.

---

[53] *Veasey v. Perry*, 769 F.3d 890, 895 (5th Cir. 2014) (emphasis added).

[54] *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring) (noting that "[l]ate judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters").

[55] *Veasey*, 769 F.3d at 895.

[56] Judge Brown's lengthy opinion uses the word "quorum" only twice, thus giving this significant interruption—which erased the first called session—scant mention. Judge Brown makes no effort to discuss the significance of that break. I just did.

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

I dissent.

\*   \*   \*   \*   \*

To show the fallacies in Judge Brown's opinion, the following discussion of the direct and indirect evidence includes a granular examination of Texas's U.S. congressional districts in the 2021 maps, plan C2193,[57] and the various editions of the 2025 maps.

The 2025 maps first were offered as plan C2308,[58] in the first special legislative session on July 30, 2025.[59] Then, after August 15, the Texas legislature updated them to plan C2331.[60] The final version, introduced on August 18, passed on August 23, and signed into law on August 29 as HB4, was plan C2333.[61] Immediately below, I reproduce the 2021 maps, plan C2193, and the 2025 adopted map, plan C2333.[62] Careful consideration of these maps, and attention to changes in certain districts such as C2193-CD35 to C2333-CD35, is fundamental to understanding this case and to distinguishing between a racial gerrymander and a cynical partisan gerrymander by disentangling race from politics where "race and partisan preference are highly correlated," as is strictly required under *Alexander*.[63]

---

[57] *See* https://senate.texas.gov/cmtes/87/c625/SB6-plan-C2193.pdf, Available in interactive format and therefore much greater visual detail at https://dvr.capitol.texas.gov/Congress/56/PLANC2193 (DistrictViewer is a website maintained by the Texas Capitol).

[58] https://dvr.capitol.texas.gov/Congress/73/PLANC2308

[59] Gonzales Plaintiffs' Second Supplemental Complaint, 3:21-cv-00259-DCG-JES-JVB, ECF No. 1147, pg. 30 (August 28, 2025) ("Second Supplemental Complaint").

[60] https://dvr.capitol.texas.gov/Congress/0/PLANC2331; Second Supplemental Complaint at 33.

[61] https://dvr.capitol.texas.gov/Congress/89/PLANC2333; Second Supplemental Complaint at 33-34.

[62] Plan C2333's summary statistics including VAP and CVAP breakdowns are also available at https://capitol.texas.gov/tlodocs/892/districtplanrpts/pdf/HB00004H_PLANC2333.pdf. ("C2333 summary statistics").

[63] 602 U.S. at 6.

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)



**The 2021 Maps, C2193.**



**The 2025 Maps, C2333.**

Everybody agrees that a plaintiff asserting a racial-gerrymandering claim may "make the required showing through direct evidence of legislative intent,"[64] such as "a relevant state actor's express acknowledgement that race played a role in the drawing of district lines,"[65] "circumstantial evidence of a district's shape and demographics, or a mix of both."[66] The legislative intent is the critical question, and the Supreme Court has instructed that "legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents," as "legislators have a duty to exercise their [own independent] judgment."[67]

---

[64] *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (citation modified).

[65] *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 8 (2024).

[66] *Cooper*, 581 U.S. at 291.

[67] *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 689–90 (2021).

24

So, let's talk about the direct evidence first, and then the indirect and statistical evidence.

\* \* \* \* \*

This panel decides both law and fact. The salient issue of fact is whether the Legislature drew the new lines on account of race. The answer is easy: It did not. And that question is not even close.

Did I forget to mention: "The most obvious reason for mid-cycle redistricting, of course, is partisan gain."

In that regard, everyone can agree that the star witness was Adam Kincaid. For months, there was controversy as to who drew "the map." Without dispute, it turns out to be Kincaid. He is a paid, experienced, dedicated Republican operative, through and through. His lengthy testimony was the highlight of the preliminary-injunction trial.

Kincaid courageously spoke the truth, despite being the target of what authorities termed a "credible death threat" made shortly before he was scheduled to testify. As one of the finders of fact, I conclude that Kincaid was credible in every respect.

Knowing that Kincade is credible, Judge Brown makes every effort to ignore or circumvent Kincaid's solid testimony. Judge Brown avoids the details of that testimony. Because he won't tell you that, I do so now.

Adam Kincaid's testimony is credible and irrefutable. Beginning in the Panhandle and moving clockwise, he went district-by-district and described his map-drawing process with painstaking detail (and without any notes for two days). His testimony is methodically detailed, and he is a solid witness, especially on the key question of intent and race.

I begin with a roadmap. The preliminary discussion provides a brief background on Kincaid and his general approach to redistricting, which prioritizes partisanship and disclaims any reliance on race. First, I detail Kincaid's traditional redistricting criteria. Second, I highlight judges' questions

to Kincaid and Kincaid's responses. Third, I describe Kincaid's district-by-
district testimony organized by the relevant Texas region. Fourth, I describe
what Kincaid noted as at least three changes between C2308 and C2333.

Adam Kincaid drew all or most of the Texas 2025 enacted congressional
map. Tr. 10/7/25 AM 33:25-34:2.[68] Specifically, he used software, "Esri for
Redistricting." 41:7-13 . In no uncertain terms, Kincaid stated "I don't think
it's constitutional to draw maps based off of race." 46:13-14. He unequivocally
said "I do not" use race as a proxy for partisanship when drawing a map. 56:7-
9. Instead, he reiterated that he used partisan data at the block level. 47:20-
52:19. He said, "I drew my map using politics from start to finish and provided
that to the Legislature." Tr. 10/7/25 PM 93:11-12. As if he could not be clearer,
Kincaid repeated, "I drew a race-blind map using partisan results, and that's how
I created the map." Tr. 10/8/25 AM 69:6-7.

Kincaid used traditional redistricting criteria. His top priority was to
protect incumbents and improve or maintain existing Republican districts. His
"top criteria was to make sure that every Republican incumbent who lived in
their seat stayed in their seat." 64:23-25. "Another criteria was to make sure
that every Republican incumbent who was in a district that President Trump had
won with 60 percent of the vote or more in 2024 stayed in a district that
President Trump won by — with 60 percent of the vote or more." 65:1-5. In
fact, Kincaid "was not allowed to take any incumbent Republican who was above
60 below 60." 65:5-6. For Republican districts with incumbents that Trump
carried by less than 10 points, Kincaid had to either "improve [these seats] or
keep their Partisan Voting Index exactly the same." 65:10-11.

Kincaid's criteria in the five pickup opportunities were Trump+10, a Ted
Cruz victory, a strong Abbott performance, and a durability test.

First, "every single one of [the Republican pickup opportunities] had to
be a district that President Trump carried by ten points or more at a minimum"

---

[68] All subsequent transcript citations in this section refer to Tr. 10/7/25 AM, unless
otherwise noted.

in the 2024 Presidential Election. 67:25-68:1, 68:12-14. Second, "every one of those seats had to be carried by Ted Cruz in 2024," by any margin. 68:2-5. Third, the districts were generally those in which Governor Abbott "carried by as decent a margin as possible" in 2018 and 2022 because the "first test of this map would be in a midterm election versus a presidential election." 72:9-17. Fourth, Kincaid ran a "durability test" on these districts, looking "at every presidential, senate, and governor's race in Texas, U.S. Senate and governor's race in Texas, from 2012 through 2024." 73:8-20.

Kincaid admitted that was not looking at the Cruz and Abbott numbers in Republican districts that were not pickup opportunities because "it is a fair assumption that if you are drawing a seat at 60 percent Trump, it probably went Republican down ballot as well." 150:17-25.

For other criteria, Kincaid used the balancing of population as well as compactness and neutral geographic features.

Kincaid had to balance population perfectly among the 38 districts in the state. 54:1-16. He "wanted to take [] districts [in the 2021 map] and make them cleaner, more compact, more city-based, [and] more county-based." 66:22-25. He considered neutral geographic units or boundaries when drawing districts. 75:17-23. He "tried to use neutral boundaries across the entire map where possible." 100:10-11.

Judge Brown actively questioned Mr. Kincaid. He asked, "When you drew the 2025 map, did you know that CDs 9, 18, 29, and 33 under the 2021 map were considered minority opportunity districts, in that they provided minorities an opportunity to elect candidates of their choice?" Tr. 10/8/25 AM 133:14-17.

Kincaid said that he knew. *Id*. 133:18.

Kincaid said that he was generally aware that a comfortable majority of Hispanics in Texas vote in favor of Democrat candidates, notwithstanding President Trump's better performance among Hispanics. *Id*. 133:19-134:1. Kincaid added that he "know[s] that President Trump carried Hispanic voters by about 10 percent statewide by various reports in 2024." *Id*. 134:1-3.

When asked why he changed CD 9 from Democrat to Republican but left CD 7 Democrat, Kincaid said that "[t]here were political constraints on the west side of Harris County," although he "actually wanted to flip that one." *Id.* 134:4-9. The structural orientation of Congressman Luttrell's seat (in CD 8), Congressman McCaul's seat (in CD 10), and Congressman Hunt's seat (in CD38) prevented Kincaid from "restructur[ing] the population in 7 enough to redraw that seat." *Id.* 134:12-15.

Judge Brown asked whether Kincaid received any instructions to protect (or not alter) Democrat districts similar to those instructions Kincaid received during the 2021 map drawing process. *Id.* 134:1-23. Although Kincaid testified that he received some instructions while drawing the 2021 map to protect some Democrat districts, he did not receive similar instructions regarding the 2025 map. *Id.* 134:16-23.

District by district, Kincaid drew the map by starting at the northwest corner and generally working clockwise.

I recount Kincaid's testimony in the order that it appeared in his direct examination, which typically coincides (but not necessarily) with the order in which he drew the Texas 2025 congressional map.

The only district that did not change at all was Texas District 19. 77:13-15. Beyond that, Kincaid began his map-drawing in the Texas Panhandle.

Texas 13 was the first district drawn, which is in the northwesternmost part of the state. 76:9-77:4. Intuitively, starting with the northwestern part of the state (the top left of the map) makes perfect sense. Indeed, Texas 13 is in the Panhandle and stretches across North Texas south of the Red River. 77:5-18.

Kincaid changed the lines in Wise and Denton Counties first. 77:16-18. Specifically, he moved some Democrats from the southwestern side of Denton County out of District 26 into District 13. 78:7-12. Because he had added some people into the 13th District, Kincaid had to take people out—he "took the line for Texas 26 and moved it north into Wise County." 79:12-16. He also kept the cities at the center of Wise County whole. 78:14-17.

Kincaid reiterated that he "worked in a clockwise direction through Metro DFW." 80:1-2. He took heavily Democrat precincts in the southeast corner of Denton, previously drawn out of 26 during the last redistricting, back into District 26 in this new map. 80:10-25. Kincaid put Democrats into the 26th District to "move Republican strength across the state from district to district" and "make sure that the 26th District didn't become too Republican." 81:7-13.

District 4: After the piece of Frisco in Texas 26 was taken out, District 4 took on all of Frisco, making Frisco whole in District 4. 81:23-82:5. Kincaid took the 2021 map's three-way Plano split within Collin County and made it a two-way split with a clean line dividing Plano. 82:18-83:7. To the north, the part of the city of Celina, which is in northwestern Collin County, is whole in the 4th District. 84:10-14. Kincaid fixed the population of District 4 in the east, noting that he made the county with Clarksville (presumptively Red River County) whole. 84:17-22. The military installation in Bowie County was also made whole in the 4th District. 84:23-85:4.

District 3: Kincaid also made Allen and McKinney whole in District 3. 83:25-84:2. Because the 3rd District picked up more Democrats in the Plano area that it had before, he included more Republican strength, from rural East Texas counties, into the district. 85:10-13.

For the Dallas/Fort Worth Metroplex (DFW), we begin with District 32. The border between Districts 3, 4, and 32 is the city boundary of Richardson. 85:15-16. Kincaid made Richardson whole in District 32. 86:3-5. Four years ago, Texas District 32 could have been redrawn, but Kincaid did not take the opportunity to do so. 87:2-4. He took 40% Republican areas in North Dallas County, which were more Republican than the rest of the county, and paired them with more Republican counties east of Dallas County to create a new Republican district that extended from North Dallas County to the east. 87:12-88:9.

District 5: Kincaid had to keep Kaufman, Van Zandt, and Henderson Counties whole in District 5. 89:20-22. They had to remain the core of the district, per the instruction from the Texas Republican congressional delegation.

29

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

89:23-90:2. On the eastern side of Dallas County, Kincaid made Seagoville and Mesquite whole. 90:23-91:6. Kincaid used the Garland and Dallas city line between Districts 5 and 33 to move District 5 to the northwest, including areas that are more Republican. 91:6-13. However, Kincaid added the Democrat precincts north of 33 and east of 24 to District 5, which lowered the Republican support in the district. 10/7/25 AM 91:22-92:12. To counteract this and keep the district at 60% or above, he added Anderson County, which had been there in the previous decade, back into the 5th District. 92-18-20. Finally, Kincaid included north of downtown Dallas to bring District 5 to population. 92:19-20.

District 24: Kincaid kept the Park Cities, University Park and Highland Park, whole in District 24. 93:5-11. He made Farmers Branch, which was previously split, whole as the "conduit from the Park Cities to the west." 94:22-24. Kincaid went into the southeast, where there were precincts in the "40s for President Trump versus the ones further down that are much bluer," to balance the population. 94:7-14. Because District 24 was held by a Republican under the 2021 map, Kincaid made sure to ensure that the district office for District 24 stayed in the district. 95:1-21. Therefore, Addison had to be split slightly to keep the district office in District 24. 95:11-21. Admittedly, Kincaid did not prioritize keeping district offices for Democrat incumbents in the same way. 95:22-25.

Because the 24th District gets most of its Republican strength from Northeast Tarrant County, Kincaid used Farmers Branch as a conduit to "connect the western side of the district with the eastern side of the district in one continuous seat" and make the city boundary whole. 96:17-97:6. Kincaid made the city of Coppell whole and made the split in Irving to the north to make sure that Congresswoman Beth Van Duyne continues to live in District 24. 97:13-18. In Northeast Tarrant County, he "made sure that the district boundary aligned with the cities of Euless, Hurst, and Richland Hills, as well as North Richland Hills and Watauga." 98:6-9. Kincaid made a small split of Haltom City to balance the population and added a few precincts to "clean up" the line on the western side of 24 between Districts 12 and 24. 98:10-14. The interstate forms the northwestern boundary of District 24. 98:15-20.

District 12:  Kincaid left the Parker County line the same because he needed to ensure that Congressman Williams, a Republican incumbent, continued to reside in his seat in the 25th District.  99:3-8.  The border between Districts 12 and 25 was set at the Haltom City line; from there, Kincaid used rivers down to the major road.  99:10-17.  He balanced the population in Southwestern Tarrant County.  10/7/25 AM 99:17-18.  His goal was to keep the district above 60% Trump, protect the Republican incumbent, and "absorb more Democrats in the seat."  99:19-21.  He used neutral boundaries whenever possible, including Interstate 20 and the South Fork of the Trinity River.  100:23-101:9.

Districts 30 and 33:  Kincaid drew one "megadistrict . . . of the most Democrat VTDs [he] could find in Dallas and Tarrant County."  102:8-11.  He did so to avoid having to redraw districts that he was otherwise satisfied with.  102:2-11. After doing so, he moved to District 6.  102:23-103:4.

To divide the one "megadistrict" into two districts, Kincaid used partisan shading to put together clustered precincts south of downtown where President Trump received 20% or less of the vote ("very Democratic precincts") into one seat for District 30.  109:18-110:8.  From there, Kincaid worked west, assigning Democrat precincts to District 30.  110:11-14.  Kincaid took about 250,000 people from heavily Democrat precincts in southeastern Tarrant County into District 30, creating a portion that juts into Tarrant County.  110:15-111:8.  Using neutral boundaries, Kincaid set the border between Districts 30 and 33 — he used Interstate 20, working north to the local metro line, and then again joined a highway.  111:20-112:3.  There is a small triangle with a "little nub" south of the interstate where Kincaid balanced the population.  112:25-113:6.

Kincaid made clear that his objective was to "make [District] 30 the more heavily Democrat seat of the two" to make for a more compact seat.  113:12-114:1.  He had no concern about incumbents in Democrat districts.  Tr. 10/7/25 PM 67:14-16.  District 33 was simply the district "left over from the creation of [District] 30 within the super district."  114:8-12.

Although there may be territory to the northeast that is in District 33 that

is more Democrat than the territory in Tarrant County, Kincaid did not go for the District 33 territory because he "was using the footprint of [District] 30 as it currently existed." Tr. 10/7/25 PM 71:11-19. Kincaid also noted that he considered building a more Democrat district by having it take on central Dallas County but did not do so because it created "a wall of a whole bunch of Democrats on the eastern side," which he would have needed to move west. 73:3-21. This decision is why Kincaid "took the 30th District down . . . and put in its current footprint." Tr. 10/7/PM 73:16-18. He said that he was generally maintaining the borders of District 33 and only moved small blocks to balance the population along the edges. *Id.* 21:10-20.

Kincaid indicated that Congresswoman Jasmine Crockett is no longer in the 30th District. *Id.* 114:22-24. He agreed that Congressman Veasey was no longer in District 33. *Id.* 114:14-21.

District 6: The areas in Irving moved significantly to Republicans in 2024 compared to 2020. 103:9-13, 104:6-13. The new District 6 was bound by the city of Irving on the eastern side. 104:16-20. In so doing, Kincaid put more Republicans into District 6 and out of Districts 30 and 33, which made the future Districts 30 and 33 as Democratic as possible. 105:2-9. Kincaid used the city boundary of Arlington and Rendon as a boundary for District 6. 106:2-6. Since the district became more compact and lost several counties to the east, Kincaid made changes to the south for population reasons. 107:3-6. Ultimately, the district "picked up a lot of Arlington." 107:7-10.

Noting one of the changes between C2308 and C2333, Kincaid made Navarro County whole in the 6th District, which allowed him to get "more Republican strength into [District] 17." 172:20-173:2.

District 25: The "entertainment district" had to remain in the 25th District. 106:8-9. While drawing the district, Kincaid prioritized the incumbency of Republican Congressman Williams, whose district office is in Cleburne and is a location of a split. See 106:22-25, 109:5-8. The border with District 6 set District 25, meaning that "the border between 6 and 25 was set between the two seats, all the way up through using the Rendon border." 108:24-

109:8.

Regarding the Houston metropolitan area: Kincaid "had already drawn the rest of the state and got to the Harris County area last" because he "like[s] to start in the corners" when drawing maps. 121:23-122:7. Because the central Texas area was the "most complicated to draw," it was the next-to-last portion of Texas that Kincaid drew. 122:18-21.

District 36: Kincaid "changed the line in Harris to come in and pick up some Democrat areas closer in toward downtown." 123:1-9. The Jefferson County line stayed "roughly the same" between Districts 14 and 36. 123:9-10. Kincaid used Interstate 10 as the dividing line between Districts 14 and 36. 174:21-22. Kincaid said that he drew CD 36 with 61.8% Trump 2024 general support. Tr. 10/8/25 AM 34:18-21.

Because Kincaid added Liberty County to District 9, District 36 became "underpopulated by about 93,000 people" and noncontiguous. 174:14-16. As a result, Kincaid had to change the way that District 36 was drawn through Jefferson County. 174:18-20. He took District 36 into the northern part of Brazoria County to "add population in 36 that was not too heavily Democrat." 175:4-176:12. Kincaid also put three VTDs, previously in District 9, into District 36 to balance the population. 185:2-11. He added these three VTDs because he wanted to make District 36 contiguous and not add more Republicans to District 9 after District 9 got sufficient Republicans from Liberty County. 186:11-18. Kincaid moved these particular VTDs because he did not want to split Baytown or the downtown area in half. 186:19-22.

When asked on cross-examination whether he could have created CD 9 at over 60% Trump by swapping precincts with CD 36, Kincaid acknowledged that he could have done so. Tr. 10/8/25 AM 35:9-12. Responding to a hypothetical that if he had swapped those precincts back and forth to make CD 9 60% Trump whether the Hispanic CVAP would have dropped below 50%, Kincaid said, "I don't know that. That's certainly possible. But I wasn't targeting the Hispanic CVAP numbers." *Id.* 35:15-20.

District 14:  Kincaid moved District 14 "down through Galveston County and changed the orientation of Brazoria."  123:11-12.  Because he added Liberty County to District 9, the 14th District "ended up growing into Fort Bend County."  176:17-19.

Kincaid said that he drew CD 14 with 61.5% Trump 2024 general support. Tr. 10/8/25 AM 35:5-7.

District 18:  The goal of the redistricting process was to pick up five seats. 123:19-21.  Because there used to be four Democrat seats in the middle of Harris County, "one of those seats had to be flipped."  123:18-21.  Kincaid "shaded on the partisanship and looked for the most partisanly Democrat precincts in Harris County and then into Ford Bend and Brazoria Counties and put all of those together in the 18th District."  124:1-8.

In the northeast portion of District 18, there is an epiglottis-shaped region that sticks down, which consists of "two or three very Democrat VTDs," a feature that also exists on the 2021 map. 130:10-18.

The 18th District needed to grow in population because District 14 moved into the southern part of Fort Bend County and both Districts 14 and 36 moved into the northern part of Brazoria County. 180:16-21.  Therefore, Kincaid brought up District 18 to the Sam Houston Parkway to add population.  181:15-19.  The Sam Houston Parkway was the northern border set in District 18. 181:16-19.  On the eastern and northern borders between Districts 18 and 29, the more Republican VTDs were drawn in Republican districts. 189:17-21.

District 22:  First, Kincaid "changed the southwestern Harris County a little bit . . . and then changed some of the area where 7 came down into 22." 140:18-22.  Specifically, he put the Sugar Land areas that were performing better for Republican candidates into District 22 to make the district as Republican as he could.  141:12-142:6.

On the border between District 14 in Brazoria County and District 22, Kincaid took territory to the south of District 14 and put it into District 22 to "keep the district at a good Republican Trump number . . . or better than it had

been before." 142:14-143:2. The northern part of Brazoria County is Republican, but not as Republican as the area that Kincaid swapped out of District 14 into District 22. 142:18-22. The 22nd District picked up more of Brazoria County, and the area in southwestern Harris County changed. 176:25-177:2. Kincaid moved Republicans from District 22 into District 8, and vice versa, to balance populations. 177:23-178:2. He was able to make District 22 a district that President Trump carried with 60% or more. 178:3-6.

Kincaid considered the Fort Bend County line between Districts 18 and 22 to make sure that District 22, "stayed as Republican as it had been before or got better." 125:4-21. Indeed, some of the precincts between Districts 18 and 22 are not as "deep blue" as those in District 18, "but they are still much more Democrat than the rest of 22." 126:21-24.

District 9: Kincaid drew District 9 after he drew District 18. 130:23-24. In fact, Kincaid notes that the "9th kind of drew itself" after he drew Districts 18 and 36 — the eastern border of District 18 and northern border of District 18 were set, so he "took the 9th District up the eastern side of Harris County." 131:2-7. However, the 9th District did not completely encompass the area north of Baytown because Republican Congressman Crenshaw lives in that area and Kincaid drew around his house to avoid putting him into the 9th District. 131:8-20. Kincaid was "trying to make the 9th district as Republican" as he could so District "36 ended up taking Baytown" and he "took the 9th north from there." 132:4-13.

When asked where he started when redrawing the Harris County map for Plan 2333, Kincaid said that he "added Liberty County to the 9th District" to make it "redder." 173:15-174:1. Indeed, Kincaid said that he drew CD 9 in Plan C2333 with about Trump '24 general support at 59.5%. Tr. 10/8/25 AM 34:8-11. Kincaid said that he did not make any change to District 9 based on racial data. 174:5-6. Adding Liberty County to District 9 "created a clockwise rotation around the Houston area." 176:13-17.

Comparing C2193 to C2333, Kincaid acknowledged that District 29 has been distributed into five districts, the biggest chunk (43%) of which went into

the new 9th District. *Id.* 24:13-20. Kincaid indicated that Congressman Green no longer lives in Congressional District 9—he lives in the new 18th District. *Id.* 114:25-115:16.

District 2: Indeed, Congressman Crenshaw lives in District 2, a district that President Trump carried with at least 60% of the vote. 131:24-25. If Kincaid drew him in District 9, Congressman Crenshaw would be in a district that President Trump did not carry with at least 60% of the vote. 131:25-132:3.

Kincaid drew District 2 after he drew District 9. 132:17-19. Because District 2 lost population in eastern Harris County based on the way District 9 was drawn, Kincaid added Humble, slightly above 40% Trump support and "redder than the other areas around it," into District 2. 132:21-133:5.

Kincaid brought District 2 further north into the Conroe area in Montgomery County to add more Republicans because District 2 "had shed a whole bunch of Republicans in northeastern Harris" County. 133:7-20. To keep District 2 above 60% Trump support, Kincaid extended District 2 "along the northwestern side of 29," where there "are a series of competitive but Democrat-leaning precincts." 133:23-134:17. He also made sure that The Woodlands was "relatively whole" in District 2, as it had been before. 135:5-9.

Kincaid added the Kingwood area in northeastern Harris County back into District 2 to help make it a reliable 60%+ Trump seat. 179:19-22.

District 29: District 29, north of District 18, was a "pretty straightforward draw." 125:2-3. Kincaid drew District 29 after he drew District 2. 135:11-12. He took the heavily Democratic precincts on the northern border of the district and eastern side of Humble and put them in District 29, working his way south to create the most Democratic seat in the area. 135:15-21, 136:20-22. Kincaid could not have put the finger-like portion of eastern Humble, a heavily Democratic VTD, in District 2 "because that would have endangered the 60 percent Trump target in 2." 136:5-15.

From the west side of CD 29 where a "finger . . . carves down on the right side" bordering District 2 to the bottom part of the district bordering the 610

Loop, Kincaid captured heavily Democrat precincts. 136:23-137:13. Notably, he used the 610 Loop as the southern border of District 29 because it was a natural boundary. 137:11-18. Kincaid brought in a small area south of the 610 Loop to balance the population. 138:8-10. Between Districts 18 and 29, Kincaid used a railroad track, instead of the VTD line, to clean it up. 139:7-14. And between Districts 7, 18, and 29, Kincaid used roads, interstates, and railroad tracks as boundaries, as done in the Dallas area. 140:7-11.

When asked about the change in District 29 from C2193 to C2333, Kincaid acknowledged that District 29 was "definitely reworked." Tr. 10/8/25 AM 23:6-9. Comparing C2193 to C2333, Kincaid acknowledged that District 29 has been distributed into five districts, the biggest chunk (43%) of which went into the new 9th District. *Id.* 24:13-20. About 37% of District 29 remained in District 29. *Id.* 24:21-23. The remainder of the district went into District 7 (2%), District 18 (8%), and District 36. *Id.* 24:24-25:9.

District 38: Kincaid was trying to give District 38 as Republican a character as he could, so he tweaked the line between Districts 29 and 38 to make sure he got as many Republicans as possible into District 38 and out of District 29. 138:13-139:2. He adjusted the line between Districts 8 and 38 to "get the 38th District back to where it had been in the previous draw." 145:6-9. District 38, which had lost Republican territory to District 2, was the last piece to fall into place in its area. 145:15-22.

District 14: The Congressman in District 14 wanted all seven ports that he represented to remain in the 14th District, which is why 14 is shaped the way it is at the bottom. 143:3-13. A heavily Democrat precinct on the south side of District 18 in C2308 was added to District 14 to make District 14 contiguous with the area just below District 18. 177:15-18.

District 7: When asked why he changed CD 9 from Democrat to Republican but left CD 7 Democrat, Kincaid said that "[t]here were political constraints on the west side of Harris County," although he "actually wanted to flip that one" as well. Tr. 10/8/25 AM 134:4-9. The structural orientation of Congressman Luttrell's seat (in CD 8), Congressman McCaul's seat (in CD 10),

and Congressman Hunt's seat (in CD 38) prevented Kincaid from "restructur[ing] the population in 7 enough to redraw that seat." *Id*. 134:12-15. On cross-examination with Mr. Bledsoe, Kincaid added the 22nd District (with Congressman Nehls) as one of the seats, in addition to those listed above (CD 8, CD 10, CD 38), that constrained him. *Id*. 141:9-13. Specifically, the 22nd District has "a hook down in the middle of Fort Bend County," which is a "carve-out for Mr. Nehls' home and a lot of population . . . [t]hat has to go somewhere." *Id*. 142:2-6.

Kincaid said that he could not change District 7 from Democrat to Republican because of "the other parameters that [he] had and the constraints with the incumbents." *Id*. 140:18-20. He reiterated that "[i]t was just an impossible thing to do," even though he tried to "create only two Democrat seats in Houston instead of three." *Id*. 140:20-23. The structuring of the neighboring seats, incumbent needs, and partisanship thresholds made it impossible to flip District 7 from Democrat to Republican. *Id*. 142:7-9. Kincaid said that putting the heavily Democrat areas of Harris County in District 18 "into one district on purpose" prevented him, in part, from flipping District 7. *Id*. 141:18-142:2.

Kincaid tried to "put as many Democrats" as possible into District 7, particularly to the north of District 18. 142:7-9, 143:23-144:2. After working on District 22, he addressed Districts 7, 8, and 38, simultaneously. 143:18-21. Kincaid cleaned up the border between what had been the 9th District and the 7th District, running the border along the bayou that runs to the highway and down to the county line. 144:6-10.

The line between Districts 7 and 22 changed slightly. 177:12-13. Kincaid moved some population from District 18 into District 7 to balance the population. 181:4-9.

District 8: Kincaid put some Republican-leaning, less Democrat VTDs bordering Districts 7 and 8 into District 8. 145:2-5. District 10 comes in over the top of District 8 and picked up Republican precincts from District 8. 124:20-23. District 8 lost some population it had in southwestern Harris County to District 22. 177:3-11. Indeed, Kincaid moved Republicans from District 22 into

District 8, and vice versa, to balance populations. 177:23-178:2. Kincaid was "able to put a little more Republican strength back into the 8th District so it didn't sink too far down." 178:7-9.

District 10: District 10 comes in over the top of District 8 and picked up Republican precincts from District 8. 124:20-23.

Kincaid then addressed the Travis County area.

District 37: Every VTD in District 37, which encompasses the Austin area, was less than 30% Trump support in 2024. 146:22-147:4. Controlling for population equality, the line between Districts 27 and 37 was a "strictly partisan" draw that differentiated along the 30% Trump number. 147:19-148:2.

District 27: Every VTD in District 27 was "30 percent or more Trump in 2024." 146:22-25. Kincaid wanted to keep District 27 above 60% Trump support. 148:10-11. He moved the 27th District to the north along the Gulf and made sure that Victoria County, where the incumbent lives, was in the 27th District. 148:23-149:1. From there, Kincaid fit the 27th District underneath the 10th District and brought part of Hays County into District 27 to help get above 60% Trump support. 149:1-3, 150:2-8. Although he tried to avoid a split in Refugio, Aransas, and San Patricio Counties, Kincaid made sure that the 27th District was contiguous by road because, otherwise, it would have been only contiguous by water. 149:21-25.

District 34: Kincaid "had to carve out some heavily Democrat precincts in Nueces County and Corpus Christi" to get the 34th District to be a Trump+10 district. 148:18-22. Kincaid said, "Working up from the border, I knew 34 and 28 were already Trump seats, and I knew I was going to make those redder." 10/8/25 AM 131:20-22.

District 21: Kincaid pulled the 21st District out of Travis County. 155:12-13. He had to keep this district a "60 percent Trump seat" because it was an incumbent Republican seat. 163:12-13, 163:25-164:3.

Kincaid then testified as to what he did with the Central Texas, Bexar County, and Travis County areas.

Districts 31, 17, 11, and 10 are all stacked above the 37th District in the form of a "layer cake." 151:23-25. The 10th, 17th, 27th, and 31st Districts were all "barely over 60 percent Trump seats," so much of Kincaid's work was to balance the partisanship among those districts. 152:1-5, 154:21-25.

District 10: Kincaid had to fit District 27 underneath District 10 because the 10th District had been stretched from western Travis County to the east to pick up Brazos County for at least two reasons—first, to accommodate incumbent Republican Congressman McCaul, who lived there, and second, to keep the district above 60% Trump support. 149:6-10, 153:1-7 (referencing the "McCaul hook"). In District 10, the "McCaul hook" is so slender because Kincaid had to avoid picking up Democrats closer to downtown and by the university in Brazos County. 154:4-16.

Kincaid was "trying to get as few Democrat areas as possible" in District 10. 171:18-21.

District 11: Kincaid pulled Lee County out of the 11th District and brought north Travis County into the 11th District. 152:6-10. This allowed the 11th District to pick up more Democrat areas in Pflugerville, which is whole in the 11th District. 152:9-10, 153:20-21.

But the southern line of district 11 stayed the same. 155:9. Kincaid did not move any counties into District 11 between Districts 11 and 21 or between Districts 11 and 23. 155:10-11. He kept the north boundary between Districts 11 and 23 unchanged. 160:6-7.

District 31: Kincaid also wanted to make District 31 more compact than it had been under the previous draw. 154:25-155:2.

District 35: District 27 "abuts" District 35, which is in Central Texas. 151:4-5. Kincaid indicated that the drawing of the districts by the border, namely Districts 15, 16, 28 and 34, influenced the way in which he drew District 35. See generally 156:1-161:25. Based on the movement in the border counties (see infra), Guadalupe, Wilson, and Karnes Counties were "free to be worked with" and indeed were combined with the area of Bexar County to make the 35th

District. 161:23-162:4.

Like the other pickup opportunities, District 35 needed to be a "Trump plus 10 seat that Ted Cruz had also carried in 2024." 162:9-11. Kincaid looked at Governor Abbott's strong performance there and performed a durability analysis. 162:15-19. The south side of Bexar County approaching District 35 (but below District 20) allowed Kincaid to make District 35 more Republican. 167:9-12.

Although Kincaid technically could have evened out the Trump performance between adjacent Districts 21 and 35 by giving more heavily Republican precincts to CD 35 (54.6% Trump support in C2333), he could not do so without running afoul of the criteria that 60%+ Republican incumbent districts needed to be at 60%+ Trump support: He could not drop the 21st District (which had 60.2% Trump support and a Republican incumbent) much more. Tr. 10/8/25 AM 38:15-39:16. Kincaid acknowledged that as many as eight precinct splits occurred in a heavily Hispanic area in CD 35. *Id.* 41: 11-17.

District 20: To allow District 35 to become a true Republican pickup opportunity, District 20 had to "absorb as many Democrats" as possible. 164:10-14. Kincaid wanted to make District 20 as Democrat as he could. 164:16-19. Kincaid put parts that had previously been in District 35 into District 20. 164:7-22. He made a straight line between Castle Hills and Olmos Park as the northern border of District 20. 166:10-19. He said that San Antonio "had to be split no matter what." Tr. 10/8/25 AM 38:1-5.

Kincaid noted that he drew the Kirby area into District 20, not District 35, because there is a "steady line of heavily Democrat precincts that are contained within 20 and then a smattering of 20 percent [Trump] precincts – or heavily Democrat precincts with smaller ones clustered in [the] Kirby area." 168:16-22. He did so because he wanted to "maximize the Trump and Cruz numbers," not simply maximize Republican performance overall. Tr. 10/7/25 PM 74:9-17. Kincaid was not concerned about an incumbent in District 20 or 35. Tr. 10/7/25 PM 76:6-15.

Kincaid remarked that the draw In Bexar County (Districts 20, 21, 23) was very complicated. For one, the 21st District could not move more to the west. 165:3-4. In an ideal world, Kincaid would have put the precincts on the west side of District 20 into a more Republican seat. 165:5-7. However, Kincaid could not do so because moving those precincts to District 23 would make District 23 more Democrat, causing it to miss its political targets. 165:6-10.

District 21: Kincaid made three small cities whole in the 21st District. 166:6-10. Although Kincaid could have evened out the Trump performance between adjacent Districts 21 and 35 by giving more heavily Republican precincts to CD 35 (54.6% Trump support in C2333) as a technical matter, he could not do so without running afoul of the criteria that 60%+ Trump districts with Republican incumbents in the 2021 map needed to remain at 60%+ Trump support — he could not drop the 21st District (which had 60.2% Trump support and a Republican incumbent) much more. Tr. 10/8/25 AM 38:15-39:16.

Kincaid then addressed the border counties.

District 34: Kincaid drew the 34th District as a "series of whole counties all the way up the Gulf Coast" until he "ran out of population in Corpus Christi." 156:2-5. This took the 34th District out of Hidalgo County, making it a more compact district in the north. 156:5-7.

District 15: This was a complicated draw for Kincaid because the district was an "R plus seven district" for incumbent Republican Congresswoman Monica De La Cruz, and Kincaid needed to keep the district at the same margin. 156:15-23. Kincaid "had to pick up the eastern Hidalgo County part" that he "had just drawn out of 34," which made things complicated because this part of Hidalgo County consisted of 52% Trump VTDs. 156:24-157:5. As a result, Kincaid included counties that had previously been part of District 34 into District 15 this time. 157:6-9.

Kincaid had to make sure that the incumbent congresswoman continued to live in her seat. 157:14-18. He reiterated that he starts at the corners while map drawing. 158:3-5. Overall, District 15 moved to the east. 161:20-21.

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

District 23: Kincaid needed to ensure that the 23rd District stayed at "R plus seven or greater during the draw" because it had a Republican incumbent. 158:20-25. Kincaid made Horizon City whole in District 23. 159:18-19. He included VTDs north of "where it says El Paso" in District 23 because those VTDs were 50% Trump. 159:19-24. Generally, Kincaid included Republican areas of El Paso County in District 23. 160:2-4. Kincaid kept the north boundary between Districts 11 and 23 unchanged. 160:6-7.

District 16: Kincaid's border between Districts 16 and 23 did not make it into the final map, and Kincaid did not draw the change between Districts 16 and 23 between C2308 and C2333. 7-14. Kincaid made Socorro whole in District 16. 159:19.

District 28: Kincaid took the remainder of Hidalgo County and put it into District 28. 160:12-14. Then, he "used whole counties up to Atascosa and balanced the population of [District] 28 in Maverick County." 160:14-16. District 28 was a Republican pickup opportunity drawn to be a "Trump plus 10 seat." 160:22-23. Overall, District 28 moved south. 161:21. Kincaid said, "Working up from the border, I knew 34 and 28 were already Trump seats, and I knew I was going to make those redder." 10/8/25 AM 131:20-22.

Kincaid noted at least three changes between C2308 and C2333.

First, he made Navarro County whole in the 6th District. 172:20-25.

Second, the Texas House changed a part of the map in El Paso—Kincaid did not draw this change. 173:3-4.

Third, there was a rotation of seats in the Houston metropolitan area. 173:6-7.

In conclusion, Kincaid's testimony is credible and irrefutable. His two-day testimony (without any notes) was detailed, methodical, and meticulous. When given the opportunity to do so, on both direct and cross, he had a perfectly legitimate and candidly partisan explanation for his every decision.

Despite testifying under a death threat, Kincaid was calm and

straightforward. He is a solid witness on the key question of intent and race, and I easily credit his testimony as wholly convincing and unassailable.

Kincaid's testimony is fully consistent with the law: "The most obvious reason for mid-cycle redistricting, of course, is partisan gain." As Kincaid cogently explained, he was put in charge of that partisan gain for Texas in 2025. And as his testimony shows, it was all about politics, not race.

I dissent.

\* \* \* \* \*

After outlining Mr. Kincaid's compelling testimony on the map-drawing process, we need to consider his statements, along with those of Senators Phil King and Adam Hinojosa, and Chairman Cody Vasut, which Judge Brown considers to be defense-favorable direct evidence,[69] and weigh them against those of Chairman Todd Hunter,[70] Speaker of the House Dustin Burrows, Representatives David Spiller, Tom Oliverson, and Steve Toth, which Judge Brown considers to be damaging direct evidence.[71] Of course, Judge Brown buries this question of legislative intent—the principal question in the case—after a lengthy recitation of ambiguous and contradictory direct evidence on the White House's pressure, outside media coverage, the DOJ's letter, the Texas AG's letter, and Governor Abbott's statements,[72] *none* of which can easily be attributed to the Legislature, and all of which butts up against *Alexander*'s presumption of good faith for legislatures.[73]

---

[69] Brown Op. at 79-104.

[70] To avoid ambiguity, it is important to note that Representative Hunter was Chairman of the Special Select Committee on Redistricting, while Chairman Vasut is Chairman of the overall Redistricting Committee.

[71] Brown Op. at 66-79.

[72] Brown Op. at 59-66.

[73] *See Alexander*, 602 U.S. 1, 10 (2024) ("This presumption of legislative good faith directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions.") (citing *Abbott v. Perez*, 585 U.S. 579, 610-612 (2018)).

So, how should you weigh the evidence in this case? Judge Brown admits, as he must, that legislative intent remains the fundamental question.[74] Yet legislative intent is notoriously challenging to discern.[75]

These are the main competing bodies of evidence:

- first, the Texas legislators' statements, notably including Hunter, Burrows, Vasut, Hinojosa and King;
- second, the actual outcomes on the map drawn in Plan C2333;
- third, Adam Kincaid's testimony as the map-drawer;
- fourth, Governor Abbott and other Texas politicians' statements, generally to the media;
- fifth, the Department of Justice and Donald Trump's statements.

Each one is relevant and probative, but some are more relevant than others. In particular, the (1) legislators' statements, (2) actual map adopted by them, and (3) the map-drawer's explanation—as agent for the legislature—of *every* choice made during drawing the map look the most probative.

Meanwhile, statements of politicians in Texas's executive branch (including the governor and attorney general) or statewide delegation to the United States congress are less probative of the Texas *legislature's* intent.

Further, statements by non-Texas federal politicians in Washington D.C. are even less probative, though Judge Brown repeatedly hangs his hat on this nigh-irrelevant body of information, contrary to *Alexander* and the manifest weight of the evidence.[76] Opposite to the clearly-established law, they fail to draw competing inferences as they are required to.[77] I will point

---

[74] Brown Op. at 56.

[75] *See, e.g.,* Antonin Scalia, *Common-Law Courts in a Civil-Law System: The Role of the United States Federal Courts in Interpreting the Constitution and Laws*, A MATTER OF INTERPRETATION: FEDERAL COURTS AND THE LAW, 16-17 (Amy Gutmann, ed., 1997).

[76] Brown Op. at 15-35.

[77] *Alexander*, 602 U.S. at 10.

out each of these wrong turns, so we can make a U-turn and get back on track.

To unwind this narrative, we may have to bounce around, so bear with me.[78]

\* \* \* \* \*

Judge Brown singles out representatives Hunter, Oliverson, Burrows, and Toth.[79] Simultaneously, it buries Vasut, Hinojosa and King's contrary evidence with little basis.[80] It also relies upon statements from members of the opposing party—notably Representative Thompson to Chairman Hunter and Senator Gutierrez to Senator King.

Judge Brown centrally focuses on Chairman Hunter's exposition of the racial demographics of the new map on the floor of the Texas House, including his colloquies with Representatives Pierson and Spiller.[81]

The Supreme Court, however, has emphasized that legislators will "almost always be aware of racial demographics" when drawing districts, so it imposes a higher standard before subjecting districts drawn with awareness of racial data to strict scrutiny—otherwise, redistricting might be impossible.[82]

Nothing Judge Brown says gets past ambiguity. He argues that Hunter's reciting demographics and mentioning *Petteway* jointly "suggests that the mapdrawers purposefully manipulated the districts' racial demographics to convert coalition districts into single-race-majority districts.[83] Suggestion, as against the *Alexander* presumption of good faith, is not enough.

---

[78] I did tell you to buckle up, didn't I?

[79] Brown Op. at 67-69.

[80] Brown Op. at 79-90.

[81] *See* Brown Op. at 67-79 (covering Hunter's recitation of demographic statistics and mentions of *Petteway* and *Rucho*).

[82] *Miller v. Johnson*, 515 U.S. 900, 916 (1995).

[83] Brown Op. at 74-75.

So, how to best interpret Chairman Hunter's exposition of these facts and figures?  Interpreting Hunter's invocation of both *Rucho* and *Petteway*, Judge Brown flouts *Alexander*'s presumption of good faith to draw the forbidden rather than permitted inference.[84]

Faithfully applying the presumption of good faith, the more plausible explanation is that Chairman Hunter was publicly attacked in the 2021 redrawing, again bound-up in the history of this case, and felt motivated to defend his reputation and that of the Texas house by expositing the racial statistics of the new map.  That easily covers his presentation of the new maps on August 1, 2025, and why he "volunteered" Hispanic CVAP statistics.  Hunter had previously been attacked and pilloried as a racist in the 2021 cycle—so, for him to present figures that he explained were *increasing* the number of majority-Hispanic districts easily fits the inference that he was aiming to defend the bill and bolster his credibility.

Further, drawing this positive inference is consistent with legislative awareness of race—which Judge Brown concedes, but then breezily walks by, contrary to *Alexander*.  Hunter provided more than enough favorable commentary to support the positive inference—discussing the race-blind drawing process, apparently delighting in the partisan advantage of *Rucho*—so, for Judge Brown to insist that he harbored inward racial animus on this ambiguous fact pattern unfairly paints Hunter, a former democrat,  as an unreformed, unrepentant racist maintaining a flagging veneer of partisan nastiness over Strom Thurmond-like segregationism.  This upside-down fantasy entertained by Judge Brown is plain error and justifies reversal.

But Judge Brown compounds his error of drawing a negative rather than positive inference from individual legislators' mixed and conflicting statements.  He interprets Speaker Burrows' mix of partisan and post-

---

[84] Brown Op. at 77; *contra* Prelim. Inj. Hr'g Tr. Day 8 (Afternoon), ECF No. 1344, at 115:2-7 (Hunter: "As based in my previous commentary on *Rucho*, this map is based on partisanship, political performance.  And for all of you here, it has enhanced and increased Republican partisanship, enhanced performance.  The intent of the changes was to increase Republican political performance in existing Republican districts from the proposed plan.").

*Petteway* or anti-coalitional thinking in a post-passage press release from August 20 as showing racist intent.[85]  Keep in mind, this was weeks after drawing the maps and after heated floor debates involving *Rucho* and *Petteway*.[86]  In that direct, 1:1 tradeoff, *Alexander* commands this court to draw the positive inference.

Similarly, out of 88 House Republicans voting for the bill, he snipes at Representative Oliverson's and Toth's statements to the press.  In Oliverson's NPR interview, he mentions *Petteway*, but in the next breath disclaims specific knowledge of the bill and invokes *Rucho*.[87]  On this conflicted piece of evidence, *Alexander* requires the partisan inference.  Toth's statement was similarly made during a sprawling TV interview, with the added context that Toth is running for the U.S. House of Representatives.  There, he said, "Texas just went ahead when we drew these maps, as Joan Huffman said, I drew the maps blind to race.  And that's what we did,"[88] while offering a wide range of conflicting purely-partisan and *Petteway* rationales.  Again, *Alexander* demands the partisan inference.

Judge Brown also hand-waves past Chairman Vasut, Senator Hinojosa, and even Senator King's statements showing partisan intensity as the legislature's motive.[89]

Judge Brown ignores Chairman (of the Redistricting Committee)

---

[85] Brown Op. at 74-75; *see* Brooks Prelim. Inj. Ex. 282, ECF No. 1326-28 at 1 (Burrows: "I want to thank Representative Todd Hunter for carrying this bill and for his tireless efforts ensuring the new map is not only constitutional, but secures Republican representation in Congress . . . .  Today's passage of the congressional map has ushered in a new chapter of Republican unity…").

[86] How can you avoid talking about *Petteway*?  If representatives asked about *Petteway* had said, for example, "I don't want to talk about that," Judge Brown's motivated reasoning could twist such a response into *concealing* their racist intent.  That style is conspiracy-theorist thinking.

[87] Brooks Prelim. Inj. Ex. 327-T, ECF No. 1327-27 at 3 ("So I am on the main redistricting committee also, but I'm not on the special select committee that's reviewing these particular maps . . . . I think what I would say is that I know that we certainly have the right to look at the maps and make changes.  I think the courts have consistently held that redistricting for purposes of political performance by either party is acceptable.").

[88] Brooks Prelim. Inj. Ex. 339-T, ECF No. 1411-5, at 1-2.

[89] Brown Op. at 79-90.

Vasut's contemporaneous statements, made during the map-drawing process on August 2.[90] Judge Brown also downplays Senator Hinojosa's speech defending the bill on partisan grounds, despite that speech, delivered *in* the legislature, having equal or greater probative significance than errant remarks from Oliverson or Toth *outside* the legislature.[91]

Where Judge Brown attacks Senator King for his minimal involvement in the bill-drafting process, he does not apply the same lens to Burrows, Toth, or Oliverson.[92] Almost all the house Republicans co-sponsored the bill: 78 in total. And worse for him, Chairman Hunter disclaimed any knowledge of the redistricting process earlier in the summer until he was asked to carry it on the floor. Given King's prior discussions with Kincaid at ALEC, how can Judge Brown claim that King was uninvolved, but everyone else knew and embodied the legislative intent?

Instead of weighing those against Chairman Hunter's statements in the aggregate and applying the presumption of legislative good faith to the entire collective body of the Texas legislature, Judge Brown seizes onto a

---

[90] *See* Prelim. Inj. Hr'g Tr. Day 8 (Afternoon), ECF No. 1344, at 117:11 – 118:18 (Vasut: "I see no evidence that this was racially drawn. This is a political performance map. I haven't looked at those. The question I had when I, you know, looked at this – and I was evaluating it myself, was – does this improve the political performance of Republicans in Texas? Which is where we have been trending and what we need to do to respond nationally. This is not just a Texas issue. It's a nationwide issue, it's perhaps one of the biggest issues that we're taking up. And when we've seen all of these blue states over-perform with their maps and Texas is underperforming, that puts Republicans at a distinct disadvantage nationwide, and it's right for Texas to step up. So I have not seen any evidence that this map was racially based. What I have seen is evidence that this map was politically based. And that's totally legal, totally allowed, totally fair. . . . I disagree with the assumption that this process had anything to do with the DOJ letter. Yeah, they sent a letter, but as you know, the proclamation called us in to do congressional redistricting, and we did congressional redistricting when we passed HB4 based off of political performance. So I frankly don't care what the DOJ letter said – and I think it's pretty clear that no one does. And I ought to probably prepare to sign this bill. So this bill was not based off of that DOJ letter. That bill was based off of improving political performance.").

[91] *See* Prelim. Inj. Hr'g Tr. Day 7 (Afternoon), ECF No. 1343, at 67–70 ("[L]et's stop pretending that this is all about race. It is about values. It is about representation—real representation. The fact that we are redrawing the maps is to ensure that . . . the people are able to have representation that reflects their values, not their last name, not their skin color. . . . And with that, members, I proudly stand and look forward to casting my vote in favor of House Bill 4.").

[92] Brown Op. at 66-69.

tendentious interpretation of Hunter's statements and then imputes that to the whole legislature—House and Senate alike!

Worse for Judge Brown, there is no evidence that Hunter *drew* the maps, so any of his exposition of the racial statistics resulting from the outcome of that process is *a posteriori*, rather than probative of the legislature's invidious racial intent in *drawing* the maps.[93]  Is it really credible to think that Hunter could have had his own self-contained invidious intent to enact a clean map?  That stretches credulity.

Instead, Kincaid presented remarkably credible and ultimately unrebutted evidence proving his drawing of the maps on race-blind criteria including partisan affiliation, natural geographic boundaries, representatives' home and office addresses, and greater compactness in the 2025 than 2021 maps.

Another big problem for Judge Brown is that Kincaid started drawing the maps before the DOJ letter, and far before Chairman Hunter was asked to carry the bill on the floor.[94]  Kincaid was told about upcoming redistricting in Texas in March while on a visit to the White House.[95]  Kincaid also drew the maps last time around, and regularly explores "what is possible or what would have been possible… across the entire country."[96]  Concretely, he

---

[93] The earliest that Hunter was involved with the maps was apparently July 23.  *See* Prelim. Inj. Hr'g Tr. Day 8 (Morning), ECF No. 1420, at 140-141.

[94] *See* Prelim. Inj. Hr'g Tr. Day 1 (Morning), ECF No. 1414, at 127:18-128:9; 129:1-3.

[95] Asked when he became aware that the White House was having conversations about redistricting, Kincaid answered, "It would have been earlier in 2025. . . I was aware that people were meeting with White House officials on redistricting probably [in] February or March." *Morning Transcript*, 10/7/2025, 58:13-17 (Direct Exam of Adam Kincaid).  And when asked when he first began speaking with a Texas national committeeman about redistricting in Texas, Kincaid answered, "I believe it was in March was when I first had a conversation with Robin [Armstrong] about this." *Id.* at 59:22-23.

[96] In response to defendant counsel's question, "How often would you say you draw maps. . . ?" Kincaid replied, "We do a lot of different things in [the National Republican Redistricting Trust].  But when it's quiet, I'll sit down and I'll look at a map and see what I can do in different places.  So it's regularly that part of my job is to look at maps and see what is possible or what would have been possible, yeah, across the entire country." Prelim. Inj. Hr'g Tr., 10/7/2025, 36:24 – 37:4 (Direct Exam of Adam Kincaid).

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

states that he started drawing these maps as early as June[97]—weeks before the DOJ letter—and apparently around the time he told Senator King that five pickups statewide were possible.[98]

So, contrary to what Chairman Hunter told his political opponent Representative Thompson on the floor of the Texas House, the Legislature *was* redistricting during June.[99]  The probative value of Chairman Hunter's statement to his rival is nada and zilch—where Judge Brown relies upon it, that exposes the weakness of his position.[100]  Similarly, where Judge Brown invokes *New York Times* articles from June discussing the mixed impressions of U.S. representatives from Texas in Washington, D.C., that is minimally probative of the Texas state legislature's intent in Austin.[101]  They are different people in different places, months before the final enactment.

Looks like Judge Brown's so-called "direct evidence" doesn't amount to a hill of beans.

---

[97] *See id.* at 58–59.

[98] *See* Prelim. Inj. Hr'g Tr. Day 6 (Afternoon), ECF No. 1342, at 20–22.  Senator King either had a lapse of memory or was concealing the number of conversations he had with Kincaid.  Given Kincaid's remarkably lucid, rapid-fire, and forthright demeanor on the stand—compared to King's calculated demeanor—I think it is obvious that Kincaid is telling the truth.  Additionally, Kincaid's was entirely consistent with Senator Hinojosa, who had a sober demeanor and was another sponsor of the bill.

[99] Prelim. Inj. Hr'g Tr. Day 2 (Morning), ECF No. 1415, at 90–91 ("Q. "Now, it's been stated by others that redistricting was in the conversation prior to [the DOJ Letter discussed below] . . . . What do you say to that? | [REPRESENTATIVE THOMPSON:] I heard it all during the session, and I made inquiries about it. And I asked [Chairman Hunter] . . . if they were going to be redistricting. . . . And subsequent he said he didn't know. You know, I think he told me he was unaware of any redistricting. And he kind of brushed it off as though it just might have been just a rumor or something, you know."); *Morning Transcript*, 10/7/2025, 62:1-3 ("I think the final phase of the redistricting for 2025 probably started late June or early July").

[100] Brown Op. at 17 n.48.

[101] *See* Brown Op. at 15-17; *also* Defs.' Resp. Intervenors' & Tex. NAACP's Prelim. Inj. Mot., ECF No. 1195, at 23–24 ("Given the danger to President Trump's legislative agenda posed by [the] 2026 elections and the historical trend of the presidential party doing poorly in non-presidential election years, there was a great deal of political pressure placed on the State of Texas to match the political gerrymandering of Democrat states. This pressure only intensified when other states, especially California, pledged to perform mid-decade redistricting to make their already one-sided congressional maps even more favorable to Democrats. . . . None of those factors indicate race was involved . . . .").

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

\* \* \* \* \*

On legislative intent, to the extent Judge Brown attributes Hunter's intent to the whole legislature, he likely violates *Prejean v. Foster*.[102] There, the Fifth Circuit rejected on summary judgment and while granting every inference to the nonmoving party—rather than on preliminary injunction and assessing likelihood of success on the merits—the argument that the intent of an external mapdrawer who averred zero racial motivation could be "taken as conclusive proof of the legislature's intent."[103] Instead, the fact that the Legislature adopted the external mapdraw's districting plan at best "support[ed] an inference that racial considerations did not predominate."[104]

Here, under a different procedural posture, the question is whether the fact that Kincaid's map was adopted by the Legislature suggests that his intent can be attributed to the legislature. Evaluating this as a standard piece of evidence, rather than granting every reasonable inference to the opposite party, the answer must clearly be yes (in part). At a minimum, Kincaid's intent is probative of the Legislature's intent, given that he acted as their agent in drawing the maps and was given numerous instructions related to incumbency protection at the level of voting thresholds, home addresses, district office addresses, and communities of interest.[105]

Judge Brown also rushes past the nuance that courts must be careful not to "overemphasiz[e] statements from individual legislators,"[106] as "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it."[107] But in dismissing Chairman Vasut's

---

[102] 227 U.S. F.3d 504 (5th Cir. 2000).

[103] *Id.* at 510.

[104] *Id.*

[105] *Supra*, Kincaid testimony at 31-32.

[106] *See Fusilier v. Landry*, 963 F.3d 447, 466 (5th Cir. 2020).

[107] *United States v. O'Brien*, 391 U.S. 367, 384 (1968); *also Fusilier v. Landry*, 963 F.3d 447, 466 (5th Cir. 2020) (discussing *O'Brien*); *N. & S. Rivers Watershed Ass'n v. Town of Scituate*, 949 F.2d 552, 555 n.6 (1st Cir. 1991) ("[S]tatements of individual legislators, even the sponsors of legislation, should not be given controlling effect."), *overruled on other grounds by Blackstone Headwaters Coal., Inc. v. Gallo Builders, Inc.*, 32 F.4th 99 (1st Cir. 2022).

and Senator Hinojosa's statements disclaiming racist intent, Judge Brown reduces them and dozens of the other members of the Texas legislature to mere cat's paws, or dupes, mopes and muppets following the leader, which theory the Supreme Court criticized in *Brnovich v. Democratic National Committee*.[108] There, the Court wrote,

> The 'cat's paw' theory has no application to legislative bodies. The theory rests on the agency relationship that exists between an employer and a supervisor, but the legislators who vote to adopt a bill are not the agents of the bill's sponsor or proponents. Under our form of government, legislators have a duty to exercise their judgment and to represent their constituents. It is insulting to suggest that they are mere dupes or tools.[109]

The rule is clear: Judge Brown cannot treat the statements of Hunter or Burrows as dispositive of the intent of the full legislative body, not only excluding over 80 other Republicans in the House, but scores more in the Senate.

In sum, *Prejean*'s refusal to equate the intent of an external mapdrawer to the legislature itself cuts in both directions: the statements of an outside drawer are not conclusive in either direction, and need to be weighed for their probativity and credibility, like any piece of evidence. Here, Hunter's statements are minimally probative, while Kincaid's statements are highly probative, consistently delivered, and credible. It is plainly in error for Judge Brown to reach the opposite conclusion.[110]

* * * * *

Having considered the mixed legislative statements—which individually and aggregately fail to overcome the presumption of legislative good faith—we consider Judge Brown's discussion of the maps' outcomes.

Judge Brown's tour of the circumstantial evidence is lackluster, especially considering his overarching theory of the facts is that "the redistricting bill's

---

[108] 594 U.S. 647 (2021).

[109] *Id.* at 689-90.

[110] Brown Op. at 100-104.

sponsors made numerous statements suggesting that they had intentionally manipulated the districts' lines to create more majority-Hispanic and majority-Black districts . . . [which] suggest that they did so because such a map would be an easier sell than a purely partisan one."[111] Judge Brown begins by arguing that the Legislature "fulfilled almost everything that DOJ and the Governor desired."[112]

This is fanciful framing at best and intentionally deceptive at worst.

The DOJ letter erroneously singled out four districts as coalition districts. One of those, CD 29, was a majority Hispanic CVAP, meaning the DOJ was incorrect as flagging it as a coalition district in the first instance. However, Judge Brown appears to suggest that changing CD 29 fulfilled the DOJ's goals, even though the Hispanic CVAP dropped below 50% and created a district where no race or ethnic group is a majority of the citizen voting age population.[113] If the Legislature intends to sell this map by emphasizing how many Hispanic majority CVAP districts there are and to claim they were required to eliminate coalition districts, why in the world would they get rid of an Hispanic majority CVAP district and create what at least has the outward appearance of a coalition district? Judge Brown has no answer to that question. With the map's not fulfilling the DOJ's vision of CD 29 and CD 33 remaining a coalition district, the tally stands at 2-2 for doing things that the DOJ letter suggested.  Two districts looked like the DOJ wanted them to look and two didn't. Far from the record's making it obvious that Kincaid and the Legislature did the DOJ's bidding, it seems as though Kincaid drew his map blind to race and the bill sponsors, *who had virtually no input on the lines in question*, just sought to pay lip service to *Petteway*.

As for Governor Abbott, Judge Brown claims that Abbott wanted to "increase[e] the number of majority-Hispanic districts," and the Legislature

---

[111] Brown Op. at 3.

[112] Brown Op. at 105.

[113] Brown Op. at 38.

obliged. However, Judge Brown doesn't connect the dots correctly.

There is no evidence in the record, before the map was revealed at the end of July, that the Governor said anything about increasing the number of Hispanic majority CVAP districts. Rather, it's only after the map is revealed that the Governor says anything that can be construed as stating the lines were drawn to increase Hispanic majority districts.[114]

Far from the map's being drawn with an eye toward achieving the Governor's goal, it appears he adjusted his rhetoric to defend the map in a forward-facing capacity. If the Governor's concern throughout the redistricting process was increasing the number of Hispanic majority CVAP districts, then one imagines he would have said something about it before the legislature revealed a map which happens to have a higher number of Hispanic majority CVAP districts.

Judge Brown then talks about how the map's "'on-the-nose attainment of a 50% [C]VAP' for so many districts suggests that the Legislature was following a 50%-plus racial target' 'to the letter,' such that the 'racial target had a direct and significant impact on those districts' configurations[s].'"[115] While it may feel odd or uncomfortable to see four of the thirty-eight  districts right at that 50% mark, Judge Brown provides no serious rebuttal to the reasons Kincaid gave for the lines that he drew in those districts.

The Kincaid testimony is thorough and largely based on testable claims about the areas in which he drew the lines. Even if we assume that the plaintiffs don't need to produce an *Alexander* map, when provided with thorough reasoning concerning the lines that exist and contrary evidence, as found throughout this dissent, that undermines the existence of a racial target, it seems concerning that the only conclusion Judge Brown can come to is that these numbers suggest legislature followed the DOJ's order to the letter, even though they only did half of what the DOJ suggested.

---

[114] *See, e.g.*, Brooks Prelim. Inj. Ex. 335-T, ECF No. 1328-1.

[115] Brown Op. at 105.

Judge Brown also suggests that the fact that the legislature left a majority white Democrat district largely unchanged is further evidence of racial motivations.[116] This claim does not even fit Judge Brown's theory of the facts. Across his lengthy opinion, Judge Brown's theory is that the legislature conspired to make a map that's easier to sell by intentionally creating more minority districts while also still achieving partisan aims. However, here he appears to pivot into a suggestion that the legislature is outright bigoted and that a partisan legislature would try and make significant modifications to CD37 just like it did to the non-white district of CD 9, but failed to do so because CD37 was a white Democratic district.[117]

This is cherry-picking of the highest order. Of the 5 pick-up opportunities that were majority-minority, CD28 (53.6%) and CD34 (61.6%) kept a majority of their 2021 district intact.[118] In comparison, CD32(41.2%) is a white majority CVAP district and kept the third least of its original territory out of the five pickup opportunities.[119] It is hard to imagine how a rational actor comes to the conclusion that majority-white CVAP CD37 keeping 6% more of its territory than majority-minority pick-up district CD34 and 26% more than majority white CD32 is evidence of racial predomination. Judge Brown's argument here is just plain faulty, and his discrediting of Kincaid's testimony is more of a judicial handwave than a legitimate, reasoned explanation.[120]

Judge Brown also claims that the fact that a Republican coalition district (CD27) became majority-white is circumstantial evidence of racial gerrymandering. Here, Judge Brown truly shows his biases and nakedly shows that he has no true desire to disaggregate race and politics. Judge Brown doesn't seem to realize that in a political gerrymander, the voting power for flipped districts must come from somewhere. So, one should not "expect the

---

[116] Brown Op. at 106-7.

[117] Brown Op. at 106.

[118] *See* Brooks Prelim. Inj. Ex. 267, ECF No. 1326-14 at 5-6.

[119] *Id.* at 6.

[120] Brown Op. at 107 n.403.

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

Legislature not to make fundamental changes to the racial demographics of Republican districts" because the only way one is going to pick up seats in a partisan gerrymander is by taking strength from heavily Republican districts and adding them to slightly Democrat districts (or some similar formulation).[121]

It's entirely plausible and even expected that the racial composition of some of the Republican districts might change as a result. After all, the people that got added to the district are not the same ones who got removed from the district. When looking back at the record, it's unsurprising to find that, sure enough, CD27 was a district where Republican strength was taken, and Kincaid had to work to keep the Trump numbers above 60%.[122]

From the very outset, Kincaod admits that the 2025 maps "achieved *all but one* of the racial objectives demanded by DOJ."[123]  Specifically, CD-27 in Houston remains a 'coalition' district as previously authorized by *Petteway*. But Judge Brown's *Petteway* analysis gets it logically wrong by suggesting that the outcomes were driven by the DOJ letter.  If Texas had been responding to DOJ's threat, why would they have left one coalition district on the table still subjecting them to liability?  That doesn't make sense.

Instead, the correct inference on *Petteway* is that if you do not *have* to draw coalition districts, you may or may not draw them.[124]  And that is exactly what the state did.  Texas drew some (CD-27) and dismantled others (CD-9).  So, the concept that the *Petteway* change drove or explains all of the variance is at odds with the facts that some coalition districts still exist, and others do not exist—rather than every coalition district having been eliminated.  The right inference is that they were conducting the draw on some other criterion than eliminating all coalition districts.

Plaintiffs also seize upon alleged racial shifts in CD-22 and CD-27,

---

[121] Brown Op. at 107.

[122] Tr. 10/7/25 AM 148:10-11.

[123] Brown Op. at 3 (emphasis added).

[124] Judge Brown states the law correctly here, Brown Op. at 89, but later misapplies it.

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

Republican performing districts under both Plan C2193 (2021 map) and C2333 (the final 2025 map), per *LULAC Second Supplemental Complaint* at *42, 56. They allege that the shifts in composition among those districts are performed for racial reasons. Indeed, Judge Brown suggests that changes to CDs 22, 27, 30, 32, and 35 are racial gerrymandering.[125] Here, though, he again struggles to disentangle race from politics, given that, as in South Carolina, "race and partisan preference are highly correlated"[126] in Texas, and these districts are drawn for Republican performance constrained by the knock-on effects from drawing other districts.[127]

Indeed, there are clear knock-on effects in C2333 from creating CD-35, which pulls in Guadalupe and Wilson Counties from the C2193-CD15, which then pulls in counties from the east such as Dewitt and Lavaca, and in turn pushes CD27 further east into Wharton and Matagorda Counties to politically balance out new population from Hays and southeastern Travis Counties, in turn pushing CD-22 into Brazoria County to claw back absolute population. To accuse CD-22 and CD-27 of hewing to new racial targets neglects the far more parsimonious explanation consistent with legislative good faith, which is that those districts were moved east to reflect a *partisan* gerrymander.

Both Judge Brown and plaintiffs devote relatively little attention to CDs 15, 28 and 34 under the new plan because they reflect anodyne partisan tweaks, as well as reflect the politically-inconvenient reality of Hispanic Texans in the Rio Grande Valley shifting for Donald Trump.

CD-18 in C2333 does track Black CVAP voting precincts, but plaintiffs fail to disentangle race from politics here. While race is a proxy for partisanship, the problem is that *partisanship is also a proxy for race*. And Black voters in Harris county favor the Democratic party at overwhelming rates, north of 90%, suggesting that a *partisan* packed map grouping together

---

[125] Brown Op. at 41-50.

[126] *Alexander*, 602 U.S. at 6.

[127] *Supra*, Kincaid testimony at

all the most-intensive Democrat precincts would likely track racial lines, given the parallel trend of residential racial segregation.[128]  Indeed, the much celebrated "dangly bit," or the eastern prong of CD-18 reaching into CD29 on map C2193 and reaching into CD9 on C2333 tracks just such a residential concentration performing at extremely high rates for the Democrat party.  To disentangle the partisan correlation from the racial correlation, where that correlation is above 0.9, requires sensitive statistical analysis.  Judge Brown relies completely on Dr. Duchin's analysis—which was, unfortunately, mis-calibrated.[129]

CD-33 remains a coalition district, despite being named in the DOJ letter, which undermines the 1:1 DOJ application theory advanced by Judge Brown, since there is not a pattern of actually dismantling pre-*Petteway* coalition districts.  How can Judge Brown say that only eliminating *three* such districts in CD-35, CD-9 and CD-18, while leaving in one, amounts to a clear pattern of action?  The state only does it 75% of the time, in the one observed instance.  If they were really conducting a full-*Petteway* reversal, and abiding by the DOJ's letter, why would they leave in one coalition district that would subject them to the terrors of Harmeet Dhillon's DOJ enforcement arm?  While racial gerrymandering claims may proceed "district by district," the state map drawing process indisputably took place on a map-wide draw, given Kincaid's unrebutted testimony.[130]

As to Judge Brown's attack—relegated to a footnote—on CD-7, he argues that Kincaid's failure to eliminate CD-7 is probative of racial intent, because a White Democrat, Lizzie Fletcher, holds that seat.[131]  Yet Kincaid credibly testified that there were just not enough degrees of freedom, compared to the core retention constraint, given the nearby presence of CD-

---

[128] *Supra*, Kincaid testimony at 36, 48.

[129] *Infra* at 64 et seq.

[130] *Bethune-Hill v. Va. State Bd. of Elecs.*, 580 U.S. 178, 191-192 (2017) (quoting *Ala. Leg. Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015)).

[131] Brown Op. at 107, n.403.

38 (Wesley Hunt's district), which was itself relatively compact, and the pressure on CD-22 to move northeast from consolidating CD-35 in Bexar county and the changes in the Rio Grande Valley districts.[132]

\* \* \* \* \*

In sum, Judge Brown does fine in his recitation of some of the law governing racial gerrymandering claims, but recitation and application are different things, and his application of law to facts is sorely wanting. To begin, it has been stated multiple times by the Supreme Court that federal courts must "'exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race.'"[133] We act so cautiously because reviews of districting legislation "represents a serious intrusion on the most vital of local functions."[134] Judge Brown's analysis is not careful, nor does it appreciate how serious an intrusion is being made here.

Judge Brown's direct evidence analysis is contradictory and legally wrongheaded. He cites *Common Cause Florida v. Byrd* for the proposition that the purported motivations of the DOJ and the Governor "do not become those of the [Legislature] as a whole unless it is shown that a majority of the [Legislature's] members shared and purposefully adopted (i.e., ratified) the [Governor and DOJ's] motivations."[135] This case helps demonstrate the flaws in Judge Brown's analysis, and I thank him for pointing it out.

Assuming that *Common Cause* represents a proper reading of the law in this circuit, Judge Brown does not provide evidence that the majority of the Legislature shared and *purposefully adopted* the Governor's and DOJ's motivation. Instead, the Judge Brown collects statements from a handful of representatives and then fails to explicitly assert that the majority of the legislature specifically acted to ratify the underlying conduct. Instead Judge

---

[132] *Supra* at Kincaid Testimony, 36-37.

[133] *Alexander v. S.C. State Conference of the NAACP*, 602 U.S. 1, 7 (2024) (quoting *Miller v. Johnson*, 515 U.S. 900, 915–16 (1995)).

[134] *Id.* (quoting *Miller v. Johnson*, 515 U.S. 900, 915 (1995)).

[135] 726 F. Supp. 3d 1322, 1364–65 (N.D. Fla. 2024).

Brown spends much of his direct evidence section talking about the secretive plan that was hatched between Hunter and his co-authors but fails to make any credible connection to the intent of the majority of the Legislature as is necessary in *Common Cause*. Judge Brown's only attempted connection is that the Legislature "fulfilled almost everything that DOJ and the Governor desired."[136] As will be demonstrated shortly, this claim is simply untrue. Under Judge Brown's own rubric, the DOJ Letter and the statements of Governor Abbott are not direct evidence that race was the "'predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'"[137]

Even if Judge Brown decided to use the standard for direct evidence that was given in *Alexander*, neither the DOJ letter nor Governor Abbott's statements are direct evidence. Direct evidence "comes in the form of a relevant state actor's express acknowledgment that race played a role *in the drawing of district lines*."[138] The logical implication of this description of direct evidence is that direct evidence needs to come from a state actor who has control over the drawing of district lines. Here, Judge Brown provides no evidence, and the record provides minimal support for the prospect that Governor Abbott or the DOJ actually controlled the drawing of district lines in any way.

\* \* \* \* \*

Turning now to the "indirect evidence," mainly developed by the experts' statistical analysis, Judge Brown gets things woefully off-base.

First, and importantly, Judge Brown studiously avoids any reference to Dr. Barreto, despite the plaintiffs' heavy reliance on him in their post-trial brief, *LULAC Post-Hearing Brief* at 25, 33. Judge Brown also fails to make any reference to Dr. Murray, Dr. Ansolabehere, or Dr. Ely, apparently abandoning days of expert testimony developed in the hearing to grasp after straws.

---

[136] Brown Op. at 105.

[137] *Alexander*, 602 U.S. at 7 (quoting *Miller v. Johnson*, 515 U.S. 900, 916.)

[138] *Alexander*, 602 U.S. at 8.

Instead, Judge Brown depends *exclusively* on Dr. Duchin's analysis.[139] While Dr. Duchin may be a fine mathematician, she was demonstrably unaware of several of the redistricting criteria used by the State of Texas. Thus, she would likely be forced to admit that her analysis is statistically skewed. On a correct appraisal of her report for its substance—rather than merely being cowed into accepting her conclusions by her strong credentials[140]—one will quickly realize that her report is so flawed as to be irrelevant at best and cunningly misleading at worst.

As to the role of an expert in a bench trial, normally "jurors are supposed to reach their conclusions on the basis of common sense, common understanding and fair beliefs, grounded one evidence consisting of direct statements by witnesses or proof of circumstances from which inferences can fairly be drawn."[141] Where a fact-finder needs to draw complex inferences, however, expert testimony is helpful.[142] But expert testimony does not supplant the factfinding role; the Supreme Court has warned that even meritless expert testimony "can be both powerful and quite misleading because of the difficulty in evaluating it."[143] While judges normally sit as gatekeepers of expert testimony, in a bench trial we are tasked with evaluating it.[144] Therefore, we should not hesitate in poking readily-observable holes in expert testimony—precisely as the Supreme Court did in *Alexander*—with this exact expert witness.

In *Alexander*, plaintiffs challenged redistricting around the city of Charleston, South Carolina, for racial vote dilution.[145] The Supreme Court faulted Dr. Duchin's vote dilution analysis for failing to account for partisanship or core retention metrics.[146] It also faulted, in the vote-dilution

---

[139] Brown Op. at 108-127.

[140] *See* Brown Op. at 108, lauding her credentials.

[141] *Schulz v. Pennsylvania R.R. Co.*, 350 U.S. 523, 526 (1956).

[142] There are "causes of action in which the law predicates recovery upon expert testimony." *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962).

[143] *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993) (citation omitted).

[144] Federal Rules of Evidence 702, 703.

[145] *Alexander*, 602 U.S. at 15.

[146] *Id.* at 33, citing *Bethune-Hill*, 580 U.S. at 191 ("the basic unit of analysis for racial gerrymandering claims ... is the district"); *Ala. Legislative Black Caucus*, 575 U.S. at 262-63 (a racial

context, Dr. Duchin's report for conducting a statewide draw rather than attending to the particular district at issue to identify whether the map cracked or packed it: "Dr. Duchin's conclusion was based on an assessment of the map as a whole rather than District 1 in particular. A state-wide analysis cannot show that District 1 was drawn based on race."[147]

Although her analysis was primarily directed toward claims of racial vote dilution, Duchin had three steps in her analysis relevant to a claim of racial gerrymandering.[148] First, she conducted a compactness analysis of the 2025 maps compared to the 2021 maps, and the 2021 maps compared to the 2012 maps.[149] Second, she generated ensembles of hypothetical maps across metro-area "clusters," which were defined as all the territory included in the C2333 districts that touched Travis/Bexar counties (San Antonio), Dallas/Tarrant counties (Dallas and Fort Worth), and Harris/Fort Bend (greater Houston).[150] These maps were the results of random walks and

---

gerrymandering claim "does not apply to a State considered as an undifferentiated 'whole'"); *see also Alexander* at 45 (Thomas, J., concurring in part) ("A legislature seeking to gerrymander a district will often proceed by "packing" or "cracking" groups of minority voters . . . . But, in areas where 'political groups … tend to cluster (as in the case with Democratic voters in cities)' apparent packing or cracking can simply reflect 'adherence to compactness and respect for political subdivision lines' or 'the traditional criterion of incumbency protection.' This case exemplifies the problem—Judge Brown observes that Dr. Moon Duchin's report failed to 'account for' the traditional districting principles of 'partisanship or core retention' in 'assessing whether the Enacted Plan 'cracks' black voters among multiple districts… The difference between illegitimate packing and the legitimate pursuit of compactness is too often in the eye of the beholder.") (quoting *Vieth v. Jubelirer*, 541 U.S. 267, 278)).

[147] *Id.* at 33.

[148] We therefore pass over her analysis of effective minority representation, which was disputed at the hearing due to her changes of denominators between two recent editions of her report to include more past elections in Austin related to Rep. Lloyd Doggett. *See* Expert Report of Dr. Moon Duchin, September 7, 2025 ("Duchin Report"), ECF No. 1384-8 at 9.

Also, between the August and September editions of her report, she made several material changes to her box plot histograms, *compare* Expert Report of Dr. Moon Duchin, August 25, 2025 ("Duchin's August Report"), ECF 1142-6, pg. 14-15; *with* Duchin Report at 14-15. These changes generally ramped up her estimates of outlier behavior. But if she was so certain of her report's results in August, what can explain her materially changed results in September? What is to suggest that her results may not change again, if an out-of-state academic again needs to fly into Texas to override the will of tens-of-millions of voters in the state?

[149] Expert Report of Dr. Moon Duchin ("Duchin Report"), ECF 1142-6, pg. 5-6.

[150] Duchin Report at 1-2, 14-15.

spanning trees mapping out possible permutations within the defined areas.[151] Third, she conducted a "winnowing" process, or adjustment of the simulation results from the second step, by applying her choice of "filters" including (i) Republican performance across the cluster, (ii) Trump performance, (iii) urban/rural composition, and (iv) a cap on incumbent double-bunking.[152]  The results of these latter two steps are offered at Duchin Report 14-15. ("the histograms").[153]

While Duchin's analysis is an interesting simulation, it contains several internal[154] and external threats to validity.[155]  Her report also contains several weaknesses in presentation—such as inadequately labelled histograms that we nevertheless do our game best to interpret, but which arguably fail the burden of production on the plaintiffs' side.[156]  She also offers several

---

[151] I use the term random walk here to refer to Markov Chain analysis, which is a step-wise outcome generation process where the prior state probabilistically influences the subsequent state. A demonstrative thought experiment is the "drunk at the lamppost" scenario. In this experiment, a drunk moves randomly from the lamppost, in any direction. Where is the most likely place for him to end up after an hour?  Right back at the lamppost.

As to spanning tree analysis, this is a topological exercise that in Euclidean space collapses to geometric connection of vertices. Put simply, this is connect-the-dots, with probabilistic weights that affect the probability of the spanning tree's connecting to the next vertex. Duchin describes these weights as "surcharges" geared towards compactness. Duchin Report at 19.

[152] Duchin Report at 14-15, 22-23 (the three histograms and Appendix E).

[153] *See also* Brown Op. at 108-122.

[154] In statistics, an internal threat to validity is a factor that can undermine the proposed relationship between a variable an outcome.  The simplest example is "omitted variable bias," where a third factor C drives the relationship between observed factors A and B.  Since Hume, we have all been aware that correlation does not imply causation.  Omitted variable bias is one of the phenomena that drives this distinction.

[155] An external threat to validity limits the relationship between a research study and its application to the external world.  While the most famous examples typically come from the medical literature, as in placebo trials affecting patients' behavior, which demands the double-blind protocol, a simpler example is that external conditions may change during and after the time of the study. Instantly, this could include Hispanic voters shifting their preferences to the Republican party in Texas, rather than remaining a constant figure, as was developed by Dr. Lewis's expert testimony and report.  *See Expert Report of Jeffrey B. Lewis*, 3:21-cv-00259-DCG-JES-JVB ECF No. 1386 at pg. 4-6 (Exhibit 570) ("Lewis Report").

[156] *See* Duchin Report at 14–15, lacking any labels of the blue dots in her histograms.  She was invited to clarify the meaning of these actual outcomes, compared to the ensemble simulation, during her oral testimony. *Morning Transcript* 10/4/2025 at *130, ll.10-24.   However, she failed to do so. Neither she nor plaintiffs' counsel ever clarified which dot corresponds to which real outcome district's composition.  It is best to scrutinize these small points, which compared to the broad

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

conclusory leaps toward assuming intent.[157]   While expert witnesses are welcome to opine on ultimate issues, in a bench trial this cuts both ways, where judges are then responsible for scrutinizing the conclusions advanced by an expert.[158]

First, on compactness, the 2025 maps scored better on every measure in Duchin's own analysis, supporting a soft inference that traditional redistricting criteria were used.[159]   One might say that Texas has a little less 'mander' to its 'gerry.'

Further, Duchin's analysis of precinct splits was completely rebutted by Adam Kincaid's testimony.[160]   Duchin announced the conclusion that "the state has not disclosed the use of any partisan data below the precinct level, while race data is available at the block level [so that] the high number of precinct splits … is more indicative of a focus on race than on partisanship."[161]   However, in Kincaid's testimony, he reveals the State's use of commercially available and State-provided partisan data available below the precinct level, directly undermining Duchin's conclusions on compactness and precinct

---

labelling on the Y-axis provide little guidance, and compare them to the available statistics in the C2333 tables to figure out exactly what she means.  *Cf.* C2333 summary statistics at pg. 13-15, https://capitol.texas.gov/tlodocs/892/districtplanrpts/pdf/HB00004H_PLANC2333.pdf.

[157] For example, Duchin bizarrely asserts that congressional districts CD-29, CD-18 and CD-9 were rotated in their name assignment so as to confuse any reviewing body.  Duchin Report at 6.  But the reason is not particularly confusing: CD-18, by virtue of having been Sheila Jackson Lee's former seat, the "Barbara Jordan district," while also being the easternmost seat in central Harris County, could not have been moved outside the county without provoking greater uproar.  So, it made sense to move CD-9, at least in terms of *name*, even though CD-9 substantially swapped locations with CD-18 measured by core retention, such that CD-18 remained a safe Democrat seat.  Duchin's assertion that the name change was made for conspiratorial and racist reasons suggests her motivated reasoning, as contrasted with dispassionate expert testimony.

[158] Federal Rule of Evidence 704; *see generally,* Molly Treadway Johnson et Al., *Expert Testimony in Federal Civil Trials, a Preliminary Analysis*, FEDERAL JUDICIAL CENTER (2000).

[159] *See* Duchin Report at 6, showing improved scored on Polsby-Popper, Reock, and Block Cut Edges in Plan C2333 as compared to Plan C2193.  Higher scores on Polsby-Popper and Reock are better, reflecting greater "circle-like" nature to a district, where a perfect circle would have the highest score.  Lower scores are better on Block Cut Edges, reflecting the total 'scissoring' or serration in the plan.

[160] Duchin Report at 5-6.

[161] *Id.*; Duchin Report at 16 (conclusions).

65

splitting.[162]

Second, I recognize that Dr. Duchin attempted to improve her analysis from *Alexander* by including partisanship and core retention weights in her map-drawing algorithm. However, several problems emerge. One is that she does not include the *same* partisanship constraints as those used by the map-drawer. Unlike Duchin's blanket 55-Republican metric, in real life Kincaid had included constraints to reflect that (i) any Republican in a greater than 60-R district could not be reduced below 60, (ii) any Republican in a below-60-R district had to be kept constant or improved, and (iii) any newly drawn districts were to be as Trump-favorable as possible while also winning Ted Cruz the senate seat, beginning at the 10% margin.[163] ( Judge Brown hand-waves past this concern, stating "The State Defendants have… failed to persuade us that Dr. Duchin's 55% figure is off the mark," while failing to recognize that this departure likely skews Duchin's outputs.[164])

Duchin also conducted only metro-area or cluster-wide draws, rather than any state-wide draw, whereas we know that Kincaid conducted a statewide draw beginning in the northwestern corner of the state, rather than conducting metro-area or cluster-wide draws.[165] Therefore, the knock-on effects from one district affecting another may significantly affect the *range* of results included in the simulation outputs.[166] Each of her clusters includes a significant number of surrounding counties outside the metropolitan core of Dallas-Fort Worth, Houston, and San Antonio.[167] However, this underrepresents the degrees of freedom available to Kincaid—we know from his testimony that he drew eastern counties into CD-32 to make it perform for Republicans, but he likely had numerous other options available across rural, Republican-performing counties generally in the Dallas-Fort Worth

---

[162] *Supra* Kincaid testimony at 28-29; *compare* Prelim. Inj. Hr'g Tr. Day 6 (Morning), at 37-39; *with* Prelim. Inj. Hr'g Tr. Day 5 (Morning), at 84:15-23.

[163] *See* Defs.' Post-Hr'g Br., ECF No. 1284, at 51–52.

[164] Brown Op. at 126-127.

[165] *Supra*, Kincaid testimony at 30.

[166] *See* Duchin Report at 14-15, considering the core targets and tails of the generated ensembles.

[167] Duchin Report at 1-2.

area, such that constraining the map-drawing space to only the counties *actually* chosen underrepresents the available space and constrains the output of the ensemble.[168]  Where Duchin then complains that the actual outcomes are outliers, that may be an artifact of her flawed map-drawing process.[169]

A statewide map draw, rather than one localized to 7 or 8 congressional districts in the Harris and Dallas-Tarrant County metros, will necessarily have greater variance.  But Dr. Duchin concedes that she limited her analysis only to the subsets of those metro areas, thereby hacking a lower variance figure that ultimately excludes the final outcomes.[170]

While Duchin was criticized in *Alexander* for not analyzing a particular district for vote dilution purposes, Judge Brown uses her analysis to support a racial gerrymandering claim that depends on statewide statistics.[171]  Therefore, unfortunately, the opposite criticism carries water: that she failed to conduct a statewide draw that would fully capture the range of possible outcomes in the ensemble.

If Judge Brown had pursued a vote-dilution theory, the relevant interpretation of Duchin's analysis might differ.  But here, her analysis is clearly flawed by constraining the space within which the spanning trees could generate sets of possible maps.  She should have realized that the metro constraint foreseeably manipulates the variance in her derivative statistics in a way that favors her preferred outcome.

Third, Duchin's winnowing criteria did not accurately capture the possible distributions available to a state map-drawer, because she chose off-base and thereby skewing filters.  When selecting a subset from a wider set, or even transforming a set entirely, using accurate winnowing criteria can affect the *variance* or the *skew* of your outcome.  So, where she compares her adjusted sets (in orange) to the ultimate outcomes (in blue), the probative nature of her analysis is severely limited by the fact that she used off-base

---

[168] *Supra*, Kincaid testimony at 30.

[169] Duchin Report at 16.

[170] *Id.* at 1-2.  Judge Brown discusses her cluster method, Brown Op. at 108-110, but fails to consider its constraints on variance and how those may drive skew.

[171] 602 U.S. at 33.

winnowing criteria.[172]  It is also worth pointing out that under *Alexander*, she needs to attend to particular districts—so it is legally insufficient for her to refer merely to some possible set of outcomes in black and orange without accounting for the actual outcomes in blue.[173]  It is the plaintiffs' burden to establish which districts were cracked and/or packed, just as in *Alexander* it was the plaintiffs' burden to show that that specific Charleston district had been racially vote-diluted.

Dr. Duchin's generation and winnowing conditions explained in Appendix E indicate numerous loose ends.[174]  For instance, leaving districts within 1% of population for Ensemble Generation does not exclude the possibility of splitting precincts at the census bloc level for the last mile.[175]  Indeed, where districts total 766,987 leaves about 7,670 voters on the table for each district—allowing the variance in both directions actually doubles this to 15,340 potential swings, whereas the true maps were required to be strictly equi-populous.  That distinction can warp the distribution in multiple ways— but the most logical inference is that the truly available sets were a more discrete or constrained set and therefore would look skewed relative to a set chosen on softer parameters.  Considering that Duchin completely ignored independents, libertarians, and greens, when we are at the level of arguing about a few thousand voters, these 'silent' votes could be disruptive in years with stronger or weaker, e.g., libertarian performance or independent swings.

As to her implementation of core retention in the spanning trees with either a 0.1 or 0.2 surcharge for crossing counties, census-designated county subdivisions (natural communities of interest), or newly drawn districts, Duchin does nothing to suggest that this surcharge results in figures with equivalent core retention to the actual map, and therefore does nothing to suggest that her core retention weights resemble those actually used.  If she used either lower or higher core retention rates, rather than deriving her core retention weights from real life, her departure could foreseeably skew her

---

[172] *See* Duchin Report at 14-15.

[173] *Id.*

[174] Duchin Report at 22-23.

[175] *Id.* at 22 ("Population balance is enforced by requiring each step to leave districts within 1% of ideal population.").

results. Indeed, we know that core retention was *intentionally* violated in CD-9, given Kincaid's testimony that he planned to pull one Republican-performing district out of Harris County. Her spanning-tree analysis completely fails to distinguish between core retention for Republican incumbents (which was favored) and core retention for Democrat districts (which was actively disfavored, as through targeting Greg Casar and Lloyd Doggett in Austin through substantially changing CD-35 and CD-37).

As for Duchin's partisan weightings, her partisan score lagged considerably, including elections from 2012,[176] whereas Kincaid's partisan shading principally incorporated President Trump's and Ted Cruz's recent performances.[177] Given the recent changes in Hispanic preferences for the Republican party in Texas, using a lagging indicator could foreseeably skew the distribution of ensemble maps away from recent changes and thereby falsely represent the actual maps as outliers.

Dr. Duchin's use of a 50.1% sharp cutoff for Republican wins on her simulated map was problematic[178] and did not reflect the realities of the map-drawing process conducted by Kincaid, which aimed to provide far greater insulation.[179] Foreseeably, Dr. Duchin's ensemble likely included a bulk of sub-55 maps which drove statistical skew, at least in the original outputs, even if not in the adjusted outputs. On wider tails embracing 54%, or 53% Trump-performance benchmarks, the variance would predictably be wider because there are 'more possible ways' to draw permissible maps within that space. Fortifying in underperforming Republican incumbents such as Dan Crenshaw could also warp the map, she failed to account for wins above 51%, instead analyses win and loss at the 51% cutoff.

Keep in mind, the general goal in gerrymandering is win by a little, lose by a lot.

---

[176] *Id.* at 22-23.

[177] *Supra*, Kincaid testimony at 28-29.

[178] *See* Duchin Report at 20 ("Republican performance: Republicans overall have at least as many wins in each cluster as in C2333"). But the map-drawer did not care about 50.1% wins—he cared about safe wins. *Cf. Morning Transcript* 10/4/2025 at *63, ll. 5-12.

[179] *Supra*, Kincaid testimony at 28-29.

Further, Dr. Duchin leaves out at least three other constraints: current addresses of representatives' homes, keeping congressional offices within districts, and favoring natural geographic boundaries like highways and rivers. Duchin actually used outdated incumbent data[180]—and while she claims that this had no effect, it can predictably have affected the skew and variance in generating thousands of maps, which discredits Judge Brown's "box-and-whiskers" histogram standard deviation interpretation.[181] Dr. Duchin was aware that the Winnowing Condition incumbent addresses were out of date, and she has been requesting updated addresses for months from her own counsel. She knowingly conducted a flawed analysis, which would have skewed the maps in unpredictable ways—in particular by pushing the actual maps further toward outlier status. Also, the urban-rural winnowing condition forces the redrawn CDs 9 and 32 to face strong outlier conditions, given the constraint down to only 10% swing, and the substantial relocation of those districts across Harris and Dallas counties respectively.[182]

Another more arcane statistical feature that likely reduces variance is the set transformation involved in her branching trees analysis, since that only moves the line between two districts at a time, excluding other permutations from its random walk.[183] The problem is that this takes the outer-boundary conditions as given and modulates down the variance, whereas the variance on unbounded line-drawing can be expected to be higher. This reflects the same principle developed *supra* as to the statewide draw, which is that *a statistic on a statistic generally loses variance.* For her to then fault the actual

---

[180] Morning Transcript 10/4/25, at 9:4-10; *see also* Defs.' Post-Hr'g Br., ECF No. 1284, at 54.

[181] Brown Op. at 112-116.

[182] As to CD29 and CD9, answering the question: What is the significance of altering the urban, rural -- the urban-rural demographics of the county? Duchin's answer: Well, this is a kind of configuration that's often consistent with taking, as I said earlier, pieces of more diverse urban population and combining them with more rural population. This is the kind of reconfiguration you would often see when trying to change the partisan composition of a district. This is consistent with partisanship, but it also has demographic markers. (Transcript Morning 10/4/25,*51, ll. 9-17).

[183] *See* Duchin Report at 22, 23 (on "filtering down to maps that meet all of these conditions…"). Note, this is not filtering in the sense of strictly pulling a subset—this is filtering in the sense of a matrix transformation, as is shown by the fact that the curves are sometimes non-overlapping, *see Id.* at 15, Figure 9, Plot 4 (non-overlap).

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

outcomes for being beyond her down-regulated variance tails may be in error.

Further, Dr. Duchin's conclusions derived from her ensemble analysis are misrepresented, even on her own terms. The correct interpretation, in the social science literature, of a distribution analysis such as Dr. Duchin's is that any outcome within a set number of standard deviations is not considered a statistically significant outlier. Her use of the 1st and 99th percentile cutoffs is slightly unusual, given that two standard deviations generally embrace the 95% of the central distributions, while three standard deviations embrace 99.7% of the distribution.[184]  Even on merely two standard deviations (narrowing the tails at Duchin Report 14-15), however, her conclusions as to Travis/ Bexar Counties, suggesting that "patterns characteristic of packing and cracking. . . are present in each of the three clusters," is flatly untrue. The outcome needs to be an outlier to overcome the *null hypothesis*, which is that the map is normative and exhibits no evidence of cracking and packing. Therefore, as to the Travis/Bexar cluster, Dr. Duchin's analysis actually supports the *opposite* inference, which is that the maps were not racially gerrymandered, but instead were partisan draws.[185]

This should have caused a dispassionate academic some pause. But Duchin plowed on. So next, the correct interpretation of Tarrant/Dallas suggests that *one* of the actually drawn districts (the sixth of eight in the series) was a statistically significant low outlier.[186]  And for Harris/Fort Bend, four outlier districts were low, while one was high.[187]

---

[184] *See* Duchin Report at 15, figure 8 ("The results of the algorithmic runs are shown in the boxplots in black, where the whiskers span from the 1st to the 99th percentile in each case.").

[185] *See* Duchin Report at 15, figure 10.

[186] *See* Duchin Report at 14, figure 8.

[187] An additional wrinkle here is that Duchin employs the pre-*Petteway* "all persons of color" approach, meaning that she aggregates together Black, Hispanic, Asian and Pacific Island, Native American, and the growing group of 'other' and mixed-race voters. Therefore, her high outlier in Harris-Fort Bend may itself be artificially inflated through the inclusion of these voters who are not material to Judge Brown's theory and should properly have been accounted for in the ensemble analysis.

Additionally, it neglects the possibility that through the census counting of non-citizen voters, for example Hispanic voters in Colony Ridge in *Liberty County*, i.e. CD-9 in C2333, there is a deflation in the CVAP figure. Kincaid was required to draw maps equi-populously based on census results, so any counting of non-citizens may correspondingly deflate the CVAP figure for that district.

71

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

As for Dr. Duchin's conclusions elicited in testimony, she got more specific on the particular precincts. She asserts that you see residential splits by race across CD-18 and CD-7, but there is drift across in either direction of Whites and Hispanics.[188] In CD-29, there is a significant concentration of white voters, rebutting the claim that the census lines neatly follow paths of segregation.[189] Indeed, the CD-18-C2193 "Barbara Jordan" district in Harris County more clearly followed the Black population lines than the newly reconfigured CD-29, which has a lower Black CVAP but is overall more diverse.[190] For CD-9 vs CD-18, she also failed to contemplate the political protection of the "Barbara Jordan district." As in *Alexander*, where the Supreme Court expressly approved South Carolina's protecting Jim Clyburn's seat with a sur-abundance of democrat voters, Duchin here again fails to disentangle race from politics by ignoring relevant political alternatives.[191]

On cross-examination, Duchin also expressly ruled out using commercially available datasets with partisan data at the *house* level to interpolate data below the voting precinct level,[192] which Kincaid later discussed.[193] The State of Texas also likely had access to specific voter registration data, which it could have provided to the legislature.[194]

\* \* \* \* \*

All these holes having been poked, Judge Brown breathlessly wraps himself in Duchin's report.[195]

---

This dynamic may negate the inference of cracking in at least one of Duchin's Harris/Fort Bend outliers, *see* Duchin Report at 15, Figure 9.

[188] *Morning Transcript* 10/4/2025 at \*51-53.

[189] *Id.* at \*52.

[190] *See* Plan C2333 summary statistics at pg. 14, https://capitol.texas.gov/tlodocs/892/districtplanrpts/pdf/HB00004H_PLANC2333.pdf.

[191] *See Alexander*, 602 U.S. at 1.

[192] Generally, note that County > Voting Precinct > Census Block > House, in terms of levels of partisan (or racial) voter data.

[193] *Supra* Kincaid testimony at 28-29.

[194] Prelim. Inj. Hr'g Tr. Day 6 (Morning), at 37-39.

[195] Brown Op. at 108-127.

Judge Brown fails to read the maps correctly, declaring that "the orange figures—which are the ones we're most interested in—represent the range of minority populations for each district in each randomly generated map."[196]

Not so simple.

What they actually represent is the adjusted or transformed set of maps after application of Duchin's winnowing criteria.[197] And it's not that these are a strict subset—they are really a transformation, given that they have different statistical features reflecting a different imputed underlying natural population.

Any statistic tries to capture, from a black box *a priori* condition or *null hypothesis*, the truth of an underlying population. The correct interpretation of the black boxes on the histogram is as representing the 50th percentile, 25th and 75th (box), and then 1st and 99th (whiskers) cutoffs on the ensembles of maps in terms of their expected all-minority "POC" CVAP composition. The orange boxes represent the ensembles after transformation.

So, when Judge Brown next says "the district with the lowest minority population in the Dallas/Fort Worth area had a minority percentage somewhere between 26% and 41%," he is a bit off.[198] What that orange figure shows is that *after* applying the winnowing conditions, the 1st percentile of maps started around 26% POC CVAP, and the 99th percentile of maps started around 41% POC CVAP. On 40,000 maps, this means 400 were outside of the range in each direction, for 800 total.[199]

Where Judge Brown concludes "if a dot falls outside the box but within the 'whiskers,' that suggests that the enacted district's minority

---

[196] Brown Op. at 112.

[197] *See* Duchin Report at 14 ("The orange boxplot shows the statistics once we have filtered the ensembles to only include plans that meet the full checklist of districting principles."); *Id.* at 22-23 (Appendix E) (explaining the first round of district generation and the second round of winnowing).

[198] Brown Op. at 113.

[199] Nevertheless, within orthodox social science, this would be a fine measure to identify outlying outcomes with a *p*-certainty value below 0.05.

population is on the outer edge of what we'd expect if the Legislature were relying exclusively on partisanship and other race-neutral considerations," he gets it subtly wrong.[200]  A C2333 outcome showing up in the simulation 'whiskers' means there is no outlying behavior identified at all.  It cannot be said to be "on the outer edge," it just means nothing relative to the *null hypothesis*.

Additionally, where Judge Brown states "If the dot falls outside the whiskers entirely, that suggests that none of the race-neutral maps that Dr. Duchin generated have the racial characteristics approximating that of the enacted district," he is again without foundation.[201]  It does not mean that *none* of them had that characterization—it means that less than 1% did, rendering it an outlier relative to the simulation's imputed target.

Where Judge Brown then analyzes the Houston and Dallas–Fort Worth cluster maps, he fails to account for any of the statistical phenomena discussed above, which may affect a sensitive calibration.[202]  If you are targeting the wrong natural imputed population because of off-base inputs, your outputs will be off-base.

Additionally, where Judge Brown suggests that "those [patterns] in the Travis/Bexar County area… are even less [stark], they nonetheless reinforce the conclusion that the enacted map is a statistical outlier," he reveals his statistical naivety.[203]  What the Travis/Bexar cluster actually reveals is that there is no statistically significant outlier behavior—so this evidence actually cuts in the opposite direction and supports an inference of a *partisan* gerrymander.[204]

Judge Brown praises Duchin's "enormous number of maps"[205]

---

[200] Brown Op. at 116.

[201] *Id.*

[202] *Id.* at 118-20.

[203] *Id.* at 119, 122.

[204] *Id.* at 122.

[205] *Id.* at 112.

and her "tens of thousands of congressional maps."[206]  But this is similarly clueless.  It would not matter whether there was 1 map, 1 million maps, or 1 billion maps drawn, provided that the criteria used for drawing those maps were off-base.[207]  As a matter of probability theory, the underlying imputed natural population being sampled is *not* the same population as that which was actually sampled.  A statewide map draw, rather than one localized to the 8-or-so congressional districts in the Harris and Dallas-Tarrant metros, will necessarily have greater variance.  But Dr. Duchin concedes that she limited her analysis only to the subsets of those metro areas, thereby hacking a lower variance figure that ultimately excludes the final outcomes.

Moreover, where Judge Brown praises Duchin's consideration of partisanship, he reproduces her phrase that she "executed a run seeking to match the number of districts with Trump's 2024 major-party vote share over 55%" and achieved results consistent with her prior findings.[208]  But she offers no report of those robustness tests, which would have different variability, and instead presents the 50.1% cutoff figures, which may impact the skew of her distribution.

Plaintiffs have the burden of production of showing Duchin's robustness—merely calling something "consistent" does not mean that it showed statistically significant outlier variance, where consistency is an ambiguous term.  After all, Duchin misrepresents the Travis/Bexar cluster as affirmatively showing evidence of cracking and packing where that shows nothing as a statistical matter.  So, Judge Brown can hand-wave over Duchin's nonconformity with Kincaid's constraints, but Judge Brown has no rational basis to reject the idea that "Dr. Duchin's 55% figure is off the mark."  He just does not know.  And in the very next breath, he inverts the burden of proof, "if raising the floor to a value

---

[206] *Id.* at 128.

[207] Also, where Judge Brown claims that "not one of them had racial demographics that looked anything like the enacted map," Brown Op. 127, this is flatly without logical foundation, given that 400 maps were off either end of the tails, *supra* at 76.

[208] *Id.* at 125 (quoting Tex. NAACP Prelim. Inj. Ex. 208, ECF No. 1384-8, at 23) (Duchin Report at 23).

closer to 60% would have undermined Dr. Duchin's conclusions, the State Defendants could have introduced expert rebuttal testimony to that effect."[209]

Exactly the same logical errors apply where Judge Brown hand-waves away the internal threat to the validity of Duchin's favoring core retention for *both* Democrats and Republicans (rather than Republicans only), and using an out-of-date list of incumbent addresses.[210] Judge Brown inverts the burden of proof and claims to know things he just cannot know from this record.

Duchin failed to prepare any state-wide *Alexander* map, which certainly would have included wider variance figures, that in turn may plausibly have included the truly-chosen districts within two standard deviations of the normative draw.[211] But Judge Brown hand-waves away this issue as well.[212] In particular, his drawing a favorable inference from the absence of a map is somewhat absurd.[213]

It would have actually been quite easy for Duchin, Barreto, or any other expert to draw *Alexander* map(s) based on a statewide draw using the same software. Therefore, plaintiffs' failure to muster such a map supports a negative inference against them, where that negative inference would be that statewide draws include the actual maps within two-standard deviations of their statistical tails—and for that reason, plaintiffs studiously avoided producing *any* statewide maps or derivative statistical figures. So, I do not assert that it is impossible to draw an *Alexander* map—I just find it damaging that plaintiffs failed to muster one when mustering one would be so easy, and from which one may infer that mustering one would potentially have been more damaging than cherry-picking by metro area.

---

[209] *Id*. at 127.

[210] *Id*. at 127-38.

[211] In probability theory, the variance space on any larger set is larger than the variance space on a smaller set of elements using the same draw.

[212] Brown Op. at 130-34.

[213] *See id*. at 133.

There is something wrong with this picture.

Moon Duchin contends that she could run "a million maps in a matter of seconds" *on a digital watch* and have her robot execute a hundred thousand simulations in about an hour.[214]  Yet neither plaintiffs nor their experts produce a single *Alexander* map.

Let's think of this in the context of an on-off switch.

Suppose the switch is turned off, and plaintiffs cannot produce an *Alexander* map that achieves the same partisan mapmaking criteria and greater racial "balance."  It strains credulity to suggest that they should be given a pass because the experts "didn't have time"[215] when "[a]ny expert armed with a computer 'can *easily* churn out redistricting maps that control for any number of specified criteria.'"[216]  Dr. Duchin's digital watch (the same one she claims can run a million maps in seconds) is more than capable.  Plaintiffs want the extraordinary and drastic remedy of enjoining the 2025 Texas Congressional Map, so it is their burden to clearly show that they are entitled to such drastic, equitable relief.  Bearing this in mind, it is it is highly inappropriate, in light of the weight of the procedural and substantive case law, for Judge Brown to give plaintiffs a pass and suggest that timing is the *issue*.[217]

The real *issue* is that Judge Brown is embarking on a results-oriented crusade against the Texas Legislature.  On his misguided journey, Judge Brown does not bat an eye, improperly bestowing unearned deference to supposed "experts" such as Duchin, while conveniently omitting discussion of other "experts"[218] such as Matt Barreto, whose testimony is so problematic that it is

---

[214] Tr. 10/6/2025 AM 75:25-77:5.

[215] *See* Brown Op. at 134.

[216] *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 34 (2024) (quoting *Cooper v. Harris*, 581 U.S. 285, 337 (2017) (emphasis added)).

[217] Plaintiffs' counsel cited Duchin's new job as reason for the delay in immediately turning over Duchin's materials to the State.  Tr. 10/4/2025 14:24-15:1.  When asked, plaintiffs' counsel sidestepped the question whether Duchin, a well-paid, purported "expert," did nothing between September 26th and the day of her testimony.  *See id.* 15:2-14.  Indeed, plaintiffs' counsel did not explicitly foreclose the possibility that nothing was done.  *See id.*

[218] Plaintiffs, during the preliminary injunction hearing, presented the testimony of six experts.  However, Judge Brown, in his 161-page opinion, omits any discussion of the following five

unusable.[219]   Yet Judge Brown has no problem tossing the longstanding presumption of legislative good faith straight into the trashcan, as if the presumption of legislative good faith were a relic of a bygone era.  Judge Brown pretends to know better—and to prove it, he is willing to contort himself into an illogical straitjacket.  He cannot escape.

Now, let's consider a more nefarious scenario.

Suppose the switch is turned on, and plaintiffs or their purported "experts" *could* have produced an *Alexander* map.  The fact that they did not file an alternative map curing the alleged discriminatory infirmity (the one they purport to care about) tells you all that the instant case is about—*partisan gain*. Duchin makes no bones about this, either.  She, made it clear that she would not hazard to draw an alternative map, despite her extensive experience drawing maps in other states, because partisan gerrymandering is not her "motivating influence."[220]

But Duchin may have a motivating influence.

Her CV gives us a clue.[221]  Duchin notes that her amicus brief[222] was cited

---

plaintiffs' experts: David Ely, Stephen Ansolabehere, Loren Collingwood, Matt Barreto, and Daniel Murray.  Their collective testimony spanned several days, and they submitted hundreds of pages of expert reports.  Yet, Judge Brown, despite his best efforts, fails to make a fleeting reference to these five experts.  If Judge Brown could, he would.  For what it's worth, this dissent, in a footnote, tells you more about these plaintiffs' experts than Judge Brown's entire opinion does.  And the reason is obvious—their testimony is unhelpful at best, or their analysis is flawed at worst.

Judge Brown won't tell you that.  I just did.

[219] Plaintiffs' top expert Matt Barreto is a Soros operative.  His CV confirms it.  He expects to receive $2.5 million in his Soros piggybank.  Soros has been pumping money into Barreto's UCLA Voting Rights Project for years.  And this steady supply of money will not stop until the new year, at the earliest.  Unsurprisingly, Barreto has been on quite the road show, parading across the country opposing Republican redistricting.  Judge Brown could not plausibly conjure up anything helpful from Barreto's testimony, which lasted from 9:20 AM – 3:43 PM (including breaks) on October 4th. If Judge Brown could, he would.  His testimony is untouchable (and not in the good way).

Judge Brown won't tell you that.  I just did.

[220] Tr. 10/6/2025 AM 137:14-138:10.

[221] Duchin Decl., Ex. F at 31. (Document 1142-6).

[222] To be clear, it is perfectly appropriate for someone to file an amicus brief.  In fact, amici often help judges understand complex issues and background information.  I note her involvement in the *Rucho* case because she remarked, at the preliminary injunction hearing, that partisan gerrymandering is not her "motivating influence."  Tr. 10/6/2025 AM 137:14-138:10.

in the *Rucho* dissent.[223]  *Partisan* gerrymandering may be her main problem.[224]
She had her chance in *Rucho*.  Her brief was not persuasive enough to convince
the Court to rule the other way.[225]

 *Rucho* is not the only case where Duchin wishes the Supreme Court ruled
differently or found otherwise.  The Court noted, in *Allen v. Milligan*, that
"Duchin's maps were based on old census data—from 2010 and 2020—and
ignored certain traditional criteria, such as keeping together communities of
interest, political subdivisions, or municipalities."[226][227]

 There's more.

 A few years after *Rucho*, she retooled her conclusion in *Alexander*, to say
"that it is 'not plausible' that the dilution was a mere 'side effect of partisan
concerns'".[228]  The Supreme Court kept with tradition—it discredited Duchin
for "good reason" because "various parts of Dr. Duchin's report did not account
for partisanship or core retention."[229]  The Court could have stopped there, but
it didn't:  "Moreover, Dr. Duchin's conclusion was based on an assessment of
the map as a whole rather than District 1 in particular.  A state-wide analysis
cannot show that District 1 was drawn based on race."[230]  The Court continued:
"Given these *serious problems*, it is no wonder that the challengers cite Dr.
Duchin's report only in support of their racial vote-dilution claim.  It has *no
probative force* with respect to their racial-gerrymandering claim."[231]

 Notice the pattern.

 To his credit, Judge Brown does point out how Duchin was discredited

---

[223] *Rucho v. Common Cause*, 588 U.S. 684, 742 (2019) (Kagan, J., dissenting) (citing the Brief for Mathematicians et al. as *Amici Curiae*).

[224] *Rucho* Brief for Mathematicians et al. as *Amici Curiae* at *12 (arguing that vote dilution, on the basis of partisanship, is problematic).

[225] Judge Brown won't tell you that.  I just did.

[226] *Allen v. Milligan*, 599 U.S. 1, 34 (2023).

[227] Judge Brown won't tell you that.  I just did.

[228] *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 33 (2024).

[229] *Id.* at 33.

[230] *Id.*

[231] *Id.* (emphasis added).

in *Alexander*. But he has no choice but to do so.[232] Her flawed methodology is so patently obvious in a case that was routinely cited in briefs and subject to great discussion at the preliminary injunction that even Judge Brown cannot escape this reality.

But merely acknowledging the truth would be an exercise unfamiliar to Judge Brown. Instead, he can't help himself. Judge Brown gives "extra credit" to Duchin for turning in the assignment the Supreme Court gave her in *Alexander*. I have news for Judge Brown. She turned it in late. But I am not surprised that Judge Brown is an easy grader—the lawyers in *Petteway* can tell you all about it. Judge Brown also uses the same exam every year, so it's easy to get an excellent grade in his class, especially if you've taken a class or two with him before.

Whether Judge Brown likes it, gravity exists. So does *Alexander*.

Article III courts have a solemn responsibility, especially in bench trials, to assess expert reports for what they are actually arguing and the substance of their statistical claims, rather than merely being impressed by credentials. Where an expert report fails to show anything, by virtue of its internal threats to validity and external threats to validity, it is judicial aggrandizement to leap across the bench to save an infirm expert report.

Put plainly in the light of day, given Judge Brown's lack of statistical foundation, Duchin's analysis is *irrelevant*. Plaintiffs fail as a matter of law to disentangle race and politics as is required under *Alexander*.

I dissent.

\* \* \* \* \*

Relatedly, the plaintiffs' own supplemental PI briefing shows the importance of statewide changes in map drawing. While detailing the history of the editions from C2308 to C2331 and finally C2333—with which Judge Brown neglects to grapple—plaintiffs concede that the changes from C2331 to C2333

---

[232] Judge Brown relies exclusively on the testimony of *one* of the six plaintiffs' experts, Duchin. The testimony of the other five is anywhere on the spectrum between unusable at best to deeply flawed at worst. It speaks for itself.

not only moved Liberty County (population approximately 115,000 compared to total districts of 766,987 persons), but then sliced off the top of C2331-CD9 and put that back into C2331-CD2, around Lake Houston and Huffman, which ultimately had knock on effects in the 36th, 14th, 10th, and 17th. So, the variance induced by these changes—where the only unchanged district statewide was in the 19th based around Lubbock—needs to be accounted for by both Judge Brown and Dr. Duchin.

As for Judge Brown's much-ballyhooed 49 and low-50 series numbers, Judge Brown makes zero effort to challenge or even discuss the prevalence of near-50 cutoffs in the opposite direction: indeed, would they suggest it is an intentional racial gerrymander when the legislature drew C2333 CD-8, a district west and north of Houston, at 49.3% Anglo?[233] Conversely, plaintiffs also have little to say about CD-23, covering the Western reaches of the Rio Grande, but which is already held in Republican hands. Plainly, they only dispute near-50 cutoffs where those affect elected Democrats' chances in the next election— which gives away the goose that what offends plaintiffs is not racial injury, but partisan targeting permitted under *Rucho*. Nor do they identify any problems with CDs 6, 12, 14, or 25, even though those all enjoy top-line low-50s and high-49s in their relative Anglo and non-Anglo compositions. But that is because each of these districts is held by a Republican either equally advantaged or further fortified by the C2333 2025 maps, per Kincaid's undisputed map-drawing constraints.

Further, all of these top-line high 49 and low 50-51 figures reflect the statistical trend in Texas that the Black and especially Hispanic populations are *younger* than the White population, meaning that a district can have a 49.5 and 50.5 racial percentage split while enjoying the 6- or 7-point partisan percentage margin that a Republican-maximizing map-drawer is seeking to achieve, on

---

[233] *Compare* Brown Op. 35-49; *with* C2333 summary statistics at 13-15, https://capitol.texas.gov/tlodocs/892/districtplanrpts/pdf/HB00004H_PLANC2333.pdf.

    This Anglo language itself tramples over any nuance between sub-groups of Hispanic Americans like Cubans, sub-groups of Whites such as Jewish or Arab Americans, or the growing populations of Asian, multi-racial and "other" Americans. The tri-racial vision advanced by plaintiffs, of an Anglo vs Black vs Hispanic political climate, embraces the coalitional logics overturned by *Petteway*, and defies any nuanced and mature conversation about Texas politics and its complex demographic evolution.

account of to the differently shaped population age pyramids.[234]  This race-neutral explanation more plausibly explains the overall trend in the data, including as applied to CD-32 and CD-9, rather than the cherrypicked explanation preferred by plaintiffs, which fails to rationally account for and explain the overall trend in the data.  This kind of statistical hacking, analogous to *p*-hacking in random control trials, should not escape Judge Brown's notice, apart from his motivated reasoning.

Tellingly, Judge Brown also avoids revisiting other expert testimony from Dr. Barreto and even Dr. Duchin on Ecological Inference, or deriving district-level racial voting preferences from statewide averages.  That is because the ecological inference data suggested that, while Hispanic voters overall favor the Democratic party, there has been a breakdown of support in recent years as the Hispanic community becomes more diverse and more Trump-supporting.[235] *Tejanos* in the Rio Grande Valley turned strongly for Trump, while Cuban and Venezuelan recent arrivals are more Republican-leaning than Mexican recent arrivals.

Relatedly, Judge Brown avoids discussing any of these inconvenient developments because he explains that 2 of the 5 newly-drawn Republican pickup districts are in the Rio Grande Valley and stand to elect Hispanic-supported Republicans to Congress in the next election.  Indeed, the entire preliminary injunction hearing carefully danced around discussion of the 28th and 34th districts, even as those were material to the Republican gains disputed under HB4.[236]  That should strike the judges as a conspicuous omission and should support the negative inference that those areas' redistricting resists statistical sniping as racial gerrymandering.  In fact, that is direct evidence

---

[234] There are also major VAP vs CVAP distinctions observable in the Hispanic population. For example, in CD-9, one of the districts analyzed by Judge Brown and Dr. Duchin, there are more than 100,000 non-citizen residents, *see* C2333 summary statistics at 15. https://capitol.texas.gov/tlodocs/892/districtplanrpts/pdf/HB00004H_PLANC2333.pdf.  This distinction may account for Duchin's allegation about CD9's being "cracked" or "packed," *supra* at Duchin discussion, 73-75.

[235] *See* Lewis Report at 4, figure 1, panel 3 ("Trump Support (G24)" y-axis, "Percent Hispanic Voters" x-axis).

[236] CDs 28 and 34 appear in one footnote quoting Chairman Hunter with zero further commentary from Judge Brown.  Brown Op. at 79.

cutting against racial gerrymandering that reinforces the strong positive inference of good-faith legislative intent under *Alexander*.

I dissent.

\* \* \* \* \*

Beyond all of this analysis of the facts, the most egregious shortcoming of the opinion is its treatment of the presumption of legislative good faith. To be sure, Judge Brown pays ample lip service to the presumption, but the presumption is quite strong and can't easily be overcome. As a matter of fact, the presumption is so strong that it "directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions."[237] After running through all of his proposed evidence, Judge Brown concludes that the "Chairman Hunter and the other joint authors evidently strategized that a map that eliminated coalition districts and increased the number of majority-Hispanic and majority-Black districts would be more 'sellable' than a nakedly partisan map"[238]

Unfortunately for Judge Brown, overcoming the presumption of legislative good faith requires a stronger conclusion than race "evidently" guided the drawing of map lines, even at this preliminary stage. By implication, overcoming the presumption appears to require that the evidence be able to support no other conclusion.[239] Here, the evidence can and does support alternate theories, including theories that make far more sense than Judge Brown's reading of the tea leaves. The most straightforward read of the facts is simple: The legislature had no real concern for *Petteway* and Representative Hunter and the handful of House members Judge Brown relies on were paying lip service to it in order to avoid talking about partisan gerrymandering. This conclusion is distinct from the far more involved and technical theory that Representative Hunter conspired with a man he never talked to,[240] on a map

---

[237] *Alexander*, 602 U.S. at 10.

[238] Brown Op. at 76.

[239] *See Alexander*, 602 U.S. at 10.

[240] Tr. 10/7/25 AM 37:20–24.

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

that was being drawn before he was asked to carry the bill,[241] to create a map that *doesn't even do everything the DOJ letter requests*.

Judge Brown handwaves the fact that Kincaid's map doesn't do everything the DOJ letter requests because "it's entirely possible for the Legislature to gerrymander one district without gerrymandering another."[242] This misses the mark. The problem with the map leaving a coalition district intact, as expressed earlier, is that it undermines Judge Brown's theory of the facts. Why would a legislature, conspiring to use the elimination of coalition districts as a cover for partisan gain, leave a coalition district called out by the DOJ letter in place? If race were the criterion "that, in the State's view, could not be compromised in the drawing of district lines" as part of a statewide scheme, why was it compromised in this district?

Judge Brown offers no plausible justification for this anomaly and fails to consider it when trying to discern if the presumption of legislative good faith is overcome. Such information supports the far more modest proposition that the few representatives that Judge Brown is able to point to were discussing *Petteway* pretextually in order to limit the focus on partisan gerrymandering, especially considering its unpopularity of the practice in the state and nationwide.[243] It also supports the inference that the three districts reaching just over 50% could, in fact, be a coincidence or byproduct of the partisan line-drawing in areas where race and partisanship are highly correlated, especially since Judge Brown fails to provide competent evidence disentangling race from politics.[244] In the face of such evidence, the plaintiffs have not produced evidence to overcome the

---

[241] Tr. 10/7/25 AM 61:20–24.

[242] Brown Op. at 128.

[243] *See* Texas Trends 2025, Univ. of Houston, Oct. 2025, https://www.uh.edu/hobby/txtrends/2025/ (finding that 68% of Texans believe partisan gerrymandering is a major problem and 21% believe it's a minor problem); *see also* Alexander Rossell Hayes, Large majorities of Americans say gerrymandering is a major problem, unfair, and should be illegal, YouGov, https://today.yougov.com/politics/articles/52740-large-majorities-americans-say-gerrymandering-major-problem-unfair-should-be-illegal-redistricting-texas-california-poll (finding that 76% of Americans thinks gerrymandering is a major problem).

[244] *Supra* at 75-77.

presumption of legislative good faith and thus cannot show even some likelihood of success on the merits.

I dissent.

* * * * *

In his remedial section, Judge Brown similarly hand-waves over thorny problems of remedies and the current status of the 2021 and 2025 maps.[245]

Texas's House Bill 4 ("HB4"), the statute at issue, provides:

> (a) This Act supersedes all previous enactments or orders adopting congressional districts for the State of Texas. All previous acts of the legislature adopting congressional districts for the State of Texas are repealed.

> (b) Chapter 7 (S.B. 6), Acts of the 87th Legislature, 3rd Called Session, 2021, is repealed.[246]

On a straightforward reading, this repeal provision in HB4 means that the 2021 maps were voided by the 2025 maps. Therefore, if the 2025 maps are enjoined, there can be no elections because there are no maps in place—contrary to the majority's attempt to revive the 2021 maps.

A federal court cannot reinstate a statute that the legislature has explicitly repealed and voided.[247] That move presents grave federalism concerns, commandeers the state legislature,[248] departs from the standard remedial process in voting rights cases, and intrudes into the "sensitive area of state legislative redistricting."[249] The default remedy, as Judge Brown admits, is that

---

[245] Brown Op. at 158-159.

[246] Relating to the composition of the districts for the election of members of the United States House of Representatives from the State of Texas, Tex. H.B. 4, 89th Leg. 2d Spec. Sess., Art. III § 3 (2025).

[247] *See Printz v. U.S.*, 521 U.S. 898, 912 (1997) ("[S]tate legislatures are not subject to federal direction.") (citing *New York v. U.S.*, 505 U.S. 144, 112 (1992).

[248] The Tenth Amendment imposes the same anti-commandeering limit on federal courts and the federal legislature, *see Murphy v. NCAA*, 584 U.S. 453, 471 (The legislative powers granted to Congress are sizable, but they are not unlimited. The Constitution confers on Congress not plenary legislative power but only certain enumerated powers. Therefore, all other legislative power is reserved for the States, as the Tenth Amendment confirms.").

[249] *Bush v. Vera*, 517 U.S. 952, 1003 (1996) (Thomas, J., concurring).

85

"the elected body must usually be afforded an adequate opportunity to enact revised districts before the federal court steps in to assume that authority."[250] But Judge Brown ignores the law and denies the state any opportunity to hold a special session to exercise its own legislative power.[251]

Judge Brown also fails to grapple with the fact that the prior maps have been voided.[252] Texas law is clear: the Texas Code's subchapter on "construction rules for civil statutes" provides that "The repeal of a repealing statute does not revive the statute originally repealed." Tex. Gov. Code § 312.007.[253] At the time of writing, given that the law was passed on August 20 and signed into law on August 29, HB4 has been on the books for more than 75 days.

Properly understood, Judge Brown's remedy is a novel and unlawful order imposing a new map on Texas, in an activist echo of the overturned § 5 pre-clearance regime.[254]

Judge Brown embraces a dinosaur-like understanding of equitable remedies.

The up-to-date view of injunctive relief is that injunctions represent a court-ordered policy of nonenforcement *restraining* an executive from enforcing a federal or state law. As the Supreme Court recently instructed in *Trump v. CASA, Inc.*, "traditionally, courts issued injunctions prohibiting executive officials from enforcing a challenged law or policy only against the plaintiffs in the lawsuit."[255]

This restrained view is deeply rooted in equitable jurisprudence: In *Ex Parte Young*, the Supreme Court interpreted injunctions as stripping a state actor

---

[250] *In re Landry*, 83 F.4th 300, 303 (5th Cir. 2023).

[251] Brown Op. at 160.

[252] *See* Brown Op. at 158-59.

[253] This parallels the U.S. Code, 1 U.S.C. § 108 (repeal of repealing statute does not reinstate the former statute).

[254] *Cf. Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (ending the § 5 coverage and preclearance requirement).

[255] 606 U.S. 831, 837 (2025); *see also* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 936 (2018).

from enforcing a statute that remains on the books:

> In every case where an official claims to be acting under the authority of the state… [and] the act to be enforced is alleged to be unconstitutional; and if it be so, the use of the name of the state to enforce an unconstitutional act to the injury of complainants is a proceeding without the authority of, and one which does not affect, the state in its sovereign or governmental capacity. It is simply an illegal act upon the part of a state official in attempting, by the use of the name of the state, to enforce a legislative enactment which is void because unconstitutional. If the act which the state attorney general seeks to enforce be a violation of the Federal Constitution, the officer, in proceeding under such enactment, comes into conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct."[256]

In *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, the Supreme Court definitively stated, "[equitable] jurisdiction. . . is an authority to administer in equity suits the principles of the system of judicial remedies which had been devised and was being administered by the English Court of Chancery at the time of the separation of the two countries,"[257] and "the equitable powers conferred by the Judiciary Act of 1789 did not include the power to create remedies previously unknown to equity jurisprudence,"[258] such that any enlargement of district courts' equitable power was properly left to congress.[259]

Most recently in *CASA*, the Court struck down universal injunctions for departing from the non-enforcement model and exceeding the "confin[es] of the broad boundaries of traditional relief,"[260] and cautioned that "[w]hen a court concludes that the Executive Branch has acted unlawfully, the answer is not for the court to exceed its power, too."[261]  Judge Brown's command of the state

---

[256] 209 U.S. 123, 159-160 (1908).

[257] 527 U.S. 308, 318 (1999).

[258] *Id.* at 332.

[259] *Id.* at 333.

[260] 606 U.S. at 846 (quoting *Grupo Mexicano*, 527 U.S. at 332).

[261] *Id.* at 861.

legislature not only violates the Tenth Amendment—it likely exceeds the bounds of equity, too.

Injunctions in Texas take the same, restrained form.[262]  The Supreme Court of Texas has written, "When a court declares a law unconstitutional, the law remains in place unless and until the body that enacted it repeals it, even though the government may no longer constitutionally enforce it."[263]  And Texas appellate courts have noted the "Ordering the repeal of an ordinance would present grave separation-of-powers problems."[264]  This strict separation-of-powers view prevents Texas state courts from ordering the repeal of a statute—which power is reserved to the legislature—and finely delineates between calling a law unconstitutional and technically voiding it.[265]

The other view of injunctions, more consistent with the law-declaration model of judicial review, is that courts recognize that a given law was truly unconstitutional from the moment of its inception, thereby insinuating that the legislature was without power to create it in the first place.[266]

This null-and-void, or 'discernment,' approach to injunctions sometimes

---

[262] This matters because of the *diagonal* federalism relationship between a federal court and a state legislature, *infra* at 95.

[263] *Pidgeon v. Turner*, 538 S.W.3d 73, 88 n.21 (Tex. 2017).

[264] *State by & Through Off. of Att'y Gen. of Texas v. City of San Marcos*, 714 S.W.3d 224, 244 (Tex. App. 2025), *review denied* (Sept. 12, 2025).

[265] *See City of San Marcos*, 714 S.W.3d at 244 ("The Texas Constitution vests the City of San Marcos, not the Court, with authority to adopt and repeal ordinances.") (quoting also *Ex parte E.H.*, 602 S.W.3d 486, 502 (Tex. 2020) (Blacklock, J., dissenting) ("Courts are not legislatures. The Texas Constitution reserves the law-making and law-rescinding powers to the Legislature, and it prohibits the judiciary from 'exercis[ing] any power properly attached to either of the other [ ] [branches].'" (quoting Tex. Const. art. II, § 1))).

[266] *See Civil Rights Cases*, 109 U.S. 3, 10 (1883) (The Fourteenth Amendment, "nullifies and makes void all State legislation, and State action of every kind, which impairs the privileges and immunities of citizens of the United States, or which injures them in life, liberty, or property without due process of law, or which denies to any of them the equal protection of the laws."); *Id.* at 25 (of the Civil Rights Act of 1875, "we are of opinion that no countenance of authority for the passage of the law in question can be found in either the Thirteenth or Fourteenth Amendment of the Constitution; and no other ground of authority for its passage being suggested, it must necessarily be declared void…); *Plessy v. Ferguson*, 163 U.S. 537, 546 (1896) ("In the Civil Rights Cases . . . it was held that an act of congress entitling all persons within the jurisdiction of the United States to the full and equal enjoyment of the accommodations . . . . was unconstitutional and void, upon the ground that the fourteenth amendment was prohibitory upon the states only.").

crops up in state courts too, like Texas's recent *Dickson v. Afiya Center* case.[267] Nevertheless, the weight of Texas law easily indicates that the effects of an injunction follow the first model.

*Dickson* was itself reversed on other grounds by the Supreme Court of Texas.[268] Further, the Texas Constitution provides for separation of powers between the Executive, Legislative, and Judicial Departments, "no person . . . being of one of these departments, shall exercise any power properly attached to either of the others."[269] It also vests the entire legislative power of the state of Texas in its legislature.[270] Admittedly, "there is an overlap in the functioning of the three different branches of government."[271] Still, the division between Texas's legislative power and judicial powers appears to mirror that of the federal constitution.[272]

This second discernment approach is easily the incorrect view of the effect of injunctions. Otherwise, how could a law spring back into effect after a higher court vacates a lower court's injunction?[273] A fine case-in-point is

---

[267] 636 S.W.3d 247, 263 (Tex. App. 2021), *rev'd on other grounds sub nom. Lilith Fund for Reprod. Equity v. Dickson*, 662 S.W.3d 355 (Tex. 2023) ("When a legislative act is declared to be unconstitutional, the act is 'absolutely null and void,' and has 'no binding authority, no validity [and] no existence.'") (citing *Ex parte Bockhorn*, 138 S.W. 706, 707 (Tex. Crim. App. 1911) (an unconstitutional law should be viewed as "lifeless," as "if it had never been enacted," given that it was "fatally smitten by the Constitution at its birth.").

[268] *Id.*

[269] Tex. Const. art. II § 1.

[270] Tex. Const. art. III § 1.

[271] *Martinez v. State*, 503 S.W.3d 728, 733-34 (Tex. App.—El Paso 2016, pet. ref'd).

[272] *Compare In re Texas Dep't of Fam. & Protective Servs.*, 660 S.W.3d 161, 171-172 (Tex. App. 2022) ("the trial court unduly interfered with the powers of the legislative branch when it ordered the Department [of Family and Protective Services] to submit [certain detailed] written offers to specific child-placing agencies"); *with INS v. Chadha*, 462 U.S. 919, 952 (1983) ("Whether actions taken by either House are, in law and fact, an exercise of legislative power depends not on their form but upon whether they contain matter which is properly to be regarded as legislative in its character and effect.") (internal quotation omitted).

[273] *See, e.g., Voting for Am., Inc. v. Steen*, 732 F.3d 382 (5th Cir. 2013) (vacating preliminary injunction entered against Texas voter-registration laws); *Planned Parenthood Ass'n, Inc. v. Suehs*, 692 F.3d 343 (5th Cir. 2012) (vacating preliminary injunction entered against the enforcement of a law excluding Planned Parenthood from the Texas Women's Health Program); *Tex. Med. Providers Performing Abortion Servs. v. Lakey*, 667 F.3d 570 (5th Cir. 2012) (vacating preliminary injunction

*Citizens United v. FEC*.[274]   After that decision, while the Supreme Court's controversial ruling prevents *enforcement* of the federal campaign finance statutes, those laws actually remain on the books and are ready-to-go should First Amendment jurisprudence evolve.[275]   As mentioned *supra*, the discernment approach has been cut back by newer Supreme Court jurisprudence.[276]

Here, applying the first, nonenforcement approach, the issuance of a federal injunction cannot reinstate the 2021 maps because Texas's state legislature retains its separate power to issue or repeal statutes, leaving the 2025 maps on the books but unenforceable.   Yet by the issuance of this injunction, Judge Brown's free-floating Hegelian interpretation of the law undermines the legislature's ability—and thereby the people's ability—to make laws governing themselves.[277]   As Judge Learned Hand said, this is "irksome" rule by "a bevy of Platonic Guardians."[278]

A federal court trying to reinstate a statute that the legislature has repealed may represent a limit on the equity power.   A couple of recent election law cases are relevant.   In *Democratic Nat'l Comm. v. Wisconsin State Legislature*, Justice Gorsuch wrote in concurrence, "[t]he Constitution provides that state legislatures—not federal judges, not state judges, not state governors, not other

---

entered against Texas informed-consent law).

[274] 558 U.S. 310 (2010).

[275] *See* Mitchell at 989-92 (comparing *Citizens United* with the still-extant 52 U.S.C. § 30118(a) (2012) ("It is unlawful . . . for any corporation . . . to make a contribution or expenditure in connection with any election…")).

[276] *See CASA*, 606 U.S. at 837; *also Brown v. Plata*, 563 U.S. 493, 550 (2011) (Scalia, J., dissenting) (criticizing an overbroad structural injunction); *generally Missouri v. Jenkins*, 515 U.S. 70, 88 (1995) (limiting a school segregation structural injunction and remarking "the 'principle that the nature and scope of the remedy are to be determined by the violation means simply that federal-court decrees must directly address and relate to the constitutional violation'" (quoting *Milliken v. Bradley*, 433 U.S. 267, 281-282 (1977)).

[277] *Cf. South Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613-14 (Mem.) (Roberts, C.J., concurring) (balancing political and health considerations during the Covid Era's shutdown "should not be subject to second-guessing by an 'unelected federal judiciary,' which . . . is not accountable to the people." (quoting *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 545 (1985)).

[278] Learned Hand, THE BILL OF RIGHTS: THE OLIVER WENDELL HOLMES LECTURES, 70 (1958).

state officials—bear primary responsibility for setting election rules."[279]   Justice Kavanaugh, likewise, has invoked the "principle of deference to state legislatures."[280]   In *Andino v. Middleton*, reversing a lower court ruling invalidating South Carolina's witness requirement for absentee ballots, Justice Kavanaugh wrote, "a State legislature's decision either to keep or to make changes to election rules to address COVID–19 ordinarily "should not be subject to second-guessing by an 'unelected federal judiciary,' which lacks the background, competence, and expertise to assess public health and is not accountable to the people."[281] Therefore, in addressing the *diagonal* separation of powers between federal courts and state legislatures, strict separation of powers, deference, and comity apply.

The bottom line is this: *first*, Judge Brown must permit redrawing rather than imposing his own map,[282] and *second*, it may violate separation of powers and exceed the equitable power for a court to order the legislature to reinstate a voided statute, contrary to Texas's anti-repealer statute, and to order the State executive to administer that voided statute.   Judge Brown's remedy is unlawful judicial aggrandizement.

I dissent.

\* \* \* \* \*

Also, Judge Brown's chosen remedy engenders an interesting contradiction: The plaintiffs have insisted, for years, that the 2021 maps are themselves racist and unconstitutional.   While Judge Brown's opinion exactly what they asked for, it is manifestly absurd for them to mandate an

---

[279] 141 S. Ct. 28, 29 (Gorsuch, J., concurring).

[280] *Id.* at 33 (Kavanaugh, J., concurring).

[281] 141 S. Ct. 9, 10 (2020) (Mem.) (Kavanaugh, J., concurring).

[282] *See Landry*, 83 F.4th at 303 ("the Supreme Court has repeatedly reminded lower federal courts that if legislative districts are found to be unconstitutional, the elected body must usually be afforded an adequate opportunity to enact revised districts before the federal court steps in to assume that authority . . . [such that] that 'legislative reapportionment is primarily a matter for legislative consideration and determination.'" (quoting *Reynolds v. Sims*, 377 U.S. 533, 586 (1964); *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978)).

*unconstitutional* set of 2021 maps![283] The Judiciary Act of 1789 authorizes courts to hear suits in equity[284]—but it plainly exceeds that statutory authorization to issue an unconstitutional injunction.[285]

Is Judge Brown now saying, *sotto voce*, that the 2021 maps are affirmatively constitutional? He must be, given that it would be without the Article III power to order a racist injunction. This stance then credits Chairwoman Huffman's statements from the spring trial that the 2021 maps were drawn race-blind.

Again, if they were drawn in a racist manner, then Judge Brown's order would itself be unconstitutional, exceeding the Article III power and Judiciary Act of 1789 authorizing equitable relief. And Judge Brown cannot issue an unconstitutional order, as he knows well through his related reversal in *Petteway*.[286]

Yet this conclusion also unearths another contradiction in Judge Brown's reasoning: If Huffman was right last Spring that the 2021 maps were drawn race-blind, permitting them as a remedy in this case, that then enhances the likelihood that the 2025 maps, drawn by the same map drawer in Mr. Kincaid, were drawn with the same criteria. Judge Brown's attack on Kincaid's credibility should thereby implode, given that he credits the Texas legislature's use of partisan intensity in 2021.[287] Judge Brown seems to acknowledge, at some level, that this preliminary injunction is merely the latest round in a multi-decade partisan struggle, rather than a one-time isolated episode beginning in July 2025 with the Governor's legislative call. Otherwise, how could Judge Brown approve less-partisan-gerrymandered maps from 2021, while necessarily affirming their

---

[283] *LULAC Second Supplemental Complaint* at *6, No. 3:21-cv-00259-DCG-JES-JVB, ECF No. 1147 (August 28, 2025, W.D. Tex. – El Paso).

[284] § 11, 1 Stat. 78.

[285] *See CASA*, 606 U.S. at 841 (2025) ("Though flexible, this equitable authority is not freewheeling. We have held that the statutory grant encompasses only those sorts of equitable remedies 'traditionally accorded by courts of equity' at our country's inception.") (quoting *Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 319 (1999)).

[286] *Petteway v. Galveston County*, 111 F.4th 596 (5th Cir. 2024) (en banc).

[287] *Cf.* Brown Op. at 96-99 (refusing to credit Kincaid's testimony).

constitutionality? Here, picking and choosing between partisan maps of different intensity nakedly defies *Rucho*'s rule on the non-justiciability of partisan gerrymandering as a political question.

As mentioned *supra*, this court's intrusion into bare-fist partisan politics is particularly concerning where other states are redistricting in real time.[288] Injunctions have a major trickle-down—indeed, the 2012 injunctions likely affected Lt. Gov. Dewhurst's and Sen. Cruz's electoral outcomes.[289] *Rucho* is clear: federal courts do not pick partisan winners and losers—they uphold the constitution.

I dissent.

\* \* \* \* \*

This injunction flies badly in the face of the *Purcell* principle, especially in light of the Supreme Court's stay of the injunction in *Merrill v. Milligan*.[290] The *Purcell* principle reflects "a bedrock tenet of election law: When an election is close at hand, the rules of the road must be clear and settled."[291] The principle also reflects judicial restraint so as not to interfere with the democratic process.[292] To reiterate, it represents a policy of *judicial* restraint, as distinguished from judicial activism and meddling: The legislature, with its democratic accountability, has greater authority to intervene and regulate the rules of elections as election deadlines approach.[293]

Judge Brown's approach to *Purcell* is judicial aggrandizement, plain and

---

[288] *See, e.g.*, Guy Marzorati, *California voters OK new congressional lines, boosting Democrats ahead of midterms*, NATIONAL PUBLIC RADIO (Nov. 4, 2025) (last accessed November 16, 2025) (https://www.npr.org/2025/11/04/nx-s1-5587742/election-results-california-proposition-50-redistricting).

[289] *Supra* at 21.

[290] 142 S. Ct. 879, 880–81 (2022)

[291] *Id.* (Kavanaugh, J., concurring)

[292] *See id.* at 881 ("Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others.").

[293] *See id.* ("It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election.").

simple. Quite contrary to the presumption of legislative good faith that's supposed to undergird the judiciary's approach to these sensitive legislative questions, Judge Brown's opinion is shot through with a presumption of legislative *bad* faith.

The opinion raises the specter of the legislature's being incentivized to redistrict "as close to elections as possible."[294] The opinion assumes that legislatures are often out to break the law when they redistrict and that it is the noble and just court who must always have the opportunity to step in and remedy this wrong, no matter how close to the election that this change has been made by the legislature. Judge Brown seems to miss that legislatures' being able to intervene later in the election cycle than the judiciary is a feature, not a bug, of the *Purcell* principle and reflects the different roles played by the courts as distinguished from the legislature.[295]

Judge Brown's inventive reasoning effectively mutilates *Purcell*. He goes so far as to state that "*Purcell* cannot be read to gut the Plaintiff Groups' right to seek a preliminary injunction and this Court's obligation to award one when merited."[296] But what purpose does *Purcell* serve but to deny injunctive relief that might, hypothetically, be merited and to do so because of the proximity to an election? If injunctive relief were not merited, the court would deny such relief, or the injunction would be vacated, on appeal on non-*Purcell* grounds. *Purcell* exists for those situations where injunctive relief may, in fact, be otherwise warranted but inappropriate considering the timing of the election.[297]

Judge Brown's notion of *Purcell* is that it exists almost exclusively to

---

[294] Brown Op. at 154.

[295] *See Milligan*, 142 S. Ct. at 880 (Kavanaugh, J., concurring) ("It is one thing for a State on its own to toy with its election laws close to a State's elections. But it is quite another thing for a federal court to swoop in and re-do a State's election laws in the period close to an election.").

[296] Brown Op. at 154.

[297] *See Democratic Nat'l Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring) ("It is one thing for state legislatures to alter their own election rules in the late innings and to bear the responsibility for any unintended consequences. It is quite another thing for a federal district court to swoop in and alter carefully considered and democratically enacted state election rules when an election is imminent.").

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

prevent plaintiffs from bringing challenges on the eve of the election. Judge Brown faults the legislature for making a late-breaking change to election law and essentially claims that *Purcell* can't apply if the legislature causes an injunction to be on the eve of an election. This subordinates the legislature and exalts the judiciary and is counter to the principle of judicial restraint that undergirds *Purcell*.[298]

A comparison between both the facts and the timeline of *Milligan* will demonstrate how clear the *Purcell* issue is in this case. The primary election here closer than was the primary in *Milligan*. When the district court issued the preliminary injunction on January 24, the primary election process began via absentee voting sixty-six days later on March 30. In this case, Judge Brown took well over a month to issue his opinion, leaving the state of Texas with around 60 days until absentee voting begins by ballots' being sent overseas.

Judge Brown wishes to rest much of its confidence on the fact that the 2021 maps could be used in place of the 2025 map, but those maps are no longer Texas law. The 2025 bill repealed the 2021 maps for the 2026 election, and, importantly, Texas has an anti-repealer statute, meaning that even if the act were enjoined or otherwise repealed, the repealed 2021 maps cannot spring back into life.[299] It is noteworthy that Judge Brown does not cite a single example in which a previously enacted map has been brought back from the dead by the court's enjoining a bill or by pure judicial fiat. Furthermore, both the Supreme Court and the Fifth Circuit have made it clear that the only two options for relief are judicially crafting a map or letting the legislature work:

> [T]he Court has repeatedly held that redistricting and reapportioning legislative bodies is a legislative task which the courts should make every effort not to preempt. When a federal court declares an existing apportionment scheme

---

[298] *See id.* ("That important principle of judicial restraint not only prevents voter confusion but also prevents election administrator confusion—and thereby protects the State's interest in running an orderly, efficient election and in giving citizens (including the losing candidates and their supporters) confidence in the fairness of the election.").

[299] *See* Tex. Gov't Code § 312.007.

unconstitutional, it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan.[300]

It's actually unclear whether Judge Brown mistakenly believes the 2021 maps are still in effect for the 2026 elections or if, instead, he wishes to foist an alternate, judicially created, 2021 map on Texas. Under either theory, a fatal *Purcell* problem obviously remains.

If Judge Brown believes that the 2021 maps are still on the books in Texas, he is sorely mistaken, as discussed in the repealer section of this dissent. Under this read of Judge Brown's opinion, that means the Texas Legislature must be reconvened in a special session in order to redraw the maps.[301] The court should afford the legislature at least an opportunity to do this regardless, as the Supreme Court has clearly stated,[302] but it would be necessary if the ruling of the court orders Texas to follow a repealed law.[303]

Judge Brown's contrary assertion—that such is not necessary on account of the 2021 map's being a "viable congressional map that was drawn by the legislature"—ignores the obvious fact that the legislature repealed the map.[304] To place that map back in place, the court must be imposing it on the state. The fact that the legislature at one point preferred these lines does not change the fact that they no longer preferred those lines and that they are an imposition on the legislature's authority. If anything, this represents a more odious form of imposition because it involves a map that the legislature has consciously decided

---

[300] *In re Landry*, 83 F.4th 300, 303 (5th Cir. 2023) (quoting *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978); *see also Landry*, 83 F.4th at 303 (stating that the above "is the law today as it was forty-five years ago.").

[301] *See id.* at 303 n.2 (providing myriad Supreme Court citations for the primacy of the legislature in redistricting).

[302] *Id.* (collecting cases).

[303] At the close of the preliminary-injunction trial, the State explicitly invoked its right to redraw the map should this court decide to grant relief.

[304] Brown Op. at 159.

to reject.

It should go without saying that the state of affairs that Judge Brown creates on these grounds is more severe than the situation in *Milligan*, where the district court required an Alabama legislature that was already in the midst of its regular session to redraw its maps.[305]  The Governor will have to issue a new call, the legislature will have to reconvene, and any hearings will necessarily be truncated and minimal because the filing deadline for candidates, which is fixed statutorily, is on December 8.[306]  This court is rendering its decision closer to the primary than in *Milligan*, with a legislature that is out of session, with less than a month before the close of the filing deadline and only two months before the first primary ballots go out to service members as required by federal law. Forcing the state to adjust to a new map would be setting the stage for bedlam beyond even the facts of *Milligan*.  Scarcely more should need to be said to indicate the depth of the *Purcell* problem on this version of the facts.

Even assuming that Judge Brown were able magically to bring the 2021 map back into being through judicial fiat, the *Purcell* problem remains.  While it is true that the type of relief and the ease in which the state can make the change without undue collateral effects impact "how close to an election is too close," reversion to the 2021 map by no means resolves the *Purcell* dilemma.[307]  An injunction and reversion to the 2021 map now threatens to create voter confusion, disadvantage cash poor candidates, and threaten the tight schedule of election deadlines in the state of Texas.

Christina Adkins, the Director of Elections for the Texas Secretary of

---

[305] *See* 2022 State Legislative Session Calendar, National Conference of State Legislatures, https://www.ncsl.org/ about-state-legislatures/2022-state-legislative-session-calendar (last visited Nov. 13, 2025) (stating that the Alabama regular session convened on January 11th and Adjourned on April 7th).

[306] Tex. Elec. Code § 172.023 ("An application for a place on the general primary election ballot must be filed not later than 6 p.m. on the second Monday in December of an odd-numbered year unless the filing deadline is extended under Subchapter C."); *see also* Tex. Elec. Code § 172.054 (allowing the filing deadline to be extended only due to death, withdrawal of an incumbent, or incapacity).

[307] *See Merrill v. Milligan*, 142 S. Ct. 879, 881 n.1 (Kavanaugh, J., concurring).

State's office, provided ample testimony about the structure of Texas elections and how a reversion to the 2021 election map would sow confusion amongst the voters and harm the integrity of Texas's election process, which is a complex web of statutorily set deadlines and deadlines keyed to the date of the election.[308]

As previously mentioned, the filing period for candidates seeking public office runs from November 8 to December 8, 2025.[309]  Candidates can file to run for office only if they pay a filing fee or submit a petition in lieu of that fee.[310]  The petition for congressional candidates requires 500 signatures from individuals who live in the congressional district.[311]  Many candidates choose to submit petitions in lieu of paying the filing fee both to avoid the "heftier" filing fee and to introduce themselves to voters.[312]  After the filing deadline, political party chairs enter candidate information into the candidate filing system, which takes several days.[313]  After this, the counties must perform ballot draws and begin preparing ballots, which takes approximately three weeks.[314]

All of this must be done before January 17, 2026, to comply with federal law.[315]  Any waiver of that requirement at the federal level would require the state to create a "comprehensive plan to ensure that absent uniformed service voters and overseas voters" are able to both receive, submit their ballots in time to be counted in the election, and receive approval from the President, meaning that moving the federal deadline likely provides the state with little flexibility.[316]

With the context of this complex web of interactions laid bare, Ms. Adkins testified that any change in election policy, including this injunction, would be "harder on candidates, harder on voters, [and] harder on election

---

[308] Tr. 10/8/25 AM 151:18–24.

[309] Tr. 10/8/25 AM 146:18–147:2.

[310] Tr. 10/8/25 AM 155:11–17.

[311] Tr. 10/8/25 AM 155:25–156:4.

[312] Tr. 10/8/25 PM 6:18–24.

[313] Tr. 10/8/25 PM 9:2–15.

[314] Tr. 10/8/25 PM 9:16–25.

[315] Tr. 10/8/25 PM 9:1–6; *see also* 52 U.S.C. § 20302(a)(8).

[316] 52 U.S.C. § 20302(g).

officials."[317] Ms. Adkins emphasized that there's "not much time to play with," and that delaying the opening of the filing period (and presumably extending the filing period) would threaten the ability of the counties to adequately prepare and test their ballots, thwarting the ability of the state to tabulate election results accurately.[318] Additionally, many of the counties have already began redrawing county election voter registration precincts, rendering all of that work useless.[319] Furthermore, candidates had already begun to campaign and collect signatures under the 2025 map when Ms. Adkins offered her original testimony, meeting voters and spreading their name amongst the new congressional district.[320]

Several weeks later and this has likely only gotten worse.

Many of these candidates will be shuffled between districts, and voters may not become aware of that fact until they enter the voting booth. In addition to the voter confusion, reverting the maps now means that some of those candidates will need to run in different districts, needing up to 500 new signatures if they need to get onto the ballot via petition. This seriously disadvantages outsider political candidate who are likely to have less money to dole out for filing fees. Furthermore, it has been reported that changing the map "could force candidates who have already filed or are considering entering the race to rethink their plans," meaning court intervention will fundamentally alter the state of these ongoing races.[321]

As a legal and practical matter, Judge Brown's injunction turns the Texas electoral and political landscape upside down. It creates mayhem, chaos, misinformation, and confusion. Certain statutory election deadlines for the

---

[317] Tr. 10/8/25 PM 14:16–19.

[318] Tr. 10/8/25 PM 10:16–19.

[319] Tr. 10/8/25 AM 149:19–150:5.

[320] Tr. 10/8/25 AM 8:14–23.

[321] John C. Moritz, Texas candidate filings open with a big question: Will Republicans' new map stick?, Houston Chronicle, Nov. 10, 2025, https://www.houstonchronicle.com/news/politics/state/article/redistricting-candidate-primaries-21151780.php. See also id. (describing a series of candidates who may not run or who may run elsewhere due to the alteration of the map by the court).

LULAC v. Abbott, No. 3:21-CV-259
(W.D. Tex., El Paso)

2026 cycle kicked in in September 2025. Candidates began filing for federal and state office beginning on the statutory launch date of November 8, 2025.

The prevailing expectation is that the 2025 congressional lines will be used to elect representatives in 2026. There is, of course, a trickle-down effect. Some incumbents have announced their retirements because of the new lines. Some have announced they will run in different districts. Officials holding other or "lower" or local offices have declared as candidates for Congress, meaning that other citizens have decided to run to replace them.

Lastly, Judge Brown claims that Ms. Adkins testified that "Texas election officials and systems are more than capable of proceeding with the 2026 congressional election under any map that is the law."[322]

This is a blatant misstatement, to put it politely.

The passage that Judge Brown highlights actually says:

> In all of our interactions with the counties, we have been reiterating that these [2025] maps are the maps that are in place for the primary. Unless there is something, a court order or something telling us otherwise, we have to proceed and move forward with the maps that are law, that will be law.[323]

Nowhere does Ms. Adkins indicate that the Texas is "more than capable" of proceeding under any map that's law, nor does she imply that. Rather, her statement represents the admirable but mundane proposition that Texas will do everything in its power to comply with the law under either map. Judge Brown's misrepresentation of this fact makes it clear, once again, that he is motivated by results, not a sound application of law to facts.

The concerns about timeline, voter confusion, and chaos for political candidates ring true here, just as they did with *Milligan*, even if it were possible to return to the 2021 map. As it was for Alabama in *Milligan*, the filling deadline is imminent and candidates who have already been campaigning will be shuffled

---

[322] Brown Op. at 151.

[323] Tr. 10/8/25 AM 153:13–18.

between districts, meaning new petitions, a new voter base, and confusion about the options the voters have come March.[324]

Likewise, the minimal wiggle-room in Texas's statutorily mandated elections process means that Texas is faced with an impossible dilemma should this injunction go through, extend the filing deadline for candidates threatening the integrity of their ballot preparation process or keep the original deadline and disadvantage or outright bar cash-poor political candidates across the state from qualifying as congressional candidates. Truly, compliance with this injunction "would require heroic efforts by those state and local authorities in the next few weeks—and even heroic efforts likely would not be enough to avoid chaos and confusion."[325] The fact that one congressional district is retaining its boundaries for a special election for the current Congress does little to remedy many of these concerns. At best, this relieves a single congressional district of a small portion of the burden generated by redistricting.

It should go without saying that the Judge Brown's notion—that this case somehow fits into the narrow exception to *Purcell* outlined in Justice Kavanaugh's concurrence in *Milligan*—is absurd.[326] Far from clearcut in favor of the plaintiffs, Judge Brown must strain credulity and distort the record to reach his desired result, as has been highlighted throughout this opinion. As to the feasibility of implementing the injunction without significant cost, confusion, or hardship, this entire section is a testament to how far the plaintiffs are from satisfying that requirement.

Unfairness is the word of the day, and this injunction is laden with unfair consequences. *See id.* ("Late judicial tinkering with election laws can lead to disruption and to unanticipated and unfair consequences . . ."). It is unfair to the congressional candidates (not to mention some candidates for state office) who need to rework their entire campaigns after more than a month of campaigning. It is unfair to the election officials who will be put into an impossible bind. It is

---

[324] *See Milligan*, 142 S. Ct. at 880 (Kavanaugh, J., concurring).

[325] *Id.*

[326] *See id.* at 881.

unfair to the political parties whose candidates will be chosen through a confused and muddied process as a result of judicial meddling. Most importantly, it is unfair to the Texas voters who are having a map implemented by their duly elected legislature overturned by a self-aggrandizing, results-oriented court.

I dissent.

\* \* \* \* \*

Beyond the grave error in granting an injunction, Judge Brown adds insult to injury by failing to stay the order for, say, at least 72 hours to give the state a chance to appeal or move for a stay. It is obvious that there will be chaos and political posturing as soon as the injunction is announced. Any observance of judicial restraint would dictate providing an opportunity for provisional adjustments in anticipation of further judicial action. But ideological zeal sometimes overrides common sense.

District courts often stay their orders, either pending a full appeal or for a time certain, to allow for an orderly disposition on further review. A prominent recent example, in an election case, is *Nairne v. Landry*, 151 F.4th 666 (5th Cir. 2025), in which the district court wisely granted a stay pending appeal of its order enjoining certain elections.

The same should obtain here.

I dissent.

\* \* \* \* \*

Judge Brown's analysis exposes either a naivete that is unbefitting of the judiciary or a willful blindness unbecoming of the judiciary. Collected below is a non-exhaustive list of misleading, deceptive, or false statements Judge Brown put forward. (The list would be considerably longer but for the press of time; there's no lack of fodder.)

- Judge Brown says "[w]hen the Trump Administration reframed its request as a demand to redistrict on exclusively racial grounds, however, Texas lawmakers immediately jumped on board."[327] Misleading at best.
- Judge Brown says "[b]y all appearances, however, Republican lawmakers didn't have much appetite to redistrict on purely partisan grounds—even at the President's behest."[328] Misleading at best.
- Judge Brown says "[a]nd as far as some influential members of the Legislature were aware, the prospect of redistricting in 2025 was just a rumor"[329] Misleading at best.
- Judge Brown says "[w]here the other factors are strong," the movant need only show 'some likelihood of success on the merits' to obtain a preliminary injunction."[330] Misleading at best.
- Judge Brown says "Supreme Court precedent establishes, however, that when: (1) a relevant political actor "purposefully establishe[s] a racial target" that voters of a single race "should make up no less than a majority" of the voting population; and (2) the Legislature "follow[s] those directions to the letter, such that the 50%-plus racial target ha[s] a direct and significant impact on [the districts'] configuration," a factfinder may permissibly conclude "that race predominated in drawing" those districts."[331] Deeply misleading quote mining at best, intentionally deceptive at worst.
- Judge Brown says "[w]hy not just base the 2025 redistricting exclusively on *Rucho*? The answer must be that race and Petteway were essential ingredients of the map, without which the 2025 redistricting wouldn't have occurred."[332] False.
- Judge Brown says "[in *Cooper v. Harris*], the mapmaker had achieved an "on-the-nose attainment of a 50% BVAP" in the challenged district—a feat that, in the district court's view, the mapdrawer would have been unlikely to achieve by blind adherence to partisan data alone. The district court deemed it far more likely that the mapdrawer used a 50% racial target to "deliberately redr[a]w [the challenged district] as a majority-

---

[327] Brown Op. at 2.
[328] Brown Op. at 16.
[329] Brown Op. at 16-17.
[330] Brown Op. at 55.
[331] Brown Op. at 60.
[332] Brown Op. at 79.

minority district."[333] Deeply misleading quote mining at best, intentionally deceptive at worst.

- Judge Brown says "[e]ven more notably, Dr. Duchin's testimony was effectively unchallenged; no defense expert submitted a report rebutting Dr. Duchin's findings."[334] Misleading.

- Judge Brown says "[i]n any event, if raising the floor to a value closer to 60% would have undermined Dr. Duchin's conclusions, the State Defendants could have introduced expert rebuttal testimony to that effect. Again, though, the State Defendants let Dr. Duchin's testimony go unrebutted"[335] False.

- Judge Brown says "[i]n this case, '[l]ate judicial tinkering' with Texas's congressional map is not what could 'lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters.'"[336] False.

- Judge Brown says "[t]he Court adds that even Ms. Adkins testified that the Texas election officials and systems are more than capable of proceeding with the 2026 congressional election under any map that is the law."[337] False.

* * * * *

This order, replete with legal and factual error, and accompanied by naked procedural abuse, demands reversal.

* * * * *

Darkness descends on the Rule of Law.  A bumpy night, indeed.

**So SIGNED this 19th day of November 2025.**

_____
**Jerry E. Smith**
**U.S. Circuit Judge**

---

[333] Brown Op. at 98.
[334] Brown Op. at 122.
[335] Brown Op. at 126.
[336] Brown Op. at 146.
[337] Brown Op. at 151.