UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No.: 24-cv-21983-JB

CUBANOS PA'LANTE, *et al.*,

    Plaintiffs,

v.                                                  **THREE-JUDGE COURT**

FLORIDA HOUSE
OF REPRESENTATIVES, *et al.*,

    Defendants.

_____/

Before GRANT, Circuit Judge, and RUIZ and BECERRA, District Judges.

BECERRA, District Judge:

### ORDER GRANTING IN PART AND DENYING IN PART MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** comes before the Court on Defendant Florida House of Representatives' Motion for Summary Judgment. ECF No. [122]. Plaintiffs filed a Response in Opposition to the Motion, and the House filed a Reply. ECF Nos. [127], [131]. The parties also filed Statements of Material Facts in support of their respective memoranda. ECF Nos. [123], [126], [130]. On October 29, 2025, the Court heard oral argument on the Motion. ECF No. [143].

Upon due consideration of the parties' written submissions, argument of counsel, pertinent portions of the record, and the relevant authorities, for the reasons explained below, the Motion for Summary Judgment is **GRANTED** as to State House

1

Districts 112, 113, 114 and 116, and **DENIED** as to State House Districts 115, 118 and 119, and Congressional District 26.

## I. BACKGROUND

This action challenges seven State House Districts—112, 113, 114, 115, 116, 118 and 119—and Congressional District 26 (collectively, the "Challenged Districts"), as racially gerrymandered in violation of the Fourteenth Amendment's Equal Protection Clause.[1] *See generally* ECF No. [58]. Plaintiffs allege that the Florida Legislature subordinated traditional redistricting criteria to race when drawing the Challenged Districts and did not narrowly tailor district lines to advance a compelling governmental interest. *Id.* As relevant here, Plaintiffs set forth the statements of key legislators and their staff to demonstrate that race was the predominant factor in the design of the Challenged Districts, and claim that the Challenged Districts deviate from race-neutral criteria in that district lines created noncompact shapes, cross major geographic boundaries, and unnecessarily split municipalities. *Id.* at ¶¶ 50–190.

The House now argues that Plaintiffs' claims fail as a matter of law because there is no evidence that racial considerations predominated in the drawing of district lines in any of the Challenged Districts. *See generally* ECF No. [122]. In particular, the House contends that each of the Challenged Districts adheres to traditional race-neutral districting principles, such as following existing political and geographic

---

[1] Initially, this action also challenged Congressional Districts 27 and 28. ECF No. [58]. However, in its Order on Motions to Dismiss, ECF No. [88], the Court dismissed Plaintiffs' claims based on those districts.

2

boundaries, keeping municipalities whole, and avoiding bizarre shapes. *Id.* at 10–15, 18. The House further asserts that even where the Legislature adjusted district boundaries or chose between alternative configurations, the decision was "made in unison" with traditional race-neutral districting principles or was rooted in race-neutral considerations. *Id.* at 13, 15, 16–19. The House also contends that testimony of the chief map drawer shows that "race was either a non-factor or a secondary consideration in shaping the challenged districts." *Id.* at 7.

Plaintiffs oppose the Motion, arguing that they have offered sufficient direct and circumstantial evidence for a rational factfinder to conclude that race was the Legislature's predominant motive in drawing the Challenged Districts. *See generally* ECF No. [127]. Specifically, Plaintiffs point to various statements made by key legislators and the chief map drawer regarding the role that race played in the decisionmaking process. *Id.* at 6–16. Plaintiffs also rely on the "low compactness" scores of the Challenged Districts in support of their position that the district lines do not comport with race-neutral principles. *Id.* at 16. Finally, Plaintiffs set forth expert evidence, in the form of both alternative maps for the Challenged Districts as well as statistical analyses, that support their contention that race predominated over race-neutral criteria. *Id.* at 17–19.

In short, the House's Motion for Summary Judgment presents the Court with a single issue: is there sufficient record evidence to create a genuine dispute of material fact as to whether race predominated in the design of each of the Challenged Districts? As explained below, the answer is yes as to House Districts 115, 118 and

119, and Congressional District 26, and no as to House Districts 112, 113, 114 and 116.

## II. LEGAL STANDARD

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact is one with "a real basis in the record," such that "a reasonable jury could return a verdict for the nonmoving party." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (quoting *Hairston v. Gainesville Sun Publ'g Co.*, 9 F.3d 913, 919 (11th Cir. 1993)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether a genuine issue exists for trial, the court must "view all evidence and make all reasonable inferences in favor of the nonmoving party." *In re Delco Oil, Inc.*, 599 F.3d 1255, 1257 (11th Cir. 2010). When making this determination, "the district court may not weigh the evidence or find facts . . . [n]or may the court make credibility determinations of its own." *Ga. State Conf. of the NAACP v. Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1343 (11th Cir. 2015) (quotation marks and citations omitted).

As to issues on which the nonmoving party would bear the burden of proof at trial, it is sufficient for the movant to highlight a failure of proof concerning an essential element of the nonmovant's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Once the movant carries its burden, the nonmovant must offer specific evidence showing a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary

judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992) (citation omitted). But if the record, taken as a whole, could not lead a rational trier of fact to find for the nonmovant, there is no genuine issue for trial, and summary judgment is proper. *Matsushita*, 475 U.S. at 587.

### III. ANALYSIS

"The Equal Protection Clause of the Fourteenth Amendment limits racial gerrymanders in legislative districting plans." *Cooper v. Harris*, 581 U.S. 285, 291 (2017). A racial gerrymandering claim like the one here entails a two-step analysis. *Id.* First, the challenger must establish that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Id.* (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)); *see also Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 7 (2024) (same); *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017) (same); *Nord Hodges v. Albritton*, 774 F. Supp. 3d 1340, 1344 (M.D. Fla. 2025) (same). If the challenger meets his burden, "then the burden shifts to the State to prove that the map can overcome the daunting requirements of strict scrutiny." *Alexander*, 602 U.S. at 11.

As to the first step of the analysis, the Supreme Court has repeatedly recognized that "[r]acial considerations predominate when 'race was the criterion that, in the State's view, could not be compromised' in the drawing of district lines." *Id.* at 7 (alteration adopted) (quoting *Shaw v. Hunt*, 517 U.S. 899, 907 (1996)); *see also Bethune-Hill*, 580 U.S. at 189 (same). A plaintiff satisfies its burden to show racial predominance by proving "that the legislature subordinated traditional race-

5

neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations." *Miller*, 515 U.S. at 916; *see also Alexander*, 602 U.S. at 7 (explaining that to successfully establish racial predominance, "a plaintiff must prove that the State subordinated race-neutral districting criteria such as compactness, contiguity, and core preservation to racial considerations" (quotation marks and citation omitted)).

The plaintiff can meet its burden at this first step through "some combination of direct and circumstantial evidence." *Alexander*, 602 U.S. at 8; *see also Miller*, 515 U.S. at 916 ("The plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district."); *Cooper*, 581 U.S. at 291 ("The plaintiff may make the required showing through direct evidence of legislative intent, circumstantial evidence of a district's shape and demographics, or a mix of both." (quotation marks and citation omitted)). "Direct evidence often comes in the form of a relevant state actor's express acknowledgment that race played a role in the drawing of district lines." *Alexander*, 602 U.S. at 8. In those cases, the court assesses "relevant, contemporaneous statements of key legislators" to "determin[e] whether racial considerations predominated in the redistricting process[]." *Jacksonville Branch of the NAACP v. City of Jacksonville*, No. 22-13544, 2022 WL 16754389, at *4 (11th Cir. Nov. 7, 2022) (citation omitted). In evaluating such evidence, the court must be mindful that "[r]edistricting

6

legislatures will . . . almost always be aware of racial demographics[,] but it does not follow that race predominates in the redistricting process." *Miller*, 515 U.S. at 916.

Circumstantial evidence of race-based redistricting typically includes a district's lack of "conformity to traditional districting principles, such as compactness and respect for county lines." *Cooper*, 581 U.S. at 308. It also includes a district's unusual or "bizarre" shape, which "may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale." *Bethune-Hill*, 580 U.S. at 188 (quoting *Miller*, 515 U.S. at 913). In addition, a plaintiff can submit alternative redistricting maps that reflect "greater racial balance." *Alexander*, 602 U.S. at 34–35 (citations omitted). These maps, "driven only by [the State's] professed mapmaking criteria," can "undermine[] the legislature's defense that the districting lines were based on a permissible, rather than a prohibited, ground." *Id*. (quotation marks and citation omitted). Importantly, "a conflict or inconsistency between the enacted plan and traditional redistricting criteria is not a threshold requirement or a mandatory precondition in order for a challenger to establish a claim of racial gerrymandering." *Bethune-Hill*, 580 U.S. at 190. Even where a map respects traditional, race-neutral districting criteria, "if race for its own sake is the overriding reason for choosing one map over others" or if "race-neutral considerations came into play only after the race-based decision had been made," then "race still may predominate." *Id*. at 189–190 (quotation marks omitted) (quoting *Shaw*, 517 U.S. at 907).

7

In Florida, the drawing of district lines must also comport with the Fair Districts Amendments as set forth in Article III of the Florida Constitution.[2] The Fair Districts Amendments "consist[] of two tiers, each with its own distinct standards." *In re Senate Joint Resol. of Legis. Apportionment 100* (*In re SJR 100*), 334 So. 3d 1282, 1286 (Fla. 2022) (citation omitted). Tier one "protects racial and language minority voters," and states that "districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice." *Id.* at 1286; Fla. Const. art. III, §§ 20(a), 21(a). "Practically, that non-diminishment provision instructs the State to consider racial minorities' ability to elect their candidate of choice—even in districts where the racial minority group does not comprise a majority of the population." *Nord Hodges*, 774 F. Supp. 3d at 1344–45; *see also In re SJR 100*, 334 So. 3d at 1289 ("The non-diminishment protection afforded by article III, section 21(a) means that the Legislature cannot eliminate majority-minority districts or weaken other historically performing minority districts where doing so would actually diminish a minority group's ability to elect its preferred candidates." (quotation marks and citation omitted)). To ensure that a district is likely to perform for minority candidates of choice, the Legislature must conduct a "functional analysis of voting behavior within the districts at issue." *In re SJR 100*, 334 So. 3d at 1289 (quotation marks omitted).

---

[2] Article III, section 20 sets forth the standards applicable to establishing congressional district boundaries, and section 21 sets forth the standards applicable to establishing legislative district boundaries. Fla. Const. art. III, §§ 20, 21.

8

The functional analysis "requir[es] consideration . . . of the minority population in the districts, . . . the minority voting-age population in those districts, . . . political data and how a minority population group has voted in the past." *In re Senate Joint Resol. of Legis. Apportionment 1176* (*In re SJR 1176*), 83 So. 3d 597, 625 (Fla. 2012).

Tier two sets forth race-neutral criteria that "address legislative districts' population, shape, and boundaries." *In re SJR 100*, 334 So. 3d at 1286. It requires that districts shall "be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries." Fla. Const. art. III, §§ 20(b), 21(b). Compactness refers to the "shape of a district," which courts assess by conducting a "visual examination" and using "quantitative geometric measures of compactness." *In re SJR 1176*, 83 So. 3d at 634–35. "Compact districts should not have an unusual shape, a bizarre design, or an unnecessary appendage unless it is necessary to comply with some other requirement." *Id.* at 634. Political boundaries "primarily encompass[] municipal or county boundaries," and geographic boundaries are those that are "easily ascertainable and commonly understood, such as 'rivers, railways, interstates, and state roads.'" *Id.* at 637–638. In the event of a conflict between the requirements of tier one and tier two, "[t]he tier-one standards take precedence over those in tier two." *In re SJR 100*, 334 So. 3d at 1286; Fla. Const. art. III, §§ 20(b), 21(b).

Several principles should be considered in deciding a racial gerrymandering claim. To start, racial gerrymandering claims are evaluated on a "district-by-district" basis, rather than against "a State considered as an undifferentiated 'whole.'" *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262 (2015); *see also Bethune-Hill*, 580

9

U.S. at 191 ("[T]he basic unit of analysis for racial gerrymandering claims in general, and for the racial predominance inquiry in particular, is the district."). And in evaluating such a claim, a court "should not divorce any portion of the lines—whatever their relationship to traditional principles—from the rest of the district" and "may consider evidence regarding certain portions of a district's lines, including portions that conflict with traditional redistricting principles." *Bethune-Hill*, 580 U.S. at 191–2. This is because "a legislature's race-based decisionmaking may be evident in a notable way in a particular part of a district." *Id.* at 192. Further, a challenger "can present statewide evidence in order to prove racial gerrymandering in a particular district" given that "a legislature may pursue a common redistricting policy toward multiple districts." *Id.* (quotation marks and citation omitted). In the end, courts undertake a "holistic analysis" to determine whether race was "the legislature's predominant motive for the design of the district as a whole." *Id.*

We also note that in considering racial gerrymandering claims, courts "start with a presumption that the legislature acted in good faith" because courts must "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race" given the "intrusive potential of judicial intervention into the legislative realm." *Alexander*, 602 U.S. at 6; *Miller*, 515 U.S. at 916.

> **A. Genuine Disputes of Material Fact Exist as to Whether Race Predominated in the Drawing of House Districts 115, 118 and 119, and Congressional District 26.**

The House argues that Plaintiffs lack sufficient evidence that "race was privileged above other neutral redistricting factors" when designing House Districts 115, 118 and 119, and Congressional District 26. ECF No. [122] at 15 (citation

10

omitted). The Court does not agree. Plaintiffs offer sufficient direct and circumstantial evidence from which a factfinder could conclude that race played a predominant role in the drawing of these Districts. The Court begins with the direct evidence that Plaintiffs rely upon for each of these Challenged Districts, and then turns to the circumstantial evidence offered.

District 115: With respect to House District 115, Plaintiffs point to several statements from key individuals to support their claims. For example, the chief map drawer, Jason Poreda, agreed that "ensuring Tier 1 compliance is the reason why [House District] 115 extended as far north as it does" and is also "the reason why the border between [House Districts] 115 and 116 is where it is." ECF No. [123-3] at 169:22–170:3.[3] Further, when asked by a state legislator "[w]hy wouldn't . . . [House] District 115 lose its northern appendage . . . and be more compact," then-Chair of the State Legislative Redistricting Subcommittee, Representative Cord Byrd, explained that it was "[b]ecause that's a Tier One standard that we applied." ECF No. [126-8] at 53:5–13.

Plaintiffs supplement this direct evidence with circumstantial evidence, arguing that House District 115 is not visually or mathematically compact. In particular, Plaintiffs rely upon the northern extension of House District 115, which they contend is "an irregular appendage." ECF No. [127] at 14. Plaintiffs also point to evidence that House District 115 forms an unusual "long and skinny" shape because it "runs over 15.5 miles north-south but is only 1.8 miles at its narrowest

---

[3] Deposition page numbers used herein refer to the page number reflected in the CM/ECF heading.

point." *Id.* at 16 n.9, 17; *see also* ECF No. [123-1] at 5 (Map 3). Plaintiffs further rely upon the low compactness scores of House District 115, which Plaintiffs assert is an "outlier[] compared to the rest of the map." ECF No. [127] at 16; *see also* ECF No. [130-3] at 3 (compactness scores).

At this stage, Plaintiffs have presented enough evidence to raise a genuine dispute as to whether race predominated over other considerations in the drawing of House District 115. Indeed, the House readily admits that it altered the northern boundary of House District 115 after the Legislature performed a functional analysis because "the district did not sufficiently protect the ability of Hispanic voters to elect their preferred candidates." ECF No. [122] at 12. Although the House contends that this extension was "slight" and thus, race did not have "a direct and significant impact on District 115's configuration," ECF No. [131] at 11 (quotation marks omitted), Plaintiffs disagree that House District 115 extends only "slightly" to the north, ECF No. [126] at ¶ 62. Moreover, although the House discounts Plaintiffs' evidence because it does not explain the design of House District 115 as a whole, ECF No. [131] at 10–11, "a legislature's race-based decisionmaking may be evident in a notable way in a particular part of a district." *Bethune-Hill*, 580 U.S. at 192.

The foregoing evidence is sufficient to create a triable issue as to whether race predominated in the drawing of House District 115. In addition, the parties' disagreement as to why the district line was modified is clearly a genuine issue of material fact that must be decided at trial because the Court cannot resolve factual disputes at summary judgment. *See Fernandez v. Bankers Nat'l Life Ins. Co.*, 906 F.2d 559, 564 (11th Cir. 1990) ("A trial court must not decide any factual issues it

12

finds in the records; if factual issues are present, the court must deny the motion and proceed to trial." (quotation marks and citation omitted)).

Districts 118 and 119:[4]  With respect to House Districts 118 and 119, Plaintiffs contend that statements of the chief map drawer give rise to an inference of racial predominance.  ECF No. [127] at 14.  Plaintiffs note that Mr. Poreda agreed that staff had different "equally Tier 2 compliant options of [House Districts] 118 and 119" and chose the option that was "more Tier 1 compliant . . . based on the fact that Hispanic voters' ability to elect would not be diminished."  ECF No. [123-3] at 176:10–177:8.  Mr. Poreda also stated that "ensuring that a[] Hispanic [candidate] would be elected in either district . . . was the primary focus."  ECF No. [123–3] at 174:5–6.  Such evidence is material because "race still may predominate" where "race for its own sake is the overriding reason for choosing one map over others." *Bethune-Hill*, 580 U.S at 190.

Plaintiffs also offer circumstantial evidence to show that House Districts 118 and 119, in their view, deviate from race-neutral districting criteria.  As with House District 115, Plaintiffs contend that these are "noncompact districts drawn to form long, skinny shapes running north-south."  ECF No. [127] at 16.  In addition, Plaintiffs rely on mathematical measures to show that these districts have low compactness scores.  *Id*. at 16 n.9; *see* ECF No. 130-3 at 3 (compactness scores).

The foregoing evidence is sufficient to create a triable issue as to whether race predominated in the drawing of House Districts 118 and 119.  As the Supreme Court

---

[4] In their briefing, the parties discuss House Districts 118 and 119 together, and thus the Court does the same.

13

recognized, "[t]he legislature's motivation is itself a factual question." *Hunt v. Cromartie*, 526 U.S. 541, 549 (1999) (citation omitted). As such, it is particularly ill-suited to resolution at summary judgment because the Court cannot "resolve the disputed fact of [the legislature's] motivation at the summary judgment stage." *Id*. at 552.

Congressional District 26: As for Congressional District 26, Plaintiffs again direct the Court to various statements made by key legislators and the chief map drawer, which they contend demonstrate that racial considerations drove the configuration of this district. For example, Senator Ray Rodrigues, Chair of the Senate's Committee on Reapportionment, confirmed that "[a] big consideration in drafting CD 26 . . . is that [Congressional District] 26 is a Tier One protected district." ECF No. [126-13] at 66:15–19. Representative Tyler Sirois, Chair of the House Congressional Redistricting Subcommittee, agreed that Congressional District 26 was "impacted by the fact that it's a Tier 1–protected district for Latino voters or Hispanic voters." ECF No. [126-10] at 38:10–16. Mr. Poreda explained that "[t]he shape of [Congressional] District 26 was largely because . . . it was a Tier 1–protected district" as were certain of its neighboring districts. *Id*. at 39:6–15.

Plaintiffs also rely upon statements from Alex Kelly, Governor DeSantis's Deputy Chief of Staff, who made final adjustments to the boundaries of Congressional District 26. Mr. Kelly stated that in making those adjustments, "knowing that this is a historically performing majority-minority Hispanic seat, I was watching those numbers carefully to make sure that in terms of the overall Hispanic voting age

14

population, I was staying very close to the benchmark seat, which I think is maybe a little bit more than 74 percent." ECF No. [126-11] at 73:19–25.

Plaintiffs buttress the foregoing evidence with circumstantial evidence. As with the Challenged House Districts, Plaintiffs point to the poor compactness scores of Congressional District 26. ECF No. [127] at 16; *see also* ECF No. [123-3] at 213:4–23 (testimony of chief map drawer that "the three mathematical compactness scores" for Congressional District 26 "are certainly lower than other districts in the map . . ."). The Court recognizes that Mr. Poreda takes a different view, explaining that "a seemingly low compactness score does not necessarily mean low compactness." ECF No. [123-3] at 214:15–17. However, "the credibility of the map drawer's testimony is an issue for trial." *Nord Hodges*, 774 F. Supp. 3d at 1345. Plaintiffs further point to statistical analysis conducted by their expert which found that Congressional District 26 "was drawn to divide the region along racial lines." ECF No. [127] at 19; *cf.* ECF No. [126-18] at ¶¶ 16–29. Finally, Plaintiffs rely upon alternative maps in which Congressional District 26 remains wholly within Miami-Dade County, rather than "stretch[ing] across the peninsula" into Collier County as in the enacted map. ECF No. [127] at 17–18; *cf.* ECF No. [126-16] at ¶¶ 23–29, figs. 4, 7–8.

\* \* \*

To be sure, the House disputes the inferences that Plaintiffs argue should be made from the evidence offered. The Court also recognizes that the House has cited evidence which, in its view, confirms that the Legislature designed these Challenged Districts in accordance with race-neutral criteria and attempted to balance tier one

15

and tier two considerations such that racial considerations did not predominate. *See* ECF No. [122] at 7–9, 12–19; ECF No. [131] at 3–6, 11–16. However, the Court is unable to determine the extent to which race-neutral principles were subordinated, if at all, to racial considerations without weighing the evidence—an action the Court cannot perform at this stage of the proceedings. *See Ga. State Conf. of the NAACP*, 775 F.3d at 1343 (at summary judgment, a district court may not "make credibility determinations of its own" (citation omitted)).

In sum, Plaintiffs have offered district-specific statements of key actors and district-specific circumstantial evidence that is sufficient to create a genuine dispute of material fact as to whether race predominated in the drawing of House Districts 115, 118 and 119, and Congressional District 26. *See, e.g., Nord Hodges*, 774 F. Supp. 3d at 1345–46. Accordingly, summary judgment is not appropriate with respect to these districts.

### B. There is Insufficient Record Evidence to Establish That Race Predominated in the Drawing of House Districts 112, 113, 114 and 116.

The House argues that Plaintiffs fail to provide either direct or circumstantial evidence that the Legislature was motivated predominantly by racial considerations when drawing House Districts 112, 113, 114 and 116. ECF No. [122] at 10–13. As to these Districts, the Court agrees.

District 112: With respect to House District 112, Plaintiffs assert that the district "split[s] Miami into more parts than necessary." ECF No. [127] at 16. Even assuming that Plaintiffs are correct, they do not cite any evidence that shows the Legislature decided to split the city of Miami for racial reasons. The same infirmity

16

exists with respect to Plaintiffs' other complaint, that the Legislature could have added the southeast corner of House District 112 to a neighboring district. ECF No. [126] at ¶ 55. Again, Plaintiffs do not offer any evidence that inclusion of the disputed corner in House District 112 was racially motivated. The absence of such evidence is significant, as the gravamen of a racial gerrymandering claim is that the State "intentionally assign[ed] citizens to a district *on the basis of race* without sufficient justification." *Abbott v. Perez*, 585 U.S. 579, 585–86 (2018) (emphasis supplied) (citing *Shaw v. Reno*, 509 U.S. 630, 641 (1993)). Notably, Plaintiffs do not rely upon alternative maps to argue that House District 112 was racially gerrymandered. "Without an alternative map, it is difficult for plaintiffs to defeat [the Court's] starting presumption that the legislature acted in good faith." *Alexander*, 602 U.S. at 10.

Districts 113 and 114:[5]  With respect to House Districts 113 and 114, Plaintiffs do not offer sufficient direct or circumstantial evidence to support their claim. As for direct evidence, Plaintiffs only point to generalized statements of Mr. Poreda which, at best, indicate that the Legislature was aware of race when drawing these districts. ECF No. [126] at ¶¶ 33, 46. Such evidence is not enough to create a triable issue of fact because "the legislature always is *aware* of race when it draws district lines . . . [t]hat sort of race consciousness does not lead inevitably to impermissible race discrimination." *Shaw*, 509 U.S. at 646 (emphasis in original); *see also Allen v. Milligan*, 599 U.S. 1, 30 (2023) ("[T]here is a difference between being aware of racial

---

[5] Plaintiffs offer much of the same evidence as to House Districts 113 and 114 and, therefore, the Court analyzes these Districts together.

17

considerations and being motivated by them. The former is permissible; the latter is usually not." (quotation marks and citations omitted)).   No other statements are provided which could support Plaintiffs' claim that race predominated in the design of these Districts.

As for circumstantial evidence, Plaintiffs again complain that these districts "split Miami into more parts than necessary." ECF No. [127] at 16.  However, as explained above, Plaintiffs do not cite any evidence indicating that this decision was made for racial reasons.  Plaintiffs also fail to direct the Court to any favorable findings of their statistical expert with respect to these Districts.  While Plaintiffs contend that race-based adjustments to House District *115* affected the borders of House District 114, ECF No. [127] at 14, this cannot support Plaintiffs' claim.  The Supreme Court has long held that racial gerrymandering in one district "does not prove anything about the legislature's intentions with respect to [a neighboring district]." *United States v. Hays*, 515 U.S. 737, 746 (1995); *see also Sinkfield v. Kelley*, 531 U.S. 28, 30–31 (2000) ("[A]n unconstitutional use of race in drawing the boundaries of majority-minority districts [does not] necessarily involve[] an unconstitutional use of race in drawing the boundaries of neighboring majority-white districts.").

District 116:  As for House District 116, Plaintiffs assert that the Legislature extended this district "to the north for racial reasons, at least in part." ECF No. [126] at ¶ 69.  Plaintiffs offer only meager support for this assertion, which itself fails to advance their position.  In particular, Plaintiffs cite to an extended colloquy between Representatives Fentrice Driskell and Thomas J. Leek, Chair of the House

18

Redistricting Committee, that largely focuses on other districts, rather than House District 116, and when House District 116 is specifically mentioned, Chair Leek merely repeats his view that the district is compact. ECF No. [126–8] at 46:18–50:22. None of the cited statements support the position that the House subordinated traditional districting criteria to racial considerations when drawing House District 116. Plaintiffs also rely on Mr. Poreda's testimony that "ensuring Tier 1 compliance in at least [House District] 115 is the reason why the border between [House Districts] 115 and 116 is where it is." ECF No. [123-3] at 169:25–170:3. However, as explained above, adjustments made to House District 116 because of allegedly race-based decisions as to House District 115 are insufficient to support Plaintiffs' racial gerrymandering claim regarding House District 116. *See Hays*, 515 U.S. at 746; *Sinkfield*, 531 U.S. at 30–31.

In short, Plaintiffs have not offered sufficient evidence for a rational trier of fact to conclude that race was the Legislature's predominant motive when drawing district lines as to House Districts 112, 113, 114 and 116. Accordingly, the House is entitled to judgment as a matter of law with respect to these Districts.

### IV.   CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Defendant Florida House of Representatives' Motion for Summary Judgment, ECF No. [122], is **GRANTED IN PART AND DENIED IN PART** as follows:

1. Summary judgment is **GRANTED** in favor of Defendant Florida House of Representatives with respect to State House Districts 112, 113, 114 and 116.

2. Summary judgment is **DENIED** as to State House Districts 115, 118 and 119, and Congressional District 26.

**DONE AND ORDERED** this 21st day of November, 2025.

_____
BRITT C. GRANT
UNITED STATES CIRCUIT JUDGE

_____
RODOLFO A. RUIZ II
UNITED STATES DISTRICT JUDGE

_____
JACQUELINE BECERRA
UNITED STATES DISTRICT JUDGE