# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:24-cv-21983-JB

CUBANOS PA'LANTE, *et al.*,

      Plaintiffs,

v.

FLORIDA HOUSE OF REPRESENTATIVES
and CORD BYRD, in his official capacity as
Florida Secretary of State,

      Defendants.

_____/

———————————————————————

## THE FLORIDA HOUSE OF
## REPRESENTATIVES' PRETRIAL BRIEF

———————————————————————

## TABLE OF CONTENTS

INTRODUCTION..................................................................................................................4

LEGAL FRAMEWORK.........................................................................................................5

    The Predominance Standard.....................................................................................5

    District-by-District Analysis.....................................................................................8

    The Challenger's Heavy Burden .............................................................................9

    Alternative Maps....................................................................................................10

    Florida's Redistricting Standards...........................................................................14

    Strict Scrutiny .......................................................................................................17

ARGUMENT ......................................................................................................................19

I.   RACE DID NOT PREDOMINATE IN THE DESIGN OF THE CHALLENGED STATE HOUSE
     DISTRICTS. ...........................................................................................................19

    Consideration of Race............................................................................................20

    External Constraints...............................................................................................20

    District 115.............................................................................................................23

    Districts 118 and 119.............................................................................................26

    The Legislative Record..........................................................................................33

II.  RACE DID NOT PREDOMINATE IN THE DESIGN OF CONGRESSIONAL DISTRICT 26.....................37

    The Collier County Decision..................................................................................37

    Alternative Configurations. ....................................................................................38

    District 26's Configuration. ....................................................................................39

    The Legislative Record..........................................................................................42

III.  PLAINTIFFS' EXPERT TESTIMONY DOES NOT ESTABLISH RACIAL PREDOMINANCE. ...................44

    Dr. McCartan. ........................................................................................................44

    Dr. Abott. ...............................................................................................................58

IV.   EVEN IF RACE PREDOMINATED, THE CHALLENGED DISTRICTS ARE NARROWLY
      TAILORED AND THEREFORE CONSTITUTIONAL. .................................................................64

      Compelling Interest. ................................................................................................................64

      Cohesion. ...................................................................................................................................65

      White Bloc Voting. ...................................................................................................................69

V.    THIS COURT SHOULD EXCLUDE PLAINTIFFS' UNTIMELY EXPERT EVIDENCE. ..............74

VI.   PRINCIPLES OF JUDICIAL RESTRAINT GOVERN REMEDIES IN REDISTRICTING CASES. .................78

      Deference to Legislative Remedy. ...........................................................................................78

      The *Purcell* Principle. ................................................................................................................79

      Equitable Discretion to Withhold Immediate Relief. ............................................................81

      CONCLUSION ..............................................................................................................................82

<u>**INTRODUCTION**</u>

Race was not the predominant motive behind the four challenged districts, nor did the Legislature subordinate race-neutral districting principles to racial considerations. Instead, the Legislature faithfully endeavored to implement *all* redistricting standards in combination—population equality, contiguity, compactness, utilization of political and geographical boundaries, and Florida's legal protections for minority voters—without elevating race to a predominant position above race-neutral considerations.

In doing so, the Legislature did not establish a numerical racial target or draw predominantly minority districts first. It reviewed racial demographics only when a complete district was drawn, performing the required functional analysis to assess compliance with the Non-Diminishment Clause. The Legislature considered race—as the Constitution permits—but race did not outrank race-neutral considerations. The Legislature studiously complied with all legal requirements, including the Equal Protection Clause's limits on the consideration of race.

Plaintiffs cannot carry their heavy burden to prove racial predominance. They cannot overcome the presumption of legislative good faith and demonstrate that, in drawing the challenged districts, the Legislature acted in bad faith and engaged in intentional discrimination. Even if they could, the challenged districts would be constitutional. Plaintiffs themselves maintain that compliance with the Non-Diminishment Clause is a compelling interest. And because the Non-Diminishment Clause applied to the challenged districts, the Legislature's consideration of race was narrowly tailored.

This decade, Florida's election districts have survived all scrutiny: a review of all state-legislative districts for compliance with Florida's state-constitutional standards, *In re Senate Joint Resol. of Legis. Apportionment 100* (*In re SJR 100*), 334 So. 3d 1282 (Fla. 2022), an allegation of discriminatory purpose under the Fourteenth and Fifteenth Amendments, *Common Cause Fla. v. Byrd*, 726 F. Supp. 3d 1322 (N.D. Fla. 2024) (three-judge court), an allegation of diminishment in the voting ability of

minority voters, *Black Voters Matter Capacity Bldg. Inst., Inc. v. Sec'y, Fla. Dep't of State*, 415 So. 3d 180 (Fla. 2025), and an allegation of racial gerrymandering in a State Senate district, *Nord Hodges v. Albritton*, 796 F. Supp. 3d 1082 (M.D. Fla. 2025) (three-judge court).

Here too, the challenged districts are constitutional. The Court should enter judgment in Defendants' favor.

## LEGAL FRAMEWORK

**The Predominance Standard.** To prove a racial-gerrymandering claim, a plaintiff must establish that race was "the legislature's predominant motive for the design of the district as a whole," *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 192 (2017)—*i.e.*, "that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations," *Miller v. Johnson*, 515 U.S. 900, 916 (1995). Only if the plaintiff proves racial predominance does strict scrutiny require the district to be narrowly tailored to achieve a compelling interest. *Id.* at 920.

The predominance standard is "demanding." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (quoting *Miller*, 515 U.S. at 928 (O'Connor, J., concurring)). It is not enough to show that the legislative body was "aware of racial demographics." *Miller*, 515 U.S. at 916. The constitutional wrong occurs only when race is the "dominant and controlling rationale," *id.* at 913—when "race played a *predominant* role comparatively speaking." *Easley*, 532 U.S. at 253 (emphasis in original).

A legislature *may* therefore constitutionally consider race in redistricting—and may even give racial and race-neutral considerations "equal weight." *Allen v. Milligan*, 599 U.S. 1, 31 (2023). It follows that race may constitutionally affect—or impact—a district's configuration. A plaintiff must do much more than prove that race was one motivation, *Easley*, 532 U.S. at 241, or "a mere factor in the State's redistricting calculus," *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 19 n.6 (2024); *accord* ECF No. 88 at 11 ("Legislatures can—and routinely do—consider race to comply with state and federal law.").

Thus, without more, even evidence that a legislature intentionally created a majority-minority district does not establish racial predominance. In *Bush v. Vera*, 517 U.S. 952 (1996) (plurality opinion), in a challenge to three congressional districts, the State conceded that one of its "goals . . . was to produce majority-minority districts," *id.* at 959, but the Court explained that strict scrutiny does not apply "to all cases of intentional creation of majority-minority districts," *id.* at 958. In a "mixed motive" case, a "careful review is . . . necessary" to determine whether race predominated. *Id.* at 959. While the Court found racial predominance in *Vera*, it emphasized that Texas' decision to create majority-minority districts was only "one of several essential ingredients" and was neither "objectionable in and of itself" nor "independently sufficient to require strict scrutiny." *Id.* at 962.

In *Vera*, the Court cited *DeWitt v. Wilson*, 856 F. Supp. 1409 (E.D. Cal. 1994), for the proposition that the intentional creation of a majority-minority district does not, standing alone, establish racial predominance. 517 U.S. at 958. In *DeWitt*, the plaintiffs claimed that districts drawn by special masters were racial gerrymanders. The court concluded that, although the special masters drew districts to comply with the federal Voting Rights Act (the "VRA"), they engaged in a "judicious and proper balancing" of multiple redistricting criteria, "carefully analyzed and reconciled" the requirements of the VRA and the State Constitution, and "showed depth and insight in considering race as a component of traditional redistricting principles." 856 F. Supp. at 1413–15. Because the special masters balanced race with race-neutral criteria, "strict scrutiny [was] not required." *Id.* at 1415; *accord Robertson v. Bartels*, 148 F. Supp. 2d 443, 457–58 (D.N.J. 2001), *aff'd*, 534 U.S. 1110 (2002) (finding no predominance where districts were "drawn utilizing traditional redistricting principles while seeking to comply with the Voting Rights Act").

More recently, in *Allen*, the plaintiffs alleged that section 2 of the VRA required Alabama to create a second majority-black congressional district. 599 U.S. at 19–20. When the plaintiffs' expert produced alternative maps to show "that an additional majority-minority district could [have been]

drawn," *id.* at 33, Alabama argued that the expert's maps were racial gerrymanders, *id.* at 30. The expert testified, however, that, "while it was necessary for him to consider race, he also took several other factors into account" and gave all factors "equal weight." *Id.* at 31 (emphasis omitted). On that basis, the Court held that, even though the expert's maps were intentionally drawn to create a second majority-black district and to comply with the VRA, "race did not predominate." *Id.* at 32.

While a bizarre shape is not essential to a finding of racial predominance, a finding that race predominated in a district that respects race-neutral principles is rare—and very much the exception. "In general, legislatures that engage in impermissible race-based redistricting will find it necessary to depart from traditional principles in order to do so." *Bethune-Hill*, 580 U.S. at 190. Thus, where no party has asserted that partisanship motivated the drawing of the district, a "court can make real headway" in assessing racial predominance "by exploring the challenged district's conformity to traditional districting principles," *Cooper v. Harris*, 581 U.S. 285, 308 (2017), and a district's consistency with race-neutral principles may "defeat a claim that a district has been gerrymandered on racial lines," *Shaw v. Reno*, 509 U.S. 630, 647 (1993).

Tellingly, the Supreme Court has never "affirmed a predominance finding, or remanded a case for a determination of predominance, without evidence that some district lines deviated from traditional principles." *Bethune-Hill*, 580 U.S. at 190. And when a plaintiff challenges a district that adheres to race-neutral principles, its burden becomes even heavier. To establish that race predominated in such a district, a plaintiff must offer "direct evidence of the legislative purpose and intent or other *compelling* circumstantial evidence." *Id.* at 191 (emphasis added).

At the same time, a bizarre shape is not sufficient to prove racial predominance. *Vera*, 517 U.S. at 962 (plurality opinion). Compliance with traditional race-neutral districting principles is not "constitutionally required." *Shaw*, 509 U.S. at 647. What matters is not whether race-neutral districting principles were "coincidentally neglected," *Quilter v. Voinovich*, 981 F Supp. 1032, 1049 (N.D. Ohio

1997) (three-judge court), but whether they were "subordinated to race," *Vera*, 517 U.S. at 962

(plurality opinion) (emphasis omitted); *accord Vera*, 517 U.S. at 993 (O'Connor, J., concurring) ("Only if

traditional districting criteria are neglected *and* that neglect is predominantly due to the misuse of race

does strict scrutiny apply." (emphasis in original)); *Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of

Comm'rs*, 996 F. Supp. 2d 1353, 1365 (N.D. Ga. 2014) (finding no racial predominance even though

the challenged district was intentionally drawn as a majority-minority district and its shape was

"somewhat irregular").

At the predominance stage of the analysis, it makes no difference *why* the legislature considered

race. *Navajo Nation v. San Juan Cnty.*, 929 F.3d 1270, 1288 (10th Cir. 2019). The question is whether

race predominated—not whether the legislature believed it was legally required to consider race or

whether that belief was correct.

**District-by-District Analysis.** A racial-gerrymandering claim challenges a district as a discrete

unit—not the redistricting plan as a whole, *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 262–63

(2015), or only a portion of a district, *Bethune-Hill*, 580 U.S. at 191–92. It requires courts to consider the

"districtwide context" and to conduct a "holistic analysis" of the district as the "basic unit of analysis."

*Id.* at 192.

While a "particular part of a district" might evidence a "legislature's race-based decisionmaking

. . . in a notable way," and therefore have relevance, "the ultimate object of the inquiry . . . is the

legislature's predominant motive for the design of the district as a whole." *Id.* Thus, courts "should not

divorce any portion of the lines . . . from the rest of the district." *Id.* "Concentrating on particular

portions in isolation may obscure the significance of relevant districtwide evidence . . . ." *Id.*

For the same reason, a finding that one district was racially gerrymandered does not invalidate

other districts—even adjacent districts—that were merely impacted by the unconstitutional district.

*Sinkfield v. Kelley*, 531 U.S. 28, 30–31 (2000); *United States v. Hays*, 515 U.S. 737, 745 (1995); *Nord Hodges v. Albritton*, 774 F. Supp. 3d 1340, 1348 (M.D. Fla. 2025) (three-judge court).

**The Challenger's Heavy Burden.** In proving predominance, a plaintiff must overcome a "presumption that the legislature acted in good faith." *Alexander*, 602 U.S. at 6; *accord Abbott v. Perez*, 585 U.S. 579, 603 (2018). That burden is heavy. After all, a redistricting plan that places voters of one race into one district "may reflect wholly legitimate purposes." *Shaw*, 509 U.S. at 646. Given the "sensitive nature of redistricting" and the delicate nature of any inquiry into legislative motives, courts exercise "extraordinary caution" in resolving claims of racial gerrymandering. *Miller*, 515 U.S. at 916.

The presumption of good faith directs courts, "when confronted with evidence that could plausibly support multiple conclusions," to "draw the inference that cuts in the legislature's favor." *Alexander*, 602 U.S. at 10. Recently, the Supreme Court stayed an injunction prohibiting enforcement of new congressional districts in part because the district court construed "ambiguous direct and circumstantial evidence against the legislature" and thus "failed to honor the presumption of legislative good faith." *Abbott v. League of United Latin Am. Citizens*, 607 U.S. ----, No. 25A608, 2025 WL 3484863, at *1 (U.S. Dec. 4, 2025).

Federal courts are mindful that their review of redistricting plans "represents a serious intrusion on the most vital of local functions." *Miller*, 515 U.S. at 915. After all, redistricting is a "most difficult subject"—one that presents a "complex interplay of forces" and demands "political judgment" to "balance competing interests." *Id.* at 915–16. States must traverse a "legal obstacle course," *Abbott*, 585 U.S. at 587, and apply "delicately balanced requirements regarding the consideration of race," *id.* at 585–86.

The presumption of legislative good faith shows "due respect for the judgment of state legislators," who, like judges, are "bound by an oath to follow the Constitution." *Alexander*, 602 U.S. at 11. It urges restraint before a federal court saddles a coordinate branch of government with the

"offensive and demeaning" imputation of race-based stereotyping. *Id.* And of particular relevance here, it protects courts from becoming "weapons of political warfare" that plaintiffs wield to secure "victories that eluded them in the political arena." *Id.* (internal marks omitted).

This presumption is entitled to more than lipservice. *Id.* at 7; *Abbott*, 585 U.S. at 610–11. A plaintiff must establish that, in balancing the "myriad considerations" relevant to redistricting, and in making "difficult, contestable choices" throughout the map, *Allen*, 599 U.S. at 35, the State acted in bad faith and engaged in intentional discrimination, *Alexander*, 602 U.S. at 20–21; *Abbott*, 585 U.S. at 607, 610–12.

**Alternative Maps.** The purpose of an alternative map is to demonstrate that the legislature could have achieved "greater racial balance" without a sacrifice of its race-neutral objectives. ECF No. 148 at 7 (quoting *Alexander*, 602 U.S. at 34–35); *accord Cooper*, 581 U.S. at 285 ("One, often highly persuasive way to disprove a State's contention that politics drove a district's lines is to show that the legislature had the capacity to accomplish all its partisan goals without moving so many members of a minority group into the district."); *Easley*, 532 U.S. at 256 (rejecting challengers' reliance on alternative maps that "would not have improved racial balance significantly"). As one court recently explained:

> Alternative maps configured using race-neutral principles can perform an important function in a racial gerrymandering case. "By showing that a rational legislature, driven only by its professed mapmaking criteria, could have produced a different map with 'greater racial balance,' an alternative map can perform the critical task of distinguishing between racial and [race-neutral] motivations when race and [race-neutral criteria] are closely entwined."

*Nord Hodges*, 796 F. Supp. 3d at 1116 (quoting *Alexander*, 602 U.S. at 34) (brackets in *Nord Hodges*)).

Thus, in *Alexander*, the Court concluded that the district court should have drawn an adverse inference against challengers who failed to produce an alternative map showing that the legislature could have achieved "significantly greater racial balance" consistent with "its legitimate political objectives." 602 U.S. at 34.

This focus on racial imbalance makes sense. The essence of a racial-gerrymandering claim "is that the State has used race as a basis for separating voters into districts." *Miller*, 515 U.S. at 911. "Just as the State may not, absent extraordinary justification, segregate citizens on the basis of race in its public parks, . . . it may not separate its citizens into different voting districts on the basis of race." *Id.* at 912. Equal protection prohibits the "race-based sorting of voters," *Cooper*, 581 U.S. at 291, which "bears an uncomfortable resemblance to political apartheid," *Shaw*, 509 U.S. at 647.

*Cooper* illustrates the Supreme Court's emphasis on the racial imbalance that results when voters of different races are assigned to different districts. In *Cooper*, race predominated because the legislature, to meet a racial target, "produced boundaries amplifying divisions between blacks and whites." 581 U.S. at 299. The legislature decided that "African-Americans should make up no less than a majority of the voting-age population." *Id.* The Court noted the race-based contortions and racial imbalance that were necessary to achieve that threshold: the legislature transferred "tens of thousands of additional African-American voters" to the challenged district, which had a "direct and significant impact" on the district's shape and resulted in "stark racial borders." *Id.* The district's black population was two to three times larger than the black population of the excluded portions of the same counties. *Id.*

Similarly, in *Bethune-Hill v. Virginia State Board of Elections*, 326 F. Supp. 3d 128 (E.D. Va. 2018), the court relied on evidence that geographical subdivisions "were split exactly along racial lines" and that "most significant concentrations of black voters were swept into one of the challenged districts." *Id.* at 146–47. The legislature drew a narrow "bridge" to bypass predominantly white communities and unite "geographically distinct clusters of black voters." *Id.* One of the challenged districts included a "lengthy, narrow appendage" through "white neighborhoods" to reach a corridor of significant black population, "separating white and black voters with remarkable precision." *Id.* at 163–64 (internal marks omitted). Another resembled a sideways "S" and contained a "bridge" to bring in "the smallest

possible number of whites" while extending to a large concentration of black voters. *Id.* at 167. The legislature consistently excluded concentrations of white voters from the challenged districts. *Id.* at 148–49.

And in *Vera*, the Court explained that one district's "corridors, wings, or fingers . . . reach out to enclose black voters, while excluding nearby Hispanic residents" and "separating Hispanic voters from African-American voters on a block-by-block basis." 517 U.S. at 973, 975 (plurality opinion) (quoting Richard H. Pildes & Richard G. Niemi, *Expressive Harms, "Bizarre Districts," and Voting Rights: Evaluating Election-District Appearances After* Shaw v. Reno, 92 MICH. L. REV. 483, 556 (1993)). Another district contained "narrowly and bizarrely shaped tentacles," *id.* at 965 (plurality opinion), that deliberately excluded "white neighborhoods" and collected dispersed minority communities, *id.* (plurality opinion) (quoting *Vera v. Richards*, 861 F. Supp. 1304, 1337–38 (S.D. Tex. 1994)). It is such "effort[s] to segregate voters into separate voting districts because of their race" that threaten to "balkanize" voters "into competing racial factions." *Shaw*, 509 U.S. at 657–58.

The purpose of an alternative map is not to show that the legislature could have drawn more aesthetic or eye-pleasing districts. For example, the Supreme Court has rejected as "impossibly stringent" one court's view that a race-predominant district must have "the least possible amount of irregularity in shape" to survive strict scrutiny. *Vera*, 517 U.S. at 977 (plurality opinion). A reasonably shaped district need not "defeat rival districts designed by plaintiffs' experts in endless beauty contests." *Id.* (internal marks omitted). And in *Gaffney v. Cummings*, 412 U.S. 735 (1973), the Court explained that a district map can satisfy the equal-population mandate even if a litigant can produce a "marginally 'better'" map with smaller population deviations. *Id.* at 750–51. Otherwise, a map would be invalid whenever a "resourceful mind hits upon a . . . better" one. *Id.* at 750.

For that reason, a plaintiff's production of alternative maps with somewhat "better" race-neutral metrics does not prove racial predominance. It is *always* possible to improve on any

redistricting map. Courts therefore have long rejected the argument that a legislature must draw the "best" plan—or that a plan is legally infirm if a challenger posits a better one. Because district maps are "integrated bundles of compromises, deals, and principles," *Sanchez v. State of Colorado*, 97 F.3d 1303, 1329 (10th Cir. 1996), there is "no conceivable map that would not be subject to nitpicking on some basis," *League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 177 (W.D. Tex. 2022). A court's duty is "not to select the best plan, but rather to decide whether the one adopted by the legislature is valid." *In re Senate Joint Resol. of Legis. Apportionment 1176 (In re SJR 1176)*, 83 So. 3d 597, 608 (Fla. 2012).

In *Alabama Legislative Black Caucus v. Alabama*, 231 F. Supp. 3d 1026 (M.D. Ala. 2017) (three-judge court), in a decision authored by now-Chief Judge Pryor, the court repeatedly rejected arguments that "better" maps prepared by challengers proved racial predominance. The plaintiffs' maps "established that District 99 could be drawn more compactly," but the court concluded that "these plans do not prove that race predominated in the enacted district." *Id.* at 1333. Similarly, the court noted that the challengers' maps "improve on the enacted districts" by reducing the number of counties split by District 24 from six to two, but concluded that the difference is "not suspicious by itself" and that the enacted configuration "was sensible." *Id.* at 1113. The challenged districts' imperfections did not prove that the legislature subordinated race-neutral principles to race: "The shapes of the districts are not so bizarre as to give rise to an inference of gerrymandering." *Id.* at 1068; *see also NAACP v. Snyder*, 879 F. Supp. 2d 662, 679 (E.D. Mich. 2012) (three-judge court) (rejecting an equal-protection claim of discriminatory intent because, even if the plaintiffs presented a better plan, the enacted plan did not disregard traditional race-neutral districting principles).

Federal litigation is not an art competition between the Legislature, which is constitutionally charged with redistricting, *see* U.S. Const. art. I, § 4, cl. 1; Fla. Const. art. III, § 16, and adversary interests. The fact that an expert, with the benefit of leisure and hindsight, can draw a similar or even a

slightly "better" map does not move the needle when the expert's map fails to demonstrate that the legislature could have achieved significantly greater racial balance consistent with its race-neutral objectives.

**Florida's Redistricting Standards.** Article III, sections 20 and 21 of the Florida Constitution set forth Florida's redistricting standards. These two sections govern congressional and state-legislative redistricting, respectively. The standards in the two sections are identical. *League of Women Voters of Fla. v. Fla. House of Representatives*, 132 So. 3d 135, 140 (Fla. 2013).[1]

Both sections set forth two tiers of standards. The first tier—often called "Tier One"— prohibits intentional political favoritism, protects racial and language minorities, and requires that districts be contiguous. Fla. Const. art. III, §§ 20(a), 21(a). The second tier—often called "Tier Two"— addresses the "population, shape, and boundaries" of districts. *In re SJR 100*, 334 So. 3d at 1286. It requires that districts be compact and as nearly equal in population as practicable and, where feasible, utilize existing political and geographical boundaries. Fla. Const. art. III, §§ 20(b), 21(b). Florida's tier-two standards are "meant to restrict the Legislature's discretion in drawing irregularly shaped districts." *In re SJR 1176*, 83 So. 3d at 618.

Only when standards in different tiers conflict do tier-one standards prevail over tier-two standards. Fla. Const. art. III, §§ 20(b), 21(b). Standards within the same tier have no priority over each other. *Id.* §§ 20(c), 21(c). Rather, "the Legislature retains the discretion to balance those standards." *In re SJR 100*, 334 So. 3d at 1286.

Compactness is a "geographical concept" evaluated, first and foremost, "by looking at the shape of a district." *In re SJR 1176*, 83 So. 3d at 634 (internal marks omitted). "The goal is to ensure that districts are logically drawn . . . ." *Id.* at 636. A compact district "should not have an unusual

---

[1] Of course, "federal courts are bound by a state supreme court's interpretation of state law." *United States v. Hill*, 799 F.3d 1318, 1322 (11th Cir. 2015).

shape, a bizarre design, or an unnecessary appendage." *Id.* at 634; *accord id.* at 638 ("In a compactness analysis, we are reviewing the general shape of a district . . . .").

While compactness calls for a visual examination, quantitative measures can also "assist" courts in assessing compactness. *Id.* at 635. Three common measures of compactness are the Reock, Convex Hull, and Polsby-Popper measures. *League of Women Voters of Fla. v. Detzner*, 179 So. 3d 258, 283 nn.6–8 (Fla. 2015); J. Ex. 47 at 56–58. Each generates a score between 0 and 1 that represents the ratio between the district's area and the area of another geometric shape. *League of Women Voters*, 179 So. 3d at 283 nn.6–8.

The Reock score compares the district's area to the area of the smallest circle that can circumscribe the district. *Id.* at 283 n.6. A Reock score of 0.45 means, for example, that the district's area occupies 45 percent of the circle's area. In theory, the more nearly a district's shape resembles a circle, the higher its Reock score will be. Similarly, the Convex Hull score compares the district's area to the area of a figure created by drawing straight lines around the district (imagine a taut rubber band around the district). *Id.* at 283 n.7. And the Polsby-Popper score compares the district's area to the area of a circle with a perimeter of the same length as the district's perimeter. *Id.* at 283 n.8.

The Constitution also requires districts to "utilize existing political and geographical boundaries," but only "where feasible." Fla. Const. art. III, §§ 20(b), 21(b). Political boundaries are county and municipal boundaries, *In re SJR 100*, 334 So. 3d at 1288, while geographical boundaries are "rivers, railways, interstates, and state roads" and other "easily ascertainable and commonly understood" boundaries, *In re SJR 1176*, 83 So. 3d at 638.

The Constitution does not require districts to be as compact as possible—only that they be compact. *Id.* at 635. A decision to keep cities and counties whole or to follow rivers or municipal boundaries, some of which are notoriously irregular, can affect a district's compactness, as can Florida's unorthodox shape and the interplay between residential patterns and the equal-population

mandate. *Id.* at 635–36. "[T]he Legislature is tasked with balancing the tier-two standards together in order to strike a constitutional result . . . ." *Id.* at 639.

One of the tier-one provisions that protects racial and language minorities is the so-called Non-Diminishment Clause. That provision states that "districts shall not be drawn . . . to diminish [the] ability [of racial or language minorities] to elect representatives of their choice." Fla. Const. art. III, §§ 20(a), 21(a).

The Non-Diminishment Clause applies to existing districts that have historically "performed" for minority voters—*i.e.*, districts in which a minority group has been able to elect representatives of its choice. *Black Voters Matter*, 415 So. 3d at 186–87, 193. In those districts, it prohibits "retrogression"— or a diminishment in the minority group's voting ability—when districts are redrawn. *Id.* In other words, "the Legislature cannot eliminate majority-minority districts or weaken other historically performing minority districts where doing so would actually diminish a minority group's ability to elect its preferred candidates." *In re SJR 100*, 334 So. 3d at 1286 (quoting *In re SJR 1176*, 83 So. 3d at 625).

To comply with the Non-Diminishment Clause, "one must compare the new plan to the plan that preceded it." *Black Voters Matter*, 415 So. 3d at 186. The preceding plan is called the "benchmark plan." *Id.* First, the Legislature must "identify districts in the benchmark plan where [minorities] were able to elect representatives of their choice—call them 'ability-to-elect districts.'" *Id.* Then, in drawing new districts, the Legislature must ensure that, "relative to the benchmark," the new districts do not diminish that ability. *Id.*

A minority group is able to elect its preferred candidates—and the Non-Diminishment Clause applies—if three conditions are satisfied. The minority group must:

1.  Show "some level" of voting cohesion;

2.  Control the relevant primary election; and

3.  Control the general election.

*Id.* at 187. Stated differently, to identify districts protected from diminishment, the Florida Supreme Court requires consideration of "three variables: whether the minority voters encompassed within a benchmark district vote cohesively; whether the minority candidate of choice is likely to prevail in the relevant contested party primary; and whether that candidate is likely to prevail in the general election. *Id.* at 193; *accord League of Women Voters*, 179 So. 3d at 287 n.11 (noting the three "prongs" of "our test for retrogression"). The requirement of some level of voting cohesion ensures that the district's minority voters are not evenly divided between candidates, but rather have a discernible preference and therefore have representatives of "their choice," as the constitutional text requires. *Black Voters Matter*, 415 So. 3d at 186 (quoting Fla. Const. art. III, §§ 20(a), 21(a)).

To determine whether these three conditions are satisfied—first in the benchmark district and then in the newly drawn district—the Florida Supreme Court requires the Legislature to perform a district-specific "functional analysis" of voting behavior within the district. *Id.* at 186–87 (explaining that a functional analysis determines whether the "minority group has, or can be expected to have, an ability to elect representatives of their choice in a district"). A functional analysis is a holistic review not only of census population data, but also of election results and voter turnout and registration data. *Id.*; *accord In re SJR 1176*, 83 So. 3d at 625–27, 666–67 (illustrating a functional analysis).

**Strict Scrutiny.** A race-predominant district must satisfy strict scrutiny. *Miller*, 515 U.S. at 920. "To satisfy strict scrutiny, the State must demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest." *Id.*

The Supreme Court has long assumed that a State's compliance with the VRA constitutes a compelling interest that justifies racial predominance. *Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398, 401 (2022) ("We have assumed that complying with the VRA is a compelling interest."). Here, Plaintiffs allege that compliance with the Non-Diminishment Clause also constitutes a compelling

interest. *See* ECF No. 58 ¶¶ 191, 221; *contra Black Voters Matter*, 415 So. 3d at 196 (holding that compliance with the Non-Diminishment Clause is not a compelling interest).

A district that is "necessary" to achieve a compelling interest is "narrowly tailored." *Alexander*, 602 U.S. at 11; *accord Shaw*, 509 U.S. at 655 ("A reapportionment plan would not be narrowly tailored to the goal of avoiding retrogression if the State went beyond what was reasonably necessary to avoid retrogression.").

In the context of the VRA, however, the Supreme Court has explained that a State need not always demonstrate "that its action was 'actually . . . necessary' to avoid a statutory violation." *Bethune-Hill*, 580 U.S. at 194 (quoting *Ala. Legis. Black Caucus*, 575 U.S. at 278). Even "if a court does not find that the actions were necessary," a State still satisfies strict scrutiny if the legislature had "good reasons to believe" that they were, *id.* (quoting *Ala. Legis. Black Caucus*, 575 U.S. at 278) (emphasis omitted), and performed a "pre-enactment analysis with justifiable conclusions," *Abbott*, 585 U.S. at 621.

The relaxed "good reasons" standard "gives States 'breathing room' to adopt reasonable compliance measures that may prove, in perfect hindsight, not to have been needed." *Cooper*, 581 U.S. at 301 (quoting *Bethune-Hill*, 580 U.S. at 196). It affords States some leeway "between the competing hazards of liability" under the Equal Protection Clause, which limits the consideration of race, and legal protections for minority voters, which mandate the consideration of race. *Bethune-Hill*, 580 U.S. at 196 (quoting *Vera*, 517 U.S. at 977 (plurality opinion)); *see also Abbott*, 585 U.S. at 586 (explaining that the Equal Protection Clause and the VRA pull in opposite directions); *Ala. Legis. Black Caucus*, 575 U.S. at 278 (explaining that the "good reasons" standard makes allowances for the complexities associated with the VRA and "controverted claims about voting behavior"); *Vera*, 517 U.S. at 978 (plurality opinion) (explaining that, in recognition of "each State's sovereign interest in implementing its redistricting," States retain certain "flexibility" and that "deference is due to their reasonable fears of, and to their reasonable efforts to avoid," liability under the VRA).

*Bethune-Hill* illustrates the application of these principles. Because the challengers did not dispute that compliance with the VRA was a compelling interest, the Court assumed, without deciding, that it was. 580 U.S. at 193. The Court then concluded that the State satisfied strict scrutiny. *Id.* at 194–95. It explained that the legislature had performed the required "functional analysis" and had relied on the functional analysis to conclude that the VRA required District 75's voting-age population to be at least 55-percent black. *Id.* at 194. Importantly, the Court rejected the challengers' argument that the functional analysis "was not memorialized in writing," *id.* at 195, explaining that "we do not . . . require States engaged in redistricting to compile a comprehensive administrative record," *id.* (quoting *Vera*, 517 U.S. at 966 (plurality opinion)); *accord Ala. Legis. Black Caucus*, 231 F. Supp. 3d at 1243 ("But the Supreme Court has never required that a state rely on studies to justify the drafting of a voting district in which race predominated."). The Court therefore affirmed the district court's conclusion "that the State had sufficient grounds to determine that the race-based calculus it employed in District 75 was necessary to avoid violating" the VRA. *Bethune-Hill*, 580 U.S. at 194.

## ARGUMENT

### I.     RACE DID NOT PREDOMINATE IN THE DESIGN OF THE CHALLENGED STATE HOUSE DISTRICTS.

Race was not the predominant factor in the design of the challenged State House districts. Mr. Poreda began with a blank map, employed no numerical racial target, did not draw predominantly minority districts first, and sought to comply with *all* redistricting standards in the Florida Constitution. In fact, in the drawing of the challenged State House districts, Mr. Poreda did not even review racial data or otherwise consider race until districts were drawn. Only then did he conduct the required functional analysis to assess compliance with the Non-Diminishment Clause.

Because traditional race-neutral districting principles did not take a back seat to race, this Court should enter judgment for the House as to House Districts 115, 118, and 119.

**Consideration of Race.** Mr. Poreda understood that the Non-Diminishment Clause protected the ability of Hispanic voters in the challenged State House districts to elect candidates of their choice. Still, he did not consider race while drawing those districts and instead focused on Florida's race-neutral standards and drew the challenged State House districts without attention to race.

Only when he completed a district and found a configuration that he believed appropriately balanced all race-neutral considerations did Mr. Poreda turn to the Non-Diminishment Clause and perform the required functional analysis to confirm that the district did not diminish the voting ability of Hispanic voters.

When drawing the challenged State House districts, therefore, Mr. Poreda did not display any racial data or color-coding on his computer monitor to identify where Hispanic voters were concentrated. Nor did he draw those districts with any predetermination to achieve a specific Hispanic voting-age population.

Staff's approach to the challenged districts reflects their approach more generally to districts protected by the Non-Diminishment Clause. In drawing districts, House committee staff sought whenever possible to implement all state-law standards, without elevating some and subordinating others. As a general rule, in drawing districts protected by the Non-Diminishment Clause, staff sought to comply with race-neutral standards to the maximum extent possible. Staff often found that all standards could be implemented and that compliance with the Non-Diminishment Clause did not compromise race-neutral principles.

**External Constraints.** Several considerations external to the challenged State House districts influenced their configuration.

**A.** Mr. Poreda sought to minimize the number of State House districts in Southeast Florida that cross county boundaries. Thus, only one district in the enacted map (District 104) includes population from both Broward and Miami-Dade Counties. J. Ex. 1 at 17.[2] This decision to maintain the county boundary became an important driver of the configuration of districts in Miami-Dade County.

**B.** The Non-Diminishment Clause's protection of black voters in Miami-Dade County heavily impacted the surrounding districts. In Miami-Dade County, these districts (Districts 107, 108, 109, and 117, *see* D. Ex. 201 at RFAs 77–80) were more difficult to draw than the majority-Hispanic districts. When drawing protected districts with smaller and more geographically confined minority populations, map-drawers had less flexibility and usually paid closer attention to race than they did when drawing the challenged State House districts. The districts that perform for black voters drive the overall configuration of districts in Miami-Dade County much more than do the districts that are majority Hispanic.

The Non-Diminishment Clause also protected a language minority group—Haitian-Creole speakers—in newly enacted District 108. Mr. Poreda met extensively with state representatives elected in the vicinity of District 108 to discuss the configurations of Districts 107, 108, and 109. With their help, he found a configuration that he believed protected the voting ability of language-minority voters. These districts also became a key driver of the configuration of other districts within the county.

**C.** With the county boundary maintained and Districts 107, 108, and 109 in place, one district was needed to fill the coastal areas south of the county boundary and east of Districts 107, 108, and

---

[2] In this brief, "J. Ex." refers to joint exhibits, "D. Ex." refers to Defendants' exhibits, and "P. Ex." refers to Plaintiffs' exhibits.

109. Thus, District 106 moves south from the county boundary and ends where it achieves the ideal

district population: at the southern boundary of the City of Miami Beach. D. Ex. 4.[3]

**D.** Mr. Poreda's objective in drawing the district south of District 106—District 113—was to

anchor the district within the City of Miami. One way the House has implemented the tier-two

mandate to utilize political and geographical boundaries where feasible is to draw districts wholly

within counties and, to the extent possible, wholly within large, populous municipalities such as the

City of Miami. Given the City of Miami's large population, House committee staff sought to establish

a district located predominantly, if not exclusively, within the City of Miami.

District 113 became that Miami-based district: 91.9 percent of the district's population

(167,896 of 182,742 people) resides in the City of Miami. J. Ex. 1 at 3, 19; D. Ex. 204 at RFA 38. The

only part of the district that is outside the city is the island of Key Biscayne, which could not neatly

have been added to any other district. D. Ex. 9. District 113 therefore fulfilled the non-racial priority to

draw a district that represents the City of Miami.

**E.** To the west of District 113, Mr. Poreda drew District 114 with similar objectives. District

114 encompasses all of Coral Gables and thus keeps Coral Gables whole. D. Ex. 12. Coral Gables is a

large municipality with a north-south orientation. Enclosing Coral Gables wholly within District 114

required the district to assume a similar north-south orientation. *See In re SJR 1176*, 83 So. 3d at 635–36

(explaining that a desire to keep municipalities wholly intact in a district may decrease the district's

compactness but "justify the shape of the district").

Mr. Poreda also included the Cities of West Miami and South Miami wholly within District

114. D. Ex. 12. Situated immediately to the west of Coral Gables, these cities are much smaller than

---

[3] The 2020 decennial census revealed that Florida's population had grown to 21,538,187 people. ECF No. 172 at 3 ¶ 6. The new ideal (or mean) population for each of Florida's 120 State House district is 179,485 people, while the ideal population for each of Florida's 28 congressional districts is 769,221 people. *Id.*

Coral Gables. Mr. Poreda also followed the Dolphin Expressway along the northern boundary of District 114. D. Ex. 11. He considered the Dolphin Expressway and the nearby Tamiami Trail to be ideal district boundaries. Each offered a familiar and convenient east-west boundary centrally located in Miami-Dade County's populated area. Four State House districts (Districts 111, 112, 114, and 116) border the Dolphin Expressway, while seven State House districts border the Tamiami Trail (Districts 111, 112, 113, 114, 115, 118, and 119). D. Ex. 20. In all, eight districts emanate either south or north from one or both of these east-west thoroughfares.

These background constraints—adherence to the county boundary; the carefully crafted configurations of Districts 107, 108, and 109; the geographical imperative of creating a coastal district; and the drawing of a Miami district and a Coral Gables district—set the table for the drawing of the challenged State House districts.

**District 115.** As his starting point, Mr. Poreda drew District 115 to encompass three vertically stacked municipalities: Pinecrest, Palmetto Bay, and Cutler Bay. D. Ex. 15.[4] These municipalities dictate much of District 115's shape and orientation. Once Mr. Poreda realized early in the map-drawing process that it was possible to keep Pinecrest, Palmetto Bay, and Cutler Bay whole in one district, it became a goal to keep them together.

To the east, District 115 is shaped by Biscayne Bay and the municipal boundaries of Coral Gables, South Miami, and West Miami, which are wholly included in District 114. D. Ex. 15. These municipalities press like a wall against District 115's eastern boundary. Together, Districts 114 and 115 keep six municipalities whole. D. Ex. 12; D. Ex. 15.

---

[4] Defendants' Exhibits 1 through 30 are maps of enacted districts. **Exhibit A** to this brief sets forth Defendants' Exhibits 2, 3, 14 through 19, and 21 through 29.

To the west, District 115 is shaped by District 117, which maintains the voting ability of black voters between Richmond Heights and Florida City who, despite their relatively small numbers, have historically been able to elect representatives of their choice. D. Ex. 201 at RFA 80; J1 at 4.

Mr. Poreda did not consider race—or make any adjustments on account of race—in drawing the central and southern portions of District 115. The configuration of the northern part of District 115 ebbed and flowed during the drafting process for race-neutral reasons, but, once the district was drawn, staff also performed a functional analysis and found that compliance with the Non-Diminishment standard required the district to go slightly further north (in the enacted map, to the Tamiami Trail).

Still, in drawing the northern section of the district, staff balanced racial and race-neutral considerations and adhered to race-neutral districting principles. The northern section of District 115 consists of straight lines and right angles. D. Ex. 15. It contains no fingers, tails, or other visually bizarre features. It also follows major roadways: its northern boundary is the Tamiami Trail, which serves as a boundary for seven State House districts, while the eastern and western boundaries of District 115's northern portion consist of four-lane roads with medians: to the east, 67th Avenue, and to the west, Galloway Road, which is also known as 87th Avenue or State Road 973. D. Ex. 14; D. Ex. 204 at RFA 22. As a map-drawer, Mr. Poreda likes to use the same boundary for as many districts as possible. District 115 does so at its northwest corner, where three districts meet at a point, and the district boundaries form a geometric "T" shape.

When possible, committee staff also sought to improve upon the tier-two metrics of the benchmark districts. In District 115, staff accomplished that objective. The benchmark district (shown below) extended much farther north than the Tamiami Trail (U.S. Highway 41), which is the northern boundary of current District 115:



J. Ex. 2 at 1.

Throughout the map-drawing process, staff adjusted districts for race-neutral reasons as well. For example, staff made adjustments to the shared boundary between Districts 115 and 116 at the southern end of District 116 to improve the visual appearance of both districts.

District 115 utilizes political and geographical boundaries along 92 percent of its perimeter. J. Ex. 1 at 27.[5] In addition to the roadways mentioned above, District 115's boundaries follow major roadways such as Kendall Drive (State Road 94), the Don Shula Expressway, and U.S. Highway 1. D. Ex. 14; D. Ex. 204 at RFA 22. Its boundaries also follow the boundaries of seven municipalities (Miami, West Miami, South Miami, Coral Gables, Pinecrest, Palmetto Bay, and Cutler Bay) and the

---

[5] This figure is derived from the column entitled "Non Geo/Pol Boundaries(%)," which indicates that District 115 does *not* follow political or geographical boundaries along 8 percent of its perimeter. These boundary calculations utilize the United States Census Bureau's geographic information and its designation of primary and secondary roads, railways, and significant water bodies. J. Ex. 47 at 53–54.

Cutler Drain Canal. D. Ex. 16. Its southern and southeastern boundaries consist of the Black Creek

Canal and Biscayne Bay. *Id.* District 115 does not split any municipalities. *Id.*; D. Ex. 204 at RFA 24.

Mr. Poreda will testify that race was not the predominant motive behind the design of the

district as a whole, and that, to the extent race affected a portion of District 115's boundaries, it did

not predominate over, but was considered in harmony with race-neutral districting principles after the

district was initially drawn.

Presuming the Legislature's good faith—and drawing all inferences in the Legislature's favor

where the evidence could plausibly support different inferences—Plaintiffs cannot carry their burden

to demonstrate that racial considerations received more than "equal weight" in the design of District

115 as a whole. *Allen*, 599 U.S. at 31.

**Districts 118 and 119.** Districts 118 and 119 divide a rectangular area vertically into simple,

symmetrical, parallel shapes. J. Ex. 1 at 1. These districts follow major roadways. The Tamiami Trail

(U.S. Highway 41) forms the northern boundary of both districts. D. Ex. 17; D. Ex. 204 at RFAs 28 &

30. Krome Avenue (State Road 997) is the western boundary of District 119. D. Ex. 17. The Florida

Turnpike comprises much of District 118's eastern boundary. *Id.* District 117, a district that maintains

the voting ability of black voters between Richmond Heights and Florida City, determines most of the

remainder of District 118's eastern boundary. D. Ex. 19.

The boundary between Districts 118 and 119 tracks recognizable features such as the CSX rail

line, Kendall Drive (State Road 94), and two major, north-south thoroughfares: Southwest 137th

Avenue, the relevant part of which has six lanes and a median, and Southwest 147th Avenue, a four-

lane road with a median. D. Ex. 17; D. Ex. 204 at RFA 28. A portion of Southwest 137th Avenue is a

state road (State Road 825).[6] Around its midpoint, the boundary between Districts 118 and 119 shifts

---

[6] This Court may take judicial notice of the location of state roads, as indicated on the Florida
Department of Transportation's GIS Open Data Hub, located at https://gis-

slightly to the east in part to avoid the Kendall-Tamiami Executive Airport, which is kept whole within District 119. Districts 118 and 119 consist entirely of unincorporated areas and therefore neither divide nor contain any municipalities. D. Ex. 18; D. Ex. 204 at RFAs 29, 31.

Districts 118 and 119 are compact because, as rectangular districts, they have regular, logical, orderly, understandable shapes. They do not meander or have bizarre shapes or chaotic or disorderly boundary features, such as tails or tentacles. Together with circles, triangles, and squares, rectangles are among the most familiar and elementary of geometric shapes. While the points along a rectangular district's perimeter are not equidistant from the district's centroid, that is not the test of compactness.

Many districts in Palm Beach, Broward, and Miami-Dade Counties are vertically oriented, including Districts 87, 92, 98, 100, 103, 106, 107, 108, and 109. D. Ex. 2. Most of these nine districts are not tier-one-protected districts. J. Ex. 1 at 4. A vertical configuration is therefore common and does not point to racial considerations. Plaintiffs' alternative maps also include rectangular districts. *See infra* p. 53. Plaintiffs' map-drawer considers his rectangular districts to be compact.

District 119 has the eleventh-highest Convex Hull score (0.92) in the entire State House map. J. Ex. 1 at 2–3. Its Polsby-Popper score (0.47) exceeds the mean and median Polsby-Popper score (0.45). *Id.* Its Reock score is low relative to other State House districts, *id.*, but the Florida Supreme Court does not consider any one compactness score in isolation, *see In re SJR 1176*, 83 So. 3d 646. Each compactness measure, moreover, idealizes compactness differently. Each has limitations; none is dispositive. In general, the Reock measure penalizes shapes like rectangles that are not circular; the Convex Hull score penalizes indents, or concavities, in districts; and the Polsby-Popper score penalizes wasteful length, or unnecessary meandering, in district boundaries.

---

fdot.opendata.arcgis.com/datasets/state-roads-tda/about. *See* Fed. R. Evid. 201(b)(2); *Megladon, Inc. v. Vill. of Pinecrest*, No. 21-CV-22819, 2025 WL 1517181, at *18 (S.D. Fla. May 28, 2025). State roads can be identified by selecting "View Map" and selecting a road displayed in blue.

Each compactness measure is computed differently. Their results often diverge from each other, and sometimes from common sense. *See* H.P. Young, *Measuring the Compactness of Legislative Districts*, Legislative Studies Quarterly, Vol. 13, No. 1 (Feb. 1988), *available at* https://www.rangevoting.org/YoungCompactness.pdf. To illustrate, under the Reock test, the least compact of the six shapes shown below is, improbably, the simple triangle, while a square (not pictured) is less compact than the coiled snake. *Id.* at 106.



District 118's Reock and Polsby-Popper scores are low relative to other State House districts, but its Convex Hull score (0.79) is near the mean (0.82), and its shape is simple and rectangular. J. Ex. 1 at 2–3.

The Florida Supreme Court does not consider any compactness score in isolation. In 2012, the court found that "only three [State House] districts have significantly low compactness scores using both [the Reock and Convex Hull measures]: House Districts 88, 117, and 120." *In re SJR 1176*, 83 So. 3d 646. Thus, it flagged only districts that performed poorly on **both** compactness measures (the Court did not utilize the Polsby-Popper measure in 2012) and did not condemn the mathematical compactness of any of Miami-Dade County's vertically oriented districts, which are depicted below:



**2012 State House Districts**

Notably, Plaintiffs do not allege that Districts 118 and 119 contain bizarre features such as fingers or tendrils that string together far-flung minority communities. Nor do they allege that Districts 118 and 119 resemble Rorschach blots or snake through multiple counties in search of minority enclaves. Districts 118 and 119 bear no likeness, for example, to the three congressional districts challenged in *Vera*:



517 U.S. at 986 apps. A–C. Nor do they resemble the sprawling 1992 congressional district that wound

through 14 counties in Florida and narrowed in places to 50 yards to combine black communities

across half the State:



*Johnson v. Mortham*, 915 F. Supp. 1529, 1550, 1554 app. A (N.D. Fla. 1995); *see also Miller*, 515 U.S. at

908 (analyzing a district that stretched hundreds of miles across rural counties and narrow swamp

corridors while splitting eight counties and five municipalities from Atlanta to the Atlantic Ocean).

Districts 118 and 119 are not bizarre by any stretch. Their shapes and boundaries are

consistent with traditional race-neutral districting principles—and that consistency only increases

Plaintiffs' burden. Plaintiffs' direct evidence does not suggest racial predominance in the design of

Districts 118 and 119, and their circumstantial evidence, far from being "compelling," *Bethune-Hill*, 580

U.S. at 191, has no nexus to race. "A district that is regular on its face—that is, one lacking bizarre, extending appendages—provides circumstantial evidence that the legislature did not subordinate objective race-neutral criteria to racial considerations." *Nord Hodges*, 796 F. Supp. 3d at 1123.

Staff drew other orientations of Districts 118 and 119, but in Mr. Poreda's view, none married all legal requirements as well as the vertical arrangement. Mr. Poreda regarded the vertical configuration to be at least comparable in compactness to the other configurations that staff drew and considered—including the configurations in the two staff-drawn "workshop" maps the House considered early in the redistricting process (depicted below)—while a functional analysis revealed that the vertical configuration was more likely to be found compliant with the Non-Diminishment Clause than at least some other options. Because the vertical configuration implemented all redistricting criteria, Mr. Poreda considered it the best option. According to Mr. Poreda, race did not predominate in drawing these districts; staff sought to implement all applicable criteria together.



**Workshop Option A**                    **Workshop Option B**

J. Exs. 5 & 6; ECF No. 172 at 4 ¶¶ 8–10.

Plaintiffs cite *Bethune-Hill*'s observation that, even if a district complies with race-neutral considerations, "race still *may* predominate" if "race for its own sake is the overriding reason for choosing one map over others." 580 U.S. at 190 (emphasis added). But race was not the overriding reason for choosing the final configurations of Districts 118 and 119. These configurations presented regular shapes and implemented all redistricting standards. *Bethune-Hill* did not hold that race predominates whenever a legislature prefers a configuration that complies with *all* legal requirements to one that does not.

*Bethune-Hill* provided two examples of when race "may" predominate despite a district's consistency with race-neutral principles: *first*, when a State draws a district on racial grounds, and afterwards devises race-neutral, "*post hoc* justifications" for the district's shape, *id.* at 189–90, and *second*, when a State constructs a "plethora" of alternatives that appear to be consistent with one or more of "numerous and malleable" race-neutral principles, and then selects the one map that best advances its dominant racial objectives, *id.* at 190; *cf. Alexander*, 602 U.S. at 35–36 (explaining the ease with which "tens of thousands" of maps can be generated).

*Shaw v. Hunt*, 517 U.S. 899 (1996), provides another illustration. There, the challenged district was the least compact in the country, and the State admitted that race was the "overriding purpose" behind the district. *Id.* at 906. The dissent argued that race was not predominant because the legislature also achieved two ancillary, race-neutral goals: the creation of separate rural and urban districts and the protection of incumbents. *Id.* at 907. The Court rejected that contention and concluded that race was the predominant motive in the selection of the challenged district. *Id.*

This case is different. In drawing Districts 118 and 119, the Legislature did not devise after-the-fact justifications or generate a plethora of maps in search of one that maximizes a dominant racial objective. It did not, as in *Hunt*, draw a district with race at the fore, egregiously violate basic notions

of compactness, and then identify two race-neutral objectives that it incidentally satisfied along the way.

On the contrary, Mr. Poreda drew Districts 118 and 119 without considering race before he performed a functional analysis, and then selected a configuration that he believed satisfied all of Florida's established, constitutionally prescribed redistricting criteria. Selecting an option that balances and implements all standards is the very definition of giving "equal weight" to all considerations. *Allen*, 599 U.S. at 31 (concluding that race did not predominate where the map-drawer gave "equal weight" to race-neutral principles and the VRA); *DeWitt*, 856 F. Supp. at 1413–15 (upholding districts drawn to comply with the VRA where the map-drawers engaged in a "judicious and proper balancing" of redistricting criteria and "carefully analyzed and reconciled" racial and race-neutral considerations). Mr. Poreda's selection of district configurations that comply with all legal standards, including the Non-Diminishment Clause, did not make race "the legislature's predominant motive for the design of the district as a whole." *Bethune-Hill*, 580 U.S. at 192.

**The Legislative Record.** From an immense legislative record, Plaintiffs select a few choice statements, but even those hand-picked statements lend no weight to their claim that race predominated in Districts 115, 118, and 119. These statements generally fall within five categories:

**A. Generic statements of race-consciousness.** Some statements merely describe attributes or characteristics of the newly drawn districts and do not address legislative motivation at all. When Chair Byrd commented that the Hispanic voting-age populations of nine Hispanic districts in Miami-Dade County were "similar compared to the benchmark districts," he did nothing more than state factual information about the new districts. J. Ex. 73 at 23:17–24:3.

Chair Byrd described the same nine districts collectively as "performing Hispanic districts" drawn "to maintain existing majority-minority districts." *Id.* Mr. Poreda will explain that Chair Byrd's statements reflect a concise way of providing the committee with summary information about nine

33

districts at once. And as this Court explained, this statement "does not, by itself, plausibly suggest" predominance—only that "race played *a* role in legislative deliberations." ECF No. 88 at 11. The Court has recognized that legislatures "can—and routinely do—consider race to comply with state and federal law." *Id.* Thus, in *Nord Hodges*, the court explained that, although statements in the legislative record revealed that legislators and staff "maintained an awareness of racial demographics . . . , they [did] not rise to direct evidence of racial predominance." 796 F. Supp. 3d at 1114. The same is true here.

**B. Statements regarding unchallenged districts.** Chair Leek's statement that, "when it's a protected district, we focus much less on Tier Two," comes from a discussion of unchallenged District 88. J. Ex. 75 at 68:13–23. District 88 is an unusually shaped district in Palm Beach County, drawn to protect the voting ability of black voters. J. Ex. 1 at 1, 4. Chair Leek's discussion of District 88 does not imply that race predominated in the design of largely Hispanic districts 75 miles away. *See id.* at 1100 (concluding that a legislator's explanation of a district in Jacksonville, though phrased as a generalization, did not imply predominance in a district in Tampa).

**C. Selectively edited statements scrubbed of any references to race-neutral principles.** Plaintiffs place much weight on a colloquy between Representative Driskell and Chairs Leek and Byrd, but they cherry-pick three references to race while omitting references to race-neutral principles. Throughout that colloquy, the Chairs repeatedly affirmed that the districts at issue were drawn in harmony with tier-two principles. J. Ex. 75 at 46:18–53:13. Time and again, the Chairs affirmed that the districts are compact and pointed out the districts' adherence to existing boundaries. *Id.* Plaintiffs' quotations from this colloquy have excised these important passages, as well as Chair Leek's statement that the districts represent "the best configuration that we could come up with *in balancing all of those factors.*" *Id.* at 52:13–17.

Plaintiffs cannot manufacture predominance through selective quotations. The legislative record is replete with explanations of the tier-two motivations behind the State House districts in Miami-Dade County. On multiple occasions, committee staff discussed the major roads and municipal boundaries that the challenged districts utilize and the municipalities they keep whole; the significant improvement in boundary scores, compactness scores, and the utilization of roadways and municipal boundaries relative to the predecessor districts; and the north-south nature of the population distribution and major roadways in Miami-Dade County, which contributed to a vertical orientation of districts. J. Ex. 69 at 38:21–39:2, 39:19–40:3; J. Ex. 73 at 23:17–24:20; J. Ex. 74 at 30:9–32:4; J. Ex. 75 at 20:23–23:9. Plaintiffs simply ignore these explanations, which provide essential context to their claims of predominance.

### D. References to the hierarchical structure of Florida's redistricting standards.

Members and staff often explained that, when the standards in Tier One and Tier Two conflict, the Florida Constitution gives precedence to the standards in Tier One. *See* Fla. Const. art. III, § 21(b). For example, Chair Leek explained that "we get to compactness after Tier One," J. Ex. 75 at 47:8–22, while Staff Director Leda Kelly explained that, "throughout the map, obviously, our Tier One considerations take priority, as we know, over Tier Two," J. Ex. 69 at 44:10–12. These statements refer to the Florida Constitution's prioritization of Tier One in case of conflict but do not suggest that the standards inevitably conflicted or that race took the lead in the map-drawing process. They do not expressly refer to any specific district, moreover, and therefore are the sort of "generalized language that the [Supreme] Court has rejected as insufficient when evaluating racial-gerrymandering claims on a 'district-specific' basis." *See* ECF No. 88 at 11–12 (quoting *Ala. Legis. Black Caucus*, 575 U.S. at 263).

The statements in the legislative record do not prove or even suggest that race predominated in the design of Districts 115, 118, and 119. To be sure, these unelaborated comments show that the

Legislature considered race, but they are insufficient to support a finding that race outweighed other considerations or that the Legislature did not act in good faith.

* * *

Plaintiffs' burden is heavy: they must overcome the presumption that the Legislature acted in good faith and demonstrate not only that "race was considered," but also that "race was privileged above other neutral redistricting factors." ECF No. 88 at 15.

This they cannot do. In drawing the challenged State House districts, committee staff were guided by Florida's race-neutral districting principles: contiguity, population equality, compactness, and utilization of political and geographical boundaries. Only after the districts were drawn did staff consider racial demographics and perform the necessary functional analysis to ensure compliance with the Non-Diminishment Clause.

In *Nord Hodges*, this fact was central to the court's finding that race did not predominate in the design of a State Senate district. The court explained that the Senate's map-drawer "did not begin his map-drawing with racial demographics" or "consider racial data until *after* applying race-neutral criteria." 796 F. Supp. 3d at 1111–12 (emphasis in original). It noted that the Non-Diminishment Clause "requires race to be considered, but it does not require a particular quota when drafting districts or mandate that districts be drawn using race as the starting criterion." *Id.* at 1111. "Instead, it requires that, at some point in the drafting process, the legislature review racial data to ensure it will not violate the law." *Id.*

That is what happened here. Mr. Poreda did not draw with racial demographics, but reviewed racial demographics only after districts had first been drawn in reliance on race-neutral considerations. Thus, Mr. Poreda believes that, in drawing the challenged districts, staff balanced all legal requirements and that no single requirement predominated. The districts are regularly shaped, keep municipalities whole, and respect geographical boundaries in a densely populated area of the State. Because Plaintiffs

36

cannot carry their burden, this Court should enter judgment for Defendants as to each challenged State House district.

II.   <u>RACE DID NOT PREDOMINATE IN THE DESIGN OF CONGRESSIONAL DISTRICT 26.</u>

Plaintiffs' challenge to Congressional District 26 also comes up short. That challenge revolves around Plaintiffs' contention that race was the predominant motive behind the Legislature's decision to include a portion of Collier County in District 26. But that decision did not increase District 26's Hispanic population; it decreased it. Further, the decision to cross into Collier County resulted first and foremost from the Legislature's configuration of districts to the north—and specifically its efforts to implement race-neutral, tier-two standards in those districts.

**The Collier County Decision.** In redistricting, each district impacts the boundaries of other districts—sometimes even districts at a great distance. In drawing congressional districts, committee staff's configuration of Central Florida heavily influenced its configuration of South Florida.

District 8 combined two whole counties—Brevard and Indian River—and part of Orange County. D. Ex. 21. The next district to the south thus began at the boundary between Indian River and St. Lucie Counties. To utilize political boundaries, staff followed the northern boundary of St. Lucie County and the western boundary of St. Lucie, Martin, Palm Beach, and Broward Counties. D. Ex. 22. Together with the Atlantic Ocean, this adherence to county boundaries for nearly 140 consecutive miles created a three-sided enclosure around much of Southeast Florida. D. Ex. 204 at RFA 37.

District 20 occupied much of this enclosed area. D. Ex. 22. Plaintiffs allege that the Non-Diminishment Clause and the VRA protected the voting ability of District 20's black voters. ECF No. 58 at 21 n.5; *accord* D. Ex. 201 at RFA 61. Most of District 20's population lives in the district's two arms—one in Palm Beach County and one in Broward County.

The Legislature's adherence to a 140-mile stretch of county boundaries meant that five districts could fit wholly within St. Lucie, Martin, Palm Beach, and Broward Counties. D. Ex. 22. It also made those districts more compact. District 21, as it moved south from St. Lucie and Martin Counties into Palm Beach County, reached its ideal population in exactly the right place: east of District 20's northern arm. *Id.* Thus, no district wraps around District 20's northern arm. *Id.* While District 23 wraps around the southern arm, District 25 remains under the southern arm and has a regular shape. *Id.*

Once these districts were drawn, it was impossible to configure Miami-Dade County without a district that crossed into Collier County. At least one district in Miami-Dade County (District 24, 26, 27, or 28) needed more population than Miami-Dade and Monroe Counties could provide. Because of the tier-two priorities achieved in the four counties to the north, at least one district in Miami-Dade County needed to cross into Collier County—the only place it could go—to attain the ideal population required for a congressional district.

**Alternative Configurations.** If the Legislature had not drawn a district that crossed from Miami-Dade into Collier County, then it would have been impossible to maintain the tier-two features achieved in St. Lucie, Martin, Palm Beach, and Broward Counties. Without extending west, at least one district in Miami-Dade County would have had to extend north to attain its ideal population. That would have made it impossible to maintain the 140-mile perimeter of county boundaries described above. Pushing a district north into (or further into) Broward County would have forced other districts along the coast to move north too, and eventually would have broken that perimeter.

According to Mr. Poreda, if the Legislature had not drawn a district that crossed from Miami-Dade into Collier County, then the likely effect would have been to force District 21 west. To achieve its ideal population in sparsely populated counties, District 21 would have extended nearly to Port Charlotte, crossing the State to an even greater extent than enacted District 26.

District 25 would have become less compact as well. It would have been pushed north along the coast and assumed a reverse "L" shape south and east of District 20's southern arm.

Committee staff experimented with different configurations of South Florida districts during the 2021–22 redistricting process. Staff concluded that South Florida's overall tier-two compliance was better when District 26 extended into Collier County.

Committee staff also performed a functional analysis on alternative South Florida configurations and determined that, without a district that crossed into Collier County, two of Miami-Dade County's majority-Hispanic districts became less likely to elect representatives preferred by Hispanic voters. But that functional-analysis finding was not essential to their decision to extend a district into Collier County, given the race-neutral, tier-two considerations described above.

**District 26's Configuration.** In drawing a district that crossed into neighboring Collier County, Mr. Poreda adhered to Florida's race-neutral, tier-two districting principles.

Along its northern boundary, District 26 follows county boundaries for approximately 120 miles, from Interstate 75 in Collier County to the municipal boundary of Miami Gardens in Miami-Dade County. D. Exs. 24, 26; D. Ex. 204 at RFA 32. The district's northern boundary departs from county boundaries only around unincorporated Immokalee in northern Collier County, where the district's boundary follows State Roads 82 and 29 and County Road 846 for approximately 21 miles. D. Ex. 29; D. Ex. 204 at RFA 33. In an earlier draft, District 26 included Immokalee, J. Ex. 8, but the enacted map transferred a small but concentrated Hispanic population in Immokalee *out* of District 26 and *into* District 18—contrary to what a racial gerrymanderer would have done. D. Exs. 54–56; *see also infra* pp. 37–38, 59–60.

In Collier County, District 26's southern boundary consists of the boundary between Monroe and Collier Counties. D. Ex. 27. In Miami-Dade County, it follows a major roadway, the Tamiami Trail (U.S. Highway 41). D. Ex. 24.

39

Along its western boundary, District 26 follows, in part, major roadways such as Interstate 75 and Collier Boulevard (State Road 951) and the municipal boundaries of Bonita Springs and Marco Island. D. Ex. 29; D. Ex. 204 at RFA 34.

Along its eastern boundary, District 26 follows major roadways such as the Dolphin Expressway, the Airport Expressway, and the Palmetto Expressway and the municipal boundaries of Doral, Hialeah, Miami, Miami Gardens, Miami Lakes, Miramar, Opa-Locka, and Sweetwater. D. Exs. 24–26; D. Ex. 204 at RFA 35. Seven municipalities are wholly within the district. D. Ex. 25; D. Ex. 204 at RFA 36. The only municipality that District 26 splits is Miami, *id.*, which has a population of 442,241 people, D. Ex. 235 at 52. District 26 is also impacted by adjacent District 24, D. Ex. 23, in which the Non-Diminishment Clause protects the voting ability of black voters, ECF No. 58 at 21 n.5; D. Ex. 201 at RFA 62. In all, District 26 follows political and geographical boundaries along 91 percent of its perimeter. J. Ex. 3 at 18.

Mr. Poreda did not draw District 26 to attain a specific Hispanic voting-age population. Nor is he aware that anyone else did. Staff performed a functional analysis on District 26 after it was drawn, but the functional analysis did not require any changes to ensure compliance with the Non-Diminishment Clause.

The Governor's office modified the legislatively drawn District 26 before its final passage, but the modified, enacted district did not differ fundamentally from the district initially drawn by the House. *Compare* J. Ex. 3 at 1, *with* J. Ex. 8 at 1. Alex Kelly, the Governor's Deputy Chief of Staff, explained the modifications he made. He began with a map drawn by legislative staff. J. Ex. 81 at 20:23–21:4. He found that, by splitting Polk County, which the Legislature had kept whole, he could keep whole two counties that the Legislature had split (Citrus and Sarasota). *Id.* at 26:2–7, 33:24–34:3, 34:20–25, 45:21–46:2, 55:17–24. These changes left District 18 underpopulated, so Mr. Kelly extended District 18 south into Collier County. *Id.* at 46:3–7, 46:17–24, 71:23–72:7. This change removed

population from District 26 and left District 26 underpopulated. *Id.* at 46:25–47:6, 72:8–15, 73:2–1. Mr. Kelly thus increased District 26's population along its western boundary. *Id.* He did not change any of District 26's boundaries within Miami-Dade County. *Id.* at 71:14–22, 72:16–23.

As he made these changes, Mr. Kelly was aware of District 26's status as a historically performing district and was "watching" the effect of his changes on the district's Hispanic voting-age population, which settled at 73 percent. *Id.* at 47:5–6, 72:16–23, 73:19–74:4, 75:8–17; J. Ex. 3 at 2.

The Hispanic voting-age population of enacted District 26, as modified by Mr. Kelly, is *lower* than the Hispanic voting-age population of the Miami-Dade-to-Collier district in each of the 21 congressional maps submitted by members and staff of the House and Senate. D. Ex. 201 at RFAs 34–44; D. Ex. 92. Tellingly, the 2022 redraw actually *reduced* the district's Hispanic voting-age population compared to its predecessor district, *compare* J. Ex. 3 at 2, *with* J. Ex. 4 at 2, which was Benchmark District 25, ECF No. 172 at 7 ¶ 43. District 26 includes approximately 135,000 people who did not live in the benchmark district and excludes approximately 135,000 who did. D. Ex. 201 at RFAs 45–46. The Hispanic voting-age population of the population that was moved out of the district is 77.0 percent, while the Hispanic voting-age population of the newly added population is only 71.7 percent, *id.*—a trade that no racial gerrymanderer would have made.

Plaintiffs and their map-drawer, Dr. Cory McCartan, made it a priority not to cross from Miami-Dade County into Collier County, which includes a portion of the Everglades. The Legislature did not share—and was under no obligation to share—that race-neutral priority. All 21 congressional redistricting plans submitted by members and staff of the House and Senate contained a district that united portions of Miami-Dade and Collier Counties in one district. D. Ex. 201 at RFAs 34–35.

The plaintiffs in *Nord Hodges* made a strikingly similar argument. There, the plaintiffs condemned the Legislature's decision to cross Tampa Bay—from Tampa to St. Petersburg—and imputed that decision to a racial motive. The court disagreed, concluding that the plaintiffs simply

entertained "non-racial priorities that the legislature did not share." 796 F. Supp. 3d at 1116. Just as the Legislature was not bound to treat Tampa Bay as an impassable boundary, it was not bound to treat the portion of the Everglades in Miami-Dade and Collier Counties as a impassable boundary. Not one legislator of either political party—nor any staff member in the House or Senate—proposed a map that did. D. Ex. 201 at RFA 35.

   **The Legislative Record.** As with State House districts, the few statements that Plaintiffs extract from an immense legislative record fail to overcome the presumption of legislative good faith and to establish that race predominated in District 26. Most or all of these statements fall within one or more of the following categories:

   **A. Statements that are hopelessly vague.** Statements that race "impacted" District 26, J. Ex. 77 at 38:10–16, or was a "big consideration," J. Ex. 100 at 66:15–19, or that districts protected by Tier One were "based on race" and "not race-neutral," J. Ex. 82 at 80:12–22—are too vague and indeterminate to support an inference of racial predominance—especially in the face of a presumption that requires the Court to draw inferences from ambiguous evidence in the Legislature's favor.

   Race is not a prohibited consideration, and statements so vague offer no information about the relative importance of race in the design of a district. Nor do they disclose *where*, *how*, or *to what extent* racial considerations influenced a district's shape. Rather than show which neighborhoods were included or excluded because of race—or how map-drawers used demographic data to manipulate specific boundary lines—these nebulous and innocuous assertions reveal only the race-consciousness that equal protection permits.

   **B. Statements that reference multiple districts without any differentiation.** Many of the statements on which Plaintiffs rely to show that Tier One played a role refer collectively to *four* and sometimes *five* districts—not specifically to District 26. When Mr. Poreda stated that District 26's shape was "largely because of"—or "primarily due" to—tier-one considerations, it was in a combined

discussion of *four* tier-one-protected districts in Miami-Dade County: Districts 24, 26, 27, and 28. J. Ex. 77 at 38:17–44:18. Similarly, Mr. Ferrin explained that the Non-Diminishment Clause protects five districts in Southeast Florida and therefore has a "significant impact on . . . the region." J. Ex. 93 at 13:8–13. Plaintiffs fail to disentangle those tier-one considerations and to show that racial considerations *specific to District 26* predominated in its design. To the extent racial considerations in other districts (such as District 24) impacted District 26, they do not establish predominance in District 26. *See Sinkfield*, 531 U.S. at 30–31; *Hays*, 515 U.S. at 745.

**C. Statements that Plaintiffs misunderstand.** Plaintiffs suggest that, when he modified District 26, Mr. Kelly sought to increase the district's Hispanic voting-age population ("HVAP") and, in the end, reached a target. But the record reveals the opposite: Mr. Kelly watched the district's HVAP because his changes—which were motivated by tier-two considerations—were *reducing* that figure. In fact, the HVAP in enacted District 26, as modified by Mr. Kelly (73.2 percent), is *less* than the HVAP in *any* other version of District 26 the Legislature considered. D. Ex. 201 at RFAs 34–44. No legislator or staff member proposed a District 26 with a lesser Hispanic concentration than enacted District 26. *Id.*

Finally, Plaintiffs routinely ignore portions of the legislative record. That record discusses the race-neutral determinants of District 26's shape, including the utilization of major roadways, canals, and county boundaries and the preservation of municipalities, and District 26's strong boundary score. J. Ex. 68 at 23:15–21; J. Ex. 77 at 23:10–21, 39:17–44:18, 46:3–18, 48:17–49:9, 56:8–23; J. Ex. 87 at 34:23–36:21.

\* \* \*

Plaintiffs' contention that the Legislature drew District 26 predominantly for racial reasons rings hollow. Mr. Poreda will explain the race-neutral considerations that—like a series of dominos— emanated from Central Florida and rippled through South Florida. He will explain that the tier-two

decision to follow a 140-mile stretch of county boundaries around Southeast Florida required at least one Miami-Dade County district to cross into Collier County to reach the ideal population of a congressional district.

Mr. Kelly's legislative testimony similarly shows that, while he was conscious of race when he modified District 26, race was not his predominant motive. Mr. Kelly explained that the changes he made to District 26 originated in race-neutral considerations—tier-two dominos from his efforts to keep Citrus and Sarasota Counties whole. His modified District 26 contains fewer voting-age Hispanics than the analogous district in any map published by legislators and legislative staff—proof positive that race did not drive Mr. Kelly's work.

Here, Plaintiffs cannot climb the steep evidentiary hill before them. Plaintiffs cannot overcome Mr. Poreda's testimony, Mr. Kelly's explanation in the legislative record, or the presumption of legislative good faith. Plaintiffs' climb should end there.

III.   **PLAINTIFFS' EXPERT TESTIMONY DOES NOT ESTABLISH RACIAL PREDOMINANCE.**

At trial, Plaintiffs will call Dr. Cory McCartan and Dr. Carolyn Abott as expert witnesses. Neither will offer testimony that justifies an inference of racial predominance. In fact, their testimony will undermine Plaintiffs' claims.

**Dr. McCartan.** Plaintiffs retained Dr. McCartan to draw alternative maps (as he did in *Nord Hodges*). Dr. McCartan will not opine that race was the Legislature's predominant motive or that any features of the enacted districts—such as their compactness or their treatment of counties, municipalities, or geographical boundaries—indicate a consideration of race. Instead, Dr. McCartan will present his maps and opine that it would have been possible to configure the enacted districts as they appear in his maps.

For several reasons, Dr. McCartan's maps do not move the needle on predominance.

**A.** As explained above, the proper function of an alternative map is to show that the Legislature could have drawn districts with significantly greater racial balance and still achieved its race-neutral objectives. *See supra* pp. 7–11. But Dr. McCartan's maps go in the wrong direction: their racial balance is significantly *less*.

For example, in the enacted State House map, the Hispanic voting-age population of the three challenged districts ranges from 85.7 percent to 65.9 percent—a spread of 19.8 percentage points. *See* J. Ex. 1 at 3. In Dr. McCartan's seven maps, the racial imbalance is greater; the spread varies from 27.1 to 32.2 percent. *See* J. Ex. 10 at 3; J. Ex. 11 at 3; J. Ex. 12 at 3; J. Ex. 13 at 3; J. Ex. 14 at 3; J. Ex. 15 at 3; J. Ex. 16 at 3. The table below displays, for each map, the Hispanic voting-age populations of the three challenged districts, ranked from highest to lowest, and then, in the final row, the spread between the highest and lowest:

| HVAPs of HDs 115, 118, 119 (Ranked Highest to Lowest) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Enacted Map | Map A1 | Map A2 | Map B | Map C1 | Map C2 | Map C3 | Map C4 |
| 85.7% | 91.2% | 91.1% | 91.1% | 91.2% | 91.2% | 91.2% | 91.0% |
| 85.2% | 79.8% | 79.8% | 79.8% | 79.8% | 79.8% | 79.8% | 79.7% |
| 65.9% | 63.6% | 63.6% | 63.7% | 64.1% | 59.0% | 59.0% | 62.6% |
| **19.8** | **27.6** | **27.5** | **27.4** | **27.1** | **32.2** | **32.2** | **28.4** |

J. Ex. 1 at 3; J. Ex. 10 at 3; J. Ex. 11 at 3; J. Ex. 12 at 3; J. Ex. 13 at 3; J. Ex. 14 at 3; J. Ex. 15 at 3; J. Ex. 16 at 3.

A similar pattern emerges when the table is expanded to include all seven State House districts that Plaintiffs originally challenged. (Dr. McCartan makes only minimal changes to other State House districts.) In the enacted map, the spread between the highest and lowest Hispanic voting-age populations was 28.1 percent. *See* J. Ex. 1 at 3. In Dr. McCartan's maps, the spread ranges from 30.9 percent to 37.4 percent:

| HVAPs of HDs 112, 113, 114, 115, 116, 118, 119 (Ranked Highest to Lowest) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Enacted Map | Map A1 | Map A2 | Map B | Map C1 | Map C2 | Map C3 | Map C4 |
| 94.0% | 94.5% | 94.5% | 94.6% | 96.4% | 96.4% | 96.4% | 96.4% |
| 87.4% | 91.2% | 91.2% | 93.3% | 91.5% | 94.4% | 93.2% | 91.0% |
| 85.7% | 89.9% | 89.9% | 91.1% | 91.2% | 91.2% | 91.2% | 83.7% |
| 85.2% | 79.8% | 79.8% | 84.9% | 84.3% | 79.8% | 79.8% | 79.7% |
| 74.5% | 76.7% | 73.0% | 79.8% | 79.8% | 79.3% | 79.7% | 79.3% |
| 71.9% | 68.6% | 72.4% | 63.7% | 64.1% | 67.5% | 67.5% | 72.8% |
| 65.9% | 63.6% | 63.6% | 58.2% | 59.8% | 59.0% | 59.0% | 62.6% |
| **28.1** | **30.9** | **30.9** | **36.3** | **36.5** | **37.4** | **37.3** | **33.8** |

J. Ex. 1 at 3; J. Ex. 10 at 3; J. Ex. 11 at 3; J. Ex. 12 at 3; J. Ex. 13 at 3; J. Ex. 14 at 3; J. Ex. 15 at 3; J. Ex. 16 at 3.

The racial imbalance in Dr. McCartan's maps is apparent at both the high and low ends. Dr. McCartan's maps include more districts with Hispanic voting-age populations in excess of 90 percent. They also include districts with lower Hispanic voting-age populations than in the enacted map. In fact, most of Dr. McCartan's maps move two additional districts above the 90-percent threshold and one district below the 60-percent threshold.

In the enacted map, the seven originally challenged State House districts contain a combined 850,388 Hispanics of voting age. D. Ex. 205 at RFA 1. In Dr. McCartan's maps, that number is about the same; it ranges from 849,238 to 854,696. D. Ex. 205 at RFAs 2–8. The difference is that Dr. McCartan's distribution of this population among districts creates greater racial imbalance. While Plaintiffs would carve up these seven districts differently, their own maps refute their allegations of racial sorting.

Plaintiffs cannot claim, therefore, that the Legislature concentrated Hispanic voters in particular State House districts and excluded them from others. They do not allege that the Legislature placed Hispanic and non-Hispanic voters into different districts in order to create "white" districts, "black" districts, and "Hispanic" districts.

The same is true of congressional maps. In the enacted map, the Hispanic voting-age population of Districts 26, 27, and 28 ranges from 73.2 percent to 74.2 percent—a spread of 1 percentage point. J. Ex. 3 at 2. Dr. McCartan's maps reveal far greater racial imbalance. With the exception of Map B2, the spread varies from 25.5 percent to 26.1 percent:

| HVAPs of CDs 26, 27, 28 (Ranked Highest to Lowest) | | | | | | |
|---|---|---|---|---|---|---|
| Enacted Map | Map A | Map B1 | Map B2 | Map C1 | Map C2 | Map D |
| 74.2% | 91.1% | 89.5% | 74.2% | 91.1% | 91.1% | 91.1% |
| 73.4% | 66.7% | 64.5% | 73.1% | 66.7% | 66.7% | 66.7% |
| 73.2% | 65.0% | 64.0% | 71.6% | 65.0% | 65.0% | 65.0% |
| **1.0** | **26.1** | **25.5** | **2.6** | **26.1** | **26.1** | **26.1** |

J. Ex. 3 at 2; J. Ex. 17 at 2; J. Ex. 18 at 2; J. Ex. 19 at 2; J. Ex. 20 at 2; J. Ex. 21 at 2; J. Ex. 22 at 2.

When considering South Florida more broadly (Districts 17 through 28), none of Dr. McCartan's maps creates significantly greater racial balance, and five of six create significantly greater racial imbalance:

| HVAPs of CDs 17–28 (Ranked Highest to Lowest) | | | | | | |
|---|---|---|---|---|---|---|
| Enacted Map | Map A | Map B1 | Map B2 | Map C1 | Map C2 | Map D |
| 74.2% | 91.1% | 89.5% | 74.2% | 91.1% | 91.1% | 91.1% |
| 73.4% | 66.7% | 65.0% | 73.1% | 66.7% | 66.7% | 66.7% |
| 73.2% | 65.0% | 64.0% | 71.6% | 65.0% | 65.0% | 65.0% |
| 42.3% | 40.3% | 44.5% | 44.7% | 40.3% | 40.3% | 40.3% |
| 38.5% | 33.3% | 33.6% | 33.3% | 33.5% | 33.5% | 33.5% |
| 24.7% | 26.0% | 26.0% | 26.0% | 27.0% | 27.0% | 27.0% |
| 23.7% | 23.6% | 23.5% | 23.6% | 24.3% | 24.3% | 24.3% |
| 23.7% | 23.3% | 23.3% | 23.3% | 23.3% | 23.3% | 23.3% |
| 23.0% | 22.9% | 21.7% | 21.7% | 19.7% | 20.4% | 22.8% |
| 20.5% | 17.8% | 18.0% | 17.8% | 16.1% | 15.6% | 15.3% |
| 16.2% | 16.5% | 17.3% | 17.3% | 15.9% | 15.3% | 15.0% |
| 11.5% | 12.7% | 12.7% | 12.7% | 15.0% | 15.0% | 12.8% |
| **62.7** | **78.4** | **76.8** | **61.5** | **76.1** | **76.1** | **78.3** |

J. Ex. 3 at 2; J. Ex. 17 at 2; J. Ex. 18 at 2; J. Ex. 19 at 2; J. Ex. 20 at 2; J. Ex. 21 at 2; J. Ex. 22 at 2.

Racial imbalance is greater in Dr. McCartan's maps because his maps send District 26's Hispanic population through the roof. Dr. McCartan adds more than **100,000** voting-age Hispanics to District 26. Enacted District 26 contains 456,512 voting-age Hispanics. D. Ex. 84; D. Ex. 201 at RFA 47. In five of Dr. McCartan's six maps, District 26 contains either 565,289 or 574,334 voting-age Hispanics. D. Ex. 84; D. Ex. 201 at RFAs 48–53. Dr. McCartan thus increases the district's Hispanic voting-age population from **73.2** percent to **89.5** or **91.1** percent in five of his six maps—a striking refutation of Plaintiffs' claims of racial predominance:

| | Voting-Age Hispanics in CD 26 |
|---|---|
| Enacted Map | 456,512 (73.2%) |
| Map A | 574,334 (91.1%) |
| Map B1 | 565,289 (89.5%) |
| Map B2 | 447,686 (71.6%) |
| Map C1 | 574,334 (91.1%) |
| Map C2 | 574,334 (91.1%) |
| Map D | 574,334 (91.1%) |

J. Ex. 3 at 2; J. Ex. 17 at 2; J. Ex. 18 at 2; J. Ex. 19 at 2; J. Ex. 20 at 2; J. Ex. 21 at 2; J. Ex. 22 at 2; D. Ex. 201 at RFAs 48–53.

In most of his maps, Dr. McCartan packs more voting-age Hispanics into Districts 26, 27, and 28 combined than the enacted map does:

| | Voting-Age Hispanics in CDs 26, 27, and 28 Combined |
|---|---|
| Enacted Map | 1,375,103 |
| Map A | 1,392,056 |
| Map B1 | 1,364,507 |
| Map B2 | 1,365,085 |
| Map C1 | 1,392,056 |
| Map C2 | 1,392,056 |
| Map D | 1,392,056 |

D. Ex. 83; D. Ex. 201 at RFAs 54–60.

It is no surprise that Dr. McCartan so drastically increases District 26's Hispanic population: he keeps District 26 wholly within Miami-Dade County. J. Exs. 17–22. Miami-Dade County's population is 68.7 percent Hispanic (1,856,938 of 2,701,767 people), while Collier County's population is only 27.2 percent Hispanic (102,249 of 375,752 people). D. Ex. 37; *see also* D. Ex. 228 at 2; D. Ex. 235 at 2. While Plaintiffs portray the Legislature's decision to cross into Collier County as proof that race predominated, no competent map-drawer would extend a racially gerrymandered district from a 68.7-percent Hispanic county into a 27.2-percent Hispanic county. If the Legislature had intended to racially gerrymander District 26, then it would have kept District 26 in Miami-Dade County, as Dr. McCartan did.

It is not the enacted districts, therefore, that engage in "racial sorting," *Bethune-Hill*, 580 U.S. at 187, or "political apartheid," *Shaw*, 509 U.S. at 649, or exhibit a significant lack of "racial balance" among districts, *Easley*, 532 U.S. at 258.

**B.** Mr. Poreda determined that South Florida's overall tier-two compliance was worse when District 26 did not cross into Collier County. Dr. McCartan's congressional maps confirm Mr. Poreda's assessment: they do not include a district that crosses into Collier County and fare *worse* than the enacted map on race-neutral metrics.

*First*, compactness. Some of Dr. McCartan's districts have irregular or visually bizarre shapes. For example:



**Tufted District 21**          **Boomerang-Shaped District 25**

**Irregular Appendage (District 18)**          **Tripod-Shaped District 17**

J. Exs. 17–18, 20.

While Dr. McCartan's maps improve the mathematical compactness of District 26, they degrade the mathematical compactness of surrounding districts. The tables below show the extent to which Dr. McCartan's maps increase or decrease the Reock, Convex Hull, and Polsby-Popper scores of those districts. While some districts' compactness scores experienced little change, others are appreciably lower in Dr. McCartan's maps. Dr. McCartan will agree that some of these differences are meaningful:

|        | Map A | | | Map B1 | | | Map B2 | | |
|--------|-------|--------|---------|-------|--------|---------|-------|--------|---------|
|        | Reock | C.Hull | Pol.-P. | Reock | C.Hull | Pol.-P. | Reock | C.Hull | Pol.-P. |
| CD 18  | −0.01 | −0.05  | −0.10   | −0.03 | 0.02   | −0.10   | −0.03 | 0.02   | −0.10   |
| CD 19  | 0.17  | 0.11   | 0.17    | 0.17  | 0.11   | 0.17    | 0.17  | 0.11   | 0.17    |
| CD 20  | 0.03  | 0.02   | 0.00    | 0.03  | 0.02   | 0.00    | 0.03  | 0.02   | 0.00    |
| CD 24  | −0.16 | −0.10  | −0.10   | −0.18 | −0.03  | −0.09   | −0.16 | −0.09  | −0.10   |
| CD 25  | −0.11 | −0.18  | −0.09   | −0.11 | −0.18  | −0.08   | −0.11 | −0.18  | −0.09   |
| CD 27  | −0.16 | −0.12  | −0.25   | −0.16 | −0.08  | −0.20   | 0.00  | 0.00   | −0.01   |
| CD 28  | 0.00  | 0.00   | −0.01   | 0.00  | 0.00   | −0.01   | 0.01  | 0.00   | 0.00    |

|        | Map C1 | | | Map C2 | | | Map D | | |
|--------|--------|--------|---------|--------|--------|---------|-------|--------|---------|
|        | Reock  | C.Hull | Pol.-P. | Reock  | C.Hull | Pol.-P. | Reock | C.Hull | Pol.-P. |
| CD 18  | 0.05   | −0.06  | −0.09   | 0.14   | 0.02   | −0.02   | 0.10  | −0.02  | −0.03   |
| CD 19  | 0.17   | 0.10   | 0.15    | 0.17   | 0.10   | 0.15    | 0.17  | 0.11   | 0.17    |
| CD 20  | −0.06  | 0.09   | 0.14    | −0.06  | 0.09   | 0.14    | −0.06 | 0.09   | 0.14    |
| CD 24  | −0.16  | −0.10  | −0.10   | −0.16  | −0.10  | −0.10   | −0.16 | −0.10  | −0.10   |
| CD 25  | −0.11  | −0.16  | −0.10   | −0.11  | −0.16  | −0.10   | −0.11 | −0.16  | −0.10   |
| CD 27  | −0.16  | −0.12  | −0.25   | −0.16  | −0.12  | −0.25   | −0.16 | −0.12  | −0.25   |
| CD 28  | 0.00   | 0.00   | −0.01   | 0.00   | 0.00   | −0.01   | 0.00  | 0.00   | −0.01   |

*Compare* J. Ex. 2 at 1, *with* J. Ex. 17 at 2; at 2; J. Ex. 18 at 2; J. Ex. 19 at 2; J. Ex. 20 at 2; J. Ex. 21 at 2; J. Ex. 22 at 2; *see also* D. Ex. 82.

To the extent Dr. McCartan's congressional maps make any improvements in compactness, those improvements occur far away from the alleged racial gerrymander in South Florida. Remarkably, although Plaintiffs challenge only one congressional district—and although Plaintiffs' counsel instructed Dr. McCartan to alter surrounding districts only to the extent necessary, D. Ex. 126 at 1 ¶ 5—each of Dr. McCartan's congressional maps alters between 13 and 20 of Florida's 28 districts, D. Ex. 205 at RFAs 27–32, including some districts north of Orlando, J. Exs. 32–36, shifting between 3 and 5.5 million people into different districts, D. Exs. 78–79.

*Second*, all of Dr. McCartan's congressional maps split more counties than the enacted map does. Dr. McCartan concedes that the additional splits are the natural result of his reconfiguration of District 26. The table below shows the number of counties that each map splits:

|  | Split Counties |
|---|---|
| Enacted Map | 17 |
| Map A | 18 |
| Map B1 | 19 |
| Map B2 | 19 |
| Map C1 | 20 |
| Map C2 | 20 |
| Map D | 19 |

D. Ex. 48; D. Ex. 203 at RFAs 1–7; J. Ex. 3 at 2, 16; J. Ex. 17 at 2, 8; J. Ex. 18 at 2, 8; J. Ex. 19 at 2, 8; J. Ex. 20 at 2, 8; J. Ex. 21 at 2, 8; J. Ex. 22 at 2, 8.

Plaintiffs will argue that, when one portion of a split county contains no population, the split does not count, *see League of Women Voters*, 179 So. 3d at 295 n.14, and that each of Dr. McCartan's totals should therefore be reduced by one (Hendry County), J. Ex. 3 at 16; J. Ex. 17 at 8; J. Ex. 18 at 8; J. Ex. 19 at 8; J. Ex. 20 at 8; J. Ex. 21 at 8; J. Ex. 22 at 8. But the Legislature held itself to a higher standard and attempted to avoid no-population splits. And even if such splits were excluded, only one of Dr. McCartan's maps would match the enacted map, while the others would still split more counties.

Dr. McCartan's congressional maps also split at least as many municipalities as the enacted map does:

|  | Split Municipalities |
|---|---|
| Enacted Map | 16 |
| Map A | 22 |
| Map B1 | 18 |
| Map B2 | 16 |
| Map C1 | 19 |
| Map C2 | 19 |
| Map D | 22 |

J. Ex. 3 at 17; J. Ex. 17 at 7; J. Ex. 17 at 7; J. Ex. 19 at 7; J. Ex. 20 at 7; J. Ex. 21 at 7; J. Ex. 22 at 7.

Only when no-population splits are ignored do most—but not all—of Dr. McCartan's maps split fewer municipalities:

| | Split Municipalities |
|---|---|
| Enacted Map | 16 |
| Map A | 15 |
| Map B1 | 16 |
| Map B2 | 15 |
| Map C1 | 11 |
| Map C2 | 12 |
| Map D | 13 |

*Id.* Of course, Dr. McCartan offers no evidence that the enacted map's splits of municipalities have anything to do with racial motivations in the design of District 26. Some of the municipalities that Dr. McCartan's maps make whole—such as Lakeland and Longboat Key—are many miles from District 26. *Compare* J. Ex. 3 at 17, *with* J. Ex. 17 at 7; J. Ex. 17 at 7; J. Ex. 19 at 7; J. Ex. 20 at 7; J. Ex. 21 at 7; J. Ex. 22 at 7.

*Third*, Dr. McCartan's congressional maps are less faithful than the enacted map to political and geographical boundaries. Dr. McCartan will confirm—as his maps do—that, unless one district crosses from Miami-Dade to Collier County, it is impossible to adhere (as the enacted map does) to the 140-mile stretch of county boundaries along the north side of St. Lucie County and the west side of St. Lucie, Martin, Palm Beach, and Broward Counties. Because District 26 in Dr. McCartan's map does not cross into Collier County, his districts move north into Broward County and break the 140-mile county perimeter to which the enacted districts adhere.

Numerically, Dr. McCartan's renditions of District 26 are also less adherent to political and geographical boundaries. The table below shows the percentage of District 26's boundary that follows an existing political or geographical boundary, as measured by the Legislature's boundary analysis. *See supra* note 5. The table demonstrates that, in the enacted map, 91 percent of District 26's boundary

utilizes political or geographical boundaries. In all but one of Dr. McCartan's maps, District 26 falls short:

|  | District 26's Boundary Score |
|---|---|
| Enacted Map | 91% |
| Map A | 85% |
| Map B1 | 85% |
| Map B2 | 96% |
| Map C1 | 85% |
| Map C2 | 85% |
| Map D | 85% |

J. Ex. 3 at 18; J. Ex. 17 at 9; J. Ex. 17 at 9; J. Ex. 19 at 9; J. Ex. 20 at 9; J. Ex. 21 at 9; J. Ex. 22 at 9.

Most of Dr. McCartan's congressional maps also worsen the mean boundary score for Districts 26 through 28:

|  | Mean Boundary Score for CDs 26–28 |
|---|---|
| Enacted Map | 94.3% |
| Map A | 92.7% |
| Map B1 | 91.3% |
| Map B2 | 96.3% |
| Map C1 | 92.7% |
| Map C2 | 92.7% |
| Map D | 92.7% |

*Id*; D. Ex. 81. And the same is true of the mean boundary score for Districts 17 through 28:

|  | Mean Boundary Score for CDs 17–28 |
|---|---|
| Enacted Map | 87.6% |
| Map A | 86.7% |
| Map B1 | 86.8% |
| Map B2 | 87.8% |
| Map C1 | 87.2% |
| Map C2 | 87.6% |
| Map D | 87.5% |

J. Ex. 3 at 18; J. Ex. 17 at 9; J. Ex. 17 at 9; J. Ex. 19 at 9; J. Ex. 20 at 9; J. Ex. 21 at 9; J. Ex. 22 at 9; D. Ex. 81.

As for State House districts, the enacted map splits five municipalities in Miami-Dade County,[7] while Dr. McCartan's Maps A1, A2, and C3 each split five,[8] Maps C1, C2, and C4 each split six,[9] and Map B splits eight.[10] Two of Map B's eight splits (Miami Springs and Virginia Gardens) and one of Map C2's six splits (Miami Springs) are no-population splits. J. Ex. 12 at 17; J. Ex. 14 at 17. Dr. McCartan's State House maps make no changes outside of Miami-Dade County. In the enacted map, none of the three challenged State House districts splits any municipalities. J. Ex. 1 at 18–20.

**C.** Dr. McCartan's maps refute Plaintiffs' position that rectangular districts are not compact. Dr. McCartan's maps contain long, rectangular districts—only Dr. McCartan usually orients them horizontally rather than vertically. Yet Dr. McCartan insists that those districts are compact and concedes that they would still be compact if they were rotated 90 degrees and oriented vertically.

For example, Dr. McCartan's Congressional Map B2 contains two horizontal, rectangular districts that run parallel to each other. Dr. McCartan insists that both are compact—and would remain compact if rotated to a vertical position:

---

[7] Hialeah, Homestead, Miami, Miami Gardens, and North Miami. J. Ex. 1 at 18–20.

[8] Hialeah, Homestead, Miami, Miami Gardens, and North Miami. J. Ex. 10 at 17; J. Ex. 11 at 17; J. Ex. 15 at 17.

[9] Maps C1 and C4 split Coral Gables, and Map C2 splits Miami Springs, in addition to Hialeah, Homestead, Miami, Miami Gardens, and North Miami. J. Ex. 13 at 17; J. Ex. 14 at 17; J. Ex. 16 at 17.

[10] Map B splits Miami Springs, Sweetwater, and Virginia Gardens in addition to Hialeah, Homestead, Miami, Miami Gardens, and North Miami. J. Ex. 12 at 17.



J. Ex. 19 at 1. The same is true of District 24 in Maps A and B1:



**Congressional Map A**                    **Congressional Map B1**

J. Ex. 17 at 1; J. Ex. 18 at 1. Map D contains a tall and thin, vertically oriented District 8 that runs

south from Daytona Beach to the northern boundary of Indian River County. Dr. McCartan believes

this district is compact and that its shape is very close to a rectangle:



J. Ex. 22 at 1.

**D.** Finally, Dr. McCartan will acknowledge the limitations of alternative maps. He will concede that, while an alternative map can reveal whether it is *possible* to draw a district in a certain way, it cannot reveal whether any specific configuration would be *typical* or *atypical* within the larger universe of possible maps. He recognizes that districts can be drawn in many different ways and that a map reflects the choices, decisions, biases, and preferences of the map-drawer. No matter how many maps a human map-drawer creates, the output will never be random and will not necessarily be representative of the larger universe of possibilities.

According to Dr. McCartan, computer simulations that randomly generate thousands of redistricting maps can determine whether a particular configuration is typical or atypical—or whether a specific factor, such as race, played a role. Dr. McCartan is a member of a research group called the ALARM Project that develops redistricting simulations. Dr. McCartan himself developed the algorithm that the research group used after the 2020 decennial census to produce 5,000 hypothetical, computer-generated maps of Florida congressional districts.

Dr. McCartan could have offered simulations to support his opinions here. As in *Nord Hodges*, he chose not to. In *Nord Hodges*, the court found that Dr. McCartan's alternative maps undermined plaintiffs' claims of racial predominance in part because Dr. McCartan could have applied his expertise with redistricting simulations to produce computer-generated maps, but did not. 796 F. Supp. 3d at 1116.

Dr. McCartan recognizes, however, that even thousands of computer simulations cannot determine whether race was the *predominant* factor in a district's design. By adhering to all redistricting criteria other than race, a simulation could reveal whether race was a factor. But Dr. McCartan concedes that predominance depends on the relative importance of race compared to other factors, that multiple factors could be important, and that the mere fact that race impacted a district's shape does not establish that race was the most important influence. For that reason, even computer simulations cannot differentiate between a map in which race was predominant and one in which race was a factor—perhaps even an important one—but not predominant.

**Dr. Abott.** Next, to establish racial predominance, Plaintiffs rely on an "adjacency analysis" performed by Dr. Abott. But Dr. Abott's analysis has too many holes to support Plaintiffs' claims of racial predominance.

An adjacency analysis focuses on geographical units that a district splits—such as counties and municipalities—and asks whether the portions included in the district have a higher minority concentration than the excluded portions. It also considers adjacent geographical units along the perimeter of a challenged district—one just inside and the other just outside the district—and assesses whether the included unit has a higher minority concentration than the excluded unit. In theory, if a map-drawer selectively added minorities and selectively excluded non-minorities, then an adjacency analysis might detect the pattern.

In *Nord Hodges*, however, the court pointed out a fundamental flaw of an adjacency analysis: it cannot determine causation—or *why* the included units have higher minority concentrations than excluded units. An adjacency analysis assumes that minorities are evenly distributed across the State and therefore that there is always a "50/50 chance" that included units will have higher minority concentrations than excluded units. 796 F. Supp. 3d at 1107–08, 1117–18. The court pointed out the obvious error of that assumption: "in the real world, Hispanic people, Black people, and people of other races and ethnicities are not evenly distributed, and the lines that divide neighborhoods are often major boundaries like interstates, waterways, municipal lines, etc." *Id.* at 1118. Thus, "a district line could consistently place a higher percentage of [minorities] on one side simply because it follows a main road or keeps a neighborhood whole." *Id.* The adjacency analysis cannot therefore "distinguish between a map drawer who follows an existing boundary for racial reasons and one who follows a boundary for nonracial reasons." *Id.* For these reasons, the court rejected the opinion of Dr. Matthew Barreto, *id.*, who found a less-than-one-percent chance that the challenged district was drawn without consideration of race, *id.* at 1108.

Simply put, an adjacency analysis cannot answer the *why* question. If, for example, a district follows the boundary between Broward and Miami-Dade Counties, an adjacency analysis will reveal that the Hispanic concentration of the areas just inside the Miami-Dade district are much higher than the Hispanic concentration of the areas just outside the district. But it cannot say why. It cannot determine whether the Legislature drew this district boundary (i) because it was racially motivated or (ii) because it sought to utilize county boundaries, and this one happened to coincide with significant variances in Hispanic concentrations.

The same flaw that doomed Dr. Barreto's analysis looms over Dr. Abott's. Dr. Abott also assumed that, when drawing race-blind, the chance that included areas will have higher minority concentrations than excluded areas is 50 percent. To make matters worse, Dr. Abott did not consider

and attempt to address alternative explanations (besides race) for the patterns she observed. For example, some of the adjacent areas that she compared lie on opposite sides of a county boundary. The explanation for the placement of the boundary might be Legislature's race-neutral desire to utilize county boundaries. The Legislature was not required to extend District 26 into Lee, Hendry, and Broward Counties to equalize minority concentrations along the district boundary. If its adherence to county boundaries resulted in higher minority concentrations just inside than just outside the challenged district, then the adjacency analysis does not help a fact-finder evaluate the Legislature's motive.

Similarly, some of the district boundaries that Dr. Abott analyzed follow major roadways, such as the Florida Turnpike or Krome Avenue. Dr. Abott did not assess whether any racial imbalance between included and excluded areas resulted from the Legislature's race-neutral desire to utilize these geographical boundaries.

Nor did Dr. Abott consider whether the Legislature's creation of Congressional District 24 or House District 117 to maintain the voting ability of black voters explains why some areas excluded from the challenged districts have lower Hispanic concentrations than some included areas. If state or federal law required the Legislature to maintain a district that protects the voting ability of Black voters, then it would be unsurprising if areas included in that district have lower Hispanic concentrations than areas contained in the challenged districts.

In fact, of the adjacent areas that Dr. Abott analyzes along the boundaries of House Districts 115 and 118, all but five inside-outside pairs are situated along a boundary with District 117. P. Exs. 181–82. As for District 119, the adjacency analysis *contradicts* Dr. Abott's hypothesis: most of the adjacent pairs that Dr. Abott analyzes have greater Hispanic concentrations *outside* than *inside* District 119. P. Ex. 183.

Perhaps for these reasons, Dr. Abott has no opinion as to whether race predominated—only that it cannot be ruled out. Recognizing that correlation does not establish causation, Dr. Abott offers only the most measured opinions about legislative motive. She does not even opine that race was *one* factor—only that the evidence strongly suggests it was. While she believes that race was likely at least one explanation, she agrees that there may very well be other explanations of the challenged districts' configurations.

Dr. Abott did not review—and was not asked to consider or address—the influence of non-racial considerations or potential alternative explanations for the shapes of the challenged districts. She cannot therefore opine on the relative weight or importance of racial and non-racial factors. She also believes that the evidence and her analysis are consistent with the hypothesis that *politics*—not *race*—was the predominant motive in the design of the challenged districts.

Dr. Abott appears to recognize that an adjacency analysis is unequipped to compare the relative weight and importance of different redistricting criteria and does not allow her to opine on racial predominance. Likewise in *Nord Hodges*, Dr. Barreto modestly opined that the inclusion of a minority population in the challenged district was "not a coincidence," but the court noted that the dispositive question was whether race-related goals outweighed race-neutral goals—a question that Dr. Barreto's adjacency analysis "could not answer." 796 F. Supp. 3d at 1119.

Dr. Abott's failure to consider and address alternative explanations contrasts sharply with her expert opinions in another recent redistricting case. In *GRACE, Inc. v. City of Miami*, No. 1:22-cv-24066 (S.D. Fla.), Dr. Abott opined that a city commission moved certain areas from one district to another because of race. In *GRACE*, however, Dr. Abott expressly considered and attempted to refute alternative, race-neutral explanations for the boundary changes she analyzed. Here, in contrast, Dr. Abott was not asked to and did not consider alternative explanations (besides race) for the district boundaries she analyzed.

The nail in the adjacency analysis' coffin, however, is that it also flags Dr. McCartan's alternative maps as racial gerrymanders. Dr. McCartan claims not to have considered race when he drew his maps. Yet according to the adjacency analysis, Dr. McCartan's iterations of the challenged districts also have higher Hispanic concentrations just inside than just outside their boundaries. D. Exs. 86–91. If the adjacency analysis treats not only the enacted districts but also Dr. McCartan's race-neutral districts as highly improbable statistical outliers, then the adjacency analysis is useless and cannot actually distinguish between maps drawn with respect to race and maps drawn without respect to race.

Dr. Abott's adjacency analysis is flawed for other reasons as well.

*First*, Dr. Abott's own analysis identifies many high-Hispanic areas just outside each challenged district and many low-Hispanic areas just inside each challenged district. For example, just outside District 26, Dr. Abott identified areas with Hispanic voting-age populations as high as 70.8, 70.1, 69.5, 68.5, 66.4, 65.1, 58.8, 58.0, 57.1, and 56.3 percent. D. Ex. 106; P. Ex. 177. And just inside District 26, Dr. Abott identified areas with Hispanic voting-age populations as low as 3.1, 4.1, 4.8, 5.1, 5.3, 10.0, 10.7, 13.6, 17.6, and 26.7 percent. D. Ex. 106; P. Ex. 177. If the Legislature drew District 26 as a racial gerrymander, then this observation is inexplicable.

*Second*, while an included unit might have a higher Hispanic concentration than an excluded unit, the difference is often trivial. Dr. Abott did not consider the magnitude of the differences. It defies plausibility to suppose that line-drawing decisions betray racial motivations where, for example, the included area is 67.5-percent Hispanic, and the excluded area is 67.1-percent Hispanic. P. Ex. 105.

Dr. Abott's analysis of Collier County illustrates the flaws in her analysis. She notes that the portion of Collier County assigned to District 26 is 31.8-percent Hispanic, while the remainder of Collier County is only 13.7-percent Hispanic. But the portion of Collier County assigned to District 18 is 84.2-percent Hispanic. D. Ex. 54; D. Ex. 205 at RFAs 33–35. Dr. Abott conceded that the

Legislature could have added this high concentration of Hispanics to District 26, but did not. In fact, Mr. Kelly *removed* this precise area from District 26. Again, if the Legislature drew District 26 as a racial gerrymander, then this observation is inexplicable.

Dr. Abott recognizes, moreover, that, in Collier County, the predominantly white, non-Hispanic population lives on the west coast—and that any district that moves west into Collier County will reach that population *last*. The district cannot jump over east Collier County. Nor can Dr. Abott explain why a racially motivated map-drawer would ever extend District 26 from a 68.7-percent Hispanic county (Miami-Dade) into 27.2-percent Hispanic county (Collier). D. Ex. 37; D. Ex. 228 at 2; D. Ex. 235 at 2. The decision to enter Collier County guaranteed a sharp reduction in District 26's Hispanic voting-age population. Dr. McCartan's renditions of District 26—which remain in heavily-Hispanic Miami-Dade County, and all but one of which are 90-percent Hispanic, J. Ex. 17 at 1–2; J. Ex. 18 at 1–2; J. Ex. 19 at 1–2; J. Ex. 20 at 1–2; J. Ex. 21 at 1–2; J. Ex. 22 at 1–2—prove the point.

Dr. Abott relies on Dr. McCartan's small handful of maps as a baseline to demonstrate the "natural" outcome of a race-blind redistricting process. As explained above, however, Dr. McCartan himself recognizes that map-drawers have biases and preferences and that maps drawn by human map-drawers are not random or representative samples of the larger universe of possibilities. Dr. Abott herself concedes that one who seeks to make comparisons in a more formal statistical analysis would use a larger sample of maps to ensure that the sample is representative. Still, Dr. Abott was asked to use Dr. McCartan's maps as comparators, so she did.

Finally, Dr. Abott analyzed the seven originally challenged State House districts aggregately—not individually on their own merits. She therefore offers no conclusions as to whether any specific State House district was drawn with respect to race. Her analysis of a seven-district amalgam flies in the face of precedent, which calls for a district-by-district analysis. *Bethune-Hill*, 580 U.S. at 191–92.

As in *Nord Hodges*, the adjacency analysis is too faulty and unreliable to overcome the presumption of legislative good faith and establish racial predominance. This Court should decline to draw that inference. It should find that race did not predominate in the design of any challenged district and should enter judgment for Defendants.

**IV.   EVEN IF RACE PREDOMINATED, THE CHALLENGED DISTRICTS ARE NARROWLY TAILORED AND THEREFORE CONSTITUTIONAL.**

Race did not predominate in the challenged districts. But even if it did, the challenged districts satisfy strict scrutiny.

**A. Compelling Interest.** First, Plaintiffs affirmatively allege that the State's interest in compliance with the Non-Diminishment Clause is compelling. ECF No. 58 ¶¶ 191, 221; *contra Black Voters Matter*, 415 So. 3d at 196. Plaintiffs have not therefore placed this question before the Court for a decision.

"In our adversary system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020). Both "in the first instance and on appeal . . . , we rely on the parties to frame the issues for decision," while courts decide only the "matters the parties present." *Id.* (quoting *Greenlaw v. United States*, 554 U.S. 237, 243 (2008)). "To put it plainly, courts 'call balls and strikes'; they don't get a turn at bat." *Clark v. Sweeney*, 607 U.S. ----, No. 25-52, 2025 WL 3260170, at *1 (U.S. Nov. 24 2025) (quoting *Lomax v. Ortiz-Marquez*, 140 S. Ct. 1721, 1724 (2020)).

In *Bethune-Hill*, the challengers did not dispute that compliance with the VRA was a compelling interest. 580 U.S. at 193. The Court therefore assumed that it was and proceeded to hold that District 75 was narrowly tailored to achieve compliance with the VRA. *Id.* at 193–94.

As in *Bethune-Hill*, Plaintiffs here do not dispute the existence of a compelling interest. Thus, the only question presented at the strict-scrutiny stage is whether the challenged districts are narrowly tailored to achieve the State's interest in compliance with the Non-Diminishment Clause.

Moreover, while the burden of production shifts to the State once racial predominance is established, the ultimate burden of persuasion remains with Plaintiffs throughout the litigation. *Johnson v. Mortham*, 915 F. Supp. 1574, 1577–78 (N.D. Fla. 1996) (three-judge court).[11] Where, as here, Plaintiffs do not challenge the existence of a compelling interest—and indeed allege its existence— they cannot carry their burden of persuasion on that point.

**B. Cohesion.** Plaintiffs claim the challenged districts are not narrowly tailored. According to Plaintiffs, Hispanic voters in the challenged districts are not politically cohesive, and therefore the Non-Diminishment Clause does not apply.

Plaintiffs are wrong. Their own expert, Dr. Hannah Walker, admits that Hispanic voters in the challenged districts are cohesive—and her analysis confirms it.

The cohesion requirement serves one specific function in the non-diminishment analysis. The Non-Diminishment Clause protects districts in which minorities are able "to elect representatives of their choice." Fla. Const. art. III, §§ 20(a), 21(a). Thus, to be entitled to protection, the minority group must have a "choice," or a discernible preference, among different candidates. *Black Voters Matter*, 415 So. 3d at 186. If the minority group is a toss-up or "swing" voting bloc—evenly divided between Democrats and Republicans, or regularly oscillating between them—then it has no "representatives of [its] choice," and the Non-Diminishment Clause does not apply. Fla. Const. art. III, §§ 20(a), 21(a); *Black Voters Matter*, 415 So. 3d at 186.

Stated differently, the minority group must exhibit "some level of voting cohesion." *Black Voters Matter*, 415 So. 3d at 186.

---

[11] *See also Smith v. Beasley*, 946 F. Supp. 1174, 1208 (D.S.C. 1996) (three-judge court); *Quilter v. Voinovich*, 912 F. Supp. 1006, 1019 (N.D. Ohio 1995) (three-judge court), *vacated on other grounds*, 518 U.S. 1014 (1996); *Johnson v. Miller*, 864 F. Supp. 1354, 1378–79 (S.D. Ga. 1994) (three-judge court); *Vera*, 861 F. Supp. at 1336–37; *Shaw v. Hunt*, 861 F. Supp. 408, 435–36 (E.D.N.C. 1994) (three-judge court), *rev'd on other grounds*, 517 U.S. 899 (1996).

The Florida Supreme Court has not prescribed any particular measure of cohesion. Nor has it established any bright lines or numerical thresholds. The cohesion requirement is therefore best understood in light of the question it answers: do minorities in the district have candidates "of their choice"—*i.e.*, a detectable preference between candidates?

Here, they do. Dr. Walker performed a statistical analysis to determine how Hispanic voters in the benchmark districts voted in past election contests. She determined that:

- In Benchmark District 115, Hispanic voters preferred the Republican candidate in 15 of 17 elections and the Democratic candidate in 0 of 17 elections.

- In Benchmark District 118, Hispanic voters preferred the Republican candidate in 11 of 17 elections and the Democratic candidate in 0 of 17 elections.

- In Benchmark District 119, Hispanic voters preferred the Republican candidate in 14 of 17 elections and the Democratic candidate in 0 of 17 elections.[12]

D. Ex. 160.

These data establish more than enough cohesion. The candidate preference is clear. It is implausible to suppose that voters who prefer the same political party's candidates 15-to-0, 11-to-0, or 14-to-0 have no preference between the candidates.

Dr. Walker did not identify a *single* election in which Hispanic voters in these districts preferred the Democratic candidate. The *consistency* of this preference confirms that, in each district, Hispanic voters had "representatives of their choice." *Cf. Thornburg v. Gingles*, 478 U.S. 30, 54 n.21 (1986) (explaining that voting is racially polarized when there is a "consistent relationship" between the voter's race and candidate preference). Indeed, Dr. Walker acknowledges that Hispanic voters in these districts meet her definition of cohesion.

---

[12] In the other elections, Dr. Walker could not determine which candidate Hispanic voters preferred.

The outcome is the same in Congressional District 26. Dr. Walker determined that, in the benchmark district, Hispanic voters preferred the Republican candidate in 13 of 16 elections and the Democratic candidate in 1 of 16 elections. Because Hispanic voters in the benchmark district consistently expressed the same preference, Dr. Walker considers them politically cohesive.

Plaintiffs ignore the consistency of the preference and instead focus on margins of victory. Plaintiffs claim that Hispanic voters are not cohesive because they did not routinely support Republican candidates in landslide proportions. *See* ECF No. 58 ¶ 16. Plaintiffs err for two reasons.

*First*, the Florida Supreme Court has never suggested that the Non-Diminishment Clause protects only minority groups that are "politically homogenous or monolithic." *Id.* The court's observation that the Non-Diminishment Clause requires only "*some level* of voting cohesion" points strongly to a less demanding standard. *Black Voters Matter*, 415 So. 3d at 186 (emphasis added).

By comparison, under section 2 of the VRA, federal courts have established "no bright-line numerical cutoff for a finding of political cohesion," *Ala. State Conf. of Nat'l Ass'n for Advancement of Colored People v. Alabama*, 612 F. Supp. 3d 1232, 1271 (M.D. Ala. 2020), and a "showing that a significant number of minority group members usually vote for the same candidates" is only "one way" of proving cohesion, *Gingles*, 478 U.S. at 56; *see also Holder v. Hall*, 512 U.S. 874, 903–04 (1994) (Thomas, J., concurring) (explaining that there is "no set standard" of cohesion and that the cohesion requirement "does not present much of a barrier to the assertion of vote dilution claims on behalf of any racial group").

*Second*, as a factual matter, Dr. Walker's analysis *understates* Hispanic support for Republican candidates. Dr. Walker used two different statistical methods to conduct the same analysis. Then, to determine each candidate's share of the Hispanic vote in each election, Dr. Walker in each case selected the estimate that showed *less* cohesion and discarded the estimate that showed *more* cohesion. In other words, each and every time, she chose the estimate that favored Plaintiffs' position. Dr.

Walker admits that she had no way to know which estimate was correct and no reason to believe the lesser estimate was more likely to be correct. Still, as a rule, she always chose the lesser of her two estimates. The higher, equally probable estimates that Dr. Walker ignored show Republican candidates receiving more than 60-percent support from Hispanic voters more than two-thirds of the time, and sometimes more than 70-percent support.

*Third*, at counsel's direction, Dr. Walker did not analyze any elections more recent than the 2020 general election. Since 2020, Hispanic voters in Miami-Dade County have shifted to the Republican Party in droves. Between November 2020 and April 2025, the number of Hispanics in Miami-Dade County who were registered as Republicans increased from 324,495 to 377,266—an increase of 52,771, or 16.3 percent. D. Ex. 93. Over the same period, the number of Hispanics in Miami-Dade County who were registered as Democrats decreased from 276,716 to 225,592—a decrease of 51,124, or 18.5 percent. *Id.* By excluding post-2020 elections from her analysis, Dr. Walker guaranteed that her results would not reflect this seismic shift in voter preferences.

Even at face value, however, Dr. Walker's own analysis demonstrates "some level of voting cohesion" among Hispanic voters in each challenged district, *see Black Voters Matter*, 415 So. 3d at 186—and more than enough to establish that Hispanic voters in those districts had candidates "of their choice," Fla. Const. art. III, §§ 20(a), 21(a). This Court should reject Plaintiffs' call to reinterpret the Non-Diminishment Clause to protect only minority voters who are "politically homogeneous or monolithic." ECF No. 58 ¶ 16.

Because Hispanic voters in the benchmark districts had candidates "of their choice," Fla. Const. art. III, §§ 20(a), 21(a), the Legislature correctly determined that the Non-Diminishment Clause applied—or at least had "good reasons to believe" that it did. *Bethune-Hill*, 580 U.S. at 194 (quoting *Ala. Legis. Black Caucus*, 575 U.S. at 278). The challenged districts are therefore narrowly tailored to achieve compliance with the Non-Diminishment Clause.

**C. White Bloc Voting.** Last, Plaintiffs contend that the Non-Diminishment Clause applies only when white voters *statewide* and minority voters *in the benchmark district* consistently prefer different candidates. ECF No. 58 ¶¶ 17, 197–98. Under this theory, since white voters statewide prefer Republican candidates, the Non-Diminishment Clause protects only minorities who vote for Democrats. No such requirement exists, however, and this Court should decline Plaintiffs' invitation to transform the Non-Diminishment Clause into a partisan tool.

Plaintiffs' convoluted theory goes like this. Section 2 of the VRA imposes liability—and requires the creation of a district that performs for minorities—only where three "preconditions" are satisfied. *Id.* ¶ 13.[13] The third of these preconditions is that, in the challenged district, a "white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Gingles*, 478 U.S. at 51.

Plaintiffs claim the Non-Diminishment Clause incorporates this precondition, ECF No. 58 ¶¶ 13–17, but they recognize it's not a perfect fit. The Non-Diminishment Clause protects only districts that *already perform* for minorities and prohibits changes that diminish that existing ability. *Black Voters Matter*, 415 So. 3d at 186–87; *In re SJR 1176*, 83 So. 3d at 625. Meanwhile, section 2 imposes liability where a district *does not perform* for minorities and requires the creation of one that does. *Gingles*, 478 U.S. at 48 (explaining that the "theoretical basis" of a section 2 claim "is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters"). Because the third precondition describes a non-performing district—*i.e.*, a district in which white voters outvote minorities and usually

---

[13] Once the three preconditions are satisfied, the challenger must that prove that, "based on the totality of circumstances, . . . the political processes leading to nomination or election . . . are not equally open to participation by members of a [minority group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b); *accord Gingles*, 478 U.S. at 43–46.

defeat their preferred candidates—it makes no sense to import the third precondition, as is, into the Non-Diminishment Clause.

To avoid this dilemma, Plaintiffs rejigger the third precondition in an unprecedented way. Rather than focus on white voters *in the district*—voters who can actually vote and impact elections in the district—they focus on white voters *statewide*. ECF No. 58 ¶¶ 17, 197–98. And since Dr. Walker found that white voters statewide prefer Republicans, under Plaintiffs' theory, the Non-Diminishment Clause protects only Democrats.[14]

This Court should reject Plaintiffs' partisan twist on the Non-Diminishment Clause.

*First*, the text of the Non-Diminishment Clause does not mention white voters or require that white voters vote in one particular way.

*Second*, no court has ever held that the Non-Diminishment Clause protects only minorities who vote differently from white voters statewide. The Florida Supreme Court recently explained that its "test" under the Non-Diminishment Clause has "three variables: whether the minority voters encompassed within a benchmark district vote cohesively; whether the minority candidate of choice is likely to prevail in the relevant contested party primary; and whether that candidate is likely to prevail in the general election." *Black Voters Matter*, 415 So. 3d at 193; *accord League of Women Voters of Fla.*, 179 So. 3d at 287 n.11 (explaining that the "first prong" is "whether the minority group votes cohesively" and that the other "two prongs" are "whether the minority candidate of choice is likely to prevail in the relevant contested party primary, and whether that candidate is likely to prevail in the general election"). The three variables do not include a requirement that minority voters support Democrats.

---

[14] By extension, if white voters in Florida ever return to their Democratic roots, then, under Plaintiffs' theory, the Non-Diminishment Clause will no longer protect minorities who prefer Democratic candidates.

To be sure, the Florida Supreme Court has recognized that a minority group's ability to elect its preferred candidates in the primary and general elections depends in part on "the voting patterns of *a district's* nonminority voters." *Black Voters Matter*, 415 So. 3d at 187 (emphasis added). This is only common sense. For example, if minorities comprise only 40 percent of a district, then they might be able to elect their preferred candidate if the district's white voters are politically divided or support the same candidate, but not if the district's white voters are unified behind a different candidate.

The court did not, however, require a *conflict* between minority preferences and white preferences. Indeed, the court has recognized that the Non-Diminishment Clause applies where minorities are able to elect their preferred candidates only with *support* from white voters. *See In re SJR 1176*, 83 So. 3d at 625, 627 (explaining that the Non-Diminishment Clause protects "crossover districts"—*i.e.*, districts in which minorities "make up less than a majority" but are able to elect their preferred candidates "with help from voters who are members of the majority and who cross over to support the minority's preferred candidate"). And it is a tremendous leap to infer that the Non-Diminishment Clause applies only in one narrow circumstance: where the preferences of white voters *statewide* conflict with the preferences of minority voters *in the district*.

*Third*, even under section 2 of the VRA, courts do not assess the candidate preferences of white voters on a statewide basis. Rather, courts assess whether white voters *in the district* outvote minorities *in the district* and defeat their preferred candidates. *See Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398, 405 (2022) (reversing in part because the district court did not assess white bloc voting "at the district level"); *Abbott*, 585 U.S. at 616 (same); *Cooper*, 581 U.S. at 302–03 (assessing white bloc voting at the district level); *Robinson v. Ardoin*, 37 F.4th 208, 225 n.8 (5th Cir. 2022) (explaining that white bloc voting must be assessed at the district level and that an expert's "analysis of white bloc voting statewide was not strictly relevant"); *Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1151 (5th Cir.

1993) (concluding that plaintiffs failed to prove white bloc voting because their evidence examined white preferences in "the state as a whole").

Plaintiffs' expert, Dr. Walker, was so surprised that Plaintiffs' counsel instructed her to assess the candidate preferences of white voters statewide that she asked counsel for clarification. In fact, this is the first time that Dr. Walker has ever analyzed the preferences of white voters statewide and of minority voters at the district level. She will explain that an expert normally compares the preferences of different racial groups within the same shared jurisdiction. The point of the analysis is to determine whether one group prevents another from electing its preferred candidates. But voters in far-away places such as Orlando or Pensacola have no effect on the ability of Hispanics in South Florida districts to elect their preferred candidates.

*Fourth*, while the Florida Supreme Court has noted that section 2 concepts can be "relevant" to a non-diminishment analysis, *League of Women Voters*, 179 So. 3d at 287 n.11, it does not follow that the section 2 preconditions translate wholesale into the Non-Diminishment Clause. Indeed, in *Black Voters Matter*, the court rejected an argument that the first precondition of a section 2 claim applies to the Non-Diminishment Clause. 415 So. 3d at 193–94. The Non-Diminishment Clause, after all, is patterned after section 5 of the VRA—not section 2. *Id.* at 187 (explaining that the Florida Supreme Court previously "looked to Section 2 on the issue of vote dilution and to Section 5 of diminishment"); *In re SJR 1176*, 83 So. 3d at 625 ("Just as Section 2 jurisprudence guides the Court in analyzing the state vote dilution claims, when we interpret [the Non-Diminishment Clause], we are guided by any jurisprudence interpreting Section 5."). Section 2 and section 5 "differ in structure, purpose, and application," *Reno v. Bossier Par. Sch. Bd.*, 520 U.S. 471, 477 (1997) (quoting *Holder*, 512 U.S. at 883 (plurality opinion)), and "combat different evils and . . . impose very different duties upon the States," *id.* Plaintiffs here blur the line between distinct concepts and distinct causes of action.

Plaintiffs' argument ultimately hinges on five words of dicta in *League of Women Voters*. There, the court stated that the defendants had not proven "voting cohesion and polarized racial bloc voting—the establishment of which is the first step in any retrogression analysis." 179 So. 3d at 286. But the court's analysis and holding addressed only the minority group's cohesiveness—not the preferences of white voters. *See id.* at 286–87 & n.11. More recently, in *Black Voters Matter*, the court did not include white bloc voting—let alone *statewide* white bloc voting—among the "three variables" of a non-diminishment analysis. 415 So. 3d at 193. And it certainly never articulated the unprecedented notion that the Non-Diminishment Clause protects only minorities whose candidate preferences differ from those of white voters statewide—*i.e.*, minorities who vote for Democrats.

This Court should decline to politicize the Non-Diminishment Clause and impose a fourth "variable" that limits the Non-Diminishment Clause's protections to Democrats. If the Non-Diminishment Clause excludes Republicans, then this Court should leave it to state courts to say so. *See Seling v. Young*, 531 U.S. 250, 270 (2001) (Scalia, J., concurring) (noting the Supreme Court's "sound and traditional reluctance to be the initial interpreter of state law"). Because it protects even minorities who support Republicans, the Non-Diminishment Clause applied to the challenged districts. The challenged districts are therefore narrowly tailored to achieve the State's interest in compliance with the Non-Diminishment Clause.

* * *

In 2022, the Florida Supreme Court reviewed all State House districts and determined them to be valid under the Florida Constitution's redistricting standards. *In re SJR 100*, 334 So. 3d at 1285. Although the court did not make district-specific findings, its determination of validity inevitably means one of two things: either Districts 115, 118, and 119 comply with Florida's race-neutral, tier-two standards, or the Non-Diminishment Clause applies to them and permits a deviation from those

standards. *See* Fla. Const. art. III, §§ 20(b), 21(b) (providing that tier-one standards take precedence in case of conflict).

Either finding dooms Plaintiffs' claims. If the challenged districts comply with Florida's race-neutral, tier-two standards, then Plaintiffs' burden to establish racial predominance—and the subordination of traditional race-neutral districting principles to race—is virtually insurmountable. If, however, the Non-Diminishment Clause applies, then Plaintiffs' contention that the Non-Diminishment Clause does not apply and that the challenged districts are therefore not narrowly tailored flounders.

## V.   THIS COURT SHOULD EXCLUDE PLAINTIFFS' UNTIMELY EXPERT EVIDENCE.

On November 26, 2025, more than five months after the close of discovery, and on the very day that exhibit and witness lists were due, Plaintiffs disclosed two "supplemental" expert reports. The untimely reports present a brand-new, never-before-seen State House map drawn by one of the two experts, Dr. McCartan, together with expert opinions and associated data set forth in 17 new tables.[15] Plaintiffs' deadline to disclose expert opinions, however, passed more than eight months earlier, on March 21, 2025, and discovery closed on July 18, 2025. ECF No. 98 at 1; ECF No. 101.[16] This Court should exclude any evidence presented for the first time in the two untimely "supplemental" reports.[17]

An expert report must provide "a *complete* statement of all opinions the witness will express and the basis and reasons for them." Fed. R. Civ. P. 26(a)(2)(B)(i); *accord Crawford v. ITW Food Equip. Grp., LLC*, 977 F.3d 1331, 1341 (11th Cir. 2020). "Because the expert witness discovery rules are designed to allow both sides . . . to prepare their cases adequately and to prevent surprise, compliance with the

---

[15] Dr. McCartan's and Dr. Abott's new reports are attached as **Exhibits B and C**, respectively.

[16] *See also* ECF No. 101 (setting deadline for rebuttal disclosures as June 20, 2025); ECF No. 112 (granting 1-day extension for Dr. Abott's rebuttal report).

[17] In compliance with the Court's Order Providing Instructions for Bench Trial, Defendants did not move *in limine* to exclude the belatedly disclosed expert evidence. *See* ECF No. 153 at 1–2.

requirements of Rule 26 is not merely aspirational." *Cooper v. S. Co.*, 390 F.3d 695, 728 (11th Cir. 2004) (citation omitted).

To be sure, Rule 26(e)(2) permits supplementation of an expert's report, but only "to correct inaccuracies or add information not available when the report was filed." *Crawford*, 977 F. 3d at 1341. Courts "distinguish 'true supplementation' (*e.g.*, correcting inadvertent errors or omissions) from gamesmanship." *Griffin v. United States*, No. 3:19-cv-00441, 2021 WL 4947180, at *13 (M.D. Fla. July 30, 2021), *report and recommendation adopted*, 2021 WL 4935546 (M.D. Fla. Aug. 2, 2021) (quoting *Gallagher v. S. Source Packaging, LLC*, 568 F. Supp. 2d 624, 631 (E.D.N.C. 2008)). True supplementation does not permit an expert to bolster an earlier report, buttress the expert's position, perform additional work, correct weaknesses, perfect a litigation strategy, or produce information belatedly. *Open Sea Distrib. Corp. v. Artemis Distrib., LLC*, 692 F. Supp. 3d 1151, 1247 (M.D. Fla. 2023); *Apple Inc.*, 2021 WL 2940264, at *2; *Great Lakes Ins. Se. v. Rental Boat Corp.*, No. 20-60133-CIV, 2021 WL 1686926, at *2 (S.D. Fla. Mar. 1, 2021) (Snow, Mag.).

Rule 37(c)(1) bars the use of information not disclosed in compliance with Rule 26(a) or (e), including untimely expert disclosures that are not proper supplementation. *Crawford*, 977 F. 3d at 1341; *All-Tag Corp. v. Checkpoint Sys., Inc.*, No. 9:17-CV-81261, 2019 WL 5073499, at *3 (S.D. Fla. Oct. 9, 2019) (Matthewman, Mag.). Exclusion is also an appropriate remedy under Rule 16(b), "which authorizes the court to control and expedite pretrial discovery through a scheduling order and gives the court broad discretion to preserve the integrity and purpose of a pretrial order." *All-Tag Corp.*, 2019 WL 5073499, at *3. "Courts have broad discretion to exclude untimely-disclosed expert reports, even ones designated as 'supplemental' reports." *Apple Inc.*, 2021 WL 2940264, at *2 (collecting cases).

Dr. McCartan did not supplement his opinions, but rather provided an entirely new map only a month and half before trial. Plaintiffs' counsel asked Dr. McCartan "to redraw a portion of the Florida House district map corresponding to enacted districts 115, and 118–119." Ex. B ¶ 2. Not only

did Dr. McCartan provide a brand-new map on the eve of trial, but he also produced a series of new tables with demographic data that were not previously disclosed. *See* Ex. B at 13–17 & app. C.

None of this information was previously unavailable to Dr. McCartan. It was all available to Dr. McCartan when he produced his initial report on March 21, 2025. *See Great Lakes*, 2021 WL 1686926, at *2 ("Supplementation is not proper if the new opinion is based on evidence that was available when the initial report was disclosed."). No new information justifies the supplement. *See Apple Inc.*, 2021 WL 2940264, at *2 (explaining that Rule 26(e) "is not a device to allow a party's expert to engage in additional work, or to annul opinions or offer new ones to perfect a litigating strategy"). The entry of summary judgment against Plaintiffs as to House Districts 113, 114, and 116 did not reopen expert discovery or justify an expert's creation of *new evidence*—a new alternative map—at the eleventh hour.

The redistricting data that Dr. McCartan used to draw the new map and to provide the new tables and figures had been available for years when he produced his initial report in March 2025. Nonetheless, Plaintiffs waited until 47 days before trial to provide these statistics. This is exactly what Rule 26 seeks to avoid. *Id.* ("The purpose of the rules governing expert disclosure is to safeguard against surprise." (citing *United States v. Marder*, 318 F.R.D. 186, 192 (S.D. Fla. 2016))); *see also Jouria v. CE Res., Inc.*, No. 15-61165-CIV, 2018 WL 11459496, at *2 (S.D. Fla. Apr. 18, 2018) (same). Dr. Abott's opinions are likewise new, belatedly disclosed expert opinions. Dr. Abott piggybacks on Dr. McCartan's new map, adding analysis of the new map. *See* Ex. C at 2.

Defendants anticipated that this would happen—and Plaintiffs assured the Court it wouldn't. In the parties' Joint Scheduling Report, Defendants proposed that Plaintiffs be required to produce their alternative maps by the "deadline to serve initial expert disclosures." ECF No. 92 at 9. This was to allow Defendants' experts "an opportunity to evaluate and opine on the alternative maps that

Plaintiffs intend to present to the Court." *Id.* Otherwise, "the Court may be denied the benefit of full expert analysis of key evidence." *Id.*

Plaintiffs opposed the deadline. They denied that they intended "to wait until the 'late stages of litigation' to disclose alternative maps" and assured the Court they would disclose their maps "in the ordinary course of discovery." *Id.*

They didn't. Discovery closed on July 18, 2025. ECF No. 101. More than four months later, Plaintiffs disclosed their new reports, an entirely new redistricting map, and 17 new tables of redistricting data. Plaintiffs attempt to disguise their disregard for the Court's ordered deadlines by labeling these new opinions as "supplements." However, Rule 26(e) is not a tool "to circumvent deadlines otherwise set by the court." *Jouria*, 2018 WL 11459496, at *2. Dr. McCartan and Dr. Abott are offering new expert evidence long after the deadline.

Defendants will be prejudiced if these belated disclosures are not excluded. Defendants' expert witness, Dr. Sean Trende, has other professional commitments that prevented him from immediately preparing another rebuttal expert report. Further, before they ever deposed Dr. Abott and Dr. McCartan in June and July 2025, Defendants served extensive written discovery aimed at the alternative maps that Plaintiffs disclosed in March 2025. These requests included interrogatories, requests for production, and requests for admissions. The disclosure of a new map more than four months after the close of discovery, and less than two months before trial, denies Defendants any opportunity to conduct written discovery related to the untimely map.

If the new opinions are not excluded, then Plaintiffs would gain an unfair advantage, presenting supplemental reports prepared with the benefit of extra time, and without a fair opportunity for rebuttal. The ordinary remedies used to address belated disclosures—limited discovery, rebuttal reports, or additional depositions—are not feasible here because of the compressed time (and intervening holidays) before trial commences, and Dr. Trende's prior commitments. Defendants

should not be penalized with cramming truncated discovery and depositions of two experts days before trial—nor is a deposition a substitute for rebuttal expert disclosures and written discovery.

Allowing the "supplemental" reports rewards delay and disregard for the rules and this Court's orders. It creates an unnecessary eleventh-hour scramble. Plaintiffs' impermissible attempt to bolster their case after this Court's ruling on summary judgment should not be allowed. Under Rule 37(c)(1), the late disclosure is not harmless or substantially justified. This Court should exclude the new map, the new data tables, and any expert opinions first disclosed in the belated "supplemental" reports.

## VI.   PRINCIPLES OF JUDICIAL RESTRAINT GOVERN REMEDIES IN REDISTRICTING CASES.

Because the challenged districts are constitutional, this Court need not reach the question of an appropriate remedy. If, however, the Court finds a district invalid, then several important principles of judicial restraint that federal courts have articulated in redistricting cases should characterize the post-trial remedial phase.

**A. Deference to Legislative Remedy.** First, judicial intervention into map-drawing and election administration touches on important interests of federalism and the separation of powers. To protect these interests, federal courts do not immediately impose substitute districts. Rather, they afford state legislatures an opportunity to redraw the invalid districts before the judicial branch imposes new ones. As the Supreme Court explained, redistricting "is primarily a matter for legislative consideration and determination, and . . . judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *Reynolds v. Sims*, 377 U.S. 533, 586 (1964); *accord McDaniel v. Sanchez*, 452 U.S. 130, 150 n.30 (1981) (explaining that a federal court should "give the legislature an opportunity to devise an acceptable replacement before itself undertaking the task of reapportionment").

In affording the legislative branch an opportunity to act, courts do not *order* legislative action, but rather stay their hand for a time, allowing the legislature an opportunity to convene and enact remedial legislation if it chooses. This is because an injunction that orders a legislature to enact legislation—*i.e.*, to enact a new map—would violate the separation of powers; courts have consistently refused to order legislative bodies to legislate, *see Smith & Lee Assocs., Inc. v. City of Taylor*, 102 F.3d 781, 796–97 (6th Cir. 1996); *Michigan v. U.S. Army Corps of Eng'rs*, 911 F. Supp. 2d 739, 758 n.16 (N.D. Ill. 2012).

As in other redistricting cases, this Court should not order legislation, but rather afford the Legislature time to act before a judicial remedy is imposed. To allow the Legislature an opportunity to enact redistricting legislation does not require the issuance of an order or a command to the Legislature—only the adoption of a timeline to a judicial remedy—and thus preserves the separation of powers.

**B. The *Purcell* Principle.** Second, to avoid disrupting the work of election officials and shaking public confidence in the fairness, neutrality, and integrity of the election process, federal courts do not change the rules that govern imminent elections. They recognize that the orderly administration of a "statewide election is a complicated endeavor" that requires a "massive coordinated effort," *Democratic Nat'l Comm. v. Wis. State Legis.*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay), and that, "where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid," *Reynolds*, 377 U.S. at 585.

This strong presumption against federal-court interference in imminent elections has come to be called the "*Purcell* principle." *See Purcell v. Gonzalez*, 549 U.S. 1 (2006). The *Purcell* principle "teaches that 'federal district courts ordinarily should not enjoin state election laws in the period close to an

election.'" *League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1370 (11th Cir. 2022) (quoting *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurral)). It "counsels federal courts to exercise caution and restraint," *Tully v. Okeson*, 977 F.3d 608, 611–12 (7th Cir. 2020), and directs them to "consider the importance of preserving the status quo," *Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014).

In *League of Women Voters*, the court invoked the *Purcell* principle to stay an injunction that prohibited enforcement of state laws that regulated voter-registration activities, drop boxes, and solicitation near drop boxes and polling places. 32 F.4th at 1369. When the district court entered its injunction on March 31, 2022, voting in the August 23 primary election was less than four months away. *Id.* at 1371. Citing *Milligan*, in which the Supreme Court stayed an injunction entered about four months before an election, the court concluded that the district court had issued its injunction within *Purcell*'s temporal zone. *Id.* at 1371 & n.6.

As in *League of Women Voters*, next year's election deadlines will follow shortly after the trial and post-trial briefing conclude. Florida's next primary election is scheduled for August 18, 2026. Fla. Stat. §§ 100.031, 100.061. The qualifying period for candidates for Congress runs from April 20 to April 24, while the qualifying period for state-legislative candidates runs from June 8 to June 12. *Id.* § 99.061(1). Supervisors of Elections must begin to send vote-by-mail ballots to voters by July 4. *Id.* § 101.62(3). A corporate representative for the Miami-Dade Supervisor of Elections Office testified that any revisions to existing districts would be needed by March 15 to ensure an orderly implementation. Pichs Dep. at 104:9–105:3, 112:4–113:4.

Earlier this month, the Supreme Court reaffirmed the *Purcell* principle when it stayed a preliminary injunction that prohibited the use of Texas' newly drawn congressional districts during the 2026 midterm elections. *Abbott*, 2025 WL 3484863, at *1. The Court reiterated that "lower federal courts should ordinarily not alter the election rules on the eve of an election," *id.* at *1 (quoting

*Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020)), and concluded that the district court "violated that rule" when, on November 18, 2025, it enjoined the implementation of districts ahead of primary elections scheduled for March 3, 2026, *id.* The district court thus "improperly inserted itself into an active primary campaign, causing much confusion and upsetting the delicate federal-state balance in elections," *id.*

      **C. Equitable Discretion to Withhold Immediate Relief.** Even when districts are found invalid, federal courts prefer to allow elections to proceed in existing, invalid districts than to risk voter confusion, distrust in the election process, and disruption to the orderly conduct of the election.

      The Supreme Court has commended the "wise and temperate" approach of district courts that, in the exercise of their equitable discretion, permit imminent elections to be conducted without interference, despite the invalidity of the existing districts. *Roman v. Sincock*, 377 U.S. 695, 709–10 (1964); *accord Wells v. Rockefeller*, 394 U.S. 542, 547 (1969) (upholding the trial court's decision to proceed under an infirm map when the primary election was only three months away); *Kirkpatrick v. Preisler*, 390 U.S. 939, 939 (1968) (permitting Missouri to conduct congressional elections under an unconstitutional redistricting plan); *Johnson v. Smith*, No. 94-40025, 1994 WL 907596 (N.D. Fla. July 18, 1994) (declining to preliminarily enjoin the implementation of a congressional map that it later invalidated). And as discussed above, an election-eve, court-ordered change would deny a State's legislative body the first chance to devise a remedy. *White v. Weiser*, 412 U.S. 783, 794–95 (1973) ("[W]e have recognized that reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." (internal marks omitted)).

Rather than race the clock and make changes that risk disorder, distrust, and confusion, this Court should allow Florida's upcoming midterm elections to proceed in the existing districts.[18]

## CONCLUSION

This challenged districts are constitutional. This Court should enter judgment in Defendants' favor.

Dated December 22, 2025.                    Respectfully submitted,


                                            /s/ *Andy Bardos*
Christopher M. Kise (FBN 855545)            Andy Bardos (FBN 822671)
ckise@continentalpllc.com                   andy.bardos@gray-robinson.com
CONTINENTAL PLLC                            GRAYROBINSON, P.A.
101 North Monroe Street, Suite 750          301 South Bronough Street, Suite 600
Tallahassee, Florida 32301                  Tallahassee, Florida 32301-1724
Telephone: 850-270-2211                     Telephone: 850-577-9090

Jesus M. Suarez (FBN 60086)
jsuarez@continentalpllc.com
Carmen Manrara Cartaya (FBN 73887)
ccartaya@continentalpllc.com
Jennifer Marie Hernandez (FBN 1018836)
jhernandez@continentalpllc.com
CONTINENTAL PLLC
245 Alcazar Avenue
Coral Gables, Florida 33134
Telephone: 305-677-2707


*Attorneys for Defendant, Florida House of Representatives*

---

[18] Plaintiffs could have filed this litigation two years earlier.