IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 1:24-cv-21983-JB

CUBANOS PA'LANTE, *et al.*,

    *Plaintiffs*,

v.

FLORIDA HOUSE OF
REPRESENTATIVES, *et al.*,

    *Defendants*.

_____/

### **PLAINTIFFS' PRETRIAL BRIEF**

Plaintiffs will prove at trial that the Florida Legislature violated the Equal Protection Clause by drawing Congressional District 26 and State House Districts 115, 118, and 119 (collectively, the "Challenged Districts") to intentionally create majority-minority Hispanic districts—elevating race above all other considerations—without good reason to believe doing so was necessary to comply with the Florida Constitution.

Plaintiffs will present both direct and indirect evidence showing the Legislature's unlawful racial intent. The legislative record is replete with examples demonstrating that the Legislature relied on race in drawing the Challenged Districts because it erroneously believed the Tier One standards in Florida's Fair Districts Amendments compelled it to draw majority-Hispanic districts in South Florida.[1] Plaintiffs will present testimony from two legislators who participated in the redistricting process: Representative **Fentrice Driskell**, who served on the House Redistricting Committee and was the House Democratic Caucus's policy chair during the process; and former Senator **Annette Taddeo**, who represented part of Miami-Dade County from 2017 to 2022 and

---

[1] Tier One prohibits the diminishment or dilution of racial and language minority voters' ability to elect representatives of their choice, under certain conditions. Fla. Const. art. III, §§ 20(a), 21(a). Section 2 of the VRA similarly prohibits minority vote dilution. The Fair Districts Amendments' Tier Two standards enshrine in the Florida Constitution several "traditional race-neutral districting principles," *see Miller v. Johnson*, 515 U.S. 900, 916 (1995), requiring that districts (1) be as nearly equal in population as is practicable; (2) be compact; and (3) where feasible, utilize existing political and geographical boundaries. Fla. Const. art. III, §§ 20(b), 21(b). The Legislature must adhere to the Tier Two requirements, unless doing so would violate a Tier One requirement or federal law, and may deviate from the Tier Two requirements only to the extent necessary to comply with Tier One's provisions or federal law. *Id.*

1

who will testify to the Hispanic electorate in South Florida as a former legislator, candidate, and Democratic Party official. Plaintiffs will call as an adverse witness the House's Chief Map Drawer, **Jason Poreda**, who will testify to the ways in which race drove the House's development of the Challenged Districts. Indirect evidence from two of Plaintiffs' experts will confirm that race predominated in the drawing of the Challenged Districts: **Dr. Cory McCartan**, a statistician and redistricting expert who drew a number of illustrative maps that show how, when redrawn in a race-blind manner, the Challenged Districts better adhere to race-neutral redistricting criteria; and **Dr. Carolyn Abott**, a political scientist who evaluated the demographic data that suggests the Challenged Districts were drawn along racial lines.

The law prohibits the predominant use of race here because Tier One prohibits racial "diminishment" *only* when the second and third "*Gingles* preconditions" are satisfied, meaning that (1) the minority group votes cohesively and (2) the majority bloc voting is sufficient to defeat the minority group's candidate of choice—together, a phenomenon known as "racially polarized voting" or "RPV." *Cooper v. Harris*, 581 U.S. 285, 301–02 (2017); *Black Voters Matter Capacity Bldg. Inst. v. Sec'y, Fla. Dep't of State* (*BVM*), 415 So. 3d 180, 185–86 (Fla. 2025). The *Gingles* preconditions were absent here. In crafting the Challenged Districts, the Legislature ignored the diversity of the Hispanic community and wrongfully assumed that Hispanic voters in South Florida were politically homogenous and monolithic. The Legislature ignored that Florida's white majority did not usually vote in bloc to defeat Hispanic voters' preferred candidates. Plaintiffs' third expert, **Dr. Hannah Walker**, is a political scientist who analyzed racial voting patterns in the decade leading up to the Challenged Districts' enactment, finding a lack of Hispanic voting cohesion and white bloc voting that defeats Hispanic voters' preferred candidate.[2]

---

[2] Plaintiffs have also designated portions of the deposition of **Xavier Pichs**, an employee with the Miami-Dade County Supervisor of Elections' Office, for information relevant to the implementation of a remedy, should one be necessary in this case. If necessary, Plaintiffs will also present testimony from the individuals and organizations who brought this case to establish standing and to discuss the real-world impacts of the Challenged Districts for themselves and their "communities defined by actual shared interests," *Miller*, 515 U.S. at 916: (1) **Cynthia Perez**, Cubanos Pa'lante co-founder and board member; (2) **Rebecca Pelham**, Engage Miami's outgoing executive director; (3) **Camila Suarez Melinkoff**, FIU ACLU Club president and HD 115 resident; (4) **Enrique Cruz**, founding president of the FIU ACLU Club and CD 26 resident; (5) **Cindy Polo**, resident of HD 115 and former state representative; (6) **Genesis M. Castilla Falcon**, resident of HD 118 and founding vice president of the FIU ACLU Club; and (7) **Diana Belbruno**, resident of CD 26's Collier County portion.

**ARGUMENT**

Plaintiffs' trial presentation will prove that race predominated in the design of each Challenged District. Given this evidence, the burden will shift to Defendants to prove that the use of race was narrowly tailored to achieve a compelling interest. To date, Defendants have offered no evidence coming close to meeting that burden—nor can they, given the absence of racially polarized voting. Below, we discuss why Plaintiffs' evidence will prove predominance, why Defendants' evidence will not survive strict scrutiny, and how the Court should resolve certain evidentiary issues Plaintiffs anticipate may arise at trial.

**I. The evidence will establish racial predominance.**

***A. Racial predominance is a question of legislative intent.***

The parties largely agree on the applicable substantive law. *See* Joint Pretrial Stipulation ("Joint Stip.") (ECF No. 172) at 7–8. The polestar of the racial predominance inquiry is legislative intent: the intent of the legislative body. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 7 (2024) ("[W]e require the plaintiff to show that race was the 'predominant factor motivating the *legislature's* decision to place a significant number of voters within or without a particular district.'" (emphasis added) (quoting *Miller*, 515 U.S. at 916)). To "determin[e] whether racial considerations predominated in redistricting processes," a court must assess "relevant, contemporaneous statements of key legislators[.]" *Jacksonville Branch of NAACP v. City of Jacksonville*, 2022 WL 16754389, at *4 (11th Cir. Nov. 7, 2022). The *best* evidence of legislative intent will always be those "relevant, contemporaneous statements of key legislators" who were central to the development of the challenged legislation. *Id.*; *see also Jacksonville Branch of NAACP v. City of Jacksonville* (*Jacksonville I*), 635 F. Supp. 3d 1229, 1270–71, 1294–95 (M.D. Fla. 2022) (discounting sworn declarations of eighteen city councilmembers and city's mapmaker in favor of contemporaneous direct evidence of legislative intent); *Covington v. North Carolina*, 316 F.R.D. 117, 129–30 (M.D.N.C. 2016) (pointing to contemporaneous legislator statements as evidence of legislative intent), *aff'd*, 581 U.S. 1015 (2017) (mem.).[3]

---

[3] Perhaps second-best is testimony from the key legislators themselves. *See Abbott v. LULAC*, 607 U.S. ---, No. 25A608, 2025 WL 3484863, at *1 (Dec. 4, 2025) (mem.) (faulting the district court for "fail[ing] to honor the presumption of legislative good faith by construing ambiguous direct and circumstantial evidence against the legislature" in case where multiple legislators testified in court "that race played no role in the 2025 redistricting process"), *staying LULAC v. Abbott*, EP-21-cv-259, 2025 WL 3215715, at *33 (W.D. Tex. Nov. 18, 2025).

### B. There is overwhelming direct and indirect evidence that race predominated in drawing the Challenged Districts.

Here, the contemporaneous statements of legislators and key staff members, corroborated by circumstantial evidence, will show racial predominance. When "[r]ace was the criterion that, in the State's view, could not be compromised," race predominates. *Shaw v. Hunt*, 517 U.S. 899, 907 (1996). This means race predominates when a legislature rejects a draft map *because* it fails to meet the legislature's racial criteria and instead selects an alternative configuration because it comports with racial goals. *GRACE, Inc. v. City of Miami* (*GRACE II*), 730 F. Supp. 3d 1245, 1283 (S.D. Fla. 2024) (finding "rejected alterations in the redistricting process also provide circumstantial evidence that race predominated" where those alternatives "tended to frustrate" expressed racial goals); *Jacksonville I*, 635 F. Supp. 3d at 1295 (finding racial predominance and noting that "even [a] small adjustment that [the City Council's mapmaker] initially proposed, which would have reduced the overall BVAP percentage in [one district] and unified more of the urban core into [another district], was summarily rejected"); *Bethune-Hill v. Virginia State Bd. of Elections*, 326 F. Supp. 3d 128, 156 (E.D. Va. 2018) (finding racial predominance and discussing how an incumbent proposed keeping a particular neighborhood in her district, but her proposal failed to meet the legislature's racial goal, and therefore she "'became resigned' to the fact that she would lose [the neighborhood] from her district").

Key legislators confirmed that race was the criterion that could not be compromised in drawing the Challenged Districts. For example, a key senator, Ray Rodrigues, confirmed CD 26's perceived status as a Hispanic-protected district was a "big consideration in drafting CD 26." ECF No. 148 (*MSJ Order*) at 14. Likewise, a key representative, Tyler Sirois, conceded that CD 26 was "impacted" by its perceived status as a "Tier-1 protected district for Latino voters or Hispanic voters." *Id.* And a member of the Governor's staff, Alex Kelly, admitted to making adjustments to the border of the map while "watching those numbers carefully to make sure that in terms of the overall Hispanic voting age population, I was staying very close to the benchmark seat, which I think is maybe a little bit more than 74 percent." *Id.* at 14–15; *see also id.* at 11–13 (discussing HDs 115, 118, and 119). In addition to the legislative record, Plaintiffs will present additional testimony from Dr. McCartan, Dr. Abott, Rep. Driskell, former Sen. Taddeo, and Mr. Poreda establishing racial predominance in each Challenged District.

### C. *Jason Poreda's testimony is no substitute for contemporaneous legislator statements, and Poreda cannot be a conduit for hearsay.*

Defendants' response to Plaintiffs' direct evidence is not to present competing evidence from any legislators themselves, but to offer the testimony of one of the Legislature's eight redistricting committee staff members, Jason Poreda. They are calling no member of the House, Senate, or executive branch to rebut the contemporaneous legislator statements that Plaintiffs will introduce. No committee or subcommittee chairs will testify at trial.

The law is established that "[t]he racial predominance inquiry concerns the actual considerations that provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality did not." *Bethune-Hill*, 580 U.S. at 189–90. Likewise, the Court should be cautious not to automatically impute to the Legislature the personal motivations or explanations of staff that were not shared by (or perhaps even communicated to) the legislators themselves. *See, e.g.*, *GRACE II*, 730 F. Supp. 3d at 1285 (discounting testifying mapmaker's opinion that commissioners intended to protect incumbents where that opinion was unsupported by direct evidence); *GRACE, Inc. v. City of Miami*, 674 F. Supp. 3d 1141, 1208 (S.D. Fla. 2023) (discounting testifying mapmaker's "efforts to rephrase the Commissioners' comments" from the legislative record); *cf. Legend Night Club v. Miller*, 637 F.3d 291, 298 (4th Cir. 2011) (refusing to impute the motives of municipalities lobbying for legislation onto the legislature itself). Moreover, as discussed in more detail below, when weighing Poreda's testimony, the Court is constrained to consider Poreda's statements about what others told him only for a proper non-hearsay purpose. Poreda's recollection of legislators' statements cannot be taken as truthful facts about what the legislators intended.

## II. The Challenged Districts fail strict scrutiny.

Since the evidence will show that race predominated in the drawing of the disputed districts, "[t]he burden thus shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper*, 581 U.S. at 292 (quoting *Bethune-Hill*, 580 U.S. at 193). The State asserts its compelling interest was complying with Tier One's non-diminishment requirement,[4] which Plaintiffs assume can justify race-based districting akin to the VRA. Joint Stip. at 8. "When a State invokes the VRA to justify race-based districting,

---

[4] Defendants have waived any claim that the use of race is justified by Section 2 of the VRA or Tier One's corollary vote-dilution standard. *See* Joint Stip. at 8.

5

it must show (to meet the 'narrow tailoring' requirement) that it had 'a strong basis in evidence' for concluding that the statute required its action." *Id.* (quoting *Ala. Legis. Black Caucus v. Alabama* (*ALBC*), 575 U.S. 254, 278 (2015)). "Or said otherwise, the State must establish that it had 'good reasons' to think that it would transgress the [VRA] if it did not draw race-based district lines." *Id.* at 293. "If a State has good reason to think that all the '*Gingles* preconditions' are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district. But if not, then not." *Id.* at 302 (citations omitted).

The trial record will show that Defendants failed to narrowly tailor their use of race to a compelling interest. Plaintiffs' expert Dr. Hannah Walker will testify to the absence of Hispanic vote cohesion and white bloc voting. This evidence is directly responsive to State's defense that it had "good reasons to think that all the '*Gingles* preconditions' [were] met" as Florida's non-diminishment standard requires. *Cooper*, 581 U.S. at 302.

There are at least four evidentiary issues that the Court will need to address related to Defendants' strict scrutiny burden:

1. Defendants cannot meet their burden because the House has asserted privilege and has refused to produce the analyses of Hispanic voting cohesion or white bloc voting that might support their defense. Nor can Defendants launder into the record that withheld evidence through second-hand testimony.

2. Defendants cannot meet their burden based on the Legislature's "functional analyses," which do not provide any justification for drawing the Challenged Districts based predominantly on racial considerations.

3. Defendants cannot meet their burden by relying on demographic data recorded *after* the Challenged Districts were enacted in 2022. Such evidence is irrelevant to the Legislature's knowledge at the time it drew the maps.

4. Defendants suggest that Dr. Walker's testimony on white bloc statewide is irrelevant. However, Dr. Walker's approach is consistent with caselaw requiring examination of white bloc voting beyond the precise boundaries of the districts, and the Court should reject any suggestion otherwise.

Plaintiffs discuss each issue in turn.

### A. Poreda's testimony about the Legislature's RPV analyses should be limited to how the analyses affected Poreda's drawing of the maps.

The sword-and-shield doctrine and hearsay rules bar Defendants from relying upon analyses and documents that the House refused to produce on privilege grounds. *Willy v. Admin. Rev. Bd.*, 423 F.3d 483, 497 (5th Cir. 2005). During the redistricting process, the Legislature commissioned analyses of racially polarized voting and minority-district performance from Dr. John Alford and Dr. Randy Stevenson. Plaintiffs requested these analyses during discovery.[5] P8 (House's Response to Plaintiffs' First RFP) at 4, 6, 8, 11, 13, 15, 17, Request Nos. 2–4, 6, 8–10.[6] The House refused to produce documents "that reflect analyses performed by the House's expert consultants" on work-product and legislative privilege grounds.[7] *Id.* at 6–7, 9, 11, 14–16, 18. The House also asserted work-product protection over 115 separately logged communications and documents involving Alford and Stevenson's analyses. P11 (House's Privilege Log). The logged documents date from October 2021 to March 2023 and range from information sent from House staff and counsel Andy Bardos to the experts, to questions posed to them by House staff, to the experts' "[d]ata analysis of voting cohesion and racially polarized voting." *Id.* In good-faith reliance on the House's privilege assertions, Plaintiffs curtailed related discovery.

Though testimony regarding *how* the withheld analyses *affected* Poreda's drawing of the enacted maps may be admissible, Defendants should not be permitted to unfairly shield evidence from Plaintiffs and then use it as a sword at trial.

### *1. The sword-and-shield doctrine prevents Defendants from using withheld materials in support of their strict-scrutiny defense.*

The Court should prohibit Defendants from using materials over which Defendants asserted

---

[5] The First RFP included requests for "Documents related to the analysis 'performed by experts' and 'counsel' referenced by House Redistricting Committee Chair Rep. Tom Leek on the House floor, as described in paragraph 208 of the Complaint," as well as "Documents and Communications related to [1] Voting Cohesion among Hispanic or Latino voters," "[2] White Bloc Voting," and "[3] the application of the Non-Retrogression Requirement, Non-Dilution Requirement, or Section 2 to Hispanic-majority districts in Miami-Dade County" "that were transmitted to, from, and/or between the Legislature, the Legislature's staff, and/or the Legislature's consultants between January 1, 2020 and April 19, 2022." P8 (House's Response to Plaintiffs' First RFP) at 11, 13, 15, 17, Request Nos. 6, 8–10.

[6] Trial exhibits are referred to by their prefix ("P" "D" or "J") and number.

[7] The House raised other overbreadth, vagueness, undue burden, and other objections to the First RFP, which were resolved by Plaintiffs serving a narrower Second RFP, to which the House responded by again asserting work-product protection and legislative privilege (P9) and by referring to its privilege log.

privilege to support their strict scrutiny defense. The law is clear: "the sword-and-shield doctrine prevents a party from using privileged information to prove a claim or defense while simultaneously hiding behind the shield of privilege to prevent the opposing party from effectively challenging such evidence." *Bingham v. Baycare Health Sys.*, No. 8:14-cv-73, 2016 WL 5106946, at *2 (M.D. Fla. Sept. 20, 2016). Said another way, "[a] party may not use a privilege (or work product) as a shield during discovery and then hammer it into a sword for use at the trial." *United States v. Duke Energy Corp.*, 208 F.R.D. 553, 558 (M.D.N.C. 2002) (citing *Edward Lowe Indus., Inc. v. Oil-Dri Corp. of Am.*, No. 94-c-7568, 1995 WL 609231, at *5 (N.D. Ill. Oct. 13, 1995)).

Because Plaintiffs were shielded from "effectively challenging" the Alford-Stevenson reports during discovery, Defendants should be prohibited from "using [the reports] to prove [their] defense" that their use of race was justified by a compelling interest. *See Bingham*, 2016 WL 5106946, at *2. The House cannot have it both ways. Having asserted work-product protection and legislative privilege to block Plaintiffs from accessing communications and reports related to their expert consultants, the House cannot now channel those documents into the trial record through Poreda's testimony. A party who asserted privilege cannot introduce that information in the same form or "through other means." *Bright Harvest Sweet Potato Co. v. H.J. Heinz Co.*, No. 1:13-cv-296, 2015 WL 1020644, at *2 (D. Idaho Mar. 9, 2015) (excluding testimony about emails over which party had asserted attorney-client privilege); *Mahli, LLC v. Admiral Ins. Co.*, No. 1:14-cv-175, 2015 WL 5024197, at *5 (S.D. Miss. Aug. 25, 2015) (excluding witness testimony regarding information over which party had asserted attorney-client privilege and work-product protection); *accord United States v. Keegan*, --- F.4th ---, No. 22-13019, 2025 WL 3653282, at *3, *7 (11th Cir. Dec. 17, 2025) (affirming exclusion of expert testimony intended to introduce hearsay statements of criminal defendant while defendant invoked Fifth Amendment right not to testify).

The House had a choice: to either produce the full set of requested analyses and communications so that Plaintiffs could test their soundness and challenge the Legislature's reliance on them at trial, or to invoke privilege and forego reliance on them. The House expressly chose the latter. Having made that choice, Defendants cannot now strategically insert into trial the information they withheld.

2. <u>Testimony describing the withheld materials can only be offered for a non-hearsay purpose.</u>

Poreda's testimony about the withheld materials and related communications is generally inadmissible for another reason: it is hearsay. Taking Poreda's recollection of the materials as true

8

would be using hearsay to establish the truth of the out-of-court statements. But to the extent Poreda's testimony (1) does not relate to actually-withheld information, and (2) is not offered for its truth, it may be admissible.

For example, during his deposition, Poreda referenced—and at times summarized—certain information purportedly contained in the withheld reports and communications. P36 (Poreda Dep.) 34:1–35:22, 118:21–120:16, 257:25–260:6, 272:16–273:17, 274:20–275:4. Poreda also explained how the analyses affected his mapmaking. *Id.* 34:21–35:2, 119:12–25, 258:17–259:5, 272:16–273:14. The House did not assert any privilege or work product protection over Poreda's selective references to the reports and, as such, Plaintiffs understand that the information he provided during his deposition is not privileged. The Court may consider testimony about non-privileged statements Poreda read, heard, or saw for a non-hearsay purpose, such as the statement's effect on Poreda. *Ohio A. Philip Randolph Inst. v. Householder*, 373 F. Supp. 3d 978, 1020 & n.242 (S.D. Ohio) (finding legislative staff's statement that "'[N]obody thought it was a good idea to pair' Representative Fudge with another incumbent" admissible "for the limited purpose to show the effect on [the staffer], i.e., that he did not pair Representative Fudge against another incumbent, but it cannot be used for the truth that various persons in fact thought it was a bad idea to pair Representative Fudge against another incumbent"), *vacated and remanded on other grounds sub nom. Chabot v. Ohio A. Philip Randolph Inst.*, 589 U.S. 901 (2019). As in *Householder*, Poreda's testimony about how the reports impacted his mapmaking is admissible "for the limited purpose to show the effect on" him. 373 F. Supp. 3d at 1020 n.242.

### B. *The Legislature's functional analyses of minority voting ability in proposed districts does not assess the necessary* Gingles *preconditions.*

Given that the withheld Alford and Stevenson analyses purportedly about racially polarized voting are inadmissible under the sword-and-shield doctrine, Plaintiffs expect Defendants to fall back upon "functional analyses" the House conducted to assess minority voting ability. *See, e.g.*, J42 at 78–90; J45 at 11–23. But those functional analyses put the cart before the horse: they are *predicated* on the *assumption* that Tier One required creating Hispanic-performing districts, but that is only so if the *Gingles* precondition are satisfied.

As the evidence will show, the Legislature lacked good reason to think that all the *Gingles* preconditions were met, and thus lacked good reasons to think Tier One required drawing Hispanic-performing districts at all. Dr. Walker will testify about the utter *absence* of the *Gingles* preconditions. Defendants have little—if any—evidence that the Legislature looked into whether

9

the preconditions were present before embarking on their mission to draw Hispanic-performing districts in South Florida. There will be *no* evidence of the "pre-enactment analysis" of Hispanic voting cohesion and white bloc voting "with justifiable conclusions" that those preconditions were present. *See Abbott v. Perez*, 585 U.S. 579, 621 (2018).

The Court *will* hear how the Legislature conducted a "functional analysis" of each Challenged District as it developed its maps. This functional analysis examines the minority group's ability to elect its preferred candidates in a proposed district, and (to assess compliance with the non-retrogression standard) how that ability compares to the group's preexisting ability in the benchmark plan. As the Florida Supreme Court explained:

> To undertake a retrogression evaluation requires an inquiry into whether a district is likely to perform for minority candidates of choice. This has been termed a "functional analysis," requiring consideration not only of the minority population in the districts, or even the minority voting-age population in those districts, but of political data and how a minority population group has voted in the past.

*In re Senate Joint Resol. of Apportionment 1176* (*Apportionment I*), 83 So. 3d 597, 625 (Fla. 2012).

A functional analysis is not the same thing as an analysis of whether the *Gingles* preconditions are present—it *presupposes* that the minority group's ability-to-elect is protected and must be maintained. Such an "unproven assumption" is impermissible. *League of Women Voters of Fla. v. Detzner*, 179 So. 3d 258, 286 (Fla. 2015) ("The Legislature's argument rests on an unproven assumption of Hispanic voting cohesion and polarized racial bloc voting—the establishment of which is the first step in any retrogression analysis."). The Legislature's false assumption of racially polarized voting means its functional analyses were of no use. Instead, the Legislature's maps rested on stereotypes about differences between racial groups, and sameness among Hispanic voters. The Constitution forbids this. *See Shaw v. Reno*, 509 U.S. 630, 647 (1993) (describing how racial gerrymandering "reinforces the perception that members of the same racial group . . . think alike, share the same political interests, and will prefer the same candidates at the polls.").

### C. Dr. Trende's testimony about post-enactment evidence of RPV is irrelevant.

The Court should exclude as irrelevant any evidence of racially polarized voting from after the Challenged Districts' enactment in the spring of 2022, including the proposed testimony of Defendants' expert Dr. Sean Trende. Defendants asked Dr. Trende "to examine trends in Hispanic

10

registration in Miami-Dade County since Election Day 2020," and in his report he opined on the political cohesion of Hispanic voters based on data that *post-dates* the maps' enactment. D40 (Trende Rep.) at 89–90. These are data the Legislature did not access or consider—and could not have accessed or considered—when it drew the maps.

Evidence of Hispanic cohesion and white bloc voting would be relevant to the State's defense "that it had 'good reasons' to think that it would transgress the [VRA] if it did *not* draw race-based district lines," *Cooper*, 581 U.S. at 293, only if the Legislature actually relied on, or arguably could have relied on, that evidence. "Defendants must establish that they had a 'strong basis in evidence' for believing that the [] *Gingles* factors were present in each of the districts *at the time they were drawn*." *Covington*, 316 F.R.D. at 167 (emphasis added). Evidence of racially polarized voting that *post-dates* the Challenged Districts' enactment is entirely devoid of probative value because it cannot make more or less likely the issue at strict scrutiny: whether the Legislature had good reasons to think that all the *Gingles* preconditions were met when it made its redistricting decisions. *See Abbott*, 585 U.S. at 621 (noting that the Court has found "good reasons" upon "a strong showing of a *pre-enactment* analysis with justifiable conclusions" (emphasis added)); *Shaw v. Hunt*, 517 U.S. 899, 908 n.4 (1996) ("[T]he legislature must have had a strong basis in evidence to support [its] justification *before* it implements the classification." (emphasis added)).

### D. Dr. Hannah Walker's study of white bloc voting beyond the benchmark districts is relevant and admissible.

Because Florida's congressional and State House plans are statewide maps, Dr. Walker examined white bloc voting statewide, asking whether Florida's white majority votes sufficiently as a bloc to usually defeat the choice of the minority group. Defendants have suggested that Dr. Hannah Walker's analysis of white bloc voting statewide is irrelevant. The Court should reject such argument, as Dr. Walker's analysis is consistent with caselaw requiring examination of white bloc voting beyond the precise boundaries of the districts.

The parties agree that a proper evaluation of the *Gingles* preconditions under Florida's non-diminishment standard (the corollary to Section 5 of the VRA) includes evaluating Hispanic voting cohesion in the "benchmark" districts—the districts in the preceding plans that correspond to the newly enacted districts.[8] *See Apportionment I*, 83 So. 3d at 625. This is because the non-

---

[8] The parties agree that the corresponding benchmark districts for enacted CD 26 and HDs 115, 118, and 119 are CD 25 and HDs 115, 118, and 119, respectively. Joint Stip. at 7. In other words,

11

diminishment standard protects a minority group's ability-to-elect in the benchmark plan. *Id.* As the Florida Supreme Court recently explained:

> Under our precedent, to determine whether a newly enacted districting plan complies with the Non-Diminishment Clause, one must compare the new plan to the plan that preceded it—the benchmark plan. The first step is to identify districts in the benchmark plan where "racial or language minorities" were able to elect representatives of their choice—call them "ability-to-elect districts." The second step is to determine whether, relative to that benchmark, the new plan diminishes minority voters' ability to elect representatives of their choice. Of course, the notion of a racial or language minority group having representatives of "their choice" requires that there be some level of voting cohesion among the relevant minority group. The existence and extent of that cohesion within a benchmark or new district is something that must be proven; it cannot be assumed.

*BVM*, 415 So. 3d at 186.

For the third *Gingles* precondition (white bloc voting), however, one must examine voting patterns beyond each individual benchmark district. It makes no sense to assess "whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates" in a benchmark district where one has just concluded the minority group can elect its preferred candidates. *Gingles*, 478 U.S. at 56. Definitionally, white bloc voting is insufficient in those "ability-to-elect districts" to usually defeat the minority group's preferred candidates. *See Johnson v. De Grandy*, 512 U.S. 997, 1003–04 (1994) (summarizing district court's findings that there was "a tendency of non-Hispanic whites to vote as a bloc to bar minority groups from electing their chosen candidates *except in a district where a given minority makes up a voting majority*" (emphasis added)); *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993) (reversing finding that state legislative plan violated Section 2 because, in part, "[t]he District Court specifically found that Ohio does not suffer from 'racially polarized voting'" (citation omitted)); *cf. Miss. State Conf. of NAACP v. State Bd. of Election Comm'rs*, 739 F. Supp. 3d 383, 438 (S.D. Miss. 2024) ("In majority-black districts, the evidence shows that white voters do not prevent the election of candidates that black voters prefer, but that fact supports and does not undermine that preconditions two and three are satisfied."). Therefore, Dr. Walker's statewide analysis of white bloc voting will provide relevant and helpful

---

newly enacted HDs 115, 118, and 119 correspond to the same-numbered districts in the State House plan in effect from 2012–22. Newly enacted CD 26 corresponds to CD 25 in the congressional plan in effect from 2016–22.

analysis that shows Defendants failed to narrowly tailor their use of race to a compelling interest. The Court should reject any attempt to limit her testimony on this topic.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court resolve the above issues in their favor, find for Plaintiffs after trial, and enjoin Defendants from using the Challenged Districts in upcoming elections.

Respectfully submitted December 22, 2025,

|  |  |
|---|---|
| Andrew Frackman* | /s/ Nicholas L.V. Warren |
| **O'Melveny & Myers LLP** | Nicholas L.V. Warren (FBN 1019018) |
| 1301 Avenue of the Americas, 17th Floor | Caroline A. McNamara (FBN 1038312) |
| New York, NY 10019 | Daniel B. Tilley (FBN 102882) |
| (212) 326-2000 | **ACLU Foundation of Florida, Inc.** |
| afrackman@omm.com | 4343 West Flagler Street, Suite 400 |
|  | Miami, FL 33134 |
| Brian P. Quinn* | (786) 363-1769 |
| Patrick J. Jones* | nwarren@aclufl.org |
| Emily Murphy* | cmcnamara@aclufl.org |
| Gabrielle S. Jackson* | dtilley@aclufl.org |
| Helena M. Li* |  |
| **O'Melveny & Myers LLP** | Jorge L. Vasquez, Jr.* |
| 1625 Eye Street NW | **Vasquez Attorneys at Law, PC** |
| Washington, DC 20006 | 141 Parkway Road, Suite 14 |
| (202) 383-5300 | Bronxville, NY 10708 |
| bquinn@omm.com | (212) 752-8408 |
| pjones@omm.com | jorge@vasquezpc.com |
| emurphy@omm.com |  |
| gjackson@omm.com | *Admitted pro hac vice* |
| hli@omm.com |  |

*Counsel for Plaintiffs*