# SUPREME COURT OF FLORIDA

_____

## No. SC22-131

_____


IN RE: JOINT RESOLUTION OF
LEGISLATIVE APPORTIONMENT

_____

## BRIEF OF THE FLORIDA HOUSE OF REPRESENTATIVES

_____

RECEIVED, 02/19/2022 05:28:21 PM, Clerk, Supreme Court

Chris Sprowls
*Speaker*
FLORIDA HOUSE OF
REPRESENTATIVES
402 The Capitol
402 South Monroe Street
Tallahassee, Florida 32399
chris.sprowls@
    myfloridahouse.gov

Andy Bardos
GRAYROBINSON, P.A.
Post Office Box 11189
Tallahassee, Florida 32302
andy.bardos@
    gray-robinson.com

*Counsel for the Florida House of Representatives*

## TABLE OF CONTENTS

TABLE OF CITATIONS ..................................................................... iii

PRELIMINARY STATEMENT .......................................................... 1

STATEMENT OF THE CASE .......................................................... 2

STATEMENT OF FACTS ................................................................. 2

SUMMARY OF ARGUMENT .......................................................... 5

ARGUMENT ................................................................................... 6

    I.    The House Map Was Drawn to Comply With All Constitutional Requirements. ........................................... 8

      A.    Standard of Review. ...................................................... 8

      B.    The House Map's Methodology Demonstrates Its Adherence to All Standards. ......................................... 10

    II.    The House Map Complies With All Tier-One Standards. ..... 16

      A.    The House Map Protects Minority Voting Rights. ........... 16

          1.    The House Map Does Not Diminish Minorities' Ability to Elect Representatives of Their Choice. ......... 18

          2.    The House Map Does Not Deny or Abridge Minorities' Equal Opportunity to Participate in the Political Process. ....................................................... 27

      B.    The House Map Satisfies the Contiguity Requirement. .... 31

      C.    The House Map Is Devoid of Any Political Intent. ........... 32

    III.    The House Map Complies With All Tier-Two Standards. ..... 35

      A.    The House Map Satisfies the Boundaries Standard. ........ 35

      B.    The House Map Satisfies the Compactness Standard. ..... 45

      C.    The House Map Satisfies the Equal-Population Standard. ................................................................. 60

    IV.    This Court's Judgment Is Binding on All Citizens—and Precludes Further Litigation. .......................................... 64

CONCLUSION .............................................................................. 66

CERTIFICATE OF COMPLIANCE ................................................. 68

CERTIFICATE OF SERVICE .......................................................... 69

## TABLE OF CITATIONS

**Cases**

*Abbott v. Perez,*
  138 S. Ct. 2305 (2018) ............................................................ 28

*Advisory Opinion to Attorney General re Standards for Establishing Legislative District Boundaries,*
  2 So. 3d 175 (Fla. 2009) .......................................................... 14

*Alabama Legislative Black Caucus v. Alabama,*
  575 U.S. 254 (2015)...................................................... 17, 18, 23

*Bartlett v. Strickland,*
  556 U.S. 1 (2009) ................................................................ 28, 29

*Bethune-Hill v. Virginia State Board of Elections,*
  137 S. Ct. 788 (2017) ......................................................... 18, 23

*Bone Shirt v. Hazeltine,*
  461 F.3d 1011 (8th Cir. 2006) .................................................. 30

*Cooper v. Harris,*
   137 S. Ct. 1455 (2017) ...................................................... 29, 30

*Florida Department of Health v. Florigrown, LLC,*
  317 So. 3d 1101 (Fla. 2021).......................................................9

*Florida Department of Revenue v. American Business USA Corp.,*
  191 So. 3d 906 (Fla. 2016) .........................................................9

*Florida House of Representatives v. League of Women Voters of Florida,*
  118 So. 3d 198 (Fla. 2013) ............................................ 64, 65, 66

*Florida Senate v. Florida Public Employees Council 79,*
  784 So. 2d 404 (Fla. 2001) .........................................................8

*Georgia v. Ashcroft,*
  539 U.S. 461 (2003)........................................................... 17, 23

*Growe v. Emison,*
  507 U.S. 25 (1993) ................................................................... 30

*Harris v. Arizona Independent Redistricting Commission,*
  578 U.S. 253 (2016).................................................................. 61

iii

*In re Apportionment Law Senate Joint Resolution No. 1305*,
263 So. 2d 797 (Fla. 1972) ........................................................ 9

*In re Apportionment Law*,
414 So. 2d 1040 (Fla. 1982)..................................................... 66

*In re Constitutionality of House Joint Resolution 1987*,
817 So. 2d 819 (Fla. 2002) ...................................................... 31

*In re Senate Joint Resolution 2G, Special Apportionment Session 1992*,
597 So. 2d 276 (Fla. 1992) ...................................................... 32

*In re Senate Joint Resolution of Legislative Apportionment 1176*,
83 So. 3d 597 (Fla. 2012) .................................................. passim

*League of Women Voters of Florida v. Detzner*,
179 So. 3d 258 (Fla. 2015) ........................................... 27, 55, 56

*Miller v. Johnson*,
515 U.S. 900 (1995)................................................................. 10

*Moffitt v. Willis*,
459 So. 2d 1018 (Fla. 1984)...................................................... 8

*Reno v. Bossier Parish School Board*,
520 U.S. 471 (1997)............................................................ 17, 27

*Reynolds v. Sims*,
377 U.S. 533 (1964)................................................................. 61

*Shelby County v. Holder*,
570 U.S. 529 (2013)................................................................. 24

*Thornburg v. Gingles*,
478 U.S. 30 (1986) ............................................................ passim

**Constitutional Provisions**

Art. III, § 16, Fla. Const. ......................................................... 65

Art. III, § 16(a), Fla. Const .............................................. 2, 3, 31

Art. III, § 16(c), Fla. Const. .............................................. 2, 8, 64

Art. III, § 16(d), Fla. Const. ........................................... 6, 64, 66

Art. III, § 21, Fla. Const. ................................................ 5, 10, 31

Art. III, § 21(a), Fla. Const. ............................................... passim

Art. III, § 21(b), Fla. Const. ............................................... 35, 45, 60

Art. III, § 21(c), Fla. Const. ............................................. 10, 45, 46

**Statutes**

13 U.S.C. § 141(c) ............................................................... 3

52 U.S.C. § 10301(b) .......................................................... 29

52 U.S.C. § 10304(b) .......................................................... 23

**Other Authorities**

*2020 Census Redistricting Data Files Press Kit,*
U.S. CENSUS BUREAU (Aug. 12, 2021) ............................................ 3

*Census Bureau Delivers 2020 Census Redistricting Data in Easier-to-Use Format,* U.S. CENSUS BUREAU (Sept. 16, 2021) ...................... 3

Fla. H.R. Jour. (Reg. Sess. 2022) ....................................... 5

Fla. S. Jour. (Reg. Sess. 2022) ......................................... 5

Fla. SJR 100 (2022) .................................................... 2, 5

Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act,
76 Fed. Reg. 7,470 (Feb. 9, 2011) .................................. 19, 25, 26

H.P. Young, *Measuring the Compactness of Legislative Districts,*
Legislative Studies Quarterly, Vol. 13, No. 1 (Feb. 1988) ............ 56

H.R. REP. NO. 109-487 (2006) .......................................... 21, 24

Jacob Ogles, *Civil War: Likely Florida House Map to Pit 19 Incumbents Against House Colleague,*
FLORIDA POLITICS (Jan. 29, 2021) ................................... 35

Joint Resolution's ......................................................... 10

Mary Ellen Klas, *House Advances First Redistricting Map, But Democrats Have Many Questions,*
MIAMI HERALD (Jan. 23, 2021) ...................................... 35

Nathaniel Persily, *The Promise and Pitfalls of the New Voting Rights Act,*
117 YALE L.J. 174 (2007) ........................................... 22, 23

WEBSTER'S THIRD INTERNATIONAL DICTIONARY (1993) ........................... 21

<u>**PRELIMINARY STATEMENT**</u>

In this brief, "App." refers to the appendix to this brief, and "Pet. App." refers to the appendix to the Attorney General's Petition for Declaratory Judgment, dated February 9, 2022.

"House Map" refers to the House districts in Senate Joint Resolution 100, and "Benchmark Map" refers to the predecessor House districts established in 2012 and approved by this Court in *Apportionment I.*

"*Apportionment I*" refers to *In re Senate Joint Resolution of Legislative Apportionment 1176*, 83 So. 3d 597 (Fla. 2012).

"*Apportionment III*" refers to *Florida House of Representatives v. League of Women Voters of Florida*, 118 So. 3d 198 (Fla. 2013).

"BVAP" refers to Black voting-age population, or the percentage of the 18-and-above population that is Black, and "HVAP" refers to Hispanic voting-age population, or the percentage of the 18-and-above population that is Hispanic.

Finally, "VRA" refers to the federal Voting Rights Act of 1965, 52 U.S.C. §§ 10301 to 10702.

## STATEMENT OF THE CASE

On February 9, 2022, Attorney General Moody initiated this original proceeding pursuant to article III, section 16(c), Florida Constitution. The Attorney General's petition seeks a declaratory judgment determining the validity of Senate Joint Resolution 100, which creates new state legislative districts for the State of Florida.

The deadline for parties opposing the validity of the Joint Resolution to file their briefs or comments was February 14, 2022. No opposition briefs or comments were submitted. To assist the Court in fulfilling its constitutional charge to determine the validity of the apportionment, the Florida House of Representatives submits this brief in support of the validity of the unchallenged House Map.

## STATEMENT OF FACTS

The Florida Constitution requires state legislative districts to be redrawn in the second year after each decennial census. Art. III, § 16(a), Fla. Const. In September 2021, well after its statutory deadline and one month after an initial release of the raw format data, the United States Census Bureau released the official 2020

population counts that States need in order to redraw their state legislative districts.[1]

The census data highlighted Florida's significant growth and confirmed Florida's ranking as the Nation's third most populous State. The State's total population grew nearly 15 percent over the last decade, from 18,801,310 to 21,538,187 people. App. 6–9. The ideal population for House districts increased in proportion, from 156,678 to 179,485. *Id.*[2] The growth was not evenly distributed, however, as some districts grew substantially while others declined in population. App. 8–9. To comply with the one-person, one-vote requirement, Florida's House districts required substantial revision.

Although the Legislature could not enact a new redistricting plan before its 2022 regular session, *see* Art. III, § 16(a), Fla.

---

[1] *See* 13 U.S.C. § 141(c); *Census Bureau Delivers 2020 Census Redistricting Data in Easier-to-Use Format*, U.S. CENSUS BUREAU (Sept. 16, 2021), https://www.census.gov/newsroom/press-releases/2021/2020-census-redistricting-data-easier-to-use-format.html; *2020 Census Redistricting Data Files Press Kit*, U.S. CENSUS BUREAU (Aug. 12, 2021), https://www.census.gov/newsroom/press-kits/2021/2020-census-redistricting.html.

[2] The ideal (or average) district population is the total population of the State (21,538,187) divided by the number of districts (120).

Const., it began its redistricting process much earlier. Months before session began, the House formed a redistricting committee and separate subcommittees for congressional and state legislative redistricting. *See* Florida House of Representatives Committees, https://www.myfloridahouse.gov/sections/committees/ committees.aspx (last visited Feb. 15, 2022). Collectively, the membership of the redistricting committee and two subcommittees included 62 members—a majority of the chamber's membership. *Id.*

The House's redistricting committee and state legislative subcommittee conducted eight interim meetings in 2021 and four more meetings once the session began—all with notice and open to the public. The House and Senate jointly created a redistricting website that provided the public with current information about redistricting. *See* https://www.floridaredistricting.gov. The website provided the public with access to the same web-based map-drawing application used by the Legislature, including all elections data needed to perform functional analyses of minority districts. It also offered portals for the public to submit comments and maps and displayed those maps and associated data alongside maps prepared by legislative committee staff for legislative consideration.

4

Members of the public availed themselves of the online portal to submit no fewer than 97 congressional and state legislative maps. *Id.*

Once it convened in regular session, the Legislature acted promptly to advance the redistricting process. The Senate passed the Joint Resolution on January 20, 2022. Fla. S. Jour. 215 (Reg. Sess. 2022). The House then added the proposed House districts and passed the bill, 77 to 39, on February 2, 2022. Fla. H.R. Jour. 543–44 (Reg. Sess. 2022). The next day, the Senate passed the amended bill unanimously, 37 to zero. Fla. S. Jour. 325 (Reg. Sess. 2022).

## SUMMARY OF ARGUMENT

The House Map is valid. It complies with every federal and state standard governing apportionment. It protects minority voting strength from diminishment, as required by the tier-one standards in article III, section 21, while making minority districts more compact and more faithful to political and geographical boundaries.

The House Map is equally true to article III, section 21's tier-two standards. It carefully assimilates and balances compactness, adherence to political and geographical boundaries, and population

5

equality. The result is a map with compact, understandable shapes and clear constitutional justifications for any population deviations.

The House assiduously followed the law. Its strict compliance with all governing standards demonstrates that the House Map was not drawn with any improper intent to favor or disfavor political parties or incumbents. The House lived up to its constitutional obligation and drew districts without intentional political favoritism.

No party has appeared to dispute the validity of the House Map, and indeed none could sustain the heavy burden to prove that the presumptively valid House Map is invalid. This Court should accord great deference to the legislative determinations represented in the House Map and declare it valid. As importantly, it should declare that its judgment is in fact "binding upon all the citizens of the state," Art. III, § 16(d), Fla. Const., precluding further challenge.

## ARGUMENT

The House Map satisfies every requirement of federal law and the Florida Constitution. The House Map demonstrates complete constitutional compliance and even an improvement over the Benchmark Map, which this Court approved unanimously a decade ago.

As discussed more fully below, the House Map:

- Protects minority voting rights by:

    o Establishing 18 districts that perform for Black voters and 12 districts that perform for Hispanic voters; and

    o Protecting from diminishment the ability of minorities in those 30 districts to elect their preferred candidates;

- Keeps 36 counties whole—only two fewer than the theoretical maximum based on county populations;

- Splits only 53 of Florida's 412 municipalities—a full 22 fewer than the Benchmark Map did when drawn in 2012 and 48 fewer than the Benchmark Map did by decade's end;

- Establishes visually compact districts with higher mean and median compactness scores than the Benchmark Map, and even improves the compactness of districts drawn to preserve minority voting strength; and

- Provides substantially equal populations in all districts, with each deviation from exact equality justified by the House's efforts to utilize political and geographical boundaries and to comply with other constitutional standards.

Perhaps most importantly, the House Map's strict adherence to all tier-two requirements proves that it was drawn without any intent to favor or disfavor political parties or incumbents.

## I. THE HOUSE MAP WAS DRAWN TO COMPLY WITH ALL CONSTITUTIONAL REQUIREMENTS.

### A. Standard of Review.

This Court's function in this time-limited proceeding is to enter a "declaratory judgment determining the validity" of the state legislative districts adopted for the State of Florida. Art. III, § 16(c), Fla. Const. This Court's role is not to select the "best plan." *Apportionment I*, 83 So. 3d at 608, 669. "By their very nature," the constitutional standards "permit a range of choice by the Legislature in drawing district boundaries." *Id.* at 698 (Canady, C.J., concurring in part and dissenting in part). The Court's focus, moreover, is on "objective data" and other "objective evidence," *id.* at 612, 617—not internal legislative procedures or the mechanics of the legislative process, *Fla. Senate v. Fla. Pub. Emps. Council 79*, 784 So. 2d 404, 408 (Fla. 2001) ("Where the Legislature is concerned, it is only the final product of the legislative process that is subject to judicial review . . . ."); *Moffitt v. Willis*, 459 So. 2d 1018, 1021 (Fla. 1984) ("It is the final product of the legislature that is subject to review by the courts, not the internal procedures.").

Like all legislative acts, the House Map is presumed valid. Last decade, while this Court recognized that a presumption of validity applies, it declined to apply a corollary of that presumption: that any invalidity must appear beyond a reasonable doubt. *Apportionment I*, 83 So. 3d at 606–08. But if the presumption of validity means anything, it means that reasonable doubts must be resolved in favor of validity. This Court applied this time-tested principle in its first 30-day review of legislative districts, *see In re Apportionment Law Senate Joint Resol. No. 1305*, 263 So. 2d 797, 805–06 (Fla. 1972), and has continued to apply it in other contexts, *see*, *e.g.*, *Fla. Dep't of Health v. Florigrown, LLC*, 317 So. 3d 1101, 1111 (Fla. 2021). In fact, since *Apportionment I* was decided, this Court has squarely reaffirmed that "in *all* constitutional challenges, . . . all reasonable doubts about the statute's validity are to be resolved in favor of constitutionality." *Fla. Dep't of Revenue v. Am. Bus. USA Corp.*, 191 So. 3d 906, 911 (Fla. 2016) (emphasis added).

For the reasons expressed by Chief Justice Canady in *Apportionment I*, 83 So. 3d at 695–99—including the inherent structural limitations of this original proceeding and the Court's sensitivity "to the complex interplay of forces that enter a

9

legislature's redistricting calculus," *id.* at 639 (quoting *Miller v. Johnson*, 515 U.S. 900, 915 (1995))—this Court should apply an unimpaired presumption of validity and resolve any reasonable doubts in *favor* of—and not against—the Joint Resolution's validity.

### B. The House Map's Methodology Demonstrates Its Adherence to All Standards.

The House began by considering the many legal principles that would guide its task. Article III, section 21 sets forth two tiers of standards. The first tier protects the rights of minority voters, prohibits intentional partisan or incumbent favoritism, and requires contiguity. The second tier requires districts to be compact and as nearly equal in population as practicable and, where feasible, to utilize political and geographical boundaries. Tier-two standards yield to tier-one standards to the extent they conflict. *Apportionment I*, 83 So. 3d at 640. Within each tier, none of the criteria has priority over the others, and each is subject to legislative balancing. Art. III, § 21(c), Fla. Const.

To comply with these standards, the House considered an appropriate balance of population equality, compactness, and adherence to well-known boundaries. Ultimately, it emphasized

county integrity, while fully adhering to other second-tier principles. When possible, the House sought to keep counties whole within districts, or to locate districts wholly within counties, depending on county populations. Where not feasible, the House sought to "anchor" districts within a county, tying the geography representing a majority or plurality of the district's residents to a single county.

To this end, the House used census data to identify regions of the State consisting of one or more whole counties capable of forming one or more whole districts without any remainder population. It called these regions "sandboxes." For example, the House found that the combined population of Seminole, Orange, and Osceola Counties could be divided evenly into 13 districts with an average population of 176,109. The House therefore drew 13 whole districts entirely within this three-county combination; no district crosses the outer perimeter formed by these three counties. Within each region, the House minimized, to the extent possible, the number of districts that crossed from one county into another.

With this regional "sandbox" approach, the House was better able to respect county boundaries, keep municipalities whole within districts, and create more visually compact districts. In all, the

11

State was divided into 14 whole-county regions depicted below, each of which was capable of forming a whole number of districts:



The requirement that districts be equally populated largely dictated the choice of county combinations. To form a whole number of districts within a region, the region's population, when divided by a whole number, must yield approximately the ideal population of a district. For example, the population of Seminole, Orange, and Osceola Counties (2,289,420), when divided by 13,

yields 176,109, which is 1.88 percent below the ideal population of a district (179,485). *See* App. 7, 9. The table below identifies each region depicted above, the number of counties and districts in each region, each region's population, the ideal population of districts in the region, and the difference between the ideal population of a district in the region and the ideal population of a district statewide:

| Region | Number of Counties | Number of Districts | Total Regional Population | Regional Ideal District Population | Deviation from Statewide Ideal District Population |
|---|---|---|---|---|---|
| 1 | 3 | 4 | 721,573 | 180,393 | 0.51% |
| 2 | 5 | 1 | 181,243 | 181,243 | 0.98% |
| 3 | 1 | 1 | 175,216 | 175,216 | -2.38% |
| 4 | 13 | 3 | 541,142 | 180,381 | 0.50% |
| 5 | 17 | 19 | 3,395,673 | 178,720 | -0.43% |
| 6 | 2 | 6 | 1,085,919 | 180,987 | 0.84% |
| 7 | 3 | 13 | 2,289,420 | 176,109 | -1.88% |
| 8 | 1 | 4 | 725,046 | 181,262 | 0.99% |
| 9 | 3 | 5 | 886,158 | 177,232 | -1.26% |
| 10 | 3 | 16 | 2,818,579 | 176,161 | -1.85% |
| 11 | 6 | 10 | 1,831,022 | 183,102 | 2.02% |
| 12 | 4 | 1 | 178,332 | 178,332 | -0.64% |
| 13 | 3 | 11 | 1,979,848 | 179,986 | 0.28% |
| 14 | 3 | 26 | 4,729,016 | 181,885 | 1.34% |
| **Statewide** | **67** | **120** | **21,538,187** | **179,485** | **N/A** |

*See* App. 7, 9.

13

The House emphasized county boundaries because, in its legislative judgment, counties tend to be compact and functional, and their boundaries stable and well understood. All told, the House was able to keep 36 counties whole and 84 districts wholly within single counties. App. 11; Pet. App. 463. Within each county, the House sought to keep municipalities whole. In addition to their own local governments, residents of a municipality often have shared interests and a sense of community that benefit from being kept intact within a single district. *Cf. Apportionment I*, 83 So. 3d at 636 (noting that tier two creates a "community-based standard" for drawing districts (quoting *Adv. Op. to Att'y Gen. re Standards for Establishing Legislative Dist. Boundaries*, 2 So. 3d 175, 187 (Fla. 2009) (plurality opinion))). Where county and municipal boundaries could not serve as district lines, the House relied on geographical boundaries such as rivers, railways, interstates, and state roads. As it did ten years ago, the House resolved to draw districts with understandable shapes, and without bizarre fingers or appendages.

The House was also mindful of its tier-one obligations to protect minority voters. The tier-one minority protections include two distinct requirements. One—the non-diminishment standard—

14

prohibits drawing districts that "diminish" the "ability" of minority voters "to elect representatives of their choice," imposing a statewide ban on retrogression in minority voting ability. To avoid diminishment, the House reviewed the Benchmark Map and identified the districts in which minorities were historically able to elect representatives of their choice—*i.e.*, the performing districts. Then, in drawing the House Map, the House ensured that it neither reduced the number of performing districts nor weakened the ability of minorities in those districts to elect representatives of their choice. Consistent with this Court's precedents, the House conducted the necessary functional analysis to assure compliance and protected *all* performing districts from diminishment, even if minorities did not comprise a majority of the voting-age population.

Second, the minority protections require that districts not deny or abridge the equal opportunity for minorities to participate in the political process. This provision prohibits "vote dilution," which can occur when the State could draw a majority-minority district for a reasonably compact, politically cohesive minority population, but instead draws a district in which racially polarized voting will usually defeat the minority population's preferred

15

candidate. Where majority-minority districts could be drawn and the other *Gingles* prerequisites were satisfied,[3] the House made certain to draw performing minority districts and to avoid drawing districts in which the minority-preferred candidate would usually be defeated.

II.   **THE HOUSE MAP COMPLIES WITH ALL TIER-ONE STANDARDS.**

A.   **The House Map Protects Minority Voting Rights.**

The Florida Constitution provides two distinct protections for minority voters: a prohibition against vote dilution and a prohibition against diminishment, or retrogression. Art. III, § 21(a), Fla. Const. These protections are patterned after section 2 of the VRA, which prohibits vote dilution, and section 5 of the VRA, which prohibited retrogression before it became inoperative in 2013. *Apportionment I*, 83 So. 3d at 619–20. In interpreting these provisions, this Court is guided by—but not tethered to—the United States Supreme Court's interpretations of section 2 and section 5 of the VRA. *Id.* at 620–21.

---

[3] The prerequisites to a vote-dilution claim articulated in *Thornburg v. Gingles*, 478 U.S. 30 (1986), are discussed in Part II.A.2. below.

This Court has an independent obligation to interpret Florida's provisions, notwithstanding their parallels in federal law. *Id.* at 621.

Importantly, sections 2 and 5 are two separate and distinct provisions that "impose very different duties." *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 477 (1997). They "combat different evils," *Apportionment I*, 83 So. 3d at 621 (quoting *Reno*, 520 U.S. at 477)—vote dilution and retrogression—and "differ in structure, purpose, and application," *id.* (quoting *Georgia v. Ashcroft*, 539 U.S. 461, 478 (2003)); *accord Reno*, 520 U.S. at 488 (concluding that section 2's incorporation into section 5 would be "unsatisfactory no matter how it is packaged"). To avoid confusion in their implementation, it is essential to maintain a clear distinction between these inquiries.

In evaluating compliance with tier-one minority protections, a measure of deference to the legislative judgment is especially important. The standards are unavoidably imprecise and often fail to generate consensus, even among experts. *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 278 (2015) (explaining that section 5's standards are "complex; they often require evaluation of controverted claims about voting behavior; the evidence may be unclear; and . . . judges may disagree about the proper outcome").

The minority protections also compete with other standards: they *require* the consideration of race while equal protection *limits* the consideration of race, *id.*, and permit deviations from Florida's tier-two standards, "but only to the extent necessary," *Apportionment I*, 83 So. 3d at 640. "The law cannot," therefore, "insist that a state legislature, when redistricting, determine *precisely* what percent of minority population" each district must include. *Ala. Legislative Black Caucus*, 575 U.S. at 278 (emphasis in original). Rather, the law must afford "breathing room" between the "competing hazards of liability" and uphold the legislative judgment if "good reasons" support it. *Bethune-Hill v. Va. State Bd. of Elections*, 137 S. Ct. 788, 802 (2017). Without some measure of deference to the legislative judgment on points that are fairly debatable, *any* redistricting plan the Legislature could enact would be in serious, continual jeopardy.

### 1. The House Map Does Not Diminish Minorities' Ability to Elect Representatives of Their Choice.

Districts may not be drawn to "diminish" the "ability" of minority voters to "elect representatives of their choice." Art. III, § 21(a), Fla. Const. The House Map complies with the non-diminishment standard because it neither reduces the number of

districts that perform for minority voters nor weakens the ability of minority voters in those districts to elect their preferred candidates.

The non-diminishment standard requires a comparison between the existing redistricting plan—the Benchmark Map—and the new districts. *Apportionment I*, 83 So. 3d at 624.[4] Under that standard, the Legislature "may not eliminate majority-minority districts or weaken other performing districts where doing so would actually diminish a minority group's ability to elect its preferred candidates." *Id.* at 625.[5] To assure compliance, the Legislature must perform a "functional analysis" of voting behavior. *Id.* at 625–26. This analysis begins with census population data but also considers election data—registration and turnout data and election results—to assess the ability of minorities to elect their preferred candidates. *Id.* Population data alone is insufficient; a minority

---

[4] In assessing districts for diminishment, the "most current population data" are applied to *both* maps—the Benchmark Map and the House Map. *See* Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act, 76 Fed. Reg. 7,470, 7,472 (Feb. 9, 2011).

[5] A majority-minority district is a district in which a minority group comprises a numerical majority of the district's voting-age population. *Apportionment I*, 83 So. 3d at 622–23.

group might, for example, comprise a substantial part of a district's population, but, because of low registration or turnout rates, lack the ability to elect.[6]

The text of the non-diminishment standard reveals several important guideposts. *First*, non-diminishment protects only existing performing districts—districts in which minority voters are already able to elect their preferred candidates in the Benchmark Map. It does not compel the creation of new, performing districts. Thus, the House began by reviewing the Benchmark Map to identify existing districts that perform for minority voters. *Second*, the text does not limit the non-diminishment standard to majority-minority districts. *Id.* at 625. Any district in which a minority group has sufficient effective control over both primary and general elections

---

[6] District 109 is a good example. It has an HVAP of 58.4 percent and a BVAP of 40.1 percent, but performs for Black rather than Hispanic voters. Pet. App. 450. At least one reason is that Hispanics, though a majority of the district's voting-age population, were only 38.7 percent of the district's registered voters and only 40.3 percent of the district's general-election voters in 2020, while Blacks were 49.9 percent of the district's registered voters and 49.0 percent of the district's general-election voters in 2020. Pet. App. 450–51.

to elect its preferred candidates is entitled to protection. *Id.* at 625, 667.

*Third*, on its face, the non-diminishment standard protects against *any diminishment*—not merely against a *total elimination* of the ability to elect. To "diminish" means "to make less or cause to appear less." WEBSTER'S THIRD INTERNATIONAL DICTIONARY 634 (1993), *quoted in Apportionment I*, 83 So. 3d at 702 (Canady, C.J., concurring in part and dissenting in part). Thus, in *Apportionment I*, this Court recognized that new districts may not "weaken" historically performing districts, 83 So. 3d at 625, and that the non-retrogression standard adopted by Congress, and more recently by Florida, asks whether the minority population is "more, less, or just as able to elect a preferred candidate of choice after a change as before," *id.* at 624–25 (quoting H.R. REP. NO. 109-487, at 46 (2006)); *see also id.* at 655 (concluding that the Senate's newly enacted minority districts maintain "commensurate voting ability").

Logically, if a performing district loses substantial minority population, then the remaining minority voters' ability to elect their preferred candidates is diminished. They might retain some ability, but they have *less*. The non-diminishment standard therefore

21

recognizes that the ability to elect "is a matter of degree." Nathaniel Persily, *The Promise and Pitfalls of the New Voting Rights Act*, 117 YALE L.J. 174, 243 (2007). "Diminishing a district's ability to elect does not necessarily mean reducing it from a safe district to a hopeless district . . . . It could mean reducing a safe district to a competitive district, or a competitive district to a hopeless district or any downward shifts along that very wide spectrum." *Id.* at 244. As Chief Justice Canady noted in *Apportionment I*, even small declines in voting ability can change election outcomes: "the differences are at the margins where many elections are decided." 83 So. 3d at 702.

Of course, it does not follow that a district's minority voting-age population may never decrease, no matter how slightly. *Id.* at 625. After all, the population percentage is only one indicator of minority voting ability, *id.* at 625–26, and sometimes a district that is under-populated and must add new population cannot maintain the same percentage of minority residents. But this Court clearly cautioned that any such reductions should be "slight." *Id.* at 625 (explaining that, because voting ability depends on more than mere population data, a "slight change in percentage of the minority group's population in a given district does not necessarily have a

22

cognizable effect on a minority group's ability to elect"). Similarly, the Supreme Court has explained that a reduction in a district's BVAP from 70 to 65 percent might not diminish the ability to elect, *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. at 277, but that a reduction below 55 percent might, *Bethune-Hill*, 137 S. Ct. at 802.

As one commentator aptly explained, Black voters rarely have the ability to elect when a district's BVAP is much below 30 percent, while a BVAP above 60 percent virtually guarantees an ability to elect. Nathaniel Persily, *The Promise and Pitfalls of the New Voting Rights Act*, 117 YALE L.J. at 245 & n.252. It is between these points that the ability to elect is most sensitive to reductions in BVAP. *Id.*

Section 5's history confirms this plain-language reading. In *Georgia v. Ashcroft*, 539 U.S. 461, 482 (2003), the Court interpreted section 5 to permit States to weaken "safe" minority districts in order to create "influence or coalition districts." In 2006, Congress amended section 5 to abrogate the Court's interpretation, adding an express prohibition against "diminishing" the ability to elect. 52 U.S.C. § 10304(b). It thus prohibited any voting changes that "leave a minority group less able to elect a preferred candidate of choice."

23

*Apportionment I*, 83 So. 3d at 625 (quoting H.R. REP. NO. 109-487, at 46).[7]

Applying these principles, the House determined that, under the Benchmark Map, Black voters had the ability to elect their preferred candidates in 18 districts: ten in Broward and Miami-Dade Counties, two in Duval County, two in Orange County, two in Pinellas and Hillsborough Counties, one in Gadsden and Leon Counties, and one in Alachua and Marion Counties. Pet. App. 477. The House Map preserves these districts. Pet. App. 450. The BVAPs in these 18 districts range from 28.9 percent in District 117 to 57.9 percent in District 97. *Id.* As in the Benchmark Map, seven of the 18 districts that perform for Black voters are majority-Black districts. Pet. App. 450, 477. A functional analysis of all 18 districts

---

[7] Section 5 differed from Florida's standard in two important ways. First, it applied only to select jurisdictions (in Florida, to five counties). *Apportionment I*, 83 So. 3d at 623–24. Second, it required federal preapproval—or "preclearance"—before any changes to voting procedures could take effect in the covered jurisdictions. *Id.* In *Shelby County v. Holder*, 570 U.S. 529 (2013), the Court held that the formula by which jurisdictions were selected for coverage was outdated and could no longer be applied. Since then, section 5 has been defunct, but Florida's counterpart to section 5 applies statewide and continues in effect. *Apportionment I*, 83 So. 3d at 624.

reveals that Black voters in these districts will be no less able
to elect representatives of their choice than in the Benchmark Map.

The House also determined that, under the Benchmark Map,
Hispanic voters were able to elect representatives of their choice in
twelve districts: two in Orange and Osceola Counties, and nine
exclusively and one predominantly in Miami-Dade County. Pet.
App. 477. The House Map likewise contains twelve districts that
enable Hispanic voters to elect representatives of their choice: three
in Orange and Osceola Counties and nine in Miami-Dade County.
Pet. App. 450.[8] As in the Benchmark Map, each of the twelve
Hispanic-performing districts is majority Hispanic. Pet. App. 450,
477. The House performed a functional analysis to confirm that

---

[8] Population shifts account for the loss of a district in Miami-
Dade County. Miami-Dade County's population equated to 15.93
districts in 2010, but only 15.05 in 2020. *See* App. 7. When shifts
in population prevent the maintenance of a performing district,
the non-diminishment standard does not require the impossible.
*See* Guidance Concerning Redistricting Under Section 5 of the
Voting Rights Act, 76 Fed. Reg. at 7,472 (recognizing that shifts in
population might render it impossible to maintain a performing
district); *cf. Apportionment I*, 83 So. 3d at 677 ("We note that the
non-diminishment standard does not prohibit any change to
existing boundaries . . . ."). Here, a large increase in Hispanic
population in Orange and Osceola Counties enabled the House to
establish a new performing Hispanic district in Central Florida and
to maintain the statewide number of performing Hispanic districts.

Hispanic voters in these districts will have at least the same ability to elect representatives of their choice as in the Benchmark Map.

In conducting a functional analysis on these districts, the House followed the exact methodology prescribed by this Court in *Apportionment I*. It began with minority voting-age population as the "important starting point" of the analysis. *Apportionment I*, 83 So. 3d at 625 (quoting Guidance Concerning Redistricting Under Section 5 of the Voting Rights Act, 76 Fed. Reg. at 7,471). It then reviewed election results, registration data, and turnout data—just as this Court did, *see id.* at 667–68—with its principal focus on:

- The results of presidential and gubernatorial contests;

- The minority group's share of the relevant political party's electorate at primary and general elections;

- The minority group's share of the relevant political party's registered voters;

- That political party's share of all registered voters and of the minority group's registered voters; and

- That political party's share of the entire electorate and of the minority group's electorate at general elections.

In assessing each minority district, the House reviewed these data separately for each statewide election in 2012, 2014, 2016, 2018,

and 2020.[9] It then relied on these data to reach conclusions about the voting behavior of minority voters and to draw districts that do not diminish their ability to elect the candidates of their choice.[10]

Because it neither reduces the number of performing districts nor weakens the ability of minorities in those districts to elect representatives of their choice, the House Map complies with the non-diminishment standard.

### 2. The House Map Does Not Deny or Abridge Minorities' Equal Opportunity to Participate in the Political Process.

The tier-one requirement that districts "not be drawn with the intent or result of denying or abridging the equal opportunity of

---

[9] These data are provided in the Attorney General's appendix. Pet. App. 450–62, 477–89.

[10] Footnote 11 of this Court's opinion in *League of Women Voters of Florida v. Detzner*, 179 So. 3d 258 (Fla. 2015), could be read to suggest that the non-diminishment standard incorporates the elements of a section 2 claim—*i.e.*, the *Gingles* prerequisites. The Supreme Court has never even implied that the *Gingles* prerequisites govern the retrogression standard under section 5. This reading conflicts with *Reno* and muddies—or eliminates—the line between vote dilution (section 2) and non-diminishment (section 5). *See supra* p. 17. While some of the same evidence might, as a *factual* matter, be relevant to both analyses, this Court should make clear that footnote 11 did not rewrite the non-diminishment standard set forth in *Apportionment I* and import the elements of a section 2 claim into the non-diminishment standard.

racial or language minorities to participate in the political process"
prohibits vote dilution in the same manner as section 2 of the VRA.
Art. III, § 21(a), Fla. Const.; *Apportionment I*, 83 So. 3d at 619–23.

Vote dilution can be established only by evidence that the
Legislature could have drawn a performing majority-minority
district for a reasonably compact, politically cohesive minority
population, but instead drew a district in which racially polarized
voting will usually defeat the minority population's preferred
candidate. More specifically, the following factors, often called the
"*Gingles* prerequisites," must be established: (1) the minority group
is sufficiently large and geographically compact to comprise a
majority of the district's voting-age population;[11] (2) the minority
group is politically cohesive; and (3) the majority votes sufficiently
as a bloc to enable it usually to defeat the minority group's
preferred candidates. *Apportionment I*, 83 So. 3d at 622 (citing
*Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986)); *see also Bartlett v.
Strickland*, 556 U.S. 1, 18 (2009) (plurality opinion) (explaining that

---

[11] Section 2 does not apply if the potential majority-minority
district would not perform for minority voters. *Abbott v. Perez*, 138
S. Ct. 2305, 2332 (2018).

vote dilution requires minorities to "make up more than 50 percent of the voting-age population in the relevant geographic area"). Once these prerequisites are established, it must be shown that, under the totality of circumstances, members of the minority group have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. § 10301(b); *accord Apportionment I*, 83 So. 3d at 621–22.[12]

*Cooper v. Harris*, 137 S. Ct. 1455 (2017), illustrates the vote-dilution standard. There, a congressional district's BVAP had hovered between 46 and 48 percent for nearly 20 years. *Id.* at 1470. While it was possible to draw a geographically compact majority-minority district, the Court concluded that section 2 did not require it. The 46- to 48-percent district was an "extraordinarily safe district" for minority-preferred candidates, who had consistently

_____

[12] In *Apportionment I*, this Court declined to "rule out the potential" that, even where majority-minority districts cannot be created, Florida's vote-dilution provision might sometimes require the creation of minority districts in some form. 83 So. 3d at 645, 655. For the same reasons that the Supreme Court ruled out that potential in *Bartlett*—including the "serious constitutional concerns" that it would raise, 556 U.S. at 21 (plurality opinion)—this Court should rule out that potential under Florida's analogous provision.

prevailed by large margins. *Id.* The evidence did not therefore establish the third *Gingles* prerequisite: that the candidate preferred by minorities would usually be defeated in the district "as actually drawn." *Id.* (quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993)).

There can be no serious claim that the House Map violates the vote-dilution standard—and no party suggests that it does. Quite simply, the House did not draw any non-performing districts where it could have drawn a performing majority-minority district.[13]

Sometimes, an additional majority-minority district can be created by deconstructing a district with a supermajority-minority population. *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1016 (8th Cir. 2006) (concluding that two majority-minority districts could have been drawn where a 90-percent minority district abutted a 30-percent minority district); *Apportionment I*, 83 So. 3d at 622. Here, none of the majority-Black districts exceeds even 57.9 percent BVAP. Pet. App. 450. And while some performing districts contain

---

[13] While Districts 13 and 40, with BVAPs of 48.5 and 48.0 percent respectively, could have been drawn as majority-minority districts, a functional analysis confirms that, like the district in *Cooper*, these districts will be safe districts for candidates preferred by minority voters.

large Hispanic populations, these percentages are "explained by the fact that the Hispanic population in Miami-Dade County, where these districts are located, is densely populated" by Hispanic voters, *Apportionment I*, 83 So. 3d at 645—to say nothing of the remaining *Gingles* prerequisites. As it did last decade, *id.*, this Court should find that the House Map does not violate the vote-dilution standard.

> **B.    The House Map Satisfies the Contiguity Requirement.**

Another tier-one standard requires that districts "consist of contiguous territory." Art. III, § 21(a), Fla. Const. A contiguity requirement has long appeared in article III, section 16(a), and the well-established meaning of that provision governs the contiguity standard in article III, section 21. *Apportionment I*, 83 So. 3d at 628.

A district is non-contiguous "when a part is isolated from the rest by the territory of another district or when lands mutually touch only at a common corner or right angle." *Id.* (quoting *In re Constitutionality of House Joint Resol. 1987*, 817 So. 2d 819, 827 (Fla. 2002)). However, the "presence in a district of a body of water without a connecting bridge, even if it necessitates land travel outside the district in order to reach other parts of the district,"

31

does not violate the contiguity requirement. *In re Senate Joint Resol. 2G, Special Apportionment Session 1992*, 597 So. 2d 276, 280 (Fla. 1992). Florida's islands are also considered contiguous. *Id.* at 279.

As is clear on the face of the House Map, each new district is contiguous.

### C.   The House Map Is Devoid of Any Political Intent.

Florida's tier-one standards also prohibit an apportionment plan or district from being "drawn with the intent to favor or disfavor a political party or an incumbent." Art. III, § 21(a), Fla. Const. The House Map scrupulously complies with this standard.

By its plain language, this provision against partisan and incumbent favoritism "prohibits intent, not effect." *Apportionment I*, 83 So. 3d at 617. As this Court recognized, a political effect is unavoidable: "any redrawing of lines, regardless of intent, will inevitably have an effect on the political composition of a district." *Id.*

A partisan imbalance in a redistricting plan does not prove improper intent. *Id.* at 641–43. This is so because causes other than impermissible intent can produce partisan imbalance. *Id.* For example, the creation of minority districts in compliance with state

32

or federal law might have the effect of placing disproportionate numbers of voters affiliated with one political party into a small number of districts. *Id.* at 643. Similarly, heavy concentrations of Democratic voters clustered in urban areas—compared to smaller majorities of Republican voters distributed more evenly across other regions of the State—may, without any improper intent, cause Democratic voters to be drawn into a small number of districts. *Id.* at 642–43.

This Court correctly held—and should reaffirm—that the intent standard "does not require the affirmative creation of a fair plan, but rather a neutral one in which no improper intent was involved." *Id.* at 643. The intent standard is, so to speak, a *negative* injunction that banishes partisan intent from the redistricting process, and not an affirmative mandate to manufacture an ideal partisan balance. In fact, any effort to rebalance a map politically— and to tilt its partisan composition in favor of the political party that is disadvantaged by the absence of partisan intent—would itself reflect an intent to favor a political party, inject partisanship into the redistricting process, and violate the Constitution's plain terms.

33

The House Map was not drawn with impermissible intent. The House did not consider incumbent addresses in drawing districts, so the effect on incumbents—whatever it is—is the natural result of a process devoid of any intent to favor or disfavor incumbents or political parties. Nor did the House employ political data to assess the partisan composition of the map, but only to assure compliance with minority voting protections. *See Apportionment I*, 83 So. 3d at 619 ("[M]ere access to political data cannot presumptively demonstrate prohibited intent because such data is a necessary component of evaluating whether a minority group has the ability to elect representatives of its choice . . . .").

On its face, the House Map repels any suspicion of improper intent. This Court has recognized that tier-two standards "restrict the Legislature's discretion in drawing irregularly shaped districts" and that strict compliance with those standards can therefore "undercut or defeat any assertion of improper intent." *Id.* at 618; *accord id.* at 645 (noting that tier-two compliance makes "improper intent less likely"). Last decade, the Court found that the House's close adherence to tier-two principles tended to disprove claims of improper intent in the House Map. *Id.* at 645. The same is true

34

here. As explained below, the House not only adhered to the same tier-two principles this decade, but also notably improved its map according to key measures of tier-two compliance. *See infra* Part III.

Finally, although not part of this record, news outlets have reported that as many as seven seats might swing from Republican to Democratic under the House Map, and that no fewer than 19 incumbents find themselves in a districts with another incumbent—often within their own political parties.[14] The House Map was drawn with no intent to favor or disfavor political parties or incumbents.

## III.   THE HOUSE MAP COMPLIES WITH ALL TIER-TWO STANDARDS.

### A.   The House Map Satisfies the Boundaries Standard.

The House Map complies with the Constitution's requirement that "districts shall, where feasible, utilize existing political and geographical boundaries." Art. III, § 21(b), Fla. Const. As explained

---

[14] Jacob Ogles, *Civil War: Likely Florida House Map to Pit 19 Incumbents Against House Colleague*, FLORIDA POLITICS (Jan. 29, 2021) ("An investigation by Florida Politics finds the current cartography . . . could pit at least 19 sitting representatives against one another . . . ."); Mary Ellen Klas, *House Advances First Redistricting Map, But Democrats Have Many Questions*, MIAMI HERALD (Jan. 23, 2021) ("Democrats could gain as many as seven seats . . . under a redistricting map approved Friday . . . .").

below, the House Map faithfully follows political and geographical boundaries throughout the State and makes notable gains in the number of municipalities that are kept intact within single districts.

This Court has defined "political . . . boundaries" to mean county and municipal boundaries, and "geographical boundaries" to refer to geographical demarcations that are "easily ascertainable and commonly understood, such as rivers, railways, interstates, and state roads." *Apportionment I*, 83 So. 3d at 638 (internal marks omitted). The phrase "where feasible" introduces "flexibility," *id.* at 636, and recognizes that district boundaries cannot always follow political and geographical boundaries, and that all political and geographical boundaries cannot be utilized in drawing districts, *id.* at 638 ("There will be times when districts cannot be drawn to follow county lines or to include the entire municipalities within a district.").

The House Map is replete with examples of respect for county boundaries. Three districts—Districts 5, 6, and 83—consist exclusively of one or more whole counties, while the remainder of the districts are all nested within single counties or regional county combinations. *See supra* pp. 11–13. For example, Escambia, Santa

Rosa, and Okaloosa Counties comprise exactly four districts; Duval and Nassau Counties comprise exactly six districts; Sumter, Hernando, and Pasco Counties comprise exactly five districts; and St. Lucie, Martin, and Palm Beach Counties comprise exactly eleven districts. *Id.*

This subdivision of the State into regional whole-county combinations that encompass whole numbers of districts ensures consistent respect for county boundaries throughout the State. Of the 38 counties in Florida with populations less than the ideal population of a district—*i.e.*, the counties that could theoretically have been kept whole—the House Maps splits only two (Martin and Jefferson). *See* App. 7. Only two districts (Districts 20 and 27) split more than two counties, while more than two-thirds of the districts (84 of 120) are wholly within single counties. App. 11. No less impressively, more than 37 percent of the length of the average district's perimeter adheres to county boundaries. Pet. App. 471.

The House Map shows similar respect for municipal boundaries. It decreases the number of split municipalities from 75 when the Benchmark Map was drawn in 2012 to a mere 53—a 29-percent reduction—and from 101 in the Benchmark Map at the

end of the decade, according to 2020 Census geography. Pet App. 448, 475.

Polk County strikingly illustrates the House Map's respect for county and municipal boundaries. With a population of 725,046 people, App. 7, Polk County was evenly divisible by four districts. As the following image shows, the House nested four compact districts wholly within Polk County, without splitting any of the county's 17 municipalities, Pet. App. 464–70:



A legislative decision to prioritize the integrity of counties and municipalities is one sensible way to implement the boundaries standard. Last decade, this Court quoted with approval the House's explanation of its decision to prioritize county integrity, commending the House's "reasoned approach" to "balancing the tier-two standards." *Apportionment I,* 83 So. 3d at 637, 646–47. The House explained that county boundaries "are the most readily understood, consistently compact, functional, and stable" of Florida's political and geographical boundaries, and that the preservation of whole counties preserved the municipalities within those counties and assisted in the creation of compact districts. *Id.* Municipalities in turn have their own local governments and often shared interests and a sense of community that counsel for unity in representation.

This is not to say that the Constitution prioritizes political over geographical boundaries, or that the House's methodology is the only appropriate one. The Constitution does not, after all, directly require that counties and municipalities be kept whole, but rather that their boundaries, as well as geographical boundaries, be utilized where feasible. Thus, political and geographical boundaries

39

constitute a preexisting network of potential boundaries—the raw materials from which new districts may be fabricated. Thus, a legislative decision to follow a highway that bisects a city is no less permissible than a legislative choice to follow a city boundary that crosses a highway. *Apportionment I*, 83 So. 3d at 705 (Canady, C.J., concurring in part and dissenting in part) ("Any suggestion that the use of geographical boundaries is somehow less acceptable than the use of political boundaries is totally at odds with the text . . . ."). In District 4, for example, the House could have constitutionally followed I-10 through the City of Crestview, which lies on both sides of the interstate, but instead deviated from the interstate to follow the municipal boundaries and keep Crestview wholly in the district:



Indeed, as it does along District 4's northern boundary, the House Map extensively utilizes geographical boundaries, including countless miles of rivers, railways, interstates, and state roads. District 41—a district in which Black voters are able to elect representatives of their choice—is constructed almost entirely of highways and state roads, including I-4 and the Florida Turnpike:



Likewise, District 52 consists of Sumter County and eastern Hernando County to the Suncoast Parkway, which separates Districts 52 and 53, while the Dolphin Expressway in Miami-Dade

41

County forms the northern boundary of District 114, which was designed to keep the City of Coral Gables whole, and District 116, except where District 116 extends north to keep Sweetwater whole:

 

**District 52**                     **Districts 114 and 116**

The House Map also utilizes railways where appropriate. Districts 98 and 100 follow the Florida East Coast Railway along most of their shared boundary, from Deerfield Beach to Pompano Beach:



The House Map's full compliance with the boundaries standard is confirmed by the Legislature's "boundary analysis," which calculates the percentage of each district's boundary that consists of political and geographical boundaries. This analysis utilizes the Census Bureau's geographic information and thus the Census Bureau's designation of primary and secondary roads, railways, and significant water bodies of at least ten acres. Pet. App. 384, 388 nn.8–9. By this measure, the average district in the House Map follows political and geographical boundaries along 82.7 percent of its perimeter, including county boundaries along 37.1 of

43

its perimeter, municipal boundaries along 21.3 percent of its perimeter, primary and secondary roads along 21.8 percent of its perimeter, and significant water bodies along 28.8 percent of its perimeter. Pet. App. 471.[15] These figures are especially notable because the comparatively small size of House districts can limit the number of political and geographical boundaries that are within a district's reach, and which may serve as potential boundaries for the district.

The boundary analysis reveals, for example, that District 117—which is the House Map's least compact district, and which, with a BVAP of 28.9 percent, was drawn to avoid diminishment—nevertheless follows political and geographical boundaries along 85 percent of its boundary, an increase from 57 percent in the Benchmark Map. Pet. App. 449, 473, 501. The district's eastern and western boundaries consist primarily of the Florida Turnpike and U.S. 1, while Florida City is kept whole at the southern end of the district.

---

[15] The aggregate of these numbers exceeds 100 percent because the same boundary may be classified in more than one way. For example, the Suwannee River is not only a river, but also a county boundary.

The House consistently sought to utilize political and geographical boundaries where feasible in the construction of new districts and faithfully complied with this constitutional standard.

### B. The House Map Satisfies the Compactness Standard.

The Constitution also provides that "districts shall be compact." Art. III, § 21(b), Fla. Const. Compactness is a "geographical concept" and is assessed, first and foremost, "by looking at the shape of a district." *Apportionment I*, 83 So. 3d at 634 (internal marks omitted). A compact district "should not have an unusual shape, a bizarre design, or an unnecessary appendage." *Id*. The Constitution does not require districts to be as compact as possible—only that they be compact. *Id*. at 635.

The compactness inquiry can be a complicated one, calling for sensitivity to the many forces that can impact a district's overall shape. For example, the Constitution expressly permits deviations from compactness to the extent necessary to comply with tier-one standards. Art. III, § 21(c), Fla. Const.; *Apportionment I*, 83 So. 3d at 626, 636. Drawing districts that do not diminish the ability of minority voters to elect representatives of their choice sometimes

45

requires deviations from compactness. *Apportionment I*, 83 So. 3d at at 635, 640.

Similarly, the Constitution recognizes that coequal tier-two standards may exert pressure on each other, Art. III, § 21(c), Fla. Const., and therefore leaves to the Legislature the task of "balancing the tier-two standards together in order to strike a constitutional result," *Apportionment I*, 83 So. 3d at 639. A decision to keep cities and counties whole in a district, or in adjacent districts—or to follow rivers or municipal boundaries, some of which are notoriously irregular—can affect a district's compactness, as can Florida's peninsular geography and the interplay between residential patterns and the equal-population mandate. *Id.* at 635. Compactness can even be affected by oddities in the geographical units created by the Census Bureau, which serve as the building blocks for state legislative districts.[16] Bay and Citrus Counties, for example, appear to contain "fingers" over the waters of the Gulf of Mexico, but only because the Census Bureau's geography does.

---

[16] The Census Bureau's 2020 geography divides Florida into 390,066 blocks, 13,388 block groups (which are aggregations of blocks), and 5,160 tracts (which are aggregations of block groups). Districts are constructed from combinations of census geography.

A visual examination of the House Map reveals a strong adherence to compactness and an appropriate reconciliation of competing standards. Consider this arrangement of districts in Duval and Nassau Counties, and the improvement in compactness over the Benchmark Map:



**2012 Districts**                    **2022 Districts**

These six districts are all compact, while Districts 13 and 14 avoid diminishment in minority voting ability. The six districts are wholly located within the perimeter formed by the two counties and make extensive use of geographical boundaries: District 14 follows the

I-295 beltway along much of its northern and eastern boundary, while the St. Johns River and Beach Boulevard—a major, six-lane state road and federal highway in southern Duval County—form the northern boundaries of Districts 16 and 17 respectively. These districts simultaneously satisfy all tier-one and tier-two standards.

The House Map properly balances compactness with tier-one protections for minority voters. Districts 62, 88, and 117 are among the House Map's less compact districts, but the House performed a functional analysis of minority voting behavior and determined that these district configurations were necessary to avoid diminishment. At the same time, the House markedly improved the compactness of Districts 62 and 88 over their predecessors in the Benchmark Map. District 62's predecessor—Benchmark District 70—not only crossed Tampa Bay, but also extended south into even Manatee and Sarasota Counties. As redrawn, the district protects minority voting ability from diminishment without entering Manatee and Sarasota Counties, resulting in a far more visually compact configuration:

48



**Benchmark District 70**                    **New District 62**

Likewise, Benchmark District 88 featured a long and narrow

tail that extended 20 miles to the south through Palm Beach

County. The redrawn district eliminates the tail and instead avoids

diminishment by adding population from the west, enhancing

the visual compactness of the district and indeed the entire region:

49

 

**Benchmark District 88**          **New District 88**

The House Map therefore substantially improves the compactness of two districts that, on minority-protection grounds, this Court unanimously upheld against compactness challenges ten years ago. *Apportionment I*, 83 So. 3d at 647–50. These examples demonstrate the House's commitment to minimizing deviations from visual compactness to the extent possible, without compromising tier-one priorities.

Many of the House Map's protected minority districts are not only compact, but *highly* compact. Districts 13 and 14 in Duval

County; District 21 in Alachua and Marion Counties; Districts 40 and 41 in Orange County; District 63 in Hillsborough County; Districts 97, 98, 99, 104, and 105 in Broward County; and Districts 107, 108, and 109 in Miami-Dade County all maintain the voting ability of Black voters in minority districts that have historically performed. These districts are all highly compact, without fingers or bizarre shapes, implementing both tier-one and tier-two standards.

The House also struck a constitutional balance between compactness and faithful adherence to political boundaries. District 47, for example, maintains a compact shape while it accommodates St. Cloud's city boundaries. *Apportionment I,* 83 So. 3d at 635–36 (explaining that a "desire to keep municipalities wholly intact" may detract from compactness but "serve to justify the shape of the district"). The city remains intact, wholly within the district. District 47 also affords Hispanic voters the ability to elect representatives of their choice. In doing so, it increases from two to three the number of performing Hispanic districts in Central Florida and compensates for the loss of a performing district in South Florida, *see supra* note 8:



Districts 114 and 115 are compact districts shaped largely by the municipalities they encompass. District 114 is constructed around Coral Gables, which runs vertically through the district, and includes West Miami and South Miami to the west of Coral Gables. District 115 keeps Pinecrest, Palmetto Bay, and Cutler Bay whole; its shape is also impacted by neighboring District 117, a protected district that has historically performed for Black voters.

Districts 114 and 115 themselves were drawn to maintain the ability of Hispanic voters to elect the representatives of their choice:



District 107—a performing minority district that is bordered by five performing minority districts—furnishes another example of a constitutional reconciliation of tier-two considerations. While a small part of the district's eastern boundary appears to be slightly irregular, the Legislature's desire to keep the City of North Miami Beach whole within the district fully explains the district's contours:

53



Small adjustments such as these along a district's perimeter to accommodate a municipality do not violate compactness, which concerns the district's overall shape—not the specific path of each distinct boundary segment. *Apportionment I*, 83 So. 3d at 638 ("In a compactness analysis, we are reviewing the general shape of a district; if a district has a small area where minor adjustments are made to follow either a municipal boundary or a river, this would

not violate compactness."). As they did last decade, the districts in the House Map easily satisfy a visual assessment of compactness.

In addition to a visual examination, quantitative measures sometimes assist courts in their evaluation of compactness. *Id.* at 635. Three common measures of compactness are the Reock, Convex Hull, and Polsby-Popper measures. *League of Women Voters of Fla. v. Detzner*, 179 So. 3d 258, 283 nn.6–8 (Fla. 2015). Each generates a score between 0 and 1 that represents the ratio between the district's area and the area of another geometric shape. *Id.* The closer the score approaches to 1, the more compact the district is presumed to be.

The Reock score compares the district's area to the area of the smallest circle that can circumscribe the district. *Id.* at 283 n.6. A Reock score of 0.45 means, for example, that the district's area covers 45 percent of the circle's area. In theory, the more nearly a district's shape resembles a perfect circle, the higher its Reock score will be. Similarly, the Convex Hull score indicates the ratio of the district's area to the area of the smallest convex polygon that can enclose the district (imagine a taut rubber band encompassing the district). *Id.* at 283 n.7. And the Polsby-Popper score compares

the district's area to the area of a circle with a perimeter of the same length as the district's. *Id.* at 283 n.8. The following diagram illustrates these compactness measures as applied to a hypothetical district:



**Reock**  **Convex Hull**  **Polsby-Popper**

Though favorable to the House Map, these mathematical measures are only guides, and are not dispositive. *Apportionment I*, 83 So. 3d at 635 (explaining that the Constitution does not require districts to "achieve the highest compactness scores"). Each is computed differently; their results often diverge from each other, and sometimes from common sense. *See* H.P. Young, *Measuring the Compactness of Legislative Districts*, Legislative Studies Quarterly, Vol. 13, No. 1 (Feb. 1988). To illustrate, under the Reock test, the *least* compact of the six shapes shown below is the simple triangle, while a square (not pictured) is less compact than the coiled snake. *Id.* at 106.

56



District 119 is a real-life example of divergence among compactness scores. It has the seventh *lowest* Reock score (0.28) but the eleventh *highest* Convex Hull score (0.92), while its Polsby-Popper score (0.47) is above the mean and median. Pet. App. 449. A visual inspection reveals that the rectangular district is highly regular in its overall shape and not even slightly bizarre, unusual, or tortured:



Despite the imperfections inherent in any mathematical compactness measure, the scores support what is obvious from a visual inspection—that the House Map satisfies the constitutional standard of compactness. The mean and median compactness scores in the House Map are all greater than the mean and median compactness scores in the Benchmark Map that this Court upheld:

|  | Mean Score | | Median Score | |
|---|---|---|---|---|
|  | 2012 | 2022 | 2012 | 2022 |
| Reock | 0.43 | 0.45 | 0.44 | 0.46 |
| Convex Hull | 0.80 | 0.82 | 0.81 | 0.83 |
| Polsby-Popper | 0.43 | 0.45 | 0.44 | 0.45 |

Pet. App. 448, 475.

Compactness scores also confirm visual improvements in individual districts. District 88—a majority-minority district in Palm Beach County—had the lowest Reock (0.08), Convex Hull (0.34), and Polsby-Popper (0.08) scores in the Benchmark Map. Pet. App. 476. By removing the district's 20-mile extension and instead drawing the district wholly in the northern part of the county, the House significantly improved the district's Reock (0.30), Convex Hull (0.57), and Polsby-Popper (0.12) scores, Pet. App. 449, while performing a functional analysis to avoid diminishment in the voting ability of minority voters. District 88's redesign also allowed the House to draw the entire region in a more compact fashion, without the long coastal district that, in the Benchmark Map, was set to the east of District 88.

Last decade, this Court identified three House districts that it concluded had "significantly low compactness scores": Districts

59

88, 117, and 120. *Apportionment I*, 83 So. 3d at 646. Each of these districts had a Reock score of 0.20 or less and a Convex Hull score of 0.53 or less. Pet. App. 476.[17] Still, the Court upheld all three districts. It noted that Districts 88 and 117 were properly drawn to protect minority voting rights, *Apportionment I*, 83 So. 3d at 648–50, 653, while District 120's shape was heavily impacted by the "unusual geography of the Florida Keys," *id.* at 646. This decade, only one district falls within the same range of compactness scores: District 117, which recreates Benchmark District 117 to avoid diminishment in the voting ability of minority voters, and which should be upheld for the same reasons once again. Pet. App. 449.

### C.  The House Map Satisfies the Equal-Population Standard.

The Constitution's tier-two standards also require that districts "be as nearly equal in population as is practicable." Art. III, § 21(b), Fla. Const.

---

[17] This Court did not reference Polsby-Popper scores in *Apportionment I*.

This requirement is not new. The United States Supreme Court has long interpreted equal protection to require population equality among state legislative districts. *See Reynolds v. Sims*, 377 U.S. 533 (1964). That standard does not require "mathematical perfection." *Harris v. Ariz. Indep. Redistricting Comm'n*, 578 U.S. 253, 258 (2016). Rather, it requires States to make an "honest and good faith effort" to equalize district populations, *id.* (quoting *Reynolds*, 377 U.S. at 577), while permitting deviations that further "legitimate considerations incident to the effectuation of a rational state policy," *id.* (quoting *Reynolds*, 377 U.S. at 579). When the combined deviation between the most and least populous districts is less than 10 percent, a challenge "will succeed only rarely." *Id.* at 259.

In *Apportionment I*, this Court imbued Florida's tier-two standard with the same meaning, with one caveat. Like the federal standard, Florida's standard permits deviations from "strict and unbending adherence to the equal population requirement." 83 So. 3d at 630. Under Florida's standard, however, deviations must be justified by efforts to comply with "other constitutional standards," rather than by state policies not enshrined in the Constitution. *Id.*

The House Map complies with this standard. According to the 2020 census, the State's population is 21,538,187. Pet. App. 448. The ideal district population is therefore 179,485. *Id.* The most populous district is District 4, with a population of 183,737—2.37 percent above the ideal. Pet. App. 448–49. The least populous district is District 6, with a population of 175,216—2.38 percent below the ideal. *Id.*[18] The House Map's overall range is therefore 4.75 percent—well below the 10-percent threshold that usually marks the outer limits of constitutional compliance. Pet. App. 448.

The deviations in the House Map are justified by the House's efforts to comply with other constitutional standards. Districts 4 and 6 illustrate the point well. District 6 consists of a single, whole county (Bay County). District 4 is contained wholly within Okaloosa County and follows the county boundary along 69 percent of its perimeter. Pet. App. 471. It then follows a prominent geographical boundary—I-10—except where necessary to keep Crestview whole.

---

[18] Population deviations are calculated by subtracting the ideal district population from the total population of the district and dividing the difference by the ideal district population, as follows:

$$(175,216 - 179,485) \div 179,485 = -.0238$$

Adherence to existing boundaries—a constitutional standard—
dictated the shapes and therefore the populations of both districts.

The House Map's more minor deviations were also necessary
to achieve objectives rooted in Florida's constitutional standards. As
explained above, to better respect county boundaries, the House
divided the entire State into 14 regions, or "sandboxes," each
consisting of one or more whole counties capable of forming one or
more whole districts. Each region's ideal district population was a
little above or a little below the ideal population of districts
statewide. For example, when the population of Seminole, Orange,
and Osceola Counties was divided among 13 whole districts, the
ideal population of those 13 districts was 1.88 percent less than the
statewide ideal district population. *See supra* p. 13. These 13
districts are slightly under-populated (though well within
constitutional bounds) for the simple reason that the House sought
to preserve county boundaries where feasible. The same division of
the State into county-based regions dictated the minor population
deviations of the other districts.

## IV.   THIS COURT'S JUDGMENT IS BINDING ON ALL CITIZENS—AND PRECLUDES FURTHER LITIGATION.

In entering a declaratory judgment determining the House Map's validity, this Court should make explicit what that means. It should recede from *Apportionment III*, give effect to the plain language of the Florida Constitution, and declare that the Court's declaratory judgment is binding and precludes future challenges.

The Constitution requires this Court to enter a "declaratory judgment determining the validity of the apportionment," and declares that judgment to be "binding upon all the citizens of the state." Art. III, § 16(c), (d), Fla. Const. In *Apportionment III*, this Court held that its judgment is binding as to the apportionment's "facial validity," but *not binding* as to "fact-based challenges." 118 So. 3d at 209.

The Constitution, however, makes no such distinction. As the dissent correctly explained, "there is nothing in the text of the Florida Constitution suggesting that as-applied challenges under Florida law somehow escape the rule in section 16(d)." *Id.* at 216. Instead, article III, section 16(d) "unambiguously precludes" further challenges to redistricting plans that this Court declares to be valid.

64

*Id.* at 214. "If the citizens of the state are bound by a judgment of validity, they are necessarily precluded from challenging the validity of the redistricting plan in subsequent litigation." *Id.* at 215.

Indeed, in *Apportionment I*, this Court recognized that article III, section 16 was created to secure finality and avoid litigation. From 1962 to 1968, redistricting litigation had "proliferated," and in some cases "literally spanned a period of several years, infusing the apportionment and the electoral process with uncertainty." 83 So. 3d at 601 (collecting cases). This period of instability featured alternating court battles and special sessions, four redistricting plans in five years, court-imposed districts, and even court-ordered elections.[19] This Court's review proceeding was proposed as the cure—as an "attempt to avoid further apportionment litigation." *Id.*

This Court also recognized that, to await challenges to "work their way up to this Court would itself be an endless task," *id.* at 617, and "create uncertainty" for voters and candidates, *id.* at 609. The Constitution therefore gave this Court "jurisdiction to resolve

---

[19] *See generally* Pet. for Writ of Prohibition or for Constitutional Writ to the Circuit Court of the Second Judicial Circuit at 13–15, *Apportionment III* (No. SC13-252).

all issues" related to state legislative districts, *id.* at 600 (quoting *In re Apportionment Law*, 414 So. 2d 1040, 1045 (Fla. 1982)), and declared the Court's judgment "binding," Art. III, § 16(d), Fla. Const.

The *Apportionment III* dissent correctly concluded that this "unique constitutional proceeding" was established to "conclusively determine and settle once for all the validity of a redistricting plan under state law," 118 So. 3d at 215–16, and that, to that end, article III, section 16(d) imposes an "unconditional and unequivocal rule of preclusion" that precludes future challenges, *id.* at 218. In contrast, the holding of *Apportionment III* accords no practical effect to the plain and unambiguous language of article III, section 16(d). This Court should make clear that its declaratory judgment is not a preliminary indication of validity, but rather a *binding judgment* that averts "unending litigation" over state legislative districts, *id.* at 218 (Canady, J., dissenting), and guarantees finality to all citizens of the State—just as the Constitution says, and was intended to do.

## CONCLUSION

The House Map is valid. This Court should enter a binding declaratory judgment upholding the unchallenged House Map.

Respectfully submitted,

/s/ Andy Bardos

Chris Sprowls (FBN 72863)
*Speaker*
FLORIDA HOUSE OF
REPRESENTATIVES
402 The Capitol
402 South Monroe Street
Tallahassee, Florida 32399
Telephone: 850-717-5000
chris.sprowls@
    myfloridahouse.gov

Andy Bardos (FBN 822671)
GRAYROBINSON, P.A.
Post Office Box 11189
Tallahassee, Florida 32302
Telephone: 850-577-9090
andy.bardos@
    gray-robinson.com
vanessa.reichel@
    gray-robinson.com

*Counsel for the Florida House of Representatives*

## CERTIFICATE OF COMPLIANCE

I certify that this brief is filed in Bookman Old Style 14-point font and contains 11,143 words, as determined by the word-processing system used to prepare this document, and therefore complies with the applicable font and word-count limit requirements in Florida Rules of Appellate Procedure 9.045(b) and 9.210(a)(2)(B).

/s/ Andy Bardos
Andy Bardos (FBN 822671)
GRAYROBINSON, P.A.

68

## CERTIFICATE OF SERVICE

I certify that, on February 19, 2022, the foregoing document was furnished by email on all individuals identified on the service list that follows.

*/s/ Andy Bardos*
Andy Bardos (FBN 822671)
GRAYROBINSON, P.A.

### SERVICE LIST

Daniel W. Bell
Chief Deputy Solicitor General
Office of the Attorney General
PL-01, The Capitol
Tallahassee, Florida 32399
daniel.bell@myfloridalegal.com
*Counsel for the Attorney General*

Daniel E. Nordby
Shutts & Bowen LLP
215 S. Monroe Street, Suite 804
Tallahassee, Florida 32301
dnordby@shutts.com
*Counsel for the Florida Senate*