

## DRAFT Potential QA

*House can speak to overall metrics and the districts we drew.*
*EOG can speak to who, where, why, and intent about the districts they drew, and their legal framework.*

### New Following Committee Meeting

1. **Alex Kelly said he's worked with a contract map-drawer named Adam Foltz. Mr. Foltz is "apparently" associated with partisan organization. How do we know the Governor's process was free from improper intent?**
   *I obviously cannot speak to the conversations that might or might not have taken place but the Governor's map-drawer addressed this during committee yesterday. He stated that Mr. Foltz has only worked for government entities to produce maps.*

2. **There is a UCLA report that states South Florida Hispanic communities do not vote cohesively and therefor those districts may not need to be protected. What do you think of this report/allegation?**
   *I haven't seen the report.*

   If pushed: *Listen, any person can write a report – it doesn't mean it's credible or that it wasn't produced for partisan/improper motivations.*

3. **Why are we protecting Hispanic voters over Black voters?**
   *I disagree with the premise of your question. The House has always took that position that CD 10 is not a performing/protected district. And a new legal theory regarding CD 5 has been brought forward by the Governor. This map incorporates both of those items.*

4. **Do you believe "the Courts got it wrong" last decade with how CD 5 was drawn?**
   *Listen, you are quoting to me what was said by the Governor's Office. But the more important part was in the follow-up answer – the question that is being raised today was NOT the question before the courts last decade.*

5. **This map is allegedly a 20-8 map – that is not fair – doesn't that clearly violates the Fair Districts Amendments?**
   *Not necessarily. As I've explained ad nauseum, a map cannot be drawn with the intent to favor or disfavor a political party…the Constitution never speaks to results. Every map has an inherent political results – but the courts have found that result is not solely indicative of mal-intent.*

### Big Picture

1. **Why did we wait so long to send our maps to the Governor, and why did we wait so long to call a Special Session?**
   *Those decisions are not within the purview of this committee.*

2. **Why didn't Committee Staff produce a work product for consideration?**
   *We did produce maps during regular session. The Governor called the Legislature into special session to present a map and we're here to listen.*

3. **Why are we allowing the Governor to intervene in our legislative process – aren't we separate branches of government and don't we have a constitutional responsibility to draw these maps?**
   *The Governor has a constitutional role in the enactment of all legislation. The Governor called us into special session, and we are here to consider the map the Governor has presented and asked us to consider. We are giving the Governor an opportunity to make his case.*

   *We have already done our job. We drew and passed two maps. And then the Governor did his job – and decided to veto the maps. Now our options are either to let the process go to the courts, where no elected official will be involved, truly abdicating our responsibility. OR, to come back to the table at the Governor's request, hear him out, and work together to get something legislatively-passed and executively-signed.*

4. **Why are we considering a map we know will end up in court, especially as Candidate Qualifying quickly approaches?**
   *The possibility of litigation cannot deter us from fulfilling our obligation to redraw the state's congressional districts.*

5. **Why are we now only considering 1 map?**
   *The Governor called us into special session to consider a specific map, and that's what we are here to do.*

### Between Regular Session and Special Session

6. **Did the Governor offer any incentives to Legislators to pass this map, such as endorsements or appointment of family members?**
   *Defer to EOG to answer.*

7. **How did EOG and Legislative Leadership negotiate this map? Who was involved?**
   *EOG drew the map presented here today. House Leadership did not make line-drawing decisions or request any revisions. The House was briefed and presenied with the map once it was complete. The Governor has informed us this was the map he was willing to sign and would not consider alternatives.*

8. **Did the House have input into this map? Did the Senate have input into this map?**
   *House Leadership was briefed on this map once EOG completed it. EOG drew the map. In doing so, it borrowed ten districts from the map the legislature passed in regular session. The House did not see EOG's map until the map was done. The House did not request any edits to the map, and no edits were made after House Leadership was briefed on the map. I cannot speak for the Senate.*

9. **Did EOG make any of the House's requested changes to the map?**
   *The House did not request any edits to the map. I cannot speak for the Senate.*

Page 1 of 7

House_013524
SOS_Cubanos_0095618

Page 2 of 7

House_013525
SOS_Cubanos_0095619

PLAINTIFFS' TRIAL EXHIBIT
P32
1:24-cv-21983-JB

10. **Did Legislative Leadership see this map before EOG submitted it on the portal?**
Yes. House Leadership was briefed on this map once EOG completed it. House Leadership did not request any edits to the map, and no edits were made after House Leadership was briefed on the map.

### Legal Framework

11. **Why didn't the Legislature conduct a "proper" legal analysis of the 14th Amendment, as alleged by the Governor?**
The Legislature conducted all appropriate analyses to align with state and federal law. As we've said for months now, the Governor's legal position on the 14th Amendment is a novel one and different from the Legislature's interpretation of current case law.

12. **If we vote to support this map today, does that mean we're voting to support the Governor's "novel" legal theory, as well? Does Committee Staff/Outside Counsel believe this map is constitutional?**
We will be taking a vote on the map contained in HB 1C today. The legal framework surrounding CD 5 is a significant, untested question and each Member will have to decide for themselves how they will vote.

Additionally, as we've said before – the Governor has advanced a "novel" legal theory. If the courts support this theory, it is constitutional. If the courts do not support this theory, it won't be constitutional. We will have to wait and see, but it is not the role of the legislative to decide.

13. **If we're supporting the Governor's map, and his "novel" legal theory about CD 5, does that expose our State Legislative maps to lawsuits, too?**
No, my understanding is that the Governor's legal position hinges specifically on CD 5 and its shape, generally speaking. In my opinion, the State House districts are compact and should not be affected.

14. **Is the Legislature prepared to defend this "unconstitutional" map in court? Is the Governor going to defend his novel legal theory?**
As always, it is premature to determine the legislature's role in litigation that has not even been filed.

*If pushed:* Let me be clear, no litigation has been filed at this point in time. However, if YOU are aware of entities that are intending to bring forward this litigation, I encourage you to cease those conversations. In my experience, those groups are often partisan in nature.

15. **Is the Governor trying to eliminate the Fair District Amendments or diminish minorities' ability to elect?**
*Defer to EOG.*

16. **EOG has repeatedly used the term "race-neutral" districts. Is this an official standard in the state constitution? Does this eliminate a protected minority-majority district? What case law or statute if he getting this term from?**
*Defer to EOG.*

### Governor's Map-drawing Process
*Defer to EOG for these types of questions.*

17. Who specifically drew this map?
18. Who was consulted while drawing this map?
19. How were the Governor's map-drawer(s) insulated "from interests that may intentionally or unintentionally attempt to influence the redistricting process inappropriately?"
20. Has EOG implemented a records retention process for redistricting materials?
21. Was this map drawn to favor or disfavor a political party or incumbent?
22. Did EOG use a similar methodology to that of the Legislature when drawing this map?

### Drawing Methodology & Analysis of Map

23. **What districts are from the Legislature and which districts are from the Governor?**
Districts 1, 2, 20-25, 27, 28 are exact replicas from the Legislature's map.

Districts 3-19 and 26 are new proposed configurations from EOG.

24. **Did Committee Staff analyze the Governor's map in full?**
Committee Staff produced the data packet that is in front of all Members. This packet details the same buckets of information we've reviewed for every other map throughout our committee process.

25. **Was a functional analysis run on the Governor's map? Which districts?**
Based on EOG's presentation, CD 5 is no longer a protected/performing Black district, therefore no functional analysis was completed on this district by Committee Staff. The only other protected district that was altered by EOG was CD 26. Committee Staff performed a functional analysis on this district, after receiving it from EOG, to ensure it does not diminish minority groups' ability to elect candidates of their choice.

26. **Was any racially polarized voting analysis, ecological regression analysis, homogeneous precinct analysis, etc. conducted on this map?**
To the extent the minority districts in this map were taken from the map passed by the legislature (CD 20, 24, 27, and 28), a racially polarized voting analysis was conducted on these districts before the legislature passed its map during the regular session. To the extent EOG drew the district (CD 26), we defer to EOG to explain its process and the analyses it performed.

Page 3 of 7

Page 4 of 7

House_013526
SOS_Cubanos_0095620

House_013527
SOS_Cubanos_0095621

27. **In the Governor's map, which districts are protected Black and Hispanic districts?**
    *Performing Black districts – 20, 24*
    *Performing Hispanic districts – 26, 27, 28*

    Refresher: The House has never considered CD 10 as a protected/performing Black district. And although CD 9 is above 50% HVAP, it is not a protected/performing Hispanic district but may become one in the future.

28. **In the Legislature's passed maps, which districts were protected Black and Hispanic districts?**
    *Performing Black districts – 5, 20, 24*
    *Performing Hispanic districts – 26, 27, 28*

    Refresher: The House has never considered CD 10 as a protected/performing Black district. And although CD 9 is above 50% HVAP, it is not a protected/performing Hispanic district but may become one in the future.

29. **What methodology was used in drawing the new districts in the Governor's map?**
    *Defer to EOG to explain their drawing process.*

30. **These maps aren't "fair." They "clearly" favor a political party and they "clearly" violate the Florida Constitution.**
    *That is a heavy accusation to allege. Remember, the Florida Constitution speaks to the intent behind drawing districts, not the result of a district. Defer to EOG to further explain methodology.*

    Background:    Article III, Section 20 of Florida Constitution
    (a) No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent…

### District-specific Questions

31. **Why is [district boundary] placed [in specific location]?**
    *Defer to EOG for these types of questions for the districts they drew.*

32. **If CD 5 was previously drawn to protect minorities' opportunity to elect a candidate of choice, why does the Governor believe it creates an unconstitutional gerrymander?**
    *Defer to EOG to explain legal framework.*

33. **In the way the Governor has drawn CD 5, is this a diminishment?**
    *Defer to EOG to explain legal framework.*

34. **Does the Legislature view CD 5 as a diminishment, therefore violating the Florida Constitution?**
    *See answer to Q12.*

35. **If compactness was a main concern, why didn't the Governor like the Duval-only (Primary map) CD 5?**
    *Defer to EOG to explain legal framework.*

36. **Is CD 9 now a performing Hispanic district since it includes portions of Polk County and does not strictly follow county boundaries? Did we perform the functional analysis on this new district?**
    *Defer to EOG to explain district.*

37. **Are we eliminating a protected/performing Black district in Central Florida?**
    *The House has never considered CD 10 as a protected/performing Black district, so no, this map does not "eliminate" it compared to the Legislature's previous map versions.*

38. **CD 10 looks similar to earlier versions produced by the House but ignores the input of our Members, how can we accept this configuration?**
    *We are here considering a map proposed by the Governor. Whether or not a Member wants to support this map is the decision of each Member.*

39. **Why does CD 14 cross Tampa Bay? Wasn't that concept struck down last decade in the Apportionment 7 ruling? Are you "packing" democrats or minority voters into this district?**
    *Defer to EOG to explain district.*

40. **How is CD 5 considered too long at 200-miles, but CD 18 is justified at 180-miles in length?**
    *Defer to EOG to explain district.*

41. **Can you speak to the Governor's intent on CD 20? Why does he believe that CD 20 is NOT a racial gerrymander the way it weaves in and out of counties, connecting very obviously, black communities and cities?**
    *Defer to EOG to explain district and intent.*

42. **Wouldn't the Governor view CD 24 in the same light as CD 5 – both drawn "with race as a predominant factor" but not over 50% BVAP?**
    *Defer to EOG to explain district and intent.*

    Background: The House did not draw the Duval-only CD 5 with race as a predominant factor.

43. **Why was CD 26 altered? Is it still a performing district?**
    *Committee Staff performed a functional analysis on this district, after receiving it from EOG, to ensure it does not diminish minority groups' ability to elect candidates of their choice. Defer to EOG to explain district further.*

44. **Why were none of the other South Florida districts altered?**
    *Defer to EOG to explain drawing decisions.*

Page 5 of 7

Page 6 of 7

House_013528
SOS_Cubanos_0095622

House_013529
SOS_Cubanos_0095623

## Miscellaneous

**45. Why was the 30-day statute of limitations language removed from this bill?**

**46. Have Leda and Alex discussed maps or other redistricting-related things "behind the scenes"?**
*Leda and Alex are both professionals and conduct themselves as such. This line of personal questioning is inappropriate. Do you have a question about the legislation before us today.*

**47. Why is there $1 Million appropriated in this bill?**
*External parties have indicated they want to litigate this map and this money is appropriated for that purpose. Additionally, the whole premise of this map exists because of a novel legal theory presented by the Governor – that we've said repeatedly will be the responsibility of the courts to rule upon.*

**48. The "state court language" included in the bill doesn't seem to do anything that's not already in law – why is this in here?**
*Looking to provide explicit clarity surrounding these provisions. And additionally, reaffirm the State's immunity under the 11th Amendment and that the State does not waive that immunity.*

Background:
- Requires any state court challenge to the congressional map to be filed in Leon County.
- Requires all challenges based on state law to be filed in state court, rather than federal court.
    - Under the Eleventh Amendment to the United States Constitution, the State is immune from suit in federal court on state-law grounds. *Pennhurst State School v. Halderman, 465 U.S. 89 (1984).*
    - This provision reaffirms the State's immunity under the Eleventh Amendment and makes clear that the State does not waive that immunity.
- Permits any state court challenge to raise both state law claims and, to the extent the circuit court has jurisdiction, federal law claims.
- Makes explicit that nothing in the bill precludes federal courts from deciding challenges based on federal law.

House_013530
SOS_Cubanos_0095624