# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:24-cv-21983-JB/Torres

CUBANOS PA'LANTE, *et al.*,

     *Plaintiffs*,

v.

FLORIDA HOUSE OF REPRESENTATIVES,
*et al.*,

     *Defendants*.

_____/

### DEFENDANT SECRETARY OF STATE'S PROPOSED
### FINDINGS OF FACT AND CONCLUSIONS OF LAW

     Consistent with this Court's direction, Defendant Secretary of State Cord Byrd submits his proposed findings of fact and conclusions of law. He asks that judgment be entered in his favor.

     In this document, "PX" refers to Plaintiffs' exhibits, "DX" refers to Defendants' exhibits, and "JX" refers to joint exhibits. "Tr." refers to trial transcripts, with the trial day indicated before the "Tr." So a citation to the first day of trial would look like this: (1)Tr.12:3-4.

1

I.      **Introduction**

With motions to dismiss and summary judgment behind us, this case now concerns a racial gerrymandering claim against four districts: Congressional District 26 and Florida House Districts 115, 118, and 119. *See* Doc.88 at 19-20; Doc.110 at 1; Doc.148 at 19-20. Plaintiffs allege that the Florida Legislature violated the Fourteenth Amendment's Equal Protection Clause when drawing these districts. But, at trial, Plaintiffs failed to establish Article III standing to challenge the districts, particularly Congressional District 26 and House District 119. Regardless, based on the current state of the law and the trial record, Plaintiffs failed to carry their heavy burden of proving that race predominated in the drawing of any of the four districts. This Court thus enters judgment in favor of Defendants, the Secretary of State and the Florida House of Representatives.

II.     **Findings of Fact**

We first make credibility determinations for the witnesses at trial. We summarize the evidence introduced at trial along the way.

Plaintiffs produced twelve witnesses at trial. Fact witnesses included: Rebecca Pelham, Representative Cindy Polo, Cynthia Perez, Enrique Cruz, Genesis Castilla Falcon, Camila Suarez Melinkoff, Senator Annette Taddeo-Goldstein, Representative Fentrice Driskell, and Jason Poreda. Plaintiffs' expert witnesses were Dr. Cory McCartan, Dr. Hannah Walker, and Dr. Carolyn Abott.

Defendants produced three witnesses at trial. They too called Jason Poreda as a fact witness. Alfredo Gonzalez and Dr. Sean Trende were called as experts.

Noticeably absent from Plaintiffs' trial presentation was the testimony of Diana Belbruno. She's the only named Plaintiff who's alleged to reside in Congressional District 26.

There was also no trial testimony from any individual Plaintiff who resides in House District 119.

We now consider each witness in turn, discussing the evidence as appropriate.

**Rebecca Pelham.** Ms. Pelham is the executive director of Plaintiff Engage Miami. (1)Tr.9:20-21. She's also a member of the organization. (1)Tr.23:20-21. She recently moved to Vermont. Thus, Ms. Pelham neither resides in one of the districts being challenged nor intends to vote in upcoming elections held in the districts. (1)Tr.47:16-21; (1)Tr.47:24-48:1.

Ms. Pelham did, however, provide documents concerning Engage's other members. PX 46 is "Engage Miami's current member intake form which was most recently updated in 2024." (1)Tr.21:1-2. Information from the form "goes into [Engage's] CRM, which is [Engage's] database

of all of [its] membership activities." (1)Tr.22:7-9. A member's self-reported address appears in the CRM database. (1)Tr.24:19-23. Per the CRM database, Engage has members in each of the districts at issue. (1)Tr.28:24-29:10. But Engage members don't have to be registered voters. (1)Tr.26:13-15. Nor does Engage verify voter registration, eligibility, or registration status as part of its member-intake process. (1)Tr.26:8-12.

PX 43 is Plaintiffs' attempt to get around standing-related problems. It's a list of members who, in Ms. Pelham's estimation, reside in the challenged districts and are registered voters. (1)Tr.29:17-30:1; (1)Tr.30:13-22. Ms. Pelham's understanding of registration status comes from a "VAN ID," a sort of voter roll maintained by a private company, not the official roll from the Florida Department of State. (1)Tr.37:13-23; (1)Tr.38:12-19; (1)Tr.39:10-21; (1)Tr.40:7-9. Ms. Pelham seemingly conceded that there's at least one discrepancy in the data. (1)Tr.30:13-31:4. There's no testimony about whether the VAN ID's data is current and accurate. There was no attempt to determine whether members on Engage's list support the lawsuit, no submission of voter ID cards from the members, and no testimony from the members listed in PX 43. (1)Tr.33:9-18; (1)Tr.40:25-41:3; (1)Tr.42:2-25. Ms. Pelham also doesn't know whether any of the members listed in PX 43 intend to vote in any upcoming election. (1)Tr.48:6-12.

We find Ms. Pelham's testimony relevant to the standing analysis. It's credible to the extent it shows that Engage has members and that some members may *reside* in the districts being challenged. It's *not* credible as to which members are or aren't *registered voters* because Plaintiffs fail to explain whether the source of this voter roll information—the private company—is accurate. And, as explained in greater detail below, even if the private voter registration information is accurate, and even if organizations can maintain redistricting lawsuits, Ms. Pelham doesn't know whether any of the organization's members intend to vote in upcoming elections.

**Representative Cindy Polo.** Representative Polo is a former state representative, resides in House District 115, and is a Plaintiff in this case. (1)Tr.53:5-11; (1)Tr.58:7-12. She's a registered voter, (1)Tr.66:18-19; however, she never said that she intends to vote in any upcoming elections.

We find Representative Polo's testimony relevant to the standing analysis. It's credible to the extent it establishes that she's a registered voter who resides in House District 115.

**Cynthia Perez.** Ms. Perez testified as the representative of Cubanos Pa'lante, the lead Plaintiff in this case. (1)Tr.70:16-18; (1)Tr.87:8-9. She's a member of the organization but doesn't reside in any of the districts at issue. (1)Tr.88:7-11; (1)Tr.88:21-22. Nor did she provide any

information about where the organization's members reside, seemingly relying on the standing of others to participate in the case. (1)Tr.87:10-17.

We find Ms. Perez to be a truthful witness; however, her testimony is irrelevant to any of the issues in the case. That's especially so because Cubanos Pa'lante didn't even attempt to establish its own standing to bring and maintain this case; it stipulated that it's relying on other Plaintiffs to establish standing. *See* JX 150.

**Enrique Cruz.** Mr. Cruz is *not* a Plaintiff in this case. (1)Tr.98:12-14. He's a registered voter in Congressional District 26. (1)Tr.90:3-5; (1)Tr.90:23-24. Though a founding member of the FIU ACLU Club while a student at Florida International University, (1)Tr.91:18-23; (1)Tr.92:18, he's currently enrolled at St. Thomas University College of Law and *not* FIU, (1)Tr.91:7-11. He too was never asked if he intends to vote in any upcoming elections.

We find Mr. Cruz's testimony marginally relevant to the FIU ACLU Club's standing to sue; however, it's not dispositive of the issue when considered together with Mr. Cruz's graduation from FIU and the testimony of the club's current president. The latter highlights that alumni have some loose affiliation with the club that's different from membership—a status without formally recognized rights, responsibilities, or voting power to steer the club's affairs. *See infra.*

**Genesis Castilla Falcon.** Ms. Falcon is a Plaintiff. (1)Tr.109:6-7. She's a registered voter who lives in House District 118. (1)Tr.107:8-15; (1)Tr.108:2. Again, she wasn't asked whether she intends to vote in any upcoming elections.

We find Ms. Falcon's testimony relevant to the standing analysis. It's credible to the extent it establishes that she's a registered voter who resides in House District 118.

**Camila Suarez Melinkoff.** Ms. Melinkoff is the current president of Plaintiff FIU ACLU Club, (1)Tr.116:1-3, and a registered voter in House District 115, (1)Tr.120:4-5. The club has members but doesn't have exact figures for its membership. (1)Tr.117:25-118:4. "[T]o officially become a member, you would either sign up or accept the request on PantherConnect," a student portal maintained by FIU. (1)Tr.118:5-8. "FIU has certain requirements [for] those who are able to join": they must be "students in good academic standing," meaning "undergraduate" students "taking six credits" and "graduate" students "taking three credits." (1)Tr.118:16-20.

Alumni can be associated with the organization but in something less than a traditional membership capacity. That's because only current students can serve as officers of the organization, (1)Tr.122:5-7; (1)Tr.125:23-126:2, only current students can vote in general body

meetings of the organization, (1)Tr.125:12-22; (1)Tr.126:3-12, and only current students can attend the organization's on-campus events without first obtaining permission from the university, (1)Tr.122:12-123:16; (1)Tr.124:4-9. It's also reasonable to infer that only current students have access to FIU's student portal, PantherConnect.

This brings us back to Mr. Cruz. He isn't a member of the FIU ACLU Club in the traditional sense. He's no longer a student at FIU; he's at St. Thomas University. This means that he can't attend any on-campus events without permission from FIU's administration (unlike an existing FIU student). He can't serve as an officer of the organization (unlike an existing FIU student). And he can't vote in general body meetings of the organization (unlike an existing FIU student). As such, Mr. Cruz's trial testimony can't help the FIU ACLU Club establish standing to challenge Congressional District 26.

Yes, Ms. Melinkoff mentions another FIU ACLU Club member, David Brito-Murphy, who told Ms. Melinkoff that he lives in Congressional District 26. (1)Tr.121:3-14. The truth of this out-of-court statement couldn't be tested in court because Mr. Brito-Murphy never testified. Nor did the lawyer who supposedly checked his voter registration status. (1)Tr.121:15-21. There's also no testimony about Mr. Brito-Murphy's intention to vote in any upcoming elections.

We find Ms. Melinkoff's testimony relevant and credible to the extent it provides facts relevant for standing. The embedded hearsay isn't helpful. It isn't credible, either, because it's an out-of-court statement being offered for the truth of the matter, i.e., Mr. Brito-Murphy's residence.

**Senator Annette Taddeo-Goldstein.** Senator Taddeo-Goldstein served in the Florida Legislature during this past redistricting cycle, specifically the Florida Senate. (2)Tr.252:22-24. She thought the chair of the Florida Senate committee overseeing the redistricting effort "did a good job as chair." (2)Tr.253:5-7. She even "commended him" and told him that she was "impressed with his work." (2)Tr.253:8-10. But she never drew any maps of her own, (2)Tr.253:22-24; (2)Tr.253:25-254:2, or offered any amendments to the maps drawn by others, (2)Tr.254:3-8.

We find Senator Taddeo-Goldstein credible. Her testimony, however, isn't helpful.

**Representative Fentrice Driskell.** Representative Driskell currently serves in the Florida House of Representatives and served there during this past redistricting cycle. (3)Tr.6:15-16; (3)Tr.7:4-10. As a leader of the party in the super-*minority* in the legislature, Representative Driskell's testimony has little relevance to the issues at hand; the majority doesn't need Representative Driskell's vote or her caucus to pass any bill. (3)Tr.36:7-21. Her testimony about

being involved in the redistricting process is also undercut by the fact that she never proposed a map of her own during the process, (3)Tr.37:23-25, never offered any amendments to the maps proposed by others, (3)Tr.38:1-3, never asked staff at the legislature to assist her in creating any maps, (3)Tr.38:4-6, and doesn't even know key staff (like Mr. Langan) though staff was specifically mentioned in videos Plaintiffs played for her, (3)Tr.40:19-24. She also admitted to never raising a concern about her own district, which she conceded is "a little oddly shaped" because of its "tail at the end," and therefore not visually compact in her own estimation. (3)Tr.39:5-15.

We find Representative Driskell's testimony neither credible nor relevant.

**Dr. Cory McCartan.** Dr. McCartan is Plaintiffs' map drawer. (1)Tr.129:6-10. He offered different variations of the State's congressional map and house map to remedy the alleged racial gerrymanders at issue here. He conceded, however, that "redistricting" "is an intensely local and geographical process," where "map drawers must balance many competing constraints and criteria," making "trade offs" along the way. (1)Tr.204:7-16. "[T]here are more ways to draw a redistricting map than there are atoms in the universe," per Dr. McCartan. (1)Tr.252:22-25.

Geographic boundaries are crossed as part of the map drawing process and were crossed in Dr. McCartan's alternative maps. (1)Tr.206:10-22. The Everglades is a geographic boundary that features prominently in the challenge to Congressional District 26 though its exact bounds are up for debate. (1)Tr.211:3-22; *see also* (4)Tr.51:9-21. We also know from Dr. McCartan that the Everglades has no "superior position or superior importance relative to other geographic boundaries." (1)Tr.211:23-212:5.

Plaintiffs maintain, however, that the Everglades shouldn't have been crossed in the plan the State enacted; the Florida Legislature's decision to cross the Everglades in Congressional District 26 is indicative of a racial gerrymander in Plaintiffs' telling. *Not* crossing the Everglades is thus a key feature in every one of the alternative congressional plans that Dr. McCartan produced at trial. (1)Tr.209:3-6. Yet Dr. McCartan himself crossed the Everglades in one of his earlier alternatives, which was supposedly a race-neutral alternative. (1)Tr.209:7-10. He didn't offer that earlier alternative to us because, based on guidance from Plaintiffs' counsel, he decided that crossing the Everglades was a bad idea. (1)Tr.209:17-22; (1)Tr.210:8-13. Litigation strategy, not Dr. McCartan's expertise, dictated this particular result from Plaintiffs.

And the six congressional alternatives that Dr. McCartan produced to remedy the alleged racial gerrymander in *one* South Florida district are striking for the changes they do make. In these alternatives, Dr. McCartan changes anywhere from thirteen to twenty of Florida's congressional districts, moving millions of Floridians along the way. *See infra.*

DX 31 is Dr. McCartan's Map A, which changes thirteen of the state's twenty-eight congressional districts. (1)Tr.253:8-13. The changes go all the way up to Florida's Bone Valley, a phosphate mining region in the center of the state. (1)Tr.253:22-25.



Map 31: McCartan Congressional Map A – Altered Districts Only

EXHIBIT
D31

DX 31.

DX 32 and 33 are Dr. McCartan's Maps B1 and B2. (1)Tr.254:2-4; (1)Tr.254:14-16. They change fifteen of the state's twenty-eight congressional districts, (1)Tr.254:5-6; (1)Tr.255:23-24; (1)Tr.256:1-2, making changes all the way up to the Marion County border, in Florida's horse country, (1)Tr.254:10-13.



DX 32. DX 33.

DX 34 and 35 are Dr. McCartan's Maps C1 and C2. They change eighteen districts each. (1)Tr.254:20-22; (1)Tr.255:3-5. In these alternatives, to remedy an alleged racial gerrymander in South Florida, Dr. McCartan makes changes all the way up to Brevard County, part of Florida's Space Coast. (1)Tr.254:23-255:2.



DX 34. DX 35.

DX 36 is Dr. McCartan's Map D. It changes twenty congressional districts. (1)Tr.255:6-9. The changes go as far north as the Jacksonville suburbs in St. Johns County—nearly the length of the State of Florida. (1)Tr.255:16-22.



DX 36.

While mindful of Mr. Poreda's testimony that changes to one congressional district can have "ripple effects" beyond that district, (3)Tr.205:6, Dr. McCartan's proposed changes to as many as twenty districts are extreme. Dr. McCartan would have us conclude that fixing an alleged gerrymander in the Miami area requires changes as far north as the Jacksonville suburbs.

We're suspicious of Dr. McCartan's motives given the extreme changes that he proposes and from the other trial testimony. Dr. McCartan testified, for example, that he didn't have any partisan data available to him as he was drawing his alternatives. (1)Tr.257:4-8. He also claimed

that he wasn't aware of the partisan effect of changing so many of Florida's congressional districts. (1)Tr.256:25-257:3. We don't believe Dr. McCartan.

Dr. McCartan chose to use an online application called Dave's Redistricting to draw his alternatives, not the legislature's website or his own partisan-neutral simulation software. (1)Tr.257:9-13. Dr. McCartan offered excuses for this choice. He called the legislature's website "clunky." (1)Tr.258:11-15. He told us that he couldn't use his own Harvard-produced simulations, which are designed to create partisan-neutral maps, and which he cheered on before this Court in another case, because they failed to adequately account for all the necessary redistricting constraints. (1)Tr.233:3-234:2; (1)Tr.235:22-24; (1)Tr.236:14-237:4 (discussing DX 130 at ¶ 5 from *GRACE v. City of Miami*); (1)Tr.259:10-20.

Troublingly, unlike the legislature's map drawing software, Dave's Redistricting shows partisan data to the map drawer as he draws his map; it's a layer that the map drawer can turn on with the "click of a mouse" to show where Democrats and Republicans live while drawing the map. (3)Tr.220:6-7; (3)Tr.220:11-12. Mr. Poreda told us this fact. (3)Tr.220:1-5. Dr. McCartan grudgingly acknowledged this fact. (1)Tr.257:23-258:7. Mr. Poreda also told us that the legislature designed its redistricting software specifically so that partisan information would *not* be available to the map drawer as he was drawing his map. (3)Tr.220:13-25.

The result then is this: alternatives that change thirteen, fifteen, eighteen, and twenty congressional districts, *see supra*, drawn by a mapmaker who works primarily for the ACLU, (1)Tr.259:23-260:6, is a registered Democrat, (1)Tr.260:7-8, and believes that "elected Republicans" are "fascists," (1)Tr.261:1-5; *see also* DX 134. These alternatives aren't workable given the Florida Constitution's prohibition on drawing districts with the intent to favor or disfavor any political party or incumbents (like the elected Republicans Dr. McCartan finds objectionable). *See* art. III, §§ 20(a), 21(a), Fla. Const.

We find neither Dr. McCartan nor his alternatives credible. The additional problems with his one alternative for the Florida House are discussed as part of our section on Dr. Trende's testimony responding to Plaintiffs' experts.

**Dr. Hannah Walker.** At base, Dr. Walker's expert analysis becomes relevant only if we find that race predominated and must then assess whether the State's decision to draw race-predominant districts was narrowly tailored to further a compelling government interest. Because we don't find that race predominated, Dr. Walker's testimony simply isn't relevant to the

discussion in this order. Put another way, the cohesiveness of the Hispanic community in the districts being challenged doesn't matter. Nor does the statewide voting trend of white voters (though it's unclear to both us and Dr. Walker herself why Plaintiffs' counsel wanted a comparison of Hispanic voters in specific districts to white voters statewide). *Compare* (2)Tr.91:12-16, *with* (2)Tr.91:24-93:20.

**Dr. Carolyn Abott.** Dr. Abott never "conclude[d] that race was the sole explanation for the shape and boundaries of the challenged district[s]." (2)Tr.181:1-4. She also "did not conclude that race was the predominant reason why the challenged districts were drawn the way that they were." (2)Tr.181:5-8. She "concluded at most that the evidence is consistent with the idea that race may have predominated." (2)Tr.181:9-11. This conclusion was driven by "observational" and "circumstantial" evidence only. (2)Tr.182:8-11. She was also never asked to assess non-racial factors or explanations as part of her review. (2)Tr.184:20-22.

We find Dr. Abott's testimony relevant. Yet, as discussed in our section on Dr. Trende, the flaws in her testimony prove fatal to support the conclusions that she would have us reach.

**Jason Poreda.** Mr. Poreda was the primary map drawer for the House of Representatives. We find his testimony relevant to our assessment. His methodical walk through the map drawing process is both credible and compelling. Specifically, we find credible his discussion of having to weigh multiple factors when giving the challenged districts their shapes. Mr. Poreda is the kind of public servant who's earned the presumption of good faith to which the legislature is entitled.

**Alfredo Gonzalez.** Mr. Gonzalez served as an expert for Defendants. He's an experienced land use lawyer who established that the legislature followed major roadways as part of its map drawing process. We find his testimony relevant and credible.

**Dr. Sean Trende.** Dr. Trende also served as an expert for Defendants. He's the only expert in this case who's ever been charged with drawing districts. The Virginia Supreme Court appointed him as a special master to draw maps "for the Virginia House of Delegates, the Senate of Virginia, and for Virginia's delegation to the United States Congress for the 2022 election cycle." DX 39 at 5. He was also appointed as a "Voting Rights Act expert by [the] Arizona Independent Redistricting Commission" in 2020. DX 39 at 5. We find this experience most relevant and helpful in assessing Dr. Trende's testimony. It shows that he has had to balance the various constraints that apply to a map drawer in a real-world situation. That's much different than writing an academic paper, submitting an expert report in litigation, or even testifying in court.

Dr. Trende critiqued the work of Dr. McCartan, Dr. Abott, and Dr. Walker. He made a few additional observations about the districts being challenged.

Dr. Trende began his assessment by providing the racial statistics for the congressional districts in both the legislature's enacted map and Dr. McCartan's alternatives. (4)Tr.44:14-18. When reporting these statistics, he focused on Congressional Districts 24 and 26 through 28, just as Dr. Abott. (4)Tr.44:19-24.

Table 1: HVAP/BVAP of Miami-Dade Districts in Dr. McCartan's Demonstration Maps.

| Map | District 24 (BVAP) | District 26 (HVAP) | District 27 (HVAP) | District 28 (HVAP) |
|---|---|---|---|---|
| Enacted | 42.2% | 73.2% | 74.2% | 73.4% |
| A, C1, C2, D | 40.2% | 91.1% | 66.7% | 65% |
| B1 | 36.7% | 89.5% | 64% | 65% |
| B2 | 36.3% | 71.6% | 74.2% | 73.1% |

DX 77.

DX 77 shows that Dr. McCartan's maps attempt to remedy a racial gerrymander in Congressional District 26 by packing *more* Hispanic voters into the district. (4)Tr.45:20-46:2. Dr. McCartan's Maps A, C1, C2, and D have a Hispanic Voting Age Population, or HVAP, of 91.1%—compared to only 73.2% in the enacted map. DX 77. His Map B1 is not much different with its HVAP of 89.5%. DX 77. That's a counterintuitive remedy for the alleged sorting of voters based on race.

Dr. Trende also put into perspective the scope of the changes in Dr. McCartan's proposed alternatives. Dr. McCartan would move anywhere from 3.4 million to 5.5 million residents as part of his alternatives. DX 78. That's four to seven entire congressional districts worth of people being moved to change one alleged racial gerrymander. (4)Tr.46:20-47:8. And the shifts are "not just minor repairs, either." (4)Tr.47:11-18. Millions of people are being shifted from one district to another, all over the state. (4)Tr.47:19-48:21. Some "ripple effects on the districts" are to be expected, but only a wave, not a ripple, can make changes of this magnitude "all the way up" to "the Georgia border." (4)Tr.48:22-49:3; *see also* DX 79.

Table 3: Total number of residents moved in Dr. McCartan's Demonstration Maps, by Enacted district number.

| District | Map A | Map B1 | Map B2 | Map C1 | Map C2 | Map D |
|---|---|---|---|---|---|---|
| 6 | – | – | – | – | – | 88,091 |
| 7 | – | – | – | – | – | 298,365 |
| 8 | – | – | – | 159,788 | 174,481 | 216,946 |
| 9 | – | – | – | 159,879 | 174,572 | 168,059 |
| 10 | – | – | – | 132,520 | 132,520 | 319,012 |
| 11 | – | 4,109 | 4,109 | 4,085 | 4,085 | 337,631 |
| 15 | – | 117,277 | 117,277 | 117,277 | 117,277 | 117,277 |
| 16 | 317,908 | 256,788 | 256,788 | 416,575 | 405,941 | 258,604 |
| 17 | 361,149 | 361,058 | 361,058 | 507,738 | 497,109 | 361,057 |
| 18 | 317,098 | 256,788 | 256,788 | 416,647 | 406,013 | 188,380 |
| 19 | 361,149 | 361,057 | 361,057 | 349,767 | 349,772 | 361,057 |
| 20 | 39,698 | 28,618 | 39,698 | 263,115 | 263,115 | 263,115 |
| 21 | 214,125 | 214,125 | 214,125 | 255,226 | 255,226 | 255,226 |
| 22 | 242,669 | 242,669 | 242,669 | 447,970 | 447,970 | 447,970 |
| 23 | 251,262 | 240,182 | 251,262 | 468,132 | 468,132 | 468,132 |
| 24 | 234,924 | 305,823 | 304,015 | 234,924 | 234,924 | 234,924 |
| 25 | 240,255 | 240,255 | 240,255 | 232,015 | 232,015 | 232,015 |
| 26 | 323,168 | 381,245 | 306,262 | 323,168 | 323,168 | 323,168 |
| 27 | 323,168 | 350,416 | 2,283 | 323,168 | 323,168 | 323,168 |
| 28 | 203,025 | 203,025 | 2,283 | 203,025 | 203,025 | 203,025 |

DX 79.

And while the professed goal of keeping the Everglades intact can't justify this statewide redrawing of the map, *see* (4)Tr.51:9-21, it's unclear whether Dr. McCartan actually succeeded in that goal. For one thing, the Everglades boundaries aren't neatly defined. Florida's Everglades Forever Act, § 373.4592, Fla. Stat. (2025), defines the Everglades Protection Area as the region from Lake Okeechobee all the way down to Florida Bay. *See* DX 45. Others "would take it up to Orlando almost," the area that feeds into Lake Okeechobee. (4)Tr.50:5-9. The boundaries of

14

Everglades National Park are more confined but, even there, Dr. McCartan's maps cross those boundaries—they fail to keep the geographic feature intact. DX 46; (4)Tr.50:11-21; (4)Tr.51:5-8.

Dr. McCartan's congressional alternatives don't fare better than the enacted map on split counties, either. (4)Tr.53:19-54:19. Keeping county boundaries intact wherever possible is a traditional redistricting criterion that the Florida Legislature followed. But despite starting off with the decision *not* to have a split in Congressional District 26 in Collier and Hendry Counties on one side, and Miami-Dade and Broward Counties on the other, Dr. McCartan still couldn't beat the enacted map on split counties. (4)Tr.52:1-15. That's regardless of whether we count the triangle-shaped corner of Hendry County as a split. *See* DX 47; (4)Tr.52:16-53:8.

Figure 20: Split Counties, by map

| Enacted | A | B1 | B2 | C1 | C2 | D |
|---|---|---|---|---|---|---|
| Broward | Broward | Broward | Broward | Broward | Brevard | Brevard |
| Collier | Duval | Charlotte | Charlotte | Duval | Broward | Broward |
| Duval | Hendry | Duval | Duval | Hendry | Duval | Duval |
| Hillsborough | Hillsborough | Hendry | Hendry | Highlands | Hendry | Hendry |
| Lafayette | Lafayette | Hillsborough | Hillsborough | Hillsborough | Hillsborough | Hillsborough |
| Lake | Lake | Lafayette | Lafayette | Lafayette | Lafayette | Lafayette |
| Lee | Lee | Lake | Lake | Lake | Lake | Lake |
| Marion | Marion | Lee | Lee | Lee | Lee | Lee |
| Miami-Dade | Miami-Dade | Marion | Marion | Manatee | Manatee | Marion |
| Orange | Orange | Miami-Dade | Miami-Dade | Marion | Marion | Miami-Dade |
| Palm Beach | Palm Beach | Orange | Orange | Miami-Dade | Miami-Dade | Orange |
| Pasco | Pasco | Palm Beach | Palm Beach | Orange | Orange | Palm Beach |
| Pinellas | Pinellas | Pasco | Pasco | Palm Beach | Palm Beach | Pasco |
| Polk | Polk | Pinellas | Pinellas | Pasco | Pasco | Pinellas |
| St. Johns | Sarasota | Polk | Polk | Pinellas | Pinellas | Polk |
| Volusia | St. Johns | Sarasota | Sarasota | Polk | Polk | Sarasota |
| Walton | Volusia | St. Johns | St. Johns | Sarasota | Sarasota | St. Johns |
| — | Walton | Volusia | Volusia | St. Johns | St. Johns | Volusia |
| — | — | Walton | Walton | Volusia | Volusia | Walton |
| — | — | — | — | Walton | Walton | — |

DX 48.

The story's much the same on boundary analysis, another traditional redistricting criterion. Only nine percent of the enacted Congressional District 26's boundaries fail to follow political and

geographic boundaries. DX 81. Except for his Map B2, the percentage is higher—meaning worse—for Dr. McCartan's alternatives. DX 81.

The compactness figures for Dr. McCartan's maps aren't better than the enacted plan. DX 82. On all three metrics used by the legislature, the numbers are almost identical. DX 82.

So, the big takeaway from Dr. McCartan's alternatives is this: millions of people are moved throughout the state to fix a racial gerrymander in South Florida, *but* the fix includes packing more, not less, Hispanic voters into Congressional District 26. That makes little sense, but we're told that's okay, because Dr. McCartan drew a race-blind map compared to the legislature.

Dr. Abott supplies most of the "observational" and "circumstantial" evidence for race being improperly considered in the legislature's configuration of Congressional District 26. Yet, as Dr. Trende explained, Dr. Abott's work begins with a critical design flaw. Dr. Abott attempts to compare the legislature's work to some race-blind draw—a race-neutral baseline. (4)Tr.57:7-9. Her two baselines miss the mark, however.

The first baseline is a region that consists of Congressional Districts 18, 19, 20, 24, 25, 26, 27, and 28—a stand-in for the demographic information we should, on average, expect to see in the area. (4)Tr.57:19-58:6. The problem is that the Hispanic population in this region isn't evenly distributed. HVAPs vary widely in the area because racial groups aren't randomly distributed within this region. (4)Tr.58:2-6. As DX 49 and 50 show, in the purple, the Hispanic population is clustered in only certain parts of Dr. Abott's region of study. (4)Tr.58:11-20; (4)Tr.58:22-59:25.



Figure 21: HVAP of precincts, South Florida, with Enacted Map boundaries overlaid



Figure 22: HVAP of census blocks, South Florida, with Enacted Map boundaries overlaid

DX 49. DX 50.

What's more, in Dr. Abott's baseline region there are 2.2 million Hispanic people of voting age. (4)Tr.60:2-4. Of those, 1.5 million live in Miami-Dade County—about seventy percent. (4)Tr.60:5-9. Another 350,000 live in Broward County. (4)Tr.60:13-17. This means that only two of the counties in the region account for approximately eighty-five percent of the HVAP in the region. (4)Tr.60:18-21. This is not an even distribution—it's not a race-blind baseline that can be used for any comparison. (4)Tr.60:22-61:5.

The second baseline that Dr. Abott uses is Dr. McCartan's seven-map set of alternatives. (4)Tr.61:7-9. For starters, seven maps aren't enough to give a true view of what a race-neutral draw might look like; that's unlike the thousands of random computer simulations that map drawers use, such as the 5,000 simulations that Dr. McCartan's ALARM team at Harvard created for Florida. (4)Tr.61:10-25. And we harbor serious doubts about simply taking Dr. McCartan's word (or that of Plaintiffs' counsel) for the fact that he drew race-neutral maps. That's particularly true when we look at the HVAP spreads for Congressional Districts 26, 27, and 28. Only one district has a low spread comparable to the enacted map's District 26 (Map B2), while the rest have far higher spreads indicative of packing Hispanic voters. (4)Tr.62:10-18; (4)Tr.63:5-15.

17

| HVAPs of CDs 26, 27, 28 (Ranked Highest to Lowest) | | | | | | |
|---|---|---|---|---|---|---|
| Enacted Map | Map A | Map B1 | Map B2 | Map C1 | Map C2 | Map D |
| 74.2% | 91.1% | 89.5% | 74.2% | 91.1% | 91.1% | 91.1% |
| 73.4% | 66.7% | 64.5% | 73.1% | 66.7% | 66.7% | 66.7% |
| 73.2% | 65.0% | 64.0% | 71.6% | 65.0% | 65.0% | 65.0% |
| 1.0 | 26.1 | 25.5 | 2.6 | 26.1 | 26.1 | 26.1 |

J. Ex. 3 at 2; J. Ex. 17 at 2; J. Ex. 18 at 2; J. Ex. 19 at 2; J. Ex. 20 at 2; J. Ex. 21 at 2; J. Ex. 22 at 2.

Illustrative Aid 3 (HVAPs of CDs 26, 27, 28 Ranked Highest to Lowest).

Indeed, when looking at Dr. McCartan's so-called race-neutral maps, we see that each variation of Congressional District 26 (with one exception) includes more Hispanic voters. (4)Tr.65:15-66:7 (discussing DX 84). It's difficult to understand how a more pronounced sorting of voters based on race can serve as a race-neutral baseline—a comparator—for the State's map that's being challenged for sorting people based on race.

Table 8: HVAP of District 26, by Map

| Map | Hispanic Voting Age Population, District 26 |
|---|---|
| Enacted | 456,512 |
| A | 574,334 |
| B1 | 565,289 |
| B2 | 447,686 |
| C1 | 574,334 |
| C2 | 574,334 |
| D | 574,334 |

DX 84.

At a more granular level, Dr. Abott's county-split analysis is also flawed. Here, she focuses on where the enacted plan splits Collier and Miami-Dade Counties—the western and eastern ends of Congressional District 26.

Taking Collier first, Dr. Abott "looks at the HVAP of District 26 in Collier County" and "compares it to" "HVAPs of the portions of [Congressional Districts] 18 and 19 in Collier County combined." (4)Tr.67:18-21. Again, we don't know what a race-blind draw would yield because we don't have a workable baseline. (4)Tr.68:1-3. There's another problem: averaging together the Hispanic populations of Districts 18 and 19 doesn't make sense because the populations of the two districts are "radically different." (4)Tr.68:6-8. DX 53 shows this through a dot-density map where Hispanic voters are in blue and white voters are in orange; white voters tend to cluster around the coast. (4)Tr.68:9-69:24 (discussing DX 51, 52, and 53).

Figure 25: Dot density map of Hispanic and White Populations, Collier County (one blue dot = 10 Hispanic Residents of Voting Age; one orange dot = 10 White Residents of Voting Age



DX 53.

In fact, if Congressional Districts 18 and 19 are split off from one another, we see that Congressional District 26's HVAP falls somewhere between the HVAPs for 18 and 19. *See* DX 54. This is consistent with the idea that white voters tend to cluster around the coast and Hispanic voters are more inland. So, what Dr. Abott suggests is packing of Hispanic voters through her averaging of numbers, really isn't that; the reality on the ground "gets washed out when she averages the districts together." (4)Tr.70:1-21.

Figure 26: Division of Collier County, Enacted Map



DX 54.

Dr. Abott's claims become more untenable when we zoom into the border between Congressional Districts 26 and 18 near Immokalee. *See* DX 55. Here, the boundary between the two districts cuts through the Hispanic population, leaving a significant Hispanic concentration just outside District 26. (4)Tr.71:3-15. To state the obvious: if this is a racial gerrymander, then it's an incompetent one. *See also* DX 56, 57, 58.

Figure 27: Division of Immokalee, shaded at census block level by HVAP%

DX 55.

Similar issues play out throughout the rest of the borders in Collier County. (4)Tr.73:5-74:6; DX 59, 60, 61, 62. In northern Collier County, we see a more Hispanic region, in green, left out of Congressional District 26 when a race-driven draw would have included it in the district. DX 63; (4)Tr.74:7-24. In south and central Collier County, we see varying levels of HVAPs on either side of the congressional boundaries. DX 64.



Figure 35: District 19/26 split, Northern Collier County, shaded by HVAP% at VTD level

Figure 36: District 19/26 split, South/Central Collier County, shaded by HVAP% at VTD level

DX 63 & DX 64 (side by side).

Moving to Miami-Dade County, Dr. Abott's central thesis of race-driven boundaries for Congressional District 26 doesn't carry much weight. Again, the Hispanic population isn't evenly distributed. (4)Tr.75:4-8. "It is in fact concentrated in a boomerang that Dr. Abott memorably coins in her report." (4)Tr.75:10-11; DX 67. The black and white populations in the area are also clustered with the area being white, closest to the coast, then black, moving inland, and then becoming more Hispanic. DX 65 (black); DX 66 (white). If the State's map gets flagged for being a racial gerrymander in this area, then so too are Dr. McCartan's supposedly race-neutral maps. (4)Tr.77:20-78:7.

Separately, Dr. Abott's municipality-split analysis is also flawed. It looks at only five data points that include only one municipality (the City of Miami) and four census-designated places. (4)Tr.78:20-79:12. Four of these data points are on the Miami-Dade County side of Congressional District 26's border and only one (Immokalee) is on the Collier County side. (4)Tr.79:13-20. On the Miami-Dade County side, all of the four data points come from the boundary between Districts 26 and 24. Because District 24 is a black performing district, we'd expect populations within District 24 to have a higher BVAP and a lower HVAP. Municipal splits along this boundary thus tell us little of value. (4)Tr.79:21-80:10.

The precinct-level splits suffer from much the same flaws. Again, clustering of populations is a better and more natural explanation for the data that Dr. Abott reports, particularly along the border between Congressional Districts 26 and 24. (4)Tr.81:3-16. Dr. Abott also fails to tell us when a change in HVAP between neighboring districts becomes meaningful—an important indicator of some nefarious map drawing exercise. (4)Tr.81:17-83:11.

Dr. Trende also looked at the evolution of the congressional districts in the area (namely Districts 26 to 28) over the course of the legislature's redistricting efforts. (4)Tr.85:17-25. His work tells us that these particular districts "weren't the focus of the legislative process." (4)Tr.86:16-17. "They were put into place and generally tinkered with but not" "overwhelmingly disputed." (4)Tr.86:17-19. It also tells us that there are no red flags—no huge differences in the racial makeup—of the areas taken into and taken out of the districts as they evolved during the legislative process. (4)Tr.87:5-21.

Turning to Dr. Abott's analysis for the Florida House, the problems are much the same. She fails to account for the clustering of voters and can't establish an appropriate baseline—a race-neutral comparator. (4)Tr.90:13-91:25. Dr. Abott's analysis of the boundaries and precincts doesn't work, either. (4)Tr.92:1-19.

Dr. McCartan's alternatives for the house map don't fare much better than the enacted map when it comes to traditional redistricting criteria. (4)Tr.93:1-10. Plaintiffs presented only one of these maps, Dr. McCartan's House Map D, which stacks House Districts 118 and 119. In describing this alternative map, Dr. McCartan focused on the significance of Kendall Drive "as some type of racial boundary in that the population south of it [has a] lower [HVAP] than the HVAP to the north of it." (4)Tr.94:5-11. If it's a racial boundary at all, it's certainly not a stark contrast. (4)Tr.94:12-25. A side-by-side image of Miami-Dade County (on the left) with Detroit (on the right) makes

clear that in the latter there's a stark contrast and in the former it's more of a gradient. (4)Tr.95:1-24. It's also counterintuitive to follow a racial boundary (as Dr. McCartan claims to do) to cure an alleged racial gerrymander.



DX 357. DX 358.

In sum, we find Dr. Trende's testimony relevant, credible, and helpful. We give it great weight as part of our assessment of racial predominance.

### III.   Conclusions of Law (and Application of Law to Facts)

**Standing.** It's Plaintiffs' burden to establish standing, and this Court has an independent obligation to determine its own subject-matter jurisdiction under Article III's "case or controversy" requirement. *Bischoff v. Osceola County*, 222 F.3d 874, 877-78 (11th Cir. 2000) (citing *United States v. Hays*, 515 U.S. 737, 742 (1995)). Plaintiffs' burden increases at each stage of the litigation as they work to establish (1) an injury-in-fact (2) that is traceable to Defendants and (3) that can likely be redressed by a favorable ruling. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). As to each district, only one Plaintiff needs to establish standing for each claim for us to have jurisdiction. *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 53 n.2 (2006).

In most cases, an organization can have standing to sue under two theories. First, an organization can have standing to sue in its own right to challenge conduct that impedes its ability to attract members, raise revenue, or fulfill its purposes. *See Havens Realty Corp. v. Coleman*, 455

U.S. 363, 379 (1982). Second, an organization can sue on behalf of its members "when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires participation of individual members in the lawsuit." *Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

Redistricting cases are unique, however. They implicate the right to vote. The Supreme Court's most recent standing-related redistricting case said this about the right to vote: "We have long recognized that a person's right to vote is 'individual and personal in nature.'" *Gill v. Whitford*, 585 U.S. 48, 65 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)). "Thus, 'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' to remedy that disadvantage." *Id.* at 65-66 (quoting *Baker v. Carr*, 369 U.S. 186, 206 (1962)). The Court in *Gill* concluded that the individual plaintiffs in the case lacked standing to sue over an overall redistricting plan because their case was about "group political interests, not individual legal rights" tethered to specific districts. *Id.* at 72. This focus on individual voting rights was particularly important to the Court because "the holdings in *Baker* and *Reynolds* were expressly premised on the understanding that the injuries giving rise to those claims were 'individual and personal in nature.'" *Id.* at 67 (quoting *Reynolds*, 377 U.S. at 561). The claims brought in both those seminal cases "were brought by voters who alleged 'facts showing disadvantage to themselves as individuals.'" *Id.* (quoting *Baker*, 369 U.S. at 206).

If standing in a redistricting case implicates the right to vote, and the right to vote is personal and individual in nature, then we can't conclude that any of the organizational Plaintiffs have standing to sue in this case. To state the obvious, organizations don't vote. Nor do they have the right to vote. Without that right, organizations can't sue to vindicate this most personal of rights. The organizations aren't the ones being sorted into congressional or state legislative districts. For this reason, Engage Miami and the FIU ACLU Club's attempts to establish standing must fall short. *But see S.C. State Conf. of the NAACP v. Alexander*, No. 3:21-cv-03302-TJH-MBS-RMG, 2022 WL 2334410, at *2 (D.S.C. June 28, 2022) (applying organizational standing test in a redistricting case).

Even if organizations could sue to vindicate the right to vote, the organizations in this case still haven't established standing. Cubanos Pa'lante never tried. Neither Ms. Pelham (for Engage

Miami) nor Ms. Melinkoff (for the FIU ACLU Club) provided credible testimony about their members' registration status or intention to vote. Ms. Pelham's testimony relies on some private company's database to verify voter registration information maintained in Engage Miami's CRM system. Ms. Melinkoff relies on pure hearsay about whether another member of the organization even resides in Congressional District 26. Ms. Melinkoff's testimony also undercuts the conclusion that Mr. Cruz, as a former student at FIU, is a member of the FIU ACLU Club. What's more, neither Ms. Pelham nor Ms. Melinkoff could tell us that any of their members intend to vote in any upcoming elections, let alone for elections in the districts being challenged, making it speculative for us to conclude that any member would be or believes they'd be harmed. *See Common Cause Fla. v. Byrd*, 726 F. Supp. 3d 1322, 1385 n.1 (N.D. Fla. 2024) (Winsor, J., concurring in part) ("Ms. Keith's testimony was insufficient to show associational standing for Common Cause because merely having members in an affected district does not establish standing. There had to be proof that those members intended to vote, and Ms. Keith could not say that they did." (citing *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State*, 454 U.S. 464, 489 (1982))).

For that matter, not one Plaintiff ever said that he or she intends to vote in upcoming elections. Residence aside, that's a standing problem. *Id.*; *see also Dimaio v. Democratic Nat'l Comm.*, 520 F.3d 1299, 1302 (11th Cir. 2008) ("This complaint undeniably fails the test for constitutional standing established in *Lujan*. Notably, DiMaio never alleged that he actually voted, nor even so much as suggested that he intended to vote in the Florida Democratic Primary.").

Taking a step back, standing is not difficult to establish in redistricting cases. It requires testimony from actual people. These people need to say that they reside in a district being challenged and intend to vote in upcoming elections. The first of the three-judge cases concerning Florida's most recent congressional plan makes this clear. There, the Northern District of Florida said this about standing: "Mr. Clark credibly testified that he has lived in Tallahassee since 1982, that he is a registered and active voter, that he intended to vote in future elections, that he was in the former Benchmark CD-5, and that he is now in the Enacted CD-2. That is enough to demonstrate his standing." *Common Cause Fla.*, 726 F. Supp. 3d at 1358.

Here, by contrast, days of testimony failed to yield the simple answers needed for standing. We don't believe standing has been established for any of the challenged districts by any of the Plaintiffs because none have said that they intend to vote in upcoming elections. And if residence is the only requirement for standing in a redistricting case, which it isn't, we still conclude that

there's no standing to challenge Congressional District 26 and House District 119. That's because no individual Plaintiff testified that he or she lives in those districts. Ms. Belbruno—the only named Plaintiff who's an alleged resident of Congressional District 26—was noticeably absent from trial. Plaintiffs chose not to have her testify in the case.

Defendants are thus entitled to judgment. Still, as an alternative basis for our decision, we proceed to the racial predominance inquiry where, too, Plaintiffs fail to carry their burden.

**Racial Predominance.** "The Equal Protection Clause prohibits a State, without sufficient justification, from 'separat[ing] its citizens into different voting districts on the basis of race.'" *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 911 (1995)). This requires a two-step analysis: (1) race must be the predominant factor used to draw the district, and (2), if race predominated, then the State's race-based actions must satisfy strict scrutiny. *Cooper v. Harris*, 581 U.S. 285, 291-92 (2017).

Race predominates when it's "the criterion that" "could not be compromised," *Shaw v. Hunt*, 517 U.S. 899, 907 (1996), *subordinating* race-neutral districting criteria like "compactness, contiguity, and core preservation," *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 7 (2024). Plaintiffs must carry their burden of proving racial predominance through direct evidence, such as explicit legislative language making race predominant, *id.* at 8, circumstantial evidence, such as a district's bizarre shape explained by race alone, *id.* at 8-9, or circumstantial evidence presented through an assessment of the *Arlington Heights* factors, *see Jacksonville Branch of the NAACP v. City of Jacksonville*, 635 F. Supp. 3d 1229, 1244-45 (M.D. Fla. 2022) (collecting cases, including *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999)).

The racial predominance standard is "demanding." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (quoting *Miller*, 515 U.S. at 928 (O'Connor, J., concurring)). It's not enough to show that the redistricting body was "aware of racial demographics," or used race as a criterion. *Miller*, 515 U.S. at 916. For now, the intentional creation of majority-minority districts, or districts that perform for certain groups, isn't enough. *See Allen v. Milligan*, 599 U.S. 1, 31-32 (2023); *Bush v. Vera*, 517 U.S. 952, 958-62 (1996) (plurality); *but see League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 517 (2006) (Scalia, J., concurring in judgment in part and dissenting in part) ("[W]hen a legislature intentionally creates a majority-minority district, race is necessarily its predominant motivation[,] and strict scrutiny is therefore triggered.").

In this case, taking the law as it is, Plaintiffs failed to establish racial predominance. They offered only isolated statements from the legislative record and a hodgepodge of testimony from Dr. Abott that we don't find persuasive. Mr. Poreda's walk through the map drawing process is more persuasive and credible. Dr. Trende's point-by-point retort of Dr. Abott further establishes that Dr. Abott's analysis (and the maps produced by Dr. McCartan) can't serve as the basis for concluding that race predominated in the drawing of any of the districts at issue here. And, at both the motion to dismiss stage and at closing at trial, Plaintiffs (grudgingly) took the position that the mere drawing of a Hispanic-performing district does *not* necessarily mean that race predominates.

**Presumption of Legislative Good Faith.** In addition, given the "sensitive nature of redistricting," *Miller*, 515 U.S. at 916, a "presumption that the legislature acted in good faith" attaches, meaning that there's a presumption race was *not* a predominant motive in the State's decision to draw the challenged districts as it did, *Alexander*, 602 U.S. at 6. This presumption applies at every stage of litigation from the pleadings through trial. *Miller*, 515 U.S. at 916-17. This "especially stringent" presumption "directs district courts to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 602 U.S. at 10-11 (citations omitted); *see also League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1373-74 (11th Cir. 2022) (requiring same).

At its core, the presumption of good faith "ensures that 'race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines.'" *Alexander*, 602 U.S. at 10 (quoting *Miller*, 515 U.S. at 913). Importantly, the presumption avoids having the judicial branch be "quick to hurl" race-based "accusations at the political branches." *Id.* at 11.

In this case, based on this trial record, we can't say that Plaintiffs have rebutted the strong evidentiary presumption of good faith that attaches to the maps at issue. No legislative statement is so clear as to say that race predominated. No testimony from the map drawer is so clear as to say that race predominated. No testimony from Plaintiffs' experts is so clear as to say that race predominated. And, again, Plaintiffs aren't arguing to us that the intentional creation of a Hispanic-performing district means that race predominated.

**Alternative Maps.** Another proposition that stands out from the Supreme Court's recent decision in *Alexander* is this: The party challenging a map must disentangle permissible from impermissible considerations, and the way to do that is to submit a viable, alternative map. 602

27

U.S. at 34-35. Only by disentangling the permissible from the impermissible can the challenger show that a rational legislature had the ability to draw a compliant map. *Id.* The Florida Supreme Court adopted much the same standard for Florida's redistricting-related constitutional provisions. *Black Voters Matter Capacity Bldg. Inst., Inc. v. Sec'y, Fla. Dep't of State*, 415 So. 3d 180, 198 (2025) ("To establish the invalidity of the Enacted Plan, the plaintiffs bore the burden of proving the possibility of drawing a North Florida district that is both non-diminishing and non-race-predominant. And the plaintiffs had to do so with an alternative map.").

Plaintiffs have provided several alternative maps in this case. None are demonstrably better than the State's maps. And, even if they were slightly better, that doesn't establish racial predominance either. *See, e.g.*, *Ala. Legis. Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1113, 1333 (M.D. Ala. 2017) (three-judge panel).

More to the point, these alternatives aren't workable. Florida doesn't allow maps to be infected with partisan and anti-incumbent intent. *See League of Women Voters of Fla. v. Detzner*, 172 So. 3d 363, 378 (Fla. 2015), *abrogated on other grounds by Black Voters Matter Capacity Bldg. Inst.*, 415 So. 3d 180. Yet Plaintiffs' map drawer—Dr. McCartan—harbors a deep-seated dislike of Republicans. He called elected Republicans "fascists." To draw his alternatives, he also used software that allows for partisan data layered onto his screen when non-partisan avenues were available to him through the legislature's map drawing software and his own simulation analysis. But he conveniently called the former "clunky" and said that the latter is unable to handle the relevant map drawing constraints even though he told this Court otherwise in a prior case, *GRACE v. City of Miami*.

## IV.    Conclusion

For the foregoing reasons, we enter judgment for Defendants.

Dated: February 27, 2026

Respectfully submitted by:

Ashley Davis (FBN 48032)
 GENERAL COUNSEL
ashley.davis@dos.fl.gov
FLORIDA DEPARTMENT OF STATE
R.A. Gray Building
500 S. Bronough St.
Tallahassee, FL 32399
(850) 245-6511

/s/ Mohammad O. Jazil
Mohammad O. Jazil (FBN 72556)
mjazil@holtzmanvogel.com
zbennington@holtzmanvogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK PLLC
119 S. Monroe St. Suite 500
Tallahassee, FL 32301
(850) 270-5938

*Counsel for the Secretary*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 27, 2026, I electronically filed the foregoing with the Clerk of Court by using CM/ECF, which automatically serves all counsel of record for the parties who have appeared.

<u>/s/ Mohammad O. Jazil</u>
Mohammad O. Jazil
