## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:24-cv-21983-JB

CUBANOS PA'LANTE, *et al.*,

      Plaintiffs,

v.

FLORIDA HOUSE OF REPRESENTATIVES
and CORD BYRD, in his official capacity as
Florida Secretary of State,

      Defendants.

_____/

_____

## DEFENDANT FLORIDA HOUSE OF REPRESENTATIVES'
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

_____

<u>FINDINGS OF FACT</u>

I. <u>DRAWING DISTRICTS</u>.

1. During this decade's redistricting process, Jason Poreda served as the Chief Map Drawer for the Florida House of Representatives. T3 at 52:17–19.

2. Committee staff began with a blank map. T3 at 73:6–8, 141:8–14.

3. Although the Florida Constitution provides that tier-one standards control in case of conflict, Fla. Const. art. III, §§ 20(b), 21(b), absent a conflict, staff sought to balance all redistricting standards to the best of their ability. T3 at 156:15–25.

4. Before drawing, staff reviewed the predecessor maps (called "benchmark" maps) to identify protected districts, T3 at 83:13–17—*i.e.*, districts in which the Florida Constitution's Non-Diminishment Clause protected a minority group's voting ability, *see* Fla. Const. art. III, §§ 20(a), 21(a). Staff thus knew how many benchmark districts in Miami-Dade County were protected. T3 at 92:6–10.

5. When drawing protected districts, staff did not mimic the benchmark districts, but started afresh and attempted to apply tier-two principles. T3 at 73:12–18. When drawing protected districts, staff sought to comply with tier-two standards as much as possible and to improve upon the tier-two metrics of the benchmark districts. T3 at 157:1–14, 158:2–4.

6. Throughout his testimony, Mr. Poreda emphasized that, in drawing districts, staff sought to "balance" or "marry" all redistricting standards, racial and non-racial. T3 at 94:1–3, 95:17–24, 96:15–97:1, 99:8–13, 101:8–15, 103:16–21, 111:13–20, 111:25–112:3, 156:19–25, 181:5–12, 191:21–192:17, 204:3–17, 216:13–19.

7. Staff considered race only to the extent that staff (who worked with outside counsel) determined that there was a legal obligation to consider race. T3 at 54:15–20, 121:11–17. If staff determined that legal protections for minority voters applied to a district, then race was considered in drawing that district, but to the extent staff determined that there was no legal obligation to consider race in drawing a district, race was not considered. T3 at 121:11–17.

II. <u>DRAWING DISTRICTS IN MIAMI-DADE COUNTY</u>.

8. In Miami-Dade County, staff's approach to drawing districts that historically performed for Hispanic voters was different from staff's approach to drawing districts that historically performed for black voters. T3 at 162:20–24.

9. Because minority communities in districts that historically performed for black voters are more concentrated in specific areas, while the Hispanic community is more numerous throughout

1

Miami-Dade County, staff were more mindful of minority populations when drawing districts that historically performed for black voters. T3 at 162:20–163:11.

10.    When drawing districts that historically performed for Hispanic voters in Miami-Dade County, staff focused primarily on tier-two principles—such as keeping municipalities whole and following roadways, canals, and other major geographical features—and performed the required functional analysis when a complete district had been drawn. T3 at 164:1–16.

11.    A dense population and a large number of municipalities are among the challenges of drawing districts in Miami-Dade County. T3 at 162:11–19.

12.    When drawing districts that historically performed for Hispanic voters in Miami-Dade County, staff did not use a heat map or any other functionality of the map-drawing application to identify concentrations of Hispanic voters. T3 at 163:16–25, 192:18–22. In contrast, when drawing districts that historically performed for black voters in Miami-Dade County, staff sometimes used a heat map or viewed racial data in real time. T3 at 163:12–15.

13.    A heat map is a map that visually represents a scale of concentrations—for example, of minority voting-age populations—by a gradation of colors. T3 at 140:16–24.

14.    Staff determined that the predecessors to Congressional Districts 24, 26, 27, and 28 and State House Districts 115, 118, and 119 were protected districts and that their analogues in the new maps would require a functional analysis to ensure compliance with the Non-Diminishment Clause. T3 at 91:10–17, 117:6–9; J. Ex. 1 at 4.

15.    Staff performed the required functional analysis only when a district was at or near its ideal population, and generally only after staff had drawn a group of districts. T3 at 154:12–155:5.

16.    In drawing the four challenged districts, staff did not target any numerical threshold of Hispanic concentration, T3 at 92:16–93:1, 192:23–25, 214:2–5, or look to maintain the benchmark districts' numerical threshold of Hispanic concentration, T3 at 193:1–3, 214:6–8. Staff were never instructed to draw these districts with any specific racial composition. T3 at 193:7–9, 214:21–23.

17.    Race was one consideration in drawing the four challenged districts, but only because the Florida Constitution required it. T3 at 217:22–218:3. Staff did not consider race when drawing districts to which legal protections for minority voters did not apply. T3 at 121:18–23.

18.    Staff sought to comply with the Florida Constitution and performed the functional analysis required by the Florida Supreme Court. T3 at 218:2–6. Mr. Poreda testified, however, that, in drawing the four challenged districts, the tier-two considerations of compactness and utilization of political and geographical boundaries did not take a back seat to racial considerations. T3 at 218:7–10.

19.     In fact, staff considered tier-two standards first, and only then performed the required functional analysis to ensure compliance with the Non-Diminishment Clause. T3 at 217:10–18.

## III.   DRAWING STATE HOUSE DISTRICTS IN MIAMI-DADE COUNTY.

20.     Early in the redistricting process, committee staff found that the population of Broward, Miami-Dade, and Monroe Counties together could be divided into 26 whole State House districts. T3 at 166:21–167:6.

21.     Staff decided to minimize the number of times that districts crossed county boundaries within this three-county region. T3 at 167:13–168:14. Only one district in the enacted map (District 104) includes population from both Broward and Miami-Dade Counties. J. Ex. 1 at 17.

22.     Early in the redistricting process, committee staff prepared and published two State House maps—called workshop maps—to highlight various decision points throughout the State. T3 at 161:19–162:7; ECF No. 172 at 4 ¶ 8. In response to the workshop maps, members provided committee staff with feedback on the configuration of Miami-Dade County. T3 at 165:17–166:7.

23.     Much of this feedback concerned four districts that historically performed for black voters: Districts 107, 108, and 109 in the northeast part of the county—in the workshop maps, Districts 107, 108, and 112—and District 117. T3 at 165:17–166:7; D. Ex. 206 at RFAs 77–80. Enacted Districts 107, 108, and 109 reflect the feedback that members provided. T3 at 168:20–23.

24.     With the county boundary maintained and Districts 107, 108, and 109 in place, District 106 filled the coastal areas south of the county boundary and east of Districts 107, 108, and 109, moving south to the southern boundary of the City of Miami Beach. D. Ex. 4; T3 at 168:24–169:7.

25.     Committee staff sought to anchor one district in the City of Miami. T3 at 169:12–21. South of District 106, District 113 became the Miami-based district: 91.9 percent of its population (167,896 of 182,742 people) resides in the City of Miami. J. Ex. 1 at 3, 19; D. Ex. 204 at RFA 38.

26.     West of District 113, committee staff drew District 114 to encompass all of Coral Gables—a large municipality with a north-south orientation—and thus keep Coral Gables whole. T3 at 170:4–11; D. Ex. 12. Mr. Poreda also included the Cities of West Miami and South Miami—two smaller municipalities west of Coral Gables—wholly within District 114. T3 at 170:4–11; D. Ex. 12.

27.     Mr. Poreda often utilized the Tamiami Trail (U.S. Highway 41) or the Dolphin Expressway as east-west district boundaries. T3 at 170:22–171:17; D. Ex. 20. In Miami-Dade County, seven House districts border the Tamiami Trail (Districts 111, 112, 113, 114, 115, 118, and 119), while four border the Dolphin Expressway (Districts 111, 112, 114, and 116). T3 at 170:22–171:9; D. Ex. 20.

28.     In all, eight districts emanate either south or north from one or both of these east-west thoroughfares. D. Ex. 20. When staff utilized a major geographical boundary, they sought to use that boundary along as many districts as possible. T3 at 171:10–17.

## IV.   DRAWING THE CHALLENGED STATE HOUSE DISTRICTS.

### A.     State House District 115.

29.     The most significant impact on District 115's orientation was committee staff's efforts to keep municipalities whole. T3 at 173:6–22. Specifically, District 115 is shaped by the decision to keep Coral Gables whole in adjacent District 114 and to keep Cutler Bay, Palmetto Bay, and Pinecrest—three vertically stacked municipalities—whole in one district. T3 at 173:6–22; D. Ex. 15.

30.     In the drawing process, it became a goal for committee staff to keep Cutler Bay, Palmetto Bay, and Pinecrest whole within one district, especially since two of them had been split in the benchmark map. T3 at 173:6–22.

31.     The municipal boundaries of Coral Gables, South Miami, and West Miami, which are all in District 114, press against District 115's eastern boundary, as does Biscayne Bay. D. Ex. 15.

32.     Together, Districts 114 and 115 keep six municipalities whole. D. Ex. 12; D. Ex. 15. District 115 does not split any municipalities. T3 at 178:5–6; D. Ex. 16; D. Ex. 204 at RFA 24. District 115's boundaries follow the boundaries of seven municipalities (Miami, West Miami, South Miami, Coral Gables, Pinecrest, Palmetto Bay, and Cutler Bay). T3 at 174:17–21, 177:25–178:4; D. Ex. 16.

33.     On its west side, District 115 is shaped by District 117, a protected district that maintains the voting ability of black voters who have historically been able to elect representatives of their choice. T3 at 173:23–174:3; D. Ex. 206 at RFA 80; J. Ex. 1 at 4.

34.     In drawing District 115, staff also utilized geographical boundaries extensively. The district follows major roadways such as Kendall Drive (State Road 94), the Don Shula Expressway (State Road 874), U.S. Highway 1, and Southwest 117th Avenue. T3 at 174:4–16; D. Ex. 14; D. Ex. 204 at RFA 22; T1 at 59:6–60:12. The district's boundaries also follow major canals: the Cutler Drain Canal and, along its southern boundary, the Black Creek Canal. T3 at 174:17–21; D. Ex. 16.

35.     District 115 utilizes political and geographical boundaries along 92 percent of its perimeter. T3 at 161:7–17, 178:5–11; J. Ex. 1 at 27.

36.     Race was never a consideration in drawing the central or southern parts of District 115. T3 at 175:11–14. In fact, in drawing District 115, staff did not consider race at all until they performed the required functional analysis on a completed district. T3 at 157:15–17.

37.     Once the functional analysis was performed, race had some impact on the northern part of the district. T3 at 175:18–20. The functional analysis revealed some diminishment in the ability of Hispanic voters to elect representatives of their choice. T3 at 107:3–6, 175:18–176:8.

38.     To ensure compliance with the Non-Diminishment Clause, staff made an adjustment that "took the district maybe a little bit further north" than in some earlier drafts. T3 at 104:3–7, 175:18–176:8. Even so, District 115 has the lowest HVAP (65.86 percent) of any protected district in Miami-Dade County that performs for Hispanic voters, J. Ex. 1 at 4, reflecting a decrease of 5 percentage points compared to Benchmark District 115 (70.96 percent), J. Ex. 2 at 3.

39.     In making an adjustment to the northern part of the district, staff also implemented non-racial districting principles. T3 at 176:9–23. The northern section of District 115 consists of straight lines and right angles and contains no fingers, tails, or other visually bizarre features. D. Ex. 15.

40.     It also follows major roadways: its northern boundary is the Tamiami Trail, which serves as a boundary for seven House districts, while the eastern and western boundaries of District 115's northern portion consist of major roadways. T3 at 177:1–7; D. Ex. 14; D. Ex. 204 at RFA 22.

41.     The northern section's western boundary is Galloway Road (87th Avenue or S.R. 973). T3 at 177:1–7; D. Ex. 14; D. Ex. 204 at RFA 22. Its eastern boundary is 67th Avenue, a heavily traveled road that connects the Tamiami Trail to Kendall Drive. T4 at 14:14–15, 15:23–16:4, 17:17–25.

42.     Plaintiff Polo, who lives in District 115, agreed that Kendall Drive, Tamiami Trial, the Don Shula Expressway, and Southwest 117th Avenue are major roadways. T1 at 58:7–9, 59:6–60:12.

43.     District 115's northern portion also respects municipal boundaries, utilizing the municipal boundaries of Miami, West Miami, and South Miami. T3 at 177:8–13; D. Ex. 14. At its north end, the district stops where it meets Miami's municipal boundary. T3 at 177:17–19; D. Ex. 14.

44.     Mr. Poreda sought to use the same boundary for multiple districts where possible. District 115 does so at its northwest corner, where three districts meet at a point and form a geometric "T" shape. T3 at 179:4–12.

45.     District 115 also improved on the benchmark district's tier-two metrics. The benchmark district extended much further north than the Tamiami Trail, which is enacted District 115's northern boundary. T3 at 176:9–23, 180:1–18; J. Ex. 2 at 1. Notably, in *In re Senate Joint Resolution of Legislative Apportionment 1176* (*In re SJR 1176*), 83 So. 3d 597 (Fla. 2012), the Florida Supreme Court concluded that Benchmark District 115 complied with Florida's redistricting standards.

46.     Because of its adherence to major boundaries and the district's improvements on the benchmark district's tier-two metrics, Mr. Poreda did not consider the northern part of District 115 to be bizarrely or irregularly shaped. T3 at 178:12–20.

47.     On the House floor, Representative Cord Byrd, Chair of the State Legislative Redistricting Subcommittee, ECF No. 172 at 3, was asked why District 115 extends as far north as it does. J. Ex. 75 at 52:18–53:13. Chair Byrd responded: "Because that's a Tier One standard that we applied." J. Ex. 75 at 52:18–53:13.

48.     Chair Byrd's response is consistent with Mr. Poreda's testimony that, to avoid diminishment, staff made an adjustment that took District 115 "maybe a little bit further north" than in some earlier drafts. T3 at 104:3–7, 175:18–176:8. Addressing Chair Byrd's statement at trial, Mr. Poreda testified that, while tier-one considerations were one factor in drawing District 115's northern portion, they were not the only factor. T3 at 109:12–110:13.

49.     Throughout the map-drawing process, Mr. Poreda made adjustments to District 115 for race-neutral reasons as well. T3 at 179:13–15. For example, he adjusted District 115 to allow the City of Sweetwater to be kept whole within District 116 and to improve District 116's visual compactness. T3 at 179:13–25.

50.     Mr. Poreda considers District 115 to be compact and to utilize political and geographical boundaries where feasible. T3 at 180:20–24.

51.     Mr. Poreda testified that race was not the predominant factor in drawing District 115 as a whole. T3 at 180:25–181:2. Mr. Poreda considers District 115 to be a good example of staff's efforts to "balance or marry all of the standards where we could." T3 at 181:3–12.

52.     In 2022, the Florida Supreme Court upheld District 115 under Florida's redistricting standards. *In re Senate Joint Resol. of Legis. Apportionment 100* (*In re SJR 100*), 334 So. 3d 1282, 1285 (Fla. 2022).

**B.     State House Districts 118 and 119.**

53.     Early in the redistricting process, the House's workshop maps presented two different configurations of Districts 118 and 119. J. Ex. 39 at 26; J. Ex. 5 at 1; J. Ex. 6 at 1.

54.     In one, District 119 formed an "L" shape west and south of District 118; in the other, District 119 extended west into an unpopulated area and, to achieve population equality, included a protrusion to the south, near Homestead and Florida City. T3 at 181:13–182:21; J. Ex. 39 at 26.

55.     To the east of Districts 118 and 119, the workshop maps contained different versions of District 117, which is a protected district. T3 at 182:22–183:11; J. Ex. 39 at 26.

56.     Staff was not satisfied with the visual compactness of either of the workshop configurations of Districts 118 and 119. T3 at 183:18–184:17. Rather than maintain either of the workshop configurations, enacted Districts 118 and 119 divide a rectangular area vertically into simple, symmetrical, parallel shapes. T3 at 110:16–19, 183:18–184:17; J. Ex. 1 at 1.

57.     In drawing enacted Districts 118 and 119, staff sought to divide a rectangular area into regular shapes and to follow roadways and railways. T3 at 183:18–184:17.

58.     The Tamiami Trail (U.S. Highway 41) forms the northern boundary of both districts. T3 at 184:18–20; D. Ex. 17; D. Ex. 204 at RFAs 28 & 30.

59.     Krome Avenue (State Road 997) is the western boundary of District 119. T3 at 184:25–185:1; D. Ex. 17. Staff considered Krome Avenue to be a major roadway and utilized Krome Avenue as a boundary for three districts (Districts 111, 119, and 120). T3 at 185:1–4; D. Exs. 17 & 20.

60.     District 118's eastern boundary follows two major roads (the Florida Turnpike and Southwest 117th Avenue) and otherwise respects adjacent District 117, a protected black district that helps to create the rectangle that Districts 118 and 119 occupy. T3 at 185:5–20, 229:7–15; J. Ex. 1 at 4; D. Exs. 17 & 19.

61.     Southwest 117th Avenue is a heavily used roadway that runs alongside the Florida Turnpike all the way north to Florida International University. T4 at 17:17–25. Plaintiff Polo agreed that Southwest 117th Avenue is a major road in the area. T1 at 60:10–12.

62.     In selecting a dividing line between Districts 118 and 119, staff sought to "find what we considered to be the cleanest or most visually good lines to divide these districts." T3 at 185:21–186:14. Staff used the map-drawing application's satellite view to identify major roads with medians or multiple lanes in each direction that are easily and commonly recognizable. T3 at 185:21–186:14.

63.     The boundary between Districts 118 and 119 therefore follows Southwest 147th Avenue and Southwest 137th Avenue (Lindgren Road), which, upon visual examination, staff concluded were major or commonly understood roadways in the area, as well as the CSX rail line. T3 at 186:15–22; D. Exs. 17 & 20; D. Ex. 204 at RFAs 28, 30.

64.     Southwest 137th Avenue and Southwest 147th Avenue are heavily traveled roads in Miami-Dade County. T4 at 18:3–12, 20:14–21:5. A portion of Southwest 137th Avenue is a state road (State Road 825). D. Ex. 17; FDOT Interactive Map.

65.     Around its midpoint, the boundary between Districts 118 and 119 shifts slightly to the east to ensure population equality in Districts 118 and 119 and, in doing so, avoids the Miami Executive Airport, which is kept whole in District 119. T3 at 187:3–11; D. Ex. 17.

66.     Districts 118 and 119 consist entirely of unincorporated areas and therefore do not divide nor contain any municipalities. T3 at 187:12–16; D. Ex. 18; D. Ex. 204 at RFAs 29, 31.

67.     Districts 118 and 119 are compact because, as rectangular districts, they have regular, logical, orderly, understandable shapes. D. Ex. 17. They do not meander or have bizarre shapes or chaotic or disorderly boundary features, such as tails or tentacles. D. Ex. 17.

68.     Mr. Poreda considered Districts 118 and 119 to be compact. Because they "were rectangles," both districts had regular shapes and no odd appendages. T3 at 187:20–188:10. Mr. Poreda considers squares and rectangles to be equally compact. T3 at 189:14–17.

69.     Dr. McCartan testified that, because compactness is primarily a visual judgment, he tried to use rectangular or square configurations where possible. T1 at 148:4–10.

70.     Dr. McCartan considers his own rectangular districts—whether vertical or horizontal—to be compact. These include District 24 in Congressional Maps A and B1, Districts 24 and 26 in Congressional Map B2, and Districts 8 and 21 in Congressional Map D. T1 at 222:4–8, 226:8–10, 228:15–22, 231:6–13, 231:19–22; J. Ex. 17 at 1; J. Ex. 18 at 1; J. Ex. 19 at 1; J. Ex. 22 at 1.

71.     Dr. McCartan's assessment of a district's compactness does not depend on whether the district is oriented vertically or horizontally. T1 at 229:5–7. Thus, if Dr. McCartan's rectangular, horizontally oriented districts were rotated 90 degrees to a vertical position, he would still consider them compact. T1 at 222:9–11, 226:11–19, 228:23–229:3.

72.     Dr. McCartan testified that one of his districts—District 8 in Congressional Map D— is visually compact and "very close to a rectangle." T1 at 231:6–18.

73.     Many of the enacted map's South Florida districts are vertically oriented, including Districts 87, 92, 98, 100, 103, 106, 108, and 109. T3 at 188:11–189:1; D. Ex. 2. Most of these nine districts are not protected districts. T3 at 189:8–12; J. Ex. 1 at 4.

74.     While its Reock score is low, District 119 has the eleventh-highest Convex Hull score (0.92) in the entire State House map, and its Polsby-Popper score (0.47) exceeds the mean and median Polsby-Popper score (0.45). J. Ex. 1 at 2–3; T3 at 189:18–190:4.

75.     District 118's Reock and Polsby-Popper scores are low relative to other State House districts, but its Convex Hull score (0.79) is near the mean (0.82), and its shape is simple and rectangular. J. Ex. 1 at 1–3.

76.     Mr. Poreda considered Districts 118 and 119 to be more compact visually than their benchmark districts. T3 at 190:15–24; J. Ex. 1 at 1; J. Ex. 2 at 1. In *In re SJR 1176*, 83 So. 3d 597 (Fla.

2012), the Florida Supreme Court concluded that Benchmark Districts 118 and 119 complied with Florida's redistricting standards.

77.     When Mr. Poreda had drawn the completed districts, he performed a functional analysis on Districts 118 and 119. T3 at 190:25–191:2. In drawing Districts 118 and 119, Mr. Poreda perceived no conflict between tier-one and tier-two principles. T3 at 191:6–8.

78.     Mr. Poreda chose the enacted configurations of Districts 118 and 119 because those configurations best balanced all of Florida's standards, had regular shapes, and compared favorably to the benchmark configurations. T3 at 191:19–192:2.

79.     Staff considered different configurations of Districts 118 and 119. T3 at 110:20–21. Staff considered the different options to be comparable in tier-two metrics and performed a functional analysis on each option. T3 at 111:5–24. Staff advanced the option that they considered to best balance all tier-one and tier-two standards. T3 at 111:5–24.

80.     Mr. Poreda testified that race was not the predominant factor in drawing District 118 or District 119. T3 at 192:3–8. The final configuration reflects a "balancing" of standards that staff considered "collectively when . . . analyzing districts." T3 at 192:9–17. While race was one factor in the design of these districts, race-neutral considerations "played just as big of a part." T3 at 192:9–17.

81.     In 2022, the Florida Supreme Court upheld Districts 118 and 119 under Florida's redistricting standards. *In re SJR 100*, 334 So. 3d at 1285.

   **C.     Dr. Abott's Analysis of State House Districts 115, 118, and 119.**

82.     Dr. Abott observes that, in Miami-Dade County, the highest concentrations of Hispanic voters live in a large, boomerang-shaped area and that each of the three challenged State House districts includes a portion of the boomerang. T2 at 174:25–176:1, 216:22–217:7; P. Ex. 177.

83.     The boomerang stretches from the Broward County line east of Krome Avenue down to Little Havana and then to Kendall West. P. Ex. 177. The population south of the boomerang is still majority Hispanic, but gradually declines in Hispanic voting-age population (HVAP). T2 at 217:8–11.

84.     Dr. Trende found it unclear why Dr. Abott considers it unusual or improper for the challenged State House districts to include portions of this large boomerang, especially since the boomerang is not only heavily Hispanic, but also densely populated in general. T4 at 90:6–91:12. It is therefore natural for districts to be drawn in that region. T4 at 91:6–11.

85.     Dr. Abott, moreover, did not establish a race-neutral baseline for comparison and therefore did not demonstrate that districts drawn without regard to race would likely not include portions of the large boomerang. T4 at 90:13–21.

86.     Dr. Abott considered the fact that each challenged district is partially inside and partially outside the boomerang to be evidence of racial motivation. T2 at 217:17–23. But if the Legislature had drawn some districts wholly inside and others wholly outside the boomerang, then Dr. Abott might also have considered that to be evidence of racial motivation. T2 at 217:12–16.

87.     By stacking districts vertically, Dr. McCartan placed the northern districts mostly inside and the southern districts mostly outside the boomerang, resulting in greater racial imbalance—or "variation," as Dr. Abott calls it—between districts. ECF No. 191-3 at 31; T2 at 215:5–216:1.

88.     Dr. Abott recognizes that Districts 115, 118, and 119 have a broader spread of HVAPs in Dr. McCartan's map (91.2, 79.8, and 64.2 percent) than in the enacted map (85.7, 85.2, and 65.9 percent). ECF No. 191-3 at 31; T2 at 176:2–177:18. Dr. McCartan conceded that his vertically stacked configuration creates greater racial imbalance than the enacted map does. T1 at 232:25–233:2.

89.     Dr. Abott did not assess whether there is enough population either between the boomerang's arms (in District 111) or outside the boomerang along the coast (in Districts 114 and 115) to draw a whole district. T2 at 218:2–19. Dr. Trende does not believe there is. T4 at 98:18–25.

90.     Dr. Trende testified that it is unclear what Dr. McCartan's State House map accomplishes, since it reconfigures the region but is still overwhelmingly Hispanic, T4 at 93:1–6, and in fact increases the HVAP in two districts above 90 percent, ECF No. 191-3 at 31; T4 at 95:25–96:8.

## V.     DRAWING CONGRESSIONAL DISTRICT 26.

91.     On March 4, 2022, the Legislature passed a bill that contained two congressional maps, including a primary map known as Plan 8019. ECF No. 172 at 6 ¶¶ 31–33; T3 at 194:20–195:24.

92.     Mr. Poreda prepared Plan 8019 to merge the House's and Senate's respective congressional-map proposals into a single, compromise proposal. T3 at 194:13–19, 195:25–196:22.

93.     In Plan 8019, District 26 contained portions of Miami-Dade and Collier Counties and all of Hendry County. J. Ex. 8 at 1. Before Plan 8019 was prepared, the Senate had included Hendry County in, and the House had excluded Hendry County from, District 26. T3 at 197:6–15. The House believed that excluding Hendry County improved District 26's compactness. T3 at 197:20–198:5. In Plan 8019, the House accepted the Senate's position on Hendry County. T3 at 197:6–8, 198:6–9.

### A.     Plan 8019 and the Pinwheel Effect.

94.     Two districts had an especially significant impact on the way that districts in South Florida were configured in Plan 8019: Districts 16 and 20. T3 at 198:12–201:6; J. Ex. 3 at 1.

95.     Staff found that Polk County is nearly as populous as one congressional district and therefore kept the county whole in District 16. T3 at 198:19–199:19; J. Ex. 8 at 1. The southern

boundaries of Polk, Osceola, and Indian River Counties became the southern boundaries of Districts 16, 9, and 8. T3 at 198:19–199:19; J. Ex. 8 at 1. These boundaries formed a flat line across the center of the State and walled off South Florida from the rest of the State. T3 at 198:19–199:19; J. Ex. 8 at 1.

96.     District 20 is a protected district in Palm Beach and Broward Counties. T3 at 198:12–18; J. Ex. 3 at 1. Plaintiffs allege that both the Non-Diminishment Clause and the Voting Rights Act protect the voting ability of District 20's black voters. ECF No. 58 at 21 n.5; D. Ex. 206 at RFA 61.

97.     Within walled-off South Florida, District 20 created a pinwheel effect, as districts could be rotated clockwise or counterclockwise around District 20. T3 at 199:20–201:16. Staff experimented with this pinwheel effect and rotated districts around District 20. T3 at 200:18–19.

98.     In Plan 8019, District 26 includes 214,124 residents of Hendry County (39,619) and Collier County (174,505). T3 at 200:5–17; J. Ex. 8 at 16.

99.     Staff concluded that removing District 26 from Hendry and Collier Counties, and moving it east, wholly into Miami-Dade County, would have a domino effect across the South Florida region, forcing districts to rotate counterclockwise around District 20. T3 at 200:5–17, 201:23–202:2.

100.    Districts along the east coast would be forced to the north to achieve population equality. T3 at 200:18–201:2. District 25 would be squeezed up and around District 20's southern arm, pushing Districts 23 and 22 further north. T3 at 202:3–16. District 21 would be forced west through rural counties across central Florida, nearly to the Gulf Coast in Charlotte County. T3 at 200:18–201:2.

101.    Staff's chosen positioning of districts around District 20 allowed District 21 to follow the county boundaries of St. Lucie and Martin Counties. T3 at 201:3–5, 202:17–22. In fact, in Plan 8019, the western boundaries of Districts 20 and 21 and the northern boundary of District 21 adhere for nearly 140 consecutive miles to the entire western boundaries of Broward, Palm Beach, Martin, and St. Lucie Counties and the entire northern boundary of St. Lucie County. D. Ex. 204 at RFA 37.

102.    Staff attempted to follow county boundaries whenever feasible. T3 at 213:23–25. The enacted districts follow county boundaries extensively, as illustrated by Defendants' Exhibit 30, which depicts with red lines all district boundaries that track county boundaries. D. Ex. 30; T3 at 213:14–22.

103.    Staff's chosen positioning of districts around District 20 also allowed staff to utilize the Palm Beach Inlet as the boundary between Districts 21 and 22, ensuring that neither district wrapped around District 20's northern arm, while District 22 in Palm Beach County and District 25 in Broward County each remain wholly contained within a single county. T3 at 201:6–16; D. Ex. 22.

104.    By crossing into Collier County, District 26 allowed staff to make other districts to the north—specifically, Districts 21, 22, 23, and 25—as tier-two compliant as possible. T3 at 203:17–23.

105.     In the drafting process, staff prepared an option that did not include a Miami-Dade-to-Collier district, but staff did not advance that option because of its harmful effect on the compactness of the overall region; because of its impact on District 21, which would have crossed the middle of the State from the Atlantic Ocean nearly to the west coast; and because it would have diminished the voting ability of minority voters in District 26 and either District 27 or District 28. T3 at 128:5–129:3.

106.     During the redistricting process, each congressional map that staff published included a Miami-Dade-to-Collier district. T3 at 197:3–5. Staff were never instructed, however, to include a portion of Collier County in District 26. T3 at 204:22–24.

107.     Dr. McCartan's testimony supports Mr. Poreda's analysis of the pinwheel effect. Dr. McCartan agrees that, if District 26 were removed from Collier County and drawn wholly in Miami-Dade County, then districts must rotate counterclockwise to equalize populations. T1 at 213:14–23.

108.     When Dr. McCartan moved District 26 wholly into Miami-Dade County, it forced other districts in his maps to rotate counterclockwise around the western boundary of Palm Beach and Broward Counties. T1 at 216:8–17. Dr. McCartan's decision to move District 26 wholly into Miami-Dade County created a domino effect that impacted districts as far north as Tampa. T1 at 216:18–20.

109.     Dr. McCartan agrees that, when he moved District 26 wholly into Miami-Dade County, some other district in Miami-Dade County had to move out of—or further out of—Miami-Dade County. T1 at 223:3–8. In Dr. McCartan's maps, that district was District 24, which moved further out of Miami-Dade County and further into Broward County. T1 at 223:3–11. This northward movement of District 24 pushed District 25 to the north and required District 25 to take additional population along the east coast. T1 at 223:16–19. In Dr. McCartan's maps, District 25 turns north and moves up the coast because of the changes that Dr. McCartan made to District 26. T1 at 223:20–23.

110.     In contrast to its compact shape in the enacted map, District 25 assumes a reverse "L" shape in Dr. McCartan's maps. T1 at 223:24–224:4; J. Ex. 3 at 1; J. Ex. 17 at 1; J. Ex. 18 at 1; J. Ex. 19 at 1; J. Ex. 20 at 1; J. Ex. 21 at 1; J. Ex. 22 at 1.

111.     Dr. McCartan agrees that District 25's northward shift in his maps has a domino effect on Districts 23 and 22, which also move north, and that, as a result, District 21 can no longer follow county lines along its northern and western boundaries, as in the enacted map. T1 at 223:24–224:19.

112.     Enacted Districts 20 and 21 follow the entire northern boundary of St. Lucie County and the entire western boundary of St. Lucie, Martin, Palm Beach, and Broward Counties, but none of Dr. McCartan's maps follows those county boundaries to their full extent. T1 at 224:20–225:2.

113.    Dr. McCartan agrees that, when he moved District 26 wholly into Miami-Dade County, it pushed other districts to the north and prevented the maintenance of these county boundaries. T1 at 225:3–6. He agrees that breaking that set of county boundaries was a natural consequence of his decision to move District 26 wholly into Miami-Dade County. T1 at 225:7–10.

114.    In fact, Dr. McCartan agrees that any map that follows the northern boundary of St. Lucie County and the western boundary of St. Lucie, Martin, Palm Beach, and Broward County must contain a Miami-Dade-to-Collier district. T1 at 225:11–17. It is impossible to adhere to those county lines without drawing a district that crosses from Miami-Dade into Collier County. T1 at 225:18–22.

115.    In Maps B1 and B2, District 21 extends from the Atlantic Ocean west to the Peace River near Port Charlotte along the west coast of Florida. T1 at 227:10–15; J. Ex. 18 at 1; J. Ex. 19 at 1. East to west, District 21 in Maps B1 and B2 is longer than enacted District 26. T1 at 227:16–19.

116.    Dr. McCartan admits that all of these changes to Districts 25, 23, 22, and 21 followed from his decision to move District 26 wholly into Miami-Dade County. T1 at 225:23–226:1.

117.    Mathematically, Districts 24, 25, and 27 are less compact in Dr. McCartan's maps than in the enacted map. T1 at 218:16–24; D. Ex. 132. Dr. McCartan concedes that some of these differences in compactness scores are meaningful. T1 at 218:25–219:2.

118.    Plan 8019's positioning of districts around District 20 did not affect tier-one compliance, and Mr. Poreda perceived no conflict between tier-one and tier-two principles in drawing District 26. T3 at 202:23–203:4.

119.    Mr. Poreda decided to present a District 26 that includes portions of Miami-Dade and Collier Counties because it allowed staff to place all other districts in the region in their orientations and because it was similar to the benchmark district, T3 at 203:5–10, which the Florida Supreme Court approved, T3 at 197:16–19; *League of Women Voters of Fla. v. Detzner*, 179 So. 3d 258, 287–90 (Fla. 2015).

**B.    Mr. Kelly's Revisions to Plan 8019.**

120.    Governor DeSantis vetoed the bill that contained Plan 8019. ECF No. 172 at 6 ¶¶ 31–34. On April 19, 2022, the Legislature convened in special session. ECF No. 172 at 6 ¶ 35.

121.    Alex Kelly, the Governor's Deputy Chief of Staff, modified Plan 8019 and presented the modified plan (Plan 109) to the Legislature. J. Ex. 81 at 20:23–21:4; T3 at 205:8–14. The Legislature eventually passed, and the Governor signed, a bill that contained Mr. Kelly's proposal, which became the enacted map. J. Ex. 151 ¶¶ 3–4; ECF No. 172 at 6 ¶¶ 36–41.

122.     Mr. Kelly's proposal made no changes to any district boundaries in east-coast counties Brevard, Indian River, St. Lucie, Martin, Palm Beach, Broward, Miami-Dade, and Monroe. T3 at 205:25–206:9; J. Ex. 8 at 1; J. Ex. 3 at 1.

123.     Thus, Mr. Kelly did not change the portion of District 26 in Miami-Dade County. T3 at 206:10–13; J. Ex. 81 at 71:14–22, 72:16–23. Mr. Kelly's proposal also continued to utilize the county boundaries of St. Lucie, Martin, Palm Beach, and Broward Counties as the western boundary of Districts 20 and 21 and the northern boundary of District 21, just as Plan 8019 had. T3 at 206:17–20.

124.     Mr. Kelly moved District 18 inland, away from the west coast, and extended the district both north and south. J. Ex. 3 at 1; J. Ex. 8 at 1; T3 at 206:25–207:10. While his modified District 18 moved into and split Polk County, it enabled him to keep Citrus and Sarasota Counties whole—two counties that Plan 8019 had split. J. Ex. 81 at 26:2–7, 33:24–34:25, 45:21–46:2, 55:17–24.

125.     Mr. Kelly extended District 18 south into Hendry County and partially into Collier County to achieve population equality. J. Ex. 81 at 46:3–7, 46:17–24, 71:23–72:7; T3 at 207:11–17. By removing Hendry County from District 26, Mr. Kelly made District 26 more like the districts the House had drawn early in the redistricting process, before it prepared Plan 8019. T3 at 207:21–24.

126.     Mr. Kelly's extension of District 18 into Hendry and Collier Counties removed population from District 26 and left District 26 underpopulated. J. Ex. 81 at 46:25–47:6, 72:8–15, 72:25–73:18. Mr. Kelly thus increased District 26's population along its western boundary. J. Ex. 81.

127.     As he made these changes, Mr. Kelly was aware of District 26's status as a protected district and was "watching" the effect of his changes on the district's HVAP, which settled at 73.2 percent. J. Ex. 81 at 47:5–6, 72:16–23, 73:19–74:4, 75:8–17; J. Ex. 3 at 2.

128.     Mr. Kelly's revisions did not increase, but decreased District 26's HVAP. In Mr. Kelly's proposal (which the Legislature enacted), District 26's HVAP was 73.2 percent—lower than in any of the 21 congressional maps submitted by members or staff of the House and Senate. J. Ex. 3 at 2; D. Ex. 206 at RFAs 34–44; D. Ex. 92; T4 at 85:14–87:4. In the 21 earlier maps, the Miami-Dade-to-Collier district's HVAP ranged from 74.0 to 76.9 percent. D. Ex. 206 at RFAs 34–44; D. Ex. 92.

129.     In Mr. Kelly's proposal, District 26's HVAP was lower than in the benchmark district (74.4 percent), which was Benchmark District 25. ECF No. 172 at 7 ¶ 43; J. Ex. 3 at 2; J. Ex. 4 at 2.

130.     Enacted District 26 includes approximately 135,000 people who did not live in the benchmark district, and it excludes approximately 135,000 who did. D. Ex. 206 at RFAs 45–46. Significantly, the HVAP of the population that was moved out of the district is 77.0 percent, while the HVAP of the newly added population is considerably lower (71.7 percent). D. Ex. 206 at RFAs 45–46.

**C.      District 26's Adherence to Tier-Two Principles**.

131.      District 26 follows political and geographical boundaries along 91 percent of its perimeter. J. Ex. 3 at 18; T3 at 161:7–17. With one small exception, it follows county boundaries along its entire northern boundary—for approximately 120 miles—from Interstate 75 in Collier County to the municipal boundary of Miami Gardens in Miami-Dade County. D. Exs. 23, 26, 27; D. Ex. 204 at RFA 32; T3 at 207:25–208:23, 212:15–19. The district's northern boundary deviates from county boundaries only briefly, around unincorporated Immokalee in north Collier County. D. Ex. 23, 27, 55.

132.      Around Immokalee, District 26's boundary follows State Roads 82 and 29 and County Road 846. D. Ex. 29; D. Ex. 204 at RFA 33; T3 at 207:25–208:23. The portion of Immokalee that Mr. Kelly transferred from District 26 to District 18 contains a small but heavily Hispanic population. D. Exs. 54–58; T3 at 208:24–209:19.

133.      In Collier County, District 26's southern boundary consists of the county boundary between Monroe and Collier Counties. D. Ex. 27. In Miami-Dade County, it follows two major roadways: the Tamiami Trail (U.S. Highway 41) and the Dolphin Expressway. D. Ex. 24.

134.      Along its western boundary, District 26 follows, in part, major roadways such as Interstate 75 and Collier Boulevard (State Road 951) and the municipal boundaries of Bonita Springs and Marco Island. D. Ex. 29; D. Ex. 204 at RFA 34; T3 at 207:25–208:23; FDOT Interactive Map.

135.      Beginning at the Broward County boundary, District 26's eastern boundary first follows the municipal boundary of Miami Gardens, which is also State Roads 847 and 826. T3 at 249:11–19; D. Ex. 26. The House attempted to utilize state roads where feasible. T3 at 249:25–250:2.

136.      District 26's eastern boundary then follows the boundary between—and avoids splitting—Miami Gardens and Miami Lakes along State Road 823. D. Ex. 26. It then follows State Road 924 to Opa-Locka and utilizes the boundary between Opa-Locka and Hialeah, keeping both municipalities whole. T3 at 249:20–24; D. Ex. 26. Finally, it follows a combination of geographical boundaries—the Little River Canal, State Roads 9 and 934, the Airport Expressway, and U.S. Highway 1—to ensure that Districts 24 and 26 are equally populated. D. Ex. 26; T3 at 209:20–212:14, 250:3–16.

137.      Adjacent District 24, a protected district for black voters, also impacts District 26's eastern boundary. ECF No. 58 at 21 n.5; D. Ex. 23; D. Ex. 206 at RFA 62. Mr. Poreda did not use a heat map to identify Hispanic populations along District 26's boundary with District 24. T3 at 211:20–212:1. He did, however, use a heat map to identify concentrations of black voters along the same boundary to avoid diminishment in the voting ability of District 24's black voters. T3 at 250:22–25.

138.    In Miami-Dade County, District 26 follows eight municipalities' boundaries: Doral, Hialeah, Miami, Miami Gardens, Miami Lakes, Miramar, Opa-Locka, and Sweetwater. D. Exs. 24–26.

139.    In Miami-Dade County, seven municipalities are kept whole in District 26. D. Ex. 25; D. Ex. 204 at RFA 36; T3 at 213:3–8. The only municipality that District 26 splits is Miami, which has a population of 442,241 people. J. Ex. 3 at 17; D. Ex. 235 at 52.

140.    Staff performed the required functional analysis on District 26. T3 at 215:2–5. The functional analysis did not require any changes to District 26 to avoid diminishment in the voting ability of Hispanic voters. T3 at 215:6–9.

141.    Mr. Poreda testified that race was not the predominant factor in drawing District 26. T3 at 216:3–5.

**D.    Dr. Abott's Analysis of Congressional District 26.**

**142.    Dr. Abott observes that the HVAPs in Districts 26, 27, and 28 are "remarkably similar," even though the region as a whole exhibits "quite a bit of racial voting-age population variation." T2 at 146:3–10, 148:15–24.**

143.    Dr. Trende testified that, without a baseline to show what characteristics would be typical or atypical when districts are drawn without consideration of race, the similarity in HVAPs among Districts 26, 27, and 28 does not suggest race-based redistricting. T4 at 62:19–63:4.

144.    Accordingly, Dr. Abott has no opinion as to what HVAP one would expect in Districts 26, 27, and 28 if race were not considered. T2 at 188:6–9.

145.    Without a race-neutral baseline, it is impossible to know whether the similarity in HVAPs is unusual. T4 at 63:5–64:11. Dr. Trende testified that, ordinarily, the 90-percent HVAP in Dr. McCartan's iterations of District 26 would be a stronger indicator of racial motivation. T4 at 63:5–15.

146.    Dr. Abott does not claim that the similarity in HVAPs proves that the Legislature intentionally produced that result. T2 at 188:14–17. Mr. Poreda testified that he did not draw District 26 with an intent to balance the HVAPs in Districts 26, 27, and 28. T3 at 214:9–11.

147.    Dr. Abott concedes that, in one of Dr. McCartan's congressional maps (Map B2), the HVAPs of Districts 26, 27, and 28 range from 71.6 to 74.2 percent—a small range of only 2.6 percentage points. T2 at 190:10–15. Dr. McCartan testified that he did not intentionally balance these HVAPs, T1 at 229:8–17, and denied that he referred to racial or political data in drawing his maps, T1 at 136:5–7. Dr. Abott does not claim that the enacted map's 1.0-percentage-point range evidences race-based redistricting but that Map B2's 2.6-percentage-point range does not. T2 at 190:19–23.

148.     Dr. Abott also recognizes that, in each of Dr. McCartan's maps, the difference in HVAP between Districts 27 and 28 is less than two percentage points, but Dr. Abott does not claim that Dr. McCartan intentionally balanced these HVAPs. T2 at 191:4–10.

149.     Dr. Abott acknowledges that Dr. McCartan did not present a map that includes a Miami-Dade-to-Collier district, and that she (Dr. Abott) cannot therefore determine what his HVAP range would have been if he had. T2 at 192:1–10.

150.     Computer simulations might reveal whether the similarity in HVAPs among Districts 26, 27, and 28 is unusual, but Dr. McCartan did not produce simulations in this case. T4 at 63:5–64:11.

**151.     Dr. Abott observes that, in Districts 18, 19, 20, 24, 25, 26, 27, and 28 combined, the HVAP is 45.6 percent—much lower than in Districts 26, 27, and 28. T2 at 149:3–24.**

152.     Dr. Trende testified that Dr. Abott's analysis is fundamentally flawed because racial groups are clustered and not evenly distributed. T4 at 55:23–58:6. It cannot be assumed that, when districts are drawn without consideration of race, minority voters will be evenly distributed among districts among these eight districts. T4 at 55:23–58:6, 60:22–61:5, 76:18–77:17.

153.     In fact, about 70 percent of voting-age Hispanics in Dr. Abott's eight-district region live in one county (Miami-Dade County). T4 at 60:2–12.

154.     Accordingly, Dr. Abott concedes that there is no reason to think that these eight districts should have the same or even similar HVAPs. T2 at 186:5–12. Dr. Abott concedes it is unsurprising that districts based principally in Miami-Dade County have higher HVAPs than districts based principally in other counties, T2 at 187:1–6, and that there is no reason to think a district drawn in Lee County would have the same HVAP as one drawn in Miami-Dade County, T2 at 186:13–16.

155.     Dr. Abott could not say whether it is even possible to draw these eight districts with similar HVAPs, T2 at 187:7–12, nor does she think a map-drawer should try, T2 at 187:13–16.

156.     Dr. Abott concedes that the same eight districts in Dr. McCartan's maps also display variations in HVAP—and in fact greater variations than in the enacted map. T2 at 187:17–24.

**157.     Dr. Abott opines that the boundary between Districts 24 and 26 exhibits a "stark" racial divide. T2 at 152:13–25.**

158.     Dr. Abott did not analyze whether the boundary between Districts 24 and 26 tracks municipal boundaries and weaves between municipalities, avoiding municipal splits. T2 at 197:2–7. Dr. Abott mistakenly believed that there are no municipalities around this district boundary. T2 at 197:2–7.

159.     Dr. Abott did not analyze the extent to which the boundary between Districts 24 and 26 utilizes state roads. T2 at 197:8–10. As explained above, it utilizes both municipal and geographical boundaries extensively.

**160.     Dr. Abott opines that, near the boundary between Districts 19 and 26, certain high concentrations of Hispanic voters are included in District 26, while certain areas of lesser Hispanic concentration are included in District 19. T2 at 154:5–18.**

161.     Dr. Trende offered contrary evidence. He showed that, along the boundary between these districts, some areas of high Hispanic concentration were excluded from District 26, while some areas of low Hispanic concentration were included in District 26. T4 at 73:20–74:24; D. Exs. 63, 64.

162.     Dr. Trende demonstrated that the boundary between Districts 19 and 26 is not a clean demarcation of Collier County's racial contours. T4 at 73:20–74:24; D. Exs. 63, 64.

**163.     Dr. Abott performed an "adjacency" analysis, which compares the HVAPs of areas included in District 26 to the HVAPs of adjacent areas excluded from District 26 (whether portions of counties, municipalities, Census-designated places (CDPs), or voting-tabulation districts (VTDs)). T2 at 152:3–7, 153:1–15, 155:2–157:18, 158:19–160:25, 161:9–163:21.**

164.     In all of her analysis of adjacent areas, Dr. Abott admittedly did not examine any alternative, race-neutral explanations for why the district boundary runs between the included and excluded areas. T2 at 203:18–23.

165.     Dr. Abott did not consider, for example, whether the district boundary runs between the included and excluded areas because it follows a municipal boundary, major roadway, waterway, or county boundary. T2 at 203:24–204:22.

166.     Dr. Abott did not produce maps that would reveal where these included and excluded areas are and whether political or geographical boundaries run between them. T2 at 204:23–205:2.

167.     Dr. Abott served as an expert witness in another redistricting case—*GRACE, Inc. v. City of Miami*, No. 1:22-cv-24066 (S.D. Fla.)—where she opined that a city commission moved certain areas between districts for racial reasons. T2 at 200:19–25. There, Dr. Abott considered and attempted to rule out alternative, race-neutral explanations for the boundary changes she analyzed. T2 at 201:1–9.

168.     Here, she did not. Dr. Abott explained that, in *GRACE*, she was explicitly instructed to consider alternative explanations, while she received no similar instruction here. T2 at 201:10–15.

169.     Dr. Abott admits that, if the Legislature's map-drawers were unaware of the precise HVAPs along the district boundaries, then they would have been unable to selectively include higher Hispanic concentrations and exclude lower Hispanic concentrations, as she hypothesizes. T2 at

203:11–17. The selective inclusion of higher HVAPs and exclusion of lower HVAPs assumes that the Legislature's map-drawers were aware of the HVAPs along the district boundaries. T2 at 203:11–17.

**170.     Dr. Abott observes that, within Miami-Dade County, the HVAPs of Districts 26, 24, 27, and 28 are 88.9, 39.3, 74.2, and 80.2 percent, respectively. T2 at 151:4–24. She infers that the map-drawer might have kept Miami-Dade County's highest Hispanic concentrations for District 26. T2 at 152:3–7.**

171.     In five of Dr. McCartan's six congressional maps, the portion of Miami-Dade County in District 26 has an even higher HVAP: 89.5 percent in Map B1 and 91.1 percent in Maps A, C1, C2, and D. J. Ex. 17 at 2; J. Ex. 18 at 2; J. Ex. 20 at 2; J. Ex. 21 at 2; J. Ex. 22 at 2.

172.     Dr. Abott conceded that, in all six of Dr. McCartan's congressional maps, the Miami-Dade County portion of District 26 has a higher HVAP than the rest of the county. T2 at 197:15–23.

173.     The north-central portion of Miami-Dade County contains municipalities with exceptionally high concentrations of Hispanic voters: 96.1 percent in Hialeah, 96.5 percent in Hialeah Gardens, and 96.5 percent in Medley. D. Ex. 205 at RFAs 36–38; D. Ex. 25.

174.     Enacted Districts 26, 27, and 28 contain a combined 1,375,103 voting-age Hispanics. In Dr. McCartan's maps, these three districts contain between 1,364,507 and 1,392,056 voting-age Hispanics, without crossing into Collier County. D. Ex. 206 at RFAs 54–60.

175.     Given that it was possible to find the same number of voting-age Hispanics in Miami-Dade County without crossing into Collier County, Dr. Abott cannot explain why the Legislature extended District 26 into Collier County. T2 at 192:13–193:2.

176.     Dr. Abott was unable to say whether the Legislature's efforts to protect the voting ability of black voters in District 24 might be at least one reason why District 24 has a lower HVAP than its surrounding districts, T2 at 196:11–15, but she acknowledged that, if a district (like District 24) has a higher black voting-age population, then it will likely have a lower HVAP, T2 at 196:7–10.

177.     Dr. Abott acknowledged that the Florida Constitution protects the voting ability of black voters in District 24, that these legal protections are a constraint on District 24's overall composition, and that the Legislature was required to draw District 24 so that its composition complied with Florida Constitution. T2 at 195:19–196:6.

**178.     Dr. Abott observes that the HVAP of District 26's portion of Collier County is 31.8 percent, while the HVAP of the remainder of Collier County (Districts 18 and 19 combined) is 13.7 percent. T2 at 153:1–15.**

179.    But Dr. Abott conceded that the HVAP of District 18's portion of Collier County is 84.2 percent. T2 at 194:21–25; D. Ex. 205 at RFAs 33–35. When she combined District 18's and District 19's portions of Collier County, Dr. Abott masked District 18's high HVAP. T4 at 70:12–25.

180.    Dr. Abott conceded that it would have been possible for the Legislature to place District 18's portion of Collier County—with its 84.2-percent HVAP—into District 26. T2 at 195:1–5.

181.    Dr. Abott also recognized that Collier County's predominantly white, non-Hispanic population lives along the west coast—while the Hispanic population is clustered in central and eastern Collier County—and that any district that moves west from Miami-Dade County into Collier County will reach the west-coast population last. T2 at 195:6–13; T4 at 69:11–19.

182.    Dr. Trende testified that Dr. Abott has not established a baseline to show whether the enacted map's split of Collier County—and the Hispanic concentration in each district—would be unexpected in a map drawn without regard to race. T4 at 67:15–68:5.

183.    Miami-Dade County's population is 68.7 percent Hispanic (1,856,938 of 2,701,767 people), while Collier County's population is only 27.2 percent Hispanic (102,249 of 375,752 people). D. Ex. 37; D. Ex. 228 at 2; D. Ex. 235 at 2. Dr. Abott acknowledged that the addition of Collier County population to District 26 did not increase, but decreased the district's HVAP. T2 at 198:11–21.

**184.    Dr. Abott observes that District 26 splits one municipality (Miami) and four CDPs (Immokalee CDP, Brownsville CDP, Gladeview CDP, and West Little River CDP) and that, except in one instance (Immokalee CDP), the portion included in District 26 has a higher HVAP than the portion excluded from District 26. T2 at 155:2–157:18.**

185.    Dr. Trende noted that a sample of five observations is too small to furnish conclusions to a reasonable degree of certainty. T4 at 78:13–79:1.

186.    The portion of Immokalee CDP that was excluded from District 26 has an HVAP of 84.6 percent. T2 at 200:2–6. Dr. Abott could not explain why the Legislature would have foregone the opportunity to include this high concentration of Hispanic voters in District 26. T2 at 200:7–13.

187.    Dr. Trende testified that, if the Legislature sought to segregate voters by race, then it failed badly when it split Immokalee CDP and excluded an area with an 84.6-percent HVAP from District 26. T4 at 71:1–15; D. Ex. 55. Dr. Trende also noted that the split of Immokalee CDP follows major roadways. T4 at 72:2–11; D. Ex. 57.

188.    Dr. Abott did not consider any possible explanations (besides racial motivations for District 26) for the way that Brownsville CDP, Gladeview CDP, and West Little River CDP were split.

T2 at 200:14–18. These CDPs are all split between Districts 24 and 26, and Dr. Abott recognizes that the Florida Constitution protects the voting ability of black voters in District 24. T2 at 201:21–202:3.

189.     Dr. Trende testified that one would expect District 24 to have a lower HVAP than District 26. T4 at 79:21–80:3. Black voters cluster within that area of Miami-Dade County, and the Florida Constitution protects the voting ability of black voters in District 24. T4 at 79:21–80:3.

**190.     Dr. Abott compared the HVAPs of VTDs (or portions of VTDs) included in District 26 to the HVAPs of VTDs (or portions of VTDs) excluded from District 26. T2 at 158:19–160:25, 161:9–163:21.**

191.     Dr. Abott's analysis of VTDs assumes that, in a map drawn without regard to race, there would be an equal 50/50 chance that higher Hispanic concentrations would be placed inside or outside a district—in other words, that the areas on one side of a district boundary would have a higher HVAP half the time and a lower HVAP half the time. T2 at 202:13–202:4.

192.     Dr. Trende explained that, because minorities cluster, Dr. Abott never established her assumption that the effects she observed are unexpected in districts drawn without regard to race. T4 at 83:24–18. Dr. Abott did not establish that, in a race-neutral map, a VTD with a higher HVAP would have an even chance of being included in or excluded from a district. T4 at 84:22–85:3.

193.     Clusters of minority populations sometimes align with county boundaries, municipal boundaries, and major roadways. T4 at 97:11–20. A map-drawer's decision to follow county boundaries, municipal boundaries, and major roadways can therefore create uneven racial distributions among districts, but for race-neutral reasons. T4 at 97:21–98:9. For example, the Hispanic concentration is much higher just south of the boundary between Broward and Miami-Dade Counties than just north of it. T4 at 97:21–98:9; D. Ex. 49.

**194.     Dr. Abott observes that District 26 splits 13 VTDs and that, in most cases, the included portion has a higher HVAP than the excluded portion. T2 at 158:19–160:25.**

195.     Dr. Abott did not examine any alternative, race-neutral explanations for why the district boundary splits these VTDs. T2 at 205:3–18.

196.     Dr. Abott agreed that, according to her own data, District 26 excludes VTD fragments with HVAPs as high as 84.6, 67.1, 53.4, 48.7, 47.8, and 40.4 percent and includes VTD fragments with HVAPs as low as 9.7, 11.6, 12.7, 23.3, and 33.6 percent. T2 at 205:20–206:25; P. Ex. 170; D. Ex. 105. Dr. Abott did not examine why the Legislature would have placed VTD fragments with high HVAPs just outside District 26 and VTD fragments with low HVAPs just inside District 26. T2 at 207:1–23.

197.     Five of the 13 VTDs that District 26 splits are shared with District 24. T2 at 207:24–208:4. Dr. Abott did not analyze whether the Legislature's efforts to protect the voting ability of black voters in District 24 affected the way those VTDs were split. T2 at 208:5–8.

198.     Dr. Trende testified that District 24's protected status is an alternative explanation for the differential that Dr. Abott observed and that one would expect to see a higher black voting-age population in a district drawn to protect the voting ability of black voters. T4 at 80:25–81:16.

199.     Dr. Abott did not factor into her analysis the size of the differences in HVAP between included and excluded areas. T2 at 210:3–7. In six of the 13 split VTDs, the difference in HVAP between the included and excluded portions was less than five percentage points. T2 at 208:9–209:9; P. Ex. 170. In two more, the difference was less than ten percentage points. T2 at 209:10–13; P. Ex. 170.

200.     For example, the included portion of Collier 002 has an HVAP of 12.7 percent, while the excluded portion's HVAP is 6.3 percent. T2 at 209:14–19; P. Ex. 170. The included portion of Collier 079 has an HVAP of 11.6 percent, while the excluded portion's HVAP is 7.7 percent. T2 at 209:20–24; P. Ex. 170. The included portion of Collier 071 has an HVAP of 67.5 percent, while the excluded portion's HVAP is 67.1 percent. T2 at 209:25–210:2; P. Ex. 170.

201.     Dr. Trende testified that, from a social-science perspective, these small differentials are not meaningful, since a map-drawer will not be attentive to such minor differences. T4 at 82:25–83:11.

**202.     Dr. Abott observes that, when comparing adjacent VTDs on either side of District 26's boundary—one inside and one outside District 26—the included VTD usually has a higher HVAP than the excluded VTD. T2 at 161:9–163:21.**

203.     Dr. Abott did not examine any alternative, race-neutral explanations for why the district boundary runs between the included and excluded VTDs. T2 at 203:18–23.

204.     The included and excluded VTDs often straddle a county boundary. T2 at 211:3–19; P. Ex. 171a. Dr. Trende testified that, rather than race, a desire to utilize county boundaries might explain why these VTDs were included in or excluded from District 26. T4 at 83:24–84:9.

205.     In 19 of 43 pairings in Dr. Abott's table, the excluded VTD is located in a county that District 26 does not even enter (Lee, Broward, or Hendry County). T2 at 211:3–19; P. Ex. 171a. Dr. Abott did not analyze whether the Legislature's attempts to adhere to county boundaries might explain why the district boundary ran between the included and excluded VTDs. T2 at 211:20–23.

206.     In another 17 of 43 pairings in Dr. Abott's table, the excluded VTD is in District 24—a district in which the voting ability of black voters is protected. P. Ex. 171a; T2 at 195:19–22.

207.    Of the 43 pairings in Dr. Abott's table, only seven do not involve an excluded VTD that is either in another county or in District 24. P. Ex. 171a. In five of these seven pairings, the included VTD's HVAP is lower than the excluded VTD's HVAP. P. Ex. 171a.

208.    Dr. Abott agreed that, according to her own data, District 26 excludes VTDs with HVAPs as high as 70.8, 70.1, 69.5, 68.5, 66.4, 65.1, 58.8, 58.0, 57.1, and 56.3 percent and includes VTDs with HVAPs as low as 3.1, 4.1, 4.8, 5.1, 5.3, 10.0, 10.7, 13.6, 17.6, and 26.7 percent. T2 at 213:3–214:4; P. Ex. 171a; D. Ex. 106. Dr. Abott did not examine why the Legislature would have placed VTDs with high HVAPs just outside and VTDs with low HVAPs just inside District 26. T2 at 214:5–11.

209.    In Dr. Abott's table, an included VTD is often listed multiple times, even though the Legislature made the decision to include the VTD in District 26 only once. T2 at 211:24–213:2; P. Ex. 171a. Seven VTDs (Collier 120, 057, and 122 and Miami-Dade 248.0, 246, and 314) appear twice among the 43 pairings in Dr. Abott's table. T2 at 212:3–22; P. Ex. 171a. Miami-Dade 232, 201, and 365 each appear three times, and Miami-Dade 369.0 appears four times. T2 at 212:15–20; P. Ex. 171a.

**E.      Dr. McCartan's Congressional Maps.**

210.    In five of Dr. McCartan's six congressional maps, District 26 has an HVAP around 90 percent—much higher than in the enacted map (73.2 percent). T1 at 231:23–232:4; J. Ex. 3 at 2; J. Ex. 17 at 2; J. Ex. 18 at 2; J. Ex. 19 at 2; J. Ex. 20 at 2; J. Ex. 21 at 2; J. Ex. 22 at 2.

211.    These 90-percent HVAP districts contain more than 110,000 additional voting-age Hispanics above and beyond the number in enacted District 26. T1 at 232:14–18. In the enacted map, District 26 contains 456,512 voting-age Hispanics, while in Dr. McCartan's Maps A, B1, C1, C2, and D, District 26 contains either 565,289 or 574,334 voting-age Hispanics. D. Ex. 206 at RFAs 47–53.

212.    Accordingly, the South Florida districts in Dr. McCartan's maps have a greater range of HVAPs. T2 at 168:2–169:16. Rather than enhance racial balance, Dr. McCartan's maps create greater racial imbalance among districts. T2 at 168:2–169:16.

213.    In the enacted map, the HVAPs of Districts 26, 27, and 28 range from 73.2 percent to 74.2 percent—a spread of 1 percentage point. J. Ex. 3 at 2. Dr. McCartan's maps reveal far greater racial imbalance: with the exception of Map B2, the spread varies from 25.5 percent to 26.1 percent. J. Ex. 3 at 2; J. Ex. 17 at 2; J. Ex. 18 at 2; J. Ex. 19 at 2; J. Ex. 20 at 2; J. Ex. 21 at 2; J. Ex. 22 at 2.

214.    When considering South Florida more broadly (Districts 17 through 28), none of Dr. McCartan's six maps creates greater racial balance, and five create significantly greater racial imbalance. J. Ex. 3 at 2; J. Ex. 17 at 2; J. Ex. 18 at 2; J. Ex. 19 at 2; J. Ex. 20 at 2; J. Ex. 21 at 2; J. Ex. 22 at 2.

23

215.     Dr. Trende testified that a 90-percent minority population is often a sign of—not a cure for—a racial gerrymander. T4 at 45:14–46:2, 55:16–20.

216.     At an early stage of his work on this case, Dr. McCartan drew a map that included a Miami-Dade-to-Collier district. T1 at 209:7–10. Plaintiffs' counsel then discussed the Everglades with Dr. McCartan and provided him with information about the geography of the Everglades. T1 at 209:17–22. It was only when counsel shared this information that he (Dr. McCartan) came to conclude that a district that crosses the Everglades violates Florida's tier-two standards. T1 at 209:23–210:7.

217.     Dr. McCartan did not produce the map he drew with a Miami-Dade-to-Collier district, nor did he present it at trial. T1 at 209:11–16.

218.     Still, Dr. McCartan is not especially familiar with South Florida's geography or the geographical extent of the Everglades and cannot identify the Everglades' boundaries. T1 at 211:3–10.

219.     In Maps B1 and B2, Dr. McCartan drew a district (District 21) that extends west to Port Charlotte near Florida's west coast. T1 at 227:10–15; J. Ex. 18 at 1; J. Ex. 19 at 1. The central part of the district is sparsely populated; the Kissimmee River flows south through the middle of the district, and the Kissimmee Basin contains conservation lands with little or no population. T1 at 227:25–228:9. But Plaintiffs' counsel did not provide Dr. McCartan with information about the geography of the Kissimmee Basin, as they did with respect to the Everglades. T1 at 228:10–13.

220.     Counsel instructed Dr. McCartan, when drawing his maps, to "alter surrounding districts only to the extent necessary" to follow counsel's instructions and comply with the Florida Constitution. D. Ex. 126 at 1 ¶ 5; T1 at 212:6–14.

221.     Dr. McCartan's six congressional maps alter 13, 15, 15, 18, 18, and 20 districts. T1 at 212:23–213:13; D. Exs. 31–36. In all six maps, the altered districts stretch at least to Polk County; in one, they stretch to St. Johns County. D. Exs. 31–36; D. Ex. 205 at RFAs 27–32.

222.     Although Plaintiffs challenge only one congressional district, each of Dr. McCartan's maps moves between 3,430,408 and 5,465,222 people out of their current districts. D. Exs. 78, 79; T1 at 46:15–49:9. Dr. McCartan moves more people out of some unchallenged districts than out of District 26. D. Ex. 79; T1 at 48:10–21.

223.     Nevertheless, Dr. McCartan believes that he complied with counsel's instruction to alter surrounding districts only to the extent necessary and that it would have been impossible to alter surrounding districts to a lesser extent consistent with his instructions. T1 at 212:15–17, 213:14–22.

224.     Dr. McCartan drew two districts (District 17 in Map C2 and District 18 in Map D) that he considers compact and that, like enacted District 26, have stairstep shapes, using straight lines and right angles to follow county boundaries. T1 at 230:8–231:5; J. Ex. 3 at 1; J. Ex. 21 at 1; J. Ex. 22 at 1.

225.     District 26 has a better boundary score in the enacted map than in five of Dr. McCartan's six congressional maps. T1 at 217:7–10; J. Ex. 3 at 18; J. Ex. 17 at 9; J. Ex. 18 at 9; J. Ex. 19 at 9; J. Ex. 20 at 9; J. Ex. 21 at 9; J. Ex. 22 at 9.

226.     District 26 follows county boundaries to a much greater extent in the enacted map (54 percent of its perimeter) than in Dr. McCartan's maps (between 7 and 16 percent). T1 at 217:11–218:15; J. Ex. 3 at 18; J. Ex. 17 at 9; J. Ex. 18 at 9; J. Ex. 19 at 9; J. Ex. 20 at 9; J. Ex. 21 at 9; J. Ex. 22 at 9.

227.     Each of Dr. McCartan's congressional maps splits more counties than the enacted map does. D. Ex. 48; T4 at 53:19–54:13. Even if Dr. McCartan's unpopulated split of Hendry County is not counted, only one of Dr. McCartan's congressional maps splits the same number of counties as the enacted map does, while the others still split more. D. Ex. 48; T1 at 219:4–17; T4 at 53:19–54:13.

228.     Each of Dr. McCartan's congressional maps splits Sarasota County, which the enacted map keeps whole. T1 at 219:18–21. Dr. McCartan admits that this county split is a consequence of his revisions to District 26. T1 at 220:1–5. In fact, Dr. McCartan admits that all county splits that appear in his map but not in the enacted map result from his redrawing of District 26. T1 at 220:6–10.

**F.     Dr. McCartan's Flawed Configurations of Congressional Districts 20 and 24.**

229.     Plaintiffs admit that the Non-Diminishment Clause protects Districts 20 and 24. ECF No. 58 at 21 n.5

230.     Dr. Walker opined that, in Dr. McCartan's configurations of Districts 20 and 24, black voters would be able to elect their preferred candidates. T2 at 45:20–46:3.

231.     However, Dr. Walker did not assess whether the minority group's voting ability is nevertheless diminished—even if the district still performs for minority voters. T2 at 108:7–11. Dr. Walker's answer is binary: the district performs or does not perform. T2 at 108:12–14, 118:14–17.

232.     Dr. Walker understands "diminish" to mean "reduce" or "become less than what it was before." T2 at 107:25–108:2. She did not evaluate the degree to which the minority group's voting ability became less than what it was before—only whether the district still performs. T2 at 108:3–6.

233.     Although counsel's instruction letter to Dr. Walker quoted a paragraph in which the Florida Supreme Court discussed the Non-Diminishment Clause, Dr. Walker only skimmed that excerpt before she analyzed Dr. McCartan's Districts 20 and 24. T2 at 105:23–106:6; D. Ex. 157 at 2.

234.     Apart from the paragraph that she only skimmed, Dr. Walker did not review any Florida court decisions to understand how the Florida Supreme Court measures diminishment in voting ability. T2 at 106:7–15. The Non-Diminishment Clause prohibits "*any diminishment*—not merely . . . a *total elimination* of the ability to elect." P. Ex. 30 at 21–24 (House brief) (emphasis in original).

235.     In fact, Dr. Walker is unaware of the legal requirement that prohibits diminishment and is not specifically aware that the Florida Constitution protects the ability of minorities to elect their preferred candidates. T2 at 106:16–24. Dr. Walker expressly did not render an opinion on the legal question whether Districts 20 and 24 comply with the Non-Diminishment Clause. T2 at 106:25–107:6.

236.     In Maps C1, C2, and D, Dr. McCartan moved District 20 out of Palm Beach County and wholly into Broward County. J. Ex. 20 at 1; J. Ex. 21 at 1; J. Ex. 22 at 1. In those maps, District 20's black voting-age population declines by 9.9 percentage points, from 52.37 to 42.44 percent, compared to Benchmark District 20. T2 at 109:1–110:18; D. Ex. 163.

237.     The percentage of registered voters who are black declines on average by 13.5 percentage points, from 49.4 to 35.9 percent. T2 at 111:2–8; D. Ex. 163.

238.     The percentage of registered Democrats who are black declines on average by 14.0 percentage points, from 64.6 to 50.6 percent. T2 at 111:9–12; D. Ex. 163.

239.     The percentage of turned-out general-election voters who are black declines on average by 14.9 percentage points, from 52.3 to 37.4 percent. T2 at 111:13–15; D. Ex. 163.

240.     Blacks represent on average only 51.95 percent of registered Democrats who turn out to vote at general elections, compared to 66.94 percent in the benchmark district—a decline of 14.99 percentage points. T2 at 111:16–22; D. Ex. 163.

241.     Blacks represent on average only 42.76 percent of registered voters who turn out at primary elections, compared to 60.54 percent in the benchmark district—a decline of 17.8 percentage points. T2 at 111:23–112:2; D. Ex. 163.

242.     Blacks represent on average only 53.49 percent of registered Democrats who turn out in primary elections, compared to 71.04 percent in the benchmark district—a decline of 17.6 percentage points. T2 at 112:3–7; D. Ex. 163.

243.     Dr. Walker agrees that, in District 20 in Maps C1, C2, and D, there are "notable drops" in black voter-registration and turnout compared to the benchmark district. T2 at 112:8–11.

244.     The instruction letter that Dr. Walker received from counsel contained a paragraph in which the Florida Supreme Court stated that "a slight change in the percentage of a minority group's

population in a given district does not necessarily have a cognizable effect on a minority group's ability to elect its preferred candidate of choice." T2 at 112:12–23; D. Ex. 157 at 2.

245.  Dr. Walker agrees that the 9.9-percentage point decrease in black voting-age population in District 20 in Maps C1, C2, and D is more than a "slight change." T2 at 112:24–113:3.

246.  In Dr. McCartan's Maps B1 and B2, District 24 decreases the black voting-age population by 6.95 and 7.29 percentage points, respectively. T2 at 116:7–117:7; D. Ex. 164.

247.  The percentage of registered voters who are black declines on average by 19.99 and 11.4 percentage points in District 24 in Maps B1 and B2, respectively. T2 at 117:8–11; D. Ex. 164.

248.  The percentage of registered Democrats who are black declines on average by 9.25 and 9.67 percentage points in District 24 in Maps B1 and B2, respectively. T2 at 117:12–15; D. Ex. 164.

249.  The percentage of turned-out general-election voters who are black declines on average by 10.86 and 11.29 percentage points in District 24 in Maps B1 and B2, respectively. T2 at 117:16–19; D. Ex. 164.

250.  The percentage of turned-out Democrats who are black declines on average by 8.43 and 8.89 percentage points in District 24 in Maps B1 and B2, respectively. T2 at 118:2–5; D. Ex. 164.

251.  The percentage of turned-out primary-election voters who are black declines on average by 10.22 and 10.65 percentage points in District 24 in Maps B1 and B2, respectively. T2 at 118:6–9; D. Ex. 164.

252.  The percentage of turned-out Democratic primary-election voters who are black declines on average by 8.1 and 8.58 percentage points in District 24 in Maps B1 and B2, respectively. T2 at 118:10–13; D. Ex. 164.

253.  In the instruction letter that counsel provided to Dr. Walker, counsel disclosed that Districts 20 and 24 in Dr. McCartan's maps had been drawn by another expert retained by the same attorneys who had retained her (Dr. Walker). T2 at 101:14–102:17; D. Ex. 157 at 1.

254.  Dr. Walker serves as a journal reviewer for academic journals, nearly all of which engage in a double-blind review process—*i.e.*, the reviewer does not know the author's name, and the author does not know the reviewer's name. T2 at 102:18–103:7. This review process helps to remove conscious or unconscious bias and facilitates an evaluation of the article on its merits. T2 at 103:8–12.

255.  Dr. Walker agrees that there could be similar biases when an expert is asked to review a redistricting map and is informed that the map was drawn by another expert retained by the same attorneys. T2 at 103:13–17.

## VI.    DR. ABOTT'S OPINIONS.

256.    Dr. Abott did not conclude that race predominated in drawing the challenged districts. T2 at 177:20–23, 181:5–8. She admits that her analysis does not compel the conclusion that race predominated. T2 at 181:25–182:2.

257.    At most, she concluded that the evidence is "consistent with the idea" that race may have predominated, which means only that racial predominance cannot be ruled out. T2 at 181:9–15.

258.    Dr. Abott cannot make a stronger claim because it is very difficult, from observational data, to make claims about causation. T2 at 181:16–19. She agrees that correlation does not prove causation. T2 at 181:20–21.

259.    In Dr. Abott's view, her analysis strongly suggests that race was one factor in drawing the challenged districts. T2 at 182:3–5. But Dr. Abott is not even opining that race was in fact one factor—only that the evidence strongly suggests it was. T2 at 182:6–9.

260.    Dr. Abott testified that her analysis is also consistent with the idea that politics predominated in the drawing of the challenged districts, but Dr. Abott did not present that analysis at trial. T2 at 182:12–21. The fact that Dr. Abott's analysis is consistent with the idea that politics predominated, when no party contends that politics had any role in shaping the challenged districts, highlights the weakness and unreliability of Dr. Abott's analysis.

261.    Dr. Abott concluded that race was likely at least one explanation for the shape and boundaries of the challenged districts, but conceded that there may very well be other explanations, in addition to race, for the shape and boundaries of the challenged districts. T2 at 183:7–13.

262.    Dr. Abott was not asked to consider the effect of race-neutral considerations on the challenged districts and therefore was unable to opine on the relative importance of racial versus non-racial considerations in drawing the districts. T2 at 184:20–185:9. Thus, even if Dr. Abott's analysis proves that race was considered—a point that is undisputed—it does not show racial predominance.

## VII.    RELIANCE ON DR. MCCARTAN'S MAPS AS COMPARATORS.

263.    Dr. Abott has no opinion as to whether it is appropriate to rely on such a small sample of maps as Dr. McCartan's six illustrative congressional maps to draw inferences about what was or was not considered in drawing the enacted map. T2 at 193:21–25. Dr. Abott considered that question outside her scope and relied on Dr. McCartan's maps because counsel instructed her to. T2 at 194:1–5.

264.    Dr. Abott concedes that, in a more formal statistical analysis, one would want to have a larger sample of maps. T2 at 194:6–9.

265.     Dr. McCartan agreed that six or seven maps drawn by an individual map-drawer can show what is possible, but not what features are typical or atypical in the universe of possibilities. T1 at 245:1–8. Dr. Trende agreed that seven maps drawn by an individual map-drawer are not a usable baseline from which one may draw inferences about how race-neutral districts would look. T4 at 61:6–25.

266.     Because a human map-drawer does not draw randomly, a human map-drawer cannot take the place of a computer algorithm when determining what district features are typical or atypical. T1 at 245:9–12. Even a human map-drawer who draws 5,000 maps cannot reveal what district features are typical or atypical. T1 at 245:13–15. In fact, no number of human map-drawers can reveal what district features are typical or atypical, unless they draw all possible redistricting maps. T1 at 245:16–19.

267.     Dr. McCartan admits that each of his maps reflects his own choices, decisions, and preferences, within the framework of Florida's standards, as he understands them. T1 at 245:23–246:3.

268.     To determine whether a district feature is atypical and whether a factor (such as race) influenced the drawing of districts, one must either identify all possible district maps or use statistics and sampling (like a public-opinion poll) to guard against systemic bias. T1 at 234:18–235:3, 244:4–25.

269.     Computer algorithms can randomly generate large numbers of maps. T1 at 233:3–6.

270.     As a student, Dr. McCartan helped to found the ALARM Project, a research group that studies redistricting simulations. T1 at 233:9–14. Dr. McCartan developed the algorithm that the ALARM Project used to generate 5,000 simulated maps of Florida congressional districts. T1 at 233:18–234:2, 244:9–12. Dr. McCartan is still affiliated with the ALARM Project. T1 at 233:15–17.

271.     The ALARM Project generates 5,000 maps in a single redistricting simulation because 5,000 randomly generated maps are usually sufficient to afford statistical confidence in the differences detectable between the computer-generated maps and the map under analysis. T1 at 244:13–17.

272.     As more maps are generated, the more confidence the simulation affords statistically that the factor under analysis (such as race) affected the enacted map. T1 at 244:18–21. To make statistical claims with confidence about congressional or State House districts, one should generate at least 500 to 1,000 simulated maps. T1 at 234:13–17.

273.     For purposes of this case, despite his expertise with redistricting simulations, Dr. McCartan did not attempt to design an algorithm that would generate maps compliant with Florida's redistricting standards. T1 at 239:3–6.

274.     In generating redistricting maps, a computer simulation must follow the same rules and criteria that applied to the enacted map; otherwise, the simulation does not provide an apples-to-apples comparison. T1 at 195:5–196:1.

275.     Dr. McCartan claims that the Florida congressional maps produced by the ALARM Project's algorithm were not compliant with Florida's redistricting standards, T1 at 196:6–21, even though he stated the exact opposite in an expert report, T1 at 236:3–237:15.

## VIII.   DR. MCCARTAN'S OPINIONS.

276.     Dr. McCartan did not opine that race was the predominant factor in drawing the challenged districts or that the challenged districts' compactness or treatment of counties, municipalities, or geographical boundaries indicates a consideration of race. T1 at 251:23–252:15.

277.     Dr. McCartan recognized that, to determine whether race predominated, one must know more than simply whether racial information impacted the way a district looks. T1 at 242:2–6.

278.     Dr. McCartan recognized that there are many different ways to draw districts and that redistricting is an intensely local and geographical process. T1 at 204:4–9.

279.     Dr. McCartan agrees that, in general, redistricting criteria are not independent of one another and that the map-drawer determines how trade-offs will be made. T1 at 204:13–16. Dr. McCartan agrees that, under Florida's redistricting standards, the map-drawer must sometimes balance tier-two standards and, in the process, make trade-offs between those standards. T1 at 204:17–20.

280.     Dr. McCartan agrees that sometimes there might be tension between the compactness requirement and the requirement to utilize political and geographical boundaries where feasible. T1 at 205:1–4. For example, in his congressional maps, to make districts more compact, Dr. McCartan split some municipalities in Polk County that the Legislature had kept whole. T1 at 204:21–25.

281.     Dr. McCartan agrees that, in Florida, the test for compactness is primarily a visual measure and that mathematical scores are secondary to that visual examination. T1 at 205:5–10.

282.     A number of districts that Dr. McCartan drew and considers to be compact—including Districts 21 and 25 in Map A and District 18 in Maps B1 and C1—have less regular shapes than the challenged districts. T1 at 221:20–221:3, 222:17–23, 226:2–23, 229:21–230:3; J. Ex. 17 at 1; J. Ex. 18 at 1; J. Ex. 20 at 1.

283.     Dr. McCartan agrees that each mathematical measure of compactness is sensitive to different geographical characteristics and might be sensitive in different ways to district features that might not be problematic under Florida's constitutional standards. T1 at 205:15–22.

284. Dr. McCartan explained that, because the Reock, Convex Hull, and Polsby-Popper measures each have advantages and disadvantages for measuring certain aspects of compactness, people tend to consult all three. T1 at 156:13–20. Mr. Poreda agreed that compactness scores are good tools, but only tools, and that no single compactness measure is a gold standard that deserves to be elevated above other compactness measures. T3 at 190:5–11.

285. Dr. McCartan intentionally created unpopulated splits—*i.e.*, splits of a county's or municipality's territory, but not of its population—to increase adherence to other tier-two standards, such as compactness. T1 at 185:4–11; T4 at 54:24–55:10. Although the Florida Supreme Court has excused unpopulated splits, the House attempted to avoid them. T3 at 152:5–13. The only unpopulated split the House created to improve compactness affected a portion of Hillsborough County that extends through Tampa Bay between Pinellas and Manatee Counties. T3 at 68:2–16.

## IX. THE LEGISLATIVE RECORD.

286. When members of the House or Senate referred to race during the redistricting process, they were invariably attempting to explain Florida's legal standards or how staff applied those legal standards in drawing districts. Notably absent from the legislative record are any normative statements in which proponents of the enacted maps advocated the consideration of race, argued for race-based map-drawing, or cited race as the reason for their votes in support of the enacted maps.

287. On February 1, 2022, Chair Leek answered a question about the State House map as follows: "So we can tell you generally that you need to get about 65% of Hispanics concentrated within an area for it to perform. Generally. There is no threshold and it is a district-by-district analysis that is ultimately determined based on the performance of that district." J. Ex. 75 at 62:21–63:7.

288. Chair Leek expressly stated that there is no fixed threshold and that a district-by-district analysis determines whether a district performs for Hispanic voters; his reference to 65 percent was phrased as a general observation—not as a directive or requirement. J. Ex. 75 at 62:21–63:7.

289. Mr. Poreda testified that the House did not target 65 percent. T3 at 92:16–25. He emphasized that 65 percent was not a hard-and-fast rule and that the district-specific functional analysis determines whether the voting ability of Hispanic voters is diminished. T3 at 193:4–194:1.

290. Mr. Poreda explained that, because the Hispanic share of a district's registered voters and turned-out electorate is often less than the Hispanic share of the district's voting-age population, districts often do not perform for Hispanic voters absent a Hispanic supermajority. T3 at 193:4–194:1.

291. Chair Leek also stated that, "when it's a protected district, we focus much less on Tier Two." J. Ex. 75 at 68:13–23. This statement comes from a discussion of unchallenged House District

88, an unusually shaped district in north Palm Beach County. J. Ex. 75 at 68:13–23; D. Ex. 2. Similarly, Chair Leek stated that "we get to compactness after Tier One." J. Ex. 75 at 47:8–22.

292.    Mr. Poreda interpreted these statements to refer to the "global nature of the standards where tier-one does trump tier two if there is a conflict." T3 at 216:7–19; *see* Fla. Const. art. III, §§ 20(b), 21(b). Mr. Poreda testified, however, that, when drawing districts, map-drawers do not necessarily start with tier one and then proceed to tier two. T3 at 216:7–19. Rather, drawing is a more organic process in which map-drawers attempt to implement both tiers where feasible. T3 at 216:7–19.

293.    Mr. Poreda emphasized that, in many protected districts other than District 88, race does not need to be a "front of mind issue" and that map-drawers can be respectful of tier-two considerations in conjunction with tier-one standards. T3 at 216:25–217:3. In fact, Mr. Poreda testified that, in drawing South Florida districts that historically performed for Hispanic voters, he did not "focus much less" on tier two or "get to" tier two "only after" he addressed tier one. T3 at 217:4–9.

294.    In committee, Representative Dotie Joseph asked Representative Tyler Sirois, Chair of the Congressional Redistricting Subcommittee, ECF No. 172 at 3, whether District 26 was "impacted" by its tier-one protected status, and Chair Sirois responded, "Yes." J. Ex. 77 at 38:10–16.

295.    The House does not dispute that race was one consideration in the drawing of the challenged districts, T3 at 217:22–24—only that race was the predominant consideration.

296.    Mr. Poreda's statement in committee that District 26's shape was "impacted" by tier-one considerations—or was "largely because" of or "primarily due" to tier one—referred collectively to four or five protected districts in the region. J. Ex. 77 at 38:17–44:18; T3 at 203:24–204:21.

297.    Mr. Poreda testified at trial that the protected status of four districts in Miami-Dade County and District 20 to the north impacted the shapes of all districts in the region. T3 at 203:24–204:21. This testimony is consistent with his testimony that districts rotated around District 20. T3 at 199:20–201:16.

298.    The legislative record is replete with explanations of the tier-two motivations behind House Districts 115, 118, and 119. Committee staff discussed the major roads and municipal boundaries that the challenged districts utilize and the municipalities they keep whole; the improvement in boundary scores, compactness scores, and the utilization of roadways and municipal boundaries relative to the benchmark; and the north-south nature of the population distribution and major roadways in Miami-Dade County, which contributed to a vertical orientation of districts. J. Ex. 69 at 38:21–39:2, 39:19–40:3; J. Ex. 73 at 23:17–24:20; J. Ex. 74 at 30:9–32:4; J. Ex. 75 at 20:23–23:9.

299.     That legislative record also discusses the race-neutral determinants of District 26's shape, including the utilization of major roadways and county boundaries, the preservation of municipalities, and District 26's strong boundary score. J. Ex. 68 at 23:15–21; J. Ex. 77 at 23:10–21, 39:17–44:18, 46:3–18, 48:17–49:9; J. Ex. 87 at 34:23–36:21.

## X.     REPRESENTATIVE DRISKELL'S TESTIMONY.

300.     Representative Driskell testified that race was a predominant factor in drawing protected districts. T3 at T3 at 21:21–25. But Representative Driskell, as a member of the opposition party who consistently voted against the enacted maps, was not personally involved in drawing the enacted maps. T3 at 36:10–15, 46:11–14, 49:12–15.

301.     Representative Driskell conceded that, apart from information that was shared publicly in committee meetings or legislative floor sessions, she has no personal knowledge of what motivated the particular design of any specific district. T3 at 50:16–21.

## XI.     DR. WALKER'S ANALYSIS OF HISPANIC COHESION.

### A.     Ecological-Inference Analysis.

302.     Dr. Walker opined that there is evidence of cohesion among Hispanic voters in Benchmark Congressional District 25 and Benchmark State House Districts 115, 118, and 119—the predecessors to the challenged districts—although she characterized the degree of cohesion as weak. T2 at 13:13–17; ECF No. 172 at 7 ¶ 43.

303.     Dr. Walker defined vote cohesion to mean the degree to which a minority group votes together as a group in favor of a candidate or political party over a series of elections. T2 at 14:1–8.

304.     Dr. Walker opined that cohesion falls along a spectrum and that there is no single threshold or fixed percentage that scholars agree represents cohesive voting. T2 at 15:4–18, 68:16–18.

305.     According to Dr. Walker, at the high end of the cohesion spectrum, 100 percent of the minority group votes for the same political party's candidate in 100 percent of elections. T2 at 15:4–18, 68:19–22. At the low end, a majority of the minority group votes for the same party's candidate in a majority of elections. T2 at 69:2–20. Between these endpoints are degrees of cohesion. T2 at 69:21–23.

306.     If cohesive voting is present among Hispanic voters in South Florida, then, in a two-party contest, Dr. Walker would expect, at a minimum, to see a majority of Hispanic voters vote to support the same political party's candidate across a majority of elections. T2 at 70:8–13.

307.     If the same political party's candidate receives more than 50 but less than 60 percent of the minority group's votes at a majority of elections, then the minority group is on the cohesion spectrum, although Dr. Walker would describe the degree of cohesion as weak. T2 at 70:14–20.

308.     If a minority group is evenly divided between two candidates, then the minority group is not cohesive. T2 at 15:4–18, 69:13–15.

309.     Dr. Walker observed that, to assess vote cohesion, political scientists employ a statistical analysis called ecological inference, which evaluates correlations between a precinct's minority concentration and its candidate vote shares. T2 at 14:9–15:3.

310.     Dr. Walker used a statistical computing package called eiCompare to conduct her ecological-inference analysis. T2 at 66:6–16. Dr. Walker prepared the data, and eiCompare generated estimates of vote share and the confidence bands that Dr. Walker then displayed. T2 at 66:14–67:3.

311.     eiCompare can perform different variations of ecological-inference analysis. T2 at 67:4–6. Dr. Walker chose two methods: the iterative EI method and the rows-by-columns method. T2 at 16:17–23, 67:7–9.

312.     Dr. Walker explained that she employed more than one method to validate the estimates derived from one method. T2 at 18:2–9.

313.     Dr. Walker explained that, in assessing vote cohesion, it is essential to evaluate multiple elections and not rely on a single election contest. T2 at 22:16–21, 68:4–7. Dr. Walker looks for consistency across elections to identify patterns in the data. T2 at 68:8–15.

314.     Dr. Walker evaluated how Hispanic voters in the benchmark districts voted in each statewide election from 2012 to 2020 and, to the extent the data were available, in each endogenous election from 2016 to 2020. T2 at 22:4–15.

315.     Dr. Walker treated a candidate as the "preferred candidate" of Hispanic voters if (i) both ecological-inference methods agreed that the candidate received majority support from Hispanic voters; and (ii) within an ecological-inference method, the confidence bands of the two competing candidates did not overlap. T2 at 67:14–21.

316.     To estimate the share of the Hispanic vote received by the preferred candidate, Dr. Walker reviewed the point estimate generated by the iterative EI method and the point estimate generated by the rows-by-columns method and, for each election, chose the lesser of the two estimates, which she calls the "more conservative" estimate. T2 at 28:8–29:15, 71:17–21.

317.     The lesser of the two estimates is the estimate that shows a lower vote share and therefore less cohesion. T2 at 72:3–8. If one method indicates that the preferred candidate received 58 percent of the Hispanic vote, and the other indicates that the preferred candidate received 64 percent of the Hispanic vote, then Dr. Walker would accept the 58-percent estimate. T2 at 71:22–72:2.

318.     Dr. Walker admits that she invariably selected the lesser of the two point estimates even though she has no way to know which of the two estimates is correct and has no reason to believe that the lesser estimate is more likely to be correct than the higher estimate. T2 at 72:9–21.

319.     Dr. Walker admits that, if she had use three or four methods of ecological inference instead of two, then she might have found a method that generated an even lower estimate of vote share. T2 at 73:2–5.

320.     Although she claimed that, when confronted with two different estimates, it is standard scholarly practice to accept the "more conservative" estimate, Dr. Walker could not cite any scholarly article or other authority to support that practice or to support the proposition that, in assessing vote cohesion, one should always accept the lower estimate of vote share. T2 at 73:6–74:8.

321.     Dr. Walker also admitted that, if the lesser estimate is the *more* conservative estimate of the successful candidate's vote share, then it is also the *less* conservative estimate of the unsuccessful candidate's vote share: if the successful candidate received fewer votes, then the unsuccessful candidate received more. T2 at 74:9–19.

322.     When she decided to use the lower point estimate, Dr. Walker knew that Plaintiffs hoped to demonstrate a lack of cohesion among Hispanic voters. T2 at 75:4–6. She has known this since she was first retained. T2 at 74:20–75:3.

323.     Dr. Walker did not opine that the 60- or 70-percent threshold of vote share has any legal significance or that any Florida court has ever treated these thresholds as legally significant. T2 at 88:15–22.

**B.     Hispanic Cohesion in the Challenged Districts.**

324.     Dr. Walker found that, in Benchmark District 115, Hispanic voters preferred the Republican candidate in 15 of 17 elections she analyzed and the Democratic candidate in 0 of 17 elections. T2 at 76:9–20; D. Ex. 160. In each of these 15 election contests, both methods of ecological inference agreed that Hispanic voters preferred the Republican candidate. T2 at 76:13–16.

325.     In Benchmark District 115, despite using the lesser estimate of vote share in each election, Dr. Walker found that the Republican candidate received at least 60 percent of the vote among Hispanic voters in 10 of 17 elections. T2 at 76:21–25; D. Ex. 160.

326.     Dr. Walker testified that Hispanic voters in Benchmark District 115 were cohesive, albeit, in her view, at the lower end of the cohesion spectrum. T2 at 77:14–19. Dr. Walker testified that Hispanic voters in Benchmark District 115 qualify as cohesive because the same political party's candidate received a majority of the Hispanic vote in a majority of elections. T2 at 78:5–25.

327.     Dr. Walker found that, in Benchmark District 118, Hispanic voters preferred the Republican candidate in 11 of 17 elections she analyzed and the Democratic candidate in 0 of 17 elections. T2 at 79:1–14; D. Ex. 160. In each of these 11 election contests, both methods of ecological inference agreed that Hispanic voters preferred the Republican candidate. T2 at 79:7–10.

328.     In Benchmark District 118, despite using the lesser estimate of vote share in each election, Dr. Walker found that the Republican candidate received at least 60 percent of the vote among Hispanic voters in 5 of 17 elections. T2 at 80:24–81:2; D. Ex. 160.

329.     Dr. Walker testified that Hispanic voters in Benchmark District 118 were cohesive, albeit, in her view, at the lower end of the cohesion spectrum. T2 at 79:15–80:13.

330.     Dr. Walker found that, in Benchmark District 119, Hispanic voters preferred the Republican candidate in 14 of 17 elections she analyzed and the Democratic candidate in 0 of 17 elections. T2 at 81:5–15; D. Ex. 160. In each of these 14 election contests, both methods of ecological inference agreed that Hispanic voters preferred the Republican candidate. T2 at 81:9–12.

331.     In Benchmark District 119, despite using the lesser estimate of vote share in each election, Dr. Walker found that the Republican candidate received at least 60 percent of the vote among Hispanic voters in 4 of 17 elections. T2 at 81:16–20; D. Ex. 160.

332.     Dr. Walker testified that she found evidence of Hispanic cohesion in Benchmark District 119, although she characterizes that cohesion as weak. T2 at 82:9–11.

333.     Dr. Walker found that, in Benchmark Congressional District 25, Hispanic voters preferred the Republican candidate in 13 of 16 elections she analyzed and the Democratic candidate in 1 of 16 elections. T2 at 86:23–25, 87:21–24. In each of these 13 election contests, both methods of ecological inference agreed that Hispanic voters preferred the Republican candidate. T2 at 87:17–20.

334.     In Benchmark District 25, despite using the lesser estimate of vote share in each election, Dr. Walker found that the Republican candidate received at least 60 percent of the vote among Hispanic voters in 6 of 16 elections. T2 at 87:25–88:4.

335.     Dr. Walker testified that her analysis shows cohesion among Hispanic voters in Benchmark District 25, albeit, in her view, at the lower end of the cohesion spectrum. T2 at 88:5–11.

336.     Of the two methods of ecological inference that Dr. Walker employed, the iterative EI method tended to show more cohesion. T2 at 82:21–24.

337.     Dr. Walker admitted that, according to her iterative EI method, Hispanic voters in Benchmark Congressional District 25 and Benchmark State House Districts 115, 118, and 119 displayed a "clear preference" for Republican candidates. T2 at 99:23–100:2; D. Ex. 161.

338.     Although Dr. Walker testified that she has no opinion as to whether iterative EI or rows-by-columns is better, T2 at 67:10–12, she used only the iterative EI method when the Harvard Election Law Center retained her to evaluate racially polarized voting in the City of Jacksonville, T2 at 85:22–86:–17, and when assessing the voting patterns of white voters in this case, T2 at 94:2–9.

339.     According to the iterative EI method, in Benchmark District 115, Hispanic voters preferred the Republican candidate in 16 of 17 elections and the Democratic candidate in 0 of 17 elections, and the Republican candidate received at least 60 percent of the Hispanic vote in 12 of 17 elections. T2 at 83:10–23; D. Ex. 162.

340.     According to the iterative EI method, in Benchmark District 118, Hispanic voters preferred the Republican candidate in 17 of 17 elections, and the Republican candidate received at least 60 percent of the Hispanic vote in 16 of 17 elections and at least 70 percent in 5 of 17 elections. T2 at 84:15–85:2; D. Ex. 162.

341.     According to the iterative EI method, in Benchmark District 119, Hispanic voters preferred the Republican candidate in 17 of 17 elections, and the Republican candidate received at least 60 percent of the Hispanic vote in 13 of 17 elections and at least 70 percent in 4 of 17 elections. T2 at 85:7–20; D. Ex. 162.

**C.     The Growth of Hispanic Cohesion Since 2020.**

342.     Dr. Trende found that, between November 2020 and April 2025, the Republican advantage among Hispanic registered voters in Miami-Dade County grew "pretty substantially." T4 at 87:22–88:14; D. Ex. 93.

343.     From November 2020 to April 2025, the number of Hispanics in Miami-Dade County who were registered as Republicans increased from 324,495 to 377,266 people—an increase of 52,771 people, or 16.3 percent. T2 at 120:23–121:20; D. Ex. 93.

344.     Over the same period, the number of Hispanics in Miami-Dade County who were registered as Democrats decreased from 276,716 to 225,592 people—a decrease of 51,124 people, or 18.5 percent. T2 at 121:21–122:10; D. Ex. 93.

345.     Dr. Walker does not dispute these data or even Dr. Trende's conclusion that, since 2020, Hispanic voters in Miami-Dade County have become more cohesive. T2 at 120:10–122:10. Dr. Walker disputes only Dr. Trende's reliance on voter-registration data to arrive at that conclusion. T2 at 58:7–13, 120:14–16.

346.     Dr. Walker opined that reliance on voter-registration data can yield over- or under-estimates of vote cohesion because the electorate that turns out to vote might differ from the

composition of registered voters. T2 at 59:15–23. Dr. Trende did not rely on voter-registration data to estimate vote share, but rather to illustrate a broader shift in partisan preference. T4 at 87:22–88:14.

347.    Indeed, Dr. Walker agrees that voter registration is an indicator or political preference and provides some information about a population's political leanings. T2 at 120:17–22.

348.    Dr. Walker opined that an ecological-inference analysis is the better method of assessing cohesion, but although Dr. Walker could have responded to Dr. Trende with an ecological-inference analysis of post-2020 elections, she did not do so. T2 at 125:1–15. Counsel instructed Dr. Walker not to analyze elections conducted after April 22, 2022. T2 at 125:20–126:13; D. Ex. 156.

349.    Dr. Walker opined that, in assessing voter-registration data, Dr. Trende should have evaluated voters who are unaffiliated with the two major political parties. T2 at 58:7–22, 124:5–7.

350.    Dr. Walker agrees, however, that, over the relevant time period, there has been no significant change in the percentage of registered Hispanics in Miami-Dade County who are unaffiliated with either of the major political parties. T2 at 123:21–24. This percentage has remained between 33.6 to 34.7 percent over the relevant time period—a narrow, 1.1-percentage-point range. T2 at 123:14–20.

351.    Dr. Walker is unaware of any facts to suggest that registered Hispanic voters in Miami-Dade County who are unaffiliated with either of the two major political parties have voted more Democratic since November 2020. T2 at 123:25–124:4.

352.    Dr. Walker opined that, in assessing voter-registration data, Dr. Trende should have evaluated inactive voters. T2 at 58:7–22. But Dr. Walker does not know what percentage of inactive voters become active again or how long an inactive voter remains inactive before the voter is removed from the voter rolls. T2 at 127:5–10.

353.    Regardless of whether inactive voters are included or excluded, Dr. Walker agrees that the number of Hispanics in Miami-Dade County who are registered as Republican is more than 60 percent greater than the number of Hispanics in Miami-Dade County who are registered as Democrat. T2 at 127:14–19.

354.    Dr. Walker is unaware of any facts to suggest that the shift in voter registration toward the Republican Party would not translate into increased vote share for Republican candidates among Hispanic voters in Miami-Dade County. T2 at 127:20–25.

## XII.   DR. WALKER'S ANALYSIS OF WHITE VOTERS STATEWIDE.

355.   Dr. Walker opined that white voters statewide vote as a bloc and that the candidate preference of white voters statewide (Republican) often aligns with that of Hispanic voters in the South Florida districts she analyzed. T2 at 13:17–21.

356.   Dr. Walker analyzed the voting patterns of white voters on a statewide basis because counsel directed her to. T2 at 42:12–13; D. Ex. 152 at 2.

357.   When Dr. Walker received her instruction letter from counsel, she interpreted the letter to instruct her to evaluate white voters statewide. T2 at 90:7–11. Dr. Walker requested clarification because, in her experience, comparing one racial group on a statewide basis to another racial group in an individual district is not how one would normally assess racially polarized voting. T2 at 90:12–25. Ordinarily, the expert compares the voting preferences of voters who share the same jurisdiction and therefore can vote in the same elections. T2 at 91:1–6.

358.   For example, if an expert were tasked with evaluating racially polarized voting in Miami-Dade County, then the expert would compare the voting behavior of the county's white voters to the voting behavior of the county's Hispanic voters. T2 at 91:12–16. The expert would not consider how white voters vote in Orlando or Jacksonville when analyzing a district in Miami-Dade County, since those voters cannot vote in the district. T2 at 91:17–23.

359.   Dr. Walker had never before conducted an analysis that compares one racial group on a statewide basis to another racial group on a district basis. T2 at 92:18–22.

360.   In response to her request for clarification, counsel clarified that Dr. Walker should assess the voting behavior of white voters statewide, and Dr. Walker complied. T2 at 92:23–93:6.

361.   Dr. Walker found that white voters statewide displayed a clear preference for the Republican candidate in each election she studied. T2 at 93:17–20.

362.   Dr. Walker agrees that racially polarized voting would never exist if one compares white voters statewide to a minority group that prefers Republican candidates. T2 at 93:21–94:1.

363.   To assess the voting behavior of white voters statewide, Dr. Walker used only one method of ecological inference: iterative EI. T2 at 94:2–9. She claims she did so because her objective was to determine whether white voters consistently support one candidate over another. T2 at 42:16–43:18. She did not explain why she used two methods to identify the preferred candidate of Hispanic voters but only one to determine whether whites consistently support one candidate over another.

364.   Dr. Walker also claims that she used only one method because iterative EI was "less computationally intensive" than the rows-by-columns method, which "requires a lot of computing

power," T2 at 42:16–43:18, but she did not explain why extra computing power was a worthwhile investment when assessing Hispanic voting patterns but not when assessing white voting patterns.

365.    Using only the iterative EI method, Dr. Walker found that Hispanic voters in Benchmark Congressional District 25 and Benchmark State House Districts 115, 118, and 119 not only preferred the same candidates (Republicans) as white voters statewide, but also voted for those candidates to the same or a similar extent as white voters statewide. T2 at 99:17–22; D. Ex. 161.

## XIII.   PLAINTIFFS AND THIS LITIGATION.

366.    There are currently three individual Plaintiffs: Plaintiffs Polo, Falcon, and Belbruno. Ms. Polo testified that she resides and is registered to vote in District 115. T1 at 58:7–12. 66:18–19. Ms. Falcon testified that she resides and is registered to vote in District 118. T1 at 107:8–19, 110:3–5. Neither testified that she resides in District 26 or intends to vote. Ms. Belbruno did not testify.

367.    Plaintiff Cubanos Pa'lante offered no information about where its members reside and relies solely on the standing of other Plaintiffs to participate in this case. J. Ex. 150; T1 at 87:19–22.

368.    Plaintiff Engage purports to have members in all of the challenged districts and offered a list of its members who purportedly live in the challenged districts. P. Ex. 43; T1 at 29:17–22.

369.    Engage does not verify the voter-registration status of its members. T1 at 26:8–12. It collects its members' addresses through its intake process, and Ms. Pelham then cross-referenced that information against a separate, unofficial "voter file" database to determine whether and where Engage's members are registered to vote. T1 at 30:13–22; 36:23–40:13. Ms. Pelham admitted to at least one discrepancy between the address information provided by members and the registration information on the private "voter roll." T1 at 30:13-31:4. Ms. Pelham is not aware of whether any Engage members intend to vote or have any concerns about their districts. T1 at T1 42:15–22, 48:6-12. She admitted that Engage members might actually agree with the configuration of their districts. T1 at 42:15–22. Engage did not take a vote of its membership before joining this litigation. T1 at 33:9–18.

370.    At best, Plaintiff FIU ACLU offered evidence relating to the standing of only three of its members. *First*, Ms. Melinkoff testified that she was a member and was registered to vote in District 115, but did not testify whether she intends to vote. T1 at 115:25–116:3, 120:4–5. *Second*, Ms. Melinkoff testified that another member, David Brito-Murphy, told her that he lives in Congressional District 26. T1 at 120:17–19. In support of this hearsay statement, Ms. Melinkoff states she "believe[d] that [her] attorney Gabrielle Jackson did cross-reference" what Mr. Brito-Murphy told her. T1 at 121:3–21. Ms. Melinkoff did not testify about Mr. Brito-Murphy's registration status or intent to vote.

371.     *Third*, Mr. Cruz, a founder and former president of FIU ACLU, testified that he is registered to vote in Congressional District 26. T1 at 90:2–7, 90:14–17. He did not testify about whether he intends to vote. Mr. Cruz is no longer enrolled at FIU and did not testify that he currently maintains any association with FIU ACLU. T1 at 91:6–11, 104:7–12. Alumni may attend approved events, but may not serve on the board, T1 at 122:5–7, 125:23–126:2, attend or vote in general body meetings, T1 at 125:12–22, 126:3–14, or attend events without FIU approval, T1 at 122:12–123:16.

372.     All Plaintiffs testified they were approached by the ACLU about joining or initiating this litigation, and there is no evidence that Plaintiffs had any inclination to file suit over the challenged districts before the ACLU approached them. T1 at 34:15–24, 61:10–15, 75:9–13, 99:4–7, 112:17–19.

<u>CONCLUSIONS OF LAW</u>

**Standing.** Plaintiffs bear the burden to establish standing—*i.e.*, that they have suffered an injury in fact that is fairly traceable to the challenged conduct and likely to be redressed by a favorable decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). An association may sue if, *inter alia*, it proves that "its members would otherwise have standing to sue in their own right." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). The "right to vote is 'individual and personal in nature.'" *Gill v. Whitford*, 585 U.S. 48, 65 (2018) (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)).

Plaintiffs did not establish their standing to bring these claims. Engage claims that at least one of its members is registered to vote in each challenged district, but it offered almost no information about the unofficial voter database that Ms. Pelham used to verify the registration status of Engage's members. It is unclear who created and maintains the database, when and from whom the information in the database was obtained, and whether that information is current and accurate. Ms. Pelham found at least one discrepancy between the information in the database and that provided by a member. The Court cannot simply assume the veracity of a private database when its subject-matter jurisdiction is at stake. Without any evidence of the database's reliability, Plaintiffs have not proven Engage's standing.

Apart from Engage, there is no evidence that any individual Plaintiff or organizational Plaintiff member resides in District 119. And apart from Engage, the only individual Plaintiff or organizational Plaintiff member who resides in District 118 is Plaintiff Falcon, but there is no evidence that Plaintiff Falcon intends to vote in future elections in District 118. Similarly, while FIU ACLU claims one member (Ms. Melinkoff) who is registered to vote in District 115, Ms. Melinkoff provided no evidence of her intent to vote in future elections in District 115. *See Common Cause Fla. v. Byrd*, 726 F. Supp. 3d 1322, 1358 (N.D. Fla. 2024) (three-judge court) (finding standing to assert an intentional vote-dilution claim where individual plaintiff was a resident and an active, registered voter and "intended to vote in

future elections"); *id.* at 1385 n.1 (Winsor, J., concurring in part) (concluding that organization failed to prove associational standing because it presented no evidence that its "members intended to vote").

As for Congressional District 26, apart from Engage, only FIU ACLU provided any evidence related to standing. It relies solely on rank hearsay relating to Mr. Brito-Murphy's residence, and the testimony of alumnus, Mr. Cruz, who offered no evidence that he maintains an association with the organization, and who cannot legitimately be regarded as a member considering the severe restrictions placed on alumni participation in FIU clubs. None of this is sufficient to establish Article III standing.

**The Predominance Standard.** To prevail on their claim, Plaintiffs must first establish that race was the "predominant motive for the design of the district as a whole," *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 192 (2017)—*i.e.*, that "the legislature subordinated traditional race-neutral districting principles . . . to racial considerations," *Miller v. Johnson*, 515 U.S. 900, 916 (1995).

This standard is "demanding." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (quoting *Miller*, 515 U.S. at 928 (O'Connor, J., concurring)). A plaintiff must do more than show that the legislature gave racial and non-racial considerations "equal weight," *Allen v. Milligan*, 599 U.S. 1, 31 (2023), or that race was one motivation, *Easley*, 532 U.S. at 241, or "a mere factor in the State's redistricting calculus," *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 19 n.6 (2024); *accord* ECF No. 88 at 11 ("Legislatures can—and routinely do—consider race to comply with state and federal law.").

The Supreme Court has never affirmed a predominance finding "without evidence that some district lines deviated from traditional principles." *Bethune-Hill*, 580 U.S. at 190; *see also* ECF No. 175 at 32–33 (discussing *Bethune-Hill*'s suggestion that a bizarre shape is not a prerequisite to a finding of predominance). "In general, legislatures that engage in impermissible race-based redistricting will find it necessary to depart from traditional principles . . . ." *Bethune-Hill*, 580 U.S. at 190. Conversely, a bizarre shape alone is insufficient: what matters is not whether race-neutral criteria were neglected, but whether they were "subordinated to race." *Bush v. Vera*, 517 U.S. 952, 962 (1996) (plurality opinion).

A racial-gerrymandering claim challenges a district as a whole—not part of a district. *Bethune-Hill*, 580 U.S. at 191–92. Courts must consider the "districtwide context" and conduct a "holistic analysis." *Id.* While a part of a district might furnish relevant evidence, "the ultimate object of the inquiry" is the "predominant motive for the design of the district as a whole." *Id.* at 192. Thus, courts "should not divorce any portion of the lines . . . from the rest of the district." *Id.* "Concentrating on particular portions in isolation may obscure the significance of relevant districtwide evidence . . . ." *Id.*

A finding that one district was racially gerrymandered does not invalidate other districts—even adjacent, impacted districts. *Sinkfield v. Kelley*, 531 U.S. 28, 30–31 (2000); *United States v. Hays*, 515 U.S. 737, 745 (1995).

**The Presumption of Good Faith.** Plaintiffs must overcome a "presumption that the legislature acted in good faith." *Alexander*, 602 U.S. at 6; *accord Abbott v. Perez*, 585 U.S. 579, 603 (2018). This presumption is entitled to more than lip service. *Alexander*, 602 U.S. at 7; *Abbott*, 585 U.S. at 610–11. A plaintiff must establish that, in balancing the "myriad considerations" relevant to redistricting and making "difficult, contestable choices," *Allen*, 599 U.S. at 35, the State acted in bad faith and engaged in intentional discrimination, *Alexander*, 602 U.S. at 20–21; *Abbott*, 585 U.S. at 607, 610–12.

The presumption concerns inferences from the factual record: "when confronted with evidence that could plausibly support multiple conclusions," courts must "draw the inference that cuts in the legislature's favor." *Alexander*, 602 U.S. at 10. Thus, in *Abbott v. League of United Latin American Citizens*, 146 S. Ct. 418, 419 (2025), the Court stayed an injunction against the implementation of new districts in part because the district court construed "ambiguous direct and circumstantial evidence against the legislature." Given the "sensitive nature of redistricting" and of any inquiry into legislative motives, courts exercise "extraordinary caution" in racial-gerrymandering cases. *Miller*, 515 U.S. at 916.

**Analysis.** With these principles in mind, this Court concludes that Plaintiffs have failed to carry their heavy burden to prove that race was the predominant motive in drawing any challenged district as a whole. Defendants do not dispute that the Legislature considered race—the Florida Constitution's Non-Diminishment Clause required it to—but it considered race alongside a mix of race-neutral considerations. As Mr. Poreda testified, the map-drawers sought to "marry" or "balance" all of Florida's redistricting standards and, like the expert map-drawer in *Allen*, did not give more than "equal weight" to racial considerations. 599 U.S. at 31. In drawing the challenged districts, the Legislature faithfully honored the limits that equal protection imposes on the consideration of race.

Central to our analysis is Mr. Poreda's testimony—which we find credible and persuasive—that committee staff (i) began with a blank map; (ii) considered race only where staff determined that it was legally necessary; (iii) sought to apply and implement all of Florida's race-neutral, tier-two standards when drawing protected districts; (iv) drew the challenged districts with those race-neutral standards in mind, first and foremost; (v) did not employ a heat map or other functionality of the map-drawing application to identify concentrations of Hispanic voters; (vi) did not target any specific numerical threshold of Hispanic voting-age population; (vii) performed the required functional analysis

only when a complete district had been drawn; and (viii) only then considered race, and only for the limited purpose of ensuring compliance with the Florida Constitution's Non-Diminishment Clause.

**House District 115.** Mr. Poreda credibly and compellingly explained that the Legislature's desire to keep municipalities whole was the most significant factor in the design of District 115. District 115 contains three whole, vertically stacked municipalities that dictate much of the district's shape, and carefully avoids splitting four municipalities that are adjacent to and just outside the district. The southern part of District 115 is also constrained by District 117, a protected district, and Biscayne Bay. Mr. Poreda explained that, throughout the district, staff sought to utilize recognizable features such as major roadways and canals as district boundaries. More than 90 percent of the district's perimeter consists of political or geographical boundaries. And while staff made a slight adjustment to the northern part of the district to ensure compliance with the Non-Diminishment Clause, equal protection does not prohibit consideration of race altogether. It is difficult to imagine a more modest impact: racial considerations affected only one small part of the district as a whole. And in adjusting the northern part of the district, staff applied race-neutral principles. The northern section of the district consists of straight lines and right angles, has no bizarre features, follows major roadways, and adheres to the boundaries of multiple municipalities. On this record, and construing any ambiguities in the Legislature's favor, the Court cannot conclude that race predominated in drawing District 115.

**House Districts 118 and 119.** Mr. Poreda credibly explained that, in drawing Districts 118 and 119, the Legislature balanced a mix of considerations and that no one consideration predominated. Mr. Poreda explained that staff sought to divide a rectangular area into two regularly shaped districts that utilize geographical boundaries. Staff followed major thoroughfares such as the Tamiami Trail, Krome Avenue, the Florida Turnpike, and Southwest 117th Avenue around the rectangle's perimeter, which was also impacted by adjacent District 117, a protected district. Staff divided the rectangular area vertically into clean, symmetrical, rectangular shapes with no bizarre features. Both Mr. Poreda and Dr. McCartan testified that rectangles are visually compact shapes. The final configurations of Districts 118 and 119 improve upon the compactness of the benchmark districts and of the workshop options published early in the redistricting process. Dr. McCartan's map divides the rectangular area horizontally, but equal protection does not compel this configuration. In dividing the rectangle vertically, the Legislature made a policy choice well within its discretion. The Legislature was under no obligation to choose a configuration that it determined violates the Non-Diminishment Clause when it had an available option that implements all legal standards and gives at least equal weight to race-neutral considerations. On this record, and construing any ambiguities in the

Legislature's favor, the Court cannot conclude that race predominated in drawing Districts 118 and 119.

**Congressional District 26.** Mr. Poreda credibly explained that the Legislature's chosen positioning of districts (including District 26) around District 20 best furthered the overall compliance of the broader South Florida region with all legal standards, including race-neutral criteria in particular. Mr. Poreda explained that, in South Florida, districts rotated around District 20, a protected district in Palm Beach and Broward Counties. If District 26 had been moved east, wholly into Miami-Dade County, then the resulting counterclockwise rotation of districts around District 20 would have decreased the compactness of the region, including that of Districts 25 and 21; broken the enacted map's adherence to a 140-mile stretch of county boundaries; and forced District 21 to cross the middle of the State from the Atlantic Ocean nearly to Port Charlotte. Drawing District 26 partially into Collier County enabled staff to achieve worthy, race-neutral objectives throughout the South Florida region.

Dr. McCartan's testimony and illustrative maps confirm Mr. Poreda's analysis. Dr. McCartan's illustrative maps move District 26 wholly into Miami-Dade County but decrease the compactness of South Florida districts generally, split more counties, decrease boundary scores throughout the region, break the county boundaries that enacted District 21 follows, and alter between 13 and 20 districts, with ripple effects extending as far as North Florida. Dr. McCartan agreed it would be impossible to follow the 140-mile stretch of county boundaries on the north side of District 21 and the west side of Districts 20 and 21 without drawing a district that includes parts of Collier and Miami-Dade Counties.

All but one of Dr. McCartan's maps add more than 110,000 voting-age Hispanics to District 26 and increase the district's HVAP from 73.2 to around 90 percent—begging the question why a legislature focused on race would not have drawn District 26 wholly in Miami-Dade County, as Dr. McCartan did. Instead, Mr. Kelly's revisions to District 26 reduced its HVAP to 73.2 percent—lower than the HVAP in the benchmark district and lower than the HVAP in any of the 21 congressional district maps submitted during the redistricting process by members or staff of the House and Senate.

The Legislature's chosen positioning of districts around District 20 enabled District 26 to utilize political and geographical boundaries along more than 90 percent of its perimeter. District 26's boundary consists mostly of county boundaries (54 percent) and otherwise faithfully follows highways, interstates, state roads, and municipal boundaries. District 26 splits only one municipality (Miami) as it navigates the plethora of municipalities in populous Miami-Dade County. Its eastern boundary was shaped by these race-neutral considerations and by committee staff's efforts to maintain the voting ability of black voters in an adjacent protected district (District 24). Mr. Poreda explained that he used

the map-drawing application's heat map to identify concentrations of black voters, but not Hispanic voters, along this boundary. On this record, and construing any ambiguities in the Legislature's favor, the Court cannot conclude that race predominated over race-neutral considerations in drawing District 26.

**Dr. McCartan's Maps.** Dr. McCartan's evidence does not prove racial predominance.

First, the function of alternative maps is to demonstrate that the legislature could have achieved "significantly greater racial balance" while still achieving its legitimate, race-neutral objectives. ECF No. 175 at 10–11 (quoting *Alexander*, 602 U.S. at 34). Alternative maps that *decrease* racial balance can hardly prove that the State "separate[d] its citizens into different voting districts on the basis of race." *Miller*, 515 U.S. at 912. By creating districts with HVAPs of 90 percent or more, Dr. McCartan's maps go the opposite direction and cause *more* racial separation and racial imbalance among districts.

Second, while Dr. McCartan's State House map has aesthetic value, the production of an eye-pleasing or even a somewhat "better" map does not prove racial predominance. It is always possible to improve on any redistricting map. Courts therefore have long rejected the argument that the legislature must draw the "best" map—or that its map is legally infirm if a challenger produces a better one. ECF No. 175 at 12–14. Federal litigation is not an art competition between the Legislature, which is constitutionally charged with redistricting, and adversary interests. The fact that an expert, with the benefit of leisure and hindsight, can draw a similar or slightly "better" map does not move the needle.

Third, for the reasons set forth above, Dr. McCartan's congressional maps refute Plaintiffs' claims. Dr. McCartan packs Hispanics into District 26, increases the district's HVAP from 73.2 to approximately 90 percent, moves millions of people between districts throughout much of the State, and, in important respects, is less faithful than the enacted map to race-neutral, tier-two standards.

**Dr. Abott's Adjacency Analysis.** Dr. Abott's adjacency analysis suffers from the same shortcomings as the ill-fated adjacency analysis performed by Dr. Barreto in *Nord Hodges v. Albritton*, 796 F. Supp. 3d 1082, 1107–08, 1117–19 (M.D. Fla. 2025) (three-judge court). Dr. Abott's analysis incorrectly assumes that minorities are evenly distributed and therefore that there is an even chance that areas with high minority concentrations will be included in or excluded from a district. In fact, minorities tend to cluster, and those clusters often align with political or geographical boundaries. As Dr. Trende pointed out, Dr. Abott never established what characteristics one could expect in a race-neutral map and thus never established that the enacted map's characteristics suggest racial motivation.

Dr. Abott never explored alternative, race-neutral explanations for her observations. She did not assess whether the district boundary might run between included and excluded areas for reasons

unrelated to race—for example, because it follows county or municipal boundaries or major roads. Many of the excluded areas are situated in another county or in District 24, a district drawn to protect the voting ability of black voters. And Dr. Abott's own data reveal that District 26 includes many low-HVAP areas and excludes many high-HVAP areas, and that often the difference in HVAPs between the included and excluded areas is inappreciable. Dr. Abott's analysis has too many holes to be helpful.

**The Florida Constitution's Conflict Provision.** Under Florida's redistricting framework, when "compliance with the standards in [tier two] conflicts with the standards in" tier one, the standards in tier-one control the standards in tier two. Fla. Const. art. III, §§ 20(b), 21(b). But this Court rejects Plaintiffs' position that a conflict arises and race predominates whenever tier-two standards, although satisfied, are not fully optimized or maximized. That is not conflict, but only the balancing of standards of "equal weight," which equal protection permits. *Allen*, 599 U.S. at 31.

By its plain language, the Florida Constitution's "conflict" provision applies only when "compliance" with both tier-one and tier-two standards is impossible. In that case, the "conflict" provision directs tier-two standards to yield. *See In re SJR 1176*, 83 So. 3d at 667 ("[T]he Legislature is permitted to violate compactness only when necessary to avoid conflict with tier-one standards . . . .").

There is a clear distinction, however, between *conflict* and the *balancing* of equally weighted standards. When equally weighted standards are balanced, none is violated, even if some trade-offs are made. Dr. McCartan explained, for example, that trade-offs are sometimes necessary between tier-two standards, T2 at 204:10–205:4, which are expressly equal in rank, Fla. Const. art. III, §§ 20(c), 21(c); *see also In re SJR 1176*, 83 So. 3d at 639 (explaining that Florida's standards leave to the Legislature the task of "balancing the tier-two standards together in order to strike a constitutional result"). This balancing of tier-two standards does not make one standard predominant and the others subordinate.

Likewise, a mere balancing of tier-one and tier-two standards does not implicate the "conflict" provision. A tier-one standard might prevent a district from being a perfect circle and maximizing compactness. But a tier-two standard might restrain the same district from maximizing minority population or performance. Compliance does not demand maximization: it does not require districts to be as compact as possible (only to meet the minimum threshold of compactness) or to maximize minority population or performance (only to avoid diminishment in voting ability). *See In re SJR 1176*, 83 So. 3d at 635 (noting that districts need not boast "the highest mathematical compactness scores").

This Court rejects Plaintiffs' position that, if state or federal legal protections for minority voters require even the slightest downward departure from maximal compactness, then race is predominant. In drawing the challenged districts, the map-drawers thoughtfully harmonized all legal

standards and struck an appropriate balance. If the challenged districts do not maximize compactness, then there is also no record evidence that they maximize minority populations or performance. At most, the evidence discloses a judicious balancing of all standards—not racial predominance. *See DeWitt v. Wilson*, 856 F. Supp. 1409, 1413–15 (E.D. Cal. 1994) (concluding that map-drawers engaged in a "judicious and proper balancing" of racial and non-racial standards and "carefully analyzed and reconciled" the requirements of both the Voting Rights Act and the State Constitution). Indeed, Plaintiffs' position would interpose new obstacles to compliance with the federal Voting Rights Act, since even the slightest and most reasonable accommodations between racial against race-neutral considerations would, under their theory, necessitate a finding of predominance. That is not the law.

**Narrow Tailoring.** Finally, even if race had predominated in drawing the challenged districts, the districts would satisfy strict scrutiny.

Plaintiffs affirmatively allege that the State's interest in compliance with the Florida Constitution's Non-Diminishment Clause is compelling. ECF No. 58 ¶¶ 191, 221; *contra Black Voters Matter Capacity Bldg. Inst., Inc. v. Sec'y, Fla. Dep't of State*, 415 So. 3d 180, 196 (Fla. 2025). Plaintiffs contend only that the Non-Diminishment Clause does not apply to the challenged districts and that the Legislature's consideration of race in drawing the challenged districts is therefore not narrowly tailored to advance that interest. The question then is whether the Non-Diminishment Clause applied.

The Florida Supreme Court recently explained that the Non-Diminishment Clause applies when the benchmark district satisfies "three variables": (i) the minority group votes cohesively; (ii) the minority group's preferred candidate is likely to prevail in the relevant contested party primary; and (iii) that candidate is likely to prevail in the general election. *Black Voters Matter Capacity*, 415 So. 3d at 193; *accord id.* at 186–87. If these three variables are present in the benchmark district, then, when the district is redrawn, the ability of minorities to elect their preferred candidates may not be diminished.

Plaintiffs do not contest the second and third variables—only the first. As to cohesion, *Black Voters Matter* explained that the Non-Diminishment Clause requires only "some level of voting cohesion." *Id.* at 186. The cohesion requirement ensures compliance with the textual prerequisite that minorities have "representatives of their choice." *Id.* (quoting Fla. Const. art. III, §§ 20(a), 21(a))

The Florida Supreme Court has neither prescribed a specific measure of cohesion nor established any bright lines or numerical thresholds. Its statement that "some level of voting cohesion" is needed does not suggest an exacting standard. *Id.* The cohesion requirement is therefore best understood in light of the question it answers: do minorities in the district have candidates "of their

choice"—*i.e.*, a discernible preference between candidates? Or are minorities a toss-up or "swing" voting bloc, evenly divided between the major political parties, and regularly fluctuating between them?

Here, Hispanic voters in the benchmark districts clearly have "representatives of their choice." Fla. Const. art. III, §§ 20(a), 21(a). Hispanic voters preferred the Republican candidate 15 times in Benchmark District 115, 11 times in Benchmark District 118, and 14 times in Benchmark District 119. Hispanic voters did not prefer the Democratic candidate in a single election in any one of these three districts. Likewise, in Benchmark Congressional District 25, Hispanic voters preferred the Republican candidate in 13 elections and the Democratic candidate only once. These data do not paint an ambiguous picture or leave the Court at a loss to determine which candidate Hispanic voters prefer.

The candidate preference is clear. The Court rejects as implausible Plaintiffs' position that voters who prefer the same political party's candidates 15-to-0, 11-to-0, 14-to-0, or 13-to-1 have no choice or preference between the candidates. The *consistency* of this preference confirms that they do, *cf. Thornburg v. Gingles*, 478 U.S. 30, 54 n.21 (1986) (explaining that voting is racially polarized when there is a "consistent relationship" between the voter's race and candidate preference), and even Dr. Walker herself acknowledges that Hispanic voters in these districts meet her definition of cohesion.

Plaintiffs ignore the consistency of this expressed preference and instead focus on margins of victory. The Supreme Court has explained, however, in construing section 2 of the Voting Rights Act, that a "showing that a significant number of minority group members usually vote for the same candidates" is only "one way of proving" cohesion. *Gingles*, 478 U.S. at 56. And the Florida Supreme Court has never suggested that the Non-Diminishment Clause protects only minority groups that are politically homogenous or monolithic, or that prefer one candidate in landslide proportions. Further, Dr. Walker's analysis understates Hispanic support for Republican candidates because she systematically selected the lesser estimate of vote share. Dr. Walker's own iterative EI method found that Republicans routinely receive more than 60 percent of the Hispanic vote and, according to Dr. Walker herself, display a clear preference for Republican candidates. Finally, the significant shift among Hispanics to the Republican Party since 2020 only confirms the cohesion that Dr. Walker identified.

Dr. Walker opined that a 60-percent vote share is weak evidence because, if the election were held among ten people, one vote would make the difference between 60 percent and a toss-up. But elections are not held among ten people, and a 60-40 victory is ordinarily considered a landslide. Dr. Walker's argument also ignores the remarkable consistency of the preference for Republican candidates, which refutes any suggestion that the Hispanic preference was razor thin or precarious.

The record clearly shows that the Legislature's limited consideration of race in the challenged districts was necessary to comply with the Non-Diminishment Clause and was narrowly tailored to that end.

**White Voting Statewide.** Plaintiffs continue to argue that the Non-Diminishment Clause protects only Democrats—*i.e.*, minorities who vote differently from white voters across Florida. As fully explained in the House's Pretrial Brief, there is no partisan test for tier-one protection. ECF No. 175 at 69–74. Simply put, being a Democrat is not among the "three variables" that determine whether the Non-Diminishment Clause applies. *See Black Voters Matter*, 415 So. 3d at 193. Thus, Dr. Walker's evidence that white voters statewide display a clear preference for Republican candidates is irrelevant.

CONCLUSION

The evidence presented at trial did not establish that race predominated in the drawing of the challenged districts. Plaintiffs failed to overcome the presumption that, in drawing the challenged districts, the Legislature acted in good faith. But even if Plaintiffs had established racial predominance, the Legislature's consideration of race in drawing the challenged districts is narrowly tailored to a state interest that Plaintiffs accept as compelling. This Court accordingly enters judgment for Defendants.

Dated February 27, 2026.                                       Respectfully submitted,

                                                              */s/  Andy Bardos*

Christopher M. Kise (FBN 855545)                              Andy Bardos (FBN 822671)
ckise@continentalpllc.com                                     andy.bardos@gray-robinson.com
CONTINENTAL PLLC                                              GRAYROBINSON, P.A.
101 North Monroe Street, Suite 750                            301 South Bronough Street, Suite 600
Tallahassee, Florida 32301                                    Tallahassee, Florida 32301-1724
Telephone: 850-270-2211                                       Telephone: 850-577-9090

Jesus M. Suarez (FBN 60086)
jsuarez@continentalpllc.com
Carmen Manrara Cartaya (FBN 73887)
ccartaya@continentalpllc.com
Jennifer Marie Hernandez (FBN 1018836)
jhernandez@continentalpllc.com
CONTINENTAL PLLC
245 Alcazar Avenue
Coral Gables, Florida 33134
Telephone: 305-677-2707

*Attorneys for Defendant, Florida House of Representatives*