# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 1:24-cv-21983-JB

CUBANOS PA'LANTE, *et al.*,

*Plaintiffs,*

v.

FLORIDA HOUSE OF REPRESENTATIVES, *et al.*,

*Defendants.*

## PLAINTIFFS' PROPOSED FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

Andrew Frackman*
**O'Melveny & Myers LLP**
1301 Avenue of the Americas, 17th Floor
New York, NY 10019
(212) 326-2000
afrackman@omm.com

Brian P. Quinn*
Patrick J. Jones*
Emily Murphy*
Gabrielle S. Jackson*
Helena M. Li*
**O'Melveny & Myers LLP**
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300
bquinn@omm.com
pjones@omm.com
emurphy@omm.com
gjackson@omm.com
hli@omm.com

Nicholas L.V. Warren (FBN 1019018)
Caroline A. McNamara (FBN 1038312)
Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
nwarren@aclufl.org
cmcnamara@aclufl.org
dtilley@aclufl.org

Jorge L. Vasquez, Jr.*
**Vasquez Attorneys at Law, PC**
141 Parkway Road, Suite 14
Bronxville, NY 10708
(212) 752-8408
jorge@vasquezpc.com

* *Admitted pro hac vice*

*Counsel for Plaintiffs*

**TABLE OF CONTENTS**

I.   FINDINGS OF FACT.................................................................................................1

   A.  Plaintiffs.........................................................................................................1

   B.  Overview of the Florida Legislature's Redistricting Process ...............................2

   C.  Race predominated in drawing each Challenged District. ..................................6

      i.   Race predominated in drawing HD 115. ....................................................7

      ii.  Race predominated in drawing HDs 118 and 119.......................................15

      iii. Race predominated in drawing CD 26. .....................................................19

   D.  Other legislative statements support the case for racial predominance. ..............30

   E.  The presumption of good faith compels the Court to credit contemporaneous statements that race was the reason for the districts' configurations.....................32

   F.  The second and third *Gingles* preconditions were absent in South Florida...........36

      i.   Hispanic voters do not vote cohesively......................................................36

      ii.  White bloc voting sufficient to defeat Hispanic voters' preferred candidates is also absent. ........................................................................38

      iii. The Legislature was on notice that Hispanic cohesion and white bloc voting were absent. .......................................................................38

II.  CONCLUSIONS OF LAW ....................................................................................43

   A.  Defendants bear the burden of proving that the use of race was narrowly tailored to a compelling interest. .....................................................................43

   B.  Even assuming a compelling interest in complying with the Non-Diminishment Clause, the use of race was not narrowly tailored to that interest. ........................45

      1.  Tailoring Standards ................................................................................45

      2.  Minority cohesion and white bloc voting are preconditions for the Non-Diminishment Clause to apply. ........................................................46

      3.  Each district fails strict scrutiny because there is no evidence of the second and third *Gingles* preconditions...........................................................47

      4.  The Legislature was on notice that its "affirmative-action program" was unnecessary before it embarked on it.........................................................48

   C.  Plaintiffs have standing to challenge each district. ...........................................48

   D.  The constitutional violations should be remedied expeditiously............................50

III. CONCLUSION .....................................................................................................50

## I.  FINDINGS OF FACT

### A.  Plaintiffs

1.        Cindy Polo is a Colombian American resident of House District ("HD") 115. Day 1 Tr. 58:7–9, 66:5–6. Genesis Castilla Falcon resides in HD 118. *Id.* 108:1–2.

2.        Cubanos Pa'lante is a South Florida-based nonpartisan, nonprofit membership organization whose mission is to educate, organize, and mobilize Cuban Americans because "we're not free until we're all free." *Id.* 72:5–12. Cubanos Pa'lante's activities include encouraging Cuban Americans to be politically engaged; conducting voter education, registration, and get-out-the-vote drives; combatting misinformation about politics, government, and elections; and holding community forums and other events on these and other issues. *Id.* 72:13–73:18, 81:5–9, P55 (Bylaws) at 3.[1]

3.        Engage Miami Inc. is a nonpartisan, nonprofit membership organization serving Miami-Dade County since 2015. Day 1 Tr. 10:22–11:3; P45 (Bylaws).[2] Founded by young people, Engage Miami's mission is to build a more just, democratic, and sustainable community by developing a local culture of civic participation for young people. Day 1 Tr. 12:15–19. It carries out its mission through voter engagement such as voter registration and get-out-the-vote efforts; leadership development work, such as fellowship programs; and advocacy on its issue platform, which includes democracy and voting rights. *Id.* 12:20–13:10; P47 (Young People's Priorities Platform). Within democracy and voting rights, Engage Miami's advocacy includes promoting access to the vote, fair redistricting, election protection, and protecting voting rights. Day 1 Tr. 14:3–19; P47. It also mobilizes people to respond to the census and educates voters about redistricting, with a focus on ensuring that young people are engaged, aware, and able to advocate for fair districts. Day 1 Tr. 15:3–13; P47. Engage Miami's members include registered voters in HD 115, HD 118, HD 119, and Congressional District ("CD") 26 (collectively, the "Challenged Districts"). Day 1 Tr. 20:4–11, 20:22–21:24, 26:6–7, 28:14–29:22, 31:8–16; P43 (Membership List); P46 (Member Intake Form).

---

[1]    The parties resolved a discovery dispute by agreeing that Cubanos Pa'lante would not present evidence of certain information about its members in exchange for Defendants foregoing discovery about that information. P86 (Stip. re Cubanos Pa'lante Membership). The parties further agreed that "if the Court finds that a Plaintiff has standing to challenge a particular district, then, to the extent Cubanos Pa'lante seeks the same relief, the Court need not consider whether Cubanos Pa'lante has standing to challenge that district[.]" *Id.* ¶ 5.

[2]    Trial exhibits are referred to by their prefix ("P"; "D"; or "J") and number.

4.      The American Civil Liberties Union—For The Panthers Club @ FIU is a nonpartisan, unincorporated membership association registered as a Florida International University student organization and affiliated with the ACLU of Florida. Day 1 Tr. 91:12–23; P54 (Constitution). The Club's mission is to promote student involvement in civic engagement, civic education, and constitutional rights. Day 1 Tr.  94:2–10, 116:15–18, 117:20–24. As part of its mission, the Club educates its members and the broader public by facilitating civic engagement on a variety of topics. *Id.* 93:10–25, 117:4–19. Specifically, the Club educates the public about voting rights, including by encouraging eligible citizens to register and vote, phone-banking, petitioning, and hosting forums, know-your-rights trainings, and other educational events. *Id.* 93:10–25, 117:4–8. The Club's members include FIU students and alumni interested in being civically engaged.[3] *Id.* 91:12–20, 94:11–20, 116:6–18, 118:13–15. The Club has members who are registered voters residing in at least HD 115, HD 118, and CD 26. *Id.* 90:14–24, 92:21–22, 106:2–23, 107:7–19, 108:1–2, 115:25–116:9, 120:2–19.

5.      The Enacted Plans split up the Plaintiffs' communities and group their communities with dissimilar ones. *Id.* 16:11–17:1, 17:8–16, 19:17–25, 65:12–15, 97:12–98:3, 110:17–111:4. For the reasons that follow, if the Enacted Plans are not enjoined, the individuals and the Organizational Plaintiffs' members will be harmed by living and voting in unconstitutionally racially gerrymandered districts.

### B.  Overview of the Florida Legislature's Redistricting Process

6.      In 2021–22, the Florida Legislature redrew the state's legislative and congressional maps, yielding Plan H000H8013 ("Plan 8013" or the "Enacted House Plan"), adopted through Senate Joint Resolution 100, and Plan P000C0109 ("Plan 109" or the "Enacted Congressional Plan"), adopted through Senate Bill 2-C. Jt. Pretrial Stip. (Dkt. No. 172, "Stip.") at 2–6. The process, outlined in the parties' Joint Pretrial Stipulation, proceeded through committee and subcommittee meetings in both chambers.[4] Stip. at 2–3. Although the full Legislature adopted SJR 100, the Senate otherwise played no role in developing the Enacted House Plan. Day 3 Tr. 55:20–56:1.

---

[3]    FIU alumni and faculty can be members of the Club and participate in Club activities, while certain privileges (such as participating in general body meetings and serving on the executive board) are limited to a subset of current students. Day 1 Tr. 118:13–20, 125:16–126:5.
[4]    For concision, Plaintiffs will largely not repeat here the overview of the legislative process outlined in the Joint Pretrial Stipulation.

7.      The redistricting committees and subcommittees, the dates they met, and their chairs and vice chairs were as listed below. Stip. § 5 ¶ 3. The House was assisted by committee staff, including Staff Director Leda Kelly; Chief Map Drawer Jason Poreda; and two analysts. *Id.* ¶ 4. The Senate was assisted by committee staff, including Staff Director Jay Ferrin, a special counsel, and two analysts. *Id.* ¶ 5.

| Florida House Committee and Meeting Dates | Chair | Vice Chair |
|---|---|---|
| Redistricting Committee<br>   9/22/21, 10/12/21, 11/2/21, 1/13/22, 1/26/22, 2/25/22 | Tom Leek | Randy Fine |
| Congressional Redistricting Subcommittee<br>   9/23/21, 10/13/21, 10/20/21, 11/3/21, 12/2/21,<br>   1/11/22, 2/18/22, 4/19/22 | Tyler Sirois | Kaylee Tuck |
| State Legislative Redistricting Subcommittee<br>   9/23/21, 10/13/21, 10/20/21, 11/3/21, 12/3/21,<br>   1/11/22, 1/21/22 | Cord Byrd | Will Robinson |
| **Florida Senate Committee and Meeting Dates** | **Chair** | **Vice Chair** |
| Committee on Reapportionment<br>   9/20/21, 10/11/21, 10/18/21, 1/13/22, 4/19/22 | Ray Rodrigues | Doug Broxson |
| Select Subcommittee on Congressional Reapportionment<br>   11/16/21, 11/29/21, 1/10/22 | Jennifer Bradley | — |
| Select Subcommittee on Legislative Reapportionment<br>   11/17/21, 11/29/21, 1/10/22 | Danny Burgess | — |

8.      Several key legal requirements cabin the Legislature's discretion in redistricting, including the Fourteenth Amendment's Equal Protection Clause, Section 2 of the VRA, and the Florida Constitution's Fair Districts Amendments.

9.      The Equal Protection Clause prohibits redistricting in which race predominates, subordinating traditional, race-neutral redistricting considerations to racial decision-making, unless the use of race is narrowly tailored to advance a compelling government interest. *Id.* at 7–8; P3 (SOS's Answer) ¶ 42.[5]

10.     Section 2 of the VRA prohibits racial vote dilution. Section 2's protections are triggered if the three *Gingles* preconditions are established, and if, in the "totality of the circumstances," "the political process is not 'equally open' to minority voters." *Allen v. Milligan*,

---

[5]    Citations to an Answer (P2, P3) include the corresponding paragraphs in the Complaint (P1). One defendant's admissions are admissible against all defendants since the Answers were admitted without objection. Day 1 Tr. 7:7–16. This principle also applies to admissions in other exhibits.

599 U.S. 1, 18 (2023) (quoting *Thornburg v. Gingles*, 478 U.S. 30, 45–46 (1986)). The *Gingles* preconditions are that: (1) the minority group is sufficiently large and geographically compact to constitute a majority in a reasonably configured district; (2) the minority group is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate. *Id.*; P3 (SOS's Answer) ¶ 43. Together, the second and third *Gingles* preconditions (minority cohesion and white bloc voting) are referred to as "racially polarized voting." 478 U.S. at 55–56.

11.     The Florida Constitution's Fair Districts Amendments set forth two "tiers" of requirements for legislative and congressional redistricting in Florida. Fla. Const. art. III, §§ 20–21. So-called "Tier One" contains four requirements, which take precedence over the so-called "Tier Two" requirements. *Id.* § 21(a).

12.     ***First***, Tier One prohibits redistricting plans and individual districts from being "drawn with the intent to favor or disfavor a political party or an incumbent"—banning partisan and incumbency gerrymandering. *Id.* §§ 20(a), 21(a). ***Second***, Tier One incorporates Section 2's vote-dilution standard, prohibiting districts from being "drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process." *Id.* §§ 20(a), 21(a); *In re Senate Joint Resol. of Legis. Apportionment 1176* (*Apportionment I*), 83 So. 3d 597, 619 (Fla. 2012). ***Third***, Tier One incorporates the "diminishment" or "retrogression" standard from Section 5 of the VRA, 52 U.S.C. § 10304(b), prohibiting districts drawn "to diminish [racial or language minorities'] ability to elect representatives of their choice." Fla. Const. art. III, §§ 20(a), 21(a). This requirement "attempts to eradicate impermissible retrogression in a minority group's ability to elect a candidate of choice." *Apportionment I*, 83 So. 3d at 620. ***Fourth***, Tier One mandates that districts be contiguous. Fla. Const. art. III, §§ 20(a), 21(a). These four Tier One requirements take precedence over the "Tier Two" requirements.

13.     Tier One's "dilution" and "diminishment" standards incorporate the second and third *Gingles* preconditions: the minority group must vote cohesively, and majority bloc voting must be sufficient to defeat the minority group's candidate of choice (*i.e.*, racially polarized voting). *Black Voters Matter Capacity Bldg. Inst. v. Sec'y, Fla. Dep't of State* (*BVM*), 415 So. 3d 180, 186 (Fla. 2025). "[T]he establishment of . . . [minority] voting cohesion and polarized racial bloc voting . . . is the first step in any retrogression analysis." *League of Women Voters of Fla. v.*

4

*Detzner* (*Apportionment VIII*), 179 So. 3d 258, 286 (Fla. 2015). "The existence and extent of that cohesion within a benchmark or new district is something that must be proven; it cannot be assumed." *BVM*, 415 So. 3d at 186.

14.     Tier Two sets out three more requirements. The Tier Two requirements enshrine in the Florida Constitution several "traditional race-neutral districting principles." *See Miller v. Johnson*, 515 U.S. 900, 916 (1995). Tier Two requires that districts (1) be as nearly equal in population as is practicable; (2) be compact; and (3) where feasible, utilize existing political and geographical boundaries. Fla. Const. art. III, §§ 20(b), 21(b).

15.     The Legislature must adhere to the Tier Two requirements, unless doing so would violate a Tier One requirement or federal law, and may deviate from the Tier Two requirements only to the extent necessary to comply with Tier One's minority-protection provisions or federal law. *Apportionment I*, 83 So. 3d at 626 (relying on "illustrative plans . . . that make the least departure from [Florida's] stated redistricting criteria needed to prevent retrogression) (alterations in original; citation omitted); *see also id.* at 640 ("It is critical that the requirement to protect minority voting rights when drawing district lines should not be used as a shield against complying with Florida's other important constitutional imperatives . . . .").

16.     Early in the redistricting process, the Senate Committee and House committees heard presentations on redistricting law from attorneys Daniel Nordby, Andy Bardos, and Pete Dunbar, and on redistricting fundamentals from committee staff, including explanations of the VRA and the Fair Districts Amendments' Tier One and Tier Two mandates. Stip. § 5 ¶¶ 7, 17–18; P2 (House's Answer) ¶ 46; P3 (SOS's Answer) ¶ 46; J85 (10/11/21 S. Comm.) 38:14–87:6; J65 (11/2/21 H. Comm.) 5:5–30:17; J66 (11/3/21 H. Con. Subcomm.) 4:17–23:22; J67 (11/3/21 H. Leg. Subcomm.) 5:10–19:10.

17.     Once the Legislature concluded that a given district was protected from racial diminishment or dilution under the VRA or Tier One, legislative staff determined whether the district was likely to perform for the minority group's candidates of choice by performing a "functional analysis." P2 (House's Answer) ¶ 47; Day 3 Tr. 84:8–15, 87:1–7, 91:14–20; J85 (10/11/21 S. Comm.) 74:3–8; J60 (10/12/21 H. Comm.) 12:11–15; J65 (11/2/21 H. Comm.) 20:10–21. The functional analysis considered statistics within the proposed district including minority population, minority voting-age population, minority voter registration, minority turnout in past elections by race, and election results. P2 (House's Answer) ¶ 47; J85 (10/11/21 S. Comm.) 74:3–

17; J65 (11/2/21 H. Comm.) 20:10–21; Day 3 Tr. 86:8–10, 87:8–89:5. Critically, a functional analysis was performed *after* the Legislature decided the district was Tier One-protected; it was not used to determine *whether* a minority group's ability-to-elect was protected from diminishment or dilution in the first place. Day 3 Tr. 87:1–7, 91:14–23; J65 (11/2/21 H. Comm.) 20:10–12.

18.     Following the presentations and throughout the redistricting process, legislators, their attorneys, and their staff used the terms "Tier One" and "Tier Two" as shorthand references to the requirements contained within those tiers, including Tier One's minority-protection provisions. P2 (House's Answer) ¶ 48; P3 (SOS's Answer) ¶ 48; Day 3 Tr. 58:6–13. A "Tier One protected district" or simply "protected district" refers to a district where the Legislature concluded a racial minority group's ability-to-elect was protected from diminishment, dilution, or both. Day 3 Tr. 58:2–5; *e.g.* J75 (2/1/22 H. Sess.) 8:4–6, 8:14, 22:8–10; J94 (1/19/22 S. Sess.) 10:15–16, 21:14–19.

### C.  Race predominated in drawing each Challenged District.

19.     That Tier One requirements take precedence over Tier Two does not itself establish racial predominance. The Equal Protection Clause permits consideration of race only when its use is narrowly tailored to a compelling interest. The question here is not whether the Legislature prioritized Tier One in theory, but whether it treated racial performance as a fixed outcome that dictated district boundaries in practice.

20.     Contemporaneous statements of key legislators and staff, Poreda's trial testimony, and circumstantial evidence of the Challenged Districts' shapes and demographics all tell the same story: race predominated in drawing each Challenged District. *See Covington v. North Carolina*, 316 F.R.D. 117, 129 (M.D.N.C. 2016) (listing various pieces of "direct and circumstantial evidence of legislative intent" relevant to predominance), *aff'd*, 581 U.S. 1015 (2017) (mem.). While other factors may have played some role, race—and more specifically, designing districts that the Legislature thought would perform for Hispanic voters—was "the criterion that . . . could not be compromised" as the maps developed. *Bethune-Hill v. Virginia State Bd. of Elections* (*Bethune-Hill I*), 580 U.S. 178, 189 (2017) (quoting *Shaw v. Hunt*, 517 U.S. 899, 907 (1996)). "[T]he legislature's motivation for placing 'a significant number of voters within or without [each] particular district'" was to ensure Hispanic performance—a racial goal. *Bethune-Hill I*, 580 U.S. at 191 (quoting *Miller*, 515 U.S. at 916). Plaintiffs discuss the evidence "district-by-district." *Ala. Legis. Black Caucus v. Alabama* (*ALBC I*), 575 U.S. 254, 262 (2015).

### i.   *Race predominated in drawing HD 115.*

21.   **Poreda Testimony:** We start with the new information "smoked out" during this litigation, *see Alexander v. S.C. State Conf. of NAACP*, 602 U.S. 1, 8 (2024)—testimony from House Chief Map Drawer Jason Poreda confirming that HD 115's boundaries were predominantly driven by the racial goal of ensuring Hispanic performance. During HD 115's development, staff drew a draft of that district "based on Tier Two" principles alone (*i.e.*, without considering race), performed a functional analysis on that draft, and then that functional analysis indicated that the draft district had a problem with Tier One compliance. Day 3 Tr. 101:16–103:5. Specifically, the problem with Tier One compliance was an issue with Hispanic ability-to-elect in the draft HD 115. *Id.* 103:2–5. After reaching that conclusion, staff adjusted HD 115 to achieve a target level of Hispanic electoral performance, which the Legislature assumed Tier One required. *Id.* 103:6–9. Those adjustments, which included changes to the borders with HDs 114 and 116, resulted in HD 115 extending further north than it originally had in the earlier drafts.[6] *Id.* 104:3–11; *cf. infra* ¶ 36 (comparison of Enacted House Plan (Dkt. No. 191-1 at 11) with Plaintiffs' alternative State House Plan ("Plan D") (P239)).[7] Poreda's testimony indicates that the House "purposefully established a racial target," *Cooper v. Harris*, 581 U.S. 285, 299 (2017)—ensuring there was the proper "balance" of Hispanic voters in both party primaries. Day 3 Tr. 107:23–108:3.

22.   *How* race drove the shape of HD 115—and how the "adjustments" made to it achieve purported Tier One compliance—is explained by walking through the "functional analysis" staff performed. In the Legislature's view, HD 115 was a "competitive district" that could be won by either a Republican or a Democrat. *Id.* 104:12–16. Thus, staff's functional analysis looked at both party primaries, because their goal would be to draw a district where Hispanics of either party could potentially control the primary. *Id.* 104:17–25. The Legislature's theory was that, then, on both sides, the Hispanic-preferred candidate would make it to the general election, and that would ensure a Hispanic was elected, regardless of whether they were a Republican or

---

[6]   These and all unpublicized draft maps are not in evidence because the House and Senate asserted legislative privilege to shield them from disclosure. P8 at 18–19 (RFP No. 11); P14 at 9 (RFP No. 10).

[7]   In Dr. McCartan's Plan D, HD 115 has a more compact shape consistent with (even if it cannot be confirmed to be identical to) Poreda's description of the original, race-neutral draft HD 115. *See* Day 3 Tr. 104:3–11.

Democrat.[8] *Id.* 105:1–6. As staff drew "competitive districts" like HD 115, they believed they had to make sure that the Hispanic Republican could nominate their candidate in the Republican primary, and the same thing on the Democratic side. *Id.* 105:7–13. Then, in the general, whoever won a competitive race would be the minority candidate of choice (so the Legislature believed). *Id.* 105:14–16. Electing a Hispanic specifically was the goal of the Tier One compliance in a district like HD 115. *Id.* 105:17–19.

23.     To ensure that Hispanics could control both party primaries, staff tried to ensure there would be an adequate Hispanic share of both party primary electorates, to the best of their ability. *Id.* 105:20–106:3. Staff was trying to ensure that a Hispanic candidate regardless of party could be elected to ensure (in their conception) that minority community could elect a candidate of their choice; Tier One compliance was their overall goal. *Id.* 106:4–11. In drafting HD 115, the specific problem was that Hispanic voters might not control the party primary of one party or the other (or at least might have a diminished opportunity compared to the benchmark). *Id.* 106:22–107:6. And since HD 115 was a "competitive district," where the Legislature believed it had to ensure an adequate Hispanic share in both party primaries, this made drawing it without diminishing Hispanic ability-to-elect "difficult from the start." *Id.* 107:14–22.

24.     Extending HD 115 further north than in the race-neutral drafts ensured that there was the proper "balance"—Hispanic share—of both party primaries. *Id.* 107:23–108:3. The purpose of that change to HD 115 was to ensure that the district performed for Hispanic voters, and that Hispanic voters' opportunity remained the same as in the benchmark. *Id.* 108:4–8. In other words: ensuring Tier One compliance is *the* reason why HD 115 extends as far north as it does. *Id.* 109:1–3. Ensuring Tier One compliance in HD 115 is also *the* reason why the 115/116 border is where it is, and that goal affected the 114/115 border, too. *Id.* 109:6–11. Thus, HD 115's overall long, skinny, north-south shape—extending from the Tamiami Trail in Central Miami-Dade County along the City of Miami border to the southern limit of Cutler Bay in South Miami-Dade

---

[8]     The Legislature's approach to "competitive districts"—*i.e.*, starting by assessing the Hispanic share of both party primaries—underscores the lack of Hispanic cohesion. This is so because if a supermajority-Hispanic district is "competitive" for both parties, the Hispanic voters by definition are not politically cohesive; they *must* be relatively evenly divided. It was this analytical flaw that prompted the Florida Supreme Court to criticize the Legislature's analysis in 2015 for failing to consider the absence of cohesion. *Apportionment VIII,* 179 So. 3d at 286–87. It was not publicly known until this litigation that the Legislature again followed this flawed approach this cycle.

County—is because of the Legislature's racial goal.

25.     The fact that HD 115 extends northward and added its northern appendage for racial reasons renders the district a racial gerrymander, regardless of whether other areas may be explained by other considerations. While "[r]acial gerrymandering claims proceed 'district-by-district,'" "[t]his is not to suggest that courts evaluating racial gerrymandering claims may not consider evidence pertaining to an area that is larger *or smaller* than the district at issue." *Bethune-Hill I*, 580 U.S. at 191–92 (emphasis added). "[R]ace-based decisionmaking may be evident in a notable way in a particular *part* of a district. It follows that a court may consider evidence regarding *certain portions* of a district's lines, including portions that conflict with traditional redistricting principles." *Id.* (emphasis added); *see also GRACE, Inc. v. City of Miami* (*GRACE II*), 730 F. Supp. 3d 1245, 1282–83 (S.D. Fla. 2024) (finding the treatment of particular "portion[s]," "area[s]," and "part[s]" of districts probative of racial predominance); *GRACE, Inc. v. City of Miami* (*GRACE I*), 674 F. Supp. 3d 1141, 1209–11 (S.D. Fla. 2023) (same, and finding the ways particular district portions deviated from race-neutral redistricting criteria probative of racial predominance); *Jacksonville Branch of NAACP v. City of Jacksonville* (*Jacksonville I*), 635 F. Supp. 3d 1229, 1274 (M.D. Fla. 2022) (summarizing expert's analysis of "portions of the district lines that are particularly bizarre").

26.     HD 115's development is akin to that of Texas HD 90, struck down as a racial gerrymander in *Perez v. Abbott* (*Perez I*), 267 F. Supp. 3d 750 (W.D. Tex. 2017), *aff'd in relevant part* (*Perez II*), 585 U.S. 579 (2018). Redrawing its map in 2013, the Texas Legislature moved a single neighborhood (Como) into the district at the behest of Como residents and the incumbent. *Perez I*, 267 F. Supp. 3d at 788–89. But Como was predominantly Black, so adding it to HD 90 undermined the Legislature's goal "to make it a Latino opportunity district." *Perez II*, 585 U.S. at 620. The Legislature thus swapped populations with an adjacent district to "keep[] this district a Hispanic district" while accommodating the race-neutral desire to include Como. *Id*; *Perez I*, 267 F. Supp. 3d at 789–90. Even though the alterations responded to moving a single neighborhood added for non-racial reasons, affected population in only one other district, added less than 5% and removed less than 5% of HD 90's total population, "did not draw a new district but instead was limited to making changes only along a portion of the district," and increased HD 90's Hispanic percentage by less than two percentage points, the district court found "race was the predominate factor motivating the decision of which individuals to place within and without HD90." *Perez I*,

267 F. Supp. 3d at 789–92.

27.    **Legislative Record:** "Direct evidence often comes in the form of a relevant state actor's express acknowledgment that race played a role in the drawing of district lines." *Alexander*, 602 U.S. at 8; *see also Jacksonville Branch of NAACP v. City of Jacksonville* (*Jacksonville II*)*,* No. 22-13544, 2022 WL 16754389, at \*4 (11th Cir. Nov. 7, 2022) (concluding "relevant, contemporaneous statements of key legislators are to be assessed when determining whether racial considerations predominated in redistricting processes"). And indeed, HD 115's skinny, north-south shape and its northern appendage drew legislators' attention on the House floor. J75 (2/1/22 H. Sess.) 68:22–23. House leadership confirmed its shape was driven by racial considerations. *Id.* 47:16–19, 52:13–14, 53:10–13.

28.    Rep. Fentrice Driskell noted of five districts including HDs 115, 118, and 119: "In looking at the districts in 8013, these districts are all long, skinny, vertical districts, and they are significantly greater in their length than they are in their width." *Id.* 46:18–21. She asked about these districts' low compactness scores, their long length relative to their width, and the fact that they "might be outliers with respect to the rest of the map." *Id.* 47:8–11. Chair Leek responded there were "some protected districts, so there is also another analysis that goes in that, in addition to compactness." *Id.* 47:16–19. Because "we get to compactness after Tier One, . . . we had to make sure the protected districts continue to perform within reason, as they had performed." *Id*.

29.    Rep. Driskell then asked: "[W]as it necessary that those five districts be long and skinny and noncompact to comply with Tier One?" *Id.* 52: 9-11. Chair Leek acknowledged the Tier One criteria took priority: "Tier One is a wholly separate analysis, and so we're not going to get to compactness until we are assured that Tier One is satisfied." *Id.* 52:13-14.

30.    Finally, Rep. Driskell asked about a specific alternative configuration to eliminate the very appendage that Poreda later revealed was added to boost the district's Hispanic performance:

> Why wouldn't, for example, District 115 lose its northern appendage
> up to the Tamiami Trail and be more compact, taking up the southern
> portion of 116 and trading the appendage with 116?

*Id.* 53:7–9.

31.    Chair Byrd explained the reason solely by reference to the racial requirements of Tier One: "Because that's a Tier One standard that we applied." *Id.* 53:10–13.

32.    The next day, in debate, Rep. Driskell summed up the deficiencies in HDs 115, 118,

119, and their "long and skinny" neighbors:

> The reason why I homed in on these districts is because when you look at them with the eye test, with compactness, they don't look very compact. They look a little irregularly drawn. Some of them have appendages. And when you look at their compactness scores under the different ways to analyze those, whether it's Reock, Convex Hull or Polsby-Popper, these maps look like outliers. And the questions that I asked specifically went to compactness and whether or not we took into consideration if we lopped off an appendage and tried to make it pass the eye test better and look more compact, what would that have done to the performance for minority voters in those districts. That's just one example . . . where I believe we could have done a better job.

J76 (2/2/22 H. Sess.) 34:17–35:3.

33.     Rep. Driskell confirmed at trial that she asked these questions "because when you look at these districts just using the eye test" (the visual "gateway to compactness" assessment the Redistricting Committee learned), "[y]ou can see that these districts are very long. They're very narrow, and they're quite unlike other districts in other parts of the map, and so I wanted to understand why these districts were drawn this way, because there was something about them that just didn't pass the eye test." Day 3 Tr. 14:15–15:9. As a Redistricting Committee member, she understood from Leek and Byrd that the districts "were drawn this way because of tier-one requirements[.]" *Id.* 15:15–20.

34.     **Circumstantial Evidence:** Racial predominance can also be proven with indirect evidence, like a district's lack of "conformity to traditional districting principles, such as compactness and respect for county lines." *Cooper*, 581 U.S. at 308. "[C]ertain types of circumstantial evidence, such as a district's 'shape and demographics,' or the splitting of neighborhoods, 'strongly suggest[ ]' racial predominance." *GRACE II*, 730 F. Supp. 3d at 1255 (quoting *Cooper*, 581 U.S. at 291, and *Covington*, 316 F.R.D. at 145, 160). The circumstantial evidence is consistent with the direct evidence discussed above: HD 115's shape reflects the Legislature's stated intent to ensure Hispanic performance by intentionally drawing an unusual, elongated northern boundary that protrudes into a heavily Hispanic area.

35.     As to its overall shape, HD 115 runs over 15.5 miles north-south from the Tamiami Trail to the Black Creek Canal south of Cutler Bay, but it is 1.8 miles at its narrowest point. D14. HD 115 features a chimney-like appendage jutting north of Kendall Drive to the Tamiami Trail. *Id.* The compactness metrics Rep. Driskell mentioned on the House floor bear out that HD 115 is

an outlier. The measures the Legislature itself used were the Reock, Convex Hull, and Polsby-Popper scores. Day 3 Tr. 62:14–22. The highest compactness score possible under each metric is 1.0. P2 (House's Answer) ¶ 87; P3 (SOS's Answer) ¶ 87. HD 115 has Plan 8013's seventh-worst Reock score, its eleventh-worst Convex Hull score, and its twelfth-worst Polsby-Popper score. J1 at 2–3.

36.     Alternative district configurations that satisfy race-neutral criteria can demonstrate "that the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles." *Alexander*, 602 U.S. at 10 (quoting *Easley v. Cromartie*, 532 U.S. 234, 258 (2001)); *see also GRACE II*, 730 F. Supp. 3d at 1283 (rejected alternative plans constitute evidence of racial predominance). Here, Plaintiffs submitted an alternative State House plan (Plan D) drawn by Dr. Cory McCartan to follow the Legislature's race-neutral redistricting standards, but (unlike the Legislature) without referring to racial data at all.[9] Day 1 Tr. 133:9–134:14, 134:23–136:12, 136:22–138:9; P70 (McCartan instructions); P71 (Rodrigues memo).

---

[9]    Although "an alternative map is not a substantive requirement of a racial-gerrymandering claim," especially where (as here) the state does not raise a partisan-gerrymandering defense, *Cubanos Pa'lante v. Fla. House of Reps.*, 766 F. Supp. 3d 1204, 1211 (S.D. Fla. 2025), "[a]lternative maps configured using race-neutral principles can perform an important function," *Nord Hodges v. Albritton*, 796 F. Supp. 3d 1082, 1116 (M.D. Fla. 2025). But Defendants suggest the Court should disregard Dr. McCartan's plans, as the *Nord Hodges* court did. Dkt. No. 175 at 44, 58. In *Nord Hodges*, Dr. McCartan's maps were of little value because he "could have provided race neutral maps that merely followed the legislature's own criteria—but he didn't[.]" 796 F. Supp. 3d at 1116. Here by contrast, Dr. McCartan did exactly that. Day 1 Tr. 133:9–134:14, 134:23–136:12, 136:22–138:9; P70; P71. They are thus useful comparators that illuminate the ways in which the Legislature's maps were driven by racial goals.

Defendants also critique Dr. McCartan for failing to conduct algorithmic simulations. Dkt. No. 175 at 57–58. But Dr. McCartan explained that "no team [he] know[s] of in this world has figured out how to incorporate" Florida's constitutional criteria into a redistricting algorithm, and simulated Florida plans he previously worked on failed to comply with Florida's standards, including the equal-population requirement. Day 1 Tr. 195:5–197:16. Thus, algorithmically generated plans would not be useful comparisons to Florida's enacted plans, as Defendants' expert Dr. Trende himself conceded. *Id.* 195:19–196:5, 235:4–236:10, 238:21–239:2; Day 4 Tr. 107:23–108:3; *see, e.g., McClure*, 800 F. Supp. 3d at 1241 (finding plaintiffs' expert's non-algorithmic alternatives that "performed equal to or better than the [enacted] plan on traditional redistricting principles" supported predominance); *GRACE II*, 730 F. Supp. 3d at 1282–83, 1292 (finding evidence of non-algorithmic alternative maps supported predominance).



*Left: Enacted State House Plan (Dkt. No. 191-1 at 11). Right: Alternative Plan D (P239)*

37.     Plaintiffs' map matches or exceeds the Enacted State House Plan on all race-neutral criteria the House itself employed. Day 1 Tr. 160:19–22. On compactness, all altered districts in Plan D have higher compactness scores than the Enacted House Plan, except for HD 116's Convex Hull score, which is 0.02 lower. *Id.* 159:21–160:1; P243. Under the "boundary analysis" score—a metric the Legislature developed to measure adherence to Tier Two's mandate to utilize political and geographic boundaries—Plan D improves across the board, with some districts seeing a dramatic improvement in the extent to which their borders align with recognized boundaries like city lines, railways, and major roads and waterways. P241, P242; Day 1 Tr. 151:15–19, 152:23–156:2. Plan D also splits no additional cities or counties. Day 1 Tr. 150:24–151:1. Plan D therefore pursues the Legislature's "legitimate political objectives in alternative ways" and is thus a useful foil to root out the ways in which the Enacted House Plan was motivated by racial considerations. *Alexander*, 602 U.S. at 10.

38.     Contrasting the demographics of HD 115 in the enacted and Plaintiffs' plans illuminates how race drove the enacted HD 115's configuration. The distribution of the Hispanic population within HD 115 is not uniform. Rather, the Hispanic concentration increases markedly to the north, as illustrated by P225 (showing the Hispanic voting-age population ("HVAP") concentration):



39. Dr. Carolyn Abott described this high-HVAP area as a "boomerang shape" of concentrated HVAP running through Miami-Dade County, and testified that the first thing that "stands out immediately is the unusual shape of these districts," which are "particularly long and skinny, whereas if they were more compact, they would be more of a square shape." Day 2 Tr. 175:11–22. This elongated configuration resulted in "each one of the districts dip[ping] into this boomerang of very high HVAP." *Id.* 175:25–176:1. This is consistent with the legislator and staffer testimony above explaining that HD 115 was drawn intentionally to stretch northward into the heavily Hispanic boomerang band, achieving a racial composition that (in the Legislature's view) would perform for Hispanic voters.

40. As discussed above, Poreda admitted that ensuring Hispanic performance is the reason why HD 115 added its appendage and extends as far north as it does. *Supra* ¶¶ 21–24. Comparing the demographic statistics of the enacted and alternative HD 115 bears this out. Because the House asserted legislative privilege over draft maps and related analyses, the record does not reveal the precise manner staff changed the district to ensure Hispanic performance. But the record does show that staff "purposefully established a racial target," *Cooper*, 581 U.S. at 299, of meeting a specific threshold of Hispanic VAP and/or registrants that staff deemed necessary for the district to perform for Hispanics. While HD 115 in both enacted and alternative plans is

14

majority-Hispanic by voting-age population, VAP is only one element of the "functional analysis" the House performed to gauge Hispanic performance. Day 3 Tr. 87:8–89:2; J65 (11/2/21 H. Comm.) 20:12–14; J73 (1/21/22 H. Leg. Subcomm.) 40:17–41:1. The functional analysis also looked at Hispanic share of registered voters (because sometimes there is a drop-off between HVAP and registration); Hispanic share of each party's registrants; Hispanic turnout in general elections (because there can be a drop-off between registration and turnout); and registration and turnout in the relevant party primaries. Day 3 Tr. 87:14–88:17. For all these data points, staff looked at the full range of elections from 2012 to 2020 available in the Legislature's mapping application, not just a single election. *Id.* 88:18–89:2. Looking at all these functional-analysis data shows that reconfiguring HD 115 compactly—as in Dr. McCartan's alternative Plan D—reduces the Hispanic share across *all* metrics. P250; Day 1 Tr. 161:16–163:14, 164:15–24. Most significantly, the district drops *below majority Hispanic registration* under the decadal average. P250. The data is therefore consistent with staff reconfiguring the race-neutral draft of HD 115 to achieve a Hispanic registration majority. *See Perez I*, 267 F. Supp. 3d at 789 (adjusting district to attain 50% Spanish Surname Voter Registration supports predominance); *Covington*, 316 F.R.D. at 129 (describing "indications that attaining a racial percentage within a given district was nonnegotiable" as evidence of predominance). Moreover, it is significant that enacted HD 115's HVAP percentage is just above the 65% threshold that Redistricting Committee Chair Leek repeatedly explained was "generally" and "usually" necessary for a district to perform for Hispanics. *Compare* J75 (2/1/22 H. Sess.) 62:21–63:7 (Chair Leek explaining "generally [] you need to get about 65% of Hispanics concentrated within an area for it to perform") *and* 44:10–11 (Leek explaining "across the maps, usually you won't see that type of performance occur until you get to about the 65% or 70% Hispanic voting-age population") *and* J73 (1/21/22 H. Leg. Subcomm.) 30:19–23 (Ms. Kelly: "Generally speaking . . . there's usually a higher percentage of just the HVAP, in isolation, that's needed in order to create a performing district.) *with* J1 at 3 (HD 115 at 65.86% HVAP).

### ii. *Race predominated in drawing HDs 118 and 119.*

41.     HDs 118 and 119 are "long, skinny, vertical" districts sitting side-by-side in unincorporated western and southwestern Miami-Dade County. D19 (below); J75 46:20–21. Plaintiffs consider them together because their development during the redistricting process (and the race-based choices the House made to configure them) were tied together in the larger rectangle that encloses them both. *See, e.g.*, Day 3 Tr. 110:16–111:4.



42.     **Poreda Testimony:** We again start with previously non-public information that came to light in discovery and at trial. In particular, Poreda testified that the House considered options for HDs 118 and 119 that were equivalent on race-neutral criteria, yet the House then picked the enacted configuration *because* it had "better" Hispanic performance for both districts. Where a legislature confronts multiple districting options that are equivalent under traditional redistricting principles and selects one just because it better satisfies racial performance goals, race is not merely considered—it predominates. *See Bethune-Hill I*, 580 U.S. at 179 ("[A] State could construct a plethora of potential maps that look consistent with traditional, race-neutral principles. But if race for its own sake is the overriding reason for choosing one map over others, race still may predominate."). "Race was the criterion that, in the State's view, could not be compromised[.]" *Hunt*, 517 U.S. at 907.

43.     During the development of HDs 118 and 119, staff drew different options for them, plus looked at publicly submitted maps that proposed different configurations. Day 3 Tr. 110:20–111:1, 224:25–225:9. One of the configurations that staff looked at had HDs 118 and 119 stacked on top of each other like squares. *Id.* 111:2–4, 225:4–9. Staff concluded that all those different options—including the "stacked" option—were equally Tier Two-compliant; their metrics on the

race-neutral criteria were comparable. *Id.* 111:5–7, 111:16–18, 225:10–13. Staff then performed functional analysis on HDs 118 and 119 in all those options. *Id.* 111:8–10, 225:14–16. And then staff advanced the option that they concluded would be most Tier One-compliant in both 118 and 119, "and specifically the one that would satisfy the non-diminishment standard the best, meaning the opportunity to elect for the minority community to elect a candidate of their choice in both districts would be comparable of that to the analogous benchmark districts." *Id.* 225:17–23. The primary focus of staff's diminishment analysis was ensuring a Hispanic would be elected in *both* districts, and that Hispanics' opportunity to elect in *each* district was comparable and not diminished when compared to the benchmark. *Id.* 225:24–226:4. That decision resulted in the enacted map configuration, with north-south-oriented HDs 118 and 119 sitting side-by-side in the larger bounding rectangle. *Id.* 112:14–19.

44.     **Legislative Record:** For HDs 118 and 119, consistent with Poreda's testimony, legislators, too, "express[ly] acknowledge[ed]" that race played a role in the drawing of district lines." *Alexander*, 602 U.S. at 8. As with HD 115, Rep. Driskell on the House floor asked the same questions about "long, skinny, vertical" HDs 118 and 119 as she did with 115, eliciting the same answers about these "outliers." J75 (2/1/22 H. Sess.) 46:18–22, 47:8–11. To reiterate, Chair Leek explained there were "some protected districts, so there is also another analysis that goes in that, in addition to compactness, and since "we get to compactness after Tier One, . . . we had to make sure the protected districts continue to perform within reason, as they had performed." *Id.* 47:16–19. Answering "was it necessary that those five districts be long and skinny and noncompact to comply with Tier One," Chair Leek admitted that in his mind, "Tier One is a wholly separate analysis, and so we're not going to get to compactness until we are assured that Tier One is satisfied." *Id.* 52:9–11, 52:13–14.

45.     Chair Leek refused to answer why HDs 118 and 119 "couldn't . . . just be stacked on top of each other like squares," *id.* 52:19–22, but Chair Byrd's answer about HD 115 immediately after—"Because that's a Tier One standard that we applied"—accords with Poreda's testimony that the House selected the enacted 118/119 configuration *because* it was deemed more adherent to Tier One's racial mandates. *Id.* 53:13.

46.     Moreover, unlike the alternative version of HD 115 shielded by legislative privilege discussed above, the House actually considered and rejected a "stacked squares" alternative proposed by a citizen. P33; Day 3 Tr. 16:1–16. We know from Poreda that the House rejected that

configuration *because* it failed to comport with its racial goals. *Supra* ¶ 43. This supports racial predominance. *GRACE II*, 730 F. Supp. 3d at 1283 (rejection of alternatives for racial reasons is evidence of predominance).

47.     **Circumstantial Evidence:** As with HD 115, HDs 118 and 119's "shape and demographics" are consistent with the testimony and legislative record, and show racial predominance. *Cooper*, 581 U.S. at 291. The districts' compactness and boundary analysis scores indicate they are outliers, as Rep. Driskell noted. HD 118 has the second-worst Reock score of any district in Plan 8013, higher only than a district protected under Tier One for Black voters. J1 at 2–5. HD 118 also has Plan 8013's second-worst boundary analysis score. *Id.* at 25–27. HD 118 is in the thirteenth percentile for Polsby-Popper, and the twenty-ninth percentile for Convex Hull of all the districts in Plan 8013. *Id.* at 2–3. HD 118 runs over 14 miles north-south from the Tamiami Trail down to SW 232nd Street, but it is just 1.7 miles at its narrowest point. D17; P18 at 7 (RFA No. 12). HD 119 also stretches from the Tamiami Trail to SW 232nd Street and is over four times longer than it is wide. D17; P18 at 7 (RFA No. 13). HD 119 has Plan 8013's seventh-worst Reock score and its thirteenth-worst boundary analysis score. J1 at 2–3.

48.     As discussed above, Plaintiffs' alternative Plan D (including redrawn HDs 118 and 119) shows "the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles." *Alexander*, 602 U.S. at 10 (quotation omitted); *supra* ¶¶ 35–40. Contrasting the demographics of the enacted and alternative HDs 118 and 119 again illuminate how race drove the enacted configuration. As Dr. Abott explained, these districts share the same "long and skinny" orientation as HD 115, running north-south so that each one "dips into this boomerang of very high HVAP" on the north end. Day 2 Tr. 175:16–176:1; P225. This allows each district to be more uniformly Hispanic than if they were stacked more compactly like squares: In the enacted map, HDs 118 and 119 have near-identical HVAPs of 85.7% and 85.2%, respectively, whereas in the alternative plan their HVAPs differ by more than 11 percentage points. Day 2 Tr. 176:16–177:5; P250.

49.     As with HD 115, the data confirms the legislative record and trial testimony: the House configured HDs 118 and 119 for racial reasons, specifically to ensure Hispanic voters would "control" the relevant party primaries and general elections in both districts. Though both HDs 118 and 119 are majority-HVAP in the enacted and alternative maps, looking at each data point in the House's functional analysis, the "stacked" orientation transforms the southern district (numbered

119 in Plan D) into a *much* less Hispanic district, across *all* metrics. P250. Crucially, HD 119 in Plan D is majority-Hispanic in Democratic primary elections in the enacted plan, but in the "stacked" alternative it is under 45% on that decadal metric. *Id.* As Poreda testified, whether "minorities [will] be able to control the primary election" was one of the two prongs of the House's functional analysis. Day 3 Tr. 85:21, 86:8–19. Again, the circumstantial evidence illuminates what the House's assertion of legislative privilege casts in shadow, explaining why the House chose these long-and-skinny configurations.

### iii.   Race predominated in drawing CD 26.

50.    As the Joint Pretrial Stipulation outlines, Congressional redistricting proceeded concurrently in both chambers and eventually involved the Governor's office. Stip. at 5–6. The Senate and House initially passed plans with similar South Florida configurations, Plans 8060 and 8019; the Legislature sent Plan 8019 to the Governor, who vetoed it over disagreements with districts outside of South Florida; then the Legislature passed, and the Governor signed, Plan 109, which in large part resembled Plans 8060 and 8019 in South Florida. *Id.* § 5 ¶¶ 28, 32–34, 38–41; J3 at 1; J8 at 1; J9 at 1; P2 (House's Answer) ¶¶ 132, 135–36.

51.    Because the House, Senate, and Executive Office of the Governor (EOG) were all involved in the development of enacted CD 26, statements from key actors in all three are relevant to racial predominance. These statements, plus trial testimony from the one actor who agreed to testify (Poreda),[10] and supported by circumstantial evidence of CD 26's shape and demographics, prove that race predominated in its enacted configuration. Racial predominance in CD 26 manifests most starkly in two ways: the joining of Miami-Dade County to Collier County, which legislators and staff explained was due to racial reasons, and the way that CD 26 divides both Collier and Miami-Dade along racial lines, separating more-Hispanic from less-Hispanic areas.

52.    **Poreda Testimony:** Again, we begin with the new information about CD 26's development learned in discovery and at trial. Poreda agreed that the way the Legislature drew CD 26, and certain other districts it deemed protected, "was not race neutral." Day 3 Tr. 121:6–10. In particular, at trial Poreda testified that the Legislature considered all four congressional districts in Miami-Dade County to be Tier One protected districts for minority voters. *Id.* 117:6–9. Because staff had to make sure that they could each individually perform and not diminish for the relevant

---

[10]    The significance of committee chairs' and other staff members' refusal to testify are discussed further *infra* ¶¶ 88–96.

minority group, if staff were going to make changes to one of those districts, they needed to ensure that they weren't impacting the other districts and *their* functional analysis, too. *Id.* 119:21–120:9. Thus, in drawing neighboring CD 24 (a district the Legislature considered protected for Black voters), staff were not only concerned about ensuring Tier One compliance in CD 24, but also avoiding negatively impacting the Tier One performance of the adjacent Hispanic districts, including CD 26. *Id.* 120:10–14.

53.     At trial, Poreda admitted that Tier One factors—Florida's racial mandates—plus equal population "are what primarily governs the shapes of the districts down in Dade County." *Id.* 129:4–18. Tier One considerations were not only "a reason" for the way the City of Miami was split, it was "a large contributing factor" for how it was split, along with equal population. *Id.* 117:13–18. Because an equal population goal "is part of the redistricting background, taken as a given," it cannot explain why CD 26 takes its particular form. And once population equality is satisfied, the Legislature's own testimony establishes that race "primarily" (*i.e.*, predominantly) drove the configurations of each of Dade's four congressional districts, including CD 26. *ALBC I*, 575 U.S. at 272 ("[A]n equal population goal is not one factor among others to be weighed against the use of race to determine whether race 'predominates.'").

54.     Even if Poreda's concession that race "primarily" drove the shapes of CDs 24, 26, 27, and 28 alone were not enough to establish race predominated in the drawing of all four districts, additional evidence unearthed in discovery establishes that, at the very least, race predominated in "the legislature's . . . design of the district as a whole," CD 26's shape connecting two distinct Hispanic population centers on opposite sides of Florida. *Bethune-Hill I*, 580 U.S. at 192. At one point in the congressional redistricting process, staff drew a draft map that did *not* include a district incorporating portions of both Miami-Dade and Collier. Day 3 Tr. 128:5–8. In other words, staff explored options that followed the Dade-Collier line and separated the coasts at the southern end of the state. *Id.* 128:9–12. But staff rejected that alternative partly because eliminating the Collier-Dade district would have negatively impacted the Hispanic-ability-to-elect in CD 26 (and one of 27 and 28). *Id.* 128:24–129:3.[11] Again, the rejection of alternatives for racial reasons supports

---

[11]   According to Poreda, the other two reasons were because (1) he thought it would negatively impact the compactness of other districts (an assertion that cannot be confirmed, since the draft maps are not in evidence), and (2) "you'd have to have a district that extends a long way across the state from the Atlantic westward anyway," just further north (an assertion undermined by McCartan's alternative maps, *see* P209, P216, P217, P218). Day 3 Tr. 128:16–23.

predominance.

55.     **Legislative Record**: Key legislators and staff freely acknowledged during the process that CD 26's shape was a function of their racial goals, and that race-neutral criteria took a back seat to achieving Hispanic performance.

56.     We begin at the process's end, when EOG staffer Alex Kelly presented Plan 109 in the House Congressional Subcommittee. Concluding his presentation by noting Plan 109's nips and tucks to CD 26, Mr. Kelly commented: "I equalized the population in Collier County. . . . The resulting District 26 still has a Hispanic voting age population of 73.22 percent." J81 (4/19/22 H. Con. Subcomm.) 46:18–19, 47:5–6. Of the eighteen districts Plan 109 changed from Plan 8019, CD 26 was the *only* district for which Mr. Kelly cited a racial population percentage when he walked through the changes. *See id.* 15:2–47:8.

57.     A colloquy between Miami-Dade Rep. Dotie Joseph and Mr. Kelly highlights the racial motive for CD 26's design.[12] Rep. Joseph noted that CD 26 "spans from the Everglades to Collier County [and] Miami all the way to Hialeah." *Id.* 71:8–10. She asked Mr. Kelly to "talk to us about your premise in drawing that particular map in crossing over the way you did." *Id.* 71:10–12. Mr. Kelly responded in part by again emphasizing the Hispanic population he attained: "Overall, as I mentioned earlier in my testimony, the Hispanic voting age population of the district is still quite high. It's a little more than 73% Hispanic voting-age population." *Id.* 72:16–19.

58.     Rep. Joseph followed up: "So when you say you were in need of population, you were specifically referring to the Latino population to create this district[?]" *Id.* 73:2–4. Mr. Kelly explained how he drew CD 26 to target a specific Hispanic percentage "threshold":

> Really both. I was in need of population initially just because I was taking the district out of Hendry County and then also out of part of the Immokalee [] area. . . .
>
> So, in effect, I needed people for equal population, first and foremost, to complete the district. . . .
>
> That said, knowing that this is a historically performing majority-minority Hispanic seat, I was watching those numbers carefully to

---

[12]   Rep. Joseph highlighted CD 26's Tier Two "drawbacks" and "deficiencies" on the House floor the following day, for example that it includes "an additional split of Collier, and it cuts the Immokalee community in half following local streets like County Road 846, which isn't in our geographic boundaries database." J82 (4/20/22 H. Sess.) 45:7–17. Chair Leek would not answer when she asked if "you or anybody concluded that those Tier 2 drawbacks are necessary to maintain Tier 1 compliance to keep that Hispanic voting group together?" *Id.* 45:20–23, 46:2–6.

> make sure that in terms of the overall Hispanic voting age
> population, I was staying very close to the benchmark seat, which I
> think is maybe a little bit more than 74%.
>
> So the seat that I drew, the percentage is around 73, still very high,
> still at a threshold that should perform for a Hispanic – a majority
> Hispanic voting age population seat.

*Id.* 73:7–74:4. Mr. Kelly's testimony confirms "attaining a racial percentage within a given district was nonnegotiable[.]" *Covington*, 316 F.R.D. at 129; *see also ALBC I*, 575 U.S. at 267 ("prioritizing mechanical racial targets" is evidence of predominance).

59.     In the Senate, Sen. Gary Farmer also probed the race-based motivations and justifications for CD 26. He began by asking: "Big consideration in drafting CD 26 is, and a lot of districts in South Florida that are around it, is that 26 is a Tier One protected district, correct?" J100 (4/19/22 5pm S. Sess.) 66:16–17. Chair Rodrigues responded simply: "That is correct." *Id.* 66:19.

60.     Sen. Farmer continued:

> During the committee process, we talked about – the committee and
> members, and testimony was received, that CD 26 is maybe having
> some Tier Two drawbacks that are necessary to maintain Tier One
> compliance. . . .
>
> Some of those got a bit worse from 8017 to 1809, and now to 109. I
> would use, by way of example, what's been referred to as the
> Stairway to Immokalee, which stretches all the way to the Biscayne
> Bay from the Gulf of Mexico, cutting off a piece of CD 24 in
> Downtown Miami that's now connected to the rest of CD 24 only
> by a bridge. So you've got this kind of stairway-looking district.
> Now, 109 actually introduces an additional split of Collier County,
> plus it cuts the Immokalee community in half, following local
> streets. . . .
>
> So I guess I'm just looking for confirmation that this map 109
> concluded that those Tier Two drawbacks are necessary to maintain
> that Tier One compliance for CD 26.

*Id.* 66:21–67:9.

61.     Chair Rodrigues replied:

> I did not have a discussion specific to that level of detail in the
> briefing that I received from the Executive Office of the Governor.
> But what I do have is confirmation, looking at the data, that District
> 26 retains its minority-majority status, and that particular seat is a
> minority-majority district for Hispanics. It was under both of the

> maps that we passed previously [8060 and 8019]. It remains in this
> map as well.

*Id.* 67:11–15.

62.     Discussions of earlier iterations of CD 26—all very similar to the version ultimately enacted—also support the case for racial predominance. *See* J3 at 1 (Enacted Congressional Plan); J43 at 14 (Plan 8011 considered on 2/18/22); J9 at 1 (Plan 8060 considered on 1/19/22).

63.     In response to Republican Rep. Fabricio's questions about CD 26's "low" compactness scores on February 18, 2022, Chair Sirois stressed that "**Tier 1 standards take precedent**"; Ms. Kelly made clear "**compactness is secondary to our Tier 1 requirement to ensure that a minority population has an ability to elect a candidate of their choice**," responding to the question about why CD 26 had low compactness by explaining "District 26 is a protected Hispanic district." J77 (2/18/22 H. Con. Subcomm.) 45:14–48:7.

64.     Rep. Dotie Joseph asked a number of questions about the reasons for CD 26's shape at the same meeting. The answers all pointed to Tier One—race. She asked whether CD 26 was "impacted by the fact that it's a Tier 1-protected district for Latino voters or Hispanic voters," to which Chair Sirois replied simply: "Yes." *Id.* 38:10–16. Poreda confirmed this fact. Day 3 Tr. 113:21–25. Rep. Joseph went on:

> So looking at kind of the image of it, it's kind of like an extruded
> stair-step shape, stretching up from the Gulf of Mexico all the way
> over to a little finger that points just 700 yards short of Biscayne Bay
> in Miami. Was that shape necessary to comply with Tier 1? Or were
> there other factors that went into just how it ends up looking there?

J77 38:17–24.

65.     Chair Sirois deferred to Poreda, who confirmed CD 26's shape was indeed necessary to comply with Tier One:

> Yes. The shape of District 26 was largely because not only it was a
> Tier 1-protected district, but the other three districts in Miami-Dade
> County – District 24 are protected black district. And District 27 and
> 28 are also protected districts. So trying to balance all the Tier 2
> issues that are there in addition to, first, protecting all three of those
> districts and their ability to elect, that largely impacted the shapes of
> all four of those districts.

*Id.* 39:6–15. Poreda confirmed his answer was accurate. Day 3 Tr. 115:15–22.

66.     Rep. Joseph also summed up the race-neutral principles CD 26 violated, and essentially asking whether they were subordinated to achieve Tier One compliance:

> [T]he Everglades boundary coincides with the political boundary where the Dade-Collier County boundary is. So with that in mind, looking at the Tier 2 factors with CD [2]6, like this stairway to [Immokalee] shape, it crosses those county lines. It splits Collier, which is smaller than the ideal district size. It splits the city of Miami in three ways, and Miami is smaller than ideal district size too. All of those Tier 2 – I don't want to say deficiencies, but infirmities, if we can call it that, were those necessary to maintain Tier 1 compliance?

J77 43:12–23.

67.     Chair Sirois suggested that a "different approach" could be explored at the next committee stop, *id.* 44:3–6, and then deferred to Poreda, who answered that CD 26's "Tier Two infirmities" were "primarily" because of Tier One—racial—considerations:

> As I mentioned earlier, that is primarily due to Tier 1 considerations[.] In addition to the equal population standard because the boundaries within Collier County, for example – even though, Collier County, there's lots of counties throughout the map. Walton County is another example; Citrus County, where counties have to be split in a congressional map because of the equal population standard.

*Id.* 44:10–18. Poreda testified that this answer was accurate. Day 3 Tr. 117:1–3. His response, confirming that CD 26's deviations from the race-neutral criteria were "primarily due to Tier 1 considerations" (plus equal population, which again is part of the redistricting background) is an unambiguous, contemporaneous confession that the Legislature subordinated race-neutral principles to racial goals in drawing CD 26.

68.     Finally, Rep. Joseph asked "to see how we could avoid crossing the Everglades," referencing that the State Senate and State House maps avoid doing that, because "it would make it more Tier 2 compliant," and "uphold or maximize the Tier 2 criteria." J77 55:14–56:1, 57:7–10. Emphasizing leadership's focus on the racial status of the district, Chair Sirois responded first by emphasizing "Congressional District 26 remains a protected Hispanic district," and then suggested he "can look at" her proposal, which was ultimately rejected. *Id.* 56:5–6, 57:20–23; Day 3 Tr. 28:8–15.

69.     Earlier in the process, Senate Committee Staff Director Jay Ferrin admitted that the boundary of the district (numbered 25 in Senate drafts) "departs from [major] geographic features when necessary to equalize population and to maintain the ability to elect in this and enabling Tier-One districts." J87 (11/16/21 S. Con. Subcomm.) 35:9–12. In other words, the Legislature

"departed" from race-neutral criteria to achieve its racial goal, thus subordinating that criterion to race. *See Alexander*, 602 U.S. at 7; *Cooper*, 581 U.S. at 308.

70.    Also in the Senate, Miami-Dade Sen. Annette Taddeo asked why the Senate's proposed congressional plan divided two "communities defined by actual shared interests," *Miller*, 515 U.S. at 916, whereas the benchmark plan united them in a single district. J94 (1/19/22 S. Sess.) 9:20–23, 10:11–12; Day 2 Tr. 237:7–21. Of the first community, Biscayne Bay islands divided between CDs 24 and 27, Chair Rodrigues yielded to Ferrin, who responded in part: "keep in mind that you're drawing Tier One protected Hispanic districts here[.]"[13] J94 10:7–8. As to why the Fontainebleau community was split between CDs 25 and 27,[14] Chair Rodrigues explained: "We started drawing from the bottom up there, keeping in mind this is a Tier One protected district, so we had to ensure that the district, after it was drawn, would continue to perform in a functional analysis." *Id.* 10:15–17.

71.    As Sen. Taddeo—who voted for that congressional map—summarized, Chair Rodrigues and Ferrin explained that these communities were split because "they were giving priority to making sure that they were Hispanic" and "giving much more emphasis on that than on keeping communities together[.]" Day 2 Tr. 236:11–13, 238:1–4.

72.    **Circumstantial Evidence:** CD 26's "shape and demographics" bear out how traditional redistricting criteria were subordinated to race, as legislators and staff acknowledged. *Cooper*, 581 U.S. at 291. Its shape, which Poreda explained was "primarily due to Tier One," gives it below-average scores on all three compactness measures: CD 26 has the third-worst Reock score of all 28 districts, the fifth-worst Polsby-Popper score, and a worse-than-average Convex Hull score. J3 at 2.

---

[13]   Relatedly, Poreda explained that when coastal Miami-Dade was moved into CD 24 (the subject of Sen. Taddeo and Ferrin's discussion), and CD 26 shifted eastward to take in areas previously assigned to CD 24, he was not only concerned about ensuring Tier One compliance in CD 24, but also avoiding negatively impacting Hispanic performance in adjacent Hispanic districts like CD 26. Day 3 Tr. 117:21–120:14. The division of the Biscayne Bay island communities between CDs 24 and 27 is thus a function of how CD 26 is drawn. *Cf. ALBC I*, 575 U.S. at 266 (discussing relevance of the fact that the use of race to draw challenged districts "affected the boundaries of other districts as well").

[14]   CD 25 in the Senate's Plan 8060 and earlier drafts was similar in configuration to the enacted CD 26. *Compare* J3 at 1 (Enacted Plan) *with* J9 at 1 (Plan 8060); Day 3 Tr. 240:13–16.

For purposes of Florida's Non-Diminishment Clause, CD 25 in the benchmark congressional plan is the benchmark district for enacted CD 26. Day 3 Tr. 113:3–14.

73. The ways in which CD 26 splits Collier and Miami-Dade Counties also indicate racial predominance. *See McClure v. Jefferson Cnty. Comm'n*, 800 F. Supp. 3d 1209, 1261 (N.D. Ala. 2025) ("Demographic circumstantial evidence correlates race with legislative decisions to split counties, precincts, and other political subdivisions among districts."), *stay granted on* Purcell *grounds*, No. 25-13253, 2025 WL 2977740 (11th Cir. Oct. 16, 2025). Considering district shape "in conjunction with racial and population densities" suggests race drove the boundary lines. *Clark v. Putnam Cnty.*, 293 F.3d 1261, 1270 (11th Cir. 2002).

74. The portion of Collier in CD 26 is 31.8% HVAP. Day 2 Tr. 153:10–12. The remainder has an Hispanic concentration less than *half* that, at 13.7% HVAP. *Id.* 153:13–15. Even less Hispanic still is the thin coastal appendage of CD 19 which CD 26's division of Collier forces CD 19 to assume; that portion of CD 19 is 11.98% HVAP. D54; *cf. ALBC I*, 575 U.S. at 266 (finding "perfectly relevant" evidence "that the use of race to draw the boundaries of the majority-minority districts affected the boundaries of other districts as well").[15] In other words, Collier County is split along racial lines, with more-Hispanic areas assigned to CD 26.[16] Day 2 Tr. 153:16–18, 154:12–18; P223. In Miami-Dade, the dividing line between CD 26 and the adjacent district which the Legislature did *not* consider "protected" for Hispanic voters—CD 24—follows racial lines. Day 2 Tr. 151:14–152:7, 152:21–25, 154:23–157:8, 158:13–163:21; P224; P170: P171a. The borders of the three Hispanic protected districts, meanwhile, converge to keep all three districts' HVAP within a single percentage point, with CD 26 at 73% (the number Mr. Kelly was "watching carefully to make sure" he "was staying very close to the benchmark" of about 74%). Day 2 Tr. 146:3–7; J81 73:21–25. These consistent patterns, explained by Dr. Carolyn Abott, are evident at various levels of geographic analysis, ranging from large to small. Day 2 Tr. 150:6–163:21; P167; P170; P171a.

---

[15] Senate staff explicitly admitted that CD 19's shape "is a result of the configuration of District 25, which is a Hispanic majority minority district protected from diminishment under Tier-One," tying CD 19's unusual shape to CD 26's Hispanic-protected status. J87 (11/16/21 S. Con. Subcomm.) 30:8–12; *see also* J93 (1/13/22 S. Comm.) 12:23–13:1 (Ferrin again noting CD 19 "is affected by the neighboring District 25, which is a Tier One protected district"); 13:9 (Ferrin explaining that South Florida having five Tier One protected districts "has a significant impact on the configuration of the region").

[16] While the piece of Collier County assigned to CD 18 has a higher HVAP, that small area (less than 5,000 residents) that does not change the fact that the portion of the county assigned to CD 26 is much more Hispanic than the portion excluded from it. Day 2 Tr. 227:20–228:9. Alex Kelly told the Legislature he added that piece to CD 18 because that's where he equalized population—while "still" keeping CD 26 with a 73.22% HVAP. J81 (4/19/22 H. Con. Subcomm.) 46:3–47:6.

The splitting of cities, precincts, and other geographic subdivisions along racial lines, as Dr. Abott describes, "strongly suggests" racial predominance. *Covington*, 316 F.R.D. at 129, 145, 160 ("district lines that cut through traditional geographic boundaries or local election precincts" provides circumstantial evidence of predominance); *Bethune-Hill v. Va. State Bd. of Elections* (*Bethune-Hill II*), 326 F. Supp. 3d 128, 148 (E.D. Va. 2018); *Jacksonville I*, 635 F. Supp. 3d at 1275 (discussing racial patterns in how precincts were split); *GRACE I*, 674 F. Supp. 3d at 1193–94, 1210–11. Further, CD 26 unnecessarily splits the City of Miami, which Poreda admitted was split largely for racial reasons. Day 3 Tr. 117:13–18.

75.     Overall, there is a large and unform concentration of Hispanic voters in CDs 26, 27, and 28, that is not explainable by variations in regional demographics. Day 2 Tr. 143:8–16, 146:3–10, 148:15–24; P167; P198; *see Jacksonville I*, 635 F. Supp. 3d at 1273–76, 1284 (similar expert analysis concluding "district lines are consistently drawn in a manner such that the precincts in [protected Black districts] have higher BVAP than the neighboring precincts on the other side of the line" was "strong evidence" of predominance); *GRACE I*, 674 F. Supp. 3d at 1193–94 & n.15, 1209–11 (crediting similar analysis and finding predominance); *McClure*, 800 F. Supp. 3d at 1261–62 (explaining that "[e]xpert witnesses may offer opinions regarding the role race played in redistricting" and crediting experts' analyses to support racial predominance).

76.     While some of the portions of the district boundary also track major roads or city lines, many do not—but *do* track racial divisions. Day 3 Tr. 236:5–239:20; Dkt. No. 191-6. Regardless, when a legislature follows a city line or road *because* it tracks a racial division (as the Legislature did here) that too suggests racial predominance. *Jacksonville I*, 635 F. Supp. 3d at 1284 (finding precinct demographic data was "strong evidence that the borders of the Challenged Districts follow racial lines" and noting city failed to explain "how such consistent racial sorting would result if the border lines were not drawn on the basis of race"); *Bethune-Hill II*, 326 F. Supp. 3d at 160 (finding predominance where districts "follow[ed] the boundaries of black and white neighborhoods").

77.     The population dot map of CD 26 (P238, below) illustrates how the district joins disconnected communities and breaches the Miami-Dade-Collier county boundary that coincides with a major geographic boundary:



78.     That the Legislature configured CD 26 to connect Miami-Dade and Collier for racial reasons (as legislators and staff explained) is underscored by the contrary approach in the State House and Senate maps, which respect that county boundary. Indeed, the House had a race-neutral goal to minimize the number of times the Miami-Dade County boundary was crossed in the State House map, to follow the Tier Two mandate to utilize existing political boundaries. Day 3 Tr. 122:8–17.

79.     As Poreda explained, one manifestation of that mandate is to minimize the number of times a county boundary is crossed. *Id.* 122:18–21. And in 2022, the House eliminated a benchmark State House district that crossed from Miami-Dade to Collier, which "visually looked a little out of place," to comply with that mandate. *Id.* 123:1–125:5, 126:12–15; J75 (2/1/22 H. Sess.) 7:9–16 (Leek noting "points of improvement" including that the House "worked to improve visual compactness of districts or the eyeball test, such as no longer having a district that stretches from Miami-Dade County to Collier County"); J76 (2/2/22 H. Sess.) 31:3–6 (Rep. Persons-Mulicka praising the map for eliminating the "coast-to-coast district" and having "only two districts [that] cross the Miami-Dade County line"); *see also* Day 3 Tr. 127:5–14.

80.     Despite the Legislature applying a "consistent methodology" for applying the race-neutral criteria to the State House and congressional maps, the congressional map features a "coast-to-coast" CD 26 that crosses the Miami-Dade County line unnecessarily, just like the visually noncompact district the House eliminated for race-neutral reasons. Day 3 Tr. 69:2–10, 127:15–

128:4, J87 (11/16/21 S. Con. Subcomm.) 4:7–12; J91 (1/10/22 S. Con. Subcomm.) 11:6–9, 19:1–2; J93 (1/13/22 S. Comm.) 3:13–15 (discussing consistent application of Tier Two criteria in the Senate); Day 1 Tr. 192:23–193:24 (discussing how Senate map respects the Dade-Collier boundary); J55 at 639 (Senate map).

81.     Additional circumstantial evidence of racial predominance comes from Plaintiffs' alternative maps, which again show "the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles." *Alexander*, 602 U.S. at 10 (quotation omitted); Day 1 Tr. 192:17–22. In particular, the alternative maps demonstrate that the racial divisions and demographics of the Enacted Congressional Plan are not merely a function South Florida's geography, but the result of *choices* the Legislature made to concentrate and distribute Hispanic populations in the three "protected" Hispanic districts, and to separate the region along racial lines. Day 2 Tr. 166:14–171:3, 172:21–174:19. This is most starkly visible in the border between CD 24 and the district(s) to its south: in the Enacted Congressional Plan, the districts hew to racial boundaries while splitting the City of Miami and following local streets, while in the alternative maps the districts divide the area irrespective of race, even while keeping constant CD 24 as a Black-performing district, as the Legislature intended. Day 2 Tr. 56:25–57:12; *see* P224 and Dkt. No. 191-1 at 40, below (showing, from left to right, the Enacted Plan and alternatives A, C1, C2, and D; B1; and B2):



82.     To sum up: CD 26 splits Collier County unnecessarily, assigning more-Hispanic areas of Collier to CD 26. CD 26 splits the City of Miami unnecessarily, again along racial lines. CD 26 splits Miami-Dade County into more districts than necessary, and the county division again tracks racial lines, in many cases along local streets. Contrary to the Legislature's "consistent methodology" applying its race-neutral criteria, CD 26 joins Miami-Dade with Collier County,

crossing the Miami-Dade County line more times than necessary and breaching both a major political boundary and a large uninhabited area to connect distinct population centers on the two coasts, connecting distinct "communities defined by actual shared interests" into a single district. *Miller*, 515 U.S. at 916; *see*, *e.g.*, Day 1 Tr. 96:10–98:3 (Cruz explaining differences in the communities in CD 26). CD 26 is a plan outlier on multiple compactness measures and worse than average on all metrics. Legislators and staff admitted that many of these deficiencies were *because* of racial goals. Race-neutral alternative maps that do *not* track the region's racial divides show "the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles." *Alexander*, 602 U.S. at 10 (citation omitted). "[R]ace was the predominant factor motivating the legislature's decision to place a significant number of voters within or without" CD 26. *Cooper*, 581 U.S. at 291 (quoting *Miller*, 515 U.S. at 916).

**D. Other legislative statements support the case for racial predominance.**

83.     Considering the role race played in redistricting requires a "holistic analysis." *Bethune-Hill I*, 580 U.S. at 192. Plaintiffs "'can present statewide evidence in order to prove racial gerrymandering in a particular district' given that 'a legislature may pursue a common redistricting policy toward multiple districts.'" Dkt. No. 148 (*MSJ Order*) at 10 (quoting *Bethune-Hill I*, 580 U.S. at 192). Indeed, plaintiffs can "rel[y] heavily upon statewide evidence to prove that race predominated in the drawing of individual district lines"; such statewide evidence is "perfectly relevant." *ALBC I*, 575 U.S. at 266. A legislature's common policy toward multiple districts "provides evidence that race motivated the drawing of particular lines in multiple districts[.]" *Id.* at 267.

84.     Here, numerous statements from key legislators and staff evince a multi-district policy of subordinating race-neutral criteria to the race-based Tier One requirements. The Supreme Court has observed that "[s]uch concessions are not uncommon because States often admit to considering race for the purpose of satisfying [ ] precedent interpreting"—for example—"the Voting Rights Act of 1965," *Alexander*, 602 U.S. at 8, but that does not make them any less probative evidence of racial predominance. Plaintiffs briefly summarize the multi-district evidence.

85.     Staff and committee chairs repeatedly introduced and categorized the Challenged Districts as "protected majority-minority Hispanic districts" that were drawn "to maintain existing

majority-minority districts" and that "ensure that the minority groups['] ability to elect a candidate of their choice is maintained." J69 (12/3/21 H. Leg. Subcomm.) 37:19–22; J72 (1/13/22 H. Leg. Subcomm.) 90:3–13; J73 (1/21/22 H. Comm.) 23:18, 20-23; J74 (1/26/22 H. Comm.) 30:15, 18:20; J75 (2/1/22 H. Sess.) 8:3–14; J75 (2/1/22 H. Sess.) 22:7–12; J87 (11/16/21 S. Con. Subcomm.) 30:10–12; J93 (1/13/22 S. Comm.) 13:3–5; J68 (12/2/21 H. Con. Subcomm.) 23:10–12; J72 (1/13/22 H. Comm.) 31:8–13, 47:22–25; J77 (2/18/22 H. Con. Subcomm.) 23:4–9; J78 (2/25/22 H. Comm.) 41:10–15; J79 (3/3/22 H. Sess.) 23:3–6; J97 (3/4/22 S. Sess.) 5:25–7:20 (Rodrigues: "[W]e were very clear that we preserved the districts of opportunity for our minority voters . . . .).

86.     More general statements by key legislators and staff similarly confirm that the Legislature subordinated race-neutral principles when drawing districts it considered protected by Tier One. For example, Chair Leek admitted that "**race was never the predominant factor in drawing a district, outside of protecting the protected districts**." J75 (2/1/22 H. Sess.) 76:22–77:11. Chair Leek's admission that race was the predominant factor in protected districts accords with how the Legislature "classified" citizens into districts it considered Tier One-protected and those it didn't. In the latter districts, the Legislature drew race-blind, with race not even considered as a factor at all—even though it could have been. Day 3 Tr. 121:18–122:3; *Alexander*, 602 U.S. at 22. In the former districts, the Legislature considered race, Day 3 Tr. 122:4–7, and believed its use of race *could* permissibly be predominant (if the Legislature's assumptions about Tier One were correct). Despite Chair Leek explaining at the time that the House employed race as the predominant factor to protect the protected districts, the House now argues the opposite is true, only after its assumption that these districts were "protected" is revealed to be faulty.

87.     Chair Leek also explained to the House how the House Committee subordinated traditional redistricting criteria to race when drawing what it considered to be Tier One-protected districts: "If your primary concern is, as it should be, [] Tier One compliance—[] Tier Two is Tier Two for a reason. So, **when it's a protected district, we focus much less on Tier Two**." J75 (2/1/22 H. Sess.) 68:22–23. House Committee member and Legislative Subcommittee Vice-Chair Rep. Will Robinson confirmed that the Legislature prioritized racial considerations (*i.e.*, Tier One) over traditional redistricting criteria (*i.e.*, Tier Two) in what the Legislature believed to be Tier One-protected districts, including CD 26:

> I couldn't help notice yesterday there were a lot of questions about whether we elevated Tier Two standards over Tier One standards. We also heard this line of questioning in the subcommittee, and I

31

want to say firmly that that has never been the case. Tier One always
outranks Tier Two. And in my opinion, that is firmly true in this map
before us.

J83 (4/21/22 H. Sess.) 53:11–18.

### E.   The presumption of good faith compels the Court to credit contemporaneous statements that race was the reason for the districts' configurations.

88.     "Although race-based decisionmaking is inherently suspect, until a claimant makes
a showing sufficient to support that allegation the good faith of a state legislature must be
presumed." *Miller*, 515 U.S. at 915 (citing *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 218
(1995), and *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 318–19 (1978) (opinion of Powell,
J.)) (internal citations omitted). In other words, courts start with a presumption that a legislature's
stated reasons for its policymaking are its honest reasons. *See Ga. State Conf. of NAACP v.
Georgia*, No. 1:21-cv-5338, 2023 WL 7093025, at *8 (N.D. Ga. Oct. 26, 2023); *GRACE II*, 730 F.
Supp. 3d at 1293–94.

89.     This case is different from those in which the plaintiffs claim the "stated reasons for
the redrawing of" a district "were not the real reasons." *LULAC v. Abbott*, 601 F. Supp. 3d 147,
179 (W.D. Tex. 2022), *appeal dismissed sub nom. Brooks v. Abbott*, 143 S. Ct. 441 (mem.). In
those cases, "the law puts a finger on the scale in favor of Defendants" by presuming the legislature
"redistricts in good faith." *Id.* And "the presumption of good faith is overcome only when there is
a showing that a legislature acted with an ulterior *racial* motive." *Id.* at 181 (finding plaintiffs failed
to overcome the presumption where one senator "did not fully disclose her reasons for supporting"
the map, but nothing suggested her true reasons were racial).

90.     This played out recently in another Texas case, where the district court granted a
preliminary injunction while discounting three legislators' in-court testimony and
contemporaneous statements that "race played no role in the 2025 redistricting process," that they
"did not look at racial data at all," that "the 2025 Map was drawn blind to race," and that they
supported the map for *partisan* rather than racial reasons. *LULAC v. Abbott*, No. EP-21-cv-259,
2025 WL 3215715, at *33, *38 (W.D. Tex. Nov. 18, 2025). The Supreme Court stayed the
injunction, faulting the district court for "fail[ing] to honor the presumption of legislative good

faith by construing ambiguous direct and circumstantial evidence against the legislature." [17] *Abbott v. LULAC*, 146 S. Ct. 418, 419 (2025) (mem.).

91.     In this case, by contrast, Plaintiffs do not ask the Court to reject any legislators' in-court testimony, discount their contemporaneous statements, or draw inferences against them "when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 602 U.S. at 10.[18] Nor do Plaintiffs assert the Legislature "acted with an ulterior racial motive" that the Court must somehow unearth by finding bad faith. *See LULAC*, 601 F. Supp. 3d at 179. Rather, Plaintiffs ask the Court to take legislators' and staff members' contemporaneous explanations—which evince *overt*, not ulterior, racial motives—at face value.

92.     Plaintiffs ask the Court to credit the plans' architects when they said "**race was never the predominant factor in drawing a district, outside of protecting the protected districts**." J75 (2/1/22 H. Sess.) 76:22-77:11. When they said they were "watching those numbers [(CD 26's HVAP)] carefully to make sure" they were "staying very close to the benchmark" of "a little bit more than 74%." J81 73:7–74:4. When they said CD 26's shape was largely because it and others adjacent are Tier One-protected districts. J77 39:6–15. When they said CD 26's "Tier Two infirmities" were "primarily due to Tier 1 considerations." J77 44:10–18. When they said,

---

[17]   The second error the Court identified was that the district court "failed to draw a dispositive or near-dispositive adverse inference against [the plaintiffs] even though they did not produce a viable alternative map that met the State's avowedly partisan goals." 146 S. Ct. at 419. That consideration is inapplicable here since Plaintiffs *did* produce viable alternative maps and the State disavowed having *any* partisan goals. P16 at 2–3 (RFAs 1–2); P19 at 1 (RFAs 1–2); Day 3 Tr. 72:23–73:2.

[18]   In contrast to *Abbott v. LULAC*, here, no legislators testified; all refused, as did other staff members besides Poreda. Day 3 Tr. 254:7–12. In civil litigation, courts may draw adverse inference from the assertion of privilege. *See, e.g.*, *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (adverse inference upon assertion of Fifth Amendment privilege permitted in civil cases); *FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1252 n.4 (S.D. Fla. 2007) ("Courts have held that adverse inferences may be drawn in the civil context when Defendants invoke the privilege in refusing to testify in response to probative evidence offered against them.").

While there is no controlling authority on whether a court can draw an adverse inference from the assertion of legislative privilege, the *LULAC* panel found it could when a key senator refused to testify to her motivations. 601 F. Supp. 3d at 180 ("Though courts may not draw negative inferences from a criminal defendant's assertion of his Fifth Amendment rights, no similar constraint binds our assessment of a civil witness's assertion of legislative privilege."). The court weighed the senator's refusal to testify in assessing her credibility and interpreting her contemporaneous statements. *Id.*

The best evidence of legislative intent available to the Court remains the "contemporaneous statements" from the legislative record. *Jacksonville II*, 2022 WL 16754389, at *4.

"we get to compactness after Tier One." J75 47:16–19. When they said, "we're not going to get to compactness until we are assured that Tier One is satisfied." J75 52:13–14. When they said HD 115 couldn't lose its appendage "[b]ecause that's a Tier One standard that we applied." J75 53:10–13. When they agreed a "big consideration in drafting CD 26 . . . is that 26 is a Tier One protected district." J100 66:16–19. When they said "Tier 1 standards take precedent" over compactness. J77 45:14–48:7. When they explained CD 26's low compactness scores by explaining "District 26 is a protected Hispanic district." *Id.* When they agreed CD 26 "was impacted by the fact that it's a Tier 1-protected district for Latino voters." *Id.* 38:10–16. When they explained why CD 26 splits communities of interest by "keeping in mind this is a Tier One protected district." J94 10:15–17. When they said the districts were drawn "to maintain existing majority-minority districts." J73 23:18, 20-23; J74 30:15; J75 8:3–14. When they said the district's boundary deviates from major geographic features "to maintain the ability to elect." J87 35:9–12. When they said, "when it's a protected district, we focus much less on Tier Two." J75 68:22–23. When they said, "Tier 1 always outranks Tier 2." J83 53:16. When they said, "that is firmly true in *this* map" (the congressional map). J83 53:17 (emphasis added). When they said they "never" "elevated Tier 2 standards over Tier 1 standards." J83 53:13–16.

93.     The Court *must* credit these statements, as well as all the others cited here. The presumption of good faith compels it. To ignore these statements, to discount these explanations, to conclude legislators meant something different than what they said—*that* would be presuming their bad faith. This, the Court cannot do.

94.     For similar reasons, the Court must reject "*post hoc* justifications the legislature in theory could have used but in reality did not," because "[t]he racial predominance inquiry concerns the actual considerations that provided the essential basis for the lines drawn[.]" *Bethune-Hill*, 580 U.S. at 189–90. For example, Poreda explained at trial that CD 26 connects Miami-Dade and Collier Counties because the Legislature wanted to "hold the Saint Lucie and Martin County line" as a border between CDs 8 and 21, and the "cascading effect" from that decision gave CD 26 its shape. Day 3 Tr. 201:3–4, 200:10. But that wasn't how *legislators* and other staff explained why CD 26 has its shape. *They* explained CD 26's shape as due to that fact that it was deemed a Tier One protected district for Hispanic voters, the fact that it "retains its minority-majority status," and a desire to "stay[] very close to the benchmark" HVAP. J100 66:16–67:15; J81 73:7–74:4; J77 45:14–48:7, 38:10–16; J94 10:7–8, 10:15–17. At the time—rather than years later after deposition

and trial prep—Poreda himself explained CD 26 as "primarily" and "largely" the result of *racial* considerations, without mentioning any of the other considerations he explained when examined by the House.[19] J77 39:6–15, 44:10–18. The presumption of good faith compels the court to credit the "relevant, contemporaneous statements" over *post hoc* justifications when assessing what "motivat[ed] *the legislature's* decision to place a significant number of voters within or without a particular district." *Jacksonville II,* 2022 WL 16754389, at *4; *Cooper*, 581 U.S. at 291 (emphasis added) (quoting *Miller*, 515 U.S. at 916). Those contemporaneous statements are not only the best evidence of the legislators' intent; they also reflect the information legislators had available when they made their decisions, unlike interpretations explained at trial that do *not* appear in the legislative record. *See* Dkt. No. 176 (Pls.' Pretrial Br.) at 3–5.

95.     Relatedly, the possibility "that other considerations may have played a role in . . . redistricting does not mean that race did not predominate." *Clark*, 293 F.3d at 1270. Likewise, "[r]ace may predominate even when a reapportionment plan respects traditional principles . . . if 'race was the criterion that, in the State's view, could not be compromised,' and race-neutral considerations 'came into play only after the race-based decision had been made.'" *Bethune-Hill*, 580 U.S. at 189–90 (quoting *Shaw*, 517 U.S. at 907) (alteration in original omitted). "To show that race predominated, Plaintiffs need not establish that the legislature disregarded every traditional districting principle." *Page v. Va. State Bd. of Elections*, No. 3:13-cv-678, 2015 WL 3604029, at *11 (E.D. Va. June 5, 2015) (citing *Miller*, 515 U.S. at 917), *appeal dismissed*, 578 U.S. 539 (2016). "[P]arties may rely on evidence other than bizarreness to establish race-based districting." *Miller*, 515 U.S. at 913. Plaintiffs need not show actual "conflict or inconsistency" between district design and traditional race-neutral districting principles. *Bethune-Hill*, 580 U.S. at 190.

96.     Finally, "it is important to emphasize that a finding that race was the predominant motive in drawing a district does not automatically render that district unconstitutional. Nor does it signify that the legislature acted in bad faith or with discriminatory intent in its redistricting."

---

[19]   Poreda's *contemporaneous* explanation is bolstered by the fact that the Senate developed a similar Collier-Dade configuration for CD 26 (numbered 25 in Senate drafts), while *not* adhering to the same county boundaries in Central Florida (noted in the text above) as the House. J9; Day 3 Tr. 240:8–242:23. Thus, the "pinwheel" "cascading effect" Poreda described at trial does *not* adequately explain the choice of the entire Legislature to orient CD 26 in its enacted configuration. Rather, the common denominator across both chambers' maps, plus EOG's adjustments, was the desire to maintain CD 26 as a protected Hispanic seat (and the shared explanation that this desire primarily drove the district's shape).

*Covington*, 316 F.R.D. at 129. Finding racial predominance simply means the state's use of race must withstand strict scrutiny.

### F. The second and third *Gingles* preconditions were absent in South Florida.

97.     Though the Legislature shielded its analyses of Hispanic voting cohesion and white bloc voting from scrutiny both in the legislative process and this litigation, P9 at 3–15; P14 at 5–9; *infra* ¶ 110, Plaintiffs' expert Dr. Hannah Walker analyzed the extent to which the candidate preferences of Hispanic and white voters in the Challenged Districts differed—that is, the extent to which voting in South Florida is racially polarized.

#### i. *Hispanic voters do not vote cohesively.*

98.     Dr. Walker found weak evidence of cohesive voting among Hispanic voters in benchmark HDs 115, 118, 119, and CD 25. Day 2 Tr. 13:13–17. To reach her conclusions, Dr. Walker performed a statistical analysis of voting patterns in a series of elections using two methods of ecological inference ("EI"), King's or iterative EI; and rows by columns. *Id.* 16:17–17:22. Dr. Walker selected these methods as they are "the two most commonly used methods by scholars." *Id.* 17:23–18:1. She analyzed multiple methods of EI to validate the results derived from each method as "[s]cholars have demonstrated that when there is strong cohesion present" each method "will generate estimates that are within a couple of points of one another." *Id.* 16:17–18:9. Across each of the House benchmark districts analyzed, Dr. Walker found wide variation in the estimates produced by the two EI methods, which is itself evidence of weak cohesion. *Id.* 19:24–20:3, 25:15–26:19, 32:3–12, 35:7–36:2.

99.     Dr. Walker testified that political scientists analyze vote cohesion on a spectrum, whereby cohesion at a level of simple majority (around 50%) is completely non-cohesive and an estimate at 100% is completely cohesive. *Id.* 15:8–18. Within that spectrum, "scholars have tended to describe cohesion that falls below the threshold of 60 percent as noncohesive or very weakly cohesive." *Id.* 29:16–20. While, as Dr. Walker testified, scholars have "typically described estimates that exceed 80 or 85 percent as evidence of strong cohesion." *Id.* 37:2–6. The 50% threshold or at the level of simple majority is not probative for analyzing vote cohesion as in any two-candidate contest, one candidate must receive a majority of the votes so using the 50% threshold results in "observ[ing] cohesive voting in every single election" which is "not a useful standard." *Id.* 40:2–16. Further, at the 50% threshold, the "race is functionally a toss up[,]" which is not helpful to understand future voting behaviors. *Id.*

100.    Dr. Walker found weak evidence of cohesive voting among Hispanic voters in each of benchmark HDs 115, 118, and 119, and benchmark CD 25—the benchmark districts for each Challenged District. P109; P115; P118; P121; Day 2 Tr. 39:11–15.

101.    Defendants' two experts did not perform a vote cohesion analysis using EI themselves or contest the accuracy of Dr. Walker's analysis; her analysis is unrebutted.[20] Day 4 Tr. 109:12–14. Dr. Trende testified regarding voter registration trends among Hispanics in Miami-Dade County for the Republican and Democratic parties from November 2020 to April 2025. *Id.* 108:21–25; D71; D93. His testimony is of no value in determining whether Hispanic voters vote cohesively. *First*, Dr. Trende only analyzed data for Miami-Dade County as a whole and did not conduct the required district-by-district analysis. Day 4 Tr. 109:15–19; *Apportionment I*, 83 So. 3d at 625 ("[T]his determination requires a functional analysis of the electoral behavior within the *particular jurisdiction or election district*[.]" (emphasis added) (quoting DOJ Guidance Notice, 76 Fed. Reg. at 7471)). *Second*, Dr. Trende analyzed voter registration post-dating the enactment of the at-issue maps—data that Dr. Trende himself admits was not available to Legislature at the time it enacted its maps, and therefore cannot be relevant to whether the Legislature had good reasons to believe the *Gingles* preconditions were present at the time it made its mapmaking decisions. Day 4 Tr. 109:25–110:6; *see* Pls.' Pretrial Br. at 10–11. *Third*, Dr. Trende did not analyze any election results, and he is aware of no scholars or other authority who advocate for using voter registration data instead of actual election returns to analyze voter cohesion. Day 4 Tr. 109:5–11. And Dr. Trende concedes that voter registration for a certain party does not mean that an individual will vote for that party or even vote at all on Election Day. *Id.* 109:1–5. As Dr. Walker testified, political scientists use methods of ecological inference to evaluate vote cohesion—an analysis that Dr. Trende did not conduct. *Id.* 109:12–14; Day 2 Tr. 14:9–12, 58:23–59:23. *Fourth*, Dr. Trende offered no opinion about what level of voter registration share is necessary to show voter cohesion. Day 4 Tr. 111:8–11. *Fifth*, even assuming his analysis was proper to analyze vote cohesion, he omitted in every month analyzed over 300,000 Hispanic voters who registered with No Party Affiliation, with a minor party, or are inactive but eligible to vote. Day 2 Tr. 62:15–63:14; P164; P165. By omitting these voters, he consistently overestimated the Republican advantage by 150%

---

[20] This is unsurprising, since until relatively recently, the House was arguing that minority cohesion was not a prerequisite under the Non-Diminishment Clause at all. P30 at 27 n.10; Day 3 Tr. 30:19–33:1.

to 160%. Day 2 Tr. 63:6–14.

102.   There can be no dispute based on this record: Hispanic voters in the Challenged Districts do not vote cohesively.

### ii. *White bloc voting sufficient to defeat Hispanic voters' preferred candidates is also absent.*

103.   Dr. Walker also analyzed white bloc voting statewide in Florida. She concluded that "white voters do vote as a bloc at the state level, but they do not do so sufficiently to defeat the preferences of Hispanic voters in each of the jurisdictions under consideration because their preferences align." Day 2 Tr. 45:13–19. To reach this conclusion, Dr. Walker performed a statistical analysis of voting patterns in all statewide elections from 2012 to 2020, using iterative EI. *Id.* 42:10–15. Based on this analysis, she determined that white voters in Florida do vote as a bloc. *Id.* 43:19–21.

104.   After determining that white voters vote as a bloc, Dr. Walker "evaluated whether or not the candidates who [white votes] tend to support are the same as the candidates or different from the candidates who Hispanic voters tend to support." *Id.* 43:19–25. She concluded that white and Hispanic voters preferred the same candidate for all elections under study for benchmark HDs 115, 118 and 119. *Id.* 44:11–23. In other words, white bloc voting was *not* sufficient to defeat Hispanic voters' preferred candidates in those districts.

105.   For benchmark CD 25, Dr. Walker concluded that white and Hispanic voters preferred the same candidate, except for two contests (the 2016 and 2012 presidential elections). *Id.* 44:24–45:7. In the 2012 presidential election, Hispanic voting preferences were undetermined and therefore Dr. Walker could not determine whether white and Hispanic preferences aligned. *Id.* 44:24–45:7. In the 2016 presidential election, the Hispanic-preferred candidate (Clinton) was defeated by the white-preferred candidate (Trump). *Id.* 44:24–45:5.

106.   Defendants did not present any competing analysis of white bloc voting.

107.   There can similarly be no dispute: while white voters vote as a bloc statewide, they do not do so sufficiently to usually defeat the preferences of Hispanic voters in the benchmarks for the Challenged Districts.

### iii. *The Legislature was on notice that Hispanic cohesion and white bloc voting were absent.*

108.   The Legislature was on notice—but ignored—that the preconditions were absent. Just a few years before the 2020-cycle redistricting process, the Florida Supreme Court observed

"a lack of Hispanic voting cohesion" in Miami-Dade-based congressional districts. *Apportionment VIII*, 179 So. 3d at 287. While the congressional map was still in development, a report from the Latino Policy & Politics Institute at UCLA found "voting data make clear that it is not accurate to speak about 'the Latino vote' as one cohesive bloc," and "grouping all Latino voters as a single cohesive voting block is not supported by the data." P31 at 2. Legislators asked questions about and quoted from that report as the congressional map was debated, and House Redistricting Committee staff read it at the time. J82 (4/20/22 H. Sess.) 40:19–44:9; J100 (4/19/22 5pm S. Sess.) 67:17–69:15; Day 3 Tr. 134:16–17.

109.    Throughout the legislative process, legislators interrogated what analysis the Legislature did to confirm minority cohesion and white bloc voting. *E.g.*, J75 (2/1/22 H. Sess.) 39:22–40:1 (Joseph: "Did the House's analysis involve ecological regression or inference analysis to determine the level of minority cohesion, white voting bloc, and racially polarized voting?"), 40:9–45:5, 64:15–66:21, 77:20–78:4; J77 (2/18/22 H. Con. Subcomm.) 51:2–55:3; J79 (3/3/22 H. Sess. 45:16–46:4; J82 (4/20/22 H. Sess.) 40:15–45:4, 69:19–72:10; J100 (4/19/22 S. Sess.) 66:5–69:23.

110.    At times, committee chairs alluded to some analysis having been done, but wouldn't share the results:

> Chair Leek: "The analysis you're talking about is a very intensive analysis that has to be performed by experts. Now the answer to your question is yes, it is performed by experts. . . . What I can tell you is that we are conducting all the appropriate constitutional analyses and that information then comes to us and we use that to make the decisions that are necessary in the maps that you have in front of you." J75 (2/1/22 H. Sess.) 40:4–6, 14–16.

> Rep. Joseph: "Can you identify for this body which districts those three kinds of analyses were performed for?" *Id.* 41:11–12.

> Chair Leek: "[N]ot as I stand here today, no." *Id.* 41:15.

> Rep. Joseph: "So somebody has this information. Some of the analysis was performed. Can you share with the body who conducted that analysis and how we can access that information? Because we still don't have it and we're about to vote on it." *Id.* 42:12–14.

> Chair Leek: "I think quite frankly even if you had the information, . . . it doesn't report itself in a way that the normal person can look at it and use it, right." *Id.* 42:17–19.

> Rep. Skidmore: "I remember Chair Leek . . . didn't want to go into a deep rabbit hole, but these questions are not typical. Rep. Joseph asked if the House analysis involved ecological regression or inference analysis to determine the level of

minority cohesion and white block voting, racially polarized voting. Chair Leek said yes. But he didn't say what the outcome of those analyses were. So . . . as applied to the congressional map in South Florida, does the House have an analysis of minority cohesion, white block voting, and racially polarized voting in the benchmark Latino minority-majority districts in South Florida or in Miami-Dade?" J77 (2/18/22 H. Con. Subcomm.) 51:8–16, 52:8–12.

Chair Sirois: "I want to begin by answering that the Florida Supreme Court has recognized that the only performance measure is the functional analysis test. The data that you're referring to, that Chair Leek spoke to on the floor, is some of the advanced statistical analysis that legal counsel has assisted the House with conducting." *Id.* 52:17–23.

Rep. Skidmore: "So the data exists, but we're just not privy to it? *Id.* 53:5–6.

Chair Sirois: "That data is an advanced statistical analysis that was performed -- expert analysis that was performed at the request of the legal counsel that is advising the House on the redistricting process. So the information that is a part of that relationship as a part of that contract is retained by outside counsel." *Id.* 53:9–15.

111.    At other times, leadership responded evasively by conclusorily insisting they had followed the law:

Rep. Joseph: "For the protected districts, restricting it to the 30 that this analysis was performed for, did it show high, medium, or low cohesion among Latino voters or Hispanic voters?" J75 (2/1/22 H. Sess.) 43:20–22.

Chair Leek: "You know, cohesion is one of the factors in determining what is a protected district. And cohesion changes district by district, ethnicity by ethnicity. So it is difficult to answer the question as if it's being asked broadly for the whole map. What I could tell you is that in some instances, you may have the African American protected districts, Black districts are – they may be cohesive and able to elect the candidate of their choice with, you know, a 29% [] Black voting-age population. Hispanics on the other hand, if you look across the maps, usually you won't see that type of performance occur until you get to about the 65% or 70% Hispanic voting-age population." *Id.* 44:4–11.

Rep. Joseph: "[I]n 2015, the Florida Supreme Court said, the evidence before this court suggests a lack of Hispanic voting cohesion in the Miami-Dade area. Has the House's analysis confirmed that or contradicted it based on the specific ones that are in Miami-Dade County . . . ?" *Id.* 44:16–18.

Chair Leek: "It's difficult to give you a precise answer to that question. All of the districts in front of you, including the Hispanic protected districts, are drawn to be legally compliant." *Id.* 4:21–23.

112.    At still other times, leadership asserted that the Legislature need not determine whether cohesion and racially polarized voting existed at all, denied that any cohesion analysis existed, insisted that all they needed to do was conduct a "functional analysis" of minority

performance, or gave non-sequiturs about how districts were still majority-Hispanic:

> Rep. Joseph: "Has the House considered the diversity within the Latino community when doing the functional analysis that you referred to by outside counsel in the South Florida districts?" *Id.* 45:2–4.

> Chair Leek: "That's not part of the data that's given to us, the census data or the elections data." *Id.* 45:7–8.

> Rep. Valdés: "Is it a requirement that the minority group vote cohesively before one starts looking at dilution?" *Id.* 64:17–18.

> Chair Leek: "I think we might be mixing some legal concepts here. But in the end, there is a functional analysis that tells you performance. And that's where the decision is made on whether to protect a district or it's no longer a protected district." *Id.* 64:20–23.

> Rep. Valdés: "Is it a requirement that the minority group vote cohesively before considering retrogression?" *Id.* 65:22–23.

> Chair Leek: "You don't know the answer to any of those until you perform the functional analysis, right. And so cohesion is part of a functional analysis. You know, just because the majority-minority district is predominantly Hispanic doesn't mean that every Hispanic votes in the same way. So that may not be cohesive. It nonetheless may perform, right." *Id.* 66:2–6.

> Rep. Skidmore: "So is there any cohesion of voting data that is available to us?" J77 (2/18/22 H. Con. Subcomm.) 53:23–24.

> Chair Sirois: "That's the analysis that the Court requires to be performed is the functional analysis. So beyond that, you know, I'm not able to answer your question." *Id.* 54:3–6.

> Rep. Skidmore: "Are there any reports, conclusions, or analysis regarding cohesion that have been conducted that would be able to be shared with us? I know Chair Leek said that it's not – you know, the average person isn't going to want to go through this, but is there anything that has been reported that – or, you know, memos or anything that would help us understand cohesion?" *Id.* 54:10–17.

> Chair Sirois: "There are no formal reports that exist at this stage of the game in anticipation of litigation. What I would add is that the Florida Supreme Court requires the completion of a functional analysis. We have done that, and that information is contained in your packet." *Id.* 54:19–25.

> Rep. Joseph: "What analysis did you use to determine whether or not the *Gingles* factors were met and a specific population was entitled to protection before you started drawing the districts?" J79 (3/3/22 H. Sess.) 45:17–19.

> Chair Leek: "[T]he *Gingles* test is actually a test that is used to determine whether a plaintiff can bring a lawsuit or not. The required functional analysis that we have is constitutional, and we're only required to perform the functional analysis, but we're not plaintiffs bringing a case. There might be plaintiffs in this room or outside of this room that are going to bring a case and have to pass that standard, but that's

not us." *Id.* 45:22–46:4.

Rep. Diamond: "I want to further understand this issue of establishing voter cohesion because my understanding from the case law is that that's the first step in any retrogression analysis. And, specifically, the question is relating to Hispanic voting cohesion in the South Florida. Given what the Florida Supreme Court has said about that issue, are we taking into account, in this map, particularly around CD 26, how those Latinos – the voting cohesion of those Latino voters in that part of the state?" J82 (4/20/22 H. Sess.) 69:25–70:10.

Chair Leek: "I believe you're talking about the Gingles test, which, once again, is only performed upon a challenge. So the Gingles test is a plaintiff's obstacle declare to bring a claim." *Id.* 70:14–17.

Rep. Diamond: "[L]ike CD 26, where we're making these assumptions about Latino voting populations. Let me ask it this way. Has there been any analysis done on CD 26, with regard to the Latino voting population, that there will be sort of a cohesiveness necessary in that voting population in order to defend that district under that test?" *Id.* 71:11–18.

Chair Leek: "Remember, the only analysis that we are required to perform is the functional analysis, which has been done." *Id.* 71:22–24.

Sen. Farmer: "The UCLA report found that the majority-Latino precincts split about 55 to 45% between Republican and Democratic candidates in recent elections. Did you or we consider such a breakdown to be evidence of political cohesion among Latino voters when drawing these new Latino-majority districts in South Florida?" J100 (4/19/22 5pm S. Sess.) 68:15–18.

Chair Rodrigues: "Well, the South Florida seats are the lines that we drew in the Senate. If you go back, they are very similar to the lines on our original map. They are very similar to the lines on the compromise map with the House. . . . That the answer to that is yes, we believe these lines were constitutional in terms of protecting minority-majority status in those districts." *Id.* 68:20–69:2.

113.    At other times, members were prevented from asking questions on these topics. J75 (2/1/22 H. Sess.) 42:22–43:3, 66:8–21, 77:22–78:3.

114.    Shortly before the 2021–22 redistricting process finally concluded, Sen. Farmer ended with a question, and a warning:

> In its 2015 *Apportionment VIII* ruling, the Florida Supreme Court held that, quote, the establishment of voting cohesion and racially polarized voting is the first step in any retrogression analysis. And federal courts interpreting both Section 2 and Section 5 of the Voting Rights Act have said the same thing. The Supreme Court went on to say that the Legislature made, quote, an unproven assumption of Hispanic voting cohesion and polarized racial bloc voting in South Florida. So I think that holding by the Supreme Court differs a little bit without your analysis. But given the court's warning just six

42

years ago, and combine that with what the UCLA report has indicated, can we figure out whether we are adequately taking into account the actual reality of Latino voting patterns in South Florida, and not drawing maps based on the same unproven assumptions that the court struck down in 2015?

J100 (4/19/22 5pm S. Sess.) 69:5–15.

115.    The trial record exposes that the Legislature willfully ignored the court's warning, made the same "unproven assumptions" it did the prior decade, actively prevented evidence of noncohesion from influencing its mapmaking, pretended cohesion and racially polarized voting were not prerequisites to drawing minority-protected districts at all, and utterly failed to take into account the actual reality of Latino voting patterns before imposing its racial affirmative-action policy on South Floridians.

## II.  CONCLUSIONS OF LAW

### A.  Defendants bear the burden of proving that the use of race was narrowly tailored to a compelling interest.

"[I]f racial considerations predominated over others, the design of the district must withstand strict scrutiny. The burden thus shifts to the State to prove that its race-based sorting of voters serves a 'compelling interest' and is 'narrowly tailored' to that end." *Cooper*, 581 U.S. at 292 (quoting *Bethune-Hill*, 580 U.S. at 193) (internal citation omitted). Here, the only interest Defendants assert to meet their strict-scrutiny burden is compliance with Florida's Non-Diminishment Clause, although the Legislature believed the Challenged Districts were also protected by Section 2 of the VRA and Florida's anti-vote-dilution corollary. Stip. § 8; Day 3 Tr. 91:2–13.

The Supreme Court "has long assumed that one compelling interest is complying with operative provisions of the Voting Rights Act of 1965," *Cooper*, 581 U.S. at 292. Since the Fair Districts Amendments codify "the principles enumerated in Sections 2 and 5 of the VRA," *Apportionment I*, 83 So. 3d at 619, Plaintiffs have never contested that seeking to satisfy the Non-Diminishment Clause *could* serve as a compelling government interest to justify race-predominant districting—when the Clause's provisions apply. Why the Legislature failed to clear the "limited degree of leeway" afforded to it (even assuming it had a compelling interest in complying with the Non-Diminishment Clause) is explained further below. *See Bush v. Vera*, 517 U.S. 952, 977 (1996).

As to whether compliance with the Non-Diminishment Clause serves a compelling interest at all, the Florida Supreme Court answered that question while this case was pending. The Court

43

held that "[t]he obligation to comply with the Non-Diminishment Clause would not of its own force give the Legislature a compelling interest in drawing a race-predominant district." *BVM*, 415 So. 3d at 196. Instead, "the Legislature itself would have to specify and justify the compelling interest, with a fresh evidentiary record." *Id.* "[W]hether to take on that burden is a matter for the Legislature's discretion," "[g]iven [its] role as the primary policy maker in our state." *Id.*

Rather than point to anything in the legislative record indicating the Legislature exercised its exclusive discretion to take on that burden, Defendants instead disclaim any need to prove a compelling interest at all. They argue that whether the Legislature's use of race serves a compelling interest is "not an issue that's before the Court" because it was only raised "on the last day of trial." Day 4 Tr. 146:7–9. But although whether the state has a compelling interest does not appear in the Joint Pretrial Stipulation under the heading "concise statement of issues of law which remain for determination by the Court," Stip. § 8, neither does the issue appear in the "concise statement of issues of law on which there is agreement." *Id.* § 7. In other words, nowhere have the parties affirmatively agreed that this issue has already been resolved. Instead, all parties *do* agree that at the second step of a racial gerrymandering case, the State bears the burden to prove that its race-based sorting of voters serves *both* a compelling interest *and* is narrowly tailored to that interest. *Id.* § 7 ¶¶ 4, 6. Defendants clearly understood that was their burden; they agreed the law made it so. Plaintiffs acknowledged that "excessively race-based line drawing is constitutional only where . . . it is narrowly tailored to advance a compelling interest" on page 1 of their Complaint. P1 ¶ 1.

In any event, a party cannot waive the application of the correct law. *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 816 n.8 (11th Cir. 2022) (en banc) ("We are duty bound to apply the correct law; 'parties cannot waive the application of the correct law or stipulate to an incorrect legal test.'" (quoting *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 923 (11th Cir. 2018))). Applying that correct law (which the parties are in agreement on), this Court must look at the standard the Florida Supreme Court newly articulated in *BVM* in the middle of this litigation, holding that justifying race-predominant districting requires a "fresh evidentiary record" targeted at (1) the discrimination, past or present, public or private, that the non-diminishment clause is meant to remedy; and (2) documentation of the evidence necessary to establish a proper connection between the amendment's means and ends. 415 So. 3d at 196–97. The parties cannot simply waive the dictates of the U.S. and Florida Supreme Courts; this Court must apply them.

Finally, because *BVM* ties the existence of a compelling interest to what the *Legislature*

did, Defendants could have done nothing additional to support their burden besides cite any relevant portions of the legislative record at the time the maps were passed (which is already in evidence in its entirety, *see* J23–J146). Defendants will therefore suffer no prejudice from either the Florida Supreme Court's late-breaking articulation of the compelling-interest standard, or this Court's application of that standard to the present case. And when this Court reviews the legislative record, it will find the Legislature failed to meet *BVM*'s onerous requirements.

**B. Even assuming a compelling interest in complying with the Non-Diminishment Clause, the use of race was not narrowly tailored to that interest.**

### 1. Tailoring Standards

"When a State invokes the VRA to justify race-based districting, it must show (to meet the 'narrow tailoring' requirement) that it had 'a strong basis in evidence' for concluding that the statute required its action."[21] *Cooper*, 581 U.S. at 292 (quoting *ALBC I*, 575 U.S. at 278). "Or said otherwise, the State must establish that it had 'good reasons' to think that it would transgress the Act if it did *not* draw race-based district lines." *Id.* at 293. It is not enough "that the VRA *might* support race-based districting;" the state must prove it had "good reasons for thinking that the Act *demanded* such steps[.]" *Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398, 403–04 (2022) (emphasis in original) (quotations omitted). This requires "evidence or analysis supporting [the] claim that the VRA required" the race-based measures, "much more" than "uncritical" assumptions and "generalizations." *Id.*; *see also Abbott*, 585 U.S. at 621 (requiring "a strong showing of a pre-enactment analysis with justifiable conclusions"). "Strict scrutiny remains, nonetheless, strict." *Vera*, 517 U.S. at 978.

A state fails to clear strict scrutiny when the law does not require the state's race-based measures "under a correct reading of the statute," *Miller*, 515 U.S. at 921, or when the state follows an interpretation of the law that courts had "rejected" and which "fell short of [judicial] standards," *Wis. Legislature*, 595 U.S. at 403–04. Furthermore, states must narrowly tailor their use of race every time they redraw a district. *See Clark*, 293 F.3d at 1267 n.16 (holding that map failed strict scrutiny even where it "preserved as much as possible" court-ordered predecessor districts); *Ala.*

---

[21] For the purposes of *narrow tailoring*, Plaintiffs assume compliance with Tier One can, when Tier One is properly implicated, justify race-predominant districting, and therefore cite federal caselaw analyzing the VRA as the state's asserted interest. *See Cooper* (assuming complying with VRA is a compelling interest but finding district failed strict scrutiny because legislature lacked good reasons to believe all the *Gingles* preconditions were present).

*Legis. Black Caucus v. Alabama* (*ALBC II*), 231 F. Supp. 3d 1026, 1065, 1085 (N.D. Ala. 2017) (holding "the legislature drew new lines in 2012 that must be evaluated on their own merit" and striking down district that "maintained . . . core" of previous one).

### 2. Minority cohesion and white bloc voting are preconditions for the Non-Diminishment Clause to apply.

The Supreme Court has set a clear rule: "[i]f a State has good reason to think that all the 'Gingles preconditions' are met, then so too it has good reason to believe that § 2 requires drawing a majority-minority district. But if not, then not." *Cooper*, 581 U.S. at 302 (citations omitted). Just as minority cohesion and majority bloc voting are preconditions for Section 2, they are also preconditions for the Non-Diminishment Clause. The Florida Supreme Court announced this most clearly in *League of Women Voters of Florida v. Detzner* (*Apportionment VIII*), 179 So. 3d 258 (Fla. 2025). There, the court rejected the Legislature's arguments regarding a proposed remedial congressional district based in Miami-Dade County, stating "[t]he Legislature's argument rests on an unproven assumption of Hispanic voting cohesion and polarized racial bloc voting—the establishment of which is the first step in any retrogression analysis." *Apportionment VIII*, 179 So. 3d at 286. The court described "whether the minority group votes cohesively" as "the first prong of our test" for retrogression.[22] *Id.* at 286 n.11.

Commenting on the third *Gingles* precondition (white bloc voting), the court went on to state that "[t]he *Gingles* preconditions are relevant not only to a Section 2 vote dilution analysis, but also to a Section 5 diminishment analysis," cited a federal case applying Section 5's retrogression standard, quoted that case's determination that "at the outset, a court addressing a proposed voting plan under Section 5 must determine whether there is cohesive voting among minorities *and whether minority/White polarization is present*," and reiterated that the interpretation of Florida's Tier One provisions is guided by federal caselaw on the VRA's corollary requirements.[23] *Id.* (quoting *Texas v. United States*, 831 F. Supp. 2d 244, 262–63 (D.D.C. 2011)

---

[22] *BVM* reiterated that the Non-Diminishment Clause requires the minority group to be cohesive, and that "[t]he existence and extent of that cohesion within a benchmark or new district is something that must be proven; it cannot be assumed." 415 So. 3d at 186.

[23] The House argues that the third *Gingles* precondition (white bloc voting) is not a prerequisite under the Non-Diminishment Clause at all. Dkt. No. 175 at 69–73. This argument utterly ignores *Apportionment VIII*, which could not be clearer: "at the outset," one "must determine" "whether minority/White polarization is present" before evaluating a district under the Non-Diminishment Clause. 179 So. 3d at 286 n.11 (quoting *Texas*, 831 F. Supp. 2d at 262–63) (alteration in original

(emphasis added, alteration in original omitted)).

Thus, if the Legislature lacked good reasons to think that *either* Hispanic cohesion *or* Hispanic/white polarization were present, then so too it lacked good reasons to believe that the Non-Diminishment Clause requires drawing a minority-performing district, and its use of race fails strict scrutiny.[24] *See Cooper*, 581 U.S. at 302.

### 3. Each district fails strict scrutiny because there is no evidence of the second and third *Gingles* preconditions.

The "strong basis in evidence" required to justify race-predominant districts is "much more" than "uncritical" assumptions and "generalizations"; instead, the Legislature must bring "evidence or analysis supporting [its] claim" that the VRA required race-based districts. *Wis. Legislature*, 595 U.S. at 403–04.

But to the contrary, the evidence shows Hispanic cohesion and effective white bloc voting were absent. As discussed *supra* at 36–38, Hispanic voters in the Challenged Districts do not vote cohesively. And while white voters do vote as a bloc at the statewide level in Florida, they do not do so sufficiently to defeat the preferences of Hispanic voters in each of the at-issue districts because white and Hispanic voters' preferences align.

Since the second and third *Gingles* preconditions were absent, the Legislature lacked any basis—much less a strong one—for concluding the Non-Diminishment Clause required race-based redistricting. *Cf. Cooper*, 518 U.S. at 302 (no strong basis where "electoral history provided no evidence that a § 2 plaintiff could demonstrate the third *Gingles* prerequisite").

---

omitted). This Court can, "of course, never second guess state supreme court decisions about state law." *Patterson v. CitiMortgage, Inc.*, 820 F.3d 1273, 1278 n.2 (11th Cir. 2016).

Moreover, imposing a racial non-diminishment requirement *without* requiring racially polarized voting would raise serious concerns about whether such a requirement can be constitutionally justified. *See Gingles*, 478 U.S. at 55 (collecting cases and scholarly literature discussing why "racial bloc voting is a key element of a vote dilution claim"); *id.* at 98–100 (O'Connor, J., concurring in the judgment) (discussing constitutional doctrinal origins of the VRA's "inquiry into the extent of the minority group's opportunities to participate in the political processes").

[24]   Plaintiffs explain in their Pretrial Brief why one must evaluate at the statewide level whether "the majority population votes sufficiently as a bloc to enable it usually to defeat the minority's preferred candidate." *Apportionment VIII*, 179 So. 3d at 286 n.11 (quotations and alterations in original omitted). Pls.' Pretrial Br. at 11–13. Evaluating majority bloc voting in a benchmark district in which one has already concluded minority voters have the ability to elect preferred candidates makes no sense; ignoring majority bloc voting as a prerequisite would rewrite the plain language of the Florida Supreme Court's decisions.

**4. The Legislature was on notice that its "affirmative-action program" was unnecessary before it embarked on it.**

"[T]he institution that makes the racial distinction must have had a 'strong basis in evidence' to conclude that remedial action was *necessary*, '*before* it embarks on an affirmative-action program.'" *Wis. Legislature*, 595 U.S. at 404 (quoting *Shaw*, 517 U.S. at 910). But here, the Legislature was on notice that remedial action was *unnecessary*. As described above, legislators repeatedly probed redistricting committee chairs on whether the Legislature had confirmed that Hispanic voters were politically cohesive. The response was either (1) the Legislature had done that analysis, but it would not be made available, *supra* ¶ 110,[25] or (2) cohesion was not even something the Legislature needed to investigate at all, *supra* ¶ 112.[26]

Just a few years before the 2020-cycle redistricting process, the Florida Supreme Court observed "a lack of Hispanic voting cohesion" in Miami-Dade-based congressional districts. *Apportionment VIII*, 179 So. 3d at 287. While the congressional map was still in development, a the UCLA Latino Policy & Politics Institute report observed "it is not accurate to speak about 'the Latino vote' as one cohesive bloc," and "grouping all Latino voters as a single cohesive voting block is not supported by the data." P31 at 2. Legislators asked questions about and quoted from that report as the map was debated, and House Redistricting Committee staff read it at the time. *Supra* ¶ 108. The Legislature not only lacked a strong basis in evidence to believe the relevant *Gingles* preconditions were present—there was a strong basis to believe they were *absent*. Rather than an "informed bipartisan consensus," *Bethune-Hill*, 580 U.S. at 194, supported by "justifiable conclusions," *Abbott*, 585 U.S. at 621, the Legislature's decisions to designate the Challenged Districts as "Tier One Hispanic districts" and draw them in a race-predominant manner rested on ill-informed assumptions contradicted by the readily available evidence before it.

**C. Plaintiffs have standing to challenge each district.**

An individual living in a racially gerrymandered district is injured because she is "subjected to a racial classification, as well as being represented by a legislator who believes his primary

---

[25] The analysis referenced—if indeed it exists at all—is not in the record.

[26] Legislative leaders' contradictory responses were accompanied by an attempt to get the Florida Supreme Court to "make clear" that the *Gingles* preconditions do not "govern the retrogression standard" under the Non-Diminishment Clause. P30 (House's Brief, *In re SJR 100*) at 27 n.10. The Florida Supreme Court rejected that attempt, *see generally In re SJR 100*, 334 So. 3d 1282 (Fla. 2022), and then in *BVM* conclusively reiterated that minority cohesion was necessary, 415 So. 3d at 186.

obligation is to represent only the members of a particular racial group." *ALBC I*, 575 U.S. at 263 (cleaned up); *see also Miller*, 515 U.S. at 911–12 ("When the State assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls.'" (quoting *Shaw*, 509 U.S. at 647)). Beyond the racial classification, racial gerrymandering can cause other types of harm that "are more than just theoretical." *Jacksonville I*, 635 F. Supp. 3d at 1273. Such harms can include impaired constituent-representative relationships, less responsiveness on the part of elected officials to the communities that compose their districts, and difficulty in advocating around shared interests. *Id.* at 1271–73.

In *United States v. Hays*, 515 U.S. 737 (1995), the Supreme Court "set forth a bright-line standing rule . . . : if the plaintiff lives in the racially gerrymandered district, she has standing[.]"[27] *Dillard v. Baldwin Cnty. Comm'rs*, 225 F.3d 1271, 1279 (11th Cir. 2000). Plaintiffs Polo and Castilla Falcon therefore have standing to challenge HDs 115 and 118, respectively.

An organization has associational standing where its members "would have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claims asserted nor the relief requested requires individual[] members' participation in the lawsuit." *ALBC I*, 575 U.S. at 269 (cleaned up). Engage Miami has standing to challenge each Challenged District, and the FIU ACLU Club has standing to challenge HDs 115 and 118 and CD 26, because they have members who reside in the relevant districts and they otherwise satisfy the requirements of associational standing because the interests at stake are germane to the organizations' purposes and individual participation is not required. *Id.* at 269.

Because at least one plaintiff has demonstrated standing to challenge each district, the Court need not inquire into any other plaintiff's standing to seek the same relief. *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1195 (11th Cir. 2009).

---

[27]   The Secretary's argument that a plaintiff must intend to vote in the district in the future, *see* Day 4 Tr. 157:20–158:2, flies in the face of *Hays*' bright-line rule, which requires a plaintiff only *live* in the district. Also unfounded is his argument that associational standing is inapplicable to racial gerrymandering, Day 4 Tr. 158:9–23. *See, e.g.*, *ALBC I*, 575 U.S. at 268–71 (reversing district court's holding that organization lacked standing and remanding to "give the [organization] an opportunity to provide evidence of member residence"); *GRACE II*, 730 F. Supp. 3d at 1295–97 (crediting organizational representatives' testimony about their members' residences to find organizations had standing, including Ms. Pelham's testimony about Engage Miami).

**D. The constitutional violations should be remedied expeditiously.**

"[I]ndividuals . . . whose constitutional rights have been injured by improper racial gerrymandering have suffered significant harm. Those citizens are entitled to vote as soon as possible for their representatives under a constitutional apportionment plan." *Harris v. McCrory*, 159 F. Supp. 3d 600, 627 (M.D.N.C. 2016) (cleaned up), *aff'd sub nom. Cooper*, 581 U.S. 285. "When a federal court declares an existing apportionment scheme unconstitutional, it is . . . appropriate . . . to afford a reasonable opportunity for the legislature to . . . adopt[ ] a substitute measure." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978).

Here, the Court should exercise its equitable power and impose a post-trial remedial-phase schedule to ensure constitutional maps are implemented expeditiously. *North Carolina v. Covington*, 585 U.S. 969, 976 (2018) (finding district court properly retained jurisdiction over post-trial remedial phase).[28] The Governor has already convened a special session for late April to consider "legislation relating to the drawing of congressional districts . . . and any legal challenges thereto," providing a convenient window for the Legislature to exercise its "reasonable opportunity." Dkt. No. 183-1 (Governor's Proclamation).[29]

### III. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court enter judgment in their favor and: (1) declare Congressional District 26 and House Districts 115, 118, and 119 to be unconstitutional racial gerrymanders in violation of the Fourteenth Amendment; (2) permanently enjoin Defendants and their agents from calling, conducting, or certifying any elections using the Challenged Districts; (3) enter a remedial decree that ensures Plaintiffs live and vote in constitutional districts as soon as practicable; and (4) award Plaintiffs reasonable attorneys' fees and costs.

---

[28] *See also, e.g.*, *McCrory*, 159 F. Supp. 3d at 627 (permanently enjoining map and giving legislature 14 days to propose remedy); *Milligan v. Allen*, No. 2:21-cv-1530 (N.D. Ala. June 20, 2023), Dkt. No. 168 (after Supreme Court affirmed preliminary injunction, giving legislature 31 days to propose remedy), *stay of remedial order denied*, 144 S. Ct. 476 (2023) (mem.), *and appeal of remedial order dismissed*, No. 23-12922, 2023 WL 6568350 (11th Cir. Oct. 3, 2023).
[29] Should they be unable to secure effective relief before the next election, Plaintiffs will renew their request for special elections pleaded in their Complaint, so they and their neighbors do not have to wait another election cycle to live and vote under constitutional lines.

Respectfully submitted February 27, 2026,

Andrew Frackman*
**O'Melveny & Myers LLP**
1301 Avenue of the Americas, 17th Floor
New York, NY 10019
(212) 326-2000
afrackman@omm.com

Brian P. Quinn*
Patrick J. Jones*
Emily Murphy*
Gabrielle S. Jackson*
Helena M. Li*
**O'Melveny & Myers LLP**
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300
bquinn@omm.com
pjones@omm.com
emurphy@omm.com
gjackson@omm.com
hli@omm.com

_/s/ Nicholas L.V. Warren_
Nicholas L.V. Warren (FBN 1019018)
Daniel B. Tilley (FBN 102882)
Caroline A. McNamara (FBN 1038312)
**ACLU Foundation of Florida, Inc.**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-2714
nwarren@aclufl.org
dtilley@aclufl.org
cmcnamara@aclufl.org

Jorge L. Vasquez, Jr.*
**Vasquez Attorneys at Law, PC**
141 Parkway Road, Suite 14
Bronxville, NY 10708
(212) 752-8408
jorge@vasquezpc.com

*Admitted pro hac vice*

*Counsel for Plaintiffs*