UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 1:24-cv-21983-JB


CUBANOS PA'LANTE, *et al.*,

      Plaintiffs,

v.

FLORIDA HOUSE OF REPRESENTATIVES
and CORD BYRD, in his official capacity as
Florida Secretary of State,

      Defendants.

_____/


DEFENDANT FLORIDA HOUSE OF
REPRESENTATIVES' SUPPLEMENTAL MEMORANDUM

As directed by the Court, ECF Nos. 211, 213, the House respectfully submits this supplemental memorandum on the Supreme Court's opinion in *Louisiana v. Callais*, Nos. 24-109, 24-110 (U.S. Apr. 29, 2026), and the Florida Legislature's adoption of a new congressional redistricting plan on April 29, 2026 (the "2026 Plan").

I.    ***CALLAIS* DOES NOT IMPACT THIS CASE.**

The Supreme Court's recent decision in *Callais* does not impact the legal principles that govern Plaintiffs' claims. To avoid constitutional concerns, *Callais* placed a limiting construction on section 2 of the federal Voting Rights Act (the "VRA"). But it did not alter the equal-protection framework that, for 31 years, has governed racial-gerrymandering challenges to electoral districts, and neither section 2 nor its state constitutional analogue—the Vote-Dilution Clause of the Florida Constitution—is at issue here.

**Background.** After the 2020 census, Louisiana was apportioned six seats in Congress. *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 767 (M.D. La. 2022). Its legislature enacted a congressional redistricting plan that contained one majority-black district. *Id.* at 768. Two sets of plaintiffs alleged that Louisiana's failure to create a second majority-black district violated section 2 of the VRA. *Id.* The court entered a preliminary injunction that prohibited enforcement of the new districts. *Id.* at 766. It explained that the

"appropriate remedy" is a district map "that includes a second majority-Black congressional district." *Id.*

The Supreme Court stayed the injunction through the 2022 election. *Callais v. Landry*, 732 F. Supp. 3d 574, 586 (W.D. La. 2024). When litigation resumed, to avoid a trial on the merits, the Louisiana Legislature redrew the State's districts and created a second majority-black district. *Id.* at 586–87, 604. A different set of plaintiffs challenged the new districts, alleging that the second majority-black district was a racial gerrymander. *Id.* at 582. The court agreed and enjoined implementation of the new districts. *Id.*

The district court found that race predominated in the challenged district's configuration. *Id.* at 606. The new district cut from the State's northwest corner to Baton Rouge in southeast Louisiana, 250 miles away. *Id.* at 588. Along the way, it incorporated portions of four metropolitan areas—but only the portions with majority-black populations. *Id.* at 600. Moreover, "key political figures" such as the Governor, Attorney General, and members of the Louisiana Legislature stated that the district's primary purpose was to create a second majority-black district and thus avoid liability under the VRA. *Id.* at 604.

Louisiana appealed to the Supreme Court. Op. 13.[1] It argued that race did not predominate and that, if it did, the State's efforts to comply with section 2 satisfied strict scrutiny. Br. for Appellant at 32–53 (No. 24-109), 2024 WL 5245865. But after one round of briefing and argument, the Court scheduled the appeal for re-argument and ordered supplemental briefing on the following question: "Whether the State's intentional creation of a second majority-minority congressional district violates the Fourteenth or Fifteenth Amendments to the U. S. Constitution." Op. 17. On that issue, Louisiana argued that equal protection prohibits *any* consideration of race—or, alternatively, that any consideration of race triggers strict scrutiny. Suppl. Br. for Appellant at 43–45 (No. 24-109), 2025 WL 2523396. It urged the Court to overrule *Miller v. Johnson*, 515 U.S. 900 (1995), which first announced the predominance standard. *Id.* at 46.

The United States' amicus brief proposed a different approach. It urged the Court to retain the predominance standard, which the parties had not challenged in their opening briefs, since "jettisoning predominance would aggravate, not terminate, the 'endless' redistricting litigation Louisiana bemoans." Suppl. Br. for United States As Amicus Curiae Supporting Appellees at 6 (Nos. 24-190, 24-110), 2025

---

[1] "Op." refers to the slip opinion issued by the Supreme Court in *Callais* on April 29, 2026.

WL 2742532. Instead, the United States proposed modifications to the elements of a section 2 claim to avoid constitutional concerns and align those elements with the statutory text. *Id.* at 20–31. The United States argued that, with those modifications, rather than operate as an entitlement to majority-minority districts, *id.* at 17–18, section 2 will target practices that bear strong indicia of intentional discrimination, *id.* at 10.

The ***Callais*** **Decision.** *Callais* is best understood as an attempt to resolve the "tension" between section 2 of the VRA, as interpreted in *Thornburg v. Gingles*, 478 U.S. 30 (1986), and the Fifteenth Amendment, which grants the authority on which Congress relied when it enacted the VRA in 1965. Op. 1, 4.

The Fifteenth Amendment provides that the "right of citizens of the United States to vote shall not be denied or abridged . . . on account of race." U.S. Const. amend. XV, § 1. It also authorizes Congress to "enforce" this guarantee "by appropriate legislation." *Id.* § 2. Notably, the Fifteenth Amendment prohibits only state action motivated by a "discriminatory purpose." Op. 23 (quoting *Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481 (1997)). To be constitutional, legislation enacted to enforce the Fifteenth Amendment must reflect "congruence and proportionality" between the means employed and the injury that Congress attempted to prevent. Op. 22–23 (quoting *City of Bourne v. Flores*, 521 U.S. 507, 520 (1997)).

In *Callais*, the Court explained that section 2 may not be interpreted to prohibit a district map "solely because it fails to provide a sufficient number of majority-minority districts." Op. 24. This would stretch section 2 well beyond the Fifteenth Amendment's ban against intentional discrimination. *Id.* To ensure consistency with the Fifteenth Amendment, the Court modified the elements of a section 2 claim to align that claim with "enforcement of the Fifteenth Amendment's prohibition on *intentional* discrimination." Op. 23 (emphasis in original). As construed in *Callais*, section 2 does not impose liability absent a "strong inference" of intentional discrimination. *Id.* The Court concluded that compliance with section 2, so construed, is a compelling interest that justifies race-based discrimination in redistricting. Op. 2–3.

The ***Callais*** **Decision's Impact.** For multiple reasons, *Callais* has no effect on the present case.

**A.** *Callais* did not categorically prohibit any consideration of race, as Louisiana urged the Court to do. *Callais'* recognition that compliance with section 2 is a compelling interest that justifies race-based redistricting refutes the categorical argument that equal protection proscribes any consideration of race.

**B.** *Callais'* holding that States have a compelling interest in compliance with section 2, as properly construed, is of no import here. Plaintiffs affirmatively allege that Florida's interest in compliance with the Florida Constitution's Non-Diminishment Clause is compelling. ECF No. 58 ¶¶ 191, 221. Because Plaintiffs did not question the existence of a compelling interest, that question is not before the Court.[2]

**C.** Unlike *Callais*, this case does not involve section 2 of the VRA or Florida's analogue to section 2. Rather, the challenged districts were drawn in compliance with the Non-Diminishment Clause, which was patterned after section 5 of the VRA. *See Black Voters Matter Capacity Bldg. Inst., Inc. v. Sec'y, Fla. Dep't of State*, 415 So. 3d 180, 187 (Fla. 2025) (explaining that the Florida Supreme Court has "looked to Section 2 on the issue of vote dilution and to Section 5 on diminishment"); *In re Senate Joint Resol. of Legis. Apportionment 1176*, 83 So. 3d 597, 625 (Fla. 2012) (noting that "Section 2 jurisprudence guides . . . state vote dilution claims" while "jurisprudence interpreting Section 5" guides claims of diminishment). And because the Non-Diminishment Clause is not federal legislation enacted to enforce the Fifteenth Amendment, the congruence-and-proportionality standard does not constrain the Non-Diminishment Clause.[3]

**D.** *Callais* did not accept Louisiana's invitation to scrap the predominance standard and overrule the precedents that, for 31 years, have applied a predominance standard to racial-gerrymandering claims.

In *Miller*, the Court held that strict scrutiny applies only when race is the "predominant factor" in a district's design. 515 U.S. at 916. The Court reasoned that legislatures will "almost always be aware

---

[2] Plaintiffs belatedly attempted to raise this argument for the first time in their closing argument at the conclusion of trial. *See* ECF No. 202 at 124:23–126:18. In their closing argument, Plaintiffs argued that the following question presented in the parties' Joint Pretrial Stipulation raised the compelling-interest question: "Whether, if the Court finds that race was the predominant factor in the design of any Challenged District, the use of race was narrowly tailored to compliance with the Florida Constitution's Non-Diminishment Clause." *See* ECF No. 172 at 8. But that statement does not even mention "compelling interests." In fact, it was written to reference the Non-Diminishment Clause—rather than make general reference to an unspecified compelling interest—precisely because Plaintiffs had already taken the position that compliance with the Non-Diminishment Clause is a compelling state interest.

[3] In separate litigation, the House has argued that the express racial classifications in article III, section 20(a) of the Florida Constitution, including the Non-Diminishment Clause, violate the Equal Protection Clause of the Fourteenth Amendment. *See Equal Ground Educ. Fund, Inc. v. Byrd*, No. 2026-CA-000914 (Fla. 2d Cir. Ct.). That challenge is different from the question that answered in *Callais*—*i.e.*, whether section 2, as construed, is consistent with the Fifteenth Amendment's grant of authority to Congress. Plaintiffs here have never questioned the Non-Diminishment Clause's constitutionality.

4

of racial demographics" and that a predominance standard best comports with the "extraordinary caution" that courts must exercise when addressing the sensitive topic of race consciousness in redistricting. *Id.* Since then, the Court has consistently applied the predominance standard in racial-gerrymandering cases. *See Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 7 (2024); *Allen v. Milligan*, 599 U.S. 1, 31 (2023); *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 187 (2017); *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015); *Easley v. Cromartie*, 532 U.S. 234, 241 (2001); *Hunt v. Cromartie*, 526 U.S. 541, 547 (1999); *Bush v. Vera*, 517 U.S. 952, 959 (1996) (plurality op.); *Shaw v. Hunt*, 517 U.S. 899, 907 (1996).

In *Callais*, the Court recognized that, although "any use of race in government decisionmaking generally triggers strict scrutiny, in gerrymandering cases a challenger must show that race was the government's predominant consideration." Op. 9. It noted that, "in cases where race predominated," States have sometimes argued that compliance with the VRA justified their "use of race." *Id.* It also recognized that, in the case before it, the predominance standard raised the "question whether race or politics" was the predominant motive, which in turn highlighted "problems in the existing body of §2 case law." Op. 2.

Nowhere in the *Callais* opinion, however, did the Court address these problems in *section 2* case law by overruling the many decisions that espouse a predominance standard under the Equal Protection Clause. To be sure, the Court's opinion asks whether compliance with the VRA constitutes a compelling interest that justifies the "use of race," without reference to the *predominance* of race. *E.g.*, Op. 2, 17. But it does not follow that the Court implicitly discarded the predominance framework and established, for the first time, that *any* degree of racial motivation exposes a district to strict scrutiny. The Supreme Court does not topple decades of precedent by implication. If it had intended to overrule *Miller* and apply strict scrutiny to any use of race, then the Court would have said so—not by a subtle semantic switch, but in the same didactic, expository manner in which it announced its modifications to the section 2 elements.

Supreme Court precedent that is "directly on point" continues to be binding "unless and until the Supreme Court explicitly overrules it." *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1264 (11th Cir. 2012); *accord Agostini v. Felton*, 521 U.S. 203, 237 (1997) ("We do not acknowledge, and we do not hold, that other courts should conclude our more recent cases have, by implication, overruled an earlier precedent."); *United States v. Hernandez*, 159 F.4th 425, 428 (5th Cir. 2025) (explaining that lower courts

"lack the authority to recognize 'implicit' overruling by the [Supreme] Court of its precedents"). The Supreme Court "does not normally overturn, or so dramatically limit, earlier authority *sub silentio*," *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 17–18 (2000), and reserves to itself "the prerogative of overruling its own decisions," *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). Before it overrules its precedents, the Court "usually" undertakes a careful evaluation of "the traditional *stare decisis* factors." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 621 (2020) (plurality opinion).

A mere variation in language does not signal a break from decades-old precedents. *Callais* did not announce any intention to overrule *Miller* and its progeny and to do away with the predominance standard. It did not examine the *stare decisis* factors. Whatever the future might hold, the Supreme Court's precedents are binding until the Court itself disavows them. *See Wilkins v. United States*, 598 U.S. 152, 163–64 (2023) ("Speculating about what this Court might have thought about arguments it never addressed needlessly introduces confusion. This Court looks for definitive interpretations, not holdings in hiding."); *United States v. Hatter*, 532 U.S. 557, 566–67 (2001) (explaining that lower court was correct to apply Supreme Court precedent—and to leave it to the Supreme Court to overrule its precedents—even though changes in judicial doctrine had significantly undermined the holding of the Court's precedent).

**E.** *Callais* also addressed the second and third preconditions of a section 2 claim. Op. 30. These preconditions are satisfied when the minority group is politically cohesive and the white majority votes as a bloc usually to defeat the minority-preferred candidate. Op. 30. The Court concluded that, to satisfy these preconditions, a plaintiff must "provide an analysis that controls for party affiliation"—*i.e.*, show that racially polarized voting reflects more than a mere difference in political-party preference. *Id.* For three reasons, this condition does not affect the analysis of cohesion under Florida's Non-Diminishment Clause.

*First*, under section 2, a plaintiff must control for party affiliation only if the State asserts as a defense that the challenged districts were drawn for partisan and not racial reasons. *See* Op. 25, 32, 36. Only then must a plaintiff disentangle racial from partisan considerations and exclude the possibility that partisan motives explain the disputed districts. Defendants here have not cited partisanship as a defense.

6

*Second*, the requisite showing of cohesion serves an altogether different function under Florida's Non-Diminishment Clause than under section 2. The Non-Diminishment Clause requires "some level of voting cohesion" to ensure compliance with the textual prerequisite that minorities have candidates "of their choice," *Black Voters Matter*, 415 So. 3d at 186; ECF No. 175 at 65—*i.e.*, a discernible preference. To determine whether minorities have candidates of their choice, it is unnecessary to control for party affiliation. Indeed, the Florida Supreme Court has never attempted to control for party affiliation when evaluating cohesion. *See League of Women Voters of Fla. v. Detzner*, 179 So. 3d 258, 285–87 (Fla. 2015); *In re Senate Joint Resol. of Legis. Apportionment 1176*, 83 So. 3d at 667. Neither did Plaintiffs' expert, Dr. Walker.

*Third*, as explained previously, the Florida Constitution's Non-Diminishment Clause does not require any showing analogous to the third section 2 precondition—*i.e.*, that whites vote as a bloc usually to defeat the minority-preferred candidate. ECF No. 175 at 69–74. Far from it: the Non-Diminishment Clause applies only to districts in which minority-preferred candidates have usually *won*—not where they have usually *lost*.

Accordingly, the Supreme Court's decision in *Callais* does not impact this Court's resolution of Plaintiffs' claims.

## II.   THE 2026 PLAN MOOTS PLAINTIFFS' CHALLENGE TO CONGRESSIONAL DISTRICT 26.

**Challenged CD 26 No Longer Exists.** The 2026 Plan repealed the congressional redistricting map enacted in 2022. *See* Fla. HB 1D (2026). Its passage significantly altered CD 26, mooting Plaintiffs' challenge.

A case is moot when the issues "are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs*, 868 F.3d 1248, 1255 (11th Cir. 2017) (en banc) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 (1969)). Federal courts may decide "only actual, ongoing cases or controversies." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477 (1990). On "numerous occasions, the Supreme Court has held that the repeal of or amendment to challenged legislation rendered moot a plaintiff's request for injunctive relief." *Coral Springs St. Sys. v. City of Sunrise*, 371 F.3d 1320, 1329 (11th Cir. 2004) (collecting cases). When new legislation changes the challenged portion of prior legislation, no case or controversy remains, and the challenge to the prior legislation becomes moot. *Id.*

7

The repeal of challenged CD 26 moots Plaintiffs' challenge to that district. Because the district no longer exists, there is no live case or controversy, and the challenge to CD 26 should be dismissed as moot.

**The Voluntary-Cessation Exception Does Not Preclude CD 26's Mootness.** Government actors that terminate challenged conduct are entitled to a rebuttable presumption that the conduct will not resume, *Troiano v. Supervisor of Elections*, 382 F.3d 1276, 1282–83 (11th Cir. 2004), and the plaintiff bears the burden to present affirmative evidence to rebut that presumption, *Flanigan's*, 868 F.3d at 1256. "When government laws or policies have been challenged, the Supreme Court has held almost uniformly that cessation of the challenged behavior moots the suit." *Troiano*, 382 F.3d at 1283–84 (collecting cases). This is so because governmental actors are afforded "considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities." *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257, 1267 (11th Cir. 2020) (quoting *Flanigan's*, 868 F.3d at 1256). "That is especially true when . . . a government defendant has formally rescinded a challenged statute, ordinance, rule, or policy." *Id.* at 1268.

Courts examine "three broad factors" to determine whether, under the totality of circumstances, there is a "reasonable expectation that the government entity will reenact the challenged policy." *Id.* at 1268. *First*, the Court must assess "whether the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate our jurisdiction." *Id.* On this point, courts "examine the timing of the repeal, the procedures used in enacting it, and any explanations independent of this litigation which may have motivated it." *Id.*

Here, there is no evidence that the Legislature enacted the 2026 Plan in reaction to this litigation or to manipulate jurisdiction. To the contrary, the Governor issued a Proclamation on January 7, 2026, convening a special session to consider "legislation relating to the drawing of congressional districts for the State of Florida." ECF No. 183-1 at 2. The Proclamation cited the Florida Supreme Court's decision in *Black Voters Matter* and the United States Supreme Court's then-forthcoming decision in *Callais* as reasons to redraw Florida's congressional districts "in the interest of making further improvements . . . based upon traditional redistricting principles." *Id.* The Governor's Proclamation did not reference this litigation; the special session was motivated by "recent legal developments" unrelated to this action. *Id.*

8

*Second*, the Court must determine "whether the government's decision to terminate the challenged conduct was 'unambiguous'—which, in turn, entails an inquiry into whether the government's policy shift is fairly viewed as being 'permanent and complete.'" *Keohane*, 952 F.3d at 1268 (quoting *Flanigan's*, 868 F.3d at 1257). The 2026 Plan is a "permanent and complete" change. Enacted by the Legislature and signed into law by the Governor, it supplants the congressional map Plaintiffs challenge.

*Third*, the Court must determine "whether the government has consistently maintained its commitment to the new policy." *Id.* The 2026 Plan established new districts for future elections. By the legislation's terms, the new districts apply to the elections to be held this year. *See* Fla. HB 1D, § 5 (2026).

Confirming the government's commitment to its new policy, Defendants and the Florida Senate are actively defending three consolidated cases that challenge the 2026 Plan. *See Equal Ground Educ. Fund, Inc., v. Byrd*, No. 2026-CA-000914 (Fla. 2d Cir. Ct.) (the "2026 Litigation"). In the 2026 Litigation, the plaintiffs seek a temporary injunction prohibiting implementation of the 2026 Plan and reinstating the prior map.

The 2026 Litigation is moving quickly. On May 15, 2026, Judge Joshua Hawkes held an expedited hearing on the plaintiffs' motions for temporary injunction. A ruling is expected imminently. The Secretary has filed a declaration in the 2026 Litigation in which the Director of the Division of Elections states that "the deadline by which my office needs to have a definitive answer on the maps being used is Monday, **May 25, 2026**"—the date when citizens may first begin to qualify as candidates for Congress. *See* Decl. of Maria Matthews at 4 (Ex. 3 to Def. Sec'y of State's Notice of Filing Exs. in Supp. of Sec'ys Resp. in Opp'n to Pls.' Mot. for Temporary Inj. (May 13, 2026)). In the meantime, redistricting legislation, "like any legislation, is entitled to a presumption of validity." *Black Voters Matter*, 415 So. 3d at 197.

There is no risk that the government will, of its own volition, re-enact the 2022 congressional map. Its actions and vigorous defense of the 2026 Plan show a firm resolve to implement its new policy.

III.   **ALTERNATIVELY, THIS COURT SHOULD HOLD A RULING ON CD 26 IN ABEYANCE AND ENTER A PARTIAL FINAL JUDGMENT AS TO THE CHALLENGED HOUSE DISTRICTS.**

If the Court is disinclined to dismiss Plaintiffs' challenge to CD 26 while motions for temporary injunction are pending in the 2026 Litigation, this Court could hold its resolution of that challenge in abeyance and enter an appealable partial final judgment with respect to the challenged House Districts.

*See* Fed. R. Civ. P. 54(b) (authorizing the "entry of a final judgment as to . . . fewer than all . . . claims . . . if the court expressly determines that there is no just reason for delay"); *Lloyd Noland Found., Inc. v. Tenet Health Care Corp.*, 483 F.3d 773, 777 (11th Cir. 2007) (explaining that a judgment disposing of fewer than all claims is immediately appealable if the district court certifies the judgment pursuant to Rule 54(b)).

This Court has wide latitude in the management of its docket, including authority to hold a decision on CD 26 in abeyance under these unique circumstances. *See Clinton v. Jones*, 520 U.S. 681, 706 (1997) ("The district court has broad discretion to stay proceedings as an incident to its power to control its own docket."); *Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936) ("[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket . . . .").

Here, practical considerations and the significance of the issues before the Court support holding any ruling on CD 26 in abeyance. The 2026 Plan is a duly enacted and presumptively constitutional state statute that has replaced the challenged congressional district. The 2026 Plan is the operative map for the upcoming primary and general elections. Thus, Plaintiffs will not be prejudiced if this Court holds its ruling on CD 26 in abeyance. And for the reasons outlined in the House's Pretrial Brief, if this Court finds any district invalid, then it should "exercise caution and restraint," *Tully v. Okeson*, 977 F.3d 608, 611–12 (7th Cir. 2020), and "consider the importance of preserving the status quo," *Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014), especially considering the approaching elections and the 2026 Litigation.

<u>**CONCLUSION**</u>

*Callais* has no impact on the principles of law that govern Plaintiffs' claims. The 2026 Plan does, however, impact Plaintiffs' challenge to CD 26. Rather than issue a ruling on a congressional district that is no longer in effect, this Court should either dismiss Plaintiffs' challenge to CD 26 or hold any ruling on CD 26 in abeyance. At this stage, for the reasons stated in the House's Pretrial Brief, ECF No. 175 at 79–81, the Court should decline to issue any ruling that could compromise Florida's administration of the 2026 elections. *See League of Women Voters of Fla., Inc. v. Fla. Sec'y of State*, 32 F.4th 1363, 1370 (11th Cir. 2022) (explaining that "district courts ordinarily should not enjoin state election laws in the period close to an election" (quoting *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurral))).

Dated May 18, 2026.

Respectfully submitted,

/s/ *Andy Bardos*

Christopher M. Kise (FBN 855545)
ckise@continentalpllc.com
CONTINENTAL PLLC
101 North Monroe Street, Suite 750
Tallahassee, Florida 32301
Telephone: 850-270-2211

Andy Bardos (FBN 822671)
andy.bardos@gray-robinson.com
GRAYROBINSON, P.A.
301 South Bronough Street, Suite 600
Tallahassee, Florida 32301-1724
Telephone: 850-577-9090

Jesus M. Suarez (FBN 60086)
jsuarez@continentalpllc.com
Carmen Manrara Cartaya (FBN 73887)
ccartaya@continentalpllc.com
Jennifer Marie Hernandez (FBN 1018836)
jhernandez@continentalpllc.com
CONTINENTAL PLLC
245 Alcazar Avenue
Coral Gables, Florida 33134
Telephone: 305-677-2707

*Attorneys for Defendant, Florida House of Representatives*