**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:24-cv-21983-JB

CUBANOS PA'LANTE, *et al.*,

     *Plaintiffs*,

v.

FLORIDA HOUSE OF
REPRESENTATIVES, *et al.*,

     *Defendants*.

_____/

### PLAINTIFFS' SUPPLEMENTAL BRIEF

The Court has ordered supplemental briefing on the impact, if any, of Florida's newly enacted congressional map ("2026 Plan") and *Louisiana v. Callais*, --- S. Ct. ---, 2026 WL 1153054 (U.S. Apr. 29, 2026). Dkt. No. 211. Plaintiffs address each issue in turn.

**I. The new congressional map does not moot Plaintiffs' claims.**

Plaintiffs' claims against HDs 115, 118, and 119 (and previously dismissed claims against HDs 112, 113, 114, and 116) are unaffected by the 2026 Plan and should proceed to judgment. As to CD 26, pending state-court litigation seeking to enjoin the 2026 Plan means Plaintiffs' claim falls into the "capable of repetition, yet evading review" and voluntary cessation exceptions to mootness. Plaintiffs respectfully submit that the Court should (1) enter judgment on the claims against the Challenged House Districts under Rule 54(b); and (2) hold the CD 26 claim (and previously dismissed claims against CDs 27 and 28) in abeyance until the 2026 Plan is enjoined or the pending state-court challenges are otherwise resolved.

**A. Enactment of the 2026 Plan and Pending Legal Challenges**

Governor DeSantis submitted the 2026 Plan to the Legislature on April 27, 2026, explaining his submission in a letter by General Counsel David Axelman (**Exhibit 1**). Therein, Mr. Axelman explained that "the Fair Districts Amendments (FDA) to the Florida Constitution require the Legislature to account for race when drawing congressional districts." Ex. 1 at 1. "This requires the use of race in redistricting—something that the U.S. Supreme Court has signaled is unconstitutional." *Id.* After noting that South Florida districts in 2022 "were drawn with the Hispanic voting age population in mind to comply with the race-based requirements of the FDA," he went on to say: "The use of race in redistricting should never happen. Any decision taken

'because of' race triggers (and should trigger) the strictest of federal constitutional scrutiny." *Id.* at 2 (citations omitted). "Whether race is the predominant reason for drawing a district or just one among other reasons should make no constitutional difference. Properly understood, the Fourteenth Amendment forbids the government from divvying up the citizenry based in whole or in part upon race." *Id.*

Mr. Axelman also explained the Governor's view that "[b]ecause [the FDA's race-based provisions] require consideration of race in the drawing of congressional districts, they cannot satisfy strict scrutiny and are unconstitutional under the Fourteenth Amendment." *Id.* at 3. "The race-based requirements of the FDA also cannot be severed from the other requirements of the FDA." *Id.* The same day, the Governor explained why he was redrawing Florida's map by noting the state has "moved from a Democrat majority to a 1.5 million Republican advantage."[1]

On April 28, Jason Poreda (who drew the 2026 Plan for the Governor's office) and Mohammad Jazil (representing the Governor) presented the 2026 Plan in the Senate Committee on Rules and House Select Committee on Congressional Redistricting. Mr. Poreda admitted to using partisan data to draw the 2026 Plan. Apr. 28, 2026 Senate Rules Comm. at 43:45–44:06 ("[N]ot having to comply with the Fair Districts Amendments, the entire suite of redistricting criteria that are available to other states, I used here, including partisan data."), 1:02:39–52 (available at https://thefloridachannel.org/videos/4-28-26-senate-committee-on-rules/). Mr. Jazil explained that any consideration of race in redistricting triggers strict scrutiny. *Id.* at 5:33–43 ("Race should not be used at all when drawing districts. We should instead adhere to those basic background equal protection principles that say race has no role in the process."), 53:07–13 ("trying to take race into account to comply with the Fair Districting Amendment runs smack-dab into the Equal Protection Clause"); *contra* Secretary's Proposed Findings of Fact and Conclusions of Law (FOFCOLs), Dkt. No. 206 at 26 ("It's not enough to show that the redistricting body . . . used race as a criterion."). He also explained that "trying to comply with . . . the Florida race-based provisions in Article III, Section 20 is not a compelling interest." Senate Rules Comm. at 8:37–46.

Mr. Jazil also confirmed that the legal theory underpinning the new map was contingent on judicial validation. He agreed that the map was "based on . . . a legal theory that's sort of

---

[1] Preston Mizell, *Ron DeSantis Unveils New Florida Congressional Map That Would Give the GOP an Extra Four Seats*, Fox News (Apr. 27, 2026), https://www.foxnews.com/politics/ron-desantis-unveils-new-florida-congressional-map-would-give-gop-extra-four-seats.

underpinned by two 'ifs.' If *Callais* comes out, and if the Supreme Court were to adopt [the Governor's] non-severability argument, then we would be able to adopt a map that does not regard race and is drawn with partisan intent." *Id.* at 1:31:08–30. And he explained his position that the Florida Constitution's ban on partisan or anti-incumbent intent "does not apply." *Id.* at 11:31–40, 41:28–32, 48:38–41 ("partisan intent can be taken into account"); *contra* Secretary's FOFCOLs at 28 ("Florida doesn't allow maps to be infected with partisan or anti-incumbent intent.").

The Governor signed the 2026 Plan into law on May 4, 2026. Within 24 hours, three lawsuits were filed in the Second Judicial Circuit Court in Leon County challenging the 2026 Plan as an illegal partisan gerrymander under the Florida Constitution. *Equal Ground Educ. Fund v. Byrd*, No. 2026 CA 914; *Thompson-Wynn v. Byrd,* No. 2026 CA 925; *Common Cause v. DeSantis*, No. 2026 CA 928. All three cases seek to enjoin the 2026 Plan. If any of these cases succeeds, the map will revert to the 2022 Plan that Plaintiffs challenge here. *See, e.g.*, Compl. at 68, *Equal Ground* (requesting to "[r]einstat[e] the 2022 Plan . . ."); Compl. at 48, *Common Cause* (requesting to "[o]rder the implementation of the 2022 benchmark congressional redistricting plan for the upcoming 2026 election and every election thereafter . . .").

Responding to the *Equal Ground* temporary injunction motion, the Secretary repeated many of the Governor's legal arguments explained earlier by Mr. Axelman and Mr. Jazil. Secretary's Response to Mot. for Temp. Inj. at 9, 16–18, *Equal Ground* (May 13, 2026). In its own response, the House explained its positions that the FDA's race-related provisions "violate the Equal Protection Clause," that "[n]o compelling interest justifies the express racial classifications in [the FDA]," that the racial provisions "are not narrowly tailored," and that the FDA's ban on partisan intent is unconstitutional since the entire FDA is non-severable. House's Response to Mot. for Temp. Inj. at 1–3, *Equal Ground* (May 13, 2026); *contra* House's FOFCOLs, Dkt. No. 207 at 42 ("In drawing the challenged districts, the Legislature faithfully honored the limits that equal protection imposes on the consideration of race."), 50 ("[E]ven if race had predominated in drawing the challenged districts, the districts would satisfy strict scrutiny."); House's Pretrial Brief, Dkt. No. 175 at 4 ("[B]ecause the Non-Diminishment Clause applied to the challenged districts, the Legislature's consideration of race was narrowly tailored.").

On May 15, 2026, the Second Judicial Circuit held a hearing on the temporary injunction motions in the three consolidated cases.

### B. The "capable of repetition, yet evading review" exception applies.

The pending litigation over the 2026 Plan renders the racial classification Plaintiffs challenge in the 2022 Plan "capable of repetition, yet evading review." Under that mootness exception, a case is not moot if "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1343 (11th Cir. 2014) (citation omitted). Plaintiffs discuss both prongs in reverse order.

If the 2026 Plan is enjoined (either temporarily or permanently after trial) and the 2022 Plan reinstated, the conduct Plaintiffs challenge would recur: the very district Plaintiffs challenge in this case would come back into force and again subject them to a racial classification. There is a "reasonable expectation" the 2026 Plan *will* be enjoined: Mr. Poreda admitted he considered partisan data to draw the 2026 Plan, the Governor explained his reasons for redistricting by referencing Florida's Republican lean, the Governor and the Legislature argue that they need not comply with the Fair Districts Amendments at all, and "the Florida Constitution prohibits drawing a plan or district with the intent to favor or disfavor a political party or incumbent; there is no acceptable level of improper intent." *In re Senate Joint Resol. of Legis. Apportionment 1176*, 83 So. 3d 597, 617 (Fla. 2012).

After the 2026 Plan is enjoined, there will likely not be enough time to fully litigate the 2022 Plan again before the 2028 election, and perhaps not even before the next decennial redistricting. If this Court dismisses Plaintiffs' CD 26 claim as moot now and Plaintiffs must wait for the state litigation to conclude, they will then have to file a new complaint, proceed through discovery, and re-try their case against CD 26. By that time, further elections will have passed and a new redistricting cycle will be around the corner. Such a duplicative suit would not only waste judicial resources, it would permit additional elections to proceed under the challenged CD 26 without judicial review, perhaps even through the next redistricting cycle. *See Fouts v. Harris*, 88 F. Supp. 2d 1351, 1354 (S.D. Fla. 1999) (dismissing racial gerrymandering case filed in 1998 as laches-barred because court-ordered redistricting would be based on "old census figures"), *aff'd*, 529 U.S. 1084 (2000) (mem.).

The reasonable prospect that a successful state-court challenge could reinstate the 2022 Plan without adequate time to re-adjudicate CD 26's constitutionality makes this mootness exception directly applicable. Moreover, the trial record independently establishes a reasonable

expectation of recurrence. The Legislature has engaged in race-based mapmaking across successive redistricting cycles, willfully ignoring the Florida Supreme Court's prior warnings against relying on unproven assumptions about Hispanic voting cohesion and actively preventing evidence of noncohesion from influencing its mapmaking. Pls.' FOFCOLs, ECF No. 208 at ¶¶ 6–31, 114–15. A Legislature that has repeatedly engaged in unconstitutional redistricting cannot credibly contend that Plaintiffs face no reasonable expectation of being subjected to the same conduct again.

### C.  The Voluntary Cessation Doctrine also applies to the CD 26 claim.

For similar reasons, the Voluntary Cessation Doctrine independently defeats mootness. "A defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice," unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). While government defendants are afforded "the benefit of the doubt" in voluntary-cessation cases, a dispute is not moot if "there is 'a reasonable expectation' that the government 'will reverse course and reenact the allegedly offensive' policy" *Walker v. City of Calhoun*, 901 F.3d 1245, 1270 (11th Cir. 2018) (quoting *Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs*, 868 F.3d 1248, 1255 (11th Cir. 2017) (en banc)). "A change in policy will moot a case *only* if it 'fundamentally alter[s]' the original policy so 'as to render the original controversy a mere abstraction.'" *Keister v. Bell*, 29 F.4th 1239, 1250 (11th Cir. 2022) (*quoting Naturist Soc., Inc. v. Fillyaw*, 958 F.2d 1515, 1520 (11th Cir. 1992)) (emphasis added).

In the Eleventh Circuit, courts may consider various factors to determine whether voluntary cessation by a government actor moots a case, but one is dispositive here: "whether the actions that have been taken to allegedly moot the case reflect a rejection of the challenged conduct that is both permanent and complete." *Walker,* 901 F.3d at 1270. The pending challenges to the 2026 Plan mean its legal validity is uncertain. Moreover, as Mr. Jazil explained to the Legislature, the Governor's defense against partisan gerrymandering claims hinges on a doubly contingent theory requiring judicial review (the "legal theory [] underpinned by two 'ifs'"), including that the Fair Districts Amendments are entirely void. Until the challenges to the 2026 Plan conclude, the State's termination of the offending conduct will be neither permanent nor complete. *See A.R. v. Dudek*, No. 12-60460, 2013 WL 11971282, at *7 (S.D. Fla. Aug. 6, 2013) (finding pending challenge to a

new agency rule meant a challenge to prior wrongful conduct had not been "unambiguously terminated" and was therefore not moot).

Additionally, courts look to "whether the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate our jurisdiction," which requires examining "the timing of the repeal, the procedures used in enacting it, and any explanations independent of this litigation which may have motivated it". *Walker*, 901 F.3d at 1270. The lack of deliberation surrounding the 2026 Plan underscores that the Legislature's cessation of the challenged conduct is neither genuine nor permanent. Mr. Poreda was the "only map drawer" and completed the map in approximately two weeks. Senate Rules Comm. at 1:26:06–47. He refused to disclose the identities of those who were involved in developing, reviewing, and consulting on the map. *Id.* at 44:14–34, 1:35:05–58. The map's Senate sponsor even explicitly rejected the legal theory "underpinning" the map.[2] A map drawn by a single individual in two weeks, shielded from public scrutiny, passed two days after it was released, and justified by legal arguments its own sponsor repudiated cannot reflect the kind of "substantial deliberation" that would warrant a finding of mootness. *See Walker*, 901 F.3d at 1271 (finding voluntary cessation factor unmet where government was 'unnecessarily secretive' in failing to disclose the process behind the new policy).

**D. The Court should hold the CD 26 claim in abeyance.**

The Court should exercise its inherent authority to manage its docket by holding Plaintiffs' CD 26 claim in abeyance until the 2026 Plan is enjoined or the state-court proceedings are otherwise resolved. In *Georgia State Conference of the NAACP v. Georgia*, a three-judge panel held a racial gerrymandering case in abeyance pending appeal of related litigation enjoining the same maps under the Voting Rights Act, finding that "conservation of judicial resources" warranted a stay. No. 1:21-cv-5338 (N.D. Ga. Nov. 1, 2023), Dkt. No. 204 at 2–3 ("The inherent discretionary authority of the district court to stay litigation pending the outcome of a related proceeding in another forum is not questioned.").

The same logic applies here. Three state-court challenges to the 2026 Plan are already underway, and their resolution will directly determine whether the 2022 Plan is reinstated. *See*

---

[2] Apr. 29, 2026 Senate Session at 3:47:39–3:48:11 (available at https://thefloridachannel.org/videos/4-29-26-senate-session/) (Senator Gaetz: "I believe that the rest of the Fair Districts Amendment could and should and ought to stand. . . . I believe that we should be required to follow all of the other demands of the Fair Districts Amendment.")

*Growe v. Emison*, 507 U.S. 25, 33 (1993) (requiring federal courts to defer to state-court redistricting litigation). If the state courts invalidate the 2026 Plan and reinstate the 2022 Plan, the CD 26 claim will plainly be justiciable. Abeyance is the most efficient path for the parties and the Court to both avoid duplicative litigation and refrain from ruling on the constitutionality of a district that might not be effective again after January 3, 2027.[3] Dismissing the CD 26 claim now would be premature and could require Plaintiffs to relitigate issues they already tried.

The wait will probably be short. The state-court challenges are likely to be resolved quickly, and well before the 2028 election. In *Black Voters Matter Capacity Building Institute, Inc. v. Secretary, Florida Department of State*—filed in 2022—the Florida Supreme Court admonished the First District Court of Appeal for failing to speed the case along so that the Supreme Court could issue a final ruling by the 2024 election. 415 So. 3d 180, 193 (Fla. July 17, 2025). The directive to lower state courts is clear: constitutional redistricting cases are of "great public importance" and should be resolved expeditiously. *Id.*

## II. Plaintiffs Prevail on Their Claims Under *Callais*.

*Callais* confirms that Plaintiffs prevail on their racial-gerrymandering claims. While the decision rewrites the test for proving racial vote dilution under Section 2 of the Voting Rights Act, 2026 WL 1153054, at *15–16, it also sheds new light on the Fourteenth Amendment racial-gerrymandering framework. *Callais* repeats the formulation of "racial predominance" the Supreme Court first articulated two years ago: race predominates when a state makes "an 'express acknowledgment that race played a role in the drawing of district lines.'" *Callais*, 2026 WL 1153054, at *17 (quoting *Alexander v. S.C. State Conf. of NAACP*, 602 U.S. 1, 8 (2024)). A state that makes such an express acknowledgment "therefore ha[s] to satisfy the 'extraordinarily onerous' standard of proving that its use of race was narrowly tailored to further a compelling governmental interest." *Id.* (quoting *Alexander*, 602 U.S. at 11).

*Callais* also explains that "using race" when drawing district lines triggers strict scrutiny. Adopting a new requirement that Section 2 plaintiffs draw their additional majority-minority district without taking race into account at all, the Court explained:

> If a plaintiff can produce an additional majority-minority district
> only ***by using race***—a process that would be unconstitutional if a

---

[3] The 2026 Plan does not take effect until the terms of the current members of Congress expire, except with respect to the 2026 elections used to elect members of the next Congress. HB 1-D (2026), §§ 5–6, at 157–58.

> State engaged in such mapmaking, *see Alexander*, 602 U.S., at 6—that illustrative map sheds no light on whether the State acted unconstitutionally by not adopting such a map. Thus, an illustrative map ***in which race was used*** has no value in proving a §2 plaintiff's case.

2026 WL 1153054, at \*15 (emphasis added). The Court is clear: "using race" to draw a majority-minority district is unconstitutional—or at least must survive strict scrutiny—when the government does it. *See also id.* at \*10 ("considering whether the Constitution permits ***the intentional use of race*** to comply with the Voting Rights Act" (emphasis added)); *Malliotakis v. Williams*, 146 S. Ct. 809, 810 (mem.) (Alito, J., concurring) (noting that "draw[ing] a new congressional district for the express purpose of ensuring that 'minority voters' are able to elect the candidate of their choice . . . is unadorned racial discrimination" subject to strict scrutiny).

 *Callais* also sheds light on just how "extraordinarily onerous" the government's burden becomes at the strict-scrutiny step of a racial-gerrymandering case. Because "the Constitution almost never permits the Federal Government or a State to discriminate on the basis of race," "the intentional use of race to comply with the Voting Rights Act" must be justified by "remediating specific, identified instances of past discrimination that violated the Constitution or a statute." *Id.* (quoting *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 207 (2023)). First, the state "must identify the specific instances of past discrimination that it aims to remediate and, in light of that specification, must 'determine the precise scope of the injury it seeks to remedy.' *Id.* (quoting *Shaw v. Hunt*, 517 U.S. 899, 909 (1996)). "Second, after identifying the specific instance of discrimination, 'the institution that makes the racial distinction must have a strong basis in evidence to conclude that its remedial action is necessary.'" *Id.* (quoting *Shaw*, 517 U.S. at 910) (alterations in original omitted).

 *Callais* therefore makes clear that Plaintiffs prevail. The Legislature "express[ly] acknowledge[ed] that race played a role in the drawing of district lines." *Id.* at \*17 (quotation omitted); *see, e.g.*, House's FOFCOLs, ECF No. 207 at 2 ("Race was one consideration in drawing the four challenged districts . . . ."). The State "therefore ha[s] to satisfy the 'extraordinarily onerous' standard of proving that its use of race was narrowly tailored to further a compelling governmental interest." *Callais*, 2026 WL 1153054, at \*17 (quotation omitted). And the State did nothing to either "identify the specific instances of past discrimination that it aims to remediate" or show "a strong basis in evidence to conclude that its remedial action is necessary." *Id.* at \*10 (quotation omitted). Plaintiffs have proven their claims.

Respectfully submitted May 18, 2026,

Andrew Frackman*
**O'Melveny & Myers LLP**
1301 Avenue of the Americas, 17th Floor
New York, NY 10019
(212) 326-2000
afrackman@omm.com

Brian P. Quinn*
Patrick J. Jones*
Emily Murphy*
Gabrielle S. Jackson*
Helena M. Li*
**O'Melveny & Myers LLP**
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300
bquinn@omm.com
pjones@omm.com
emurphy@omm.com
gjackson@omm.com
hli@omm.com

/s/ *Nicholas L.V. Warren*
Nicholas L.V. Warren (FBN 1019018)
Caroline A. McNamara (FBN 1038312)
Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida, Inc.**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-1769
nwarren@aclufl.org
cmcnamara@aclufl.org
dtilley@aclufl.org

Jorge L. Vasquez, Jr.*
**Vasquez Attorneys at Law, PC**
141 Parkway Road, Suite 14
Bronxville, NY 10708
(212) 752-8408
jorge@vasquezpc.com

*\*Admitted pro hac vice*

*Counsel for Plaintiffs*

9