

**RON DeSANTIS**
GOVERNOR

STATE OF FLORIDA

# Office of the Governor

THE CAPITOL
TALLAHASSEE, FLORIDA 32399-0001

www.flgov.com
850-717-9418

April 27, 2026

The Honorable Don Gaetz
Chair, Ethics & Elections Committee
Florida Senate
404 South Monroe St.
Tallahassee, FL 32399

The Honorable Mike Redondo
Chair, Select Committee on Congressional Redistricting
Florida House of Representatives
402 South Monroe St.
Tallahassee, Fl 32399

Dear President Gaetz and Representative Redondo:

The Executive Office of the Governor (EOG) submits the attached map of proposed congressional districts and urges the Florida Legislature to adopt it during the special session that is scheduled to commence on April 28.

The people of Florida have been deprived of appropriate representation in the U.S. House of Representatives. Despite substantial population growth since the 2010 census, which catapulted Florida to the third most populous state in the nation, Florida gained only one additional seat in the House after the 2020 census. However, a post-census survey conducted by the U.S. Census Bureau demonstrated that Florida was shortchanged by more than 760,000 people.[1] This undercount cost Florida at least one additional House seat.

Florida's representation in the U.S. House has also been distorted by considerations of race. Passed in 2010, the Fair Districts Amendments (FDA) to the Florida Constitution require the Legislature to account for race when drawing congressional districts. Specifically, section 20(a) provides that "districts shall not be drawn [(1)] with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process[,] or [(2)] to diminish their ability to elect representatives of their choice." Art. III, § 20(a), Fla. Const. These race-based requirements, moreover, supersede the traditional redistricting criteria in section 20(b), such as the requirement to maintain compactness and to utilize existing political and geographical boundaries, whenever there is a conflict. *See* Art. III, § 20(b), Fla. Const. (providing that the traditional redistricting criteria in subsection (b) are mandatory "[u]nless compliance with [those standards] conflicts with the standards in subsection (a) or with federal law"). This requires the use of race in redistricting—something that the U.S. Supreme Court has signaled is unconstitutional.

---

[1] U.S. Census Bureau, *2020 Census Undercount and Overcount Rates by State, Post-Enumeration Survey* (May 19, 2022), https://perma.cc/ YA7F-JXK7.

1

In 2022, after the 2020 census, the FDA's race-based requirements caused the Legislature to enact two versions of Congressional District 5. The primary version packed the black population of Duval County into one district. Even though the black voting age population was diminished relative to the benchmark district, the Legislature nevertheless believed that the black population was large enough that black voters could still elect candidates of their choice. The alternative version, which would take effect if a court blocked the primary version, essentially maintained the racially gerrymandered configuration of the benchmark district, which had been described as having the shape of a "barbell" and "stretched over two hundred miles across the Florida/Georgia border to encompass the black populations in Duval County in the east and Leon and Gadsden Counties in the west." *Black Voters Matter Capacity Bldg. Inst., Inc. v. Sec'y, Fla. Dep't of State*, 415 So. 3d 180, 188 (Fla. 2025). The Legislature drew both versions to comply with the FDA, but because racial considerations predominated with respect to both, which could not satisfy strict scrutiny, the Governor vetoed both maps on the ground that they violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. The Legislature eventually enacted, and the Governor signed, the current congressional map with a race-neutral version of Congressional District 5.

The existing map is the result of a compromise between the Legislature and the Governor. Parts were drawn by EOG, and parts were drawn by legislative staff. The southeastern part came from the Legislature. Congressional District 20 in the southeast has an odd shape with two claws that track the black population. The claws are arguably a telltale sign of racial predominance. They were used to create a majority-minority district to comply with Section 2 of the Voting Rights Act. Other districts in the region do not have the odd appendages but, the legislative record shows, were drawn with the Hispanic voting age population in mind to comply with the race-based requirements of the FDA.

The use of race in redistricting should never happen. Any decision taken "because of" race triggers (and should trigger) the strictest of federal constitutional scrutiny. *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979); *see also Students for Fair Admissions, Inc. v. President & Fellows of Harv. Coll.*, 600 U.S. 181, 214-18 (2023). The U.S. Supreme Court, however, has attempted in vain to distinguish between the race-conscious drawing of districts and the drawing of districts where race predominates. While only the latter triggers strict scrutiny under current precedent, *Cooper v. Harris*, 581 U.S. 285, 291-92 (2017), the line is nevertheless blurry. That is because the line is intellectually dishonest. As Justice Scalia put it, "when a legislature intentionally creates a majority-minority district, race is necessarily its predominant motivation and strict scrutiny is therefore triggered." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 517 (2006) (Scalia, J., concurring in judgment in part and dissenting in part). Whether race is the predominant reason for drawing a district or just one among other reasons should make no constitutional difference. Properly understood, the Fourteenth Amendment forbids the government from divvying up the citizenry based in whole or in part upon race.

The Supreme Court is poised to affirm this basic non-discrimination principle in *Louisiana v. Callais*. This case has an unusual procedural posture that portends a significant decision. It was first argued on March 24, 2025. *See* Supreme Court Docket, Case No. 24-109. It was re-listed for a second argument on June 27, 2025. *Id.* And it was re-argued on October 15, 2025. *Id.* Past cases re-argued before the Supreme Court include *Brown v. Board of Education*, 347 U.S. 483 (1954) (segregation); *Roe v. Wade*, 410 U.S. 113 (1973) (abortion); and *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010) (campaign finance). The re-listing and re-argument of *Callais* suggests that it will be a landmark decision just as the others were.

2

The proposed congressional map that EOG now submits does not take race into consideration at all. Race was neither a predominant factor nor one of many factors. And because race was never considered, the map also makes no attempt to adhere to the race-based requirements of the FDA. Because those provisions require consideration of race in the drawing of congressional districts, they cannot satisfy strict scrutiny and are unconstitutional under the Fourteenth Amendment. For one thing, they lack a pre-enactment record that would justify a race-based remedy for a race-based wrong. There's also no temporal limit to these provisions. And plainly, they were not adopted under Congress's enforcement powers pursuant to Section 2 of the Fifteenth Amendment to the U.S. Constitution. *See generally Black Voters Matter Capacity Bldg. Inst., Inc.*, 415 So. 3d at 196-97 (recognizing those differences).

The race-based requirements of the FDA also cannot be severed from the other requirements of the FDA. The FDA was sold to the voters as a package. There was no severability provision included in the FDA when it was presented to the voters. And because one part is unconstitutional, there's little reason to think that voters would have approved the remaining parts by themselves. As Florida's Chief Justice commented during the oral argument in *Black Voters Matter*: "If it ever were to come to the point that we thought that the non-diminishment essentially doesn't work here, would the whole FDA have to go because it seems like this was part of a kind of package deal?" Oral Argument at 1:17:15, https://wfsu.org/gavel2gavel/viewcase.php?eid=2894. That led to the following rhetorical question: "How do we neuter half of [the FDA] and then leave the other part intact?" *Id.*

The proposed map redraws on race-neutral terms districts in southeast Florida that were affected by the FDA's race-based requirements. Changes in this region result in changes elsewhere in the map. In addition, since the 2020 census, Florida's population has continued to grow at a breakneck pace, adding almost 2 million more residents as of July 1, 2025—an 8.9% increase.[2] The most population growth appears to have occurred in the outlying areas surrounding Tampa and Orlando and north of Palm Beach County up the eastern coast.[3] While still based on 2020 census data, the proposed map nevertheless attempts to account for these dramatic population changes by reconfiguring districts around the areas of high growth.

On behalf of EOG, I urge you to approve the attached congressional map.

Sincerely,

David Axelman
General Counsel

---

[2] U.S. Census Bureau, Quick Facts, Florida, https://www.census.gov/quickfacts/fact/table/FL/PST045225#PST045225.

[3] U.S. Census Bureau, *Sunshine State Home to Metro Areas Among Top 10 U.S. Population Gainers from 2022 to 2023* (March 14, 2024), https://www.census.gov/library/stories/2024/03/florida-and-fast-growing-metros.html; *see also* Office of Economic & Demographic Research, *April 1, 2025 Estimate of Counties and Municipalities*, https://edr.state.fl.us/Content/population-demographics/data/index-floridaproducts.cfm.