Filing # 248949428 E-Filed 05/26/2026 03:35:26 PM

**IN THE CIRCUIT COURT OF THE SECOND JUDICIAL CIRCUIT
IN AND FOR LEON COUNTY, FLORIDA**

EQUAL GROUND EDUCATION FUND INC., et al.,
　　　Plaintiffs,

vs.　　　　　　　　　　　　　　　　　　　　　Case No.: 2026 CA 914

CORD BYRD, in his official capacity as Florida
Secretary of State, et al.,
　　　Defendants.

_____/

### <u>ORDER ON MOTIONS FOR PRELIMINARY INJUNCTION</u>

THIS CAUSE came before the Court for hearing on May 15, 2026, upon Plaintiffs' Motions for a Preliminary Injunction (the "Motions").[1]  At the hearing, no testimonial evidence was offered, but each of the Plaintiffs submitted their own evidence packet, with affidavits, expert reports, and committee reports and testimony from the associated legislative proceedings. The Equal Ground Plaintiffs submitted approximately 1900 pages of evidence, comprising 75 exhibits.[2] The Thompson-Wynn Plaintiffs submitted approximately 220 pages of evidence, comprising 21 exhibits. The Common Cause Plaintiffs submitted approximately 1250 pages of evidence, comprising 18 exhibits.[3] The Court has reviewed the Motions, the exhibits, the Defendants' responses in opposition and evidence, the arguments offered at the two-hour hearing, and is otherwise fully advised in the premises.  Accordingly, the Court FINDS as follows:

---

[1] The case is a consolidated group of Plaintiffs against mostly the same Defendants, with each set of Plaintiffs filing their own preliminary injunction motion and associated evidence packet.  The last-filed case, the Common Cause Plaintiffs, sued various individuals, but the representation is conveniently expected to be the same (*e.g.*, Florida Senate counsel representing individual senators, etc.).

[2] The Court will use the parties' exhibit numbers, with the following prefixes: EG-Exh. --, TW-Exh. --, and CC-Exh. – (for Equal Ground, Thompson-Wynn, and Common Cause, respectively). Similarly, for Defendants' exhibits, with prefixes of CB-Exh. --, S-Exh. --, and H-Exh. -- (for Secretary Cord Byrd, the Florida Senate, and the Florida House, respectively).

[3] The Common Cause Plaintiffs referenced a deposition of Jason Poreda from 2025 as Exhibit 11 that was not in the court file, that the Court can find.

## I.   POSITIONS OF THE PARTIES

Plaintiffs take the position that this case is unusual because the maps were redrawn mid-cycle, with a sole map drawer, who admitted on the public record that the Congressional Districts (CD) were drawn with partisan data and without the need to comply with the Fair Districts Amendment (FDA).

Defendants resist the temporary injunction both procedurally and substantively. Procedurally, Defendants contend that the injunction could only realistically be put in place after a trial. Substantively, Defendants contend that improper intent has not been shown with the available evidence and that Plaintiffs' improperly impute legislative intent from numerous outside sources.

Both parties spend considerable time arguing the constitutionality of the FDA and whether it must be struck down not at all, in part, or in whole.  The Court will note at this preliminary stage, and especially with the way the Motions are resolved herein, the question of the FDA's continued constitutional viability is premature.

## II.   FINDINGS OF FACT

Findings of fact are necessary at this stage, but the Court is mindful that they are made on an incomplete record.  Thus, the Court's initial perceptions could change given more robust factual development after discovery, testing of experts, the parties solidify their positions, and credibility determinations that are expected after trial.

1.      The Governor's office requested that the Congressional maps be redrawn in a special session he convened before the regular legislative session, to take place after the regular session.  EG-Exh. 6.

2.      The Governor submitted proposed maps for the special session, citing two primary criteria considered in their construction: removing the racial components of CD-20 and adjusting for lopsided population growth in Central Florida while still using 2020 Census Data as required. TW-Exh. 13.

3.      Each house of the Legislature held a committee meeting to hear from the Governor's office regarding his legal position on the redrawing of maps and a description of how the maps were drawn. *See generally* EG-Exh. 11; EG-Exh. 12.

4.      The consensus at this stage of the litigation is that Mr. Jason Poreda was the sole drawer of the maps. EG-Exh. 12 at 23 (Mr. Poreda answering that "I am the only one that drew

2

the map."). Mr. Poreda gave a presentation to each chamber to explain his process and then answered questions. *See generally* EG-Exh. 11; EG-Exh. 12.

5.       The thrust of his presentation and method that he claimed to use was that once he changed CD-20, in South Florida, it has cascading effects all throughout the center part of the state. In addition he sought to account for population growth while complying with "traditional redistricting criteria" of compactness, etc.

6.       The maps were voted out of committee and then debated on the floor, where they were passed and signed by the Governor.

7.       The Secretary of State estimates that May 25, 2026, is the cutoff for implementation of maps. CB-Exh. 14 at 3.

### III.    LEGAL STANDARD

#### A.  *Injunctive relief.*

Under Florida law, a party seeking a preliminary injunction must prove four elements with competent, substantial evidence: (1) substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm; (3) the unavailability of an adequate remedy at law; and (4) that the injunction serves the public interest. The failure to establish even one of these elements is fatal to the request for injunctive relief.

The Court is bound by recent cases on this very issue, in a very similar posture. The First District Court of Appeal explained that the constitutional writ of a temporary injunction is "to preserve the status quo [and] will not support [the trial court] going further to grant a remedy on a provisional basis." *Byrd v. Black Voters Matter Capacity Bldg. Inst., Inc.*, 339 So. 3d 1070, 1076 (Fla. 1st DCA 2022) (*Byrd I*). Further, "the Legislature clearly eschewed the availability of a provisional remedy in a chapter 86 action." *Byrd I* at 1077.  Thus, to succeed on their motion, Plaintiffs must find the balance of preserving the status quo without a provisional remedy. *Byrd I* at 1079 ("Thus, a temporary injunction, if warranted, could only reinstate the former congressional map.").

#### B.  *Constitutional issue.*

Plaintiffs challenge is under the FDA, which is reproduced below:

Standards for establishing congressional district boundaries.—In establishing congressional district boundaries:

(a)   [*Tier 1 criteria*] No apportionment plan or individual district shall be drawn with the intent to favor or disfavor a political party or an incumbent; and

districts shall not be drawn with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process or to diminish their ability to elect representatives of their choice; and districts shall consist of contiguous territory.

(b)   [*Tier 2 criteria*] Unless compliance with the standards in this subsection conflicts with the standards in subsection 1(a) or with federal law, districts shall be as nearly equal in population as is practicable; districts shall be compact; and districts shall, where feasible, utilize existing political and geographical boundaries.

(c)   The order in which the standards within subsections 1(a) and (b) of this section are set forth shall not be read to establish any priority of one standard over the other within that subsection.

Art. III, § 20, Fla. Const. (italicized annotations added).[4]

### IV.   ANALYSIS

#### A. *Improper Use of Injunctive Power*

A preliminary injunction is an extraordinary and drastic remedy that is the exception, rather than the rule. The parties argue extensively about the scope of this Court's injunctive power. Defendants point to *Byrd I* to argue that the Court has no power to issue a preliminary injunction in a declaratory action (*i.e.*, without a final hearing), because the declaratory judgment is the relief. Plaintiffs counter that the Court still has all writs power to enjoin and maintain the status quo during litigation. This contention seems right.  Indeed, Defendants seem to concede that if the map were obviously deficient, some interim relief would be warranted. However, Defendants then counter that for Plaintiffs to receive a mandatory injunction under this Court's all writ power, they must show that the plan they propose is also constitutional.

Plaintiffs make several compelling points in support of the 2022 map. First, the 2022 map had the same presumption of constitutionality as all legislative acts. Second, the 2022 map was heavily litigated for several years and has been in operation for two election cycles (2022 and 2024). Third, the same process produced that map (*i.e.*, a Governor-called special session), with the same principal map drawer.

However, Defendants have the better of this argument. The 2022 map litigation did not question the constitutionality of potential race-based district lines present in CD-20.  Thus, the prior litigation is not an endorsement of CD-20 or the 2022 map in toto. The earlier litigation just

---

[4] The FDA is broadly understood to include a very similar provision for state legislative districts (*i.e.*, Art. III, § 21), but that section is not at issue in this litigation.

addressed Plaintiffs' challenges, which focused on the prior majority-minority district of what was known as CD-5. Further, the 2022 map was declared unconstitutional when the Governor and Legislature replaced it with the 2026 map challenged in this litigation. The political branch's position was in anticipation of a changing legal landscape with the Supreme Court's pending ruling in *Louisiana v. Callais*, 146 S. Ct. 1131 (2026).[5] Plaintiffs' evidence focuses on challenging the constitutionality of the 2026 map, but does not sufficiently challenge the political branches' finding that CD-20 in the 2022 map was drawn with impermissible racial intent.

Plaintiffs' evidence at this stage is insufficient to support the permissibility of this Court forcing the 2022 map onto the electorate in contravention of the duly enacted 2026 map. Indeed, if Plaintiffs prevail it seems the proper remedy is not for the Court to order a particular map, but for it to order the Legislature to redraw the map in a constitutional manner. *Byrd I* at 1083 ("The supreme court in fact repeatedly recognized that the Legislature, not the courts, has the prerogative to redraw the lines where the first lines were found wanting."). It would seem presumptive on a limited evidentiary record and rushed proceedings to overturn both the Legislature's 2026 map while also overturning their finding that the 2022 map is unconstitutional. This is especially so where, if the Legislature and the Governor are correct that the 2022 map has racial classifications, Plaintiffs would have to provide this Court with sufficient evidence under strict scrutiny to justify the Court ordering its use again. *See, e.g.*, *Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) ("when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny"). To the extent the Court has to balance Florida's FDA prohibition of improper partisan intent and the United States Constitution's Equal Protection guarantees, it seems clear that the potential partisan intent in the 2026 map is the lesser of the two evils.

In that way, the Court's ruling on the preliminary injunction is understandably frustrating given the timeline[6] of this case and the short-fused call to action. Assuming Plaintiffs ultimately

---

[5] Indeed, the dissent described *Callais*' effect as the "now-completed demolition of the Voting Rights Act." *Callais*, 146 S. Ct. at 1166 (Kagan, J., dissenting). Add to that demolition the understanding in Florida law that the FDA's race-based criteria "follow almost verbatim the requirements embodied in the Federal Voting Rights Act." *In re Senate Joint Resolution of Legislative Apportionment 1176*, 83 So. 3d 597, 619 (Fla. 2012) (*Apportionment I*) (citations omitted).

[6] Looking ahead to the merits, and assuming similar case-processing times as the last challenge, after this Court's final ruling, it would take three months for the District Court to complete its

prevail in challenging the maps, there likely will be additional elections held on maps that violate the FDA, as has happened in the past. *See, e.g.*, *Byrd I* at 1083 ("two congressional elections went forward under a redistricting plan that was challenged as—and later determined to be—violative of the FDA, with the tacit or express approval of the circuit court and supreme court").

Although finding that the extraordinary measure of a temporary injunction is improper in this case, the Court goes on to analyze the traditional elements of a temporary injunction.

### B. *Substantial Likelihood of Success on the Merits*

A substantial likelihood of success requires more than a disputed claim. The most important issue in this litigation is whether the maps were drawn with impermissible partisan intent. The intent of the map drawer is not as apparent as Plaintiffs argue, nor is the applicability of imputing Mr. Poreda's intent (if any) to the entire Legislature established on this record.

Plaintiffs argue that there is direct evidence that Mr. Poreda drew with impermissible partisan intent, which is to say with the intent to favor or disfavor an incumbent or political party. The evidence they chiefly rely on is an answer from the question-and-answer period from Mr. Poreda's presentation to the Florida Senate. EG-Exh. 12 at 23. First, this statement is not direct evidence of impermissible intent. That is, Mr. Poreda did not say that he drew district lines to favor or disfavor an incumbent or party. Rather, one must infer that because he used partisan data (along with all other data available), that he then used it with impermissible intent. Once an inference is required, evidence moves into the circumstantial category.

Second, the Court does not accord the same weight to this statement that Plaintiffs do, at least not on a cold record at this stage in the litigation. It was one of two presentations that Mr. Poreda gave that day. In both presentations, his message was consistent and clear: he removed the race-based aspects of CD-20, which required him to redraw the surrounding districts that then cascaded to changes throughout the state. The level of questions he received fell well short of what one would expect in an adversarial cross-examination from a skilled advocate.[7]

---

review. *Byrd v. Black Voters Matter Capacity Bldg. Inst., Inc.*, 375 So. 3d 335 (Fla. 1st DCA 2023) (*Byrd II*, decided December 1, 2023, from September 4, 2023, notice of appeal). If the Florida Supreme Court accepts jurisdiction, perhaps another 19.5 months for it to complete its review. *Black Voters Matter Capacity Bldg. Inst., Inc. v. Byrd*, 415 So. 3d 180 (Fla. 2025) (decided July 17, 2025 from a December 4, 2023, certiorari petition). Thus, it seems this challenge is more geared toward the 2028 or 2030 election cycles than the 2026 election cycle.

[7] For example, Mr. Poreda was asked at one point why he did not just draw an additional district. EG-Exh. 11 at 52 ("I noticed that we still have only 28 Congressional districts. Based on that

Plaintiffs point to additional facts. Notably, they present an array of experts with associated metrics for measuring districts. However, Defendants' evidentiary objection to Plaintiffs numerous experts at the preliminary injunction stage without adequate chance at rebuttal is well taken.  As one example, Plaintiffs' expert indicated that he did not use Florida's EDR data to measure mid-decade population shifts, while Mr. Poreda indicated that he did. *Compare* CC-Exh. 3 at 4-5 *with* EG-Exh. 11 at 54. Perhaps the expert's data is better, but it would not support their position regarding intent if Mr. Poreda thought he was balancing population based on EDR data when, in fact, the districts became more out of balance looking at a different data set.

Thus, the Court concludes that from this record, there is insufficient evidence of impermissible intent to show substantial likelihood of success on the merits.

### C.  Irreparable Harm

The Executive and Florida House Defendants do not dispute the notion of irreparable harm. Plaintiffs cite cases for the notion that irreparable harm is per se when there is a constitutional violation. *Bd. of Cnty. Commissioners, Santa Rosa Cnty. v. Home Builders Ass'n of W. Fla., Inc.*, 325 So. 3d 981, 985 (Fla. 1st DCA 2021) ("[T]he law recognizes that a continuing constitutional violation, in and of itself, constitutes irreparable harm.") (citations omitted).  The Florida Senate argues that because Plaintiffs' right to vote is not at issue, the precedent they cite is not as relevant in a map-drawing case. The Court need not decide that issue at this stage given the other points raised and decided.

### D.  Adequate Remedy at Law

Like the last prong, Defendants do not dispute that there is a lack of adequate remedy at law. Indeed, to the extent Plaintiffs show constitutional injury, they cannot be compensated through money damages.

### E.  Balance of Hardships and the Public Interest

Even if Plaintiff had established all of the other elements, the balance of hardships and the public interest weigh heavily against the issuance of an injunction. Stability before elections promotes "[c]onfidence in the integrity of our electoral processes," which "is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006).  While the

---

growth, as you were making decisions drawing the maps, was there any consideration to adding another Congressional district?").

Court views *Purcell* as more of a federal prudential policy of restraint for federal courts not throwing state elections into disarray, it is a common-sense and sound principle.

However, the Florida Supreme Court also recognizes that "[t]o undertake to interfere with the election process at this late date, even if a clear legal right were shown, would result in confusion and injuriously affect the rights of third persons." *State ex rel. Haft v. Adams*, 238 So. 2d 843, 845 (Fla. 1970); *see also State ex rel. Walker v. Best*, 163 So. 696, 697 (Fla. 1935) ("it is now too late for the town clerk to effectively and legally carry out the commands of the alternative writ, as the election has been called . . . is only fifteen days off").

The election machinery of the state is already underway. CB-Exh. 14. Similar to the town election in *Walker v. Best*, it is more difficult for the much larger ship of statewide elections to change directions at this juncture. The primary is less than three months away, and the general less than six months. The public interest weighs more in favor of certainty than a haphazard judicial mandate of discarded maps.

V. RULING

It is hereby ORDERED AND ADJUDGED as follows:

A. Plaintiffs' Motions for a Preliminary Injunction are DENIED.

B. This denial of preliminary injunctive relief does not preclude the entry of a final injunction at the conclusion of a trial on the merits.

C. This is a non-final order reviewable under Florida Rule of Appellate Procedure 9.130.

DONE AND ORDERED in chambers at Tallahassee, Leon County, Florida on this 26th day of May, 2026.

_____
JOSHUA HAWKES
Circuit Judge

Copies to:
Parties via e-filing portal

8