**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.: 24-cv-21983-JB**

CUBANOS PA'LANTE, *et al.*,

        Plaintiffs,

v.                                                **THREE-JUDGE COURT**

FLORIDA HOUSE OF REPRESENTATIVES, *et al.*,

        Defendants.

_____/

Before GRANT, Circuit Judge, and RUIZ and BECERRA, District Judges.

GRANT, Circuit Judge:

### <u>MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW</u>

The U.S. Constitution prohibits, in almost every circumstance, the use of race in government decisionmaking.  That includes allowing race to be the predominant concern when drawing electoral districts.  According to Supreme Court case law, race may be considered alongside—but cannot override—traditional race-neutral redistricting criteria like contiguity and maintaining political subdivisions.  But where racial considerations predominate over those neutral factors, strict scrutiny requires the government to show that a compelling state interest justifies the use of race.

The plaintiffs in this case claim that the Florida Legislature's creation of four majority-minority Hispanic districts in South Florida violated the Constitution as a racial gerrymander.  Following a trial, we conclude that race did not predominate in the drawing of the challenged state house districts.  Judgment is therefore entered in favor of the defendants as to these three districts.  As for the fourth, the State of Florida has recently

enacted a new congressional map, which means that district is no longer in play, at least for now. We will therefore hold the challenge to that district's lines in abeyance pending ongoing litigation over Florida's new congressional map.

## I. BACKGROUND

This action challenges three Florida house districts (115, 118, & 119) and Congressional District 26 as racially gerrymandered in violation of the Fourteenth Amendment's Equal Protection Clause. The plaintiffs allege that the Florida Legislature subordinated traditional redistricting criteria to race when drawing the challenged districts and did not narrowly tailor the use of race to advance a compelling governmental interest. We held a four-day bench trial on these claims in January 2026.

By way of background, we discuss Florida law governing redistricting, the redistricting process that gave rise to the challenged districts, the procedural background of this case, and the plaintiffs' standing to bring this action.

### A. Florida Law

Article III of the Florida Constitution sets out, in materially identical provisions, standards for the drawing of both congressional and state legislative district boundaries. Fla. Const. art. III, § 20 (congressional), § 21 (legislative).[1] These two sections (known as the Fair Districts Amendments) were adopted by referendum in 2010, and each lays out two sets of standards—commonly referred to as "Tier One" and "Tier Two"—that must be satisfied when establishing congressional or legislative district boundaries. *See In re Senate Joint Resol. of Legis. Apportionment 100* (*In re SJR 100*), 334 So. 3d 1282, 1286 (Fla. 2022).

---

[1] Aside from references to "congressional" and "legislative" districts, respectively, sections 20 and 21 are virtually identical. *Compare* Fla. Const. art. III, § 20(a) ("No apportionment plan or *individual* district shall be drawn . . . ." (emphasis added)), *with id.* § 21(a) ("No apportionment plan or district shall be drawn . . . .").

Tier One sets forth three requirements.  *See* Fla. Const. art. III, §§ 20(a), 21(a).  *First*, it prohibits political gerrymandering, forbidding the drawing of any district "with the intent to favor or disfavor a political party or an incumbent."  *Second*, it incorporates vote-dilution and non-diminishment (or non-retrogression) standards by disallowing the drawing of any district "with the intent or result of denying or abridging the equal opportunity of racial or language minorities to participate in the political process" or with the intent or result of diminishing "their ability to elect representatives of their choice."  *Third*, it requires districts to "consist of contiguous territory."  Congressional and legislative districting plans must satisfy each of these requirements, which are of equal priority.  *See id.* §§ 20(c), 21(c).

Tier Two includes three traditional, race-neutral requirements—districts must (1) "be as nearly equal in population as is practicable," (2) "be compact," and (3) "where feasible, utilize existing political and geographical boundaries."  *Id.* §§ 20(b), 21(b).  As with Tier One, the Tier Two standards are of equal priority in relation to one another.  *Id.* §§ 20(c), 21(c).  But in the event of a conflict between the Tier One and Tier Two requirements, the former take precedence over the latter.  *In re SJR 100*, 334 So. 3d at 1286; Fla. Const. art. III, §§ 20(b), 21(b).  In other words, while the Florida Legislature must adhere to the Tier Two standards when drawing districts, it may deviate from these standards to the extent necessary to comply with the Tier One standards (or federal law).  *See In re SJR 100*, 334 So. 3d at 1286.

The Florida Supreme Court has interpreted several of the Tier One and Tier Two standards in ways that bear directly on this case.  For example, under Florida law, political boundaries comprise county and municipal boundaries, and geographical boundaries are those which are "easily ascertainable and commonly understood, such as rivers, railways,

3

interstates, and state roads." *In re Senate Joint Resol. of Legis. Apportionment 1176* (*In re SJR 1176*), 83 So. 3d 597, 638 (Fla. 2012) (quotation omitted).

Compactness, according to the Florida Supreme Court, is "a standard that refers to the shape of the district." *Id.* at 636. As a result, it is judged by a visual inspection of the district, which members of the Florida Legislature have sometimes referred to as the "eyeball test." *Id.* at 634; *see, e.g.*, Transcript of House State Legislative Redistricting Subcommittee Meeting, January 21, 2022 (ECF No. 196-73), at 7:1 (Rep. Byrd); Transcript of House Session, February 1, 2022 (Feb. 1 House Session) (ECF No. 196-75), at 7:15 (Rep. Leek). "The goal is to ensure that districts are logically drawn and that bizarrely shaped districts are avoided." *In re SJR 1176*, 83 So. 3d at 636. In assessing compactness, courts may supplement their visual examination of a district with "quantitative geometric measures of compactness." *Id.* at 635. The Florida Legislature uses three recognized mathematical compactness tests: Reock, Convex-Hull, and Polsby–Popper. *See In re SJR 100*, 334 So. 3d at 1287. Each method produces a score between 0 and 1, with 1 representing the highest degree of compactness. *League of Women Voters of Fla. v. Detzner*, 179 So. 3d 258, 283 nn.6–8 (Fla. 2015), *abrogated in part on other grounds by Black Voters Matter Capacity Bldg. Inst., Inc. v. Sec'y, Fla. Dep't of State*, 415 So. 3d 180 (Fla. 2025).

The Reock method "measures the ratio between the area of the district and the area of the smallest circle that can fit around the district." *League of Women Voters*, 179 So. 3d at 283 n.6 (quotation omitted). The Convex-Hull method "measures the ratio between the area of the district and the area of the minimum convex bounding polygon that can enclose the district." *Id.* at 283 n.7 (quotation omitted). Finally, the Polsby–Popper method "measures the ratio between the area of the district and the area of the circle with the same perimeter

4

as the district." *Id.* at 283 n.8.  The following illustration, drawn from a meeting packet for the Florida House Redistricting Committee and also presented at trial, explains the three methods:



**Reock Score**

$$R = \frac{A_D}{A_{MBC}}$$

The ratio of the area of the district ($A_D$) to the area of a minimum bounding circle ($A_{MBC}$) that encloses the district's geometry. A district's Reock Score falls within the range of [0,1] and a score closer to 1 indicates a more compact district.



**Convex-Hull Score**

$$CH = \frac{A_D}{A_{MCP}}$$

The ratio of the area of the district ($A_D$) to the area of the minimum convex polygon ($A_{MBP}$) that can encloses the district's geometry. A district's Convex-Hull score falls within the range of [0,1] and a score closer to 1 indicates a more compact district.



**Polsby Popper Score**

$$PP = 4\pi \times \frac{A_D}{P_D^2}$$

The ratio of the area of the district ($A_D$) to the area of a circle whose circumference is equal to the perimeter of the district ($P_D$). A district's Polsby-Popper score falls with the range of [0,1] and a score closer to 1 indicates a more compact district.

*See* Meeting Packet, House Redistricting Committee, October 12, 2021 (ECF No. 196-30), at 10; *cf.* Trial Transcript, January 12, 2026 (Tr. Day 1) (ECF No. 199), at 157:1–158:21.  In each case, the red district's area is compared to the area of the black figure surrounding it.  In this example, the Convex-Hull method produces the highest degree of compactness, while the Polsby–Popper method produces the lowest.

Finally, Tier One's Non-Diminishment Clause prohibits the Florida Legislature from eliminating majority-minority districts or weakening "performing minority districts."  *In re SJR 100*, 334 So. 3d at 1289 (quotation omitted).  Evaluation of whether a new districting plan complies with the Non-Diminishment Clause follows a two-step test.  *Black Voters Matter*, 415 So. 3d at 186.  The first step is to look at the prior map (known as the "benchmark plan") and identify districts "where racial or language minorities were able to elect representatives of their choice."  *Id.* (quotation omitted).  "The second step is to determine whether, relative to that benchmark, the new plan diminishes minority voters' ability to elect

representatives of their choice." *Id.* This ability is predicated on the existence of "some level of voting cohesion among the relevant minority group." *Id.* And whether a minority group has the ability to elect representatives of their choice is evaluated with a "functional analysis," which "assesses a cohesive minority group's effective voting strength, especially by asking whether the group controls the relevant primary election and the general election in the district under consideration." *Id.* at 186–87.

### B. Florida's 2021–22 Redistricting Process

Following the 2020 Census, Florida passed new maps for its 40 state senate districts, 120 state house districts, and 28 federal congressional districts.

#### 1. *New State Legislative Districts*

The Florida House Redistricting Committee and the Florida Senate Committee on Reapportionment began holding meetings regarding redistricting in September 2021. Joint Pretrial Stipulation (ECF No. 172), at 3. Both committees had separate subcommittees for congressional and state legislative redistricting. *Id.* The committees were assisted by staff, including analysts and counsel. *Id.* Among the staff was Jason Poreda, who served as the chief map drawer. *Id.* During their fall meetings, the House Redistricting Committee and its subcommittees "received informational briefings on the census data, legal requirements governing redistricting, and the Legislature's online map-drawing application." *Id.*

In December 2021 and January 2022, the House State Legislative Redistricting Subcommittee and House Redistricting Committee, respectively, workshopped two different state house plans. *Id.* at 4. The House Redistricting Committee eventually settled on a map known as Plan 8013. *Id.* Plan 8013 included 18 districts intended to perform for black voters and 12 intended to perform for Hispanic voters, numbers which were unchanged from the

6

benchmark plan. *In re SJR 100*, 334 So. 3d at 1289. The House combined Plan 8013 with the Senate's plan for its own districts and passed the new state legislative maps on February 2, 2022. Joint Pretrial Stipulation (ECF No. 172), at 4. The Florida Senate passed the maps the next day, and they have been in effect since the 2022 election. *Id.*

> 2. *Review by the Florida Supreme Court*

In Florida, state legislative redistricting is accomplished by joint resolution. *See* Fla. Const. art. III § 16(a). The new maps are then subject to judicial review. *See id.* § 16(c). The Florida Constitution directs the attorney general to petition the Florida Supreme Court "for a declaratory judgment determining the validity of the apportionment." *Id.* In making its determination, the Florida Supreme Court must "permit adversary interests to present their views," but in 2022, "no one appeared to oppose the Legislature's plans." *Id.*; *In re SJR 100*, 334 So. 3d at 1285. Still, even without "specific challenges to the joint resolution," the Florida Supreme Court was constitutionally required "to enter a judgment determining the validity of the apportionment." *In re SJR 100*, 334 So. 3d at 1285.

After the new state legislative maps passed in the House and Senate, the Florida Supreme Court reviewed the entire 2022 state legislative districting plan and issued a declaratory judgment on March 3, 2022, unanimously finding that the plan for the state legislative districts (both House and Senate) was valid under the Florida Constitution. *Id.* at 1290. To be clear, this was a facial determination regarding each legislative map considered as a whole, made in the absence of any challenges to specific districts based on particular facts. *Cf. id.* at 1285, 1290. And the evaluation was for their validity under Florida (not federal) law, although the Florida Supreme Court considers certain federal requirements to be consistent with the Florida standards. *Id.* at 1286. For example, the Florida Supreme

Court holds that the "one person, one vote" requirement of the Fourteenth Amendment's Equal Protection Clause has been subsumed within the Tier Two population standard. *Id.*

### 3. New Congressional Districts

The path for the *congressional* map ran through the Governor's office rather than the Florida Supreme Court.  The two chambers of the Florida Legislature each developed their own plans for the new congressional map, eventually agreeing on Plan 8019, which passed on March 4, 2022.  Joint Pretrial Stipulation (ECF No. 172), at 5–6.  But Governor Ron DeSantis vetoed their congressional map on March 29, 2022, because of concerns about certain districts outside of South Florida.  *Id.* at 6.

Alex Kelly, a deputy chief of staff for the Governor, prepared a new congressional map, which came to be known as Plan 109.  *See* Transcript of House Congressional Redistricting Subcommittee Meeting, April 19, 2022 (Subcommittee) (ECF No. 196-81), at 15:3–5, 16:8–15, 17:16–19.  In preparing this map, Mr. Kelly started with the Legislature's map and made adjustments to it, ultimately altering 18 congressional districts and leaving 10 of them untouched. *See id.* at 6:10–14; 21:2–4.  The new map eliminated a district in Northern Florida that, according to the Governor, violated the Equal Protection Clause by assigning voters primarily on the basis of race (without being narrowly tailored to advance a compelling state interest).  *Id.* at 21:12–22:9.  Mr. Kelly explained that the new map's adjustments also made "overall improvements with respect to Tier 2 redistricting criteria" as compared to the Legislature's map in other parts of the State.   *Id.* at 22:25–23:7.   With respect to Congressional District 26, Mr. Kelly's map left the City of Miami side of the district untouched, while removing Hendry County from the district and making adjustments on the Collier County side.  *Id.* at 71:23–72:15.  He moved the district further "into unincorporated East

Naples . . . utilizing the major roadways there," as well as a few waterways. *Id.* at 72:12–14. Because he knew that Congressional District 26 corresponded to a Hispanic-performing benchmark district, he watched the Hispanic population numbers "carefully" while adjusting the district to make sure that he "was staying very close to the benchmark seat." *Id.* at 73:19–25.

The Florida Legislature convened for a special session on April 19, 2022. Joint Pretrial Stipulation (ECF No. 172), at 6. Both houses considered Plan 109, which was presented by Mr. Kelly to both Senate and House committees. *See* Subcommittee (ECF No. 196-81), at 15:2–47:8; Transcript of Senate Committee on Reapportionment Meeting, April 19, 2022 (ECF No. 196-98), at 5:7–86:24. Although a few legislators raised questions about the changes to Congressional District 26, the new map passed both houses in the next two days, and Governor DeSantis signed it into law on April 22, 2022. Subcommittee (ECF No. 196-81), at 71:5–75:23 (Rep. Joseph); Transcript of House Session, April 20, 2022 (ECF No. 196-82), at 41:11–47:4 (Rep. Joseph); *id.* at 69:19–72:10 (Rep. Diamond); Transcript of Senate Session, April 19, 2022, 5 pm (Apr. 19 Senate Session) (ECF No. 196-100), at 66:14–69:2 (Sen. Farmer); Joint Pretrial Stipulation (ECF No. 172), at 6.

### 4.  *The Enacted Versions of the Challenged Districts*

Before considering the procedural history of this lawsuit, we briefly consider the final versions of the challenged districts as enacted. The parties agree that the challenged districts correspond to specific benchmark districts against which the Hispanic minority's ability to elect representatives of their choice was compared under Florida's Non-Diminishment Clause. *See* Joint Pretrial Stipulation (ECF No. 172), at 7.

The three challenged house districts all lie entirely within Miami-Dade County.  House

District 115, shown in the map below, splits no municipalities.



Map 15: State House Districts 115 and 116 – Municipalities

EXHIBIT
**D15**

*See* Defendants' Exhibit 15 (ECF No. 193-15).  Its borders fully enclose three municipalities—

Cutler Bay, Palmetto Bay, and Pinecrest—while following the municipal boundaries of four

other municipalities (Coral Gables, South Miami, West Miami, and Miami) that remain

outside the district.  *Cf.* Feb. 1 House Session (ECF No. 196-75), at 23:2–6.  The district has a

boundary analysis score of 92% and a Hispanic voting-age population of 65.86%.[2]  *See*

Florida House's Statement of Material Facts (Def. Material Facts) (ECF No. 123), ¶ 59 (*cf.*

Plaintiffs' Statement of Material Facts (ECF No. 126), ¶ 59); Meeting Packet, House

Redistricting Committee, January 26, 2022 (Jan. 26 Meeting Packet) (ECF No. 196-42), at 77.

Its Reock score is 0.28 (tied for seventh lowest); its Convex-Hull score is 0.72 (tied for

eleventh lowest); and its Polsby–Popper score is 0.30 (tied for twelfth lowest).  *See* Jan. 26

Meeting Packet (ECF No. 196-42), at 77.

House Districts 118 and 119, shown in the map below, lie in unincorporated Miami-

Dade County, where they neither split nor border any municipalities.

---

2    The boundary analysis score calculates "the extent to which each district's boundary lines coincide with political and geographical boundaries."  *In re SJR 100*, 334 So. 3d at 1288.  The average house district in the new plan has a score of 82.7%, an improvement from 78.5% in the benchmark plan.  *Id.*



Map 18: State House Districts 118 and 119 – Municipalities

EXHIBIT
D18

*See* Defendants' Exhibit 18 (ECF No. 193-18).  House District 118 has a Hispanic voting-age population of 85.74%.  *See* Jan. 26 Meeting Packet (ECF No. 196-42), at 77.  Its Reock score is 0.22 (tied for second lowest); its Convex-Hull score is 0.79 (a little below the average of 0.82); and its Polsby–Popper score is 0.33 (tied for sixteenth lowest).  *See id.*  According to uncontradicted evidence submitted by the plaintiffs at trial, House District 118 has a boundary score of 46%.[3]  *See* Plaintiffs' Exhibit 242 (Pl. Ex. 242) (ECF No. 197-81).

House District 119 has a Hispanic voting-age population of 85.20%.  *See* Jan. 26 Meeting Packet (ECF No. 196-42), at 77.  Its Reock score is 0.28 (tied for seventh lowest); its Convex-Hull score is 0.92 (tied for eleventh *highest*); and its Polsby–Popper score is 0.47 (slightly above the average of 0.45).  *See id.*  The plaintiffs' evidence at trial showed that House District 119 has a boundary score of 63%.  *See* Pl. Ex. 242 (ECF No. 197-81).

Congressional District 26, shown in the map below, stretches across the Everglades and includes portions of both Collier and Miami-Dade Counties, but follows the borders of four neighboring counties (Broward, Hendry, Lee, and Monroe).

---

3    Dr. Cory McCartan testified that he produced a boundary report for each of the challenged house districts using the legislature's online redistricting software, and he tabulated the numbers from those reports in Plaintiffs' Exhibit 242, which was admitted without objection.  Tr. Day 1 (ECF No. 199), at 151:11–152:12.  Because the boundary report calculates the percentage of a district's boundaries that align with each of five categories of features that may coincide with each other, the percentages for a single district may add up to more than 100%.  *Id.* at 152:19–154:6.  The number we refer to as the "boundary score" is found by subtracting the "Other" score from 100%.



Map 23: Congressional District 26

*See* Defendants' Exhibit 23 (ECF No. 193-23).  As seen in the next map, the portion of Congressional District 26 in Collier County does not split any municipalities, but includes one municipality (Everglades) entirely within the district and follows the municipal boundaries of Marco Island and Bonita Springs, which lie wholly outside the district.

15



Map 28: Congressional District 26 in Collier County – Municipalities

EXHIBIT
**D28**

16

*See* Defendants' Exhibit 28 (ECF No. 193-28).  Finally, the next map shows that the portion of the district that includes Miami-Dade County splits the City of Miami, but includes seven municipalities entirely within the district (Doral, Hialeah, Hialeah Gardens, Medley, Miami Lakes, Miami Springs, and Virginia Gardens), while following the boundaries of another four municipalities that remain wholly outside the district (Miami Gardens, Miramar, Opa-Locka, and Sweetwater).



Map 25: Congressional District 26 in Miami-Dade County – Municipalities

*See* Defendants' Exhibit 25 (ECF No. 193-25).   Congressional District 26 has a Hispanic voting-age population of 73.22% and a boundary analysis score between 91% and 92%.  *See* Map and Data Packet, Enacted Congressional Districts (Enacted Congressional Packet) (ECF No. 196-3), at 2; Trial Transcript, January 14, 2026 (Tr. Day 3) (ECF No. 201), at 213:9–13. Its Reock score is 0.29 (third lowest); its Convex-Hull score is 0.77 (a little below the average of 0.81); and its Polsby–Popper score is 0.33 (fifth lowest).  *See* Enacted Congressional Packet (ECF No. 196-3), at 2.

### C.  Procedural Background

The plaintiffs filed this lawsuit on May 23, 2024.  Complaint (ECF No. 1).  There are three organizational plaintiffs (Cubanos Pa'lante, Engage Miami, and FIU ACLU Club) and three individual plaintiffs (Cindy Polo, Genesis M. Castilla Falcon, and Diana Belbruno). Second Amended Complaint (ECF No. 58), ¶¶ 21–24, 26–27.   The Second Amended Complaint brings racial gerrymandering claims under 42 U.S.C. § 1983 against seven Florida house districts and three congressional districts, all in the Miami area.  *Id.* ¶ 4.  The defendants are the Florida House of Representatives and Cord Byrd, in his official capacity as Secretary of State (which makes him Florida's "chief election officer").  *Id.* ¶¶ 31–32; *see* Fla. Stat. § 97.012.

The defendants moved to dismiss for failure to state a claim.  House's Motion to Dismiss (ECF No. 59); Secretary's Motion to Dismiss (ECF No. 60).  Following oral argument, we dismissed the claims regarding Congressional Districts 27 and 28, but otherwise denied the motions.  *Cubanos Pa'lante v. Fla. House of Representatives* (*Cubanos I*), 766 F. Supp. 3d 1204, 1217 (S.D. Fla. 2025) (three-judge panel).  After the defendants filed their Answers, we

set trial for January 2026, with oral argument on any dispositive pretrial motions scheduled for October 2025.  Scheduling Order (ECF No. 98).

After discovery was completed, the Florida House filed a motion for summary judgment on the eight remaining challenged districts.  House's Motion for Summary Judgment (ECF No. 122).  The plaintiffs opposed the motion, and we held oral argument.  Response in Opposition (ECF No. 127); Minute Entry for Oral Argument (ECF No. 143).  We then granted summary judgment to the Florida House on House Districts 112, 113, 114, and 116, but denied summary judgment as to the other districts.  *Cubanos Pa'lante v. Fla. House of Representatives* (*Cubanos II*), 810 F. Supp. 3d 1292, 1307 (S.D. Fla. 2025) (three-judge panel).

Claims on the remaining four districts—House Districts 115, 118, & 119, and Congressional District 26—proceeded to trial as scheduled in January.  This Court heard from fourteen witnesses across four days and admitted more than 7,000 pages of exhibits into evidence.  *See* Defendants' Notice of Filing Trial Exhibits (ECF No. 193); Joint Notice of Filing Joint Trial Exhibits (ECF No. 196); Plaintiffs' Notice of Filing Trial Exhibits (ECF No. 197); Tr. Day 1 (ECF No. 199); Trial Transcript, January 13, 2026 (Tr. Day 2) (ECF No. 200); Tr. Day 3 (ECF No. 201); Trial Transcript, January 15, 2026 (Tr. Day 4) (ECF No. 202).

### D.  Standing

The rule for standing in racial gerrymandering cases is simple: a plaintiff who resides in a racially gerrymandered district has standing to challenge it because "the legislature's reliance on racial criteria" has denied the plaintiff "equal treatment."  *United States v. Hays*, 515 U.S. 737, 744–45 (1995).  The Supreme Court has repeatedly applied this rule.  *See Miller v. Johnson*, 515 U.S. 900, 909 (1995) ("As residents of the challenged Eleventh District, all

20

appellees had standing."); *Shaw v. Hunt* (*Shaw II*), 517 U.S. 899, 904 (1996) ("Two appellants . . . live in District 12 and thus have standing to challenge that part of Chapter 7 which defines District 12."); *Bush v. Vera*, 517 U.S. 952, 957–58 (1996) (plurality op.) (holding that plaintiffs only have standing to challenge the districts they reside in); *cf. Gill v. Whitford*, 585 U.S. 48, 66 (2018) (a partisan gerrymandering case that gives the rule for standing in racial gerrymandering cases). Contrary to the Secretary's arguments at trial, an intention to vote is not required to establish standing in racial gerrymandering cases because the constitutional violation is centered on Equal Protection, not the right to vote. Tr. Day 4 (ECF No. 202), at 157:20–160:7 (closing argument). Finally, the ordinary conditions for associational standing apply in racial gerrymandering cases, which means that organizations may bring racial gerrymandering claims on behalf of members who live in the allegedly gerrymandered districts. *See Ala. Legis. Black Caucus v. Alabama* (*ALBC*), 575 U.S. 254, 268–271 (2015).

Rebecca Pelham, Engage Miami's then-executive director, testified at trial and authenticated a membership list for Engage Miami which was admitted into evidence without objection. Tr. Day 1 (ECF No. 199), at 9:18–10:5, 29:17–31:21. Pelham generated the list herself, and it showed that Engage Miami had multiple members living in each of the challenged districts. *Id.* at 29:23–24; *see* Plaintiffs' Exhibit 43 (ECF No. 197-25). That is sufficient evidence for Engage Miami to establish associational standing on behalf of its members to challenge all four districts at issue in this case.

The standing inquiry is thus satisfied because at least one plaintiff (Engage Miami) has standing to challenge each district. *See Horne v. Flores*, 557 U.S. 433, 446–47 (2009) (citing *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 & n.9 (1977)).

However, for the sake of completeness, we note that several of the other plaintiffs in this case also established standing. Two of the named plaintiffs, Cindy Polo and Genesis Castilla Falcon, established their own standing to challenge House Districts 115 and 118, respectively, by testifying that they lived in those districts.[4] Tr. Day 1 (ECF No. 199), at 58:7–12, 108:2. And the FIU ACLU Club established its standing to challenge at least House District 115 because its president, Camila Suarez Melinkoff, testified that she lives in that district. *Id.* at 120:4–10.[5]

## II.   LEGAL STANDARDS

The Equal Protection Clause forbids states from "intentionally assigning citizens to a district on the basis of race without sufficient justification." *Abbott v. Perez*, 585 U.S. 579, 585–86 (2018); *see* U.S. Const. amend. XIV, § 1. To prove such a racial gerrymandering claim, plaintiffs must demonstrate that race was the "predominant" factor for how a significant number of individuals were assigned to districts. *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 7 (2024) (quotation omitted). "The plaintiff may make the required showing through direct evidence of legislative intent, circumstantial evidence of a district's shape and demographics, or a mix of both." *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (quotations omitted). The inquiry is carried out on a district-by-district basis, and its ultimate object is "the legislature's predominant motive for the design of the district as a whole." *ALBC*, 575 U.S. at 262; *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 192 (2017). If racial predominance is established, strict scrutiny applies, meaning that the district will not

---

4   The third named plaintiff, Diana Belbruno, was unable to testify at trial. *See* Tr. Day 2 (ECF No. 200), at 5:22–23.

5   In accordance with pretrial stipulations, Cubanos Pa'lante did not offer any evidence regarding where its members live. *See* Tr. Day 1 (ECF No. 199), at 87:10–17; *cf.* Stipulation (ECF No. 86), at 1.

survive constitutional review unless the use of race is narrowly tailored to achieve a compelling governmental interest.  *Cooper*, 581 U.S. at 292.

### A.  General Principles Regarding Predominance

To make a showing of predominance, "a plaintiff must prove that the legislature subordinated traditional race-neutral districting principles . . . to racial considerations." *Miller*, 515 U.S. at 916.  In other words, race must have been the "dominant and controlling rationale" for "the design of the district as a whole."  *Id.* at 913; *Bethune-Hill*, 580 U.S. at 192. "Racial considerations predominate," in other words, "when race was the criterion that, in the State's view, could not be compromised in the drawing of district lines."  *Alexander*, 602 U.S. at 7 (alteration adopted and quotation omitted).   The predominance standard is "demanding": race must have been "the overriding factor causing neutral considerations to be cast aside."  *Id.* at 17, 8 (quotations omitted).

*Consideration of race is permissible.*   Without more, consideration, awareness, or consciousness of race does not prove the kind of predominance necessary to establish racial gerrymandering.  Redistricting "differs from other kinds of state decisionmaking in that the legislature always is *aware* of race when it draws district lines," but that "sort of race consciousness does not lead inevitably to impermissible race discrimination."  *Shaw v. Reno* (*Shaw I*), 509 U.S. 630, 646 (1993); *cf. Cubanos I*, 766 F. Supp. 3d at 1212 (three-judge panel). In the racial gerrymandering context, the mere fact that "race played a role in a decision made by a government actor" is not enough to trigger strict scrutiny.  *Louisiana v. Callais*, 146 S. Ct. 1131, 1146–47 (2026).

*Race and other factors may be given equal weight.*  Not only may a legislature consider race in redistricting, but it may also give "equal weight" to race and nonracial considerations.

23

*Allen v. Milligan*, 599 U.S. 1, 31 (2023) (quotation omitted).  In *Allen*, the Supreme Court held that "race did not predominate" in a map where the expert mapmaker testified that he had given "equal weight" to race and "several other factors."  *Id.* at 31–32 (quotation omitted).

*Even intentional creation of majority-minority districts does not establish racial predominance.*  Although the map in *Allen* was deliberately drawn to create an additional majority-minority district, that fact alone did not establish racial predominance.  *Id.* at 32. The Supreme Court has explained that strict scrutiny does not "apply to all cases of intentional creation of majority-minority districts."  *Vera*, 517 U.S. at 958 (plurality op.). Indeed, the intentional creation of majority-minority districts is neither "objectionable in and of itself" nor "independently sufficient to require strict scrutiny."  *Id.* at 962.  Rather, to establish predominance and get to strict scrutiny, "traditional districting criteria must be subordinated to race."  *Id.* (emphasis omitted).

*Proving predominance requires some evidence that race-neutral considerations were cast aside.*  "In general, legislatures that engage in impermissible race-based redistricting will find it necessary to depart from traditional principles in order to do so."  *Bethune-Hill*, 580 U.S. at 190.  The Supreme Court has never "affirmed a predominance finding, or remanded a case for a determination of predominance, without evidence that some district lines deviated from traditional principles."  *Id.* at 190.  Thus, a court "can make real headway" in determining whether race has predominated "by exploring the challenged district's conformity to traditional districting principles, such as compactness and respect for county lines."  *Cooper*, 581 U.S. at 308.  These traditional principles represent "objective factors that may serve to defeat a claim that a district has been gerrymandered on racial lines."  *Shaw I*,

509 U.S. at 647.  So, the greater a map's adherence to traditional, race-neutral criteria, the weaker a challenger's ability to establish predominance.

In the past, the Supreme Court had held open the possibility that "there may be cases where challengers will be able to establish racial predominance in the absence of an actual conflict by presenting direct evidence of the legislative purpose and intent or other compelling circumstantial evidence."  *Bethune-Hill*, 580 U.S. at 191.  But more recently, the Court said that "a plaintiff *must prove* that the State subordinated race-neutral districting criteria such as compactness, contiguity, and core preservation to racial considerations."  *Alexander*, 602 U.S. at 7 (emphasis added and quotations omitted).  At the very least, "as a practical matter, challengers will often need to show that the State's chosen map conflicts with traditional redistricting criteria."  *Id.* at 8 (alteration adopted and quotation omitted).  Even "in the absence of a conflict with traditional principles," the burden remains on challengers "to find other evidence sufficient to show that race was the overriding factor *causing neutral considerations to be cast aside*."  *Bethune-Hill*, 580 U.S. at 190 (emphasis added).  The ultimate inquiry always remains whether those traditional districting principles were subordinated to race.  *See Alexander*, 602 U.S. at 7; *Miller*, 515 U.S. at 916; *Vera*, 517 U.S. at 962 (plurality op.).

*Predominance in a neighboring district is not enough.*  Racial gerrymandering claims cannot be "based on the idea that a racial gerrymander of one district affected the lines of a neighboring district."  *Nord Hodges v. Albritton*, 774 F. Supp. 3d 1340, 1348 (M.D. Fla. 2025) (three-judge panel) (first citing *Hays*, 515 U.S. at 745–46; and then citing *Sinkfield v. Kelley*, 531 U.S. 28, 30–31 (2000)).  In other words, evidence must be presented that race

25

predominated in the drawing of the district being challenged, not just that racial gerrymandering in the district next-door affected the two districts' shared boundary.

*Partisan gerrymandering may defeat racial predominance.*   A claim of partisan gerrymandering can defeat the inference of racial predominance.  *See Alexander*, 602 U.S. at 9 (citing *Rucho v. Common Cause*, 588 U.S. 684 (2019)).  But here this defense is not available because the Florida Constitution's Tier One criteria forbid partisan gerrymandering.  Fla. Const. art. III, §§ 20(a), 21(a).

*Callais does not directly affect the Equal Protection analysis.*   The Supreme Court's recent decision in *Louisiana v. Callais* does not affect the framework we apply here.  146 S. Ct. 1131.  *Callais* considered whether compliance with § 2 of the Voting Rights Act provides "a compelling reason for race-based districting."  *Id.* at 1143.  The Court's answer was yes— but only so long as § 2 was properly construed.  *Id.*  On that score, *Callais* clarified that "the focus of § 2 must be enforcement of the Fifteenth Amendment's prohibition on *intentional* racial discrimination."  *Id.* at 1155.  So the analysis will now be different for § 2 claims, with the Court emphasizing that "§ 2 imposes liability only when the evidence supports a strong inference that the State intentionally drew its districts to afford minority voters less opportunity because of their race."  *Id.* at 1157.  After *Callais*, if plaintiffs "cannot disentangle race from the State's race-neutral considerations, including politics, then § 2 cannot impose liability."  *Id.*

That said, in explaining its holding, the Court did not disturb the predominance standard for evaluating racial gerrymandering claims under the Equal Protection Clause.  It restated that standard, in fact, when describing the tension between § 2 cases that seemed to demand race-based districting and Equal Protection cases that prohibited race-based

districting.  *Id.* at 1146–47.  "Although *any* use of race in government decisionmaking generally triggers strict scrutiny, in gerrymandering cases a challenger must show that race was the government's predominant consideration."  *Id.* at 1147.  Although we offer no opinion on what impact, if any, *Callais* may have on Florida's two-tiered constitutional standards for redistricting, because *Callais* did not change the Court's precedent on predominance as described above, we continue to apply it.

### B.  Alternative Maps

Alternative maps are also a crucial part of the analysis.  They serve as a kind of counterfactual evidence, showing how the legislature could have drawn the districts differently, still achieving its districting objectives without letting race predominate.  *Cf. Allen v. Milligan*, 146 S. Ct. 1377, 1380 (2026) ("for plaintiffs to satisfy the first *Gingles* precondition, a plaintiff's alternative map must meet *all* the State's legitimate districting objectives just as well as the State's own map" (alteration adopted and quotations omitted)).  For this reason, an alternative map can provide circumstantial evidence of racial gerrymandering when it achieves these objectives while also showing "significantly greater racial balance" than the enacted map.  *Alexander*, 602 U.S. at 34 (quotation omitted); *cf. id.* at 10; *Easley v. Cromartie*, 532 U.S. 234, 249, 258 (2001); *Cooper*, 581 U.S. at 321–22.

Still, the legislature need not have drawn the best possible map to survive review.  An enacted district does not have to "defeat rival . . . districts designed by plaintiffs' experts in endless 'beauty contests'" to be constitutionally valid.  *Vera*, 517 U.S. at 977 (plurality op.).  As other three-judge district courts have recognized, plaintiffs can always draw districts "differently than the legislature did," and for that very reason, an alternative map is generally not enough to support a finding of racial predominance on its own.  *Ala. Legis. Black Caucus*

27

*v. Alabama*, 231 F. Supp. 3d 1026, 1204 (M.D. Ala. 2017) (three-judge panel); *cf. League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 177 (W.D. Tex. 2022) (three-judge panel).  An enacted map is not constitutionally infirm just because a "resourceful mind" can come up with a marginally better one.  *Gaffney v. Cummings*, 412 U.S. 735, 750 (1973).

### C.   The Presumption of Legislative Good Faith

Evaluations of racial predominance are limited by the presumption of legislative good faith, which requires courts "to draw the inference that cuts in the legislature's favor when confronted with evidence that could plausibly support multiple conclusions." *Alexander*, 602 U.S. at 10.  The Supreme Court has explained that federal courts "must exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Id.* at 7 (quotation omitted).  This presumption not only "ensures that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines," but it also serves the values of federalism and comity by directing federal courts to respect the work of state governments and avoid accusing them of "offensive and demeaning conduct" without clear evidence.  *Id.* at 11 (quotations omitted); *see also Miller*, 515 U.S. at 915.

This presumption has proven powerful—it cannot be overcome by a showing that the legislature was aware of or even used race in drawing districts.  Instead, it requires a ruling in favor of the legislature unless there is evidence sufficient to prove that the legislature "acted in bad faith and engaged in intentional discrimination." *Abbott*, 585 U.S. at 607.  The Supreme Court has also explained that it is "difficult for plaintiffs to defeat" the presumption of legislative good faith without producing an alternative map.  *Alexander*, 602 U.S. at 10.

28

### III. EVIDENCE PRESENTED AT TRIAL

Among the witnesses who testified at trial, six were either plaintiffs themselves or representatives of the organizational plaintiffs. As described in the standing discussion above, individual plaintiffs Cindy Polo and Genesis Castilla Falcon, Engage Miami Executive Director Rebecca Pelham, and FIU ACLU Club President Camila Suarez Melinkoff all testified regarding their individual and organizational involvement in the lawsuit. Tr. Day 1 (ECF No. 199), at 52:13–69:3 (Polo); *id.* at 104:19–114:15 (Castilla Falcon); *id.* at 8:19–52:12 (Pelham); *id.* at 114:16–126:22 (Suarez Melinkoff); *see supra* Section I.D. The plaintiffs also called Enrique Cruz—an alumnus of FIU, a founding member of the FIU ACLU Club, and a resident of Congressional District 26—who testified about his experience with the Club and his personal knowledge of the district. Tr. Day 1 (ECF No. 199), at 89:4–104:18. Finally, Cynthia Perez, the chief operating officer of Cubanos Pa'lante, testified about that organization and its involvement in this lawsuit. *Id.* at 70:3–89:3.

Beyond these preliminary witnesses, the plaintiffs called two fact witnesses and three expert witnesses, both sides called Jason Poreda as a fact witness, and the defendants called two expert witnesses. We address the testimony provided by these witnesses in turn.

#### A. The Plaintiffs' Fact Witnesses

The plaintiffs presented testimony from two Florida legislators—Senator Annette Taddeo-Goldstein and Representative Fentrice Driskell.

Senator Taddeo served in the Florida Senate during the 2021–22 redistricting process. Tr. Day 2 (ECF No. 200), at 233:4–234:2. She voted in favor of the enacted state house map, but boycotted the special session where the final congressional map was approved and therefore did not vote on it. *Id.* at 239:25–240:10, 259:10–25; *see* Defendants'

Exhibit 329 (ECF No. 193-205).  Senator Taddeo did not serve on the Senate Committee on Reapportionment or any of its subcommittees; nor did she, at any point in the redistricting process, offer any alternative maps or submit any amendments to the maps under consideration.  Tr. Day 2 (ECF No. 200), at 253:11–254:8.  She did, however, publicly express concerns during the debate over Senate Plan 8060, an earlier version of the congressional map.  *Id.* at 236:1–237:21.  She argued that it was "dividing communities of interest, for example, the islands"—referring to the barrier islands along Miami-Dade's Atlantic coast.  *Id.* at 237:7–13; *cf.* Transcript of Senate Session, January 19, 2022 (ECF No. 196-94), at 9:12–23.  She explained that it was her understanding of the Fair Districts Amendments that the Legislature was "not supposed to do that."  Tr. Day 2 (ECF No. 200), at 237:20–21.  She understood the answers she received in response to these concerns as explaining that the Legislature was focused on ensuring that the South Florida congressional districts would be Hispanic rather than keeping communities of interest intact.  *Id.* at 237:25–238:4.  She ultimately voted in favor of Plan 8060 because she "felt that it was okay."  *Id.* at 238:5–10.

Representative Driskell was serving in the minority in the Florida House during the redistricting cycle.  Tr. Day 3 (ECF No. 201), at 6:15–7:6.  She consistently voted against the enacted maps and was not personally involved in drawing them.  *Id.* at 46:11–14, 49:12–15.  Although she served on the House Redistricting Committee, Representative Driskell did not raise any concerns about the design of the house district map in committee.  *Id.* at 49:24–50:15.  Nor did she propose any maps of her own or offer amendments to the maps that were presented to her.  *Id.* at 37:23–38:6.  Instead, she raised concerns about the compactness of House Districts 115, 118, and 119—which she described as "long, skinny, vertical districts"—"for the first time the day before they passed the full House."  Feb. 1 House

30

Session (ECF No. 196-75), at 46:18–22; Tr. Day 3 (ECF No. 201), at 50:12–15. She admitted that, apart from publicly available information shared in committee or on the House floor, she has no "personal knowledge of what motivated the particular design of any specific district." Tr. Day 3 (ECF No. 201), at 50:16–21. That said, she believes that "race was a predominant factor in drawing protected districts" and that the three challenged house districts do not "pass the eye test." *Id.* at 21:24–25, 14:16–22.

## B. The Plaintiffs' Expert Witnesses

The plaintiffs called three expert witnesses at trial: Dr. Cory McCartan, Dr. Hannah Walker, and Dr. Carolyn Abott.

Dr. McCartan testified as an expert in redistricting, map drawing, and the use of Census data, a role he has performed several times in previous cases. Tr. Day 1 (ECF No. 199), at 131:24–132:15. He served as an expert map drawer for the plaintiffs, who provided him with instructions on how to redraw Florida's maps before he prepared his reports. *Id.* at 132:19–136:19; *see* Plaintiffs' Exhibit 70 (Pl. Ex. 70) (ECF No. 197-36). Dr. McCartan was given the enacted maps (Plan 8013 and Plan 109) with the challenged districts removed and asked to fill in the missing districts in accordance with Florida's constitutional standards, adjusting neighboring districts as little as possible. Tr. Day 1 (ECF No. 199), at 133:24–135:5; *cf.* Pl. Ex. 70 (ECF No. 197-36), at 1. He was instructed not to "refer to any racial or political data when conducting" his work, but was also warned that several specific neighboring districts were protected minority districts so that if he made adjustments to them, another expert would perform a functional analysis to ensure compliance with Florida's Non-Diminishment Clause. Tr. Day 1 (ECF No. 199), at 135:15–136:4; *cf.* Pl. Ex. 70 (ECF No. 197-36), at 2. Dr. McCartan testified that he did not refer to any racial or political data while

31

drawing his maps and that he was not instructed to alter or freeze any specific district boundaries.  Tr. Day 1 (ECF No. 199), at 136:5–12.

Dr. McCartan prepared and presented six alternative congressional maps, none of which included a district like Congressional District 26 that combines portions of Collier and Miami-Dade Counties.  *See* Defendants' Exhibits 31–36 (ECF Nos. 193-31–193-36); *cf.* Tr. Day 1 (ECF No. 199), at 213:14–23, 216:11–217:6.  He also offered one alternative map at trial for the challenged house districts.  *See* Plaintiffs' Exhibit 239 (Pl. Ex. 239) (ECF No. 197-78). He started with a map in which the enacted versions of House Districts 115, 118, and 119 had been removed and began by "filling in the blank area."  Tr. Day 1 (ECF No. 199), at 143:8– 12.  This was an iterative process, and in order to "configure a more compact District 115," he also "made adjustments to 116 and 114 to bring their boundaries together, configure them more compactly." *Id.* at 143:12–144:1, 145:6–14.  Dr. McCartan testified that he applied all of the nonracial criteria required by the Florida Constitution: he drew equal-population, contiguous, and compact districts that respected existing political and geographical boundaries where feasible and did not favor or disfavor any political party or incumbent. *Id.* at 147:15–149:18.

Dr. Hannah Walker is an expert in political science, with a particular focus on "issues of racially polarized voting and minority groups' ability to elect their candidates of choice." Tr. Day 2 (ECF No. 200), at 13:8–10.  She was asked by the plaintiffs to evaluate whether, and the extent to which, Hispanics voted cohesively in various benchmark districts, including the ones corresponding to the challenged districts, as well as in Miami-Dade County and several blocs of specified counties in southern Florida.  *See* Defendants' Exhibit 156 (Def. Ex. 156) (ECF No. 193-143), at 1.  She was also asked to "compare the voting behavior of white voters

across the entire state to the voting behavior of Hispanic voters in select jurisdictions,"
although this was not, in her experience, the normal way to assess racially polarized voting.
Tr. Day 2 (ECF No. 200), at 90:7–25; *cf.* Def. Ex. 156 (ECF No. 193-143), at 2.  As a result, Dr.
Walker performed an analysis of "patterns of cohesive voting among Hispanic voters in
select jurisdictions in south Florida, as well as patterns of white bloc voting statewide."  Tr.
Day 2 (ECF No. 200), at 9:8–10.  She used two standard methods of "ecological inference" to
evaluate Hispanic vote cohesion in these districts.  *Id.* at 14:9–18, 16:17–18:1.  Inferential
methods are necessary because of the secret ballot: political scientists can see who turned
out to vote, but not which candidates they voted for.  *See id.* at 14:19–15:3.

Dr. Walker's analysis showed "weak evidence for cohesive voting among Hispanic
voters" in the benchmarks for all of the challenged districts.  *Id.* at 13:15–17.  She also
concluded that although "white voters statewide do vote as a block," "their preferred
candidate often aligns with the preferences of Hispanic voters" in the jurisdictions she
analyzed.  *Id.* at 13:17–21.[6]

Dr. Carolyn Abott is an expert in political science and quantitative analysis.  Tr. Day 2
(ECF No. 200), at 139:8–18; *cf. id.* at 142:16–20.  She performed an adjacency analysis on the
enacted congressional map, looking at the overall regional variation in demographics, as well
as the way that counties, cities, Census-designated places, and voting tabulation districts
were split across Congressional District 26's boundaries.  *Id.* at 143:22–144:4; *see* Plaintiffs'
Exhibit 167 (ECF No. 197-56); Plaintiffs' Exhibit 170 (ECF No. 197-57); Plaintiffs' Exhibit
171a (ECF No. 197-58); Plaintiffs' Exhibit 198 (ECF No. 197-59); *cf.* Tr. Day 2 (ECF No. 200),

---

6   Because minority voting cohesion is a predicate for drawing majority-minority districts under
Florida's Non-Diminishment Clause, we only need to consider Dr. Walker's testimony if we reach strict scrutiny.

at 146:15–147:6. She also did some analysis of Dr. McCartan's alternative congressional maps. Tr. Day 2 (ECF No. 200), at 169:17–171:3; *see* Plaintiffs' Exhibit 199 (ECF No. 197-60). Finally, Dr. Abott analyzed the challenged house districts and compared them to the districts in Dr. McCartan's alternative map. *See* Tr. Day 2 (ECF No. 200), at 176:10–177:18. She found that there was a larger variation in the Hispanic voting-age population of the districts in Dr. McCartan's alternative map than in the enacted map. *Id.* at 177:9–13.

Based on her analyses, Dr. Abott concluded that "Congressional District 26 in the State of Florida enacted map divides the region along racial lines in south Florida and that Florida State House Districts 115, 118, and 119 each stretch into a high—a particularly high [Hispanic voting-age population] band within Miami-Dade County." *Id.* at 178:1–5. Dr. Abott "concluded at most that the evidence is consistent with the idea that race may have predominated." *Id.* at 181:9–11. She did not conclude "that race was the sole explanation for the shape and boundaries" of the challenged districts or "that race was the predominant reason why the challenged districts were drawn the way that they were." *Id.* at 181:1–8. She conceded that there could be other reasons, besides race, for the shape and boundaries of the challenged districts, but she was never asked to assess nonracial factors or explanations as part of her review, so she could not opine on the relative importance of racial and nonracial considerations in the drawing of the challenged districts. *Id.* at 183:7–13, 184:20–185:9. Dr. Abott admitted that her analysis does not compel the conclusion that race predominated in the drawing of the challenged districts, although she testified that it strongly suggests that race was one factor in drawing them. *Id.* at 181:25–182:9.

### C. Fact Witness Jason Poreda

Jason Poreda, who served as the primary map drawer for the Florida House and was responsible for producing the design of the house districts challenged in this case, was called as a fact witness by both sides. *See* Tr. Day 3 (ECF No. 201), at 52:17–19.

Mr. Poreda explained that the process of drawing new maps began with blank maps: he and his staff did not start with the benchmark plans. *Id.* at 73:6–11; *cf. id.* at 141:8–14. They did not "seek in any way to preserve the cores of preexisting districts." *Id.* at 73:3–5. Nor did they seek to favor or disfavor any incumbent or any political party. *Id.* at 72:23–73:2. Before drawing the maps, however, the staff reviewed the previous (benchmark) maps to identify districts where the Florida Constitution protected a minority group's voting ability. *Id.* at 83:13–17; *see* Fla. Const. art. III, §§ 20(a), 21(a). This included several protected districts for black and Hispanic voters in Miami-Dade County. Tr. Day 3 (ECF No. 201), at 92:6–10. Still, when drawing protected districts, Mr. Poreda did not mimic the benchmark districts, but started afresh and sought to apply the traditional race-neutral Tier Two principles required by Florida's Constitution. *Id.* at 73:12–18, 157:1–14. In fact, he testified that he tried to make the protected districts "more Tier Two compliant than their predecessor districts," meaning that they would be more compact and show greater consistency with political and geographical boundaries. *Id.* at 158:2–4. In drawing the new districts, Mr. Poreda sought to "balance" or "marry" all of the redistricting standards, both racial and nonracial. *See, e.g.*, *id.* at 94:1–3, 95:17–24, 156:17–25.

"Because the Hispanic population throughout Miami-Dade County is so high," Mr. Poreda was able to focus on traditional race-neutral principles in drawing the protected Hispanic districts challenged in this case. *Id.* at 164:1–13. As a result, he did not view racial

data in real time while drawing the protected Hispanic districts in Miami-Dade County. *Id.* at 163:16–25, 192:18–22. Rather, the functional analysis required to ensure that the new districts would continue to perform for Hispanic voters was not run until after the districts were drawn. *Id.* at 164:13–16; *cf. id.* at 154:12–155:5. This was different than other areas of the state, where he had to "have a closer focus on race or racial data even before performing the functional analysis." *Id.* at 164:17–165:2.

Mr. Poreda explained that each of the challenged districts in this case corresponds to a protected Hispanic district in the benchmark plan. *Id.* at 91:2–17; *cf. id.* at 117:6–9. He did not have numerical thresholds for Hispanic population that he was trying to achieve in the challenged districts, he was not trying to maintain the same threshold of Hispanic concentration as the benchmark districts, and he was not instructed to draw these districts with any specific racial composition. *Id.* at 192:22–193:3, 194:2–9, 214:2–23. Mr. Poreda testified that race was just "one consideration in the design of the four challenged districts" because they were Tier One protected districts under the Florida Constitution. *Id.* at 217:22–218:1. But he also testified that he sought to comply with the Florida Constitution in drawing the challenged districts, including the Tier Two criteria of compactness, boundary utilization, and population equality. *Id.* at 218:2–10.

## D. The Defendants' Expert Witnesses

Finally, the defendants called two expert witnesses.

Alfredo Gonzalez is a land-use lawyer who testified as an expert in local infrastructure. *Id.* at 256:16–257:17, 263:4–16. His testimony focused on his understanding of "major roads" and his opinion that various roads used as boundaries in the challenged districts were "easily ascertainable and commonly understood" because they were "major

36

roads." Tr. Day 4 (ECF No. 202), at 12:6–24:1. Mr. Gonzalez acknowledged that the Florida Supreme Court has not recognized his "major roads" construct. *Id.* at 36:4–6.

Dr. Sean Trende is a lawyer with academic qualifications in political science and applied statistics. *Id.* at 41:2–20. He also has experience drawing actual district lines, having been appointed by the Virginia Supreme Court as a special master to draw new congressional and state legislative maps for the 2022 election cycle. *See* Defendants' Exhibit 39 (ECF No. 193-39), at 5. He testified as an expert in "American politics with an emphasis on redistricting and applied statistics." Tr. Day 4 (ECF No. 202), at 43:19–44:4. Dr. Trende was asked to review the reports of the plaintiffs' expert witnesses and respond to them. *Id.* at 44:8–13. Although he performed some of his own analysis of the enacted districts (as well as the districts in Dr. McCartan's alternative maps), this was all in service of offering a critique of the evidence and testimony provided by the plaintiffs' experts. *See, e.g.*, *id.* at 44:14–24.

## IV.   PREDOMINANCE

The question we decide at the first stage of the analysis is whether race predominated in the drawing of a challenged district. On that front, the plaintiffs have pointed to statements from those involved in the redistricting process indicating that racial considerations (often described obliquely in terms of "Tier One" factors) played a role in the drawing of the challenged districts. For example, Representative Tom Leek, Chair of the House Redistricting Committee, explained, in answering a question from Representative Driskell about protected house districts in Miami-Dade County, that "we get to compactness after Tier One" because "we had to make sure that the protected districts continue to perform within reason, as they had performed." Feb. 1 House Session (ECF No. 196-75), at

47:16–19.  And Jason Poreda, who drew the house districts being challenged, testified that all of the challenged districts had to pass functional analyses after they were drawn because they corresponded to protected benchmark districts.  Tr. Day 3 (ECF No. 201), at 91:2–17. Because predominance must be established district by district, we consider this evidence as it applies to each challenged district.  *ALBC*, 575 U.S. at 262.

## A.  House District 115

At trial, Mr. Poreda testified about the process used to draw House District 115.  Tr. Day 3 (ECF No. 201), at 173:6–181:12.  He explained that "the most significant impact in the orientation" of this district came from "trying to keep Coral Gables whole and entirely within District 114, its neighboring district to the east," and "trying to get Cutler Bay, Palmetto Bay, and Pinecrest, the three cities which are stacked right on top of each other, wholly within a district."  *Id.* at 173:9–15.  The shape of House District 115 was also constrained by the presence of a protected black district to its west (House District 117).  *Id.* at 173:23–174:3.

Although race was not a consideration in the initial drawing of the district and did not impact the central or southern parts of the district, it became a factor after a functional analysis was performed on the completed district.  *Id.* at 175:11–20.  The district as initially drawn did not satisfy the Non-Diminishment Clause, so the northern part of the district was adjusted.  *Id.* at 175:22–176:8.  Because the Florida House asserted privilege over various documents, including draft maps, we have no record of what the district looked like before this adjustment.  *See* Tr. Day 4 (ECF No. 202), at 115:5–8.  But that adjustment was designed to follow both major roadways and municipal boundaries.  Tr. Day 3 (ECF No. 201), at 177:1– 13.

In response to the plaintiffs' factual contentions, Mr. Poreda testified that he does not consider the northern part of House District 115 to be "bizarrely or irregularly shaped," nor does he think it contains any "bizarre features." *Id.* at 178:12–22.  He explained that other adjustments were made to House District 115 during the drafting process for race-neutral reasons having to do with the shape of neighboring House District 116. *Id.* at 179:13–25.  Mr. Poreda testified that he considers House District 115 to be compact, and that it uses "political and geographical boundaries where feasible." *Id.* at 180:20–24.  He added that it is "a good example of us trying to balance or marry all of the standards where we could." *Id.* at 181:3–12.

In terms of the plaintiffs' expert evidence, Dr. McCartan presented an alternative map in which he redrew the three challenged districts, as well as neighboring House Districts 114 and 116[7]:



*See* Pl. Ex. 239 (ECF No. 197-78).   There was a larger variation in Hispanic voting-age population across the five districts in Dr. McCartan's alternative map than in the enacted map. *See* Tr. Day 2 (ECF No. 200), at 176:23–177:13.  Dr. Trende allowed that the districts in Dr. McCartan's alternative House map might be "a little more visually pleasing," but said that

---

7    Dr. McCartan also made a small adjustment to House District 117, moving an unpopulated sliver of land into it so that the Florida Turnpike would form a shared boundary for five districts in the area.  *See* Tr. Day 1 (ECF No. 199), at 145:15–23.

it was not clear what the map accomplished. Tr. Day 4 (ECF No. 202), at 95:25–96:8; *see also id.* at 93:1–10.

It is well-settled that even if the alternative map presents a marginal improvement in visual compactness, that is not sufficient by itself to demonstrate infirmity in the enacted version of the district. *See Vera*, 517 U.S. at 977 (plurality op.); *cf. Gaffney*, 412 U.S. at 750–51. Here, Dr. McCartan's version of House District 115 is slightly more visually compact and has higher compactness scores—0.439 (Reock), 0.818 (Convex-Hull), and 0.409 (Polsby–Popper)—than the enacted version (0.278, 0.723, and 0.302, respectively), as well as an improved boundary score (99% instead of 92%). *See* Plaintiffs' Exhibit 243 (Pl. Ex. 243) (ECF No. 197-82) (compactness); Pl. Ex. 242 (ECF No. 197-81) (boundary analysis). But even his version of House District 115 would remain in the bottom half of all districts when ranked according to any of the compactness scores. *Cf.* Map and Data Packet, Enacted State House Districts (Enacted House Packet) (ECF No. 196-1), at 2 (providing compactness scores for the enacted districts).

Dr. McCartan's "improvements" are not evidence that the Legislature deviated from race-neutral principles in drawing House District 115, much less that those principles were *subordinated* to race. *See Alexander*, 602 U.S. at 7. To make that showing, alternative maps are expected to bring about "significantly greater racial balance," something which the alternative map here does not do. *Easley*, 532 U.S. at 258. Instead, Dr. McCartan's alternative districts are still "overwhelmingly Hispanic districts just reconfigured in different ways." Tr. Day 4 (ECF No. 202), at 92:20–93:6. And House District 115 itself goes from being 65.9% Hispanic in the enacted map to 64.2% in Dr. McCartan's alternative. Plaintiffs' Exhibit 250

(Pl. Ex. 250) (ECF No. 197-83).   Given that, the alternative map does not support the argument that race predominated in the drawing of House District 115.

Dr. Abott's testimony does not establish predominance either.  She offered testimony related to House District 115 and its relationship to an area in Miami-Dade County that she described as a "boomerang."  *See* Tr. Day 2 (ECF No. 200), at 175:11–14. The boomerang is illustrated in the map below, which is shaded to show the Hispanic voting-age population in each voting tabulation district in the enacted house districts in and around Miami:



*See* Plaintiffs' Exhibit 225 (ECF No. 197-74).   In this "heat map," the browner areas correspond to higher percentages of the voting age population being Hispanic, while the bluer areas correspond to lower percentages.  *See* Tr. Day 2 (ECF No. 200), 174:25–175:4; Tr. Day 1 (ECF No. 199), at 166:6–22.

Dr. Abott described the concentration of dark brown, high-Hispanic voting tabulation districts in this map as a "boomerang" and noted that the vertically oriented districts challenged in this lawsuit all "dip into" it.  *See* Tr. Day 2 (ECF No. 200), at 216:23–217:23.

The fact that they all "contain some areas inside the boomerang and some areas outside the boomerang" suggests to Dr. Abott that the Legislature may have considered race in drawing these districts. *Id.* at 217:17–23.  She also conceded, however, that she might have thought the Legislature had considered race if it had instead drawn "some districts wholly within the boomerang and other districts wholly outside of the boomerang." *Id.* at 217:12–16.  Indeed, as Dr. Trende pointed out, Dr. Abott failed to establish a "baseline of what race-neutral maps would look like to compare [the enacted] map against to determine whether it's also race neutral." Tr. Day 4 (ECF No. 202), at 90:13–21.  Without that, it is impossible to say whether the fact that House District 115 dips into the boomerang is "improper or unusual." *Id.* at 90:16–17.  Plus, the boomerang is "not only a heavily Hispanic area," but also "a more densely populated area." *Id.* at 91:6–9.  Dr. Trende highlighted the alternative map to illustrate this point, explaining that most of Dr. McCartan's districts "dip into the boomerang as well because that's where the population exists, and we're required to be more or less equipopulous for house district maps." *Id.* at 91:10–12.

The plaintiffs argue that the key evidence in support of their argument that there was racial predominance in the drawing of House District 115 is the fact that changes were made to it "because of some perceived flaw in the functional analysis." *Id.* at 161:19–22.  They also point to answers given by the relevant committee and subcommittee chairs in response to questions from Representative Driskell about the shape of this district and its "northern appendage" to the effect that "we're not going to get to compactness until we are assured that Tier One is satisfied." Feb. 1 House Session (ECF No. 196-75), at 52:8–17 (Rep. Leek); *cf. id.* at 53:5–13 (Rep. Byrd).  Analyzing these statements in context, however, we are not convinced that the chairs were describing the process by which the district was actually

44

drawn, so much as the legal priority of the redistricting requirements presented in the Florida Constitution. *See* Fla. Const. art. III, § 21; *cf.* Tr. Day 3 (ECF No. 201), at 216:7–217:21. Moreover, we find Mr. Poreda's testimony describing the process by which he drew this district to be credible. *Cf. Alexander*, 602 U.S. at 19–20, 22 (crediting testimony of mapmaker). Specifically, he took a race-neutral approach in drawing the initial district, focusing on nonracial Tier Two districting criteria. *See, e.g.*, Tr. Day 3 (ECF No. 201), at 175:15–17. Only after doing so did he make adjustments to the northern portion of the district because of concerns about its performance under the required functional analysis. *See id.* at 175:18–176:8. However, those adjustments, as noted below, were made consistent with race-neutral principles.

Finally, the plaintiffs suggest that House District 115's northern extension potentially exhibits a conflict between Tier One and Tier Two criteria. *See id.* at 94:4–96:3; *see also supra* page 36. They pressed Mr. Poreda on this point at trial because he had offered the northern extension of this district as a possible example of such a "conflict" during his deposition. Tr. Day 3 (ECF No. 201), at 94:9–95:16. At trial, however, Mr. Poreda said that he "wouldn't necessarily characterize it as a conflict," but rather "a compromise between all of the standards." *Id.* at 95:17–19. Indeed, the final district is bounded by major roadways, adheres to municipal boundaries, features straight lines and right angles, and has no bizarre features. Given the evidence introduced at trial, House District 115's northern extension is consistent with race-neutral principles, so it does not meet the plaintiffs' "demanding" burden of demonstrating that race was the one "criterion that, in the State's view, could not be compromised" in the drawing of this district. *Alexander*, 602 U.S. at 17, 7 (quotations omitted).

Indeed, based on the evidence at trial we find that the most significant factor in the shape of House District 115 was the effort to keep municipalities whole, a race-neutral Tier Two criterion. This district's boundaries fully enclose three municipalities within the district and follow the borders of four more municipalities that lie outside the district. *Cf.* Feb. 1 House Session (ECF No. 196-75), at 23:2–6. In total, House District 115 follows political and geographical boundaries along 92% of its perimeter, a value almost 10% higher than the 82.7% of the average house district. *See* Def. Material Facts (ECF No. 123), ¶ 59; *In re SJR 100*, 334 So. 3d at 1288. And though it does not control our own analysis, we are mindful that the Florida Supreme Court has already determined that, as a matter of Florida's constitutional standard for compactness, all of the house districts in Plan 8013 pass muster. *In re SJR 100*, 334 So. 3d at 1287. Given that House District 115 passes the eye test and is faithful to municipal boundaries, we are unpersuaded that the district's mathematical compactness scores—though they fall around the top of the bottom decile—establish a failure to comply with the Florida Constitution's Tier Two compactness requirement. A comparatively low score is not dispositive of noncompliance. And this conclusion is reinforced by the fact that the plaintiffs' alternative map had almost the same percentage of Hispanic residents in the district as the enacted map, and only marginal improvements in compactness.

Considering the district as a whole (as we are required to do), and applying the presumption of legislative good faith to resolve any ambiguities, we cannot conclude that traditional race-neutral—or, in Florida terms, "Tier Two"—criteria were subordinated to race. Simply stated, the plaintiffs did not prove that race predominated in the drawing of House District 115.

46

### B. House Districts 118 & 119

Because House Districts 118 and 119 were drawn in tandem, we address them together. *See* Tr. Day 3 (ECF No. 201), at 181:18–182:8. But we evaluate them individually, as we must. *See ALBC*, 575 U.S. at 262.

Mr. Poreda described the process by which House Districts 118 and 119 were drawn at trial. Tr. Day 3 (ECF No. 201), at 181:13–194:12. The key fact here is that the two districts were designed to divide up the larger rectangular area that they jointly occupy. *See id.* at 183:18–184:17. The overall perimeter of this larger area is defined almost entirely by major roads and the shared boundary with House District 117, an opportunity district for black voters that all parties agreed needed to be preserved. *Id.* at 184:18–185:20. Mr. Poreda and his staff experimented with different ways of dividing the larger area into two districts, including an L-shaped district cupping a smaller district, stacked districts, and a vertical configuration, similar to what was ultimately enacted. *Id.* at 184:5–8, 185:24–186:14. Mr. Poreda testified that he considers both districts to be compact and believes that their boundaries primarily follow major roads. *See id.* at 186:7–188:10. He added that the final configuration was comparable in terms of Tier Two criteria, including both compactness and boundary utilization, to the other configurations considered. *Id.* at 188:8–10, 191:9–18. He also identified more than a dozen other districts in South Florida with a generally vertical orientation, some protected minority districts, some not. *Id.* at 188:17–189:12 (identifying House Districts 87, 92, 98, 100, 102, 103, 106, 108, 109, 110, 112, 114, 115, and 116). All of these districts can be seen in the following map:



Map 2: State House Districts in Palm Beach, Broward, and Miami-Dade Counties

*See* Defendants' Exhibit 2 (ECF No. 193-2).

The final, vertical configuration of House Districts 118 and 119 was chosen, Mr. Poreda said, because it represented "the best balance of all of the standards."  Tr. Day 3 (ECF No. 201), at 191:19–192:2.  He also testified that the new districts visually improved upon the benchmark districts they replaced.  *Id.* at 190:20–24.  For comparison, both the benchmark versions of House Districts 118 and 119 and the updated, enacted versions are displayed below, with benchmarks on the left and new districts on the right:



*Compare* Map and Data Packet, Benchmark State House Districts (ECF No. 196-2), at 1, *with* Enacted House Packet (ECF No. 196-1), at 1.

Finally, Mr. Poreda testified that although race was a factor in choosing the final configuration, he did not at the outset consider the concentration of Hispanic voters when drawing the house districts.  Tr. Day 3 (ECF No. 201), at 192:14–22.  Nor was he trying to achieve "any numerical threshold of Hispanic concentration" in any of these districts or maintain the same percentages as the benchmark districts.  *Id.* at 192:23–193:3.  Ultimately,

he emphasized that race was not the primary consideration; rather, "all of the Tier Two issues in that area played just as big of a part." *Id.* at 192:14–17.

Turning to the expert evidence, Dr. McCartan offered the same alternative map for these two districts that he offered for House District 115, and it is subject to the same criticism.   Dr. McCartan testified that the two districts were more compact in his configuration, as evidenced by significantly improved compactness scores.[8]  Tr. Day 1 (ECF No. 199), at 159:18–160:1; *cf. id.* at 161:7–15; Pl. Ex. 243 (ECF No. 197-82).   But these mathematical measures are intended to supplement—not replace—the visual examination of the districts.  *See In re SJR 1176*, 83 So. 3d at 635.  "Compactness is primarily a visual judgment" after all, as Dr. McCartan himself admitted at trial.  Tr. Day 1 (ECF No. 199), at 148:4.  And on that score, we simply cannot say that the enacted versions of House Districts 118 and 119 fail the compactness standard: neither has "an unusual shape, a bizarre design, or an unnecessary appendage," nor can their shapes be described as "tortured," "irregular," or "grotesque."  *In re SJR 1176*, 83 So. 3d at 634–35.

Along the same lines, Dr. McCartan's versions of the districts showed significant improvements in their boundary scores.[9]   *See* Pl. Ex. 242 (ECF No. 197-81).   The mathematical values, however, are not the criterion for the district boundaries; rather, the Legislature is supposed to follow "easily ascertainable and commonly understood" existing boundaries where feasible.  *In re SJR 1176*, 83 So. 3d at 638; *cf.* Fla. Const. art. III, § 21(b).  Dr.

---

8     Dr. McCartan's version of House District 118 had compactness scores of 0.656 (Reock), 0.952 (Convex-Hull), and 0.734 (Polsby–Popper), compared to 0.216 (Reock), 0.788 (Convex-Hull), and 0.333 (Polsby–Popper) for the enacted district.  Pl. Ex. 243 (ECF No. 197-82).  For House District 119, his version had scores of 0.584 (Reock), 0.938 (Convex-Hull), and 0.676 (Polsby–Popper), compared to 0.285 (Reock), 0.919 (Convex-Hull), and 0.466 (Polsby–Popper) for the enacted district.  *Id.*

9     Dr. McCartan's versions of House Districts 118 and 119 have boundary scores of 89% and 70%, respectively, compared to 46% and 63% for the enacted districts.  Pl. Ex. 242 (ECF No. 197-81).

50

McCartan's map does not show that it failed to do so: his version of the two districts covers essentially the same territory as the enacted districts, but arranges them differently.  *Cf.* Tr. Day 1 (ECF No. 199), at 144:12–145:5; *compare* Pl. Ex. 239 (ECF No. 197-78) (McCartan's map), *with* Enacted House Packet (ECF No. 196-1) (enacted districts), at 1.  While the Legislature's map divides this area vertically, following primarily SW 147th Ave, SW 137th Ave, and a CSX rail line, Dr. McCartan divided the area horizontally, following primarily Kendall Avenue, essentially recreating one of the alternative configurations for these two districts that Mr. Poreda rejected during the map-drawing process.  *See* Tr. Day 4 (ECF No. 202), at 18:1–21, 122:15–19; Tr. Day 3 (ECF No. 201), at 185:24–186:6.  Because the choice to divide these two districts vertically does not compromise the race-neutral criterion of following recognizable boundaries, we do not find that Dr. McCartan's alternative configuration reveals that traditional principles were subordinated to race.

Though Dr. McCartan's map shows an improvement in scores, it fails to achieve greater racial balance.  *See Alexander*, 602 U.S. at 10.  In his map, both districts remain overwhelmingly Hispanic; House District 119 shows marginal improvements (79.8% instead of 85.2% in the enacted district), while House District 118 becomes *less* racially balanced and even more Hispanic (91.2% instead of 85.7%).  Pl. Ex. 250 (ECF No. 197-83).  In short, Dr. McCartan's alternative map does not support a finding of racial predominance in the drawing of these districts.  Similarly, Dr. Abott's testimony about the Hispanic "boomerang" in Miami-Dade County fails to prove racial predominance for these two districts just as it did for House District 115.  *See* Tr. Day 2 (ECF No. 200), at 216:23–217:23; Tr. Day 4 (ECF No. 202), at 90:13–91:12.

As their strongest evidence of racial predominance, the plaintiffs point to the fact that "the vertical orientation was selected among other equally Tier Two compliant options by staff because it had some improved or enhanced metrics on the functional analysis for Hispanic ability to elect." Tr. Day 4 (ECF No. 202), at 162:1–5. But Mr. Poreda testified credibly that the nonracial criteria were not subordinated to race in selecting the final configuration of the two districts. Because map drawers may permissibly give equal weight to race and race-neutral factors, the use of racial criteria to choose between otherwise comparable configurations of these two districts does not, without more, establish racial predominance. *See Allen*, 599 U.S. at 31–32.

It is true that House District 118 has a low Reock score, but its Polsby–Popper score is substantially higher. And its Convex-Hull score is almost average: these mathematical measures of compactness do not undermine our essential conclusion that the district satisfies the Florida Constitution's compactness requirement. Finally, an inspection of the district's boundaries reveals mostly long, straight lines and right angles drawn almost entirely along roads (major or not). *See* Defendants' Exhibit 102 (ECF No. 193-99). And with regard to visual compactness, we find ourselves again in agreement with the Florida Supreme Court that this district passes the eye test.

House District 119 fares even better. Again, it has a relatively low Reock score, but its Polsby–Popper score is above average, and its Convex-Hull score is among the highest in the State. We see no reason to conclude that the Legislature compromised the compactness requirement in drawing this district. Inspecting the district's boundaries again reveals mostly long, straight lines and right angles drawn almost entirely along roads. *See*

Defendants' Exhibit 103 (ECF No. 193-100).  Here, too, we agree that the district passes the eye test.

In conclusion, we find that House Districts 118 and 119 were constitutionally drawn. Though race was considered because Florida law required it to be, the best evidence shows that both districts' lines were drawn to achieve visual compactness and follow geographical boundaries.  Further, the plaintiffs were unable to offer an alternative map of these districts that achieved greater racial balance than the enacted version.  On this record—and applying the presumption of good faith in the Legislature's favor—we cannot conclude that race predominated in the drawing of House District 118 or House District 119.

### C.  Congressional District 26

Though the trial in this case also included evidence regarding Congressional District 26, the Florida Legislature convened in a special session at the end of April and passed a new congressional map for the State.  *See* H.B. 1D, 1st Spec. Sess. (Fla. 2026), https://www.flhouse.gov/Sections/Bills/billsdetail.aspx?BillId=84427 [https://perma.cc/TU7M-QGHM].  Governor DeSantis signed that map into law on May 4.  *See id.*

The new map supersedes the version of Congressional District 26 challenged in this lawsuit.  Ordinarily, that might be enough to render this challenge completely moot.  Here, however, the new map is already subject to ongoing legal challenges in state court. *See Equal Ground Educ. Fund, Inc. v. Byrd*, No. 2026 CA 000914 (Fla. 2d Cir. Ct. Leon Cnty.); *Thompson-Wynn v. Byrd*, No. 2026 CA 000925 (Fla. 2d Cir. Ct. Leon Cnty.); *Common Cause v. DeSantis*, No. 2026 CA 000928 (Fla. 2d Cir. Ct. Leon Cnty.).  The plaintiffs in those consolidated cases seek injunctive relief not only to enjoin the use of the new congressional map, but also to reinstate its predecessor, the version challenged in this lawsuit.  *See, e.g.*, Complaint at 70–

71, *Equal Ground*, 2026 CA 000914 (filed May 4, 2026), Dkt. No. 3.  Although the Florida trial court has denied their request for a preliminary injunction, they may yet obtain that relief after trial or on appeal.  *See* Order on Mots. for Prelim. Inj. at 8, *Equal Ground*, 2026 CA 000914 (filed May 26, 2026), Dkt. No. 76.  Because the prior map may be reinstated by court order, we conclude that the prudent course is to hold the Congressional District 26 claim in abeyance pending further developments in the state-court litigation over the new map.

## V.   CONCLUSION

We find that each of the challenged state house districts was drawn in accordance with traditional race-neutral redistricting criteria.  The districts respect both geographical and political boundaries and keep municipalities in South Florida intact within individual districts.  Each of the districts readily satisfies Florida's visual test for compactness, and the mathematical measures of compactness do not demonstrate otherwise.  The plaintiffs have produced neither evidence that traditional nonracial criteria were subordinated to race, nor an alternative map that achieves greater racial balance.  Considering the evidence for each challenged district in light of the presumption of legislative good faith, we cannot conclude that race predominated in the drawing of any of them.  Because we do not find racial predominance in any of the challenged state house districts, we have no need to consider whether they would survive strict scrutiny.

We rule in favor of the defendants on the plaintiffs' racial gerrymandering claims regarding House Districts 115, 118, and 119.  Final judgment on those claims, appealable in accordance with Rule 54(b), will be entered by separate order.  We hold in abeyance our decision regarding Congressional District 26.  The parties are **ORDERED** to file a joint status

report every **sixty (60) days** regarding the ongoing litigation over Florida's new congressional map.  The Clerk is directed to **ADMINISTRATIVELY CLOSE** this case.

**DONE AND ORDERED** this 6th day of August, 2026.

**BRITT C. GRANT**
**UNITED STATES CIRCUIT JUDGE**

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**

**JACQUELINE BECERRA**
**UNITED STATES DISTRICT JUDGE**